**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

|  |  |  |
|---|---|---|
| JORGE VALLE-RAMOS, | ) | |
| | ) | Case No. 6:24-CV-01276-CEM-DCI |
| *Plaintiff,* | ) | |
| | ) | Hon. Carlos E. Mendoza |
| *v.* | ) | |
| | ) | |
| CITY OF ORLANDO, MICHAEL | ) | |
| STANLEY, and DANIEL BRADY. | ) | |
| | ) | |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

## COMPLAINT

NOW COMES Plaintiff, JORGE VALLE-RAMOS, by his attorneys LOEVY & LOEVY,

and complaining of Defendants the CITY OF ORLANDO, MICHAEL STANLEY, and DANIEL

BRADY, states as follows:

### INTRODUCTION

1.      Plaintiff Jorge Valle-Ramos was just 19 years old when he was wrongfully

targeted and convicted for burglary and grand theft. Plaintiff was arrested and tried solely

because the Defendant police officers conspired among themselves to coerce and manipulate

false eyewitness identifications.

2.      Defendants' misconduct caused Valle-Ramos to be sentenced to nearly three years

in prison, spend five years on supervised release, and pay $9,000 in restitution.

3.      This began a ten-year-long ordeal to clear his name, during which time Valle-

Ramos missed out on precious time with family and friends and spent time in Florida prison

1

where he endured the constant struggle of knowing he might spend the rest of his life carrying the label of "convicted felon" for a crime he did not commit.

4.      After nearly a decade, an eyewitness who was manipulated into identifying Valle-Ramos realized she had made a horrible mistake and recanted her identification. That witness always had doubts about her identification, but repeatedly had her concerns assuaged by the wrongful acts of Defendants.

5.      Valle-Ramos's attorneys moved for a new trial based on that recantation. After a hearing on the matter, a court found the recanting witness's testimony more credible than that of Defendant Michael Stanley. The court vacated Valle-Ramos's conviction on March 5, 2024.

6.      A week later, the State entered a motion of *nolle prosequi* and dismissed all charges against him.

7.      Valle-Ramos now brings this case seeking justice and redress for the devastating injuries the Defendant police officers caused him.

**PARTIES**

8.      Plaintiff Jorge R. Valle-Ramos is an individual living in Orlando, Florida who spent several years incarcerated for a crime he did not commit.

9.      Defendant City of Orlando is a municipality and was or is the employer of each individual defendant. The City of Orlando is liable for the individual Defendants' misconduct while acting within the scope of their employment for the City.

10.      Defendant Michael Stanley was an Orlando Police Department ("OPD") officer acting under color of law at all relevant times. Plaintiff sues Defendant Stanley in his individual capacity only.

11.     Defendant Daniel Brady was a sergeant and supervisor at the OPD. At all relevant times, Brady was responsible for supervising Defendant Stanley. In that role he facilitated, condoned, and approved the constitutional violations committed by Defendant Stanley. Defendant Brady acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Plaintiff sues Defendant Brady in his individual capacity only.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 and Florida law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

13.     This Court has subject-matter jurisdiction over Plaintiff's 42 U.S.C. § 1983 claims under 28 U.S.C § 1331.

14.     The court has subject-matter jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

15.     Venue is appropriate in this district and division because the events giving rise to all of Plaintiff's claims occurred in the City of Orlando. 28 U.S.C. § 1391(b).

## ALLEGATIONS

### The Crime

16.     On the morning of April 9, 2013, three young men burglarized the home of George Gonzalez and stole several pieces of jewelry.

17.     Gonzalez returned home during the burglary and saw one of the burglars exit his home office. The two stared at each other for several seconds before the burglar fled. Gonzalez gave chase.

18.     After failing to catch the first burglar, Gonzalez returned inside his home to call the police. At this point Gonzalez ran into a second and third burglar. After a struggle, those

burglars were also able to flee.

19.    When the OPD responded to the scene, Gonzalez gave a statement describing the first burglar as between the ages of seventeen and twenty and "Hispanic, light brown color" with an afro. Gonzalez had seen the burglar for about seven seconds while standing 25-40 feet away.

20.    Bethany Szewczyk, a licensed attorney, lived in an adjacent condominium complex. She also gave a statement, explaining that as she was leaving for work that morning, she saw three young Hispanic men run and jump into a vehicle parked in the roadway near her carport. She saw the men for longer than Gonzalez, and from a closer distance.

