## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JORGE VALLE-RAMOS,                                Case No. 6:24-cv-1276

     Plaintiff,

vs.

CITY OF ORLANDO, MICHAEL
STANLEY, and DANIEL BRADY,

     Defendants.

_____/

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants CITY OF ORLANDO (the "City"), MICHAEL STANELY ("Det. Stanley"), and DANIEL BRADY ("Sgt. Brady"), pursuant to Fed. R. Civ. P. 56, and hereby move for final summary judgment on the amended complaint filed by Plaintiff JORGE VALLE-RAMOS ("Valle-Ramos") (Doc. 41).

1.     This is a 42 U.S.C. § 1983 civil rights matter arising from Valle-Ramos's state court conviction for home-invasion burglary.  In short, Plaintiff contends that two City police officers, Defendants Stanley and Brady, conspired to frame Plaintiff of the offense by suggesting Plaintiff's identity to witnesses through photographic lineups and verbal affirmations.  Why they would do so is anyone's guess.

2.     Following execution of Mr. Valle-Ramos's sentence of prison and probation, his new attorneys moved to vacate the conviction because one witness recanted her identification—but only after the lawyer's private investigator himself

1

suggested a different potential perpetrator.  The court granted the motion, and the State, with little motivation to relitigate a crime where the sentence had been served, dropped all charges.

3.  Count I is a due process claim under the Fourteenth Amendment.  It is true that an unduly suggestive suspect lineup procedure can be grounds to suppress a witness's identification.  However, this rule is merely prophylactic such that its violation does not amount to a constitutional injury.  An unduly suggestive lineup can therefore never serve as the basis for a § 1983 claim against an individual officer.

4.  Even if an improper lineup could serve as the basis for a § 1983 claim, Det. Stanley's lineup was not unduly suggestive.  Moreover, to obtain qualified immunity, Det. Stanley's lineup was only required to be *arguably not* unduly suggestive under clearly established law at the time of its use in 2013.  Plaintiff cannot carry his burden demonstrating otherwise, affording an independent basis for summary judgment.

5.  Plaintiff has also asserted the withholding of *Brady* evidence as part of his due process claim.  But the "withheld evidence" is not *Brady* evidence at all, as it would have actually strengthened the case against him.  Specifically, the evidence was an alleged video of Mr. Valle-Ramos during his post-custody interview that would have shown his hairstyle.  However, his hairstyle was clearly depicted in his mugshot taken the same day, and that mugshot matched the "small afro" seen in the six-pack.  The alleged video was therefore at best not "material"

under *Brady* jurisprudence in the first place. Nor is there any evidence that Det. Stanley intentionally withheld the video from the prosecutor sufficient to enter § 1983 territory. And again, no clearly established law put Det. Stanley on notice of some duty to preserve all video regardless of its nature in 2013, and he is therefore entitled to qualified immunity for that reason alone.

6.     The third aspect of the due process claim arises from Det. Stanley's disputed "introduction" of the two eyewitnesses outside the criminal courthouse in 2014. There is no evidence that Det. Stanely had any substantive discussions about the case or possibly influenced the witnesses' testimonies. And to be sure, there was no clearly established constitutional law that an officer may not say hello to a witness during trial.

7.     Count I therefore fails substantively, but qualified immunity presents a much lower threshold for summary judgment and is equally appropriate.

8.     Count II sounds in § 1983 malicious prosecution. Among its elements, a malicious prosecution claim requires a plaintiff to demonstrate the lack of probable cause. Regardless of Mr. Valle-Ramos's alleged innocence, probable cause existed for his arrest. Even if there were a question of fact in this regard, though there is not, only arguable probable cause is required to afford Det. Stanley qualified immunity. Summary judgment is therefore also appropriate on Count II.

9.     For his part, Sgt. Brady merely reviewed Det. Stanley's arrest affidavit and approved it for submission to the judge. His inclusion in the case at this point is frivolous.

10.    If the Court agrees with any of the foregoing, then the state law claims of intentional infliction of emotional distress, civil conspiracy, and malicious prosecution require nominal additional analysis.    Suffice to say, summary judgment is appropriate on all three theories.

11.    Finally, all claims against the City have been previously resolved in the City's favor (Doc. 40, 52), and final judgment should thus be entered on all claims.

WHEREFORE, Defendants hereby respectfully request the entry of final judgment in their favor.

## MEMORANDUM OF LAW

### I.    The summary judgment standard.

The Rule 56 summary judgment standard is well established.  The moving party must demonstrate "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The court must view the evidence and the inferences from the evidence in the light most favorable to the nonmovant."  *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 692 (11th Cir. 2014).  "A genuine dispute of material fact exists when the nonmoving party produced evidence allowing a reasonable factfinder to return a verdict in its favor."  *Id.*  If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists."  *Id.*

This case involves the same witnesses providing deposition or courtroom testimony as many as four times over ten years in addition to written sworn and

unsworn statements. "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quotation omitted). "Nevertheless, a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1293–94 (quotation omitted). But inadmissible hearsay cannot be used to "defeat summary judgment when that hearsay will not be reducible to admissible form at trial." *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996).

No construction of the admissible evidence creates a triable question of fact.

## II.    Statement of the Facts.

The morning of April 9, 2013, victim George Gonzalez returned to his Orlando condominium after visiting a friend. (Dep. Gonzalez 29–30.) "I heard something first and then I hesitated." (*Id.* at 30.) Someone was in his office in the back of the condominium. (*Id.* at 30–31.) "[H]e heard me and then he peeked around. I looked at him and he looked at me and that was it." (*Id.* at 31.)

Mr. Gonzalez, a veteran, did not shy away from confrontation. (*Id.* at 32.) "I went after him." (*Id.* at 26.) He initially gained on the burglar, getting within "maybe ten feet … because he was not able to get the door." (*Id.* at 31–32.) I seen his face because he -- I remember, he was looking back to see how close I was or something." (*Id.* at 32.) "I busted out chasing after him, but I'm not going to catch a 20-year-old at 55 years old." (*Id.* at 29.) After the burglar escaped, Mr. Gonzalez

reentered the condo and called the police when he encountered two more perpetrators inside. (*Id.*) Having forgotten his gun in his car, Mr. Gonzalez pepper sprayed and headlocked one criminal, but the duo was also able to get away. (*Id.*)

This case focuses on the first burglar, who Mr. Gonzalez has always and continues to unequivocally maintain was Mr. Valle-Ramos. (*E.g.*, *id.* at 16.) At summary judgment, of course, we accept Mr. Valle-Ramos's alibi that he was asleep at home and had nothing to do with the invasion. (Dep. Valle-Ramos 129–30.)

Police responded to Mr. Gonzalez's home after the perpetrators escaped with nearly $10,000 in jewelry and other items. (Dep. Gonzalez 72–73.) Mr. Gonzalez executed a sworn victim statement that described the first burglar as a "Spanish individual had an afro." (Dep. Gonzalez Ex. 12.) Police also met with an eyewitness neighbor, Attorney Bethany Szewczyk, who provided her own sworn statement. (Dep. Szewczyk Ex. 15.) Ms. Szewczyk described "3 young [H]ispanic males rushing to get in their vehicle." (*Id.*) A second neighbor-witness, Ms. Charlene Bloom, also provided a sworn statement describing "3 young guys running to their car." (Dep. Bloom Ex. 3.) Ms. Bloom described the vehicle as a "gray compact maybe a Hundai [sic] or Datsun," while Ms. Szewczyk reported a "new model Toyota, gray in color and has 4 doors." (Dep. Szewczyk Ex. 15; Dep. Bloom Ex. 3.)