21.    She described the driver as approximately age twenty, with dark hair, dark eyes, and "poofy" hair like an afro.

22.    Charlene Bloom, a neighbor of Gonzalez, also witnessed the commotion and gave a statement. She looked out her second-floor bedroom window and saw three men running to a vehicle. She was sure that none of the men had an afro.

**Jorge Valle-Ramos**

23.    In April 2013, Jorge Valle-Ramos was living in Orlando and studying to become an X-Ray technician.

24.    Valle-Ramos had nothing to do with the Gonzalez burglary. He is completely innocent of the crime.

25.    Valle-Ramos woke up around noon the day of the burglary, about the same time as his roommate, and the two hung out at their apartment for most of the day.

26.    About a week earlier, Valle-Ramos was a passenger in a vehicle pulled over for a traffic stop, during which time law enforcement collected photo identification from each occupant.

4

27. In Valle-Ramos's photo identification—a driver's license issued two years prior in 2011—he had an afro.

28. On April 9, 2013, the day of the robbery, Valle-Ramos did not have an afro. He had long hair that hung down over his face and shoulders.

**Unduly Suggestive Identification Procedures**

29. The day after the burglary and theft, Detective Michael Stanley of the OPD was assigned to the case. At that point, Stanley had been a Detective for just under a year.

30. Defendant Daniel Brady supervised the investigation.

31. Defendant Brady, as the supervisor of the investigation into the Gonzalez burglary, was responsible for overseeing the investigation.

32. Defendant Brady was responsible for ensuring that investigative information was documented and reported and eventually transmitted to state criminal prosecutors and to criminal defense attorneys.

33. Moreover, Brady was responsible for ensuring that the investigation into the Gonzalez burglary was conducted pursuant to the policies and customs of OPD.

34. At all times during the investigation, Brady kept himself appraised of all evidence collected in the case.

35. Based on nothing other than a hunch, Stanley concluded that one of the people who committed the Gonzalez burglary was Valle-Ramos, who had been a passenger in a car pulled over by OPD officers about a week earlier.

36. In an effort to implicate Valle-Ramos notwithstanding his innocence, Stanley prepared a deliberately suggestive six-person photo array using photographs obtained from the State's driver's license database.

37. Because the witnesses had described a perpetrator with an afro, Stanley included an old photo of Valle-Ramos—perhaps from a learner's permit—in which he had an afro, a hairstyle he did not wear in April 2013.

38. Stanley also included five other "filler" photographs, but not a single one of the other photos in the photo array had an afro.

39. When he conducted these identification procedures, Stanley had no intention of accurately identifying the perpetrator. Instead, he rigged the photo identification procedures with the sole purpose of framing Valle-Ramos, correctly believing that the witnesses could be manipulated into selecting his chosen suspect.

40. About a week after the burglary, Stanley showed Gonzalez the unduly suggestive array containing Valle-Ramos's photo, knowing he would identify Valle-Ramos because he was the only choice with an afro. Based on this unduly suggestive procedure, Gonzalez did identify Valle-Ramos.

41. Defendant Stanley then showed Gonzalez a second picture of Valle-Ramos—this one from Valle-Ramos's 2011 driver's license depicting an even bigger afro—improperly reinforcing in Gonzalez's mind that he had identified one of the perpetrators.

42. At his deposition in the underlying criminal case against Valle-Ramos, Gonzalez testified that he "just pointed to the guy with the fro, because he had a fro." And when asked about what facial features, other than hairstyle, he recognized at trial, Gonzalez could not identify any.

43. Nearly five months later, in September 2013, Stanley decided to show the unduly suggestive array to Szewczyk in an effort to strengthen his case with another false identification.

44. Szewczyk identified Valle-Ramos because, in the photo, he had an afro.

45. Szewczyk had some doubt, however, based on the quality of the photographs in the array, as to whether the skin tone or eye color were a match to the young man she had seen five months earlier.

46. Immediately after she selected Valle-Ramos, and before she could express those doubts, Stanley smiled and informed Szewczyk, "that's the guy," and told her that the victim (Gonzalez) had identified the same photograph. That confirmation was unduly suggestive and temporarily quelled any doubts Szewczyk had about her identification.