Det. Stanley was assigned the case the following day. (Dep. Stanley 66.) He was the only detective on the case, as it was within his geographical jurisdiction that included the "India Sector" of Orlando. (*Id.* at 19–20, 33.) Det. Stanley had

at least one introductory conversation with Mr. Gonzalez shortly after the case assignment.  (Dep. Stanley 78–79; Dep. Gonzalez 74–75.)

The following week, on April 15, OPD issued a criminal information bulletin, or "BOLO," referencing a suspicious vehicle in India Sector.  (Dep. Stanley 77, Ex. 19.)  The BOLO described four suspects casing homes on April 3 in a silver 4-door 2003 Jetta.  (Dep. Stanley Ex. 19.)  One of the Jetta occupants was "seen knocking on doors to different houses and then entering the back yard of 5075 Andrea Blvd." (*Id.*)  The suspects were Danielle Colon, Mr. Valle-Ramos, Marquis Hickson, and Karl Jeudy.  (*Id.*)  All were around twenty years old.  (*Id.*)  Mr. Valle-Ramos's photograph is notable for its large afro.  (*Id.*)  As Det. Stanley reasoned:

> Well the incident that is listed here, this location 5075 Andrea Boulevard, was approximately two miles from Mr. Gonzalez's residence.  The location where the officers stopped this vehicle was right outside their residence on Curry Ford Road.  These individuals were located in a silver four-door vehicle, and a silver four-door vehicle was -- description as given by the people involved that had witnessed Mr. Gonzalez's burglary.

(Dep. Stanley 80–81.)  And while the Jetta did not match the Hyundai, Datsun, or Toyota described by the witnesses, "I believe that from my history, a lot of people don't know cars and get them wrong."  (*Id.* at 81.)

Based on this lead, Det. Stanely prepared three "six-pack" photographic lineups, each of which had one of the three male suspects in the top-middle position.  (*Id.* at 82, "Six-Packs."[1])  In 2013, compiling the "filler" photos was

---

[1] The three six-packs were discussed throughout discovery, but, somehow, the undersigned's office only produced the six-pack including Mr. Valle-Ramos

"totally up to the discretion of the detective who's constructing the photo array." (Dep. Stanley 40.)   Det. Stanley did not receive any formal training on the compilation of photo lineups, but he used a program called Mugshots which required the user to input six photos.   (*Id.* at 45.)   Resources available to Det. Stanely were limited to the Orange County Corrections's arrest photographs and the Florida Driver and Vehicle Information Database ("DAVID"). (*Id.*) "You would certainly look for a picture of your potential suspect, and you would look for five other people with similar physical characteristics." (*Id.*)   Det. Stanely agreed that it was "wrong for a lineup to be suggestive" and testified that he "wouldn't use a photo lineup that is suggestive" because it could lead to suppression.   (*Id.* at 41–42.)   When asked what characteristics he attempted to match, Det. Stanley explained,

> Obviously, sex, race.   You would want age.   You would want the background of the photograph to match.   You would look at the other physical characteristics to include a beard, any earrings, ears, hair, clothing.

(*Id.* at 42–43.) Det. Stanley has compiled well over 100 photo lineups, and he had prepared roughly 25 back in 2013. (*Id.* at 43.)

Per policy, Det. Stanley would read instructions from a preprinted form before presenting a photo lineup to a witness.   (*Id.* at 46.)   If an identification was

---

despite having all three at all times.  This was recognized during the drafting of the present motion and immediately brought to Plaintiff's attention, who has now filed an appropriate motion to address the situation with hopefully nominal disruption to the case, if any.  The three six-packs are attached included as a separate exhibit to this motion.

made, whether it was the suspect or an erroneously selected "filler" photo, the witness completed a statement and signed the form. (*Id.* at 47–48.)

Notably, the photograph of Mr. Valle-Ramos that was selected for the six-pack was different than his photograph in the BOLO. (*Compare* Dep. Stanley Exs. 17, 19.) This was because the BOLO photograph depicted a large afro, which Det. Stanley decided "was too problematic … [i]t would've been too suggestive." (Dep. Stanley at 179–80.) Mr. Valle-Ramos did not have any mugshots at the time, so Det. Stanley selected an older driver's license photograph "of when his hair was much shorter and found comparable subjects to also include there." (*Id.* at 179.)

Det. Stanley arranged for Mr. Gonzalez to meet him at the OPD station on April 18, 2013, which was therefore nine days after the burglary. (Dep. Gonzalez 77, 79, Ex. 14.) Det. Stanley presented the "Photo Line-up Administration and Witness Instructions" form to Mr. Gonzalez, and both men signed the document. (*Id.* at 79, Ex. 14.) The instructions that Det. Stanley would have read to the witness, which were also provided on the form that Mr. Gonzalez signed, stated in full, with bolding added:

> It is just as important to clear innocent persons from suspicion as it is to identify guilty parties. Regardless of whether you make an identification, we will continue to investigate this incident. With that in mind, I am going to show you six photos arranged so they be simultaneously viewed. This group of photos may or may not contain a picture of the person who committed the crime now being investigated. **Keep in mind that hairstyles, beards, and moustaches may easily be changed.** The photos may not always depict the true complexion of a person – it may be lighter or darker than shown in the photo. Pay no attention to the order of the photos or markings and/or numbers that may appear on the photos, or to any

> differences in the type or style of photographs.  Take your time; when you have looked at all the photos, tell me whether or not you see the person who committed the crime.  If you do identify someone, you will circle and initial that person on the line-up.  Please remember this is an on-going investigation, you are not permitted to discuss this identification procedure with anyone other than law enforcement or legal counsel.

(*Id.* at Ex. 14.)  It is unclear if Det. Stanley showed Mr. Gonzalez a color or black-and-white copy of the lineups, but Mr. Gonzalez immediately and confidently identified Mr. Valle-Ramos.  (*Id.* at 81–84.)  Mr. Gonzalez testified, as he has consistently over the last decade:

> I think he had a couple of sets of these, and I -- and I -- on -- on one, I say, no, no, no, no.  And then -- then as soon as I saw that, I said, yep; that's him.
>
> ...
>
> I looked at every face, and then I just pointed at the one that hit me right away.  I said, that's it; right there.

(*Id.* at 83; *see also id.* at 17 ("I knew for sure immediately because I picked him right away."); *id.* at 43–44 ("[W]hen the police gave me that picture, I was positive about him."); Criminal Trial 56 ("Yeah, that's the photo display.  Yeah.  That's where I picked him out immediately.  ...  I picked him directly right off the bat."); Post-conviction H'g 111 ("Q.  And is there any change to your testimony?  A.  No, there's no change.").)  In fact, Mr. Gonzalez thinks that one of the co-perpetrators was also shown in one of the other two lineups, but he was not sure enough to make an identification.  (Dep. Gonzalez 83 ("I think this guy, too.  But I said, no, because I'm not sure, positively sure, so I pointed at this one."); Criminal Trial 57 ("There

was another picture I thought might be one of the other guys, but I didn't pick it because I wasn't sure.  So I just let it go.").)