47. Around the same time, Defendant Stanley reached out to Bloom about her participation in a photo lineup. But by that point Bloom had seen Valle-Ramos's mugshot on the internet, and she told Defendant Stanley that she had not seen him on the day of the crime. Because Defendant Stanley was more interested in framing Valle-Ramos than legitimately investigating the crime, he told Bloom she did not need to participate in a lineup.

48. After he obtained the manipulated identifications from Gonzalez and Szewczyk, Stanley closed the investigation.

49. Stanley knew that fingerprints lifted from a candy wrapper at the scene did not match Valle-Ramos. He did not order any of the items collected from the crime scene—a backpack containing coins and a knife and a cigarette butt—to be tested for DNA, although they could have been.

50. All told, Stanley spent just six hours investigating the burglary before he closed the case.

### Valle-Ramos's Wrongful Arrest, Conviction, and Imprisonment

51. Based on Gonzalez's false and manipulated witness identification, Defendant Stanley secured an arrest warrant for Valle-Ramos.

52.     On information and belief, Defendant Brady reviewed and signed off on Defendant Stanely's arrest warrant affidavit.

53.     A stunned Valle-Ramos was arrested and interrogated by Stanley and an unknown OPD officer. At some point, Stanley showed Valle-Ramos his 2011 driver's license photo and asked, "Is this you?" Valle-Ramos confirmed it was, but it was obvious that his hair, pulled back in a ponytail, no longer looked the same.

54.     On information and belief, a video recording of Valle-Ramos's interrogation was created and would have shown Valle-Ramos's hair did not resemble his 2011 drivers' license photo with the afro. However, it was never turned over to the state or Plaintiff's defense counsel.

55.     Defendant Stanley and Brady knew there was no probable cause to suspect Valle-Ramos for the burglary and grand theft. No physical evidence connected Valle-Ramos to the crime scene. The fingerprints lifted from the candy wrapper apparently were not a match—although a report was never generated. And no DNA was collected from the backpack or cigarette butt left in Gonzalez's house. Defendants also ignored that Valle-Ramos's hair, just one week after the crime, in no way resembled the "poofy" afro described by the witnesses. Indeed, the only evidence tying Valle-Ramos to the crime—Gonzalez's supposed identification—was procured through manipulation and an unduly suggestive identification procedure.

56.     As a result of Defendant Stanley's misconduct, and Defendant Brady's facilitation and approval of that misconduct, Valle-Ramos was tried in the Circuit Court of Orange County on May 21, 2014, in a jury trial.

57.     The State's case hinged upon the identifications by Gonzalez and Szewczyk. There was no other evidence, physical or otherwise, linking Valle-Ramos to the crime.

58.     Gonzalez testified first, identifying Valle-Ramos. This identification was tainted by the unduly suggestive procedures that preceded it.

59.     When Szewczyk arrived in court that day, she was uneasy about her identification. When she saw Valle-Ramos in person, she believed that his skin tone was too dark and his eyes were too light to be the person she had seen on April 9, 2013. But, despite an order of sequestration, Defendant Stanley introduced her to Gonzalez—after Gonzalez testified but before Szewczyk had.

60.     Having been improperly given the opportunity to do so, Gonzalez told her that he was certain Valle-Ramos was one of the burglars. Szewczyk's doubts were assuaged, and she too identified Valle-Ramos.

61.     Bloom, on the other hand, testified that Valle-Ramos was not one of the men she had seen fleeing Gonzalez's home on the day of the burglary.

62.     Valle-Ramos also testified, asserting his innocence and presenting an alibi, namely that he was at home all morning with his roommate, where they both slept until around noon.

63.     Valle-Ramos's roommate corroborated that claim on the stand.

64.     Without the unduly suggestive photo lineup resulting in Gozalez and Szewczyk's manipulated confessions, Valle-Ramos never would have been convicted.

65.     A jury found Valle-Ramos guilty of burglary and grand theft in the third degree, and the judge sentenced him to thirty months in prison to be followed by five years of supervised release, along with nearly $9,000 in restitution.

66.     Valle-Ramos was also ordered to pay the investigative costs: A total of $116.40 for six hours of Stanley's time. Defendant Brady signed off on the investigative costs expense report.