Det. Stanley swore out an arrest affidavit the following day, on April 19, 2013.  (Dep. Stanley Ex. 21.)  The affidavit was reviewed by Sgt. Daniel Brady, the detective sergeant supervising eastside property crimes, to ensure that "it's accurate and it's got probable cause."  (Dep. Brady 32, 106; Dep. Stanley 112.)  This is the only meaningful role Sgt. Brady played in Mr. Valle-Ramos's prosecution; indeed, Sgt. Brady testified that the only time he ever discussed this case with Det. Brady was after getting sued in this matter.  (Dep. Brady 112–13.)

Florida Circuit Court Judge Maureen Bell signed the arrest affidavit, and several officers, including Det. Stanely, approached Mr. Valle-Ramos's apartment on April 24, 2013.  (Dep. Valle-Ramos 118–20.)  Mr. Valle-Ramos was transported "straight to the police station" where Det. Stanley questioned him, and Mr. Valle-Ramos claims to have professed his innocence.  (*Id.* at 119–20.)  In contrast, in his 2025 deposition, Det. Stanley did not recall any such questioning, explained that he would have memorialized the file if a defendant gave a statement (but not if they invoked their rights), and that any statement would have been recorded.  (Dep. Stanely 124–25.)  If any such statement was provided, the recording would have been forwarded to the state attorney.  (Dep. Stanley 126.)  And for what it may be worth, in his 2013 deposition, Det. Stanley testified that Mr. Valle-Ramos "refused to speak with us."  (2013 Dep. Stanley 24.)

Despite this unclear factual history, the amended complaint's reference to this alleged questioning is not for what Mr. Valle-Ramos did or did not say; rather, it is because any alleged <u>video</u> would have allegedly constituted *Brady* evidence to the extent it depicted Plaintiff's then-current hairstyle.[2]   Thus, for summary judgment purposes, accepting that Mr. Valle-Ramos indeed professed innocence does not impact the analysis.

And aside from there being no evidence that any such recording existed, Mr. Valle-Ramos's hairstyle is fully captured in his mugshot, which was taken immediately after his alleged questioning at the station.  (Dep. Valle-Ramos 120–22; Aff. Fisher Ex. B.)  As one can see, the hairstyle in the mugshot matches nearly perfectly with the hairstyle in the photo lineup that was presented to Mr. Gonzalez.  Thus, the photo showing the large afro which appeared on the BOLO was never used for identification purposes precisely <u>because</u> it would have been too suggestive.  Put another way, the photograph used in the array would have more fairly depicted Mr. Valle-Ramos's appearance on the date of the burglary than the photograph in the BOLO.

In September 2013, Det. Stanley continued his investigation by contacting Ms. Szewczyk and arranging a meeting at her office to review the photo lineup. (Dep. Stanley 73; Dep. Szewczyk 23.)  Ms. Szewczyk identified Mr. Valle-Ramos

---

[2] *See* Am. Compl. ¶ 54 ("On information and belief, a video recording of Valle-Ramos's interrogation was created and would have shown Valle-Ramos's hair did not resemble his 2011 drivers' license photo with the afro.  However, it was never turned over to the state or Plaintiff's defense counsel.").

within five seconds and signed the same form as Mr. Gonzalez.  (Criminal Trial 87, 107; Dep. Szewczyk Ex. 16.)  After her positive identification, Det. Stanley allegedly "smiled and said that's him."[3]  (Post-conviction H'g 15.)

Separately, Det. Stanley reached out to Ms. Bloom to perform a lineup as well.  (Dep. Stanley 107.)  However, due to some combination of Ms. Bloom informing Det. Stanley that she did not get a good look at the suspects and that she had independently looked up Mr. Valle-Ramos's mugshot after the fact, no lineup was presented to this third witness.  (Dep. Stanley 106–08; Dep. Bloom 37, 41–43.)

Mr. Valle-Ramos was tried for burglary in May 2014 before Florida Circuit Judge Greg Tynan.  (Criminal Trial 1.)  During an initial colloquy, the judge asked defense counsel, "Have you investigated the case and believe there are no motions to suppress any of the statements or any of the evidence in this case that could be taken on a good-faith basis?"  (*Id.* at 12.)  Counsel answered no.  (*Id.*)  Both Mr. Gonzalez and Ms. Szewczyk identified Mr. Valle-Ramos in the courtroom without hesitation.  (*Id.* at 49, 88.)

---

[3] While we are of course taking all evidence in a light most favorable to Plaintiff, we note that Ms. Szewczyk denied any recollection of Det. Stanley's alleged "smile" or post-identification confirmation in her 2025 deposition even after confronted with her 2023 post-conviction testimony.  (Dep. Szewczyk 35.)  But this speaks to her credibility, not summary judgment.  We therefore accept for purposes of this motion only that Det. Stanley indeed smiled and confirmed that Ms. Szewczyk identified the correct suspect despite Det. Stanley's denial of the allegation.  (Dep. Stanley 102–03; Post-conviction H'g 117.)

Nonetheless, defense counsel attacked the reliability of the witness identifications in part because Mr. Valle-Ramos's hairstyle in the lineup was the only potential "afro" among the six.  (*Id.* at 110–13.)  Counsel's closing argument included, "This is a suggestive lineup.  This is terrible police work.  Who even knows who Mr. Gonzalez would have identified if there were six pictures similar to number 2 all with afros?"  (*Id.* at 246.)

Among Plaintiff's multiple theories of this § 1983 case is that Det. Stanley allegedly "introduced [Ms. Szewczyk] to Gonzalez—after Gonzalez testified but before Szewczyk had" in violation of an order of sequestration in the criminal trial.  (Am. Compl. ¶ 59.)  But there is no evidence that Det. Stanley committed anything untoward outside the courtroom.  Instead, Mr. Gonzalez might have violated the rule of sequestration by talking about his testimony to Ms. Szewczyk before she testified, but this violation could never be imputed to Det. Stanley.  (Dep. Gonzalez 44–47 (describing brief discussion with Ms. Szewczyk about their mutual identification of Mr. Valle-Ramos) & Post-conviction H'g 111–12 (recalling talking with Ms. Szewczyk but not Det. Stanley); Dep. Stanley 134–136 (denying any communications outside the courtroom) & Post-conviction H'g 117–18 (same); Dep. Szewczyk 56–58 (recalling that Det. Stanely introduced her to Mr. Gonzalez but that Mr. Gonzalez told her that he had identified the suspect) & Post-conviction H'g 16–18 (same).)

Obviously, any violation of the rule of sequestration is serious, particularly in light of its alleged effect on Ms. Szewczyk, who testified that it "certainly"

impacted her testimony.  (Post-conviction H'g 18.)  But that was a rule for the criminal court and its officers—including the lawyers—to enforce; there is no evidence that Det. Stanley influenced the witnesses beyond an allegedly informal, non-substantive introduction at worst.

Mr. Valle-Ramos was convicted of burglary of a dwelling and sentenced to thirty months in prison plus a term of probation.  (Criminal Records 1.)  The criminal judgment was affirmed without opinion, *Valle-Ramos v. State*, 166 So. 3d 811 (Fla. 5th DCA 2015), and his state court motion for postconviction relief was dismissed.  (Criminal Records 8).  Mr. Valle-Ramos's post-imprisonment probation ended on July 29, 2021.  (Criminal Records 11.)