67.     Valle-Ramos was 19 at the time of the crime. The following decade of his life has been deeply affected by the horror of his wrongful conviction and incarceration.

**Valle-Ramos's Exoneration**

68.     In the years following his conviction, prison term, and release, Valle-Ramos fought tirelessly to prove his innocence.

69.     Valle-Ramos filed a direct appeal of his conviction and sentence. He later filed a pro se motion for postconviction relief. All his efforts were unsuccessful.

70.     In 2022, Valle-Ramos requested, and was ultimately granted, a hearing based on newly discovered evidence in the form of Szewczyk's recantation of her identification.

71.     At the hearing, Szewczyk testified that the issue of her identification had troubled her for years. She had doubts during the photo lineup and at trial that Valle-Ramos was the person she had seen on April 9, 2013. But both times she was reassured: Stanley told her, "that's the guy," after she selected Valle-Ramos from the photo array, and Stanley introduced her to Gonzalez at the trial, who assured her Valle-Ramos was the perpetrator.

72.     Her fears were confirmed, however, when she was shown the photograph of another man, Amos Ortiz (deceased), who looked similar to Valle-Ramos.

73.     Around the time of the burglary, Ortiz had lived near the Gonzalez residence and had committed other property crimes in the area. Immediately, Szewczyk knew she was looking at the man she had seen fleeing the April 9th burglary, and knew she had to recant her identification of Valle-Ramos.

74.     Stanley also testified. He claimed to barely remember the photo array, but also claimed to be certain that he never told Szewczyk that the person she selected was the guy. And even though he barely remembered the trial, he insisted that Szewczyk never expressed any doubts as to her identification and that he never interacted with the witnesses that day.

75.     Between the two, the court found Szewczyk's testimony to be more reliable.

76.     On March 5, 2024, the court vacated Valle-Ramos's conviction and, a week later, the State entered a motion of *nolle prosequi* and dismissed all charges against him.

**Valle-Ramos's Injuries**

77.     Valle-Ramos's arrest without cause for a crime he did not commit yanked him suddenly from his life as a young adult and landed him in prison, where he languished for three years.

78.     Before his arrest, Valle-Ramos was proud of the life he had built for himself. He had an apartment, owned his own car, and was studying to become an X-Ray technician. Even when Valle-Ramos was out on bond before his trial, he believed the charges would be dropped because he was innocent. So, he carried on with school and had finished all his coursework by the time his trial began. In fact, all he had to do before becoming a certified technician was to complete an externship and take a licensing exam. He figured he would complete those steps after the trial. As it turned out, however, Valle-Ramos went to his trial and never came back.

79.     During his nearly three years of wrongful imprisonment, Valle-Ramos was unfairly deprived of the ability to interact with his family and friends; be present for birthdays, holidays, weddings, and other life events; pursue his passions and interests; develop a career; and live as an autonomous person.

80.     Instead, Valle-Ramos was branded a burglar and a thief and imprisoned in harsh, dangerous, and isolating conditions in Florida prison. Each day he was locked in prison, he faced physical violence, and emotional abuse.

81.     At one point while he was incarcerated, for example, Valle-Ramos was attacked by another prisoner over the use of a telephone, leaving his face bruised and bloody. He constantly lived on edge, feeling like he needed to "sleep with one eye open" in the dormitory where he lived, which housed a hundred other men.

82.     As a result of his wrongful conviction, Valle-Ramos is still struggling to build an existence outside of prison, only recently having been exonerated and having yet to reap the benefits of a clean criminal record. He is also still rebuilding the relationships that atrophied during years of neglect. And he is coping with the loss of several friends who passed shortly after his release, including his best friend, and the precious time he lost with them.

83.     In addition to causing the severe trauma of wrongful imprisonment, loss of liberty, and reputational harm, Defendants' misconduct continues to cause Valle-Ramos extreme physical bodily injury and psychological pain and suffering, humiliation, fear, anxiety, depression, despair, and other physical and psychological effects.

**COUNT I**
**42 U.S.C. § 1983 – Violation of Due Process**
**Against Michael Stanley and Daniel Brady**

84.     As set forth in paragraphs 29-67, Defendants Stanley and Brady, while acting individually, jointly, and in conspiracy with one another, and under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and his right to a fair trial.