Also sometime in 2021, Mr. Valle-Ramos's new criminal attorneys retained private investigator Jeremiah Lyons who went about interviewing the witnesses who testified in Mr. Valle-Ramos's trial.  (Dep. Lyons 11–12, 15.)  Mr. Gonzalez refused to meet with him, and the two men have vastly different recollections of their only phone call.  (Dep. Gonzalez 47–48 ("[T]hat private detective was pretty strong.  You know, he -- he tries to box you in and tries to put you in a position to where, you know, give you doubt in your own mind."); Dep. Lyons 23–24 ("[H]e really didn't want to cooperate with me at all because he was upset that Mr. Ramos was behind in restitution payments.").)

Ms. Szewczyk did agree to meet Mr. Lyons at her home.  (Dep. Szewczyk 60.)  He showed her a photo of a Mr. Amos Matthew Ortiz, deceased, "who he said had

been committing other burglaries in the area around that time."[4] (Post-conviction H'g 40–41.) To be sure, Mr. Ortiz's alleged driver license photo bears a striking resemblance to Mr. Valle-Ramos's. (Dep. Szewczyk Ex. 4.) A decade after the Gonzalez burglary, Ms. Szewczyk would tell the post-conviction court she was "a hundred percent" positive that Mr. Ortiz was the individual she saw. (Post-conviction H'g 43–44.) For his part, Mr. Gonzalez remains sure that Mr. Ortiz was not the perpetrator. (Dep. Gonzalez 95–96.) Also during that hearing, Ms. Szewczyk was clear that Det. Stanley did not suggest that Mr. Valle-Ramos was the suspect in the six-pack lineup (Post-conviction H'g 27), that she never shared her lack of confidence in the selection with prosecutors, in deposition, or at trial (*id.* at 24–25), and that no one associated with the prosecution pressured her in any way at any time (*id.* at 34).

Ms. Szewczyk has since explained that she felt "shitty" after testifying in the criminal trial because "I had doubts and didn't know what to do with them." (Dep. Szewczyk 48–49.) Yet, "Detective Stanley always behaved professionally. I never felt that he was ever trying to force or coerce me ever into anything." (*Id.* at 71.)

### III.  Qualified immunity overview and procedure.

"Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[4] There is no evidence that anyone named Amos Ortiz had committed or even been arrested for burglary, at least not in the record of this case or in publicly available court records in Orange, Osceola, Seminole, Lake, or Brevard Counties or this Court to the best of our research.

constitutional rights of which a reasonable person would have known." *Garcia v. Casey*, 75 F.4th 1176, 1185 (11th Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (further internal quotation omitted)). "For qualified immunity to apply, a government official must first establish that he was acting within his discretionary authority when the alleged wrongful acts occurred." *Id.* This asks "whether the acts the official undertook are of a type that fell within the employee's job responsibilities." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). There is little doubt that Defendants were operating in their discretionary capacities by investigating the Gonzalez burglary, interviewing witnesses, and ultimately submitting a probable cause affidavit to obtain an arrest warrant. *See id.* ("Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby.").

Once this threshold is satisfied, "the burden shifts to the plaintiff to establish that qualified immunity is inappropriate." *Garcia*, 75 F.4th at 1185 (emphasis added). "Under our precedents, officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018).

> "Clearly established" means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law.

*Id.* at 62–63 (numerous quotations and citations omitted); *see also City & Cty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (describing the standard as "exacting"). *Wesby* further explains that the constitutional rule "must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 583 U.S. at 63 (quotation omitted). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)). That is, the constitutional question at issue must be "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The Eleventh Circuit has repeatedly provided three potential means for a plaintiff to meet the "demanding" "clearly established law" test:

> First, "materially similar" case law may give an officer fair notice that his conduct would violate a constitutional right.
>
> Second, the plaintiff can show the existence of a broader, clearly established principle that should control the novel facts of his situation. In other words, even if there is no case law directly on point, general statements of the law contained within the Constitution, statute, or caselaw may sometimes provide "fair warning" of unlawful conduct.
>
> Finally, in rare instances, an official may still have notice when his conduct "so obviously violates" a constitutional right.

*Garcia v. Casey*, 75 F.4th 1176, 1185 (11th Cir. 2023) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (cleaned up)). Case law capable

of establishing clearly established law is limited to decisions from the United States Supreme Court, the Eleventh Circuit, and the Florida Supreme Court. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1206 (11th Cir. 2012). The relevant "law" is the "law at the time of the incident." *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015). The Gonzalez investigation occurred in April 2013.

## IV. Det. Stanley is entitled to qualified immunity on the due process claims.

"As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). As we interpret the Amended Complaint, Plaintiff alleges that Det. Stanley violated Mr. Valle-Ramos's constitutional rights by (1) employing an allegedly suggestive six-pack lineup with Mr. Gonzalez and Ms. Szewczyk and then allegedly reaffirming the selections; (2) withholding *Brady* evidence in the form of the alleged video interview of Mr. Valle-Ramos immediately before he was arrested; and (3) by "introducing" Mr. Gonzalez and Ms. Szewczyk outside the criminal courtroom.

We reiterate that it is Plaintiff's burden at summary judgment to explain why qualified immunity does not apply. For example, the Amended Complaint contains offhand, borderline scandalous allegations that Det. Stanely "fabricated evidence" (Am. Compl. ¶¶ 88, 102) despite no whisper of such egregious conduct arising elsewhere in the pleadings or the now-comprehensive evidentiary record.

We therefore await Plaintiff's response to this motion and reserve our right to reply to any unanticipated theory of the case that would pierce qualified immunity.

No clearly established law proscribed Det. Stanley's investigatory tactics. And while qualified immunity is the "easiest" way to resolve this litigation, it is more logical to begin with the substantive constitutional analyses despite their heightened complexity in our context.

### A. Unduly suggestive lineups are subject to suppression but cannot support a civil action under § 1983.

The Supreme Court recently clarified that a confession obtained in violation of *Miranda* does not support a § 1983 action against the eliciting officer. *Vega v. Tekoh*, 597 U.S. 134, 141 (2022); *see also generally Miranda v. Arizona*, 384 U.S. 436 (1966). In short, the Court held that *Miranda* established a prophylactic rule that was "constitutionally based" but not actually constitutional such that its violation did not give rise to a constitutional injury or, therefore, a § 1983 action. *Vega*, 597 at 142, 150.

The Seventh Circuit has extended *Vega* to the precise circumstance of an allegedly suggestive lineup. *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025) (EASTERBROOK, J.)[5]. *Blackmon*'s facts are identical to ours for all material purposes. The plaintiff/criminal defendant was convicted of murder. *Id.* at 523. During federal habeas proceedings, the district court found that the his lawyer

---

[5] We could not identify any Eleventh Circuit or Florida District Court decisions interpreting *Vega* beyond the *Miranda* context.

failed to interview potential alibi witnesses and ordered the plaintiff released unless retried.  *Id.*  The state dropped the charges, and the plaintiff filed a § 1983 action against the investigating officers.  *Id.* at 524.  The basis was a photo lineup that was "unconstitutionally suggestive because [the plaintiff] was the only person who wore his hair in braids—and both witnesses had described braids as one of the shooter's characteristics."  *Id.* at 524.  Thus, like here, his "complaint is not that he was there [in the lineup] but that the other people in the lineup did not look enough like him."  *Id.* at 525.