12

85.    As described more fully above, Defendant Stanley—with Defendant Brady's approval—procured supposed eyewitness identifications of Plaintiff, which he knew to be false and unreliable, using unduly suggestive procedures.

86.    Despite this, Defendants caused these false identifications to be used at trial.

87.    Defendants obtained Plaintiff's conviction based only on these false identifications, and they failed to correct the evidence that they knew to be false when it was used against Plaintiff.

88.    In addition, based upon information and belief, Defendant Stanley—with Defendant Brady's approval—concealed exculpatory information, fabricated evidence, and destroyed additional evidence, including but not limited to the circumstances surrounding the flawed eyewitness identifications and the recording of Plaintiff's interrogation.

89.    Defendants' misconduct directly resulted in Plaintiff's unjust and wrongful criminal prosecution, his conviction, and the deprivation of his liberty, thereby violating his right to due process and a fair trial guaranteed by the Fourteenth Amendment of the United States Constitution. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued, and Plaintiff would not have been convicted.

90.    Defendants' misconduct described in this count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights and/or in total disregard of the truth and Plaintiff's innocence.

91.    As a result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

92.     The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Orlando, in the manner more fully described below in Count V.

## COUNT II
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
### Against Michael Stanley and Daniel Brady

93.     As set forth in paragraphs 29-67, Defendants Stanley and Brady, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

94.     In so doing, Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

95.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights and/or in total disregard of the truth and Plaintiff's innocence.

96.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

97.     The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Orlando, in the manner more fully described below in Count V.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**
**Against Daniel Brady**

98.     Plaintiff incorporates paragraphs 29-67 of this complaint as if fully restated here.

99.     As described more fully above during the constitutional violations described herein, Defendant Brady stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though he had ample, reasonable opportunities as well as the duty to prevent this harm.

100.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights and/or in total disregard of the truth and Plaintiff's innocence.

101.    As a result of Defendant Brady's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**
**Against Michael Stanley and Daniel Brady**

102.    As set forth in paragraphs 29-67, Defendants Stanley and Brady, acting in concert with each other and other unknown co-conspirators, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Gonzalez burglary, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

103.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose and/or a lawful purpose by an unlawful means.

104.    In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

15

105.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

106.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights and/or in total disregard of the truth and Plaintiff's innocence.

107.    As a result of Defendant Stanley and Brady's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT V**
**42 U.S.C. § 1983 – Policy & Custom Claims**
**Against the City of Orlando**

108.    The City of Orlando employed individual Defendants Stanley and Brady, supervised them, and promulgated policies, including written policies and unwritten customs, that caused the wrongful conviction of Plaintiff as set forth in paragraphs 29-67.

109.    The constitutional violations—as set forth in Counts I and II and incorporated by reference here—that caused Plaintiff's wrongful arrest, prosecution, and conviction were the result of the City of Orlando's policies, practices, and customs, as well as by the actions of policy-making officials for the City of Orlando.

110.    At all times relevant to the events described in this complaint and for a period of time before and after, the City of Orlando either had inadequate rules, regulations, policies, and procedural safeguards, or failed to promulgate adequate rules, regulations, policies, and procedural safeguards governing: (1) the conduct of lineups and identification procedures; (2) writing police reports and taking investigative notes, including notes of witness statements; (3)

16

the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence, and impeachment evidence; (4) maintaining investigative files and disclosing those files in criminal proceedings; and (5) intervention to prevent and redress misconduct by other officers.

111. In addition or alternatively, the City of Orlando failed to train and supervise police officers and agents of the Orlando Police Department with respect to: (1) the conduct of lineups and identification procedures; (2) writing police reports and taking investigative notes, including notes of witness statements; (3) the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence, and impeachment evidence; (4) maintaining investigative files and disclosing those files in criminal proceedings; and (5) intervention to prevent and redress misconduct by other officers.

112. Officers and agents of the City of Orlando committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures notwithstanding the obvious need for such rules, regulations, policies, and procedures.

113. Had officers and agents of the City of Orlando promulgated appropriate policies and/or implemented adequate training and supervision, then the violation of Plaintiff's constitutional rights would have been prevented.