The Seventh Circuit interpreted *Vega*'s approach as containing "two steps: first, it asked whether the omission of *Miranda* warnings is the sort of constitutional violation that entitles a suspect to damages even if the suspect's statements are never used at trial; second, it asked whether the introduction of these statements at trial changes the outcome."  *Id.* at 524.

> First question: Do the police violate a suspect's constitutional rights by showing witnesses a suggestive photo array or conducting a suggestive lineup?  They do not.
>
> ...
>
> Suppose a prosecutor had concluded that the lineup or array was too suggestive and told the police to put the results in the file.  The material in a drawer would not have violated Blackmon's rights—and would not have done so even had the eyewitnesses said something that led the police to other, more reliable, evidence.  Because conducting identification procedures did not violate Blackmon's rights, a derivative use also would not have violated Blackmon's rights.  ... Blackmon himself describes the right in question ... as the 'Due Process right to a fair trial.'  ...  And that is exactly how we have described the entitlement: a right to a trial untainted by evidence obtained through unduly suggestive methods.

*Id.* at 525.  Similarly, Mr. Valle-Ramos suffered no injury when Mr. Gonzalez or Ms. Szewczyk identified him.  And also identical to *Blackmon*, Plaintiff bases his Count I on the "constitutional right to due process and his right to a fair trial."

> Second question: Do <u>the police</u> violate the suspect's constitutional right to a fair trial by introducing into evidence the results of a suggestive identification?  This question focuses not on the "what" but on the "who".  For the police do not introduce evidence at trial.  That is done by prosecutors, and rulings on admissibility are made by judges.

*Id.* (emphasis in original).

*Blackmon* again followed *Vega* in concluding that the remedy for an unduly suggestive lineup "is one <u>at</u> trial: exclusion of wrongfully obtained evidence."  *Id.* (emphasis in original).  "That is equally true of eyewitness identifications potentially influenced by suggestive procedures."  *Id.*  Moreover, as *Vega* contemplated, expanding § 1983 liability into this area could cause additional harms, including the potential for a federal court "to pass judgment on legal and factual issues already settled in state court."  597 U.S. at 151–52 (citing *Heck v. Humphrey*, 512 U.S. 477 484 (1994), and *Preiser v. Rodriguez*, 411 U.S. 475, 590–91 (1973)).  To be sure, here, Mr. Valle-Ramos did not even attempt to suppress Mr. Gonzalez's or Ms. Szewczyk's identifications—let alone assert that Det. Brady <u>intentionally</u> framed him to secure a random conviction for whatever reason.

In short, post-*Vega*, even an intentionally suggestive lineup cannot serve as the basis for a § 1983 due process claim.  The harm from such identification is

caused at trial, not in the field during investigation, and exclusion is the remedy. Plaintiff's "suggestive lineup" claim does not state a cause of action.

That said, *Vega* concluded by leaving the door open, observing, "except in unusual circumstances, the 'exclusion of unwarned statements' [in the *Miranda* context] should be 'a complete and sufficient remedy.'"  597 U.S. at 152 (quoting *Chavez v. Martinez*, 538 U.S. 760, 790 (2003) (KENNEDY, J., concurring and dissenting)).  This "proviso" might apply where an officer is guilty of "defrauding the prosecutor or otherwise manufacturing evidence" or "had only one lookalike in the photo array but then furnished the prosecutor with a bogus array containing six or eight similar persons."  *Blackmon*, 132 F.4th at 525–26.  These fraud-type exceptions speak to the other theories against Det. Stanley that we address *infra*.

### B. Even if the Court disagrees with the Seventh Circuit, neither the lineup nor Det. Brady's procedures were unduly suggestive.

"When determining whether an out-of-court identification was properly admitted, we apply a two-step test."  *United States v. Daniels*, 97 F.4th 800, 809 (11th Cir. 2024).  The ultimate inquiry is whether the identification procedure presents "a very substantial likelihood of irreparable misidentification."  *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  The first step is whether the "original identification was unduly suggestive ... consider[ing] the size of the array, the manner of its presentation, and the details of the photographs in the array."  *Daniels*, 97 F.4th at 809 (quotations omitted).  Only if this is answered in the affirmative need the

Court proceed to step two, which asks whether the identification was reliable under the totality of the circumstances. *Id.* (citing, *inter alia*, *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)). The "*Biggers* factors" for this inquiry are "(1) the witness's opportunity to view the accused; (2) the witness's degree of attention; (3) the accuracy of the witness's description; (4) the witness's level of certainty; and (5) the length of time between the crime and the identification." *Id.* (citing *id.*).

Despite this case's seeming focus on Ms. Szewczyk's recantation, it is actually Mr. Gonzalez's identification that directly led to the development of probable cause and Mr. Valle-Ramos's arrest. Ms. Szewczyk's identification did not occur for another several months. There was nothing untoward about either procedure. First, "six-packs" remains standard protocol today. *See Daniels*, 97 F.4th at 805 (describing a "six-pack photo array"); *see also United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015) (same), *cf. Manson v. Brathwaite*, 432 U.S. 98, 104 (1977) (observing that the practice of showing a witness a <u>single</u> photograph of the suspect was "widely condemned" but cautioning that a totality of the circumstances analysis remains the lodestar even when a single photograph is shown). Moreover, Det. Stanely showed Mr. Gonzalez <u>three</u> arrays, each containing a single suspect from the BOLO. The three six-packs were all tailored to their respective suspect; it is evident from any layman's review that Det. Stanley was careful to select similarly appearing fillers for each of the three lineups. Mr. Valle-Ramos was not singled out, and he was certainly not framed.

24

Second, Det. Stanley presented the six-packs in accord with judicially approved protocol. *See Daniels*, 97 F.4th at 810 ("The law enforcement officer who presented the array to Roman cautioned that it might not include a photo of the perpetrator, he did not know that Daniels was the suspect when he presented the array, and he read to Roman the standard lineup admonition—which cautions that hairstyles and facial hair can be changed, and that photos may not accurately depict an individual's complexion—before showing him the lineup."). The third and final "suggestiveness" step is the "details" of the filler photographs.

But hairstyle alone is not enough to proceed to *Bigger*'s reliability test. Notably, Det. Stanley actually opted for an older photograph depicting Mr. Valle-Ramos with a smaller afro (if it can be characterized as an afro at all), rather than the large afro appearing in the BOLO. If anything, this worked to Mr. Valle-Ramos's benefit as it was an effort to de-emphasize the hairstyle. But even if it failed to have that effect, it is undisputed that the remaining fillers are all similar in complexion and age. The hairstyle alone—particularly where Mr. Gonzalez acknowledged in writing that hairstyles can change—simply is not enough. *See Blackmon*, 132 F.4th at 524 (where suspect was only one with braided hair); *Cikora v. Dugger*, 840 F.2d 893, 897 (11th Cir. 1988) (rejecting suggestiveness claim even though not all fillers were the same race) (and citing with approval *United States v. Shoels*, 685 F.2d 379, 385 (10th Cir. 1982) (no suggestiveness where all fillers had facial hair and suspect was described as clean-shaven)); *United States v. Felix*, 591 F. App'x 777, 781 (11th Cir. 2014) ("The fact that Felix was one of only two men

pictured without facial hair did not render the photo lineup unduly suggestive because the other men in the lineup had only very slight facial hair.").