114. The constitutional harms caused by the inadequate policies, practices, and customs of the City of Orlando are not limited to Plaintiff's wrongful conviction. In 2010, for example, Malenne Joseph was wrongfully convicted of destroying property based on a mistaken eyewitness identification and a perfunctory investigation—which included failures to document important information in police reports—by the OPD detective assigned to the case. And the constitutional harms are not limited to wrongful convictions, but encompass other harms

17

committed by officers and agents of the OPD. In 2015, for example, two OPD officers were involved in an unauthorized vehicle chase which they tried to cover up through purposefully omitting information from reports. The violations were serious enough to cause the men to be fired, but the City of Orlando later took a deal allowing the officers back onto the police force. The officers, for their part, in trying to get their jobs back, argued that other OPD employees had committed worse violations and had not been fired.

115.    This misconduct—relating to perfunctory investigations involving faulty eyewitness identifications and deficiencies in reporting—is similar in kind to that alleged against the Defendant officers here, during their investigation into the Gonzalez burglary and arrest and prosecution of Plaintiff.

116.    In short, given the foregoing, at all times relevant to the events described in this complaint and for a period of time before, the City of Orlando had notice of a practice and custom by officers and agents of the OPD that included one or more of the following: (1) officers manipulated statements and testimony of witnesses to implicate criminal defendants in criminal conduct, including through suggestive identification techniques; (2) officers failed to properly document and disclose their interactions with witnesses; (3) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to criminal defendants; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) officers pursued and secured wrongful convictions through profoundly flawed investigations.

117.    These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Orlando directly encouraged them and were thereby the moving force behind the very type of misconduct at issue

18

by failing to adequately train, supervise, and control their officers, agents, and employees; by failing to adequately punish and discipline prior instances of similar misconduct; and by maintaining a code of silence pursuant to which officers were encouraged not to rat one another out, thus directly encouraging future abuses like those affecting Plaintiff.

118.    The above practices and customs, so well settled as to constitute de facto policies of the City of Orlando, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

119.    As a result of Defendant Stanley and Brady's misconduct while they were acting pursuant to one or more of the policies, practices, and customs set forth above, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VI**
**State Law Claim – Malicious Prosecution**
**Against Michael Stanley and Daniel Brady**

120.    As set forth in paragraphs 29-67, Defendant Stanley and Brady, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

121.    In so doing, Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

122.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in March 2024.

123.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights and/or in total disregard of the truth and Plaintiff's innocence.

124.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VII**
**State Law Claim – Intentional Inflection of Emotional Distress**
**Against Michael Stanley and Daniel Brady**

125.    Plaintiff incorporates paragraphs 29-83 of this complaint as if fully restated here.

126.    The actions, omissions, and conduct of Defendant Stanley and Brady as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

127.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VIII**
**State Law Claim – Civil Conspiracy**
**Against Michael Stanley and Daniel Brady**

128.    As set forth in paragraphs 29-67, Defendants Stanley and Brady,  acting in concert with each other and other unknown co-conspirators, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-

conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

129.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

130.    The violations of Florida law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

131.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights and/or in total disregard of the truth and Plaintiff's innocence.

132.    As a result of the Defendant Stanley and Brady's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Indemnification
### Against the City of Orlando

133.    Plaintiff incorporates paragraphs 29-67 of this complaint as if fully restated here.

134.    At all relevant times, Defendants Stanley and Brady were employees, members, and agents of Defendant City of Orlando who acted within the scope of their employment in committing the actions described in this complaint.

135.    Defendant City of Orlando is responsible for paying Plaintiff under any applicable contractual or statutory obligation that directs it to pay a tort judgment for compensatory damages for which its employees are liable arising from acts performed in the scope of their employment.

WHEREFORE, Plaintiff JORGE VALLE-RAMOS respectfully requests that this Court enter a judgment in his favor and against Defendants CITY OF ORLANDO, MICHAEL STANLEY, and DANIEL BRADY awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, JORGE VALLE-RAMOS, hereby demands a trial by jury pursuant to Federal Ruel of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,
**JORGE VALLE-RAMOS**

/s/ Roz Dillon
*One of Plaintiff's Attorneys*

Jon Loevy*
Roz Dillon*
Loevy & Loevy
311 N. Aberdeen, Third Floor
Chicago, IL 60607
(312) 579-0039
jon@loevy.com
dillon@loevy.com

*Application for Special Admission Granted

22