Only if the Court decides that the lineup was unduly suggestive need we consider the five *Biggers* factors. Certainly with respect to Mr. Gonzalez's identification, all five point safely in the direction of reliability. That is, (1) Mr. Gonzalez had a clear, eye-locking opportunity to view the accused in his own home and the subsequent chase; (2) his attention was supremely elevated given the tense discovery of a burglar; (3) his description perfectly matched Mr. Valle-Ramos; (4) Mr. Gonzalez remains certain about his identification today and has throughout the case; and (5) only a week passed between the crime and identification.

The analysis with respect to Ms. Szewczyk leads to the same result. As for the initial test of suggestiveness, and critically, Det. Stanley only allegedly "smiled" and affirmed her selection <u>after</u> she picked out Mr. Valle-Ramos of her own volition. Thus, the smile could not have "suggested" Mr. Valle-Ramos's identity to the witness. Accordingly, there is no need to engage in a *Biggers* analysis here either, but, if necessary, we would concede that Ms. Szewczyk's identification was marginally less reliable than Mr. Gonzalez's but not so much as to fail *Biggers*. We are nowhere near an arena where Mr. Valle-Ramos's civil rights were violated in that he was deprived of a fair trial. After all, the identifications were thoroughly cross-examined and not even subject to a motion to suppress.

Det. Brady's lineup and administration were constitutional on the merits.

### C. The lineup did not violate clearly established law in 2013.

As indicated above, the "easiest" way to adjudicate the lineup issue is by recognizing the lack of clearly established law proscribing Det. Stanley's lineup and procedures under the law in 2013. That is, every reasonable officer would have had to know that the lineup was so overwhelmingly suggestive that it violated the law under the totality of the circumstances of our case. The lineup did not violate the law in the first place, but even if there is some question in that regard, qualified immunity would still attach unless Plaintiff can carry his burden to show what that law might be at the particularized, granular level.

Further, Plaintiff must identify law that would have informed Det. Stanley, and all officers in his position, that smiling and affirming <u>after</u> an identification was made were also so unconstitutional that everyone knew it. Plaintiff must show this where the totality of the circumstances included a prior eyewitness identification by the victim themselves.

We await Plaintiff's response to this motion to ascertain what this clearly established law might be.

### D. There is no bona fide *Brady* claim, and even if there was, Det. Stanley is entitled to qualified immunity given the unusual *Brady* violation asserted.

*Brady v. Maryland*, 393 U.S. 83, 87 (1963), held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Like unduly suggestive lineup

claims, "[t]he *Brady* rule is grounded in a defendant's right to a fair trial." *Grayson v. King*, 460 F.3d 1328, 1337 (11th Cir. 2006).  This implicates the Due Process Clause's "guarantee of fair procedure, sometimes referred to as procedural due process." *Daniels v. Williams*, 474 U.S. 327, 337 (1986) (quotation omitted).

In the Eleventh Circuit, a no-fault or negligently caused *Brady* violation may suffice to set aside a <u>conviction</u>, but it is insufficient to support a § 1983 claim against the guilty officer.  *Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007) ("[W]e hold that mere negligence or inadvertence on the part of a law enforcement official in failing to turn over *Brady* material to the prosecution, which in turn causes a defendant to be convicted at a trial that does not meet the fairness requirements imposed by the Due Process Clause, does not amount to a 'deprivation' in the constitutional sense."); *see also Francis v. Scarantino*, 2024 WL 36062 *4 n.4 (11th Cir. 2024) (same).  Instead, a plaintiff must show that an officer at least recklessly failed to turn over exculpatory evidence.  *Porter*, 483 F.3d at 1308 n.11.  In fact, the Eleventh Circuit has never considered whether even recklessness is enough, *see id.*, as several circuits require a finding of intentional bad faith nondisclosure.  *See Helmig v. Fowler*, 828 F.3d 755, 760 (8th Cir. 2016) ("[A]n investigating officer's failure to disclosure exculpatory evidence does not constitute a *Brady* violation in the absence of bad faith."); *Brown v. Miller*, 519 F.3d 231, 237–38 (5th Cir. 2008) ("A police officer's deliberate concealment of exculpatory evidence violates this same right [to a fair trial], and can give rise to liability under § 1983."); *Gibson v. Superintendent*, 411 F.3d 427, 443 (3d Cir.

2005) (holding that police can be liable under § 1983 "when they affirmatively conceal material evidence from the prosecutor"); *but see Tiscareno v. Anderson*, 639 F.3d 1016, 1023 (10th Cir. 2011) ("[I]n a § 1983 context, all that is clearly established is that an investigator must not knowingly or recklessly cause a *Brady* violation.") (vacated on other grounds).

The recklessness-versus-intentional bad faith standard is academic here because the record could never support a finding of either.  Plaintiff's claim is that video, not audio, of his post-custody/pre-arrest interview would have depicted his hairstyle at a time closer to the burglary than the driver license photo used in the six-pack.  This does not constitute a *Brady* violation in the first place because the video was not "material."  Undisclosed evidence is only material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quotations omitted).  The "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important." *Id.* at 434.  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

But like all other federal claims in this litigation, Det. Stanley is entitled to qualified immunity unless all officers in 2013 knew that they were required to videotape every interview of every suspect and turn those videos over to the prosecutor regardless of whether the suspect invoked his rights, denied

29

responsibility, or confessed.  Unless Plaintiff's response to this motion includes binding law with such directives on the books at the time, Det. Stanley is entitled to qualified immunity without more.

On the merits, the alleged video of Mr. Valle-Ramos's alleged "statement" would not have been material because he received a fair trial without it.  Plaintiff's mugshot was taken the same day as the alleged statement, perhaps even within an hour or two, and it was always available to the defense—and the general public— had he or his counsel cared to offer it into evidence in the criminal case.  To be sure, the hairstyle in the mugshot matches almost perfectly with the photograph used in the six-pack.  And perhaps most tellingly, contrary to the mugshot, Mr. Valle-Ramos testified in the criminal trial that he had worn his hair "in a ponytail" and that he usually did not "keep it out."  (Criminal Trial 199.)  Indeed, much of Mr. Valle-Ramos's alibi was based on his hair length (*id.* at 199–204), and he was sharply impeached on his description.  (*Id.* at 204–06 ("So you want the jury to believe that your hair grew probably about 6 inches in two months?").

In short, as a matter of common sense, the alleged video would have depicted Mr. Valle-Ramos's hair consistent with his mugshot that was <u>in</u>consistent with his testimony—and therefore <u>in</u>culpatory, not exculpatory.  The alleged video therefore does not even enter the *Brady* ballpark.  And even if it somehow did, there is zero evidence that Det. Stanley would have had any reason to recognize its somehow exculpatory nature <u>or</u> that he intentionally concealed it to deprive Mr.

Valle-Ramos of his right to a fair trial.  No genuine questions of fact exist, and the § 1983 *Brady* claims fail on their merits and due to qualified immunity.

### E. The courthouse "introduction" is a nonevent for purposes of claims against these Defendants.

It is unknown what constitutional right Plaintiff might claim is violated through his allegation that, "despite an order of sequestration, Defendant Stanley introduced [Ms. Szewczyk] to Mr. Gonzalez" (Am. Compl. ¶ 59), though we imagine it is the right to a fair trial.  First, the <u>evidence</u> at most could support a finding that Det. Stanley merely introduced the two witnesses.[6]  There is no evidence that Det. Stanley spoke substantively about the case.

On the other hand, it is possible that Mr. Gonzalez violated the order of sequestration, but he is not a defendant here.  But Florida law governing the rule is anything but black-and-white.  *See Wright v. State*, 473 So. 2d 1277, 1288 (Fla. 1985) ("[W]e find the trial judge erred in failing to exercise his discretion to determine whether exclusion was warranted under the circumstances, and, instead, applied the sequestration rule as a strict rule of law."), *cert. denied*, 474 U.S. 1094 (1986); *see also Hines v. State*, 719 So. 2d 358, 359 (Fla. 1st DCA 1998) ("A trial court must first determine whether the testimony of a witness would be substantially different after having heard the testimony of other witnesses in violation of the rule.  ...  It should also determine whether the violation was intentional or inadvertent and, if intentional, whether it was the witness, party, or

---

[6] Again, Det. Stanley denies this.

attorney who acted in bad faith. ... Once it has determined the circumstances surrounding the violation, the trial court may then exercise its discretion in deciding whether or not exclusion of the witness is necessary."). Thus, even if Mr. Gonzalez did violate the rule, the trial judge may have remained satisfied that Ms. Szewczyk's identification would not have changed. The point is that no reading of our facts could lead to a conclusion that <u>Det. Stanley</u> engaged in the sort of fraudulent deception *Blackmon* envisioned in applying *Vega*'s potential exceptions. 132 F.4th 522, 525–26 ("Suppose the police coached the witness to identify the suspect but told the prosecutor that they had not done so.").

If Mr. Gonzalez indeed violated the rule—and if the criminal court believed the violation would have impacted Ms. Szewczyk's testimony had it been informed of the violation—the fault lies among some combination of (1) Mr. Gonzalez, to the extent he was informed of the rule's invocation; (2) the prosecutor for failing to control their witness; (3) Ms. Szewczyk, an attorney, for not addressing the violation with the criminal court; and (4) the criminal defense attorney, for not adequately cross-examining the State's witnesses. It does not lie with Det. Stanley and his alleged non-substantive, polite "introduction."

But like the other theories lodged in this lawsuit, the test for qualified immunity presents a much cleaner bar. That is, unless Plaintiff can identify a case from 2014 or earlier holding that a law enforcement officer can have literally no contact with a witness during a criminal trial without violating the Constitution, Det. Stanley is entitled to qualified immunity without more.

### V.   Arguable probable cause entitles Det. Stanley to qualified immunity on the § 1983 malicious prosecution claim.

A § 1983 malicious prosecution action requires a plaintiff to demonstrate a Fourth Amendment unreasonable seizure as well as all elements of the common law tort.  *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019).  The common law elements are "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused."  *Id.* (quotation omitted).

Note that this analysis is wholly independent of the due process allegations involving the six-pack and *Brady* claims because malicious prosecution arises under the Fourth Amendment.  *See id.*  Plaintiff's claim fails both on the federal aspect and the second element of the common law tort because Mr. Valle-Ramos's "seizure" was supported by probable cause.  The existence of probable cause defeats the cause of action on the merits.  *E.g.*, *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1308–09 (11th Cir. 2019).

Preliminarily, it is well settled that modern Fourth Amendment jurisprudence is fundamentally objective; that is, courts "look[] only at objective reasonableness, not the subjective motivations of the public official."  *Lee v. Ferraro*, 284 F.3d 1188, 1193 n.2 (11th Cir. 2002).  Thus, we consider the facts from what a hypothetically reasonable officer in Det. Stanley's position had available to him and draw the legal conclusions from there.

"Probable cause 'is not a high bar.'" *Wesby*, 583 U.S. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley*, 571 U.S. at 338 (cleaned up, citing, *inter alia*, *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (quotation omitted). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (quoting *Gates*, 462 U.S. at 243 n.13.). And "[b]ecause probable cause requires less than a preponderance of the evidence, it necessarily follows that probable cause does not require that it be more likely than not the person arrested for a crime is actually guilty of it." *Davis v. City of Apopka*, 78 F.4th 1326, 1334 (11th Cir. 2023); *see also Von Stein v. Brescher*, 904 F.2d 572, 578 n.9 (11th Cir. 1990) ("[W]hile an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction.").

But once again, for qualified immunity to attach, "an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) (quotation omitted). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that

probable cause existed to arrest Plaintiff." *Id.* (quotations omitted). "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Id.* at 734–35 (quotation omitted). The "standard is an objective one and does not include an inquiry in to the officer's subjective intent or beliefs." *Id.*

Det. Stanley had overwhelming probable cause to swear out his arrest affidavit. "Suggestive" lineup or not, the victim of the crime confidently selected Mr. Valle-Ramos from one of three six-packs as the man he witnessed burglarizing his home. "Under our case law, an eyewitness's identification of a perpetrator is ordinarily sufficient to establish probable cause for an arrest." *Banks v. Bostic*, 2018 WL 1158306, *1–2 (11th Cir. 2018) (affirming qualified immunity where "the warrant was based, at least in part, on the victim's eyewitness identification of Banks as the perpetrator of the burglary" from a "6-person photo line-up" even though the identification proved incorrect). Further, Det. Stanley had been provided the BOLO that indicated that Mr. Valle-Ramos had been casing residences in the area during the daytime—and that the Valle-Ramos vehicle had been pulled over in the immediate vicinity of Mr. Gonzalez's residence. *See United States v. Sigouin*, 494 F. Supp. 3d 1252, 1265 (S.D. Fla. 2019) ("Probable cause may be predicated on hearsay or other evidence that would not otherwise be admissible at trial.") (citing *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). Critically, even if Mr. Valle-Ramos was not involved in the casing (i.e., if he was the

victim of misidentification twice), that potential fact is irrelevant to what an objectively reasonable officer in Det. Stanley's position knew at the time he executed the arrest warrant. That is, for purposes of probable cause at least, Det. Stanley was entitled to rely on the veracity of the BOLO.

Add the gray vehicle into the fact pattern, and there is no doubt that actual probable cause existed to arrest Mr. Valle-Ramos. This is so notwithstanding the competing details of the vehicle's make and model, especially given Det. Stanley's lamentation that witnesses commonly misidentify vehicles. *See Sigouin*, 494 F. Supp. 3d at 1265 ("Reliance on the opinions and conclusions of trained and experienced law enforcement officers is appropriate [for purposes of probable cause].") (quoting *United States v. Pineda*, 2012 WL 2906758, *9 (N.D. Ga. June 4, 2012) (itself collecting cases), *adopted*, 2012 WL 2907447 (N.D. Ga. July 16, 2012)). "Moreover, the presence of contradictory evidence does not bar a finding of probable cause." *Scott v. City of Miami*, 139 F.4th 1267, 1274 (11th Cir. 2025); *see also Aguirre v. Seminole County*, 158 F.4th 1276, 1307 (11th Cir. 2025) ("Nor does a law enforcement officer have an unflagging duty to investigate independently every claim of innocence or defense.") (quotation omitted). "Ultimately, probable cause will only be vitiated if the exculpatory evidence 'did not merely make it less likely probable cause existed but <u>obviously and irrefutably</u> established that it didn't exist." *Scott*, 139 F.4th at 1274 (quoting *Davis*, 78 F.4th at 1334) (emphasis added in *Scott*).

The gray vehicle was therefore enough of a corroborating fact to cement probable cause in addition to Mr. Gonzalez's identification and the facts within the BOLO tip. *A fortiori*, the existence of arguable probable cause is beyond refute. Finally, we note that Ms. Szewczyk's identification occurred after the allegedly unconstitutional "seizure" inhering in Mr. Valle-Ramos's arrest and is therefore only tangentially relevant to the malicious prosecution inquiry. But her identification, which contained no indicia of hesitation until 2023, only provided additional evidence for an objectively reasonable officer to believe that probable cause existed to tie Mr. Valle-Ramos to the burglary.

Like the due process claims, the § 1983 malicious prosecution claims fail on the merits and due to qualified immunity.

### VI. Sgt. Brady, plainly cloaked with qualified immunity, has no business in this lawsuit, and the conspiracy theories are frivolous.

We presume Plaintiff named Sgt. Brady in a perhaps misguided attempt to cast a wide net based on Sgt. Brady's review and approval of Det. Stanley's arrest affidavit. But now at the conclusion of discovery, there is no basis whatsoever for any of the claims against Sgt. Brady to proceed to trial.[7]

---

[7] Specifically, they are: Count I (§ 1983 Violation of Due Process); Count II (§ 1983 Malicious Prosecution); Count III (§ 1983 Failure to Intervene); Count IV (§ 1983 Conspiracy to Violate Constitutional Rights); Count VI (State Law Malicious Prosecution); Count VII (State Law IIED); and Count VIII (State Law Civil Conspiracy).

For one, the "'fellow officer rule' under both federal and Florida law imputes 'the collective knowledge of the investigating officers' 'to each participating officer.'" *Scott v. City of Miami*, 139 F.4th at 1277 (quoting *Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012), and *Voorhees v. State*, 699 So. 2d 602, 609 (Fla. 1997)). Sgt. Brady's <u>only</u> substantive interaction with the Gonzalez investigation was his review and approval of Det. Brady's arrest report. Thus, because Det. Stanley had at least arguable probable cause to swear out his arrest affidavit, Sgt. Brady is similarly insulated.

Further, the "failure to intervene" claim—which, as far as we can tell, has only been applied to Fourth Amendment excessive force claims—is derivative of the underlying constitutional violation. *Ford v. Smitherman*, 669 F. Supp. 3d 1173, 1185 (N.D. Ala. 2023) ("Warren has not established that his arrest was unlawful in a constitutional sense to support his derivative failure-to-intervene claim. ... Accordingly, the Defendants are entitled to qualified immunity to the extent Warren claims they failed to intervene in his arrest."). Without an underlying constitutional violation attending Mr. Valle-Ramos's <u>arrest</u> (not conviction), there is therefore no cognizable failure to intervene.

More to the point, there is no evidence that, even if the Court finds various infirmities in Det. Stanley's investigation despite our protestations, Sgt. Brady had no reason to recognize them, whatever they are. Per his job description, he reviewed the facts as sworn to by Det. Stanley for accuracy and probable cause and found that the arrest affidavit sufficed. There is no evidence that the two men

conspired to frame Mr. Valle-Ramos or anyone else; those allegations are spurious at this phase. *See generally Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010) (explaining that a § 1983 conspiracy exists where defendants "reached an understanding" to violate the plaintiff's constitutional rights).

Sgt. Brady is therefore at least entitled to qualified immunity for even stronger reasons than Det. Stanley. And as with any qualified immunity motions, we await Plaintiff's response to ascertain what clearly established law might indicate otherwise.

## VII. The state law claims can and should be dispatched with the federal claims.

Counts VI–VIII are alleged against both Defendants and respectively sound in state law intentional infliction of emotional distress ("IIED"), civil conspiracy, and malicious prosecution. "Whether conduct is outrageous enough to support a claim of [IIED] is a question of law, not a question of fact." *Corbin v. Prummell*, 655 F. Supp. 3d 1143, 1165 (M.D. Fla. 2023) (quoting *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007)). It is evaluated on an objective basis and requires a showing of "several emotional distress ... of such a substantial quality or enduring quality that no reasonable person in a civilized society should be expected to endure it." *Id.* (quoting *Kim v. Jung Hyun Chang*, 249 So. 3d 1300, 1305 (Fla. 2d DCA 2018)). Naturally, the standard is "extremely high." *Id.* (quotation omitted).

We abstained from moving to dismiss the IIED theory because the Amended Complaint alleges a sentient scheme between two police officers to frame a random, innocent individual for no apparent reason and then stand by while he served a thirty-month prison sentence. We have no problem conceding that such conduct would be outrageous; it would be felonious. The trouble for Plaintiff at this stage is that there is absolutely no evidence that comes close to supporting the sensational claim. The fanciful theory does not warrant further analysis.

Like the federal conspiracy claim, the civil conspiracy claim similarly fails for the simple reason that there is no evidence that Sgt. Brady even discussed the Gonzalez investigation with Det. Stanley, much less conspire "to do an unlawful act" and commit "some overt act in pursuance of the conspiracy." *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006) (providing the elements of the tort). While creative pleadings can survive into discovery, they cannot survive past summary judgment, and the frivolous conspiracy claim should be dismissed.

Finally, as indicated above, under Florida law, "a malicious prosecution claim cannot survive the existence of probable cause." *Palm Coast Intracoastal, LLC v. Preserve Flagler Beach & Bulow Creek, Inc.*, 423 So. 3d 984, 986 (Fla. 5th DCA 2025). This "extremely low and easily satisfied" standard is plainly met as already explained. *Id.* (quoting *Gill v. Kostroff*, 82 F. Supp. 2d 1354, 1364 (M.D. Fla. 2000)).

## VIII. Conclusion.

If it is true that Mr. Valle-Ramos was wrongly identified by two eyewitnesses and had nothing to do with Mr. Gonzalez's burglary, then the system failed all of us.  But a systemic failure—and the absolute immunities of the State and its criminal court system—is not an excuse to "drop liability on the head of someone who might be ordered to pay damages: an officer in his capacity as an investigator." *Blackmon*, 132 F.4th 522, 525.

No clearly established law gave Det. Stanley notice that anything he did in 2013 was patently unconstitutional.  Indeed, everything he did comported with reasonably prudent police work, not that that is the standard.

Defendants are entitled to summary judgment on the claims against them, but if any doubt arises from the record, then qualified immunity disposes of the case all the same.

Respectfully submitted this **3d** day of February, 2026, by:

/s Derek J. Angell
DEREK J. ANGELL, ESQ.
Fla. Bar No. 73449
dangell@ohalaw.com
O'CONNOR, HAFTEL & ANGELL, PLLC
800 N Magnolia Ave, Ste 1350
Orlando, Florida 32803
(407) 843-2100
*Lead Counsel for Defendants*