ORIGINAL

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

**CASE NO.: 6:24-CV-01276-CEM-DCI**

**JORGE VALLE-RAMOS**

**V.**

**CITY OF ORLANDO, MICHAEL**

**STANLEY, AND UNKNOWN OFFICERS**

**DEPONENT:**

**CHARLENE BLOOM**

**DATE:**

**FEBRUARY 17, 2025**

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF FLORIDA

3  ORLANDO DIVISION

4  CASE NO.: 6:24-CV-01276-CEM-DCI

5  HONORABLE CARLOS E. MENDOZA

6

7  JORGE VALLE-RAMOS,

8  Plaintiff

9

10 V.

11

12 CITY OF ORLANDO, MICHAEL

13 STANLEY, AND UNKNOWN OFFICERS,

14 Defendants

15

16

17

18

19

20

21

22

23 DEPONENT: CHARLENE BLOOM

24 DATE:      FEBRUARY 17, 2025

25 REPORTER: SARA FODOR

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1                     APPEARANCES

 2

 3    ON BEHALF OF THE PLAINTIFF, JORGE VALLE-RAMOS:

 4    Roz Dillon, Esquire

 5    Loevy & Loevy

 6    311 North Aberdeen Street

 7    3rd Floor

 8    Chicago, Illinois 60607

 9    Telephone No.: (312) 243-5900

10    E-mail: dillon@loevy.com

11    (Appeared via videoconference)

12

13    ON BEHALF OF THE DEFENDANTS, CITY OF ORLANDO, MICHAEL

14    STANLEY, AND UNKNOWN OFFICERS:

15    Stephen M. Mistoler, Esquire

16    O'Connor, Haftel & Angell, PLLC

17    800 North Magnolia Avenue

18    Suite 1350

19    Orlando, Florida 32803

20    Telephone No.: (407) 843-2100

21    E-mail: smistoler@ohalaw.com

22

23

24

25
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

INDEX

                                                             Page

PROCEEDINGS                                      5

DIRECT EXAMINATION BY MS. DILLON                 6

CROSS-EXAMINATION BY MR. MISTOLER                58

REDIRECT EXAMINATION BY MS. DILLON               76


EXHIBITS

Exhibit                                         Page

1 - Testimony from Criminal Trial, 21-page
    Document - P 266-287                        20

2 - Testimony from Deposition, 19-page
    Document - P 1386-1404                      22

3 - Orlando Police Department Statement,
    1-Page Document, April 9, 2013 - P 1385    46

4 - Side-by-Side Photographs of
    Mr. Valle-Ramos and Mr. Ortiz - P 454      56

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1                           STIPULATION

2

3    The VIDEO deposition of CHARLENE BLOOM was taken at

4    MILESTONE REPORTING COMPANY, 315 EAST ROBINSON STREET,

5    SUITE 510, ORLANDO, FLORIDA 32801, via videoconference

6    in which some participants attended remotely, on MONDAY

7    the 17th day of FEBRUARY 2025 at 1:18 p.m. (ET); said

8    deposition was taken pursuant to the FEDERAL Rules of

9    Civil Procedure 45(a)(4).

10

11   It is agreed that SARA FODOR, being a Notary Public and

12   Court Reporter for the State of FLORIDA, may swear the

13   witness.

14

15

16

17

18

19

20

21

22

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1              PROCEEDINGS
 2         THE REPORTER:  Okay.  We are on the record.
 3    Will all parties, except for the witness, please
 4    state your appearance, how you're attending, and
 5    your location?
 6         MS. DILLON:  Roz Dillon for Plaintiff
 7    Valle-Ramos, attending via Zoom.
 8         MR. MISTOLER:  Stephen Mistoler on behalf of
 9    the Defendants, attending at Milestone Reporting in
10    Orlando, Florida.
11         THE REPORTER:  Thank you.
12         Ms. Bloom, will you please state your full name
13    for the record?
14         THE WITNESS:  Charlene Elizabeth Bloom.
15         THE REPORTER:  Thank you.  And I already
16    identified Ms. Bloom off of the record with her ID.
17    Do all parties agree that the witness is, in fact,
18    Ms. Charlene Bloom?
19         THE WITNESS:  Yes.
20         MS. DILLON:  Yes.
21         MR. MISTOLER:  Agreed.
22         THE REPORTER:  All right.  Ms. Bloom, will you
23    please raise your right hand?  Do you solemnly swear
24    or affirm that the testimony you're about to give
25    will be the truth, the whole truth, and nothing but
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1      the truth?

2            THE WITNESS:  Yes.  Absolutely.

3            THE REPORTER:  Thank you.

4         You may begin.

5               DIRECT EXAMINATION

6   BY MS. DILLON:

7      Q.   **Morning -- or good afternoon, Ms. Bloom.  It's**

8   **morning my time.  Will you please state and spell your**

9   **name for the record?**

10     A.   Say it and spell it?

11     Q.   **Yes, please.**

12     A.   Okay.  It's Charlene Bloom.  I -- it's

13  Elizabeth in the middle, but I don't know if you need

14  that.  It's C-H-A-R-L-E-N-E Bloom, B-L-O-O-M.

15     Q.   **Perfect.  And if I refer to you as Ms. Bloom,**

16  **is that all right, or is there something else you**

17  **prefer?**

18     A.   I'm sorry?

19     Q.   **If I refer to you as Mrs. Bloom, is that**

20  **okay --**

21     A.   Oh, it's fine.

22     Q.   **-- or is there a different way you'd like to**

23  **be addressed?**

24     A.   No, that's fine.

25     Q.   **Okay.  Great.  My name is Roz Dillon, and I**

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  represent the Plaintiff, Jorge Valle-Ramos, in this

2  lawsuit.  And I'm going to be deposing you this

3  afternoon after which counsel for defendant, Stephen,

4  may also depose, okay?

5      A.   Okay.

6      Q.   Okay.  And so by agreement of the parties,

7  we're doing this -- by agreement of the parties, we're

8  conducting this deposition via Zoom, and you're with the

9  court reporter in their office, correct?

10     A.   Yes.

11     Q.   Okay.  And counsel for Defendants is also in

12 the room?

13     A.   Yes.

14     Q.   Okay.  Is there anyone else in the room,

15 besides counsel for defendants and the court reporter?

16     A.   No -- no.

17     Q.   Nobody under the desk?

18     A.   No.

19     Q.   Okay.  Great.  Ms. Bloom, have you ever been

20 deposed before?

21     A.   Have I ever been what?

22     Q.   Deposed before?

23     A.   I guess I have, because I did that, right?

24          MR. MISTOLER:  You can't really ask me

25     questions.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1          THE WITNESS:  Oh --

2          MR. MISTOLER:  So to the best of your --

3          THE WITNESS:  -- I guess because I was at that

4     trial.  Is that deposed?

5  BY MS. DILLON:

6     **Q.   So the trial testimony that you gave is not a**

7  **deposition, but if I represented to you that you gave a**

8  **deposition as well in the underlying criminal case, does**

9  **that sound right?**

10    A.   I don't -- no, I didn't because I didn't do

11  anything, but go to the court.

12    **Q.   Okay.  I think that we have a transcript from**

13  **a deposition that you gave on October -- in October of**

14  **2013.  Does that ring a bell?**

15    A.   I'm 76.  I'm not the --

16    **Q.   It's not a memory test.  So fair to say that's**

17  **the only other time you've been deposed?**

18    A.   That's the only --

19    **Q.   Okay.**

20    A.   Yeah.

21    **Q.   Okay.  So I'm going to lay some ground rules**

22  **just so we're on the same page about how this will go,**

23  **okay?**

24    A.   Okay.

25    **Q.   So I'm going to ask you questions, and you're**

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  going to be giving answers under oath.  That's just as

2  if you were in a courtroom in front of a judge and jury;

3  do you understand?

4      A.   Absolutely.

5      Q.   Okay.  If you don't understand a question that

6  I ask, just say so, and I will rephrase it or will ask a

7  new question, okay?

8      A.   Okay.  Okay.

9      Q.   If you answer, we're going to assume you

10  understood the question, fair enough?

11      A.   Yes.

12      Q.   Okay.  Now, the court reporter is going to be

13  taking your testimony today, and for that reason, it's

14  important that we try not to speak over each other.  So

15  I'm going to try to wait until you finished answering a

16  question to ask you a question.  And then I just ask

17  that you try to wait for me to ask my whole question

18  before you answer, sound good?

19      A.   That's good.

20      Q.   Okay.  And for the same reason, it's important

21  that you give verbal answers today.  So shaking your

22  head won't work, giving hand gesture won't work.  We

23  need the verbal answer so that the court reporter can

24  write down --

25      A.   Yes.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1       Q.    -- what you're saying.

2       A.    Yes.

3       Q.    Okay.

4       A.    I understand.

5       Q.    All right.  Next, there might be some times

6  today where the attorney for the other side objects to

7  one of my questions.  Since there's no judge here to

8  rule on objections, the rule is that you go ahead and

9  answer anyway, even if the attorney objects.  You just

10  let them get their objection on the record, sound okay?

11      A.    Yes.

12      Q.    Okay.  Last, if you need a break for any

13  reason, you can have one and at any time, but if there's

14  a question pending, you'll just need to answer before we

15  take a break, okay?

16      A.    Okay.

17      Q.    Okay.  So anytime, feel free to stop me if you

18  need to get up, get some water, whatever, sound good?

19      A.    I've got water.

20      Q.    Okay.  Great.  Ms. Bloom, do you have any

21  medical conditions that might impact your ability to

22  testify today?

23      A.    Well, I hate to admit it, but I have the

24  marker for dementia.  It's been found three months ago.

25  I'm doing very well because I'm rebuking it.  I don't

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  want it, but my father had it.  So it's -- I do very

2  well. Sometimes, I can forget a word, but if I just stop

3  and don't talk, it comes back.

4        And so I -- I am -- I don't think I'm

5  completely to the point where I could not do it because

6  I am -- I do remember I have a good memory, but it's,

7  like -- at night or sometimes in the daytime, I'll

8  forget something, but I'm not blah, blah, blah, blah,

9  blah, you know, like that yet so --

10     **Q.**   **Okay, and how are you feeling today?**

11     A.   I'm good.  I was a little --

12     **Q.**   **Okay.**

13     A.   -- stressed, and I was a little uptight

14  because I've never, you know, Ubered.

15     **Q.**   **Oh --**

16     A.   But he was wonderful.

17     **Q.**   **Great.**

18     A.   But -- yeah.  So that was a big stress off, I

19  think.  So I'm fine.

20     **Q.**   **Okay.  And you said you're 76; is that right?**

21     A.   76.  I'll be --

22     **Q.**   **Okay.**

23     A.   -- 77 in September.

24     **Q.**   **Great.  Are you receiving -- for this marker**

25  **for dementia, do you receive any treatment for that, or**

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    is it just something that doctors watch?

2        A.    I chose -- I was doing a study, and I chose to

3    drop the study, and I have given myself Prevagen for

4    three-and-a-half years, and that is what I take.  If I

5    don't take that, I can't remember it.  I can remember;

6    but not good.

7        Q.    Okay.

8        A.    So I'm not on a prescription yet, and I don't

9    want to be, unless I have to be.

10        Q.    Okay.  Before you started taking the Prevagen,

11    did you have any memories -- memory issues?

12        A.    Yes.  Yes.

13        Q.    Okay.

14        A.    I was talking on the phone, and I say, oh,

15    wait a minute, and I have to think, and so the words

16    wouldn't come.  So yes, I'm a good advertisement for

17    Prevagen for anyone.

18        Q.    Okay.  Well, like I said, this is -- it's not

19    a memory test.  If you don't remember --

20        A.    Yes.

21        Q.    -- something or don't know an answer, it's

22    okay to say that, as long as it's the truth, okay?

23        A.    Right.  Oh, absolutely.  I do.

24        Q.    Okay.  Is --

25        A.    Never lie.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Of course.  Is there any other reason you can

2  think of that you might not be able to give full and

3  accurate testimony today?

4    A.   Not that I know of.

5    Q.   Okay.  Great.  So let -- let's get in.  I'm

6  going to be asking you some questions about a burglary

7  of your neighbor's home back in 2013.  Did you live in

8  Orlando in 2013?

9    A.   Yes, I did.  I lived in the complex where that

10  happened --

11    Q.   Okay.

12    A.   -- in Creek Condominiums.

13    Q.   Did you live with anybody else?

14    A.   Was I with him?  Anybody else?

15    Q.   Did you live with anybody else at that

16  complex?

17    A.   No.  No.

18    Q.   Okay.

19    A.   Just me and the kids.

20    Q.   Okay.  So I -- I'll direct your attention to

21  April 9, 2013, the day that your neighbor's home was

22  burglarized.  As you sit here today, do you have a good

23  memory of that day?

24    A.   I didn't know about the burglary and the --

25  whatever happened until I saw it on TV.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.    Okay.  But do you have -- as we sit here, do
2    you remember that day happening or --
3    A.    Well, I remember what I saw.
4    Q.    Okay.
5    A.    But I do --
6    Q.    So you have a memory of what you saw that day?
7    A.    Yes.  Yes.
8    Q.    Great.  So where were you that morning?
9    A.    Being nosy, looking out the window.  I had
10   just retired from Disney, and I heard some noise, and I
11   looked out the window that -- this is all I really can
12   offer.  I looked out the window.  There was a car parked
13   where we normally don't park because behind me is the
14   second condominium different place.
15          And ours fence is the -- was the difference
16   between the little road at long -- I shouldn't tell you
17   all that.  Anyway, there was a car parked there.  So it
18   caught my attention.  I didn't have my glasses on, but I
19   can see far away.  So I looked, and I thought, what --
20   what's going on?  I saw -- do you want me to tell you
21   what I saw?  That's what you want?
22   Q.    Well -- so I'll ask you specific questions.
23   A.    Okay.
24   Q.    So the -- to the best you can -- I know it's
25   hard when you're telling a story.  To the best you can,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    just try to answer the question that I'm asking.

2        A.    Okay.

3        Q.    And then I will -- I'll ask you for detail as

4    we go along.  Does that make sense?

5        A.    Yes.

6        Q.    Okay.  So let's start with your view from your

7    window.  The -- you said it was your bedroom window; is

8    that right?

9        A.    Yes.  It's the second --

10       Q.    Okay.

11       A.    -- story window, and I was looking out the

12   left --

13       Q.    Okay.

14       A.    -- over the fence.

15       Q.    Okay, and out the left, you said there's a

16   fence, and there was a car behind the fence; is that

17   right?

18       A.    Let's see.  Was it behind it?  No, actually,

19   it was the side -- opposite side of me --

20       Q.    Okay.

21       A.    -- is where the car was, but there usually are

22   never cars there.

23       Q.    Okay.  And when you look out your window, when

24   you look -- do you still -- sorry.  Let me ask you a

25   clarifying question.  Do you still live in the same

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  complex today?

2     A.   Yes.

3     Q.   Okay.

4     A.   Ten years.

5     Q.   So when you look out your bedroom window, you

6  see immediately in front of you a car.  What do you see

7  to the right of your window?  What's your view to the

8  right of --

9     A.   To the right is the driveway.  It's a little

10 road in their condo place.

11    Q.   Okay.

12    A.   I could see that, and I could see to the end

13 where the road goes towards the road -- main road. Let's

14 put it that way.  That's -- that was a different

15 condominium.

16    Q.   Okay, and what is to your left as you look out

17 the window?

18    A.   Okay.  As I looked out to my left, that's what

19 made me look.  I heard a noise, and I got out of bed,

20 and looked, and I thought, hmm.  So I opened my blinds,

21 and I have to kind of move myself to the left to be able

22 to see as far back as the car was parked, and I'm going,

23 what's the car doing there?  So then do you want me to

24 continue, or do you want to ask the questions?

25    Q.   Sure.  What did you see after you noticed the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  car parked there?

2      A.   Okay.  Okay.  I saw the car there, and I just

3  kind of looked, and I thought, what the heck?  So --

4  said -- I just looked -- you know, looked again, and I

5  could see there was a driver, and there were two younger

6  men in the back of the car.

7      Q.   Okay.

8      A.   I could see that very clearly.

9      Q.   You could see them in the car?

10     A.   Yes.

11     Q.   Is that right?

12     A.   Yes.

13     Q.   Did you see them before they got in the car?

14     A.   No.  No.

15     Q.   Okay.  Did you see --

16     A.   There was no noise, you know, to -- I --

17     Q.   Did you see them running, or did you just see

18  them in the car?

19     A.   I saw them in the car, and then the

20  gentleman -- I don't know, whatever his name is.  He got

21  out of the car, and he went to the left, which was

22  towards the pond.  We have a pond at the end of my

23  stretch of the condos, and it comes out to the side

24  where he could come out front, where he could walk out

25  into the parking lot. And that would take him over to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    little falls, where that was, I think.

2        Q.   Okay.  So you saw three boys in the car?

3    There was a driver and two passengers.  Is that what you

4    said?

5        A.   The driver was older.  He looked --

6        Q.   Okay.

7        A.   -- teenage, but he was dressed nice, and the

8    boys looked --

9        Q.   Yeah.  Let's --

10        A.   -- the boys looked like they were going to

11    Catholic school.  They were all dressed up.

12        Q.   Sure.  Let's start with the boy in the

13    driver's seat, okay?

14        A.   Uh-huh.

15        Q.   Did you get a good look at him?

16        A.   No, I didn't really pay much attention.  I

17    just thought, I wonder who he is, and what's he doing

18    here? You know, I just wondered because nobody ever

19    did -- parked there or was there before.

20        Q.   Okay.

21        A.   So I was just being questionable.

22        Q.   Do you remember what he looked like?

23        A.   He was dressed nicely.  I thought he was

24    probably going to work.  He was -- I don't know how

25    tall, but he wasn't real tall.  Maybe -- I don't know.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   He would've been taller than me by a long shot, but he

2   had brown -- dark brown hair, and it was bushy, and at

3   that time, everybody had bushy.  A lot people had bushy

4   hair, but he had bushy hair, and it appeared he was

5   going to take those kids to school, is what I thought.

6         But he's -- I watched him, and he told them --

7   I don't know if he told them, but he -- he pointed, and

8   then he left.  He left one -- to the left direction

9   towards the pond, and the kids were in the car.

10      Q.   Okay.

11      A.   He might have been 12 -- 11 and 12.  I don't

12  know, but there were two of them.  I don't know if they

13  were twins or if they were brothers.  I don't know.

14      Q.   Okay.  Ms. Bloom, I'm going to show you -- I'm

15  going to mark our first exhibit.  I'm going to share my

16  screen.  Let me make sure I've got the right one.

17      A.   Okay.

18      Q.   Okay.  Ms. Bloom, you testified -- you

19  remember testifying during Jorge Valle-Ramos's criminal

20  trial; is that right?

21      A.   I remember it testifying, but I don't know.  I

22  couldn't tell you exactly what I said.  Like, I just did

23  with that.  I wouldn't --

24      Q.   Sure.  Yeah.  That's okay.  I'm just going to

25  show you a little bit of that testimony right now to see

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    if it refreshes your memory.

2         A.   Okay.

3              MS. DILLON:  So what I've -- what I'm showing

4         you right now is going to be Plaintiff's Exhibit 1.

5         The -- for the record, this is a 21-page document.

6         It's Bates numbered P266 to 287, and I'll represent

7         to you that this is the transcript of the testimony

8         you gave at the criminal trial of Jorge Valle-Ramos,

9         okay?

10             THE WITNESS:  Okay.

11             (Exhibit 1 was marked for identification.)

12   BY MS. DILLON:

13        Q.   Okay.  So I'm going to direct our attention to

14   Page 5 of the document, and that's Bates P270 for the

15   record. and I'm going to direct our attention to Line

16   four.

17        Q.   Can you see where my cursor is on the screen?

18        A.   Yes.

19        Q.   Okay.  And is that big enough for you to read

20   it --

21        A.   It's --

22        Q.   -- the text?

23        A.   -- small, but I can read it.

24        Q.   Okay.  I'll zoom in a little bit more.

25        A.   Okay.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   And I'll -- I'm just going to read to you

2    really quickly.  So you were asked at Line four, "Could

3    you describe more specifically the driver?  Did you get

4    a good look at him?"  And then you answered, if we go

5    down to Line 16 -- or 15 and 16, you say, "He was

6    blonde.  He looked like he was probably short, maybe

7    5'3, 5'4, maybe 5'5, and he was dressed nicely."

8      Q.   Do you see that?

9      A.   He was blonde?

10     Q.   Yeah.

11     A.   He wasn't blonde.

12     Q.   Okay.  The -- yeah.  So your testimony today

13   is the driver was not blonde?

14     A.   He was not blonde, no.  He had hair the same

15   color as the kids.  It was dark.

16     Q.   Okay.

17     A.   It was brownish.

18     Q.   Okay.  Ms. Bloom, would you agree that your

19   memory at the trial which was closer in time to the

20   incident was better than your memory is today?

21          MR. MISTOLER:  Object to the form.  You can

22      answer.

23          THE WITNESS:  I can answer?

24          MR. MISTOLER:  Yes.

25          THE WITNESS:  Okay.  I get -- let's see.  Is it

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEReporting.com      Toll Free 855-MYDEPOS

1        better than then?  Yes, it had to be.

2   BY MS. DILLON:

3        Q.    Okay.

4        A.    I have a great memory.

5        Q.    Yeah.  So you don't recall giving that

6   testimony; is that right?

7        A.    I don't remember saying he was blonde.  That's

8   the only part.

9        Q.    Yeah.  Do you have any reason to doubt that

10  you said that?

11       A.    Because he wasn't blonde, and I wouldn't --

12  you know, I don't know why that would've been said.

13       Q.    Okay.  So that -- reading that doesn't refresh

14  your recollection that the driver was blonde?

15       A.    No, it makes me mad because I don't think I

16  said that.

17       Q.    Okay.  So I'm going to show you -- I'm going

18  to stop the screen share on this --

19       A.    Okay.

20            MS. DILLON:  -- document, and I'm going to

21       share -- well, let me find it.  I'm going to share

22       what's going to be marked as Plaintiff's Exhibit 2.

23       Sorry.  I am having trouble sharing it, but let me

24       see if I can get this to work.

25            Okay.  So Ms. Bloom, I'm showing you what will

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1    be Plaintiff's Exhibit 2.

 2              (Exhibit 2 was marked for identification.)

 3    BY MS. DILLON:

 4        Q.    Can you see that on your screen?

 5        A.    Yes, it's a little little.

 6        Q.    Okay.

 7        A.    But I'm okay.

 8        Q.    That's okay.  I can zoom in, as well.  So for

 9    the record, this is a 19-page document that's Bates

10    numbered P 1386 to 1404, and I'm going to represent to

11    you that this is the transcript of the testimony you

12    gave at your deposition during the criminal proceedings

13    against Jorge Valle-Ramos, okay?

14        A.    Okay.

15        Q.    All right, and I'm going to direct our

16    attention to Page four, which is Bates 1389.  And I'm

17    going to start at Line three, and this is some testimony

18    about the boys that you saw.  And it says, "And then I

19    noticed there was a car parked directly behind my house

20    at the fence, three young men.  One, the driver was

21    blonde haired, light skinned.  They all dressed in dress

22    clothes like they were going to work, but they came

23    running to this car."

24        Q.    Do you -- did I read that correctly?

25        A.    That's what it says.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Yeah.  So this testimony, does this -- do you

2   recall giving that testimony at your deposition?

3      A.   It doesn't sound right, but I guess I did, if

4   it's there.  I didn't say they were blonde.  The two

5   kids were dark-haired, and he was blonde --

6      Q.   Sure.

7      A.   -- haired, for sure.  I could see them, for

8   sure.

9      Q.   Okay.

10     A.   And --

11     Q.   So this doesn't -- seeing this doesn't refresh

12  your recollection one way or the other about whether or

13  not the driver was blonde?

14     A.   No, he wasn't.  He was the only driver, and he

15  was dark-haired.  That's for sure.

16     Q.   Okay.  I'm going to set this exhibit aside.

17  Okay.  So let's move on to the -- your -- to the other

18  two boys and what they looked like.  Did you get a good

19  look at the other two boys?

20     A.   I did.  They almost looked identical.  They

21  were very short.  They were probably, I said, 12.  They

22  probably were more, like, 8 to 9.  Maybe 12, but I don't

23  think so.  They were dressed in, like, uniforms, like

24  going to Catholic school or somewhere.  So they were in

25  the car, and they were in the back seat, and when he

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    left, they got up in the front seat, and then when he

2    came back, they got out and went in the back again.  He

3    hurried them to the back seat.

4         Q.   Okay.  So did -- do you remember anything else

5    about what those boys looked like?

6         A.   They were Hispanic.  They were cute.  They

7    looked -- they had short hair, and they were dressed,

8    like I say, like, in dress clothes to go to school. They

9    just looked like they could be twins or they could be

10   brothers, but they weren't old.  They weren't old enough

11   to drive or anything.

12        Q.   Okay.  Ms. Bloom, I'm going to, again, pull up

13   the -- your trial transcript, what's been marked as

14   Plaintiff's Exhibit 1.  Okay.  Can you see that on your

15   screen?

16        A.   Yes.

17        Q.   All right.  So I'm going to direct our

18   attention now kind of to the bottom of Page four, which

19   is Bates 269, and I'm going to read from your testimony

20   at the trial starting at Line 20, and you say, "Yes,

21   there were three young men, probably early 20s.  They

22   all three had on long sleeve dress shirts.  They looked

23   like they were going to work or somewhere.  They ran.

24   There was a driver who had blonde hair and was kind of

25   short.  And there were two other guys.  One was -- they

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   got in the back passenger door.  The one on the right-

2   hand side was a short guy, kind of stocky.  The guy who

3   was closest to me was taller and thin, but not Hispanic

4   or black, either one."

5       Q.   Ms. Bloom, do you remember giving that

6   testimony?

7       A.   I don't, but the only --

8       Q.   Okay.

9       A.   -- way that could have happened would've been

10   if that was a second day that I saw them because the

11   first day, I saw them and I -- just as I said, they were

12   in the car.  He walked away.  He came back, and they

13   left.  And then I thought that there could have been a

14   second day.  I really did.  I couldn't remember for

15   sure, but this makes me think this was the first day or

16   the second day, one of them.  And they asked me if he

17   drove out, and I don't remember what I said now, but I

18   believe I said, yes, he drove.  He was the only one that

19   could drive with the first day because they were kids.

20   So I don't --

21       Q.   Okay.

22       A.   Okay.

23       Q.   -- know.  I really don't --

24       So that's -- it's -- and it's okay if you

25   don't remember.  But -- so can you explain to me what

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

1  you mean by a first day and a second day?

2        A.    Well, I was thinking that the cars -- because,

3  see, the first day, the car was there, and he just

4  walked away, and he walked back, and they left.  I

5  think, for -- I'm not positive, but I think that there

6  was a second day, and when I see this deposition or

7  the -- whatever you call it, there had to have been a

8  second day because I wouldn't have said that because

9  they weren't blonde.  They were definitely Hispanic

10 kids, and they weren't blonde.

11             But now, the driver of the car the second day,

12 I don't know now if it was him or if it was somebody

13 else because I don't remember seeing other people.

14 Maybe, I'm blocked.  I don't know but I don't know.  I'm

15 sorry.

16       Q.    That's okay.  You don't need to apologize.  So

17 safe to say, this doesn't refresh your memory of

18 testifying that day as -- or testifying at the trial

19 about the -- these two boys not being Hispanic; is that

20 right?

21       A.    Right.  The two --

22       Q.    Okay.

23       A.    -- two little boys were Hispanic that --

24       Q.    Okay.  Do you --

25       A.    -- the first time I saw them.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    Q.    -- have any reason to doubt that you gave that

2    testimony at the trial?

3    A.    No.  I guess I did.

4    Q.    Okay.

5    A.    I was scared that day, though.  Remember, I

6    told you about being up in the garage, and I was

7    frightened that day, but I don't -- it would -- I

8    wouldn't have said that if I didn't think it because, I

9    don't --

10   Q.    Sure.  And there's no reason to think that you

11   wouldn't have told the truth at your trial; is that

12   right?

13   A.    Absolutely.  Absolutely.

14   Q.    Okay.  So I'm.

15   A.    As from what I knew, let's say.

16   Q.    Sure.

17   A.    -- as to what I knew.

18   Q.    So I'm going to skip ahead a little bit and

19   just go through some more of your trial testimony.

20   A.    Okay.

21   Q.    You -- as we mentioned, you -- or as you said,

22   you testified at his -- at Jorge Valle-Ramos' criminal

23   trial, and you remember that; is that correct?

24   A.    Yes.

25   Q.    Okay.  And you swore to tell the truth at

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    trial; is that right?

2        A.    Yes.

3        Q.    Okay.  At the trial, did you identify Jorge

4    Valle-Ramos as one of the boys you saw on April 9, 2013?

5        A.    I believe I did.  I'm not positive.

6        Q.    Okay.  Okay.  So let me just direct you to --

7    am I still sharing this exhibit?  Can you still see

8    Plaintiff's Exhibit 1 on the screen, what I'm scrolling

9    through?

10       A.    I'm sorry.

11       Q.    Can you still see the transcript on your

12   screen?

13       A.    Yes.  Thank you.

14       Q.    Okay.  So I'm going to direct our attention to

15   Page 10, and that's Bates 275.  I'm going to go down to

16   Line 20.

17       Q.    And you're asked, "On that date, April 9th,

18   when you were looking at these three fellows, the

19   driver, you said, you got the best look at."

20             And you answer, "I did."

21             And then you're asked, "Was the driver this

22   man?"  Meaning Jorge Valle-Ramos.

23             And you said, "No.  No."

24             And then you're asked, "Are you sure?"

25             And you say, "I'm positive.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1        And then you're asked, "Could the driver have

2   been this man with a large afro?"

3        And you said, "No.  No one had an afro.  No

4   one did."

5   Q.   Ms. Bloom, do you remember testifying to that?

6   A.   I remember the thing about the afro, but as

7   far as far as the first part where I said that he wasn't

8   driving, I don't know.  I thought, maybe -- well, I

9   can't go by maybes.  That doesn't work.

10       I'm thinking there were two days, and I'm

11  thinking that they came, and they left because the first

12  time I saw the kids with him, when I saw them together,

13  they didn't stay long.  He was gone, maybe ten -- 15

14  minutes.  And then he came back, and they drove away,

15  and he did drive.  Maybe, I got confused between that.

16  And this testimony part, I don't know.

17  Q.   Okay.

18  A.   I don't remember saying blonde people

19  because -- but it could have been.  Maybe, it was a --

20  the second day, and somebody came.  I don't know.  I'm

21  sorry.

22  Q.   No need -- really, no need to apologize.  This

23  is not -- it's not a memory test.  We're just -- I'm

24  just trying to see if you do remember these things, and

25  it -- it's okay if you don't.  That's a perfectly

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 acceptable answer.  So please don't feel bad.  I'm

2 just -- I know these questions are tough.  This was a

3 long time ago.  I'm just trying to see what you

4 remember, okay?

5     A.    Uh-huh.

6     Q.    And so when you say you remember this thing

7 about the afro, what do you mean?  That you remember

8 saying nobody had an afro?

9     A.    I remembered it when you read it, but I --

10    Q.    Okay.

11    A.    -- think somebody had bushy hair, but --

12    Q.    Okay.  Is there -- do you have any reason to

13 doubt that you gave this testimony?

14    A.    I'm not doubting it, but I'm thinking it could

15 have been two different days, is what I'm thinking.

16    Q.    Okay.  So one of those days would have --

17    A.    The second day -- the second --

18    Q.    -- would have been the morning of the April

19 9th burglary; is that right?

20    A.    Well, I didn't know about that until I saw it

21 on the news --

22    Q.    Right.

23    A.    -- the burglary and the guy got hurt.

24    Q.    Okay.  Do you --

25    A.    But --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.    -- Ms. Bloom, do you remember talking to the
2    police on April 9, 2013?
3    A.    It wasn't that day.  I -- I -- well, maybe it
4    was.  Yes, it was.
5    Q.    Okay.
6    A.    Yes, it was That's the day that my neighbor in
7    the other complex behind me was standing out there and
8    she had -- I guess she had called, or he had gone to
9    her, and I said, yes, I want to go.  I'm going to go
10   outside, get dressed, run, go over, and talk to him, and
11   tell him what I saw.  So --
12   Q.    Okay.  And --
13   A.    -- that --
14   Q.    -- do you remember if you -- this testimony
15   that you gave about seeing three people, one blonde and
16   then two other boys that were not Hispanic, do you
17   remember if that testimony comes from April 9, 2013, the
18   morning you went out and talked to the police?
19   A.    I only did one -- one court appearance.  So it
20   had to be the day, but I'm thinking that there were two
21   days that they came because the first day, I just saw
22   the dark-haired guy and the two kids, and then they
23   left.  They weren't there long.  They left.
24          Now, the next -- I'm almost positive the next
25   day.  Another car came, and it -- there may have been

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  blonde people in it.  Maybe, that's -- that would be

2  what I think it is.  That's what I think it was.  But

3  now, I can't honestly say, but that's what I think.  I

4  think --

5      Q.   Okay.

6      A.   -- and they asked me if he was driving the

7  first guy with the kids.  Was he driving?  And I said,

8  no.  And that was because those people with blonde or

9  hair that weren't Hispanic were in a car.  So I don't

10 know.  I think that's -- this is what I feel with

11 reading all this.  Now, that doesn't -- maybe this

12 doesn't go well, but I believe this is the truth right

13 here.

14     Q.   Okay, and that's all I'm asking for, is the

15 truth.  And if you don't remember, that's totally okay.

16     A.   When you said two blonde guys, I remembered

17 that.  That, I remembered, because I think it had to be

18 two days, and I think it may even been two different

19 cars.  I don't know.  That part, I don't know.

20     Q.   Okay.  And so I'm just going to continue on

21 Page 11 of the trial transcript when you're asked,

22 "Could this man," meaning Jorge Valle-Ramos, "been the

23 other two passengers?"

24          And you say, "No, no."

25          That -- you're asked, "Either one of them?"

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1          And you say, "no."

2          And then you're asked, "So this man does not

3    look like the person that you saw -- any of these three

4    men that you saw get into that car?"

5          And you say, "No."

6          And you're asked, "Are you pretty sure of

7    that?"

8          You say, "I'm positive."

9          So I -- I'm --

10   A.    That's what I'm --

11   Q.    -- do you recall -- okay.  So do you recall

12   that testimony?

13   A.    Yes, I do.

14         MR. MISTOLER:  Just make sure -- one second,

15    Roz.  Just make sure she gets her full question out

16    before you answer --

17         THE WITNESS:  Okay.  Yes.

18         MR. MISTOLER:  -- to make it easier for the

19    court.

20         THE WITNESS:  Yes.  I'm sorry.

21         MR. MISTOLER:  Okay?

22   BY MS. DILLON:

23   Q.    Sure and the question to you, Ms. Bloom is: Do

24   you remember that testimony that I just read back to

25   you?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Yes.

2      Q.   Okay.  So is it the truth that you did not see

3 Jorge Valle-Ramos jump into a car with two other boys on

4 April 9, 2013?

5      A.   I think it was April 8th that he walked to the

6 car with the kids, and they left.

7      Q.   Okay.

8      A.   And he did drive that day.  He drove out that

9 day, but he was just driving.  It wasn't in a humongous

10 hurry and then the next day, those -- that's what I'm

11 thinking because -- I'd forgotten, but that's really

12 what I'm thinking, that -- those three because they --

13 they were running when they came to the car.  He never

14 ran to come to the car.

15      Q.   Okay.

16      A.   That, I remember.

17      Q.   So when you say they were running to the car,

18 is this a different incident that you're remembering?

19      A.   That's what I think.

20      Q.   Okay.

21      A.   I think it's a -- the next day, the 9th, but

22 the 8th is when I think I saw him with the two kids

23 because it seems very much to be two separate

24 situations.

25      Q.   Okay.  I'm going to direct our attention to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   one more part of your trial testimony.
 2        A.   Okay.
 3        Q.   We're going to go to Page 12 at Line eight.
 4             And you're asked, "Did the police talk to
 5   an -- talk to you anymore about further investigation,
 6   like a photo lineup or anything?"
 7        A.   No.
 8        Q.   And you respond, "Well, they did call me and
 9   ask me if I could, you know -- if I knew" --
10        A.   No.
11        Q.   -- "what they looked like, and I explained,
12   you know, that I did.  But I didn't talk to them until
13   after I got the paperwork, and the picture that I saw
14   wasn't the same person that was there and didn't appear
15   to be this gentleman either."
16        Q.   Do you recall the police contacting you to see
17   if you could identify anyone you had seen running to the
18   car?  And again --
19        A.   12-and-a-half years?
20        Q.   -- if the answer is no, that's okay.  If the
21   answer is I don't remember --
22        A.   (Audio cuts out.)
23        Q.   -- that's okay.
24        A.   They -- I don't think -- I can't remember.  I
25   really can't.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   That's okay.  So carrying on down to Line 16,
2  you're asked, "What picture did you see?"
3           And you respond, "Oh, on the computer, the
4  mugshot."
5           And then you're asked, "So you saw a mugshot?"
6           And you respond, "Yes."
7           And you're asked, "Of Mr. Valle-Ramos?"
8           And you say, "Right."
9      A.   It was.
10      Q.   Do you remember seeing a mugshot of
11  Mr. Valle-Ramos on your computer?
12      A.   I do.  I do.
13      Q.   Okay.
14      A.   Yes.  Because I looked it up because of what I
15  told you about the Sundays when I was doing the
16  gardening, if you remember what I said.
17      Q.   When you say, "Sunday doing gardening," what
18  do you mean?
19      A.   Well, after -- I don't know if it was after --
20  these -- I was out front two times on Sunday, doing my
21  gardening, putting in plants, and a guy came with the
22  bush -- bushy-ish hair and two guys.  And I felt them
23  walk up.  I didn't bring my face up.  I didn't look, but
24  I knew they were there.  And then I glanced, and they
25  were sitting on the air conditioning electrical thing.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1          And he said, you look pretty busy.  And I

2    said, yeah, I'm gardening, and I'm digging deeper and

3    deeper because I was a little afraid because it was

4    three people, and they weren't little kids.  So I

5    slithered kind of, like -- and just kind of went into

6    the house, and they came two times but then they never

7    came back again.  So that would be --

8          Q.   Okay.  Okay.  So you --

9          A.   -- (audio cuts out) -- can't tell you if that

10   was before court or after court?  I don't know.

11         Q.   Okay.  So you say there were three people

12   outside your house when you were gardening.  You're not

13   sure when.  Did you say one of them had bushy hair?

14         A.   Yes, it was a Sunday.  It was -- both days

15   were Sundays.  It was, like, one week and then the next

16   week.

17         Q.   Okay.  And the person with bushy hair, was

18   that a man or a woman?

19         A.   A man.  They were all men.  Yeah.

20         Q.   And do you remember any other physical

21   features of the person with bushy hair?

22         A.   He was tall -- taller than me and thin.

23         Q.   Okay.  And the two other people that were with

24   him, were they male or female?

25         A.   They were male.  They had --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   And do you remember what --

2    A.   Go ahead.

3    Q.   Sorry.  Do you remember what they looked like?

4    A.   They were shorter than him, and they had

5  shorter hair than he had.  But they were guys, and --

6    Q.   Okay.

7    A.   -- not real tall, but not as short as me.

8    Q.   Okay.  So this is when you're gardening

9  outside the front of your house; is that right?

10   A.   Yes.  Yes.

11   Q.   Okay.  So this would not be the day that you

12 were looking from your window --

13   A.   No -- no.

14   Q.   -- on the day that your neighbor was robbed,

15 correct?

16   A.   No, absolutely not.

17   Q.   Okay.  So this was a different incident?

18   A.   Yes.  Yes.  And I didn't --

19   Q.   Okay.

20   A.   -- I didn't make anything of it because I

21 figured the less I said, the better off I'd be,

22 probably.

23   Q.   Okay, and you said there was another instance

24 with those -- was it those same three individuals or

25 different individuals?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    The same.

2    Q.    Okay.  And was that before or after the

3    incident when you were gardening?

4    A.    It was after.

5    Q.    Okay.

6    A.    It was, like, the next week or next few days

7    after.

8    Q.    Okay.  And what happened during that incident?

9    A.    I was doing the same thing.  And I said less,

10   and I just pulled myself towards the door -- and I -- it

11   went real fast and closed the door.  I didn't speak to

12   him that time, because I thought, I'm not doing this.

13   This is scary.  But I went in, and I didn't call

14   anybody.  I probably should have, but I knew they'd be

15   gone before I got anybody there, but --

16   Q.    Okay.

17   A.    -- they didn't say anything to me.  It was

18   just kind of, like, a we're here thing.

19   Q.    Were they in a car, or were they just --

20   A.    They were walking.

21   Q.    -- standing.

22   A.    They were --

23   Q.    Walking?

24   A.    Yeah.  They were walking.  I -- we had a

25   street and my parking places in my -- on my street.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  They had walked up -- up from the main Hidden Creek
2  Road -- or Avenue, and they had walked up, like, on the
3  grass to talk, and I didn't talk to him.  I just said,
4  I'm gardening.  And I put my head down.
5      Q.   Okay.  And so that also was not the day that
6  your neighbor's house was robbed; is that right?
7      A.   No.  No, I don't --
8      Q.   Okay.
9      A.   -- even know that neighbor.  I just knew that
10  he got hurt very, very badly and that he had been
11  robbed, but that's on another street --
12     Q.   Okay.
13     A.   -- in that corner.  I know where it is, but
14  I've never been there.
15     Q.   Okay.  So before we got into these incidences
16  while you were gardening, we were talking about the
17  mugshot that you saw of Mr. Valle-Ramos online.  And so
18  I'm going to direct us back to your testimony down to
19  Page 13, which is P278.
20          And you are asked, "So that picture, that
21  mugshot, did you not think that was the guy you saw on
22  April 9th?"
23          And you say, "No, absolutely not."
24     A.   Okay.  So I was right.  It's two dates.  It
25  is.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1     Q.    Okay.  So do you remember -- does that refresh

2  your memory --

3     A.    Yes.

4     Q.    -- about what happened on April 9, 2013?

5     A.    Yes, it does.  It does.

6     Q.    Okay.  So it --

7     A.    It wasn't him.  It wasn't him that day.  It

8  was somebody else.

9     Q.    Okay.  So is it true that Jorge Valle-Ramos

10 was not one of the three people you saw on April 9,

11 2013?

12    A.    No, it was not because they were the lighter

13 haired guys.

14    Q.    Okay.  And then that's why you did not

15 identify him at trial; is that right?

16    A.    Yes.

17    Q.    Okay.  Continuing on to Line five on the same

18 page, Page 13, you're asked, "When did you offer to do

19 any photo lineup?"

20          And you say, "Well, when he called me, I had

21 explained that I had looked at the picture and that it

22 wasn't anyone that I had seen."

23          And then you're asked, "So you didn't come in

24 and do a photo lineup?"

25          And you respond, "No.  He said, I didn't need

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    to come in for the lineup."

2         Q.   Do you remember giving that testimony?

3         A.   Yes, I do, I think.

4         Q.   Okay.  Do -- and is it true that you told the

5    police that you had seen Jorge Valle-Ramos's mugshot,

6    and that it wasn't anyone you had seen on April 9, 2013?

7         A.   Yes.  I -- I'm sure of that.  I'm sure of

8    that.

9         Q.   Okay.  And is it true that once you said that,

10   the police told you that you did not need to come in for

11   a lineup?

12        A.   Right.

13        Q.   Okay.  Do you remember who called you from the

14   police station?  It's okay if you don't.

15        A.   It might have been the chief, but I doubt it.

16        Q.   Okay.

17        A.   I don't know.

18        Q.   No, not a problem at all.  Okay.  I'm going to

19   set this exhibit aside for a moment.  And I'm going to

20   direct us back to the day of your neighbor's robbery,

21   April 9, 2013.

22             Do you remember that day now three men running

23   to a car or do -- I'll leave it at that.

24        A.   Yes.

25        Q.   Okay.  So do you -- before we got the -- your

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   descriptions of the boys, you were saying that they got

2   into the car.  Do you remember that?

3       A.   The kids did, yeah.

4       Q.   Okay.  What happened next?

5       A.   He -- I -- whoever he was, the dark-haired

6   guy, he would -- went around, I guess, by the pond and

7   over. And he came back and got in the car, and then they

8   left.

9       Q.   Okay.

10      A.   And he was driving that day.

11      Q.   On the day that your neighbor's --

12      A.   First day, that is --

13      Q.   Is that the day your neighbor's house was

14  robbed?

15      A.   No.  No.

16      Q.   Okay.

17      A.   It wasn't the same day.

18      Q.   So on the day your neighbor's house was

19  robbed, do you remember seeing three people in a car?

20      A.   I don't -- I'm not sure.  I'm really --

21      Q.   That's okay.

22      A.   -- not sure.

23      Q.   That's okay.  No problem.  Do you remember the

24  police showing up on April 9, 2013?

25      A.   I'm sorry.  Again?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900        www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1      Q.    Do you remember the police showing up at your

2   condominium complex on --

3      A.    No.

4      Q.    -- on April 9, 2013?

5      A.    Yes, because I could see out my -- if I looked

6   the other way, I could see that there were police cars

7   all over there.

8      Q.    Okay.  So I'd like to ask you a couple

9   questions about your interactions with the police on

10   April 9, 2013.

11      A.    I didn't see them that day.

12      Q.    You -- what -- you did --

13      A.    I did not see the police on the 9th.

14      Q.    What day did you see the police?

15      A.    I saw the police on the 8th, I think, when --

16   no, wait.  I'm sorry.  I'm getting here.

17      Q.    That's okay.

18      A.    Okay.  I saw the police, but not at my house.

19   I saw them at Little Falls --

20      Q.    Okay.

21      A.    -- across the road, is when I saw them.  I

22   didn't -- except for the one police officer that I went

23   to talk to, that was another day.  That wasn't that day.

24   That was -- well, maybe, it was that day, and that's why

25   he was there.  I don't know.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      MS. DILLON:  That's okay.  I'm going to talk

2   about a statement that you provided to the police

3   about the robbery of your neighbor's house.  So I'm

4   going to share what's been marked as Plaintiff's

5   Exhibit 3.

6          (Exhibit 3 was marked for identification.)

7   BY MS. DILLON:

8      Q.   I know that's a little small, so I will zoom

9   in.  Ms. Bloom, can you see that document on your

10  screen?

11     A.   Oh, yeah and it is annoying.

12     Q.   Okay.  And that's okay.  With the dates, you

13  know, it was a long time --

14     A.   (Audio cuts out.)

15     Q.   -- time ago.  For the record, this is a

16  one-page document, Bates number P13085.  Ms. Bloom, do

17  you recognize this document?

18     A.   It's my writing.

19     Q.   Okay.  It's your handwriting.  So let me

20  scroll down to the bottom real fast.  Do you see it in

21  the bottom right-hand corner where it says, "Charlene

22  Bloom," next to signature?

23     A.   Right.

24     Q.   Is that your signature?

25     A.   It is.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay, and you can have a moment.  Would you
2   like a moment to read this?

3    A.   Yeah.

4    Q.   Okay.  Just let me know when you're done.

5    A.   I see talking to each other.  Well, maybe, it
6   must have been the 9th then.  I didn't think it -- I
7   thought it was two days.  Maybe, it was only that day.
8   I'm sorry.  Maybe, I'm wrong.

9    Q.   You don't need --

10    A.   (Audio cuts out.)

11    Q.   -- to apologize at all.  This -- again, not a
12   memory test.  Just trying to see if you have any
13   independent memory of what you -- what happened back in
14   April of 2013, with the understanding that was a long
15   time ago.  A lot of people would have trouble
16   remembering things from that long ago.

17    Q.   So I just have a quick question -- a couple
18   quick questions about this document.  So you said this
19   is your handwriting in the body of the document; is that
20   right?

21    A.   Right.

22    Q.   Okay.  And then it's your signature at the
23   bottom?

24    A.   Yes.

25    Q.   And you would have read this before signing

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1   it; is that right?

2       A.   Yes, I believe I would have.

3       Q.   Okay.  And is it fair to say that the

4   information in the statement you gave to police would've

5   been correct?

6       A.   I'm trying to read this.  Let's see

7       Q.   If it's helpful, I could read it for you.

8       A.   No, I think I've got it.  I've got it.

9       Q.   Okay.

10      A.   I don't know.  That would be on the 9th.  So

11  maybe the first day because the first day, they didn't

12  hurry away.  They really didn't.

13      Q.   And when you say, "first day," are you

14  referring to the incident while you were gardening --

15      A.   No.

16      Q.   -- or a different incident?

17      A.   No.  No.  While I was -- when I looked out the

18  window the first time.

19      Q.   Okay.  So there's April 9th, which is when the

20  robbery happened.

21      A.   Okay.

22      Q.   And then you're saying that there was a

23  different day, you looked out the window and also saw

24  three gentlemen in a car; is that right?

25      A.   Well, the first day, I saw the guy with the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   two smaller kids.  They were kids.  And the second time

2   the next day -- I knew there were two days.  Thank you.

3   That I saw a guy -- the guy -- same guy, I thought, but

4   there was a car there, and then they sped off.  They

5   weren't there long.  They sped off real quick, but I

6   can't tell you who was in that car.  I don't know.

7        Q.   Okay.  Okay.  Is it fair to say that when you

8   gave your statement to the police, you would have told

9   the truth in your statement?

10       A.   Absolutely.

11       Q.   Okay.

12       A.   Absolutely.

13       Q.   Do you remember if anything happened after you

14  gave your statement to the police?

15       A.   That may have been when the gardening things

16  happened, but I'm not sure --

17       Q.   Okay.

18       A.   -- because I didn't -- probably had to be then

19  because I didn't know anything prior to that.

20       Q.   Okay.  Do you mean the same day or a different

21  day after?

22       A.   No, they were on Sundays.  They were on

23  Sundays.

24       Q.   Okay.

25       A.   And I don't remember what day the 9th was, but

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1   it might have been a Friday.  It seems it could have

2   been a Thursday, and a Friday, but I don't know.

3       Q.   That's okay.  I'm going to set this exhibit

4   aside.  And now, I just want to talk a little bit about

5   the deposition that you gave in the underlying criminal

6   case.  We talked about it briefly, and you didn't recall

7   testifying at a deposition in the criminal case; is that

8   right?

9       A.   I don't.  No.

10      Q.   Okay.  Has anything we've talked about today

11  refreshed your memory about testifying at a deposition?

12      A.   I didn't go anywhere, but to the Court.  I

13  didn't have to go to another office or anything.

14      Q.   Okay.

15      A.   And the police did come to the house, and I

16  believe that was what I told them.

17      Q.   Okay.  So you remember going to court to

18  testify.  Did you only go to court one time?

19      A.   Yes.  Yes.

20      Q.   Okay.  Okay.  So did -- I'm going to pull up

21  Plaintiff's Exhibit 2 one more time.

22      A.   Yes.

23      Q.   Okay.  This is Exhibit 2, which I've already

24  shown you, recall that this is a transcript of the

25  deposition that you gave in the underlying case.  And

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    I'm just going to direct our attention to the first

2    page.

3        Q.  Do you see where it says, "Deposition recorded

4    on Thursday, October 10, 2013"?

5        A.  Yes.

6        Q.  Does that help refresh your memory at all to

7    giving a deposition in the underlying case?  It --

8    again, it's okay if not.

9        A.  It really doesn't.

10        Q.  Okay.

11        A.  I don't remember it.

12        Q.  Okay.  I'm going to set that document aside.

13    Well, actually, just a couple quick questions.  Assuming

14    that you gave a deposition in the underlying case on

15    October 10, 2013, you would have told the truth at that

16    deposition; is that right?

17        A.  Yes.  Can you tell me where it was done?  And

18    that --

19        Q.  Sure.

20        A.  -- will refresh --

21        Q.  Yeah.  Let me see.  It might have been at the

22    public defender office.

23        A.  I don't remember going there.

24        Q.  Let me see.

25        A.  Maybe, I did but --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Q.   And it's okay if you don't remember.  I'm just

2  asking if you do remember, and if you don't, that's all

3  right.  I'm also just asking that, you know, if you were

4  sworn to tell the truth at your deposition, that's

5  something you would have done, right?

6    A.   Oh, always.  Always.

7    Q.   Okay.  Okay.  And your deposition in October

8  of 2013 was closer in time to the robbery of your

9  neighbor's house than your deposition today, nearly over

10  ten years later; is that right?

11    A.   That's correct.

12    Q.   Okay.

13    A.   It's --

14    Q.   And would you agree that your --

15    A.   -- 12 -- 12 years, actually.

16    Q.   Yeah.  Would you agree that your memory of the

17  events was better in October 2013 than it is today in

18  February 2025?

19    A.   Yes.

20    Q.   Okay.

21    A.   We would presume.

22    Q.   Okay.  I am -- I'm kind of getting close to

23  being done, but let me -- let us keep moving along.  I

24  want to ask you about any other interactions that you

25  can remember with the Orlando Police in connection with

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  the burglary of your neighbor's home.  We talked about

2  your initial statement; is that right?

3      A.   Uh-huh.

4      Q.   So that's one interaction you had with the

5  police; is that right?

6      A.   I stopped and talked to a -- I mean, a police

7  officer on my own at my neighbor's house.

8      Q.   Okay.  And was that the day of the robbery?

9      A.   I believe it was --

10     Q.   Okay.

11     A.   -- because he walked around, and he walked up

12 to her.  And I thought, I'm going to go tell him what I

13 saw this week.

14     Q.   Okay, and do you remember if you spoke -- do

15 you remember what police officer you spoke to their

16 name?

17     A.   No, he was just somebody that had come up.

18     Q.   Okay.  And did the police officer ask you

19 questions?

20     A.   I don't remember what they were.  If they did,

21 he probably did, or I may have just --

22     Q.   Okay.

23     A.   -- started telling him what I saw the days

24 before.

25     Q.   Okay.  And then did the police officer ask you

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    to give a statement?

2         A.   I don't know.  I'm sorry.

3         Q.   Okay.  That's okay.  It really is okay.

4    Please don't feel bad.

5         Q.   Did you ever speak with an Orlando Police

6    officer by the name of Michael Stanley?

7         A.   No, I don't know of the name.

8              MS. DILLON:  Okay.  Okay.  I think I'm done,

9         but can I ask for just a quick five-minute break to

10        go over my notes, and then we can come back on the

11        record?

12             MR. MISTOLER:  Of course.

13             MS. DILLON:  Okay.  So let's go off record.

14             THE REPORTER:  One moment.

15                (A recess was taken.)

16             THE REPORTER:  We're back on the record.

17   BY MS. DILLON:

18        Q.   All right, Ms. Bloom, I know I promised I was

19   close to being done.  I swear that's still true, but I

20   have just a couple more questions for you, okay?

21        A.   That's fine.

22        Q.   So I'm going to share, again, Plaintiff's

23   Exhibit 2 and this is the transcript of your deposition

24   testimony.  And I want to direct our attention to Page

25   eight, Line 21.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1         And you're asked, "And you looked up
2    Valle-Ramos?"
3         And you answer, "And then I maybe had to go
4    just to Ramos, but I did start with Valle-Ramos."
5         Okay.  And then I'm going to jump down to Page
6    nine, and I'm going to direct your attention to Line six
7    where it says, "You looked at his face?"
8         And you answered, "I did."
9         And then you -- you're asked -- and you said,
10   "That's not the guy."  And you --
11   A.   I remember.
12   Q.   -- answer, "That can't be the guy who gets in
13   the car, but he looks familiar to me."  And you said you
14   remember.
15        Do you remember giving that testimony?
16   A.   Yes, I do.
17   Q.   Okay.  And so it's true that when you looked
18   up Valle-Ramos on the internet, it wasn't the guy that
19   you had seen on April 9, 2013; is that right?
20   A.   I don't think so.
21   Q.   Okay.  But he looked familiar to you, is what
22   you said?
23   A.   He didn't look like that much like him.
24   Q.   Okay.  And then let me direct your attention
25   to the answer that begins at Line 11 on the same page,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   Page nine of Exhibit 2.  And you say, "Now, the reason I

2   say that, and you're going to think this is weird, but

3   two times, I don't know how long.  I don't know if he's

4   still in jail, or if he's been in jail the whole time,

5   or if he got out because in May, one day -- I have this

6   electrical thing outside of my house, like, a box, and

7   one day, I looked out, and there were four people

8   sitting on the box."

9        Q.   Is this the incident that you were describing

10  earlier --

11       A.   Yes.

12       Q.   -- while you were gardening?

13       A.   Exactly, yes.

14       Q.   Okay.  And were you saying that the guy -- one

15  of the people you had seen that day resembled

16  Mr. Valle-Ramos?

17       A.   I thought he was.

18       Q.   Okay.

19       A.   Yeah.

20            MS. DILLON:  I'm going to stop sharing on this

21       exhibit, and I'm going to share one final exhibit.

22       This is an exhibit that's been marked as Plaintiff's

23       Exhibit 4, and for the record, this is Bates P454.

24            (Exhibit 4 was marked for identification.)

25  BY MS. DILLON:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEReporting.com          Toll Free 855-MYDEPOS

1      Q.   Ms. Bloom, do you see those photographs on

2  your screen?

3      A.   I do.

4      Q.   Okay.  I'm -- I'll represent to you that the

5  gentleman on the right is Mr. Valle-Ramos.  The

6  gentleman on the left is a man by the name of Amos

7  Ortiz.

8      Q.   Do either of these men resemble the person

9  that you think you saw outside of your home while you

10  were gardening?

11     A.   Yes.

12     Q.   Okay.  As you sit here today, could you say

13  for sure if it was either one of these men?

14     A.   I think it was the one in the blue shirt.

15     Q.   Okay.  Where you lived in April 2013, was the

16  type of hairstyle you see in this photo common?

17     A.   Yes.

18     Q.   Okay.  And was it a common hairstyle on folks

19  of this complexion?

20     A.   Yes.

21        MS. DILLON:  Okay.  Thanks so much, Ms. Bloom.

22     I have no further questions for you.  I think the

23     City of Orlando and Defendant Officers still may

24     have some questions for you, but I'm all done.

25     Thank you so much for your time.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1              THE WITNESS:  Oh, no.

2                    CROSS-EXAMINATION

3    BY MR. MISTOLER:

4         Q.    I will try to be brief, but I do have some

5    questions --

6         A.    Okay.

7         Q.    -- for you, ma'am.  First off, before your

8    deposition here today, did you talk with anyone?

9         A.    Just her.

10        Q.    Just Roz?

11        A.    Uh-huh.

12        Q.    What did you all talk about?

13        A.    What it would be like when I got here, how I

14   would get here, how she would get me a ride and what I

15   would wear, that I could wear whatever I wanted.  And

16   that's about it.

17        Q.    Did she go over any of the facts or the

18   background of the case with you at all?

19        A.    No.  No.

20        Q.    Did she offer any strategies for how to

21   respond here today?

22        A.    No.

23        Q.    No?  The neighbor, Mr. Gonzalez, is that

24   correct, the individual who was the victim?

25        A.    I didn't really know him --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Yeah.

2    A.   -- to tell you the truth.  I just knew my -- I

3  have friends that live at the end of the walk, the

4  driveway, but the -- there's a walkway that goes back

5  into another building.  That's where it was.  I've never

6  been there.

7    Q.   And when you're looking out your window, and

8  it looks out the back of the -- your property, your

9  area; is that correct?

10    A.   Yes.  And it's facing the opposite complex.

11  It's -- I can't think -- what's its name.  I can't think

12  of the name of it.

13    Q.   But that is -- that opposite complex is not

14  the place.

15    A.   No.

16    Q.   That's not the location --

17    A.   No, no, no.  And that place that you're

18  talking about is actually -- if I was to get out of my

19  house, I'd walk back this way.  And then I'd have to

20  turn.  And that's where I get my mail.

21    Q.   Okay.

22    A.   But it was at the back, the very back of that

23  area.  So I've never been back there.

24    Q.   Okay.  So really, from the view from your

25  window, you can't see the location of where this

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1   burglary was located?

2      A.   No.  Oh, no.  Not at all.  All I could see was

3   the cars because when -- that's when I went to talk to

4   that guy because I said, why is -- you know?  So I

5   believe that -- I didn't see -- I didn't even -- I could

6   see the police cars, but that was it.

7      Q.   Is there a fence out back there that kind of

8   obstructs the view of the car at all?

9      A.   Well, yes.  Let's see.  Let me think.  No.  We

10  have a dog walk behind my house, and it is open to the

11  road, and it does open -- Little Falls is the name of

12  the street, is right across the road.  You know, you

13  walk across around Little Falls, but it was way down to

14  the end to the back.  So you -- I could never see that.

15     Q.   Okay.

16     A.   No.  And this kid that I saw with these two

17  boys, he didn't -- he came around this way, which he

18  would've could have walked in front of my house to go

19  there, maybe as a look, see, I don't know.  But he

20  couldn't -- you know, he couldn't -- he shouldn't have

21  been able to drive.  He drove out of the complex that he

22  was in --

23     Q.   Okay.

24     A.   -- besides mine.

25     Q.   Did you ever talk to Mr. Gonzalez, the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    neighbor victim?

2         A.    No.

3         Q.    No?  Have you had a chance to read any of his

4    testimony that you gave in this --

5         A.    No.

6         Q.    -- incident?  In his testimony, and I'll

7    represent to you, he tells us that when he comes home,

8    he encounters these individuals in his home, and one of

9    the individuals he comes in -- he encounters face to

10   face, and he gets a really good look at him.  And he

11   says that --

12             MS. DILLON:  Objection.  Misstates testimony.

13             Go ahead.

14   BY MR. MISTOLER:

15        Q.    You can still answer.  He says he looks at

16   this individual, and I'm getting to the question.  And

17   that person had a jersey on, like, a basketball or a

18   sports- type jersey.  And my question for you is: These

19   three individuals that you see getting into the car,

20   they didn't have any jerseys on, correct?

21        A.    No.  And I don't think it was the 9th.  I

22   think it was the 8th that I saw them.  I really do.

23        Q.    Okay.  You didn't see anyone with a jersey --

24   wearing a jersey?

25        A.    No.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  Q. You didn't see anyone -- plaintiff just showed

2 you in their Exhibit 4 matching the description of

3 either of those individuals --

4  A. No.

5  Q. -- on the day of the burglary --

6  A. No.

7  Q. -- right?  Would you defer to Mr. Gonzalez if

8 he -- as he walks in, and he gets a clear view of one of

9 these individuals, would you defer to him if he says he

10 saw this other individual with a jersey on?

11  A. Would I defer?

12   MS. DILLON:  Objection.  Form.

13   Go ahead.

14 BY MR. MISTOLER:

15  Q. (Audio cuts out.)

16  A. I don't know what -- how you mean?

17  Q. That's okay.  What -- let me ask it a

18 different way.

19  Q. Do you think you -- those three individuals

20 getting into the car, do you think they were involved in

21 the burglary to begin with?

22   MS. DILLON:  Objection.  Foundation.

23   Go ahead.

24 BY MR. MISTOLER:

25  Q. You can answer.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900 www.MILESTONEREPORTING.com Toll Free 855-MYDEPOS

1      A.   Okay.  I didn't -- let's see.  I'm trying to

2   think.  I didn't see -- the first day that I saw them,

3   the guy had dark hair.  But then I didn't see -- they --

4   he -- that person was not the same person that came back

5   the second day, I don't believe.  I think those people

6   were whoever they were, and they were probably in on it,

7   but I don't know.

8      Q.   Do you think those three individuals -- now

9   having heard that the victim saw a man in a jersey, do

10  you think those three individuals were the only

11  individuals involved, if at all, in the burglary?

12           MS. DILLON:  Objection.  Form.

13           You can answer.

14           THE WITNESS:  On the -- let's see.  The day

15       that I was speaking about the first day, I -- the

16       second day, I didn't -- don't think I saw the guy

17       with the dark hair, because I said they had blonder

18       hair, and I would never have said that about him

19       because he's very dark- haired.  So I'm not -- I'm

20       not sure.

21  BY MR. MISTOLER:

22      Q.   Could there have been other individuals that

23  you didn't see?

24      A.   Definitely -- definitely because they said

25  there were about eight of them -- six or eight, and they

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    would've been over by the lake of the other side.

2         Q.    Six or eight individuals in total?

3         A.    They said that there were -- I thought on -- I

4    thought it was on the news that there were several -- or

5    several, they probably said several, individuals that

6    were -- came down, and they heard him and took his

7    stuff, but I don't know.

8         Q.    So it does sound like there were more than the

9    three individuals --

10        A.    Yes.

11        Q.    -- you saw get into the car?

12        A.    Yes.  It's -- I think it was more.  I think I

13   had heard was six, but I don't know.  And I didn't know

14   much about that, other than what I heard and what I saw

15   on TV.

16        Q.    This was pretty early in the morning, right?

17        A.    Uh-huh.

18        Q.    But when you saw this out of the back window

19   and, you -- I mean, we looked at your statement earlier.

20   It was the Plaintiff's Exhibit number 3.  This has a

21   timestamp, and I'll show you this, ma'am.  This one has

22   a timestamp at the top of 8:00, 8:20.  Do you see that?

23        A.    Uh-huh.

24        Q.    What were you doing up so early in the morning

25   at that time?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.   I had just retired for my 38 years with
Disney, and the last ten years, I worked midnights.  So
I was awake.  I would wake up if I heard something

Q.   **You were physically awake?**

A.   Yes.

Q.   **But maybe a little bit a --**

A.   Yeah.

Q.   **-- a mentally sleepy?**

A.   Could have been, yeah.

Q.   **Could have been?  I'm going to show you here.
This is Plaintiff's second exhibit, and this is on Bates
stamp 1391.  It's Page six of 19, starting at Line
eight.  Do you see what you say here, ma'am?  This is --**

A.   Yes.

Q.   **-- well -- and go ahead and read this part
here --**

A.   Okay.

Q.   **-- eight and nine.**

A.   I didn't give a very good statement because I
was sleepy, and I laughed.  Afterwards, I thought well,
I should have told him blonde-brown, you know, like me.

Q.   **So maybe the statement you gave was not the
best.  And you say that in your own words, right?**

A.   Yes.

Q.   **There's also now in here where we're**

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    indicating that it could have been more brown.  It's

2    hard to -- it was hard to remember, even in that

3    moment -- a few minutes later, correct?

4         A.    Uh-huh.

5              MS. DILLON:  Objection.  Misstates.

6              Go ahead.

7    BY MR. MISTOLER:

8         Q.    And, you know, simply being sleepy had an

9    effect on you and what you could remember, you know,

10   just a few minutes later; is that correct?

11        A.    Right.  Well, see, this was the first day, the

12   day the kids were in the car because I heard a noise,

13   and I looked out.  And, like I said, we had, like, a

14   fence.  And the other side of the fence is where the car

15   was.  And that's a small drive -- road drive, like thing

16   to go to a bigger one to go out of.  It's almost on my

17   brain.  It sounds like -- oh, shoot.  Just looked at the

18   name of it.  Oh, Liberty Square is the name of the

19   place. what -- was at the very back to my gate, my

20   fence.

21        Q.    Okay.

22        A.    And they were on the other side of the fence.

23   This was the gentleman with the two kids, and when the

24   others came, that -- that -- I guess the next day, they

25   must have come from around, but I didn't -- I don't

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  know.  It's not very good.  I'm sorry.

2      Q.   None of those individuals that you're talking

3  about on either day had a -- any sort of jersey, though,

4  on?

5      A.   No.  No jerseys, no.  The second day that the

6  guy wasn't dressed up, but the guys I saw weren't

7  dressed up.

8      Q.   And I think we heard testimony but you were

9  never shown a lineup, like you see in the movies --

10     A.   No.  Never did.

11     Q.   -- or even a photograph of a bunch of

12 pictures?

13     A.   No.

14     Q.   You never saw anything?

15     A.   No.

16     Q.   And that's maybe you saw -- you were watching

17 TV, the news --

18     A.   Yes.

19     Q.   -- and you saw a mugshot related to this

20 situation?

21     A.   Yes, that's possible.

22     Q.   And you decided to call over to the police

23 station and say, well, I didn't see that guy get in the

24 car; is that correct?

25     A.   Yeah.  Well, they asked me at the -- in court,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  did you see him get into the car?  And it would've been

2  the night, and I said, no.  So I don't --

3      Q.    Because you only saw three individuals get

4  into the car, correct?

5      A.    On -- on -- I think it could have been before

6  the other ones came.  I don't know.  I really don't.

7      Q.    But there may have been other individuals out

8  there that --

9      A.    Yeah, I didn't see anybody else.  I didn't see

10 anybody that was in the guy's house, except for whoever

11 came to my garden, and I --

12     Q.    Did the police officers or the police

13 department, did they ever reach out to you at all other

14 than this -- in this --

15     A.    Not much after that.  No.  No, because I found

16 out about it on TV, because I didn't know he'd been

17 hurt, and I didn't know he had a lot of stuff in his

18 house.

19     Q.    They weren't pestering you, though?

20     A.    No.  Oh, no.  No.

21     Q.    They weren't trying to get you to say --

22     A.    No

23     Q.    -- anything?

24     A.    No.

25     Q.    No?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.    Not that I remember because I -- I'm not going

2  to be one to say something new.  Now, here, I'm confused

3  that I am, but I'm not going to say something that's not

4  true.

5    Q.    **Did you ever learn what was stolen from the**

6  **victim?**

7    A.    I didn't hear what it was, but I know it was a

8  lot of money -- worth a lot of money.  I don't know if

9  it was jewelry or if it was stuff.  I don't know.  But

10  they said it was a lot of money.  That was the talk of

11  the neighborhood.

12    Q.    **At one point, there was testimony that one of**

13  **the items was found in the grass.**

14    A.    Oh.

15    Q.    **Did you know about that?**

16    A.    No.

17    Q.    **At one point, your -- you said that the**

18  **individual looked familiar.  One of these individuals**

19  **looked familiar because he was out maybe in front of**

20  **your house on the electrical box.  Do you recall that?**

21    A.    Yeah.

22    Q.    **I'm going to show you again.  This is**

23  **Plaintiff's second exhibit, starting at Line five.**

24         MS. DILLON:  Sorry.  What page?

25  BY MR. MISTOLER:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1     Q.  Yes.  Thank you.  It's Page 10.  Let me see if

2 that's where I want to start.  I'm sorry.  I'm going to

3 back it up.  I'm going to say Page nine.  Just take a

4 moment to look at this where you're talking about

5 looking up the mugshot.

6     A.  And I looked it up under the name.

7     Q.  And at one point on Line nine, you say, "kind

8 of looks familiar."  Do you see that?

9     A.  Uh-huh.

10     Q.  You give an account here where four people are

11 sitting on the electrical box, and you kind of overhear

12 them talking, and you're -- and they're talking about

13 it's over here somewhere.  Do you see that on -- at

14 the -- on Line 24, Page --

15     A.  I forgot that.  I -- yeah.  I did forget that.

16 I did hear that.

17     Q.  And then on the next Page on Line 10 -- excuse

18 me.  Excuse me.  I messed that up.  Page 10, Line five,

19 they begin -- you hear them say, oh, yeah, it's over

20 here.  And when you ask them, what's over there, they

21 indicate, I put trash or something over here.

22     A.  Oh, yeah.

23     Q.  And you thought that was odd?

24     A.  I remember that.

25     Q.  Do you think that maybe these individuals were

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    looking for something they dropped?

2        A.    Possible.

3            MS. DILLON:  Objection.  Calls for speculation.

4            You can answer.

5            THE WITNESS:  Possible.

6    BY MR. MISTOLER:

7        Q.    And you said one of those individuals had an

8    afro; is that correct?

9        A.    Uh-huh.  A fuller hair, anyway.

10       Q.    Fuller hair?

11       A.    That -- it was a real afro.

12       Q.    Did you get a very clear look at those

13   individuals?

14       A.    Yes, because I was scared.

15       Q.    Yeah.

16       A.    Yeah, because I kind of looked at him, you

17   know?  And then I looked at the other two.  They were

18   shorter.

19            MR. MISTOLER:  Roz, would you pull up your

20       Plaintiff 4?

21            MS. DILLON:  Of course.

22            MR. MISTOLER:  Okay.  (Audio cuts out) --

23       around here so I can see what it says.

24            THE WITNESS:  Okay.

25   BY MR. MISTOLER:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1      Q.   When you look at these two images as they

2   load, are you -- can you be certain that it's either one

3   of those individuals you saw out in front of kind of

4   looking in the grass?

5      A.   It was one of them, but I'm not sure which.

6      Q.   They looked pretty similar?

7      A.   They do.

8      Q.   So really, you're not able to say one way or

9   the other --

10      A.   No.

11      Q.   -- it was either of those guys?

12      A.   I'm really not.  I think it might have been

13   the one in the blue shirt, but I'm not sure.

14      Q.   I think that photo also has just a -- you come

15   around.  That one's also just easier to see in that

16   image; is that right?

17      A.   Yeah.  That's true.

18      Q.   The one on the right is a little bit harder to

19   see, a little bit grainier.

20      A.   Yeah.

21      Q.   And do we have any idea, or do you, as you sit

22   here, have any idea when either of those photos were

23   taken?

24      A.   No.  No.

25      Q.   So it could be one of the individuals, but

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1   it's a later photo, and his hair's bigger or --

2       A.   Could be.

3       Q.   Okay.  So we're not really sure when those

4   were taken?

5       A.   No, but it's not two miles to my house from

6   a -- oh, at (audio cuts out) -- never mind.

7            MS. DILLON:  Stephen, do you still need the

8        exhibit, or should I take it down?

9            MR. MISTOLER:  You can take it down.  Thank

10       you.

11           MS. DILLON:  Yep.

12           MR. MISTOLER:  I'm just looking over my notes

13       also.  Just bear with me here.

14           THE WITNESS:  Sure.

15           MS. DILLON:  No problem.

16  BY MR. MISTOLER:

17      Q.   I think you began today by saying that you

18  heard a noise out back on that one day, and that's kind

19  of what clued you to go look.

20      A.   Yeah.

21      Q.   And really, if you're hearing noises, there's

22  things that are happening out there that you're -- you

23  can't see.  Is that -- would you agree with that?

24      A.   Well, when I look out my backyard -- into my

25  backyard from my window, and I look this way, I can see

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  my actual dog walk that goes all the way down to the
2  pond, and there was always a fence at the dog walk. They
3  were parked on the opposite side, but not all the way to
4  the end, but close to the dog.  The dog thing is right
5  behind my house.  So it was kind of close to my house,
6  but it was across the fence, but I could see down to see
7  that.
8      Q.   It sounds like you follow the news.  You watch
9  the evening news, and you kind of followed along with
10 this on --
11     A.   I do know -- this was before.
12     Q.   Before?
13     A.   This was before that happened.  This was the
14 first day.  Yeah.
15     Q.   Those men who got into the car, did you ever
16 see their faces on the news in mugshots or anything?
17     A.   No, I didn't look anything up.  I wouldn't --
18 didn't want to look up anybody else's.  I'm scared.
19     Q.   Is it possible that they weren't just going to
20 school?  Like you say, they were dressed like Catholic
21 school kids.
22     A.   Those two kids were, yeah.
23     Q.   Yeah.
24     A.   That was the first day.  That wasn't the 9th.
25     Q.   But -- so was there a car on the 9th or not?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    There was a car, I believe, on the 9th.

2      **Q.    And who was --**

3      A.    I'm not sure.

4      **Q.    You can't recall?**

5      A.    I'm not sure if he was driving because they

6  asked me who was driving, and I said, did he drive?

7  And -- and somebody said, yeah.  I said, yeah, he was

8  driving because he drove both times that I saw him.  I

9  didn't see him drive in either time, but I saw him drive

10  out, because what he would've had to do is come down the

11  driveway, which is a road and make a U-turn and then get

12  on the grass beside the wall, the -- where -- fence.

13  That's what bothered me because nobody ever does that,

14  you know?

15      **Q.    But none of them wore jerseys?**

16      A.    No.  No.

17      **Q.    Did any of them have backpacks on, that you**

18  **can recall?**

19      A.    I don't think so.  There may have been in the

20  car for the kids.  I don't know.

21      **Q.    None that you saw, though?**

22      A.    No.  No.  Not that I remember.

23          MR. MISTOLER:  Ma'am.  I think those are all

24      the questions I have for you.  Roz may have some

25      follow- ups.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    THE WITNESS:  Okay.

2              REDIRECT EXAMINATION

3  BY MS. DILLON:

4    **Q.   Just a couple really quick follow-ups.  Ms.**

5  **Bloom, is your garden in the front of your house?**

6    A.   Is what?

7    **Q.   Is your garden in the front of your house?**

8    A.   When I was able to -- we used to be able to do

9  it in the front, yes.  That was the front.  Now, we

10 can't touch it but --

11   **Q.   Okay.  And does your bedroom window face the**

12 **front or the back of your house?**

13   A.   The very back.

14   **Q.   Okay.**

15   A.   And it's upstairs, and it faces the complex

16 behind me and the -- what we call the dog walk.

17   **Q.   Okay.**

18   A.   And then there's a fence, and on that side,

19 it's very close to the road.

20        MS. DILLON:  Okay.  I have no further questions

21     for you.  I'm not sure if Counsel has any follow-up

22     based on that.

23        THE WITNESS:  Okay.

24        MR. MISTOLER:  Nope.  I don't have any further

25     questions for you, ma'am.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

 1          THE WITNESS:  Thank you.

 2          MR. MISTOLER:  Thank you.

 3          THE WITNESS:  And I'm sorry if I got messed up.

 4          MR. MISTOLER:  No, you don't --

 5          MS. DILLON:  Please don't apologize.  Thank you

 6    so much for your time.

 7          THE WITNESS:  And you're welcome.

 8          THE REPORTER:  Ms. Bloom, would you like to

 9    read or waive today?

10          THE WITNESS:  Huh?

11          THE REPORTER:  Would you like to read or waive?

12          MR. MISTOLER:  So it is your right to read the

13    transcript that the court reporter has put down,

14    that not a slight on her.  It's -- you know, some

15    people choose to read the transcript and see if it

16    was accurately taken down.  Many people also waive

17    that.

18          THE WITNESS:  I think you were accurate.

19          MR. MISTOLER:  Okay.

20          THE REPORTER:  Okay.  So waive.  Ms. Dillon,

21    would you like to order the transcript at this time?

22          MS. DILLON:  Not at this time.  I'll follow up

23    after.

24          THE REPORTER:  Okay.  And Mr. Mistoler, would

25    you like to?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    MR. MISTOLER:  No.  Thank you.

2    THE REPORTER:  Okay.  I'll get us off record.

3       (Deposition concluded at 2:48 p.m. ET)

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
1              CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF ORANGE

5

6         I, the undersigned, certify that the witness in the

7    foregoing transcript personally appeared before me and

8    was duly sworn.

9

10   Identification:  Produced Identification

11

12

13

14                    _Sara Fodor_ (signature)

15                    _____

16                    SARA FODOR

17                    Court Reporter, Notary Public

18                    State of Florida

19                    Commission Expires: 07/31/2028

20                    Commission Number: HH 577206

21

22

23

24

25
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

C E R T I F I C A T E

STATE OF FLORIDA)

COUNTY OF ORANGE)

    I, SARA FODOR, Court Reporter and Notary Public for the State of Florida at Large, do hereby certify that I was authorized to and did report the foregoing proceeding, and that said transcript is a true record of the said proceeding.

    I FURTHER CERTIFY that I am not of counsel for, related to, or employed by any of the parties or attorneys involved herein, nor am I financially interested in said action.

Submitted on: November 20, 2025.



_____

SARA FODOR

Court Reporter, Notary Public

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1        **MS. CITRARO:**  Thank you, Judge.  Call Charlene

2        Bloom.

3    Thereupon,

4                        **CHARLENE BLOOM**

5    was called as a witness and, having first been duly sworn,

6    testified as follows:

7        **THE COURT:**  All right.  Ma'am, can you tell me your

8        full name, and spell your first and last name for me.

9        **THE WITNESS:**  Charlene Lizbeth Bloom.  B-L-O-O-M.

10       **THE COURT:**  All right.

11       Defense, you may inquire of the witness.

12       **MS. CITRARO:**  Thank you.

13       **THE WITNESS:**  I'm sorry?

14       **THE COURT:**  I just said that she can ask you

15       questions now.

16                     **DIRECT EXAMINATION**

17   **BY MS. CITRARO:**

18       **Q**    Good morning.

19       **A**    Good morning.

20       **Q**    Ms. Bloom, pardon my intimate question, but can you

21   tell the Court where you live, your address?

22       **A**    1708 Silver Creek Court, Orlando.

23       **Q**    Silver Creek Court, is that in the same subdivision

24   as Little Fall Circle?

25       **A**    Yes.  It's Hidden Creek Condominiums.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1      Q      Do you know Mr. Gonzalez, George Gonzalez?

2      A      I didn't until recently.

3      Q      Okay.

4      A      I had never really talked to him before.

5      Q      Are you familiar with where he lives?

6      A      I'm sorry?

7      Q      Are you familiar with where he lives?

8      A      Yes, now.

9      Q      Is it in the same subdivision?

10     A      Yes.

11     Q      Okay.  I'm gonna draw your attention to the events

12  of April 9th of last year, 2013.

13     A      Yes, ma'am.

14     Q      Did you see anything out of the ordinary that

15  morning around nine in the morning or so?

16     A      Yes, ma'am.  It was about 8:15.

17     Q      8:15?

18     A      Yeah.

19     Q      Can you tell the Court what you saw first?

20     A      Well, um, the dogs were barking in the complex

21  behind me because there's a fence between two complexes, and

22  the one dog never barks, so I got up and looked out.

23     Q      Where are you looking from exactly?

24     A      From my upstairs bedroom window.

25     Q      So you are on the second floor?

1    **A**    Yes.  Well, it's two stories.  So I was on the

2  second floor.

3    **Q**    And you're looking out the window?

4    **A**    That's correct.

5    **Q**    Okay.  What did you see?

6    **A**    Well, I saw that the gate behind the house, the

7  next subdivision, was open and it never is.  So I wondered.

8  So I stood for a few minutes and the neighbor next door came

9  out, and he had heard the dog barking and went over there too

10  and looked.  He went over and looked, and it looked like

11  someone had tried to get in.  He closed the gate, came back

12  out, spoke to another neighbor who came out at that time and

13  I think it was about the same thing --

14    **Q**    Were you still in your bedroom looking out on all

15  of this?

16    **A**    Yes.  I'm still in the bedroom the whole time.

17    **Q**    Okay.  What did you see next?

18    **A**    So they were talking, and I just figured I'd see

19  what was going on.  So I stood there, and pretty soon it

20  looked like she got the phone.  So I figured she called the

21  police.  I didn't know.

22    **Q**    Do you know the woman?

23    **A**    A little while later the police came, but they came

24  into our side, our complex.  Because I can see from my window

25  directions -- both directions towards the lake and then

1    towards the street, which is the main street of the complex.

2        **Q**    So the police responded to your subdivision?

3        **A**    I saw the police over there, yeah.  Uh-huh.

4        **Q**    Did you notice any individuals or any suspicious

5    activity before the police arrived?

6        **A**    Um, right before they got there, um, I saw out of

7    the corner of my eye.  I could see that there was -- because

8    I was looking both directions -- that there were three guys

9    coming and I wouldn't have noticed them except that they took

10   off running to the vehicle, which I didn't realize there was

11   a vehicle.

12       **Q**    Where was the vehicle?

13       **A**    Behind my fence, like, directly behind my fence

14   where I couldn't really see it.  But they ran from the lake

15   area, like, they climbed the fence and ran towards the

16   vehicle.  If they hadn't run, I probably won't have noticed

17   it.

18       **Q**    And can you describe the female that you saw

19   running?

20       **A**    Yes.  There were three young men, probably early

21   twenties.  They all three had on long-sleeve dress shirts.

22   They looked like they were going to work or somewhere.  Um,

23   they ran.  There was a driver that had blond hair and was

24   kind of short, and there was two other guys.  One was -- they

25   got in the back passenger door.  The one on the right-hand

1    side was a short guy, kind of stocky.  The guy that was

2    closest to me was taller and thin, but not Hispanic or black,

3    either one.

4        Q    And could you describe more specifically the

5    driver?  Did you get a look at him?

6        A    I did.  I was looking -- I was looking out the

7    blinds and the driver was looking -- he looked -- turned

8    around to look at the guy, the man and the woman who had

9    their back to them so they didn't see them.  That's why I

10   went downstairs, because they didn't see the people that got

11   in the car.

12        So, um, he was standing at the car door and he was

13   kind of looking, and he looked up and he stood there for a

14   minute and just gazed at me.  I don't think he could see me,

15   but he could see me looking out, and he was blond.  He looked

16   like he was probably short, maybe 5'3", 5'4".  Maybe 5'5".

17   And he was dressed nicely.  Like I say, they looked like they

18   were going to work or to school or something.

19        Q    Okay.  On that day, April 9th when you were looking

20   at these guys, could you see pretty well?

21        A    I didn't have my glasses on, which I thought of

22   later, but I could see the people.  Of course, they

23   took -- they ran to the car and then they sped away.  And

24   without my glasses, there was no way I could look at a

25   license tag or anything.  But they were so fast that if they

1  hadn't done that too, that would have been another thing that

2  I wouldn't have noticed.

3      **Q**    So without your glasses, you couldn't read a tag?

4      **A**    I -- the other day I could kind of read a tag.  But

5  that morning I was tired.  I hadn't been to bed yet because I

6  was working midnight shifts prior to that, and it was kind of

7  still hard to go to sleep.  So I was tired.  So I couldn't

8  see the tag.  But they went so fast.  They were in a gray,

9  like a -- not a silver, but a gray sedan of some sort.  I

10  figured it was probably like a Hyundai or a Nissan, something

11  like that.  Kind of a 2000 -- earlier 2000 model.

12      **Q**    I'm guessing that your glasses are for distance?

13      **A**    They are for everything.

14      **Q**    Okay.

15      **A**    Yeah.

16      **Q**    Would you say your vision is pretty well without

17  the glasses?

18      **A**    Yes.  I can see people and animals.  So, you

19  know...

20      **Q**    So do you feel like you got a pretty clear look at

21  the driver's face?

22      **A**    I did.  I did.

23      **Q**    So you don't feel like your glasses, it was fuzzy

24  and you were not sure what you were seeing?

25      **A**    Not at all.  Not at all.  And the two people that

1   got in the back, I saw them, basically, from the side, but

2   when they got into the doors, I did see their faces.

3          **MS. CITRARO:**  May I approach the witness?

4          **THE COURT:**  You may.

5   **BY MS. CITRARO:**

6      **Q**    I'm showing you what's marked for identification

7   purposes only as Defense D.  Do you recognize this scene,

8   this view what you're looking at?

9      **A**    Yes, I do.

10     **Q**    Can you tell the Court what exactly is that a

11  picture of?

12     **A**    That's the entrance to my house to the left -- to

13  the right is the lake, because I think that that would have

14  been the way that the people that were at George's house

15  would have approached the lake because see, you can go to the

16  lake and climb the fence.  And that's what people do all the

17  time, because we are a gated community.

18     **Q**    And that would have been the direction that they

19  would have been coming from to get to the car?

20     **A**    Yes, that would be correct.  That would be correct.

21         **MS. CITRARO:**  May I approach the witness again?

22         **THE COURT:**  You may.

23  **BY MS. CITRARO:**

24     **Q**    Showing you what's marked for identification as

25  Defense F Composite 1 and 2.  There's two photographs here.

1    Take a look at both of them.

2        **A**    Okay.  Okay those are --

3        **Q**    Do you recognize them?

4        **A**    Yes, I do.

5        **Q**    What are you looking at?

6        **A**    Those are where the fence meets the lake on our

7    side of the property.  It has an extension, like a link

8    fence, and it's easy to go around it or climb it.  And the

9    same -- this is just a larger picture of the same view.

10       **Q**    Okay.  So would that be the fence that it would

11   make sense they were coming from?

12       **A**    Yes.  They would come from my side and go around it

13   or over it.  One of the two.

14           **MS. CITRARO:**  May I approach one more time?

15           **THE COURT:**  Yes, ma'am.

16   **BY MS. CITRARO:**

17       **Q**    This is Defense E for identification purposes.

18   There is two more pictures here.

19       **A**    Okay.

20       **Q**    Can you take a look at those?

21       **A**    Yes.  This is the back of my house and my complex.

22   It's the dog walk for the complex.  And there's a fence.  And

23   then it shows the next-door condo, which is Liberty Square, I

24   believe, condos on Lafayette Square Avenue or Lane.

25       **Q**    And the second picture?

1      **A**     Yes.  In the second picture is, um, where the

2  people were standing.  The car was below -- right below the

3  fence, right across from where the neighbors were standing,

4  but they were facing the other direction.

5      **Q**     Okay.  So the view that that picture is showing,

6  would that be your view from the bedroom window?

7      **A**     From my bedroom window, that's correct.

8      **Q**     So that would be exactly what you were seeing?

9      **A**     Exactly.  Exactly.

10     **Q**     And the vehicle would have been there where that

11 empty space is?

12     **A**     Yes.  It would have been right along the fence.

13 And as I say, I wouldn't have noticed it if they hadn't gone

14 to the car.  I didn't realize it was there until I saw them

15 running.  And then when they took off they sped away.

16     **Q**     Okay.  Judging by looking at that picture, does it

17 appear like it's been magnified, like it's closer than it is

18 or does that look about to be the right distance?

19         **THE WITNESS:**  That looks about the right distance.

20         **MS. CITRARO:**  May I approach?

21         **THE COURT:**  You may.

22         **MS. CITRARO:**  I'll move all three exhibits and

23     composites into evidence at this time.

24         **THE COURT:**  Any objection from the State?

25         **MS. SCOTT:**  No.

1        **MS. CITRARO:**  May I publish?

2        **THE COURT:**  All right.  What's been marked as

3    Defense Exhibit D for identification will be moved into

4    evidence as Defense Exhibit 2 without objection from the

5    State.

6            What's been marked as State's Exhibit E or Defense

7    Exhibit E for identification will be moved into evidence

8    as Defense Exhibit Number 3 without objection from the

9    State.

10           What's been marked as Defense Exhibit F for

11   identification will be moved into evidence as Defense

12   Exhibit Number 4 without objection from the State.

13           (Defendant's Exhibits 2-4 received in evidence.)

14       **MS. CITRARO:**  May I publish to the jury as soon as

15   it's marked?

16       **THE COURT:**  You may.

17   **BY MS. CITRARO:**

18       **Q**    Ms. Bloom?

19       **A**    Yes.

20       **Q**    On that date, April 9th, when you were looking at

21   these three fellows, the driver you said you got the best

22   look at?

23       **A**    Um, I did.

24       **Q**    Was the driver this man?

25       **A**    No.  No.

1     **Q**     Are you sure?

2     **A**     I'm positive.

3     **Q**     Could the driver have been this man with the large

4   Afro?

5     **A**     No.  No.  No one had an afro.  No one did.

6     **Q**     Could this man have been the other two passengers?

7     **A**     No.  No.

8     **Q**     Either one of them?

9     **A**     No.

10    **Q**     So this man does not look like the person that you

11  saw, any of these three men you saw get into that car?

12    **A**     No.

13    **Q**     And are you pretty sure of that?

14    **A**     I'm positive.

15    **Q**     You're positive?

16    **A**     Yeah.

17    **Q**     You wrote a statement for police?

18    **A**     I'm sorry?

19    **Q**     Did you speak with the police that day?

20    **A**     I did.  The reason I went down, the neighbors

21  didn't see them leave, and I thought I got to -- I know what

22  they look like.  So I went down to talk to him and I talked

23  through the fence, and then I went and drove around and gave

24  him a statement.  My statement was a little -- because I was

25  tired --

1          **MS. SCOTT:**  Objection, Your Honor, nonresponsive.

2          **THE COURT:**  Overruled.

3     **BY MS. CITRARO:**

4     **Q**     But you did write a statement in the matter?

5     **A**     I'm sorry?

6     **Q**     You did write a statement?

7     **A**     I did.

8     **Q**     Did the police talk to you any more about any

9     further investigation like a photo lineup or anything?

10    **A**     Well, they did call me and ask me if I could, you

11    know, if I knew what they looked like, and I explained, you

12    know, that I did.  But, um, I didn't talk to them until after

13    I got the paperwork, and the picture that I saw wasn't the

14    same person that was there and didn't appear to be this

15    gentleman either.  So...

16    **Q**     What picture did you see?

17    **A**     Oh, on the computer.  The mugshot.

18    **Q**     So you saw a mugshot --

19    **A**     Yes.

20    **Q**     -- of Mr. Valle-Ramos --

21    **A**     Right.

22    **Q**     -- after he was arrested in this?

23    **A**     Well, yes.  I had received two summons.  One said I

24    needed to come.  The second one said I didn't.  So I said,

25    well, I don't know who this is.  So I want to see if I knew

1    who he was, and it wasn't anyone that I have seen.

2         Q    So that picture, that mugshot, did you not think

3    that was the guy you saw and April 9th?

4         A    No.  Absolutely not.

5         Q    When did you offer to do any photo lineup?

6         A    Well, when he called me, I had explained that I had

7    looked at the picture and that it wasn't anyone that I had

8    seen, so for sure--

9         Q    So you didn't come in and do a photo lineup?

10        A    No.  He said he -- I didn't need to come for the

11   lineup.

12        Q    Okay.  Have the police contacted you at all after

13   that?

14        A    I'm sorry?

15        Q    Did the police contact you at all after that?

16        A    Someone else called me.  I talked to two different

17   people and, um -- but I can't remember what the second call

18   was about.

19        Q    They didn't ask you to come in for any other

20   identifications?

21        A    No.  No.  Just for the deposition to you.  That was

22   all.

23        Q    Okay.  Nothing further at this time.

24        **THE COURT:**  All right.  Cross-examination?

25                          **CROSS-EXAMINATION**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1    **BY MS. SCOTT:**

2        **Q**    Good morning, Ms. Bloom.

3        **A**    Good morning.

4        **Q**    Okay.  I want to take you back just a little bit.

5        **A**    Okay.

6        **Q**    What point did you get home the night before?  You

7    said you work midnight shift?

8        **A**    Well, I'm retired, and I had worked night shift for

9    many, many years so my sleep patterns are a little strange.

10        **Q**    Sure.

11        **A**    So I was home the whole night.

12        **Q**    Okay.

13        **A**    But I was up all night.

14        **Q**    Okay.  So you hadn't yet gone to bed?

15        **A**    Well, I was in bed.

16        **Q**    But not sleeping?

17        **A**    Not sleeping, no, trying to.

18        **Q**    Correct.  When was the last time you had actually

19    slept prior to that morning?

20        **A**    Um...

21        **Q**    Was it the night before?

22        **A**    During the --

23        **Q**    Or was it during the day?

24        **A**    I take naps during the evening.  (Laughing.)

25        **Q**    Okay.  Okay.  How long of a nap did you have?

1      **A**     Probably an hour, hour and a half, yeah.

2      **Q**     And prior to that, was it the previous night that

3   you had a full night's rest or the previous day?

4      **A**     No, during the day, yeah.

5      **Q**     Okay.  So probably about 24 hours before this

6   happened you were going on an hour's worth of sleep at this

7   point based on that nap?

8      **A**     Yeah, probably so.  Yeah.

9      **Q**     Do you -- at what point when you -- you stated you

10  looked out of the window and you noticed out of the corner of

11  your eye and you weren't wearing your glasses -- I presume

12  you weren't wearing your glasses because you were in bed,

13  correct?

14     **A**     Right.  Right.

15     **Q**     Normally speaking when you get out of bed, you grab

16  your glasses and put them on and continue with your day?

17     **A**     Normally I do, yeah.

18     **Q**     When you saw -- when you looked out the window and

19  you said you saw these people running --

20     **A**     Uh-huh.

21     **Q**     -- how far, if you had to give a feet estimation, I

22  know that's hard, but how far is your window from where these

23  people were?

24     **A**     Um, second floor, there's a fence.  Um, gosh, I

25  don't know.  Probably --

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1      **Q**     Like 100 feet?

2      **A**     Maybe 50.

3      **Q**     Okay.

4      **A**     Yeah.  Maybe 50 feet.

5      **Q**     Okay.  And you stated before that you couldn't

6  really see the car from the angle and you probably

7  wouldn't --

8      **A**     I wasn't -- see what I did, the dog was barking --

9      **Q**     Uh-huh.

10     **A**     -- so I looked out because this particular dog

11  never barks.  The dog next door always barks and they were

12  both barking.  So that's what drew my attention to even look

13  out.  And I was just glancing, because I know the lake, so

14  I'm glancing at the lake and back, looking around to see

15  what, you know, was going on.  So I just -- I saw them come

16  out.  I saw him come out and check the gate next door because

17  it was wide open and the lady doesn't live there.

18     **Q**     Just to clarify, when you're observing all of this,

19  you are still on the second floor?

20     **A**     Yes.  And I didn't see the car at that point.

21     **Q**     And when -- at what point did you see the car?

22     **A**     Just when I saw them come from the lake running to

23  the vehicle.  And that's when I realized oh, there's a car

24  there.

25     **Q**     Okay.

1      **A**    And that caught my attention then.

2      **Q**    And then you looked at the car?

3      **A**    Yes.

4      **Q**    And then that's when you saw the driver?

5      **A**    Yes.

6      **Q**    Okay.  And there -- you stated before that they are

7    running, get in the car and speed away?

8      **A**    Yes.

9      **Q**    So it all happened very quickly?

10     **A**    Yes.  Except he stopped and looked up to try to see

11   which window it was, I guess.

12     **Q**    Right.  Would you say your memory -- when you see

13   something, would you say your memory is better closer to the

14   event that that happened, or later on in that?

15     **A**    Well, to be honest with you, I jotted it down,

16   because I thought, you know, when I went down and talked to

17   him, I thought I need to probably write this down.

18     **Q**    And him was law enforcement?

19     **A**    Yes, the police officer.

20     **Q**    And you wrote a statement that day?

21     **A**    I did.  Correct.

22     **Q**    Okay.

23          **MS. SCOTT:**  May I approach the witness?

24          **THE COURT:**  You may.

25

1    **BY MS. SCOTT:**

2         **Q**    Do you recognize that?

3         **A**    Yes.

4         **Q**    And is that your statement?

5         **A**    Yes.

6         **Q**    Can you read that statement to yourself and let me

7    know in there where you show -- where you tell the

8    description of the individuals other than what they are

9    wearing?

10        **A**    Okay.  Yes.

11        **Q**    Do you remember -- can you tell me from your

12   statement that you wrote that day what description did you

13   give to law enforcement as to these people that you saw?

14        **A**    I didn't give it to them much because I realized

15   later oh, I could have told them this, this and this, and I

16   didn't give it.

17        **Q**    But minutes after it happened, you didn't tell them

18   those details?

19        **A**    No.  No.

20        **Q**    Okay.  When you went downstairs, were there -- was

21   there -- who did you see when you went down there other than

22   law enforcement?

23        **A**    Okay.  There were the two neighbors on the other

24   side complex, they were standing talking, and then they had

25   their backs to the guys when they got in the car.

1    Q    Okay.

2    A    That's why I went down.

3    Q    One of the neighbors, is it a female?

4    A    Yes.

5    Q    Do you know who she is?

6    A    She's moved.  I didn't know her name.  I don't know

7  their names.

8    Q    Okay.

9    A    I just know who they are, you know.

10    Q    How long had you lived in that apartment complex?

11    A    Almost 14 years.

12    Q    Okay.  And I'm not trying to offend you, so please

13  excuse this question, but can you tell us how old you are?

14    A    I'm sorry?

15    Q    Can you tell us how old you are?

16    A    Yes, ma'am.  Sixty-five and a half.

17    Q    Okay.  Thank you.  Law enforcement, when you told

18  them, they didn't show you a photo lineup, right?  They never

19  ever went back out and showed you a photo lineup?

20    A    No.  No.

21    Q    And that was because when you called in response to

22  your subpoena, you said, the guy I looked up on the website

23  doesn't look like anybody that I saw?

24    A    Right.  When they called me, right.

25    Q    Okay.  And so the first time you had seen any

1  pictures was ones that you had looked up yourself months

2  after this event occurred?

3      **A**    Yes.  Because -- see, I received the first subpoena

4  probably in August.

5      **Q**    And this occurred back in April?

6      **A**    And then I got another one saying I didn't have to

7  come, so I thought well, I'll go look to see who it was, you

8  know.

9      **Q**    So just to clarify, this happens early April?

10     **A**    Uh-huh.

11     **Q**    You write your statement?

12     **A**    Uh-huh.

13     **Q**    You go on with your life, nothing happens with this

14  case, meaning no one is talking to you about it, no one is

15  showing you anything.  Then when did you say -- was it August

16  that you got the first subpoena?

17     **A**    August I got the subpoena, and I didn't know who it

18  was.

19     **Q**    And so in August you pull it up on the computer,

20  and that's when the first time you see a photo of anybody

21  related to anything that could be linked to the incident that

22  happened back in April?

23     **A**    That's correct.  That's correct.

24     **MS. SCOTT:**  Thank you.  I have no other questions.

25     **THE COURT:**  All right.  Any redirect?

1          **MS. CITRARO:**  Just briefly.

2                     **REDIRECT EXAMINATION**

3     **BY MS. CITRARO:**

4      **Q**     Did you get a look at pants or shorts?

5      **A**     Um, long pants.

6      **Q**     Long pants?

7      **A**     And long-sleeve shirts, dress shirts.

8      **Q**     Did you notice if they were wearing gloves?

9      **A**     No gloves.

10     **Q**     No gloves.  Did you notice any backpacks?

11     **A**     Nothing in their hands or anything, not carrying

12     anything.  No backpack or anything.

13     **Q**     Okay.

14     **A**     It might have been something different, I don't

15     know.  Because I didn't realize there was something going on

16     across the street where the actual thing happened until the

17     police officer told me that there was something over there,

18     too, in my complex, because I thought it was basically --

19     **Q**     And that's what turned out to be Mr. Gonzalez,

20     correct?

21     **A**     Right.  Uh-huh.

22     **Q**     Okay?

23          **MS. CITRARO:**  Nothing further.

24          **THE COURT:**  All right.  Thank you, ma'am.

25          **THE WITNESS:**  Thank you.

# C E R T I F I C A T E



**Organization:** Office of the Public Defender - 9th Circuit - Florida
**Section:** Public Defender
**Division:** Orange and Osceola
**Case Number:** 13-CF-005146-A-OR
**Case Style:** State vs. Jorge Valle-Ramos
**Deponent:** Charlene Bloom
**Deposing Attorney:** Carli Citraro
**Other Attorneys in Appearance:**
**Deposition Recorded On:** Thursday, October 10, 2013
**Duration:** 0 Hours, 27 Minutes, 0 Seconds

**\* Note: This media was uploaded to Depotek from our client for transcription and was not recorded using Depotek's secured recording systems. Therefore, Depotek can not attest to the chain of custody of the original media or have anyway of knowing if the audio is original, edited or altered in any fashion.**

DepoTek Digital Recording Services certifies that the foregoing

transcription is true and correct to the best of our transcriptionist's ability.

Dated this 22nd day of January, 2014,

## Digital Certification Number:
## UPLOADED-WMA-635254709435625000-133

Depotek Digital Recording Service
PO Box 1686
Orlando, Florida 32801
Page 1 of 19
Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001386

WHEREUPON:

1      CHARLENE BLOOM

2      was examined and testified as follows:

3      DIRECT EXAMINATION

4  BY CARLI CITRARO:

5  Q: All right, we're just gonna go right on the record.

6  A: Okay.

7  Q: This is 2013-CF-5146, State of Florida vs. Jorge Valle-Ramos. Carli Citraro on behalf

8  of Mr. Valle-Ramos. From the state attorney's office we have –

9  Q: Rachel Garcia.

10 Q: And here to be deposed, can you state your name for the record?

11 A: Charlene Bloom.

12 Q: Great. Um, now you're being recorded.

13 A: Okay.

14 Q: Because everything that you say here, it's – it's picking you up on the computer.

15 A: Okay.

16 Q: Uh, this is simple. Have you ever been deposed before?

17 A: No.

18 Q: Okay, it's a simple question and answer.

19 A: Okay.

20 Q: But you're on the record and you're sworn to tell the truth.

21 A: Okay. **I see.**

22 Q: If my question confuses you, let me know. I will rephrase.

23 A: Okay.

24 Q: If you don't ask, then I'm gonna assume you understood my question.

25 A: Okay.

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001387

1   Q: Good.

2   A: All right.

3   Q: Always answer out loud.  Otherwise it can't pick up your answer.

4   A: Okay.  Right *[clears throat]*.

5   Q: It can't see a shake or a nod.  Okay, great.  Um, and today is October 10th, 2013.  It's

6   2:27 PM.  All right, so this was back in April of this year.  Do you remember what we're

7   in reference to with this ____ _____?

8   A: Yes, I do.

9   Q: Okay.

10  A: Yes, ma'am.

11  Q: What do you remember seeing that day?

12  A: Well, I live in Hidden Creek Condominiums and my backyard faces into the Lafayette

13  Square Condominiums.  There's a fence between us.  Um, I – my bedroom is upstairs and

14  I was trying to go to sleep because I was awake all night because I'm used to being up all

15  night.  Anyway, so from working the night shifts.  Um, I couldn't get to sleep.  I heard a

16  noise.  The dogs behind were barking and they don't normally.  So I looked out.  I saw

17  my – the neighbor behind me's gate was open and she goes to work at Disney and never

18  leaves it open.  So I was a little concerned.  So I was looking out the window.  Well, then

19  I noticed that the neighbor next door, the dogs were barking.  So he came out and went

20  and checked.  Okay, so then he, um – let's see.  What next?  Um, he – the girl next door

21  to him came out to go to work, so they started talking about the gate being open.  I could

22  tell.

23  Q: Who are these people?  Do you know their names?

24  A: I don't know their names.

25  Q: Okay.

26  A: I really don't.  I don't know them.  I just know them from seeing out my window and

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001388

1    so anyway, so I'm watching them. They're talking because sometimes there's – they

2    kinda get upset with each other and I thought, "Well, I'll just keep an eye on it." And the

3    next thing I know, I see – I look – I see these guys running. And then I noticed there was

4    a car parked directly behind my house at the fence. Three young men, one, uh – the

5    driver was blonde haired, uh light skinned. Uh, they all dressed in dress clothes like they

6    were going to work. But they came running to this car. If they hadn't ran, I may not

7    thought of anything, you know? So I saw them running and I thought – and the bad part

8    is, I didn't have my glasses on, but I didn't wanna leave the window because I was afraid

9    I'd miss something, you know? And I might need to know. So I'm looking and there was

10    a driver that was blonde haired with light skin. I don't know what color eyes. I couldn't

11    see. Long sleeved shirt, short, thin. Um, there were two guys that ran to the back of the

12    car. And all I got of them was they were dressed in nice clothes. The one that got in on

13    the side by where I could see was tallish. He had dark hair, but it seemed to be – if I

14    remember correctly, it was like, straight. It was flat, you know, regular hair. I don't

15    know how to call it. And then a –

16    Q: Not like an afro style?

17    A: No.

18    Q: Okay.

19    A: And then the other guy that got in the other side, he was a short, stocky guy with light

20    brown hair and they were all dressed in long sleeved shirts and dress pants. And I

21    thought, "Oh, man. They're probably in a hurry to go to college." Well, then I thought

22    maybe she'd call the police. I don't know how I knew it, but I just had that feeling. And

23    I'm watching and then the police department – three – three police cars came into ours

24    and I thought, "Oh, man. They're probably looking for these guys." So I stayed and I

25    kept watching, because I can see over to Little Falls Court is where the robbery was. And

26    I can see to the mailboxes and over to see that. Well, they came down the main for, uh,

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001389

1    Hidden Creek Court and turned down –

2    Q: Are you talking about the cops or the car that was –

3    A: The police.

4    Q: Okay.

5    A: The police.

6    Q: Yeah.

7    A: Now, the – the guys jumped in the car.  When he first got there, when he – he looked

8    up because they looked around.  He turned around to look at the people to see if they

9    were watching.

10   Q: Who's – who's he?  Who's _____?

11   A: The driver.

12   Q: The driver.

13   A: I'm sorry.  The driver looked at – turned around and looked to see.  He was the only

14   one in the front.  The other two got in the back.

15   Q: Okay.

16   A: And he looked to see and of course they had their backs to him because they were

17   talking to each other.  And they were kind of together.  So um, then he – he's turned to

18   get in the car and he looked up and he saw me looking out.

19   Q: Okay.

20   A: And he stood and he stared at me and I thought, "Oh, no."  *[Laughs]*  You know?  So

21   anyways, they jumped in the car and they took off so fast.  And I didn't have my glasses

22   on or otherwise I would've gotten the license tag number.  Um, it was a gray – not a dark

23   gray and not a silver, but a gray, um, I would say an older model – it's either a Hyundai or

24   a, um – what's the Nissan called?

25   Q: _____.

26   A: Um, oh, shoot.  I can't remember the name of the car.  It used to be a Datsun Nissan

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001390

1   but it's – now it begins with an M, but I can't think of the kind of car. But it was a small

2   sedan. And I didn't get to really see much of it. I just saw the roof and they took off and

3   they spun out and went past those people. And then they turn around. They saw them

4   leave, but I don't know if they got a look – look at them or not, but um, I watched and

5   then I found out that there wasn't a robbery. I went downstairs, because I thought I

6   probably saw much more than anybody else did, so I'll go down there, because the police

7   came around to them. And I talked to the policeman and he asked if I would give a

8   statement. And I didn't give a very good statement because I was sleepy *[laughs]*.

9   Afterwards, I thought, "Well, I should have told him blond, brown," you know? That

10  kind of thing. But um, I really thought that they were all, um, white skinned, light

11  skinned. Um, they – that's all basically I know. I've heard – I heard what was on TV and

12  I talked to the policeman and gave him my deposition – I mean my, uh – my statement. I

13  drove around, because we were talking through the fence, and so I drove around and gave

14  him my statement. And then I found out that there had been a robbery of two places on

15  Middle Falls Court, which was the street that I saw the policeman pull into. And by then,

16  there were three police cars and crime scene assistants and stuff. So, um, that's basically

17  all. Now I – I did get asked to come to see you all and I didn't know the name at all, the

18  name knew nothing to me. I thought, "What is this about?" But I wasn't gonna look at

19  the computer, because I didn't know if that was okay or not. So then I got a letter from

20  you saying I didn't have to come. So the first thing I did, I ran upstairs and I pulled him

21  up at Orange County to see what it was about. And when it listed the date, and it listed,

22  you know, it was a robbery with a burglary with people inside, I knew that people were

23  inside because of the TV thing. And um, I – I looked at the face. The face looks familiar

24  to me. I've seen him somewhere, but I don't think he was the – the – the third person that

25  got in the car with the dark hair. I really don't.

26  Q: Are you talking about a face you saw on – on TV?

P001391

1    A: Um, no. On – on the site under his name. It was him. I had pulled it up and then after

2    that, I got another summons to come down. And I thought, "Oh, man, maybe I shouldn't

3    have looked." But I wouldn't have had a clue what it was about, so – because I even

4    called and told them here that I don't know what it's about. I have no idea, you know?

5    Q: What site would you have been looking at that you're looking at a face?

6    A: Uh, I went to Orange County – did I go to Orange County Sheriff? And then I went to

7    jail, I think.

8    Q: Uh-huh.

9    A: Or Orange County Jail, one of the two.

10    Q: Okay.

11    A: Because I know it was Orange County, because Orange County had delivered the –

12    the uh, thing to me through the mail. And then I got another one from the state.

13    Q: Were you looking at, like, an inmate picture?

14    A: Yes. Yes.

15    Q: What did you do, look up the last name?

16    A: Yes. I looked up his whole name.

17    Q: Yeah.

18    A: If you go to Orange County, um, Orange County –

19    Q: This thing is super slow.

20    A: **Sheriff's Office**? And I didn't know if he was still in, or out, or whatever, you know?

21    I –

22    Q: Do you mean – was it like the – the inmate database that you were looking at?

23    A: Yes. It was.

24    Q: Like this? And then you just looked up his name?

25    A: Right.

26    Q: Did you look up Valle, V-A-L-L-E?

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001392

1    A: I put Valle-Ramos.

2    Q: And you found him in there?

3    A: Yeah. Mm-hmm.

4    Q: When did you do the search?

5    A: That was, um, the first? Let me see. When did I get the second letter? Let me see.

6    One second. One – come on. Where did I put it? ___ ____ my purse *[laughs]*. ____

7    _____ ____ _____. Okay, so this is my _____ form for me. Yeah. Okay. I received

8    this about August 11th, so it was right around August 11th.

9    Q: That one's from me.

10    A: Yes. Uh-huh. To say I didn't need – oh, were you Kristen?

11    Q: Um, I'm Carli.

12    A: No? All right.

13    Q: But she would have sent this to you.

14    A: Okay. Okay.

15    Q: And what do you mean you didn't need to come – oh, you mean it was a cancellation.

16    A: It was a cancellation. Right.

17    Q: I see what you're saying.

18    A: And I thought, "Oh, good."

19    Q: But you looked him up at that time and you found him in here?

20    A: I found him in there, in that.

21    Q: And you looked up Valle-Ramos?

22    A: And then I maybe had to go just to Ramos, but I did start with Valle-Ramos.

23    Q: And you're sure it's the guy that's in – in question here that – that you found?

24    A: Well, from what it showed, as far as the – the, uh, why he was arrested, it looked like

25    him, because it was a larceny of, um – not a larceny. A –

26    Q: Can you see this picture here? Is that the picture you looked at?

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001393

1 A: Yes, that's the picture I looked at.

2 Q: That's the face you looked at?

3 A: That's the picture and the face I looked at.

4 Q: So you found him on the, um, database.

5 A: On the internet. I did.

6 Q: You looked at his face.

7 A: I did.

8 Q: And you said, "That's not the guy"?

9 A: I said, "That can't be the guy who got in the car, but he looks familiar to me."

10 Q: Okay.

11 A: Now the reason I say that, and you're gonna think this is weird, but two times – I don't

12 know how long. I don't know if he's still in jail or if he's been in jail the whole time or

13 _____ if he got out, because in May, um, one day – I have this electrical thing in front of

14 my house. It's like a box. And one day I looked out and there were four people sitting on

15 the box. Well, the – and you're gonna think this isn't important, but it might be. Um,

16 there were two guys and two girls. I think the one guy was this guy, if he was out then. I

17 don't know. Um, he was with a stout guy who could have been the other guy that was

18 with them, and two girls. They sat there for a long time and then they just left. Well, I

19 thought nothing about it. And then – and I went out to do some gardening around the 4th

20 of July, I believe it was. And um, I had my head down and I *[laughs]* – I heard some

21 people laughing and walking, so I looked up. I came up and as I came up, they got quiet.

22 And the guy – the guy that was – who I think was him was talking and he said, "I put it

23 right over here. It's over here somewhere. It's over here somewhere." That's what he

24 said. "It's over here somewhere."

25 Q: Was it this guy who was saying that?

26 A: Yeah, it was that guy talking. And he was walking and then he saw me after he said

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001394

1    that. He was talking to the green thing, the box. He was walking there and then he – he

2    just – he kinda did this thing and then he – he struggled to change what he was saying. I

3    could tell.

4    Q: Mm-hmm.

5    A: And he said, "Oh, oh, oh, yeah. Yeah. It's over here." So I – I put my head up. I had

6    put my head up before that and they saw me. And I said, because I'm inquisitive – I said,

7    "What's over there?" Because there's not anything but grass. And he said, "Oh, uh, uh,

8    um, I put trash or something over here." And I thought, "That's odd." That was before I

9    saw the picture. And then – so they stayed for about two minutes. They walked in front

10   of my house and they looked all around and then they left. And they never came back

11   again, but to me it was odd and when I saw that picture, I thought, "You know, that could

12   be that tallest – taller guy that was with them. I think it probably was." But now if he

13   was in jail, of course it couldn't have been him at that time. But I don't know when he got

14   out. They didn't do anything.

15   Q: He wasn't in jail during July.

16   A: No? Okay. Well, my fear was the driver said, "It's a window there. Go check it out."

17   Or whatever and he came back around. I didn't see him the day – the day that I saw three

18   people getting into the car. I did not see him. He wasn't one of the three that got into the

19   car that I saw. But I don't know. People have friends, you know?

20   Q: So you – you – you saw his face that day in July and that day – how long before was it

21   that you saw –

22   A: In May. May.

23   Q: Okay, so May and July.

24   A: _____ ___ _____ unfortunately.

25   Q: And you –

26   A: **And I'm too good**.

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001395

1  Q: You saw him with some people and you're sure it was this face?

2  A: I'm not positive, but I'm pretty sure that this was the guy that was with some.

3  Q: And this face you're pretty sure is not one of the faces of the guys in the car that day?

4  A: That got in the car – that got in the car, no, no. If there were any more people

5  involved, I don't know. But as far as I know, there were the three people got in the car is

6  all I witnessed.

7  Q: Tell us about your eyesight. You said you didn't have your glasses on. How well can

8  you –

9  A: Well, I can see distance. And I mean I can see them fine. But I couldn't see, like, the

10  tag and I went, "Oh, my glasses." And by the time I grabbed for the glasses, it was the

11  case that they were gone. They were long gone.

12  Q: So you can't read far away.

13  A: No.

14  Q: But you can see pretty well far away?

15  A: I can see far away, but I can't read far away.

16  Q: Do you know what, like, your prescription is?

17  A: It's um, 1 – 225 maybe. Maybe 225.

18  Q: _____.

19  A: So it's – but it's for – more for – it's kinda like, uh – because I had surgery a long time

20  ago to make it mono vision, so I can't read up close and I can't read that far. But I can

21  see. I can see the TV without them, you know? I'm fine.

22  Q: So would you – would you say you saw their faces fairly clearly?

23  A: I saw the driver only. The driver and the only thing I saw on the other two were the

24  clothes as they were walking up – running up – the clothes and then I saw the top of their

25  heads.

26  Q: So you saw their hairstyles?

P001396

1   A: Yeah.  Yeah.  That's all I saw.  Yeah.

2   Q: Okay.  Did – did any of the three people, when you saw their hairstyles or whatever

3   you did see, did any of them have a big afro?

4   A: No.  No.

5   Q: No big afro?

6   A: No.

7   Q: You're sure?

8   A: I'm positive.  The dark haired taller guy –

9   Q: Not for those guys.

10  A: No.  The dark haired taller guy that I saw had almost straight hair or flat, almost flat.

11  Flat hair and it might have been straight.  I don't know.  But it was flat where – because I

12  would have remembered if there had been – because of the one thing I was thinking at the

13  moment, and I was gonna put it on the paper and I forgot.  They looked to me to be all

14  white, you know?  They didn't' look –

15  Q: Did they look Hispanic and white?

16  A: No.  No.

17  Q: It was just Caucasian white?

18  A: Yeah.  Yeah.  They did.  They did.  So those three guys for sure weren't him.

19  Q: Did you see them – uh, did you see any latex gloves on any of them?

20  A: No one had anything in their hands.  They didn't have any gloves on.  They were

21  running.  Like I say, if they hadn't been running, I would've thought, "Oh, somebody

22  parked their car there.  They're on their way to school or to work."  If they'd just

23  nonchalantly walked, I would've never noticed it, because I didn't even notice the car was

24  there till I saw them running to it.  And then I went, "Oh, there's a car down there."  You

25  know, because –

26  Q: Did you see where they ran from?

P001397

1    A: Yes.  We have behind – okay, my house is here, okay?  There's a lake here.  You go

2    around the lake.  The fence from Lafayette Square extends into the water.  But ours – or

3    actually it's the other way around.  Theirs stops.  Ours extends.  We have a wooden fence.

4    But people continually walk to the lake.  They will climb it and they don't get wet.  They

5    go foot by foot and get over.  They don't get wet.  So I'm almost positive that that is

6    where they went.  Now, the place where it – the robbery was is – there's a main street.

7    There's another section of condos to the left of that and that's where it was back in the

8    corner.  So basically, I'm on the same – there's a street between us and we're apart, but

9    I'm exactly in the same physical direction that they are, but just further down.  Um –

10   Q: Can you see the – the location of the house where this burglary occurred?  Can you

11   see that from where you were looking?

12   A: I can't.  I could see the police officers' cars in the – because I did this and kinda went

13   to the side.  I could see the police officers' cars, but I don't know which house it is or

14   where it was.

15   Q: Okay.

16   A: But I know it was in the corner.

17   Q: Would the direction that you saw them coming from, would that be consistent with

18   them running from Mr. Gonzalez's house?

19   A: Yes.  It could be.

20   Q: It could be?

21   A: It could be because they could come – they were – they – I think they ran out the back,

22   because that's how they were getting in, apparently, according to the TV.  They were

23   getting in the back doors and the lady next door was home when they went into hers.  She

24   didn't know they were there and she came down and saw them or saw them just leaving.

25   They didn't get anything in her house, I don't think.  But anyway, um, to come out the

26   door, if they went to the right, crossed the main street, went directly in front of my place,

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001398

1  it goes right to the lake.  And around my building to the end of the lake is where the fence

2  is.  And that's how they got to where they were.  They – they definitely came that way.

3  Q: How far would you estimate the distance from where the vehicle was parked to Mr.

4  Gonzalez's residence?

5  A: Oh, let's see.

6  Q: Bird's eye, so like wherever they would have –

7  A: Bird's eye?

8  Q: – they would – would have run from.

9  A: Okay, um, the car.  Okay, from my – let me think.  I don't know how many feet it is.

10  Um –

11  Q: We're talking less than a mile, right?

12  A: Oh.  Oh.  ____ ____ _____.

13  Q: We're talking less than half a mile?

14  A: By all means.  By all means, yeah.  It's – let's see.  There's how many?  There's – I

15  think there's four – four units and they were in the corner as far as I know on this side and

16  the lake is over here.  There's – the street is here.  There's four – there might be five.

17  There's four or five units here and then it goes around the side.  So probably if they were

18  running the whole time, I don't know if they were, because first they were walking as

19  they – because I saw them come from that direction.  I went, "Oh, that's odd."  Because I

20  – I noticed something moved as I was looking out.  And I saw them kind of walking.

21  And then they started running.  And they ran to the car.  As I saw them, they ran to the

22  car.

23  Q: Were they all three together?

24  A: Yes.  Yes.  These three were together and the driver went in the front and the two guys

25  got in the back.  The taller guy with the dark hair got in on the side by me.  And then the

26  shorter, stout guy got in on the other side.  So it would be he got in on the right.  The

P001399

1     other guy got in on the left in the – the backseat.

2     Q: Is – where they left – where that car was and then they took off, is that where the

3     police arrived, right where they were parked?

4     A: Not then, no.  The police came in.  I actually thought I'm going – I'm – I'm standing

5     there because somehow I knew she called the police.  I don't know how.  But anyway

6     *[laughs]*, I'm standing there and I'm thinking, "Oh, wait.  They're in the wrong place,"

7     because I saw the police coming down our main road.  And I thought, "Oh, no.  She

8     needs to re-call," and I'm standing there to see if I should call again or if they should call.

9     And I could see she was making another phone call.  And I felt she probably was calling

10    them.  I don't know.  I don't know them, so I don't really know, but this is what I figured.

11    And about that time, then a few minutes later, the police came around to her, because I

12    guess she re-called, so they came over too.  So there were three next door and then one to

13    us in the back.  And then I talked to them through the fence and I just said, "I was

14    upstairs and I saw this."  And he said, "Oh, do you mind giving a statement?"  And I said

15    "No," *[laughs]* as I always do.  I – I – if – if something was wrong with me, I'd want

16    someone to help, you know, whatever I can help.  So um –

17    Q: What floor do you live on?

18    A: I – I had an up and down, two story.

19    Q: So were you on the second story?

20    A: I was on the second floor, looking out my bedroom window, which faces – it was

21    literally right – the car was right behind the fence.  But I didn't notice it because I was

22    looking out until they ran to it.  And it was gray.  My fence is red, but I didn't really

23    notice that car until they ran to it.  And then I went, "Oh, there's a car parked down

24    there."

25    Q: Your address is 1708 Silver Creek?

26    A: That's correct.

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001400

1    Q: Is there an apartment number on that or that's just the _____ the unit?

2    A: That's the address, yeah.

3    Q: Okay.

4    A: Yeah. Well, they call it unit 97 for the – for the proper papers, but my address is

5    1708.

6    Q: So if I drove by there and it would say 1708, I would know that was where you lived?

7    A: Exactly. Exactly. Yeah.

8    Q: Okay. I think I'm gonna need to scout this one out.

9    A: Yeah.

10   Q: Because this is an interesting layout. Um –

11   A: I can let you get in it ____ ____ _____ _____ because it's – it's secured. So that's

12   another thing. They – they did that roundabout because the gate was there, and you have

13   to either be buzzed in or follow someone in.

14   Q: Mm-hmm.

15   A: People do that all the time then.

16   Q: Are there any trees or other obstructions that would have gotten in your way of seeing

17   them?

18   A: No. No. It's direct. It's nothing there. Yeah, it's the dog walk is behind my house and

19   then a fixed fence and then they have a patch of grass where they parked and then a

20   regular drive.

21   Q: Did you hear or see anything else suspicious at that time?

22   A: That was all. I mean just their – the way they were running, because I went, "Ooh,

23   wait." Because I put two to two together, because the gate next door is open and she

24   wouldn't have left it open. Because see, their gates are basically their front door. They

25   have big gates. They open up and then they go into their backdoor, which is their main

26   entrance on Lafayette Square. So that was basically their main entrance and I don't know

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001401

1    that that place was even touched, other than the dogs barked. That's what bothered me,

2    because the dogs don't bark, you know, unless you're – he's out there playing with them.

3    He has a big collie and she has her little black and white something. I don't know what it

4    is *[laughs]*.

5    Q: Do you – uh –

6    A: But –

7    Q: Do you have any idea if it's possible that the police were responding to an incident,

8    but it was not that vehicle of three guys that ran into – do you think that something else

9    could have gone down where you lived that you would have missed?

10    A: Well, that would be possible, except for George. I don't even know George's last

11    name. He was on TV and he – he actually walked in on them and he saw them.

12    Q: Mm.

13    A: And he did see there were three or four. I don't know which and I – I thought, "I only

14    saw three." He's coming in at three, I think, but I only saw three. But he actually saw the

15    guys. He pepper sprayed them, so he got the look at them.

16    Q: Do you know what he thinks he saw?

17    A: I didn't know it. I talked to him yesterday for two seconds.

18    Q: ____ ____ _____?

19    A: And I just said, "Did you get deposed up there?"

20    Q: Okay.

21    A: And he said, "Yes."

22    Q: Okay.

23    A: And we left it at that.

24    Q: Um, okay. I don't think I have any other questions. Do you have any questions?

25    Q: No questions.

26    A: Okay.

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001402

1    Q: Okay.

2    A: Okay, good.

3    Q: Um, all right.  It – when we take a deposition, it's all audio recorded.

4    A: Mm-hmm.

5    Q: But what we can do is we can transcribe it into writing.

6    A: Mm-hmm.

7    Q: Which means somebody listens to it and then types it up.

8    A: Okay.

9    Q: And it becomes writing.

10   A: Okay.

11   Q: Um, if you – if we do that at any point, you have a right to read it to make sure that

12   there's no typos.

13   A: Okay.

14   Q: That what you said is what in fact got down on paper.

15   A: Okay.

16   Q: You can't change what you said.

17   A: Right.

18   Q: But you can make sure that those were the words that came out of your mouth.

19   A: Okay.

20   Q: Do you wanna read it or do you wanna waive that right?

21   A: Um *[laughs]*, if it's gonna be just what I said, I guess it wouldn't matter.  I mean –

22   Q: All right.

23   A: Is there any way that that couldn't –

24   Q: Sometimes typos occur, which is why it's up to you to waive it, waive the right, if

25   you're not interested in checking.

26   A: Will I need to come back down to do it?

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001403

1  Q: Um, what – what we could do is we could just give it to you on the day of, I think if –

2  if this is a trial.

3  A: Okay, yeah.  I'll read it.

4  Q: We'll just let you read over it.

5  A: Oh, okay.  Okay, fine.

6  Q: Um, could you get a good phone number for us on the record?  Just say it out loud.

7  A: Yes.  407 –

8  Q: Mm-hmm.

9  A: 273 –

10  Q: Mm-hmm.

11  A: 4769 is my home.  I can give you the cell if you'd like that too.

12  Q: Great.

13  A: 407-234-5379.

14  Q: Okay, great.  Okay, um, I'm going to stop this at 2:52 PM.  Uh, and for the record,

15  when I was showing her a picture, I was showing the inmate management system

16  photograph of his booking photo from April 24th of this year.  Um, and I showed her that

17  on my I – iPad.  And it is 2:53 PM.  I'm closing this call.  **Okay.**

18  [End of Audio]

P001404

# ORLANDO POLICE DEPARTMENT

Case #: 2013-146382

## Statement
Please fill out in full detail

| Date of Statement: | Month: 04 | Day: 09 | Year: 2013 | Time: 0870 |
|---|---|---|---|---|
| Offense: | Res Burglary | | | |
| Date of Offense: | Month: 04 | Day: 09 | Year: 2013 | Time: 08:00 |
| | | | | Suspect (last, first, middle): UNK |
| Location of Offense: | 1625 Little Falls Cir | | | District: (T-) |

| Person Code: | Name (last, first, middle): BLOOM, CHARLENE ELIZABETH | Age: | DOB: 02-14-48 | Race: W | Sex: F |
|---|---|---|---|---|---|
| W | Address Residence: 1708 SILVER CREEK CT. ORLANDO, FL | Zip: 32807 | Phone: 407-273-4769 | | |
| | Address Business: | Zip: | Phone: | | |
| | Email Address: Cbloom1@fl.rr.com | | | | |

| Type of ID shown: FL DL | ID# if applicable: B450-105-48-854-0 |
|---|---|

I, CHARLENE BLOOM, do hereby voluntarily make the following statement without threat, coercion, offer of benefit, or favor by any persons whomsoever.

08:15 Looked out the window UPSTAIRS - saw 3 young guys running to their car. they were looking towards my neighbors talking to each other. Guys small built + height with dress shirts (long sleeved, dressed nicely like school or college guys.
CAR was gray compact maybe a Hundai or Datsun. they took off fast + sped off.
Spoke to officers about I saw.

Sworn to and subscribed before me, this 9th day of APRIL 2013

_Ofc. _____ Place_____ OPD/LEO_

Notary Public ☐   Law Enforcement Officer ☒   Name Key 5261
Personally Known ☐   Produced Identification ☐   Type_____

I swear/affirm the above and/or attached statements are correct and true.

Signature: x Charlene E Bloom

My signature below means that I refuse to prosecute the person(s) named above for the alleged crime(s) that occurred to me or to the property under my control.

Signature_____ Date_____
(Departmental policy prohibits use of this section in domestic violence cases.)

| Victim Rights Booklet provided? | Yes ☐ No ☒ |
|---|---|
| I will testify in court and prosecute criminally. | Initials: |
| Miranda Warning Read? Yes ☐ No ☒ | Page 1 of 1 |

1113.9   6/7/11          White: State Attorney          Yellow: Records

P001385

use of diligence"; and (2) is "of such nature that it would probably produce an acquittal on retrial." *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (citations and quotations omitted). "To reach this conclusion the trial court is required to consider all newly discovered evidence which would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." *Id.*

The newly discovered evidence here concerns a sworn affidavit executed by Ms. Szewczyk. *See* Bethany Szewczyk Aff. 1, Dec. 1, 2021 ("Exhibit A"). Ms. Szewczyk's affidavit arose from the discovery of an individual named Amos Matthew Ortiz. Mr. Valle-Ramos and Mr. Ortiz bear a striking resemblance to one another. *See* Figure 1; *see also* Exhibit B.[1] Mr. Ortiz also has an afro-style haircut in his driver's license photograph. *See* Figure 1.



*Figure 1: Amos Matthew Ortiz (left), Jorge R. Valle-Ramos (right)*

Approximately two weeks before the burglary, Mr. Ortiz was for possession and purchase of cannabis at Lake Underhill Park—approximately 2.2 miles from Mr. Gonzalez's home. *See*

---

[1] Exhibit B consists of a composite of Mr. Ortiz's and Mr. Valle-Ramos' respective driver's license photograph.

P000454

**407.423.9900**
**Fax 407.841.2779**
**Toll Free 855-MYDEPOS**

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

ORIGINAL

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF FLORIDA

3   ORLANDO DIVISION

4   CASE NO. 6:24-CV-01276-CEM-DCI

5

6   JORGE VALLE-RAMOS,

7   Plaintiff,

8

9   V.

10

11  CITY OF ORLANDO, et al,

12  Defendants.

13

14

15

16

17

18

19  DEPONENT: DANIEL BRADY

20  DATE:    JUNE 20, 2025

21  REPORTER: NICOLE WARD

22

23

24

25

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1                    APPEARANCES

2

3  ON BEHALF OF THE PLAINTIFF, JORGE VALLE-RAMOS:

4  Roz Dillon, Esquire

5  Loevy & Loevy

6  311 North Aberdeen

7  3rd Floor

8  Chicago, Illinois 60607

9  Telephone No.: (312) 243-5900

10  E-mail: dillon@loevy.com

11  (Appeared via videoconference)

12

13  ON BEHALF OF THE DEFENDANTS, CITY OF ORLANDO, et al:

14  Stephen M. Mistoler, Esquire

15  Paul & Perkins PA

16  711 North Orlando Avenue

17  Suite 202

18  Maitland, Florida 32751

19  Telephone No.: (407) 540-0122

20  E-mail: smistoler@paulandperkins.com

21  (Appeared via videoconference)

22

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1                          INDEX

2                                              Page

3  PROCEEDINGS                              5

4  DIRECT EXAMINATION BY MS. DILLON          6

5  CROSS-EXAMINATION BY MR. MISTOLER        134

6

7                        EXHIBITS

8  Exhibit                                   Page

9  17 - P1413, Photo Lineup                  99

10 4 - Photo Lineup Administration

11     Instruction Sheet                    102

12 22 - 2 Page Doc, P1418-1419 Investigative

13     Supplement                           116

14 13 - Initial Police Report               124

15 25 - One-Page Document, Bates P7.        127

16

17

18

19

20

21

22

23

24

25



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1                    STIPULATION

2

3  The deposition of DANIEL BRADY was taken at MILESTONE

4  REPORTING, 315 EAST ROBINSON STREET, SUITE 510, ORLANDO,

5  FLORIDA 32801, via videoconference in which all

6  participants attended remotely, on FRIDAY the 20th day

7  of JUNE 2025 at 1:54 p.m. (ET); said deposition was

8  taken pursuant to the FEDERAL RULES. The oath in this

9  matter was sworn remotely pursuant to FRCP 30.

10

11 It is agreed that NICOLE WARD, being a Notary Public and

12 Court Reporter for the State of FLORIDA, may swear the

13 witness and that the reading and signing of the

14 completed transcript by the witness is not waived.

15

16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1              PROCEEDINGS

2         THE REPORTER:  We are now on record.

3         Will all parties, except for the witness,

4    please state your appearance, how you're attending,

5    and your location, starting with Plaintiff counsel?

6         MS. DILLON:  Roz Dillon for Plaintiff Jorge

7    Valle-Ramos.  I'm attending remotely via Zoom from

8    Santa Cruz, California.

9         MR. MISTOLER:  Stephen Mistoler on behalf of

10   the Defendants appearing via Zoom in Orlando,

11   Florida.

12        THE REPORTER:  And Mr. Brady, will you please

13   state your full name for the record?

14        THE WITNESS:  My name is Daniel Brady.  I am

15   also remotely from my home in Central Florida.

16        THE REPORTER:  Thank you and I did ID you

17   before we got on record.

18        Do all parties agree the witness is, in fact,

19   Daniel Brady?

20        MR. MISTOLER:  Agreed.

21        MS. DILLON:  Agreed for plaintiff.

22        THE REPORTER:  Thank you.

23        All right.  Sir, please raise your right hand.

24   Do you solemnly swear or affirm the testimony you're

25   about to give will be the truth, the whole truth,


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1    and nothing but the truth?

2         THE WITNESS:  I do.

3         THE REPORTER:  Thank you.

4         You may proceed, Counsel.

5              DIRECT EXAMINATION

6         BY MS. DILLON:

7    Q.   Hi, Mr. Brady.  My name is Roz Dillon, and I

8  represent the plaintiff, Jorge Valle-Ramos, in this

9  case.

10         Can you please state and spell your name for

11 the record?

12    A.   Yeah, my name is Daniel Brady, D-A-N-I-E-L, B-

13         R-A-D-Y.

14    Q.   Great.  And do you prefer I call you Mr. Brady

15 or do you want some other title?  I think you are a

16 lieutenant.  Happy to call you Lieutenant Brady,

17 whatever.

18    A.   Dan is fine.  I'm retired.

19    Q.   Okay, great.  And so I'm sure you've gathered,

20 but I'm going to be taking your deposition this

21 afternoon.  I think you said you're at home in Central

22 Florida.

23    Q.   Is anyone else in the room with you?

24    A.   No.

25    Q.   Okay.  And Dan, have you ever been deposed



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 before?

2      A.    Yes, ma'am.

3      Q.    How many times?

4      A.    I would have to guess.  I mean, probably over

5 25 to 30, you know, well over that, I just don't know,

6 but quite a few times.

7      Q.    Were any of those cases civil cases?

8      A.    Yes.  Yes, one.

9      Q.    Do you remember how many were civil cases?

10     A.    To the best memory I have it was just the one.

11     Q.    Okay.

12     A.    One time.

13     Q.    Do you remember the name of that case?

14     A.    No.

15     Q.    Okay.  And do you know approximately when was

16 that civil case litigated?

17     A.    I'm just looking at my resume here to --

18 because I know where I was just to make sure, I'm

19 getting, you know, closer.  Imagine it was probably late

20 2017, or early 2018.

21     Q.    Okay.  And were you a party to that case?

22     A.    I was.

23     Q.    Okay.  Were you a defendant or a plaintiff?

24     A.    I was a defendant.

25     Q.    Okay.  And what was the case about?


MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.   It was the -- oh, at the time I was a sergeant

2  over the drug unit, and we had served a search warrant

3  and did not find any drugs so to speak.  And a couple of

4  years later, the suspect or who the named person in the

5  search warrant sued us and the rest of the drug unit. It

6  was probably about eight of us.  And it went to --

7      Q.   Do you remember the -- sorry, go ahead.

8      A.   Yeah, it was in -- it started off in State

9  Court and it went to Federal Court and that's where it

10 was finally heard from.

11     Q.   Okay.  Do you remember the resolution of that

12 case?

13     A.   Yeah, we were all found not guilty.

14     Q.   Okay.  So there was no -- there was a judgment

15 returned but not against you?

16     A.   No.  No.

17     Q.   Okay.

18     A.   There was no judgment against any of us.

19     Q.   Got it.  So you know, and were the remainder

20 of those, like, several dozen or so depositions, were

21 those all in criminal cases that you were a sergeant or

22 officer or lieutenant on?

23     A.   Yes.

24     Q.   Okay.  So they were all in connection with

25 your job as a police officer?

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.    Yes, ma'am.

2    Q.    Okay.  So I'm sure you know how this goes.

3 You're probably pro at these by now, but I'm just going

4 to go over some ground rules so that we're on the same

5 page this afternoon.

6          Dan, do you understand that the oath you just

7 gave is the same as if you were in a courtroom in front

8 of a judge and jury?

9    A.    Yes, I do.

10   Q.    Okay.  And that the answers you give today are

11 subject to penalty of perjury?

12   A.    Yes.  I understand.

13   Q.    All right.  So if you don't understand a

14 question, just say so and I'll rephrase or ask you a new

15 question.  If you answer, we'll assume you understood.

16 Fair enough?

17   A.    Fair enough.

18   Q.    All right.  Our court reporter here is going

19 to be taking down your testimony today.  And so for that

20 reason, it's really important we try not to speak over

21 each other.  So I just ask that you wait until I'm done

22 asking a question even if you know where I'm going with

23 it to answer and I'll try to do the same while you're

24 giving answers.

25   Q.    Okay?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    A.   Okay.

2    Q.   All right.  And for the same reason, it's

3  really important that you give verbal answers, a shake

4  of the head, uh-huh, uh-uh, those won't work for the

5  court reporter.

6    Q.   Okay?

7    A.   Okay.

8    Q.   All right.  Next, there might be sometimes

9  today where your attorney objects to one of my

10  questions, and since there's not a judge here to rule on

11  those objections, the rule is that you'll go ahead and

12  answer the question anyway, even if your attorney

13  objects, unless he explicitly instructs you not to

14  answer.

15    Q.   Do you understand?

16    A.   I understand.

17    Q.   All right.  And my intention is not to keep us

18  here for an insane amount of time, but if you need a

19  break at any moment, you can have one.  But if there's a

20  question pending, all I ask is that you'll answer before

21  we go off the record.

22    Q.   Okay?

23    A.   I understand.

24    Q.   All right.  Dan, do you have any medical

25  conditions that might impact your ability to testify



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1 today?

2     A.   The only thing that might come up is that I

3 had some pretty major skin cancer surgery on my nose and

4 on my head.  And sometimes the medication doesn't give

5 me a whole lot of notice where I might have to use the

6 restroom.  So yeah, I've --

7     Q.   Okay.

8     A.   -- been off of work for about, you know, about

9 three weeks at home resting.  So that -- that's the only

10 thing that I might, you know, if --

11     Q.   Okay.

12     A.   -- that's the reason for that.

13     Q.   Yeah.  Fair.  Fair enough.  Any -- as many

14 bathroom breaks as you need, totally happy to

15 accommodate those, okay?

16     A.   Okay.

17     Q.   Okay.  Does your medication have any impact on

18 your memory?

19     A.   No.  No.  No.  It's just antibiotic and, you

20 know, no, but nothing like that.

21     Q.   Okay, great.  Any other reason you can think

22 of that you wouldn't be able to give full testimony

23 today?

24     A.   No.

25     Q.   Great.  So moving kind of on to, like, the



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  prep you did in anticipation of this deposition.

2         Without telling me anything that was discussed

3  in a meeting with your attorney, can you tell me whether

4  or not you met with your attorney to prepare for today's

5  deposition?

6      A.   Yes.  I met with them remotely.

7      Q.   Okay.  How many times did you meet with them?

8      A.   Early on when I received the -- was served

9  with the paperwork, spoke over the phone briefly for

10  about 15 minutes.  And then last week we had a remote

11  session with Stephen, just kind of going over what was

12  the -- the case and where we were at.

13      Q.   Okay.  In that remote session last week,

14  approximately how long did that last?

15      A.   About an hour.

16      Q.   All right.  And you said it was remote?

17      A.   Yes.

18      Q.   Was there anyone else present besides your

19  attorneys?

20      A.   No.

21      Q.   Did you review any documents in preparation

22  for your deposition today?

23      A.   Yes.

24      Q.   What documents did you review?

25      A.   I reviewed the initial incident report for



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  this case.  I reviewed the supplements that were

2  available, and the affidavit for arrest warrant.

3      Q.   Anything else you can recall?

4      A.   A couple of the policies back then, you know,

5  in that 2013 window.

6      Q.   Okay.  Policies about what?

7      A.   Like initial police reports, adult booking

8  procedures, and the -- probably the photo lineup policy.

9      Q.   Okay.  Did you read the amended complaint

10  before your deposition?

11      A.   I'm -- I'm not sure of the question there.

12  Can you -- what do you --

13      Q.   Have you ever seen the complaint in this

14  matter?

15      A.   Yeah, so --

16      Q.   The document that -- sorry, go ahead.

17      A.   Yeah, I'm sorry.  I talked over you.

18      Q.   No, you're good.  I was just going to explain

19  what it was.

20      A.   So I assume you're talking about when I got

21  served with the lawsuit.

22      Q.   Yes, sir.

23      A.   There was a, you know, an affidavit from your

24  counsel and I reviewed that.

25      Q.   Okay.  Do you have an understanding about the



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

1 allegations in this case?  What they're about?

2     A.   Yes.

3     Q.   Okay.  What is your understanding?

4     A.   Well, my understanding is that the case was

5 eventually overturned and Detective Stanley was sued in

6 the city of Orlando and the initial one, some of the --

7 I saw a -- two copies, I guess.  One had unknown

8 officers named, and then mine, I guess, was the amended

9 one or where my name was added to the lawsuit.

10     Q.   Yes, that's right.  And so you understand that

11 you're named as a defendant in this case?

12     A.   I understand.

13     Q.   Okay.  So just so we're on -- so we're on the

14 same page in terms of the terminology that I'm using.

15 The civil case we're here for involved a burglary that

16 occurred at 1625 Little Falls Circle in Orlando,

17 Florida, on April 9, 2013.  And the gentleman whose home

18 was burglarized was named Jorge Gonzalez.  So when I say

19 the Gonzalez burglary, unless I say otherwise, that's

20 the incident that I'm referring to.

21     Q.   Okay?

22     A.   Okay.

23     Q.   Okay.  And in reading the complaint or talking

24 to your attorney or reviewing any of the incident

25 reports, did you have any independent recollection of



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 this investigation?

2     A.    No.

3     Q.    Okay.  Nothing at all?

4     A.    Nothing at all.

5     Q.    Okay.  So all I'll say on that is my questions

6 aren't meant to trick you.  If you can't remember

7 something that's okay to say so.

8     A.    Okay.

9     Q.    So I just want to talk a little bit about your

10 education and employment history.  Dan, what's the

11 highest education you've obtained?

12     A.    I have a Bachelor of Arts from University of

13 South Florida.  And that's the --

14     Q.    And what was -- what subject area was the

15 Bachelor of Arts in?

16     A.    Criminal justice in business.

17     Q.    And what year did you receive your bachelor's

18 degree from University of Florida?

19     A.    It was either the end of 1996 or the very

20 beginning of 2000 -- I'm sorry, of, you know, the end

21 of, you know, December time of 1996 or January, February

22 area of -- I'm sorry, now I keep saying 2000.  1997. End

23 of '96, beginning of '97, because I did graduate in that

24 winter session.

25     Q.    Okay.  Yeah.  All good.  The estimation is



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 totally fine.  Did you complete any other education

2 after you got your bachelor's degree?

3      A.   Yes.  I attended and graduated at the police

4 academy.  It was hosted by Hillsborough Community

5 College.  Took a lot of other advanced classes and, you

6 know, related to being continuing education.

7      Q.   Okay.  Were those classes also through

8 Hillsborough Community College, or did you take advanced

9 classes elsewhere?

10      A.   That -- all the advanced classes were taken

11 here at the one at Valencia in Central Florida since I

12 was hired by Orlando.  So yeah, the only affiliation I

13 had with Hillsborough Community College was the academy

14 itself.

15      Q.   Okay.  And when did you attend academy?

16      A.   In 1996.

17      Q.   And did you attend and graduate in 1996?

18      A.   Yeah, I kind of did a little bit strange, so I

19 -- I knew what I wanted to do and I knew the, back then,

20 the process for going through the application process

21 for law enforcement.  Took quite a long time, so when I

22 had one semester of classes left, I entered the police

23 academy.  So I started the police academy in like

24 January of 1996 and then graduated the police academy

25 sometime over the summer.  And --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       Q.    Okay.

2       A.    -- then I finished my last couple classes at

3  University of South Florida while I was processing.  So

4  they were kind of a, you know, a little break.  I took

5  one semester off from USF to go to attend the police

6  academy.

7       Q.    Okay.  Understood.  And then the classes you

8  -- the advanced classes you took in Valencia in Central

9  Florida, when -- what classes are those?

10      A.    I'll list off the ones I can remember.  I

11 don't

12 don't --

13      Q.    Sure.

14      A.    -- remember because I did it over my 25-year

15 career.  I took field training officer, interview

16 techniques, drug de-identification class, radar, you

17 know, I had to take a supervisor class when I was

18 promoted to sergeant, I also had to attend another one,

19 middle management class, when I was promoted to

20 lieutenant.  Took quite a few incident command classes

21 through FEMA.  I'm sure there's probably more, but those

22 are the ones I can remember off the top of my head.

23      Q.    Great.  And can we talk briefly about the

24 supervisor class you had to take when you were promoted

25 to sergeant?  Was that mandated by Orlando Police



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 Department?

2      A.   Yes.  To -- when you were promoted to

3 sergeant, you had to take a certain class and, like, a

4 few prerequisites before you could get off of probation.

5      Q.   Okay.  And do you recall the kind of the

6 subject matter, broad subject matter, you learned in

7 your supervisor class?

8      A.   I'm sure, you know, went over personalities

9 and the type of supervisor you would be, you know,

10 understanding different point of views from your

11 subordinates and yeah, I mean, it's been quite a long

12 time ago, but it was those kind of general topics.

13      Q.   Fair enough.  And about when were you promoted

14 to sergeant in your time at OPD?

15      A.   I'm just looking at my notes on my resume, so

16 I was promoted to sergeant in March of 2008.

17      Q.   Okay.  What year did you join -- did you join

18 the Orlando Police Department straight out of academy?

19      A.   There was a little bit of a break.  I started

20 in March of 1997.

21      Q.   Okay.  And it sounds like you didn't have any

22 other job in law enforcement before you joined Orlando

23 Police Department?

24      A.   Yes, that's correct.  That was my first job at

25 Orlando.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      Q.   Okay.  And if sometimes I say OPD, will you

2  understand me to be referring to Orlando Police

3  Department?

4      A.   Yes, ma'am.

5      Q.   Great.  Did you have any military service

6  before you joined Orlando Police Department?

7      A.   No, I did not.

8      Q.   Okay.  What was your -- when you entered the

9  Orlando Police Department after academy, what was your

10 first job title at OPD?

11     A.   The first job title would've probably been a

12 probationary police officer and I, after I finished

13 field training and was released solo, I was assigned to

14 the southwest section of the city of Orlando on the

15 evening shift.

16     Q.   And was that -- would that be like as a patrol

17 officer?

18     A.   Yes, it was a, yeah, patrol officer.

19     Q.   Okay.  How long did you -- were you a

20 probationary officer before you became a patrol officer?

21     A.   One year.

22     Q.   Okay.  One-year probationary police officer

23 and then, so it'd be like 1998 when you were a patrol

24 officer kind of solo?

25          MR. MISTOLER:  I'm sorry, Roz, just the idea of

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    solo.  I wasn't quite sure what you meant.

2          MS. DILLON:  Oh, sorry.  He had just mentioned

3    that he, after his probationary period, kind of went

4    solo.  So was just using --

5          MR. MISTOLER:  Okay.

6          MS. DILLON:  -- that terminology.

7          MR. MISTOLER:  Sorry.

8          MS. DILLON:  No, you're good.

9          BY MS. DILLON:

10   Q.   How -- what years did you hold the job of

11   patrol officer?

12   A.   I was a patrol officer from March 23, of 1997,

13   until about August of 1998.  Actually August of 1999,

14   and then --

15   Q.   Okay.  And what were your --

16   A.   Sorry.

17   Q.   Oh.  What were your responsibilities as a

18   patrol officer?

19   A.   I had a patrol district where I was, you know,

20   expected to handle any calls for service and respond to

21   calls, and in between calls look for traffic

22   enforcement, or other criminal activity that, you know,

23   you might observe in between calls.

24   Q.   Okay.  And during that time you were a patrol

25   officer, did you work with a partner ever?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       A.   No, not as a police officer in, like, full

2   uniform on the street, no.  I was always by myself.

3       Q.   Did you work with a partner in a different --

4   in some other capacity?

5       A.   Yes.  At different parts of my career, I did.

6   Yeah.

7       Q.   Oh, okay.

8       A.   Yeah.  But not as --

9       Q.   But not as patrol?

10      A.   No.

11      Q.   Okay.  Did your -- once you -- did your job

12  title change in August of 1999?

13      A.   Yes.  And it did.

14      Q.   What was your next job title with OPD?

15      A.   From that point I was selected to go to the

16  International Drive bike tourism unit.

17      Q.   Did you say International Drive bike?

18      A.   Yeah.  International Drive.  It's like, you

19  know, big tourist corridor in Orlando and --

20      Q.   Oh, okay.

21      A.   -- and it was also kind of like the tourism

22  unit where we, basically, we gave extra care to the

23  hotels, and Universal Studios, and the shopping areas

24  and, you know, we rode a car sometimes.  Sometimes we

25  rode on a bike.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.  How long were you with that unit?

2    A.   I was in that unit quite a long time from

3  probably -- until about November of 2006.  So for

4  almost, you know, seven and a half years I was on that

5  unit.

6    Q.   Okay.  And I think you said you gave kind of

7  extra help and care to hotels and things in the area. Is

8  there any other major responsibilities you had while you

9  were with that unit?

10   A.   So we did respond to calls, police calls, but

11 we were trying to be a little bit more proactive.  So

12 sometimes we took calls.  If we were having problems at

13 a certain hotel with a certain employee that were, you

14 know, items were taken from rooms.  We had, like,

15 cameras and stuff that we would set up bait rooms to see

16 if that employee stole when we were there.  And we would

17 also monitor crime trends if they were having break-ins,

18 or other crimes that we would try to do some plain

19 clothes activities.  So kind of we were kind of a jack

20 of all trades in that job, you know, to handle the

21 tourism area.

22   Q.   And I think you said you were you were

23 selected to go to that unit.  What did that selection

24 entail? Was it a limited amount of people who were

25 chosen?


MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       www.MILESTONEREPORTING.com       Toll Free **855-MYDEPOS**

1      A.   Yes, it was.  So that position along with

2 every other position I've had at the police department

3 you -- they put a special notice out for a position

4 opening in -- in a certain area, and you have to submit

5 a, you know, a resume and your training background.  And

6 they usually have an interview process, too.  And that

7 one did or they have an interview process and then

8 you're selected because it's a lateral movement, so it's

9 not necessarily promotion, but it's to do something

10 different.  And so it's kind of a lateral promotion.

11      Q.   Okay.  So the International Drive was not --

12 it was not necessarily a promotion from patrol officer,

13 but it did involve an application process?

14      A.   Yes.

15      Q.   Okay.  What was your next role in the OPD

16 after you ended with International Drive in November

17 2006?

18      A.   I was then selected to be a property detective

19 for the West Property Unit of Orlando Police.

20      Q.   And at what years did you hold that position?

21      A.   I think -- I'm just looking.  About a year and

22 a half, almost two years.

23      Q.   So sometime, like 2008, you ended that role?

24      A.   Yes.  At the, you know, end of March of 2008.

25      Q.   Okay.  Was that a promotion from your previous



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1 roles?

 2      A.   The detective position?

 3      Q.   Yeah.  The detective position.

 4      A.   It's very similar to the -- it's a lateral

 5 movement, so it's not.  But it definitely is to, you

 6 know, to have the rank of detective, but it -- it's not

 7 technically a promotion it's a lateral promotion and

 8 selection.

 9      Q.   Okay.  And as a detective, were you in the

10 West Property Division the -- your entire kind of two

11 year -- two-ish year stint?

12      A.   Yes.

13      Q.   Okay.  What were your responsibilities in that

14 role?

15      A.   Well, the first three quarters of that time I

16 was a property detective.  I had several districts where

17 I was responsible for investigating any crime.  And the

18 last quarter of my time there I was also the, they

19 didn't really have the rank of corporal in the detective

20 bureaus, but I was the assistant squad leader so I was

21 kind of the second charge of supervising when the

22 sergeant was not there, but I also worked cases as well.

23      Q.   Okay.  And second in charge of supervising,

24 you said when sergeants weren't there, can you explain

25 what that means?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   So I would -- I, you know, I would only be

2  responsible for our group, which was probably six to

3  eight detectives.  I had a supervisor log in so I could

4  see all the cases from the night before, so I would

5  assign cases to the detectives, and when we assign the

6  cases, we rank them based on what evidence there is and,

7  you know, so you review it and figure out, determine, is

8  this going to be a mandatory investigation or is this

9  just going to be kind of a FYI report that there's no,

10  you know, leads really to work on.  But I would rate the

11  case and assign it to the detective and fill out any

12  paperwork that might need to be handled for that day.

13    Q.   Okay.  And you said you would rank them kind

14  of based on what evidence there was, would the rankings

15  determine which detective would be assigned to lead the

16  investigation?

17    A.   No, not generally, because it -- the -- which

18  detective is based on where the crime was committed.

19  So --

20    Q.   I see.

21    A.   -- you know, a detective might have three or

22  four patrol districts.  So you know, that's where, you

23  know, it was usually assigned to based on the detective

24  and where the crime happened.

25    Q.   Okay.  Would kind of the ranking of the case



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  determine how many people would work on the

2  investigation?

3      A.   No.  No.  The amount of people, not

4  necessarily.  I mean, the detective when they got the

5  case, if it was going to be a more widespread

6  investigation with, you know, they would meet with the

7  supervisor and request additional help, but -- and

8  normally it was just one detective assigned.

9      Q.   Oh, okay.  But if it was a more substantial

10 investigation they could get support on the case if they

11 needed it?

12     A.   Yes.

13     Q.   Okay.  Anything else you can remember about

14 your responsibilities as a detective or kind of as

15 assistant squad leader in that 2006-to-2008-time frame?

16     A.   No.  I mean, basically, you know, we would get

17 the case, investigate it.  The only thing that we were

18 responsible for was that the case was rated that we --

19 it was a called an eight back then, I think they've

20 changed it but that was just a number code

21 classification that -- which meant a mandatory

22 investigation.  So you know, that one at the end of the

23 month they would have to have a supplement done.  So

24 every 30 days they would have to do a supplement on that

25 case.  The other ones that were not mandatory

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 investigations, they didn't necessarily have to complete

2 updates or do reports on.  It was just those, so making

3 sure --

4      Q.   Okay.

5      A.   -- that we did them.

6      Q.   Okay.  So the difference between the mandatory

7 investigations and the others were the -- was the

8 reporting requirements that a detective would have to do

9 in conjunction with those cases?

10     A.   Yes.

11     Q.   Okay.  And you said for mandatory

12 investigations, every 30 days there would need to be a

13 supplement from a detective?

14     A.   Yes.

15     Q.   What would that supplement entail?

16     A.   Basically, during that 30 days, what, you

17 know, the progress of their investigation, who they

18 talked to, any test results done on evidence that was

19 collected initially.  It could be a wide, you know, a

20 wide range of things, but we wanted it done every 30

21 days.  And ideally, you know, when a report came in,

22 unless they were waiting on processing or something at

23 the crime lab, we'd usually try to have, you know, we

24 didn't like to carry over cases unless, you know, they

25 were actively still working it.  So at the end of the 30

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 days, you either did a supplement closing the case or

2 that you want to, you know, what you've done and you'd

3 like to continue working the case.

4     Q.   Okay.  Would things like photo arrays that

5 were conducted in that period be included in the

6 supplement?

7     A.   Yeah.  You -- I mean, in addition to, you

8 know, copies of it in the case file that, yeah, that

9 they, on this date and time, they met with this person

10 and showed them photo lineup number.  Yeah.  But, you

11 know, the lineup information would be included in a

12 supplement.

13     Q.   Okay.  After you were a detective in that

14 property unit, what was your next role at OPD?

15     A.   I was promoted to sergeant.

16     Q.   Okay.  And that was March 20, 2008, you were

17 promoted; is that right?

18     A.   Yes.  Yeah.  March.  And it's ironic a lot of

19 my promotions and transfer dates throughout my 25-year

20 career was on March 23.  Three, but --

21     Q.   Oh, lucky day for you.

22     A.   Yeah.  So yeah, March 23, 2008.  I was

23 promoted to sergeant.

24     Q.   Okay.  And how long were you a sergeant?

25     A.   I was a sergeant of almost nine years, kind of



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 eight and a half, nine years.

2     Q.   Okay.  Sometime about 2017 ish?

3     A.   2016.

4     Q.   2016.  Okay.  And what were your

5 responsibilities as a sergeant?

6     A.   So it depended on the assignment, because I

7 had worked quite a few different assignments as a

8 sergeant. But -- so as a patrol sergeant, I would, you

9 know, have a daily briefing with my squad, which was

10 usually eight to ten, going over any crime trends.  I

11 like to have eyes on my squad every day to make sure

12 that their uniform looked appropriate and that they --

13 they did too to make sure everything was okay with them.

14 And then we would start our shift.  And as a supervisor,

15 I didn't respond every call, I couldn't.  I responded to

16 the more, like, emergency calls or if they -- it -- it

17 sounded like a complicated call.  So I tried to do my

18 best to be out there in the field and be available if my

19 squad needed me and monitor the calls and monitor all

20 the admin stuff that goes along with the supervising and

21 the team, but that was kind of the primary goal.

22     Q.   Okay.  And was patrol sergeant kind of your

23 first assignment as a sergeant?

24     A.   It was.

25     Q.   Okay.  How long were you a patrol sergeant?


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.   I was a patrol sergeant for about two years.

2      Q.   Okay.  What was your next assignment as a

3  sergeant?

4      A.   The next assignment it was, like, February of

5  2010 I was selected to supervise the neighborhood patrol

6  unit.  So they -- it was a special team that -- and this

7  was one of the few jobs where the officers themselves

8  worked in teams and they were assigned to the different

9  Orlando housing authority projects to make sure all the

10  rules were being followed and to make sure it was safe.

11  And, you know, those officers had one to two different

12  apartment complexes in the same general area that they

13  were responsible for.

14      Q.   Okay.  And you oversaw this unit; is that

15  right?

16      A.   I did.  I was a supervisor over that unit.

17      Q.   Okay.  And what kind of -- what was -- did

18  your supervising responsibilities entail over that unit?

19      A.   This one was a little different because my

20  team on that one they would, if they were available, and

21  they did a lot of special projects, but they would try

22  to handle any call for service in their housing

23  authority complex.  But we did a lot of other special

24  events stuff that since we were kind of a flexible squad

25  that there was patrol officers that handled that area.


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  We were supplemental, we would handle, like, around the

2  holidays toy bike fund, you know, drives, trying to

3  raise money. We built a giant one of those kaboom

4  playgrounds in one apartment complex.  Did a lot of

5  community service stuff but we also, if there was

6  criminal activity going on there that, you know, we kind

7  of knew who lived there and who didn't because we were

8  there all the time.  So we would do other special

9  enforcement if there was, you know, criminal activity,

10  too.  So we kind of did a little bit of everything.

11      Q.   How long were you the supervisor of the

12  neighborhood patrol unit?

13      A.   About a year and a half.

14      Q.   What was your next assignment as sergeant?

15      A.   So like, May of 2011, I was assigned to the

16  drug unit as a supervisor.  Drug enforcement.

17      Q.   Okay.  And what were your supervising

18  responsibilities with the drug unit?

19      A.   On that one my team was a little bit smaller

20  because we also had our drug dog on our team, so I would

21  make sure the handler for our drug dog was doing the

22  proper training, had the equipment he needed, you know,

23  made sure his records were okay, and we would handle a

24  lot of tips from either community leaders or a crime

25  line about, you know, drug activity.  So we had tips

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  that we were assigned and we were also forwarded police

2  report some time if patrol officer was out on and

3  encountered something that was unusual they thought

4  might have been like organized drug activity they would

5  forward the information to us.  So it was, you know,

6  working tips, supervising the team, and maintaining the

7  -- make sure the dog and his handler had all their

8  records up to date.

9       Q.   And how long were you with the drug unit as a

10 sergeant?

11      A.   Right about two years.  A little bit under two

12 years, so -- you know.

13      Q.   And what was your next assignment as a

14 sergeant?

15      A.   In April, I was transferred to the east

16 property crimes unit as a detective sergeant, to

17 supervise a squad over the east side of Orlando.

18      Q.   Okay.  And that be April 2013?

19      A.   Yes.

20      Q.   Okay.  Okay.  And in that role, what were your

21 supervisory duties?

22      A.   Lots of reading.  So every report that came

23 in, I had to read and determine where it was at, who --

24 you know, and assign it to that detective, and then rate

25 it based on any kind of evidence that was -- you know,



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 depending on if a lot of things were taken, if the place

2 was occupied, but you know, rate it to where it needed

3 to be investigated.  Yeah.

4     Q.   Okay.  And when you said what -- you had to

5 read every report that came in, do you mean, like, field

6 reports from responding officers?

7     A.   Yes.  Every -- so every field report that was

8 in the East side of Orlando that was property crime

9 related.

10     Q.   Okay.  So you'd get the reports.  How would

11 you -- how would you get those?  Would they be

12 electronic, someone hands you paper?

13     A.   They were electronic, luckily.  So yeah, it

14 was -- I don't think they use that program anymore, but

15 yeah, it was -- we call it the AS/400.  It was a DOS

16 file management system.  So that we would go in there

17 and put our code in for whatever area, and it would show

18 all the new cases or unassigned cases and --

19     Q.   Okay.  So you wouldn't necessarily talk to the

20 reporting officer, you would just get the field report?

21     A.   Yeah, just the field report.  Not unless -- I

22 mean, every once in a blue moon, an officer would come

23 up to give us a little more information, but I didn't

24 have much interaction with the officers.  It was all

25 electronically and reading reports.



**MILESTONE** | **REPORTING  COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1        Q.   Okay, and so you said you'd rate it kind of

2   based on a variety of factors.  Once you had kind of

3   done that initial rating of the report that came in,

4   what would you do with it?

5        A.   I would put that code -- oops.  Got my

6   keyboard.  I would put that code in and just -- it would

7   electronically forward to that officer.  So then as a

8   supervisor, I could -- you know, I would -- my first

9   goal is to go to the unassigned new cases that are in

10  just our general code for what our unit was and try to

11  do that first thing every morning to make sure, you know

12  -- especially if the victim is calling the next morning,

13  that the detective has had the chance to review it.  So

14  I'd usually try to do that first thing.

15       Q.   Okay.  And then you would assign to

16  detectives. Would that be based on anything specific --

17  in particular?

18       A.   I only -- I mean, the detective would just be

19  based on where it happened.  If that was in --

20       Q.   Okay.

21       A.   If it happened in their assigned district,

22  they would get it.  But I can't recall a time

23  specifically giving a detective a case that was outside

24  of their district.  It usually was whoever's district it

25  was.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.  And after you assigned based on the

2  jurisdiction to the lead detective, what was your

3  involvement in the case after that?

4    A.   In property crimes, not a whole lot more than

5  that, because it was a pretty constant volly of admin

6  and stuff to try to stay -- keep your -- you know, I

7  would review the cases.  I might -- if it was something

8  -- a massive theft or a string of thefts, I would follow

9  up with them then because I -- you know, especially if

10 something, like, it was a pattern or if it was a really

11 huge theft, you know, I might follow up on it.  Or if it

12 was a -- happened to, you know, somebody that, you know,

13 was in the media or something that might get a little

14 more attention, you know, obviously, you know -- yeah, I

15 wanted to be prepared for anything that I was going to

16 get a question on.

17   Q.   Uh-huh.  And when you say massive, like, what

18 magnitude are we talking?

19   A.   I believe back then it was, like, $20,000.

20 You know, like, you know, if -- you know, 20 grand comes

21 to mind as the -- you know, a pretty big theft, where

22 they took some jewelry, or if a firearm was tooken, or

23 if it was an occupied residential burglary, if there was

24 a struggle inside, you know, those kind of things.

25   Q.   Okay.  In those cases, you might be a little



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  bit more involved than something more simple?

2      A.   Yeah.  I mean, just in passing, if -- you

3  know, if I had a question about it.  But the bigger

4  case, especially when you're reading, you know, a couple

5  hundred cases a week, the bigger ones, you know, stayed

6  in the front of my brain a little bit more than, you

7  know, a car that was, you know, had something taken out

8  of the back of it that was unlocked, you know, with no

9  witnesses.

10     Q.   Sure.  And so once you, in your -- in your

11 system, assigned an investigation to a lead detective,

12 would you supervise it from start to finish?

13     A.   I'm not exactly sure what you're asking.

14 I'm --

15     Q.   Yeah.  Were you -- would you remain the

16 supervisor on an investigation from the moment you

17 assign it to the moment it's closed?

18     A.   That or if I was transferred to another

19 position, it -- then it would, you know, be in --

20     Q.   It would go to someone else.

21     A.   It would stay in that unit.  Yeah.  And what

22 -- not unless I was collecting evidence or had some

23 particular role in it.  But in the property crime cases,

24 I just didn't have the time to do that.  I don't believe

25 I collected any evidence in a property crime case.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

1    Q.   Okay.  So you didn't have, like, on the ground
2  responsibilities associated with --
3    A.   No.
4    Q.   -- these property crime investigations?
5    A.   No, not unless we -- if it was going to result
6  in us serving a search warrant, that was usually one of
7  the few times I went out to the scene because I was
8  required to be there for that.  But most of the -- you
9  know, the time the detectives would do their
10  investigation, and they would submit their supplement
11  report.  And they might submit reports along the way,
12  like, you know, an affidavit for arrest warrant.  And
13  that if -- I would review the warrant or -- and -- or if
14  they submitted a supplement, I would review it and make
15  sure it was grammatically correct and met the burden for
16  probable cause and approve it then.
17    Q.   Okay.  So your responsibilities as an
18  investigation was ongoing would be just to kind of
19  review the reports or supplements that were coming in
20  from the lead detective?
21    A.   Yes.  In this assignment, yeah.  It was a more
22  heavy-handed admin side, because there was just so much
23  paperwork that needed to be read and reviewed between
24  all my detectives.  So this one was more.  But I --
25  wherever the policy was, as far as -- you know -- you

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  know, it would -- you know, I'd do the required review

 2  and things like that.  But as far as, like, working with

 3  the detectives, I just didn't have the time to do that.

 4      Q.   Yeah.  Was it -- did you have any

 5  responsibility in ensuring that detectives were

 6  documenting an investigation in accordance with policy?

 7      A.   Yes.

 8      Q.   If -- and how would you know if a detective

 9  was not documenting according to policy?

10      A.   If it was a big case, especially we had a

11  weekly crime meeting, that if it was a big case or if it

12  was part of a string of cases, I would be able to go

13  into the computer system and they had -- they had case

14  notes.  So they might not actually have their full

15  supplement report done, but a lot of them -- and I did

16  as a detective, I kept case notes where, you know, on

17  the -- this date, I called the victim.  Or this date, I,

18  you know, showed a photo lineup and, you know -- just to

19  kind of have something in the system that the supervisor

20  would know they were working the case.  And I would keep

21  a note for them -- you know, keep them detailed notes

22  for when they actually did their supplement report

23  later.  So I would read case notes and supplement

24  reports.

25      Q.   Okay.  Okay.  And in the 2013 time frame, this



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  was on a computer, these case notes?

2      A.   Yes.

3      Q.   And were the case notes or other documentation

4  related to an investigation all kept in that system?

5      A.   Not necessarily.  I mean, it helped -- I liked

6  when they used it, but a lot of them kind of did it the

7  old school way.  When they would get the report, they

8  would print it out and they would have a -- like a

9  manila folder.  And they would keep all their -- the --

10 their -- everything related to that case in the folder

11 and then would -- at the end of the month, would, you

12 know, update all that information for what they'd been

13 working on.  So a lot of them would do a running paper

14 log, and then they would wrap it up in the computer when

15 they were finished.

16     Q.   Okay.  So some detectives were still kind of

17 doing paper notes and reporting at -- in the 2013 time

18 frame?  Is that what you're saying?

19     A.   Yes, they -- it was a hybrid.  Some would use

20 the system some would use the paper.  But most of them,

21 at one point or another, would have to -- you have the

22 paper, as far as to give people supplements and to keep

23 all their file together.  Most of them did have a -- you

24 know, they kept, like, a manila folder with all their

25 case information on that case together with it.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Were those manila folders with the paper

2  documents inventoried anywhere after an investigation?

3      A.   No, most of them, you know, we were --

4  whatever we were submitting as far as evidence or

5  anything related to, we would scan into the system or

6  turn in those documents.  I can't recall any of the

7  property detectives that maintained the files they

8  submitted them in so there would be digital backups.

9  And a lot of times after they had them backed up, they

10  would get rid of it and once it was -- it -- the report

11  was done.

12  So --

13      Q.   Okay.  And --

14      A.   -- I wasn't -- I wasn't inventorying notes.

15      Q.   Sure.  And when you say they would scan those,

16  like, paper documents into the system, is that the same

17  system where the case notes were kept?

18      A.   Not necessarily because we were using multiple

19  systems.  So the case notes were done in our system back

20  then that was called AS/400 that was just a DOS, pretty

21  basic record management system.  And then we kind of

22  migrated to a different kind that was more digital and a

23  little bit better organized.

24      Q.   Was there anywhere electronically where at the

25  end of the case, everything from an investigation would



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**         **www.MILESTONEREPORTING.com**         **Toll Free 855-MYDEPOS**

1 be kept at some central location or the same location?

2      A.   Well, yeah, all of our record management

3 system went back, you know, the -- one -- it -- whether

4 you scanned it in yourself or you sent it to our record

5 section to maintain it, you know, by paper, it was all

6 submitted with that case number.  And you know -- I'm

7 not sure exactly what you're asking, but I --

8      Q.   Yeah.  I guess I'm wondering if you wanted to

9 find, like, a case file for an investigation, is there

10 one place you could go to to find that?

11      A.   It should be through our record management

12 system.  The only one that I know of that kept giant

13 case files that were a paper, but we also -- they were

14 also stored with our record management system, was when

15 I was in a homicide, because those cases were massive,

16 you know.  But for property crimes, they were just, you

17 know, we -- they'd submit it to our record management

18 system, and they did their magic to preserve them, so.

19      Q.   Okay.  And I think you said it -- it's -- it

20 was the lead detective on a case that was responsible

21 for making sure that everything made it into the system?

22      A.   Yes.  I mean, generally, it was the lead

23 detective, unless they asked somebody to assist them if

24 they had a lot of evidence to turn in.  But generally,

25 it was the lead detective.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  Did you ever play a role in making sure

2  that documents from an investigation made it into the

3  system?

4    A.   My -- the only role I would have taken is if

5  -- when the officer -- I had an in-basket in my desk.

6  So in addition to any digital reports, they would give

7  me paper copies.  And whether it's a -- they called it

8  an APS, which was, like, a -- an arrest -- after a

9  person was arrested, we had a -- like, a checklist of

10 documents that you -- they needed to include, like

11 statements, and affidavits, and photo lineups, anything

12 that was kind of related to it.  So I would review the

13 -- those paperwork and make sure it was signed and

14 completed.  And then I forwarded it to our record

15 management system.  So I didn't actually do it myself.

16 I just, you know, kind of -- it was like interoffice

17 mailed to them, and they handled it, the record

18 management people.

19   Q.   Okay.  So you would have a checklist, make

20 sure everything was there, but you didn't physically put

21 anything into the system?

22   A.   Exactly.  Yeah.  The detective actually

23 completed the checklist for every -- like, a -- an

24 arrest package for if somebody was arrested and they

25 checked what they had.  And if there was a reason it

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  wasn't available, they filled out the cover sheets.  So

2  I would go through the cover sheet, make sure everything

3  that they're saying is in the whole entire document, is

4  in there, and then I would sign it at the bottom and

5  then forward it off to the record management folks.

6      Q.   Okay.  Do you know if those checklists made it

7  into the location where case files were kept?

8      A.   I imagine they would.  I -- it was -- that

9  would've been beyond me that I never did it, but a -- I

10 included -- it was all -- like, with one of them heavy

11 duty clips, holding it all together and it was the first

12 piece, so I would imagine they do.  I haven't -- can't

13 -- it's been a few years since I've retired and been

14 quite a long time since I've pulled any of those

15 documents.  But we always forwarded it to them.  I don't

16 know if it -- I thought it stayed with the case until it

17 got to the state attorney.

18      Q.   Fair enough.  I know it's been a minute.  Did

19 you have -- at the kind of -- at the close of an

20 investigation you were supervising, did you have any

21 responsibilities outside of this checklist?

22      A.   Well, in addition to that, I would review any

23 of the reports to make sure there was no errors in it

24 and make sure that the paperwork they were submitting

25 made sense, and then make sure it had the probable cause



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1 needed to move forward.

2      Q.   Okay.

3      A.   But I was mainly just reviewing documents, and

4 reports, and making sure that there was probable cause

5 in the package.

6      Q.   Okay.  And was part of that responsibility

7 ensuring that investigations were being conducted

8 according to OPD policy?

9      A.   Yes.

10      Q.   Okay.  What would you do if you discovered a

11 lead detective was not conducting an investigation

12 according to OPD policy?

13      A.   Well, I would -- it would depend on the

14 severity of it.  I -- and it's all hypothetical because

15 in my time supervising the property crime unit, I didn't

16 really have an incident where -- that -- that they were

17 violating policy as far as part of their investigation.

18      Q.   Okay.  Any other responsibilities you can

19 think of at -- when you were a supervisor for the

20 property crimes unit?

21      A.   The only thing that did, you know, I would

22 attend meetings.  You know, it was definitely very admin

23 heavy job.  I -- the crime meeting, neighborhood crime

24 watch meetings.  So yeah, I tried to handle a lot of the

25 admin stuffs [sic] and so the detectives actually could



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

 1 do the work, and if they needed something, they let me

 2 know.  But it was, you know, reading a lot of reports

 3 and attending a lot of meetings.

 4     Q.   Okay.  Would you have check-ins with lead

 5 detectives regularly or just when they needed

 6 assistance?

 7     A.   I didn't have anything like a, hey, every

 8 Wednesday at this time but generally, the one thing that

 9 I would stay updated on the case, and I'd have them

10 update me if it was a high-profile case with a big

11 theft.  And I usually wanted to -- by, you know,

12 Thursday afternoon was the big meeting, so I wanted to

13 have any supplements or any other information by, you

14 know, Thursday at noon.  But I saw them -- we were all

15 sat together in similar cubicles, pretty close to one

16 another.  So there was nothing that really set, but, you

17 know, there was a lot of impromptu or informal where

18 they'd swing by and want to talk, you know, about a case

19 or if they had a question.  But we didn't have, like, a

20 standing date.

21     Q.   Sure.  Understood.  For those crime meetings,

22 you said those were weekly?

23     A.   Yes.

24     Q.   Who were those with?

25     A.   So it was every Thursday, I think, like, at



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  2:00.  I don't know.  It was every Thursday afternoon.

2  It was the chief and the deputy chiefs off -- you know,

3  if they were available.  The -- usually the captain for

4  the certain patrol area would be in there as well.  It

5  was a lot of the management, really.  It was, you know,

6  briefing the middle and upper management about any

7  crimes and are -- and being available for any questions,

8  especially if they met -- maybe they were getting a call

9  from one of the city commissioners about a certain

10 crime.  It was just to kind of go over that week's

11 crimes and the trends.  And -- so it was a pretty

12 lengthy meeting every week.  And it -- you know, the

13 crime prevention folks would be in there, too.  So we

14 were all just discussing crime trends.  So if I was

15 working on something in my area and you had a similar

16 one, that we were talking together.  So it was just

17 going over the crimes for that week.

18      Q.   Okay.  So detectives and officers were not a

19 part of those crime meetings; is that right?

20      A.   Not generally.  Every once in a while.

21      Q.   Okay.

22      A.   Especially if, you know, they -- one of the

23 officer, detectives did a good job, the chief might want

24 to present them with something in the meeting and they

25 would come for that.  But as a general rule, it was just


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 the supervision and -- and detectives or -- you know,

2 the detectives and officers themselves didn't attend

3 that.  It was for the management.

4     Q.   Okay, and as a sergeant, who were you directly

5 reporting to?

6     A.   So when I was a sergeant in the property

7 crimes unit, I reported to the property crimes

8 lieutenant.  So that lieutenant was in charge of West

9 property, East property and, like, the auto theft unit

10 and economic crimes.  So all crimes related in the whole

11 city, we had a lieutenant in charge of that.

12     Q.   Got it.  And how long were you a sergeant in

13 the property crimes unit?

14     A.   Not very long.  At that time, there was a --

15 quite a few promotions and there was a lot of movement

16 in the police department.  So I was there about four

17 months.  And then --

18     Q.   Oh, okay.

19     A.   -- in August of 2013, I was selected to

20 supervise the assault and battery violent crimes unit.

21     Q.   Okay, and how long were you with that unit?

22     A.   I was in that unit for about eight or nine

23 months, because in February of 2014, I was selected to

24 supervise the homicide unit.

25     Q.   Okay.  For the assault and battery violent

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 crimes unit, did it operate similarly to the property

2 crimes unit, or did you have different -- a different

3 supervisory role?

4     A.   This one, I was -- I had the opportunity to be

5 involved in those cases a little bit more, because we

6 would handle shootings, stabbings, domestic violence.

7 And sometimes it might have started with us and then,

8 you know, they had complications and died as -- the

9 victim died as a result of their injuries, and we would

10 still kind of work it, but they would assign a homicide

11 detective to help us.  But yeah, so we -- you know, on

12 that one, it was less cases.  So yeah, we would --

13 sometimes the -- you know, we -- I would be out there a

14 little bit more on -- and some of those cases were a

15 little bit more high profile too and as part of, you

16 know, people being injured and hurt, so.

17          But it was similar.  I reviewed cases and I

18 assigned them their cases based on the district they

19 had.  The only one that we kind of split up was

20 downtown, because we would get the detective assigned to

21 downtown on the weekends with all the bar fights.  You

22 know, we would split those up, but -- so they could have

23 the time to investigate them.  But it was, you know,

24 same thing.  It was assigned cases, review them.  And if

25 that unit, they had a couple more search warrants and



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 things like that where I was required to be on scene.

2 But, you know, kind of -- you know, similar but just

3 more, you know -- a little less paperwork in assault and

4 battery units.

5     Q.   Okay.  So the administrative duties were kind

6 of similar, but you just got to do more hands-on

7 investigatory work?

8     A.   Yeah.  I -- well, not really invested.  I

9 didn't do investigations.  I tried to stay out of it.

10 But I'm -- I might, you know, go by if they were, you

11 know, serving a warrant.  If they were going by to

12 canvas a neighborhood, I might go pass flyers out.  But

13 I generally didn't collect debit and sort of doing any

14 investigative work.

15     Q.   Okay.  Any other duties you can think of that

16 you were doing besides -- like out in the field, besides

17 serving warrants and canvassing neighborhoods?

18     A.    I was also -- for that unit, we were -- we had

19 a grant through domestic violence and through the Harbor

20 House, the shelter.  So I did have to attend a -- some

21 more meetings with that and was involved in a little bit

22 with that grant management to make sure that we had one

23 detective in our unit that was only supposed to follow

24 up on the more severe domestic violence cases.  So you

25 know, and they kind of -- they met with the counselor

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       **Toll Free 855-MYDEPOS**

1  from the Harbor House who helped them, you know, triage

2  those cases.  But other than that, that's the only thing

3  different I can think of for that unit that I did.

4       Q.   Okay.  And then you said you went to the

5  homicide unit again, like still a sergeant, correct?

6       A.   Still a -- yes, ma'am, still a sergeant.

7       Q.   Okay.  How long were you at the homicide unit?

8       A.   Right about two years.

9       Q.   Okay.  So sometime 2016?  Sometime into 2016?

10      A.   Yeah.  Yeah.  February of '14 till March of

11  2016, I was the homicide sergeant.

12      Q.   Okay.  And kind of same question.  Were your

13  administrative duties kind of the same as with the other

14  units you supervised?

15      A.   No.  This -- this one, I --

16      Q.   Okay.

17      A.   I definitely -- yeah, definitely was in the

18  field a lot more.  You know, for the admin side,

19  luckily, you know, we didn't get as many cases, but we

20  worked missing persons as well.  So we worked homicide.

21  We worked missing persons.  And we also -- each

22  detective had a list of inherited open cases for missing

23  persons, and homicides, going back to the 60s.  So you

24  know, and we were -- also at that time, the homicide

25  unit was part of the joint homicide investigation team.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1 So we were sworn in under the state attorney, so we had

2 law enforcement authority anywhere in the 9th Circuit of

3 Orange and Osceola County to -- if it was related to a

4 homicide or a missing person.  So it would be nice that

5 we did need mutual aid, you know, that we could work in

6 that area.

7       Q.   Okay.

8       A.   And --

9       Q.   Understood.  Any -- what other supervisory

10 duties did you have as a head of -- or as a supervisor

11 of that unit?

12       A.   We also had -- we had a detective from a

13 couple different agencies that, luckily for them, their

14 jurisdictions don't have many murders.  And a lot of

15 times, they'll go years without having them.  So Winter

16 Park, Ocoee, Maitland, and Apopka had a detective that

17 worked full time out of our office, and they worked

18 seconds on a lot of them to gain that experience.  So --

19 but if their jurisdiction had a murder, we would bring

20 our whole crime unit and them -- you know, and all the

21 resources were -- all the resources they would need.  So

22 I did have to have periodic meetings with the leadership

23 of those agencies to keep them updated.  But on -- you

24 know, we also responded to officer involved shootings,

25 too, that we worked, like, as an assistant to the state

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1 and that -- but we had to respond out just like it was a

2 murder on that.

3         So as a sergeant, I would have teams of

4 detectives on call, and it's just based on availability,

5 and if we had a murder or an officer involved shooting,

6 in addition to calling out the team, I responded in as

7 well and -- you know, and assisted.  Generally, I --

8 since I did go to every murder, I -- even in this one, I

9 didn't really collect a lot of evidence.  And I mainly

10 tried to -- like, I would stay with the crime scene unit

11 while they were collecting evidence to make sure they

12 had everything they needed and -- and give any of the

13 admin assistance the detectives might need, but I tried

14 to let them work and I would stay at the scene.

15     Q.   Okay.  Any other duties that you performed

16 that you can think of as a sergeant in the homicide

17 unit?

18     A.   No, I'm sure there probably is, but I mean,

19 you know, main -- mainly you have meetings, being on

20 call, you know, 24/7 and being able to go go on a

21 second.

22     Q.   Yeah.  What was your -- after you finished

23 with your stint in the homicide unit, did you have

24 another assignment as a sergeant?

25     A.   No, that was my last assignment as a sergeant.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.  What happened after you were a

2  sergeant?

3    A.   In March of 2016, I was promoted to

4  lieutenant. And that would be a patrol lieutenant,

5  supervising uniform patrol officers as the manager.

6    Q.   Okay.  Patrol lieutenant, March 2016.  How

7  long were you a patrol lieutenant?

8    A.   About two years.  I worked on the West side

9  for about a year as a midnight watch commander

10 lieutenant. And then there was an opening on the day

11 shift on the East side of town.  And I -- it was just

12 done based on seniority and it was my turn, and I moved

13 to go to the day shift squad.  So I did that for about a

14 year then, too.

15   Q.   Okay.  And --

16   A.   So a year on the West, a year on the days.

17   Q.   Forgive my ignorance, but you were a patrol

18 sergeant as well.  What's -- what were your -- the

19 difference between your duties as a sergeant to

20 lieutenant on patrol?

21   A.   So as a patrol sergeant, I had one squad that

22 kind of would work, like, the Southwest or, you know,

23 would work, you know, one patrol district.  When I was

24 promoted to lieutenant, I would supervise two or three

25 different sergeants.  And it varied based on the



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

 1 assignment.  But, you know, I would have -- I would be

 2 -- they would -- I would be direct report for, you know,

 3 two to three different sergeants and their squads.  And

 4 at times, I was the watch commander.  I'm -- I might be

 5 the direct manager of the southwest part of Orlando, but

 6 I could be covering the entire city so I could be

 7 monitoring multiple, you know, things at once.  So on

 8 those, it was just monitoring while -- you know, during

 9 that period.  But I would directly managed you know, two

10 to three squads each time.

11      Q.   Okay.  And I think you had mentioned earlier

12 that there was some class or training required when you

13 went from sergeant to lieutenant; is that right?

14      A.   Yes.

15      Q.   Okay.  What was that?

16      A.   It was -- I believe they called it middle

17 management for law enforcement.  It was a week-long

18 course that I had to take, and I had to take two

19 incident command classes of FEMA but, you know, for --

20 based on my rank.  But yeah, it was a week-long class. I

21 believe it was called middle management.

22      Q.   Okay.  Do you remember the topics that were

23 covered in that middle -- pardon me, middle management

24 class?

25      A.   More of leadership, qualities, command and



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  control, you know, that was the gist of it a lot.  It

2  was, you know -- you know, different interpersonal

3  skills, different management styles, the importance of

4  paying attention to everything going on so that, you

5  know, as a patrol watch commander, you could be tasked

6  for doing quite a bit of stuff that, you know, you're --

7  if you're assigned to the West side, but you're covering

8  the entire city, you got to be paying attention to a lot

9  of things.  So you know, multitasking skills and things

10  like that, it kind of covered.  But it -- yeah, it's

11  been quite a while.  I can't really recall anything else

12  off the top of my head.

13      Q.   Fair enough.  And for the two incident command

14  classes with FEMA, do you -- do you recall what those

15  courses entailed?

16      A.   It was more of, like, a unified command and

17  working together, whether you might be law enforcement

18  working with public works and working with the

19  engineers.  It's unified command and control and

20  handling emergencies based on the needs of -- you know,

21  of the big picture and that kind of stuff.

22      Q.   Got it.  So you were a patrol lieutenant for

23  about two years.  What was your next assignment as a

24  lieutenant?

25      A.   My next assignment was going to the airport as



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

 1  a patrol lieutenant or watch commander at the airport at

 2  Orlando.

 3       Q.   And about when was that?

 4       A.   It was about September of 2018.

 5       Q.   Okay, and how long were you an airport patrol

 6  lieutenant?

 7       A.   Probably about a year and a half.  Yeah, a

 8  year, year and a half.  It was kind of -- it gets a

 9  little complicated, because the next assignment, I was

10  actually the -- selected to take on before I retired,

11  was the deputy division commander at Orlando

12  International, and for about nine months, I was kind of

13  doing both jobs because the lieutenant who was in that

14  position had a heart attack and was out and, you know,

15  came back for a little while and then retired.  But --

16  so I was kind of doing both jobs, you know, during -- so

17  it might be easier to, you know, break it down like

18  that, but --

19       Q.   Yeah.  No.  Let's talk about them together, if

20  that's a little bit easier --

21       A.   Yeah.

22       Q.   -- and kind of what your responsibilities were

23  in those positions.

24       A.   So now as the patrol attendant, the airport

25  was -- even though it was Orlando Police, it definitely



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  is a whole different city.  When I first went out there,

2  I was a patrol lieutenant, and I kind of worked the mid-

3  shift, because I was in charge of both the day shift,

4  and the midnight shifts.  So I would try to work a

5  schedule so I saw both of them every day when we worked,

6  and then I would be on call after hours if they had an

7  incident happen after I left.  But for that, I would --

8  I was kind of the liaison between the airport and GOAA,

9  the Greater Orlando Aviation Authority, and the Police

10 Department and the officer.  So I would try to go to the

11 briefings where they had their briefing before they

12 started their real shift and go over any issues, if we

13 had any training that needed to be done to make sure it

14 was being done, and be there for any questions or

15 concerns that the officers might have so I could reach

16 out to our counterparts.  Because there was a lot of

17 counterparts at the airport between TSA and Homeland

18 Security and, you know, the -- and the airport and their

19 security teams themselves, so I kind of tried to work in

20 the middle to accomplish the mission and be the point of

21 contact for both.

22      Q.   Okay.  And did you say that -- were you in

23 that role until your retirement?

24      A.   No, I was in that role for about a year and a

25 half.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.

2      A.   And then I was selected to become the deputy

3  division commander.

4      Q.   Okay.  And were you deputy division commander

5  until your retirement?

6      A.   I was.

7      Q.   Okay.  And when did you retire?

8      A.   I retired in, like, April of 2022.

9      Q.   Right.  Okay.  And did -- since your

10  retirement, have you held any additional employment?

11      A.   Yes, so I have.  Nothing in law enforcement.

12      Q.   Okay.

13      A.   Twenty-five years was enough.  So when I --

14  when I retired, I worked right -- I mean, I had, like,

15  one week off and then I went to the Orange County

16  Convention Center where I was a security supervisor

17  there.  And I supervised all the security, being from

18  all the shifts in the command posts.  Where the calls

19  and the brains of the Convention Center, wherever, I

20  supervised that as well.

21      Q.   How long did you work -- supervised security

22  at the Convention Center?

23      A.   About a year and a half, so like April of '22

24  until about August of 2023.

25      Q.   Okay.  And did you hold any employment after



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  that?

 2       A.   Yeah.  I left that job because I fell in love

 3  with aviation when I worked at the airport as law

 4  enforcement.  And there's an airport nearby where I

 5  lived that's a smaller airport, and they had a opening

 6  of working actually in the airfield on the runways and

 7  not being a supervisor or management anymore.  And I

 8  took that job.  It's in -- I work, less,  it's closer to

 9  the house, and it's around the aircraft and aviation. So

10  I've been doing that since September of '23 until now.

11  I'm currently there.

12       Q.   What airport is that?

13       A.   Kissimmee.  Kissimmee Gateway Airport.

14       Q.   Okay.  And that's where you currently work?

15       A.   Yes.  So it -- so I work for the City of

16  Kissimmee.  They own the airport and I --

17       Q.   Okay.

18       A.   I work in the airfield as an airfield

19  operations coordinator.

20       Q.   Great.  I'm fine to keep going, but if folks

21  need -- we've been going a little over an hour.  If

22  folks need a break, happy to take one.  Dan, how are you

23  feeling?

24           MR. MISTOLER:  Can we take a little five-minute

25      break?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1         MS. DILLON:  Yeah, sure.

2         THE WITNESS:  Yes, I was going to say the same

3      thing.  Five minutes is perfect.

4         MS. DILLON:  Sounds good.

5         MR. MISTOLER:  Thank you.

6            (A recess was taken.)

7         BY MS. DILLON:

8      Q.   All right, Dan.  So just before we went off,

9  we had kind of just finished wrapping up your employment

10  history with the Orlando Police Department and kind of

11  where you -- where you are now.

12            Now, I want to just talk a little bit about

13  some of the training and policies when you were working

14  at OPD.

15      Q.   When you worked at OPD in, like, the 2013 time

16  range, did you have a work e-mail address?

17      A.   I did.

18      Q.   Okay.  Did you use that e-mail in relation to

19  the investigations you supervised?

20      A.   I mean, at times, sure.

21      Q.   Okay.  How might you have used it at times in

22  relation to the criminal investigations?

23      A.   If I got an e-mail -- like a question from my

24  chain of command about a case, the detective might e-

25  mail me.  The system -- the state attorney would --

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 might e-mail you.  I mean, it could be a lot of

2 different ways.

3      Q.   Do you still have access to that e-mail?

4      A.   No.

5      Q.   Okay.

6      A.   I can tell you what it was.  I'm sure it's

7 archived somewhere, but no.  You know, when I retired, I

8 definitely did not use that e-mail address anymore.

9      Q.   Sure.  What was your e-mail at the time?

10      A.   It was daniel.brady@cityoforlando.net.  And

11 right at the very end, the last month or few or could

12 have been a few, it was the same thing at -- but it was

13 daniel.brady@orlando.gov.  They switched to .gov towards

14 the end.  They kind of -- they --

15      Q.   Okay.

16      A.   I think they had both of them still going.  So

17 they -- you know, but they were migrating to get away

18 from the cityoforlando.net to orlando.gov.

19      Q.   Okay.  And that was, you said, kind of towards

20 the end of your time with OPD they did that switch?

21      A.   Yes.

22      Q.   Okay.  So in 2013, that time frame, you had

23 the cityoforlando.net e-mail address?  No others?

24      A.   Yes.

25      Q.   In terms of work e-mails?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Yes.

2      Q.   Okay.  So when we were talking earlier about

3 your role as sergeant with Property Crimes Unit, I

4 believe you said that you would review reports that were

5 written by detectives, and officers, in connections with

6 the investigations you supervised; is that right?

7      A.   Yes.

8      Q.   Okay.  And that would include field reports by

9 responding officers, correct?

10     A.   Yes, generally.  Sometimes, like the --

11 obviously I'm going to get the initial report because

12 it's coded properly, but sometimes there would be

13 information reports and other kinds of reports.

14 Sometimes Mike got -- mike, you know, after it was

15 completed, sent to, like, the just, like, general area.

16 But sometimes those information one I might not find out

17 about.

18     Q.   Okay.  So for instance, if there was a field

19 report by a responding crime scene investigator, is that

20 something you would always see?

21     A.   Generally, if it was done in time, I didn't.

22     Q.   Okay.

23     A.   They had a separate supervisor for them, but

24 it -- I usually saw it when the detective finished their

25 whole, like, arrest package that had all the supplements



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  from everybody in it.  That's generally where I saw that

2  because I wasn't -- they didn't have the crime scene

3  reports, like, automatically sent to me after they were

4  reviewed.

5      Q.   Okay.  But at some point, you would expect to

6  see the reports by crime scene investigators.  Just

7  might happen a little bit later?

8      A.   Yes.

9      Q.   Okay.  And I know you said it -- that would

10 include investigative supplements by lead detectives.

11 You would review those, correct?

12     A.   Yes.

13     Q.   Would it include any photo lineups conducted

14 in the course of an investigation?

15     A.   That, I would usually see with their --  the

16 APS package that the photo lineup and then, like, the

17 photo lineup information sheet affidavit would be in

18 that package, but yeah.  And also, I would also see them

19 -- sometimes they would do photo lineups and the case

20 would go inactive.  I would review them and forward them

21 to the record management system that would upload it,

22 you know, and store it properly.

23     Q.   Okay.  Any other specific type of record or

24 document that you could think of that you reviewed in

25 connection with the property investigations?


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.   Yeah.  There would -- there would be sometimes

2 if they roped off an area and declared it a crime scene

3 and, you know, why they were investigating it, whether

4 the detectives or the crime scene people, they had like

5 a contamination sheet.  Anybody who went inside that

6 roped off area, I would review contamination sheets, and

7 also in the package, they had a, like, a recovering cost

8 of the investigation that I would review and make sure

9 that ours matched up to, you know, what they were using

10 in the case and sign that.

11     Q.   Okay.  Anything else you can think of?

12     A.   Not off the top of my head right now, but --

13     Q.   Okay, fair enough.  And was it just your

14 practice to review those things or was it OPD policy for

15 you to review those documents in connection with a

16 criminal investigation?

17     A.   Well, it depends on the document, but as a

18 general rule, I mean, all their paperwork, all the

19 paperwork from detectives would come to my end basket,

20 whether it was just supplemental reports or arrest

21 packages.  So anything that they put in my basket, I

22 would review and make sure it was accurate and sign off

23 on it and forward it to our criminal intake or record

24 management.

25     Q.   Okay.  And to your knowledge, would that be



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 all the paperwork generated by detectives in an

2 investigation that would come through your basket?

3      A.   Oh, it should.  I mean, unless for some reason

4 I was off and it was time-sensitive and they took it to

5 another supervisor or --

6      Q.   Got it.

7      A.   Yeah, or a squad leader if I -- you know --

8 you know, like, I was the sergeant, but I generally

9 would have a squad leader that could help on some.  They

10 might review some documents, but --

11      Q.   Okay.  After what events were officers or

12 detectives expected to create written reports or

13 documentation?

14      A.   That -- that's a wide range question because

15 the -- well, all officers are -- you know, if they're

16 notified of a crime, they're supposed to document it

17 whether they're, you know, it's a patrol officer or a

18 detective.  But you kind of lost me on exactly what

19 you're looking for in that question.

20      Q.   I'll get more specific.  So say a detective

21 performed a task, like talking to a witness, would you

22 expect that to be documented in a report somewhere?

23      A.   It depends.  I mean, whether they are

24 documenting it on paper with their case file, or they're

25 doing using the, you know, the notetaking, the system



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  where they're just updating it, it depends.  I would

 2  think that they would have it documented somewhere that

 3  they could recall accurately and put it into a written

 4  report, because that's generally what I reviewed.  I

 5  mean, I only went with the case notes if I was looking

 6  for a question if I got called on something and they

 7  were unavailable.  So you know, one way or another, it

 8  -- either in the computer or out in the paper with their

 9  case file, I expect them to keep notes of the who they

10  met with and what time.

11       Q.   What about a show-up identification with a

12  witness or a victim?  Is that the kind of thing you

13  would expect to be written somewhere?

14       A.   I mean, just like meeting with a witness, I

15  would expect that they would've be, you know, taking

16  notes and documenting it.  And either not necessarily a,

17  you know, a special report just for that, but have it

18  documented somewhere where they could, you know, when

19  they finished their full supplement at the end of the

20  month, that they could recall all the facts and put it

21  in that report.

22       Q.   Got it, and kind of same question, what about

23  after showing a photo lineup to a witness?  Is that the

24  kind of task you'd expect to be in a written report

25  somewhere?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1       A.    Yeah, I would expect, you know, it to be

2   documented or included in -- in a report.

3       Q.    Okay.  Is there -- did you -- when you were a

4   detective or in the 2013 time frame, did detectives

5   receive any training about report writing and

6   documenting investigative tasks?

7       A.    Well, we did annual recertification training

8   and they almost every year covered reports.  When

9   somebody was new and selected to become a detective, we

10  would kind of go over some additional training with them

11  to make sure they're prepared for them, their

12  transition.

13      Q.    Okay.  And when you supervised an

14  investigation, was part of your job to make sure that

15  detectives were documenting properly?

16      A.    Yes, I would, you know, expect that.  I would

17  expect that they're documenting things accurately.

18      Q.    Okay.  Once the reports were written, I think

19  you said they would come across your office in either a

20  basket or in that online system; is that right?

21      A.    Yes.

22      Q.    Okay.  And as a supervisor, you would never

23  just sign off on a report without reviewing it, right?

24      A.    Oh, no.  I would review it to make sure it

25  was, you know, grammatically correct and had a probable



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1 cause inside of it.

2      Q.   Got it.  And after you reviewed those reports,

3 what happened to them?  Would they just go back into

4 that online system?

5      A.   Yeah.  The ones that -- if they -- it was a

6 smaller report, it would be in the digital version where

7 I would review it.  And then after I approved it would,

8 you know, go off to where it needed to go.

9           The longer reports, they would have to

10 manually type themselves.  So that's why it was

11 important to be keeping good notes of what you did

12 because it -- they didn't have the assistance.  They had

13 to type it all up. So that -- because there was a window

14 in there where we went away from, I think during that

15 window when I was a property detective, we still had a

16 system where I believe you could call in the reports,

17 but that they were smaller.  But most of them were typed

18 in like a Word format, like, you know, like on our

19 similar paperwork.  And I would review a lot of paper

20 copies.

21      Q.   Got it.  As an OPD detective or sergeant, did

22 you receive training about interviewing witnesses in

23 connection with criminal investigations?

24      A.   Yes.  And I believe I took a class on

25 interview techniques that was a week-long course before



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  I became a detective.

2      Q.   Okay.  And besides that class, because it --

3  that class wasn't mandatory, correct?

4      A.   No.

5      Q.   Okay.  Was the interviewing witnesses training

6  part of the annual training you were talking about a

7  little bit earlier?

8      A.   Well, the -- every new detective that came in,

9  and I believe I only had one new detective that came

10 into my area when I was there for that short window, but

11 we had, like, onboarding training that kind of went over

12 our policies a little more in depth, make sure that they

13 were familiar with it and we're doing the job by the

14 policy.

15     Q.   Right.

16     A.   But in our annual training that was required,

17 the legal advisor generally would come in once a year

18 and cover a lot of topics, and a lot of times, it would

19 involve interviewing and witnesses and suspects and, you

20 know, that was -- it wasn't something scheduled, like --

21 but almost every year they had some little window where

22 they were talking about that.

23     Q.   Okay.  So there was a few different ways that

24 folks would receive training on interviewing witnesses.

25 There was the, like, informal, unscheduled, someone



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1 would come in and talk about it.  There's extra training

2 that you sought out for yourself through a course.  And

3 then there's just general training that all new

4 detectives get; is that right?

5     A.   Yes, that sounds right.

6     Q.   Okay.  Would it ever be good practice to

7 interview a witness without taking any notes?

8          MR. MISTOLER:  Objection, but you can answer.

9          THE WITNESS:  Every detective's different.  I

10     was -- I always brought a notepad and took notes,

11     and that, I think that would either did taking notes

12     or recording with an audio recorder.

13          BY MS. DILLON:

14     Q.   Okay.  It was your practice to take notes or

15 record with an audio recorder?

16     A.   Yes.  And but there wasn't any requirement

17 that they shall have a notepad and paper or shall record

18 it, but it was best --

19     Q.   Okay.

20     A.   -- practice to have it backed up so you can

21 have your information recorded accurately.

22     Q.   Yeah.  And is that so that when you're report

23 writing, you can convey accurate information?

24     A.   Yes.

25     Q.   Okay.  Was there any -- besides note-taking or



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  audio, were there best practices for how to memorialize

2  witness interviews in 2013?

3      A.   Well, it was the -- to memorialize them would

4  be, you know, to, you know, to review it.  The detective

5  generally kept a copy of the statement and to forward

6  the original document to our record management site.

7      Q.   Okay.  Was there --

8      A.   But --

9      Q.   Sorry, go ahead.

10     A.   Yeah.  I mean -- that mean that was the --

11 yeah, they kept a copy of it and they were -- it should

12 have been, you know, turned in.  So it's stored and

13 preserved.

14     Q.   Can you think of any situations where it would

15 be appropriate for a detective to interview a witness

16 without memorializing it in a report anywhere

17 afterwards?

18         MR. MISTOLER:  Objection, but you can answer.

19         THE WITNESS:  It would depend on the situation.

20     I mean, I -- you know, and if you were trying to

21     build a rapport, maybe, that you know, that it was

22     more casual, but I -- you know, I for me, I always

23     took notes.  I wanted to make sure everything was

24     accurate.

25         BY MS. DILLON:

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     Q.   Okay.  So your personal practice was to
2  memorialize any interview with a witness in writing
3  afterwards?
4     A.   Yes, but I mean, like I mentioned, for trying
5  to build rapport, I haven't seen detectives go in there
6  at first with any paper, pen to try to keep the
7  conversation a little more casual and build rapport.
8     Q.   Got it.  So there are there are circumstances
9  where it would be okay to interview a witness without
10  writing anything about it?
11     A.   Yes.
12     Q.   Okay.  Sorry, I'm just -- I got ahead of
13  myself in my notes, so give me one second.  Okay.  When
14  you were working as a detective, or sergeant, even
15  lieutenant with OPD, did you work with photo lineups
16  often?
17     A.   Yes.  I worked with them.  I don't know what
18  -- how you define often, but yeah, there was time where
19  I did frequently use a photo lineup or was around them.
20     Q.   Did you have experience creating photo
21  lineups?
22     A.   Yes.  I had to make some of -- I've made photo
23  lineups before.
24     Q.   Okay.  Any estimation of how many you've made?
25     A.   No.  I mean, I don't think I made any photo



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1 lineups once I became a supervisor, but if -- I'd be

 2 guessing, but, you know, definitely, you know, some. You

 3 know, more than ten.

 4      Q.   Okay.  So it happened when you were a

 5 detective.  You would've made photo lineups, not as a

 6 sergeant or lieutenant?

 7      A.   Yeah.  Detective or an officer, yeah.

 8      Q.   Okay.

 9      A.   When I was on the Tourism Unit on

10 International Drive, I use photo lineups down there

11 sometimes, too.

12      Q.   Was there any training provided on the proper

13 way to conduct or to create photo arrays?

14      A.   We had a policy on -- that documented it and

15 gave the legal contact and the guidance on when and they

16 should be used.  But they -- you'd want to file the

17 guidelines and the best practices and the policy at the

18 time.

19      Q.   Okay.  So thinking in around the 2013 time

20 frame, I know you were a sergeant, but you said you had

21 experience with lineups before that.  If you wanted to

22 put together a photo array, how would you go about doing

23 it?

24      A.   There was generally two ways.  The -- we had

25 one that was called our X image.  It was basically put



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 all the booking photos of people that you could put in

2 the parameters of what you're looking for, and it would

3 make a lineup using that system.  For some reason, they

4 did not have the person who you were wanting to include

5 in the lineup.  Was not -- didn't have a photo in the X

6 image booking photo database.  You'd have to go to the

7 Florida driver's license database to find photos.  And

8 that was another way we could get photos.  Because we

9 were trying to find photos that had a -- the similar

10 backgrounds, and similar styles, so they, you know,

11 would look closer.  But usually, you know, driver's

12 license or booking photos.

13     Q.   Okay.  And is it totally up to the discretion

14 of the detective or officer putting together the array,

15 what photos to use?

16          MR. MISTOLER:  Objection.  You can answer.

17          THE WITNESS:  Can you ask the question again?

18           BY MS. DILLON:

19     Q.   Yes.  Is it up to the discretion of the

20 detective or officer who's putting together the photo

21 array which photos to use?

22          MR. MISTOLER:  Same objection.  You can answer.

23          THE WITNESS:  Yeah.  And with -- there, the --

24     you didn't say you had to do one over the other.  It

25     -- you know, it just depended on what you're looking



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      for. If, you know, if it was a horrible photograph

2      where the, you know, the one photograph would really

3      stick out in the booking system and they had a

4      better one that looked a little more like everybody

5      else.  And, you know, we could use the driver's

6      license database.  So just depending on the photo

7      that was available, you wanted to make sure you

8      could put one together that would not be too obvious

9      of who -- in the person you're looking for.

10          BY MS. DILLON:

11      Q.   Okay.  So kind of the quality of the photo is

12  more important than where you're getting it from?

13      A.   Yeah, the quality and the content.  You know,

14  we wouldn't want to have -- if for say that, you know,

15  they were crying and all disarrayed in the booking

16  photo, we wouldn't want to use that.  You know, that's

17  one time we would go back to use the data -- database

18  for the driver's license.

19      Q.   Got it.  And so in terms of selecting fillers,

20  is the selection of the fillers within the discretion of

21  the detective putting together the photo array?

22      A.   It is.

23      Q.   Okay.  And when putting together a photo

24  array, what characteristics across the photographs are

25  you trying to match?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        A.    Similar age, similar complexion, similar --

2    you know, we wouldn't want somebody that had a new face

3    tattoo on there and that, you know, face -- you know, so

4    tattoos, piercings, hairstyles, anything that might, you

5    know, be unfairly characterized as the suspect.  You

6    know, we want to make sure that the other ones are

7    plausible of, you know, similar looking people.

8        Q.    Is it fair to say that the more different a

9    suspect looks from other -- the other filler photos, the

10   more suggestive the lineup might be?

11           MR. MISTOLER:  Objection.  You can answer, Dan.

12           THE WITNESS:  Yes, I could see that.

13           BY MS. DILLON:

14       Q.    And what does it mean for a lineup to be

15   suggestive?

16       A.    To be -- you know, to me for what I recall

17   from the policy, you wouldn't want to have one bald

18   person in there if they were the suspect and everybody

19   else had hair, or everybody to be wearing a white shirt,

20   and the suspect's wearing a red shirt, or a photograph

21   that clearly is from a different location.  So you

22   wouldn't want to make a photo lineup with five

23   photographs from the driver's license database and pick

24   one that's a booking photo.  So you know, a lot of

25   different things you -- we -- I always wanted to make

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 sure I put together a lineup that the other five folks

2 in the lineup, you know, had a similar hair, similar

3 complexion, similarly dressed, to try to make -- you

4 know, to -- I didn't want to unduly put too much

5 pressure, or emphasis on one person or pick one person

6 looked entirely different.

7      Q.   Okay.  So if a lineup's put together in a way

8 where the photo of the subject is distinct from the

9 other filler photos, that's what would make it

10 suggestive?

11     A.   It could be.  I mean, depending on how

12 suggestive, yeah, it could be.

13     Q.   Okay.  Is it wrong for a lineup to be

14 suggestive?

15     A.   Yes.

16     Q.   Why?

17     A.   Well, because ultimately we're investigating a

18 crime but we're trying to protect the civil rights of

19 everybody involved, including the suspect.

20     Q.   If a witness selects a suspect from a

21 suggestive lineup, is that a useful identification?

22     A.   Sorry.  From a -- can you repeat that one more

23 time?  You lost me.

24     Q.   Yeah, sure.  No, you're good.  If a witness

25 selects a suspect from a suggestive lineup, is it a



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 useful identification?

2     A.   I -- it would depend on the circumstance.  I

3 mean, if you're saying that you have a lineup that's, I

4 mean, super suggestive that, you know, they -- one --

5 the suspect looks -- doesn't look like any other person

6 in the lineup, I could say that would be suggestive. And

7 I would have a problem with a witness selecting somebody

8 from a improper lineup.

9     Q.   And in supervising cases, I think you

10 mentioned that you would probably see a photo array

11 lineup at some point, is that right, that was used in a

12 case?

13     A.   Yes.

14     Q.   You might not see it when it was put together,

15 though; is that right?

16     A.   Yeah.  That -- yeah, I almost never saw it

17 being made unless we happen to be in the same area doing

18 something together that, yeah, they completed their

19 lineup.  And sometimes they might -- the detectives

20 might come by and show it to me ahead of time but not

21 very often.  It wasn't like common practice.  I normally

22 didn't see it until the whole package was turned into

23 me.

24     Q.   Okay.  And when you were --

25     A.   And then I --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   -- reviewing -- sorry, go ahead.

2      A.   Or if they -- the detectives were making the

3   lineup specifically brought it to me, but other than

4   that, I just saw it at the end usually.

5      Q.   Got it.  And when you were reviewing the

6   package which would include the lineups, were you

7   looking at the lineups for suggestibility?

8      A.   Yes.

9      Q.   Okay.  Was that part of your job as a

10  supervisor?

11     A.   Yes.  That was -- you know, I would go through

12  every document in there to make sure that, you know,

13  sign that it was, you know, accurate and filled out, and

14  part of that would be, you know, reviewing the line, the

15  photo lineup.  And, you know, I wanted to make sure

16  there wasn't any too -- anybody too suggestive in the

17  lineups.

18     Q.   Did you ever have a circumstance as a

19  supervisor where you reviewed a lineup that you thought

20  was too suggestive?

21     A.   No, I never had an issue with one, not that I

22  can recall.

23     Q.   Okay.  Was there any required training at OPD

24  on what the administrator of a lineup is supposed to say

25  to a witness before showing them a photo array?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

1    A.   Yes.   The -- we're supposed to -- it was

2  called a -- like, a photo lineup admonition sheet that

3  before we show them lineup, we were supposed to read it

4  to them to let them know, you know, the suspect may or

5  may not be in this photograph and -- but we would read

6  it word for word to them and then show them the lineup

7  after we read the admonition to them and allowed them to

8  review the photo lineup.

9    Q.   Okay.   Besides the admonition, is there

10 anything else an officer is supposed to say before

11 administering a lineup?

12   A.   No.   I usually kept it by the books on that

13 that I would, you know -- policies changed after 2013

14 about, you know -- but at the time, you know, you would

15 read the admonition sheet, show them the lineup, and

16 they would select who they selected.  I would try to

17 avoid giving them any comments whether yes, that's him

18 or no, that's not.  That -- I wouldn't.  I just would

19 say, okay, let's fill that and stay right to the

20 paperwork and keep it in line with the admonition sheet.

21   Q.   Okay.   And I think you said that was, what,

22 kind of the protocol was in 2013, but the policies

23 changed sometime after that; is that right?

24   A.   Yes.

25   Q.   How did the policies change?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     A.   Well, for the photo lineup, the admonition and

2  instruction sheet was a little bit -- had a little more

3  details.  And I think for some reason, I think it was

4  like around 2015, '16, but it was after this that the --

5  you -- you -- that a lead detective completed the photo

6  lineup, and made it and they had to give it to an

7  independent detective that wasn't involved in the case

8  to present it.  So the lead detective didn't interact

9  with the witness when they showed them a lineup.

10     Q.   Okay.  So at some time, 2015, more details in

11  the admonition and instruction, and there, it had to be

12  a blind administration of the lineup?

13     A.   Yes.

14     Q.   Okay.  Do you know why the policy changed?

15     A.   No.  I wasn't involved in the policy.  You

16  know, best practice, and it definitely kept it more

17  organized and -- but I can't remember if there was a

18  specific incident or reason.  I think it just was best

19  practice based on, you know, law enforcement in general.

20     Q.   Do you have any understanding of why blind

21  administration is considered a better practice than

22  having the creator of the lineup administer it?

23          MR. MISTOLER:  Objection.  You can answer if

24     you know.

25          THE WITNESS:  Yeah.  I mean, it -- I wasn't



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    involved in it and it just seems -- it does seem

2    like it would be a better contained test when

3    whoever's involved in investing in the case is not

4    presenting that lineup to the witness to be more

5    impartial, I guess.

6        BY MS. DILLON:

7    Q.   Okay.  But that wasn't a requirement in 2013?

8    A.   No.

9    Q.   Okay.  So detectives who created a photo array

10   could also administer the lineup?

11   A.   Yes.

12   Q.   Was it -- did detectives ever use a blind

13   administrator to conduct a lineup, or was it common

14   practice for them to just administer themselves?

15   A.   In my unit at time, it was -- that's the

16   policy and that was the practice of, you know, because

17   they -- you know, they -- every -- all the detectives

18   had their own caseload they were wanting to work.  So

19   they - it -- that wasn't required in policy.  So you

20   know, they -- the detectives would create their own

21   lineups.

22   Q.   And then administer the on -- their own

23   lineups as well?

24   A.   Yes, in 2013.

25   Q.   Okay.  Was there any required training in the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  2013 time frame on what an administrator -- administer

2  of a lineup is supposed to say to a witness during the

3  photo array?

4      A.   I can't recall specifically.  I know in any

5  time that there was a new policy, you are required to

6  read it and review it and they generally would cover it

7  later that year in the training.  But yeah, not really.

8  Just follow the policy and every officer and detective,

9  even the chief of police, has any time a policy's

10 changed or updated or a new one's added in, you have to

11 read and review it and sign off on it, that you read and

12 understand it.

13     Q.   Got it.  So to the extent there was anything

14 about what an officer was supposed to say during a photo

15 array -- officers required to sign off on -- read the

16 policy and sign off on it in that time frame?

17     A.   Yes.

18     Q.   Okay.  How can a detective tell if a witness

19 has made an identification from a lineup?

20     A.   I'm sorry?

21     Q.   Did I cut out?  Sorry.  How can a detective or

22 an officer tell if a witness has made an identification

23 from a lineup?

24     A.   Well, back then they really shouldn't -- you

25 know, they -- if somebody picks a person on a lineup,



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 you know, you fill out the paperwork that really ideally

2 would be not until the, you know, the Court case

3 progressed along would the witness know, you know, if,

4 you know, they picked the right person or not.

5     Q.   Is there a level of certainty required to

6 decide whether a witness has positively identified

7 someone from a lineup?

8     A.   When I showed the lineups, it was either are

9 you certain or not certain.  And it wasn't, you know,

10 how, you know, what percentages we, you know, there's no

11 -- we don't do the percentages.  It's certain or not

12 certain.  If they're -- if they're certain, it is them.

13 If they're not certain whether -- I don't care if it's

14 98 percent, if the -- they're not certain, you know,

15 unless they're absolutely fully certain.  So there's no

16 partials.  It's either all or none.

17     Q.   Okay.  So you wouldn't document the level of

18 certainty in the report of the photo lineup because it's

19 either all or none?

20     A.   I didn't.  I -- when -- when I did reports and

21 when I reviewed them, that -- that's a problem if you

22 see someone they're 95 percent sure that's them, you

23 know, it was either they're certain, or not certain.

24     Q.   Okay.  And if they're not certain, do you

25 consider that not to be a positive identification?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Yes.

2      Q.    Okay.  Would it be appropriate for a detective

3  to stop investigating a property crime once a photo

4  identification has been made from a lineup?

5      A.    If there -- it depends on if there's any other

6  evidence.  If there's no other evidence -- there's no

7  other evidence, the only evidence you have is a -- is an

8  identification through a photo lineup, I would say yes.

9      Q.    Okay.  What if there were multiple suspects?

10     A.    Well, if there were multiple suspects, and I

11  had a witness or a victim that could identify them, and

12  I had access to their photos, I would usually try to

13  create a photo lineup for -- to include anybody that

14  they possibly saw, if I had a photo that was available.

15     Q.    Okay.  What if there were multiple suspects

16  and you didn't have additional photos of who those

17  people might be?

18     A.    If I didn't have the photographs, and I didn't

19  have any other evidence, the only thing I might try to

20  do is interview the suspect after he's caught -- and --

21  on the warrant or whatever and give them the opportunity

22  to talk to me about the other people.  And if they don't

23  want to talk, you know, then that pretty much wraps up

24  the case.  But I would try to meet with that person and

25  work on identifying the other people.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.   And what if there are other eyewitnesses?

2    A.   I would try to show a photo lineup to anybody

3  that was a potential witness to them, I mean, in any

4  case.

5    Q.   Okay.  Was there any required training at OPD

6  about what to say to a witness after they view a lineup?

7    A.   I know it was written in the policy that, you

8  know, ideally, we didn't want it, you know, there -- it

9  was written in the policy, but we would also -- I can

10  recall it being covered at least once during my time at

11  the police department where you ideally wouldn't want to

12  say any kind of comment after they've chosen whether,

13  no, that's not him, or yes, you got him.  You would try

14  to keep it neutral.

15    Q.   Okay.  So it would not be proper for an

16  administrator of a lineup to tell a witness that the

17  person he has selected is the suspect?

18        MR. MISTOLER:  Objection.  But you can answer.

19        THE WITNESS:  Can you repeat the question one

20     more time?

21        BY MS. DILLON:

22    Q.   Yeah.  Would it be proper for the

23  administrator of a lineup to tell a witness that the

24  person he has selected from a photo lineup is the

25  suspect?

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  MR. MISTOLER: Objection. You can answer.

2  THE WITNESS: Well, the policy encourages you

3  not to do that. So you know, improper is kind of

4  harsh. I, you know, I would -- but it definitely

5  goes against what is recommended us to -- to do and

6  say in the policy. So you really ideally shouldn't

7  say anything.

8  BY MS. DILLON:

9  Q.  Okay.  Can you think of a situation where it

10  would be appropriate to tell a witness that the person

11  he's identified from a photo lineup is the correct

12  person?

13  A.  Not off the top of my head.  I can't think of

14  where it would be best practice to tell them that they

15  identified them or not.

16  Q.  Okay.  Would it ever be proper for an

17  administrator of a lineup to tell a witness that he

18  identified the same photograph in the lineup as another

19  witness?

20  A.  Once again, I mean, really it's going against

21  the policy for best practices.  I don't think it's the

22  wisest move to do that.  But, you know, because my

23  concern is that you showed them a lineup and they've

24  picked somebody out.  And what if you have to show a

25  lineup with other people later, and you really are



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 supposed to keep that neutral, you know, but yes or no

2 on an identification with a witness or a victim.

3     Q.   Okay.  Would it ever be proper for the

4 administrator of a lineup to show an eyewitness more

5 than one photograph of a suspect when conducting a photo

6 lineup?

7     A.   To show more than one photo lineup to the same

8 person that has the same suspect in it?

9     Q.   No.  So let me rephrase it.  So assume you

10 show the witness a photo array and he selects a suspect,

11 right?  Would it ever then be appropriate to show the

12 witness another photograph of the suspect, a single

13 photograph?

14     A.   Not during this part in the investigation.  I

15 think that would -- that's probably not the best thing

16 to do.

17     Q.   Why not?

18     A.   Well, because you -- the more times you show a

19 person a photograph, it could influence them, I think.

20     Q.   Influence them how?

21     A.   Well, I mean, I think it could influence them

22 of even maybe their memory.  You know, they -- they've

23 saw the person and now if they've seen it, you know, and

24 they're pretty sure and whether they -- however they

25 communicate it to you, but it -- I could see saying --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1 showing a single photograph to somebody after you showed

2 them the lineup is just improper.

3    Q.   Okay.  Are there any other rules you can think

4 of that an administrator should not do in connection

5 with a photo lineup in a criminal investigation?

6    A.   Well, the -- some of the, you know, the most

7 important thing is you want to show the lineup to one

8 person at a time with no audience, nobody else around.

9 And if you're going to have to show that same photo

10 lineup to multiple people, if you can do it, like,

11 within close, you know, like one right after another, I

12 think it's okay to use the same lineup.  But if you're

13 showing a photo lineup to, you know, many different

14 people at different times, you might want to change the

15 pattern of the picture of where the -- where the suspect

16 is located in that array.

17    Q.   Okay.  Why would -- why might you want to

18 change the location of the subject?

19    A.   Well, especially if you're showing the same

20 photo lineup to several different people in case they

21 might mention, hey, I -- it was number two or whatever,

22 you know.  You know, especially if it was several people

23 that know one another because they're going to talk.  If

24 you can't show it to them right then and there, if

25 you're going to show the lineup to them, again, put it



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 in a different location.

2      Q.   Okay.  So to minimize any sort of bias that

3 might happen during a lineup it might be a good idea to

4 move the photo.

5      A.   Yes.

6      Q.   Is it possible in your experience for a

7 witness to make a mistaken in identification using a

8 photo lineup?

9      A.   I've never had one, you know, because like I

10 said, I -- and I encouraged all my people to err on the

11 side of caution it's certain or not certain.  That way,

12 there's no -- you can avoid a potential incident where

13 somebody recants their testimony, but I've never had it

14 happen.

15      Q.   Okay.  What kind of documentation was an

16 administrator of a lineup required to do in 2013 in

17 relation to a photo lineup?

18      A.   Well, in 2013, the detective, whoever made the

19 lineup could also be the administrator, but you were

20 supposed to have the lineup, and you were also supposed

21 to have the photo lineup admonition, or the affidavit

22 that went along with it.  You want to keep -- kept that

23 covered in private so other people aren't seeing it. And

24 you want it to go over the whole admonition, and explain

25 what they're going to do, and then present them the

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  lineup.  And then -- and I would have them fill out the

2  affidavit if it was an improper identification, because

3  I just didn't tell them, and they would fill out

4  whatever they did and whether it was a positive

5  identification or they could not identify them, I

6  included all that in my case packages.

7      Q.   Okay.  So even if an identification was not

8  made on a photo array, you would still expect that to be

9  included in whatever package you get at the end of a

10  case?

11      A.   Yes.

12      Q.   If a detective showed a single photo of a

13  person of interest to a witness, would you expect that

14  to be documented somewhere?

15      A.   Yes.

16      Q.   Okay.  And if a photo was shown to a witness

17  in any capacity, would you expect that to be documented?

18      A.   Yes.

19      Q.   Would you expect that photo to be inventoried?

20      A.   Yes.

21      Q.   Okay, and that was true in 2013?

22      A.   Yeah.  I think it's best practice.  There

23  wasn't anywhere written where you shall and shouldn't do

24  that, but, you know, that's what I, you know, wanted of

25  my people what I did myself.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.  So there maybe wasn't a policy

2  requiring

3  requiring --

4      A.   Yeah.  Yeah, I don't think it was written

5  somewhere that you had to do that, but best practice, I

6  mean, all evidence should be turned in on a case,

7  whether it, you know, it helps your case or it doesn't,

8  it's evidence and you can't pick and choose.

9      Q.   Okay.  If eyewitnesses to a crime give

10  conflicting descriptions of the perpetrators, what is a

11  detective or officer supposed to do with that

12  information?

13      A.   We document and report what we're told whether

14  it's accurate or not.  I mean, you know, you're supposed

15  to include, you know, all the information.

16      Q.   Okay.  Is there anything an officer or

17  detective is supposed to do to try to reconcile the

18  conflicting witness descriptions of perpetrators?

19      A.   We would sometimes, especially if the initial

20  responding patrol officers took the statement from the

21  victim or suspect and included it in the report, we

22  might go over the description that the officers are

23  documenting and make sure it's accurate, especially when

24  we're going out there to follow up on the initial

25  report.  I mean, you know, that could be an incident

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1 where I could think you might do that.

2      Q.   Okay.  Would it be appropriate to re-interview

3 the witnesses?

4      A.   Yes.  You can -- we definitely had times where

5 you had to re-interview witnesses and/or suspects.

6      Q.   Is it fair to say that if there -- if

7 witnesses to a crime give conflicting descriptions of

8 the perpetrator's, further investigation is needed to

9 reconcile those differences?

10      A.   Yes.  I think that would be best practice

11 that, you know, you want to -- if -- especially if

12 they're completely different.  You meet with them

13 yourself, figure out what the lighting was, how long

14 they saw them, any other factors that, you know, might

15 interfere with or conflict, you know, to try to

16 understand it a little bit better.

17      Q.   Okay.  And I assume you're familiar with law

18 enforcement's obligation to disclose evidence that could

19 be exculpatory or impeaching under Brady?

20      A.   Yes.  I don't like the Brady, but yes.  I'm

21 not part that.  I'm not any part of that.

22      Q.   Not under you.  Not under Dan.

23      A.   No.

24      Q.   And so in the 2013 time frame, was it

25 detectives that had the discretion to decide what they



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  thought was exonerating and that needed to be disclosed

2  to prosecutors?

3      A.   No.  I mean, it would -- there's all -- all

4  evidence that are related to the case should be

5  forwarded to the -- to the prosecutor for them to

6  decide.

7      Q.   Okay.  So the practice was to turn over all

8  reports, lineups, et cetera, that had been developed in

9  a case?

10     A.   Yes.  And sometimes, you know, we might send

11 over the initial case and when the -- as the

12 investigation continues, we might have a supplement or

13 paperwork turn in.  But the best practice was, you know,

14 we want to forward all evidence to the state attorney

15 and they'll, you know, decide of what's going to be used

16 or not.

17     Q.   Okay.  And do you recall any training from

18 Orlando Police Department about the obligation to give

19 prosecution all exculpatory evidence?

20     A.   It was kind of -- multiple times, yes.  I

21 mean, from the police academy, they talk about it.  And

22 then several times throughout my career, I can recall --

23 usually, when we had the legal advisor update, they

24 would always go over that, too.  But more, you know,

25 several times throughout my career.  I don't know if I



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

1 ever sat and took a specific class about that, but it,

2 you know, it was definitely covered.

3      Q.   Okay.  Maybe not in its own training session,

4 but it got touched on several times.

5      A.   Got touched on multiple times in different

6 ways.  And that was probably -- it was also covered

7 during, you know, the basic police academy on, you know,

8 going over the law and things like that.

9      Q.   Got it.  Okay.  Switching gears just a little

10 bit.  I -- I'm going to kind of turn us to the April 9,

11 2013, burglary.  But just before I do, before April 9,

12 2013, had you ever heard the name Jorge Valle-Ramos?

13     A.   No.

14     Q.   Had you ever heard a conversation about him at

15 OPD before April 9, 2013?

16     A.   No.

17     Q.   Had you ever received any correspondence,

18 memos, e-mails about him before the Gonzalez burglary?

19     A.   Not that I -- I'm recalling.  I mean, it

20 doesn't -- the name doesn't even ring a bell to me.

21     Q.   Sure.  Fair to say, Mr. Valle-Ramos was not

22 someone known to you at the time of the April 9, 2000 --

23 2013 burglary?

24     A.   No.

25     Q.   Okay.  And before April 9, 2013, was Amos



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  Ortiz a person that was known to you?

2       A.   No.

3       Q.   How about Marquis Hickson?

4       A.   No.

5       Q.   Carl Judy?

6       A.   No.

7       Q.   Jorge Gonzalez?

8       A.   That's a pretty common name.  I'm sure I heard

9  that, but not of one in particular person.

10      Q.   Fair enough.  The Jorge Gonzalez, who was the

11 victim of the burglary in this case.

12      A.   Okay.

13      Q.   Charlene Bloom?

14      A.   No.

15      Q.   Bethany Shovcheck?

16      A.   No.

17      Q.   Okay.  So the -- now I'm actually turning to

18 the investigation into the Gonzalez burglary.  You agree

19 you were working at OPD at the time, right?

20      A.   Yes.

21      Q.   As a sergeant in property crimes?

22      A.   Yes.

23      Q.   You didn't respond to the scene of the

24 Gonzalez burglary, right?

25      A.   No.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1      Q.   Okay.  But you assigned the lead detective on

2   the investigation; is that right?

3      A.   I don't -- I don't know if I actually assigned

4   it to him or not.  I -- at one point I definitely

5   approved a report that was done, because, I mean, this

6   was quite a long time ago, and it was practiced that I

7   had been in this assignment, not very long either, that

8   someone is -- when you're the new person, the squad

9   leader might help with some of the admin as far as

10  assigning cases.  So I'm not sure if I'm the one that

11  actually read and reviewed and assigned that case or the

12  squad leader did.

13     Q.   Okay.  If -- do you recall that Michael

14  Stanley was the lead detective on this case?

15     A.   I -- I'm -- I'm familiar with Detective

16  Stanley and I saw it in the documents, but I mean --

17     Q.   But you don't have an independent recollection

18  of it?

19     A.   No.

20     Q.   If he says you were the one who assigned him

21  to the case, do you have any reason to doubt that?

22     A.   No.  I mean, there -- there's a good chance --

23  it was either me or the squad leader assigned it to him.

24     Q.   Okay.  You just can't recall one way or

25  another?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     A.    Yeah.  No.

2     Q.    Okay.  Once you assigned Detective Stanley to

3 a case, do you have any independent recollection about

4 any tasks he took on the case?

5     A.    No.

6     Q.    Okay.  But you would've reviewed information

7 collected by him in reports that he had submitted to you

8 as a supervisor on the case; is that right?

9     A.    Yes.  I mean, in a perfect world, all the

10 paperwork should have funneled through me, but --

11     Q.    Okay.  And I think you said earlier, you

12 yourself wouldn't have collected evidence or written

13 reports or interviewed any witnesses in connection with

14 that investigation, right?

15     A.    Not that, I mean, I -- not that I can recall

16 or not that I've seen, you know, and that wasn't my

17 practice.  I just -- I didn't have -- I did not do that.

18     Q.    Okay.  I'll just ask real quickly if anyone

19 would like a short break for a restroom.  If not, I'm

20 happy to keep going.  How you doing Dan?

21     A.    I'm good.

22     Q.    Okay.  So I want to talk a little bit more

23 about the lineup that was used in connection with the

24 Gonzalez burglary.

25     A.    Okay.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   And I -- you mentioned earlier that you

2 wouldn't have participated in creating a lineup for any

3 of the property crime investigations that were going on

4 when you were a sergeant in that unit, right?

5    A.   No.  The only time I could think is if we had

6 a new detective coming in that I might show them how the

7 system works, but Detective Stanley had been a

8 detective, you know, he wouldn't need any assistance and

9 I don't recall any -- being involved in this at all.

10    Q.   Okay.  So he would've been the one who created

11 the lineup?

12    A.   Yeah.  I can only recall one time that I

13 helped.  As a sergeant, it was a new detective and I was

14 -- it wasn't just showing how the systems go, but I

15 can't recall ever making one that was presented.

16    Q.   Okay.  So I'm going to show you a document

17 that was previously marked as Plaintiff's Exhibit 17.

18    A.   Okay.

19         (Exhibit 17 is marked for identification.)

20         BY MS. DILLON:

21    Q.   Give me just a second to share my screen.

22         Okay.  Dan, can you see that document on your

23 screen?

24    A.   Yes.

25    Q.   Okay.  Is it big enough?  Do you want me to



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 make it bigger?

2     A. No, I can see it.

3     Q. Okay. For the record, this is a one-page

4 document with the Bates label P1413. Do you have any

5 independent recollection of ever seeing this photo

6 lineup?

7     A. No, not -- yeah, nothing independent for sure.

8     Q. Okay. Can you tell from looking at Exhibit

9 17, that the photo in the number two position depicts a

10 person who has an Afro-style haircut?

11         MR. MISTOLER: Objection. You can answer.

12         THE WITNESS: Yeah. I mean, I guess it's kind

13    of a low Afro. I mean, it -- either poofy hair or

14    Afro.

15         BY MS. DILLON:

16     Q. Okay. Can you tell when -- whether any of the

17 other persons that are in the lineup also have suspects

18 with poofy hair or an Afro?

19     A. I mean, the guy in number four is similar.

20 It's a little bit shorter. Guy in six is curly, but

21 yeah, number two looks similar, but the other two -- the

22 other three, their hair looks shorter.

23     Q. Okay. So you mentioned earlier that in

24 preparing a lineup, part of the goal is not to have

25 anyone stand out; is that right?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      A.    That -- that's the, ideally, the way you'd

2  want to do it.  Nobody, you know, stand out or unfairly

3  has lights shed on them.

4      Q.    Okay.  Do you -- would you agree that having

5  five people in the lineup with shorter haircuts makes

6  the person with longer hair stand out?

7          MR. MISTOLER:  Objection.

8          THE WITNESS:  Not necessarily based on the

9      length of these.  The folks with hair in this --

10     this one.  I mean, because number six has long hair,

11     too. It's just kind of curly.  I mean, I would say

12     they all have relatively short hair and I mean, two

13     and four, their hair is a little bit longer than the

14     ones in one, three, and five.

15         BY MS. DILLON:

16     Q.    Okay.  So is it your testimony that the person

17  in box two has a haircut that is materially similar to

18  all the other haircuts in this lineup?

19     A.    No.  I mean, I would say two has similar hair

20  to number four, but the other ones are longer or

21  shorter.

22     Q.    Okay.  Okay.  Four is a, you know, a little

23  bit longer, but the rest are shorter than the hair and

24  photo number two.

25     A.    Yes.  I'd agree to that.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.  I'm going to set this exhibit aside and

2   show you an exhibit that was previously marked as

3   Plaintiff's Exhibit 4.

4           (Exhibit 4 is marked for identification.)

5           BY MS. DILLON:

6      Q.   Okay.  Dan, can you see that on your screen,

7   that document?

8      A.   Yeah.  I'm just folding my laptop down because

9   I have a big -- bigger monitor up above.

10     Q.   Oh, okay.  Do you want me to make it bigger or

11  can you read it?

12     A.   Make it a little bit bigger because my laptop

13  is kind of small.

14     Q.   Fair.  Is that better?

15     A.   Yeah, that's better.

16     Q.   Okay.  Just a couple questions about this.

17  This is, as I mentioned a document that was previously

18  marked as Plaintiff's Exhibit 14 [sic], just for the

19  record, this is a three-page document, Bates P532 to

20  534.  Now I'm just asking kind of as a general matter,

21  do you recognize what this document is?

22     A.   I mean, generally, I recognize it to be a, you

23  know, photo lineup administration instruction sheet.

24     Q.   Yeah.  And I'll represent to you that this is

25  the lineup administered to Jorge Gonzalez by Detective

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  Stanley.  I'll just scroll down a little so you can see

 2  it, but I only have one question about the first page.

 3       A.   Sure.

 4       Q.   Okay.  So that's the whole document.  And

 5  actually, earlier, you were saying that, like, you would

 6  expect certain documentation to come with the

 7  administration of a photo lineup.  Do you see all of

 8  that here, what you would expect to be documented in a

 9  photo lineup?

10       A.   Yeah, it looks like everything was there,

11  and --

12       Q.   Okay.  So directing your attention, just Page

13  1, kind of right under this written information, there's

14  a sentence that says, "prior to presenting the photo

15  lineup, the witness provided a written-audio recorded

16  statement describing the suspect of this criminal

17  investigation."  Did I read that right?

18       A.   Yes.

19       Q.   Okay.  And not asking specifically in this

20  case, but just as a general matter, is that something

21  that's supposed to be done?

22       A.   Yeah, I am just reading it real quick.

23       Q.   Sure.

24       A.   Yes.  I would expect that because normally the

25  person who has a -- completed a sworn written statement



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 or they've given a sworn audio statement when they

2 initially were involved in the report of the crime, and

3 usually that's step one, and then this is the follow-up

4 part is when we present the photo lineup and the

5 instruction sheet.

6      Q.   Okay.  So that's not necessarily something

7 that would be done the day of photo lineup is

8 administrated?

9      A.   Yeah, that's correct.

10     Q.   Okay.

11     A.    It could be done, you know, days -- it could

12 be done all the same day, but usually we have them write

13 a statement, or we take their statement first and get

14 their testimony before we go to the step of giving them

15 a lineup.

16     Q.   Okay.  But it could be -- this could mean a

17 statement that was provided at a crime scene say?

18     A.   Yes.

19     Q.   Okay.  If it -- if this was something that the

20 person administrating the photo lineup did at the time

21 of the photo lineup, would you expect it to be

22 documented in this lineup?

23     A.   One more time?  I'm sorry.

24     Q.   Yeah, that was a terrible question.  If the

25 administrator of the lineup got this witness statement



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1  at the time he or she conducted the lineup, where would

2  you expect that statement to appear?

3      A.   I mean, I would expect the statement to be

4  turned in with the case package or the other information

5  going into the evidence.

6      Q.   Okay.

7      A.   I mean, it could be different circumstances,

8  but I would -- I would expect any of the statements to

9  be included.  You know, it might not be included right

10 then and there, but at some point during the

11 investigation to be turned in.

12     Q.   Okay.  You'd expect it at some point?

13     A.   Yes.

14     Q.   Okay.  I'm going to set this exhibit aside.

15 Okay.

16          Actually, let me re-share that really quickly.

17 Okay.  Can you see that document again, Dan?

18     A.   Yes.

19     Q.   Okay.  Do you see at the top where it says,

20 date and time, and it says April 18, 2013?

21     A.   I do.  I see that.

22     Q.   Okay.  So this is the day that Detective

23 Stanley conducted the photo lineup with the victim,

24 Jorge Gonzalez.  I'll also represent to you that

25 approximately five months later, Detective Stanley

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 conducted a photo lineup with another eyewitness.  Does

2 the five-month gap between the victim's lineup and the

3 lineup with the other witness strike you as odd?

4      A.   It's a long time.  I don't know what, you

5 know, if there was an explanation for that.  If was

6 somebody was out of town, you know, or it was forgotten,

7 about or if it -- they -- it would -- they might have --

8 sometimes they, you know, might not have got done, and

9 then the state attorney who was assigned the case test,

10 the detective to show the, you know, do the photo

11 lineup, so I don't know.  That is a long -- that is a

12 long gap, though.

13      Q.   Okay.  I'm going to now actually set that

14 exhibit aside.

15      A.   Okay.

16      Q.   Okay.  After Mr. Gonzalez identified Valle-

17 Ramos, Detective Stanley sought a warrant for his

18 arrest.  Did you have any involvement in the request for

19 a warrant for Mr. Valle-Ramos' arrest?

20      A.   No, other than I'm sure it was -- I reviewed

21 the affidavit before he went and got the warrant,

22 because that was the past practice of having either the

23 sergeant or the squad leader, you know, review to make

24 sure that, you know, that it's accurate and it's got

25 probable cause.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  So you would've -- you wouldn't have

2  participated in creating it, but you would've reviewed

3  it for accuracy and probable cause?

4      A.   Yes.

5      Q.   Do you recall what evidence supported Valle-

6  Ramos arrest for the burglary?

7      A.   I mean, I don't recall anything about this

8  case, but --

9      Q.   Fair enough.

10     A.   But I have reviewed the documents and it

11 appears that it was the victim identification and a

12 witness identification from photo lineup.  And I think

13 that -- I don't recall any other evidence related to it.

14     Q.   Okay.  Were -- you weren't present when Mr.

15 Valle-Ramos was arrested, right?

16     A.   No.

17     Q.   Okay.  Does it strike you as odd that nobody

18 ever searched Mr. Valle-Ramos' home for evidence?

19          MR. MISTOLER:  Objection.  You can answer.

20          THE WITNESS:  I don't, you know, I don't know

21     the circumstances of the case.  I mean, you

22     generally would try to search the suspect's house,

23     but, you know, if they lived with multiple people

24     or, you know, I don't know.  I don't know why it

25     wasn't searched.  I would think it would be, you

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    know, you normally make an attempt to try to search.

2         BY MS. DILLON:

3    Q.   Okay.  Did you ever personally complete any

4    paperwork that you can recall related to the Gonzalez

5    burglary investigation?

6    A.   The only paperwork that -- I don't recall any

7    of this, like I said before.  But I do --

8    Q.   That's fair.

9    A.   -- do see where I digitally approved a

10   supplement report and I may -- and the only document

11   that I would've signed would've been a recovering cost

12   of an investigation or the front APS.  That checklist

13   thing that goes to the state attorney that, you know,

14   says that I reviewed it, but that's the only thing I can

15   recall that I might have signed.

16   Q.   Okay.  And you never talked to Mr. Valle-Ramos

17   in connection with this case?

18   A.   No.

19   Q.   All right.  Did you have any role in the

20   decision to charge Valle-Ramos with the burglary of Mr.

21   Gonzalez's residence?

22   A.   No.  I mean, like I said, I reviewed their

23   affidavits and I -- based on the information that I

24   read, I felt there was probable cause, but, you know,

25   they don't really need my blessing, but, you know,

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 somebody else reviews it and, you know, and agrees that

2 there's probable cause.

3    Q.    Okay.  So fair to say you weren't present when

4 the decision was made to charge Mr. Valle-Ramos with

5 burglary?

6    A.    No.  I mean, ultimately, I assume it, you

7 know, Detective Stanley, that he made the decision that

8 he wanted to charge and go forward with the case.  I

9 would just review the documents that was in and the

10 facts.

11    Q.    Would you have discussed that decision with

12 Detective Stanley or was it within his discretion?

13    A.    Normally, we would, but -- I believe Detective

14 Stanley was also the squad leader for this unit during

15 that time.  So he would've had a little more authority

16 than another, you know, detective on the case, because

17 he was a part-time supervisor.

18    Q.    Okay.

19    A.    I don't know if that answered your question,

20 but --

21    Q.    Yeah, that did.

22    A.    Okay.

23    Q.    While the prosecutor was preparing the case

24 against Mr. Valle-Ramos, did you ever speak with anyone

25 from the DA office?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      A.    No.

2      Q.    Okay.  And did you provide the prosecutor with

3 any information at all to be used at trial?

4      A.    No.

5      Q.    All right.  Are you aware that in March 2024,

6 the criminal case against Mr. Valle-Ramos was dismissed?

7      A.    Only after I was served with the paperwork and

8 read it, but I had, you know, I had no --

9      Q.    Okay.

10     A.    No information, no knowledge of anything.  But

11 in -- I reviewed the complaint and the documents.

12     Q.    So you weren't contacted by anyone in -- when

13 Mr. Valle-Ramos' post-conviction petition was filed?

14     A.    No.  No, because I wasn't involved in the

15 really investigation other than --

16     Q.    Right.

17     A.    -- reviewing paperwork, but no, I had, I mean,

18 no contact at all until I, you know, until I got, you

19 know, the knock on the door with the process server.

20     Q.    Sure.

21     A.    That was the first -- yeah.

22     Q.    Did you have -- fair to say you didn't have

23 any involvement then in the criminal case against Valle-

24 Ramos between his conviction and exoneration?

25     A.    No, I never testified in anything.


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.

2    A.   I mean, we never had any evidence really.

3    Q.   Are you aware that an eyewitness in the

4 Gonzalez burglary investigation recanted her

5 identification of Mr. Valle-Ramos?

6    A.   Only after reviewing the, you know,

7 complaints. No, I had no information on that.  No

8 knowledge.

9    Q.   Okay.  And are you aware that the same

10 eyewitness claims that at her photo lineup, Detective

11 Stanley told her she had selected the same subject as

12 the victim of the crime?

13   A.   I read that in there.

14   Q.   Okay.  Can you recall any -- sorry, go ahead.

15   A.   Yeah.  Like I said, I -- you -- I tried to

16 review any of the documents related to this after the

17 fact, but, you know?

18   Q.   Sure.  Can you recall any other times in your

19 career with OPD where a witness has recanted an

20 identification?

21   A.   I'm sure there has been where, like, early on

22 in the investigation where somebody says somebody did

23 something and, you know, but early on in the

24 investigation, but I've never had one where, you know,

25 any cases moved forward and then we had to pull that



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 back.  I mean, it was -- it, like you said, you know,

2 maybe early on in a neighborhood dispute or something

3 like that.  But you know, not to the extent of something

4 like this.

5      Q.   Never one post-conviction?

6      A.   No, I've never heard of one before.

7      Q.   Okay.  Do you have any belief one way or the

8 other as to whether Mr. Valle-Ramos committed the

9 burglary of Mr. Gonzalez's residence?

10      A.   I don't have any belief one way or another.

11 Like I said, I don't have any independent knowledge of

12 the case other than -- reading this was like reading it

13 for the first time when I, you know, got served with the

14 paperwork.  I don't -- you know, I had no independent

15 knowledge.

16      Q.   Sure.  So when is the -- can you recall the

17 last time you spoke to anyone associated with OPD about

18 the Gonzalez burglary investigation?

19      A.   I only -- one time.  So the day I got served

20 with the paperwork, I did call Detective Stanley and

21 spoke to him on the phone, and he's the one that gave me

22 a little bit of the backstory.

23      Q.   Got it.

24      A.   I only called him because I saw his name

25 listed in it, and he told me, yeah, this -- the last


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  year or so, they've -- he's had to come to hearings on

 2  this and he gave me just a tiny bit of information, but

 3  that's the only time I've talked to Detective Stanley,

 4  and it was probably for five, ten minutes that day.

 5       Q.   Okay.  And it was just about, you know, he

 6  updated you that this case has been ongoing for some

 7  time?

 8       A.   Yeah, because it didn't -- I had no idea it --

 9  any -- why I was being included in this and he couldn't

10  give me any information on that either, other than I was

11  a supervisor, but yeah.  So that was the first and only

12  time I've talked to anybody at OPD about this.

13       Q.   Okay.  Do you consider Mr. Stanley a friend?

14       A.   No, not really.  I mean, I'm friendly with

15  him, like, you know, but he's just a work acquaintance.

16  I, like, he's not -- like we've done -- do anything

17  outside of work and I hadn't talked to him in three

18  years.  So you know, it's been a while.  I mean, I

19  always thought he was a very professional and respectful

20  police officer and I was friendly with him at work, but

21  that was just about it.  It's just work stuff.

22       Q.   Got it.  And are you aware of any discipline

23  he ever received in his capacity as an OPD detective

24  when you were working with him?

25       A.   Yeah.  I can recall one time and I think it



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 might have been during the same window when I was a

2 supervisor in the property unit that, it was a David

3 violation where he -- they used the driver's license

4 database and there was a violation of one of the rules

5 on that.

6     Q.   Do you remember what the outcome of that

7 incident was?

8     A.   Well, it was kind of like a supervisor

9 referral from the Internal Affairs department.  He --

10 that -- he definitely would have gotten some kind of a

11 discipline from it.  We had a standard book of

12 discipline for whether if you violate this policy, you

13 know, it -- it's a -- the past practice is a verbal

14 warning and, you know -- yeah, I have to go off the

15 past, you know, discipline record.

16     Q.   Sure.

17     A.   You know, I imagine he probably just got a

18 warning for it, but it was something that went in

19 through Internal Affairs.

20     Q.   Okay.  Do you recall any other discipline he

21 received with OPD?

22     A.   No, not during -- not that I know of, but I --

23 I've worked around Detective Stanley several times, but

24 I think this is the only time that I directly supervised

25 him was in --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1       Q.   Got it.

2       A.   -- in -- in -- in this window in the East

3  property, and that's the only time I can recall any

4  discipline.

5       Q.   Okay.  Did he ever do anything you disagreed

6  with?

7       A.   No.  I mean, he was always a very cautious

8  detective.  I mean, he was a former marine and he was, I

9  mean, very proud of that.  And he -- the -- he -- there

10 was no gray.  He didn't like -- there was no gray work.

11 It's, you know, either, you know, black or white, you

12 know, and very strict and, you know, he was -- he wanted

13 to protect everybody's rights, that whether they solved

14 the case or not.  I mean, he was very very cautious.

15      Q.   Okay.  It sounds like you never witnessed him

16 doing anything you would consider to be misconduct?

17      A.   No.  No, I never witnessed him do anything

18 that was misconduct.

19           MS. DILLON:  Okay.  I just have a couple

20     documents.  Are folks okay?  Does anyone need a

21     little break?  I don't have a ton left, but want to

22     make sure you're doing okay, Dan.

23           THE WITNESS:  I'm good.

24           BY MS. DILLON:

25      Q.   Okay.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      A.    I'm good.

2      Q.    So we're just going to switch gears and I'm

3 going to show you a couple documents.

4      A.    Okay.

5      Q.    Let me share my screen with you again.  I'll

6 make that a little bigger for you.

7      A.    Thank you.

8      Q.    Is that big enough?

9      A.    One more click.  My laptop is pretty small.

10     Q.    No worries.  No worries.  Is that better?

11     A.    My big screen -- yeah, that's better.

12           MS. DILLON:  Okay.  So for the record, this is

13      a document that was previously marked as Plaintiff's

14      Exhibit 22.  It's a two-page document, Bates stamped

15      P1418 to 1419.

16           (Exhibit 22 was marked for identification.)

17           BY MS. DILLON:

18     Q.    And do you generally recognize what kind of

19 document this is?

20     A.    Yes.

21     Q.    Okay.  What is it?

22     A.    It's an investigative supplement that our --

23 the detectives do.

24     Q.    Okay.  And these are the supplements you said

25 that detectives were submitting on a regular basis



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  during the course of an investigation; is that right?

 2      A.   Yeah.  I mean, yeah, definitely every 30 days,

 3  I mean --

 4      Q.   Okay.

 5      A.   They might -- they might have a running

 6  supplement narrative that they've got going in, like

 7  Word to keep updated, but they don't normally complete

 8  the incident report to the very end and submit.

 9      Q.   Got it.  Okay.  And do you see at the top

10  there where it says, "Reporting Officer Michael

11  Stanley"?

12      A.   I do.

13      Q.   Okay.  And do you see underneath that it says

14  "approving officer," that's you?

15      A.   Yes.  That's me.  Daniel Brady, yep.

16      Q.   Okay.  Is that your badge number?

17      A.   It is.

18      Q.   Okay.  And do you see on this kind of first

19  line under Narrative, it says, you know, "This officer

20  responded to 1625 Little Falls Circle in reference to an

21  occupied residential burglary.  Upon arrival, he met

22  with the victim, Jorge Gonzalez."  That's the case we've

23  been talking about today, correct?

24      A.   Yes, ma'am.

25      Q.   Okay.  So I'm just going to scroll down a



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  little bit.  Actually, before I do that, I just want to

2  ask, when you were approving an investigative

3  supplement, what was your process for approval?

4       A.   Well, first of all, I'm reviewing it for

5  grammatical errors and I'm also making sure that -- that

6  I feel there's probable cause in that if they're

7  charging somebody.  And, you know, and I'm reviewing it

8  too to make sure they've covered all their bases and not

9  missing anything as -- especially if they're completely

10 wrapping up the case and are moving on and done with it.

11      Q.   Okay.  So.

12      A.   Make sure so we have -- yeah.  I'm sorry.

13      Q.   No, no, you're good.

14      A.   Yeah.  I just want to make sure, you know, any

15 of the evidence or witnesses talked about is submitted

16 and that -- yeah, that we haven't missed anything.

17      Q.   Okay.  Fair to say you would review it

18 carefully?

19      A.   Yes.

20      Q.   Okay.  So I'm going to direct our attention to

21 the fourth paragraph down.  This one right here that

22 begins on 4-10-2013.  And I'm going to the third line

23 here where it says, "I reviewed an OPD Criminal

24 Information Bulletin in which three males, and a female

25 had been stopped and detained in reference to their



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 possible involvement in a residential burglary."  Did I

2 read that right?

3      A.   Yes, you did.

4      Q.   Okay.  Would you have also reviewed that

5 bulletin?

6      A.   Yes.  Oh, yeah.  Because, you know, a lot of

7 times we have a bulletin that we're passing amongst the

8 detectives when we're talking about the cases we're

9 working, before we actually submit it to be distributed

10 to the rest of the departments.  But yeah, I would want

11 to cover that information in there.

12      Q.   Okay.  Moving down one paragraph, kind of

13 first sentence.  It says, "I prepared a photographic

14 lineup" -- and it has the ID of that lineup --

15 "containing a photograph of Valle-Ramos."  I'll stop it

16 there because that's all we need.

17      Q.   If Detective Stanley had shown more than one

18 lineup to Mr. Gonzalez, would you expect those

19 additional lineups to be documented here?

20      A.   The only time I would think you wouldn't, is

21 if you already covered that information in a different

22 supplement report, but I would expect somewhere in the

23 reports, you would list the lineup number, and date, and

24 time, with you know, all lineups to all people related

25 to the case.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1        Q.    Okay.  The only reason it might not be in here

2   is if it was documented previously?

3        A.    Yes.

4        Q.    Is that correct?

5        A.    Yes, ma'am.

6        Q.    All right.  And now I'm just going to direct

7   your attention to the last sentence, which says, "An

8   arrest warrant for Valle-Ramos has been obtained and

9   signed by Judge Maureen Bell.  And this incident should

10  be considered inactive pending arrest."  Did I read that

11  right?

12       A.    Yes, you did.

13       Q.    Okay.  And I think you said you would have

14  also reviewed the arrest warrant; is that right?

15       A.    Yes, if I was available.  The only time I

16  could think that I didn't is because he was a squad

17  leader and an acting supervisor then, but I generally

18  would, you know -- and I don't have any specific

19  independent knowledge if I did review the warrant before

20  he went to the judge on this case.  I did see the copy

21  of it.  I had a little practice.  I used to put my

22  initials in the bottom left corner of the warrant for --

23  you know, the affidavit for warrant.  That way, you

24  know, I made my little mark on it that I reviewed it and

25  I didn't see that.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  So when you reviewed the affidavit in

2  preparation for the deposition, you noticed that a --

3  you didn't have your initials on that, and that

4  indicated to you --

5    A.   I didn't, but it was a -- no.  I'm sorry.  I

6  talked over you.

7    Q.   No, you're good.  You're good.  And that

8  indicated to you, it's -- you maybe didn't review it?

9         MR. MISTOLER:  Objection.

10        THE WITNESS:  Possibly -- yeah.

11        MR. MISTOLER:  You can answer.

12        THE WITNESS:  Possibly, but it was a -- I mean,

13     it could have been lost on, you know, the copy of a

14     copy where it just, you know -- you know?  But I

15     just know I -- that was my little past practice that

16     it didn't -- it wasn't something I had to do, but I

17     used to put my initials somewhere on that last page

18     where the detective signed at the bottom left or

19     bottom right-hand corner.

20         BY MS. DILLON:

21     Q.   Sure.

22     A.   And --

23     Q.   When you reviewed that affidavit in

24  preparation for your deposition, did you have any

25  independent recollection of reviewing it?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.   No.

2      Q.   Okay.  This last part of this sentence says,

3  "The incident should be considered inactive pending

4  arrest."  What does that mean?

5      A.   It's just kind of a -- for coding.  So like I

6  mentioned, this would have definitely been an eight or a

7  mandatory investigation.  And that's -- when you

8  inactive pending an arrest for -- when a warrant's been

9  issued, lets him administratively close a case.  The --

10 although, it's not -- you -- we change it from an open

11 case to inactive pending.  It's just a coding thing,

12 really.  That's all that means.

13     Q.   Okay.

14     A.   That's just to let me know when I'm, you know

15 coding it, the -- okay, that it's going to go out of the

16 active to the inactive until, you know, until he is

17 picked up on it, and then we'll try to talk to him then.

18     Q.   Got it.

19     A.   Yeah.  Just administrative coding thing,

20 really.  The -- that's all, other than the name of the

21 judge who signed it in there, but --

22     Q.   Okay.  I'm going to direct our attention to

23 Page 2 now.  Do you see at the top here, top left where

24 it says, "Subjects"?

25     A.   Yes.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1       Q.   Okay.  What is a reporting officer supposed to

2    include on this page under Subjects?

3       A.   For anybody we talk to, you'd want to get

4    their name, their address, their phone number, date of

5    birth. I mean, that's just the basic stuff.  I mean, I

6    can -- I see there's other stuff, you know, Social

7    Security number, e-mail address, cell phone number.  I

8    mean, you -- we try to get as much information as

9    possible, you know?

10      Q.   Okay.

11      A.   And include it in there.

12      Q.   Is there any reason you can think of where it

13   would be okay to exclude witnesses that a detective has

14   -- had talked to from a supplemental report?

15      A.   Not really.  I mean, I would -- I mean, I --

16   you think it -- any, you know, all witnesses should be

17   included.

18      Q.   Okay.

19      A.   Whether it -- you know, I don't -- and whether

20   one report or another, but I don't know if there's a,

21   you know, another supplement related to it.

22      Q.   Sure.  Well, if other witnesses had appeared

23   in just the initial field report, would you expect them

24   to be included on investigative supplements?

25      A.   I would -- I would think so, because, you



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

1 know, you may try to make sure you've talked to

2 everybody that might have any evidence or information

3 related to the call.

4      Q.   Okay.  And the way you would know that this

5 detective had talked to everybody related to the call,

6 is that the subjects would be included in this

7 supplement?

8      A.   Not -- I mean, not necessarily in this portion

9 of where you have it with the -- sometimes they might

10 leave it out of the actual listing of, you know, the

11 formal section of the, you know, where you're inputting

12 information on subjects.  They might cover it in the

13 narrative somewhere.  But, you know, whether it's up

14 here or they cover it in the narrative explaining what

15 their information or contact or interaction were, you

16 know, I would, you know, that could be another possible

17 place, too.

18      Q.   Okay.  Understood.  I'm going to stop sharing

19 that exhibit.  Share with you a separate document.  Did

20 I make it big enough for you?

21      A.   Yes, I can see it.

22          MS. DILLON:  Okay, great.  This is an exhibit

23      that was previously marked as Plaintiff's Exhibit

24      13. Just for the record, it's a two-page document,

25      Bates P1415 to 1416.


MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1              (Exhibit 13 was marked for identification.)

2              BY MS. DILLON:

3      Q.   Can you -- can you just tell -- can you tell

4  generally what this document is?

5      A.   Yeah.  I mean, this looks like the initial

6  police report that the uniformed officers would complete

7  when they got to the scene.

8      Q.   Okay.  And this is what you would review --

9  this is what you would receive and review when you're

10  determining how to tag a case and assign it?

11      A.   Yes, ma'am.  That's right.

12      Q.   Okay.  Do you have any independent

13  recollection of seeing this report when you were working

14  on the case?

15      A.   No.  No.

16      Q.   Okay.  And it says here, the reporting officer

17  was Alfonso Tejeira?

18      A.   Yes.

19      Q.   Who is he?

20      A.   He is a -- I think he's retired now, but he

21  was a police -- a uniformed police officer that would

22  respond to radio calls for service.

23      Q.   Okay.  And did you work with him often?

24      A.   No, not really.  He, ironically, he was my --

25  one of my field training officers.  And when I was in

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   training, I think he was like my third -- well, you have

2   to go through four different officers.  He was one of my

3   training officers.  But other than that incident, I

4   never worked with him again in my entire career.

5        Q.   Okay.  So he was the responding officer here.

6   Would a responding officer continue to work on an

7   investigation after responding to the scene?

8        A.   Sometimes.

9        Q.   Okay.

10       A.   Sometimes they might request to be involved,

11  and they usually would put it in the narrative, but

12  sometimes they might do the report and then reach out to

13  us that they want to assist, or they want to take the

14  lead on it, or it might be their district.  And

15  sometimes the detectives working the case will reach out

16  to the district officer and have them assist with

17  gathering information.  So it -- it's not uncommon.

18       Q.   Okay.  If -- but if he had continued on the

19  investigation past the initial field report, would that

20  be documented somewhere?

21       A.   Yeah.  It should be somewhere, either in a

22  supplement from him or some kind of a report or request

23  and they would be listed in it.

24       Q.   Got it.  Do you see at the top here where it

25  says, "Approving officer Jerry McCray"?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    Yes.

2    Q.    Okay.  Was he a sergeant in the unit as well?

3    A.    Sergeant McCray was a patrol sergeant, so he

4 was a --

5    Q.    Got it.

6    A.    He was Tejeira's supervisor.  So he was the

7 approving officer for that initial report that Tejeira

8 did.

9    Q.    Okay.  So that's why he approved this initial

10 report, but you approved the supplements is because he

11 was supervisor over Patrol Officer --

12    A.    Yep.

13    Q.    -- Tejeira?

14    A.    That's right.  That's right.

15    Q.    Got it.  Okay.  One more document.

16    Q.    Okay.  Dan, can you see that on your screen?

17    A.    Yes.

18    Q.    Is it big enough for you?

19    A.    Yes, I can see it.

20         MS. DILLON:  Okay.  So just for the record,

21     this is a document that was previously marked

22     Plaintiff's Exhibit 25.  It's a one-page document,

23     Bates

24 P7.

25         (Exhibit 25 was marked for identification.)

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          BY MS. DILLON:

2     Q.   And do you recognize just generally what this

3 document is?

4     A.   Yes.  That would be one of the few documents I

5 might sign, like along with that -- the APS cover list

6 for the --

7     Q.   Okay.

8     A.   -- state Attorney.  This would be the one

9 document that I would sign, too.

10     Q.   Okay.  I'm going to scroll down.  Do you see

11 on the bottom left where it says "Supervisor"?

12     A.   Yes.

13     Q.   Is that your signature?

14     A.   Yes, that's my signature.

15     Q.   Okay.  What was your process for approving an

16 expense report like this?

17     A.   Just, I would make sure that the time spent on

18 the case, including, you know, any follow-ups, typing,

19 anything -- even driving time, any time related to the

20 officers or detectives investigation would be included

21 in this.

22     Q.   Okay.  And how would you receive this document

23 for approval?  Would Detective Stanley put it in your

24 basket?  Would it be via electronic means?

25     A.   No.  This one back then was a carbon copy


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

 1  form. It was like a pink, yellow, white tri-copy carbon

 2  thing. So they would give me that to review and sign off

 3  on basically that the -- that was the time spent on this

 4  investigation.  And I'm --

 5      Q.   Okay.

 6      A.   Yeah.  Yeah.  I'm surprised he didn't include

 7  the, you know, the CSI, the crime scene investigator or

 8  the responding officers, too.  I mean, they could have,

 9  but I guess he just -- he only just put his name on

10  there.

11      Q.   Okay.  And is six hours an unusual amount of

12  time to spend on an investigation?

13      A.   No.

14          MR. MISTOLER:  Objection.  You can answer, Dan.

15          THE WITNESS:  Yes.  I mean, I don't think that

16      that's unusual.  I mean, this was a complicated case

17      where you had, you know, a victim and a witness,

18      that you're doing photo lineups.  No.  Yeah.  And

19      that seems about right.

20          BY MS. DILLON:

21      Q.   Okay.  I'm going to set this exhibit aside.

22          MS. DILLON:  Everyone still okay on bathroom?

23          MR. MISTOLER:  How much longer you got?

24          THE WITNESS:  Yeah, right.

25          MS. DILLON:  Probably 15 minutes, but don't



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    hold me to it.  I think it will be about that.

2         MR. MISTOLER:  Okay.

3         BY MS. DILLON:

4    Q.   All right.  Dan, are you aware of any citizen

5  complaints filed against you accusing you of misconduct

6  during your time at OPD?

7    A.   No.  No.  I mean, yeah, I can't think of, you

8  know, anything.  I could be sure I've made -- I have,

9  you know, had disciplinary stuff, but you know, not for,

10  you know --

11   Q.   Not citizen complaints?

12   A.   No.  I mean, we have sometimes informal ones

13  that come through, but I've -- I mean, I've never had a

14  formal complaint lodged against me that Internal Affairs

15  investigated about me on any misconduct.

16   Q.   Okay.  And when you worked at OPD, did you

17  ever receive any disciplinary actions against you?

18   A.   Yes.

19   Q.   How many times?

20   A.   They were all driving related.  So I -- I've

21  got -- they were just either oral or written reprimands.

22  Like over 25 years ago, I dinged a couple of cars up. So

23  three or four times for that -- for that, for driving.

24  I think they called it, you know, safe driving of police

25  vehicles and we damaged a car, so maybe four.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     Q.   Okay.  And the outcome of those were an oral

2  or written reprimand?

3     A.   Yes.  That's the most serious discipline I

4  ever got.

5     Q.   Okay.  Any other disciplinary history you can

6  recall?

7     A.   I've never -- I was never suspended.  Never,

8  you know, I wasn't -- no, I -- the most serious

9  discipline I got was a written censure for driving,

10  because I had two minor accidents within a year or

11  something with that time.  But that's the most severe

12  discipline I ever got.

13     Q.   Okay.  And were all four-ish of those driving

14  reprimands for little accidents?

15     A.   Four -- maybe -- yeah, I think it's four.  But

16  yeah, every -- that many year -- the years, I think

17  there was four different times.

18     Q.   Okay.  Are you aware of any complaints made

19  against you by coworkers?

20     A.   No.

21     Q.   Okay.  And we talked about one lawsuit before

22  this one where you were a defendant.  Any other civil

23  case where you've been a defendant?

24     A.   No.

25     Q.   Okay.  Have you ever been convicted of a

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  crime?

2      A.   No.

3      Q.   Have you ever been arrested?

4      A.   No.

5      Q.   All right.  Other than the documents we've

6  looked at today and the ones you mentioned reviewing,

7  have you ever written anything about Mr. Valle-Ramos?

8      A.   No.

9      Q.   The burglary investigation?

10     A.   No.

11     Q.   This lawsuit?

12     A.   No.  The --

13     Q.   Have you ever given -- sorry, go ahead.

14     A.   The only thing I've written is my signature on

15  the recovering cost of an investigation and then

16  digitally approving a report.

17     Q.   Okay.  Have you ever given any statements

18  about Mr. Valle-Ramos?

19     A.   No.

20     Q.   The Gonzalez investigation?

21     A.   No.

22     Q.   This lawsuit?

23     A.   No.

24     Q.   Okay.  In the time since Mr. Valle-Ramos was

25  convicted, other than your conversation with Mr.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  Stanley, have you had any communications about the

2  Gonzalez burglary?

3      A.   No.

4      Q.   As you sit here today, do you think anyone at

5  the OPD did anything wrong in connection with the

6  Gonzalez burglary investigation?

7      A.   No.

8      Q.   Anything you think you should have done

9  differently?

10         MR. MISTOLER:  Objection, but you can still

11      answer.

12         THE WITNESS:  The only thing different is, I

13      mean, times change in law enforcement.  Over my 25

14      years, a lot of things change.  But the latest

15      change that happened after this incident were that

16      we had a -- the blind showing of the lineup, I think

17      is the best practice, but it wasn't the practice at

18      the time.  So I mean, that's the only thing that

19      might take away from this that, you know, but --

20         BY MS. DILLON:

21      Q.   Okay.  So you think a blind administration is

22  better, but --

23      A.   Yeah.

24      Q.   -- it wasn't the policy at the time?

25      A.   Yes.  That was a good policy change that we

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  did later on.  But other than that, I mean, I -- based

2  on the facts that I was given when I signed and I

3  approved, I -- I -- I don't see any issues with it.

4        MS. DILLON:  Okay.  I'm fairly certain I have

5     no more questions, but can we take a five-minute

6     break and come back and just to make sure?

7        MR. MISTOLER:  Certainly.

8        THE WITNESS:  Sounds good.

9         (A recess was taken.)

10        THE REPORTER:  Back on the record.

11        MS. DILLON:  Hi, Dan.  I don't have any further

12     questions from you.  So I'll turn it over to your

13     counsel.

14        THE WITNESS:  Thank you.

15        MR. MISTOLER:  Thank you, Roz.

16               CROSS-EXAMINATION

17        BY MR. MISTOLER:

18     Q.   Just a few follow-ups here.  Earlier, you were

19  shown a lineup that had six photos.  Do you recall that?

20     A.   Yes.

21     Q.   Did you find anything when you saw that photo,

22  anything suggestive about that lineup?

23     A.   No.

24     Q.   Do you believe that Detective Stanley followed

25  the applicable policies and procedures in this



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 investigation of Valle-Ramos?

2     A.   Yes.

3     Q.   Are you aware of any instances where Detective

4 Stanley has ever framed a suspect or a suspect?

5     A.   No.  I mean, like I said, he was very very

6 conservative on the law, but I mean, it was no gray

7 area.  It was, you know, he was a by the book kind of

8 guy.

9     Q.   So you don't believe that Detective Stanley

10 framed Valle-Ramos in this subject situation?

11     A.   No.

12         MS. DILLON:  Objection.  Form.

13         MR. MISTOLER:  That -- that's fine.

14         MS. DILLON:  You can answer.

15          BY MR. MISTOLER:

16     Q.   What was the answer?  I don't think I heard

17 it.

18     A.   No.

19         MR. MISTOLER:  I don't have any other

20     questions.

21         MS. DILLON:  Based on that, I don't have

22     anything further.

23         MR. MISTOLER:  Thank you very much.  Did -- Mr.

24     Brady, you have the opportunity to read your

25     deposition transcript.  That is your right.  You can

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    waive that right, if you want to, but we do need an

2    answer here today.

3          THE WITNESS:  I prefer to read.  Read.

4          MR. MISTOLER:  Okay.  Would -- do you want to

5    provide your e-mail address in the chat here and

6    Ms. --

7          THE WITNESS:  Yeah.

8          MR. MISTOLER:  -- Ms. Ward can send it straight

9    to you?

10         THE WITNESS:  Sure.  Let's see here.  I don't

11   know where the chat section is, where it says Chat.

12         THE REPORTER:  And Ms. Dillon, are you going to

13   be ordering today?

14         MS. DILLON:  Not today.

15         THE REPORTER:  All right.  I will go ahead and

16   take us off.

17            (Deposition concluded at 4:53 p.m. ET)

18

19

20

21

22

23

24

25


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE


    I, the undersigned, certify that the witness in the

foregoing transcript personally appeared before me and

was duly sworn.


Identification:  Produced Identification


_____

NICOLE WARD

Court Reporter, Notary Public

State of Florida

Commission Expires: 09/17/2025

Commission Number:  HH 165735

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1              C E R T I F I C A T E

 2

 3   STATE OF FLORIDA)

 4   COUNTY OF ORANGE)

 5

 6       I, NICOLE WARD, Court Reporter and Notary Public

 7   for the State of Florida at Large, do hereby certify

 8   that I was authorized to and did report the foregoing

 9   proceeding, and that said transcript is a true record of

10   the said proceeding.

11

12       I FURTHER CERTIFY that I am not of counsel for,

13   related to, or employed by any of the parties or

14   attorneys involved herein, nor am I financially

15   interested in said action.

16

17   Submitted on: November 18, 2025.

18

19

20

21

22   _____

23            NICOLE WARD

24       Court Reporter, Notary Public

25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

# Orlando Police Department





1



2



3



4

5



6

Lineup Identifier:
Printed Orlando PD:  7/24/124 9:32

P001413

# Photo Line-up Administration and Witness Instructions

Case Number: _2013-146382_  Date/Time: _4|18|13  1115 HRS_

Witness Name: _GONZALEZ, GEORGE_ Administrator Name/ID: _STANLEY #14767_

Line-up Number: _22184_  Line-up reviewed by: _STANLEY #14767_

Prior to presenting the photo line-up, the witness provided a written/audio recorded statement describing the suspect of this criminal investigation.

_MDS_
Administrator's Initials

Prior to presenting the photo line-up I read "verbatim" the witness instructions to the witness. The witness indicated he/she understood the instructions.

_MDS_
Administrator's Initials

## PHOTO LINE-UP INSTRUCTIONS TO THE WITNESS:

"It is just as important to clear innocent persons from suspicion as it is to identify guilty parties. Regardless of whether you make an identification, we will continue to investigate this incident. With that in mind, I am going to show you six photos arranged so they may be simultaneously viewed. This group of photos may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards, and moustaches may easily be changed. The photos may not always depict the true complexion of a person – it may be lighter or darker than shown in the photo. Pay no attention to the order of the photos or markings and/or numbers that may appear on the photos, or to any differences in the type or style of photographs. Take your time; when you have looked at all the photos, tell me whether or not you see the person who committed the crime. If you do identify someone, you will circle and initial that person on the line-up. Please remember this is an on-going investigation, you are not permitted to discuss this identification procedure with anyone other than law enforcement or legal counsel."

I understand the photo line-up instructions and have been provided a copy of this form.

Witness's Initials

After the photo lineup, the witness provided a written statement or an audio recorded statement describing his/her identification or non-identification.

_MDS_
Administrator's Initials

*This form is to be filed in the case package. If the witness refuses to provide a sworn statement, indicate so in the incident report.*

OPD P&P 1636.0 B Rev. 10/25/11      Original: State Attorney      Yellow: Records      Pink: Witness

**Exhibit I 1**

P000532

# WITNESS PHOTO DISPLAY IDENTIFICATION FORM

## ORLANDO POLICE DEPARTMENT

PHOTO LINEUP # 22184

| | | |
|---|---|---|
| UPPER LEFT 1 | UPPER CENTER 2 | UPPER RIGHT 3 |
| LOWER LEFT 4 | LOWER CENTER 5 | LOWER RIGHT 6 |

If you have previously seen one or more of the persons shown in the photos displayed, place an "X" in the box corresponding to the photograph of the person in the lineup.

OPEN DOOR TO CONDO _____ was seen by me (state circumstances)
TURNED AND LOOKED RIGHT AT ME
AND TOOK OFF. THIS IS PERSON BOY
NO # 2.

I swear or affirm that the aforementioned is true and correct to the best of my knowledge.

Sworn to and subscribed before me

MICHAEL D. STANLEY

this 18th day of APRIL, 2013.

_____ 14767
Notary Public
or
Law Enforcement Officer
Conducting Official Investigation

_____
Signature of Witness

1625 LITTLE FALLS CIRCLE
Witness' Street Address

ORLANDO, FL 32807
City, State, Zip Code

407-509-3282
Witness' Telephone Number(s)

4/18/13   1115 HRS
Time and Date of Witness' Signature

Exhibit I 2

P000533

# Orlando Police Department





**Lineup Identifier:**

**Printed Orlando PD:** 4/17/2013 11:14

P000534



# Orlando Police Department
## Field Report – Investigative Supplement

100 S Hughey Ave   Orlando, FL  32802   (407)246-2470

Case Number: **2013-00146382**
Reporting Officer: 14767   STANLEY, MICHAEL
Approving Officer: 10322   BRADY, DANIEL

**NARRATIVE**

On 4/9/2013 at approximately 0845 hours, Ofc. A. Tejeira (7473), responded to 1625 Little Falls Circle in reference to an Occupied Residential Burglary.  Upon arrival he met with the victim, George Gonzalez, who provided a sworn written statement.

Gonzalez stated he arrived at his above listed residence and entered through the ground level front door.  Upon entering, Gonzalez stated he observed a Hispanic male (Suspect # 1) in his early 20s inside his residence on the ground floor.  Gonzalez stated Suspect # 1 then ran out his residence through his rear sliding glass door, and Gonzalez was able to chase after Suspect # 1 who ran in a northern direction.  After losing sight of Suspect # 1, Gonzalez stated he returned to his residence and encountered another Hispanic male (Suspect # 2), also in his early 20s, inside his residence and descending the stairs from the upper floor.  Gonzalez stated he was then able to pepper spray Suspect # 2 at which time he then attempted to detain Suspect # 2.  Gonzalez stated Suspect # 2 then punched him and during the struggle, Gonzalez stated he observed another Hispanic male (Suspect # 3), also in his early 20s and inside his residence descending the stairs from the upper floor.  Gonzalez stated Suspect # 3 then ran back up the stairs, and Suspect # 2 ran out the front door.  Gonzalez stated he was then able to notify the police about the incident and continued to chase after Suspect # 2.  Gonzalez stated he then returned to his residence and noted Suspect # 3 had also exited his residence.  Gonzalez stated one of the suspects did have a distinct Afro style hairdo.  All efforts to locate the suspects met with negative results.  Entry to Gonzalezs residence was determined to have been through his rear sliding glass door by smashing open the lock with a tire iron which was left behind by the suspects.

Gonzalez completed an inventory of his belongings and noted the suspects had taken numerous pieces of sterling silver jewelry valued at approximately $8,000, and a gold ring valued at approximately $1,200.  Gonzalez stated the suspects did not have permission to enter his residence or to take his belongings, and prosecution is desired.

On 4/10/2013, I, Det. M. Stanley (14767), was assigned this incident for investigative follow-up.  I reviewed the incident and noted the three suspects were described as Hispanic males in their early 20s.  I reviewed an OPD Criminal Information Bulletin (CAU-2013-0269), in which three males and a female had been stopped and detained in reference to their possible involvement in a Residential Burglary on 4/3/2013 at 5075 Andrea Blvd. (reference OPD 2013-137815), which is in the same general area as Gonzalezs residence.  One of the males in this bulletin was identified as Jorge R. Valle Ramos, W/M, DOB 4/21/93.  A review of Valle Ramoss Driver and Vehicle Information Database (DAVID) photograph noted Valle Ramos to have a distinct Afro style hairdo.

Acting upon this possible investigative lead, I prepared a photographic line-up (ID # 22184) containing a photograph of Valle Ramos with a previous DAVID photograph in which he did not have a distinct Afro style hairdo.  On 4/18/2013 I then met with Gonzalez and read him OPDs Photo Line-up Administration and Witness Instructions which Gonzalez initialed stating he understood the photo line-up instructions.  I then presented Gonzalez the photo line-up containing a DAVID photograph of Valle Ramos, and Gonzalez immediately selected Valle Ramos in photograph # 2 who he stated was one of the suspects inside his residence.  Gonzalez stated he looked directly at Valle Ramos who was inside his residence and who then ran out, exiting through his rear sliding glass door.

At this time, based upon the positive identification of Valle Ramos by Gonzalez, who he stated he observed uninvited inside his residence, and the theft of approximately $9,200 in jewelry, probable cause exists to charge Valle Ramos with Burglary of Occupied Dwelling, and Grand Theft 3rd Degree >$5,000<$10,000.

An arrest warrant for Valle Ramos has been obtained and signed by Judge Maureen Bell, and this incident should be considered inactive pending arrest.

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.

**P001418**



# Orlando Police Department
## Field Report – Investigative Supplement

*100 S Hughey Ave   Orlando, FL  32802  (407)246-2470*

Case Number: **2013-00146382**
Reporting Officer: 14767   STANLEY, MICHAEL
Approving Officer: 10322   BRADY, DANIEL

## SUBJECTS

| Case Subject Type | Subtype | Street Address | | Home Phone | Sex | Age |
|---|---|---|---|---|---|---|
| Name | | City,  State  Zip | Cell Phone | Work Phone | Race | DOB |
| Hgt  Wgt  Hair  Eyes | DL Number/State | City of Birth | State/Country of Birth | | Soc. Sec # | |

**Suspect**       Suspect       4611 CASON COVE DR-Drive 622                        M    20
VALLE RAMOS, JORGE, RUBEN       ORLANDO, FL, 32811                                 W   04/21/1993
510  150  BRN  BRN   V465-436-93-141-0/FL                                          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

**Victim**        Adult        1625 LITTLE FALLS CR-Circle                          M    57
GONZALEZ, GEORGE            ORLANDO, FL  32807       (407)509-3282                  W   04/04/1956
              G524-312-56-124-0/FL                                                 --

## PROPERTY - GENERAL

| Date | Code | Quantity | Units | Category | Value | OAN |
|---|---|---|---|---|---|---|
| | Property Type | | | Style/Drug Type | Serial Number | |

## PROPERTY - VEHICLE

| Date | Code | Year | Category/Make/Model/Model Desc | | Value | |
|---|---|---|---|---|---|---|
| | Property Type | Color | | Year/Plate/State | VIN/Serial Number | |

## PROPERTY - GUNS

| Date | Code | Type | Make | Serial Number |
|---|---|---|---|---|
| | Value | Caliber | Finish | OAN |

| I swear or affirm the above statements are correct and true. | Officer Name/ID # {Print} |
|---|---|
| Signature_____ | |

Sworn to and subscribed before me, the undersigned authority,
This _____ day of _____,_____. _____
Notary Public ☐   Law Enforcement Officer ☐  Emp # _____ Orlando Police Department

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.

Last Modified Date/Time 04/24/2013  13:33:46

P001419



# Orlando Police Department
## Field Report



100 S Hughey Ave   Orlando, FL 32802   (407)246-2470

Case Number: **2013-00146382**

## DETAILS

Location: 1625 LITTLE FALLS CIR

Reporting Officer ID: 7473      TEJEIRA, ALFONSO

Incident Type:     Residential Burglary
Occurred From:  04/09/2013  08:00   Thru:  04/09/2013  08:09
Reporting Date:   04/09/2013  08:09
Approving Officer:  12146   MCCRAY, JERRY

## OFFENSES

| Counts | Attempt/Commit | Description | Dom. Violence | Location Type |
|---|---|---|---|---|
| 1 | Committed | BURGLARY - BREAKING AND ENTERING | No | Apartment/Condo |
| 1 | Committed | THEFT | No | Apartment/Condo |
| 1 | Committed | BATTERY | No | Apartment/Condo |

## NARRATIVE

On April 9, 2013 at approximately 0845 hours, I responded to 1625 Little Falls Cir, Hidden Creek Condos, in reference to an occupied residential burglary. Upon arrival, I met with the victim who completed a sworn written statement.

According to the victim, on today's date at approximately 0800 hours he arrived home. He entered his residence via the front door. Once inside, victim observed suspect #1, on the ground level. Suspect #1 ran out the back sliding glass door. The victim chased suspect #1 who jumped the fence and ran northbound in an unknown direction. When the victim returned to his residence. Suspect #2 was coming down the apartment's stairs. The victim pepper sprayed suspect #2. The victim attempted to hold suspect #2. Suspect #2 began punching the victim. While the victim was fighting with suspect #2, Suspect #3 came down the stairs. Suspect #2 the ran out the front door northbound thru the condos. Suspect #3 was last seen by the victim going up the stairs. Suspect #2 jumped a fence north of the complex. When the victim returned to the apartment suspect #3 had left. Unknown if suspect #3 jumped out the second story window or left via front or back door. A witness observed three suspects enter a gray possibly Toyota vehicle in the complex north of the victim's condo. The description given by the witnesses of the suspect's entering the vehicle and leaving in an unknown direction did not match suspect #1. It appears the victim only saw three suspects but there could have been four. The victim did not give anyone permission to enter his residence and steal his property, or batter him. The victim will press charges. The victim did not sustain any visible injuries and did not require medical attention. CST Styer, 14857, responded to the scene and processed for latent prints. One of the witnesses stated she believed the suspects were wearing gloves.

It appears, the suspects entered the residence via the rear sliding glass door. The suspects used a tire iron to break the sliding glass door lock. The tire iron was left at the scene. Estimated damage to the door is $10.  Once inside the suspects stole approximately $8000 worth of sterling silver jewelry. The suspects also took a gold ring valued at approximately $1200. The suspect attempted to steal approximately $500 in U.S. coins and a folding knife valued at $40. The knife and the coins were in a backpack the suspects brought with them but left behind. The folding knife and the coins were returned to the owner. The backpack was taken by the CST. Officer O'Day, 12153, found a Pop Tart bag in the area where the suspect's car was last seen.  It is unknown if the bag came from suspect's car The bag was turned over to the CST. The victim stated he can identify some of the suspects.

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.



# *Orlando Police Department*
## Field Report



## SUBJECTS

| Case Subject Type | Subtype | Street Address | | Home Phone | Sex | Age |
| Name | | City, State Zip | | Work Phone | Race | DOB |
| Hgt  Wgt  Hair  Eyes | DL Number/State | City of Birth | Cell Phone | State/Country of Birth | Soc. Sec # | |
|---|---|---|---|---|---|---|
| **Suspect** | Suspect | | | | | |
| UNK, 2013-00146382 | | | | | | |
| **Suspect** | Suspect | | | | | |
| UNK, 2013-00146382 | | | | | | |
| **Suspect** | Suspect | | | | | |
| UNK, 2013-00146382 | | | | | | |
| **Suspect** | Suspect | | | | | |
| UNK, 2013-00146382 | | | | | | |
| **Victim** | Adult | 1625 Little Falls CR-Circle | | | M | 57 |
| Gonzalez, George L | | Orlando, FL  32807 | (407)459-3282 | | W | 04/04/1956 |
| | G524312561240/FL | | | | -- | |

## PROPERTY - GENERAL

| Date | Code | Quantity | Units | Category | Value | OAN |
| | Property Type | | | Style/Drug Type | Serial Number | |
|---|---|---|---|---|---|---|
| 04/09/2013 | **Damaged** | 1 | Each | General Property | $10.00 | |
| | Miscellaneous | | | | | |
| | Damage to the back door sliding glass door lock; | | | | | |
| 04/09/2013 | **Stolen Only** | 1 | Each | Jewelry | $1200.00 | |
| | Jewelry Ring | | | | | |
| | Gold ring with skull cross bones accented with ; diamonds | | | | | |
| 04/09/2013 | **Stolen Only** | | | Jewelry | $8000.00 | |
| | Jewelry Other | | | | | |
| | 30-35 pieces of sterling silver jewelry with blue ; topaz, citrine black onyx | | | | | |
| 04/09/2013 | **Stolen/Recovered** | | | Securities or Money | $500.00 | |
| | Currency/Negotiable | | | | | |
| | $500 in U.S. coins | | | | | |
| 04/09/2013 | **Stolen/Recovered** | 1 | Each | General Property | $40.00 | |
| | Miscellaneous | | | | | |
| | Buck folding knife | | | | | |

## PROPERTY - VEHICLE

| Date | Code | Year | Category/Make/Model/Model Desc | | Value |
| | Property Type | Color | | Year/Plate/State | VIN/Serial Number |
|---|---|---|---|---|---|
| | | | | | |

## PROPERTY - GUNS

| Date | Code | Type | Make | Serial Number |
| | Value | Caliber | Finish | OAN |
|---|---|---|---|---|
| | | | | |

| I swear or affirm the above statements are correct and true. | Officer Name/ID # {Print} |
|---|---|
| Signature_____ | |
| Sworn to and subscribed before me, the undersigned authority, | |
| This _____ day of _____,_____. _____ | |
| Notary Public ☐   Law Enforcement Officer ☐   Emp # _____  Orlando Police Department | |

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.

**P001416**

# ORLANDO POLICE DEPARTMENT
## INVESTIGATIVE COSTS EXPENSE REPORT

FILED IN OPEN COURT
Clerk, Cir. Ct., Orange Co. FL
*HBIA*
*J. Tucker* D.C.
By _____

**Agency Case No.** 2013-146382
**Court Case No.** 2013-CF-5146-A/O-16
**Defendant's Name** VALLE RAMOS, JORGE, R

| Employee's Name/# | Investigative Activity | Hours | Hourly Rate | Expense Total |
|---|---|---|---|---|
| STANLEY # 14767 | INVESTIGATOR | 6.00 | $19.40 | $116.40 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| **TOTAL COST OF INVESTIGATION** | | | | $116.40 |

The above is a true account of the investigative hour expenses case number 2013-146382 involving VALLE RAMOS, JORGE, R..

| | | |
|---|---|---|
| Officer's Signature | 14767 | 67535 |
| | Employee # | 5 digit OPD program # |

**SWORN to and SUBSCRIBED before me this 19 day of April, 2013.**

(Notary Public)    (Law Enforcement Officer)

SUPERVISOR
Orlando Police Department

See OPD Online, Forms, for current Pay Rate Chart
or use the employee's actual pay rate.

OPD P&P 1408.3 A Rev. 7/28/12    Original-APS    ☐ Records Copy    ☐ Fiscal

**P000007**

**407.423.9900**
**Fax 407.841.2779**
**Toll Free 855-MYDEPOS**

**MILESTONE ▌ REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF FLORIDA

3   ORLANDO DIVISION

4   CASE NO.: 6-24-CV-01246-CEM-DCI

5   HON. CARLOS E. MENDOZA

6

7   JORGE VALLE-RAMOS,

8   Plaintiff

9

10  V.

11

12  CITY OF ORLANDO, MICHAEL

13  STANLEY, AND UNKNOWN OFFICERS.

14  Defendants

15

16

17

18

19

20  DEPONENT:  GEORGE GONZALEZ

21  DATE:      FEBRUARY 24, 2025

22  REPORTER:  FLOR LOPEZ

23

24

25

**ORIGINAL**

400 North Ashley Drive, Suite 2600     100 East Pine Street, Suite 308     4651 Salisbury Road, 4th Floor
**TAMPA, FL 33602**                     **ORLANDO, FL 32801**                **JACKSONVILLE, FL 32256**
                                        **CORPORATE**

```
 1                    APPEARANCES

 2

 3  ON BEHALF OF THE PLAINTIFF, JORGE VALLE-RAMOS:

 4  Roz Dillon, Esquire

 5  Loevy & Loevy

 6  311 North Averdeen Street

 7  3rd Floor

 8  Chicago, Illinois 60607

 9  Telephone No.: (312) 243-5900

10  E-mail: dillion@loevy.com

11  (Appeared via videoconference)

12

13  ON BEHALF OF THE DEFENDANTS, CITY OF ORLANDO, MICHAEL

14  STANLEY AND UNKOWN OFFICERS:

15  Stephen Mistoler, Esquire

16  O'Connor, Haftel & Angell, PLLC

17  800 North Magnolia Avenue

18  Suite 1350

19  Orlando, Florida 32803

20  Telephone No.: (407) 843-2100

21  E-mail: smistoler@ohalawcom

22  (Appeared via videoconference)

23

24

25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

```
 1                        INDEX

 2                                        Page

 3   PROCEEDINGS                            5

 4   DIRECT EXAMINATION BY MS. DILLON       5

 5   CROSS-EXAMINATION BY MR. MISTOLER     104

 6

 7                      EXHIBITS

 8   Exhibit                               Page

 9   5 - Photograph P001405                 19

10   6 - Photograph P001406                 21

11   7 - Photograph P001407                 23

12   8 - Photograph P001408                 24

13   9 - Photograph P001410                 26

14   10 - Photograph P001411                27

15   11 - Photograph P001412                27

16   12 - Orlando Police Report P000001     60

17   13 - Field Report - P001415 - P001416  68

18   14 - Photo Line-Up and Witness Instructions

19      - P000532 - P000534                 78

20

21

22

23

24

25
```



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1                    STIPULATION

2

3  The deposition of GEORGE GONZALEZ was taken at MILESTONE

4  REPORTING COMPANY, 315 EAST ROBINSON STREET, SUITE 510,

5  ORLANDO, FLORIDA 32801, via videoconference in which all

6  participants attended remotely, on MONDAY the 24TH day

7  of FEBRUARY 2025 at 1:31 p.m. (ET); said deposition was

8  taken pursuant to the FLORIDA Rules of Civil Procedure.

9

10 It is agreed that FLOR LOPEZ, being a Notary Public and

11 Court Reporter for the State of FLORIDA, may swear the

12 witness and that the reading and signing of the

13 completed transcript by the witness is not waived.

14

15

16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1              PROCEEDINGS
 2         THE REPORTER:  On the record.
 3         Will all parties, except for the witness,
 4    please state your appearance, how you're attending,
 5    and your location?
 6         MS. DILLON:  Sure.  Roz Dillon, attending via
 7    Zoom remotely from California for Plaintiff Jorge
 8    Valle-Ramos.
 9         MR. MISTOLER:  Stephen Mistoler on behalf of
10    the defendants, attending via Zoom in Orlando,
11    Florida.
12         THE REPORTER:  And can the witness please state
13    their full name for the record?
14         THE WITNESS:  George Louis Gonzalez.  I'm in
15    Summerfield, Florida.
16         THE REPORTER:  Okay.  And, Mr. Gonzalez, can
17    you please raise your right hand?
18         THE WITNESS:  Uh-huh.
19         THE REPORTER:  Do you solemnly swear or affirm
20    that the testimony you're about to give will be the
21    truth, the whole truth, and nothing but the truth?
22         THE WITNESS:  Yes.
23         THE REPORTER:  You may begin.
24              DIRECT EXAMINATION
25     BY MS. DILLON:
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

1    Q.   All right.  Good afternoon, Mr. Gonzalez.  My

2  name is Roz Dillon, and I represent the plaintiff, Jorge

3  Valle-Ramos, in this case.

4    A.   Okay.

5    Q.   And I'm going to be deposing you this

6  afternoon, after which counsel for defendants will

7  probably also have some questions for you.

8    A.   Okay.

9    Q.   By the agreement of parties, we're doing this

10 deposition over Zoom.  Where are you this afternoon?

11   A.   In Summerfield, Florida.

12   Q.   Okay.  Is anybody with you?

13   A.   My wife is next to me.

14   Q.   Okay.  Do you have any papers with you?  Any

15 other documents?

16   A.   I just got this; what you guys sent me.

17   Q.   Okay.  Is that the summons for your

18 deposition?

19   A.   Yes, it is.

20   Q.   Great.

21   A.   United States.

22   Q.   Mr. Gonzalez, have you ever been deposed

23 before?

24   A.   What do you mean?  On -- on -- yeah, deposed

25 like ask -- being asked questions and stuff?  Yeah.

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free **855-MYDEPOS**

1     Q.   Yeah.  Yeah.  With a court reporter?

2     A.   Yeah, sure.  Uh-huh.

3     Q.   Okay.  How many times have you been deposed

4  before?

5     A.   I think mostly it's just you guys.  A couple

6  of times, I think.

7     Q.   Okay.  And you mean in relation to --

8     A.   This --

9     Q.   -- the --

10    A.   -- particular situation, yeah.

11    Q.   Okay.  Do you recall being deposed for

12  anything else outside of related to this litigation?

13    A.   Outside of this?  Oh, I don't know.  Do they

14  do that during a divorce or something?  I've been

15  divorced before.  Do they do that or --

16    Q.   Potentially, but not super common.  So --

17    A.   I don't -- I don't recall.

18    Q.   Okay.  So you may know how this goes since

19  you've done this before, but I'm just going to lay some

20  ground rules so that we're all on the same page, okay?

21    A.   Alrighty.

22    Q.   All right.  So I'm going to be asking you

23  questions and you're going to be giving answers under

24  oath, and that's the same oath as if you were in a

25  courtroom in front of a judge and jury; do you

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  understand?

2       A.   Roger that.  Yep, I do.

3       Q.   Okay.  Okay.  And if you don't understand a

4  question that I ask, please just say so and I'll

5  rephrase it or ask a new question, okay?

6       A.   Okay.

7       Q.   All right.  If you answer, we're going to

8  assume that you understood the question, fair enough?

9       A.   Okay.

10      Q.   All right.  So next, the court reporter here

11  is going to be taking down your testimony today, and so

12  for that reason it's really important that we try not to

13  speak over each other.  So all I ask is that you try to

14  let me finish my question before answering and I will do

15  the same.  I'll try to let you finish your answer before

16  interrupting with the next question, okay?

17      A.   Okay.

18      Q.   Okay.  And for the same reason, it's important

19  that you give verbal answers, a nod of the head, hand

20  gestures won't allow the court reporter to take down

21  your testimony, understood?

22      A.   Okay.

23      Q.   All right.  Next, there might be some times

24  today where the lawyer for the other side objects to one

25  of my questions.  Since there's not a judge here to rule



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  on those objections the rule is that you'll go ahead and

2  answer anyway, even if an attorney objects, okay?

3      A.   Okay.

4      Q.   All right.  Last, if you need a break, at any

5  time you can have one, water, bathroom, whatever you

6  need.  But if there's a question pending, you'll just

7  need to answer that before we take a break, okay?

8      A.   Okay.

9      Q.   All right.  I -- I'll start by saying, I

10 really appreciate you taking some time out of your day

11 to do this with us.  I know this isn't the way anyone

12 wants to spend their afternoon.  Mr. Gonzalez --

13     A.   Oh, no, I love these.

14     Q.   Glad to hear it.  Do you have any medical

15 conditions that might affect your ability to testify

16 this afternoon?

17     A.   Not really, no.  I don't think so, no.

18     Q.   Okay.  Any medications you're on that can --

19     A.   I do have some sluggishness.  I've been to

20 neurology, and I've been diagnosed with sort of a -- I

21 don't know.  Honey, what would you say?  My mind was

22 sluggish or something or slow or --

23         MS. GONZALEZ:  It's a -- foggy.

24         THE WITNESS:  Like a foggy type of thing.  You

25     know, I just did that last -- a week or so ago.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          MS. GONZALEZ:  Uh-huh.

2      BY MS. DILLON:

3      Q.  Okay.

4      A.  Because we thought I had Alzheimer's and I had

5  to go there for that, for dementia, and stuff, making

6  sure.  Because of my memory's been going.

7      Q.  Okay.  So you said about a week ago you were

8  assessed for some of the memory issues you've been

9  having, the fogginess?

10     A.  Yeah, I'm thinking about a week or two.  What

11 was it?  About a week?

12         MS. GONZALEZ:  It was on the 5th.

13         THE WITNESS:  On the 5th.  Okay.  This month.

14     BY MS. DILLON:

15     Q.  And when did you start having symptoms of

16 sluggishness or fogginess?

17     A.  Well, for a little while now, about two or

18 three years.  I've been worried about that because my

19 vocabulary has dropped and I'm slow in answering some

20 things or looking at some things when me and my wife

21 talk and -- and my -- my -- I just lose my words

22 sometimes.  That's what made me go through all this

23 stuff, so yeah.

24     Q.  Okay.  So losing your words sometimes for the

25 -- for about the past two or three years?  Is that what

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  I'm hearing?

2      A.   Well, yeah, that's I -- I saw myself, you

3  know, sort of diminishing in my vocabulary and my -- and

4  my -- my memory.

5      Q.   Okay.  And when you had your assessment, you

6  said it was with neurology last week?

7      A.   Yeah, about a couple of weeks ago, something

8  like that, yeah.

9      Q.   Okay.  Did they -- and the diagnosis, I think

10  you said was foggy mind.  Did you get an official

11  diagnosis or was there --

12      A.   I think it was due to some law in COVID that

13  I've had a lot of issues with that.

14      Q.   Okay.

15      A.   I've been out -- in and out of the doctor for

16  that quite a bit.  It's caused a lot of -- and he says

17  that it's part of -- I didn't -- the good news was I

18  didn't have Alzheimer or dementia, so --

19      Q.   Okay.

20      A.   -- you know, so I maybe could recover more

21  from this later or something.  I don't know.

22      Q.   Okay.  And before you started noticing your

23  vocabulary drop off for the last two or three years, did

24  you have any memory issues before that?

25      A.   I would say no, not really.  I mean, you know,



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

 1  just normal stuff like seniors do, I guess, but nothing

 2  that I felt, you know, was bad several years ago, no.

 3      Q.   Okay.  And did the neurologist prescribe any

 4  treatment for the symptoms that you're having?

 5      A.   Well, he did give me -- let me see here.  And

 6  -- and I -- and I -- and this was -- what was that,

 7  honey?  The leg movement?

 8          MS. GONZALEZ:  Restless leg syndrome?

 9          THE WITNESS:  Yeah, restless because I can't

10      sleep very well.  So he thought I had maybe restless

11      leg syndrome and they gave -- they prescribed me a

12      couple of medications here.

13      BY MS. DILLON:

14      Q.   Okay.  And those are for restless leg

15  syndrome, or are they for your memory?

16      A.   I don't know.  What's this one for, baby?

17          MS. GONZALEZ:  That's for depression.

18      BY MS. DILLON:

19      Q.   I --

20      A.   Oh.

21      Q.   And Mr. Gonzalez, I'll just say, I know your

22  wife is there.  I -- this deposition is just to ask you

23  questions.  If you don't know something, that's totally

24  fine, but she cannot answer for you.

25      A.   Okay.  I say I don't know.



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

1    Q.   Okay, no problem.

2    A.   I'll just say I don't know, yeah.  I don't

3 know.

4    Q.   Okay.  So aside from maybe some of the

5 fogginess that you've been having, is there any other

6 reason you can think of you wouldn't be able to give

7 accurate testimony today?

8    A.   No.  No, I'll give the -- I'll do the best I

9 can.

10    Q.   Sure.  And I'll -- and I'll say, this is not a

11 memory test.  None of the questions that you're going to

12 be asked are meant to trick you.  If you don't remember

13 something or don't know an answer, it's okay to say so

14 as long as it's the truth, okay?

15    A.   Sure.

16    Q.   Okay.  Did you do anything to prepare for your

17 deposition today?

18    A.   No.

19    Q.   Okay.

20    A.   Just waited for your call.

21    Q.   Fair question -- or fair answer.  Were you

22 contacted by anyone representing the City of Orlando or

23 Orlando Police Departments --

24    A.   No.

25    Q.   -- before your deposition?  No?



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1        A.    No.

2        Q.    Okay.  Have you spoken to any of the police

3   officers who originally invested -- investigated your

4   case in the last year?

5        A.    No.

6        Q.    Okay.  Have you spoken to any investigators

7   for the City of Orlando in the last year?

8        A.    No.

9        Q.    Okay.

10       A.    No.  The reason I hesitated was because I was

11  at court and I'm pretty sure I didn't talk to nobody

12  there.  There was a cop, you know.

13       Q.    Yeah.  Are you -- when you say you were at

14  court, are you referencing a hearing back in March,

15  2023?

16       A.    I'm thinking so.

17       Q.    Does that sound right?

18       A.    Yeah.

19       Q.    Okay.  And that was a hearing about Mr.

20  Valle-Ramos' conviction?

21       A.    Yes, uh-huh.

22       Q.    Okay.  Mr. Gonzalez, can you tell me the

23  highest level of education you've completed?

24       A.    I've done 12 with some college.

25       Q.    Okay, some college.  Do you have any training



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  or education in cognitive psychology?

2       A.   No.

3       Q.   Okay.  Any training or education about

4  eyewitness identifications?

5       A.   No.  No.

6       Q.   All right.  So I want to turn to the burglary

7  of your home back in 2013.  And when I say the burglary

8  of your home back in 2013, do you know what I'm talking

9  about?

10      A.   Sure, yeah.  Yeah.

11      Q.   Okay.

12      A.   I remember that, yeah.

13      Q.   Do you know that the gentleman who was

14  convicted of burglarizing your home back in 2013 had his

15  conviction vacated and the charges against him dismissed

16  last year?

17      A.   From what I understand, yes.  I do -- I do

18  know that.  Uh-huh.

19      Q.   Okay.  Do you -- do you remember how you

20  learned of that?

21      A.   How I learned of that?

22      Q.   Yeah, did someone tell you that?

23      A.   I think they either sent me a message or some

24  -- or wrote me something, I think.  Something like that.

25      Q.   A message or a letter?



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1    A.    Yeah, from the -- that it's been dismissed

2 from somebody in the court, I guess.

3    Q.    Okay.

4    A.    That's my -- what I recall.  That's the best

5 I --

6    Q.    Sure.  Did you have a reaction to learning

7 that the conviction was vacated and the charges were

8 dismissed?

9    A.    Yes.

10    Q.    What was your reaction?

11    A.    I didn't like it.

12    Q.    Okay.  Why didn't you like it?

13    A.    Because I know that that was the guy that

14 robbed me and the other witness, to me, was like I had a

15 private detective who was trying to pressure me and

16 intimidating me that this guy probably wasn't the guy

17 and I'm making a mistake.  Sort of trying to mess with

18 my mind a little bit that what I saw, what I didn't see,

19 was it -- you know, is it even possible that I could

20 have made a mistake?  On that note, no, not with him.

21 Because I was very close up and very -- right -- we were

22 right there.  There was three of them and I was --

23    Q.    Okay..

24    A.    -- fighting those guys off, yeah.

25    Q.    And we'll get into some of that in a lot more



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  detail, but when you say a private detective, do you

2  mean a private detective who was working with Mr. Valle-

3  Ramos?

4      A.    That's what he claimed to be.  I was away from

5  my home, he was already parked in front of my house.  I

6  was in Georgia at the time.  And we had a lengthy

7  conversation.  And -- he put the pressure on, you know,

8  trying to maybe convince me.  And I told him that, you

9  know, I've looked at witnesses when they showed me

10 pictures and that one guy I picked, I knew for sure

11 immediately because I picked him right away.  And they

12 have -- the cop took me to see someone else that was on

13 the street, but I wasn't sure.  So I told them, no, I

14 have to be positive.  And then it had another guy in the

15 picture that I told the detective, I'm pretty sure he

16 was with him, but I'm pretty sure, so I can't say.  But

17 the other guy, for sure, he -- it was him.

18      Q.    Okay.  And when you say the other guy, you

19 mean Mr. Valle-Ramos?

20      A.    Yes.

21      Q.    Okay.  And you had a lengthy conversation with

22 the investigator, and you said that was in Georgia?

23      A.    The investigator?  Yeah, I was --

24      Q.    Yeah.

25      A.    It was by the -- the camera on the phone or



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  something.  Yeah, we were just talking.

2       Q.   Okay.

3       A.   And I -- I guess it was just, you know -- I

4  just noticed him on my security camera.  He was in front

5  of my house.

6       Q.   Got it.

7       A.   He got through the security guard without me

8  being there and anything, so --

9       Q.   Okay.  Well -- we'll get into some of that in

10  a little bit, but let's take you back to the day of the

11  burglary.  Did you live in Orlando in 2013?

12       A.   Yes, uh-huh.

13       Q.   Okay.  Where did you live?

14       A.   1625 Hidden Creek -- what was it?  Let me see?

15  1625 Little Falls Circle.  It's Hidden Creek Condominium

16  and that's Orlando.

17       Q.   Okay.  And that was a complex of condominiums?

18       A.   Yeah, it's a two story condominium.

19       Q.   Okay.  Did you live with anyone else?

20       A.   Just me.

21       Q.   Okay.  And how long had you lived there at

22  that point?

23       A.   I'm guessing maybe six years, five years,

24  seven years, something like that, yeah.

25       Q.   Okay.  So maybe half a decade?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1     A.    Yeah, something like that.

2     Q.    Okay.  What I'd like to do is show you a

3  couple photographs that were taken on April 9, 2013, by

4  responding police officers of your house.  So what I'm

5  going to do is a screen share of what will be marked as

6  Plaintiff's Exhibit 5.

7     A.    Uh-huh.

8     Q.    Bear with me.  Sorry, sometimes I --

9     A.    It's okay.

10     Q.    -- have trouble figuring out where the

11  document is.

12     A.    Okay.

13     Q.    Let's see.  Okay.  Mr. Gonzalez, can you see

14  that photograph on your screen?

15     A.    Ah -- yeah, I see --

16     Q.    I can make it bigger.

17     A.    -- I see that photograph there, yeah.

18        MS. DILLON:  Okay.  For the record, this is a

19     photograph that's marked Bates P001405.

20           (Exhibit 5 was marked for identification.)

21        THE WITNESS:  Uh-huh.

22     BY MS. DILLON:

23     Q.    Mr. Gonzalez, do you recognize what's depicted

24  in this photograph?

25     A.    Well, it looks like the -- the front door of

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 my house, maybe.  I don't see a number or anything, but

2 it looks like the front door of my house, and I see a

3 backpack there.

4      Q.   Okay.  Do you recognize that backpack?

5      A.   I've had several backpacks throughout the

6 years, so I don't -- don't know, but I'm guessing that's

7 probably one from my house maybe?

8      Q.   Not a problem.  As you can see a little bit

9 into this door; is that right?  You can see a rug right

10 here --

11     A.   Uh-huh.

12     Q.   -- and then maybe something going on behind

13 the door.

14     A.   I see just the rug and the door.

15     Q.   Yeah.  It's a -- it's a little dark in --

16     A.   I don't see nothing behind --

17     Q.   It's a little dark inside.

18     A.   I don't see nothing behind the door.

19     Q.   Yeah, I do you agree that it's a little dark

20 in there.

21     A.   Yeah.  Okay.

22     Q.   Did you generally leave the lights on or off

23 when you weren't home?

24     A.   I can't recall that.

25     Q.   Okay.  Is there any reason you would leave the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  lights on if you weren't at home?

 2     A.  I could leave the light on when I'm at home,

 3  but I -- you know, I do it periodically.  Sometimes I

 4  leave the radio and the light on just to let people

 5  think I am -- I'm home.

 6     Q.  Okay.  And actually, let me pull up the next

 7  exhibit before I ask you some more questions.

 8     A.  Sure.

 9        MS. DILLON:  Okay.  There.  All right.  So now

10     I'm showing you a photograph that's Bates labeled

11     Plaintiff's 001406.  And this will be marked as

12     Plaintiff's Exhibit 6.

13           (Exhibit 6 was marked for identification.)

14     BY MS. DILLON:

15     Q.  Do you recognize what's depicted in this

16  photo?

17     A.  Yeah, that's from the fight in there and

18  knocking stuff all over the place.

19     Q.  Okay.  And is this the -- this is the front

20  door to your house on the right here; is that right?

21     A.  Yes, uh-huh.

22     Q.  Okay.  And what is -- do you see this opening

23  on the left?

24     A.  Yes, that's my kitchen.

25     Q.  Okay.  And a little farther back, do you see a



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  -- another white door?

2      A.   Yeah, uh-huh.

3      Q.   Where did -- where did this hallway lead to?

4      A.   To the -- it goes straight through the living

5  room out the back, to the patio.

6      Q.   Okay.  So there's a living room -- is there --

7  are there any other rooms between the living room and

8  the back patio?

9      A.   Yeah, there's a bathroom there with the

10 laundry.

11     Q.   Okay.  Is that -- would that be on the right

12 or the left; the bathroom and the laundry?

13     A.   That's -- looking at the picture, it would be

14 on the right side.

15     Q.   Okay.  So straight out the back, living room,

16 back door.  Is there anything else on the bottom level

17 -- was there anything else on the bottom level of this

18 home?

19     A.   No, that's basically it, that I can recall.

20     Q.   Okay.

21     A.   That's -- no, that's all.  Yeah.

22     Q.   Okay.  And is this what the view from your

23 front door would've looked like on April 9, 2013?

24     A.   I guess so, yeah.  That's -- that's the

25 picture.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1      Q.   Okay.  I'm going to stop sharing this exhibit

 2  and I'm going to pull up another photograph.

 3      A.   Okay.

 4      Q.   There's not too many of these, but bear with

 5  me.

 6           MS. DILLON:  Okay.  Next I'm showing you what

 7      is Bates labeled P001 -- or P001407.  And this will

 8      be marked as Plaintiff's Exhibit 7.

 9           (Exhibit 7 was marked for identification.)

10      BY MS. DILLON:

11      Q.   Do you recognize what's depicted in this

12  photo?

13      A.   Yeah, that's the foyer area as you come in.

14  And that's -- what do you call it?  A little table there

15  that I have -- a sofa table, sort of called it.

16      Q.   Okay.

17      A.   And --

18      Q.   On the right, is this your front door?

19      A.   It looks like it.  Yeah, and those steps go up

20  to the second floor.  Yeah.

21      Q.   Okay.  And these are the steps to the second

22  door.  And on the wall, is this pepper spray?

23      A.   That's pepper spray, yeah, that I used.

24      Q.   Okay.  I'm going to stop.

25      A.   I missed because I was fighting and there was

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1 | another guy coming at me.

 2 |     Q.   Yeah, we will -- we will get into that, but --

 3 |     A.   Sure.

 4 |     Q.   -- it seems like quite the event.  Stop

 5 | sharing this photograph.  Actually, can I ask you, what

 6 | was on the second floor of your condo?

 7 |     A.   There's two master bathrooms up there and

 8 | closets and the air conditioning area, you know, to hold

 9 | the air.

10 |     Q.   Got it.  Okay.

11 |        MS. DILLON:  And now I'm showing you what will

12 |     be marked as Plaintiff's Exhibit 8.  For the record,

13 |     this is Bates 0 -- plaintiff's 001408.

14 |          (Exhibit 8 was marked for identification.)

15 |     BY MS. DILLON:

16 |     Q.   Do you recognize what's depicted in this

17 | photo?

18 |     A.   Yeah, that's the patio there going out the

19 | back and then that's my office.

20 |     Q.   Okay.  And when you say that's the patio going

21 | out the back, do you mean this --

22 |     A.   Yeah.

23 |     Q.   -- door to the right back here?

24 |     A.   The curtain is -- yeah.  Right where that

25 | printer is, yeah.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  And this curtain to the left, are these

2  windows?

3    A.   Yes.  Uh-huh.

4    Q.   Okay.  And did you -- were these window

5  dressings were on the back patio and the windows back in

6  April -- on April 9, 2013?

7    A.   If that's what this picture's from, yes.

8  Uh-huh.

9    Q.   Yeah.  And is this also what you were

10 referring to as the living room?

11   A.   Yeah, the -- you got part of it there.

12 Uh-huh.

13   Q.   Okay.  And so when you're standing at the

14 front door, you had a view back into this space; is that

15 right?

16   A.   Yes, uh-huh.

17   Q.   Okay.  Could you see the back door from where

18 you were standing at the front door?

19   A.   When I opened my door, yes.  Uh-huh.

20   Q.   Okay.

21   A.   I can see the front door.

22   Q.   Just trying to orient myself to what you saw

23 on April 9th.

24   A.   Okay, sure.

25   Q.   Okay.  And do you recall whether or not the

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

 1 | lights were on or off on April 9, 2013, when you came

 2 | home?

 3 |     A.   Cannot recall that, no.

 4 |     Q.   Okay.  I'm going to stop sharing.  Okay.

 5 | Going to share my screen once more.

 6 |         MS. DILLON:  Okay.  Now I'm showing you what's

 7 |     been marked as Plaintiff 001410.  And this will be

 8 |     marked as Plaintiff's Exhibit 9.

 9 |           (Exhibit 9 was marked for identification.)

10 |     BY MS. DILLON:

11 |     Q.   And this is the back door that we were -- we

12 | saw in the previous exhibit; is that right?

13 |     A.   Yeah, it's a sliding glass door, actually.

14 |     Q.   Okay.  That's what I was going to ask you to

15 | -- how the door opened.  Is it outward or is it --

16 |     A.   Slide.

17 |     Q.   -- sliding?

18 |     A.   Yeah.

19 |     Q.   Okay.  And this is the door that the offender

20 | that you first saw ran out of; is that right?

21 |     A.   That's correct.

22 |     Q.   When you walked into your house?

23 |     A.   Yes, uh-huh.  When I opened the door saw --

24 | heard noise and I looked back and his head popped around

25 | and that was it.  I went after him.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1      Q.   Okay.  I'm going to stop sharing this exhibit.

 2   Two more photos.

 3      A.   Okay.  That's fine.

 4           MS. DILLON:  Okay.  I'm showing you now what

 5      will be marked as Plaintiff's Exhibit 10.  For the

 6      record, it's Bates P001411.

 7              (Exhibit 10 was marked for identification.)

 8      BY MS. DILLON:

 9      Q.   And is this the back patio --

10      A.   Yes.

11      Q.   Of your home?  Okay.

12      A.   Yeah, that's where he ran out of, right there.

13   Flipping everything over.

14      Q.   This gate?

15      A.   Yeah, uh-huh.

16      Q.   Okay.  One more.

17      A.   Oh, that's a --

18      Q.   Okay.

19      A.   -- that's one at the house, I guess.

20           MS. DILLON:  Last photo I'll show you will be

21      Plaintiff's Exhibit 11.  For the record, it's Bates

22   P001412.

23              (Exhibit 11 was marked for identification.)

24      BY MS. DILLON:

25      Q.   Do you recognize this -- what's depicted in



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  this photograph?

2       A.   Yeah, that's my bedroom with --

3       Q.   Okay.

4       A.   -- all the crap everywhere after they were

5  stealing stuff, yeah.

6       Q.   Yeah.  And this bedroom, just to confirm, was

7  upstairs, correct?

8       A.   Yes, it was.

9       Q.   Okay.  So this is not where you saw the person

10 who was in your office; is that right?

11      A.   Well, that's one person in my office, then I

12 saw another person that ran directly right into my

13 face --

14      Q.   Okay.

15      A.   -- as I was going up the stairs.  He ran into

16 me, then I saw the other guy, too.

17      Q.   Okay.

18      A.   There was three.

19      Q.   Okay.

20      A.   Yeah.

21      Q.   And you saw them all from kind of that

22 entryway in your -- in your home; is that right?  Where

23 your front door was?

24      A.   Well, when I opened my front door, that's when

25 I saw the guy in the back and I busted out chasing after



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 him, but I'm not going to catch a 20-year-old at 55

2 years old.  So he got away from me and as I come back to

3 the house, I was on the phone calling the police and as

4 I was talking to the police, I heard something.  So I

5 laid the -- the phone down on that sofa table in the

6 foyer and I started up the stairs.

7          As soon as I started up the stairs, he flew

8 down the stairs and we bumped into each other.  And I

9 grabbed him, got him in a headlock and I was trying to

10 get my weapons and my -- I forgot I left my -- my gun in

11 the car because I just got home.  And my -- what I had

12 only was pepper spray.  Then I started getting a little

13 nervous, worrisome, because now there's another guy.  So

14 I didn't know how many they were.  And then we continue

15 to fight from there and I had bad shoulders because, I

16 mean, I was waiting for an operation on my shoulders and

17 I let him -- I let him go and I couldn't catch him so --

18      Q.   Okay.  Let's break down the day of the crime

19 and what you saw a little bit further.  I'm going to

20 stop sharing my screen.

21      A.   Okay.

22      Q.   And we'll just chat for a little bit.  As you

23 sit here today -- do you have a good memory of April 9,

24 2013?

25      A.   I think the best that I can recall at this



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

1  moment.  I mean, you know, it's been a long time.  So --

2       Q.   We're talking over a decade later, right?

3       A.   Of course, yeah.

4       Q.   Okay.  And you said you had --

5       A.   I'm not getting younger.

6       Q.   You said you came home that morning.  Do you

7  remember where you were that you were coming home from?

8       A.   Yeah, a friend's house.  Uh-huh.

9       Q.   Okay.  Was it sunny outside?

10      A.   I can't recall that.

11      Q.   Okay.  Let's talk about what happened when you

12  first arrived home.  You said you opened the front door;

13  is that right?

14      A.   Yes, I did.  Uh-huh.

15      Q.   Okay.

16      A.   That's correct.

17      Q.   And as soon as -- once you opened the door,

18  what did you see?

19      A.   I heard something first and then I hesitated.

20  Then I looked back and he peeked around the corner, and

21  I let out some explicit vocabulary that I haven't forgot

22  yet, and I started after him.

23      Q.   Okay.  So you heard something and you -- did

24  you -- did you realize where that noise was coming from?

25      A.   Yes, in the back of the condo by the sliding

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 glass door.  My office actually.

2      Q.   Okay.

3      A.   He was going through things in there, yeah.

4      Q.   And how long after you opened the door did you

5 see the gentleman peek his head out?

6      A.   Probably about one second after I opened the

7 door and I probably froze for a second or two and that's

8 when --

9      Q.   Okay.

10      A.   -- I went in gear, yeah.

11      Q.   So it was -- it was pretty immediate after you

12 opened the door that this happened; you saw him?

13      A.   Oh, yeah. because he heard me and then he

14 peeked around.  I looked at him and he looked at me and

15 that was it.

16      Q.   Okay.  Do you recall how far away you were

17 from --

18      A.   From the --

19      Q.   -- the gentleman?

20      A.   -- from the front door and he was right by my

21 desk, so almost from the front to the back.  But as I

22 took off after him, he had a little trouble getting out

23 so I was a little closer, probably maybe ten feet, 12

24 feet, something like that.  But he --

25      Q.   From when you started chasing him or from when

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

 1  you started seeing him?

 2      A.   Yeah, he had a little hard time trying to get

 3  out the door because he was not able to get the door.

 4      Q.   Okay.

 5      A.   You know, and then he made it through then I

 6  chased him and I couldn't catch up to him, obviously.

 7      Q.   Yeah.  So when you were getting closer to him,

 8  was his back towards you because he was trying to go out

 9  the back door?

10      A.   Well, I seen his face because he -- I

11  remember, he was looking back to see how close I was or

12  something. He was nervous, you know.  And I was -- and I

13  was nervous, too I'm sure.  And, you know, so we're both

14  chasing each other.

15      Q.   Or --

16      A.   Or he's running; I'm chasing.

17      Q.   And I and I think you mentioned maybe you said

18  some expletives.  Did he say anything?

19      A.   No, and I'll tell you what's pretty -- pretty

20  good about this is what you -- that question is.  It's

21  -- it's a good question.  Is because none of them said

22  anything.  It's like they were well-trained.  Because I

23  know how -- I'm a -- I'm a military guy, you know, and I

24  -- and I notice a lot of things.  And that's one thing,

25  they were very quiet throughout the -- even the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  struggle.  You know, they weren't yelling or screaming,

2  let me go, or nothing, which is -- I thought was

3  unusual.  And that's it.  Yeah.  And that was sort of

4  unusual.

5      Q.   Okay.  Yeah.  So you -- still keeping us in

6  the scenario where you're -- you've just seen the guy in

7  the back of the house --

8      A.   Okay.

9      Q.   -- how long -- do you -- do you recall how

10  long you paused and stared at each other before anyone

11  made a move?

12      A.   Yeah.  I said a couple of seconds, I think it

13  was.

14      Q.   A couple seconds?

15      A.   It was -- one second I opened the door, he --

16  he popped out.  Probably two or three seconds max

17  because everything was a reaction at that point.

18      Q.   Okay.  Do you recall testifying at the

19  criminal trial?

20      A.   I -- I couldn't recall everything that I

21  testified on, no.

22      Q.   Okay.  Well, I'm just trying to see if I can

23  refresh your memory a little bit.  But at Page -- Bates

24  Page P00151, Line 3, you testified you probably stared

25  at the guy for about seven seconds.  Seven --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1        A.    Okay.

2        Q.    -- if you -- do you think that that's about

3   the amount of time you stopped and looked at each other?

4        A.    It -- it could have been.  Whatever I felt at

5   that time.  I'm sure I'm -- I'm trying to be accurate.  I

6   don't know if it was seven seconds or not, but, you

7   know, I thought it was pretty quick, you know?  So --

8        Q.    Yeah.

9        A.    My memory --

10       Q.    So everything --

11       A.    -- is what I recall.

12       Q.    Fine.  Everything was happening quick, though?

13       A.    Yeah.  Within a -- just a few seconds.  Yeah.

14  As soon as I -- yeah.  It happened --

15       Q.    Okay.

16       A.    -- happened quick.  Everything did.

17       Q.    And -- yeah.  And when you noticed him, did he

18  just peek his head out or did his full body come out of

19  the office?

20       A.    Well, he peeked -- I would say if I remember,

21  his -- I can see shoulder on up and he was sort of

22  startled too, I guess, when I -- because I was startled

23  and then he was startled I was there, so you can sort of

24  see that.  And then that's when he took off.

25       Q.    Sure.  Fair to say you weren't expecting to



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  see anyone when you opened your front door?

2      A.   No.

3      Q.   You lived alone in that -- in that unit?

4      A.   Yes.  Alone.  Yeah.

5      Q.   Had you lived alone for the half decade you

6  had already been in the unit?

7      A.   No.  I've had friends and stuff live with me

8  for a little while and, you know --

9      Q.   Okay.

10     A.   -- that have moved and stuff.  Yeah.

11     Q.   Yeah.  But on April 9, 2013, you wouldn't have

12 expected anyone to be in your --

13     A.   Not -- not that I recall at that time.  I know

14 no one's in the house at that time.  No, it was just me.

15     Q.   Okay.  Did you have any problems seeing his

16 facial features from the front door when you're

17 initially locking eyes with him?

18     A.   I -- I -- I -- I don't know how to answer

19 that. I mean, I --

20     Q.   Was it -- do you recall -- so when we were

21 looking at the photos, Plaintiff's Exhibit 8 was the

22 photo of your study.  It looked pretty dark in there. So

23 I guess I'm wondering if you had any trouble, because of

24 the lighting, viewing -- making out the facial features

25 of the person in your study?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     A.   Well, I don't know if it was dark or not, or

2  if there was -- a lamp was on or he turned on the lamp.

3  I don't know.  But I -- I got a look at them.  Yes, I

4  did get a look at him.

5     Q.   Okay.

6     A.   And not only that, when I was chasing him, he

7  turned around a couple times to see if I was still

8  coming, you know?

9     Q.   Okay.  So as I think we were just talking

10  about when you entered the house, you were surprised.

11  Were you stressed when you saw him in your study?

12     A.   I -- I don't say -- I don't know.  I -- I

13  think the word would be startled because you don't --

14     Q.   Startled.

15     A.   -- expect somebody in your house when you come

16  in, you know?

17     Q.   Yeah.  How long before it clicked for you what

18  was happening?

19     A.   Well, within that moment I saw someone in my

20  house, they're robbing me.

21     Q.   So very quickly, you put it together?

22     A.   The first -- well, yeah.  Yeah.  It's pretty

23  -- shouldn't be in my house.  You're -- you're not there

24  for any other reason, you know?

25     Q.   Okay.  And were you focused on trying to make

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  sure you were safe?

2      A.   As far -- explain that question a little

3  better?

4      Q.   Sure.  Was your -- was your initial instinct

5  your own safety?

6      A.   Well, not at that time because there was only

7  one.  I'm not worried about that.  I know how to handle

8  myself.  So then when I got the second guy, that didn't

9  worry me too much.  But then the third guy started

10 worrying -- because I -- now I don't know if these guys

11 can jack me up and stab me, leave me there or something.

12 And so now I'm a little worried, so --

13     Q.   Okay.  And the best look --

14     A.   I --

15     Q.   Would you say the best look you got at the

16 offender in your office was when you first saw him

17 peeking out of the office?

18     A.   Yeah, I would say that and when he turned

19 around to look to see how far I was, I guess, so -- but

20 it was a --

21     Q.   And was --

22     A.   -- quick look.  So the best one would be the

23 one -- because he was -- he was staring at me for a

24 second or so, and I was standing there for a second or

25 so.  Then it clicked, he needed to run, I needed to



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  chase, and it was simultaneously almost like that. Yeah.

2      Q.   Sure.  Would you agree with me that it takes

3  some time for eyes to adjust from going from an outside

4  environment into a dark environment?

5          MR. MISTOLER:  Objection.

6          You can answer, sir.

7          THE WITNESS:  Well, because I had the -- I

8      don't know what -- what -- what it was behind me,

9      but no, I didn't have problems seeing him at that

10     point. First of all, to me, the only reason I

11     remembered at that time who it was and stuff is

12     because I was startled.  He stared at me, I stared

13     at him, he's in my house, so I got the full picture

14     the best I could at that time.  Yeah.

15     BY MS. DILLON:

16     Q.   Okay.  And so you see him, you pause and stare

17  at each other.

18     A.   Yeah.

19     Q.   At some point, he turns to bolt out the back

20  and you give chase; is that right?

21     A.   Yes.

22     Q.   Okay.  And did you follow him out the back?

23     A.   Yeah, I chased him.  I was chasing him down.

24  The -- he didn't -- you know, I was going after him.  I

25  used to be very fast, but not no more.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   At some point you gave up that chase; is that

2   right?

3      A.   I -- I had to.  Yeah.  Yeah.  I was -- yeah.

4   Yeah, I had to.

5      Q.   Yeah.

6      A.   I'm not going to get him.

7      Q.   Did you see -- did you see where he went?

8      A.   He jumped over the back fence of the condo

9   area there, and he jumped over that, went into another

10  apartment complex in there.

11     Q.   Okay.  And at -- and at some point you gave up

12  the chase.  What happened then?

13     A.   I turned around, come back to call the

14  police --

15     Q.   Okay.

16     A.   -- and tried to tell them I've been robbed and

17  that, you know, this guy robbed me.  And that's when I

18  heard something upstairs, and that's when I knew there

19  was more than one person, and that's when I turned the

20  corner to go up the steps.

21     Q.   Okay.

22     A.   And that's when he ran right into me, the

23  other guy, which I saw him, you know, also, so --

24     Q.   And were you on the phone with the 911

25  dispatcher throughout the interaction with that second

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 person (audio cuts out.)

2      A.   Oh, yeah, pretty much.  Yeah, pretty much

3 until I realized -- I just got a new phone.  And don't

4 ask me why, I decided to put it down safely on the -- on

5 the -- what do you call it?  The -- what's that table I

6 told you -- the sofa table.

7      Q.   The table at the entryway?

8      A.   Yeah, the -- yeah, the floor table, and then I

9 continued on.  Yeah.  That was weird for me.

10     Q.   But at some point you became concerned that

11 your phone might get --

12     A.   Yeah.  Was that crazy or what, man?  I -- I --

13 I didn't understand that afterwards, you know?

14     Q.   Mind -- minds are a wild thing.  But, you

15 know, your phone was safe, so --

16     A.   Yeah.  Yeah.  Yeah.  Actually, I think the

17 detective could still hear me struggling on the phone --

18     Q.   Sure.

19     A.   -- as I recall.  Yeah.

20     Q.   Okay.  So do you have a good memory of that

21 911 call?

22     A.   Oh, no.

23     Q.   Okay.

24     A.   Not really because I was in the middle of

25 everything, you know?


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
**407.423.9900**       **www.MILESTONEREPORTING.com**       Toll Free 855-MYDEPOS

1      Q.   Yeah.  Do you remember giving the dispatcher

2  any information about the guy you saw in your study?

3      A.   I -- I cannot recall that.  That's --

4      Q.   Okay.

5      A.   -- a long way back and it was in the middle of

6  a lot of stuff going on.  Yeah.

7      Q.   Okay.  Do you recall anything specific that

8  you told the dispatcher?

9      A.   I -- I really can't recall, to be honest with

10  you.

11      Q.   That's okay.  So let's talk about these other

12  two offenders that you came across when you walked back

13  into your apartment.

14      A.   Yeah.

15      Q.   So you said you encountered one coming down

16  your stairs; is that right?

17      A.   Yes.  Uh-huh.

18      Q.   And you got into a physical altercation with

19  him?

20      A.   Yes.

21      Q.   Okay.  Did you get a good look at him?

22      A.   Yeah, he bumped right into my face and we

23  looked at each other.  I got him turned around and I got

24  him in a headlock.

25      Q.   Okay.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    And I was going to, you know, defend myself.

2      Q.    Okay.  And when did you see the second person?

3  Well, I guess that would actually be the third person --

4      A.    The third person.

5      Q.    -- that was in your home.

6      A.    Yeah.  Well, I had the other guy in a

7  headlock. I was going into the kitchen to get a knife,

8  and my shoulders were hurting me so bad because they're

9  -- they're, you know, disconnected, my muscle and

10 tendons on each shoulder.  And then that guy stood at

11 the stairs just staring at me.  And I'm looking at him

12 and I'm trying to get done with this guy, you know?  And

13 then after he finally broke loose from me because I just

14 couldn't hold on anymore, he -- he went ahead and ran

15 out the door.  And I -- I --

16     Q.    Okay.

17     A.    -- started a small little chase, but there's

18 no way I was going to get him.  He was already -- he was

19 fast.  And then I went up the stairs, I saw -- and I

20 went up to that guy.  And he -- what I recall, he

21 dropped the bag, one bag.  And then I think I picked up

22 the bag real quick, and then I went after him.  And he

23 jumped out the window, the second story window, if I

24 recall.  That's where he went.

25     Q.    Okay.  So let's talk briefly about what all



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  these guys looked like, to the -- to the best of your

2  memory.  The first guy who was in your study --

3      A.   Uh-huh.

4      Q.   -- can you describe any physical features that

5  he had?

6      A.   Today, no.  No.

7      Q.   Okay.

8      A.   I mean, I know they were -- I know -- I think

9  all three of them were, you know, light brown, maybe.

10  You know, Latino light brown type of a light brown color

11  like Spanish people are, you know?

12      Q.   Okay.

13      A.   Some Spanish people.

14      Q.   Fair to say the descriptions you gave back in

15  April of 2013, closer in time to the event, were

16  accurate?

17      A.   To the best of my ability at the time, yes.

18  Uh-huh.

19      Q.   Okay.  So you don't -- as you sit here today,

20  you don't have an explicit memory of how any of the boys

21  looked?

22      A.   No, not today, not really.  At the time

23  though --

24      Q.   Okay.

25      A.   -- when the police gave me that picture, I was

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  positive about him.  And then -- then during that court

2  proceeding last -- well, during the court proceeding,

3  the lady that was the second -- second witness, we

4  talked very little, and then she told me --

5       I said, well, how did you see him?

6       Said, well, I picked him out in the picture.

7       So obviously he -- she picked the same picture

8  that I did, so --

9       Q.   Okay.

10      A.   -- you know?

11      Q.   And when you say you spoke to her during a

12 court proceeding, was that the most recent hearing on

13 Mr. Valle-Ramos's conviction in March 2023, or do you

14 mean at the criminal trial back in --

15      A.   At the criminal trial.

16      Q.   Okay.

17      A.   Yeah.  It was just very short and that's it.

18 And can't recall all of it, but I know that since she's

19 a witness, I didn't want to talk to her too much because

20 then it -- it can work against my case.

21      Q.   Okay.  And so you said you learned that she

22 also selected Mr. Valle-Ramos's photo from a lineup; is

23 that right?

24      A.   Yeah, because I did ask her -- now I remember

25 one thing.  I did ask her that, well -- well, how did

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  you see him and stuff?

2        She said, well, she noticed him jumping over

3  the fence and getting into the car.

4        Because I did chase him with my car, but I was

5  -- they were too fast.  They were already gone.  And

6  that's how she saw the guy on the picture.  So she was

7  in a different area completely from where I was, because

8  that's where --

9        Q.  Okay.

10        A.  -- the escape route -- even though we're a

11  gated community, they jumped over the fence of the un-

12  gated community to come over and run --

13        Q.  Sure.

14        A.  -- inside of the place.  Yeah.

15        Q.  Sure.  And do you remember it was -- whether

16  she was the one who told you that she had selected Mr.

17  Valle-Ramos from a photo lineup, or if someone else told

18  you that?

19        A.  No, she was the one that told me that -- I --

20  because I asked her, how did you -- how did you just

21  pick him or something?  I forgot what -- what I asked

22  her, but she said it was from the photo, just like I

23  did.  I picked him from the photo also.

24        Q.  Okay.

25        A.  So you know, that's -- that's -- that was --



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  you know, so I felt good about that because I had a

2  second witness that, you know --

3      Q.   Yeah.

4      A.   So that -- had -- and I'd never seen her,

5  don't know her, and that was it.

6      Q.   Yeah.  So you interacted with her.  Do you --

7  does the name Bethany Szewczyk resonate with you?

8      A.   No, ma'am, it -- it doesn't.

9      Q.   No?  It -- I'll represent to you that the

10 witness that you're talking about is named Bethany

11 Szewczyk.  And did you interact with her after you

12 testified at Mr. Valle-Ramos's criminal trial?

13     A.   I don't think so.  I might have told her, hey,

14 thanks for coming out, or something.  And -- because

15 most people don't want to be witnesses and be bothered.

16 So I was --

17     Q.   Sure.

18     A.   -- you know I was just thanking her.  I

19 probably did, knowing me, you know, but I can't recall

20 exactly, you know?

21     Q.   Okay.  Do you remember how you came to

22 interact with her?

23     A.   Well, she was sitting in -- on -- on the

24 bench. I was sitting further away from her on the bench.

25 I'd say maybe 6, 7 feet, I don't know.  And I can't

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  recall how it started, no.

 2      Q.   Okay.  So Ms. --

 3      A.   But it could have been me, you know?

 4      Q.   Sure.

 5      A.   Because -- because I'm a very extrovert

 6  person. I like people.  I talk to a lot of people about

 7  different stuff and, you know?

 8      Q.   Sure.  But you're not sure one way or the

 9  other?

10      A.   No, ma'am.  I -- I can't recall that, exactly

11  how it started.

12      Q.   Okay.  Did you know that Ms. Szewczyk also

13  testified at the hearing on Mr. Valle-Ramos's conviction

14  back in March of 2023?

15      A.   Yes.  Uh-huh.  Uh-huh.

16      Q.   Okay.

17      A.   I was a little disappointed.

18      Q.   You're a little disappointed?  Why is that?

19      A.   Well, I was disappointed in the fact that she

20  took back her word, and I know why.  And you -- and

21  because that -- that private detective was pretty

22  strong.  You know, he -- he tries to box you in and

23  tries to put you in a position to where, you know, give

24  you doubt in your own mind.  So his questions were

25  precisely -- and he was from New York, you know?  And --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 and so am I, so I knew the kind -- kind of guy, what he

2 was doing, you know?  So --

3     Q.   Okay.  Do you remember any of his specific

4 questions?

5     A.   No, I wouldn't remember the specific

6 questions. All I remember, that he was drilling me a

7 little bit, trying to say, well, are you sure -- trying

8 to make me forget that -- or make my -- my testimony on

9 picking him that I could be -- that I could be in doubt

10 of what I've done picking him.  He -- he might not be

11 the guy.  How do you feel about that?  You know, you

12 could be sending somebody, you know, to jail.

13          And I said to him, look, all I could tell you

14 at that time, when I saw that picture, that was it.  And

15 I said, that's it.  I could have picked another guy.  I

16 didn't because I wasn't sure.  And I know how important

17 it is to be sure.  And that's the best to my ability

18 that I can do that.

19          And it -- and -- and I -- I think the cops

20 took me over there probably -- I don't know.  Could it

21 be a couple of hours or something after, right after the

22 thing or something?  I can't even remember.  Or is -- I

23 can't even remember what -- when they showed me the

24 picture.  But when he showed me several pictures, was

25 that one that I knew that was it.  Yeah.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      Q.   Okay.  Did the private detective -- or
2  investigator show you any photos?

3      A.   No, because I was -- I can't recall.  Because
4  we had a lengthy talk for a little while.  And I was in
5  Georgia, so I -- I -- I don't think he showed me a -- I
6  can't -- you know, I can't remember none of that.

7      Q.   Okay.  Okay.  So before we started talking
8  about the private investigator, we were talking about
9  Ms. Szewczyk and the evidentiary hearing where she
10 recanted.

11     A.   Yeah.  Yeah.

12     Q.   And do you remember how you learned that she
13 was going to testify and recant?

14     A.   I don't know if I knew before or at court.

15     Q.   Okay.

16     A.   I -- I know for sure when I was at court that
17 she was on the other side sitting with them, so I knew
18 something was going on, you know?  But I understood why
19 immediately, you know?

20     Q.   Okay.

21     A.   And she -- she was intimidated quite a bit.

22     Q.   And so taking us back to your interaction with
23 Ms. Szewczyk at the criminal trial, I believe you said
24 you can't remember how you came to interact with her,
25 that -- is that right?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Yeah, I couldn't exactly, but like I said

2  earlier, knowing me, I might have been the one to talk

3  or something and see -- ask her why she's here or

4  something, you know?  I just do that.  I talk to

5  everybody, so --

6      Q.    Okay.  At the March 2023 hearing, Ms.

7  Szewczyk, at Page Plaintiff's 551 at line 10, she

8  testified that Detective Stanley introduced the two of

9  you at the criminal trial.  Do you remember it happening

10 that way?

11     A.    Did she?  No, I don't remember that.  I don't

12 -- I don't -- don't remember that.

13     Q.    Okay.  Is it possible that Mr. -- Detective

14 Stanley introduced the two of you?

15     A.    Detective Stanley, is that -- you're not

16 talking about the private detective?

17     Q.    Not the private detective.  Detective Michael

18 Stanley.  Does that name sound familiar to you?

19     A.    No.

20     Q.    Okay.  I'll represent to you that he was the

21 detective assigned to your criminal case and that he was

22 the detective --

23     A.    Okay.

24     Q.    -- who showed you the photo array and who

25 testified at the criminal trial.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Oh, okay.  Yeah.

2      Q.    Does that refresh your memory to who he is?

3      A.    Well, a little bit.  I -- I can't even picture

4  him now, but --

5      Q.    Okay.

6      A.    But I know --

7      Q.    So you -- you're not sure one way or the other

8  if he would have introduced you and Ms. Szewczyk at

9  trial?

10     A.    No, I really don't even remember that part at

11 all, to be honest with you.

12     Q.    Sure.

13     A.    It's so -- yeah.  That -- that --

14     Q.    Fair enough.  I know this was a long time ago.

15 Just got to do my diligence with the questions.

16     A.    No.  Yeah.

17     Q.    So bear with me.  Do you remember -- and I

18 know you just said maybe you don't.  Do you know what

19 you two talked about aside from maybe you telling her

20 thanks for testifying?  Because you had mentioned you

21 were grateful for another witness being there?

22     A.    At -- oh, the -- at the very first time I met

23 her?

24     Q.    Yeah, the first time at the criminal trial.

25     A.    No, I -- I don't recall much more.  I could



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**         **www.MILESTONEREPORTING.com**         **Toll Free 855-MYDEPOS**

1  have said something else, but I don't really know.  I

2  don't -- you know?

3      Q.   Do you recall telling her that you also

4  identified Mr. Valle-Ramos?

5      A.   On a -- I think I said, I also identified him

6  on the picture.  Also by picture.

7      Q.   Okay.

8      A.   Yeah.  Right.

9      Q.   So you have some memory of talking with her

10 about the identification of Mr. Valle-Ramos?

11     A.   I'm sure -- I'm sure if she said that, you

12 know, she pointed him out on a picture and I said,

13 that's how I -- I probably said, I -- that's -- that's

14 how I got him, from the picture.  Yeah.

15     Q.   Okay.  So let me -- I got a little off track.

16 So let's go back to the day of the burglary.  And I

17 think you said one of the boys -- you saw one of the

18 suspects had hopped a fence to escape.  One of the boys

19 jumped out of a window, and the other boy you lost in

20 the chase.  You were --

21     A.   Yeah.  He went out the front door.

22     Q.   Okay.  And then you said you gave chase in

23 your vehicle; is that right?

24     A.   Yeah.  I was trying to get him.  Yeah.

25     Q.   Okay.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    A.   And find out where they are.

2    Q.   Were they --

3    A.   And I was calling the cops, I believe, maybe

4  at the same time or something.  I don't -- I probably

5  did. I don't know.

6    Q.   Were they also in a vehicle?

7    A.   Yeah, because I saw them getting into the

8  vehicle.

9    Q.   Okay.

10    A.   And he saw me.  I was chasing and then I

11  turned around.  Just -- unfortunately one thing I do

12  remember, I think I had the keys in the -- on the floor

13  in the foyer or something, my car keys or something.

14  And I had to go back to get it because I couldn't get in

15  the car right away.  And that's -- that's how they got

16  away from me if I remember correctly.  Yeah.

17    Q.   Okay.  So -- and you didn't catch them; is

18  that right?

19    A.   No.

20    Q.   Okay.  Did you go back to your house after you

21  gave chase?

22    A.   Yeah.  Then when I got back to the house, then

23  finally I think a police officer got there.  It was a

24  Black police officer.  I don't know his name or

25  anything, but --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.

2      A.   -- he was just very nice about everything.  He

3 just told me what to do, and I did listen to what the

4 officer said.

5      Q.   Okay.  Do you remember just one police officer

6 responding?

7      A.   No, I think it ended up -- I don't know.  No,

8 no.  I remember, I think, one more guy, a white guy that

9 was -- a short white guy, maybe.  And that's all.  I

10 don't remember much after that.  The Black guy is the

11 one that took me in the car.  The Black officer took me

12 in to look for -- they caught somebody and then they

13 told me to go look at him.  And from a -- but he was --

14 kept me from a -- which I was a little bit wondering why

15 he kept me so far back to look at him.

16          And I -- and I had to say, well, no, I -- from

17 here, I can't recognize him, I said.

18          Well -- well, he said, I'm not getting any

19 closer.  This is it.

20          I said, okay.  All right.  So then I can't say

21 it's him because I don't know.

22      Q.   Okay.

23      A.   Yeah.

24      Q.   Sure.  So was -- do you know if that was the

25 same day as the robbery --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Yes.

2      Q.    -- April 9, 2013?  Okay.

3      A.    That I remember.

4      Q.    So a Black officer took you somewhere where

5  they had someone in custody; is that right?

6      A.    Yeah.  I -- I don't know if they were in

7  custody.  I can't recall if he was in cuffs or anything.

8  I think the -- the police officer was holding him there

9  and -- and facing my way and that was it.  And then I

10 said, no, I -- I can't tell from this distance, really.

11 So I had to say --

12     Q.    Okay.

13     A.    -- no, I don't know.  You know, I can't -- I

14 can't charge somebody that I don't know, man.  You know,

15 I can't do that.

16     Q.    Sure.  Do you have any estimate of the

17 distance at which you were asked to look at this guy?

18     A.    I don't know.  I -- I would say about 100 feet

19 or something, or could be a little less.  I don't know,

20 but --

21     Q.    Okay.

22     A.    (Audio cuts out.)  Yeah.

23     Q.    Did the gentleman you were asked to look at

24 from maybe about 100 feet away, did he have an Afro?

25     A.    He might have.


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    Okay.

2      A.    He -- he might have.

3      Q.    But you're not sure one way or another?

4      A.    No.  But he -- he -- he might have.  I don't

5  know.  Now that you mention it, he could've had -- but I

6  couldn't see him.  I couldn't get up close with him.

7  Yeah.

8      Q.    Okay.  And did they take you -- did the Black

9  officer take you to go look at this person they had as a

10  suspect immediately after arriving or was it sometime

11  after arriving to your house?

12      A.    Well, it was after I met him in the house.

13  And then maybe -- I'm trying to recall.  Maybe he got a

14  call from one of the other cops and he said, come with

15  me, or something.  And I got in the car with him and

16  then we went over there, as far as I can recall.  And it

17  was --

18      Q.    Okay.

19      A.    -- I don't know, around the corner, a few

20  blocks, maybe.  I don't -- you know, something like

21  that.

22      Q.    Did the white officer stay at your house?

23      A.    That I don't know.

24      Q.    Okay.  So I want to ask you about the

25  interaction you had speaking with the police before they



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1   took you -- before that Black officer took you to do a

2   show up identification.  As you sit here --

3       A.   Remember what -- remember about that --

4   remember -- I'm sorry.  I didn't hear you.  I didn't --

5       Q.   Oh, no.  That's okay.  I just want to ask you

6   some questions about the interactions you had with the

7   police officers before the Black officer took you to go

8   do a -- an identification, okay?

9       A.   Okay.

10      Q.   Okay.  As you sit here today, do you have a

11  good memory of speaking to the police on April 9, 2013?

12      A.   I mean, not really as far as --

13      Q.   Okay.

14      A.   -- actual conversation I can tell you, you

15  know?

16      Q.   Okay.

17      A.   You know, in those times, things go very fast

18  and, you know, you've just --

19      Q.   Sure.

20      A.   -- been robbed so you're a little bit -- you

21  know, I was a little upset about everything with my

22  house torn up and them stealing stuff and, you know, so

23  had a lot going on besides that, you know?

24      Q.   Sure.  Did -- do you recall them asking you

25  for a description of the offenders?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.    Oh, I'm sure they did, and I gave it to them,

2    I'm sure, at that time.

3      Q.    Okay.  And if they had asked you for a

4    description of the offenders, you would've tried to give

5    them as much information as you could at the time,

6    correct?

7      A.    The best that I could, yes.  The best that I

8    could.

9      Q.    Okay.  Because you would -- you would want to

10   cooperate with the police; is that right?

11     A.    Of course.  Yeah.  Sure.

12     Q.    And you -- I know you said you were upset,

13   there was quite a -- quite a bit stolen from you.  You

14   know, you'd gotten in an altercation.  You would want

15   the police to catch the person who robbed you; is that

16   right?

17     A.    Yes, of course.  Yeah.

18     Q.    Okay.

19     A.    Yeah.

20     Q.    And maybe the best way for the police to catch

21   the people who robbed you is for you to describe the

22   people for them; is that right?

23     A.    I think that's just the 101 police work there,

24   right?  Yeah.

25     Q.    Sure.  And so you would've given them as much



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 information as you possibly could have; is that right?

2     A.   At that time, yes.  The best of my ability.

3 Yep.

4     Q.   Okay.  So I want to direct us to the statement

5 that you provided at the scene and I'm going to --

6     A.   Okay.

7     Q.   -- share my -- share my screen with you again.

8 Maybe.

9     A.   While you do that, may I go to the restroom

10 real quick?

11          MS. DILLON:  Sure.  Maybe now's an okay time

12     for a four-minute break?

13          THE WITNESS:  Okay.

14          MS. DILLON:  That work for folks?

15          THE WITNESS:  Yeah.  Okay.

16          MS. DILLON:  All right.

17          You can go off the record.

18          THE WITNESS:  Okay.

19          THE REPORTER:  It is 2:27 p.m. and we're off

20     the --

21             (A recess was taken.)

22          THE REPORTER:  On record.

23          THE WITNESS:  Oh, I can't -- oh, okay.  I'm

24     sorry.  Go ahead, please.

25      BY MS. DILLON:


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   No worries.  Mr. Gonzalez, right before we

2  went off, we were talking about the initial statement

3  you gave to the police on the day of the burglary.  Do

4  you remember that?

5      A.   You know what?  I'm sorry.  I drifted right

6  off.  Go ahead.  Say that again.  I'm sorry.

7      Q.   Not a problem.  So before we went off the

8  record for the break, we were talking about the

9  interactions you had with the police on April 9, 2013,

10  the day of the burglary.  Do you remember that?

11      A.   Right.

12      Q.   Okay.  So now I want to ask you some questions

13  about the statement you provided to the responding

14  officers on the day of the crime.

15          MS. DILLON:  And I'm sharing with you what will

16      be Plaintiff's Exhibit 13.  Actually, maybe this is

17      12.

18          THE WITNESS:  Can I read it, or?

19          MS. DILLON:  Can you confirm --

20          Yes.  I'm actually going to ask you to read it.

21          But can I just confirm, Court Reporter, is this

22      Exhibit 12 or 13?  I lost my numbering.

23          THE REPORTER:  This would be Exhibit 12.  11

24      was the last picture or four.

25          MS. DILLON:  Okay, great.  So this will -- this

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1    will be Plaintiff's Exhibit 12.  And for the record,

 2    this is Bates labeled P00001, and this is a one-page

 3    document.

 4          (Exhibit 12 was marked for identification.)

 5    BY MS. DILLON:

 6    Q.   Mr. Gonzalez, is this big enough for you, or

 7 do you want me to zoom in a little bit?

 8    A.   Just a little bit more.  I'm -- I think I can

 9 read it.

10    Q.   Okay.  And before you -- before you read it,

11 let me ask you just a couple quick questions.  This body

12 paragraph right here, can you see where my cursor is?

13    A.   I see it now.

14    Q.   Okay.

15    A.   Okay.

16    Q.   Is this your -- is this your handwriting?

17    A.   Yeah, pretty much.  Yeah.

18    Q.   Okay.  And down here in the bottom right-hand

19 corner, there's a signature.  Is this your signature?

20    A.   Yes, it is.

21    Q.   Okay.  And just a couple more quick questions.

22 It says, "Location of the offense," top right corner,

23 "1625 Little Falls Circle."

24          Was that your address in April 9, 2013?

25    A.   Yes.  Uh-huh.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Cool.  And then this -- there's a name, George

2  L.  Gonzalez; is that you?

3    A.   Yes.  Uh-huh.

4    Q.   Great.  I'll ask you to just read this really

5  quickly, and then let me know once you're finished,

6  okay?

7    A.   Okay.  "Opened front door.  Saw a Spanish

8  individual.  Had an Afro."  Oh, he had an Afro.  Okay.

9  "He ran out the back door."  And then it says here, "I

10  went out the front door and chased him.  Too fast,

11  jumped over the fence."  Yeah, I just shortened it

12  quite --

13    Q.   That's fine.

14    A.   "He was too fast, jumped over the fence by the

15  lake.  Came" -- "two" -- let me see.  "Two more."  Okay.

16  "I came back and then" -- let me see.  "Came back" --

17  hold on a minute.  I'm -- I'm losing my -- see, this is

18  some of the problems I have.  Hold on.  So "Too fast,

19  jumped over the fence by lake."  Okay.  "Then came back.

20  Two more individuals came down, started fighting.  One,

21  he had a short haircut, blue shirt, Spanish.  We fought,

22  and he hit me as much as he could.  To fight" -- "both

23  -- the other guy I was fighting broke loose and made it

24  out the -- the front door."  Let me see.  Then it says

25  here, "The two punks," sounds like me, "is the house

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  where" -- let me see.  I can't -- can you open it up a

 2  little bit more?

 3       Q.   Sure.

 4       A.   "Were" --

 5       Q.   Do you think that says, "About 5'8""?

 6       A.   Let me see.  "Both guy, while I was fighting,

 7  broke loose and made it out the front door.  The two

 8  punks in the house were about 5'8", thin, seven to 20

 9  years old.  Took gold rings, skull, cross bones with

10  diamond, and I can identify the two downstairs -- I can

11  identify the two downstairs.  Sterling silver jewelry

12  was lost and topaz citrine --"  Yeah.  And, "Worth

13  about" -- what?  8,000?  It says, "8 grand.  Ring about

14  12.  I had no one" -- let me see.  "I gave no one

15  permission to enter apartment and I want to press

16  charges."  That was it.

17       Q.   Okay.  So I want to focus just for a second on

18  this first -- the first two sentences, which are about

19  the individual you saw when you first opened the door.

20       A.   Right.

21       Q.   Do you agree that the individual you saw in

22  your office was Spanish?

23       A.   Well, that's of course an assumption, but I

24  would say most likely.

25       Q.   Okay.  And do you agree the individual in your



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  office had an Afro?

 2      A.   If I said it, that's what it was.

 3      Q.   Okay.  But in this description, you don't

 4  include any information about what the individual is

 5  wearing; is that right?

 6      A.   Well, if it's not in here, then I didn't.

 7      Q.   Okay.

 8      A.   You know, I'm sure I kept it short and

 9  probably --

10      Q.   Sure.

11      A.   -- left some things out, but, you know, it is

12  what it is.  That's what I put down there.

13      Q.   Sure.  And you didn't include any information

14  about the complexion of the offender in the office; is

15  that right?

16      A.   The complexion?

17      Q.   Yes.

18      A.   Oh, I thought I did say something about the

19  Spanish guy, but I didn't put complexion down.  No.

20      Q.   Okay.  No information about facial hair on the

21  offender in the office; is that right?

22      A.   No.  I mean, you know?

23      Q.   No information about eye color or anything

24  like that; is that right?

25      A.   Oh, no, no.  I couldn't --


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     Q.   Okay.  So mostly what you gave in your

2  statement was information about the offender's hair and

3  generally that he was Spanish; is that right?

4     A.   Yes.  Uh-huh.

5     Q.   Okay.  You also identify some items that were

6  stolen from you.  Do you recall that?

7     A.   Yes.  Uh-huh.

8     Q.   Okay.  You identify a gold ring, a skull cross

9  that was -- had some diamonds, I think.

10    A.   Right.

11    Q.   A little lower down, you identify 30 to 35

12 pieces of jewelry, maybe worth about 7 to $8,000, and

13 then a ring, about $1,200.  Is that an accurate account

14 of what was taken from you?

15    A.   The best that -- of my knowledge.

16    Q.   Would you consider that to be a lot of money?

17         MR. MISTOLER:  Objection.  Form.

18    BY MS. DILLON:

19    Q.   Sorry.  Let me -- let me rephrase my question.

20 It was a bad question.

21         Would you consider that to be a lot of money's

22 worth of jewelry?

23    A.   Well, yes, because it's -- it's a wholesale

24 figure.  It's not even a retail figure.

25    Q.   Sure.  Were you angry about the amount of

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  jewelry that was stolen from you?

2      A.   Yeah, I was very angry and probably more angry

3  at myself, because I was going to put it in a safety

4  deposit box the next day.  No.  Actually, excuse me,

5  before I left to go away for the week.  And then when I

6  came back and it happened, I was very mad at me, but of

7  course, I'm mad at them, because they're the one that

8  stoled it.  But I was mad at me because I procrastinated

9  like guys, do you know?  So --

10     Q.   Sure.  Is it fair to say the information in

11 the statement you gave to the police on April 9, 2013,

12 was correct?

13     A.   Yeah, that would be the best of my ability, to

14 be honest with you.  I kept it short.  You know, I -- I

15 just wanted to fill it out and go on, because I know

16 most of these guys don't get caught all the time, so I

17 -- I didn't -- I didn't -- I didn't think anything would

18 come of it, you know, even me picking the picture.  But

19 obviously, the detectives knew who they were, because I

20 guess they'd been in trouble before or something.

21     Q.   Okay.  So you say -- when you say "I kept it

22 short," are you saying there's more you could have added

23 to this statement?

24     A.   Well, I could have added a little more detail,

25 but I think I gave him the -- the basic, you know, what



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  I could remember at that time and I kept it short.

 2  That's all.  I didn't -- I didn't fill out two or three

 3  pages.

 4      Q.   Okay.  Is there -- do you know anything -- can

 5  you think of anything specifically that is missing from

 6  your statement that you --

 7      A.   I wouldn't be able to answer that ten years

 8  later.  There's no way.

 9      Q.   Okay.  Did the police -- scratch that.

10          Actually, what I'll do is I'm going to stop

11  sharing this exhibit and set it aside, and I'm going to

12  pull up another exhibit.

13          Okay.  Mr. Gonzalez, can you see this document

14  on your screen?

15      A.   Yes, I can.

16      Q.   Okay.  I'm going to zoom in a little bit.

17      A.   Yeah.

18      Q.   Do you see where it says "Orlando Police

19  Department Field Report" at the top?

20      A.   Uh-huh.

21          MS. DILLON:  Okay.  And, actually, sorry.  This

22      will be Plaintiff's Exhibit 13, and for the record,

23      it's Bates number P1415 to 1416, and I'll represent

24      to you this is a report created by the officer who

25      responded to your house.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          (Exhibit 13 was marked for identification.)

2      BY MS. DILLON:

3      Q.   Do you see right here where it says "Reporting

4  officer" and then it -- then there's a name, Alfonso

5  Tejeira?

6      A.   Yes.  Alfonso Tejeira, yeah.

7      Q.   Okay.  Does that refresh your memory about Mr.

8  Tejeira being an officer who responded to the -- to your

9  home on April 9th?

10     A.   Not at all.  Don't -- no.  Don't even -- nope.

11  Not even -- nope.  The answer would be no.

12     Q.   Okay.  Do you -- do you have any knowledge of

13  whether this is the Black officer you were referring to

14  earlier or the white officer?

15     A.   I wouldn't know.

16     Q.   Okay.

17     A.   Either one of them -- looks like they're

18  Spanish or something, so either one of them could be

19  Spanish.

20     Q.   Okay.  And actually, can I ask you for the

21  Black officer who responded, was that a male or female?

22     A.   That was a male.

23     Q.   Okay.  And was he -- can you estimate his

24  height?

25     A.   He was taller than me, so I'm guessing at

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  least 6' or something.

2       Q.   How tall are you?

3       A.   I'm 5'9".

4       Q.   Okay.  Do you remember his build?  Was he a

5  bigger guy?

6       A.   Oh, I'd say he was a -- I'd say, you know, he

7  was a -- he was a big guy.  What I can recall, that --

8  that's it, that he was a pretty big guy.

9       Q.   Okay.  I assume not, but do you recall a badge

10 number?

11      A.   Yeah.  God, I wish I could.  That would be

12 great.

13      Q.   Had to ask.  Kind of same questions for the

14 white officer: Male or female?

15      A.   I think it was a male.  It was a male.

16      Q.   Okay.  Can you estimate their height?

17      A.   I think that guy was a little shorter than me

18 or maybe about my height or a little bit less, you know?

19      Q.   So maybe around 5'9", a little less?

20      A.   Yeah.  See, right now I'm sort of getting

21 confused a little bit, because then again, my car was

22 robbed again.  Like, I put a -- a police report on that,

23 but nobody responded to that at all, so I just, you

24 know?

25      Q.   Oh, okay.  When was your car robbed?



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        A.    Oh.

2        Q.    After your house?

3        A.    It was -- it was before Christmas, just before

4   Christmas.

5        Q.    Okay.  Of the same year that your house was

6   robbed?

7        A.    I can't recall that one.

8        Q.    That's okay.  And you said you put in a report

9   about the car, but nobody responded?

10       A.    Yeah.  No one.  No one responded.

11       Q.    Okay.  Okay.  And the white officer that

12  responded to the burglary at your home, was he a big

13  guy, skinny guy?

14       A.    Say that again?

15       Q.    The white officer who responded to your home,

16  was he a bigger guy?

17       A.    No.  He was smaller than me.  That's the

18  second one, right?  The Black guy was bigger than --

19       Q.    Yeah.

20       A.    -- that guy was a little -- seemed like a

21  little smaller than me, what I can recall.

22       Q.    Okay.  So a little smaller than you?  His

23  build was not as big as the Black officer?

24       A.    No.  He was a medium build guy.  He ate well.

25       Q.    Okay.  So I am now -- while I'm sharing with



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  you this field report, I'm going to ask you to read it,

2  but you can -- you can read it silently, just to

3  yourself, and then I'm going to ask you a couple

4  questions about it, okay?  Just let me know when you're

5  done.

6      A.   Okay.  Okay.  I finished the last sentence

7  was, "The victim stated he can identify some of the

8  suspects."

9      Q.   Great.  Thank you.  I promise I won't make you

10  read too much more.

11     A.   Okay.

12     Q.   Would you agree that there's no physical

13  identifying information of any of the perpetrators in

14  this police report?

15     A.   Oh, you mean, like, dress and -- I mean,

16  like, --

17     Q.   Yeah.  Hair, complexion, height.

18     A.   I -- I guess I didn't see that, did I?

19     Q.   Okay.  Nothing in addition to what you gave in

20  your written statement; is that right?

21     A.   Looks close.  Better written.

22     Q.   Okay.  Do you recall anything you said to the

23  responding officer that is not written down in this

24  report?

25     A.   Not that I can recall, ma'am.  No.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        Q.   Okay.  Would you --

2        A.   I'm sure I said something.  Yeah.  Who knows?

3        Q.   Would you agree that there is additional

4    information about items that were missing from your home

5    that you didn't identify in your initial statement?

6        A.   There's additional items?

7        Q.   Yeah.  So you see on the third paragraph, it

8    says, you know, "There's $8,000 worth of sterling silver

9    jewelry."

10            That was in your statement, right?

11       A.   Yeah.

12       Q.   "The suspects also took a gold ring,

13   approximately 12,000."  That was in your statement?

14       A.   1,200.  1,200.

15       Q.   1,200, yeah.  Sorry.

16            That was in your statement, right?

17       A.   Right.

18       Q.   Okay.  But the suspect attempted to steal

19   approximately $500 in U.S. coins and a folding knife

20   valued at 400.  That doesn't appear in your initial --

21       A.   40.

22            MR. MISTOLER:  40.

23            THE WITNESS:  At 40.

24       BY MS. DILLON:

25       Q.   Sorry.  I am having number problems,

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

 1  apparently.

 2       A.   It's okay.

 3       Q.   A knife valued at 40.  That doesn't appear in

 4  your written statement.  Do you agree?

 5       A.   No, no.  It doesn't appear in my written

 6  statement, no.

 7       Q.   Okay.  Did you --

 8       A.   I think I just told the officer that, maybe.

 9  Yeah.

10       Q.   Okay.  So this would be something you told the

11  officer verbally about the coins and the knife; is that

12  right?

13       A.   Yes, I believe so.  Yes.

14       Q.   Okay.  And then that made its way into this

15  initial report, correct?

16       A.   Right.

17       Q.   Okay.  I'm going to set this exhibit aside and

18  stop sharing.

19            What happened after you spoke with the police

20  and did the identification with the police on the day of

21  the burglary?

22       A.   Are you asking me what I did after that?

23       Q.   Yeah; do you remember?

24       A.   Oh, yeah.  I told a good friend of mine about

25  it, and what I did was come -- he came over and we


MILESTONE **|** REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

1  cleaned up all the mess and put the house back together.

2  And that was a good thing to do, because it you feel

3  better.  You're almost back to normal, you know?  And

4  that's mostly what I did that I can recall and then talk

5  about it and stuff like that.  Yeah.

6       Q.   Okay.  Have you now told me everything you

7  remember, as you sit here today, about what happened on

8  April 9, 2013?

9       A.   To the best of --

10           MR. MISTOLER:  Objection.

11           THE WITNESS:  Yeah.  Best of my -- my

12     recollection.

13      BY MS. DILLON:

14       Q.   Sure.  When was the next time you interacted

15  with somebody from the Orlando Police Department in

16  connection with the burglary of your home?

17       A.   I wouldn't know that.

18       Q.   Okay.  So I think --

19       A.   I think we try to block these things out, you

20  know, with time, you know?

21       Q.   Yeah.  And, you know --

22       A.   Trying to move on.

23       Q.   -- I don't -- I don't know, is a -- is a fair

24  answer for something that happened that long ago.  So I

25  think you mentioned at some point you were asked to

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 participate in a photo lineup; is that right?

2      A.   It wasn't --

3      Q.   In --

4      A.   Yeah, the photo lineup, the -- the handheld --

5      Q.   Yeah.

6      A.   -- handheld photo.  Yeah.  Not a lineup.

7 Okay.

8      Q.   Yeah.  And I think you had testified that you

9 don't remember when that was, but if the photo array

10 says it was April 18, 2013, do you have any reason to

11 think that's not right?

12      A.   Well, I wouldn't know, I mean, the date,

13 because they told me, come down, and -- and I got some

14 -- I -- I just drove down and did it and left, so --

15      Q.   Okay.  Do you know who asked you to

16 participate in a photo lineup?

17      A.   Oh, I think it was that detective, I believe.

18      Q.   Okay.

19      A.   I don't know that --

20      Q.   Detective Stanley?

21      A.   Yeah.  Okay.

22      Q.   Okay.  Did he call you to ask you to

23 participate in the lineup?

24      A.   I believe he did.  I believe he called me and

25 asked me to -- that he had some pictures that he thinks



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

 1  he -- you know, see if -- whatever.

 2      Q.   Okay.

 3      A.   I don't know exactly how he put it.  Yeah.

 4  But he wanted me to see pictures.  Yeah.

 5      Q.   When he called you to say that he had some

 6  photos for you to look at, did he tell you that they had

 7  a suspect?

 8      A.   No.  I don't recall that, no.

 9      Q.   Okay.  Is it possible that he might have told

10  you that they had a suspect?

11      A.   I just don't recall that.

12          MR. MISTOLER:  Objection.

13      BY MS. DILLON:

14      Q.   Okay.

15      A.   I just don't recall that at all.

16      Q.   So you don't -- you don't know one way or the

17  other?

18      A.   Right.  Well, I -- I would think -- I -- I --

19  I remember that he just told me he had pictures and he

20  wanted me to come down.  He didn't say -- he really

21  didn't point to anything or -- you know, he sort of just

22  let me do -- he showed me the two -- what I remember,

23  showed me two pictures and he let me do what I needed to

24  do to look at them and point if I -- if I know one of

25  them, and that's it.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  Did you assume they had a suspect when

2  you were asked to come look at photos?

3      A.   I can't recall that.  I don't think so.

4      Q.   Okay.  Did Detective Stanley ask you for any

5  more of a description of who burglarized your home when

6  he called you about the photos?

7      A.   At the phone call, you mean?  When he called

8  me to go see the pictures?

9      Q.   Yes.

10     A.   Oh, I don't -- I can't remember none of that.

11 No.

12     Q.   Okay.

13     A.   I don't know.

14     Q.   Where was the photo lineup conducted?  Was it

15 at the police station?

16     A.   Yeah, just -- I think it was outside the

17 police station I met him.

18     Q.   Oh, okay.

19     A.   I believe so.  Yeah.

20     Q.   Like, at a table, his car?  Do you know where

21 outside?

22     A.   Yeah.  I think I pulled up in the parking lot

23 and I think he might've just come down and -- and just,

24 you know?  And -- and then talked to me then and stuff

25 and just gave me -- showed me the pictures.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.  Do you remember anything Detective

2  Stanley told to you before he showed you the pictures?

3    A.   No.  No.  He might have, you know, as far as,

4  you pick it or point at it and that's it, and I don't

5  know.  Don't -- don't recall his routine there, no.

6    Q.   Okay.  But eventually, he showed you some

7  photos, correct, Mr. Stanley?

8    A.   Yes, he did.  Yeah.  He -- yeah, that

9  detective showed me photos.

10    Q.   Do you know how long you had been chatting

11  with him before he showed you the photos?

12    A.   No.  No.

13    Q.   Fair enough.

14      MS. DILLON:  So I'm going to pull up what will

15    be Plaintiff's Exhibit 14.

16        (Exhibit 14 was marked for identification.)

17      THE WITNESS:  Uh-huh.

18    BY MS. DILLON:

19    Q.   I'm going to share my screen with you.

20    A.   Okay.

21    Q.   All right.  For the record, this is a

22  three-page document, Bates P532 to 534.

23      Mr. Gonzalez, do you see "Witness name" in

24  the top left corner?

25    A.   Yeah.  I don't even remember this form.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   That's okay.  Do you -- and do you see,

2  "George Gonzalez"?  Is that you?

3      A.   Yeah.  It says, "George Gonzalez."  Not my

4  writing --

5      Q.   Do you --

6      A.   -- but yeah.

7      Q.   Right.  Do you see "Date and time: April 18,

8  2013"?

9      A.   I do.

10     Q.   Okay.  Any reason to think this -- you didn't

11 do the photo array on April 18, 2013?

12     A.   Oh, no.  I know I -- I did a -- a photo thing

13 one time.  I believe that was it.  I don't know if he

14 called me back again or not.  I don't think so.

15     Q.   Okay.  And kind of towards the bottom right,

16 you see, "Witness initials"?

17     A.   Uh-huh.

18     Q.   Are those your initials?

19     A.   Uh-huh.

20     Q.   Okay.  Great.  I'm going to scroll down to the

21 second page of this document.

22          Do you see in the middle here where there's

23 some writing?

24     A.   "Opened door to condo.  Turned and looked

25 right at me and took off.  This -- this" -- what does

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 | that say?  "This is" --

2 | Q.   "This is person box 2."

3 | A.   Oh.  Person number -- oh, the one I picked.

4 | That's what this is.

5 | Q.   Yeah.  Yeah.  Is this your --

6 | A.   He showed me six at a time.  I remember this.

7 | My -- I recall my memory there.

8 | Q.   Okay.

9 | A.   Okay.

10 | Q.   So this is refreshing your memory of the photo

11 | lineup.  Is that fair to say?

12 | A.   Well, yeah.  I mean, I don't know the form,

13 | but I get the idea.

14 | Q.   Yeah.  Is this your handwriting in the middle?

15 | The, "Opened door to condo"?

16 | A.   Yeah.  That looks like my handwriting.  Yeah.

17 | Q.   Okay.  And do you see, "Signature of witness"?

18 | A.   That's me.  Yeah.

19 | Q.   That's you.  Okay.  I'm going to scroll down

20 | to one more -- or to the final page of the document.

21 | Is this the group of photos that you were

22 | shown when you did the photo lineup?

23 | A.   Well, I guess it is, because it has my initial

24 | there by the picture I picked.

25 | Q.   Okay.  And there's a circle around box number

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

1 2.  Did you draw that circle?

2      A.  I can't remember that.

3      Q.  Okay.  Are these -- and -- but these are your

4 initials?

5      A.  I know that's my initials, so I don't know if

6 I pointed and he drew it, or I pointed and -- I -- I --

7 you know, and drew it, you know?  Might have been me.  I

8 don't know.  I don't recall that.

9      Q.  Okay.  And this is a standard page size sheet

10 of paper.

11          Is that the size of the photo array that you

12 were shown?

13      A.  You know, I can't remember how he showed it to

14 me, but I know it wasn't --

15      Q.  Okay.

16      A.  It wasn't a huge picture, like, big or

17 anything.

18      Q.  Yeah.

19      A.  It was just, you know, not that huge.  It was

20 just big.  Almost like this, I guess.  Just a little bit

21 -- you know?

22      Q.  Yeah.

23      A.  Maybe that's what he showed me.  Right here,

24 is this the page he showed me?  Could have been.

25      Q.  Were you shown a black and white photo array



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  or was it in color?

2       A.   I recall like this.

3       Q.   Okay.  You recall a black and white version?

4       A.   What you're showing me right there, it almost

5  looks like that's what he showed me.

6       Q.   Okay.  You don't remember being shown a color

7  version of the photo array?

8       A.   I don't remember that at all.  No.  I

9  barely --

10      Q.   Okay.

11      A.   -- remember this, but I remember it now, you

12 know?  Yeah.

13      Q.   Fair --

14      A.   I do now.  Yeah.

15      Q.   And you selected the gentleman in box 2; is

16 that right?

17      A.   Uh-huh.

18      Q.   And the photo -- this is the person that you

19 -- this -- you believe this to be the person that you

20 saw when you first entered your home who was in your

21 office?

22      A.   I don't remember that at all -- be honest with

23 you.

24      Q.   Okay.  Did you look at each of these

25 photographs carefully?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.    Yeah.  Actually, the only thing I remember he

2   showed me -- I think he had two sets, maybe, or three.

3   I'm not sure.  He had a -- a couple and he showed me --

4   I think he had a couple of sets of these, and -- and I

5   -- on -- on one, I say, no, no, no, no.  And then --

6   then as soon as I saw that, I said, yep; that's him.

7      Q.    Okay.  So you think you might have seen

8   another photo lineup like this with the six photos?  Is

9   that what you're saying?

10     A.    I'm thinking --

11     Q.    Okay.

12     A.    -- that he showed me more than just this.

13     Q.    Okay.

14     A.    I can't remember, but I feel like there was

15  two of them or something.  I don't know.

16     Q.    Okay.  So it's possible that he showed you

17  more than one photo lineup kind of set up like this; is

18  that right?

19     A.    Yeah.  I think so, but --

20     Q.    Okay.  When you were looking at these photos,

21  did you compare each person against the other people in

22  the photo array?

23     A.    No.  I looked at every face, and then I just

24  pointed at the one that hit me right away.  I said,

25  that's it; right there.  There was one more that -- I

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 told you earlier that I thought it was him also, but I

2 couldn't -- because I thought -- I wasn't sure.  So I

3 said, nope, I can't point him out, so -- but this guy

4 was, like, immediate.  It clicked.

5      Q.   You're saying, in this photo array, you

6 thought there maybe was someone who resembled one of the

7 other perps, but you weren't sure?

8      A.   I don't know if this photo or maybe another

9 photo, if he had it.  I -- I don't remember, but I

10 remember saying, oh, but I think this guy, too.  But I

11 said, no, because I'm not sure, positively sure, so I

12 pointed at this one.

13      Q.   Got it.  Did you say anything once you noticed

14 the photo?  The photo that you selected?

15      A.   I might have said, this is the guy right here.

16      Q.   Okay.  Did Detective Stanley indicate that he

17 was satisfied with who you picked?

18      A.   No.  He didn't say nothing.  We -- I --

19      Q.   Okay.

20      A.   We -- we -- nothing like that that I can

21 recall.

22      Q.   Okay.  So now I want to focus your attention

23 on this gentleman in box number 1.

24      A.   Okay.

25      Q.   Would you agree that he does not have an Afro-



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

 1 | style haircut?

 2 |     A.   I -- I say so, yeah.

 3 |     Q.   Okay.  And this gentleman in box 3, it's a

 4 | tough one to see, but do you -- would you agree with me

 5 | that this gentleman does not have an Afro-style haircut?

 6 |     A.   No, he doesn't have an Afro.

 7 |     Q.   Okay.  The gentleman in box 4, would you agree

 8 | that this gentleman does not have an Afro?

 9 |     A.   No.  None of them look like they have Afros,

10 | except -- I grew up in the '70s.  An Afro is an Afro.

11 |     Q.   Okay.  Does it -- would you agree that the

12 | gentleman in box number 2 has somewhat of an Afro-style

13 | haircut?

14 |     A.   I wouldn't say an Afro-style.  I would say

15 | just longer hair.

16 |     Q.   Okay.  So you -- we already talked about --

17 | talked that you gave testimony in Mr. Valle-Ramos's

18 | criminal trial back in 2014; is that right?

19 |     A.   Uh-huh.

20 |     Q.   Okay.  And in that testimony, at Bates P155

21 | lines 3 to 8, you're being shown a copy of the photo

22 | array, and you're asked, "It's your testimony these

23 | guys, in your opinion, do not have Afros?"

24 |          And you responded, "Correct.  Yeah.  That's

25 | correct.  Not what we call an Afro."



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1          And then you're asked, "Okay.  But" --

2      A.   Oh, did I say that?  Oh.

3      Q.   Yeah.  Well, you said -- you said, "Yeah."
4  They're -- they don't have Afros.

5          But then you're asked, "Okay.  But person in
6  number 2 has an Afro?"

7          And you respond, "Well, he has more of an
8  Afro, yeah."

9          Does that refresh your recollection that, at
10 trial, you testified that you believed the guy in box 2
11 had more of an Afro than the others?

12     A.   Yeah.  He just had longer hair.  I don't call
13 it an Afro, because when I grew up, the Afros were, like
14 -- you know, man, they were big, you know?  An Afro is
15 an Afro.  That's just -- you know, just a longer
16 haircut, in my opinion.

17     Q.   Okay.  And was there anything else -- scratch
18 that.

19          What about photo number 2 stood out to you
20 when you saw it?

21     A.   Well, the only thing I remember is pointing
22 and saying, that's it; that's the guy.

23     Q.   Okay.  So you don't remember noticing, like,
24 his eyes, for example, were --

25     A.   No.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.

2      A.   No.

3      Q.   And this was -- this was nine days later when

4  you were shown the photo array.  Were you still upset

5  about the burglary when you saw the photo array?

6      A.   Was I still upset?  I'm sorry.  When I -- when

7  I was at --

8      Q.   Yeah.  When you --

9      A.   -- was at court or what?

10     Q.   When -- at the photo array, do you recall

11 still being upset about the burglary?  It was about a

12 little over a week later.

13     A.   Well, I would be upset at anybody that stole

14 from me in one week or one year.  I'd still be --

15     Q.   Sure.  You were injured, right, in the fight

16 with the -- some of the offenders?

17     A.   Yeah.  They tore my shoulder a little bit

18 more. Yes.

19     Q.   And they -- and they took quite a bit of

20 jewelry from you; is that right?

21     A.   Yeah.  Yeah.

22     Q.   Okay.  So you were reasonably still upset

23 about your home being burglarized?

24     A.   I'm not going to say upset like I'm -- I'm so

25 upset, I can't function.  No.  I'm a --


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    Q.   Sure.

2    A.   -- you know, it's -- you know, it's -- I mean,

3 I -- I -- look, I get upset or -- or disappointed at

4 someone, I look at someone that I love that passed away.

5 You know what I mean?

6    Q.   Yeah.

7    A.   But this is just a -- a reaction because

8 there's so much stealing, so much crime nowadays that,

9 yeah, people are upset, I think, about all this stuff,

10 you know.  So I was upset.

11    Q.   Sure.

12    A.   I didn't have much money then, you know.

13    Q.   Yeah.  Do you remember any conversation you

14 had with Detective Stanley during the photo array?

15    A.   Not really.  No, I do not.

16    Q.   Okay.  Do you recall him saying anything about

17 whether the person who committed the crime may or may

18 not be in the photo -- or the photo array?

19    A.   I can't -- I can't recall that, but --

20    Q.   Okay.

21    A.   -- he might have said that.  I don't know.  I

22 mean, you know.

23    Q.   Prior to April 9, 2013, had you seen the

24 person who burglarized your home, the one with the Afro,

25 at any point before then?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1       A.   You mean before in my house?

2       Q.   Yeah.  Before you saw him in your house, had

3  you ever seen that guy before?

4       A.   Oh, no.  No.  No.

5       Q.   Okay.  So the first time you saw that man was

6  when he poked his head out of your office when you came

7  home on April 9th?

8       A.   Right.

9       Q.   Okay.  Did Detective Stanley -- you -- I think

10  you said he might have shown you additional photo

11  arrays, like, groups of photographs.  Did he show you

12  any single photographs after you initially identified

13  box number 2?

14      A.   I mean, I -- I don't even know if he did or

15  not, to be honest with you.  No.  Don't know.

16      Q.   Okay.  Do you recall giving -- I think we

17  talked about this a little bit earlier, that you gave a

18  deposition in connection with the criminal case; is that

19  right?

20      A.   Yeah.  That other -- one of you guys draw me

21  back to court.

22      Q.   Okay.

23      A.   Yeah.

24      Q.   So at the deposition, and that's at

25  Plaintiff's 34, Line 17 -- you say, "Yeah.  It was a



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

 1  different picture of an -- or another picture with his

 2  face on it, but with a bigger fro."

 3          Does that refresh your memory of maybe being

 4  shown a photograph of Mr. Valle-Ramos with a bigger Afro

 5  on the day you did your photo lineup?

 6      A.   Ma'am, I really don't remember that.

 7      Q.   Okay.  Do you have any reason if you testified

 8  to that, that that's what happened?

 9      A.   Say that again?

10      Q.   Do you have any reason to doubt that if you

11  testified at the deposition, that you were shown a

12  picture of Mr. Valle-Ramos with a bigger Afro, that

13  that's what actually happened?

14      A.   Ma'am, I -- I -- I wouldn't know.  I mean, you

15  know, I -- I don't have -- I don't have any records or

16  anything for my own self.  I just -- just tell you what

17  I remember.

18      Q.   Fair enough.  Did you, at some point, learn

19  that an arrest had been made in the investigation of the

20  burglary into your home?

21      A.   Well, yes.  I had to, because I -- I can't

22  remember how I -- I remember -- got that, but I'm

23  thinking through the letter or something, or through a

24  mailer maybe, or saying that I have to go to court or

25  something.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1      Q.   Okay.  Maybe a letter, maybe mail.  You don't

2 remember getting a phone call from Detective Stanley

3 about that?

4      A.   No.  Not at all.  Not at all.

5      Q.   Okay.  Did you know Detective Stanley before

6 the robbery?

7      A.   Oh, no.

8      Q.   Okay.  And you had a few interactions with him

9 during the criminal investigation; fair to say?

10      A.   I don't know how many interactions I had with

11 him.  I -- I would think it would be -- I'm guessing --

12 I don't know.  I almost feel like -- oh, I saw him -- I

13 think, twice I saw him, once for the pictures and maybe

14 once in the courthouse, I'm guessing.

15      Q.   Okay.  So you recall seeing him --

16      A.   In the courthouse.

17      Q.   -- at the photo array and then at the

18 courthouse?  Do you mean at the criminal trial?

19      A.   Yeah.  The criminal trial, the first one.

20 Yeah.

21      Q.   Okay.  In between the time you did the photo

22 array and the time of the criminal trial, do you

23 remember any interactions with Detective Stanley?

24      A.   No, ma'am.  I don't.  No, I don't.

25      Q.   Okay.  And in between the time you testified

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  at the criminal trial and the time you testified in

2  March of 2023 at the hearing on Mr. Valle-Ramos's

3  conviction, did you have any conversations with

4  Detective Stanley?

5      A.   I'm sorry.  I got -- I drifted off, because I

6  had a medical appointment at 3:00 and it's past that,

7  but that's okay.  My wife is talking to him.  I got

8  distracted from that.  So go ahead and ask --

9      Q.   Okay.

10      A.   -- your question again.

11      Q.   Yeah.  Between the time you testified at the

12  criminal trial and the time you testified at the hearing

13  in 2023, did you have any interactions with Detective

14  Stanley?

15      A.   Okay.  So you're -- you're asking if I had any

16  interaction by the time I saw the photos and the time

17  that I -- I saw him in court.  In between there, did I

18  have any interactions?

19      Q.   No.  So that you answered no.  So in the last

20  -- basically, in the last decade, have you had any

21  interactions with -- actually, let me ask it this way.

22      A.   Oh, here --

23      Q.   Did you --

24      A.   -- I -- I never --

25      Q.   Did you stay in --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    -- saw him again after the courthouse.

2      Q.    Okay.

3      A.    I never saw him again.

4      Q.    Okay.  That's what I was getting at.  Did

5  you --

6      A.    Okay.

7      Q.    -- you didn't stay in touch with him after --

8      A.    Oh, no.

9      Q.    Okay.

10     A.    No.  No, ma'am.

11     Q.    Okay.  I am getting close.

12     A.    Okay.

13     Q.    Let me -- okay.  Earlier, we talked about Ms.

14  Szewczyk, Bethany Szewczyk, the other witness who

15  later --

16     A.    Yes.

17     Q.    -- who recanted.  Do you remember that?

18     A.    Yes, I do.

19     Q.    Okay.  And you testified at that hearing, as

20  well, in March 2023.  We talked about that, right?

21     A.    Yes.

22     Q.    Okay.  Did you have any interactions with

23  Detective Stanley at that hearing?

24     A.    I don't even know if I talked to the guy at

25  all or nothing.  I don't -- I don't think so.  I

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  don't --

 2       Q.   Okay.

 3       A.   Could have been.  I don't know.  I don't

 4  remember that.

 5       Q.   Fair enough.  And you're aware that she

 6  recanted her identification of Mr. Valle-Ramos; is that

 7  right?

 8       A.   I sure am.

 9       Q.   Are you aware that part of the reason she

10  recanted her identification of Mr. Valle-Ramos is

11  because she believes a different person bearing

12  resemblance to Mr. Valle-Ramos was the person she

13  actually saw?

14       A.   Oh, that's the private detective gave me the

15  same thing.  That's the guy who was pressuring me to try

16  to change my mind on it, and I told him no.

17       Q.   Sure.  So are you saying that --

18       A.   I don't know.  I don't know if she did that or

19  she -- well, she must have done it, you know.

20       Q.   Yeah.  So are you saying that --

21       A.   To me, in my opinion, she was just convinced

22  to do that, in my opinion.  My opinion is that he put

23  enough pressure on her and she folded, and that was it.

24  But at the time, I do remember that she was -- she came

25  up as a witness, because she wanted to help, and she saw



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  the person.

2      Q.   Yeah.  Fair enough.  So you said -- did you --

3  did you just say the private detective -- or private

4  investigator also showed you a photo, or did I

5  misunderstand you?

6      A.   I didn't say that.

7      Q.   Okay.  So let me show you what was previously

8  marked as Plaintiff's Exhibit -- oh, I've been sharing a

9  screen this whole time.  Apologies.  Let me share with

10  you something that was previously marked at another

11  deposition, Plaintiff's Exhibit 4.

12           Can you see that on your screen?

13      A.   Yeah.  I see two pictures.

14      Q.   Okay.

15      A.   Now, you see, that's more of an Afro there.

16      Q.   Noted.  For the record, this is a one-page

17  document, Bates number P454.  And I'll represent to you

18  that the photograph on the right is Mr. Valle-Ramos.

19      A.   Okay.

20      Q.   The photograph on the left is a gentleman

21  named Mr. Ortiz.

22      A.   Okay.

23      Q.   And I'd like to ask, do you agree that these

24  two men bear a striking resemblance to one another?

25           MR. MISTOLER:  Objection.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      BY MS. DILLON:

2      Q.   You can answer.

3      A.   Well, a little bit.

4      Q.   A little bit?

5      A.   A little bit.  Yeah.

6      Q.   Okay.  What similarities do you see between

7   the two photographs?

8      A.   Well, they almost have the same hair.  Nose is

9   different.  Eyebrows are different, but it's -- it's --

10  yeah, that's what I notice.

11     Q.   Okay.  Do you think it's possible that you

12  actually saw Mr. Ortiz or some other young man with an

13  Afro on April 9, 2013?

14     A.   Nope.

15     Q.   Okay.  Why don't you think it's possible?

16     A.   Because I was fresh in my memory when I did

17  it, and I was exact about it.  And if I wasn't exact

18  about it, I wouldn't pointed out the guy, because I

19  never want to get somebody in trouble that don't deserve

20  it.  You know what I mean?  So that's just how I am.

21     Q.   Okay.  I'm going to stop sharing this exhibit.

22  Mr. Gonzalez, you testified at the criminal trial,

23  correct?  We've talked about that?

24     A.   Uh-huh.

25     Q.   We talked about an interaction that you had



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 with Bethany Szewczyk, another witness, when you

2 testified at trial, remember that?

3      A.   Say it one more time, please?

4      Q.   We talked about an interaction you had with

5 another witness, Bethany Szewczyk, when you were

6 testifying at the criminal trial.  Do you remember we

7 talked about that?

8      A.   You're talking about the -- the one that --

9 that -- that pointed out the picture, or you talking

10 about --

11      Q.   Yes.

12      A.   -- the lady that didn't want to come to the

13 courthouse?

14      Q.   The lady who pointed out the picture.

15      A.   Oh, okay.  Because there was another lady that

16 didn't want to come to the courthouse, that saw what

17 happened, because they -- they jumped the fence right

18 behind our house, and she --

19      Q.   Okay.

20      A.   -- came over to check on me.  But anyways,

21 they -- she -- she didn't want to go to court.  She

22 didn't want to get her nose in it.  That's why I was

23 happy when she did, that lady did.  I said, well --

24      Q.   Okay.

25      A.   -- that's good.  Yeah.  Not many people want

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  to do that.  Yeah.

2      Q.   Sure.  Do you remember having interactions

3  with any other witnesses besides Ms. Szewczyk at

4  criminal trial?

5      A.   Other witnesses?

6      Q.   Yeah.

7      A.   Now, the only remember -- thing that I

8  remember from the criminal trial is that I met the

9  mother and the father.  And they came over and came to

10  me, and asked me to forgive him and to try -- you know,

11  not to put him through this and all this other stuff.

12  And I just made a deal with them then.

13          I said, okay.  I said, but I want to regain my

14  monies back from what I've lost, because no one is

15  talking about me and my -- and what I've lost.  They

16  just want to either get the criminal or whatever, but no

17  one thinks about what I'm out of, the money and stuff.

18  They don't care about that.  And at that time, I was

19  having a tough time.  So we made a deal with them, and

20  the lawyer was there next to them.  And they were going

21  to give me 2 to $300 a month to pay me back, you know.

22          And then when I went to court -- because I

23  worked at a prison system, and when I went back to the

24  court, I was telling the judge, I worked at Lowell's

25  prison for a little while.  And in Lowell's prison, I

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  knew that if this kid was his first rap, I didn't want

2  him really to go to prison, in a sense.  I really wanted

3  him to get, you know, a good scare and get, you know, to

4  -- and then I said that to the judge.  I don't know if

5  you have transcripts of that, but I said something to

6  that effect, you know.

7      Q.    Yeah.  Was that at --

8      A.    Another thing, too, I don't --

9      Q.    -- Mr. Valle-Ramos's sentencing hearing?

10     A.    I believe so.  Yeah.  And I --

11     Q.    Okay.

12     A.    -- and I told Ramos.  Ramos spoke up to yell

13  at his mom, saying, don't worry about it, I'll take care

14  of it, all this stuff, because he did say that he -- I

15  remember that.  He says, don't worry about it, mom. I'll

16  pay you back.  It's okay, you know.  And then that was

17  it.

18          I talked to the judge, and I gave him my

19  reason why I thought jail time might not be the best way

20  or not a long sentence or something.  I can't remember.

21  But I was trying to -- you know, if the kid screwed up

22  the first time.

23          But you know what?  Afterwards, when I really

24  started analyzing what happened and how everything went,

25  to me, these are people that have not robbed for the

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  first time.  They've been -- they've robbed before.  And

2  the reason why because none of them said anything or

3  said, FU, get off me.  Nothing.  That's a pretty

4  well-trained individual.

5        You know, you know, being in the military, we

6  go through certain training and stuff and, you know,

7  that's what it looked like to me.  So that's that, you

8  know.

9     Q.  Okay.  So at -- so at sentencing, you spoke up

10  and told the judge something to the effect of, you know,

11  if it's a first offense, I don't -- I don't know if jail

12  time is appropriate or it should be short.  Do you

13  recall the reasons you gave her why you thought that?

14     A.  Because when you go to jail, you get an

15  education there on crime, and that's just a fact.  And,

16  you know, I mean, those guys that -- that I was guarding

17  with, trying to tell me how to steal stuff, you know,

18  and I'm not into that.  So -- or do this or do that or,

19  you know.  But no, it's -- jail is just not -- I -- I

20  don't think is -- at least in my time, wasn't helpful. I

21  don't think that it was really rehabilitating many

22  people.  They just get an education there and meet up

23  later and do stuff, whatever, you know.

24     Q.  Sure.  Okay.  So now, I want to switch gears

25  and just make sure we've talked about all the


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  interactions you can remember with the Orlando police in

 2  connection with the burglary.  I promise there's just a

 3  few.  We're getting close.

 4       We talked about the initial statement you gave

 5  and that there was the Black officer and the white

 6  officer, correct?

 7  A.   What I recall, yes.  That's the --

 8  Q.   Okay.  And the Black --

 9  A.   I mean, I think there was more people later,

10  you know, when they -- I think if -- I think later,

11  there might've been more people in there --

12  Q.   Okay.  It's --

13  A.   -- but I'm not sure, you know.

14  Q.   When you say in there, in the -- in your

15  house?

16  A.   In the -- in the condo, yeah.  I think --

17  Q.   Okay.

18  A.   I think maybe fingerprint people later came or

19  something.  I don't know.  Yeah.  Stuff like that.

20  Q.   Were -- do you remember being present when the

21  forensics folks came?

22  A.   Yeah, I think I do, because I think they

23  couldn't get no prints because they're all wearing

24  gloves.

25  Q.   Okay.  So --

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.   Like I said they're experience.

2    Q.   Sure.  So we talked about the interactions you

3 had with the police on the day of the crime.  We talked

4 about the interactions you had with Mr. Stanley for the

5 photo array; is that right?

6    A.   Okay.

7    Q.   Okay.

8    A.   Yes, that's right.

9    Q.   We talked about -- we talked about you maybe

10 having an interaction with Mr. -- Detective Stanley at

11 trial, but you couldn't really recall; is that right?

12    A.   Well, the interaction I just had with him was

13 short and sweet.  It wasn't nothing like -- that I can

14 recall sitting down talking for 15 minutes or anything.

15 But, you know, that's -- I don't recall that a long

16 conversation at all with him at all.

17    Q.   Okay.  Do you recall any other interactions

18 with the Orlando police in connection with the burglary

19 of your home?

20         MR. MISTOLER:  Objection.

21    BY MS. DILLON:

22    Q.   You can answer.

23    A.   No, I'm thinking.  I can't -- I can't recall

24 any other calls unless they called me from the police

25 station for something that might have happened, but I



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

1  don't know.  It's too long now.

2       MS. DILLON:  Okay.  I think I'm done, but I'm

3    going to ask for a quick five-minute break to make

4    sure, if that's all right with folks.  People can

5    use the bathroom, whatever.  So let's go off the

6    record really quickly if that's okay.

7       THE WITNESS:  That's fine.  I'm having water.

8    Thank you.

9       MS. DILLON:  Right.

10       MR. MISTOLER:  In the meantime, Mr. Gonzalez,

11    can I have your e-mail address?  I'm going to send

12    you --

13       THE REPORTER:  This on the record?

14       MR. MISTOLER:  No, this is -- this --

15       THE REPORTER:  Okay.

16       MR. MISTOLER:  -- can be off the record.  We're

17    fine.

18       THE REPORTER:  One moment.

19         (A recess was taken.)

20       THE REPORTER:  On the record.

21       MS. DILLON:  All right.  Mr. Gonzalez, I have

22    no further questions for you, so I'm going to pass

23    it off.

24       THE WITNESS:  Thank you.

25            CROSS-EXAMINATION


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      BY MR. MISTOLER:

2      Q.   Thank you so much for being here today, Mr.

3  Gonzalez.  My name's Stephen Mistoler.  I represent the

4  defendants in this matter.  I had a few follow-up

5  questions for you.

6           Starting with the idea that -- you mentioned

7  -- you testified that there was a private investigator,

8  a private detective that came around and asked questions

9  after the fact, after the 2013 trial and everything had

10  kind of finished.  Do you recall that?

11      A.   Uh-huh.

12      Q.   And I think you said that he was intimidating

13  or you felt intimidated, something along those lines; is

14  that correct?

15      A.   Yeah.  There -- he -- yeah, you can.  Yeah, I

16  -- yep.

17      Q.   What specifically in those interactions made

18  you feel intimidated?

19      A.   Well, he was redundant in questioning.  His

20  voice inflection was high and low, and -- and his

21  questions were -- were changing.  Same question,

22  different verbiage, trying to get me to fold that, you

23  know, could it be anybody else?  Is it possible that's

24  anybody else?  And I told them at that time, I'm

25  positive of who I picked, and I have been positive ever



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  since.  If not, I wouldn't have picked them.  I want

2  nobody going to jail that don't deserve to go to jail.

3  That's for sure.  I've been there.  I know how it works.

4      Q.   All right.  How many interactions did you have

5  with that private investigator?

6      A.   I think a couple, if I remember correctly.  I

7  think a couple.  I think he tried me again.  And to the

8  best of my recollection -- well, it had to be because I

9  was out of town.  I told him I don't have time to talk

10 to this long.  I'm, you know, on vacation.  I said, when

11 I get home, call me, you know, and I'm pretty sure

12 that's what happened.

13     Q.   When you say a couple, do you mean two or more

14 than two?

15     A.   I'm sorry?

16     Q.   When you say a couple -- a couple of

17 interactions, do you mean two or do you mean more than

18 two?

19     A.   I -- I -- I -- I can probably maybe guess that

20 it was two that I can maybe recall.  You know, might

21 have been three, but I think two.  No, I think -- I

22 think -- I don't know.  It might've been two or three.  I

23 don't know.

24     Q.   Okay.  I think you testified that Ms. -- is it

25 Szewczyk?  I am --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1        MS. DILLON:  I think it's Szewczyk.

2        MR. MISTOLER:  Szewczyk?

3        MS. DILLON:  I could be wrong.

4     BY MR. MISTOLER:

5     Q.   I may just call her Ms. S., Ms. Bethany S. for

6  this purpose.  I think you said you -- that Ms. Bethany

7  S. recanted her testimony, and you, sir, believe that it

8  was because of this intimidating private detective?

9     A.   Oh, yeah.  Yeah.  Yeah.  He was good at what

10  he was -- was doing.  I mean, you know, but I know what

11  I saw.

12     Q.   Were you ever coached by any of the Orlando

13  police officers?

14     A.   Oh, no.

15        MS. DILLON:  Objection.  Foundation.  Form. You

16     can answer.

17        THE WITNESS:  I said no.

18     BY MR. MISTOLER:

19     Q.   Were you coached how to testify by any of the

20  detectives?

21     A.   No.

22        MS. DILLON:  Objection.  Foundation.

23        THE WITNESS:  No -- no one -- no one's helped

24     me with anything.  I just go as I get called by the

25     court.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      BY MR. MISTOLER:

2      Q.   We looked at Plaintiff's Exhibit 12 and 13.

3  They were your statement that you had written on the day

4  of the incident, and then the OPD field report.  Do you

5  recall looking at that earlier today?

6      A.   Yes, sir.

7      Q.   In addition to the written statement that you

8  made, were you just generally -- as officers were there

9  and as detectives were there on the day of incident,

10 were you just providing as much detail and information

11 as you could to those individuals?

12     A.   When they asked me questions, you know, I

13 mean, you got to understand.  I've been through a

14 robbery and physical fighting and a lot of things going

15 on, the adrenaline's going, you know how it is.  So

16 that's -- that's -- I did it to the best of my ability.

17     Q.   Sure.  So -- and it's fair to say that the

18 statement, while it has many facts in it, maybe doesn't

19 comprise of all the information that you provided to the

20 officers or detectives in the course of that

21 investigation?

22        MS. DILLON:  Objection.  Form.  Go ahead.

23        THE WITNESS:  I -- I think it's difficult to

24     remember every detail after someone goes through

25     something like that, but you try to just focus on



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      the main details, you know, which is trying to catch

2      the guy and what he stole and how it happened and

3      that's it.  So I'm sure, you know, if I was watching

4      it from a distance happening, I'm sure my report

5      would've been better.

6       BY MR. MISTOLER:

7       Q.   And in the Orlando Police Department field

8  report that you looked at, Plaintiff's Number 13, you

9  didn't write that report, did you?

10      A.   You're talking about the printed report?

11      Q.   The one that the police officers put together.

12      A.   Well, no, you -- that was typed.  My

13  handwriting was the only one that I -- I wrote.  That

14  one -- the first one she showed me.

15      Q.   So there's likely other information that you

16  provided to either officers or detectives that didn't

17  make it into that field report?

18       MS. DILLON:  Objection.  Form.  You can answer.

19       THE WITNESS:  I wouldn't know.  I guess as a

20      detective's taking the notes, it's up to him to take

21      a -- be as accurate as possible of what I'm saying.

22      I'm not -- you know, I don't know what happens after

23      that. It's out of my control.

24       BY MR. MISTOLER:

25      Q.   Sure.  I think we also saw a -- the photo

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1 lineup.  It was in black and white.

 2       MR. MISTOLER:  And Ms. Dillon, would you please

 3    pull that one back up?

 4       MS. DILLON:  Sure.

 5       THE WITNESS:  Okay.  I see it.

 6    BY MR. MISTOLER:

 7    Q.   This looks almost like it's been scanned into

 8 a computer.  Would you agree with that, sir?

 9    A.   I don't know.  I'm not a computer guy, but it

10 looks like it might be faxed in or e-mailed or

11 something.

12    Q.   It looks like maybe it has the -- all these

13 dots all over it?

14    A.   Yeah, I see that.  It looks like it's been

15 punch holed there.

16    Q.   Is there any chance that on the day that you

17 made this identification, that you were actually looking

18 at a color copy of these images, and really today, what

19 we're looking at is a copy of that?

20    A.   Well, I think --

21       MS. DILLON:  Objection.  Form.  Go ahead.

22       THE WITNESS:  I think I stated earlier, I can't

23    remember exactly what copy it was what.  I remember

24    the format though, sort of the way -- the six --

25    because I think it was showing me six at a time



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1    maybe.

2     BY MR. MISTOLER:

3     Q.   But it could have been in color, you just

4  don't recall?

5     A.   Well, I -- no, I don't recall if it was in

6  color or not in color.

7     Q.   You had an opportunity to review your trial

8  transcripts that occurred on May 21 of 2014; is that

9  correct?

10    A.   The transcript you just had me review?

11    Q.   Correct.  Yes, sir.

12    A.   Yeah, I reviewed it quickly.  I scanned over

13  it.  I didn't read it all word by word.

14    Q.   When you were --

15        MS. DILLON:  Sorry, Counsel, do you want me to

16    stop sharing?

17        MR. MISTOLER:  You can stop sharing.  Thanks.

18    BY MR. MISTOLER:

19    Q.   In your review of that transcript --

20    A.   Hey honey.

21    Q.   -- did you see --

22    A.   Go ahead.

23    Q.   Did you -- did you see anything that you

24  would've changed about any testimony that you gave in

25  that -- in that trial proceeding?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**         **www.MILESTONEREPORTING.com**         **Toll Free 855-MYDEPOS**

1      A.   You know, sir, we're going on 11 years later.

2  Whatever it's been, it's hard for me to -- to answer

3  that question, you know.  I mean, to ask that honestly

4  and inaccurately, I couldn't do that.

5      Q.   Okay.  Would you defer to your prior

6  deposition testimony and the prior trial testimony --

7      A.   Excuse me.

8      Q.   -- as being -- as being accurate?

9      A.   I try to be as accurate as possible, yes.

10     Q.   And so really, if there's things today that

11 you don't recall, you would defer us back to the prior

12 testimony you gave under oath?

13     A.   Yes, I would have to.  Yeah.

14         MR. MISTOLER:  I don't think I have any other

15     questions for you, sir.  I appreciate you coming out

16     here today and giving your statement.

17         THE WITNESS:  Thank you.

18         MS. DILLON:  And I have nothing else based on

19     that, so you are free to go.

20         THE WITNESS:  Okay.  Well, thank you, folks.

21     And I hope everything works out for everybody.

22         THE REPORTER:  And are you going to read or

23     wave?

24         MR. MISTOLER:  That is a question to you, sir.

25     It's your right to read back through the transcript

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    that the court reporter has provided.  It's totally

2    up to you, and it's not a slide on her.  It's just

3    whether you would want to see if the transcript was

4    taken down accurately.  If you don't want that -- to

5    do that, you can waive that.

6         THE WITNESS:  You're talking about what I

7    talked about today, correct?

8         MR. MISTOLER:  Today.

9         THE WITNESS:  Do you think I need to keep a

10   copy of that for some reason?

11        MR. MISTOLER:  I don't think we can advise you

12   today, sir.

13        MS. DILLON:  Yeah.  It's totally up to you.

14        THE WITNESS:  Well, then I guess she can e-mail

15   me a copy.  Am I going to be called again?

16        MR. MISTOLER:  No, really.  It's just to see if

17   the transcript was accurate or not.

18        THE WITNESS:  Okay.  But am I going to be

19   called again?

20        MS. DILLON:  There's not a way to let you know

21   that at this point but --

22        THE WITNESS:  Okay.  So then I'll take a --

23   I'll take a copy of the transcript.

24        MS. DILLON:  Of course.

25        THE WITNESS:  That way, in case I get called



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   again.

2          THE REPORTER:  Okay.  And are we ordering the

3   transcript at this time?

4          MS. DILLON:  Not at this time for Plaintiff.

5          THE REPORTER:  Okay.  And that is --

6          MR. MISTOLER:  No, ma'am.

7          THE REPORTER:  And that is 3:46 p.m., and we're

8   going off record.

9              (Deposition concluded at 3:46 p.m. ET)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1                    CERTIFICATE OF OATH

2

3  STATE OF FLORIDA

4  COUNTY OF ORANGE

5

6     I, the undersigned, certify that the witness in the

7  foregoing transcript personally appeared before me and

8  was duly sworn.

9

10  Identification:  Produced Identification

11

12

13

14

15  _____

16         FLOR LOPEZ

17         Court Reporter, Notary Public

18         State of Florida

19         Commission Expires: April 1, 2026

20         Commission Number:  HH 234001

21

22

23

24

25



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
1                  C E R T I F I C A T E

2

3  STATE OF FLORIDA)

4  COUNTY OF ORANGE)

5

6       I, FLOR LOPEZ, Court Reporter and Notary Public for

7  the State of Florida at Large, do hereby certify that I

8  was authorized to and did report the foregoing

9  proceeding, and that said transcript is a true record of

10  the said proceeding.

11

12       I FURTHER CERTIFY that I am not of counsel for,

13  related to, or employed by any of the parties or

14  attorneys involved herein, nor am I financially

15  interested in said action.

16

17  Submitted on: November 24, 2025.

18

19

20

21

22       _____

23       FLOR LOPEZ

24       Court Reporter, Notary Public

25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS



P001405



P001406



P001407



P001408



P001410



P001411


P001412

# ORLANDO POLICE DEPARTMENT

Case #: 2013-146382

## Statement
Please fill out in full detail

| Date of Statement: | Month: 4 | Day: 9 | Year: 13 | Time: 0825 |
|---|---|---|---|---|

Offense: Res Burglary

| Date of Offense: | Month: 4 | Day: 9 | Year: 13 | Time: 0800 | Suspect (last, first, middle): Unk |
|---|---|---|---|---|---|

Location of Offense: 1625 Little Falls Cir.

District: K-2

Person Code: Name (last, first, middle): Gonzalez, George L

Age: | DOB: 4-4-56 | Race: W | Sex: M

Address Residence: 1625 Little Falls Cir | Zip: 32807 | Phone: 407-459-3282 cell

Address Business: | Zip: | Phone:

Email Address:

Type of ID shown: FLDL

ID# if applicable: G 524-312-56-124-0

I, , do hereby voluntarily make the following statement without threat, coercion, offer of benefit, or favor by any persons whomsoever.

OPEN FRONT DOOR SAW SPANISH INDIVIDUAL
HAD A AFRO HE RAN OUT THE BACK DOOR
I WENT OUT THE FRONT AND CHASED HIM. TOO FAST
JUMP OVER FENCE BY LAKE. CAME BACK TWO
MORE INDIVIDUALS (ARE) DOWN STARTED FIGHTING
ONE HE HAD SHORT HAIR CUT BLUE SHIRT SPANISH.
WE FOUGHT AND HE HIT ME AS MUCH HE COULD
I WAS WORRIED ABOUT THE SECOND GUY SO TRYING
TO FIGHT BOTH THE OTHER GUY I WAS FIGHTING
BROKE LOOSE AND MADE IT OUT THE FRONT DOOR
THE TO PUNKS IN THE HOUSE WERE ABOUT 5'8 THIN
17-20 YRS OLD. TOOK GOLD RING CROSS SKULL
CROSS BONES ACCENTED WITH DIAMONDS. I CAN
IDENTIFY THE TWO DOWN STAIRS. STERLING SILVER
JEWELRY WITH BLUE TOPAZ, CITRINE BLACK ONYX
ABOUT 30-35 PIECES. M-8000 DOLLARS.
RING 1200. I GAVE NO ONE PERMISSION TO
ENTER APARTMENT. I WANT TO PRESS CHARGES

Sworn to and subscribed before me, this 9 day of April, 2013

Signature: Alfonso Tejera

Notary Public ☐ | Law Enforcement Officer ☐ | Name Key 7497
Personally Known ☐ | Produced Identification ☐ | Type FLDL

My signature below means that I refuse to prosecute the person(s) named above for the alleged crime(s) that occurred to me or to the person under my control.

Signature: | Date: 4-9-13
(Department policy prohibits use in this section in domestic violence cases.)

I swear/affirm the above and/or attached statements are correct and true.

Signature: X

Victim Rights Booklet provided? Yes ☑ No ☐

I will testify in court and prosecute criminally. | Initials:

Miranda Warning Read? Yes ☐ No ☑ | Page 1 of

OPD P&P 1113.10 A Rev. 9/23/11 | White: State Attorney | Yellow: Records

P000001



# Orlando Police Department
## Field Report



100 S Hughey Ave   Orlando, FL  32802   (407)246-2470

Case Number: **2013-00146382**

## DETAILS

Location: 1625 LITTLE FALLS CIR

Reporting Officer ID: 7473      TEJEIRA, ALFONSO

Incident Type:    Residential Burglary

Occurred From:  04/09/2013  08:00    Thru:  04/09/2013  08:09

Reporting Date:  04/09/2013  08:09

Approving Officer:  12146   MCCRAY, JERRY

## OFFENSES

| Counts | Attempt/Commit | Description | Dom. Violence | Location Type |
|--------|----------------|-------------|---------------|---------------|
| 1 | Committed | BURGLARY - BREAKING AND ENTERING | No | Apartment/Condo |
| 1 | Committed | THEFT | No | Apartment/Condo |
| 1 | Committed | BATTERY | No | Apartment/Condo |

## NARRATIVE

On April 9, 2013 at approximately 0845 hours, I responded to 1625 Little Falls Cir, Hidden Creek Condos, in reference to an occupied residential burglary. Upon arrival, I met with the victim who completed a sworn written statement.

According to the victim, on today's date at approximately 0800 hours he arrived home. He entered his residence via the front door. Once inside, victim observed suspect #1, on the ground level. Suspect #1 ran out the back sliding glass door. The victim chased suspect #1 who jumped the fence and ran northbound in an unknown direction. When the victim returned to his residence. Suspect #2 was coming down the apartment's stairs. The victim pepper sprayed suspect #2. The victim attempted to hold suspect #2. Suspect #2 began punching the victim. While the victim was fighting with suspect #2, Suspect #3 came down the stairs. Suspect #2 the ran out the front door northbound thru the condos. Suspect #3 was last seen by the victim going up the stairs. Suspect #2 jumped a fence north of the complex. When the victim returned to the apartment suspect #3 had left. Unknown if suspect #3 jumped out the second story window or left via front or back door. A witness observed three suspects enter a gray possibly Toyota vehicle in the complex north of the victim's condo. The description given by the witnesses of the suspect's entering the vehicle and leaving in an unknown direction did not match suspect #1. It appears the victim only saw three suspects but there could have been four. The victim did not give anyone permission to enter his residence and steal his property, or batter him. The victim will press charges. The victim did not sustain any visible injuries and did not require medical attention. CST Styer, 14857, responded to the scene and processed for latent prints. One of the witnesses stated she believed the suspects were wearing gloves.

It appears, the suspects entered the residence via the rear sliding glass door. The suspects used a tire iron to break the sliding glass door lock. The tire iron was left at the scene. Estimated damage to the door is $10.  Once inside the suspects stole approximately $8000 worth of sterling silver jewelry. The suspects also took a gold ring valued at approximately $1200. The suspect attempted to steal approximately $500 in U.S. coins and a folding knife valued at $40. The knife and the coins were in a backpack the suspects brought with them but left behind. The folding knife and the coins were returned to the owner. The backpack was taken by the CST. Officer O'Day, 12153, found a Pop Tart bag in the area where the suspect's car was last seen.  It is unknown if the bag came from suspect's car The bag was turned over to the CST. The victim stated he can identify some of the suspects.

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.



# Orlando Police Department
## Field Report



*100 S Hughey Ave  Orlando, FL  32802  (407)246-2470*

Case Number: **2013-00146382**

## SUBJECTS

| Case Subject Type | Subtype | Street Address | | Home Phone | Sex | Age |
|---|---|---|---|---|---|---|
| Name | | City, State Zip | | Work Phone | Race | DOB |
| Hgt  Wgt  Hair  Eyes | DL Number/State | City of Birth | Cell Phone | State/Country of Birth | Soc. Sec # | |

**Suspect**                    Suspect
UNK, 2013-00146382

**Suspect**                    Suspect
UNK, 2013-00146382

**Suspect**                    Suspect
UNK, 2013-00146382

**Suspect**                    Suspect
UNK, 2013-00146382

**Victim**                     Adult          1625 Little Falls CR-Circle                                    M    57
Gonzalez, George L                            Orlando, FL  32807          (407)459-3282                      W    04/04/1956
                   G524312561240/FL                                                                          --

## PROPERTY - GENERAL

| Date | Code | Quantity | Units | Category | Value | OAN |
|---|---|---|---|---|---|---|
| | Property Type | | | Style/Drug Type | Serial Number | |
| 04/09/2013 | **Damaged** | 1 | Each | General Property | $10.00 | |
| | Miscellaneous | | | | | |
| | Damage to the back door sliding glass door lock; | | | | | |
| 04/09/2013 | **Stolen Only** | 1 | Each | Jewelry | $1200.00 | |
| | Jewelry Ring | | | | | |
| | Gold ring with skull cross bones accented with ; diamonds | | | | | |
| 04/09/2013 | **Stolen Only** | | | Jewelry | $8000.00 | |
| | Jewelry Other | | | | | |
| | 30-35 pieces of sterling silver jewelry with blue ; topaz, citrine black onyx | | | | | |
| 04/09/2013 | **Stolen/Recovered** | | | Securities or Money | $500.00 | |
| | Currency/Negotiable | | | | | |
| | $500 in U.S. coins | | | | | |
| 04/09/2013 | **Stolen/Recovered** | 1 | Each | General Property | $40.00 | |
| | Miscellaneous | | | | | |
| | Buck folding knife | | | | | |

## PROPERTY - VEHICLE

| Date | Code | Year | Category/Make/Model/Model Desc | | Value |
|---|---|---|---|---|---|
| | Property Type | Color | | Year/Plate/State | VIN/Serial Number |

## PROPERTY - GUNS

| Date | Code | Type | Make | Serial Number |
|---|---|---|---|---|
| | Value | Caliber | Finish | OAN |

| I swear or affirm the above statements are correct and true. | Officer Name/ID # {Print} |
|---|---|
| Signature_____ | |
| Sworn to and subscribed before me, the undersigned authority, | |
| This _____ day of _____,_____. _____ | |
| Notary Public ☐   Law Enforcement Officer ☐   Emp # _____  Orlando Police Department | |

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.

**P001416**

# Photo Line-up Administration and Witness Instructions

Case Number: _2013 - 146382_    Date/Time: _4|18|13  1115 HRS_

Witness Name: _GONZALEZ, George_ Administrator Name/ID: _STANLEY #14767_

Line-up Number: _22184_    Line-up reviewed by: _STANLEY #14767_

Prior to presenting the photo line-up, the witness provided a written/audio recorded statement describing the suspect of this criminal investigation.

_MDS_
Administrator's Initials

Prior to presenting the photo line-up I read "verbatim" the witness instructions to the witness. The witness indicated he/she understood the instructions.

_MDS_
Administrator's Initials

## PHOTO LINE-UP INSTRUCTIONS TO THE WITNESS:

**"It is just as important to clear innocent persons from suspicion as it is to identify guilty parties. Regardless of whether you make an identification, we will continue to investigate this incident. With that in mind, I am going to show you six photos arranged so they may be simultaneously viewed. This group of photos may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards, and moustaches may easily be changed. The photos may not always depict the true complexion of a person – it may be lighter or darker than shown in the photo. Pay no attention to the order of the photos or markings and/or numbers that may appear on the photos, or to any differences in the type or style of photographs. Take your time; when you have looked at all the photos, tell me whether or not you see the person who committed the crime. If you do identify someone, you will circle and initial that person on the line-up. Please remember this is an on-going investigation, you are not permitted to discuss this identification procedure with anyone other than law enforcement or legal counsel."**

I understand the photo line-up instructions and have been provided a copy of this form.

Witness's Initials

After the photo lineup, the witness provided a written statement or an audio recorded statement describing his/her identification or non-identification.

_MDS_
Administrator's Initials

*This form is to be filed in the case package. If the witness refuses*
*to provide a sworn statement, indicate so in the incident report.*

OPD P&P 1636.0 B Rev. 10/25/11    Original: State Attorney    Yellow: Records    Pink: Witness

**Exhibit I 1**

<span style="color:red">**P000532**</span>

# WITNESS PHOTO DISPLAY IDENTIFICATION FORM

## ORLANDO POLICE DEPARTMENT

**PHOTO LINEUP #** 22184

| | | |
|---|---|---|
| UPPER LEFT 1 | UPPER CENTER 2 | UPPER RIGHT 3 |
| LOWER LEFT 4 | LOWER CENTER 5 | LOWER RIGHT 6 |

If you have previously seen one or more of the persons shown in the photos displayed, place an "X" in the box corresponding to the photograph of the person in the lineup.

OPEN DOOR TO CONDO ___was seen by me (state circumstances)
TURNED AND LOOKED RIGHT AT ME
AND TOOK OFF. THIS IS PERSON BOY
NO # 2.

I swear or affirm that the aforementioned is true and correct to the best of my knowledge.

Sworn to and subscribed before me

MICHAEL D. STANLEY
this 18th day of APRIL , 2013 .

___ 14767
**Notary Public**
**or**
**Law Enforcement Officer**
**Conducting Official Investigation**

_Signature of Witness_

1625 LITTLE FALLS CIRCLE
**Witness' Street Address**

ORLANDO, FL 32807
**City, State, Zip Code**

407-509-3282
**Witness' Telephone Number(s)**

4|18|13   1115 HRS
**Time and Date of Witness' Signature**

**Exhibit I 2**

P000533

# Orlando Police Department





| | | |
|---|---|---|
| 1 | 2 | 3 |
| 4 | 5 | 6 |

**Lineup Identifier:**

**Printed Orlando PD:** 4/17/2013 11:14



CASE NO.: 6:24-CV-1276

JORGE VALLE-RAMOS

V.

CITY OF ORLANDO, MICHAEL

STANLEY, AND DANIEL BRADY

DEPONENT:

JEREMIAH LYONS

DATE:

SEPTEMBER 16, 2025

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF FLORIDA

3  ORLANDO DIVISION

4  CASE NO.: 6:24-CV-1276

5

6  JORGE VALLE-RAMOS,

7  Plaintiff

8

9  V.

10

11  CITY OF ORLANDO, MICHAEL

12  STANLEY, AND DANIEL BRADY,

13  Defendants

14

15

16

17

18

19

20

21

22

23  DEPONENT:  JEREMIAH LYONS

24  DATE:      SEPTEMBER 16, 2025

25  REPORTER:  NICOLE DE BLOIS

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     APPEARANCES

2

3 ON BEHALF OF THE PLAINTIFF, JORGE VALLE-RAMOS:

4 Roshna Bala Keen, Esquire

5 Loevy & Loevy

6 311 North Aberdeen

7 3rd Floor

8 Chicago, Illinois 60607

9 Telephone No.: (312) 243-5900

10 E-mail: roshna@loevy.com

11 (Appeared via videoconference)

12

13 ON BEHALF OF THE DEFENDANTS, CITY OF ORLANDO, MICHAEL

14 STANLEY AND DANIEL BRADY:

15 Zachary G. Phipps, Esquire

16 O'Connor, Haftel & Angell, PLLC

17 800 North Magnolia Avenue

18 Suite 1350

19 Orlando, Florida 32803

20 Telephone No.: (407) 843-2100

21 E-mail: zphippslaw@gmail.com

22 (Appeared via videoconference)

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900  www.MILESTONEREPORTING.com  Toll Free 855-MYDEPOS

1                    INDEX

2                             Page

3   PROCEEDINGS                        5

4   DIRECT EXAMINATION BY MR. PHIPPS        6

5   CROSS-EXAMINATION BY MS. KEEN           43

6   REDIRECT EXAMINATION BY MR. PHIPPS        49

7

8                    EXHIBITS

9   Exhibit                    Page

10  1 - Affidavit of Bethany Szewezyk        45

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          STIPULATION

2

3   The deposition of JEREMIAH LYONS was taken at MILESTONE

4   REPORTING COMPANY, 315 EAST ROBINSON STREET, SUITE 510,

5   ORLANDO, FLORIDA 32801, via videoconference in which all

6   participants attended remotely, on TUESDAY the 16th day

7   of SEPTEMBER 2025 at 1:02 p.m. (ET); said deposition was

8   taken pursuant to Rule 30, Fed. R. Civ. P. It is agreed

9   that NICOLE DE BLOIS, being a Notary Public and Court

10  Reporter for the State of FLORIDA, may swear the witness

11  and that the reading and signing of the completed

12  transcript by the witness is not waived.

13

14

15

16

17

18

19

20

21

22

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1          PROCEEDINGS

2      THE REPORTER:  Okay.  We are on record.  The

3    time is 1:02 p.m.  Will all parties, except for the

4    witness, please state your appearance, how you're

5    attending and your location.

6      THE WITNESS:  Jeremiah Lyons.  I've been

7    subpoenaed and I'm in Ocean Pines, Maryland.

8      MS. KEEN:  Roshna Bala Keen.  I'm an attorney

9    from Loevy & Loevy, and I represent the plaintiff.

10      MR. PHIPPS:  Zach Phipps on behalf of City of

11    Orlando, appearing from my office in Orlando,

12    Florida.

13      THE REPORTER:  Okay.  Mr. Lyons, will you

14    please state your full name for the record?

15      THE WITNESS:  Jeremiah Lyons.

16      THE REPORTER:  Will you please hold your ID up

17    to the camera?  A little closer for me, please.

18    Perfect.  Thank you.  Do all parties agree that the

19    witness is, in fact, Mr. Lyons?

20      MS. KEEN:  Yes.

21      MR. PHIPPS:  It appears so.

22      THE REPORTER:  Okay.  Mr. Lyons, will you

23    please raise your right hand for me?  Do you

24    solemnly swear or affirm that the testimony you're

25    about to give will be the truth, the whole truth,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    and nothing but the truth?

2        THE WITNESS:  I do.

3        THE REPORTER:  Perfect.  You may begin.

4        MR. PHIPPS:  Okay.

5            DIRECT EXAMINATION

6  BY MR. PHIPPS:

7      Q.   Good afternoon, Mr. Lyons.  My name is Zach

8  Phipps and I'm an attorney on behalf of the City of

9        Orlando.  My first question for you is: Have

10  you ever been deposed before?

11      A.   Yes.

12      Q.   Okay.  Approximately how many times?

13      A.   Not that many.  Not -- not that many, but --

14  but I've been deposed and I've testified before.

15      Q.   Okay.  Can you give me a ballpark about how

16  many times?

17      A.   Five, ten.

18      Q.   Okay.  Okay.  And have you been deposed in

19  relation to investigative work?

20      A.   Yes.

21      Q.   Okay.  The main reason I ask that is just to

22  make sure that everybody who I propose understands that

23  we're being recorded here and what we're saying is going

24  to be transcribed and therefore, you know, answers need

25  to be clear.  In other words, like, you know, clear

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  verbalized answers as opposed to, you know, headshaking

2  or uh-huhs or uh-uhs, so -- all right.  You say you were

3  appearing from Ocean Park, Maryland; is that correct?

4     A.  Yes, sir.

5     Q.  Is that where you reside?

6     A.  Yes, sir.

7     Q.  Where did you go to high school?

8     A.  I went to high school in New York City.

9     Q.  Okay.  What about college, did you attend

10  college?

11     A.  I dabbled in it a little bit.

12     Q.  Okay.  Well, what school did you dabble in it

13  with?

14     A.  John Jay College of Criminal Justice.

15     Q.  Okay.  And where's that located?

16     A.  New York City.

17     Q.  Okay.  Did you receive any degrees from there,

18  any certificates?

19     A.  No.  What I did at John Jay, when I got out of

20  the military, I was in the Navy.  When I got out of the

21  military, I went to John Jay for a little while and then

22  I -- I -- you know, I wasn't big on college, college

23  wasn't big on me.  And -- but later on in my career as a

24  police detective, I would go to John Jay and teach new

25  detectives investigations.  So I did that at -- and --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    and that was held at John Jay College of Criminal

2    Justice.

3        Q.   You mentioned that you were formerly employed

4    as a law enforcement officer?

5        A.   Yes.  I was a detective in New York City.

6        Q.   Was that for NYPD?

7        A.   Well, I -- I was with the transit police and

8    then -- back at that time, they had the city police, the

9    transit police and the housing police.  And then as I

10   was leaving, they were merging and I left just before

11   the merge.

12       Q.   Okay.

13       A.   I was a -- I was a first grade detective with

14   them, when I was there.

15       Q.   With the transit police?

16       A.   Yes.

17       Q.   Okay And how long did you work there?

18       A.   20 years.

19       Q.   Okay.  Did you work in law enforcement

20   anywhere prior to that?

21       A.   No.

22       Q.   Okay.  And you mentioned that you were in the

23   military --

24       A.   Yes, sir.

25       Q.   -- is that correct?  Okay.  What branch, sir?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1 A. Navy.

2 Q. Navy.  And how long were you in the Navy?

3 A. Just a few years.

4 Q. And were you honorably discharged?

5 A. Yes.

6 Q. Okay.  And another thing too about this

7 deposition, I'm not asking any of these questions to try

8 to insult you, just background information that could be

9 necessary for whatever reason.  But I ask these of

10 pretty much everybody that I depose.

11 A. I understand.

12 Q. Okay.  Okay.  And where did you work after you

13 left the transit police?

14 A. I started my own business, a private

15 investigation -- at first I worked in -- I had a

16 business in Maryland, because I moved -- I was living in

17 Maryland at the time.  And I started a -- a business, I

18 did security guards, private investigations and served

19 subpoenas.

20 Q. And you said you started that business?

21 A. Yes.

22 Q. What was the name of it?

23 A. Lyons Professional Services.

24 Q. Okay.  And how long did you operate Lyons

25 Professional Services?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900 www.MILESTONEREPORTING.com Toll Free 855-MYDEPOS

1    A.  Oh, I don't know, ten, 15 years.  Then I moved

2  to -- I moved to Florida in 2008, and I started Jeremiah

3  Lyons Investigations in 2009.  So -- I've been in the --

4  in the criminal justice field for over 50 years.

5    Q.  Okay.  Where in -- you said you lived with --

6  lived -- ah, sorry, moved to Florida, where in Florida

7  did you live?

8    A.  Port St. Lucie.

9    Q.  Okay.  And you started Lyons Investigation

10  Services here?

11    A.  No.  Jeremiah Lyons Investigations.

12    Q.  Jeremiah Lyons Investigations.  Okay.  And are

13  you still operating Jeremiah Lyons Investigations?

14    A.  A little bit.  A little bit.  Being in

15  Maryland it's -- it's difficult, but I -- I'm still

16  licensed.

17    Q.  Okay.  And what type of investigative work

18  does Jeremiah Lyons Investigations perform?

19    A.  Just criminal.  Just criminal, mostly

20  homicides.  You know, just -- just criminal.

21    Q.  Okay.  And who are you often -- who are you

22  most often retained by, law enforcement agencies or

23  private citizens?

24    A.  Law -- law enforcement agencies have their own

25  detectives.  So you know, when I left the police

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  department, if I wanted to do investigations, you know,

2  I had to hang out my own shingle, but now I work for

3  defense attorneys.

4    Q.  Okay.  And when you say now you "work for

5  defense attorneys," was that since you started the

6  investigation business?

7    A.  Yes.

8    Q.  Okay.

9    A.  It's always been for the defense.

10   Q.  Okay.  How did you come to be familiar with

11  Mr. Jorge Valle-Ramos?

12   A.  I'm familiar.  I didn't hear the beginning of

13  the sentence.

14   Q.  Okay.  How did you become familiar with him?

15   A.  He retained an attorney that I did some work

16  for.

17   Q.  Do you recall what attorney that was?

18   A.  Lisabeth Fryer.

19   Q.  Okay.  And was she his criminal defense

20  attorney?

21   A.  She is what she is.  I think it's mostly

22  criminal defense.  She may get involved in other things,

23  but I don't know.

24   Q.  Okay.  And she was representing Mr. Valle-

25  Ramos?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.   For the -- for the purpose of his appeal, I

2  believe so, yes.

3    Q.   Was it post-conviction relief?

4    A.   Yes.

5    Q.   Have you met Mr. Valle-Ramos?

6    A.   I don't believe I've ever met him.

7    Q.   Okay.

8    A.   Oh, wait.  You know what, maybe at -- at the

9  post-conviction hearing, I might have met him there.

10    Q.   What type of services did you provide on

11  behalf of his attorney for Mr. Valle-Ramos?

12    A.   I just interviewed the -- the witness, Bethany

13  -- Beth -- I can't pronounce her last name, last name

14  and name, but you know who I'm talking about, and -- and

15  Gonzalez, the victim of the burglary.  That's all.

16    Q.   Okay.  Did you interview anybody else related

17  to the case?

18    A.   No.  I don't think there was -- no.  Not that

19  I -- I'm pretty sure no.

20    Q.   Okay.  None of the law enforcement --

21    A.   I would've loved to in -- in -- to spoke to

22  law enforcement.

23       MS. KEEN:  I'm just going to lodge an

24  objection, it calls for speculation.

25  BY MR. PHIPPS:

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Did you attempt to speak to any of the law

2  enforcement officers involved in the case?

3    A.   No.

4       MS. KEEN:  Objection.  Foundation.

5  BY MR. PHIPPS:

6    Q.   And Mr. Lyons, I'm not sure if you're aware in

7  a civil -- this is a civil deposition.  So if there's an

8  objection, you still can answer, just, you know, it --

9  whether or not the testimony is admissible will be later

10  on argued in front of the Court.

11    A.   Okay.

12    Q.   And when you first began investigating Mr.

13  Valle-Ramos's case, what was your understanding of what

14  he was charged with?

15    A.   Burglary.

16    Q.   And did you review any police reports?

17    A.   I don't believe so.

18    Q.   Now, Mr. Valle-Ramos went to trial and there

19  was a trial transcript.  Did you review that?

20       MS. KEEN:  Objection.  Foundation.

21  BY MR. PHIPPS:

22    Q.   Was that a no?

23    A.   I don't remember reviewing that.

24    Q.   Okay.  What about any deposition transcripts?

25       MS. KEEN:  Same --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1       THE WITNESS:  No.

2       MS. KEEN:  -- objection.

3       THE REPORTER:  I'm sorry, can you repeat the

4   last question, my thing broke up?

5       MR. PHIPPS:  I asked if he reviewed I asked if

6   he'd reviewed any deposition transcripts.

7       THE REPORTER:  Was there an objection as well?

8       MR. PHIPPS:  Yes.

9       MS. KEEN:  Yes.  It was same objection.

10   Objection, lacks foundation.

11  BY MR. PHIPPS:

12      Q.   Now I'll have a hard time pronouncing her name

13  as well, but Ms. Bethany Szewezyk, I believe.

14      A.   I know who you're talking about.

15      Q.   Okay.  She was a witness in -- for the state

16  in Mr. Valle-Ramos's case, correct?

17      A.   Correct.

18      Q.   Okay.  And what made you decide to seek her

19  out for an interview?

20      A.   She was a witness in the case.

21      Q.   And what was your understanding as to her --

22  what her testimony was?

23      A.   I just -- she was a witness -- I didn't have

24  an understanding of what her testimony was when I went

25  to see her.  I -- she was a witness in the case and

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEReporting.com     Toll Free 855-MYDEPOS

1  because she was a witness in the case, I wanted to talk

2  to her. Just like with Mr. Gonzalez, he was a victim in

3  the case.  Because he was a victim in the case, I would

4  want to talk to him.

5     Q.  Okay.  There was another witness or eyewitness

6  to the case as well, did you speak with that person?

7  I'll get the name here.

8     A.  Did that person testify at trial?

9     Q.  That's what I'm trying to figure out right

10  now. It's probably why it's -- it was on there -- here

11  we go. A Ms. Charlene Bloom.

12        MS. KEEN:  I'm just going to object, that that

13     lacks foundation.  Calls for speculation.

14  BY MR. PHIPPS:

15     Q.  Bloom?

16     A.  Excuse me?

17     Q.  It was Charlene Bloom in this case?

18     A.  Did she testify at the trial, make an

19  identification?

20     Q.  I'm not sure if she did.  Do you recall

21  whether or not you interviewed her?

22     A.  I -- I only interviewed somebody who testified

23  at the trial and made an identification.

24     Q.  Okay.  So that was Mr. --

25     A.  I --

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.  Oh, sorry, go ahead.

2    A.  No.  Go ahead.  I -- I would -- never mind.

3    Q.  Okay.  Now, how did Mr. Valle-Ramos' attorney

4  get in contact with you about this case?

5    A.  She called me up.

6    Q.  Okay.  Had you worked with her previously?

7    A.  Yes.

8    Q.  For similar work?

9    A.  Excuse me?

10    Q.  For similar work?

11    A.  For criminal -- criminal stuff, yeah.

12    Q.  Approximately how many times had you worked

13  for her prior to this?

14    A.  She -- several cases a year, either post-

15  conviction or an ongoing case.

16    Q.  And how did your relationship with her first

17  begin?  How did you first start working for her?

18    A.  I was the investigator on the Casey Anthony

19  case, I worked on that case, I was Casey's investigator.

20  And Lisabeth Fryer was part of the defense team, and

21  that's how I met her.

22    Q.  Okay.

23    A.  She's a good attorney.  Brilliant.

24    Q.  And was that the first time you had worked

25  with miss -- with her?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.   That was the first -- that's when I met her

2   and that's the first time we did anything together.

3    Q.   Okay.  And approximately how much did you

4   charge for your services in this case to her?

5    A.   I think -- I think I got $2,500, but I'm not

6   even sure.  Because I was willing to do it for nothing.

7    Q.   On this particular case?

8    A.   I -- I -- I'm -- I -- I -- I'm willing to do

9   that, you know, often, but I'm -- in this particular

10   case, I got $2,500.

11    Q.   Okay.  And now as far as Ms. Szewezyk, Ms.

12   Bethany, how did you get in contact with her for the

13   interview?

14    A.   I knocked on her door.

15    Q.   Okay.  Was she willing to meet with you at

16   that moment?

17    A.   Yeah.

18    Q.   And what did that conversation involve?

19    A.   I just -- I told her who I was, told her who I

20   was working for.  And she told me at that time that --

21   I'm trying to I'm trying to remember and get it

22   straight.  So she told me at that time that the person

23   that she had identified in the photo when she saw him in

24   court, she believed that it wasn't the person she saw

25   running from the house.  She said that there was a -- a

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  problem with the complexion and that she told this to

2  the detective at the time, and that the detective told

3  her that she picked the right guy.

4      Q.   And did she identify who that detective was?

5      A.   I could tell you who it was.  I got it here

6  somewhere.

7          MS. KEEN:  Could you -- I apologize.  I

8  couldn't hear the question, could you read it back?

9          MR. PHIPPS:  I asked him if the Ms. Szewezyk or

10    Ms. Bethany identified which detective she spoke

11    with.

12         MS. KEEN:  Thank you.

13         THE WITNESS:  I believe it was Detective

14    Michael Stanley.  I believe.

15  BY MR. PHIPPS:

16      Q.   And then did she say whether or not she spoke

17  with him before or after her testimony?

18      A.   Before.  Before.

19      Q.   To your acknowledge, she still testified at

20  trial, correct?

21      A.   What?

22      Q.   To your knowledge, she still testified at

23  trial?

24      A.   Well, she was reassured by the detective that

25  she picked the right guy.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.  Okay.  Do you know what he said --

2    A.  She --

3    Q.  -- to reassure her?

4    A.  What?

5    Q.  Do you know what he said to reassure her?

6    A.  I -- I -- I wasn't there.

7    Q.  Did she tell you what he said?

8    A.  She said -- yeah.  That he picked -- that she

9  picked the right guy.

10    Q.  Okay.

11    A.  And that the -- and she -- and he told her

12  that the victim also picked that picture.  So she -- so

13  he reassured her that she picked the right guy.

14    Q.  And this was after she had done her photo

15  lineup though, before trial?

16        MS. KEEN:  Objection.  Form.

17  BY MR. PHIPPS:

18    Q.  Is that correct?

19    A.  Well, it was -- after the photo lineup, when

20  she -- she picked the guy out in the photo lineup, when

21  she saw the guy in person, she realized she picked the

22  wrong person.  When she told the detective this the

23  detective reassured her, that she picked the right

24  person and the victim reassured her, that she picked the

25  right person.  You know, maybe the detective should have

MILESTONE │ REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    went to the state attorney with this.

2        Q.   Now, Ms. Bethany wound up filing an affidavit

3    where she recanted her statement, correct?

4        A.   Correct.

5        Q.   Her testimony?  Okay.

6        A.   Correct.

7        Q.   And do you know who drafted her affidavit --

8        A.   It was --

9        Q.   -- for recanting --

10       A.   It was drafted, I believe at the law office,

11   Lisabeth Fryer.

12       Q.   Okay.  Were you present when she signed it?

13       A.   Yes.

14       Q.   With your work through Jeremiah Lyons

15   Investigations, how often have you -- how often have you

16   obtained a recantation of trial testimony?

17       A.   Gee, this might -- this might have been the

18   first.  You know, I don't know, so --

19       Q.   What about -- how about since?

20           MS. KEEN:  How about what?

21   BY MR. PHIPPS:

22       Q.   Since this one -- you said this would -- might

23   have been the first, have there been any other since

24   this one?

25           MS. KEEN:  I apologize.  It is a little bit

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900        www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1    blurry for some reason -- I'm a little bit muffly,

2    but thank you for repeating that.

3         THE WITNESS:  This may have been the only one.

4    So normally when I get involved in post-conviction

5    work, it's, you know, investigating, you know, the

6    case or whatever, and, you know, looking say it

7    might be -- what is it?  You know, when it -- and --

8    you know, where the counselor may have not -- you

9    know, come up a little short and different things

10   like that.  So -- but as far as I know, this may --

11   may have been the only case where I had a witness

12   recant.

13   BY MR. PHIPPS:

14      Q.   And do you work with any other law firms other

15   than the one that we've been discussing here today that

16   represented Mr. Valle-Ramos, doing this type of work?

17      A.   Yes.  Yes.  I do.

18      Q.   And what other law firms do you work for?

19      A.   The -- Boyers Law Firm in Miami, and several

20   law firms where I live in, by Port St. Lucie, Fort

21   Pierce area.  You know, when I lived there, I would do

22   -- do that work.  Cheney Mason, he was an attorney in

23   Orlando.  I've done -- you know him, I've done work for

24   him.  So --

25      Q.   Now did you -- strike that.

MILESTONE │ REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      THE REPORTER:  Is there any way to get clearer

2    audio from you, Mr. Phipps?

3      MR. PHIPPS:  Sure.  I don't usually I have a

4    problem.  I'll try and speak a little closer to my

5    microphone.

6      THE REPORTER:  That's clear.  Thank you.

7  BY MR. PHIPPS:

8    Q.   Part of our subpoena included a Schedule A of

9  information regarding your investigation in this case.

10  Were you able to recover any of these things that we

11  asked for?

12    A.   I had told your firm that I didn't have

13  anything.

14    Q.   Okay.  So when you met with Ms. Bethany, did

15  you record that conversation?

16    A.   Not that I know of.  I don't remember doing

17  so.

18    Q.   Did you take --

19      MS. KEEN:  Objection.  Form.  Sorry.  I was

20    muted to the -- did you record anything, it was

21    objection.  Form.

22  BY MR. PHIPPS:

23    Q.   Other than her recantation, did you acquire

24  any kind of statement from her?

25    A.   No.  Just that -- no.  Just what I already

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  told you.

2    Q.  Okay.  So as we sit here today, you don't have

3  any documents whatsoever regarding this investigation?

4    A.  I have e-mails between myself and the

5  attorneys.

6    Q.  You still are in possession of those e-mails?

7    A.  Yes.

8    Q.  They aren't technically under subpoena, now

9  we'd request obviously that you don't erase them or do

10  anything with them.

11    A.  I'm not -- I won't be --

12    Q.  I'm --

13    A.  I won't be insulted by that, Counselor.

14    Q.  I was going to say, I have to say that a lot

15  of times whenever somebody's like, oh yeah, we got this.

16  Oh.  And then we go and ask --

17    A.  I won't be insulted by -- I won't be insulted

18  by that, Counselor.  I've been doing this longer than

19  you've been alive.

20    Q.  Now, you spoke with Mr. Gonzalez too in this

21  case, correct?

22    A.  Yes.

23    Q.  And what do you recall about your interview

24  with him?

25    A.  He wasn't interested in -- in much.  He was

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    upset.  Well, he also told me that he was reassured, you

2    know, at the time of the trial, by the -- by the

3    detective.  And he was -- he really didn't want to

4    cooperate with me at all because he was upset that Mr.

5    Ramos was behind in restitution payments.  So he was

6    more upset about the restitution payments than whether

7    he got the identification correct or not.

8        Q.   So what did he say to you that made you think

9    -- that caused you to believe he thought his

10   identification wasn't correct?

11       A.   He just said -- I -- I said, listen, I said --

12   I forgot exactly how he put it, but I wanted to show him

13   pictures of Ramos, and he -- he wouldn't meet with me.

14   And he told me that basically that the guy owes him

15   money -- well, and because when I was talking to him

16   about that, he mentioned about the detective and he

17   mentioned about something I believe in -- in the court,

18   where -- where he was reassured also by the detective

19   that they picked the right person.  And with that, I

20   believe he reassured Bethany, I -- I'm not a -- 100

21   percent clear on all of this, I'm trying to remember.

22   But I remember him being upset and not wanting to

23   cooperate because he was telling me that the burglar got

24   away with a lot more -- you know, he had a lot of --

25   like, he had like, basically got away with thousands and

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1 thousands of dollars' worth of -- worth of stuff and

2 that the restitution was only for a small amount

3 compared to that and that the guy wasn't even paying the

4 restitution for that.  So he was more upset about that

5 than anything else.

6     Q.   Okay.  When you -- how did you speak with him,

7 did you meet with him in person or was it was over the

8 phone?

9     A.   He wouldn't meet with me, I spoke to him over

10 the phone.

11     Q.   Okay.  And how long was your conversation with

12 him?

13     A.   Oh, I don't -- not -- not very long.  Not very

14 long.

15     Q.   And when you say that the detective reassured

16 him, what -- in what context did the -- did -- was he --

17 did he need reassurance?

18     A.   You know, I don't know.  I don't know.  You

19 know, I was -- I was talking to him about the person

20 that I wanted -- and I wanted him to look at this other

21 picture, and he basically didn't need to look at the

22 other picture because he was told that he already picked

23 the right person.

24     Q.   Did you ask him if he was reassured or did he

25 volunteer that?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.  He -- well, I wouldn't know without him saying

2 it

3    Q.  With Ms. Bethany, you've indicated that she

4 was willing to speak with you and immediately

5 volunteered that she was unsure about her

6 identification?

7    A.  Yes, sir.

8    Q.  You asked her what type -- what if anything,

9 that the detectives did to reassure her or get her to

10 continue with her testimony?

11      MS. KEEN:  Objection.  Asked and answered.

12 BY MR. PHIPPS:

13    Q.  You can answer, Mr. Lyons.

14    A.  I agree with the counselor.

15    Q.  Well, that's okay.  You can still answer.

16    A.  That's okay.  That's okay.

17    Q.  You have to answer, sir.

18    A.  That's okay.

19    Q.  You stated that Ms. Bethany had issues, I

20 guess, with Mr. Ramos's complexion; is that correct?

21    A.  That's correct.

22      MS. KEEN:  Objection.  Form.

23 BY MR. PHIPPS:

24    Q.  Okay.  And --

25    A.  She also told me that in the photo lineup, the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1   photo array, that he was the only one with facial hair

2   and that encouraged her to pick that picture.

3       Q.   Did you see the photo lineup that she was

4   given?

5       A.   I believe I did.  And I was wondering why his

6   defense attorney didn't fight it at that time because it

7   was a terrible photo array.

8       Q.   And what was terrible about it?

9       A.   Well, he was the only one with facial hair.

10      Q.   Okay.

11      A.   When the target of the -- of the -- when the

12  target of the lineup is different than everybody else,

13  that's a problem.

14      Q.   And you think that's so something that his

15  defense attorney should have challenged the --

16      A.   Should have challenged --

17      Q.   -- court?

18      A.   Should have challenged, yes.

19          MS. KEEN:  Objection.  Calls for a legal

20  conclusion.

21  BY MR. PHIPPS:

22      Q.   Were there any other discrepancies in the

23  lineup that you recall?

24          MS. KEEN:  Objection.

25          THE WITNESS:  I --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1       MS. KEEN:  Form.  Excuse me.  It calls for

2   speculation.  Foundation.  You can answer.

3       THE WITNESS:  I -- I -- I think something about

4   an Afro or something like that.  I don't -- I don't

5   really remember.  I'm trying to remember the best I

6   can.

7   BY MR. PHIPPS:

8       Q.   Did Ms. Bethany tell her -- discuss who

9   provided her with the photo lineup?

10      A.   I don't remember that.

11      Q.   And is that -- you said you were trying to

12  show her a picture of another individual; is that

13  correct?

14      A.   It would've been Mr. Ramos.

15      Q.   Oh, you -- so you're trying to show her

16  another -- a different picture of Mr. Ramos?

17      A.   Oh, no.  Wait a minute.  Wait a minute.  Wait

18  a minute.  I'm sorry.  It was a picture of somebody

19  else, I forget the person's name, he's -- he's dead now,

20  who looks a lot like Mr. Ramos.

21      Q.   Do you recall if that individual's named Amos

22  Matthews -- Matthew Ortiz?

23      A.   It could be.

24      Q.   This other individual.  How did you become

25  aware of this person?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.  I got the information from the attorney.

2    Q.  And what information was given to you about

3  Mr. Ortiz, or this individual?

4    A.  Just that he was believed to be somebody who

5  was committing other burglaries, I believe, and in the

6  area.

7    Q.  And did you show this -- that picture to

8  Ms. Bethany?

9    A.  I believe I did.

10    Q.  Recall what her statement was upon viewing the

11  photo?

12    A.  No.  I -- I -- I really don't.

13    Q.  Do you recall whether or not she identified

14  this person as having been the individual she saw

15  burglarizing Mr. Gonzalez's house?

16    MS. KEEN:  Objection.  Calls for speculation.

17  Foundation.

18  BY MR. PHIPPS:

19    Q.  You can answer.  Did she recall -- did she

20  identify that individual?

21    A.  She -- she may have said that he looks like

22  the individual.

23    Q.  That attempt to -- was this the photo that you

24  stated that you were trying to show Mr. Gonzalez as

25  well?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.  Probably.

2    Q.  Now in your work with -- your investigative

3  work with these defense law firms, how often have you

4  been called to testify in a civil matter like this?

5    A.  Not often at all, if any.

6    Q.  Okay.  Have you ever been deposed in a civil

7  matter?

8    A.  I think I have, but I'm -- you know, I'm --

9  outside of a divorce, probably not, so --

10    Q.  Okay.  Have you ever testified in a civil

11  matter that was the result of an overturned conviction?

12        MS. KEEN:  Objection.  Calls for speculation.

13        THE WITNESS:  No.

14  BY MR. PHIPPS:

15    Q.  How many cases have your -- that you've worked

16  on in an investigative capacity with Jeremiah Lyons

17  Investigations, how many of those cases have resulted in

18  overturned convictions?

19    A.  You -- are you talking about where I got

20  involved in the post-conviction end of it or --

21    Q.  Yes.

22    A.  You know, I don't -- I don't do many, the --

23  of the post -- I've done some, I don't do many.  A lot

24  of times I don't know if -- if they're, you know,

25  overturned or not.  I know I've -- I'm involved in one

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1 right now and -- in the Panhandle where it's a murder

2 case and we're waiting for the Appeals Court to -- to

3 rule on a -- you know, on a post-conviction.

4    Q.  And what law firm is that with?

5    A.  Pinnell Law, Bill Pinnell.

6    Q.  And of the cases that you've worked for and

7 regarding post-conviction relief, do you know how many

8 of them have subsequently resulted in a civil trial or a

9 civil lawsuit?

10    A.  None that I know of.

11    Q.  We understand that this case here is a result

12 of Mr. Ramos filing a civil lawsuit, correct?

13    A.  Correct.

14    Q.  Okay.  And this is the only one that you're

15 aware of where that has happened regarding your work

16 during post-conviction relief?

17      MS. KEEN:  Objection.

18      THE WITNESS:  Yes.

19      MS. KEEN:  Lacks foundation.  Calls for

20 speculation.

21 BY MR. PHIPPS:

22    Q.  Your answer was yes, this is your only one?

23    A.  Yes.

24    Q.  Does your business do any kind of marketing or

25 advertising?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.   No.

2    Q.   What do you do to go out and pick up new cases

3  or new clients?

4    A.   Word of mouth.  You know, word of mouth.

5  People are happy with me.

6    Q.   Of these criminal defense firms that you've

7  worked with, have you ever worked for a law firm that

8  represents plaintiffs in civil cases?

9      MS. KEEN:  Objection.  Foundation.

10      THE WITNESS:  I -- some -- no.  I really don't

11   know.  I don't believe so, but I don't know.

12  BY MR. PHIPPS:

13    Q.   So if one of the firms that you work for, does

14  plaintiff work --

15    A.   I work for --

16    Q.   -- is that --

17    A.   -- I work for attorneys that do criminal work.

18    Q.   Okay.

19    A.   I'm a criminal investigator.

20    Q.   And if they happen to do plaintiff work as

21  well, that --

22    A.   I'm a criminal investigator.  I work for

23  attorneys that do criminal work.  I don't work for

24  marriage attorneys or stuff like that.  I do criminal

25  investigations.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    Q.  And how many times have you testified in court

2  as an -- as a private investigator?

3    A.  Only maybe less than a handful.

4    Q.  Were any of those involving post-conviction

5  relief?

6    A.  Yes.

7    Q.  Do you recall the specifics of those cases?

8    A.  Yeah.  It was -- it happened in the -- in the

9  Clearwater area, and it was a guy who was doing time for

10  shaking baby.  And I testified in -- in that case, where

11  I -- I found doctors, you know, I went to Dayton

12  Children's Hospital in Ohio, got a couple of experts on

13  shaken baby, you know, and different things like that.

14  And I guess basically -- I -- I mean, I testified in

15  that, but it was only like maybe three or four questions

16  that were asked of me and that was it.

17    Q.  In the other cases where you've testified, do

18  you recall any of your testimony in those places in the

19  capacity of regarding witness statements?

20    A.  No.  You know if -- if I could just say, I

21  don't -- in -- in a court, I don't have to testify

22  because they have the witness testify.  You know, with

23  me, it would only be hearsay, so that's why I don't -- I

24  don't testify.

25    Q.  So in some instances, your investigative work

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1   has, should we say, uncovered witnesses that weren't

2   previously interviewed; is that correct?  Would that be

3   correct to say?

4         MS. KEEN:  Objection.  Form.

5         THE WITNESS:  You know, I -- I -- I -- I don't

6    know if I uncover say additional witnesses.  You

7    know, I'm -- a lot of times I'm going off the police

8    report. It would have to -- if maybe my client said

9    that, you know, they were with so-and-so at the time

10    or, you know, something like that or -- you know,

11    maybe I would interview, you know, somebody like

12    that.  But I -- I -- I wouldn't say that I uncover

13    witnesses.

14   BY MR. PHIPPS:

15    Q.   Okay.  Do you go and re-interview witnesses

16   that are already on police reports?

17    A.   Well, that's what I should be doing, yes.

18    Q.   Okay.  How often does that -- how often do

19   those interviews result in changes in testimony or

20   changes in statements?

21         MS. KEEN:  Objection.  Foundation.  Form.  And

22    calls for speculation.

23         THE WITNESS:  You know, I don't -- I don't know

24    if it changes, you know, anything, you know, I -- I

25    really don't.  I really don't.  I -- I interview

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    somebody -- you know if a -- if a defense

2    investigator didn't go out and interview witnesses,

3    then we only have the prosecution side of it, right?

4    So you know -- you know, so you go out, you talk to

5    the witnesses and maybe they'll say the same thing

6    they told the cops, maybe -- maybe they won't, you

7    know, but you just go out, and you talk to

8    witnesses, that's all.

9    BY MR. PHIPPS:

10       Q.   Have you ever had an instance where you

11   interviewed somebody that wound up giving favorable

12   testimony to the state that wasn't previously disclosed

13   or uncovered?

14       A.   Did I interview somebody and then they gave me

15   favorable information to the state --

16       Q.   Yeah.

17       A.   -- that the state didn't already know about?

18       Q.   Yes.

19       A.   Not that I can remember, no.

20       Q.   If that were to occur, would you feel any

21   obligation to disclose that information?

22           THE WITNESS:  I would --

23           MS. KEEN:  Objection.  Incomplete hypothetical.

24    You can answer.

25           THE WITNESS:  I would disclose it to the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1     attorney I'm working for, and then it would be up to

2     him or her, right?

3   BY MR. PHIPPS:

4      Q.   Fair enough.  In this particular matter with

5   Mr. Valle-Ramos, did you uncover any information or any

6   statement that would -- scratch that.  Strike that.

7   Strike that question.

8           In your investigation in the matter involving

9   Mr. Valle-Ramos, did you speak to any witness or receive

10   any testimony or statement that corroborated his

11   conviction?

12      A.   Just Gonzalez.

13           MR. PHIPPS:  Just give me a few minutes.  I

14   just got to look over a couple notes.  I think

15   that's all -- that all I have for you today, sir.

16           THE WITNESS:  Okay.

17           MR. PHIPPS:  We can go off the record.  Come

18   back at 1:53.

19           (A recess was taken.)

20           THE REPORTER:  Back on.  You can continue.

21   BY MR. PHIPPS:

22      Q.   Mr. Lyons, you stated before that you were

23   paid $2,500 for this matter; is that correct?

24      A.   I believe so, yes.

25      Q.   Okay.  And was that money paid by Mr. Valle-

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Ramos or by his attorney's firm or some other way?

2        A.   It probably came from him.

3        Q.   Do you recall if it was in a check, cash?

4        A.   It was -- no.  It was not cash.  It was

5    probably a -- a check from the law firm.

6        Q.   Okay.  Is that typically how you are paid for

7    your services from the law firms that represent the

8    clients?

9        A.   Yes.  Not all the time, some attorneys like to

10   do it differently.

11       Q.   And I know you deal mostly in the criminal

12   world, so I don't know if you understand what this term

13   is, but in the civil world we have what's called a

14   letter of protection.  Have you ever heard that phrase

15   before?

16       A.   Yes.

17       Q.   Have you ever entered into a letter of

18   protection for your services?

19       A.   Well, maybe you should tell me what a letter

20   of protection is.

21       Q.   Have you ever entered in an agreement where

22   you've promised to do work or provide investigative

23   services in a matter where your compensation will be

24   determined at a later date as a result of any kind of

25   legal settlement?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1    A.  No.

2    Q.  And for the $2,500 that was paid, was that a

3  standard fee or was there an itemized bill for that?

4    A.  Just a -- a fee, that's it.

5    Q.  And during your investigations, do you keep

6  any kind of journal or notes as to the work you're

7  doing?

8    A.  I'm not really good at that.  You know, I take

9  -- I take notes.  Yeah.  I -- I mean, as far as a

10  journal, I don't know what you mean by a journal, but,

11  you know, I would -- I would take notes.  I have a

12  yellow pad, you know?

13    Q.  Okay.  And do you have a yellow pad that you

14  took notes on in this matter?

15    A.  I don't think so.  I probably had one with me,

16  but I don't know if I took -- I don't know what notes I

17  took.  I really don't, I don't have anything, so I don't

18  know what notes I took.  I mean, I'm -- I'm sure I

19  jotted something down, you know, I mean, somewhere, but

20  I don't know.

21    Q.  And when you provide -- when you provide your

22  bills for your services, are they all standard fees or

23  do you ever have any kind of itemized bills for these

24  investigations?

25    THE WITNESS:  It's -- I get a retainer --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1     MS. KEEN:  Objection.  Foundation.  Sorry, go

2  ahead.

3     THE WITNESS:  Okay.  I get a retainer, and the

4  retainer normally covers investigative hours and

5  travel time.  All right?  And -- because basically

6  that's my time, whether I'm doing an investigation

7  or I'm traveling, that's my time.  So the retainer

8  basically covers that.  Expenses are billed

9  separately.

10  BY MR. PHIPPS:

11     Q.   And can you give me an example of what your

12  expenses are?

13     A.   Well say if I travel, hotels, airfare, you

14  know, stuff like that.  If it's -- if I have to go a

15  long way, it may be -- and I'm driving, it may be gas

16  and tolls.  You know, if it's a long, long way, I may

17  rent a car, so it's -- it's for stuff like that.

18     Q.   And do you recall how much time you put in, in

19  this matter?

20     A.   It wasn't a lot and -- but no, I mean, you

21  know, I spoke with Beth, I -- I don't know the last

22  name, so I'm just calling her that, and, you know, spoke

23  with Gonzalez.  I tried to go to his house, he wasn't

24  home and -- and that's why we spoke on the -- on the

25  phone.  So that took -- you know, it was an hour and a

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 half each way going to his house. And, you know, I did

2 that and then I was present for the -- the post-

3 conviction, you know, what whatever it was to overturn

4 the -- the verdict, I was I was present for that. And

5 so that -- that's about it, you know?

6    Q. Did you testify in the post-conviction

7 proceeding?

8    A. No. I was there. I -- I -- I thought I may,

9 but I didn't.

10    Q. And I might have asked this before, but I

11 don't think I did, who did you speak with first, Ms.

12 Bethany or Mr. Gonzalez?

13    A. Bethany.

14    Q. Did you inform Mr. Gonzalez that Ms. Bethany

15 had recanted her testimony, her identification?

16    A. I don't remember doing so.

17    Q. About how long was the conversation with

18 Mr. Gonzalez?

19    A. I spoke to him a couple of times, but it was

20 only, you know, a short -- a short period of time. He

21 wasn't interested, so -- it doesn't -- doesn't take long

22 for somebody to tell you they're not interested.

23    Q. Do you recall if he made any statements

24 confirming --

25    A. What was that?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Q.  -- or --

2    A.  What -- what --

3    Q.  Sorry.  Do you recall if he made any

4 statements in your conversations where he reiterated his

5 positive identification of Mr. Ramos?

6    A.   Just that he -- he felt confident because the

7 detective, and he said that the witness identified him

8 also.  So he was reassured, you know, by both of that,

9 but -- you know --

10    Q.  And --

11    A.  -- the witness and he spoke together with the

12 detective before the trial, and -- and that never should

13 have happened.

14    Q.  And did Mr. Gonzalez confirm this?

15    A.  No.  No.

16    Q.  Did he confirm that he spoke with the witness

17 --

18    A.  He --

19    Q.  -- and --

20    A.  -- he confirmed that the witness identified

21 the same guy.

22    Q.  And you didn't inform him during your

23 conversation that she had now recanted?

24    MS. KEEN:  Objection.  Asked and answered.

25 Lacks foundation.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  BY MR. PHIPPS:

2    Q.  I believe you did say that you didn't recall.

3  Okay.  I guess my last question, just for the record,

4  how many people did you interview in this matter?

5      MS. KEEN:  Objection.  Asked and answered.

6      MR. PHIPPS:  I don't believe I -- answered that

7    one.  I went over how many -- I went over the

8    witnesses, I didn't ask how many.

9      THE WITNESS:  Just these two.

10 BY MR. PHIPPS:

11   Q.  Those two?  As part of your investigation, did

12 you speak with Mr. Ramos?

13   A.  No.

14   Q.  Your -- you earlier said that Mr. Ortiz, the

15 person where I'm assuming was the other individual they

16 wanted to show you a photo of, he was presented to you

17 by Defense Counsel, correct?

18   A.  Yes.

19   Q.  Did you do any investigation as to -- as to

20 him?

21   A.  He's dead.

22   Q.  I mean, did you look into him at all, what he

23 was doing at the time?  Was he dead at the time this

24 happened?

25      MS. KEEN:  Objection.  Foundation.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    THE WITNESS:  I may have, but I don't remember.

2  It wouldn't be unusual, but I -- I don't remember.

3    MR. PHIPPS:  Okay.  That's all the questions I

4  have for you.  I don't know if Ms. Keen's going to

5  have any questions.

6    MS. KEEN:  I have a -- just a short handful.

7  Hopefully not more than a couple minutes.  Just --

8  asking clarification on a couple of things we can

9  move right into that now, unless anyone needs a

10   break.  I think it'll just be couple minutes total.

11    MR. PHIPPS:  I'm good now.

12    MS. KEEN:  Okay.  How about you, Mr. Lyons?

13    THE WITNESS:  I'm fine.  Thank you.

14      CROSS-EXAMINATION

15  BY MS. KEEN:

16    Q.  Okay.  Thank you for being here.  In -- you

17  testified that you were paid a fee, you think it was

18  $2,500 for your investigative work in this matter,

19  correct?

20    A.  Correct.

21    Q.  Was it your understanding that you were going

22  to be paid that amount regardless of the outcome of what

23  the witnesses told you?  In other words, that's the fee

24  for your work, regardless of any particular content you

25  obtained?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    A.   Yes.  I -- it's in my retainer -- well, I

2  don't -- you know, when I have a retainer, I -- I cannot

3  guarantee an outcome, you know, I'm being paid for the

4  work that I do.

5    Q.   And was it your understanding that you were

6  engaged by the attorney to do investigative work as part

7  of her legal representation of Mr. Valle-Ramos?

8    A.   Yes.

9    Q.   Okay.  You were also asked about notes, you

10  said you probably took some notes, but you can't recall

11  specifically.  My question is: Have you moved or is

12  there any specific reason why you may no longer possess

13  notes that you would've once possessed regarding your

14  work on this case?

15    A.   Yes.  I -- I now live in Maryland, and so I

16  moved from Port St. Lucie to Maryland.  And, you know, I

17  -- I -- I figured that this was over, there's other

18  cases that I've worked on that I figured they were over

19  and, you know, so I no longer have, you know, stuff that

20  I would've normally had.

21    Q.   You were -- okay.  So now -- thank you.  The

22  other thing I wanted to ask you about was, you were

23  asked a bunch of questions about what Ms. Bethany told

24  you when you were talking to her.  Do you recall being

25  asked questions by Counsel --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.  Yes.

2    Q.  -- regarding your conversation?  Okay.  And

3  today, when you've been answering those questions, have

4  you been looking at or referencing Ms. Bethany's

5  affidavit in front of you or are you --

6    A.  I have it over --

7    Q.  -- testifying from memory?

8    A.  I have it over here and -- but I really

9  haven't had an opportunity, you know, to look at it.

10    Q.  Okay.  Can I ask you to look at it?  Well,

11  I'll -- I can put it on the screen.

12    A.  I have it.  I have it in front of me.

13      MS. KEEN:  Okay.  I guess what I'll mark it as

14    exhibit -- how are you doing exhibit numbers,

15    counsel? Is it like sequential or should I just do

16    Exhibit 1, Lyons' Exhibit 1?

17      MR. PHIPPS:  I usually do numbers and depos and

18    letters in trial.

19      MS. KEEN:  Okay.  So why don't we just call it

20    -- with your agreement, we'll call it Lyons'

21    Deposition Exhibit 1.

22      MR. PHIPPS:  Sounds good.

23        (Exhibit 1 was marked for identification.)

24  BY MS. KEEN:

25    Q.  Okay.  Let me get that.  Well, if you have in

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  front of you -- and do you have a document that's called

2  -- it's -- the title is Affidavit of Bethany Szewezyk?

3      A.  Yes.

4      Q.  Okay.  And it's dated December 1st, 2021?

5      A.  Yes.

6          MS. KEEN:  Okay.  I'm just going to put it on

7      the screen so that the record is clear that we're

8      looking at the same document.  Do I have permission

9      to share?

10         THE REPORTER:  Yes.

11         MS. KEEN:  Okay.

12         MR. PHIPPS:  It's the little green arrow at the

13     bottom there.

14         MS. KEEN:  Do you all see the affidavit?

15         THE WITNESS:  I do.

16         MS. KEEN:  Okay.  And Zach, you see that as

17     well?

18         MR. PHIPPS:  Yep.  I can see it.

19         MS. KEEN:  Okay.  Great.

20  BY MS. KEEN:

21      Q.  Is this the document that you have a copy of

22  in front of -- in your home with you, Mr. Lyons?

23      A.  Yes.

24      Q.  Okay.  And is this the affidavit that you

25  recall being present for the signing of at the law firm?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Yes.

2    Q.   And in Paragraph 4, do you see that Ms.

3  Bethany has sworn, "During the photographic lineup

4  identification process Detective Michael Stanley told me

5  that the homeowner, Mr. George Gonzalez, had confidently

6  identified Mr. Valle-Ramos as the individual who

7  burglarized his home."  Do you see that in Paragraph 4?

8    A.   Yes.  I do.

9    Q.   As you sit here today, is that your

10  understanding of Ms. Bethany's -- of what Ms. Bethany

11  was saying, as far as -- let me re-ask that.  As you sit

12  here today, is that a true and accurate statement of

13  Ms. Bethany's recollection as far as you know?

14    A.   Yes.

15    Q.   So when you testified earlier that you

16  couldn't recall specifically when the detective told

17  Ms. Bethany that Gonzalez, the victim, had already

18  identified the same guy, does this refresh your

19  recollection that the detective told Ms. Bethany that

20  during the photo ID procedure?

21    A.   Yes.

22    Q.   Okay.  You testified earlier today that you --

23  Mr. Gonzalez had also received reassurance from the

24  detective that the guy he picked, named Valle-Ramos, was

25  also who the eyewitness picked.  Do you recall that

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1 testimony?

2     A.   Yes.

3     Q.   As you see here today, can you recall whether

4 the detective told Mr. Gonzalez that during the photo ID

5 procedure or sometime after or both; do you recall?

6     A.   I -- I don't know.  All I -- I remember Mr.

7 Gonzalez just telling me that both the detective and the

8 witness, I -- you know, the detective told him he had

9 the right guy, and the witness also identified the

10 person.  So he felt, you know, good about it because the

11 detective told him and -- and the witness also

12 identified.

13     Q.   Last area.  Regarding what Ms. Bethany told

14 you, I believe you testified earlier that she -- one of

15 the reasons she picked -- or strike that.

16         The -- I believe you testified that she told

17 you she picked Mr. Valle-Ramos from the photo array

18 because he was the only one with an Afro style haircut;

19 is that correct?

20     A.   I think what I said was facial hair, but now

21 I'm reading the affidavit, and you're right, it's an

22 Afro style haircut.

23     Q.   Well, you also testified about Afro style, but

24 does reviewing the affidavit refresh your recollection

25 as to what she said was his characteristic that made her

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  pick Valle-Ramos out of the photo ID?

2      A.   Just that he was the only one that had this.

3      Q.   That had what?

4      A.   I guess, the Afro -- the -- the Afro style

5  haircut.

6      Q.   Okay.

7      A.   And I believe -- I believe facial hair, but

8  I'm -- you know, I -- I -- now that I'm reading this,

9  I'm saying I could be wrong with that.

10     Q.   You're doing your best to recall the

11  conversation --

12     A.   Yes.  I am.

13     Q.   -- as you sit here today?

14          Okay.  Very good.  Well, thank you very much

15  for your time.  I have no further questions at this

16  time.

17          MR. PHIPPS:  I just have just a couple

18  redirects.

19               REDIRECT EXAMINATION

20  BY MR. PHIPPS:

21     Q.   Mr. Lyons, what did you do to prepare for

22  today, for this deposition?

23     A.   I --

24     Q.   And before you answer -- sorry, before you

25  answer that, but if you spoke to any attorney, I want to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   know if you spoke to an attorney, but do not tell me

2   anything about the substance of the conversation.

3      A.  I spoke with Ms. Keen yesterday.

4      Q.  Okay.

5      A.  And she sent me the affidavit because I -- I

6   don't have any paperwork --

7      Q.  Okay.

8      A.  -- so she sent it to me.  Just like your

9   office today also sent me -- because I don't have -- I

10  -- I -- I don't even -- I can't even find a subpoena,

11  that they sent me a copy of the subpoena, so I would be

12  able to, you know, get on the Zoom and to do this.

13     Q.  Understood.  Other than the affidavit, what

14  other documentation did you review for today?

15     A.  That's it.  I -- I went -- well, to be honest,

16  I went through my e-mails to see if there was anything

17  there, and there was nothing.

18     Q.  Currently, as we sit here today, how many

19  cases are you currently investigating that involve post-

20  conviction relief or --

21     MS. KEEN:  I'm just going to -- I'm sorry.  I'm

22   going to object that this is outside the scope of my

23   cross.  Proceed.

24     MR. PHIPPS:  Well, you let me -- let -- all

25   right.  That's fine.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  BY MR. PHIPPS:

2   Q.  When we were discussing payment earlier and

3  you had -- and I had asked you previously the question

4  about the letter of protection, you said that you knew

5  what one was, but when I explained to you, well, my

6  definition of what it was you -- you've indicated you're

7  not -- you've not entered any agreement regarding

8  compensation; is that correct?

9   A.  Right.  I mean, a letter of protection, the

10 way you described it to me, was foreign to me.  I don't

11 --

12  Q.  Okay.

13  A.  You know, it's not the way I -- I do -- you

14 know, I work, that's all.

15  Q.  Okay.  And what is your understanding of a

16 letter of protection?

17  A.  I don't have one, evidently, so -- I mean, I

18 -- that's -- that -- that might be a -- a legal term that

19 lawyers use.  You know, I -- I have a retainer, and I

20 guess that's my letter of protection.  You know, I --

21 you know, is my retainer, that's -- that's all.

22  Q.  And I guess with that understanding, have you

23 ever been compensated regardless of an agreement as a

24 result of a settlement or jury verdict or verdict

25 otherwise, in a civil proceeding for your investigative

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1 work?

2   A.  No.

3     MR. PHIPPS:  That's all the questions I have

4 for you, unless you have --

5     MS. KEEN:  I'm all done here, too.  Thank you

6 very much, Mr. Lyons.

7     THE WITNESS:  All right.  Thank you.

8     THE REPORTER:  All right.  Will the witness be

9 reading or waiving?

10     THE WITNESS:  What was that?

11     THE REPORTER:  Would --

12     MR. PHIPPS:  Ms. Keen, do you want to --

13     THE REPORTER:  -- you be reading or waiving?

14     THE WITNESS:  I still don't understand what you

15 said.

16     THE REPORTER:  Counsel?

17     MR. PHIPPS:  Yeah.  Mr. Lyons, if somebody is

18 to order a transcript of today's deposition, you

19 have the right to review your transcribed testimony

20 and you can comment if there were -- if it was taken

21 down incorrectly.  A lot of people waive that right,

22 and they assume that it's going to be transcribed

23 correctly.  Or you can retain that right and have a

24 -- it sent to you before it's typed up to make any

25 corrections.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    THE WITNESS:  If somebody orders a copy, I

2  would like to have a copy.

3    MR. PHIPPS:  Okay.

4    THE REPORTER:  What is a good e-mail to send to

5  you?

6    THE WITNESS:  J-L-Y-O-N-S-P-I, @yahoo.com.

7    THE REPORTER:  Perfect.  Mr. Phipps, would you

8  like to order?

9    MR. PHIPPS:  Not at this time.

10    THE REPORTER:  And what about you, Ms. Keen?

11    MR. PHIPPS:  You're on mute.

12    MS. KEEN:  Sorry.  Not at this time.

13    THE REPORTER:  Okay.  Let me get off the

14  record.

15     (Deposition concluded at 2:17 p.m. ET)

16

17

18

19

20

21

22

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1          CCERTIFICATE OF OATH

2

3   STATE OF FLORIDA

4   COUNTY OF ORANGE

5

6      I, the undersigned, certify that the witness in the

7   foregoing transcript personally appeared before me and

8   was duly sworn.

9

10   Identification:  Produced Identification

11

12

13

14

15   _____

16          Nicole De Blois

17          Court Reporter, Notary Public

18          State of Florida

19          Commission Expires: 07/27/29

20          Commission Number:  HH 702614

21

22

23

24

25

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          C E R T I F I C A T E

2

3     STATE OF FLORIDA)

4     COUNTY OF ORANGE)

5

6          I, Nicole De Blois, Court Reporter and Notary

7     Public for the State of Florida at Large, do hereby

8     certify that I was authorized to and did report the

9     foregoing proceeding, and that said transcript is a true

10    record of the said proceeding.

11

12         I FURTHER CERTIFY that I am not of counsel for,

13    related to, or employed by any of the parties or

14    attorneys involved herein, nor am I financially

15    interested in said action.

16

17    Submitted on: November 17, 2025.

18

19

20

21

22    _____

23    Nicole De Blois

24    Court Reporter, Notary Public

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Affidavit of Bethany Szewczyk
Regarding Case No. 1998-CF-000242 Valle-Ramos, Jorge R.

1. I, Bethany Szewczyk, testified at trial as a witness for the State of Florida in case number 1998-CF-000242.
2. I am now recanting my testimony identifying Jorge R. Valle-Ramos as the individual who entered the driver's side of the getaway vehicle.
3. I selected Mr. Valle-Ramos' photograph because he was the only individual in the photographic lineup with an afro-style haircut.
4. During the photographic line up identification process, Detective Michael Stanley told me that the homeowner, Mr. George Gonzalez had confidently identified Mr. Valle-Ramos as the individual who burglarized his home.
5. If I had been presented with a photographic lineup that included Amos Matthew Ortiz, I would have identified Mr. Ortiz as the individual who entered the driver's side of the getaway vehicle.
6. When I arrived in court for trial, I observed that Mr. Valle-Ramos had darker skin than the individual who entered the driver's side of the getaway vehicle.
7. During trial, after the victim Mr. George Gonzalez testified but before I testified, Detective Michael Stanley introduced me to, George Gonzalez. Mr. Gonzalez then told me that he was certain that Mr. Valle-Ramos was one of the burglars before my testimony.
8. I no longer identify Jorge R. Valle-Ramos as the individual who entered the driver's side of the getaway vehicle.

Under penalty of perjury, I swear or affirm that the above statements are true and correct.

December 1, 2021

Affiant: Bethany Szewczyk

WITNESS my hand and official seal in the State of Florida and County of Seminole.

NOTARY PUBLIC

TRINAISE L. MADDOX-SUDDITH
MY COMMISSION # GG 962071
EXPIRES: February 25, 2024
Bonded Thru Notary Public Underwriters

EXHIBIT
1

**407.423.9900**
**Fax 407.841.2779**
**Toll Free 855-MYDEPOS**

**MILESTONE I REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY



1   JORGE VALLE-RAMOS V. CITY OF ORLANDO, MICHAEL STANLEY

2   AND DANIEL BRADY       **ORIGINAL**

3   CASE NO. 6:24-CV-01276-CEM-DCI

4   _____/

5   DEPOSITION OF MICHAEL STANLEY - AUDIO TRANSCRIPT

6   DATE:     OCTOBER 10, 2013

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1  PRESENT

2  CARLI CITRARO, ESQUIRE - ATTORNEY FOR JORGE VALLE-RAMOS

3  COLIN SMITH, ESQUIRE

4  RAYCHEL GARCIA, ESQUIRE - ASSISTANT STATE ATTORNEY

5  MICHAEL STANLEY - DEPONENT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1              PROCEEDINGS
 2          MS. CITRARO:  Okay.  We're on the record.  This
 3      is 2013CF5146, State v. Jorge Valle-Ramos.  Carli
 4      Citraro on behalf of Mr. Valle-Ramos.  We also have
 5      here from the PD's office, Colin Smith.  From the
 6      State Attorney's Office, we have Raychel Garcia.
 7      Here to be deposed, we have --
 8              DIRECT EXAMINATION
 9          BY MS. CITRARO:
10      Q.  Can you say your name for the record?
11      A.  Michael Stanley.
12      Q.  Great.  Have you been deposed before?
13      A.  Yes, I have.
14      Q.  Good.  You've been sworn today?
15      A.  Yes, I have.
16      Q.  Good.  It's 1:38 p.m.  It's October 10, 2013.
17  Do you have any questions about how a deposition works?
18      A.  No, I do not.
19      Q.  Okay.  Great.  Do you recall this case?  This
20  is from April of this year.
21      A.  Yes, I do.
22      Q.  Okay.  Great.  You were the detective
23  assigned?
24      A.  That's correct.
25      Q.  Okay.  When was the -- what -- how did you
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1  begin your involvement with this case?

2       A.   My involvement was initiated upon just the

3  assignment to myself.  I was the detective responsible

4  for the incidents occurring in that geographic area.

5       Q.   What did you do first?

6       A.   Reviewed the report.  Reviewed the statements

7  and --

8       Q.   Did you speak with anybody?

9       A.   -- that was the beginning.  I spoke with the

10  victim and later on I spoke with the witnesses.

11       Q.   Okay.  Victim Mr. Gonzalez?

12       A.   That's correct.

13       Q.   What do you recall him telling you?

14       A.   Just that he had come home, observed some

15  people in his residence.  He gave chase to at least two

16  of those people.  While that was going on, he was

17  attempting to notify law enforcement to come and assist

18  him.

19       Q.   He identified three separate people, right?

20       A.   He stated there were three separate people.

21  Correct.

22       Q.   Okay.  Did he say if he knew if there were

23  more people?

24       A.   Other than three, no, he did not.

25       Q.   Okay.  Do you have some idea, like, what the



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  involvement of each suspect was?  Like, he told you,

2  like, the first one did this, the second one this, third

3  one did this?

4      A.   More or less, yes.

5      Q.   Okay.  Do you have any idea which one of these

6  people is suspected to be Mr. Valle-Ramos?

7      A.   I believe in my narrative, I believe it was

8  suspect number 1.

9      Q.   Number 1.  So --

10     A.   That I -- that I've noted in there.  Suspect

11 number 1, I believe is Mr. Ramos -- Valle-Ramos.

12     Q.   So the first person that Mr. Gonzalez came in

13 contact with would have been Mr. Valle-Ramos?

14     A.   Correct.  That he came into contact with on

15 the ground floor of his residence.

16     Q.   Okay.  So he was the one who just fled

17 immediately?

18     A.   I believe so.  Yes.

19     Q.   Okay.  Based on Mr. Gonzalez's story?

20     A.   That's correct.

21     Q.   Okay.  So Mr. Gonzalez didn't ID him as the

22 guy that he pepper-sprayed and was punched by, correct?

23     A.   I believe that's correct, yes.  Yes.  I'd have

24 to revisit his statement after the fact that he

25 provided, but I do not believe that he was battered or

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 pepper sprayed, the other two.

2      Q.   Okay.

3      A.   I do not believe that Mr. Ramos -- Valle-Ramos

4 was those other two that he was battered by or pepper-

5 sprayed.

6      Q.   Based on the identification of the Afro-style

7 hairdo?

8      A.   That's correct.  After the fact.  Yes.

9      Q.   Okay.  There was quite a bit of evidence that

10 was collected, Pop Tart wrappers, knife, and backpack.

11 What kind of DNA evidence was trying to be collected

12 here?

13      A.   At the time, I do not believe any -- FDLE is

14 not currently conducting touch DNA testing on anything

15 other than a violent crime.

16      Q.   Okay.

17      A.   So I do not believe that any of that was --

18 was tested.

19      Q.   How about fingerprints?

20      A.   I would have to refer to the crime scene

21 technician's report.  I did not respond to the scene at

22 the time or process the scene personally.

23      Q.   Do you know if any fingerprints were taken or

24 lifted or?

25      A.   I -- I would -- again, I'd have to refer to



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  the crime scene technician's report.  I -- I cannot

2  recall right at this time.

3      Q.   Would that be this one?

4      A.   Yes.  CSI Steyer.  Yes.  "Processed the scene

5  for latent prints with negative results.  Collected --

6  items were processed for latent prints with positive

7  results."

8      Q.   You had no personal knowledge of any of this?

9      A.   I -- I am aware of this, but I just had to

10 refresh myself.  But they were -- they were never

11 identified as belonging to anybody.

12     Q.   Okay.  The actual prints that were --

13     A.   The prints -- when she notated with -- with

14 positive results.  They were then submitted and if there

15 was an identification made, it would've been noted.

16     Q.   Do -- were they connected to anyone or were

17 they just not a positive ID to Mr. Valle-Ramos?

18     A.   It's not that they were -- they were not -- I

19 believe they were not his fingerprints.  If they had

20 been, they would -- it would've been noted as his

21 fingerprints were already in the system.

22     Q.   Did they figure out whose fingerprints they

23 were?

24     A.   No, they -- they were not.

25     Q.   So there were no matches?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.   There were no matches to anybody.

2      Q.   But they compared them to Mr. Valle-Ramos'

3 fingerprints and they did not match?

4      A.   When I said compare them to, they would've --

5 it would've been something that would've automatically

6 happened.  I don't think they said, oh, can we compare

7 them to this individual here?  They would've said, oh,

8 there are a match to -- to this -- this person.  I'm not

9 an expert in how that fingerprinting is done, but I -- I

10 -- I do know that had they -- a match would've --

11 would've popped up, I guess.  You'd have to, I think,

12 speak to the fingerprint examiner.

13      Q.   I'm not sure I have him coming in.  Do you

14 know if --

15      A.   And I guess I would say that because they are

16 not -- if a fingerprint was obtained, it would've

17 indicated who it was from.

18      Q.   Is that only if they had his fingerprints in

19 the system, in the database, that would come up with a

20 match, or are we assuming his fingerprints are in there?

21      A.   I -- I -- did he -- if he had a previous

22 arrest, they would've been in there.

23      Q.   Okay.  So only if he had a previous arrest,

24 would there even be a possibility of there coming up a

25 match?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    That's correct.  There would've -- if -- had

2  there not been, there would've been nothing else to

3  compare it to on the file.

4      Q.    Okay.  Okay.  But you never ran Mr. Valle-

5  Ramos' fingerprints for a match to these?

6      A.    Did -- did I say, can you compare these prints

7  to the -- the --

8      Q.    Yes.

9      A.    -- individual that's been arrested?  I do not

10  know the date of the -- they were processed and the date

11  of Mr. Ramos' arrest and seeing if that was -- was done.

12      Q.    Okay.  So you're not sure?

13      A.    I'm not sure.

14      Q.    That's fine.  All right.  Were there any

15  gloves collected at the scene?

16      A.    Unless it's indicated in CSI Steyer's

17  report --

18      Q.    Okay.

19      A.    -- I -- I'm not sure.

20      Q.    Do you know anything about the backpack that

21  was collected, if there was any way to identify whose it

22  was?

23      A.    I -- I don't think so, unless it's indicated

24  there.  No.  There -- there was no identification inside

25  the backpack, if that's what you're --

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     Q.    Okay.

2     A.    -- getting at.

3     Q.    Who else did you speak to at the scene or who

4  was involved?

5     A.    I spoke to two of the witnesses.  Bethany is

6  one name and I think the other.  One said --

7     Q.    Charlene?

8     A.    Yeah, Charlene Bloom, I think.  One could

9  identify and the other said not at all, did not identify

10 or see anybody.

11    Q.    What did Ms. Bethany say?

12    A.    Can you just refresh my memory which one Ms.

13 Bethany is?

14    Q.    Let's see.

15    A.    Was she younger?

16    Q.    Would you like her statement?  She's probably

17 the other one.  I think Ms. Bloom was the old one.

18    A.    Okay.  Then I did speak and meet with Bethany,

19 the younger one.

20    Q.    Okay.  What do you recall her saying?

21    A.    Just that -- I'm trying -- I think she was --

22 had been living in a -- was she in a different apartment

23 complex, and saw them running, the victim running behind

24 Mr. Ramos.  I think --

25    Q.    Would it help refresh your memory looking at



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  her statement perhaps, or would it be one of your

2  reports you'd be looking at her statement?

3       A.   Please.  Yeah.  That's yeah.  That -- that --

4  you know, that certainly is when I did meet with her to

5  provide her the photo lineup that kind of summarizes

6  what our conversation consisted of.

7       Q.   What does?

8       A.   The state -- the statement that, you know,

9  consists of everything that we spoke about.  And she

10  said that the statement was an accurate representation

11  of what she -- what took place that day.

12       Q.   Now she kind of describes more than one person

13  in here.  Do you know which of these people she was

14  indicating would have been Mr. Valle-Ramos?

15       A.   No, I do not.

16       Q.   Okay.  Did you talk to her more than once?

17       A.   I spoke to one on the telephone and then I met

18  with her in person.

19       Q.   Okay.  Did -- she wrote the statement, I'm

20  assuming, in person?

21       A.   She wrote that statement for the officers that

22  responded, not for me.

23       Q.   Okay.  So she didn't write anything for you?

24       A.   Just the --

25       Q.   Photo ID?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     A.   -- photo ID.  Yeah.  Anything that's attached

2  to that was what she did in my presence.

3     Q.   Okay. Is this, Yeah.  Is this the photo lineup

4  that you would have shown her?

5     A.   Yes, it is.

6     Q.   Just for the record, in your opinion, would

7  you say that the person in one, three, four, five, or

8  six have an Afro-style hairdo?

9     A.   I don't think any of them have an Afro-style

10 hairdo.

11    Q.   You don't think that the person in number 2

12 has an Afro-style hairdo?

13    A.   I do not, no.

14    Q.   You don't consider that to be an Afro?

15    A.   Do you have a picture of the suspect's

16 driver's license?  Or actually that picture right there?

17    Q.   You mean the next one?

18    A.   Yeah.  That's an Afro-style hairdo in my

19 opinion.

20    Q.   So you consider it to be much longer?

21    A.   I consider that to be an Afro-style.  Yeah,

22 exactly.

23    Q.   Okay.  Did she say anything about the other

24 people in this picture?

25    A.   No.  I don't -- I don't recall if she said

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  anything about that.

2      Q.   Do you recall what she did say when she did

3  the

4  ID?

5      A.   No.  She just immediately pointed at the

6  person in Box number 2.

7      Q.   Did she say why?

8      A.   Do you have her statement there?

9      Q.   Well turned out --

10     A.   Just -- yeah.  "See what I mean early morning

11 as he was getting into a vehicle with blue latex gloves

12 on and speeding away, also with two others."  That's --

13 you know, that's somewhere -- that's --

14     Q.   She said nothing additional to what she wrote

15 there?

16     A.   Not that I recall, no, not that she hadn't

17 placed on there.

18     Q.   Was there any video surveillance collected at

19 all in this case?

20     A.   I don't believe there was any available to

21 collect.

22     Q.   Okay.  How about the other witness, Ms. Bloom

23 (phonetic)?  What did she --

24     A.   I spoke to her on the telephone.  I had been

25 tasked with attempting to show her a photo lineup.  She



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

1  indicated that she had not seen anybody that would

2  provide any further investigative assistance and/or

3  identification.

4      Q.   Did she give any information at all,

5  descriptions about what little she did see?

6      A.   Again, I'd have to look at her statement, but

7  she -- I felt she had very little to offer, but -- and

8  despite that, she said she -- despite having very little

9  to offer, she did in fact still provide a statement as

10 to what she had seen that day.

11     Q.   And she did give some basic description there.

12     A.   That's -- that's basically what I spoke to

13 there on the phone, but she said she could not

14 positively identify -- identify anybody.

15     Q.   Did you offer her a photo lineup to look at?

16     A.   I asked her if she would -- if I could meet

17 with her to do that, and she stated that it wouldn't be

18 something that she would even be able to do.

19     Q.   So she was never even given one?

20     A.   Not at all.

21     Q.   She declined that?  Okay.

22     A.   She did, yes.

23     Q.   Okay.

24     A.   Never met with us.

25     Q.   Were there any other witnesses that -- aside



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  from Mr. Gonzalez (phonetic) as well?

2       A.   I -- I don't think so.  Not that I'm aware of,

3  I -- I think.  I don't think there's anybody -- I think

4  the initial caller was -- was Mr. Gonzalez.

5       Q.   He's the owner of the home?

6       A.   Yes.  Yeah.  If you keep going -- let's see,

7  one -- you know --

8       Q.   Going --

9       A.   Yeah, I think you can keep going all.  I -- I

10 did -- I think I saw -- yeah, this -- this ongoing

11 thing.  This was what our dispatcher had typed in as he

12 was running away and what they were getting, but I do

13 believe that was coming from him and -- and, you know,

14 if there was something that says another caller.

15      Q.   There was no plate gotten from the vehicle

16 when they left the residence, correct?

17      A.   I don't think anybody positively identified a

18 plate.  I don't think so, no.  Had -- had there been,

19 you know, that would have been a substantial thing to --

20 to work with, so I -- we didn't have one.

21      Q.   How was Mr. Valle-Ramos gotten in contact with

22 later?  How did this come out?

23      A.   How did his name develop?

24      Q.   Yes.

25      A.   An officer a week or two, maybe, within 10



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  days, had stopped Mr. Ramos, two of the males, and a

2  female, in a vehicle that had matched the description of

3  a vehicle that had been possibly involved in a

4  residential burglary in and around that area.

5      Q.   And when you say match description, was it the

6  exact model and make, or were they not sure what the

7  model and make was?

8      A.   They -- they were not sure.  They, you know --

9  maybe it was somebody's leaving the scene, oh, I've got

10  a possible car here, you know.  As a result of that, the

11  vehicle was stopped.

12      Q.   Okay.

13      A.   Maybe because -- you know, imagine that the

14  vehicle and the type of people that had seen leaving.

15  Those people's names were identified.  Field

16  investigative reports were -- were done, and his name

17  was developed.  Came time for this -- and the officer at

18  the time of that previous incident had noted that this

19  one individual that had an afro-style haircut, you know,

20  a -- a quite grand --

21      Q.   In the vehicle --

22      A.   -- haircut.

23      Q.   -- when he was stopped?

24      A.   Yes.

25      Q.   Okay.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    A.   The one prior to the incident, how his name

2 was initially generated.

3    Q.   This was prior to the incident?

4    A.   Yes.

5    Q.   Okay.  So prior to the burglary, this vehicle

6 had been stopped with four passengers in it, one of

7 which had an afro.

8    A.   I don't say it's -- I don't know if it's the

9 same vehicle.

10    Q.   A vehicle.

11    A.   Mr. Valle-Ramos on the 3rd or the 5th of April

12 was in a vehicle that was stopped by an officer who

13 believed that they had been involved in a burglary.  His

14 name --

15    Q.   Not this case?

16    A.   No.

17    Q.   No?

18    A.   No.  It's -- can I refer to the --  It's

19 outlined completely in the -- in the --

20    Q.   What do you want to see?  The warrant?

21    A.   At the bottom of -- of Page 1.  Actually about

22 the second page of the arrest affidavit.

23    Q.   Arrest affidavit?

24        MS. GARCIA:  Is that what you're talking about?

25        MS. CITRARO:  No.  No, that's the affidavit for

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      arrest.

2           THE WITNESS:  Yeah.  It mentions it out at the

3      bottom down here.  He had been stopped on April 3rd

4      in reference to that incident.  In one of those --

5      and the officer, he put -- when he met with Mr.

6      Ramos on that date -- is it April 3rd -- that he had

7      an afro-style haircut.

8           BY MS. CITRARO:

9      Q.   What was --

10     A.   When this incident took place, we had learned

11  that one of the males had an afro-style haircut.

12     Q.   So this was an unrelated burglary from prior

13  to the burglary in question here --

14     A.   That's correct.

15     Q.   -- at a different residence.

16     A.   That's correct.

17     Q.   And this vehicle and this description was

18  suspicious for that burglary?

19     A.   Two separate incidents.

20     Q.   Right.

21     A.   That's correct.

22     Q.   Okay.  How did you come into knowledge of

23  that?

24     A.   How did I come into knowledge of --

25     Q.   That this vehicle was stopped for a -- another


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  burglary suspicion before.

2      A.   When officers, you know, would stop that

3  vehicle, they would complete, like, a it's -- it's an

4  FIR, field investigative report.  It happened in the

5  area to which I'm assigned -- was assigned at that time.

6  Geographically, I would receive all of those names.  His

7  name came across my desk as having been stopped in that

8  vehicle on that date.  To the point, you know, I was

9  aware that he may or may not be a possible suspect for

10 any future incidents in that area.

11     Q.   Did anything ever come out of that burglary

12 that was supposed to have occurred at 5075 Andrea

13 Boulevard?

14     A.   No, it did not.

15     Q.   No arrests?

16     A.   No.

17     Q.   No suspects?

18     A.   No.

19     Q.   Okay.  What about the other three people in

20 the vehicle when it was stopped? --

21     A.   I believe I --

22     Q.   Was anybody suspected?

23     A.   I believe I was assigned or attached the --

24     Q.   The suspicious person document?

25     A.   Yes.  Yeah.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        Q.    Okay.  With these four people?

2        A.    That's correct.  Yeah, those are the people

3   that referenced that other incident.

4        Q.    Are they suspected of any foul play in this

5   case at hand?

6        A.    No, they're not.

7        Q.    So the only person in that vehicle that a

8   connection was drawn is Mr. Valle-Ramos?

9        A.    I guess I -- I need to know what incident

10  you're -- you're meaning, the one on --

11       Q.    To this one.

12       A.    To this one?  That's correct.

13       Q.    Okay.  So --

14       A.    And again, that was based on, you know, he

15  said that -- from his statement, it says this guy had an

16  afro-style haircut.  You wouldn't believe -- Mr. Ramos'

17  picture had that same style of haircut, so that's why we

18  presented him as a possible suspect to the detective.

19       Q.    And the vehicle that was stopped that he was

20  in is named here.  It's in -- you know the model, you

21  know the year, you know the color.

22             Did anybody ever identify this vehicle?

23       A.    You mean anybody as in our --

24       Q.    In this case?

25       A.    Our -- our victim?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    Yeah.

2      A.    I don't -- I don't know.  I don't think so.

3      Q.    You don't think so?

4      A.    No, I don't think so.

5      Q.    And neither of the independent witnesses

6  either were able to say it was this vehicle?

7      A.    I don't believe so, no.

8      Q.    Did you ask them, like show them a picture of

9  this vehicle and say, hey, is that the car you saw that

10  day?

11      A.    Well, I never met with the old -- is it --

12      Q.    Ms. Bloom?

13      A.    Ms. Bloom.  I never met with the older one.

14      Q.    Okay, not her.

15      A.    So negative.  And I don't recall that I -- I

16  don't think I showed Bethany a picture of that

17          vehicle ---

18      Q.    Okay.

19      A.    -- either.

20      Q.    Was she able to give you a description of the

21  vehicle really, aside from something in general?

22      A.    Unless it's -- I'd have to look and see what

23  her statement said.  Again, I -- I think it said gray.

24  Was it a -- a gray vehicle?

25      Q.    "Newer model Toyota, gray in color, had four



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  doors."

 2        A.    Okay, Toyota is what she said.

 3        Q.    You got no further information than that about

 4  it?

 5        A.    No, I don't.

 6        Q.    Okay.  Okay.  Would I be right to say that the

 7  somewhat similar description of the vehicle and the afro

 8  and the fact that he's Hispanic are -- and aside from

 9  any personal identifications made by witnesses or Mr.

10  Gonzalez, is that the only things that are tying him to

11  this case?  There's no fingerprint connections?  There's

12  no DNA connections?

13        A.    That -- that's correct.  There were no

14  fingerprints, and there were no DNA.

15        Q.    Okay.

16        A.    Anything that positively linked him to this,

17  that's correct.

18        Q.    Okay.  And you only have three people who saw

19  it, one person who says they didn't -- couldn't make any

20  identifications --

21        A.    That's correct.

22        Q.    -- at all.  Another one was the independent

23  witness who said, yeah, it's him, based on photo ID,

24  photo lineup.

25        A.    That's correct.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    And then Mr. Gonzalez.

2    A.    That's -- that's completely accurate, yes.

3    Q.    And Mr. Gonzalez was given a photo lineup as

4  well?

5    A.    Yes, he was.  I -- I believe I saw it there.

6    Q.    Yeah, I saw it in here, yeah.  How sure was he

7  when he pointed to -- I'm assuming he just pointed at

8  him and said, that's the guy?

9    A.    He did.  Yeah, he -- he looked at it and --

10  and -- and selected him.

11    Q.    Did he say why?  Aside from whatever he wrote

12  down, did he give you any kind of story, any

13  explanation?

14    A.    No.  You know, he just -- the other attached

15  sheet that I had below that section there is where he

16  would have indicated where he'd seen him.

17    Q.    Okay.  Is there any further investigation

18  being done on this case, or is it --

19    A.    No, there's not.

20    Q.    -- closed?

21    A.    That's correct.

22    Q.    Okay.

23    A.    It's closed.

24    Q.    Okay.  And there are no other suspects at this

25  point?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Well, there were two, but, you know, nothing

2   that we ever followed up on.  When Mr. Ramos was

3   arrested, our fugitive unit brought him to our

4   headquarters, but yeah, he refused to speak with us and

5   was determined --

6      Q.   So you got no statements out of Mr. Valle-

7   Ramos that night?

8      A.   No, we did not.

9      Q.   Okay.  Did you ever recover any of this

10  jewelry or items that were lost or stolen?

11     A.   A -- negative, no.  None of the --

12     Q.   Okay.

13     A.   -- property -- stolen property was ever

14  recovered.

15     Q.   Was it ever looked into as if maybe sold at a

16  pawn shop or something?  Did anybody follow up on that?

17     A.   You know what?  I -- I -- I looked after the

18  fact for anything that Mr. Ramos might have pawned, but

19  he hadn't pawned anything.

20     Q.   No pawning?

21     A.   That's correct.

22     Q.   Can you do, like, a general search to see what

23  has been pawned --

24     A.   Yeah.  You can look --

25     Q.   -- for him --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   You can look for him specifically, and you can

2  look up, you know -- additionally look by -- something

3  close to the property.

4    Q.   Right.

5    A.   You know, jewelry, you know, it's -- it's

6  quite broad.

7    Q.   Did you do a search like that?

8    A.   I -- I did, and it was just --

9    Q.   Impossible to narrow down?

10   A.   Just -- it's just so labor-intensive.  It was

11 more than what we could, you know --

12   Q.   Okay.

13   A.   -- reasonably accomplish.

14   Q.   Did you have anything to do with his arrest?

15   A.   No.

16   Q.   Aside from writing the arrest warrant --

17   A.   Negative, no.  The physical arrest, I did not.

18   Q.   Yeah.  So after he was in custody, that's when

19 you went to speak with him?

20   A.   He was brought to our headquarters after he

21 was arrested.  Attempted to speak to him and he stated

22 he didn't want to speak, and he was brought to the jail.

23   Q.   Nothing was lifted from the tire iron, was it?

24 No evidence, no --

25   A.   No.  Had -- had there been anything

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  subsequent, it -- it would have been presented to you

2  guys.

3      Q.   How long after the incident were these --

4  probably dated actually.  You dated this September 4th,

5  so was it approximately five months later that they did

6  these photo lineup IDs?

7      A.   Only with Bethany (phonetic).  It was quite

8  some time after Mister -- is it Mr. Gonzalez (phonetic),

9  right?

10     Q.   This is five months later.

11     A.   And Mr. Dove (phonetic) maybe -- two weeks,

12  maybe.

13     Q.   What did I do with him?  April 18th.

14     A.   April 18th.

15     Q.   Okay.  And this is it?  There were no other

16  photo lineups shown to him?

17     A.   That's correct.

18     Q.   One sheet?

19     A.   Just that one.

20     Q.   Was it just like this?  They weren't separate

21  photographs?  It was just like this, all one sheet?

22     A.   No, that's the actual document.

23     Q.   Okay.

24     A.   Yes.

25     Q.   Was any of that audio recorded?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   No, it was not.

2      Q.   Okay.  Was that -- do you know if there was

3 only just one 911 call or if there were any 911 calls?

4 Are you familiar with that?

5      A.   If you -- if you have that recording that I

6 had indicated there, which would've been the typed

7 narrative of the --

8      Q.   The CAD report --

9      A.   That's correct, yeah.  It would tell -- you'd

10 be able to tell if there were additional callers or

11 number indicated.

12          I believe that this -- no -- this call -- this

13 is when Bethany calls in, (315) 416-1246.  That's when

14 she spoke.  Caller, that would've been Mr. Gonzalez.

15          Doesn't indicate that anyone else had called

16 in other than --

17      Q.   Bethany called in, too?

18      A.   Bethany did call in.  Bethany, (315) 416.

19 This is when she would've called in.

20      Q.   So there would've been two calls then,

21 Gonzalez and Bethany?

22      A.   Yes, they did -- the original one from Mr.

23 Gonzalez and then Bethany.

24      Q.   Okay.

25      A.   She became involved.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  Is there anything else of note that you

2   recall about this case I didn't specifically ask you

3   about?

4      A.   No.  No.  Just I, you know, hoped to identify

5   the other two individuals involved, but we weren't able

6   to do that.

7      Q.   Okay.

8      A.   But no, nothing else significant.

9      Q.   How close in proximity would that address on

10  Andrea Boulevard, or Avenue, whatever, be to the

11  location of this burglary?

12     A.   We could --

13     Q.   Is it close?  Is it the same neighborhood?

14     A.   I don't think the same neighborhood.  It's --

15  it's the very same side of town.  I believe that it is

16  -- is it Curry -- curry Ford, Semoran -- you're going

17  east.  It's -- it's pretty close.  It's --

18     Q.   Okay.  Do you know where the vehicle was

19  stopped?  It says India Sector.

20     A.   India Sector is also the east side of town as

21  is the incident.

22     Q.   Is that as specific as it's going to get as to

23  where the stop of this vehicle was?

24     A.   No.  It -- it -- it is not.  In reference to

25  this incident, there would be a reference to where

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          the ---

2      Q.   If we looked up the sign --

3      A.   If we looked up that -- that 2013 137815,

4  there should be something around that -- that call,

5  where an officer stopped this vehicle.  It would --

6  would -- it'd have the exact location where he called

7  out with that vehicle.

8      Q.   And he wasn't arrested on that day, correct?

9      A.   No, not at all.

10     Q.   Okay.  No.  Do you know anything about the

11 facts of that stop or what happened or if there were

12 charges or --

13     A.   There weren't any charges.  I just -- it's

14 just a suspicious vehicle.  Somebody -- I think somebody

15 had said there's, you know, a suspicious car in the

16 neighborhood, some people knocking on doors.  They left.

17 Officer was in the area, said, hey, this looks like the

18 vehicle, and maybe --

19     Q.   Do you --

20     A.   -- stopped and identified those three -- four

21 people.

22     Q.   Do you know if that stop happened on the exact

23 same day as the burglary to this 5075 Andrea Boulevard

24 house, or was it later?

25     A.   I think it was the same day.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   You think it was the same one?

2      A.   4-3 of '13.  That's correct.

3      Q.   Okay.  Are you investigating that case as well

4  or not?

5      A.   I might have been at that time, but I --

6  nothing, I don't think, ever happened with that.

7      Q.   Okay.  You are the detective on that case,

8  though?

9      A.   If it was in -- if it was in India, I would

10 not have been.  I believe that would probably have been

11 other -- two other detectives, but --

12     Q.   But you're not familiar with any leads on that

13 one?

14     A.   No, I'm not.

15         MS. CITRARO:  Okay.  Okay.  I don't have any

16     further questions.

17         Do you have any questions?

18         MS. GARCIA:  No, thank you.

19             CROSS-EXAMINATION

20         BY MR. SMITH:

21     Q.   Just quickly, how do you determine which

22 picture goes where for the photo lineups?

23     A.   Just arbitrarily --

24     Q.   Yeah.

25     A.   -- place it.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

1       Q.    Okay, so --

2       A.    I never place it number 1.

3       Q.    Uh-huh.

4       A.    I'll say that.  So anywhere other than

5    three --

6       Q.    Three?

7       A.    -- four, five, or six.

8       Q.    Okay.  So is it usually in the middle, top

9    middle?  It's really --

10      A.    It's arbitrar [sic].  You know, I -- it's

11   never in one.  I never place anything in number 1.

12      Q.    And how exactly is the process that -- you

13   choose where you put the pictures.  If I'm going to make

14   an ID, you hand me the piece of paper?

15      A.    No, not at all.

16      Q.    How does it -- just how does it work?

17      A.    If there's a -- there's a piece of paper that

18   I have attached there, if I can -- if you have that for

19   a second --

20           MS. CITRARO:  Uh-huh.

21           THE WITNESS:  To each receive one.  Yeah, the

22       instructions.  Includes the instructions.  I will

23       read that -- as indicated in the report, I will read

24       that to the person that's attempting to do the

25       identification, whether it's a photo identification,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      whether it's a show-up identification -- or

2      actually, physical lineup, you would have a specific

3      set of instructions for that.

4           Read that to both --

5           BY MR. SMITH:

6      Q.   And with --

7      A.   -- Mr. Gonzalez and Bethany, and they placed

8  their initials indicating they understood those

9  instructions.  Once that happens, I -- I then would

10 provide them a manila envelope.

11     Q.   Okay.

12     A.   Something similar like that, and they would

13 open that --

14     Q.   Okay.

15     A.   -- and have access to the photo lineup.

16          MR. SMITH:  Okay.  That's all I got.

17          THE WITNESS:  Yeah.

18               REDIRECT EXAMINATION

19          BY MS. CITRARO:

20     Q.   It was an immediate ID?  No hesitation, for

21 either one of them?

22     A.   Yeah.  Yeah, it wasn't I'll get back to you,

23 kind of thing.  You know, I stated not immediate, but

24 hey, yeah, it was immediate.

25     Q.   Okay.  And 100 percent?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Yes, 100 percent.

2      Q.   Both of them?

3      A.   Yes.

4           MS. CITRARO:  Okay.  All right.  I have nothing

5      further.  Did you have any additional questions?

6      Okay.

7           You want to read or waive?

8           I'm sorry.

9                RECROSS-EXAMINATION

10          BY MR. SMITH:

11     Q.   Do people ever say, no, it's none of the

12     above? It's --

13     A.   Oh, sure.  Yeah, absolutely.

14     Q.   Okay.

15     A.   Yep.

16          MS. CITRARO:  Anything else?

17          MR. SMITH:  No.

18          MS. CITRARO:  Okay.  Read or waive?

19          THE WITNESS:  Read.

20          MS. CITRARO:  Okay.  Do you want to put your

21     phone number on the record?  Just say it out loud.

22          THE WITNESS:  (321) 202-4145.

23          MS. CITRARO:  Thank you.  And I'm stopping this

24     at 2:09.

25               (End of recording.)


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1                    CERTIFICATE OF TRANSCRIPTIONIST

2

3   STATE OF FLORIDA

4   COUNTY OF ORANGE

5

6        I, the undersigned, certify that I was authorized

7   to and did transcribe to the best of my ability the

8   foregoing audio provided to me by the Offices of

9   Milestone Reporting Company, Inc., and that the

10  transcript is a true and accurate representation of the

11  recording as heard by me.

12

13       I further certify that I am not a relative,

14  employee, attorney or counsel of any of the parties nor

15  am I a relative or counsel connected with the parties'

16  attorneys or counsel associated with the action, nor am

17  I financially interested in the outcome of the action.

18

19  Submitted on: February 2, 2026.

20

21

22

23       _____

24       JACLYN BOLINSKI

25



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY



1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF FLORIDA    ORIGINAL

3   ORLANDO DIVISION

4   CASE NO.:  6:24-CV-01276-CEM-DCI

5   HON. CARLOS E. MENDOZA

6

7   JORGE VALLE-RAMOS,

8   Plaintiff

9

10  V.

11

12  CITY OF ORLANDO, MICHAEL

13  STANLEY, AND UNKNOWN OFFICERS,

14  Defendants

15

16

17

18

19

20

21

22

23  DEPONENT:  MICHAEL STANLEY

24  DATE:      MARCH 4, 2025

25  REPORTER:  SHEILA JONES

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1                    APPEARANCES

2

3  ON BEHALF OF THE PLAINTIFF, JORGE VALLE-RAMOS:

4  Roz Dillon, Esquire

5  Loevy & Loevy

6  311 North Aberdeen

7  3rd Floor

8  Chicago, Illinois 60607

9  Telephone No.: (312) 243-5900

10  E-mail: dillon@loevy

11

12  ON BEHALF OF THE DEFENDANT, CITY OF ORLANDO, MICHAEL

13  STANLEY, AND UNKNOWN OFFICERS:

14  Stephen Mistoler, Esquire

15  O'Connor, Haftel & Angell, PLLC

16  800 North Magnolia Avenue

17  Suite 1350

18  Orlando, Florida 32803

19  Telephone No.: (407) 843-2100

20  E-mail: smistoler@ohalaw.com

21

22  Also Present: Evenicole Ortiz, Videographer

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.MILESTONEREPORTING.com        **Toll Free 855-MYDEPOS**

<pre>
1                          INDEX

2                                              Page

3   PROCEEDINGS                                  5

4   DIRECT EXAMINATION BY MS. DILLON             6

5   CROSS-EXAMINATION BY MR. MISTOLER          177

6

7                        EXHIBITS

8   Exhibit                                    Page

9     3        Statement of Charlene Bloom      158

10   12        Statement of George Gonzalez     153

11   13        Orlando Police Department Field  143

12             Report

13   15        Statement of Bethany Szewczyk    156

14   16        Photo Line-Up Administration by   99

15             Ms. Szewczyk

16   17        Photo Array                       96

17   19        Criminal Information Bulletin     76

18   20        Supplemental Case Report         109

19   21        Affidavit for Arrest Warrant     138

20   22        ICJIS Warrant Arrest Affidavit   141

21   23        Orlando Police Department Field  149

22             Report (Original)

23   24        CSI Styer's Field Report         160

24   25        Investigative Costs Expense Report 163

25
</pre>



MILESTONE **|** REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1                    STIPULATION

2

3 The VIDEO deposition of MICHAEL STANLEY was taken at

4 O'CONNOR, HAFTEL & ANGELL, PLLC, 800 NORTH MAGNOLIA

5 AVENUE, SUITE 1350, ORLANDO, FLORIDA 32803 on TUESDAY

6 the 4th day of MARCH 2025 at 1:25 p.m. (ET); said

7 deposition was taken pursuant to Rule 30 of the FEDERAL

8 Rules of Civil Procedure.

9

10 It is agreed that SHEILA JONES, being a Notary Public

11 and Court Reporter for the State of FLORIDA, may swear

12 the witness and that the reading and signing of the

13 completed transcript by the witness is not waived.

14

15

16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1              PROCEEDINGS

2         THE VIDEOGRAPHER:  We are now on the video

3    record.  The time is 1:24 p.m.  My name is Eve, and

4    Sheila is the court reporter.  Today is the 4th of

5    March 2025, to the deposition of Michael Stanley in

6    the matter of Jorge Valle-Ramos v. City of Orlando,

7    Michael Stanley, and unknown officers, pending in

8    the -- pending in the United States District Court

9    for the Middle District of Florida.  Case number

10   6:24-CV-01276-CEM-DCI.

11        Will Counsels please identify themselves for

12   the record, starting with the plaintiff.

13        MS. DILLON:  Roz Dillon for plaintiff, Jorge

14   Valle-Ramos.

15        MR. MISTOLER:  Stephen Mistoler on behalf of

16   Defendants.

17        THE VIDEOGRAPHER:  Thank you.  Madam Court

18   Reporter, please now swear the witness.

19        THE REPORTER:  Mr. Stanley, will you raise your

20   right hand?  Do you solemnly swear or affirm that

21   the testimony you're about to give will be the

22   truth, the whole truth, and nothing but the truth?

23        THE WITNESS:  Yes, I do.

24        THE VIDEOGRAPHER:  Okay.  We may begin.

25              DIRECT EXAMINATION



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1           BY MS. DILLON:

2      Q.   Hi.  My name is Roz Dillon and I represent the

3  plaintiff, Jorge Valle-Ramos in this case.  Can you

4  please state and spell your name for the record?

5      A.   Michael Stanley, M-I-C-H-A-E-L, S-T-A-N-L-E-Y.

6      Q.   And I'm going to be deposing you this

7  afternoon.  I assume you've been deposed before?

8      A.   I have.

9      Q.   Okay.  Approximately how many times?

10     A.   40 or 50.

11     Q.   Okay.  Are those all civil cases?

12     A.   No.  Maybe only two or three civil.

13     Q.   Okay.  Two or three civil.  Do you remember

14  the names of any of the civil cases?

15     A.   I don't.  No.  They were premises liability

16  cases for shootings.

17     Q.   Okay.  So you probably know how this goes, but

18  I'm just going to lay a couple ground rules so that

19  we're on the same page, okay?  So you understand that

20  the oath you just took is the same as if you were in a

21  courtroom in front of a judge and jury, correct?

22     A.   Yes.

23     Q.   Okay.  And the answers you give today are

24  subject to the penalty of perjury, correct?

25     A.   Correct.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   All right.  If you don't understand a question

2  I ask, please just say so and I'll rephrase it.  If you

3  answer, everyone will assume you understood the

4  question.  Fair enough?

5      A.   Fair.

6      Q.   All right.  And the court reporter is going to

7  be taking down your testimony today.  So for that

8  reason, it's really important that you give verbal

9  answers.  Shaking your head, hand movements won't allow

10 her to take down your testimony, okay?

11     A.   Sure thing.

12     Q.   So for the same reason, it's important that we

13 try not to speak over each other.  So I'm going to do my

14 best to let you finish answering a question before I

15 jump in.  And I just ask that you do the same, okay?

16     A.   Deal.

17     Q.   All right.  So next, there might be some times

18 today where your attorney objects to one of my

19 questions, but since there's no judge here to rule on

20 the objections, the rule is that you'll answer anyway,

21 unless he explicitly directs you not to answer it,

22 understood?

23     A.   I do.

24     Q.   Okay.  Finally, if you need a break at any

25 time, you can ask for one, but if there's a question

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  pending, you'll just need to answer it before we go off

2  the record, okay?

3      A.   Sure thing.

4      Q.   All right.  And do you prefer Mr. Stanley,

5  Detective Stanley?

6      A.   Mike -- Mike works.

7      Q.   Mike?

8      A.   Yeah, honestly.

9      Q.   All right.  Mike, do you have any medical

10 conditions that might affect your ability to testify?

11     A.   I do not.

12     Q.   Okay.  Any other reason you can think of that

13 you wouldn't be able to give full and accurate testimony

14 today?

15     A.   None.

16     Q.   All right.  And without telling me what you

17 discussed with your attorneys, can you tell me whether

18 or not you met with your attorney to prepare for today?

19     A.   Yes.

20     Q.   Okay.  How many times?

21     A.   I'd say once.

22     Q.   All right.  How long was that meeting?

23     A.   I'd say maybe an hour.

24     Q.   All right.  And when was that?

25     A.   Last week.

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Was there anyone else present besides you and

2  your attorney in that meeting?

3    A.   No.  There were two attorneys present in this

4  office.

5    Q.   Okay.  Did you review any documents to prepare

6  for your deposition?

7    A.   I did.

8    Q.   Okay.  What documents did you review?

9    A.   I reviewed the case reports that were

10  submitted as -- as part of the criminal case for this

11  incident.

12    Q.   Do you mean case reports written by you or

13  case reports written by others?

14    A.   Both.

15    Q.   Okay.  Did you review any of your prior

16  testimony before the deposition?

17    A.   I did.

18    Q.   Okay.  Which prior testimony did you review?

19    A.   I reviewed my deposition, I reviewed my

20  testimony in the criminal case, and I reviewed my

21  testimony in the motion for post-conviction relief.

22    Q.   Okay.  Did you review the photo lineups that

23  were developed in this case?

24    A.   I did.

25    Q.   Okay.  Can you recall -- can you recall any

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1 other documents you reviewed?

2      A.   I reviewed the testimony of the other people

3 that had participated in this incident, Mr. Gonzalez and

4 Ms. Bethany.

5      Q.   Okay.  And what testimony of theirs did you

6 review?

7      A.   Their testimony from the criminal trial and

8 from the motion for post-conviction.

9      Q.   Okay.  Did you review their deposition

10 testimony?

11      A.   I did not have that.

12      Q.   Okay.  Anything else you can remember

13 reviewing?

14      A.   No.

15      Q.   Did you read the complaint in this case?

16      A.   I have.

17      Q.   Okay.  Do you have an understanding about the

18 allegations in this case?

19      A.   Yes, I do.

20      Q.   Okay.  What is your understanding?

21      A.   Just that there is a contention that Mr.

22 Valle-Ramos was not responsible for this incident.

23      Q.   Okay.

24      A.   In summary.

25      Q.   And so just so that we're on the same page in



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   terminology, the civil case that we're here for involved

2   a burglary that occurred at 1625 Little Falls -- little

3   Falls Circle in Orlando, Florida on April 9, 2013.  Does

4   that sound right to you?

5        A.   Yes, it does.

6        Q.   Okay.  And the gentleman whose home was

7   burglarized was named George Gonzalez.  Does that sound

8   right?

9        A.   Yes, it does.

10       Q.   Okay.  So when I talk about the Gonzalez

11  burglary, unless I specify otherwise, that's the

12  incident that I'm going to be referring to, okay?

13       A.   Okay.

14       Q.   And when you were reviewing those documents in

15  preparation for your deposition, did you remember this

16  investigation?

17       A.   No.

18       Q.   Okay.

19       A.   No.

20       Q.   They didn't spark any independent memory of

21  the investigation?

22       A.   No, they did not.

23       Q.   All right.  What year did you join the Orlando

24  Police Department?

25       A.   2005 in May.

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  And if I sometimes say, "OPD," will you

2  understand me to be meaning --

3      A.   I -- I will.

4      Q.   Okay.  And did you have any employment in law

5  enforcement or security before you started?

6      A.   No, I did not.

7      Q.   Okay.  Did you have any military service?

8      A.   Yes, I did.

9      Q.   Okay.  What branch?

10     A.   I was in the Marine Corps.

11     Q.   For how long?

12     A.   Five years.

13     Q.   And were you honorably discharged?

14     A.   Yes, I was.

15     Q.   All right.  Let's talk about your time with

16  the Orlando Police Department.  Before you started at

17  OPD, did you have to go through police academy?

18     A.   I did.

19     Q.   Okay.  What year did you go through the

20  academy?

21     A.   January of 2005 through May of 2005.

22     Q.   Okay.  And what kinds of courses or training

23  did you get in the academy?

24     A.   You certainly received training in all of the

25  high liability areas to include defensive tactics,

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  firearms, driving, in addition to instruction on all of

2  the other issues with which you might be forced to make

3  a decision as a law enforcement officer.

4      Q.   Okay.  And when you say, "other issues you

5  might be forced to make a decision on," can you give

6  some examples?

7      A.   Let's say criminal law.  Let's say domestic

8  violence.  Let's say drugs, DUI, Fourth and Fifth

9  Amendment issues.  I'm -- I'm certain there's a -- a lot

10  more, but --

11      Q.   Okay.  Any other kind of general training

12  areas you recall getting training on at the police

13  academy?

14      A.   At the police academy?  Not.  If -- if -- I'm

15  certain if I saw my curriculum, they would jump out at

16  me, but --

17      Q.   Okay.

18      A.   -- but no.

19      Q.   Not as you sit here today?

20      A.   Not as I sit here.  Yeah.

21      Q.   Were you trained on any OPD specific policies

22  in the academy?

23      A.   No.

24      Q.   Okay.  All right.  So you finished academy May

25  20, 2005, correct?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      A.   Correct.

2      Q.   And then did you start immediately at the

3 Orlando Police Department?

4      A.   I did.

5      Q.   Okay.  What was your first job title?

6      A.   I would say underwent approximately six months

7 of field training officer.

8      Q.   Okay.

9      A.   And going through training as a field training

10 officer.

11      Q.   All right.  And after you went through

12 training of -- as a field training officer, did you

13 become a --

14      A.   I went solo.  Yes.

15      Q.   Okay.  Can you explain what that means?

16      A.   During -- you know, you receive training with

17 another officer that is -- that is present with you

18 through several phases until you have met and satisfied

19 a criteria with which you're able to be a solo officer.

20      Q.   Okay.  Do you recall how long you were in the

21 position of solo officer?  Is that a title?

22      A.   No.  No.  You just -- I guess you would say

23 you -- you've completed field training.

24      Q.   Okay.  Did you have a title change over time

25 from solo officer?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.   No.  No.

2      Q.   Okay.  So when you were -- when did you become

3  a detective with --

4      A.   In May of 2012.

5      Q.   Okay.  And how long did you hold the title of

6  detective?

7      A.   Until September of 2019.

8      Q.   So for about seven years?

9      A.   That sounds about accurate.  Yes.

10     Q.   Okay.  And was that a promotion from your time

11  as a solo officer, or is it just a different --

12     A.   It's a -- it was -- it's a lateral move.

13     Q.   Okay.

14     A.   Yeah.  You're still an officer.

15     Q.   What were your responsibilities as a

16  detective?

17     A.   To investigate crimes that have occurred that

18  have not been resolved by an initial response by a

19  patrol officer.

20     Q.   Okay.  Did you have a partner when you were

21  working as a detective?

22     A.   No.

23     Q.   No?

24     A.   No, I did not.

25     Q.   Okay.  After -- you said you were a detective



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  until September 2019.  Did you assume a different role

2  after that?

3      A.   I -- I did.

4      Q.   What role did you assume?

5      A.   I was an investigator in Internal Affairs.

6      Q.   Okay.  And how long did you hold that

7  position?

8      A.   I held that position until December of 2021.

9      Q.   Okay.  And was that a promotion or another

10  lateral transfer?

11      A.   To -- to Internal Affairs?

12      Q.   Yes.

13      A.   That's a lateral movement.  I was still an

14  officer.

15      Q.   Okay.  And what was your -- what were your

16  responsibilities as an Internal Affairs officer or an

17  investigator in Internal Affairs?  Sorry.

18      A.   To investigate alleged officer misconduct.

19      Q.   Anything else?

20      A.   That probably encapsulates everything.

21      Q.   Okay.  And after December 2021, did you assume

22  a different role at Orlando Police Department?

23      A.   Yes, I did.

24      Q.   Okay.  What role was that?

25      A.   I was promoted to sergeant at that time in



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  December of '22.

2       Q.   Okay.  And is that the role you hold today?

3       A.   It's the rank I hold today.

4       Q.   Okay.  How long -- did you retire from Orlando

5  Police Department?

6       A.   I did not.  No.

7       Q.   Okay.  So you were promoted to sergeant, you

8  said, December 2022?

9       A.   Yes.

10      Q.   Okay.  And what were your responsibilities as

11 a sergeant?

12      A.   I was a patrol sergeant, and -- and the

13 responsibilities there are to supervise a squad of

14 officers in a specific geographic area within the city.

15      Q.   Okay.  All right.  Have you always been

16 assigned to officers in the same geographic area, or has

17 that changed?

18      A.   When I was a patrol sergeant, it was one

19 specific area.

20      Q.   Okay.  What area was that?

21      A.   That was the India sector, which is kind of

22 south of downtown, a little bit towards the east side of

23 town.

24      Q.   Okay.  And you said you -- when you were a

25 patrol sergeant, does that mean you changed roles as a



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  sergeant at some point?

2      A.   Yes.

3      Q.   Okay.  When was that?

4      A.   That would've been in September of 2022.

5      Q.   Okay.  And what sergeant role did you shift

6  to?

7      A.   I shifted to a sergeant in the Violent Crimes

8  Unit within the Criminal Investigations division.

9      Q.   Okay.  And in that role, what are your -- what

10 were your responsibilities?

11     A.   To oversee violent crimes being investigated

12 by officers by -- investigated by detectives that

13 occurred in the city.

14     Q.   Okay.  The whole city?

15     A.   Correct.

16     Q.   And are you still a sergeant in the Violent

17 Crimes Unit?

18     A.   No, I'm not.

19     Q.   Okay.  When did you shift from the Violent

20 Crimes Unit?

21     A.   I shifted from the Violent Crimes Unit as a

22 sergeant to the homicide unit as a sergeant in December

23 of 2023.

24     Q.   Okay.  And you said that -- the homicide unit?

25     A.   Correct.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    And what were your duties as a homicide

2  sergeant?

3    A.    To oversee the investigations of homicides

4  occurring in the -- in the city in addition to officer-

5  involved shootings, suicides, missing people.  That's --

6  that's about it.

7    Q.    Okay.  And are you a homicide sergeant today

8  or --

9    A.    Yes, I am.

10    Q.    Okay.  So you still work at OPD.  In 2013, you

11  were working as a detective; is that right?

12    A.    Yes, it is.

13    Q.    When you first became a detective, what was

14  your assignment?

15    A.    My assignment was as a detective within the

16  East Property Unit.

17    Q.    Okay.  And how long were you a detective in

18  the East Property Unit?

19    A.    I would say from when I started in May of 2012

20  until approximately August of 2013.

21    Q.    Okay.  And what did you do in that assignment?

22    A.    We investigated property-related crimes, which

23  occurred within the eastern section of the city.

24    Q.    Okay.  Same sector as when you were a sergeant

25  at the India sector?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.   It would've.  I guess it would've included.

2   That would've been one area.  Yes.

3      Q.   Okay.  So it was multiple sectors?

4      A.   Correct.

5      Q.   All right.  Did your assignment change over

6   time?

7      A.   Within?

8      Q.   As a detective?

9      A.   Within the property unit?

10      Q.   No.  After you were -- in August of 2013.

11      A.   I went to the -- it was called the Assault and

12   Battery Unit at that time.

13      Q.   Okay.  And how long were you at the Assault

14   and Battery Unit?

15      A.   I would say until maybe March of 2016.

16      Q.   Okay.  And then after March of 2016, did --

17   what was your next assignment as a detective?

18      A.   In the Robbery unit.

19      Q.   And how long were you a detective in the

20   Robbery unit?

21      A.   I would say until May of 2019.

22      Q.   Okay.  Is that when you were promoted to -- or

23   the -- is that when you changed to an investigator?

24      A.   No.  No.  I was in the homicide unit as a

25   detective between the robbery unit and Internal Affairs.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  And were you in the homicide unit until

2   you became an investigator?

3      A.   Correct.

4      Q.   All right.  And so your assignment -- in 2013,

5   you were in the East Property Unit; is that right?

6      A.   Yes, it is.

7      Q.   Who did you report directly to?

8      A.   I had a number of sergeants there in that unit

9   at that time.  I recall Danny Schad, S-C-H-A-D, was a

10  sergeant in that unit.  I remember Dan Brady.  And I

11  remember Ian Berkman, B-E-R-K-M-A-N, in those units as

12  -- that was the sergeant.

13     Q.   Okay.  How many sergeants would you say were

14  in the East Property Unit in 2013?

15     A.   Well there was only one that would've been

16  assigned there.  But as far as when they came and went,

17  I'm not -- I don't remember.

18     Q.   Okay.  And as a detective in the six or so

19  years you were a detective, did you ever have a partner?

20     A.   No.

21     Q.   Okay.  When you worked at the Orlando Police

22  Department in the 2013 range, did you have a work e-mail

23  address?

24     A.   I did.

25     Q.   Okay.  Do you -- did you use that e-mail in

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  relation to your ongoing investigations?

2      A.   Yes.

3      Q.   Okay.  How might you have used it?

4      A.   I -- I might have used it to reach out to a

5  complainant.  I might have used it to reach out to a --

6  a victim.  I might have used it if those -- if phone

7  call -- if I had an e-mail, if phone calls were not

8  working.

9      Q.   Would you use it to communicate with other

10  officers about ongoing investigations?

11      A.   I -- not that I remember, but I'm not -- I --

12  I don't know.

13      Q.   Not that you recall?  Is it possible that you

14  used it with --

15      A.   Sure.  Sure, it is.

16      Q.   Okay.  Do you still have access to that e-

17  mail?

18      A.   I don't know.

19      Q.   Okay.  Have you been asked to search it for e-

20  mails related to the Gonzalez burglary or Mr. Valle-

21  Ramos?

22      A.   Well I think that a request was made for those

23  e-mails.  I think that information may have been

24  provided to the city, but I don't have the ability to go

25  back that far and look.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1     Q.   Okay.  So you couldn't -- even if you wanted

2  to, you couldn't search that far back?

3     A.   I -- I don't believe so.

4     Q.   Okay.  Did you use -- did you type -- scratch

5  that.  In 2013, did you do your reports on a computer?

6     A.   Yes.

7     Q.   Okay.  Were any officers still using

8  handwritten reports in 2013?

9     A.   Handwritten reports?

10    Q.   Yeah.

11    A.   No.

12    Q.   Okay.  So it wasn't -- it wasn't your practice

13 to do typewritten reports?  It just what happened

14 in 2013?

15    A.   I would certainly type it out and then input

16 it into the system that creates our reports.

17    Q.   Okay.  And in 2013, did you regularly type

18 reports in connection with the investigations that you

19 worked on?

20    A.   Yes.

21    Q.   Okay.  When would you write a report in

22 connection with a criminal investigation?

23    A.   When you had made an arrest, or if the

24 incident was unfounded, or if it was a certain level of

25 a case in which a report was required and it had not

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

 1  been resolved.  No other investigative leads for, you

 2  know, certain types of cases.

 3      Q.   Okay.  Are there other events in a case that

 4  you can recall that you would be required to write a

 5  report after?

 6      A.   No.

 7      Q.   So if, during the course of an investigation,

 8  a detective performed an investigative task like talking

 9  to a witness, is that something you would expect to be

10  documented in a report?

11      A.   You certainly should.  Yes.

12      Q.   Okay.  And you say, "you should."  Is that --

13  does that mean it's good practice to do so, or was it

14  required policy?

15      A.   It is good practice.

16      Q.   Okay.  But no explicit policy requiring

17  documentation of --

18      A.   I -- I guess it would have to be on the

19  judgment of the detective that is conducting a -- an

20  interview.

21      Q.   Okay.  Would you ever have a communication

22  with a witness that you would not document in a report?

23      A.   Through maybe a phone call.

24      Q.   Okay.  What kinds of phone calls would you

25  expect maybe wouldn't be documented in a report?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.    That would not?

2      Q.    Yes.

3      A.    If it didn't have any investigative value or

4  if it was merely scheduling, if it was -- if they had

5  some other -- if they had something -- I don't know.

6  You wouldn't document necessarily every communication

7  that you have.  I guess I would say only the important

8  issues with which to -- that would lead the case along.

9      Q.    Okay.  And is it up to the discretion of the

10  investigator or the detective to decide what important

11  issues would lead the case along?

12      A.    Yeah, I -- I -- it would -- I think if I

13  presented something to a state attorney and it said I

14  spoke to so-and-so on the phone call and there was no

15  answer or, you know, they confirmed they were going to

16  meet at certain time, you know, you wouldn't include

17  that.  It has no -- no investigative value.

18      Q.    Okay.  What about, like, a show-up

19  identification with a witness or a victim?  Is that

20  something you would expect to be documented in a report?

21      A.    Yes.

22      Q.    Even if the victim or witness did not identify

23  someone?

24      A.    Yes.

25      Q.    All right.  And what about show -- after



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  showing a photo lineup to a witness?  Is that the kind

2  of task you would expect to see a written report on?

3      A.   Yes.

4      Q.   All right.  What information did you include

5  in your reports?

6      A.   I included an overall, I guess, description of

7  what had transpired, what investigative leads had

8  developed, the action taken, and a conclusion based upon

9  the results obtained.

10     Q.   Okay.  And how did you know what to include in

11 your reports?

12     A.   Common sense.

13     Q.   Okay.  Did you receive any training in report

14 writing?

15     A.   No.  No.

16     Q.   Okay.  So you just learned how to write your

17 reports through common sense?

18     A.   Yeah.

19     Q.   Okay.  As a detective, what did you do with

20 your reports once you had written them?

21     A.   They were submitted as completed into the

22 report writing system.  And then it would ultimately be

23 reviewed, merged, completed.

24     Q.   Okay.  You said, "reviewed, merged, and

25 completed?"

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1        A.    I did.

2        Q.    Okay.  Who would review the reports?

3        A.    The sergeant would review those reports, or in

4   his absence, the assistant squad leader.

5        Q.    Okay.  And you are a sergeant.  You are a

6   sergeant, correct?

7        A.    Correct.

8        Q.    So as a sergeant, in your capacity as

9   sergeant, do you act as a reviewing officer on reports?

10       A.    I do.

11       Q.    Okay.  What are the supervisor duties related

12  to reviewing reports?

13       A.    Look for completeness.  You look for -- if

14  it's an arrest warrant, you would look for -- you would

15  want to make certain that probable cause has been

16  established by the evidence that they're presenting.

17       Q.    Okay.  You'd be looking for completeness.

18  Would you be looking for accuracy?

19       A.    Absolutely.

20       Q.    Okay.  You'd be looking for probable cause,

21  right?

22       A.    Yes.

23       Q.    Anything else you can think of that you would

24  be reviewing a report for?

25       A.    Grammar, dates, times, people.  Yeah.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Oh, a sergeant or a supervisor would never

2  just sign off on a report without reviewing it

3  carefully, correct?

4      A.   You shouldn't.  No.

5      Q.   Okay.  After sergeant reviews, did you say

6  they're merged?  What does that mean?

7      A.   I don't really know.  It merged into the

8  computer system with which they are, you know?

9      Q.   Okay.

10     A.   And in some capacity, in a report review unit

11 within our department, I -- I have very little

12 understanding of how that works.

13     Q.   Okay.  Is there -- was there a requirement in

14 the 2013 era that the reports went into a case file

15 related to the investigation?

16     A.   Into a -- I'm not sure I understand.

17     Q.   Did -- when you were working on an

18 investigation as a detective, did you maintain a file

19 for your investigation?

20     A.   I maintained some of the documents that I felt

21 were important to have immediately available with which

22 not to have to open up a computer to look at them.

23     Q.   Okay.  So there wasn't a specific case file

24 that was created in each investigation?  Each detective

25 just maintained a file --

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1       A.    I'm sure --

2       Q.    -- with documents they thought were important?

3       A.    -- I'm -- I'm sure.  Yes.  You would have a

4  case file for that specific case as you were working on

5  it.

6       Q.    Okay.  Do you recall if as a detective in the

7  2013 timeframe you would ever make handwritten notes?

8       A.    I'm certain I might have scratched something

9  down on a piece of paper related to a -- to a case if I

10 was speaking to somebody on a phone.

11      Q.    What would happen to those notes?

12      A.    I have no clue.

13      Q.    Okay.  Would they go in the case file?

14      A.    They might if you did not complete the case,

15 and you didn't think you were going to be around any

16 longer, and there would be some notes for the next

17 person if they picked up the case.

18      Q.    Okay.  So you would include your handwritten

19 notes if you thought the case was going to be handed

20 over to someone else; is that right?

21      A.    Yeah.

22      Q.    Okay.  But you wouldn't include them

23 otherwise?

24      A.    No.

25      Q.    Okay.  As an OPD detective, did you receive



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  training on interviewing witnesses in connection with

2  criminal investigations?

3      A.   I took a 40-hour class at the Valencia

4  Criminal Justice Institute called Interviews and

5  Interrogations.

6      Q.   That was Valencia Criminal Justice Institute?

7      A.   Well that's correct, yes.

8      Q.   Okay.  Is that something that was required or

9  something that you just did?

10     A.   It was not required.  It was something I did.

11     Q.   Okay.  And what did that 40-hour class cover?

12     A.   I really don't remember specifically.  I

13 remember two detectives from somewhere in Orange County

14 presented the class.

15     Q.   Okay.

16     A.   But, you know, I -- I'm certain we -- we

17 talked about scenarios and interviews.

18     Q.   Is it fair to say that interviewing witnesses

19 was something you had experience with in 2013?

20     A.   I would say so.

21     Q.   Okay.  In 2013, how often did you interview

22 witnesses in connection with ongoing criminal

23 investigations?

24     A.   And you'd certainly want to speak to them

25 about every case that you would've been assigned.

**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1    Q.   Are there best practices for when to conduct

2 witness interviews?

3    A.   Not that I'm aware of.

4    Q.   Okay.  Any rules about whether or not more

5 than one officer should be present when interviewing

6 witnesses?

7    A.   No.

8    Q.   Okay.  Would you ever interview a witness

9 without taking notes or documenting that interview?

10    A.   Yeah, I -- I'd say so.

11    Q.   So you -- so you -- there would be scenarios

12 where you wouldn't document a witness interview?

13    A.   I'm certain that there -- probably there could

14 be.

15    Q.   In what scenarios would it be appropriate not

16 to document a witness interview?

17    A.   If they told you something that you had

18 already known, or they didn't have any other information

19 to offer.

20    Q.   Any other scenario where you think it would be

21 appropriate not to document a witness interview?

22    A.   I can't think of any as I sit right here now.

23    Q.   Were there any best practices for when you

24 decided you were going to document an interview on how

25 to do that?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      *Toll Free 855-MYDEPOS*

1      A.    I'm going to have to ask that again.  I --

2      Q.    Yeah, it was terribly worded.  Were there best

3  practices for how to memorialize witness interviews in

4  the 2013 timeframe?

5      A.    Not that I remember, no.

6      Q.    Okay.  So there wasn't a -- an official policy

7  on how to document witness interviews?

8      A.    No.  No.

9      Q.    It would be up to the discretion of the

10  detective on the case to document?

11      A.    Yes.

12      Q.    Okay.  Would you -- when you were working as a

13  detective in 2013, did you ever audio record or video

14  record your witness interviews?

15      A.    I never video recorded interviews.  Those

16  would only be done in an interview room.  They would not

17  be done out in the field or in a setting like we're in

18  today.

19      Q.    Okay.  So you would -- you would never video

20  record an interview unless it was an official something

21  at the station in an interview room?

22      A.    That's correct.

23      Q.    Okay.  How about audio recording?

24      A.    Yes.  I forget.  I can't remember when I

25  received an audio recorder.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Did you have an audio recorder in 2013?

2      A.   I don't believe so.

3      Q.   Okay.  Do -- and you can't remember when you

4  got your audio recorder?

5      A.   I don't.  No.

6      Q.   Was there a policy or practice -- strike that.

7  In your experience in 2013, how many detectives would

8  typically be assigned to investigate a burglary?

9      A.   One.

10     Q.   Okay.  So it was common for one detective to

11 be assigned to a burglary?

12     A.   Yes.

13     Q.   Do you know how it was determined what officer

14 would -- or what detective would be selected to

15 investigate a particular burglary?

16     A.   If it occurred in a specific district that you

17 were assigned within a specific sector.

18     Q.   Okay.  So if it was -- you -- each detective

19 was assigned a specific area.  And if something happened

20 in that area, you would become the lead on that case?

21     A.   That's accurate, yes.

22     Q.   Okay.  Would a detective generally be called

23 to the scene of a burglary?

24          MR. MISTOLER:  Object to form.

25          THE WITNESS:  Yes and no.  I might not have



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    even been aware of a -- a burglary that's occurring.

2    You might -- the patrol officers that are handling

3    it might not make a notification.

4        BY MS. DILLON:

5    Q.   Okay.  So it's not unlikely that a detective

6  who's later assigned to lead a burglary investigation

7  didn't respond to the scene?

8    A.   That's correct.

9    Q.   Okay.  If a detective didn't respond to the

10 crime scene, but was appointed later as a lead on the

11 investigation, how would he get the information he

12 needed to investigate the case?

13   A.   Excuse me.  You would look at the report that

14 was generated and any witness statements that are

15 available.

16   Q.   How would you get those reports?

17   A.   You would get the reports from the computer

18 program with which reports are archived.

19   Q.   Is that the same way you would get witness

20 statements?

21   A.   They would be scanned in with the report.

22   Q.   Okay.  How did the -- did you -- strike that.

23 When you were investigating burglaries as a detective,

24 would you reach out to the responding officers and speak

25 with them about their reports?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.   Only if I had a question or something was

2 unclear.

3    Q.   Okay.  So it wasn't your practice to always

4 speak to the officers who responded if it was a burglary

5 when -- you were assigned to?

6    A.   That's correct.

7    Q.   Okay.  When officers respond to the scene of

8 the burglary and the case is assigned to a detective, do

9 the responding officers stay on the investigation after

10 the initial response?

11    A.   No.

12    Q.   Okay.  Was it the lead detective's

13 responsibility to follow up on any information in the

14 officer's reports?

15    A.   When you say, "follow up," what do you -- in

16 reference to the reports, I mean --

17    Q.   So if, for example, there were conflicting

18 eyewitness descriptions of suspects in a report, would

19 it be the detective's responsibility to take steps to

20 reconcile those conflicting statements?

21    A.   Well I think you would want to speak to the

22 people that generated the conflict if those came from

23 two different parties.

24    Q.   So if there were discrepancies in eyewitness

25 reports, you would want to speak with the individuals



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  who gave those reports to try and reconcile?

 2      A.   Reconcile or to hear from them first-person

 3  what their recollection or what they saw would be.

 4      Q.   Would it be appropriate to ignore

 5  discrepancies in eyewitness reports and take no steps to

 6  try and reconcile?

 7           MR. MISTOLER:  Objection.

 8           THE WITNESS:  I think it would be appropriate

 9      to speak to those people to find out what it --

10      exactly it was that they saw and what they recall.

11      And historically, I found that people offer varying

12      degrees of recollection in my history of

13      investigating crimes. People see the same thing and

14      can oftentimes provide a complete different

15      description of an event.

16           BY MS. DILLON:

17      Q.   Okay.  So fair to say best practice would be

18  to follow-up with the individuals who gave the

19  conflicting statements?

20      A.   Yes.

21      Q.   After a case is closed, what happens to the

22  reports or the case file that was being maintained?

23      A.   Well, the reports never go away.  Those are

24  forever memorialized within the computer program that

25  they are created and -- and stored in.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    Does that include, like, witness statements

2  and photo arrays and things like that?

3      A.    They should be scanned in -- in the -- in the

4  best practice.

5      Q.    Okay.  In the best practice they should be

6  scanned in, who is responsible for scanning those in?

7      A.    The -- the detective would be responsible for

8  scanning those in.

9      Q.    And you said it's best practice.  Does that

10 mean there's no official policy on --

11     A.    I -- I don't always -- I've sometimes not

12 gotten witness statements for a case.  And I've, you

13 know, found out that the officer didn't scan them in.  So

14 I -- I didn't get it after I reviewed a report, and they

15 make reference to a written statement.  So then you

16 begin to look for wherever that is.

17          So in a perfect situation, you know, each and

18 every statement would be scanned in, and it would

19 accompany the report that it's linked to.  But I found

20 that -- that does -- is a perfect world and -- and that

21 this doesn't exist.

22     Q.    Okay.  So -- and ideally, every document

23 related to a case would be scanned in.  But sometimes,

24 it doesn't happen because that's human error?

25     A.    That's correct.  Human error, yes.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    When you were working as an OPD detective, did

2  you work with photo lineups in your investigations?

3      A.    Yes, I did.

4      Q.    In the 2013 timeframe, did the Orlando Police

5  Department have any explicit policy for what was

6  required to conduct a photo array?

7      A.    Yes, they did.

8      Q.    Okay.  Do you remember how many times you saw

9  that policy?

10     A.    I -- I don't.  I certainly know I would've

11  signed off on it.  When it was sent to us, you would

12  sign off on a policy.  Anytime there is a change or a

13  revision, it would be resubmitted, and you would have to

14  re-sign off on that policy to acknowledge the changes.

15     Q.    Okay.  When you say you signed off on it, what

16  do you mean?

17     A.    I mean, in a -- there's a computer program

18  that is utilized to archive all the policies,

19  procedures, regulations, training bulletins, et cetera.

20  And that's where you would go to look up those, not a

21  paper copy.

22     Q.    Okay.  As a detective, you had access to that

23  archive?

24     A.    I did.

25     Q.    How -- was there any training you received on



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1 the appropriate way to conduct a photo array?

2      A.   No.  No.  I'd seen it done many times as a

3 patrol officer.  I -- I knew how to use the system.

4      Q.   Okay.  So you say you saw it done a lot of

5 times while you were a patrol officer.  Is that how you

6 learned the proper way to conduct photo arrays?

7      A.   I -- I don't know if there was a -- a training

8 syllabus or anything that was done to learn how to use

9 that.  It -- it wasn't a complicated computer program.

10     Q.   Okay.  You said you -- you're not sure if

11 there was a specific protocol or training you --

12     A.   I -- I don't know.  I -- I don't believe there

13 was.

14     Q.   Okay.  But you don't remember?

15     A.   I don't.

16     Q.   Okay.

17     A.   No.

18     Q.   What is the proper way to conduct a photo

19 array?

20     A.   I guess that's kind of a broad question.  I --

21 I don't know what you mean by that --

22     Q.   Sure.

23     A.   -- setting.  I mean --

24     Q.   At -- okay.  So in the -- thinking about in

25 the 2013 timeframe, if you wanted to put together a

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1 photo array, how would you go about doing it?

2   A.   You would certainly look for a picture of your

3 potential suspect, and you would look for five other

4 people with similar physical characteristics.

5   Q.   Where did you get the photos that you would

6 use to construct photo arrays?

7   A.   They were largely from arrest photographs

8 maintained by the -- or taken by the Orange County

9 Corrections.

10  Q.   Okay.  Any other database you pulled from --

11  A.   Yes.

12  Q.   -- for photo arrays?  What other places did

13 you pull from for photo arrays?

14  A.   Florida Driver and Vehicle Information

15 Database.

16  Q.   And is it totally up to the discretion of the

17 detective who's constructing the photo array to select

18 which photos to use?

19  A.   Yes, it is.

20  Q.   Okay.  Did you ever, as a -- as a detective,

21 when you're putting together photo arrays, show your

22 photo array to another OPD officer?

23  A.   From time to time, yeah.

24  Q.   Okay.  And did -- do -- did -- during your

25 time as a detective, did other detectives show you photo



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1 arrays they had constructed.

2      A.   Yes.

3      Q.   Okay.  What was the purpose of that?

4      A.   To see if they thought it was too suggestive,

5 too similar.  Look for -- make sure you didn't have the

6 person in there twice, you know, just a -- a kind of a

7 proofread, so to speak.

8      Q.   Okay.  And what does it mean for a lineup to

9 be suggestive?

10      A.   That a person's -- the background in the

11 photograph or their -- something about the photograph is

12 leading.

13      Q.   So if the lineup's put together in a way where

14 the photo of the subject is distinct from the other

15 photos, that would be a suggestive lineup?

16          MR. MISTOLER:  Objection.

17          THE WITNESS:  A -- a photograph that is

18      distinct and stands out would likely be construed as

19      suggestive.

20          BY MS. DILLON:

21      Q.   Is it wrong for a lineup to be suggestive?

22      A.   It is.

23      Q.   Why is that wrong?

24      A.   It would lend itself to a suppression hearing

25 in -- in trial.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Any other reason why it's wrong for a lineup

2  to be suggestive?

3      A.   It is just not the best practice.

4      Q.   Okay.  If a witness selects a suspect from a

5  suggestive lineup, it's not a useful identification,

6  fair to say?

7      A.   I don't know.  I -- it would have to make

8  certain that the lineup itself was suggestive.

9      Q.   Okay.  You wouldn't rely on a photo lineup you

10  thought was suggestive; is that right?

11      A.   I wouldn't use a photo lineup that is

12  suggestive.

13      Q.   Okay.  And in putting together a photo array,

14  you would want the characteristics of all the fillers to

15  match the suspect as closely as possible, correct?

16          MR. MISTOLER:  Object to form.

17      A.   Objection.  You would want them to have

18  similar physical characteristics with which the person

19  -- you are subject of interest.

20      Q.   What characteristics would you be trying to

21  match?

22      A.   Obviously, sex, race.  You would want age.

23  You would want the background of the photograph to

24  match. You would look at the other physical

25  characteristics to include a beard, any earrings, ears,

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1 | hair, clothing.

2 |     Q.   Anything else you can think of?

3 |     A.   I can't.

4 |     Q.   Okay.  And I -- as -- you as a detective, you

5 | put together photo arrays, correct?

6 |     A.   Yes, I have.

7 |     Q.   How many times?

8 |     A.   I -- in 2013 or -- or now?

9 |     Q.   Let's start with now.

10 |     A.   Easily well over 100.

11 |     Q.   Okay.  And in 2013?

12 |     A.   I'd say probably at that time, 25, maybe.

13 |     Q.   Okay.  Have you ever heard of any detective or

14 | officer at OPD facing discipline for improperly

15 | conducting a photo array procedure?

16 |     A.   No.

17 |     Q.   In terms of creating a fair photo array, would

18 | you agree that you'd want to use as up-to-date photo of

19 | the suspect as possible?

20 |     A.   Not necessarily.

21 |     Q.   Okay.  What do you mean by that?

22 |     A.   I mean, the photograph that you may have may

23 | not be usable.

24 |     Q.   When you say, "may not be usable," what does

25 | that mean?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   You might not be able to find anybody that is

2  comparable to that person in photographs that you have.

3      Q.   So there's scenarios where you can't find

4  fillers that resemble the suspect close enough to use;

5  is that right?

6      A.   Yes.

7      Q.   And in that case, it would be appropriate to

8  use a photo from a different period in time that's

9  easier to match?

10     A.   Yes.

11     Q.   Okay.  Any other scenarios you can think of

12  where it would be appropriate to use a photo that's not

13  up-to-date?

14     A.   Yeah.  If -- if the photo was -- you know, a

15  lot of times, the backgrounds are -- are very different

16  in -- in the terms of color that is used by either the

17  jail.  I -- I just think that the main situation would

18  be where you cannot find anybody that is -- any other

19  photographs that are comparable.

20     Q.   Okay.  Fair to say matching the photographs is

21  more important than the date with which the suspect

22  photograph was taken?

23     A.   Yes.

24     Q.   Okay.  And you -- were you given any training

25  in 2013 about how many fillers needed to be in a photo

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  array?

2      A.   Well I didn't receive any training, no.

3      Q.   Okay.  How -- what was your understanding in

4  2013 of how many fillers --

5      A.   Well there's --

6      Q.   -- needed to be in a photo array?

7      A.   -- six places for pictures.

8      Q.   And when you say, "there's six places for

9  pictures," is there a standard form that you use when

10 constructing photo arrays?

11     A.   It was a program, and it had places -- places

12 for six pictures.

13     Q.   Do you recall what the program was called?

14     A.   Mugshots.

15     Q.   Okay.  And it's a program where you can put in

16 your photos and then it spits out a lineup; is that --

17     A.   Yes.

18     Q.   Okay.  When conducting a photo array in 2013,

19 was the practice to include all six photos on the same

20 page, or show them one at a time?

21     A.   All six photos at the same time.

22     Q.   Okay.  And I know you mentioned you weren't

23 given -- you can't recall any training on photo arrays,

24 but how did you know what to say to a witness before

25 showing them a photo array?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    There was a standard form that was called a
2  photo lineup administration and witness instructions. It
3  was pre-printed.

4      Q.    Okay.  And the pre-printed form contained
5  everything a detective was supposed to say to a witness
6  during a photo array?

7      A.    Yes.

8      Q.    Okay.  You can't recall anything that wouldn't
9  be on that form that you would say to folks who are
10 doing photo arrays?

11     A.    No.

12     Q.    Was the administrator of a photo array
13 supposed to ask the witness to provide a statement
14 regarding the suspect -- a description in as much detail
15 as possible?

16     A.    Yeah.  After -- if there had been a selection,
17 they would provide a statement.

18     Q.    Okay.  If there'd been -- there was a
19 selection, they were going to -- they should provide a
20 statement.

21     A.    That's correct.

22     Q.    But before the photo array, was it your
23 practice to ask suspects to -- or witnesses to give a
24 statement involving the suspect?

25     A.    No, because I -- I would've already been aware



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900           www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  of what their statement likely was.

2      Q.   Okay.  And that would be from witness

3  statements that --

4      A.   Correct.

5      Q.   -- were available to you?

6      A.   Correct.

7      Q.   Were you supposed to say anything to witnesses

8  during photo arrays?

9          MR. MISTOLER:  Objection.

10          THE WITNESS:  I don't know what you mean.

11      Anything specific --

12          BY MS. DILLON:

13      Q.   While a witness was looking at a photo array,

14  are detectives supposed to say anything?

15      A.   No.

16      Q.   Okay.  How did you know that if you weren't

17  given any training on that?

18      A.   Common sense.

19      Q.   Okay.  And had you -- in the 2013 timeframe,

20  had you seen other detectives conducting photo arrays

21  with witnesses?

22      A.   Yes.

23      Q.   Okay.  How can a detective tell if a witness

24  has made a positive identification from a photo array?

25      A.   They would certainly -- if they do make a

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  selection, sometimes it is the person that -- your --

2  your person of interest or it could be somebody else.

3      Q.  Okay.  When you say, "somebody else," you mean

4  the -- someone who's not the suspect?

5      A.  Yeah, absolutely.  A filler photograph.

6      Q.  Okay.  So there's a -- have there been

7  occasions in your work as a detective where a witness

8  has selected a filler photograph instead of a suspect?

9      A.  Yes.

10     Q.  What do you do in that scenario?

11     A.  I have them complete a statement, and that --

12 that's done.

13     Q.  Okay.  Have you ever had a scenario where a

14 witness identifies a suspect and then you later develop

15 a better suspect for a criminal investigation?

16     A.  Not that I can remember.

17     Q.  Okay.  Is there any level of certainty

18 required to decide whether a witness has positively

19 identified a subject from a photo lineup?

20     A.  No.

21     Q.  Okay.  Are you required to document the level

22 of certainty with which --

23     A.  No.

24     Q.  Do you agree that -- that's important

25 information?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          MR. MISTOLER:  Objection.

2          THE WITNESS:  I just go by what our policy

3     states, and I don't ask any question as to a

4     percentage that they felt they were making their

5     decision upon.

6          BY MS. DILLON:

7     Q.   Okay.  So OPD policy states it's not

8  appropriate to ask a witness the percentage or they are

9  in their identification?

10    A.   Yes.

11    Q.   Okay.  If a witness makes an identification in

12 a photo lineup, how does a -- how does a detective use

13 that information in the criminal investigation?

14    A.   Well you would certainly -- it depends on the

15 scenario with which the photo lineup is -- is being used

16 for.  Is it the person that you believe committed the

17 crime?  Is it the person that you believed you saw

18 driving a -- a car?  I mean, it would be kind of case

19 specific.

20    Q.   Okay.  So are -- I -- what I hear you saying

21 is that there's scenarios where you would do a photo

22 lineup, not to identify a suspect of a crime, but to

23 identify some other important person?

24    A.   Perhaps, yes.

25    Q.   Okay.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

1     A.    Yeah.

2     Q.    When you were working as a detective, did you

3 consider a positive identification from a photo lineup

4 proof that the identified person was the right suspect?

5     A.    I think it would go to establishing probable

6 cause.

7     Q.    Okay.  Why do you say that?

8     A.    When weighed in with any other facts and

9 evidence that you may have, it goes to establish a

10 probable cause when the person makes a positive

11 identification from a photo lineup.  When you are

12 attempting to identify somebody that may have been

13 involved in a -- in a crime that this person may have

14 intimate knowledge of.

15     Q.    Okay.  And you said, "when weighed with other

16 facts and evidence, it can establish probable cause."

17 What about when there aren't other facts and evidence?

18     A.    You would certainly want to have as strong a

19 case a -- as you could, but with some other facts and

20 evidence, but I -- I don't believe that you could not

21 consider that weight of a photo lineup identification.

22     Q.    Would you stop investigating a case once you

23 had a positive identification from a lineup?

24     A.    Yes and no.  It would have to depend upon the

25 specific case.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1     Q.   In what scenarios would you stop investigating

2  a case with a positive photo lineup identification?

3     A.   If -- if you -- you know, you believe that --

4  that was the person that was responsible for the

5  incident.

6     Q.   Okay.  Anything else?

7     A.   I can't think of anything as I'm sitting here

8  right now.  No.

9     Q.   In what scenarios would you continue

10 investigating a case once a photo identification had

11 been made from a lineup?

12    A.   If you had multiple suspects, for example.

13    Q.   Anything else?

14    A.   I can't think of anything right now.

15    Q.   Okay.  Would it be proper for a detective to

16 tell a witness that the person they selected from a

17 photo array is the suspect?

18         MR. MISTOLER:  Objection.

19         THE WITNESS:  No.

20         BY MS. DILLON:

21    Q.   Why not?

22    A.   I think you should not provide them any other

23 information about the incident and just conclude it with

24 their statement.

25    Q.   Okay.  And is that official policy or personal

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1  practice?

 2      A.   Personal practice.  I -- I don't have the

 3  policy with me now.

 4      Q.   Would it be proper for a detective to tell a

 5  witness that he identified the same photograph as

 6  another witness in a photo lineup?

 7          MR. MISTOLER:  Objection.

 8          THE WITNESS:  No.

 9          BY MS. DILLON:

10      Q.   Why not?

11      A.   I think it speaks for itself in that you would

12  want to keep their recollection of the incident and

13  their participation in the photo lineup process

14  distinctly separate from anyone else.

15      Q.   Is the concern that telling a witness that he

16  identified the same photograph as another witness, that

17  it would taint the identification?

18      A.   I don't know what the scenarios could be.

19  That could certainly be one.  But, you know, you would

20  want to maintain the integrity of the case by keeping

21  that person's testimony and the action they took with a

22  photo lineup specific to their own experience and

23  interaction.

24      Q.   Is it appropriate for a detective to take any

25  steps before, during, or after a photo lineup to suggest



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  to the witness which photograph belongs to the suspect?

2       A.   No, that's not appropriate.

3       Q.   Why not?

4       A.   I -- I again, I think it speaks for itself.

5  It's suggestiveness, and it's just not proper.

6       Q.   Is it appropriate for a detective to show an

7  eyewitness more than one photograph of a suspect when

8  conducting a photo lineup?

9       A.   No.  You get one shot at it.

10      Q.   Okay.  So if you were to show a witness a

11 photo array and you selected a suspect, would it ever be

12 appropriate to then show the witness another photograph

13 of the suspect?

14      A.   No.  You get one shot at it.

15      Q.   Okay.  Are there any other rules about what a

16 detective should not do in connection with using a photo

17 array lineup in a criminal investigation?

18          MR. MISTOLER:  Objection.

19          THE WITNESS:  I -- I don't know if there are

20      any other rules per se, but I think you would just

21      want to use common sense and know that you -- it's

22      just not appropriate to speak to them about anything

23      other than the purpose that you're there for.

24          BY MS. DILLON:

25      Q.   What kind of documentation were detectives

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  required to do in 2013 in relation to photo array

2  lineups?

3      A.   As far as the create -- I -- I created it

4  or --

5      Q.   Yeah.  Was there any kind of requirement to

6  create a report after conducting a photo array lineup?

7      A.   You would have certainly wanted to include

8  your actions taken within your report.

9      Q.   What do you mean by that?

10      A.   I met with Mr. Jones.  I read Mr. Jones' --

11  the -- our photo lineup administration, witness

12  instructions, then what -- what you did next and then

13  what the results were, you know, something as simple as

14  that.

15      Q.   Okay.  Would that be in, like, a supplemental

16  report?

17      A.   Yes.

18      Q.   Okay.  And was it your practice to create a

19  supplementary report in connection to each photo array

20  lineup you conducted?

21      A.   It -- it should be done.

22      Q.   Okay.  Was there any -- strike that.  What

23  about with a show-up?  Was it standard practice to write

24  a police report when a show-up identification procedure

25  was used?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.   As detectives, we don't do really show-ups.

2  Those are mainly done by patrol personnel.

3      Q.   Would it be standard practice for patrol to

4  write a report documenting a show-up?

5      A.   It should, yes.

6      Q.   Okay.  If a detective showed a single

7  photograph of a person of interest to a witness, would

8  you expect that to be documented somewhere?

9      A.   If a patrol officer --

10     Q.   If a detective or patrol officer?

11     A.   Would I expect it to be documented?

12     Q.   Yes.

13     A.   You should certainly, yes, document that.

14     Q.   Okay.  If a photo was shown to a witness in

15  any capacity, would you expect that to be documented?

16         MR. MISTOLER:  Objection.

17         THE WITNESS:  Yes.

18         BY MS. DILLON:

19     Q.   Okay.  And would you expect the photo to be

20  inventoried?

21     A.   You would want to certainly make reference to

22  what specific photo it was that you were showing to a

23  person.

24     Q.   Okay.  And that was true in 2013?

25     A.   Yes.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.    Are you familiar with the concept of blind

2  administration of a photo lineup?

3      A.    Yes, I am.

4      Q.    Okay.  What is your understanding of blind

5  administration of photo lineups?

6      A.    To have somebody else, excuse me, administer

7  the photographic lineup that has no knowledge of -- of

8  the person of interest that you have within the photo

9  lineup.

10      Q.    Is that important?

11      A.    It is now, yes.

12      Q.    When you say, "it is now," was there a time

13  when that wasn't important?

14      A.    Yes.

15      Q.    When was that?

16      A.    That law changed on October 1st of 2017 in the

17  State of Florida.

18      Q.    Okay.  So prior to 2017, it wasn't important

19  to have a blind administration of a photo lineup?

20      A.    It -- not -- not that it wasn't important.  It

21  was not required.

22      Q.    Okay.  It wasn't officially required?

23      A.    It was not officially required.  It's not that

24  it wasn't important.  It was not required statutorily.

25      Q.    Okay.  Would it be best practice to have a

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 | blind administration of a photo lineup?

2 |         MR. MISTOLER:  Objection.

3 |         THE WITNESS:  It looks like it was as the

4 |     statute was changed.

5 |         BY MS. DILLON:

6 |     Q.   Okay.  Is it important because if the

7 | administrator knows something about the case or they

8 | know who the suspect is, they might signal to the

9 | witness in some way who to pick even if subconsciously?

10 |        MR. MISTOLER:  Objection.

11 |        THE WITNESS:  No.

12 |        BY MS. DILLON:

13 |    Q.   Why do you say no?

14 |    A.   Because that's just not something that anyone

15 | would ever -- it's not something I would do or have

16 | done, but that is, I would imagine, something as to why

17 | -- I'm just speculating as to why they would've changed

18 | the statute.

19 |    Q.   So you think that could be a reason why they

20 | changed the statute?  But to you personally, it's not

21 | something that is important?

22 |        MR. MISTOLER:  Objection.

23 |        THE WITNESS:  No, I didn't say not important. I

24 |     said, "it was not required."  I corrected myself.

25 |        BY MS. DILLON:

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.

2           MR. MISTOLER:  Roz, we've been going about an

3      hour.  Do you want to take a break?

4           MS. DILLON:  Sure.  I have just a couple more

5      questions on photo lineups.  Can we close those out?

6      It'll take maybe five minutes.

7           MR. MISTOLER:  Okay.

8           MS. DILLON:  And then -- is that okay?

9           MR. MISTOLER:  Sure.  It is

10          MS. DILLON:  Right.  I -- actually, let's -- we

11     can take a break now.

12          MR. MISTOLER:  Okay.

13          THE VIDEOGRAPHER:  Okay.  The time is 2:24 p.m.

14     We're going off record.

15          (A recess was taken.)

16          THE VIDEOGRAPHER:  We're back on record.  The

17     time is 2:34 p.m.

18          BY MS. DILLON:

19     Q.   All right, Mike.  We were talking a little bit

20 before we went off the record about blind eyewitness

21 lineup administration.  Do you remember that?

22     A.   Yes, I do.

23     Q.   Okay.  And you had said the law changed in

24 2017 to require blind administration of lineups?

25     A.   Yes, I did.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      Q.   Okay.  Before 2017, did you have a personal

2   practice of conducting lineups blind?

3      A.   No.  They -- they could have been administered

4   either by yourself.  You could administer it by

5   yourself.  You could have somebody else do it.  If there

6   was a scheduling issue and you were not able to make the

7   time when it -- lineup was going to be administered, so

8   you would have someone else do it, but --

9      Q.   Okay.  So there's various reasons why maybe it

10  would be administered by the creator of the lineup or

11  someone who didn't create it, but it didn't have to do

12  with the blind administration?

13     A.   Yes.

14     Q.   Okay.  Are you familiar with the concept of

15  tunnel vision?

16     A.   In what context?

17     Q.   Just as a general concept?

18     A.   Yes.

19     Q.   Okay.  What is your understanding of that

20  concept?

21     A.   Well --

22          MR. MISTOLER:  Objection.

23          THE WITNESS:  Yeah.  I'm trying to --

24          BY MS. DILLON:

25     Q.   Are you familiar with that concept as it

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 pertains to policing?

2     A.   Yes.  In multiple different scenarios.

3     Q.   Okay.  It's fair to say it's best to avoid

4 tunnel vision in policing?

5          MR. MISTOLER:  Objection.

6          THE WITNESS:  Yes.

7          BY MS. DILLON:

8     Q.   Were you given any training on how to avoid

9 tunnel vision as a detective?

10     A.   I'm -- I guess.  I -- I make certain I'm -- I

11 -- again, like I said, there are many different

12 scenarios with which I -- I can think of a use of force

13 situation when somebody develops tunnel vision.

14     Q.   Okay.

15     A.   I -- I'm just trying to answer your question.

16     Q.   Sure.

17     A.   I think is it -- if it's appropriate for here.

18     Q.   Are there scenarios where you can think of

19 tunnel vision occurring in policing?

20     A.   Sure.

21     Q.   What other scenarios can you think of where

22 tunnel could occur as a detective?

23     A.   When you might only consider one person or one

24 scenario as being in -- in existence for a -- a specific

25 crime.


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  So do you agree to -- that in order to

2 avoid tunnel vision in that scenario, it's best to

3 pursue all possible suspects?

4           MR. MISTOLER:  Objection.

5           THE WITNESS:  It'd be best to try to utilize

6      all of the evidence that you have available with

7      which to develop suspects.

8           BY MS. DILLON:

9      Q.   Okay.  So in a scenario -- to avoid a scenario

10 where an officer has tunnel vision, considering only one

11 person as a suspect, you agree it would be best to

12 pursue all the evidence to try to develop any additional

13 suspects?

14      A.   You would go the -- you would go where the

15 evidence takes you.

16      Q.   Okay.  How do you determine as a detective

17 whether or not to eliminate someone from consideration

18 of being a suspect?

19      A.   If the evidence doesn't support them being

20 included in as a suspect.

21      Q.   Okay.  So in general, if evidence pointed away

22 from a suspect, that would cause you to stop pursuing a

23 suspect; is that right?

24           MR. MISTOLER:  Objection.

25           THE WITNESS:  You -- if -- you're asking if --



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      to rule somebody out?

2          BY MS. DILLON:

3      Q.   Yes.

4      A.   You know, if the evidence certainly ruled

5  somebody out, then that would be it -- it for them as a

6  suspect.

7      Q.   Okay.  Are you familiar with law enforcement's

8  obligation to disclose evidence that could be

9  exculpatory or impeaching?

10     A.   Yes.

11     Q.   Okay.  What do you understand that obligation

12 to entail?

13     A.   If there is some piece of evidence that is in

14 existence that could serve to exonerate somebody or

15 otherwise eliminate them as being a suspect, law

16 enforcement is required to disclose that information.

17     Q.   Okay.  And did detectives in 2013 generally

18 have discretion to decide what they thought was

19 exculpatory or exonerating that needed to be disclosed?

20     A.   No.

21     Q.   Okay.  How would it be determined what

22 evidence was exonerating or --

23     A.   You would turn over any and all evidence with

24 which you had uncovered and were in possession of

25 related to a crime.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    Q.   Okay.  So the policy was to turn over

2    everything in a case file pertaining to a crime?

3    A.   That's correct.  That's correct.

4    Q.   You wouldn't pick and choose what --

5    A.   No.

6    Q.   -- was exonerating or not to give to the

7    prosecution?

8    A.   No.

9    Q.   Okay.  Did detectives have discretion about

10   what went into the case file?

11   A.   And -- and when you say, "case file," what are

12   you referring --

13   Q.   Whatever you would be turning over to the

14   prosecution.

15   A.   No.  You would turn over everything that you

16   had gathered and used with which to make your decision

17   for -- to affect an arrest warrant or some other

18   charging scenario.

19   Q.   And did you receive any training at OPD about

20   the obligation to give prosecution all kinds of

21   exculpatory evidence?

22   A.   Not that I directly recall.  Although we have

23   a legal -- legal update annually, so I'd be surprised if

24   -- if that topic was not covered at some point.

25   Q.   Okay.  What is the legal update annually?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  What format does that take?

2      A.   It takes place in a classroom.

3      Q.   So it's like an ongoing classroom-based

4  update?

5      A.   Yes.

6      Q.   Okay.  Is it required?

7      A.   Yes, it is.

8      Q.   Okay.  And that happens every year?

9      A.   It does.

10     Q.   Is it required for all OPD officers, or just

11 detectives?

12     A.   All officers.

13     Q.   Okay.  And you said you would be surprised if

14 that didn't include information about exculpatory

15 evidence, but you can't remember one way or the other?

16     A.   I -- I can't, no, but it's on a variety of

17 topics.

18     Q.   So before -- now I'm going to direct us a

19 little more towards the case that we're here for. Before

20 April 9, 2013, did you know the name Jorge Valle- Ramos?

21     A.   No.

22     Q.   Had you ever heard a conversation about him at

23 OPD?

24     A.   No.

25     Q.   Did you ever -- had you ever received any



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   correspondence, memo, or e-mail about him before the

2   Gonzalez burglary?

3       A.   No.

4       Q.   Fair to say Mr. Valle-Ramos was not known to

5   you at the time of the Gonzalez burglary?

6       A.   That's correct.

7       Q.   Before April 9, 2013, was Amos Ortiz

8   (phonetic) a person that was known to you?

9       A.   No.

10      Q.   How about Marquis Hickson?

11      A.   No.

12      Q.   Karl Jeudy?

13      A.   No.

14      Q.   George Gonzalez?

15      A.   No.

16      Q.   Charlene Bloom?

17      A.   Nope.

18      Q.   Bethany Szewczyk?

19      A.   Nope.

20      Q.   I want to now ask about your participation in

21  the investigation into the Gonzalez burglary that

22  happened on April 9, 2013.  Were you working that day?

23      A.   I don't remember.

24      Q.   Okay.  Would you agree you were working at the

25  Orlando Police Department at that time?

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.   Yes.  Yes, I would.

2    Q.   Do you recall what shift you worked?

3    A.   I worked normally a day shift, and then there

4  was an on-call rotation that cycled through amongst all

5  of the office -- amongst all of the property detectives

6  in which you worked later hours.

7    Q.   Okay.

8    A.   I don't remember.

9    Q.   That's okay.  It's not a memory test.  Was the

10  day shift you worked, do you recall what days?

11    A.   You would work Monday through Friday.

12    Q.   Okay.  And your assignment was East Property

13  Division; is that --

14    A.   East Property Unit.

15    Q.   Okay.  East Property Unit.  Do you recall when

16  you got the assignment to head of the Gonzalez burglary

17  investigation?

18    A.   From reviewing my report, I recall I was

19  assigned it the next day.

20    Q.   Okay.  Do you have any independent

21  recollection of being assigned?

22    A.   I don't.

23    Q.   Who -- do you know who gave you the

24  assignment?

25    A.   Whoever the sergeant was would've received the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

 1  case and then sent it out to the appropriate detective,

 2  again, based on their geographic area.

 3      Q.   If I -- if I said it could be Daniel Brady,

 4  does that jog your memory at all or just --

 5      A.   I -- I don't remember when Dan Brady was our

 6  sergeant.

 7      Q.   Would the assigning sergeant also become the

 8  supervisor on the case?

 9      A.   I guess, technically, yes.

10      Q.   Okay.  When you say, "technically yes," what

11  do you mean?

12      A.   They would not be doing any investigating --

13      Q.   Okay.

14      A.   -- per se.  But they would be merely assigning

15  those cases.  They'd read them and then assign them to

16  the detectives that would be under their supervision.

17      Q.   Would they sign off on the reports related to

18  the investigation that they assigned?

19      A.   No.  They wouldn't sign off on a report.  No,

20  the -- they would just merely assign it.

21      Q.   Okay.  Who would be -- if you were the

22  detective -- you were the detective on the George

23  Gonzalez burglary investigation.  Were you directly

24  reporting to anybody?

25      A.   I would've been reporting directly to a -- a



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  sergeant in that unit at the time.

2      Q.   Okay.  We're just not sure who that was?

3      A.   That's correct.

4      Q.   What information did you have about the

5  burglary when you were assigned?

6      A.   Well I would've had the case report that was

7  generated by the initial officer and any statements that

8  they obtained.

9      Q.   Okay.  And I think you said earlier, you

10 would've got that information from a computer system; is

11 that right?

12     A.   That's correct.

13     Q.   Would you take care to review all reports

14 available to you in a case where you were assigned as

15 lead detective?

16     A.   Would I take care to --

17     Q.   Would you be careful to review all the

18 reports?

19     A.   Oh, yes.

20     Q.   Okay.  That would include witness statements,

21 correct?

22     A.   Yes.

23     Q.   Evidence reports?

24     A.   Yes.

25     Q.   Scene reports of responding officers?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.    Yes.

2      Q.    Okay.  Do you have any -- do you have any

3  independent recollection of reviewing those reports when

4  you were assigned the case?

5      A.    No.

6      Q.    Okay.  After you gathered that information,

7  what did you do next?

8      A.    Looking at my report again, I contacted Mr.

9  Gonzalez, spoke to him.  I don't remember if I spoke to

10 Ms. Bloom or not.

11     Q.    Well let's take it step by step.  Let's talk

12 about Mr. Gonzalez for a second.  You said you reached

13 out to him.  Do you recall how many times you reached

14 out to him?

15     A.    I don't.

16     Q.    And did you reach out to him via phone?

17     A.    I would have to defer to my report.  I don't

18 remember if we met or if it was by phone.

19     Q.    Okay.  And do you remember anything about what

20 you said to him?

21     A.    I don't.

22     Q.    Do you remember anything about what he said to

23 you?

24     A.    I don't.

25     Q.    Do you remember if anyone else was present for


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  that conversation?

2      A.   No, I don't.

3      Q.   Okay.  Do you remember memorializing in any

4  way your first interaction with Mr. Gonzalez?

5      A.   A -- any memorialization of my activity with

6  him would've been documented in the case -- case report,

7  and actually the supplemental report that I did.

8      Q.   Okay.  Do you remember showing him a lineup?

9      A.   Vaguely.

10      Q.   Okay.  And that wouldn't have been the first

11  time -- interaction you had with him, would you have

12  called him before that or talked to him before that?

13      A.   I probably would've had to have called

14  somebody to arrange a time and a place.

15      Q.   Do you remember where you conducted the lineup

16  with Mr. Gonzalez?

17      A.   I feel like it was at our station.

18      Q.   Okay.  And when you say you feel that, is that

19  just where it would've been, or do you have an

20  independent memory of showing him the lineup at the

21  station?

22      A.   I -- I don't have an independent memory.

23      Q.   Okay.  Do you remember him selecting a

24  suspect?

25      A.   I don't remember the process of being with him



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1  that day.

2      Q.   Okay.  So you don't remember if he was

3  confident in a selection?

4      A.   I don't remember, other than going back

5  through my reports and noting that he did select a

6  person that I believe was the suspect.

7      Q.   Okay.  Do you remember showing him any other

8  photographs of Mr. Valle-Ramos the day you conducted the

9  lineup?

10     A.   No, I don't.

11     Q.   Okay.  Would you have memorialized that if you

12  had?

13     A.   Yes.

14     Q.   Did you show him a black and white photocopy

15  of a lineup or a color copy of a lineup?

16     A.   I don't remember which.

17     Q.   Do you remember in 2013, if you were going to

18  print out a photo array for a witness to view, whether

19  it would've been printed in black and white or color?

20     A.   I certainly would've used color if the

21  background of the photographs were all consistent.

22     Q.   Okay.  You would've tried to use a color

23  lineup if you could have?

24     A.   Yes.

25     Q.   But it's possible you showed a black and white



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 photo lineup?

2      A.   It's possible if the backgrounds didn't match.

3      Q.   Okay.

4      A.   Some were gray, some were white, some were

5 blue, so.

6      Q.   Fair enough.  So you did the lineup with Mr.

7 Gonzalez.  Do you remember the next investigative step

8 you took as it relates to the case?

9      A.   I believe that I then created an arrest

10 warrant for Mr. Valle-Ramos.

11      Q.   Okay.  And before you created the arrest

12 warrant, do you remember talking to a lady named

13 Charlene Bloom?

14      A.   I did, yes.

15      Q.   Okay.  And do you remember that conversation

16 happening before you created the arrest warrant?

17      A.   I don't remember the order.

18      Q.   Okay.

19      A.   But I'm certain my report would've documented

20 the timeframe --

21      Q.   Okay.

22      A.   -- when that occurred.

23      Q.   Do -- and so you say you remember talking to

24 Ms. Bloom?

25      A.   I -- I remember -- I -- I remember looking at



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**         **www.MILESTONEREPORTING.com**         **Toll Free 855-MYDEPOS**

 1  my report.

 2        Q.   Okay.

 3        A.   But I don't remember the actual conversation.

 4        Q.   Right.  So you don't have any independent

 5  recollection of what she said to you during that

 6  conversation?

 7        A.   I don't.

 8        Q.   Do you remember talking with a woman named

 9  Bethany Szewczyk?

10        A.   I do.

11        Q.   Okay.  Do you remember how many times you

12  talked with Ms. Szewczyk?

13        A.   I think once definitely on the phone to

14  arrange the time for the photo lineup, and then another

15  time in person.

16        Q.   Okay.  Do you remember any -- about the

17  initial phone call, do you remember anything that Ms.

18  Szewczyk said to you?

19        A.   I don't.

20        Q.   Anything you said to her?

21        A.   I don't.

22        Q.   Do you remember showing her a photo lineup?

23        A.   Vaguely.

24        Q.   What do you remember about showing her a

25  lineup?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

1      A.   I feel like it was out by UCF.

2      Q.   Okay.  UCF is that a --

3      A.   It's at University Central Florida.

4      Q.   Do you remember her selecting a suspect?

5      A.   Yes, I do.

6      Q.   Do you remember whether she was confident in

7  her selection?

8      A.   I remember not independently.  I remember in

9  reviewing her testimony from the criminal trial, it

10  shows that she made a selection.

11     Q.   Okay.  So you remember because you reviewed

12  the report, you don't have an independent recollection?

13     A.   That's -- that's correct.

14     Q.   Did you show her any other photographs of Mr.

15  Valle-Ramos?

16     A.   No.

17     Q.   And do you remember -- these might be the same

18  answers for what I just asked you for Mr. Gonzalez, but

19  do you remember whether you showed her a black and white

20  photo array or a color copy?

21     A.   I don't remember.

22     Q.   Okay.  Was there any policy or practice about

23  whether or not to show photo arrays in color or black

24  and white?

25     A.   No, there was not.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.

2      A.   Again, you would come down to common sense.

3      Q.   Okay.  So there's scenarios where it would be

4  appropriate to print something in black and -- a photo

5  or in black and white and show it to a suspect.  Is that

6  -- or a witness; is that right?

7      A.   Yes.

8      Q.   Okay.  Do you remember any other interactions

9  with Bethany Szewczyk?

10     A.   I don't.

11     Q.   Okay.  Did you ever speak with any other

12  witnesses in connection with the Gonzalez burglary?

13     A.   None other than the ones that we've discussed

14  here today.

15     Q.   Yeah.  Other than the people we discussed --

16     A.   No.

17     Q.   -- you have no memory of talking to anybody

18  else?

19     A.   No.

20     Q.   Okay.  So let's take a couple steps back.  At

21  some point, you decided Mr. Valle-Ramos was a suspect in

22  the Gonzalez burglary, correct?

23     A.   I did.

24     Q.   How did you develop Mr. Valle-Ramos as a

25  suspect in the Gonzalez burglary?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      A.   I saw his photograph in a criminal information

2 bulletin.

3           MS. DILLON:  So I'm going to show you what will

4      be Plaintiff's Exhibit 19.

5           (Exhibit 19 was marked for identification.)

6           THE WITNESS:  Okay.

7           MS. DILLON:  I'm sorry.  Oops.  I'll let you

8      mark it before I -- okay.

9           BY MS. DILLON:

10     Q.   And for the record, this is a one-page

11 document, Bates P1414.  Do you see at the top there

12 where it says, "City of Orlando Police Department

13 Criminal Information Bulletin?"

14     A.   Yes, I do.

15     Q.   Okay.  Do you recognize this?

16     A.   I do.

17     Q.   What is it?

18     A.   It is a criminal information bullet --

19 bulletin documenting a suspicious vehicle in the India

20 sector.

21     Q.   Okay.  Is this a bulletin you were just

22 referring to?

23     A.   It is.

24     Q.   And is this how you selected Mr. Valle-Ramos

25 as a suspect?



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Not solely, no.

2      Q.   Okay.  What do you mean when you say that?

3      A.   Well it -- I looked at the background of what

4  led up to this incident.

5      Q.   Okay.  So you took some further investigative

6  steps to look into the underlying incident, and that's

7  referred to in the bulletin?

8      A.   Yes, I did.

9      Q.   And what did you learn?

10     A.   I learned that these four individuals were

11 stopped in a vehicle in a certain geographic area, and

12 this vehicle had earlier on the day of April 3rd been

13 seen essentially casing houses.

14     Q.   What do you mean, casing houses?

15     A.   Looking for houses with which to burglarize.

16     Q.   What were they doing to case houses to

17 burglarize?

18     A.   The report that was generated stated that

19 there was a homeowner who had seen some people go up and

20 knock on a front door, and when there was not a

21 response, they would go around to the back door.  And

22 this woman observed them going up to houses when there

23 were no cars in the driveway.

24     Q.   Okay.  And do you agree with me there are four

25 pictures --



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1     A.   Yes, there --

2     Q.   -- in the middle of this --

3     A.   Yes there are.

4     Q.   -- document?  Why did you select Mr. Valle-

5  Ramos as a suspect for the Gonzalez burglary

6  investigation?

7     A.   It had been provided to me by Mr. Gonzalez

8  that the -- one of the suspects in the burglary at his

9  residence had a very distinct Afro haircut.

10    Q.   When did Mr. Gonzalez provide you that

11 information?

12    A.   It was either on his statement in the report

13 or in a conversation that I had with him.

14    Q.   Okay.  And a conversation related to the photo

15 lineup; is that right?

16    A.   No.  No.  A conversation that I would've had

17 with him as the -- reaching out to talk to him as he was

18 the victim of the incident, and I would've introduced

19 myself as the detective that would've been assigned to

20 his case.

21    Q.   Okay.  And do you have any independent

22 recollection of that conversation?

23    A.   I -- I don't, other than that's what I would

24 do on cases that I would be assigned.

25    Q.   Okay.  And so it's possible you got



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  information about an Afro, either from the witness

2  statement or from a phone call with Mr. Gonzalez; is

3  that right?

4      A.  Yes, it is.

5      Q.  If you had gotten it -- that information from

6  a phone call, would you have documented that

7  information?

8      A.  No, not necessarily.  I mean, I -- I would've

9  remembered it at the time.

10     Q.  Okay.  Do you know how old the photograph in

11  the bulletin was?

12     A.  I -- I don't know the date of that photograph.

13 No.

14     Q.  Okay.  Would you agree a person's hair can

15 change over time?

16     A.  Yes.

17     Q.  Did you check -- did you take any

18 investigative steps to see if Mr. Valle-Ramos still had

19 an Afro-style haircut before you decided to include him

20 in a photo lineup?

21     A.  This was the most recent photograph of Mr.

22 Valle-Ramos in his driver license summary, but I did not

23 know the date of it, nor did I know -- recall -- nor do

24 I recall if that was the -- when it was taken.

25     Q.  Okay.  So besides checking the driver's

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  license database and noticing this photograph was the

2  most recent of Mr. Valle-Ramos, was there any other

3  steps you took to check and see if Mr. Valle-Ramos still

4  had an Afro?

5      A.   No.

6      Q.   Was there anything stopping you from taking

7  such a step?

8      A.   Other than going and -- and finding him.

9      Q.   Okay.  Could you have found him if you wanted

10 to?

11     A.   I -- I don't know.  I don't know -- recall

12 where his address -- if it looked like it was an

13 accurate address.  I -- I don't recall.

14     Q.   Okay.  And is there any other reason besides

15 Mr. Valle-Ramos having an Afro that you selected him as

16 a suspect for the Gonzalez burglary in this -- that you

17 can point out in this bulletin?

18     A.   Well the incident that is listed here, this

19 location, 5075 Andrea Boulevard, was approximately two

20 miles from Mr. Gonzalez's residence.  The location where

21 the officers stopped this vehicle was right outside

22 their residence on Curry Ford Road.  These individuals

23 were located in a silver four-door vehicle, and a silver

24 four-door vehicle was -- description was given by the

25 people involved that had witnessed Mr. Gonzalez's

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 burglary.

2      Q.   Anything else?

3      A.   No.

4      Q.   Okay.  So one of the things you mentioned is

5 that the four-door 2003 Volkswagen Jetta described in

6 the bulletin matched witness descriptions of the vehicle

7 seen fleeing the burglary?

8      A.   Of a silver vehicle.

9      Q.   Of a silver vehicle.  Okay.  But you agree

10 this picture, the car in the bulletin, is described as a

11 silver four-door 2003 Volkswagen Jetta?

12      A.   That's correct.

13      Q.   Okay.  If the eyewitness who was closest to

14 the vehicle reported that it was a newer gray Toyota, do

15 you believe that description matches the description of

16 a silver 2003 Volkswagen Jetta?

17          MR. MISTOLER:  Objection.

18          THE WITNESS:  I -- I believe that from my

19     history, a lot of people don't know cars and get

20     them wrong.

21          BY MS. DILLON:

22      Q.   Okay.  Did you take any steps to try and see

23 if the eyewitnesses recognized the vehicle depicted in

24 the -- in the bulletin?

25      A.   No.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  What about -- do you agree there's two

2  other gentlemen depicted in this bulletin besides Mr.

3  Valle-Ramos?

4    A.   Yes.

5    Q.   And were you aware that Mr. Gonzalez said that

6  he had seen three perpetrators that broke into his house

7  and that he could identify them?

8    A.   Yes.

9    Q.   Okay.  Did you present Mr. Gonzalez a lineup

10 with Marquis Hickson in it?

11   A.   Yes.

12   Q.   You did present him a lineup --

13   A.   Yes, I did.

14   Q.   -- with Marquis Hickson?  When did you do

15 that?

16   A.   The same day I did with Mr. Ramos.

17   Q.   The same day --

18   A.   That his photo lineup was presented

19   Q.   -- that you put up a photo lineup?  So did you

20 show Mr. Gonzalez more than one photo lineup?

21   A.   Yes.  I also showed him a photo lineup

22 containing one with Mr. Karl Jeudy.

23   Q.   If you had shown Mr. Gonzalez photo lineups

24 with Mr. Hickson and Mr. Jeudy, would you have

25 documented those photo lineups?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1     A.   They should have been.  Yes.  I don't recall

2 if -- if they were.  Everything that I had done would've

3 been presented to the State Attorney's office.

4     Q.   Okay.  And you said earlier that the detective

5 who created the photo lineups would be responsible for

6 uploading photo arrays so that they could be turned over

7 eventually; is that right?

8     A.   Yes.

9     Q.   Okay.  Okay.  So based on this bulletin, did

10 you ever try to find the 2003 Volkswagen Jetta?

11     A.   I did not.  The officers located it and

12 generated this bulletin.

13     Q.   Okay.  But in connection with the Gonzalez

14 Burglary investigation, did you try to locate the 2003

15 Volkswagen Jetta?

16     A.   I never located this vehicle.  No.

17     Q.   Did you take any steps to try to locate the

18 vehicle?

19     A.   Not that I remember.  No.

20     Q.   Okay.  You were aware that the suspects had

21 fled the scene in the vehicle described by the

22 witnesses, correct?

23     A.   Yes.

24     MS. DILLON:  Okay.

25     MR. MISTOLER:  And object to that last

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1      question.  I'm sorry.  I missed that one, Madam

2      Court Reporter.

3           BY MS. DILLON:

4      Q.   And you believed this could be the same

5  vehicle, this Volkswagen Jetta?

6      A.   Could be the same as the silver four-door?

7      Q.   As -- yes.

8      A.   Yes.

9      Q.   Did you think there could be evidence in the

10 getaway vehicle?

11          MR. MISTOLER:  Objection.

12          THE WITNESS:  I don't know.

13          BY MS. DILLON:

14     Q.   Okay.  And you have a -- there's -- in the

15 third sentence down in this case info, in the middle of

16 the page, it says, "Florida tag M64-2EK;" is that right?

17     A.   That's what the detective put.  Yes.

18     Q.   Could you have located the vehicle's owner

19 with that tag number?

20          MR. MISTOLER:  Objection.

21          THE WITNESS:  Potentially.

22          BY MS. DILLON:

23     Q.   Okay.  But you didn't take any steps to do so;

24 is that right?

25     A.   No.  I -- not that I remember.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.  Why not?

2    A.   Why don't I remember, or --

3    Q.   Why wouldn't you, if you did not take any

4 steps to seek out this --

5    A.   I don't know.

6    Q.   -- four-door?  You don't know?

7    A.   I don't know.

8    Q.   Okay.  So we can set this exhibit aside.

9 Actually, one more question.

10    A.   Yes.

11    Q.   Did you show Ms. Szewczyk a photo lineup with

12 Marquis Hickson?

13    A.   I don't remember.

14    Q.   Okay.  Did you show her a photo lineup with

15 Karl Jeudy?

16    A.   I don't remember.

17    Q.   If you had, you would've documented it, right?

18    A.   I -- I should have.  Yes.

19    Q.   Okay.  And if you had documented it, you would

20 have taken care to upload it to the case file or

21 wherever the reports were uploaded to?

22    A.   Yes.

23    Q.   Okay.  I want to talk about a little -- a

24 little more about the lineup you used specifically in

25 connection with the Gonzalez burglary.  And you were the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  only detective on the case; is that right?

2      A.   Yes.

3      Q.   So you created the lineup used for the

4  Gonzalez burglary investigation?

5      A.   I did.  Yes, I did.

6      Q.   How many lineups did you create?

7      A.   One lineup.

8      Q.   Okay.  One lineup with Mr. Valle-Ramos?

9      A.   Yes.

10     Q.   And did you say just a minute ago you also

11 created lineup with Marquis Hickson?

12     A.   Oh.  Yes.  So it would've been three.

13     Q.   Okay.  And how many pictures did you include

14 in each lineup?

15     A.   Well six are required, so six.

16     Q.   Okay.  Did you select the photos that went

17 into those lineups?

18     A.   Yes, I did.

19     Q.   Okay.  And how did you select those

20 photographs?

21     A.   By similar physical characteristics.

22     Q.   Okay.  Did you show that lineup that you

23 created to anyone else at OPD to assure yourself it

24 wasn't suggestive?

25     A.   I don't remember.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  What were you hoping to accomplish with

2  the lineup with Mr. Valle-Ramos in it?

3    A.   To see if Mr. Gonzalez could identify the

4  person.

5    Q.   And he did identify Mr. Valle-Ramos, correct?

6    A.   Yes, he did.

7    Q.   Okay.  And then what were you hoping to

8  accomplish with the lineup that you said you showed Mr.

9  Gonzalez with Marquis Hickson?

10   A.   Same.

11   Q.   Okay.  Did Mr. Gonzalez make an identification

12 on that lineup?

13   A.   He did not.

14   Q.   Okay.  What about the lineup with Karl Jeudy?

15 What were you hoping to accomplish with that lineup?

16   A.   The same.

17   Q.   Okay.  And did Mr. Gonzalez make an

18 identification off the lineup with Mr. Jeudy?

19   A.   No, he did not.

20   Q.   And even if a witness does not make an

21 identification in a lineup, was it your practice to

22 document a photo lineup?

23   A.   It should be.  Yes.

24   Q.   Okay.  And when you say, "it should be," what

25 do you mean?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     A.   Human error.  You might have not -- you

2  might've forgotten to do it.  You just didn't update it

3  and -- and document that.  It -- it should be done.

4     Q.   If you had conducted three lineups at one time

5  with a witness and one of those lineups you put into the

6  system, would you --

7     A.   I guess I don't know what you -- when you say,

8  "put it into the system."

9     Q.   So I think you said earlier, it's the

10 responsibility of detectives to scan reports and case

11 information into the computer at -- or a computer at

12 OPD; is that right?

13    A.   Yes.  Yes.

14    Q.   Okay.  And so if you had scanned in a photo

15 lineup that you conducted with a -- an eyewitness, is

16 there any reason why two additional photo lineups that

17 you conducted with that witness would not also have made

18 it into the system?

19    A.   All three should certainly have been scanned

20 in.

21    Q.   Okay.

22    A.   It certainly would've been provided to the

23 State Attorney.

24       MS. DILLON:  I'm going to show you a document

25    that was previously marked as Plaintiff's Exhibit 4.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

 1          BY MS. DILLON:

 2      Q.   This is the one document that did not print,

 3  so unfortunately I'm going to have to show it to you on

 4  my computer.  I'll just hand it to you, and I'm going to

 5  be asking you some questions about it, okay?

 6      A.   Yep.

 7          MS. DILLON:  So for the record --

 8          MR. MISTOLER:  We can set this down to make it

 9      easier.

10          MS. DILLON:  Yeah.

11          BY MS. DILLON:

12      Q.   So for the record, this is a three-page

13  document, Bates P532 to P534.  Do you recognize this as

14  the -- or actually, I'm going to come stand next to you,

15  because I have some questions about the --

16          THE VIDEOGRAPHER:  Be careful with --

17          MS. DILLON:  Oh.

18          THE VIDEOGRAPHER:  -- your mic.

19          MS. DILLON:  Oh.  Sorry.  Did I just run over

20      you?  I'm sorry.

21          THE VIDEOGRAPHER:  Oh, you're good.

22          BY MS. DILLON:

23      Q.   Do you see at the top there where it says,

24  "photo lineup and witness instructions?"

25      A.   I do.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        Q.   And do you see --

2             THE VIDEOGRAPHER:  Sorry.  I'm sorry.  I need

3      to hear you.

4             MS. DILLON:  Will it reach?  Yeah.

5             THE VIDEOGRAPHER:  The mic only --

6             MR. MISTOLER:  Only the mic there.  The mic

7      piece.  The little --

8             THE VIDEOGRAPHER:  The mic piece.  There we go.

9             BY MS. DILLON:

10        Q.   Do you see at the top there where it says,

11  "Photo Lineup Administration and Witness Instructions?"

12        A.   I do.

13        Q.   And do you see where it says, "Witness Name:

14  Gonzalez, George?"

15        A.   I do.

16        Q.   Do you see where it says, "Administrator Name:

17  Stanley?"

18        A.   I do.

19        Q.   Do you see the date and time as

20  April 18, 2013?

21        A.   Yes, I do.

22        Q.   Does reviewing any of that give you any

23  independent recollection of conducting this exhibit --

24  or this lineup with Mr. Gonzalez on April 18th?

25        A.   It doesn't.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1     Q.   Okay.  So I'll just point you down, just below

2  the identifying information where it says, "Prior to

3  presenting the photo lineup, the witness provided a

4  written/audio recorded statement describing the suspect

5  of this criminal investigation."  Did I read that right?

6     A.   You did.

7     Q.   And are those your initials next to

8  administrator's initials?

9     A.   They are.

10     Q.   Okay.  If Mr. Gonzalez had provided a

11  written/audio recorded statement -- actually, strike

12  that.  Is it true that Mr. Gonzalez provided a

13  written/recorded statement describing the suspect?

14          MR. MISTOLER:  Objection.  Not

15     written/recorded, but --

16          BY MS. DILLON:

17     Q.   Written or audio recorded statement describing

18  the suspect?

19     A.   He -- he did provide a written statement and

20  that was in his initial statement to the patrol officers

21  at the scene.

22     Q.   Okay.  So when you're administrating a photo

23  lineup, if an eyewitness has provided a statement at the

24  scene, you don't require them to provide another

25  recorded statement at the time of the lineup?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     A.    No.  Because I would be doing it after the

2  lineup.

3     Q.    Okay.  You would ask for a written or audio

4  recorded statement describing the suspect after the

5  lineup?

6     A.    After.  That -- that's right.  And I think I

7  have such a document there.

8     Q.    Okay.  And where would -- where would that

9  appear in your report of the photo lineup?

10    A.    Where would it appear in the --

11    Q.    Yeah.

12    A.    -- lineup?

13    Q.    Where would Mr. Gonzalez's written or audio

14 recorded statement describing the suspect appear in a

15 documentation?

16    A.    I -- I think it was in the initial report.

17    Q.    Okay.  So I'm going to scroll down just a

18 little bit.  And can you just read this paragraph to

19 yourself and let me know when you're done?

20    A.    Okay.

21    Q.    Okay.  Are these the only instructions given

22 to a witness when conducting a photo lineup?

23    A.    Yes.

24    Q.    Okay.  So at the bottom where it says, "After

25 the photo lineup, the witness provided a written

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 statement or audio recorded statement describing his or

2 her identification or non-identification." Did I read

3 that right?

4    A.   You did.

5    Q.   Is it true that the witness provided a written

6 statement or audio statement describing his or her

7 identification, or non-identification?

8    A.   I believe if I see a document that would be

9 able to --

10    Q.   Is --

11    A.   -- help me answer that, but it should be.

12 Yes.

13    Q.   Is this the same statement you were referring

14 to earlier where -- let me just scroll up. Is the

15 statement describing the identification or non-

16 identification the same thing as the witness providing a

17 written or audio recorded statement describing the

18 suspect?

19    A.   I guess I'm not tracking what you're saying.

20 Is there another page we could look at on this --

21    Q.   Yeah.

22    A.   -- says --

23    Q.   We're going to go to it. Scroll down to Page

24 2. Do you see your name at the bottom left-hand corner,

25 Michael Stanley?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1      A.   I do.

2      Q.   Is that your handwriting?

3      A.   It is.

4      Q.   Okay.  And is that your signature below your

5  handwriting?

6      A.   It is.

7      Q.   And do you see in the middle where it says,

8  "Opened door to condo, turned and looked right at me,

9  and took off.  This is person Box number 2."  Is this

10 the statement that Mr. Gonzalez gave after he selected

11 Mr. Valle-Ramos from the lineup?

12     A.   Yes.

13     Q.   And does that include a detailed description

14 of the suspect?

15     A.   It doesn't.  No.

16     Q.   Okay.  Last page of the lineup.  Do you

17 recognize this page of six photos as one of the lineups

18 you created to present to Mr. Gonzalez?

19     A.   Yes, I do.

20     Q.   Box 2 is circled; do you agree?

21     A.   Yes, I do.

22     Q.   What does that mean?

23     A.   Well in connection with Mr. Gonzalez's

24 statement and his initials, if you scroll up, that

25 person in Picture 2, Mr. Gonzalez is stating when he



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  opened the door to his condo, he turned and looked right

2  at him, and then took off.

3      Q.  Okay.  And after Mr. Gonzalez identified Mr.

4  Valle-Ramos, did you talk to him about who he selected?

5      A.  I don't remember.  No.

6      Q.  Okay.  Would that be proper to talk to him

7  about who he selected?

8      A.  No.

9          MR. MISTOLER:  Objection.

10          BY MS. DILLON:

11      Q.  Okay.  Afterwards, what did you do with this

12  specific photo lineup?

13      A.  Probably sent it to the State Attorney along

14  with the case package.

15      Q.  Okay.  After Mr. -- or strike that.  Did you

16  show Mr. Gonzalez the photo lineups, including Marquis

17  Hickson and Karl Jeudy, before you showed him the photo

18  lineup of Mr. Valle-Ramos, or after?

19      A.  I don't remember --

20      Q.  Okay.

21      A.  -- the -- the order.  I don't remember the

22  order.

23      Q.  I'm going to set this exhibit aside.

24          THE VIDEOGRAPHER:  The mic.

25          MS. DILLON:  Oh.  The mic.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        THE VIDEOGRAPHER:  Thank you.

2        BY MS. DILLON:

3    Q.   Okay.  And I'm actually going to show you.

4        THE VIDEOGRAPHER:  Put it right there.

5        MS. DILLON:  Oh.  The mic.  Yeah.  You told me

6    that.  I'll get it right next time maybe.

7        THE REPORTER:  And what is the title for

8    Exhibit 4?

9        MS. DILLON:  Exhibit 4?

10       THE REPORTER:  That you just did.

11       MS. DILLON:  Oh.  George Gonzalez Photo Lineup.

12       THE REPORTER:  Okay.

13       MS. DILLON:  I am going to show you what's been

14   previously marked as Plaintiff's Exhibit 17.

15       (Exhibit 17 was marked for identification.)

16       BY MS. DILLON:

17   Q.   Do you recognize this as --

18   A.   Is this mine?

19       THE REPORTER:  He doesn't have it yet.

20       MS. DILLON:  Oh, sorry.

21       THE REPORTER:  Sorry.

22       BY MS. DILLON:

23   Q.   Here you go.  Okay.  And for the record, this

24   is a one-page document with Bates P1413.  Do you

25   recognize this as the photo array you developed in the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  Gonzalez burglary investigation?

 2      A.   Well I -- I recognize it, but it looks much

 3  different.

 4      Q.   Do you agree this is a better quality

 5  version --

 6      A.   Well --

 7      Q.   -- of the photo array that was shown in the

 8  report?

 9          MR. MISTOLER:  Objection.

10          THE WITNESS:  I would have probably shown Mr.

11      -- if I had the original, I would certainly say a

12      color version, I think that we have here, is better.

13      But this one --

14          BY MS. DILLON:

15      Q.   Yeah.  This should have been printed in color,

16  actually, and I can show you the color version.

17      A.   I mean, it -- it just -- I have seen the one

18  -- the black and white one from the filings and -- and

19  the criminal trial.  But as far as compared to -- it's

20  not the color one, and it's not copied one.

21      Q.   Sure.

22      A.   That's the only reason I'm saying it looks --

23  looks different.

24      Q.   Got it.  I just want to ask you a couple

25  questions about --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.    But they are the -- they are the people that

2  are depicted on the one that is in color.

3      Q.    And I just want to ask you a couple questions

4  about the photographs.  Can you tell from looking at

5  Exhibit 17 that the photo in Box number 2 depicts a

6  person with an Afro style haircut?

7      A.    It is a small Afro.

8      Q.    Okay.  Can you tell whether the other photos

9  that are in the lineup show suspects with Afros?

10      A.    I would say number 4 did, and I think number 6

11  did.

12      Q.    Okay.  Would you agree that the five filler

13  photos, those that are not Mr. Valle-Ramos, have shorter

14  haircuts than Mr. Valle-Ramos?

15          MR. MISTOLER:  Objection.

16          THE WITNESS:  They're a little bit shorter.

17          BY MS. DILLON:

18      Q.    Okay.  Would you agree that having five people

19  in a lineup with short haircuts makes the person with

20  longer hair stand out?

21          MR. MISTOLER:  Objection.

22          THE WITNESS:  Not necessarily.

23          BY MS. DILLON:

24      Q.    Okay.  Why do you say that?

25      A.    Because when you read the photo lineup and the

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  witness instructions, they are instructed to disregard

2  the hair, pay no attention.  I believe it says -- if we

3  can revisit that, there's a section there where they are

4  instructed and they sign, acknowledging that they

5  understand that.

6         MS. DILLON:  Sure.  So I'm actually going to

7      show you what was previously marked as Plaintiff's

8      Exhibit 16.

9         (Exhibit 16 was marked for identification.)

10         BY MS. DILLON:

11     Q.   Okay.  And for the record, this is a three-

12 page document, Bates 529 to 531.  And do you see at the

13 top there where it says, "Witness Name," it says,

14 "Bethany Szewczyk?"

15     A.   Yes, I do.

16     Q.   Okay.  And do you see your name next to

17 administrator?

18     A.   Yes, I do.

19     Q.   Okay.  And do you see the date, September 4,

20 2013?

21     A.   Yes, I do.

22     Q.   Okay.  Does that refresh your recollection at

23 all that you did a photo lineup with Ms. Szewczyk on

24 September 4, 2013?

25     A.   It did -- it shows that we did that.  Yeah.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  That's all accurate.

2      Q.   Okay.  And the first -- pointing you to the

3  first sentence of these witness instructions, again.

4  This is prior to presenting the photo lineup.  "The

5  witness provided a written/audio recorded statement

6  describing the suspect of this criminal investigation."

7  And are those your initials next to administrator's

8  initials?

9      A.   Yes, they are.

10     Q.   Okay.  And is that true, did Ms. Szewczyk

11 provide a written or audio recorded statement describing

12 the suspect?

13     A.   I don't remember or if I remember seeing her.

14 If -- if there -- if she had a written statement that is

15 referred to in the initial case report, then it would

16 likely have been on that document.

17     Q.   Okay.  So if she had provided a witness

18 statement, that satisfies the requirement prior to

19 presenting the photo lineup, that the witness provide a

20 written or record -- or audio recorded statement

21 describing the suspect?

22     A.   That's correct.

23     Q.   It doesn't have to happen simultaneously with

24 the photo lineup?

25     A.   No, it does not.


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1       Q.   Should it happen simultaneously with the photo

2  lineup?

3       A.   I -- I don't know.

4       Q.   Do you know why it's -- this instruction is

5  included on the photo lineup if you're not supposed to

6  ask it at the time of the photo array?

7            MR. MISTOLER:  Objection.

8            THE WITNESS:  I -- I don't know why it's

9       included in there.  It -- it doesn't address the

10      timing of the -- obtaining that statement.

11           BY MS. DILLON:

12      Q.   Okay.  And I think you said the instructions

13 that are given to the witness include an instruction not

14 to look at the hair; is that right?

15      A.   Yeah.  It said, keep -- let me -- if I can

16 find it.  "Keep in mind that hairstyles, beards, and

17 mustaches may easily be changed.  May not -- the photos

18 may not always depict the true complexion of a person,

19 may be lighter or darker.  When shown a photo, pay no

20 attention to the order of the photos or markings, and or

21 numbers that may appear."  And that's what I was

22 referencing to.

23      Q.   Okay.

24      A.   When -- when they mentioned the hairstyles,

25 beards, and mustaches may easily be changed.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      Q.    And it's that instruction that makes you say

2  Mr. Valle-Ramos's longer hair does not make him stand

3  out from the other five filler photographs?

4      A.    Well --

5           MR. MISTOLER:  Objection.

6           THE WITNESS:  I feel number 4 and I feel number

7      6 also have longer hair.

8           BY MS. DILLON:

9      Q.    Okay.  Do -- would you say they have -- their

10  hair is as long or as poofy as the photo in Box

11  number 2?

12     A.    It's a little bit longer.

13     Q.    Okay.  I'm going to direct your attention to

14  the second page of this document.  Okay.  And do you see

15  your signature again at the bottom left-hand corner of

16  the page?

17     A.    Yes, I do.

18     Q.    And your handwriting that says, "Michael D.

19  Stanley?"

20     A.    Correct.

21     Q.    All right.  Do you see the short description

22  in the center of the page, "The person in Box number 2,

23  early morning as he was getting into vehicle with blue

24  latex gloves on, and speeding away.  Also, with two

25  others.  Incident took place at Hidden Creek Apartments,

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  and I saw him as he exited."

2      A.   Yes.  I see that.

3      Q.   Okay.  Is this the extent of with what Ms.

4  Szewczyk said after the photo lineup?

5      A.   That's what she documented -- this document

6  shows what she wrote down.

7      Q.   Okay.  If she had said anything else to you,

8  would you have documented it?

9      A.   I would've had her write it down.

10     Q.   Okay.  I'm going to direct your attention.

11 And if you -- strike that.  If you had -- had her write

12 it down, what -- would you have had her write it down in

13 this --

14     A.   Yes.

15     Q.   -- on Page 2?

16     A.   Yes.

17     Q.   Okay.  Let's turn our attention to Page 3.  It

18 looks like Box number 2 is circled.  Does that mean Ms.

19 Szewczyk picked Box number 2?

20     A.   Yes, it does.

21     Q.   Did you talk with Ms. Szewczyk about who she

22 picked?

23     A.   No.  I don't remember anything about the

24 incident other than it was someplace out by UCF.

25     Q.   Okay.  Did you tell her she selected the right



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1  person?

2      A.   I don't recall that at all.  And it wouldn't

3  have been proper to do so.  It doesn't sound like

4  anything I would do.

5      Q.   Okay.  Did you tell her that Mr. Gonzalez had

6  also selected Mr. Valle-Ramos?

7      A.   Again, I -- I don't remember being out there,

8  other than just it was out by UCF, but --

9      Q.   Okay.  Would it be proper to have told her

10  that Mr. Gonzalez also selected -- Mr. Gonzalez also

11  selected Mr. Valle-Ramos?

12      A.   No.

13      Q.   Okay.  After you conducted the lineup with Ms.

14  Szewczyk, did you -- what did you do with this lineup

15  form?

16      A.   I sent it to the State Attorney's office.

17      Q.   Okay.  Why did you send it?  Did you send it

18  directly to the State Attorney's office?

19      A.   And that's -- it's the only way to send it.  I

20  -- I --

21      Q.   Did you do anything else with it first?

22      A.   I -- I don't remember.

23      Q.   Okay.  Did you create a supplemental report

24  documenting this lineup?

25      A.   I -- unfortunately, I did not.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       Q.   Okay.  Why do you say, "unfortunately?"

2       A.   I -- I should have done one to memorialize

3  that.  But in looking at the case number for this

4  incident, it does not show that I did one.

5       Q.   Okay.  So I'm going to set that exhibit aside.

6  Between April 18, 2013, which is the day you did the

7  Gonzalez lineup and September 4, 2013, did you do

8  anything to investigate the Gonzalez burglary?

9       A.   No, I did not.

10       Q.   Okay.  Why not?

11       A.   I believe Mr. Gonzalez -- excuse me, Mr.

12  Valle- Ramos had been arrested sometime in April '22,

13  '23, '24, in -- in that timeframe.

14       Q.   Okay.  Did you want to identify the other two

15  suspects?

16       A.   It would've been nice.

17       Q.   Okay.  What steps did you take to try to

18  identify the other suspects?

19       A.   I didn't do anything else to identify them.

20  They had not been identified in the photographic lineup

21  that was shown to Mr. Gonzalez.  I didn't think there

22  was much else that we could do with that.

23       Q.   Okay.  And would you agree there's a five-

24  month gap between the victim's photo lineup and the

25  lineup with Ms. Szewczyk?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.    Absolutely.

2    Q.    Does that strike you as unusual?

3         MR. MISTOLER:  Objection.

4         THE WITNESS:  I realized that I had never shown

5    Ms. -- Ms. Szewczyk a photo lineup, and I needed to,

6    so I went and did that.

7         BY MS. DILLON:

8    Q.    Why did you say you need -- why do you say you

9  needed to?

10    A.    Because she was a witness who had not been

11  shown a photo lineup.

12    Q.    Okay.  Did something prompt you to reach out

13  to Ms. Szewczyk?  Did someone ask you to do it?

14    A.    I -- I don't remember.

15    Q.    Okay.

16    A.    I just know that it -- it should have been

17  done.

18    Q.    Okay.  You were aware at the time you

19  constructed the lineup, there were three eyewitnesses,

20  correct?

21    A.    Yes.

22    Q.    Okay.  Did you reach out to the older or the

23  other eyewitness, who is a little bit older, Ms.

24  Charlene Bloom about a photo array?

25    A.    In looking at my report, it looks like I spoke

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  to her on the telephone.

2      Q.   Okay.  Do you -- and you don't have any

3  recollection of what was said on the telephone?

4      A.   I don't.

5      Q.   Okay.  She didn't end up doing a photo array;

6  is that right?

7      A.   That's what it worked out as.  Yes.

8      Q.   Why?

9      A.   I think my report indicated that she said she

10  didn't feel she got a good enough look at the people

11  with which to complete a -- she didn't think she would

12  be able to identify anybody.

13      Q.   Okay.  Did she tell you she did not -- she had

14  looked up Mr. Valle-Ramos on the Florida Department of

15  Corrections website and that she did not recognize him

16  as someone she had seen on April 9, 2013?

17      A.   That who?

18      Q.   That she had -- did she tell you that she had

19  looked up Mr. Valle-Ramos's mugshot and had decided that

20  he was not one of the people she'd seen that day?  Did

21  she tell you that?

22      A.   No.  And I don't know that it was possible --

23      Q.   What do you mean?

24      A.   -- for her to do, because at the time of this

25  incident, he did not have any arrest photographs.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   At the time of the incident, April 9, 2013.

2  What about after his arrest?  Would his picture have

3  shown up?

4      A.   I don't know where things show up.  I just --

5      Q.   Okay.

6      A.   I use the databases that I have access to.

7      Q.   Do you recall when your conversation with Ms.

8  Bloom was?

9      A.   Does it say in the -- I -- I would have to

10  defer to my report.

11      Q.   I don't -- I don't think it says.

12      A.   It sounds like it was -- would've certainly

13  been before.

14      Q.   Before the arrest?

15      A.   Absolutely.

16      Q.   Okay.

17      A.   And then before the photo lineup, I would

18  imagine, with Mr. Gonzalez.

19      Q.   Okay.  I believe she testified that she heard

20  from you sometime in August.  Does that refresh your

21  recollection about when?

22      A.   I don't remember that at all.

23      Q.   Okay.  If she recalls the conversation

24  happening in August, could that be right?

25      A.   What is the --

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1          MR. MISTOLER:  Objection.

2          THE WITNESS:  What is the conversation?

3          BY MS. DILLON:

4     Q.   About conducting a photo array with her?

5     A.   Well I think I -- if I defer to my report, I

6  feel like in there is when I documented the results of

7  when she said she didn't believe she could make a photo

8  identification.  So I feel like that would've been

9  before, in April.

10    Q.   In April?  Yeah.  And do you mean your

11 supplemental report?

12    A.   My supplemental report is -- is what it

13 actually should be.

14    Q.   Okay.  So I'm going to jump ahead a little

15 bit.

16    A.   My -- my case report.

17         MS. DILLON:  And this is what will be

18     Plaintiff's Exhibit 20.

19         (Exhibit 20 was marked for identification.)

20         BY MS. DILLON:

21    Q.   Okay.  For the record, Exhibit 20 is a two-

22 page document, Bates stamped P1418 to 1419.  Mr. -- or,

23 Mike, do you recognize this document?

24    A.   Yes, I do.

25    Q.   Okay.  What is it?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   It is the investigative supplement that I

2  would have completed for this incident.

3      Q.   Okay.  Is this the only investigative

4  supplement you recall completing for the Gonzalez

5  burglary investigation?

6      A.   After reviewing the -- what was in the case

7  file.  Yes.

8      Q.   Okay.  You can have a minute to read through

9  this.  But I think you mentioned that you -- if you had

10  talked to Ms. Bloom before Mr. -- Mr. Valle-Ramos's

11  arrest, that you would've documented that conversation,

12  correct?

13      A.   I thought that it was in here.

14      Q.   Okay.  Do you see it anywhere in here?

15      A.   I -- I don't.  No.

16      Q.   Okay.  Well let's just stay on this for a

17  minute.

18      A.   I feel like it was in the case report that was

19  done by the initial officer.  I think there is a

20  reference to her saying that she didn't think she got a

21  good view of him.  I thought it was documented someplace

22  somewhere, but maybe not necessarily by myself.

23      Q.   Okay.  Let's stick on this for a while.  We'll

24  come back to --

25      A.   All right.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.    Okay.  Do you agree that you authored this

2   report?

3     A.    Yes, I do.

4     Q.    Okay.  Why did you write this report?

5     A.    Well I'm required to.  And two, to sum up --

6   to summarize what had happened within this incident.

7     Q.    Okay.  And before writing this report, did you

8   review the -- any other reports from OPD officers

9   relation -- in relation to the case?

10     A.    I looked at the initial case report.  I

11   would've -- I looked at -- the practice would've been to

12   look at the case report, practice would be to look at

13   the witness statements.  Practice would be to look at

14   any other supplement reports done by any crime scene

15   investigators.

16     Q.    Okay.  So the practice would've been to look

17   at the crime scene investigator's report, the forensic

18   investigator's report, responding officer's report, the

19   witness statements; anything else?

20     A.    If there had been anything developed by a

21   latent print examiner.

22     Q.    Okay.  Anything by latent print examiner.

23   Before writing, did you discuss anything you put in this

24   report with any other Orlando Police Department

25   officers?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.   No.

2      Q.   Okay.  How did you write it?  Did you type it

3   yourself or did you dictate it?

4      A.   I typed it myself.

5      Q.   Okay.  And what did you do with it when you

6   were done typing it?

7      A.   With this report?

8      Q.   This report.  Yes.

9      A.   I entered it into the system that these

10  reports are created in.

11     Q.   Okay.  And then I think you said once it goes

12  into that system, it would be reviewed by --

13     A.   It looks like in this --

14     Q.   -- a supervisor?

15     A.   -- incident, it says, "Approving Officer --

16  Daniel Brady."

17     Q.   Okay.  And does that mean Daniel Brady was

18  your supervisor on the case?

19     A.   I -- I'd say he was the supervisor for the

20  East Property Unit at the time.

21     Q.   Okay.  And does that mean he would be

22  overseeing investigations on -- in relation to any crime

23  occurring in that area -- any property crime?

24     A.   He would be overseeing his detectives that

25  were assigned these cases.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  And you were one of his detectives

2  assigned these cases; is that right?

3    A.   Yes, it is.

4    Q.   Were you asked to make any changes to this

5  report?

6    A.   I don't remember.

7    Q.   Okay.  Do you remember if there were any other

8  drafts of this report?

9    A.   I --

10        MR. MISTOLER:  Objection.

11        THE WITNESS:  I don't -- I don't remember.  But

12    it's not, like, a thing where you make drafts.

13        BY MS. DILLON:

14    Q.   Okay.  So even if you had edited it, there

15  wouldn't be, like, multiple versions of this report?

16    A.   No.

17    Q.   Okay.  Fair to say as a general rule, you took

18  care to make sure the information in your reports was

19  correct?

20    A.   At every attempt.  Yes.

21    Q.   Okay.  And fair to say you took your

22  responsibilities for report writing seriously as a

23  detective?

24    A.   Yes.  I do.

25    Q.   Okay.  You do your best to be thorough when

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  creating reports?

2      A.   I do.

3      Q.   Do your best to be accurate when creating

4  reports?

5      A.   Yes.

6      Q.   Would you ever leave information out of a

7  report that you knew was important?

8      A.   No.

9      Q.   Okay.  When is the last time you saw this

10  document?

11      A.   Well I -- I was asked earlier what I had

12  reviewed.  And I had reviewed this.

13      Q.   So this is one of the reports you reviewed in

14  preparation for the deposition?

15      A.   That's correct.  Yes.

16      Q.   Is there anything in this document that's

17  incorrect?

18      A.   No.  It memorializes everything that was done.

19      Q.   Okay.  Do you agree with me that there's

20  nothing about the other two eyewitnesses included in

21  this supplement?

22      A.   Yes.

23      Q.   Okay.  Did you know there were at least two

24  other potential eyewitnesses who gave statements when

25  you created this report?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.    I -- I was aware of -- is it Ms. Bloom?

2      Q.    Yes.

3      A.    And -- and Ms. Bethany.  Yes.

4      Q.    Okay.

5      A.    I don't know why.  Maybe they -- I -- I

6 couldn't get in touch with them at the time.  I -- I

7 don't know why.

8      Q.    Okay.  So it's possible you tried to reach out

9 to them, but didn't get in touch?

10      A.    It -- it could very well be.

11      Q.    Okay.  Any other reason why you wouldn't have

12 included them in the report?

13      A.    That maybe I hadn't been able to get in

14 contact with them.

15      Q.    Okay.  As you -- that's the only reason as you

16 sit here today you can think of that they would've been

17 left out?

18      A.    I -- and again, I'm just speculating.  Yes.

19      Q.    Sure.  Would -- when you submitted this

20 supplement -- supplemental report into the system where

21 it went for approval, would you have submitted it by

22 itself, or would you have included the additional

23 reports with it?

24      A.    This was the only report that I did that would

25 be -- was being submitted --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.

2      A.   -- for that --

3      Q.   So you wouldn't include -- for instance, you

4  make a reference to a lineup.  You wouldn't include that

5  with the report when you submitted it?

6      A.   No.

7           MS. DILLON:  Okay.  We can set that exhibit

8      aside.  We've been going about another hour.  Folks

9      okay or does anyone need --

10           MR. MISTOLER:  We can take a break.

11           THE WITNESS:  I'm going to take a quick

12      bathroom --

13           MS. DILLON:  Yeah.  No problem.

14           THE VIDEOGRAPHER:  Okay.  The time is 3:34 p.m.

15      We're going off record.

16           (A recess was taken.)

17           THE VIDEOGRAPHER:  We're back on record.  The

18      time is 3:42 p.m.

19           BY MS. DILLON:

20      Q.   Okay.  Mike, before we went off the record, we

21  were reviewing some reports that were created in

22  connection with the Gonzalez burglary investigation.  Do

23  you remember that?

24      A.   Yes, I do.

25      Q.   Okay.  Did you take any steps to try to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  connect Mr. Valle-Ramos to the crime scene physically?

2      A.   The -- I -- in looking at the crime scene

3  investigator's report, I reviewed that, and it does not

4  appear that I was able to make any connections to the --

5  anything that might have been left there at the scene.

6      Q.   Okay.  Do you recall what kinds of evidence

7  was collected?

8      A.   I thought there was reference to a backpack

9  and a tire iron.

10     Q.   And you didn't collect any evidence from the

11 scene --

12     A.   I -- I did not.

13     Q.   -- is that fair to say?

14     A.   That is very accurate.  Yes.

15     Q.   Okay.  Did you ever search Mr. Valle-Ramos's

16 home for evidence?

17     A.   No.

18     Q.   Did you ask anyone to?

19     A.   I did not obtain a search warrant for his

20 residence.  No.

21     Q.   Okay.  Do you know if anyone searched Mr.

22 Valle-Ramos's home for evidence?

23     A.   Not as -- as it relates to this case.  No.

24     Q.   Okay.  You agree with that Mr. Valle-Ramos was

25 charged with the burglary of George Gonzalez's home,

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

 1 correct?

 2     A.   Yes, I do.

 3     Q.   Can you think of any reason why it would be

 4 appropriate to not search Mr. Valle-Ramos's home?

 5          MR. MISTOLER:  Objection.

 6          THE WITNESS:  I don't know if I would've been

 7     able to establish that any evidence recovered would

 8     not have been stale through obtaining a search

 9     warrant for his residence --

10          BY MS. DILLON:

11     Q.   Okay.

12     A.   -- based on the --

13     Q.   When you say, "stale," what do you mean?

14     A.   Based on the length of time.

15     Q.   And when you say, "stale," do you mean, like,

16 physical DNA evidence?

17     A.   I mean that if it had -- if this had happened

18 a day later, I might have moved to get a search warrant

19 for his residence.  The fact that it was now maybe two-

20 and-a-half weeks, I believe, after the incident, I did

21 not get a search warrant for his residence.

22     Q.   Did you think it was important to check and

23 see if Mr. Valle-Ramos had clothes in his possession

24 matching the witness' descriptions of the perpetrators?

25          MR. MISTOLER:  Objection.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        *Toll Free 855-MYDEPOS*

1          THE WITNESS:  Anything that you could add to a

2      case would have been nice to have had.

3          BY MS. DILLON:

4      Q.   Okay.  Did you think it was important to check

5  and see if Mr. Valle-Ramos was in possession of any of

6  the items taken from the crime scene?

7          MR. MISTOLER:  Objection.

8          THE WITNESS:  Again, anything that you would be

9      able to ever recover that would help to further

10     connect a person to a crime would be beneficial.

11         BY MS. DILLON:

12     Q.   Did Mr. Valle-Ramos have a car?

13     A.   I don't remember.

14     Q.   Do you remember taking any steps to

15  investigate whether or not Mr. Valle-Ramos had a car?

16     A.   Well I know I looked at his DAVID photograph,

17  and that would've certainly listed his -- any vehicles

18  that he would've had registered to him.  I don't

19  remember if he had any registered to him.

20     Q.   Okay.  If Mr. Valle-Ramos did have a car,

21  would it -- would it be important to search that car for

22  evidence?

23         MR. MISTOLER:  Objection.

24         THE WITNESS:  Again, it would -- it would be

25     beneficial if you would be able to search a vehicle

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     to see if there is any evidence inside, if you would

2     be able to legally do so.

3          BY MS. DILLON:

4     Q.   Aside from the supplementary report, what

5  other paperwork did you create related to the Gonzalez

6  burglary investigation?

7     A.   I would've submitted everything that I had

8  compiled and submitted it to the State Attorney's

9  Office.

10    Q.   And when you say everything you compiled, you

11 mean photo lineups?

12    A.   Yes.

13    Q.   Witness statements?

14    A.   Correct.

15    Q.   Responding officer reports?

16    A.   Yes.

17    Q.   Crime scene investigator reports?

18    A.   Yes.

19    Q.   Anything else you can think of?

20    A.   I think for this case, that sums up the

21 involvement of the people that were involved.

22    Q.   What's the last thing you remember doing in

23 connection with the Gonzalez burglary investigation?

24    A.   I vaguely remember testifying at the trial.

25    Q.   Okay.  You testified at the trial in 2014; is

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 that right?  The criminal trial?

2      A.   Yes.

3      Q.   You requested a warrant for Mr. Valle-Ramos's

4 arrest, correct?

5      A.   Yes, I did.

6      Q.   What evidence supported Valle-Ramos's arrest

7 for the Gonzalez burglary?

8      A.   His selection in a photographic lineup by Mr.

9 Gonzalez.  A crime bulletin that shows he was in a

10 vehicle 0.6 tenths of a mile from the location, in

11 addition to the fact that he was -- a vehicle he was

12 later seen on -- a vehicle he was located in later in

13 the day was described previously in that same geographic

14 area about two miles away, attempting to -- some

15 individuals were attempting to burglarize a residence.

16 It was also a silver vehicle in both incidents.  The

17 timeframe was in the middle of the day, as was Mr.

18 Gonzalez's burglary.  I felt strongly that he was one of

19 the individuals that had been in Mr. Gonzalez's

20 residence that day.

21      Q.   Okay.  You never found any fingerprints

22 placing him at the crime scene, correct?

23      A.   Correct.

24      Q.   No DNA placing him at the crime scene?

25      A.   No DNA, but at that time, I do not believe the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  Florida Department of Law Enforcement would accept DNA

2  for a property crime.

3      Q.   Why do you say you believe that they weren't

4  accepting DNA for a property crime?

5      A.   They only accepted it for violent crimes at

6  the time when I remember -- if I remember back then.

7      Q.   Okay.  Was there ever a period of time where

8  the -- they accepted DNA for property crimes that you

9  recall?

10     A.   I recall incidents where blood was obtained or

11  left at a scene, and then it was later entered into

12  CODIS and it came back with a match for a potential

13  person, but here they would not take DNA from an object

14  unless there was a one-to-one comparison to be made with

15  a contributor to that DNA.

16     Q.   Okay.

17     A.   If any of that makes sense.

18     Q.   Yeah.  I think so.  Let me break it down a

19  little bit, though.

20     A.   Okay.

21     Q.   So if you had someone to compare the DNA to,

22  you could submit objects for a touch DNA sampling?

23     A.   If -- yes.  If there was DNA located on an

24  object.  In this case, I was not confident that there

25  would be any DNA, as they stated that they had seen



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  people wearing blue latex gloves, so I was not confident

2  that there would be any DNA.

3      Q.   Okay.  So you did not submit -- you didn't

4  request any DNA testing of any of the items that were

5  collected from Mr. Gonzalez's home; is that right?

6      A.   I -- I did not as at that time, they -- they

7  would not take it for a property case.

8      Q.   Okay.  And after Mr. Valle-Ramos was arrested

9  for the Gonzalez burglary, did you submit the items

10  recovered at Mr. Gonzalez's house for DNA testing?

11      A.   I did not get a warrant for a DNA standard

12  from Mr. Valle-Ramos.  No.

13      Q.   Okay.  Did you -- you never found any evidence

14  in Mr. Valle -- Valle-Ramos's home connecting to the --

15  him to the crime, correct?

16          MR. MISTOLER:  Objection.

17          THE WITNESS:  I did not search his home.

18          BY MS. DILLON:

19      Q.   Okay.  Were you present when Mr. Valle-Ramos

20  was arrested?

21      A.   No, I was not.

22      Q.   Do you recall anything about his arrest?

23      A.   I don't.

24      Q.   Okay.  Do you know who arrested him?

25      A.   I don't.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Do you know who was present during his arrest?

2    A.   I -- I don't know who.  Typically, arrest

3 warrants would be entered and activated in a teletype

4 system, and I don't remember who it was that would've

5 arrested him.

6    Q.   Okay.  Did you ever talk to Mr. Valle-Ramos in

7 connection with this -- the Gonzalez burglary

8 investigation?

9    A.   In reviewing my deposition testimony, it looks

10 like he was brought to our agency, but I don't remember

11 this incident.  That's the only recollection I have.

12    Q.   Okay.  So you have no independent recollection

13 of interviewing Mr. Valle-Ramos?

14    A.   I -- I don't.  I do not.

15    Q.   Do you -- if you had interviewed Mr. Valle-

16 Ramos, would there have been another officer present?

17    A.   Not necessarily.  No.

18    Q.   Okay.  If you had interviewed Mr. Valle-Ramos

19 and there was another officer present, do you have any

20 idea who that would've been?

21    A.   No, I don't.

22    Q.   Okay.  And so because you don't remember ever

23 interviewing Mr. Valle-Ramos, you don't have any

24 recollection of what you said to him?

25    A.   I don't.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   What he said to you?

2      A.   I don't.

3      Q.   If you had interviewed Mr. Valle-Ramos on the

4   day of his arrest, would you have memorialized that

5   interview?

6      A.   If I had spoken to him, I would've

7   memorialized that.  Yes.

8      Q.   Okay.

9      A.   If I -- if -- if I had -- if I spoke to a

10  person and -- and they offered something -- if --

11  historically, if somebody -- I spoke to somebody and

12  they, you know, invoked their constitutional rights,

13  then that -- that would be it and -- and I wouldn't

14  memorialize anything.

15     Q.   Okay.

16     A.   And if they maybe did speak about it, I -- I

17  would have.

18     Q.   You would have memorialized it?

19     A.   I -- I would have if they -- if they did agree

20  to speak.

21     Q.   Was there a practice of audio or video

22  recording interviews at the station with recently-

23  arrested suspects in 2013?

24     A.   You would have requested -- I think they're

25  always -- always recording.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1        Q.    Okay.

2        A.    You would've just requested the timeframe and

3   the specific interview room that you were in --

4        Q.    Okay.

5        A.    -- that would've documented that.

6        Q.    So if you had interviewed Mr. Valle-Ramos,

7   there would be some kind of recording of that interview;

8   is that right?

9        A.    There -- there should have been.  Yes.

10  Because they were always recording.

11       Q.    Okay.  What would happen with that recording,

12  whether it's video or audio, after the interview?

13       A.    You would send it to the State Attorney.

14       Q.    Okay.  Would it go anywhere else?

15       A.    No.

16       Q.    Did you have any role in the decision to

17  charge Mr. Valle-Ramos with burglary?

18       A.    I authored the arrest warrant.  Yes.

19       Q.    Okay.  Were you present when the decision was

20  made to charge Mr. Valle-Ramos with burglary?

21       A.    I would kind of have to be.  I -- I made --

22  you know, made the decision and met the statutory

23  definition of that crime.

24       Q.    Okay.  And I'm talking -- I think you're

25  talking about the arrest warrant.  I'm talking about the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1 | prosecution's decision --

 2 |      A.   About the -- about --

 3 |      Q.   -- to charge.

 4 |      A.   About the actual filing?

 5 |      Q.   Yes.

 6 |      A.   No.  Not at all.

 7 |      Q.   Did you discuss the decision to charge Mr.

 8 | Valle-Ramos with a crime to anyone at OPD?

 9 |      A.   For my arrest warrant?

10 |      Q.   For anything.

11 |      A.   I didn't discuss it with anyone for my arrest

12 | warrant, and I didn't have any idea what -- the filing

13 | decision had been made likely until the trial.

14 |      Q.   Okay.  So as best as you can recall, you

15 | didn't talk about the decision to seek an arrest

16 | warrant, but - - on Mr. Valle-Ramos with anyone else at

17 | OPD?

18 |      A.   No.

19 |      Q.   While the prosecutor was preparing the case

20 | against Mr. Valle-Ramos, did you speak with anyone from

21 | the District Attorney's Office?

22 |      A.   No.

23 |      Q.   Okay.

24 |      A.   Not -- not that I remember.

25 |      Q.   Not that you recall?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    A.   No.  I -- certainly they would probably have

2  been present at the deposition.

3    Q.   Okay.  If you had participated in the process

4  of preparing the case against Mr. Valle-Ramos with the

5  DA's office, would you have memorialized that in any

6  way?

7    A.   It would've been a first.

8    Q.   Okay.  It would've -- it's not your practice

9  to --

10    A.   We -- no, it's not.

11    Q.   Okay.  And that's across Orlando Police

12  Department?

13    A.   For a property crime?  Yes.  For -- for a

14  homicide, you know, you're very involved --

15    Q.   Okay.

16    A.   -- in that decision and working, you know,

17  with somebody that's assigned immediately.  But for a

18  property case?  No.  I never had that experience.

19    Q.   Okay.  So for some of the crimes you've

20  investigated as a sergeant at -- homicides, violent

21  crimes, you would be more participatory in the --

22  preparing the case, but not for property crimes?

23    A.   That's correct.

24    Q.   Okay.  Did you provide the prosecutor any

25  information to use at trial that you recall?


**MILESTONE | REPORTING  COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.   Just what was within the case reports,

2  investigative supplement, photo lineups, the crime

3  scene, investigator reports.

4      Q.   Okay.  But you don't remember talking to the

5  prosecutor?

6      A.   I don't.

7      Q.   You testified at a deposition; is that right?

8      A.   Yes, I did.

9      Q.   Did you meet with the state's attorney to

10 prepare for your deposition?

11     A.   I don't remember.  And I -- again, I would

12 probably say no, because it's not very typical for them

13 to speak before.

14     Q.   Okay.  It's unlikely that you --

15     A.   It's unlikely.  Yeah.

16     Q.   -- prepared with the state's attorney?

17     A.   Yeah.

18     Q.   Did you testify truthfully at your deposition?

19     A.   Yes, I did.

20     Q.   When did -- you said you reviewed a transcript

21 of your deposition testimony in preparation for today;

22 is that right?

23     A.   Yes, I did.

24     Q.   Is there anything you would change in your

25 testimony?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      A.   I -- I don't know.  I -- I -- it was accurate

2 when I provided it, and I don't -- I think it sounds

3 accurate as to what I remembered at -- at the time.

4      Q.   Okay.  As far as you can recall --

5      A.   As far as I can recall?  No.

6      Q.   -- everything in your deposition transcript is

7 true?

8      A.   I -- I testified truthfully.

9      Q.   Okay.  And you testified at the criminal trial

10 in 2014, correct?

11     A.   Yes.

12     Q.   Do you recall meeting with the state's

13 attorney to prepare for your trial testimony or is that

14 something that maybe wouldn't have happened with a

15 property crime?

16     A.   I don't recall it ever happening with --

17     Q.   Okay.  Do you recall how you prepared for your

18 trial testimony in the Gonzalez burglary investigation?

19     A.   I probably would've read the case report in my

20 investigative supplement.

21     Q.   Okay.  And at the criminal trial, did you

22 testify truthfully?

23     A.   Yes, I did.

24     Q.   And you reviewed a copy of the criminal trial

25 transcript in advance of today's deposition; is that

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  right?

2      A.   Yes, I did.

3      Q.   Okay.  And everything in there was accurate?

4      A.   Yes.

5      Q.   Anything you would change?

6      A.   No.

7      Q.   And you're aware -- are you aware that in

8  March 2024, Mr. Valle-Ramos -- the criminal case against

9  Mr. Valle-Ramos was dismissed?

10     A.   Yes.

11     Q.   When did you first become aware that Mr.

12  Valle- Ramos had filed a post-conviction petition?

13     A.   I was contacted by the State Attorney that

14  handled that.

15     Q.   Okay.  Did you participate -- did you have any

16  participation in helping the state's attorney defend

17  against the post-conviction petition?

18     A.   No.

19     Q.   Okay.  You testified at the hearing on the

20  post-conviction petition; is that right?

21     A.   Yes.

22     Q.   Back in March 2023?

23     A.   Yes.

24     Q.   Did you meet with anyone to prepare your

25  testimony for that hearing?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   No, I didn't.

2      Q.   Did you testify truthfully?

3      A.   Yes, I did.

4      Q.   And you reviewed a copy of that transcript in

5   advance of today's deposition; is that right?

6      A.   Yes, I did.

7      Q.   And was it all accurate?

8      A.   Yes.

9      Q.   Anything you'd change?

10      A.   No.

11      Q.   Do you understand that Ms. Szewczyk recanted

12   her identification of Mr. Valle-Ramos?

13      A.   Yes, I do.

14      Q.   Can you recall any other times in your career

15   where -- as a detective where a witness where recanted

16   an identification?

17      A.   I cannot for any cases that I have been

18   involved in.  I've certainly been aware of some other

19   cases where a witness intentionally lied to get somebody

20   arrested, but not where they -- where the witness made

21   the recantation.

22      Q.   Okay.  So none of the eyewitness

23   identifications you've secured in your career can you

24   recall a witness later recanting that identification; is

25   that right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Yes, that's correct.

2      Q.   Were you surprised that Ms. Szewczyk recanted

3  her identification?

4      A.   Was I surprised?

5      Q.   Yes.

6      A.   Yes and no.

7      Q.   Okay.  Let's start with the yes.  Why were you

8  surprised that she recanted her identification?

9      A.   Well because she was given the same

10 instructions as Mr. Gonzalez.  She was never pressured

11 or coerced to make a decision.  I think she was an

12 educated person and could've certainly said something

13 before the trial if she had any issues.

14     Q.   Okay.  Any other reason you were surprised at

15 Ms. Szewczyk's recantation?

16     A.   No.  I mean, I -- I don't know.  I -- I just

17 didn't -- that was -- that was my take on it.

18     Q.   Sure.  And I believe you said, "yes and no,"

19 so let's go to the no.

20     A.   Yeah.

21     Q.   Can you explain any reason why you weren't

22 surprised that she recanted her identification?

23     A.   Yeah.  I think the manner in which she was

24 approached by a private investigator and shown two

25 pictures -- I believe, two pictures side by side, which



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  I think was very suggestive.

2       Q.   Okay.  Any other reason you're not surprised

3  by --

4       A.   No.

5       Q.   -- Ms. Szewczyk's recantation?

6       A.   That's about all I thought about the -- about

7  the issue.

8       Q.   Okay.  And do -- have you ever had experience

9  with the private investigator who approached Ms.

10 Szewczyk, last name Lyons?

11      A.   No, I have not.

12      Q.   Do you remember -- did you say you reviewed

13 Ms. Szewczyk's post-conviction transcript testimony in

14 advance of today's deposition?

15      A.   I've reviewed her trial testimony --

16      Q.   Yeah.

17      A.   -- prior to the post-conviction trial.

18      Q.   Okay.  Have you ever seen her post-conviction

19 hearing testimony?

20      A.   I don't believe I have.  No.

21      Q.   Okay.  Do you know that she accused you of

22 telling her during the photo lineup that she corrected -

23 - she selected the correct person?

24      A.   I don't recall that at all.

25      Q.   Okay.  Do you have a reaction to hearing that?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      A.   That's surprising, and is not something that I

2  would have done.

3      Q.   Okay.  Surprising because it's not something

4  you would've done.  Any other reaction to hearing that

5  Ms. Szewczyk said you told her she selected the right

6  person during the photo lineup?

7      A.   No.

8      Q.   Okay.  Do you know that she also said -- she

9  also testified that during her photo lineup -- or after

10  her photo lineup, you told her Mr. Gonzalez had also

11  selected Mr. Valle-Ramos?

12      A.   Yeah.  I don't remember that, and again, that

13  doesn't sound like anything I would've done.

14      Q.   Okay.  And your -- so your reaction to that is

15  the same as hearing she --

16      A.   Yes.

17      Q.   Do you know that she testified that you

18  introduced her and Mr. Gonzalez at the trial despite an

19  order of sequestration?

20      A.   Yeah.  I don't -- I don't remember that at all

21  and I --

22      Q.   Same reaction?

23      A.   Same reaction.  Yeah.  I would just sit there

24  and keep to myself in the meeting.

25      Q.   At the trial union?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1      A.   At the -- at the trial.  At the waiting area.

2  Yeah.

3      Q.   Okay.  So you don't have any recollection of

4  an interaction between you, Mr. Gonzalez, and Ms.

5  Szewczyk at the trial in the waiting area?

6      A.   No, I don't.

7      Q.   When did you first hear of Mr. Valle -- that

8  Mr. Valle-Ramos's conviction was dismissed?

9      A.   I think I got a -- something from either the

10 State Attorney that handled it.  I don't know if that

11 was a phone call or an e-mail or -- or anything.

12     Q.   Okay.  So you're not sure how exactly you were

13 told, but someone from the State's Attorney's Office let

14 you know?

15     A.   I -- I feel like that.  Yes.

16     Q.   Okay.  Do you recall what was said in that

17 either e-mail or phone call?

18     A.   No.  I just think that I was aware that there

19 was a nolle pros filed in that.

20     Q.   Yeah.  That's correct.  Were you surprised to

21 hear that Mr. Valle-Ramos's criminal conviction was

22 dismissed -- or vacated and dismissed?

23     A.   Was I surprised?

24     Q.   Yeah.

25     A.   I don't know if I was surprised or not.  I

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  just read the summation and accepted it.

2      Q.   So no strong feelings one way or the other?

3      A.   Like I said, I just accepted that that's what

4  a judge made a determination of.

5      Q.   Between Mr. Valle-Ramos's conviction and the

6  dismissal of his conviction, did you have any

7  involvement in the criminal case against Mr. Valle-Ramos

8  that you can recall?

9      A.   No.

10     Q.   Do you believe Mr. Valle-Ramos committed the

11  burglary of Mr. Gonzalez's home?

12     A.   Yes, I do.

13     Q.   Okay.  Why do you say that?

14     A.   I felt the conviction with which Mr. Gonzalez

15  made his identification back then that led me to create

16  this report in conjunction with the other evidence that

17  I had, a subsequent identification by Ms. Bethany.  It

18  was not just one person, but a second person.  The fact

19  that it went to a jury trial and -- and was tried.  I --

20  I feel that all those things added together led -- leads

21  me to believe that he was the one that was responsible

22  for this.

23     Q.   Okay.  You mentioned the two eyewitness

24  identifications, the police bulletin, and the jury

25  trial.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      A.   The -- the police bulletin that showed him in

2  his car directly outside, you know, less than six-tenths

3  of a mile from his residence, the earlier bulletin,

4  again, with the similar description of a silver car, and

5  also -- similar fact-based crimes in a similar

6  geographic area was what I was referring to.

7      Q.   Okay.  When is the last time you spoke to

8  anyone associated with OPD about the Gonzalez burglary

9  investigation?

10     A.   At OPD?  I don't remember.  Even just back

11 then, probably.

12         MS. DILLON:  Okay.  So I'm going to show you

13     some documents now.  The first one will be

14     Plaintiff's Exhibit 21.  Okay.  And for the record,

15     this is a three- page document, Bates Plaintiff's 8

16     to 10.

17         (Exhibit 21 was marked for identification.)

18         BY MS. DILLON:

19     Q.   Do you see at -- kind of at the bottom it

20 says, "affidavit for arrest warrant?"

21     A.   Yes, I do.

22     Q.   Okay.  And in the second line in the -- in the

23 paragraph right below that, it says, "Michael Stanley --

24 Detective Michael Stanley"?

25     A.   Yes.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   That -- is that you?

2    A.   Yes, it is.

3    Q.   Okay.  Do you recognize this document?

4    A.   Yes, I do.

5    Q.   Okay.  What is it?

6    A.   It is the arrest warrant for this case, issued

7 for Mr. Valle-Ramos.

8    Q.   Okay.  What information were you supposed to

9 include in an affidavit for arrest when you filed one?

10   A.   The applicable information.

11   Q.   And do you mean the applicable information

12 that established probable cause?

13   A.   Yes.

14   Q.   Okay.  And you are the affiant in this

15 affidavit, correct?

16   A.   Yes, I am.

17   Q.   Meaning you made the statement under oath?

18   A.   Yes, I did.

19   Q.   Did you tell the truth in your affidavit?

20   A.   Yes, I did.

21   Q.   Would you ever leave anything out of an

22 affidavit for an arrest warrant that you thought was

23 important?

24   A.   Not intentionally, no.

25   Q.   Okay.  Can you imagine any scenario you would

MILESTONE **|** REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**         www.MILESTONEREPORTING.com         *Toll Free 855-MYDEPOS*

1  leave out evidence?

2      A.   No.  No.

3      Q.   Is there any evidence against Mr. Valle-Ramos

4  that you failed to mention in your affidavit

5  application?

6          MR. MISTOLER:  Objection.

7          THE WITNESS:  No.

8          BY MS. DILLON:

9      Q.   Okay.  I'm going to go to the second page, I

10 think second paragraph from the bottom.  Actually, hold

11 on.  Okay.  Sorry.  Second page, second paragraph, kind

12 of near the bottom, and you say, "Gonzalez stated one of

13 the suspects had a distinct Afro-style hairdo."  Do you

14 see that?

15     A.   I do.

16     Q.   Okay.  Were those your words or Mr. Gonzalez's

17 words?

18     A.   They would've been Mr. Gonzalez's words.

19     Q.   Okay.  And when would you have heard those

20 words from Mr. Gonzalez?

21     A.   Either on a statement or in a phone

22 conversation.

23     Q.   Okay.  And you mean the phone conversation

24 where you called to introduce yourself?

25     A.   Yes.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   I'll direct your attention to the last page.

2  I just want to confirm, do you see where it says,

3  "Detective Michael Stanley," and there's a signature?

4      A.   Yes.

5      Q.   That's your signature, correct?

6      A.   Yes, it is.

7      Q.   Okay.  And do you see at the bottom, where it

8  says, "April 19, 2013," just below that?

9      A.   Yes, I do.

10      Q.   Okay.  Is that the date you submitted this

11  affidavit for arrest?

12      A.   Yes, it would've been.

13          MS. DILLON:  I'm going to set that exhibit

14      aside.  And I'm going to show you what will be

15      Plaintiff's Exhibit 22.  And just for the record,

16      this is a three-page document, Bates P1420 to P1422.

17          (Exhibit 22 was marked for identification.)

18          BY MS. DILLON:

19      Q.   Do you see at the top, it says, "ICJIS Warrant

20  Arrest Affidavit?"

21      A.   Yes, I do.

22      Q.   Do you know what ICJIS stands for?

23      A.   I've never thought to figure it out, honestly.

24      Q.   I'll ask a different question: Do you know

25  what that is?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1     A.    ICJIS is the computer program maintained by

 2  the Orange County Corrections Department to submit

 3  either a warrant arrest affidavit or an -- an arrest

 4  affidavit -- warrant arrest affidavit or arrest

 5  affidavit.  There's two different types.

 6     Q.    Okay.  Can you explain -- that's what I wanted

 7  to ask you: What is the difference between those two

 8  things?

 9     A.    One is if -- a warrant arrest, Mr. Valle-Ramos

10  was arrested pursuant to an arrest warrant.

11     Q.    Okay.

12     A.    And the officer that made the physical arrest

13  transport -- transported him to the jail and submitted

14  this document to get him booked in.

15     Q.    Okay.  So this document is just saying that

16  Mr. Valle-Ramos was arrested pursuant to the arrest

17  warrant you secured for him; is that correct?

18     A.    Yes, it is.

19     Q.    Okay.  And do you see at the bottom where it

20  says, "officer signature," there's an Officer Sidney

21  Iverson?

22     A.    Oh, yes.

23     Q.    Do you know who that is?

24     A.    I don't think he works with us anymore, but I

25  -- I've seen the name.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1      Q.   Okay.  But you don't have any recollection of

2  who -- do you have a recollection of who he is?

3      A.   I -- I don't, no.  I never worked with him.

4      Q.   Okay.  You didn't work with him, you didn't

5  personally know him?  Is that fair to say?

6      A.   Yes.

7      Q.   Did you have anything to do with the

8  preparation of this document?

9      A.   No.

10     Q.   Is it something you would've seen?

11     A.   No.

12         MS. DILLON:  Okay.  We can set this exhibit

13     aside.  We already looked at your summary report.

14     I'm going to show you what was previously marked as

15     Plaintiff's Exhibit 13.  Okay.  And for the record,

16     this is a two-page document, Bates P1 -- P1415

17     to P1416.

18         (Exhibit 13 was marked for identification.)

19         BY MS. DILLON:

20     Q.   And can you see at the top there it says,

21  "Orlando Police Department Field Report?"

22     A.   Yes.

23     Q.   Okay.  And at -- under details on the left, it

24  says, "Location: 1625 Little Falls Circle?"

25     A.   Yes.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   And then it says, "Incident Type: residential

2   burglary?"

3      A.   Correct.

4      Q.   Okay.  Do you -- do you know what this is?

5      A.   This is the case report for the incident.

6      Q.   Okay.  And do you remember seeing this report

7   while you were working on the case?

8      A.   Yes, I -- I would've looked at this.

9      Q.   Okay.  And you -- did you say you reviewed

10  this in anticipation of your deposition today?

11     A.   Yes, I did.

12     Q.   All right.  It says here at the top left under

13  -- still under details, that the reporting officer is

14  Alfonso Tejeira.  Do you see that?

15     A.   I do.

16     Q.   Do you know who that is?

17     A.   I knew who he was.  He was a patrol officer on

18  the east side of town, but I -- I never worked with him.

19     Q.   Okay.  So his role in 2013, was a patrol

20  officer, and his role in the investigation was

21  responding officer; is that right?

22     A.   Yes, it is.

23     Q.   Did he have any role in the investigation

24  after authoring this report?

25     A.   No.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.  And do you see on the right, it says,

2        "Approving Officer: Jerry McCray?"

3    A.   Yes.

4    Q.   Do you know who that is?

5    A.   Yes.  I knew who Jerry McCray was.

6    Q.   Okay.  Who -- in 2013, what role did Jerry

7 McCray have at OPD?

8    A.   In -- in looking at this, he would likely have

9 been the sergeant that approved this report for this

10 patrol unit.

11    Q.   Did you work with him often?

12    A.   I never worked with him, no.

13    Q.   Okay.  And did he -- do you recall Mr. McCray

14 having any involvement in this investigation aside from

15 approving Mr. Tejeira's report?

16    A.   No.  He -- I don't remember, but he would not

17 have had -- a patrol supervisor would not have had any

18 subsequent involvement.

19    Q.   Okay.  Now I just want to direct your

20 attention to the second paragraph, and you can -- I know

21 you've read this before, so you can skim it if you would

22 like. But there is no mention of an Afro in this

23 paragraph; is that right?

24    A.   That's correct.

25    Q.   Okay.  Does it strike you as odd that the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  field report doesn't mention an Afro?

2        MR. MISTOLER:  Objection.

3        THE WITNESS:  Yes and no.

4        BY MS. DILLON:

5    Q.   Let's start with yes.

6    A.   Okay.  You would've liked -- you would've

7  liked to have had that documented at the initial time of

8  the report.  And no, because oftentimes, in my

9  experience, people have been through a traumatic

10  experience, they recall some things 24 hours later that

11  they might not have recalled at the time when they were

12  still dealing with the trauma associated with a -- with

13  a crime.

14    Q.   And do you see kind of towards the bottom of

15  this paragraph where it says, "The description given by

16  the witnesses of suspects entering the vehicle and

17  leaving in an unknown direction did not match suspect

18  number 1?"

19    A.   At the end of what paragraph?

20    Q.   Sorry.  Yeah.  It -- it's at the end of the --

21  oh, sorry.  End of the second paragraph, kind of in the

22  middle.

23    A.   Oh, second.  Witnesses of the suspects

24  entering the vehicle and leaving in an unknown direction

25  did not match suspect number 1.  Yes, I read that.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      Q.   Okay.  Is this what you were referring to when
2  you were saying that you got the idea that one of the
3  eyewitnesses could not identify the suspects?
4      A.   Given by the witnesses.  I am just trying
5  to --
6      Q.   Sure.  Take your time.
7      A.   Yes.  In looking at this document, I see that
8  under subjects, there's four unknown suspects listed,
9  and then only one victim, and nobody is listed as a
10 witness, which tells me I would've probably had
11 statements from Bethany and Ms. Bloom.
12     Q.   Yeah.
13     A.   I -- I -- in -- in a perfect world, you should
14 have entered those people there.  Here, the officer that
15 did this should have entered their names up there --
16     Q.   Okay.
17     A.   -- under subjects.  So I can only -- I just
18 speculate that it was a -- either on a statement from
19 them, where this officer got this information, or it was
20 from direct testimony that was provided to the officer.
21 I -- I'm just trying to --
22     Q.   Sure.  So what I'm asking is --
23     A.   I don't know.
24     Q.   -- is a little bit different.  What I'm asking
25 is earlier we were talking about Ms. Bloom --

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      A.    Okay.

2      Q.    -- and you had mentioned that, you know, you

3 didn't do a photo lineup with her because you were under

4 the impression she could not identify the suspects, and

5 it wasn't in your report --

6      A.    Correct.

7      Q.    -- but then you speculated that it might be in

8 this initial report.  And I'm just wondering if anything

9 in this report --

10     A.    I -- I don't know.  I would like to see the --

11 if she provided a written statement.

12     Q.    Sure.  And I'll represent she did provide a

13 written statement --

14     A.    And I --

15     Q.    -- and we'll look at that.

16     A.    Okay.

17     Q.    But anything in this?

18     A.    In this document, no.

19     Q.    Okay.

20     A.    And I don't know if it would've been from a

21 review of her written statement and or a conversation

22 with her.

23          MS. DILLON:  Okay.  I'm going to set this

24     exhibit aside and show you what will be Plaintiff's

25     23. Okay.  And for the record, this is an eight-page



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    document, Bates P1468 to 1475.

2          (Exhibit 23 was marked for identification.)

3          BY MS. DILLON:

4    Q.   Do you recognize what this is?

5    A.   Yes.

6    Q.   Okay.  What is it?

7    A.   It is a -- it's this same report, but this

8  would've been printed out probably recently, and this

9  would've been printed out at -- at the time.  That's why

10 the form looks different.

11   Q.   Okay.  Got it.  So these are the same thing?

12   A.   It's the same report, but we've subsequently

13 updated our reporting software --

14   Q.   Okay.

15   A.   -- and it -- they print out differently.

16   Q.   Okay.

17   A.   And this looks like a document that I -- I see

18 some holes here at the top.

19   Q.   Yeah.

20   A.   It looks like it probably would've been

21 submitted in a case package --

22   Q.   Okay --

23   A.   -- and --

24   Q.   -- so this is just the older version of that

25 report --



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.   Yes.

2      Q.   -- is that right?

3      A.   Yes.

4      Q.   On the top right-hand corner, do you see some

5  handwriting?

6      A.   Yes, I do.

7      Q.   Is that your handwriting?

8      A.   Yes, it is.

9      Q.   Okay.  And you wrote, Valle-Ramos, Hickson,

10  and Jeudy.  Why did you write those names?

11      A.   Those are the ID numbers for the photo

12  lineups --

13      Q.   Okay.

14      A.   In which they would have been presented to Mr.

15  Gonzalez.

16      Q.   Okay.  And would you have attached -- would

17  those -- strike that.  Why would you write that on this

18  report specifically, instead of its own separate

19  supplementary report?

20      A.   I don't know.

21      Q.   Okay.  And do you agree those -- the names,

22  Valle-Ramos, Hickson, and Jeudy do not appear in

23  Plaintiff's Exhibit 22?

24      A.   Which one is that?

25      Q.   Or was it 21 -- 22?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

1      A.   It was 22.

2      Q.   Sorry.  The last one we looked at, the field

3  report.

4      A.   This one?

5      Q.   Yes.

6      A.   I think you said, "13."

7      Q.   Oh, yeah.  I'm sorry.  That was 13.

8      A.   Well this one looks like it was submitted to

9  the State Attorney's Office.  And this one was just

10  printed either recently or well subsequent to the date

11  that this system was stopped being utilized.

12     Q.   Okay.  Have you seen this version of the

13  report before?

14     A.   I probably did once --

15     Q.   Okay.

16     A.   -- when I submitted it to the State Attorney's

17  Office.

18     Q.   Are you aware of anything in these reports

19  that's inaccurate?

20          MR. MISTOLER:  Objection.

21          THE WITNESS:  The wording and the case

22     narrative looks the same.

23          BY MS. DILLON:

24     Q.   I'm sorry, let me clarify my question.  You

25  reviewed all of the case reports available when you were

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  assigned as lead detective on the Gonzalez burglary

2  investigation, correct?

3      A.   Yes.

4      Q.   If you'd seen any inaccuracies when you

5  reviewed the reports, would you have asked the

6  responding officers to fix them?

7      A.   As far as inaccuracies, I don't know what your

8  -- what you mean, inaccuracy.

9      Q.   Yeah.  Anything that you had reason to believe

10 was not accurate?

11         MR. MISTOLER:  Objection.

12         THE WITNESS:  I -- I don't -- I don't -- I

13     don't know.  I -- I mean, I would go upon this

14     officer as attesting and swearing that what he has

15     submitted is correct.  I think if you somehow

16     clarify that suspect one should have actually been

17     suspect three, and suspect two should have been

18     suspect one.  I -- I don't know if he mixed up any

19     of that in his translation of what had been told to

20     him by the witnesses and the victim.

21         BY MS. DILLON:

22     Q.   Sure.  And if you had seen anything in these

23 reports that directly contradicted what was written in

24 the witness statements, would you have identified that?

25     A.   I think I would've clarified it in -- if



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  something like that existed, I would've clarified it in

2  my supplement.

3     Q.   Okay.  It's not something you would've changed

4  in the initial report, you just wouldn't?

5     A.   No, that's -- you -- you can't change that --

6     Q.   Okay.

7     A.   -- you know?  Yeah.

8     Q.   It's just something you would later document?

9     A.   Yeah.

10        MS. DILLON:  Okay.  I'm going to show you --

11     I'm going to set that exhibit aside.  I'm going to

12     show you Plaintiff's -- it's previously been marked

13     as Plaintiff's 12.  Okay.  For the record, it's a

14     one-page document, Bates P1.

15        (Exhibit 12 was marked for identification.)

16        BY MS. DILLON:

17     Q.   Do you see at the top where it says, "Orlando

18  Police Department Statement?"

19     A.   Yes, I do.

20     Q.   Is this a standard form that was used in 2013,

21  to collect witness statements?

22     A.   Yes, it is.

23     Q.   All right.  And do you see at the top here

24  where it says, "Residential burglary, 1625 Little Falls

25  Circle, George Gonzalez?"

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Yes, I do.

2      Q.   Okay.  Do you recognize this as Mr. Gonzalez's

3   statement that he gave in connection with the Gonzalez

4   burglary?

5      A.   Yes, and it has his name up there and a

6   signature, the responding officer's signature in the

7   lower left.

8      Q.   Okay.  And were you familiar with this

9   statement during your investigation of the Gonzalez

10  burglary?

11     A.   I would've been, yes.

12     Q.   Okay.  Do you see at the top where -- top of

13  the written statement, that was -- is that something

14  that Mr. Gonzalez would have written?

15     A.   What -- what are you referring to?

16     Q.   The paragraph in the center of the --

17     A.   Oh.  Yes.

18     Q.   And do you see where at the very first

19  sentence he writes, "Open front door, saw Spanish

20  individual, had an Afro, he ran out the back."  Did I

21  read that right?

22     A.   Yes.

23     Q.   Okay.  There's no specific information about

24  size or color of the Afro in that statement; is that

25  right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.   That's correct.

2      Q.   How did you know what kind of Afro you were

3  looking for?

4      A.   I'm guessing after, when I spoke to him on the

5  phone.

6      Q.   Okay.  And if Mr. Gonzalez had provided

7  additional detail to you over the phone that he did not

8  include in his statement, would you have documented

9  that?

10          MR. MISTOLER:  Objection.

11          THE WITNESS:  I guess I did.

12          BY MS. DILLON:

13     Q.   What do you mean?

14     A.   In the form it said it was a large Afro --

15  distinct Afro.

16     Q.   It's a distinct Afro?

17     A.   Yeah.

18     Q.   You meant large when you said, "distinct

19  Afro?"

20     A.   Well I'm -- I'm --

21          MR. MISTOLER:  Objection.

22          THE WITNESS:  -- I'm guessing.  You know, it

23     said that he had an Afro.  I would probably --

24     typically, you would ask them questions, if they had

25     any other information, any recollection.  But I'm --

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   maybe that's where he came up with it or during our

2   conversation.

3       MS. DILLON:  Okay.  We can set this exhibit

4   aside.  I'm going to show you what was previously

5   marked as Plaintiff's 15.  All right.  So for the

6   record, Exhibit 15 is a one-page document Bates

7   Plaintiff 2.

8           (Exhibit 15 was marked for identification.)

9           BY MS. DILLON:

10      Q.   And do you see it at the top, this is another

11  witness statement?

12      A.   Yes, it is.

13      Q.   Okay.  And it says, "Location of offense: 1625

14  Little Falls Circle.  Name -- Bethany Szewczyk?"

15      A.   Yes.

16      Q.   Okay.  Do you recognize this as Ms. Szewczyk's

17  statement she gave in connection with the Gonzalez

18  burglary?

19      A.   It appears to be, yes.

20      Q.   Okay.  And were you familiar with this

21  document when you were conducting the Gonzalez burglary

22  investigation?

23      A.   I would've been, yes.

24      Q.   All right.  So I want to ask you just one more

25  question about this.  In the bottom left, there's an

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  officer, presumably the officer who took her statement,

2  correct?

3       A.    Yes.

4       Q.    Do you have any idea what that name says?

5       A.    I -- I don't.  Charles -- Officer --

6       Q.    It looks like Charles something.

7       A.    Something, and I can barely make out his

8  employee number is a four digit number.

9       Q.    Yeah.  It's 5261.

10       A.    Then that's who it would be.

11       Q.    Okay.  And the -- and when you say that's who

12  it would be, it's the officer associated with that badge

13  number; is that right?

14       A.    It'd be their employee number.

15       Q.    Their employee number?

16       A.    Employee number, correct.

17       Q.    Can you figure out who an officer is from

18  their employee number?

19       A.    Yes.

20       Q.    How would you do that?

21       A.    I access a program to -- to look out and

22  figure out --

23       Q.    Okay.

24       A.    -- who it was.

25       Q.    And would it be able to access officers who

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  are no longer working at OPD?

2      A.  Oh, yes.

3      Q.  Okay.  And do you see after his -- this

4  signature, there's something that says, "OPD/, is L-E-

5      O."

6      A.  It would be law enforcement officer.

7          MS. DILLON:  Okay.  We can set that exhibit

8      aside.  Two more.  I'm going to show you now what

9      was previously marked as Plaintiff's 3 --

10     Plaintiff's Exhibit 3.  Okay.  For the record, it's

11     a one-page document, Bates P1385.

12         (Exhibit 3 was marked for identification.)

13         BY MS. DILLON:

14     Q.  Do you recognize this as another witness

15  statement?

16     A.  Yes, it is.

17     Q.  Okay.  And you see, "Location of offense: 1625

18  Little Falls Creek?"

19     A.  Yes.

20     Q.  "Witness -- Charlene Bloom?"

21     A.  Yes, I do.

22     Q.  Okay.  Do you recognize this as Ms. Bloom's

23  witness statement in relation to the Gonzalez burglary

24  investigation?

25     A.  Yes.  It's -- it would've been.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.   Okay.

2    A.   It looks like the statement she provided --

3 written statement.

4    Q.   And you were familiar with this document

5 during your investigation of the Gonzalez burglary?

6    A.   Yes, I would've had this.

7    Q.   Okay.  And can you just take a minute, and I

8 know her handwriting is a little tough to read, can you

9 try to read that --

10    A.   Yes.

11    Q.   -- to yourself and let me know when you're

12 done?

13    A.   Okay.

14    Q.   Do you see anything in this document -- or in

15 Ms. Bloom's statement that suggests she could not

16 identify the suspects?

17    A.   No, I don't.

18        MS. DILLON:  Okay.  We can set that exhibit

19    aside.  Well I actually have two more.  Are folks

20    okay to power through, or do people need a bathroom

21    break?

22        MR. MISTOLER:  I'm fine.  We're still ten

23    minutes away from, like, our hour marks.

24        THE WITNESS:  I'm good.

25        MS. DILLON:  Okay.  So I'm going to show you

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      what will be Plaintiff's 24. Okay. And for the

2      record, this is a one-page document,

3      Plaintiff's 1417.

4           (Exhibit 24 was marked for identification.)

5           BY MS. DILLON:

6      Q.   Mike, do you see at the top where it says,

7  "Orlando Police Department Field Report Narrative

8  Supplement?"

9      A.   Yes, I do.

10     Q.   And do you see on the right-hand side, there's

11  reporting officer, Chantel Styer?

12     A.   Yes.

13     Q.   Do you know what this document is?

14     A.   This is -- it would've been CSI Styer's

15  supplemental report for this incident.

16     Q.   Okay. And after CSI Styer collected evidence

17  and produced this report, did she have any further role

18  in the Gonzalez burglary investigation?

19     A.   I think she testified at trial, but no.

20     Q.   Okay. Aside from testifying at trial --

21     A.   No.

22     Q.   -- no distinct --

23     A.   No.

24     Q.   And do you see approving Officer Andrew

25  Brennan?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Yes, I do.

2      Q.   Okay.  Do you know who that is?

3      A.   Yes, I do.

4      Q.   Okay.  Who's that?

5      A.   He is a retired -- currently retired officer

6 that would've been in charge of the crime scene unit

7 investigators at the time.

8      Q.   Okay.  And did you work with him often or at

9 all?

10      A.   From time to time.

11      Q.   Okay.  Did Mr. -- or Sergeant Brennan have any

12 role to play in the Gonzalez burglary investigation

13 after approving this report?

14      A.   No.  No.

15      Q.   Okay.  And you were familiar with this report

16 during your investigation; is that right?

17      A.   Yes, I was.

18      Q.   Okay.  Just a general question.  Once evidence

19 collection is completed in a case at a crime scene, what

20 responsibilities does a lead detective have in testing

21 of the evidence?

22      A.   Some, I -- I guess follow-up with the testing

23 of that evidence if it's sent to the Florida Department

24 of Law Enforcement for further testing that is not done

25 by our agency.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.  Whose responsibility would it be to

2  submit evidence for testing?

3      A.   To submit evidence for testing with --

4      Q.   Yes.

5      A.   -- with an outside --

6      Q.   With an outside organization?

7      A.   -- agency?

8      Q.   Yeah.

9      A.   It would probably be the lead detectives, and

10  in conjunction with current practices, that would've

11  been allowed to send evidence outside our agency for

12  testing if it met -- met a certain criteria.

13      Q.   Okay.  What kinds of criteria would evidence

14  -- or evidence need to meet to be sent outside?

15      A.   If it was for a violent crime.

16      Q.   Okay.  Not a property crime?

17      A.   Correct.

18      Q.   Okay.  So all the evidence testing in this

19  case would've been done internally?

20      A.   That's what this indicates, yes.

21      Q.   Okay.  And were you responsible for deciding

22  what testing would be done?

23      A.   Well they would have -- it says, "the

24  collected items were" -- it says, "she processed for

25  latent prints with positive results."  That would've

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1 been -- that's obviously done in-house, and you don't

 2 have to ask them.

 3     Q.   Okay.  That's something that just happens?

 4     A.   That just happens, yes.

 5     Q.   Okay.  And we already talked about DNA testing

 6 not being available for latent touch DNA on objects for

 7 property crimes.  Was there any sort of other forensic

 8 evidence that was available to you in 2013?

 9     A.   No, there wasn't.

10     Q.   Okay.  And as you sit here today, you're not

11 aware of any of the physical evidence that was collected

12 at the crime scene tying back to Mr. Valle-Ramos; is

13 that right?

14     A.   No, I'm not.

15         MS. DILLON:  Okay.  We can set that exhibit

16     aside.  I'm going to show you what will be

17     Plaintiff's 25.  Okay.  For the record, this is a

18     one-page document, Bates P7.

19         (Exhibit 25 was marked for identification.)

20         BY MS. DILLON:

21     Q.   Do you see on the top right corner it says,

22 "Court case -- or Defendant's name -- Valle-Ramos,

23 George?"

24     A.   Yes, I do.

25     Q.   Okay.  And do you see under employee's name,

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  it says, "Stanley;" is that you?

2      A.   Yes, it is.

3      Q.   Okay.  And do you see at the bottom where it

4  says, "Officer's signature," is that your signature?

5      A.   Yes, it is.

6      Q.   Okay.  Do you recognize what this is?

7      A.   Yes, I do.

8      Q.   What is it?

9      A.   It's an investigative costs expense report.

10     Q.   Okay.  When would you create an investigative

11 cost expense report?

12     A.   When a case is sent to the State Attorney's

13 Office, this document accompanies the case package.

14     Q.   Okay.  So it's one of the package of documents

15 that you had sent to the State's Attorney's Office along

16 with the documents you collected in relation to the

17 Gonzalez burglary; is that right?

18     A.   That's correct.

19     Q.   Okay.  Do you see next to supervisor, there's

20 a signature there?

21     A.   Yes, I do.

22     Q.   Do you know whose signature that is?

23     A.   I'm going to -- since --

24     Q.   Would it be Daniel Brady?

25     A.   Well that's where I'm -- I'm going, yeah.  As

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1 he approved the -- as he approved the -- my

2 investigative supplement, I'm going to say it was

3 probably Sergeant Brady that signed that.

4      Q.   Okay.  That would be consistent with general

5 practices?

6      A.   Yes.

7      Q.   Did you -- when you were working on the

8 Gonzalez burglary investigation, did you speak with Mr.

9 Brady -- or Sergeant Brady about the investigation?

10      A.   I don't recall.

11      Q.   Okay.  As the supervisor on the case, would he

12 be responsible for signing off on an investigation?

13      A.   I want to make sure I know what you mean by

14 when you say, "signing off."

15      Q.   Responsible for making sure that the

16 investigation was conducted within the policies and

17 practices of the Orlando Police Department?

18      A.   I -- I'd say so, yeah, in his review of the

19 investigative supplement, yes.

20      Q.   Okay.  And would he have reviewed - he's --

21 he's assigned as the reviewing officer on the

22 investigation supplement, correct?

23      A.   Yes.

24      Q.   Would he have also reviewed the other

25 documents you had gathered in relation to the Gonzalez

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

1 burglary -- or burglary investigation --

2      A.   As --

3      Q.   -- as a supervising officer on the case?

4      A.   You have to specify, because I have just the

5 investigative supplement and I have the arrest warrant.

6      Q.   Sure.  I -- let me ask you a different

7 question: So you -- I think you mentioned earlier, that

8 in your role as sergeant, you have acted as a supervisor

9 in reviewing reports on cases.  In your -- in your

10 capacity as supervisor on cases, are you responsible for

11 reviewing all the documents that are gathered in an

12 investigation?

13      A.   Ultimately, yes.  I would review and approve

14 any arrest warrant prior to it going to a judge for

15 signature --

16      Q.   Okay.

17      A.   -- in current practice.

18      Q.   Sure.

19      A.   And the same would go for a search warrant.

20      Q.   And do you know if that was the practice

21 in 2013?

22      A.   I -- I'm guessing it probably was.  I -- I

23 don't remember, but I -- I think that it was --

24      Q.   Okay.  And --

25      A.   -- but I --

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   -- the supervising officer on a case, how

2 would he stay informed about what was going on in a

3 case?  Was that the lead detective's responsibility?

4    A.   I guess he would -- just being present and

5 asking.

6    Q.   What do you mean?

7    A.   Being involved in what your detective's cases,

8 they currently are.

9    Q.   And when you say, "being involved in the

10 cases," what do you mean?

11    A.   I mean being aware of he would've -- you know,

12 he would certainly be aware of the cases that you've

13 assigned out, and you would want to know the status of

14 some of those cases.

15    Q.   Okay.  Would you expect a supervisor on a case

16 to be aware, for example, of positive witness

17 identifications and photo lineups?

18    A.   Yes, as it would've been memorialized in the

19 case report and the arrest affidavit.

20    Q.   Okay.  And you would expect them to be

21 familiar with the supplement and the arrest warrant.  Is

22 that what you said?

23    A.   Yes.

24    Q.   Okay.  Turning back to this investigative cost

25 expense report, do you see at the top where it says,

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  "hours?"

2       A.   Yes.

3       Q.   And it says, "six hours?"

4       A.   Yes.

5       Q.   Is -- does it strike you as unusual to spend

6  six hours on an investigation?

7            MR. MISTOLER:  Objection.

8            THE WITNESS:  I -- I probably low-balled it, to

9       be honest with you.  I don't know why I --

10           BY MS. DILLON:

11      Q.   Do you recall spending more than six hours on

12  the --

13      A.   I -- I don't recall --

14      Q.   Okay.

15      A.   -- the length of time that I did, but I don't

16  know how accurate that is.

17      Q.   Okay.  You -- did you complete this report?

18      A.   I did, yes.

19           MS. DILLON:  Okay.  You can set this exhibit

20      aside.  We could take a quick break if folks want.

21      I don't have a ton left, but if people need a

22      bathroom break, that's fine.

23           MR. MISTOLER:  We can take a break.  Yeah.

24           MS. DILLON:  Okay.

25           THE VIDEOGRAPHER:  Okay.  This time is 4:42



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    p.m.  We're going off record.

2           (A recess was taken.)

3           THE VIDEOGRAPHER:  The time is 4:48 p.m.  Going

4    back on record.

5           BY MS. DILLON:

6       Q.   Okay, Mike, just before we went and took our

7    break, we were reviewing some documents in connection to

8    the Gonzalez burglary investigation; is that right?

9       A.   Yes, it was.

10      Q.   Okay.  Now I just want to talk about any

11   disciplinary or litigation history that you may have.

12      A.   Okay.

13      Q.   Are you aware of any citizen complaints filed

14   against you, accusing you of misconduct?

15      A.   There have been, yes.

16      Q.   Okay.  Can you recall specific instances?

17      A.   No.  Although in preparing for this, I did

18   obtain my complete discipline history, and I looked at

19   some of those, and having worked in Internal Affairs,

20   sometimes you've never made aware of certain complaints.

21      Q.   Okay.  So if you had -- if there had been

22   citizen complaints against you, you might not have

23   always heard about them?

24      A.   Correct.

25      Q.   In what instance would you hear about a

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       **Toll Free 855-MYDEPOS**

1  citizen complaint, is -- are there any?

2      A.   There are none against me --

3      Q.   Sure.

4      A.   -- that rose to a level of a full

5  investigative report initiated by the Chief of Police.

6      Q.   Okay.

7      A.   So I -- I --

8      Q.   So you would hear about a citizen complaint if

9  it got escalated to investigation; is that correct?

10     A.   Correct.  The very top --

11     Q.   Okay.

12     A.   -- level of investigation.

13     Q.   But you weren't -- you wouldn't hear about

14  them otherwise?

15     A.   Otherwise, they are -- they are frequently

16  handled by the Internal Affairs investigators --

17     Q.   Okay.

18     A.   -- without sometimes the officer even being

19  made aware.

20     Q.   Do you recall any -- the nature of any of the

21  specific citizen complaints against you when you were

22  viewing your history?

23     A.   I didn't remember them.  No, I didn't.

24     Q.   Okay.  Do you -- do you remember what they

25  were about after having reviewed the disciplinary

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

 1 │ history?

 2 │     A.   I -- I -- some -- I don't even remember them,

 3 │ that some of them were so far -- so far back.

 4 │     Q.   Okay.

 5 │     A.   I remember some other ones, but not from

 6 │ complaints from the public, no.

 7 │     Q.   Okay.  Did you -- have you -- in your time in

 8 │ Internal Affairs, have you ever heard about any OPD

 9 │ officer being disciplined in connection with a citizen

10 │ complaint?

11 │     A.   Absolutely.

12 │     Q.   Okay.  Have you ever heard of an officer being

13 │ disciplined in connection with a citizen complaint as it

14 │ relates to a wrongful conviction?

15 │     A.   Yes.

16 │     Q.   Okay.  What specific instances have you heard

17 │ about, or do you know about of an OPD officer being

18 │ disciplined in connection with a wrongful conviction

19 │ complaint?

20 │     A.   It wasn't conviction.  I'm sorry.  They were

21 │ never convicted.

22 │     Q.   Okay.

23 │     A.   It would've been wrongful arrest.

24 │     Q.   Okay.  And for the wrongful arrest citizen

25 │ complaints you're thinking of, do you -- what do you


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  recall about those incidents?

2      A.   A detective showed a single image to a witness

3  and obtained an arrest warrant based upon that showing

4  of a single image.

5      Q.   Oh, okay.  So a detective did a photo

6  identification procedure with someone with a single

7  photo?

8      A.   That's correct.

9      Q.   Okay.  And that -- is that something that got

10  escalated to a higher tier investigation?

11      A.   Absolutely.  Absolutely.  Yes.

12      Q.   Were you the investigator on that?

13      A.   No, I was not.

14      Q.   Okay.  Do you know how it was resolved?

15      A.   I think the officer received a disciplinary

16  action, some suspension of some hours.

17      Q.   Okay.  Do you recall any other -- hearing

18  about any other OPD officer being disciplined in

19  connection with a photo lineup, photo array citizen

20  complaint?

21      A.   No.

22      Q.   Have you ever received a reprimand in your

23  time at OPD?

24      A.   Yes.

25      Q.   Okay.  How many times?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      A.   I crashed two cars.  I had an inadvertent

2  discharge of a firearm that struck another officer's

3  vehicle, and I accessed the driver information database

4  for a purpose that was not authorized.

5      Q.   Okay.  So is that -- is that four?  Was the

6  crashed cars two different incidents?

7      A.   Yes.

8      Q.   Okay.  Were you disciplined for any of those

9  incidents?

10     A.   All of them.

11     Q.   Okay.  What discipline did you receive?

12     A.   For a vehicle crash, it would've been a verbal

13  warning.

14     Q.   Okay.  What about for the inadvertent

15  discharge of firearm?

16     A.   That would've been an eight-hour suspension.

17     Q.   And what about for the accessing driver

18  incident database?

19     A.   Also eight hours.

20     Q.   Okay.  Do you recall when those incidents

21  were?

22     A.   The crashes were sometime between 2005 and

23  2009, I'm guessing.

24     Q.   So somewhat early in your career?

25     A.   Yes.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   What about the inadvertent discharge?

2    A.   Maybe 2011, and the -- the other, accessing

3 the information was maybe 2012 or '13.

4    Q.   Okay.  So all over a decade ago?

5    A.   Yes.

6    Q.   And what was the resolution on those, you just

7 got your eight-hour suspension or verbal reprimand and

8 that was it?

9    A.   Yes.

10   Q.   Okay.  Are you aware of any complaints made

11 against you by coworkers?

12   A.   No.

13   Q.   Have you ever been a defendant in a lawsuit

14 other than this one?

15   A.   No.

16   Q.   Have you ever been convicted of a crime?

17   A.   No.

18   Q.   Have you ever been arrested?

19   A.   No.

20   Q.   Okay.  And just a couple questions about your

21 supervisor on the case, Mr. Brady -- or Sergeant Brady.

22 Are you aware of any discipline he received in his

23 capacity as an OPD officer?

24   A.   No, I'm not.

25   Q.   Okay.  Any citizen complaints that you're



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  aware of?

2      A.   No, I'm not.

3      Q.   Did he ever do anything you disagreed with in

4  connection to an investigation?

5      A.   No, not that I recall.

6      Q.   Okay.  Did you ever witness him -- anything

7  that you considered to be misconduct?

8      A.   No.

9      Q.   To the best of your knowledge, what was

10 Sergeant Brady's reputation at OPD while you worked with

11 him?

12     A.   Fantastic reputation.  He ended up becoming

13 the homicide sergeant, and he was promoted to lieutenant

14 out there, and I believe he retired as a lieutenant.

15     Q.   Okay.  And are you -- are you in contact with

16 Sergeant Brady -- or Lieutenant Brady?

17     A.   No.  No, I'm not.

18     Q.   Okay.  No socialization outside of work --

19     A.   No.

20     Q.   -- just a professional relationship?

21     A.   Correct.

22     Q.   Okay.  Other than the documents we've looked

23 at today, have you ever written anything about Mr.

24 Valle-Ramos?

25     A.   No, I haven't.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1    Q.   Okay.  Have you ever written anything about

2  the Gonzalez burglary investigation other than what

3  we've looked at today?

4    A.   Other than what we've got here today, no.

5    Q.   Okay.  Have you written anything about this

6  present lawsuit?

7    A.   No.

8    Q.   Have you given any statements about Mr. Valle-

9  Ramos?

10   A.   No.

11   Q.   The Gonzalez investigation?

12   A.   No.

13   Q.   This lawsuit?

14   A.   No.

15   Q.   In the time since Mr. Valle-Ramos was

16  convicted, have you had any communications about the

17  Gonzalez burglary?

18   A.   With?

19   Q.   Anyone.

20   A.   No.

21   Q.   Okay.  As you sit here today, do you think

22  anyone at the Orlando Police Department did anything

23  wrong in connection with the Gonzalez burglary

24  investigation?

25   A.   No.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1    Q.  Do you have any regrets about your involvement

2 in the Gonzalez burglary investigation?

3    A.  No, I don't.

4    Q.  Anything you think you should have done

5 differently?

6    A.  Nothing specifically, as I'm sitting right

7 here today.

8        MS. DILLON:  Okay.  I have no more questions.

9            CROSS-EXAMINATION

10       BY MR. MISTOLER:

11    Q.  I have a few.  I won't be three hours, so.

12 Thanks so much for presenting, obviously, and taking the

13 time to answer our questions here today.  I just wanted

14 to go back over a few things before we wrap up.

15       We looked at some of your reports today, and

16 in making those reports, does it happen that information

17 is left out of those reports?

18        MS. DILLON:  Objection.  Form.

19        THE WITNESS:  These were done when there was

20     not a subsequent body-worn camera recording, so it

21     is very possible that oftentimes what is said to an

22     officer in either a statement or verbally does not

23     get encapsulated perfectly in their case report, so

24     yes.

25        BY MR. MISTOLER:

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1      Q.    It's not a malicious thing that happens,

2  though, right?

3      A.    No.  I think you would look then to the

4  quality of the statement given, the capacity of the

5  person giving the statement, the ability of the officer

6  to articulate what was said, and -- and document that.

7  I -- I guess there's a couple -- a lot of factors that

8  go into just how good, and that's why it's important for

9  -- for follow-up to --

10     Q.    It's probably --

11     A.    -- see what would -- had been missed or

12  further recalled by a -- person.

13     Q.    It's probably impossible to capture every

14  aspect in a narrative of all -- everything that's, you

15  know, come into the case or that you know in the case at

16  that time?

17     A.    Yes.  It's possible that you certainly would

18  certainly try to get it as right as possible.

19     Q.    Okay.  Do you believe your interactions with

20  the victim, Gonzalez, were in any way improper in this

21  case?

22     A.    No.

23     Q.    Do you believe you engaged in any sort of

24  coaching in any way, in any time for Gonzalez?

25     A.    No.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    Q.   Same question: Do you believe any of your

2  interactions with Bethany were in any way improper at

3  any point in your investigation of the case?

4    A.   No.

5    Q.   And -- well I'll move forward.  When you were

6  making the photo arrays, the six-pack photos, did you do

7  your best with trying to put those together?

8    A.   Yes.

9    Q.   What -- did you find it difficult when you

10  were making some of those photo arrays?  I know we've

11  heard about photo arrays for three of the possible

12  suspects, but specifically with Valle-Ramos, was that

13  difficult to put all those pictures together or find

14  those pictures in the database?

15    A.   Yes, it was.

16    Q.   Why was that difficult?

17    A.   I remember I had to use a driver's license

18  photograph for him.  An arrest photograph did not exist.

19  And the most recent one that he had was a -- one with a

20  large Afro.  And as I began to search for other people

21  with similar demographics, I didn't find any that would

22  be suitable for comparison and an inclusion in a photo

23  lineup.  So I went to an older photograph of his when

24  his hair was much shorter and found comparable subjects

25  to also include there.  It was -- it was too problematic

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  with his hairdo to have anything.  It would've been too

2  suggestive.  There was no other comparative --

3  comparable dated photographs that I could locate.

4      Q.  So it's not like you had a group of six guys

5  with Afros, and you kicked all the people with similar

6  hairstyle, similar Afros out.  It was just a difficult

7  process?

8      A.  I couldn't find --

9          MS. DILLON:  Objection.  Form.  You can answer.

10         THE WITNESS:  I was struggling to find anybody

11     to include in there, so that forced me to go to a --

12     the photograph with a different hairstyle, to have

13     in the same photographic lineup for Mr. Valle-Ramos.

14         BY MR. MISTOLER:

15     Q.  But in this whole process, your intent was to

16  find the closest matches that you could?

17     A.  Yes.

18     Q.  You didn't try to get any of the suspects to

19  choose Valle-Ramos in the -- or excuse me.  Strike that.

20  You didn't try to get any of the witnesses when you were

21  showing them the lineups, to choose Valle-Ramos

22  specifically in the lineups?

23     A.  No, I did not.

24     Q.  I only have one more question and it is: Did

25  you frame Valle-Ramos in this -- in this instance?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

1      A.   No, I did not.

2           MS. DILLON:  Based on that, I have nothing

3      further.

4           THE REPORTER:  Okay.  Will our witness read or

5      waive?

6           THE WITNESS:  Read, please.

7           THE REPORTER:  Sure.  And Counsel, will you be

8      placing an order today?

9           MS. DILLON:  Not today.

10          THE REPORTER:  For you, either?

11          MR. MISTOLER:  No, ma'am.

12          THE REPORTER:  Okay.

13          THE VIDEOGRAPHER:  Okay.  Let me go off record.

14     The time is 5:03 p.m.

15          (Deposition concluded at 5:03 p.m. ET)

16

17

18

19

20

21

22

23

24

25


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

CERTIFICATE OF OATH

     I, the undersigned, certify that the witness in the
foregoing transcript personally appeared before me and
was duly sworn.

Identification:  Produced Identification


_____

SHEILA JONES

Court Reporter, Notary Public

Commission Expires: 12/21/2027

Commission Number: HH475516



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

C E R T I F I C A T E

     I, SHEILA JONES, Court Reporter and Notary Public
for the State of Florida at Large, do hereby certify
that I was authorized to and did report the foregoing
proceeding, and that said transcript is a true record of
the said proceeding.

     I FURTHER CERTIFY that I am not of counsel for,
related to, or employed by any of the parties or
attorneys involved herein, nor am I financially
interested in said action.


Submitted on: November 25, 2025.





     _____

           SHEILA JONES

           Court Reporter, Notary Public


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

# ORLANDO POLICE DEPARTMENT

Case #: 2013-146382

## Statement
Please fill out in full detail

| Date of Statement: | Month: 04 | Day: 09 | Year: 2013 | Time: 0870 |
|---|---|---|---|---|
| Offense: Res Burglary | | | | |
| Date of Offense: | Month: 04 | Day: 09 | Year: 2013 | Time: 08 00 |

Suspect (last, first, middle): UNK.

Location of Offense: 1625 Little Falls Cir

District: IT-2

| Person Code: W | Name (last, first, middle): BLOOM, CHARLENE ELIZABETH | Age: | DOB: 09-14-48 | Race: W | Sex: F |
|---|---|---|---|---|---|
| | Address Residence: 1708 SILVER CREEK CT. ORLANDO, FL | | Zip: 32807 | Phone: 4072734769 | |
| | Address Business: | | Zip: | Phone: | |
| | Email Address: cbloom1@cfl.rr.com | | | | |

Type of ID shown: FL DL

ID# if applicable: B450-105-48-834-0

I, CHARLENE BLOOM, do hereby voluntarily make the following statement without threat, coercion, offer of benefit, or favor by any persons whomsoever.

08:15 Looked out the window upstairs - saw 3 young guys running to their car, they were looking towards my neighbors talking to each other. Guys small built + height with dress shirts (long sleeved, dressed nicely like school or college guys. Car was gray compact maybe a Hundai or Datsun. They took off fast + sped off.
Spoke to officers about I saw.

Sworn to and subscribed before me, this 9th day of APRIL 2013

OFC. Charles Place Cert/LEO

Notary Public ☐   Law Enforcement Officer ☒   Name Key 5261
Personally Known ☐   Produced Identification ☐   Type _____

I swear/affirm the above and/or attached statements are correct and true.

Signature: x Charlene E Bloom

My signature below means that I refuse to prosecute the person(s) named above for the alleged crime(s) that occurred to me or to the property under my control.

Signature _____ Date _____
(Departmental policy prohibits use of this section in domestic violence cases.)

| Victim Rights Booklet provided? | Yes ☐ No ☒ |
|---|---|
| I will testify in court and prosecute criminally. | Initials: |
| Miranda Warning Read? Yes ☐ No ☒ | Page 1 of 1 |

1113.9   6/7/11          White: State Attorney          Yellow: Records


Exhibit 3
Stanley
Date 8/4/15

P001385

8:45

# ORLANDO POLICE DEPARTMENT

Case #: 2013-146382

## Statement
Please fill out in full detail

| Date of Statement: | Month: 4 | Day: 13 | Year: 13 | Time: 0825 | | |
|---|---|---|---|---|---|---|
| Offense: | Res Burglary | | | | | |
| Date of Offense: | Month: 4 | Day: 9 | Year: 13 | Time: 0800 | Suspect (last, first, middle): Unk | |

Location of Offense: 1625 Little Falls Cir                    District: K-2

| Person Code: | Name (last, first, middle): Gonzalez, George L | | Age: | DOB: 4-4-56 | Race: W | Sex: M |
|---|---|---|---|---|---|---|
| ✓ | Address Residence: 1625 Little Falls Cir | | | Zip: 32807 | Phone: 407-459-3282 cell | |
| | Address Business: | | | Zip: | Phone: | |
| | Email Address: | | | | | |

Type of ID shown: FLDL               ID # if applicable: G 524-312-56-124-0

I, _____, do hereby voluntarily make the following statement without threat, coercion, offer of benefit, or favor by any persons whomsoever.

OPEN FRONT DOOR SAW SPANISH INDIVIDUAL HAD A AFRO HE RAN OUT THE BACK DOOR I WENT OUT THE FRONT AND CHASED HIM. TOO FAST JUMP OVER FENCE BY LAKE. CAME BACK TWO MORE INDIVIDUALS CAME DOWN STARTED FIGHTING ONE HE HAD SHORT HAIR CUT BLUE SHIRT SPANISH. WE FOUGHT AND HE HIT ME AS MUCH AS HE COULD I WAS WORRIED ABOUT THE SECOND GUY SO TRYING TO FIGHT BOTH THE OTHER GUY I WAS FIGHTING BROKE LOOSE AND MADE IT OUT THE FRONT DOOR THE TO PUNKS IN THE HOUSE WERE ABOUT 5.8 THIN 17-20 YRS OLD. TOOK GOLD RING CROSS SKULL CROSS BONES ACCENTED WITH DIAMONDS. I CAN'T IDENTIFY THE TWO DOWN STAIRS. STERLING SILVER JEWELRY WITH BLUE TOPAZ, CITRINE BLACK ONYX ABOUT 30-35 PIECES. 7-8000. DOLLARS. RING 1200. I GAVE NO ONE PERMISSION TO ENTER APARTMENT. I WANT TO PRESS CHARGES

| Sworn to and subscribed before me, this 9 day of April, 2013 | I swear/affirm the above and/or attached statements are correct and true. |
|---|---|
| _Alfonso Teixeira_ | Signature: X _____ |
| Notary Public ☐  Law Enforcement Officer ☑  Name Key 7494 | |
| Personally Known ☐  Produced Identification ☑  Type: FLDL | |
| My signature below means that I refuse to prosecute the person(s) named above for the alleged crime(s) that occurred to me or to the person(s) under my control. | Victim Rights Booklet provided?  Yes ☑  No ☐ |
| | I will testify in court and prosecute criminally.  Initials: _GG_ |
| Signature: _____  Date: 4-9-13 | Miranda Warning Read?  Yes ☐  No ☐ |
| (Department policy prohibits use of this section in domestic violence cases.) | Page ___ of ___ |

OPD P&P 1713.10 A Rev. 9/23/11          White: State Attorney          Yellow: Records


Exhibit 12
Stanley
Date 3/4/25

P000001




# *Orlando Police Department*
## Field Report

100 S Hughey Ave   Orlando, FL  32802   (407)246-2470

Case Number: **2013-00146382**

## DETAILS

| | |
|---|---|
| Location: 1625 LITTLE FALLS CIR | Incident Type: **Residential Burglary** |
| | Occurred From: 04/09/2013  08:00   Thru: 04/09/2013  08:09 |
| | Reporting Date: 04/09/2013  08:09 |
| Reporting Officer ID: 7473      TEJEIRA, ALFONSO | Approving Officer: 12146  MCCRAY, JERRY |

## OFFENSES

| Counts | Attempt/Commit | Description | Dom. Violence | Location Type |
|---|---|---|---|---|
| 1 | Committed | BURGLARY - BREAKING AND ENTERING | No | Apartment/Condo |
| 1 | Committed | THEFT | No | Apartment/Condo |
| 1 | Committed | BATTERY | No | Apartment/Condo |

## NARRATIVE

On April 9, 2013 at approximately 0845 hours, I responded to 1625 Little Falls Cir, Hidden Creek Condos, in reference to an occupied residential burglary. Upon arrival, I met with the victim who completed a sworn written statement.

According to the victim, on today's date at approximately 0800 hours he arrived home. He entered his residence via the front door. Once inside, victim observed suspect #1, on the ground level. Suspect #1 ran out the back sliding glass door. The victim chased suspect #1 who jumped the fence and ran northbound in an unknown direction. When the victim returned to his residence. Suspect #2 was coming down the apartment's stairs. The victim pepper sprayed suspect #2. The victim attempted to hold suspect #2. Suspect #2 began punching the victim. While the victim was fighting with suspect #2, Suspect #3 came down the stairs. Suspect #2 the ran out the front door northbound thru the condos. Suspect #3 was last seen by the victim going up the stairs. Suspect #2 jumped a fence north of the complex. When the victim returned to the apartment suspect #3 had left. Unknown if suspect #3 jumped out the second story window or left via front or back door. A witness observed three suspects enter a gray possibly Toyota vehicle in the complex north of the victim's condo. The description given by the witnesses of the suspect's entering the vehicle and leaving in an unknown direction did not match suspect #1. It appears the victim only saw three suspects but there could have been four. The victim did not give anyone permission to enter his residence and steal his property, or batter him. The victim will press charges. The victim did not sustain any visible injuries and did not require medical attention. CST Styer, 14857, responded to the scene and processed for latent prints. One of the witnesses stated she believed the suspects were wearing gloves.

It appears, the suspects entered the residence via the rear sliding glass door. The suspects used a tire iron to break the sliding glass door lock. The tire iron was left at the scene. Estimated damage to the door is $10.  Once inside the suspects stole approximately $8000 worth of sterling silver jewelry. The suspects also took a gold ring valued at approximately $1200. The suspect attempted to steal approximately $500 in U.S. coins and a folding knife valued at $40. The knife and the coins were in a backpack the suspects brought with them but left behind. The folding knife and the coins were returned to the owner. The backpack was taken by the CST. Officer O'Day, 12153, found a Pop Tart bag in the area where the suspect's car was last seen.  It is unknown if the bag came from suspect's car The bag was turned over to the CST. The victim stated he can identify some of the suspects.



Exhibit 13
Stanley
Date: 3/4/25

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.
Last Modified Date/Time 04/09/2013  17:27:41



# Orlando Police Department
## Field Report



*100 S Hughey Ave  Orlando, FL  32802  (407)246-2470*

Case Number: **2013-00146382**

## SUBJECTS

| Case Subject Type | Subtype | Street Address | | Home Phone | Sex | Age |
|---|---|---|---|---|---|---|
| Name | | City, State  Zip | Cell Phone | Work Phone | Race | DOB |
| Hgt  Wgt  Hair  Eyes | DL Number/State | City of Birth | State/Country of Birth | | Soc. Sec # | |
| **Suspect** | Suspect | | | | | |
| UNK, 2013-00146382 | | | | | | |
| **Suspect** | Suspect | | | | | |
| UNK, 2013-00146382 | | | | | | |
| **Suspect** | Suspect | | | | | |
| UNK, 2013-00146382 | | | | | | |
| **Suspect** | Suspect | | | | | |
| UNK, 2013-00146382 | | | | | | |
| **Victim** | Adult | 1625 Little Falls CR-Circle | | | M | 57 |
| Gonzalez, George L | | Orlando, FL  32807 | (407)459-3282 | | W | 04/04/1956 |
| | G524312561240/FL | | | | -- | |

## PROPERTY - GENERAL

| Date | Code | Quantity | Units | Category | Value | OAN |
|---|---|---|---|---|---|---|
| | Property Type | | | Style/Drug Type | Serial Number | |
| 04/09/2013 | **Damaged** | 1 | Each | General Property | $10.00 | |
| | Miscellaneous | | | | | |
| | Damage to the back door sliding glass door lock; | | | | | |
| 04/09/2013 | **Stolen Only** | 1 | Each | Jewelry | $1200.00 | |
| | Jewelry Ring | | | | | |
| | Gold ring with skull cross bones accented with ; diamonds | | | | | |
| 04/09/2013 | **Stolen Only** | | | Jewelry | $8000.00 | |
| | Jewelry Other | | | | | |
| | 30-35 pieces of sterling silver jewelry with blue ; topaz, citrine black onyx | | | | | |
| 04/09/2013 | **Stolen/Recovered** | | | Securities or Money | $500.00 | |
| | Currency/Negotiable | | | | | |
| | $500 in U.S. coins | | | | | |
| 04/09/2013 | **Stolen/Recovered** | 1 | Each | General Property | $40.00 | |
| | Miscellaneous | | | | | |
| | Buck folding knife | | | | | |

## PROPERTY - VEHICLE

| Date | Code | Year | Category/Make/Model/Model Desc | | Value | |
|---|---|---|---|---|---|---|
| | Property Type | Color | | Year/Plate/State | VIN/Serial Number | |

## PROPERTY - GUNS

| Date | Code | Type | Make | Serial Number |
|---|---|---|---|---|
| | Value | Caliber | Finish | OAN |

| | |
|---|---|
| I swear or affirm the above statements are correct and true. | Officer Name/ID #  (Print) |
| Signature_____ | |
| Sworn to and subscribed before me, the undersigned authority, | |
| This _____ day of _____,_____. | |
| Notary Public ☐   Law Enforcement Officer ☐   Emp # _____   Orlando Police Department | |

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.

# Statement
Please fill out in full detail

| Date of Statement: | Month: 04 | Day: 09 | Year: 2013 | Time: 8:40 A |
| Offense: | Res Burglary | | | |
| Date of Offense: | Month: 04 | Day: 09 | Year: 2013 | Time: 0800 |

Suspect (last, first, middle): UNK.

| Location of Offense: 1625 Little Falls Cir | | District: K-2 |

| Person Code: | Name (last, first, middle): SZEWCZYK, BETHANY C. | Age: | DOB: 08-18-82 | Race: W | Sex: F |
| W | Address Residence: 1716 Lafayette Ct Orlando, FL | Zip: 52807 | Phone: (315) 416-1246 |
| | Address Business: 3501 Quadrangle Blvd. Suite 175, Orlando, FL. | Zip: 32817 | Phone: (407) 736-1418 |
| | Email Address: BETHANYXS@MAC.COM | | |

| Type of ID shown: FL DL | ID# if applicable: 5220-063-82-798-0 |

I, Bethany Szewczyk, do hereby voluntarily make the following statement without threat, coercion, offer of benefit, or favor by any persons whomsoever.

On April 9th at approx. 8:10AM, I left my unit at 1716 Lafayette Court to witness 3 young hispanic males rushing to get in their vehicle. The driver was wearing blue interiors. They were all dark hair with dark eyes and almost appeared to be brothers. The car was a newer model Toyota, gray in color and had 4 doors. There was a blank white license plate on the front. The car was clean. They all were shorter no taller than 5'9" or 5'10" and appeared very young. 16-20 years old. They had a very small build. I could not see which direction they went when they left.

Sworn to and subscribed before me, this 9th day of April 2013.

ofc. [signature] O69/LEO

| Notary Public ☐ | Law Enforcement Officer ☐ | Name Key 3261 |
| Personally Known ☐ | Produced Identification ☐ | Type |

I swear/affirm the above and/or attached statements are correct and true.

Signature: [signature Bethany Szewczyk]

My signature below means that I refuse to prosecute the person(s) named above for the alleged crime(s) that occurred to me or to the property under my control.

Signature _____ Date _____
[Departmental policy prohibits use of this section in domestic violence cases.]

Victim Rights Booklet provided? Yes ☐ No ☑
I will testify in court and prosecute criminally. Initials:

Miranda Warning Read? Yes ☐ No ☑

Page 1 of 1

1113.9  6/7/11     White: State Attorney     Yellow: Records


Exhibit 15
Stanley
Date 3/4/25

P000002

# Photo Line-up Administration and Witness Instructions

Case Number: 2013-146382   Date/Time: 9/4/13 1000
Witness Name: SZEWCZYK, BETHANY   Administrator Name/ID: STANLEY #14767
Line-up Number: 02184   Line-up reviewed by: STANLEY #14767

Prior to presenting the photo line-up, the witness provided a written/audio recorded statement describing the suspect of this criminal investigation.

_____
Administrator's Initials

Prior to presenting the photo line-up I read "verbatim" the witness instructions to the witness. The witness indicated he/she understood the instructions.

_____
Administrator's Initials

## PHOTO LINE-UP INSTRUCTIONS TO THE WITNESS:

**"It is just as important to clear innocent persons from suspicion as it is to identify guilty parties. Regardless of whether you make an identification, we will continue to investigate this incident. With that in mind, I am going to show you six photos arranged so they may be simultaneously viewed. This group of photos may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards, and moustaches may easily be changed. The photos may not always depict the true complexion of a person – it may be lighter or darker than shown in the photo. Pay no attention to the order of the photos or markings and/or numbers that may appear on the photos, or to any differences in the type or style of photographs. Take your time; when you have looked at all the photos, tell me whether or not you see the person who committed the crime. If you do identify someone, you will circle and initial that person on the line-up. Please remember this is an on-going investigation, you are not permitted to discuss this identification procedure with anyone other than law enforcement or legal counsel."**

I understand the photo line-up instructions and have been provided a copy of this form.

_____
Witness's Initials

After the photo lineup, the witness provided a written statement or an audio recorded statement describing his/her identification or non-identification.

_____
Administrator's Initials


Exhibit 10
Stanley
Date 3/4/25

*This form is to be filed in the case package. If the witness refuses to provide a sworn statement, indicate so in the incident report.*

# WITNESS PHOTO DISPLAY IDENTIFICATION FORM

## ORLANDO POLICE DEPARTMENT

PHOTO LINEUP # *22184*

| | | |
|---|---|---|
| UPPER LEFT 1 | UPPER CENTER 2 | UPPER RIGHT 3 |
| LOWER LEFT 4 | LOWER CENTER 5 | LOWER RIGHT 6 |

If you have previously seen one or more of the persons shown in the photos displayed, place an "X" in the box corresponding to the photograph of the person in the lineup.

*The person in Box #2* _____ was seen by me (state circumstances)
*early morning as he was getting into vehicle with blue*
*latex gloves on and speeding away - also with 2 others.*
*Incident took place at Hidden Creek Apartments & I saw him also*
*exited.*

I swear or affirm that the aforementioned is true and correct to the best of my knowledge.

Sworn to and subscribed before me
*MICHAEL D. STANLEY*
this *4th* day of *SEPT* , *13* .

_____ (4767)
Notary Public
or
Law Enforcement Officer
Conducting Official Investigation

*Bethany A George*
Signature of Witness

*1716 LAFAYETTE CT.*
Witness' Street Address

*ORLANDO, FL 32807*
City, State, Zip Code

*315-416-1046*
Witness' Telephone Number(s)

*9/4/13  1000*
Time and Date of Witness' Signature

**Exhibit H 2**

# Orlando Police Department





Lineup Identifier:
Printed Orlando PD: 8/26/2013 15:0

# Orlando Police Department







**1**       **2**       **3**





**4**       **5**       **6**

**Lineup Identifier:**
**Printed Orlando PD: 7/24/124 9:32**



Exhibit _n_
Stanley
Date 3/4/25

P001413

 
# CRIMINAL INFORMATION BULLETIN
## APRIL 15, 2013     CAU #2013-0269
SUSPICIOUS VEHICLE – INDIA SECTOR

**Case #:** 2013-137815
**Location:** 5075 Andrea Blvd.



**CASE INFO:**

ON 4/3/13, AN OCCUPANT OF A SILVER 4-DOOR 2003 VOLKSWAGEN JETTA GLS (SIMILAR TO THE ONE PICTURED) BEARING FLORIDA TAG M64-2EK WAS SEEN KNOCKING ON DOORS TO DIFFERENT HOUSES AND THEN ENTERING THE BACK YARD OF 5075 ANDREA BLVD. TAC OFFICERS STOPPED THE VEHICLE THE SAME DAY AND IDENTIFIED THE FOUR OCCUPANTS BELOW. PROBABLE CAUSE DOES NOT EXIST AT THIS TIME; HOWEVER, BE ON THE LOOKOUT FOR THIS VEHICLE. IF YOU COME INTO CONTACT WITH THE VEHICLE, PLEASE FIR ALL OCCUPANTS AND NOTIFY DETECTIVE OSSO.

   

| Danielle Colon | Jorge Ruben Valle Ramos | Marquis Hickson | Karl Jeudy |
|---|---|---|---|
| DOB: 9/24/93 | DOB: 4/21/93 | DOB: 12/2/92 | DOB: 7-9-93 |

---

If you have or need any additional information about this suspect/case, please contact:

# CRIMINAL INVESTIGATIONS DIVISION
# PROPERTY SECTION—EAST PROPERTY UNIT
## DETECTIVE DAVID OSSO
david.osso@cityoforlando.net
## Phone:  407.246.4168
*Orlando Police Department*
**CONFIDENTIAL:  For Law Enforcement Use Only**

Exhibit 19
Stanley
Date 3/4/25

P001414



# Orlando Police Department
## Field Report – Investigative Supplement

100 S Hughey Ave  Orlando, FL  32802  (407)246-2470

Case Number: **2013-00146382**
Reporting Officer: 14767  STANLEY, MICHAEL
Approving Officer: 10322  BRADY, DANIEL

**NARRATIVE**

On 4/9/2013 at approximately 0845 hours, Ofc. A. Tejeira (7473), responded to 1625 Little Falls Circle in reference to an Occupied Residential Burglary. Upon arrival he met with the victim, George Gonzalez, who provided a sworn written statement.

Gonzalez stated he arrived at his above listed residence and entered through the ground level front door. Upon entering, Gonzalez stated he observed a Hispanic male (Suspect # 1) in his early 20s inside his residence on the ground floor. Gonzalez stated Suspect # 1 then ran out his residence through his rear sliding glass door, and Gonzalez was able to chase after Suspect # 1 who ran in a northern direction. After losing sight of Suspect # 1, Gonzalez stated he returned to his residence and encountered another Hispanic male (Suspect # 2), also in his early 20s, inside his residence and descending the stairs from the upper floor. Gonzalez stated he was then able to pepper spray Suspect # 2 at which time he then attempted to detain Suspect # 2. Gonzalez stated Suspect # 2 then punched him and during the struggle, Gonzalez stated he observed another Hispanic male (Suspect # 3), also in his early 20s and inside his residence descending the stairs from the upper floor. Gonzalez stated Suspect # 3 then ran back up the stairs, and Suspect # 2 ran out the front door. Gonzalez stated he was then able to notify the police about the incident and continued to chase after Suspect # 2. Gonzalez stated he then returned to his residence and noted Suspect # 3 had also exited his residence. Gonzalez stated one of the suspects did have a distinct Afro style hairdo. All efforts to locate the suspects met with negative results. Entry to Gonzalezs residence was determined to have been through his rear sliding glass door by smashing open the lock with a tire iron which was left behind by the suspects.

Gonzalez completed an inventory of his belongings and noted the suspects had taken numerous pieces of sterling silver jewelry valued at approximately $8,000, and a gold ring valued at approximately $1,200. Gonzalez stated the suspects did not have permission to enter his residence or to take his belongings, and prosecution is desired.

On 4/10/2013, I, Det. M. Stanley (14767), was assigned this incident for investigative follow-up. I reviewed the incident and noted the three suspects were described as Hispanic males in their early 20s. I reviewed an OPD Criminal Information Bulletin (CAU-2013-0269), in which three males and a female had been stopped and detained in reference to their possible involvement in a Residential Burglary on 4/3/2013 at 5075 Andrea Blvd. (reference OPD 2013-137815), which is in the same general area as Gonzalezs residence. One of the males in this bulletin was identified as Jorge R. Valle Ramos, W/M, DOB 4/21/93. A review of Valle Ramoss Driver and Vehicle Information Database (DAVID) photograph noted Valle Ramos to have a distinct Afro style hairdo.

Acting upon this possible investigative lead, I prepared a photographic line-up (ID # 22184) containing a photograph of Valle Ramos with a previous DAVID photograph in which he did not have a distinct Afro style hairdo. On 4/18/2013 I then met with Gonzalez and read him OPDs Photo Line-up Administration and Witness Instructions which Gonzalez initialed stating he understood the photo line-up instructions. I then presented Gonzalez the photo line-up containing a DAVID photograph of Valle Ramos, and Gonzalez immediately selected Valle Ramos in photograph # 2 who he stated was one of the suspects inside his residence. Gonzalez stated he looked directly at Valle Ramos who was inside his residence and who then ran out, exiting through his rear sliding glass door.

At this time, based upon the positive identification of Valle Ramos by Gonzalez, who he stated he observed uninvited inside his residence, and the theft of approximately $9,200 in jewelry, probable cause exists to charge Valle Ramos with Burglary of Occupied Dwelling, and Grand Theft 3rd Degree >$5,000<$10,000.

An arrest warrant for Valle Ramos has been obtained and signed by Judge Maureen Bell, and this incident should be considered inactive pending arrest.

Exhibit 20
Stanley
Date 3|4|25

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.



# Orlando Police Department
# Field Report – Investigative Supplement

*100 S Hughey Ave  Orlando, FL  32802  (407)246-2470*

**Case Number: 2013-00146382**
Reporting Officer: 14767  STANLEY, MICHAEL
Approving Officer: 10322  BRADY, DANIEL

## SUBJECTS

| Case Subject Type | Subtype | Street Address | | Home Phone | Sex | Age |
|---|---|---|---|---|---|---|
| Name | | City, State Zip | Cell Phone | Work Phone | Race | DOB |
| Hgt  Wgt  Hair  Eyes | DL Number/State | City of Birth | State/Country of Birth | | Soc. Sec # | |
| **Suspect** | Suspect | 4611 CASON COVE DR-Drive 622 | | | M | 20 |
| VALLE RAMOS, JORGE, RUBEN | | ORLANDO, FL, 32811 | | | W | 04/21/1993 |
| 510  150  BRN  BRN | V465-436-93-141-0/FL | | | | 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 | |
| **Victim** | Adult | 1625 LITTLE FALLS CR-Circle | | | M | 57 |
| GONZALEZ, GEORGE | | ORLANDO, FL  32807 | (407)509-3282 | | W | 04/04/1956 |
| | G524-312-56-124-0/FL | | | | -- | |

## PROPERTY - GENERAL

| Date | Code | Quantity | Units | Category | Value | OAN |
|---|---|---|---|---|---|---|
| | Property Type | | | Style/Drug Type | Serial Number | |

## PROPERTY - VEHICLE

| Date | Code | Year | Category/Make/Model/Model Desc | | Value | |
|---|---|---|---|---|---|---|
| | Property Type | Color | | Year/Plate/State | VIN/Serial Number | |

## PROPERTY - GUNS

| Date | Code | Type | Make | Serial Number |
|---|---|---|---|---|
| | Value | Caliber | Finish | OAN |

| | |
|---|---|
| I swear or affirm the above statements are correct and true.<br>Signature_____ | Officer Name/ID #  (Print) |

Sworn to and subscribed before me, the undersigned authority,
This _____ day of _____,_____.  _____
Notary Public ☐   Law Enforcement Officer ☐   Emp # _____  Orlando Police Department

Disclaimer: This temporary field report should not be considered the final official police report on the incident described within. This report is to be used only for proceedings requiring a report prior to the final report being completed. Any information contained within is subject to verification and/or change.

**IN THE CIRCUIT/COUNTY COURT OF THE NINTH JUDICIAL CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA**

COMPLAINT NO. 2013-CF-5146-AO

OPD CASE NO. 2013-146382

Florida Statute(s): 810.02(3)-19, 812.014(2)(C)(2)

Charge(s): Burglary Of Occupied Dwelling, Grand Theft 3rd Degree>$5,000<$10,000

**STATE OF FLORIDA,**
     Plaintiff,

v.

**VALLE RAMOS, JORGE, R.**
LKA: 4611 CASON COVE DRIVE # 622
     ORLANDO, FL, 32822
Race/Sex: W / M
Height/Weight: 5'10" / 150 lbs
DOB: 04/21/1993
Social Security Number: ▓▓▓▓▓▓



    **Defendant.**
_____/

### AFFIDAVIT FOR ARREST WARRANT

**THE STATE OF FLORIDA**
**COUNTY OF ORANGE**

    BEFORE ME, the undersigned Judge, personally appeared your Affiant, Detective Michael Stanley #14767, a member of the Orlando Police Department, who, by me being first duly sworn, says that on the 9th day of April, 2013, in Orange County, Florida, the Defendant, VALLE RAMOS, JORGE, R., did in violation of section(s) 810.02(3)-19, 812.014(2)(C)(2) , Florida Statutes, unlawfully did commit Burglary Of Occupied Dwelling, Grand Theft 3rd Degree>$5,000<$10,000.



Exhibit 21
Stanley
Date 3/14/05

OPD Case Number: **2013-146382**

On 4/9/2013 at approximately 0845 hours, Ofc. A. Tejeira (7473), responded to 1625 Little Falls Circle in reference to an Occupied Residential Burglary. Upon arrival he met with the victim, George Gonzalez, who provided a sworn written statement.

Gonzalez stated he arrived at his above listed residence and entered through the ground level front door. Upon entering, Gonzalez stated he observed a Hispanic male (Suspect # 1) in his early 20's inside his residence on the ground floor. Gonzalez stated Suspect # 1 then ran out his residence through his rear sliding glass door, and Gonzalez was able to chase after Suspect # 1 who ran in a northern direction. After losing sight of Suspect # 1, Gonzalez stated he returned to his residence and encountered another Hispanic male (Suspect # 2), also in his early 20's, inside his residence and descending the stairs from the upper floor. Gonzalez stated he was then able to pepper spray Suspect # 2 at which time he then attempted to detain Suspect # 2. Gonzalez stated Suspect # 2 then punched him and during the struggle, Gonzalez stated he observed another Hispanic male (Suspect # 3), also in his early 20's and inside his residence descending the stairs from the upper floor. Gonzalez stated Suspect # 3 then ran back up the stairs, and Suspect # 2 ran out the front door. Gonzalez stated he was then able to notify the police about the incident and continued to chase after Suspect # 2. Gonzalez stated he then returned to his residence and noted Suspect # 3 had also exited his residence. Gonzalez stated one of the suspects did have a distinct Afro style hairdo. All efforts to locate the suspects met with negative results. Entry to Gonzalez's residence was determined to have been through his rear sliding glass door by smashing open the lock with a tire iron which was left behind by the suspects.

Gonzalez completed an inventory of his belongings and noted the suspects had taken numerous pieces of sterling silver jewelry valued at approximately $8,000, and a gold ring valued at approximately $1,200. Gonzalez stated the suspects did not have permission to enter his residence or to take his belongings, and prosecution is desired.

On 4/10/2013, I, Det. M. Stanley (14767), was assigned this incident for investigative follow-up. I reviewed the incident and noted the three suspects were described as Hispanic males in their early 20's. I reviewed an OPD Criminal Information Bulletin (CAU-2013-0269), in which three males and a female had been stopped and detained in reference to their possible involvement in a Residential Burglary on 4/3/2013 at 5075 Andrea Blvd. (reference OPD 2013-137815), which is in the same general area as Gonzalez's residence. One of the males in this bulletin was identified as Jorge R. Valle Ramos, W/M, DOB 4/21/93. A review of Valle Ramos's Driver and Vehicle Information Database (DAVID) photograph noted Valle Ramos to have a distinct Afro style hairdo.

Acting upon this possible investigative lead, I prepared a photographic line-up (ID # 22184) containing a photograph of Valle Ramos with a previous DAVID photograph in which he did not have a distinct Afro style hairdo. On 4/18/2013 I then met with Gonzalez and read him OPD's Photo Line-up Administration and Witness Instructions which Gonzalez initialed stating he understood the photo line-up instructions. I then presented Gonzalez the photo line-up containing a DAVID photograph of Valle Ramos, and Gonzalez immediately selected Valle Ramos in photograph # 2 who he stated was one of the suspects inside his residence. Gonzalez stated he looked directly at Valle Ramos who was inside his residence and who then ran out, exiting through his rear sliding glass door.

At this time, based upon the positive identification of Valle Ramos by Gonzalez, who he stated he observed uninvited inside his residence, and the theft of approximately $9,200 in jewelry, probable cause

exists to charge Valle Ramos with Burglary of Occupied Dwelling, and Grand Theft 3rd Degree
>$5,000<$10,000.

Due to the above facts, it is your Affiant's belief that the defendant, **VALLE RAMOS, JORGE, R.**, has committed aforementioned violations of the laws of the State of Florida and that probable cause exists for the issuance of an arrest warrant.

_____
Detective Michael Stanley #14767

**SWORN TO AND SUBSCRIBED** before me in the County and State aforesaid this 19 day of April, 2013.

_____
Judge Maureen Bell
P.O. Box 4934
Orlando, Florida 32802

Ninth Judicial
Circuit
Orange County

# Orange County     ICJIS Warrant Arrest Affidavit

| Writ ☐ VOP ☐ Fugitive ☐ | Document #: 514931 | Division #: 16 |
| FTA ☐ Other ☑ | | Court Case #: 2013-CF-5146A0 |

| Document Date: | 4/24/2013 | | | |

| Location of Defendant's Vehicle: | NONE | | Date-Time Booked: | 04/24/2013 17:23 | Agency Case Number: | 201300169085 |
| (ORI): FL0480400 | Arresting Agency: | ORLANDO POLICE DEPT | | PCTC/NCTC Check: ☑ | Date-Time of Arrest: | 04/24/2013 16:39 |
| Address of Arrest: | 1611 CASON COVE DR | | | | Total Bond Set At: $ |

| DEFENDANT | Adult ☑ | Juvenile ☐ | Jacket Number: | | Inmate Number: 13014205 | Language: ENGLISH |

| NAME (L,F,M): | VALLE RAMOS, JORGE | | A.K.A.: | | Race: W | Sex: M | DOB: 04/21/1993 | Age: 20 |
| Height: 5'10" | Weight: 145 | Hair: BLK | Eyes: HAZ | POB City: PUERTO RICO | POB State: | POB Country: UNITED STATES OF AMERICA (US) |
| RES Street#: | 1611 CASON COVE DR / APT # 622 | | | | | Citizenship: UNITED STATES |
| City: ORLANDO | | State: FL | Zip: 32811 | Home Phone: 4074121936 | Other Phone: | |
| Scars/Tattoos: | | | | | | Ethnicity: HISPANIC OR LATINO |
| Driver's License/ State ID No: V465-436-93-141-0 | | State: FL | Year Expires: 2020 | | SSN #: | |
| Next of Kin Name: | | Address: FL | | | | Phone: |
| Business and Occupation: | | | | | | |
| BUS Street#: | | | | | | |
| City: | | State: FL | | Zip: | Bus Phone: | |

## Out of State Warrant Arrest: Book as Fugitive from Justice. FSS 941.14, JIT 941.02 NO BOND

| OFFENSES | Felony ☑ Misd. ☐ ORD. ☐ Traffic ☐ | Out of County ☐ | Court Location: CIRCUIT | | Domestic Violence: ☐ |
| Original Agency Name / ORI: | | Original Agency Case Number: 2013-146382 | BOND AMT $ | Originating State or County: | ORANGE |
| # 1 | BURGLARY OF OCCUPIED DWELLING | 810.02(3)-19 | 5,000.00 | FSS: 810.02.3A |
| # 2 | GRAND THEFT 3RD DEGREE (>$5,000,<$10,000) | 812.014(2)(C)(2) | 150.00 | FSS: 812.014.2C2 |

| CHECK IF OFFENSES ARE CONTINUED | ☐ |

## ORIGINAL OFFENSE IF KNOWN ON VOP, FUGITIVE, FTA ONLY

| # 1 | BURGLARY OF OCCUPIED DWELLING |
| # 2 | GRAND THEFT OF THE THIRD DEGREE |

☐ I, being an Orange County Deputy, read and executed the above capias to the above named defendant.

## NARRATIVE:
tele-type confirmed that Valle-Ramon has an active warrant out of orange County. Defendant was transported to BRC for processing.

| Sworn to and subscribed before me, this 24 day of April year 2013 | I swear or affirm the above statements are correct and true | 4072462470 |
| Notary Public ☑ Law Enforcement or Corrections Officer ☐ | Officer's Signature | Officer's Bus. Phone No. IVERSON, SIDNEY / 7591 |
| Personally Known ☑ Produced Identification ☐ Type of Identification: | | Officer's Name/Badge ID |
| Notary Signature: Consetta Green | NOTARY PUBLIC STATE OF FLORIDA | GREEN, CONSETTA | EE835671 / 09/17/2016 |
| | | Notary Name | Notary Commission # / Exp. Date |

RT COPY  RECORD COPY  STATE ATTORNEY COPY  INMATE RECORDS COPY  AGENCY/REPORT REVIEW COPY  DEFENDANT COPY

Exhibit 22
Stanley
Date 3/4/15

IN THE CIRCUIT/COUNTY COURT OF THE NINTH
JUDICIAL CIRCUIT IN AND FOR ORANGE
COUNTY, FLORIDA

COMPLAINT NO. 2013 CF-5146A0
OPD CASE NO.  2013-146382
Florida Statute(s): 810.02(3)-19, 812.014(2)(C)(2)
Charge(s):  Burglary Of Occupied Dwelling, Grand Theft
3rd Degree>$5,000<$10,000

STATE OF FLORIDA,
    Plaintiff,

v.

VALLE RAMOS, JORGE R.
LKA: 4611 CASON COVE DRIVE # 622
    ORLANDO, FL 32822
Race/Sex: W / M
Height/Weight: 5'10" / 150 lbs
DOB: 04/21/1993
Social Security Number: 

Defendant.

## ARREST WARRANT

TO:   ALL AND SINGULAR THE SHERIFFS OF THE STATE OF FLORIDA;
SPECIAL AGENTS OF THE FLORIDA DEPARTMENT OF LAW
ENFORCEMENT; AND/OR ANY INVESTIGATOR OF THE SEVERAL STATE
ATTORNEYS' OFFICES; AND/OR ANY MUNICIPAL POLICE OFFICER,
INCLUDING MEMBERS OF THE ORLANDO POLICE DEPARTMENT

An Affidavit or sworn Complaint having this day been presented to me as Committing
Magistrate wherein it is alleged that on the 9th day of April, 2013, in Orange County, Florida,
the Defendant, VALLE RAMOS, JORGE, R., did in violation of section(s) 810.02(3)-19,
812.014(2)(C)(2) , Florida Statutes, unlawfully did commit Burglary Of Occupied Dwelling,
Grand Theft 3rd Degree>$5,000<$10,000.

P001421

OPD Case Number: 2013-146382

The Court, based on said affidavit, finds probable cause to believe the defendant committed the offense listed herein.

**THEREFORE,** you are hereby commanded to arrest instanter the said Defendant if he/she be found within your jurisdiction, and bring said Defendant before the proper court to be dealt with according to law.

The said Defendant shall be admitted to bail in the sum of:

| | | |
|---|---|---|
| **(Count-1) Burglary Of Occupied Dwelling** | - $5,000 |
| **(Count-2) Grand Theft 3rd Degree>$5,000<$10,000** | - $ 150 |
| **(Count-3)** | - $ |
| **(Count-4)** | - $ |
| **(Count-5)** | - $ |
| **(Count-6)** | - $ |
| **(Count-7)** | - $ |
| **(Count-8)** | - $ |
| **(Count-9)** | - $ |

**TOTAL BAIL - $5150** (5150)

and the court imposes the following special conditions of bail, bond, or other pretrial release:

_____ may be modified by First Appearance Judge;
_____ may *not* be modified by Appearance Judge

(COURT SEAL)

Judge _____ Circuit
      Judge Maureen Bell
      P.O. Box 4994
      Orlando, Florida 32802

Case Description:                    Case Number: 2013-146382
Residential Burglary                 ID # 22184 - VALLE RAMOS
                                     ID # 22185 - HICKSON
Primary Victim:  GONZALEZ,GEORGE,L,  ID # 22188 - JEUDY

Date/Time Reported: 04/09/13  8:09 Hrs.   Dispatch Incident Type:
Date/Time Occurred: 04/09/13  8:00 Hrs.   RES B&E
Date/Time Between : 04/09/13  8:09 Hrs.
Location Occurred : 1625 LITTLE FALLS CR
Common/Business . :
Grid: 1619          SubGrid: 1619A                  Dist: K2


Reporting Officer :      7473  TEJEIRA,ALFONSO,T,
Primary Unit Assigned to Investigate: E Property
Scene Processed by :    14857  STYER,CHANTAL,M,
Significant Event : Yes     Shots Fired: No      Apv Ofcr:     12146

Case Status: FW INV REV  Disposition:           Disp. Date:
No. of Offenses:   3   No. of Offenders:   4   No. of Victims:   1

-------------------------------------------------------------------------

CASE NARRATIVE 4/10/2013 5:11 AM
On April 9, 2013 at approximately 0845 hours, I responded to 1625
Little Falls Cir, Hidden Creek Condos, in reference to an occupied
residential burglary. Upon arrival, I met with the victim who
completed a sworn written statement.

According to the victim, on today`s date at approximately 0800 hours
he arrived home. He entered his residence via the front door. Once
inside, victim observed suspect #1, on the ground level. Suspect #1
ran out the back sliding glass door. The victim chased suspect #1 who
jumped the fence and ran northbound in an unknown direction. When the
victim returned to his residence. Suspect #2 was coming down the
apartment`s stairs. The victim pepper sprayed suspect #2. The victim
attempted to hold suspect #2. Suspect #2 began punching the victim.
While the victim was fighting with suspect #2, Suspect #3 came down
the stairs. Suspect #2 the ran out the front door northbound thru the
condos. Suspect #3 was last seen by the victim going up the stairs.
Suspect #2 jumped a fence north of the complex. When the victim
returned to the apartment suspect #3 had left. Unknown if suspect #3
jumped out the second story window or left via front or back door. A
witness observed three suspects enter a gray possibly Toyota vehicle
in the complex north of the victim`s condo. The description given by
the witnesses of the suspect`s entering the vehicle and leaving in an
unknown direction did not match suspect #1. It appears the victim
only saw three suspects but there could have been four. The victim
did not give anyone permission to enter his residence and steal his
property, or batter him. The victim will press charges. The victim
did not sustain any visible injuries and did not require medical
attention. CST Styer, 14857, responded to the scene and processed for
latent prints. One of the witnesses stated she believed the suspects
were wearing gloves.



Exhibit 23
Stanley
Date 3/4/25

Case Description:
Residential Burglary

It appears, the suspects entered the residence via the rear sliding glass door. The suspects used a tire iron to break the sliding glass door lock. The tire iron was left at the scene. Estimated damage to the door is $10.  Once inside the suspects stole approximately $8000 worth of sterling silver jewelry. The suspects also took a gold ring valued at approximately $1200. The suspect attempted to steal approximately $500 in U.S. coins and a folding knife valued at $40. The knife and the coins were in a backpack the suspects brought with them but left behind. The folding knife and the coins were returned to the owner. The backpack was taken by the CST. Officer O`Day, 12153, found a Pop Tart bag in the area where the suspect`s car was last seen.  It is unknown if the bag came from suspect`s car The bag was turned over to the CST. The victim stated he can identify some of the suspects.

---

PRINCIPALS

---

Victim . . : Present Information           Non Disclosure of Info: No
Primary      GONZALEZ,GEORGE,L,                    Phone:      658-8242
Adult        1625 LITTLE FALLS CR
             ORLANDO                        FL 32807

     Race : White        Sex: Male           D.O.B: 04/04/56  Age:    57
                                             Age at Occurrence :   57
     Build:              Complexion:         Ethnicity: Hispanic
     Dr Lic #: G524312561240       St:   FL  Soc Sec #: 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

     Additional Contact Information:
        CellPhone# 04/10/13   407-459-3282
        WorkPhone# 04/06/04       857-5700
        HomePhone# 08/05/96       658-8242

     School/Business Information:
           WORLD CHEVROLET                   Phone:      857-5700
           5600 LEE VISTA RD
           ORLANDO                    FL

     Residence Type  : Orlando        Residence Status : Full Year
     Disposition . . :                Vict Infrm Rights: Yes
     Extent of Injury: Unknown        Medical Treatment:
     Injury Type . . : Unknown        Injury Type  . . :
     Statement Type  : Written        Related Offenses :  1  2

     VICTIM OFFENDER RELATIONSHIPS:
     UNK,2013-00146382,,                              Undetermin

---

Suspect  . : Present Information           Non Disclosure of Info: No
Primary      UNK,2013-00146382,,                   Phone:
Suspect

P001469

| | | | |
|---|---|---|---|
| Race : Unknown | Sex: Male | D.O.B: | Age:   18 |
| Hgt  : 5'10"  Wgt: 145  Hair: | | Eyes . . : | |
| Build: Thin/Small  Complexion: Medium | | Ethnicity: Hispanic | |
| Dr Lic #: | St: | Soc Sec #: 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 | |
| Residence Type  : N/A | | Residence Status : N/A | |
| Disposition . . : | | Vict Infrm Rights: No | |
| Extent of Injury: Not Appli | | Medical Treatment: | |
| Injury Type . . : NA | | Injury Type  . . : | |
| Statement Type  : None | | Related Offenses : 1 | |

CASE SUBJECT NOTE 4/10/2013 5:10 AM
 Suspect was about 18 years old, 5` 10` 145lbs, with an afro. Last
 seen wearing a tank top (possibly red)

---------------------------------------------------------------------

Suspect  . : Present Information      Non Disclosure of Info: No
   Primary      UNK,2013-00146382,,           Phone:
   Suspect

| | | | |
|---|---|---|---|
| Race : Unknown | Sex: Male | D.O.B: | Age:   18 |
| Hgt  : 5'07"  Wgt: 150  Hair: | | Eyes . . : | |
| Build: Thin/Small  Complexion: Light | | Ethnicity: Hispanic | |
| Dr Lic #: | St: | Soc Sec #: 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 | |
| Residence Type  : N/A | | Residence Status : N/A | |
| Disposition . . : | | Vict Infrm Rights: No | |
| Extent of Injury: Not Appli | | Medical Treatment: | |
| Injury Type . . : NA | | Injury Type  . . : | |
| Statement Type  : None | | Related Offenses : 1  2 | |

CASE SUBJECT NOTE 4/10/2013 5:10 AM
 Suspect was approximately 18 years old, 5` 7` 150lbs, last seen
 wearing blue short sleeve shirt and shorts

---------------------------------------------------------------------

Suspect  . : Present Information      Non Disclosure of Info: No
   Primary      UNK,2013-00146382,,           Phone:
   Suspect

| | | | |
|---|---|---|---|
| Race : Unknown | Sex: Male | D.O.B: | Age:   18 |
| Hgt  : 5'08"  Wgt: 140  Hair: | | Eyes . . : | |
| Build: Thin/Small  Complexion: Light | | Ethnicity: Hispanic | |
| Dr Lic #: | St: | Soc Sec #: 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 | |
| Residence Type  : N/A | | Residence Status : N/A | |
| Disposition . . : | | Vict Infrm Rights: No | |
| Extent of Injury: Not Appli | | Medical Treatment: | |
| Injury Type . . : NA | | Injury Type  . . : | |
| Statement Type  : None | | Related Offenses : 1 | |

P001470

Case Description:
Residential Burglary


CASE SUBJECT NOTE 4/10/2013 5:10 AM
 Suspect was approximately 18 years old, 5` 8` 140lbs,


---------------------------------------------------------------------

Suspect  . : Present Information      Non Disclosure of Info: No
  Primary    UNK,2013-00146382,,              Phone:
  Suspect

     Build:           Complexion:              Ethnicity: Hispanic
     Dr Lic #:                       St:       Soc Sec #: 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
       Residence Type  : N/A         Residence Status : N/A
       Disposition . . :            Vict Infrm Rights: No
       Extent of Injury: Not Appli  Medical Treatment:
       Injury Type . . : NA         Injury Type  . . :
       Statement Type  : None       Related Offenses :  1

---------------------------------------------------------------------

Witness  . : Present Information      Non Disclosure of Info: No
             BLOOM,CHARLENE,E,               Phone:     249-2527
             1708 SILVER CREEK CT
             ORLANDO                   FL 32807

     Race : White      Sex: Female        D.O.B: 09/14/48  Age:   64
                                           Age at Occurrence :   64
     Dr Lic #:                    St:      Soc Sec #: 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

     Additional Contact Information:
       CellPhone# 04/10/13  407-273-4769
       HomePhone# 06/18/91      249-2527

     School/Business Information:
       WALT DISNEY WORLD                 Phone: 407-824-2222
       LAKE BUENA VISTA          FL

       Residence Type  : N/A         Residence Status : N/A
       Disposition . . :            Vict Infrm Rights: No
       Extent of Injury: Not Appli  Medical Treatment:
       Injury Type . . : NA         Injury Type  . . :
       Statement Type  : Written     Related Offenses :  1

---------------------------------------------------------------------

Witness  . : Present Information      Non Disclosure of Info: No
             SZEWCZYK,BETHANY,,              Phone:
             1716 LAFAYETTE CT
             ORLANDO                   FL 32807

     Race : White      Sex: Female        D.O.B: 08/18/82  Age:   30
                                           Age at Occurrence :   30
     Dr Lic #: S220063827980     St:      Soc Sec #: 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

     Additional Contact Information:

P001471

Case Description:                     Case Number: 2013-146382
Residential Burglary

CellPhone# 04/10/13  315-416-1246
Residence Type  : N/A         Residence Status : N/A
Disposition . . :             Vict Infrm Rights: No
Extent of Injury: Not Appli   Medical Treatment:
Injury Type . . : NA          Injury Type  . . :
Statement Type  : Written     Related Offenses : 1

------------------------------------------------------------
                        PROPERTY RECAP
------------------------------------------------------------
No Code Type                Description          Value Owner
1)  D   P    1.00  EA DAMAGE TO THE BACK DOOR SL    10.00  V  1
2)  S   J    1.00  EA GOLD RING WITH SKULL CROSS  1200.00  V  1
3)  S   J             30-35 PIECES OF STERLING S  8000.00  V  1
4)  SR  S  500.00  DR $500 IN U.S. COINS           500.00  V  1
5)  SR  P    1.00  EA BUCK FOLDING KNIFE            40.00  V  1

------------------------------------------------------------
                        PROPERTY DETAIL
------------------------------------------------------------
Property: GONZALEZ,GEORGE,L,
   Item Number . :   1 Subject #:   1 Subject Type: Victim
   Property Code : Damaged     Property Type  : General
   Date Received : 04/09/13    Initial Value  :        10.00

   Year/Desc . :    DAMAGE TO THE BACK DOOR SLIDING GLASS DOOR LOCK
   Quantity  . :         1.000  EA  Model/Style:
   Registratn# :         State :          Expires :
   Subjects  . : GONZALEZ,GEORGE,L,           Reason: Owner
------------------------------------------------------------
Property: GONZALEZ,GEORGE,L,
   Item Number . :   2 Subject #:   1 Subject Type: Victim
   Property Code : Stolen      Property Type  : Jewelry
   Property Class: Ring
   Date Received : 04/09/13    Initial Value  :     1,200.00

   Year/Desc . :    GOLD RING WITH SKULL CROSS BONES ACCENTED WITH
                    DIAMONDS
   Style . . . : Mans          OAN . . :
   Metal . . . : GOLD   Karats:        Value . :         .00
   Quantity  . :         1.000  EA  Model/Style:
   Subjects  . : GONZALEZ,GEORGE,L,           Reason: Owner
------------------------------------------------------------
Property: GONZALEZ,GEORGE,L,
   Item Number . :   3 Subject #:   1 Subject Type: Victim
   Property Code : Stolen      Property Type  : Jewelry
   Property Class: Other
   Date Received : 04/09/13    Initial Value  :     8,000.00

P001472

Case Description:
Residential Burglary

Year/Desc . :     30-35 PIECES OF STERLING SILVER JEWELRY WITH BLU
                  TOPAZ, CITRINE, BLACK ONYX
Metal . . . : SILV   Karats:      Value . :            .00
Subjects  . : GONZALEZ,GEORGE,L,              Reason: Owner

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Property: GONZALEZ,GEORGE,L,
     Item Number . :   4  Subject #:   1  Subject Type: Victim
     Property Code : Stol/Recvd    Property Type  : Securities
     Property Class: Curr/Negot
     Date Received : 04/09/13    Initial Value  :      500.00

     Year/Desc . :     $500 IN U.S. COINS
     Quantity  . :        500.000  DR  Model/Style:
     Denomination:              Year Made:      Value:       500.00
     Subjects  . : GONZALEZ,GEORGE,L,              Reason: Owner

**** Recovered Information  ****
     Date Recovered: 04/09/13 809  Recovered Value:       500.00
     Recovery Loc. : Other         Recovery Code  : Local All
     RFOJ?: N  Notify Owner Date: 04/09/13    Notified How?: Person
     Recovery Cond : FairCondn    Good Latents   : No
     Recovery Ofcr : TEJEIRA,ALFONSO,T,
     Recoverd By . : OWNER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Property: GONZALEZ,GEORGE,L,
     Item Number . :   5  Subject #:   1  Subject Type: Victim
     Property Code : Stol/Recvd    Property Type  : General
     Property Class: Miscellane
     Date Received : 04/09/13    Initial Value  :       40.00

     Year/Desc . :     BUCK FOLDING KNIFE
     Make . . . : Buck       Model :           Style . :
     Quantity  . :        1.000  EA  Model/Style:
     Registratn# :           State :            Expires :
     Subjects  . : GONZALEZ,GEORGE,L,              Reason: Owner

**** Recovered Information  ****
     Date Recovered: 04/09/13 809  Recovered Value:        40.00
     Recovery Loc. : Other         Recovery Code  : Local All
     RFOJ?: N  Notify Owner Date: 04/09/13    Notified How?: Person
     Recovery Cond : FairCondn    Good Latents   : No
     Recovery Ofcr : TEJEIRA,ALFONSO,T,
     Recoverd By . : OWNER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                              Offense
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Offense Number:   1              Attempted/Committed : Committed
Crime Code: 02200 BURGLARY/BREAKING AND ENTERING

P001473

Case Description:                          Case Number: 2013-146382
Residential Burglary

Statute . : 810.02 3
Stat Desc : BURGLARY TO STRUCTURE/CONVEYANCE-UNARMED
Location Type . : Apartment          Criminal Activity . : N/A
Occupancy Code  : Occupied           No. Premises Entered:   1
Type of Weapon  : N/A                Weapon Feature  . :
Entry Method  . : Pried              Entry Point . . . . : SlidinDoor
Exit Method . . : InNarrativ         Exit Point . . . . : InNarrativ
Alcohol Related : No                 Drug Related . . . : No
Domestic Crime  : No                 Hate Crime . . . . : No
Computer Related: NA                 Just. Homicide Code :
Statute ORI/Group . : S              Agg Aslt/Homc Crcmst:
Counts . . . . . . : 001             Larceny/Theft Offnse:
Offense Date . . . : 04/09/2013      Victim Drug Related :
Abandoned Structure : NO             Property Damage . .          10
Tool Used . . . . . : Pry Instru     Counterfeit Type  . :
Gang Related . . . : No              Additional Subcode  :

-------------------------------------------------------------------------

CRIME SPECIFIC INFORMATION:

Type Information: Visibility From Street
None

Type Information: Outside Lighting
Good

Type Information: Suspect's Action
Used Tools
Ransacked

Type Information: Victim's Location
Present

Type Information: Location of Structure
Mid Block
Primarily Residential

Type Information: Type of Structure
Apartment

-------------------------------------------------------------------------

Offense Number:   2                  Attempted/Committed : Committed
Crime Code: 0130B SIMPLE ASSAULT
Statute . : 784.03
Stat Desc : BATTERY
Location Type . : Apartment          Criminal Activity . : N/A
Occupancy Code  : N/A                No. Premises Entered:
Type of Weapon  : Hands/Fist         Weapon Feature  . :
Entry Method  . : NA                 Entry Point . . . . :
Exit Method . . : NA                 Exit Point . . . . :
Alcohol Related : No                 Drug Related . . . : No

P001474

Case Description:
Residential Burglary

Domestic Crime   : No          Hate Crime  . . . . : No
Computer Related: NA          Just. Homicide Code :
Statute ORI/Group . : S       Agg Aslt/Homc Crcmst:
Counts . . . . . . : 001      Larceny/Theft Offnse:
Offense Date . . . : 04/09/2013  Victim Drug Related :
Abandoned Structure : NO      Property Damage . .

*********************************************************************

```
I Swear or affirm the above statements | Officer Name/ID# (Print)
are correct and true.
(Signature)_____|
                                        |_____
Sworn to and subscribed before me, the undersigned Authority,

This_____day of _____,20___.    _____
Notary Public |_|  Law Enforcement Officer |_| Emp# _____ Orlando PD
```

P001475



# *Orlando Police Department*
## Field Report – Narrative Supplement

*100 S Hughey Ave  Orlando, FL  32802  (407)246-2470*

Case Number: **2013-00146382**
Reporting Officer: 14857  STYER, CHANTAL
Approving Officer: 7276  BRENNAN, ANDREW

**NARRATIVE SUPPLEMENT**

On April 9, 2013 at 0835 hours, I, CSI Styer (#14857) responded to 1625 Little Falls Circle, in reference to a residential burglary.  Upon my arrival, I met and was briefed by Officer Tejeira (#7473).  I took 38 digital color photographs, depicting gray card with date and case number, location, overall views of a second story window screen on the ground by the front door, overall views of the interior of the residence, with close up views of pepper spray on the walls by the front door.  I also photographed the open exterior patio gate, a tire iron on the ground by the sliding glass door, and a cigarette butt on the patio table.  I collected these items as evidence.

I then proceeded to photograph the second floor, with close up views of areas of disturbance in the bedrooms. A red and black backpack containing coins and a knife was located in the hallway.  The coins and knife were returned to the victim.  I collected the backpack as evidence, as it did not belong to the victim.

I processed the scene for latent prints with negative results.  I also collected a "Pop-Tarts" wrapper from Officer Tejeira.

I departed the scene at 0933 hours.  Upon my arrival at OPH, 38 photographs were downloaded and are on file with the Forensic Imaging Lab.  Evidence was secured in a locker in the Forensic Lab for processing and packaging on a later date.

On April 15, 2013, the collected items were processed for latent prints with positive results.  Five (5) latent prints were developed and lifted from the "Pop-Tarts" wrapper.  The prints were submitted to the Latent Print Examiners for evaluation.

All items were then packaged and entered into Evidence under #AE9209A.



Exhibit 24
Stanley
Date 2/4/25

| I swear or affirm the above statements are correct and true. | Officer Name/ID # (Print) |
|---|---|
| Signature_____ | |
| Sworn to and subscribed before me, the undersigned authority, | |
| This _____ day of _____, ____.  _____ | |
| Notary Public [  ]   Law Enforcement Officer  [  ]   Emp # _____  Orlando Police Department | |

Disclaimer:  This temporary field report should not be considered the final official police report on the incident described within.  This report is to be used only for proceedings requiring a report prior to the final report being completed.  Any information contained within is subject to verification and/or change.

# ORLANDO POLICE DEPARTMENT
## INVESTIGATIVE COSTS EXPENSE REPORT

FILED IN OPEN COURT
Clerk, Cir. Ct., Orange Co., FL

By _____ D.C.

**Agency Case No.** 2013-146382
**Court Case No.** 2013-CF-5146-A/O-16
**Defendant's Name** VALLE RAMOS, JORGE, R

| Employee's Name/# | Investigative Activity | Hours | Hourly Rate | Expense Total |
|---|---|---|---|---|
| STANLEY # 14767 | INVESTIGATOR | 6.00 | $19.40 | $116.40 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| **TOTAL COST OF INVESTIGATION** | | | | $116.40 |

The above is a true account of the investigative hour expenses case number 2013-146382 involving <u>VALLE RAMOS, JORGE, R.</u>.

_____   14767   67535
Officer's Signature        Employee #   5 digit OPD program #

**SWORN to and SUBSCRIBED before me this 19 day of April, 2013.**

_____
(Notary Public)  (Law Enforcement Officer)

_____
SUPERVISOR
Orlando Police Department

Exhibit **75**
Stanley
Date 3/4/25

See OPD Online, Forms, for current Pay Rate Chart
or use the employee's actual pay rate.

OPD P&P 1408.3 A Rev. 7/28/12    Original-APS    ☐ Records Copy    ☐ Fiscal

P000007

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

ORIGINAL

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF FLORIDA

3   ORLANDO DIVISION

4   HON. CARLOS E. MENDOZA

5   CASE NO. 6:24-CV-01276-CEM-DCI

6

7   JORGE VALLE-RAMOS,

8   Plaintiff

9

10  V.

11

12  CITY OF ORLANDO, MICHAEL

13  STANLEY, AND UNKNOWN OFFICERS,

14  Defendants

15

16

17

18

19

20  DEPONENT:  BETHANY SZEWCZYK

21  DATE:      FEBUARY 27, 2025

22  REPORTER:  SHEYLA MENDOZA

23

24

25

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1                          APPEARANCES

2  ON BEHALF OF THE PLAINTIFF, JORGE VALLE-RAMOS:
   Roz Dillon, Esquire
3  Loevy & Loevy
   311 North Aberdeen Street
4  3rd Floor
   Chicago, Illinois 60607
5  Telephone No.: (312) 243-5900
   E-mail: dillon@loevy.com
6  (Appeared via videoconference)

7  ON BEHALF OF THE DEFENDANTS, CITY OF ORLANDO, MICHAEL
   STANLEY, AND UNKNOWN OFFICERS:
8  Stephen M. Mistoler, Esquire
   O'Connor, Haftel & Angell, PLLC
9  800 North Magnolia Avenue
   Suite 1350
10 Orlando, Florida 32803
   Telephone No.: (407) 843-2100
11 E-mail: smistoler@ohalaw.com
   (Appeared via videoconference)
12
   ON BEHALF OF THE DEPONENT, BETHANY SZEWCZYK:
13 Eric J. Sorice, Esquire
   Ponall Law, P.A.
14 253 North Orlando Avenue
   Suite 200
15 Maitland, Florida 32751
   Telephone No.: (407) 622-1144
16 E-mail: esorice@ponalllaw.com
   (Appeared via videoconference)
17

18

19

20

21

22

23

24

25



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1                          INDEX

2                                           Page

3   PROCEEDINGS                             5

4   DIRECT EXAMINATION BY MS. DILLON        6

5   CROSS-EXAMINATION BY MR. MISTOLER       60

6   REDIRECT EXAMINATION BY MS. DILLON      74

7

8                         EXHIBITS

9   Exhibit                                 Page

10  15 - Orlando Police Department Statement

11       of Bethany Szewczyk - Bate

12       Stamp P000002                      17

13  16 - 3 Pages Photo Line-Up Administration

14       and Witness Instruction of Bethany

15       Szewczyk - Bate Stamp P000529-531  27

16  17 - Group of Photographs - Bate

17       Stamp P1413                        31

18  4 - Photographs of Amos Ortiz and Jorge

19       Valle-Ramos - Bate Stamp P000454  52

20  18 - Affidavit of Bethany Szewczyk -

21       Bate Stamp P473                    54

22

23

24

25



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1                     STIPULATION

2

3  The deposition of BETHANY SZEWCZYK  was taken MILESTONE

4  REPORTING COMPANY, 315 EAST ROBINSON STREET, SUITE 510,

5  ORLANDO, FLORIDA 32801, via videoconference in which all

6  participants attended remotely, on THURSDAY the 27th day

7  of FEBUARY 2025 at 1:33 p.m. (ET); said deposition was

8  taken pursuant to the FEDERAL Rules of Civil Procedure.

9

10 It is agreed that SHEYLA MENDOZA, being a Notary Public

11 and Court Reporter for the State of FLORIDA, may swear

12 the witness.

13

14

15

16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

```
1              PROCEEDINGS
2         THE REPORTER:  Okay, we're on record.  Will all
3    parties except for the witness, please state your
4    appearance, how you're attending, and your location,
5    starting with Plaintiff's counsel?
6         MS. DILLON:  Roz Dillon, counsel for Plaintiff,
7    Jorge Valle-Ramos.  I'm appearing remotely via Zoom
8    from Santa Cruz, California.
9         MR. MISTOLER:  Stephen Mistoler on behalf of
10   Defendants, appearing via Zoom from Orlando,
11   Florida.
12        MR. SORICE:  And Eric Sorice on behalf of the
13   witness, appearing via Zoom also in Orlando,
14   Florida.
15        THE REPORTER:  Thank you.
16        And, Ms. Bethany, would you please state your
17   full name for the record?
18        THE WITNESS:  Bethany Corinne Szewczyk.
19        THE REPORTER:  All right.  If counsels can
20   please stipulate on behalf of the witness?
21        MS. DILLON:  Counsel for Plaintiff stipulates
22   that this is the witness.
23        MR. MISTOLER:  Yep.  Counsel for Defendants
24   agrees that this is the witness.
25        MR. SORICE:  Likewise, counsel for the witness,
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       Ms. Szewczyk, agrees that this is, in fact, Ms.

2       Bethany Szewczyk.

3           THE REPORTER:  Thank you.

4           If you can just raise your right hand for me,

5       ma'am.  Do you solemnly swear or affirm the

6       testimony you're about to give will be the truth,

7       the whole truth, and nothing but the truth?

8           THE WITNESS:  Yes, I do.

9           THE REPORTER:  Thank you.

10          You may proceed, Counsel.

11                  DIRECT EXAMINATION

12          BY MS. DILLON:

13      Q.   Great.  Good morning, or good afternoon.  My

14  name is Roz Dillon and I represent the plaintiff Jorge

15  Valle-Ramos in this case.  Thanks so much for joining us

16  this afternoon.  Can you just start by stating and

17  spelling your name for the record please?

18      A.   My first name is Bethany, B-E-T-H-A-N-Y.  My

19  last name is Szewczyk, S-Z-E-W-C-Z-Y-K.

20      Q.   Okay.  Thanks so much.  I'm going to be asking

21  you some questions today about a burglary of your

22  neighbor's home back in April of 2013 and the

23  investigation that followed, okay?

24      A.   Okay.

25      Q.   And after I'm done, counsel for defendants

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  will probably also have some questions for you.  By the

2  agreement of parties we're doing this deposition over

3  Zoom.  Where are you this afternoon?

4       A.   I'm at my home in Orlando, Florida.

5       Q.   Okay.  And is there anybody with you?

6       A.   No.  Well, just my cat.

7       Q.   I accept that as someone with you.  Have you

8  ever been deposed before?

9       A.   Yes.

10      Q.   How many times?

11      A.   Once.

12      Q.   And is that in the underlying criminal case

13  against Mr. Valle-Ramos?

14      A.   Correct, in the appeal.

15      Q.   Okay.  Any other times?

16      A.   Well, actually, I'm sorry.  I guess -- I guess

17  that would be twice.

18      Q.   Oh, okay.  So you were deposed once before the

19  criminal trial; is that correct?

20      A.   Correct.

21      Q.   Okay.  And then you said you were deposed once

22  more during the appeal?

23      A.   Correct.

24      Q.   Okay.  So you -- I'm sure you know how this

25  goes, but I'm just going to lay a few ground rules so

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  that we're all on the same page this afternoon.  So I'm

2  going to be asking you questions and you're giving

3  answers under oath just as if you were in a courtroom in

4  front of a judge and jury, understand?

5      A.   I understand.

6      Q.   Okay.  And if you don't understand a question,

7  just say so and I'll rephrase or ask a new question.  If

8  you answer, we're going to assume you understood; fair

9  enough?

10     A.   Yes.

11     Q.   Okay.  So the court reporter is taking down

12 your testimony today and so, for that reason, it's

13 really important we don't talk over each other.  So I

14 just ask you try to wait until I'm done asking my

15 question to answer and I'll do the same for you, okay?

16     A.   Yes.

17     Q.   All right.  And for the same reason, it's

18 important that you give verbal answers this afternoon.

19 Nodding your head or hand gestures won't allow the court

20 reporter to take down your testimony, okay?

21     A.   Okay.

22     Q.   All right.  Next, there might be some times

23 today where your lawyer or the lawyer for Defendants

24 objects to one of my questions.  Since there's no judge

25 here to rule on those objections, the rule is that



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  you'll go ahead and answer the question, even if an

2  attorney objects, okay?

3       A.   Yes.

4            THE REPORTER:  I'm sorry.  I didn't -- did you

5       say yes?

6            THE WITNESS:  Yes.

7            THE REPORTER:  Okay.  Thank you.

8            BY MS. DILLON:

9       Q.   Okay.  Last, if you need a break, you can have

10  one at any time, but if there's a question pending,

11  you'll just need to answer the question before we go off

12  the record, okay?

13       A.   Yes.

14       Q.   Okay.  Ms. Szewczyk, do you have any medical

15  conditions that might affect your ability to testify

16  today?

17       A.   No.

18       Q.   Okay.  Any other reason you can think of that

19  you might not be able to give full and accurate

20  testimony today?

21       A.   No.

22       Q.   Great.  Did you do anything to prepare for

23  your deposition?

24       A.   No.

25       Q.   Okay.  Didn't review any documents?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    No.

2      Q.    None of your prior testimony?

3      A.    No.

4      Q.    Okay.  And were you contacted by anyone

5  representing the City of Orlando or Orlando Police

6  Department in this matter?

7      A.    Recently?

8      Q.    Yes.

9      A.    No.

10     Q.    Okay.  Did you have any conversations with any

11 of the lawyers for Defendants in this case in relation

12 to this deposition?

13     A.    No.

14     Q.    Okay.  And, Ms. Szewczyk, you're an attorney;

15 is that right?

16     A.    Yes.

17     Q.    Okay.  What type of law do you practice?

18     A.    Family law and probate.

19     Q.    Okay.  Do you have any training or education

20 in cognitive psychology?

21     A.    I have personal knowledge.  I don't think I

22 have any training or education.  No.

23     Q.    Okay.  No formalized education or training?

24     A.    No.

25     Q.    Okay.  Do you have any training --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Undergraduate --

2      Q.    Oh, sorry.  Go ahead.

3      A.    Undergraduate classes and that would be it.

4      Q.    Okay.  So you take -- you took some

5  undergraduate classes in cognitive psychology, is that

6  what you said?

7      A.    Correct.

8      Q.    Okay.  And do you have any training or

9  education or understanding about eyewitness

10  identifications?

11      A.    No.

12      Q.    Okay.  No formal training at all as it relates

13  to eyewitness identifications or error rates and

14  misidentifications?

15      A.    No.

16      Q.    Okay.  So I want to turn to the burglary of

17  your neighbor's home back in April of 2013.  Did you

18  live in Orlando in 2013?

19      A.    Yes.

20      Q.    Where did you live?

21      A.    2013?  I lived at 1716 Lafayette Court in

22  Orlando, Florida.

23      Q.    Okay.  And was that some kind of complex?

24      A.    Yes, it's a condo community.

25      Q.    Okay.  At that point in time, how long had you

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  lived there?

2       A.   Since July of 2008.

3       Q.   Okay.  So for, like, half a decade, you had

4  lived there by 2013?

5       A.   About five years.  Yeah.

6       Q.   Okay.  I'm going to direct your attention back

7  to April 9, 2013, the day that your neighbor's house was

8  burglarized.  As you sit here today, do you have a good

9  memory of that day?

10      A.   No.

11      Q.   Okay.  I'll -- all I ask is that you do the

12  best you can as we chat about this.  If you don't know

13  something, that's a perfectly acceptable answer as long

14  as it's the truth, okay?

15      A.   Yes.

16      Q.   What were you doing that morning?

17      A.   Going to work.

18      Q.   Okay.  Were you inside your home or outside

19  your home?

20      A.   I was inside my home and then I left.

21      Q.   Okay.  And when you left at some point that

22  morning, after you left your home while you were

23  standing outside, did you witness three young men

24  running towards a vehicle?

25      A.   I don't remember.



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Okay.  So as you sit here today, you don't
2  remember witnessing anyone running towards a vehicle
3  outside your home?
4    A.   I remember that I witnessed something and
5  there was individuals.  I don't remember how many.
6    Q.   Okay.  So you're aware that something
7  happened, but you're not sure how many people you saw;
8  is that right?
9    A.   That's correct.
10    Q.   Okay.  Did you notice a vehicle parked outside
11  of your home that morning?
12    A.   Yes.
13    Q.   Okay.  Did you notice it before you saw any
14  young men running towards that vehicle?
15    A.   I don't remember.
16    Q.   Okay.  Do you remember what that vehicle
17  looked like?
18    A.   No, I do not.
19    Q.   Okay.  You don't know what color it was?
20    A.   No.
21    Q.   Whether it had tinted windows?
22    A.   No, I don't recall.
23    Q.   Okay.  So at some point, I think you said you
24  recall seeing people, but you don't remember how many;
25  is that right?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.    Correct.

2      Q.    Okay.  When did you first notice the people

3 that you saw?

4      A.    I don't remember.

5      Q.    Okay.  Do you remember how close they were to

6 the car when you noticed them?

7      A.    No, I don't.

8      Q.    Do you remember how close they were to you

9 when you noticed them?

10     A.    I don't recall.

11     Q.    Okay.  Do you know recall what they were

12 doing?

13     A.    No.

14     Q.    Were they running?

15     A.    I have no clue.

16     Q.    Okay.  Did you hear them say anything?

17     A.    I don't recall.

18     Q.    Okay.  At some point, did you see the boys get

19 into a car?

20     A.    I don't remember.

21     Q.    Okay.  You don't remember, as you sit here

22 today, whether or not you saw anyone get into a vehicle

23 on April 9th, 2013?

24     A.    I don't recall.

25     Q.    Okay.  If you -- do you remember giving

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  testimony at the criminal trial in this lawsuit?

2       A.   Which one?

3       Q.   The underlying criminal trial in May of 2014.

4       A.   Vaguely.

5       Q.   Okay.  If you testified at that trial that you

6  saw three boys run and get into a car, do you have any

7  reason to think that that -- that's not correct?

8       A.   No.

9       Q.   Okay.  You just can't recall one way or the

10 other; is that right?

11      A.   I can't recall.

12      Q.   Okay.  Do you -- okay.  Let's talk a little

13 bit about what you remember about what those guys looked

14 like.  Do you have any memory of what the people you saw

15 running that morning looked like?

16      A.   They were male.

17      Q.   Okay.  They were all three were male?

18      A.   I don't know.

19      Q.   Okay.  Did you get a good look at any of them?

20      A.   At the time I probably did, yes, but I don't

21 remember what they looked like.

22      Q.   Okay.  Do you remember what their races were?

23      A.   No.

24      Q.   Do you remember what their hair looked like?

25      A.   No.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  Eye color?

2      A.   No.

3      Q.   Had you ever seen any of those people you saw

4 on the morning of April 9th, 2013, before that morning?

5      A.   No, I don't think so.

6      Q.   Okay.  Do you recall the people you saw

7 running that -- or the people you saw that morning

8 getting into the vehicle and driving away?

9      A.   I -- I believe so, yes.  I believe they drove

10 away and I only say I remember that because I remember

11 that's what I testified to.  I don't --

12     Q.   Okay.  So you don't have an independent memory

13 of them driving away.  You remember that you testified

14 that they drove away.  Is that what you're saying?

15     A.   Correct.

16     Q.   Okay.  And if you testified that they drove

17 away, is there any reason to think that that's not

18 correct, that you didn't testify correctly?

19     A.   No.

20     Q.   Okay.  Do you remember calling the police

21 after you witnessed this incident on April 9th, 2013?

22     A.   No.

23     Q.   Okay.  So no memory of talking to a dispatcher

24 about the incident?

25     A.   No.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.  Do you have any memory between -- do

2   you have any memory of talking to the police --

3      A.   No.

4      Q.   -- when they showed up?  Okay.  So I'm going

5   to share with you what will be marked as Plaintiff's

6   Exhibit 15.  Okay.  Can you see that on your screen?

7           (Exhibit 15 was marked for identification.)

8      A.   Yes.

9           MS. DILLON:  All right.  So for the record,

10      this is a one-page document that's Bates numbered

11      P2.

12           BY MS. DILLON:

13      Q.   Is it -- is this type large enough that you

14   can see it well enough to read --

15      A.   Yes.

16      Q.   -- or do you want me to make it bigger?  It's

17   an okay size?  Okay.  Do you see this in the middle of

18   the -- what I'm showing you, do you see kind of a

19   handwritten paragraph right there?

20      A.   Yes, that's my handwriting.

21      Q.   Okay.  That's your handwriting.  That's what I

22   was going to ask you.  And then if you -- if I scroll

23   down a little bit and direct your attention to the

24   bottom right-hand corner, where it says signature, is

25   that your signature?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       **Toll Free 855-MYDEPOS**

1        A.    Yep.  Yes, that is.

2        Q.    Okay.  Why don't you take just a minute to

3   read that paragraph, if you would, and let me know when

4   you're done, okay?

5        A.    Okay.  Okay.

6        Q.    Okay.  So kind of near the top, you write that

7   you saw three young Hispanic males rushing to get in

8   their vehicle.  Do you -- does this do anything to

9   refresh your memory about what you saw that morning?

10        A.    I remember the blue latex gloves in the next

11  paragraph.

12        Q.    Okay.  The blue latex gloves that the driver

13  was wearing; is that right?

14        A.    Correct.

15        Q.    Okay.  So what's -- scratch that.  I mean,

16  strike that.

17             If you look a little bit further down, kind of

18  in the middle, you say, "They were all dark hair with

19  dark eyes."  Does that do anything to refresh your

20  recollection about what they looked like?

21        A.    No.

22        Q.    Okay.  Do you have any reason to think that --

23  actually, strike that.

24             Do you recognize this as a statement you

25  provided to the police who responded on April 9th, 2013?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.    I recognize that as my handwriting.

2    Q.    Okay.  Any reason to doubt that it's a

3  statement that you wrote?

4    A.    No.

5    Q.    Okay.  And if you look up at the top left,

6  where it says date of statement, all the way to the

7  right, there's a timestamp and it says 8:40 a.m.  Do you

8  see that?

9    A.    Yes.

10    Q.    Okay.  And then on -- next to date of the

11  offense, a couple -- two lines down all the way to the

12  right, it says, time 8:00 a.m.  So it's -- it seems you

13  gave the statement about 40 minutes or so after you

14  witnessed the event; do you agree?

15    A.    That's what it says, yes.

16    Q.    Okay.  Do you have any reason to believe that

17  40 minutes after the event you did not give the details

18  that are included in this statement?

19    A.    I don't think I understand your question.

20    Q.    Okay.

21    A.    Are you asking if I believe that was the right

22  time?  I don't remember what time it was.

23    Q.    I -- I'll ask a better question.  Do you have

24  any reason to doubt that -- strike that.

25          If you gave this statement 40 minutes after



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  you witnessed the event, would you agree that your

 2  memory at that time is better than your memory would be

 3  as we sit here today over a decade later?

 4       A.   I don't have any reason to doubt that, no.

 5  I'm sure I gave an accurate statement at that time.

 6       Q.   Okay.  A little bit further down in the

 7  statement you say that, "The boys were all shorter, no

 8  taller than 5'9" or 5'10" and they appeared very young,

 9  16 to 20 years of age."  Does anything about that

10  statement refresh your recollection about what the boys

11  looked like?

12       A.   No.

13       Q.   Okay.  In the middle of the statement, you

14  talk about the vehicle you saw and you say, "It was a

15  newer model Toyota, gray in color and had four doors."

16  Does that do anything to refresh your recollection about

17  what the vehicle looked like?

18       A.   I think I remember it was gray.

19       Q.   Okay.  It helps you remember it was gray, but

20  nothing else about that sentence helps you remember what

21  the vehicle looked like; is that right?

22       A.   That's correct.

23       Q.   Okay.  Fair to say that the information in the

24  statement that you gave to the police on April 9th,

25  2013, was correct?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

1    A.    Yes.

2          MR. MISTOLER:  Objection.

3          BY MS. DILLON:

4    Q.    Is there anything not in your statement that

5    you remember telling the police when they responded?

6    A.    I don't recall.

7    Q.    Okay.  Did any police officer take you to see

8    a suspect on the day of the April 9th, 2013 incident?

9    A.    No.

10    Q.    Okay.  What happened after -- do you remember

11    what -- anything that happened after you spoke to the

12    police and gave the police your statement?

13    A.    That day?

14    Q.    That day.

15    A.    I probably went to work.

16    Q.    Okay.  Have you now told me everything you

17    remember as you sit here today about what happened on

18    the morning of April 9, 2013?

19    A.    Yes.

20    Q.    Okay.  Do you remember when was the next time

21    you interacted with someone from the Orlando Police

22    Department in connection with the April 9th incident?

23    A.    Do I remember when?

24    Q.    Yeah.

25    A.    No, I don't remember when.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  At some point you were asked to

2    participate in a photo lineup; is that right?

3    A.   I believe so.

4    Q.   Okay.  Do you remember when that was?

5    A.   No.

6    Q.   If the photo array said it was September 4th,

7    2013, do you have any reason to dispute that that's

8    right?

9    A.   If the what?

10   Q.   If the photo lineup says that you conduct --

11   you -- if there's a photo lineup that says you viewed it

12   on September 4th, 2013, do you have any reason to doubt

13   that that's correct?

14   A.   I don't think so, no.

15   Q.   Okay.  And that's about five months after the

16   April incident, correct?

17   A.   Correct.

18   Q.   All right.  And what I hear you saying is,

19   between the April 9th incident and the photo array, you

20   don't recall ever speaking with an officer with the

21   Orlando Police Department?

22   A.   I recall he called me and asked to come to my

23   office when I was working at Siemens to conduct the

24   photo lineup, yes.

25   Q.   Okay.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          A.   So I did have a conversation.  I don't know

2     who it was or how many conversations we had.

3          Q.   Okay.  So you recall someone calling you about

4     a lineup; is that right?

5          A.   Yes.

6          Q.   Do you recall whether that was a detective

7     named Michael Stanley?

8          A.   I don't remember his name.

9          Q.   Okay.  Was the person who called you the same

10    person that ultimately conducted the photo array with

11    you?

12         A.   Yes.

13         Q.   Okay.  And so if the person that conducted the

14    photo array with you was a detective named Michael

15    Stanley, that would've been the person who called you;

16    is that right?

17         A.   I believe so.  I would have no -- yeah, I

18    believe it was.

19         Q.   Okay.  Do you remember anything else about the

20    phone call you had with Detective Stanley before you

21    participated in the lineup?

22         A.   No.

23         Q.   Okay.  He -- did he tell you that they had a

24    suspect?

25         A.   I don't remember.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  It's possible you just don't remember;
2  fair enough?
3      A.   I don't recall.  I can't really see you
4  anymore.  Do you still need this up?
5      Q.   Oh, I need it up for just one second.  I want
6  to ask you --
7      A.   Okay.
8      Q.   -- a couple more questions about it.  So
9  between -- actually, strike that.
10         Would the police have found you if they needed
11  to find you between April 9th and September 4th?
12     A.   Say that again?
13     Q.   Would you agree that the police could have
14  found you if they needed to find you at any point
15  between April 9th and the photo array?
16     A.   I mean, they're the police.  I suppose they
17  can find anybody.
18     Q.   Fair enough.  You gave them your contact
19  information, correct?
20     A.   Yes.  Yeah.  They knew where I lived.  They
21  had my phone number, so -- and I wasn't avoiding their
22  calls, so.
23     Q.   Sure.  Sure.  And so you see, I just -- this
24  is the last on -- last thing I'll say on this exhibit,
25  you see where it says, address residence?  At the top

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1 there, it says 1716 Lafayette?

2      A.    Yes.

3      Q.    That was your address at the time, correct?

4      A.    Correct.

5      Q.    Okay.  And do you see a little bit over to the

6 right of that address there's a phone number --

7      A.    Yes.

8      Q.    -- starting with 315.  Was that your phone

9 number at the time?

10      A.    Yes.  That phone number did not change until

11 2017.

12      Q.    Okay.  So they had your residence and they had

13 your personal phone number; fair enough?

14      A.    Yes.

15      Q.    All right.  And do you see where it says,

16 address business and there's a 3501 address listed

17 there?

18      A.    Correct.

19      Q.    Okay.  Is that -- and that's where you worked

20 at the time?

21      A.    That is where I worked until June of 2019,

22 yes.

23      Q.    Okay.  And then you see there's a phone number

24 kind of to the right of that business address.  Is --

25 was that your business phone number at the time?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.   I believe so.  It's been a few years since I

2  was there, so -- but I believe that was, yes.

3      Q.   Fair enough.  And do you see an e-mail

4  address, bethanycs@mac.com?

5      A.   Yes.

6      Q.   Was that your e-mail address at the time?

7      A.   That is still my e-mail address, so yes.

8      Q.   Okay.  So you gave the police numerous methods

9  by which they could have -- they could contact you; fair

10  to say?

11      A.   Yes.

12      Q.   All right, I'm going to set that exhibit aside

13  and I think you were saying that, you know, the --

14  someone called you about the photo array, the same

15  person who ultimately conducted the photo array with

16  you.  Where was the photo array conducted?

17      A.   At that address where it says business

18  address, right in my office.

19      Q.   Okay.  It was conducted at your work?

20      A.   Correct.

21      Q.   Do you recall anything that the detective said

22  to you when he arrived at your work with the photo

23  array?

24      A.   No, I don't.

25      Q.   Okay.  He -- you can't recall if he talked to



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  you about the incident?

 2       A.   I don't recall.

 3       Q.   Okay.  And you don't recall if he asked you

 4  any more questions about the description of the people

 5  you saw that day?

 6       A.   I don't recall.

 7       Q.   Okay.  Eventually, you were shown photographs;

 8  is that correct?

 9       A.   I don't recall.  I assume so.  That's what he

10  was there to do.

11          MS. DILLON:  Okay.  I'm going to share with you

12     what will be marked as Plaintiff's Exhibit 16.

13          (Exhibit 16 was marked for identification.)

14          BY MS. DILLON:

15       Q.   Okay.  Can you see that document on your

16  screen?

17       A.   Yes.

18          MS. DILLON:  Okay.  For the record, this is a

19     three-page document, Bates number P529 to 531.

20          BY MS. DILLON:

21       Q.   And up at the top next to witness name, do you

22  recognize your name there?

23       A.   Yes.

24       Q.   Okay.  And you -- do you see right next to

25  your name to the right of it it says administrator name



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

1  and it -- and there's a name Stanley written there.  Do

2  you see that?

3      A.   Yes.

4      Q.   Okay.  Does that do anything to refresh your

5  recollection of the name of the detective?

6      A.   No.

7      Q.   Okay.  And do you see the date just above the

8  administrator name, September 4th, 2013?

9      A.   Yes.

10      Q.   Okay.  And does that do anything to refresh

11  your memory as to that being the date you viewed a photo

12  lineup?

13      A.   No.

14      Q.   Okay.  So I'm going to scroll down a little

15  bit.  And do you see where it says, witness initials

16  near the bottom right-hand corner?

17      A.   Yes.

18      Q.   Okay.  Are those your initials?

19      A.   Yes.

20      Q.   And did -- is that your handwriting?

21      A.   Yes.

22      Q.   Okay.  I'm going to direct your attention to

23  the next page of the document.  Do you see in the middle

24  here where there's some handwriting, a little paragraph?

25      A.   Yes.  That is my handwriting.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   That's your handwriting.  Okay.  That's what I

2  was going to ask.  And do you see where it says

3  signature of witness?

4    A.   Yes.

5    Q.   Is that your signature?

6    A.   Yes.

7    Q.   Okay.

8    A.   But I didn't put anything underneath there.

9    Q.   Yeah.  This -- you would agree that this

10 handwriting, the address and the name Michael Stanley,

11 that looks like different handwriting than yours; is

12 that right?

13   A.   Correct.  I did not write that.

14   Q.   Okay.  So you wrote your signature and you

15 wrote this little paragraph.  Is there anything else on

16 this document that you see that you wrote?

17   A.   I circled that box --

18   Q.   Okay.

19   A.   -- and I initialed next to it.

20   Q.   Okay.  Nothing -- aside from the box, the

21 initials, this handwritten paragraph and your signature,

22 anything else on this page that you wrote?

23   A.   Not that I can see.

24   Q.   Okay.  I'm going to direct your attention to

25 the final page of this document.  This is a set of six

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   photographs.  Do you recognize this as the group of

2   photographs that you were shown in connection to the

3   April 9th incident?

4        A.   No, I don't.  I don't remember it at all.

5        Q.   Okay.  You have no memory one way or the other

6   about this group of photographs?

7        A.   No, I don't.

8        Q.   Okay.  Do you -- this is a black and white

9   copy of photos.  Do you agree with that?

10       A.   Yes.

11       Q.   Were you shown a black and white photo array?

12       A.   I don't recall.

13       Q.   You don't recall.  Do you recall the quality

14  of the photographs that you were presented?

15       A.   I don't recall.

16       Q.   Okay.  You testified at a hearing about Mr.

17  Valle-Ramos's conviction back in March of 2023, correct?

18       A.   I don't recall the date, but yes, I did.

19       Q.   Okay.  At Plaintiff's 547, Line 14, you

20  testified the pictures, number one, were all very poor

21  quality and dark.  They were dark pictures.  Does that

22  refresh your memory that the photos you viewed at the

23  September 4th lineup were bad quality?

24       A.   No.

25       Q.   Okay.  So you couldn't say one way or the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1 | other if they were like the ones I'm showing you in

2 | Exhibit

3 | 16?

4 |     A.   I don't recall.

5 |     Q.   Okay.  Do you recall Detective Stanley

6 | commenting on the poor quality of the photos?

7 |     A.   No, I don't.

8 |     Q.   Okay.  So on the same page of your post --

9 | your hearing testimony, the March 2023 hearing,

10 | Plaintiff's 547, Line 18, you testified that Stanley

11 | told you, "I'm sorry.  I know they're not the best

12 | quality."  Does that do anything to refresh your memory

13 | that Stanley told you the pictures were bad quality?

14 |     A.   No.

15 |        MS. DILLON:  Okay.  I'm going to set this

16 |     exhibit aside just for a minute and I'm going to

17 |     show you what will be Plaintiff's Exhibit 17.

18 |        (Exhibit 17 was marked for identification.)

19 |        BY MS. DILLON:

20 |     Q.   Okay.  Can you see that on your screen?

21 |     A.   Yes.

22 |        MS. DILLON:  Okay.  For the record, this is a

23 |     one-page document Bates labeled P1413.

24 |        BY MS. DILLON:

25 |     Q.   Do you recognize this document as a group of



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  photos you were shown on September 4, 2013?

2       A.   No.

3       Q.   Okay.  Would you agree with me that the

4  quality of the photos in this exhibit are good?

5            MR. MISTOLER:  Objection.

6            BY MS. DILLON:

7       Q.   You can answer.

8       A.   My father is a professional photographer so

9  the answer to that is definitely no.

10      Q.   Would you agree that these photographs are not

11 blurry?

12      A.   One of them is.

13      Q.   Which one is blurry?

14      A.   Number 2.

15      Q.   Okay.  Would you agree -- actually, scratch

16 that.

17           Do you think these photographs are dark?

18      A.   They're better quality than the one you just

19 showed me.

20      Q.   Okay.  Does this refresh your memory one way

21 or another -- way one way or another whether you were

22 shown a color copy of a photo array -- photo array or a

23 black and white copy?

24      A.   No.

25      Q.   Okay.  I'm going to set this aside.  Actually,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  let me just ask you a couple more questions about this

2  photo array.  This gentleman in box number 1, he does

3  not have an Afro style haircut, correct?

4          MR. MISTOLER:  Objection.

5          THE WITNESS:  I'm not a barber.

6          BY MS. DILLON:

7      Q.   Would you agree that the gentleman in box

8  number 2 has an Afro style haircut?

9          MR. MISTOLER:  Objection.

10         THE WITNESS:  I don't know.

11         BY MS. DILLON:

12     Q.   You don't know one way or the other?

13     A.   No.

14     Q.   Okay.  If you testified at the March 2023

15 hearing that the gentleman in box 2 was the only person

16 in the photo array with an Afro style haircut do you

17 have any reason to doubt the truth of that testimony?

18     A.   I have no reason to doubt that I said that --

19     Q.   Okay.

20     A.   -- if that's what I said.

21     Q.   Okay.  I'm going to set this exhibit aside.

22 Okay.  And I'm going to reopen or re-share for you

23 Plaintiff's Exhibit 16.  Okay.  And do you see -- is the

24 document visible to you on your screen?

25     A.   Yes.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  Do you see the circle around the person
2  in box number 2?
3      A.   Yes.
4      Q.   Okay.  Did you draw that circle?
5      A.   I don't recall.  I probably -- those are my
6  initials, so I assume I did.
7      Q.   Okay.
8      A.   I don't recall drawing it.
9      Q.   Okay.  And those initials are your
10  handwriting?
11      A.   Yes.
12      Q.   Okay.  Do you remember your reaction to seeing
13  the photograph depicted in box number 2?
14      A.   No.
15      Q.   Okay.  Did you say anything -- or strike that.
16           Actually, no.  Did you say anything in
17  response to noticing the photo?
18      A.   No.  I -- I don't recall.
19      Q.   Before you selected the photograph in box
20  number 2, did Detective Stanley say anything to you?
21      A.   I don't remember.
22      Q.   Once you selected box number 2, did Detective
23  Stanley indicate he was satisfied with who you picked
24  out?
25      A.   I don't remember.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  At your -- at the March 2023 hearing,

2   Plaintiff's P549, you testified that, "He smiled and

3   said that's him."  Does that do anything to refresh your

4   memory about what Detective Stanley said to you after

5   you selected the photo in box number 2?

6      A.   No.

7      Q.   Okay.  And on the same page, you testified,

8   "He told me the victim, Mr. Gonzalez, had identified him

9   also."  Does that do anything to refresh your memory

10  that Detective Stanley told you that the victim had also

11  identified box number 2?

12     A.   No, I don't recall.

13     Q.   Okay.  Did you ask the detective if you had

14  selected the correct person?

15     A.   No, I did not.

16     Q.   Okay.  I'm going to set this exhibit aside.

17  Okay.  Do you remember any conversations that you had

18  with Detective Stanley during the photo array?

19     A.   No, I don't.

20     Q.   Was anyone else present when Detective Stanley

21  showed you the photo array?

22     A.   Not in my office.  There was two other offices

23  next to mine, but we were in my office with the door

24  closed.

25     Q.   Okay.

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    That's all I really remember.

2      Q.    Okay.  Was Detective Stanley taking notes when

3  he met with you for the photo array?

4      A.    I don't recall.

5      Q.    Okay.  And did Detective Stanley show you any

6  other photographs after you selected box number 2?

7      A.    I don't recall.

8      Q.    Okay.  Did you know Detective Stanley, or

9  Detective Michael Stanley, before April 9th, 2023?

10      A.    No.

11      Q.    Would the photo array have been the first

12  interaction you had with Detective Stanley?

13      A.    No.  No, because he -- he called me before we

14  -- to schedule it, but I don't remember any other

15  conversations, though.

16      Q.    Okay.  So you interacted him -- with -- you

17  interacted with Detective Stanley when he called you

18  about the photo array and then you interacted with him

19  during the photo array.  Did you have any other

20  interactions with Detective Stanley from the time of the

21  photo array to the time you testified at the criminal

22  trial?

23      A.    I don't remember.

24      Q.    Okay.  And you testified at -- I think you

25  already mentioned that you testified at a hearing back



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

 1  in, I think you said you couldn't recall the date, but a

 2  hearing on Mr. Valle-Ramos's conviction in 2023; is that

 3  right?

 4      A.   Are you talking about the -- the appellate

 5  hearing?

 6      Q.   The post-conviction hearing?

 7      A.   Right.  Yes, I did.

 8      Q.   Okay.  In between the time you testified at

 9  the criminal trial and the time you testified at the

10  post- conviction hearing, did you have any interactions

11  with Detective Stanley?

12      A.   No.

13      Q.   Okay.  Did you have any interactions with

14  anyone from the Orlando Police Department?

15      A.   You're talking --

16      Q.   In relation to the --

17      A.   The time frame again?  Can you restate the

18  time frame?

19      Q.   Sure.  In between the time you testified at

20  trial and the time you testified at the post-conviction

21  hearing, did you have any conversations with anyone at

22  the Orlando Police Department in relation to Mr. Valle-

23  Ramos's case?

24      A.   The -- there was a gentleman who came to my

25  home with the attorney on the post-conviction case.  They

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  showed up at my house, introduced themselves and wanted

2  to speak to me.  I -- it was the first time I met this

3  woman.  She introduced herself as the attorney for the

4  State, and she had a -- there was a police officer with

5  her, who I believe introduced himself as, like, the

6  chief or somebody who was in charge, but representing

7  the police department in some capacity.

8       Q.   Okay.  Do you remember --

9       A.   That was --

10      Q.   -- when that was?

11      A.   That was -- no, I don't remember when it was.

12  It was before the hearing, obviously, the post-

13  conviction hearing.

14      Q.   Okay.  Do you remember what year it was?

15      A.   No.

16      Q.   Okay.  So you said that the -- oh, sorry, go

17  ahead.

18      A.   2022.  Because you said the post-conviction

19  hearing was '23, so it was before then.

20      Q.   Okay.  So sometime before the hearing in 2023,

21  but you're not really sure of the date; is that right?

22      A.   Correct.

23      Q.   Okay.  Do you remember the attorney for the

24  State's name?

25      A.   No.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.    Okay.  And you said it was a female; is that
2    correct?

3    A.    Yes.

4    Q.    Do you remember -- can you describe what she
5    looked like?

6    A.    She was a -- a very professional looking and
7    Black woman with like --

8    Q.    And you --

9    A.    -- long dark hair.

10   Q.    And long dark hair, is that what you said?

11   A.    I think so, yeah.

12   Q.    Okay.  And you said there was a police officer
13   with her?

14   A.    Some -- yes.  Somebody from the police
15   department.  I don't know that he was an officer.  He --
16   I can't remember.  He gave me his business card.  I --
17   and I just remember that his business card indicated he
18   was from the police department.

19   Q.    Okay.  Do you still have that business card?

20   A.    I can go look right now.  I don't know.
21   Because I know where I keep them all, but I don't know.

22   Q.    Maybe on a break we -- I might ask you if you
23   can check and see if you still have that card.  Can you
24   describe what the person with the attorney looked like?

25   A.    He was a man, an older man, late 40s, early

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  50s, scary looking.

2      Q.   What do you mean when you say scary looking?

3      A.   Just, I mean, intimidating.  You know, police

4  officers can sometimes be a little intimidating

5  looking --

6      Q.   Sure.

7      A.   But that's -- but he was nice.

8      Q.   What was his build like?

9      A.   He was jacked.

10     Q.   Do you remember how tall he was?

11     A.   5'11", 6'.

12     Q.   Okay.  And I think you said they introduced

13  themselves and wanted to speak with you.  Did you end up

14  speaking with the attorney and the gentleman that she

15  had with him -- with her?

16     A.   No, they did not come in my house.  They

17  indicated that they wanted to talk to me about this

18  case.  I said it wasn't a good time and -- and that --

19  and he gave me his card and she probably gave -- I don't

20  -- I actually don't remember.  I don't think she gave me

21  hers, but I don't know.  She took my name and number.

22     Q.   Okay.

23     A.   And they said we would reschedule.  And then I

24  contacted the attorney on the case who had initially

25  contacted me to let her know what had happened.  And



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  that was when I retained Counsel.

2      Q.   Okay.  And when you say you contacted the

3  attorney that was initially on the case, do you mean the

4  attorneys for Mr. Valle-Ramos?

5      A.   Correct.  This would be Elisabeth [sic] Fryer.

6  I contacted her.

7      Q.   Okay.  And did you ever reschedule an

8  interaction with the attorney and the -- whoever it was

9  from the police that she had with her?

10     A.   No.  They scheduled a deposition instead.

11     Q.   Okay.

12     A.   And the officer was not there.

13     Q.   The officer that showed up at your house --

14     A.   Correct.

15     Q.   -- wasn't there?

16     A.   Correct.  He wasn't at the depo.  I never saw

17  him again.

18     Q.   Okay.  But the attorney who was at your house,

19  she was at the deposition?

20     A.   Yes.  She conducted the deposition as well as

21  the post-conviction hearing on behalf of the State.

22     Q.   Okay.  Do you recall when that deposition took

23  place?

24     A.   No.

25     Q.   Okay.  Do you have any idea the year it took



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  place?

2      A.   I -- I don't.  It was obviously prior to the

3  post-conviction hearing.

4      Q.   Sure.  So I'd like to talk a little bit about

5  the post-conviction hearing and how you came to recant

6  your identification of Mr. Valle-Ramos.  I hear you say

7  you were -- you were approached by some people from the

8  State and the police about Mr. Valle-Ramos's case.  Were

9  you also approached by someone with an attorney for Mr.

10  Valle-Ramos?

11      A.   What do you mean?  Yeah.  I spoke with his

12  attorney.  I spoke with Ms. Fryer.

13      Q.   Okay.  And was that before the State

14  approached you?

15      A.   Yes.

16      Q.   Okay.  Can you -- do you remember the first

17  conversation with -- that you had with Ms. Fryer?

18      A.   Not really.  Actually, I don't -- no.  I don't

19  know if I did speak with her first, actually.  I don't

20  remember.

21      Q.   Okay.  Okay.  So you're not sure one way or

22  the other the order in which you spoke for someone with

23  this date and someone for Mr. Valle-Ramos, but --

24      A.   Oh, no.

25      Q.   -- you do --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   I -- no, I definitely spoke with Ms. Fryer

2  first as well as her private investigator.  I don't know

3  who happened first because I spoke with Mr. Jerry Lyons.

4      Q.   Okay.  And so Mr. Jerry Lyons, was that the

5  private investigator?

6      A.   Yes.  That is Attorney Elisabeth [sic] Fryer's

7  private investigator, or at least the one she was

8  working with at the time.

9      Q.   Okay.  And how did he approach you?

10     A.   He -- he -- I think he called -- or I can't

11 remember.  He called or came to my house.  I think he

12 called me.  Initially, he called me.

13     Q.   Okay.  Do you remember anything about that

14 initial phone call with Mr. Lyons?

15     A.   He wanted to come here and talk to me.  That's

16 all I remember.

17     Q.   Okay.  And did you agree to --

18     A.   He asked me if I remembered the case.

19     Q.   Do you -- did you agree to let Mr. Lyons come

20 to your house and talk to you?

21     A.   Yes.

22     Q.   How many times did you meet with Mr. Lyons?

23     A.   Once.

24     Q.   Okay.  And that was at your house?

25     A.   Yes.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.    Okay.  As you sit here today, do you have a

2 good memory of that meeting with Mr. Lyons?

3    A.    Yeah, I do.

4    Q.    Okay.  How did it start?

5    A.    We sat down in my dining room table and he

6 showed me a picture of a young man and asked me if I

7 remembered the case.

8    Q.    Okay.  Did he show you a picture of one person

9 or more than one person?

10    A.    He showed me multiple pictures at the meeting,

11 but initially he showed me picture of a young man he

12 identified by the name of Amos.

13    Q.    Okay.  And that's how he started the meeting

14 with you, is that what you're saying?

15    A.    I -- from my -- yes, that's what I remember.

16    Q.    Okay.  Did he ask you questions?

17    A.    Yes.

18    Q.    Okay.  Do you remember what he asked you?

19    A.    Not really.

20    Q.    Okay.  And I think you said he, at least on

21 the phone call, had asked if you remembered the case.

22 Do you remember him asking you that at the meeting in

23 your home?

24    A.    Yes.

25    Q.    Okay.  How did you respond?

**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        A.    I said, yes, I remembered it.

2        Q.    Okay.  What was your reaction to being reached

3   out to by the private investigator?

4        A.    Mixed feelings.

5        Q.    What do you -- when you say mixed feelings,

6   what do you mean?

7        A.    I don't know.  It was like it just -- I don't

8   know.  Just, I don't know.  I wasn't overly surprised.

9        Q.    Okay.  Why do you say you weren't overly

10  surprised?

11       A.    Because I had always had a feeling that they

12  had arrested the wrong gentleman.

13       Q.    Okay.  And when you say you always had a --

14  had that feeling, do you recall when that feeling

15  started for you?

16       A.    Yeah, the day I walked into his hearing and

17  saw him in the courtroom in 20 -- the first, first

18  hearing

19            hearing ---

20       Q.    Okay.  The --

21       A.    -- for the trial -- for the trial.

22       Q.    -- the criminal trial back in 2014?

23       A.    Yes.

24       Q.    That's when some doubts -- when you had some

25  doubts that they had the correct person?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      A.   Right.

2      Q.   Okay.  At some point -- I just want to ask you

3  a couple of questions about your experience testifying

4  at trial.  Do you remember coming into contact with the

5  victim, Mr. George Gonzalez, at trial?

6      A.   Yes.

7      Q.   Okay.  How did you come to interact with him?

8      A.   I was waiting outside the courtroom and he

9  came out of the courtroom.

10     Q.   Okay.  And you -- we -- we've been talking

11 about the post-conviction hearing in 2023.  At

12 Plaintiff's 551, Line 18, or 10 to 18, you testified

13 that Detective Stanley introduced the two of you.  Do --

14 does that refresh your recollection that it was

15 Detective Stanley who introduced you to Mr. Gonzalez?

16     A.   The same gentleman, the same detective who was

17 doing the photo lineup and that I had been talking to

18 about the case.  I don't personally know his name.

19 You've provided it, but yes, it was the same gentleman

20 who introduced me to the other witness.

21     Q.   Okay.  And I think you said that was after the

22 other witness testified and you were in the waiting

23 room; is that correct?

24     A.   I was in the hall, like the lobby outside the

25 courtroom.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    Okay.

2      A.    Yes.

3      Q.    Okay.  What did you two talk about?

4      A.    I just said hello to him.  He kind of went on

5  this rant.  We didn't really talk.

6      Q.    Okay.  When you say he went on a rant, do you

7  remember what he ranted about?

8      A.    What he had seen that day.

9      Q.    And do you mean at -- the day that his home

10  was burglarized or at trial?

11      A.    The day his home was burglarized.

12      Q.    Okay.  Do you remember him telling you that he

13  identified Mr. Valle-Ramos?

14      A.    I don't remember.

15      Q.    Okay.  Do you remember him being --

16      A.    Identified him -- sorry.  Identified him at

17  trial or identified -- like, what do you -- what do you

18  mean?

19      Q.    Yeah.  Do you remember Mr. Gonzalez telling

20  you that he had identified Mr. Valle-Ramos at trial?

21      A.    No.

22      Q.    Okay.  If you testified at your -- at the

23  March 2023 hearing, this at Plaintiff's P551, that he --

24  that Gonzalez told you he was certain he made the

25  correct identification of Mr. Valle-Ramos, is there any

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  reason to doubt that that testimony was true?

2       A.   No.

3       Q.   Okay.  After you spoke to Mr. Gonzalez, you

4  testified at the criminal trial, correct?

5       A.   Yes.

6       Q.   Okay.  How did you feel before you gave your

7  trial testimony?

8       A.   Hungry?  I don't -- I don't -- I don't know.

9  I don't remember.  I probably just -- I don't know.

10 Mixed feelings, probably, nervous.

11      Q.   Okay.  Nervous, maybe hungry.  Do you recall

12 anything else you were feeling before you testified?

13      A.   Before I went into the courtroom?

14      Q.   Yeah.  Before you went into the courtroom and

15 gave your testimony?

16      A.   Just nervous.

17      Q.   Okay.  And you identified Mr. Valle-Ramos at

18 trial; is that correct?

19      A.   Yes.

20      Q.   Okay.  How did you feel after you identified

21 Mr. Valle-Ramos?

22      A.   Shitty.

23      Q.   And why did you feel?

24      A.   Excuse my language.  I didn't feel great.

25      Q.   Okay.  And why didn't you feel great?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Because I had doubts and didn't know what to

2  do with them.

3      Q.   Okay.  Did your conversation with Mr. Gonzalez

4  make you feel more confident?

5      A.   Yes.

6           MR. MISTOLER:  Objection.

7           BY MS. DILLON:

8      Q.   Okay.  Did anyone from the Orlando Police

9  Department speak with you after you gave your testimony?

10     A.   I don't recall.

11     Q.   Okay.  Do you recall anyone from the

12 prosecution speaking with you after you gave your

13 testimony?

14     A.   Yes, actually.  They e-mailed me.

15     Q.   Okay.

16     A.   The prosecutor e-mailed me.

17     Q.   Was that -- how long after trial before you

18 got that e-mail from the prosecutor?

19     A.   It was either the same day or the next day.

20 You're talking about the first trial?

21     Q.   Yes.  Yes.  The criminal trial back in 2014.

22     A.   Yeah.  So the same -- the same day or the next

23 day.

24     Q.   Okay.  What did the e-mail say?

25     A.   I just remember she told me I did a great job.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.    Okay.  Said you did a great job, but you can't

2  remember if the e-mail included anything else?

3    A.    Something about she was looking for a new

4  position and I don't know why we were discussing that,

5  but she was looking for another job and that's all I

6  really recall.  And I don't remember her name.

7    Q.    Okay.  Do you still have that e-mail?

8    A.    No, I'm sure not.

9    Q.    Okay.  Did you speak with anyone from the

10  defense after you gave your testimony?

11    A.    No.  I don't think so.

12    Q.    Okay.  And did you -- at the criminal trial,

13  did you have any interactions with any other witnesses

14  besides Mr. Gonzalez?

15    A.    No.  I don't think there were any other, but

16  if there were, no.

17    Q.    Okay.  So before we were chatting about your

18  -- the testimony at the criminal trial, we were talking

19  about Mr. Lyons and how he got in contact with you and

20  you had had the, you know, mixed feelings that they had

21  always gotten the wrong gentleman.  Do you remember

22  talking about that?

23    A.    Yes.

24    Q.    Okay.  What did you -- at -- during your

25  conversation at your home with Mr. Lyons, did you recant



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1  your prior identification of Mr. Valle-Ramos?

2      A.   To Mr. Lyons?

3      Q.   Yes.

4      A.   I believe I did.  I don't remember exactly

5  what I said, but I believe we agreed that the other

6  gentleman was the guy that I remembered.

7      Q.   Okay.  Do you remember anything else specific

8  about your conversation with Mr. Lyons?

9      A.   I remember he gave me some background about

10  Amos and that he was deceased.  I believe he also gave

11  me some information about what Mr. Valle-Ramos, what had

12  -- what had happened with him subsequent to him being

13  convicted.  We just generally talked about the case, but

14  that's all I really -- he -- he made some jokes about

15  his wife or ex-wife.  I think that's all I remember.

16      Q.   Do you remember any of the specific

17  information he told you about Mr. Valle-Ramos and what

18  had happened with him after the conviction?

19      A.   He went to prison for, I think, three years,

20  has always -- had always maintained his innocence.  He

21  had a lovely girlfriend who had been trying to advocate

22  for him.  And that's how Attorney Fryer had come onto

23  the case.  I believe that's all I remember.

24      Q.   Okay.  Did Mr. Lyons pressure you to recant

25  your prior identification?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.    No.  Uh-uh.

2      Q.    You had had doubts over the years, correct?

3      A.    Yes.

4           MS. DILLON:  Okay.  I'm going to show you what

5      we'll -- what has been previously marked as

6      Plaintiff's Exhibit 4.

7           (Exhibit 4 was marked for identification.)

8           BY MS. DILLON:

9      Q.    Okay.  Ms. Szewczyk, do you see these

10 photographs on your screen?

11      A.    Yes.

12           MS. DILLON:  Okay.  So for the record, this is

13      a one-page document.  Bates number P454.

14           BY MS. DILLON:

15      Q.    Is -- are these the photographs that Mr. Lyons

16 showed you when he met with you at your home?

17      A.    I don't recall.

18      Q.    Okay.

19      A.    I don't think so.

20      Q.    Okay.  You don't -- these don't seem familiar

21 as the photos that he showed you of -- that he showed

22 you when he met you at your house?

23      A.    They look familiar --

24      Q.    Okay.

25      A.    -- so I know at some point I've probably seen

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 them, but I don't think they were the ones that he

2 showed me that day.  I don't remember.

3     Q.   Okay.  I'll represent to you that this

4 gentleman on the left is Amos Ortiz and the gentleman on

5 the right is Mr. Valle-Ramos.  Do you agree that these

6 two men bear a striking resemblance to one another?

7          MR. MISTOLER:  Objection.

8          THE WITNESS:  Yeah, I would agree.

9          BY MS. DILLON:

10     Q.   Can you describe what features look similar to

11 you?

12     A.   Their hair.  I would say their head is kind of

13 in a similar position.  They both have full lips.  The

14 -- the shape -- the shape of their eyebrows is similar.

15 Their eye shape is similar.  Their nose shape is

16 similar.  The ears are even similar.  I mean, their --

17 their jaw kind of looks similar, although there's a

18 holograph over Mr. Valle-Ramos's face, but they just

19 look very similar.

20     Q.   Okay.  If you had been presented a lineup with

21 both of these men on September 4th, 2013, would you have

22 selected either of them?

23          MR. MISTOLER:  Objection.

24          THE WITNESS:  Yes, I would've.

25          BY MS. DILLON:



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      Q.   Which one would you have selected?

2           MR. MISTOLER:  Objection.

3           THE WITNESS:  Amos, the one on the left.

4           BY MS. DILLON:

5      Q.   Okay.  The one on the left in the blue shirt;

6  is that right?

7      A.   Yes.

8      Q.   Okay.  I'm going to set this exhibit aside.  I

9  promise I'm getting pretty close.  At some point you

10 executed an affidavit recanting your identification of

11 Mr. Valle-Ramos; is that right?

12     A.   Yes, I did.

13          MS. DILLON:  Okay.  I'm going to share with you

14    what will be Plaintiff's Exhibit 18.

15          (Exhibit 18 was marked for identification.)

16          BY MS. DILLON:

17     Q.   Okay.  Ms. Szewczyk, can you see that document

18 on your screen?

19     A.   Yes.

20          MS. DILLON:  Okay.  For the record, this is a

21    one-page document, Bates number P473.

22          BY MS. DILLON:

23     Q.   And do you see your name at the top here where

24 it says Affidavit of Bethany Szewczyk?

25     A.   Yes.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  And do you see at the bottom here where

2  it says affiant, is that your signature?

3      A.   Yes.

4      Q.   Okay.  And do you see the date, December 1,

5  2021?

6      A.   Yes.

7      Q.   All right.  So I'm just going to ask you a

8  couple of questions about this document.  First,

9  paragraph 3 says, "I selected Mr. Valle-Ramos's

10 photographs because he was the only individual in the

11 photographic lineup with an Afro style haircut."  Did I

12 read that correctly?

13     A.   Yes.

14     Q.   Okay.  Is it true that you selected Mr. Valle-

15 Ramos because he was the only person in the lineup with

16 an Afro?

17     A.   I'm sure that was one of the reasons.  That

18 was probably the primary reason.

19     Q.   Okay.  So one of the reasons maybe that -- one

20 of the primary reasons that you selected, Mr. Valle-

21 Ramos was his hairstyle in the lineup; is that fair?

22     A.   Correct.

23     Q.   Okay.  Now let's go to paragraph 4, which

24 says, "During the photographic lineup process, Detective

25 Michael Stanley told me that the homeowner, Mr. George

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Gonzalez, had confidently identified Mr. Valle-Ramos as

2  the individual who burglarized his home."

3          Did I read that correctly?

4      A.   Yes.

5      Q.   Is it true that Detective Stanley told you

6  that Mr. Gonzalez confidently identified Mr. Valle-Ramos

7  as the person who burglarized his home?

8      A.   I don't recall.  I remember him saying

9  something -- I -- he -- he did not identify Mr. George

10  Gonzalez by name, but that is who --

11      Q.   Okay.

12      A.   -- I assume he was referring to, and I

13  remember him saying something along those lines, like he

14  had already been identified.

15      Q.   Okay.  You don't remember him saying

16  explicitly the name George Gonzalez?

17      A.   No.

18      Q.   Okay.  But he might have -- did he identify

19  him by the victim of the crime or something like that?

20      A.   I don't remember what he said.

21      Q.   Okay.  Now, directing your attention to

22  paragraph 7, it says, "During trial, after the victim,

23  Mr. George Gonzalez, testified, but before I testified,

24  Detective Michael Stanley introduced me to George

25  Gonzalez."  Did I read that correctly?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      A.   Yes.

2      Q.   Okay.  Is it true that Detective Stanley

3 introduced you to George Gonzalez before you testified

4 at trial?

5      A.   Yes, he did.

6      Q.   Okay.  And then the second part of that

7 paragraph says, "Mr.  Gonzalez then told me that he was

8 certain that Mr. Valle-Ramos was one of the burglars

9 before my testimony."  Did I read that correctly?

10      A.   Yes.

11      Q.   Okay.  And is it true that Mr. Gonzalez told

12 you that he was certain that Mr. Valle-Ramos was one of

13 the burglars before you gave your testimony?

14      A.   He told me that he had identified him.  He was

15 certain that the man in the courtroom -- we didn't

16 really use names.

17      Q.   Okay.

18      A.   But yes, that's what he based -- he said.

19      Q.   Okay.  Without saying names, Mr. Gonzalez

20 conveyed to you that Mr. Valle-Ramos --

21      A.   Yes.

22      Q.   -- was one of the burglars?

23      A.   Yes.

24      Q.   Okay.

25      A.   And he told me the story of what he remembered



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   that morning.

2        Q.   At the time you executed this affidavit, did

3   you have any reason to do Mr. Valle-Ramos a favor?

4        A.   No.

5        Q.   Did you know him?

6        A.   No.  I -- I've still never spoken a word to

7   Mr. Valle-Ramos ever.

8        Q.   Okay.  Were you just telling the truth about

9   what happened?

10       A.   Yes.

11       Q.   Okay.  I'm going to --

12       A.   That's what I'm always trying to do.

13       Q.   I'm going to set this exhibit aside.  Just a

14  few more questions from me.  So we've established that

15  you testified at a hearing about Mr. Valle-Ramos's

16  conviction in March 2023, and you sort of tell the truth

17  at that hearing, correct?

18       A.   I'm sorry, could you repeat the question?  I'm

19  sorry.

20       Q.   That's okay.  You testified at a hearing about

21  Mr. Valle-Ramos's conviction back in March of 2023,

22  correct?

23       A.   The post-conviction hearing?  Yes.

24       Q.   Yes, the post-conviction hearing.  And you

25  swore to tell the truth at that hearing, correct?


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Yes.

2      Q.   Okay.  At that hearing, did you recant your

3 earlier identification of Mr. Valle-Ramos?

4      A.   Yes.

5      Q.   Okay.  And at that time in March of 2023, did

6 you have any reason to do Mr. Valle-Ramos a favor?

7      A.   A favor?  No.

8      Q.   Okay.  You -- I think you said just a minute

9 ago that you've never talked to Mr. Valle-Ramos and that

10 was true in March 2023, correct?

11      A.   Correct.

12      Q.   Okay.  Were you just telling the truth about

13 what happened?

14      A.   Yes.

15          MS. DILLON:  Okay.  Okay.  I think I'm done.

16      I'm just going to ask for a quick two, three-minute

17      break to make sure.  Is that okay with folks?

18          MR. MISTOLER:  Of course.

19          MS. DILLON:  Okay.  So let's go off the record

20      for a quick break.  People can use the bathroom and

21      then we can come back.

22          THE REPORTER:  One moment.  Let me go off

23      record.

24              (A recess was taken.)

25          THE REPORTER:  Okay.  We're back on record. You



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    may proceed, Counsel.

2          MS. DILLON:  All right.  Ms. Szewczyk, thank

3    you so much for your time.  I have no further

4    questions for you.  So we'll pass it off to counsel

5    for defendants.

6          THE WITNESS:  Okay.

7               CROSS-EXAMINATION

8          BY MR. MISTOLER:

9    Q.    Thanks for being here.  I know you'd rather do

10   anything else on a Thursday afternoon than talk about

11   this case, more so.  I know everyone here appreciates

12   you.  I did have some follow-up questions for you.  And

13   I wanted to start on -- start with talking about Mr.

14   Jerry Lyons and the communications you had with him.

15   A.    Okay.

16   Q.    I think -- well, how many times did you say

17   you spoke with Mr. Lyons?

18   A.    He called me.  He came to my home once and

19   then he was present in Attorney Fryer's office when we

20   executed my affidavit.  So those are the only three

21   times I recall speaking to him.

22   Q.    How would you describe his demeanor?

23   A.    He's super nice.  He's super friendly.

24   Q.    Not an intimidating guy?

25   A.    No, I don't -- not to me at all.  No.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    No -- never harassed you or anything?

2      A.    No.

3      Q.    Did you ever feel like he -- it was his goal

4  to get you to recant your testimony?

5      A.    Never.

6      Q.    And you mentioned he was in the office with

7  Fryer when you signed the affidavit; is that correct?

8      A.    Correct.

9      Q.    Who prepared the affidavit?

10     A.    Ms. Fryer's associate attorney.  I can't think

11 of her name.

12     Q.    You read it over before you signed it?

13     A.    In fact, I actually edited it myself a little

14 bit while I was there, and yes.

15     Q.    Other than the attorneys you've retained to

16 represent you here today, have you talked with anyone

17 about your testimony here today?

18     A.    My boyfriend at the time.  That would be it.

19     Q.    Have you talked -- have you talked with Ms.

20 Dillon at all about your testimony today?

21     A.    No.  This is the first time I think I've

22 spoken to her and met her.

23     Q.    Have you talked with anyone from her office

24 about your deposition testimony today?

25     A.    No.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   And without going into any discussions you've

2  had with your attorney, has anyone coached you on how to

3  respond to questions today?

4      A.   No.

5      Q.   Did you witness the burglary at Mr. Gonzalez's

6  house?

7      A.   No.  I just would say I witnessed the getaway.

8      Q.   Could you see and you live in a different

9  place than the location we discussed earlier, correct,

10 today?

11     A.   Correct.

12     Q.   From that old house, the 1716 Lafayette Court,

13 could you see where Mr. Gonzalez lived?

14     A.   No, I -- no.  I mean, I could see the

15 apartment complex on the other side of the fence, but if

16 you're asking me which -- if I knew where his apartment

17 was or anything like that, no.

18     Q.   So again, really, you didn't see any of the --

19 Mr. Gonzalez coming home and the --

20     A.   No.

21     Q.   -- the pursuit after that on the day of the

22 incident?

23     A.   No.

24     Q.   You didn't see how he got into a scuffle with

25 a couple of individuals in his apartment?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     A.   I don't even -- I don't even know those

2 details, so no.

3     Q.   But you do know that Mr. Gonzalez has been --

4 always been pretty confident, 100 percent confident with

5 his identification of Mr. Valle-Ramos?

6          MS. DILLON:  Objection.  Form.  Foundation.

7          You can answer.

8          THE WITNESS:  I -- I mean, I would say no

9     because I haven't spoken to him since the day of the

10    original trial.  So I don't know what he said or not

11    said.  I do know that when Mr. Lyons was at my

12    house, he told me that they had tried to contact Mr.

13    Gonzalez and he had declined to speak to them.  And

14    he said that he had -- something like he had blocked

15    everything out. That's all I remember.  And that was

16    something that Mr. Lyons told me, not -- I didn't

17    get that information myself.

18          BY MR. MISTOLER:

19    Q.   You don't know if, after that conversation

20 with Mr. Lyons, they were -- Lyons was able to get in

21 contact with Gonzalez?

22    A.   No.  No clue.

23    Q.   Would it surprise you if you were to know that

24 at no point has Mr. Gonzalez ever wavered from his

25 identification of Mr. Valle-Ramos?


MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1            MS. DILLON:  Objection.  Form.

2            You can answer.

3            THE WITNESS:  Would it surprise me?

4            BY MR. MISTOLER:

5      Q.   Yeah, that he's never wavered on his

6  identification of Valle-Ramos?

7      A.   No, it wouldn't surprise me because they look

8  similar, so.

9      Q.   On that day, really, you saw maybe one or a

10 few individuals coming and getting into a car that was

11 near where your apartment condo house was, correct?

12     A.   Yes.  The car I believe was parked right

13 behind my carport, so yeah.

14     Q.   Is it possible that Mr. Gonzalez saw an

15 individual that day that you did not see get into that

16 car?

17           MS. DILLON:  Objection.  Form.  Foundation.

18           You can answer.

19           THE WITNESS:  Sure.  I -- yeah, I suppose

20     that's possible.

21           BY MR. MISTOLER:

22     Q.   Are you 100 percent certain that the

23 individual, and I understand your testimony today, but

24 the individuals who got into the car near your house,

25 right in front of your house, as you've previously



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  described it, are you confident that those were all the

2  individuals involved at the burglary of Mr. Gonzalez'

3  house?

4          MS. DILLON:  Objection.  Form.  Calls for

5      speculation.

6          Go ahead.

7          THE WITNESS:  No.  All I -- I didn't witness

8      the actual burglary.  I just witnessed three

9      individuals on a getaway and one was wearing blue

10      latex gloves and holding something, which told me

11      that -- you know, when people are running like that,

12      they obviously weren't doing something great.

13          BY MR. MISTOLER:

14      Q.   How many individuals were involved in the

15  burglary of Mr. Gonzalez' house and any other burglaries

16  in the area that morning?

17      A.   I have no idea.  I don't know because I don't

18  burglarize houses, so I wasn't hanging out with them.

19      Q.   Did any of them have a -- like a jersey, a

20  basketball jersey or maybe a shirt with cutoff sleeves

21  that you can recall?

22      A.   I don't recall.  What I recall is when they

23  were driving away, the driver, he had really long

24  eyelashes.  I'll never forget Mr. Amos's eyelashes.  And

25  when I saw him, I knew it was him because I like



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 eyelashes, so.

2    Q.   But again, you're not certain if, in that

3 moment, that was Mr. Amos?

4    A.   What I'm certain of is when Mr. Lyons showed

5 me the picture of Amos, it confirmed what I had known

6 for years, and suspected, was that I had misidentified

7 somebody who looked similar, very similar to Amos.  But

8 I was pretty confident that that probably wasn't the

9 guy, but because he looked so similar, I doubted my own

10 memory and other people had identified him as well,

11 which I had been told.  And so I tried to just reassure

12 myself that I was doing the right thing, but Mr. Valle-

13 Ramos has darker skin and shorter eyelashes than what I

14 saw that day.

15    Q.   And again, you know, we talk about people

16 identifying this individual.  Are you 100 percent

17 certain that you and Mr. Gonzalez are in fact talking

18 about the same person, even?

19    A.   No.

20       MS. DILLON:  Objection.  Form.

21       Go ahead.

22       THE WITNESS:  No, I have no idea who he saw

23    that day.  I just know who I saw that day.

24       BY MR. MISTOLER:

25    Q.   Oops.  Let me see.  I hope I'm sharing this.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  Can you see your affidavit here?

2      A.   Yes, sir.

3      Q.   So in Line 2, it says, "I am now recanting my

4  testimony, identifying Jorge R.  Valle-Ramos as the

5  individual who entered the driver's side of the getaway

6  vehicle"; is that correct?

7      A.   Yes, that's correct.

8      Q.   And in Line 8, it says, "I no longer identify

9  Jorge R. Valle-Ramos as the individual who entered the

10  driver's side of the getaway vehicle," correct?

11     A.   Correct.

12     Q.   But that's really all you are recanting is

13  that the individual who's the driver was, according to

14  you, not Valle-Ramos, correct?

15     A.   Correct.

16     Q.   This isn't a statement that Valle-Ramos could

17  have been involved in the burglary, correct?

18     A.   Correct.

19     Q.   Because you didn't see the burglary, correct?

20     A.   Correct.

21     Q.   You talk about skin tone also at points.

22  Individuals can become more tan or less tan; is that

23  correct?

24     A.   Sure.  Yes.

25     Q.   Do you recall if those individuals had any



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  items on them when they were in the car or the -- or the

2  one individual got into the car?

3      A.   I remember the driver had blue latex gloves

4  and he was carrying something, probably car keys, but I

5  -- it was small.  He was holding something in his hand.

6      Q.   Did any of them have backpacks?

7      A.   I don't recall.

8      Q.   Why didn't you talk a little bit -- why didn't

9  you speak up -- strike that.

10         Why didn't you speak up sooner if you had

11  these doubts about identification?

12         MS. DILLON:  Objection.  Form.

13         You can answer.

14         THE WITNESS:  Elaborate on sooner?

15          BY MR. MISTOLER:

16      Q.   Well, I mean, there's a period of, I think,

17  seven years in between the criminal trial when you

18  identify Valle-Ramos in the courtroom and when you

19  signed the affidavit here, recanting your testimony.  So

20  with that context, why did you not bring forth your

21  doubt sooner?

22      A.   To who?

23         MS. DILLON:  Same objection.

24         You can answer

25         THE WITNESS:  To who?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          BY MR. MISTOLER:

2     Q.   Anyone involved in the case on the day or even

3  on the day to speak up sooner.  Why -- just what was

4  your thought process there?

5     A.   My thought process was that I felt confident I

6  had done the right thing and I was just trying to move

7  on.

8     Q.   I think you also testified and, you know,

9  perhaps rightfully so, that you were nervous on that

10 day, right?

11    A.   Sure.  Yes.

12    Q.   Probably you would agree that it's natural for

13 anyone to feel nervous in a situation like you were in

14 where you were a witness called to identify someone and

15 possibly send that individual to jail; would you agree?

16    A.   I would agree I was a little hard on myself,

17 but you're probably right.

18    Q.   And you would agree that it's a serious

19 situation to identify someone as you did, to possibly

20 send them to jail, correct?

21         MS. DILLON:  Objection.  Form.

22         You can answer.

23         THE WITNESS:  Prison, actually, and yes.

24          BY MR. MISTOLER:

25    Q.   Thank you for the correction.  Would you feel,


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  and to use your words earlier, shitty just if you had to

2  send anyone to prison in a similar fashion?

3           MS. DILLON:  Objection.  Form.

4           You can answer.

5           THE WITNESS:  No, not if they did it, no.

6           BY MR. MISTOLER:

7     Q.   Did anyone force you to provide the testimony

8  identifying Valle-Ramos that -- in the criminal trial?

9           MS. DILLON:  Objection.  Form.  Foundation.

10          You can answer.

11          THE WITNESS:  Did anyone force me?  No, but I

12     definitely did not feel like I had a choice at that

13     point.  I was subpoenaed, so I -- I was forced by

14     law. My -- my testimony was mandated.

15          BY MR. MISTOLER:

16     Q.   Do you agree you could have not performed the

17  identification in that moment in the criminal trial?

18          MS. DILLON:  Objection.  Form.

19          Go ahead.

20          THE WITNESS:  Sure.  Yeah.  I -- no, I -- I

21     wasn't forced when I was giving testimony to

22     identify anyone in particular.  No.

23          BY MR. MISTOLER:

24     Q.   When you talked about Stanley introducing you

25  to Mr. Gonzalez outside the courtroom, did you feel like

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  there was a vendetta there?

2      A.   No.

3          MS. DILLON:  Objection.  Foundation.

4          Go ahead.

5          BY MR. MISTOLER:

6      Q.   Was it perhaps simply just a friendly

7  interaction?

8      A.   It was.

9      Q.   No one was trying to coach you in that moment

10  of how to testify, correct?

11     A.   No.

12         MS. DILLON:  Objection.  Foundation.

13         Go ahead.

14         THE WITNESS:  No.

15         BY MR. MISTOLER:

16     Q.   And really, prior to that moment, no one from

17  Orlando Police Department or Stanley had coerced you or

18  coached you into giving that testimony?

19         MS. DILLON:  Objection.  Form.  Foundation.

20         Go ahead.

21         THE WITNESS:  No.  Detective Stanley always

22     behaved professionally.  I never felt that he was

23     ever trying to force or coerce me ever into

24     anything.

25         BY MR. MISTOLER:



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.   And lastly, you do agree that it is possible

2  that Mr. Gonzalez saw an individual that you did not see

3  on the day of the burglary?

4     A.   Sure.  It's entirely possible that he did.

5     Q.   Did Mr. Gonzalez, to your knowledge, ever

6  indicate that the driver of the car that you saw was in

7  fact Mr. Valle-Ramos, to your knowledge?

8     A.   Can you say that again?

9     Q.   Sure.

10    A.   Because I only had one -- that one interaction

11 with him, so --

12    Q.   So it -- to the best of your knowledge, has

13 Mr. Gonzalez ever indicated that Jorge Valle-Ramos, the

14 individual he believed burgled his home, was the driver

15 of the car that you saw in the getaway car on that day?

16    A.   No, because we never -- when I talked to him,

17 he just ranted.  So he never asked me about my testimony

18 or what I even saw.

19    Q.   And again, it's possible that you both saw a

20 different individual that day?

21        MS. DILLON:  Objection.  Asked and answered.

22        Go ahead.

23        THE WITNESS:  Yes, it's possible.

24        BY MR. MISTOLER:

25    Q.   When you were working for Siemens, what time

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  of day would you normally wake up?

2      A.   7:00, 7:30, 7:15.

3      Q.   I mean, it always takes me a little bit of

4  time to get going in the morning.  Like, what time would

5  you say you're fully awake and alert?

6      A.   10:00 a.m.

7      Q.   10:00 a.m.?

8      A.   I'm not a morning person, so.

9      Q.   Sharing your statement from the date of

10 incident, and you saw this earlier, Counsel pointed this

11 out to you, but the time of the offense, that reads 8:00

12 here, would you agree?

13     A.   Yes.  It was probably an estimate, but that

14 would've been around the time.

15     Q.   And the time you gave the statement was at

16 8:40 a.m., correct?

17     A.   Correct.  According -- yes.

18     Q.   And so according to you, really, you're not

19 fully alert and awake until 10:00 a.m., correct?

20     A.   I'm just not a morning person.  So I mean, I

21 drink coffee all morning, but when you walk out and you

22 see something like that, you wake up pretty quickly.

23     Q.   Okay.  Let me just look over my notes and I --

24 I'm going to wrap up here.  I'm just going to mute

25 myself and hang out here.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Okay.

2           MR. MISTOLER:  I won't be long.  I don't think

3      I have any more questions for you, ma'am.  I

4      appreciate you very much.

5           THE WITNESS:  Okay.

6                    REDIRECT EXAMINATION

7           BY MS. DILLON:

8      Q.   Based on that, I have one follow-up question.

9   Ms. Szewczyk, did you trust Detective Michael Stanley?

10          MR. MISTOLER:  Objection.

11          THE WITNESS:  No, I didn't know him, so I mean,

12     I trusted him to do his job.

13          BY MS. DILLON:

14     Q.   Okay.  You didn't know him, so you didn't

15  personally trust him, but you trusted that he would do

16  his job?

17     A.   Correct.  Personal trust, professional trust,

18  those are two different things, so.

19     Q.   Okay.  So professionally, you trusted --

20     A.   Yes.

21     Q.   -- detective Stanley?  Okay.

22          MS. DILLON:  That's all I have.

23          MR. MISTOLER:  Thank you, ma'am.

24          THE REPORTER:  All right.  Would you like to

25     read or waive, ma'am?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          THE WITNESS:  Are you talking to me?

2          THE REPORTER:  Yes.

3          THE WITNESS:  Do I need to what?

4          THE REPORTER:  Read or waive the transcript?

5          THE WITNESS:  Oh, I'll waive.  I don't need it.

6          THE REPORTER:  Okay.  And any orders at this

7     time, counsels?

8          MS. DILLON:  Not at this time from Plaintiff.

9          MR. MISTOLER:  No, thank you.

10          THE WITNESS:  Eric, do you need a transcript,

11     my attorney?

12          MR. SORICE:  We do not.

13          THE WITNESS:  Okay.

14          THE REPORTER:  Okay.  All right.  Give me one

15     moment to get us off record.

16          (Deposition concluded at 3:03 p.m. ET)

17

18

19

20

21

22

23

24

25


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1                    CERTIFICATE OF OATH

2

3

4

5

6     I, the undersigned, certify that the witness in the

7  foregoing transcript personally appeared before me and

8  was duly sworn.

9

10  Identification:  Produced Identification

11

12

13

14

15     _____

16        SHEYLA MENDOZA

17        Court Reporter, Notary Public

18        Commission Expires: 12/07/2027

19        Commission Number: HH471346

20

21

22

23

24

25



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1                C E R T I F I C A T E

2

3

4

5

6       I, SHEYLA MENDOZA, Court Reporter and Notary Public

7   for the State of Florida at Large, do hereby certify

8   that I was authorized to and did report the foregoing

9   proceeding, and that said transcript is a true record of

10  the said proceeding.

11

12      I FURTHER CERTIFY that I am not of counsel for,

13  related to, or employed by any of the parties or

14  attorneys involved herein, nor am I financially

15  interested in said action.

16

17  Submitted on: November 18, 2025.

18

19

20

21

22  _____

23          SHEYLA MENDOZA

24          Court Reporter, Notary Public

25



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

# ORLANDO POLICE DEPARTMENT

Case #: 2013-146382

## Statement

Please fill out in full detail

| Date of Statement: | Month: 04 | Day: 09 | Year: 2013 | Time: 8:40A |
|---|---|---|---|---|
| Offense: | R&S Burglary | | | |
| Date of Offense: | Month: 04 | Day: 09 | Year: 2013 | Time: 0800 |

Suspect (last, first, middle): UNK

Location of Offense: 1625 Little Falls Cir.          District: 1(-2)

| Person Code: | Name (last, first, middle): SZEWCZYK, BETHANY C. | | Age: | DOB: 08-18-82 | Race: W | Sex: F |
|---|---|---|---|---|---|---|
| W | Address Residence: 1716 LAFAYETTE CT  ORLANDO, FL | | | Zip: 52807 | Phone: (315) 416-1246 | |
| | Address Business: 3501 QUADRANGLE BLVD, SUITE 175 ORLANDO, FL. | | | Zip: 32817 | Phone: (407) 736-1418 | |
| | Email Address: BETHANYXS@MAC.COM | | | | | |

Type of ID shown: FL DL          ID# if applicable: 5220-063-82-798-0

I, Bethany Szewczyk, do hereby voluntarily make the following statement without threat, coercion, offer of benefit, or favor by any persons whomsoever.

On April 9th at approx. 8:10AM, I left my unit # at 1716 Lafayette Court to witness 3 young hispanic males rushing to get in their vehicle. The driver was wearing blue intel shorts. They were all dark hair with dark eyes and almost appeared to be brothers. The car was a newer model Toyota, gray in color and had 4 doors. There was a blank white license plate on the front. The car was clean. They fell were shorter - no taller than 5'9" or 5'10" and appeared very young. 16-20 year old. They had a very small build. I could not see which direction they went when they left.

Sworn to and subscribed before me, this 9th day of APRIL 2013

ofc. Alexander R. Roa / 091/160

Notary Public ☐   Law Enforcement Officer ☑   Name Key: 5264
Personally Known ☐   Produced Identification ☐   Type:

I swear/affirm the above and/or attached statements are correct and true.

Signature: [signature]

My signature below means that I refuse to prosecute the person(s) named above for the alleged crime(s) that occurred to me or to the property under my control.

Signature _____ Date _____
[Departmental policy prohibits use of this section in domestic violence cases.]

Victim Rights Booklet provided?   Yes ☐   No ☑
I will testify in court and prosecute criminally.   Initials:
Miranda Warning Read?   Yes ☐   No ☑         Page 1 of 1

1113.9   6/7/11          White: State Attorney          Yellow: Records

EXHIBIT 15

P000002

# Photo Line-up Administration and Witness Instructions

Case Number: __2013-146382__  Date/Time: __9/4/13  1000__

Witness Name: __SZEWCZYK, BETHANY__ Administrator Name/ID: __STANLEY  #14767__

Line-up Number: __02184__  Line-up reviewed by: __STANLEY  #14767__

Prior to presenting the photo line-up, the witness provided a written/audio recorded statement describing the suspect of this criminal investigation.

_MDS_
Administrator's Initials

Prior to presenting the photo line-up I read "verbatim" the witness instructions to the witness. The witness indicated he/she understood the instructions.

_MDS_
Administrator's Initials

## PHOTO LINE-UP INSTRUCTIONS TO THE WITNESS:

"It is just as important to clear innocent persons from suspicion as it is to identify guilty parties. Regardless of whether you make an identification, we will continue to investigate this incident. With that in mind, I am going to show you six photos arranged so they may be simultaneously viewed. This group of photos may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards, and moustaches may easily be changed. The photos may not always depict the true complexion of a person – it may be lighter or darker than shown in the photo. Pay no attention to the order of the photos or markings and/or numbers that may appear on the photos, or to any differences in the type or style of photographs. Take your time; when you have looked at all the photos, tell me whether or not you see the person who committed the crime. If you do identify someone, you will circle and initial that person on the line-up. Please remember this is an on-going investigation, you are not permitted to discuss this identification procedure with anyone other than law enforcement or legal counsel."

I understand the photo line-up instructions and have been provided a copy of this form.

_BS_
Witness's Initials

After the photo lineup, the witness provided a written statement or an audio recorded statement describing his/her identification or non-identification.

_MDS_
Administrator's Initials

_This form is to be filed in the case package. If the witness refuses to provide a sworn statement, indicate so in the incident report._

OPD P&P 1636.0 B Rev. 10/25/11    Original: State Attorney    Yellow: Records    Pink: Witness

**Exhibit H 1**

P000529

EXHIBIT
16

# WITNESS PHOTO DISPLAY IDENTIFICATION FORM

## ORLANDO POLICE DEPARTMENT

PHOTO LINEUP # __22184__

| | | |
|---|---|---|
| UPPER LEFT 1 | UPPER CENTER 2 | UPPER RIGHT 3 |
| LOWER LEFT 4 | LOWER CENTER 5 | LOWER RIGHT 6 |

If you have previously seen one or more of the persons shown in the photos displayed, place an "X" in the box corresponding to the photograph of the person in the lineup.

_The person in Box #2_ _____ was seen by me (state circumstances)
_early morning as he was getting into vehicle with blue_
_latex gloves on and speeding away - also with 2 other_
_incident took place at Hidden Creek Apartments & I saw him also_
_exited._

I swear or affirm that the aforementioned is true and correct to the best of my knowledge.

Sworn to and subscribed before me

__MICHAEL D. STANLEY__
this __4th__ day of __SEPT__, __13__.

__[signature]__ (4767)
Notary Public
or
Law Enforcement Officer
Conducting Official Investigation

__[signature] Bethany Guzzle__
Signature of Witness

__1716 LAFAYETTE CT.__
Witness' Street Address

__ORLANDO, FL 32807__
City, State, Zip Code

__315-416-1246__
Witness' Telephone Number(s)

__9/4/13    1000__
Time and Date of Witness' Signature

**Exhibit H 2**

P000530

# Orlando Police Department





**Lineup Identifier:**

**Printed Orlando PD:** 8/26/2013 15:0

# Orlando Police Department





**1**



**2**



**3**



**4**



**5**



**6**

Lineup Identifier:
Printed Orlando PD:  7/24/124 9:32

EXHIBIT

17

**P001413**

use of diligence"; and (2) is "of such nature that it would probably produce an acquittal on retrial." *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (citations and quotations omitted). "To reach this conclusion the trial court is required to consider all newly discovered evidence which would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." *Id.*

The newly discovered evidence here concerns a sworn affidavit executed by Ms. Szewczyk. *See* Bethany Szewczyk Aff. 1, Dec. 1, 2021 ("Exhibit A"). Ms. Szewczyk's affidavit arose from the discovery of an individual named Amos Matthew Ortiz. Mr. Valle-Ramos and Mr. Ortiz bear a striking resemblance to one another. *See* Figure 1; *see also* Exhibit B.[1] Mr. Ortiz also has an afro-style haircut in his driver's license photograph. *See* Figure 1.



*Figure 1: Amos Matthew Ortiz (left), Jorge R. Valle-Ramos (right)*

Approximately two weeks before the burglary, Mr. Ortiz was for possession and purchase of cannabis at Lake Underhill Park—approximately 2.2 miles from Mr. Gonzalez's home. *See*

---

[1] Exhibit B consists of a composite of Mr. Ortiz's and Mr. Valle-Ramos' respective driver's license photograph.

EXHIBIT
4

P000454

Affidavit of Bethany Szewczyk
Regarding Case No. 1998-CF-000242 Valle-Ramos, Jorge R.

1. I, Bethany Szewczyk, testified at trial as a witness for the State of Florida in case number 1998-CF-000242.
2. I am now recanting my testimony identifying Jorge R. Valle-Ramos as the individual who entered the driver's side of the getaway vehicle.
3. I selected Mr. Valle-Ramos' photograph because he was the only individual in the photographic lineup with an afro-style haircut.
4. During the photographic line up identification process, Detective Michael Stanley told me that the homeowner, Mr. George Gonzalez had confidently identified Mr. Valle-Ramos as the individual who burglarized his home.
5. If I had been presented with a photographic lineup that included Amos Matthew Ortiz, I would have identified Mr. Ortiz as the individual who entered the driver's side of the getaway vehicle.
6. When I arrived in court for trial, I observed that Mr. Valle -Ramos had darker skin than the individual who entered the driver's side of the getaway vehicle.
7. During trial, after the victim Mr. George Gonzalez testified but before I testified, Detective Michael Stanley introduced me to, George Gonzalez. Mr. Gonzalez then told me that he was certain that Mr. Valle-Ramos was one of the burglars before my testimony.
8. I no longer identify Jorge R. Valle-Ramos as the individual who entered the driver's side of the getaway vehicle.

Under penalty of perjury, I swear or affirm that the above statements are true and correct.

December 1, 2021

Affiant: Bethany Szewczyk

WITNESS my hand and official seal in the State of Florida and County of Seminole.

NOTARY PUBLIC

TRINAISE L. MADDOX-SUDDITH
MY COMMISSION # GG 962071
EXPIRES: February 25, 2024
Bonded Thru Notary Public Underwriters

EXHIBIT
18

**Exhibit A 1**

P000473

**ORIGINAL**

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CASE NO.: 6:24-CV-1276

JORGE VALLE-RAMOS

V.

CITY OF ORLANDO, MICHAEL

STANLEY, AND UNKNOWN OFFICERS

DEPONENT:

JORGE VALLE-RAMOS

DATE:

MARCH 6, 2025

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1   UNITED STATES DISTRICT COURT

2   MIDDLE DISTRICT OF FLORIDA

3   ORLANDO DIVISION

4   CASE NO.: 6:24-CV-1276

5

6   JORGE VALLE-RAMOS,

7   Plaintiff

8

9   V.

10

11  CITY OF ORLANDO, MICHAEL

12  STANLEY, AND UNKNOWN OFFICERS,

13  Defendants

14

15

16

17

18

19

20

21

22

23  DEPONENT:  JORGE VALLE-RAMOS

24  DATE:     MARCH 6, 2025

25  REPORTER:  LYNSI HERGERT

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1          APPEARANCES

2

3   ON BEHALF OF THE PLAINTIFF, JORGE VALLE-RAMOS:

4   Roz Dillion, Esquire

5   Loevy and Loevy

6   311 North Aberdeen Street

7   Suite 3

8   Chicago, Illinois 60607

9   Telephone No.: (312) 243-5900

10  E-mail: dillion@loevy.com

11

12  ON BEHALF OF THE DEFENDANTS, CITY OF ORLANDO, MICHAEL

13  STANLEY, AND UNKNOWN OFFICERS:

14  Stephen Mistoler, Esquire

15  O'Connor, Haftel & Angell, PLLC

16  800 North Magnolia Avenue

17  Suite 1350

18  Orlando, Florida 32803

19  Telephone No.: (407) 843-2100

20  E-mail: smistoler@ohalaw.com

21

22

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1             INDEX

2                       Page

3  PROCEEDINGS                        5

4  DIRECT EXAMINATION BY MR. MISTOLER          6

5  CROSS-EXAMINATION BY MS. DILLON        168

6

7             EXHIBITS

8  Exhibit                 Page

9  1 - Criminal Information Bulletin, Dated

10    April 15, 2013              104

11  2 - Orlando Police Department Lineup

12    Identifier              125

13  3 - Google Maps Screenshot           134

14

15

16

17

18

19

20

21

22

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1          STIPULATION

2

3   The deposition of JORGE VALLE-RAMOS was taken at

4   O'CONNOR, HAFTEL AND ANGELL, 800 NORTH ORANGE AVENUE,

5   SUITE 1350, ORLANDO, FLORIDA 32801 on THURSDAY the 6th

6   day of MARCH 2025 at 1:19 p.m. (ET); said deposition was

7   taken pursuant to the Federal Rules of Civil Procedure.

8   It is agreed that LYNSI HERGERT, being a Notary Public

9   and Court Reporter for the State of FLORIDA, may swear

10   the witness and that the reading and signing of the

11   completed transcript by the witness is not waived.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      PROCEEDINGS

2      THE REPORTER:  We are now on record.  Will all

3   parties, except for the witness, please state your

4   appearance, how you are attending, and your

5   location?

6      MS. DILLON:  Roz Dillon for Plaintiff Jorge

7   Valle-Ramos.  I'm appearing in person.

8      MR. MISTOLER:  Stephen Mistoler on behalf of

9   Defendants, also appearing in person at our office

10   at O'Connor, Haftel & Angell.

11      THE REPORTER:  Thank you. Mr. Ramos, will you

12   please state your full name for the record?

13      MR. RAMOS:  Jorge Valle-Ramos.

14      THE REPORTER:  Thank you.  You did verify your

15   ID off record with your Florida driver's license.

16      Do you all parties agree that the witness is,

17   in fact, Jorge Ramos?

18      MR. MISTOLER:  Yes.

19      MS. DILLON:  I do.

20      THE REPORTER:  Perfect.

21      Mr. Ramos, if you'll raise your right hand to

22   be sworn in?  Do you solemnly swear or affirm that

23   the testimony you're about to give will be the

24   truth, the whole truth, and nothing but the truth?

25      THE WITNESS:  Yes.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1        THE REPORTER:  Thank you.

2        Counsel, you may begin.

3            DIRECT EXAMINATION

4    BY MR. MISTOLER:

5        Q.  First off, thanks so much for being here.  My

6    name's Stephen Mistoler.  I know you have a fantastic

7    attorney, and she's prepared you today, so I'm not going

8    to go into so many of the, you know, details of this.

9    Really, today is my opportunity to talk with you, so

10   again, thanks for coming.  I know you'd rather do

11   anything else on a -- like we were saying, a nice day

12   like this, so I appreciate you showing up.

13       A.  Appreciate that.

14       Q.  I have -- you know, I have a little outline

15   I'm going to kind of look through, maybe use it as a

16   template, but I just want to get to know you and kind of

17   your story over, you know, maybe the afternoon and take

18   it from there.

19       A.  Okay.

20       Q.  So I'm going to start at the beginning, at the

21   -- what -- when were you born?

22       A.  April 21, 1993.

23       Q.  Right on.  Where were you born?

24       A.  Puerto Rico, San Juan.

25       Q.  San Juan.  When did you come to the United --

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  well, come to Florida?

2    A.  I moved here in the 3rd grade.  I was, like, 9

3  years old, so that's, like, 2022.  Sounds about right.

4    Q.  Do you remember anything growing up in San

5  Juan?

6    A.  Just a small memory of my elementary school

7  and living in a high-rise with my mom on the ninth

8  floor. And that's about it.

9    Q.  Was it your mom -- you lived with your mom

10  there?

11    A.  Yeah.  It was just -- she was a single mom,

12  and then she met my stepdad, and she got pregnant with

13  my little sister, and that's when we moved to Florida.

14    Q.  Okay.  I'm -- you know, I may ask some

15  questions this afternoon -- I'm not trying to upset you

16  or anything.

17    A.  Uh-huh.

18    Q.  Like I said, I'm just trying to understand who

19  Jorge Valle-Ramos is.

20    A.  Yeah.

21    Q.  Do you -- did you know your biological father?

22    A.  I've never met him.

23    Q.  Never met him.

24    A.  And we have the same name.

25    Q.  Growing up with your mom -- you said she got

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1   remarried at some point?  Or --

2       A.  Uh-huh.

3       Q.  Well, was she married to begin with?

4       A.  Yeah, she was married to my father.  They got

5   a divorce not long after I was born, and yeah, she

6   remarried my stepfather when I was, like, 9, 10.

7       Q.  Do you know what your biological father is

8   doing today?

9       A.  No.

10      Q.  No.  Do you know why he -- why your mom got

11  divorced to him?

12      A.  Not really.  No.

13      Q.  She didn't talk about that, really?

14      A.  She didn't talk about it.  I didn't ask about

15  it much.

16      Q.  Okay.

17      A.  I -- I had my stepdad as a father-figure, so I

18  didn't really feel like I was missing --

19      Q.  Okay.

20      A.  -- a father, you know, so that kind of made up

21  for that.

22      Q.  Sure.  Any grandparents in the area --

23      A.  No.

24      Q.  -- or in Puerto Rico, I guess?

25      A.  Yeah.  I have a grandma out there in Puerto

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1    Rico.

2        Q.   How often would you see your grandmother

3    growing up when you were living there?

4        A.   Well, growing up in Puerto Rico, she used to

5    babysit me all the time.  I know that.  Throughout the

6    years of us living over here, she would come live with

7    us maybe for like a year or two, go back.  Then she

8    would come again, back and forth.  She always missed

9    home, so she always wanted to go back.

10       Q.   Okay.  Any grandfather?

11       A.   No.  My grandfather passed away in a fire

12   before I was born, so I never really met him.

13       Q.   In Puerto Rico, what did your mother do for

14   work?

15       A.   I -- I'm pretty sure she was, like, a hair

16   stylist or something like that.  I was young, so I don't

17   know much of what she was doing.  I know she had, like,

18   wigs around the house and stuff to practice, so I -- I

19   know she was involved with that.

20       Q.   My wife is from Colombia, and, like, her mom

21   has a salon in the garage.

22       A.   Yeah.  Yeah.

23       Q.   So I get.  Did she -- so would she go and work

24   at a salon or something or --

25       A.   I think for a while, she was -- like I said, I

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  was 9 years old, so I have, like, very little memory,

2  but yeah.  She would -- I remember her dyeing some

3  people's hairs at times.  She even dyed my hair at one

4  point.  Blonde.

5      Q.  In your -- was it an apartment?

6      A.  Yeah.

7      Q.  Okay.  Would clients come there to the

8  apartment?

9      A.  No.  Never saw no clients come in the

10 apartment or anything.

11     Q.  Did she go to, like, a salon or anything?

12     A.  Yes.

13     Q.  Or have a spot, a chair or something?

14     A.  Yeah.  I think -- I think she worked at a --

15 at a shop for a short period of time.  I remember, I

16 think. Yeah.

17     Q.  When she would be working, what would you be

18 doing?

19     A.  My aunt and my grandma would babysit me.

20 Uh-huh.

21     Q.  Okay.  What -- what's your mom's name?

22     A.  Lourdes Rios.

23     Q.  How about your grandmother?

24     A.  Her name is Carmen Ramos.

25     Q.  And --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.  And we call her Lola.  Uh-huh.

2    Q.  Lola?  Okay.  And the (speaking Spanish), the

3  aunt, you said?

4    A.  Her name is Carmen, as well.

5    Q.  Carmen.  Okay.  Your mother -- that's your

6  mother's sister?

7    A.  Uh-huh.

8      THE REPORTER:  Is that a yes?

9      THE WITNESS:  Yes.  Is that --

10  BY MR. MISTOLER:

11    Q.  And that's a good point.  If you do say uh-huh

12  --

13    A.  Got you.  Got you.

14    Q.  I know your attorney has instructed you.

15    A.  Yes.

16    Q.  It's just easier for the court reporter here.

17  Can you recall any friends growing up in San Juan?

18    A.  No.  Just cousins and family.

19    Q.  Okay.  What -- did you have, like, cousins

20  come over to the house and stuff or --

21    A.  Yeah.  I usually just went over to their

22  house.

23    Q.  Okay.

24    A.  Spend time with them.

25    Q.  And you said about 9 years old, you came to

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Florida, was it?

2     A.  Yes.

3     Q.  And have you kind of lived in Florida ever

4  since?

5     A.  Pretty much.  Yep.  I went to Massachusetts

6  for a few months when I was in the 10th grade, but that

7  was about it.  Came back.  We've been here since.

8     Q.  Okay.  I guess when you came to Florida, who

9  did you come with?

10    A.  My mom, my stepdad, and my sister.  Oh, my mom

11  was pregnant, so she was in -- my sister was in the

12  belly.

13    Q.  Okay.

14    A.  So -- but yeah, it was just us three.

15    Q.  What was the reason from moving from San Juan

16  to Florida?

17    A.  We had -- we had an uncle out here who we

18  doing pretty good for himself at the time.  Oh, I think

19  he was.  I think that's why we came.  We had an -- we --

20  we had an uncle out here, which was her only brother.

21  And once my mom got pregnant with my sister, she just

22  wanted to try to have better opportunities for us

23  growing up type of thing.  I think that's -- that's what

24  her mindset was.  So we -- yeah, we came out here.  We

25  had a uncle out here, her brother, and --

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   What did your uncle do for a living?

2    A.   He was a chef.  He was -- I don't know where

3  he worked.  He worked at a lot of different places, but

4  that was, like, his main -- that was his career.  He did

5  -- he did, like, catering events and worked at -- I know

6  he worked supposedly for the Celtics at one point when

7  he was in Boston.  I don't -- I wasn't there, so I don't

8  know.  But I just heard that through, like, family.  But

9  yeah, his -- he was a chef.  He did a lot of catering.

10    Q.   And he -- did he live in Massachusetts?

11    A.   Yeah.  So when we came out here, not -- not

12  many years later, he ended up moving to Massachusetts.

13  So then we were just -- it was just us here now.

14    Q.   Okay.  So he was initially here, but then he

15  --

16    A.   Yeah.  He was here.  Then we came, and then he

17  left.

18    Q.   Would you -- about how long was -- did he

19  leave before -- strike that.  Let me just say that

20  again. About how long did you live here before he left

21  for Massachusetts?

22    A.   I was -- it was very -- I don't -- I have very

23  little memory of him being here for that long.  So I

24  would say maybe like a year or two or three, something

25  like that.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    Q.   When you came here, did your mom continue to

2   be a hairdresser?

3    A.   No.

4    Q.   What did she do?

5    A.   She was working at Disney for a while, I

6   remember.  For the most part, though, she -- she was

7   unemployed through -- through the years because she

8   suffered an injury on her leg, and so she couldn't stand

9   up for long periods of time.  So then -- and then her

10  language barrier, too.  She didn't know much English.  So

11  between the injury and her language barrier, she didn't

12  work much throughout the year.  So she was just like a

13  stay-at-home mom for the most part.

14   Q.   What'd she do at Disney?

15   A.   I think she was doing, like, some housekeeping

16  stuff at the time.

17   Q.   Can you recall, like, when she would go to

18  work sometimes and you would you stay at home when she

19  was at work?

20   A.   Yeah.  I mean, I was going to school.  I don't

21  remember her working for long at all, to be honest.

22   Q.   How'd she injure her leg?

23   A.   She fell at Publix, and she had to get an

24  artificial artery, I think, on her leg, something like

25  that.  She had to get surgery.  Yeah.  She slipped and

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  fell.

2    Q.  About how long was that after you came to

3  Florida?

4    A.  Years after.  I was, like, 17 at the time when

5  that happened, so, like, eight years after we moved to

6  Florida.

7    Q.  What about your stepfather?  What did he do

8  for a living?

9    A.  He's done --

10    Q.  And I guess, let me qualify it at, like, about

11  that time.  You know, as you're -- you've moved here --

12    A.  Oh, okay.  I remember one of his first jobs

13  being, like -- like, a warehouse door installer, like

14  garage doors.  He used to install, like, a lot of garage

15  doors.  I know he was wearing -- working for a company

16  for a lot of years, and they were called American Roll

17  Up Doors.  So I remember -- I remember that.  He was

18  working installing garage doors.  Then he got into --

19  that's actually what he's doing now again.  I know he

20  got into some other stuff.  He was doing, like,

21  maintenance work at some apartments for a while.  But he

22  eventually ended up going back to his original trade,

23  which was installing garage doors.

24    Q.  Does he work for a company, or does he have

25  his own company?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.  Yeah, he works for a company.

2    Q.  What company is it?

3    A.  I can't recall to be honest because I know he

4  was working for DND Garage Doors, but that was, like,

5  two or three years ago.  So I -- I know he just changed

6  companies recently, like in the past couple years.  I

7  don't know what it is.  Can't remember.

8    Q.  What's his name?

9    A.  Braulio Rios.

10    Q.  Could you spell his first name?

11    A.  Yeah.  B-R-A-U-L-I-O.

12    Q.  Okay.  And --

13    A.  And R-I-O-S last name.

14    Q.  Thank you.  When was your sister born?

15    A.  20 -- yeah.  That same year we moved, so 2022.

16  She's -- we're in 2025.  She turns 22 this year.  2022.

17  She turns 23 this year.  She got old fast.

18    Q.  So like, what, I guess --

19    A.  March 8, 2022, I'm pretty sure.

20      MR. MISTOLER:  Is her birthday -- 28 --

21      MS. DILLON:  You mean 2002, maybe?

22  BY MR. MISTOLER:

23    Q.  2002?

24      THE WITNESS:  Oh, yeah.  That's -- sorry.

25      MS. DILLON:  No, it's okay.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1  BY MR. MISTOLER:

2     Q.  Not trying to trick you.  Say -- so say the

3  date again.

4     A.  Yeah.  2002.  2002.

5     Q.  What was the -- I'm sorry.  It was March?

6     A.  March 8th.  Yeah.

7     Q.  That's a couple of days.  You got to --

8     A.  Yeah.  Yep.

9     Q.  Don't forget.

10    A.  (Audio cuts out) -- her birthday dinner is on

11  Sunday.

12    Q.  Oh.  Where are you guys going?

13    A.  Actually, she wants to do brunch.  So I think

14  the diner to go get some brunch.

15    Q.  You just -- you've -- all this time, you keep

16  in contact with her?

17    A.  Yeah.  Yeah.  They -- they -- they're the only

18  family I got out here, so we try to, like, link up for

19  the holidays, and birthdays, and stuff.

20    Q.  What does she do for work, if she works?

21    A.  She works at -- she works for State Farm.  I'm

22  not sure if she's an insurance agent or works at the --

23  I'm not really sure what her position is.

24    Q.  What's your sister's name?

25    A.  Shayra Rios, S-H-A-Y-R-A.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.  When you came to Florida, you were enrolled in

2  school?

3    A.  Uh-huh.  Yes.

4    Q.  What school did you attend?

5    A.  Right away, I remember I went to McCoy

6  Elementary, 3rd, 4th, and 5th grade.

7    Q.  Where is McCoy Elementary?

8    A.  It's on Semoran Boulevard by the airport.

9    Q.  So really, your family moved to Orlando,

10  initially?

11    A.  Uh-huh.  Yes.

12    Q.  Okay.  So you attended McCoy Elementary 3rd,

13  4th, and 5th grade?

14    A.  Yes.

15    Q.  As you were there, what were your interests?

16  Did you participate in any extracurriculars or sports or

17  anything?

18    A.  Yeah.  Yeah.  Sports always been -- I was in a

19  Little League baseball at the time, I remember.  I did

20  Little League baseball for, like, two or three years,

21  maybe.  Always trying to race the kids from school and

22  trying to see who's the fastest.  Yeah.  That's --

23  sports -- we were always being outside and doing little

24  boy stuff.

25    Q.  Sure.  You would go to -- would you go to,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1 like, practice and stuff for baseball?

2   A.  No.  Yeah.  Baseball?  Yes.  I didn't get to

3 school sports.

4   Q.  Okay.

5   A.  That was, like, a separate Little League that

6 I had got into because I was playing baseball in Puerto

7 Rico, too.  I was playing T-ball and stuff.

8   Q.  Nice.  What position do you like?

9   A.  So I was -- they had me in the outfield.

10   Q.  Is that the fast runners?

11   A.  Yeah.  So I was playing in the outfield.

12 That's pretty much all I remember from that.

13   Q.  Okay.  When you would go to practice, how

14 would you get there?  Would your -- one of your parents

15 take you?

16   A.  Yeah.  Yeah, definitely.  My mom was always

17 the one there getting me back and forth from anywhere I

18 was going.  She was always involved.

19   Q.  When you were at McCoy, did you have any

20 friends, that you can remember?

21   A.  Yeah.  I had my best friend, Christopher.  He

22 -- we ended up growing up together, and we were -- been

23 friends for years.

24   Q.  What's Christopher's last name?

25   A.  Vargas.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Q.  What does he do for work?

2    A.  He's actually deceased.  Yeah.

3    Q.  How did he pass?

4    A.  He was found in his bed one morning.  We never

5  really got a response to what happened.  Apparently it

6  was some -- some type of overdose or -- but to be

7  honest, I don't know if that was it.  They just said

8  they found drugs in his systems, but we don't really

9  know what happened.

10    Q.  That's --

11    A.  I think it was just his heart stopped or

12  something.

13    Q.  I'm sorry to hear that.

14    A.  Yeah.

15    Q.  Did you know if, like, what -- Christopher

16  used drugs or anything?

17    A.  No.  Because he kind of got into that stuff

18  while I was incarcerated.  I didn't really see him ever

19  do that in front of me or do anything like that.  When I

20  got incarcerated, I'm not sure what he was going through

21  or who he was hanging out with.  I was gone for two

22  years.  And then when I got out, I was -- I was at my

23  mom's house in Ocala for two years, so we also spent

24  that time apart.  And by the time I moved back to

25  Orlando from the time I got arrested, it's been -- it

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1   was like a five-year gap.  And by the time I moved back,

2   I started, like, seeing him again.  When I first seen

3   him again, he was in a rehab center, and so I still

4   didn't see him behaving like that or anything.  So never

5   -- never got to see him at his worst.  You know what I'm

6   saying?  So I never really see him -- I never really saw

7   that part of him.

8        Q.   Did he visit you while you were incarcerated?

9        A.   No.  I was -- I was far away, and he had -- he

10  had a kid on the way and stuff like that.  And the only

11  people who visited me was my -- my girlfriend and my

12  mom.

13       Q.   I'll work into that definitely as we progress

14  here.  Let's see.  Well, at McCoy, did you have a

15  favorite subject?

16       A.   I was always good at math.  I always passed

17  the FCAT math with flying colors.  It was easy to me.

18  So I guess that would probably be my favorite class.

19       Q.   Can -- after you -- and you completed 3rd,

20  4th, and 5th grade?

21       A.   Yes, sir.

22       Q.   Where'd you go after McCoy?

23       A.   I went to Odyssey Middle School, and I went to

24  Dundee Middle School, and that was it.  Odyssey, 6th and

25  7th grade.  And I finished 8th grade at Dundee.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   Q.   So let's start with Odyssey.  Where is Odyssey

2   Middle?

3   A.   That's off of Lee Vista by the airport, also.

4   Q.   Okay.

5   A.   Close to the same area as McCoy.

6   Q.   Okay.  Kind of -- yeah.  Kind of close to

7   McCoy.  And then where is Dundee?

8   A.   It's out there, like, between Poinciana and

9   Haines City area, kind of out there.  I forgot what

10  county that was.  Yeah.  I forgot what county that is.

11   Q.   How were you as a -- as a student as you

12  transitioned to Odyssey Middle?

13      MS. DILLON:  Objection.  Form.

14      You can answer.

15      THE WITNESS:  Pretty normal.  I always passed

16  my classes with above-average grades.  You talking

17  about Odyssey Middle School?

18  BY MR. MISTOLER:

19   Q.   Yeah.  We -- we'll start with Odyssey.  Like,

20  would you consider yourself like an A, B, C student or

21  --

22   A.   Yeah, yeah.  I was definitely, like, a B

23  student.  I -- I never really had issues in school, no.

24   Q.   Did you stay in contact at that point with

25  your friend Christopher?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    A.  I -- yeah, not as much because we weren't in

2    the same school anymore, but yeah.  He -- he didn't live

3    far, so we would try to see each other once in a while,

4    and I -- I'll come over to his house, he'll come over to

5    my house stuff type of thing.

6    Q.  Did you make any new friends at Odyssey?

7    A.  I was always making new friends.  I was always

8    going to a new school.  Like, high school, I ended up

9    going to, like, five different schools.

10    Q.  Okay.

11    A.  So --

12    Q.  Can you recall any of the -- like, the friends

13    you made in Odyssey?

14    A.  I didn't make any long-term friends, to be

15    honest.  Nobody I talk to, to this day.  It was 6th and

16    7th grade, and then after that, I never -- didn't keep

17    much contact with those people.

18    Q.  Why'd you move to Dundee Middle?

19    A.  My mom -- we were living in apartments, and

20    then she was able to get a house out there.  And so just

21    a better opportunity for us.  She always wanted a home,

22    you know?

23    Q.  Kind of in a different district or something?

24    A.  Uh-huh.  Yeah.

25    Q.  Can you recall any, like, disciplinary actions

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   and stuff at Odyssey?

2      A.  No.

3      Q.  No, like, detentions, or suspensions, or

4   anything?

5      A.  No.

6      Q.  Okay.  And Dundee Middle, you were only there

7   for 8th grade, right?

8      A.  Yes, sir.

9      Q.  How were your grades at that point, too?

10     A.   They were good.  I never really had any issues

11  of in the verge of getting held back or anything. School

12  was pretty much, for the most part, easy to me. I think

13  the hard part was just kind of always ending up in a new

14  school.

15     Q.  I mean, the question -- it, you know, may seem

16  obvious to you, but why was it hard to transition to a

17  different school like that?

18     A.  You know, I was just always meeting new kids

19  and getting accustomed to different classes, different

20  teachers, different schedules and --

21     Q.  Did you find that --

22     A.  -- the different environments.

23     Q.  Sorry.  Did you find that difficult to

24  acclimate to?

25     A.  It got easy after a while.  I didn't mind it.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  I was always meeting new friends.  I was never really

2  the type to kind of, like, make long-term friends. Like,

3  I didn't want to -- like, it didn't really matter to me

4  to have to move, you know?

5      Q.   Were you still keeping up with, like, baseball

6  practice and stuff at that time?

7      A.   No.  I gave up baseball at that time.  And I

8  never -- was never the most athletic, so I couldn't make

9  the school team, so kind of just let that go.

10     Q.   At the end of your days when school would end,

11  can -- do you -- what would you do?  Would you go home,

12  or would you, like, hang out with friends or go to,

13  like, a sports practice or something?

14        MS. DILLON:  Objection.  Form.

15        You can answer.

16        THE WITNESS:  Those -- those days, I just

17  remember playing video games a lot, outside stuff.

18  Middle school, not really.  I was still kind of shy.

19  I mean, I -- recently, it took, what -- I didn't

20  learn English until, like, 4th, 5th grade, you know?

21  So my English was still a little choppy, so it was

22  kind of, like, tricky to make a lot of friends.  So

23  I -- I stuck to myself a lot.

24  BY MR. MISTOLER:

25     Q.   Would your mom pick you up and bring you home

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1   from school?

2       A.   Yeah.  We used to -- or I think I took the

3   school bus, yeah, for the most part.

4       Q.   At this time, about how old was your little

5   sister?

6       A.   Middle school?

7       Q.   Yeah.

8       A.   When I was in middle school?

9       Q.   Yeah.  When you were in middle school, how old

10  was she?

11      A.   Yeah.  So she was probably, like, 5.

12      Q.   Did you interact with her and --

13      A.   Yeah.

14      Q.   -- kind of have a brother-sister relationship?

15      A.   Yeah.  Yeah.  It was my only -- only sibling,

16  so we were -- it was a nine-year gap, and she was a

17  girl, so there wasn't much we could, you know, have in

18  common but --

19      Q.   And at this time, your stepfather is living

20  with you, also?

21      A.   Yeah.  He's been with us always.

22      Q.   And what was your relationship like with him

23  as you, you know, continued to live together, all of you

24  in the same household?

25      A.   It was pretty good.  I always respected him

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  for taking care of us so -- he was a very quiet person

2  who goes to church.  He's not the type of guy to raise

3  his voice a lot, you know, anything like that.  So I

4  always had respect for him.

5      Q.  Okay.  You mentioned video games.  What kind

6  of video games would you play?

7      A.  Yeah.  Just, like, basketball games, racing

8  games, stuff like that.  Sports games a lot.  That was a

9  big thing back in the day.

10     Q.  Did you follow any basketball teams, like the

11 Magic or anyone?

12     A.  Yeah.  Yeah.  I was -- grew up watching Tracy

13 McGrady and --

14     Q.  T-Mac.

15     A.  -- seen LeBron's career and -- yeah, I've been

16 a big basketball fan.

17     Q.  Okay.

18     A.  For the most part.

19     Q.  Who's your favorite team?

20     A.  Whichever one LeBron is in.  But yeah, no, we

21 -- we root for the Magic, though.

22     Q.  It doesn't matter to me.

23     A.  I go to Magic games all the time.

24     Q.  Did you ever have any, like, school discipline

25 or anything at Dundee Middle, that you can recall?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.  No.

2    Q.  No suspensions or anything?

3    A.  No.

4    Q.  Detentions?

5    A.  No.

6    Q.  I know some schools do, like, lunch

7  detentions. I had to pick up trash on a couple occasions

8  during lunch.

9    A.  Yeah.

10    Q.  Nothing like that?

11    A.  Uh-uh.

12    Q.  I think you said your grades were pretty good

13  also during that time?

14    A.  Yeah.

15    Q.  So after 8th grade, where did you go to

16  school?

17    A.  After 8th grade, I went to Haines City High

18  School.  That was my freshman year.

19    Q.  And I know you said you kind of changed

20  schools a bit.  This -- give me the rundown of the

21  schools you were in, and then I'm going to go back and

22  kind of ask some questions.

23    A.  Yeah.  So went to Haines City freshman year.

24  Sophomore year, I went to Colonial High School for, like,

25  -- until February, and I finished the -- finished my

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  sophomore year in Massachusetts, Salem High School. Then

2  I came back for my junior year, and I went to Boone High

3  School junior year.  And then senior year, I ended up

4  going to Lake Nona and Aloma High School for my senior

5  year.  Yeah.

6      Q.   Okay.  For Haines City High School, do you

7  remember what it was like at that school?

8      A.   Yeah, I -- I'm -- you know, chill for the most

9  part.  I think it was a small school, I think.  Yeah.

10  Not -- not much went on.  I lived -- I was only there

11  for that year, and I left so --

12      Q.   That's kind of when kids start getting into

13  sports and stuff --

14      A.   Uh-huh.

15      Q.   Varsity sports.  Did you do anything like

16  that?

17      A.   No.  I -- I don't think I was aware that

18  schools did sports until it was too late, you know?

19  Like, I always saw, like, there was -- they had a

20  basketball team, but I didn't know, like, I could try

21  out for it stuff.  You know, I was kind of uncultured

22  with that stuff because we don't have that in Puerto

23  Rico, you know?  Like, they don't have school sports so

24  --

25      Q.   The schools wouldn't go around and be like,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 hey, we have tryouts, or anything for you, no?

2    A.   Yeah.  No.  I was always interested in it, but

3 I just never -- you know, I didn't know if you had to,

4 like, know somebody or, like -- type of thing, you know?

5    Q.   Not something you, like, sought out or went to

6 the teacher --

7    A.   Yeah.  I didn't have my friends doing it or

8 anything, so I never really, like, pursued it, you know?

9 Maybe it was the shyness in me.

10    Q.   Okay.  Like, it sounds like you did have

11 friends though there, right?

12    A.   Uh-huh.  Yeah, I have some friends.

13    Q.   Can you recall any of the people you would

14 hang out with?

15    A.   Yeah.  I mean, during school, I've had, like,

16 a girlfriend at the time, but no.  If -- I could

17 probably remember some names, but not -- no -- no long-

18 term friends or anything like that.

19    Q.   Who was the girlfriend?

20    A.   I think her name at the time was Tatianna.

21    Q.   Can you remember her last name?

22    A.   No.

23    Q.   That's not someone you keep in touch with?

24    A.   Uh-uh.

25    Q.   Okay.  And it --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        THE REPORTER:  That's a no?

2        MR. MISTOLER:  Yeah.

3    BY MR. MISTOLER:

4        Q.  It's a no, right?

5        A.  No.  No.  Sorry.

6        Q.  Okay.  So really, you know, you didn't have

7    any friends doing any sports, so what would you do with

8    your afternoons after school?

9        A.  Not much but spend time at home because we

10    lived in a place where it was -- you had to drive to get

11    anywhere, you know, and we were in high school.  We

12    didn't have cars.  So there wasn't much after-school

13    activities, other than going home.  It -- I just lived

14    in one big neighborhood, and there's just houses around

15    us.

16        Q.  That's the same house that you moved to with

17    your family that you mentioned earlier?

18        A.  No.  This was a different one.  This was in

19    Poinciana.

20        Q.  What was the -- can you remember the address

21    of where you first moved here when you first moved?

22        A.  I can't.  It -- it was somewhere around

23    Semoran or -- or Conway.  Definitely close to McCoy.

24        Q.  And you mentioned at one point your mother was

25    able to get a house?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.  Yes.

2    Q.  Do you recall the address there?

3    A.  No.  I just know it was in Poinciana.

4    Q.  Okay.  So now you're at a different house,

5  right?

6    A.  Uh-huh.

7    Q.  When you're at -- what -- why did you move

8  houses?

9    A.  I'm not sure.  I was a kid.  Adult decisions

10  were being made, and I wasn't involved, and I'm not sure

11  what my parents were going through at the time.  I was

12  just kind of tagging along wherever they took us.

13    Q.  Always.  Your mother and your stepfather had a

14  really good relationship?

15    A.  Yep.

16    Q.  And you said, like, kind of Poinciana area?

17    A.  Uh-huh.  Yes.

18    Q.  I'm bad at catching it, too.  I'm sorry.

19    A.  Sorry.

20    Q.  Especially when you're right here.  Was the

21  house bigger; can you recall?

22    A.  Yeah.  It was a nice house.  I remember it

23  being a nice house.  Had a -- we had, like, a

24  screened-in patio, backyard.  I think it was, like, a

25  two-car garage, maybe.  Yeah, it was nice.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Q.   We talked a little bit about your family

2   members, your uncles, your aunts --

3    A.   Uh-huh.

4    Q.   -- the grandmother.  Would they come and visit

5   you and visit the family?

6    A.   Every so often, we got -- we got a family

7   visit.  Yeah.  My aunt has always come out here every so

8   often.  Her kids are out here now too, and her

9   grandkids, so she still comes.  And same thing with my

10  grandma.  She would live with us for a little bit and

11  wanted -- wanted to go back home.  Then she'll get tired

12  of home, come over here, hang out with us, and that type

13  of thing.

14   Q.   When she would come, would she come to this

15  Poinciana house ever?

16   A.   She stayed with us at the Poinciana house.  I

17  remember her being there one time.  Yeah.

18   Q.   How about the other house on -- I can't recall

19  where you said the other house was.  I'm sorry.

20   A.   Oh, Ocala?  That was, like, later --

21   Q.   Yeah.  Ocala.

22   A.   Yeah.  That was, like, later on in high school

23  --

24   Q.   Before the Poinciana house, where -- you said

25  you were in another house?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Oh, no.  No.  We just lived in apartments.

2    Q.   Apartment.  And then they bought the Poinciana

3  house?

4    A.   Yes.

5    Q.   And then they moved to the Ocala house later?

6    A.   Yep.

7    Q.   Okay.  Got it.

8    A.   Yes.

9    Q.   How many cousins do you have?

10    A.   I have -- let's see.  Five plus three --

11  eight. Eight.

12    Q.   Do you have good relationships with any of

13  them?

14    A.   Yeah.  I have two of them that live out here

15  in Florida.  We -- we see them, like, in the holidays.

16  You know, we have, like, Thanksgiving dinner, and

17  Christmas, and stuff like that.  They live in Lakeland,

18  so can't see them every weekend.  And then I have my

19  five other cousins from my uncle's side.  They all live

20  in Massachusetts.  We stay in touch on the phone, and

21  I'll go visit them.  They'll come visit me.  To them,

22  I'm like their only cousin, so -- that they talk to.  So

23  that's -- they're -- they all kind of embrace me.

24    Q.   Okay.

25    A.   That's why I embrace them.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Do you have a favorite cousin?

2    A.   No.  I -- I like all my cousins.

3    Q.   What's one that you keep in touch with the

4  most, maybe?

5    A.   Probably my boy cousin Ruben.  He's, like, one

6  of the only male cousins I got, and they're all --

7  because everybody else is a girl.  So I'm, like, the

8  only -- he has five -- four sisters, so he looks to me

9  as -- as his brother, you know, because he didn't get

10  one.

11    Q.   What's Ruben's last name?

12    A.   Ramos.

13    Q.   About how old is Ruben?

14    A.   I think he's, like, 37 now.

15    Q.   Today he's about 37?

16    A.   I think he's, like, five years older than me,

17  more or less.

18    Q.   Five years older?

19    A.   Yeah.

20    Q.   Okay.  What is -- what does Ruben do for work?

21    A.   He's in the hospitality industry.  I know he

22  works for, like, hotels management.  Not really sure

23  what his position is, but yeah, some -- some -- he does

24  management at the -- at a hotel in -- in Boston.

25    Q.   So he lives in Boston?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.   Yeah, he lives in Boston.

2    Q.   When you were at the Haines City High School,

3  would you ride the bus to school?

4    A.   Yes.  School --

5    Q.   In the morning?

6    A.   School transportation.  Yep.

7    Q.   What -- how did, like, a lunch work?  Would

8  you get lunch at school, or would -- what -- would you

9  pack one or --

10   A.   Yeah.  I would get school lunch.

11   Q.   And then you'd take the bus back home?

12   A.   Yes.

13   Q.   Sometimes the high schools also -- in addition

14  to sports, they have, like, clubs and stuff.

15   A.   Correct.

16   Q.   Did you participate in any clubs?

17   A.   No.  Since I was always moving and making new

18  friends, I felt like I never really got the -- the

19  chance to, like, settle and get into those type of

20  things.

21   Q.   Did you mention, like, a good friend that you

22  had that you can recall in -- at Haines City?

23   A.   I had just like classmate friends.  Not --

24  nobody, like, long-term or anything.

25   Q.   You mentioned -- that's when you kind of met

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Tatianna?

2     A.  Yes.

3     Q.  What would you and Tatianna do?

4     A.  She'd -- go to her house and watch movies, or

5  she would come to my house and do the same.  At the

6  time, there wasn't much to do.  Like I said, we --

7  everything was far, and we lived in a big neighborhood,

8  just houses around us.  So yeah, we just kind of

9  spending some time at each other's house, for the most

10 part.

11    Q.  You go to Colonial High School next, correct?

12    A.  Yes.

13    Q.  And that was for 10th grade, right?

14    A.  Yes.

15    Q.  Why was there the change from Haines City to

16 Colonial High?

17    A.  Let's see.  I'm trying to figure out where we

18 moved -- we moved.  I don't know.  I don't know what --

19 why my mom decided to move, but we ended up downgrading.

20 We went from a house back to an apartment.  I'm not sure

21 why.  I'm not sure what they were going through at the

22 time.

23    Q.  Can you recall what year that would've been?

24 If you're in 9th grade to 10th grade?

25    A.  I think I would have been, maybe, like, 2007,

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1  2008, sounds about right.

2     Q.  But you didn't have to change schools for

3  discipline reasons?

4     A.  No.

5     Q.  No -- again, no suspensions at Haines City?

6  No --

7     A.  No.

8     Q.  -- detentions or anything?

9     A.  No.

10    Q.  How about at Colonial High School, any

11  suspensions?

12    A.  No.

13    Q.  Detentions?

14    A.  No.

15    Q.  How were your grades at Colonial?

16    A.  From what I remember, I think they were pretty

17  good.

18    Q.  Like an A, B, C, if you could put out an --

19    A.  I've -- I've always -- I think I would just be

20  a B student.  I was never, like, below average, but I

21  was never, like, a straight-A student.

22    Q.  Okay.  How was that transition from Haines

23  City to Colonial?

24    A.  I was actually happy about it because I came

25  back to Orlando.  And I was, you know, closer to a more

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 familiar area.  And, you know, it was much different in

2 the city than out in Poinciana.

3    Q.  Uh-huh.

4    A.  So I -- I was happy.  I was happy to move

5 back.

6    Q.  Did you keep in touch with your friend,

7 Christopher?

8    A.  Yeah, I kept in touch with Chris.  That was

9 kind of good.

10    Q.  Any other friends you can recall from that

11 time that you would hang out with?

12    A.  No, not really.  I met -- I met my other best

13 friend, like, my senior year.

14    Q.  Okay.

15    A.  Yeah.  That's about it.

16    Q.  Would you describe yourself kind of as a

17 loner?

18      MS. DILLON:  Objection.  Form.

19      You can answer.

20      THE WITNESS:  No, not really.  Just never stood

21 anywhere long enough to kind of, you know, make

22 those long-term relationships.  I think that's --

23 that's -- if anything, that was -- that was about

24 it.

25 BY MR. MISTOLER:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.  You liked coming back to Colonial High because

2  you were kind of more closer to Orlando, but was it --

3  would it take a toll on you when you would change the

4  schools and, you know, you'd develop relationships, and

5  then you would move; was that difficult?

6      MS. DILLON:  Objection.  Form.

7      You can answer.

8      THE WITNESS:  No, I -- sometimes it was.  After

9  a while, it was -- became normal.  It didn't really

10  bother me.  Plus I always kind of stayed central.

11  If I was going to a school -- a new school, it was

12  kind of, like, down the street so it's not like I

13  moved too far anyways.

14  BY MR. MISTOLER:

15    Q.  Did you keep in touch with Tatianna?

16    A.  No.  After -- after 9th grade, no.

17    Q.  Kind of broke up?

18    A.  Went our separated ways.  Yeah.

19    Q.  Did you start dating anyone else?

20    A.  No, not at the time.

21    Q.  I kind of keep asking the same questions, but

22  you know, it's different schools.  Did you participate

23  in any sports or anything there?

24    A.  No.

25    Q.  No?  Any clubs?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.  No.

2    Q.  Was math still one of your favorite subjects

3  that you would participate in?

4    A.  It was just easy for me.  Like, I was always,

5  like, one of the first ones to finish the test, you

6  know, when -- when it was, like, a math test.  I never

7  really had a problem understanding it.  Like, when we

8  took the state exams, I always got a -- a 4, which was,

9  like, the best score you can get.  So not necessarily it

10  was my favorite, but it was, like, the easiest one for

11  me.

12    Q.  Sometimes that's the favorite one.

13    A.  Yeah, exactly.

14    Q.  Well, which was your least favorite subject?

15    A.  Probably, like, a history class or something.

16  Science.

17    Q.  Were those harder?

18    A.  Just less interesting, I -- I guess.

19    Q.  You left that school in February, correct?

20    A.  Which one?

21    Q.  Colonial High School?

22    A.  Yes.  I remember it being February because --

23  no, I came back to Colonial, like, in -- I went to

24  Boston in February.  I remember that because I was in

25  Haines City, and it was, like, Valentine's Day, and I

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   was with Tatianna.  That's -- that's really all I

2   remember.  I went to Massachusetts in February, 10th

3   grade.

4       Q.  Let me just try to make sure.

5       A.  And I came back to Colonial for --

6       Q.  Let me try to get -- I think I misunderstood.

7   So you were -- for 9th grade, you went to Haines City,

8   and you went the full year?

9       A.  Yeah, I went to Haines City, and -- no.  Okay.

10  Yeah, you're right.  I -- I started Colonial tenth

11  grade.  Finished in Boston.  Yes, I went to -- I went to

12  Boston around February.

13      Q.  Okay.  And why'd you go to Boston in February

14  from Colonial High School?

15      A.  My mom following her brother around again.

16  She -- he was -- he was living out there.  And I don't

17  know. She -- she had her brother out there, and decided

18  to move her family out there --

19      Q.  Did your --

20      A.  -- to just try it out.  He was doing -- I

21  don't know if he was doing well for himself, or I don't

22  know if he sold her a dream, like, hey, come over here.

23  Things are better.  I -- I don't really know what the

24  circumstances were, but yeah.

25      Q.  Do you think he, like, sold her some sort of

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  dream?

2     A.  I'm not sure.  I'm not sure why she was, like

3  -- decided up to move to a different state at the time.

4  But it didn't work out so that's why we came back.

5     Q.  You moved with your mother, and your

6  stepfather, and your sister?

7     A.  Yes, sir.

8     Q.  Where'd you move to in Boston?

9     A.  I went to -- we lived in Lynn.  And I went to

10  Salem High School.  It was, like, between Lynn and

11  Salem.  I wasn't really sure.  I don't remember.

12     Q.  Did you --

13     A.  I couldn't tell what city I was in.  I knew

14  they were next to each other.

15     Q.  Did you like Boston?

16     A.  It was a nice experience.  I've never seen

17  snow so -- and I hadn't seen my cousins for a while, so

18  that -- that part was fun.  But I wanted to come back

19  home so --

20     Q.  You were ready to come back home?

21     A.  Yeah.  It was too cold.

22     Q.  Your cousin, Ruben, was there, right?

23     A.  Yes.

24     Q.  Did you spend time with him at all when you

25  were in Boston?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1   A.  No.

2   Q.  Any reason why not?

3   A.  No.  At the time, he was incarcerated, so I

4  didn't get to see him.

5   Q.  Why was he incarcerated?

6   A.  I'm not really sure what the -- I was young.

7  Nobody really wanted to tell me what happened.  He never

8  really told me what happened.  I never bothered to ask

9  him.

10   Q.  So for the duration of you being in Boston,

11  really, you didn't --

12   A.  No, I just hung out with the girls.

13   Q.  Did you have an option to go visit him or

14  anything?

15   A.  No, because I was underage, so I couldn't do

16  visitation.  I know my mom went to go visit him.

17   Q.  About how old is your sister at this point?

18   A.  So if I was -- I was, like, 15, nine year

19  difference, she was probably, like, 6.

20   Q.  6.  Is she -- she's in elementary school at

21  this time?

22   A.  Yes.

23   Q.  How was the Salem High School?  Did you like

24  it?

25   A.  Yeah, it was nice.  It was a nice school.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    They had, like, extracurricular classes that they didn't

2    offer in Florida.  Like, I remember, like, they had,

3    like, photography class, and wood shop.  Wood shop.  What

4    is it?  Like, wood class.  And, like, they have a big

5    basketball gym in their basement.  So it was, like,

6    nice.

7        Q.  Did you participate in any of those?

8        A.  No, I wasn't there long enough.  I was only

9    there for, like, four or five months, I remember.

10       Q.  No photography?

11       A.  Yeah, I did the photography class.  I made --

12   I remember making, like, a camera out of, like, a

13   cardboard box.  And going into, like, one of those --

14   those rooms that you do the film, like, the dark room.

15   And you put the film through the water and stuff, and

16   process it, and doing stuff like that.  Pretty cool.

17       Q.  I'm trying to -- you said that.  You said the

18   basketball court there.  Did you play basketball there?

19       A.  No, at the time, it was, like, super cold,

20   super snowy.  I didn't -- I wasn't -- like I said, I

21   wasn't there long to, like, get involved in any, like,

22   extracurricular activities at the time.  So I kind of

23   just went straight home, and with my cousins, and spent

24   time with them.

25       Q.  What would you guys do after school?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.   Not much.  Kind of stay in the house.  It was

2  a snowy -- a snowy time, so we kind of just spent most

3  of the time indoors.

4    Q.   Okay.  You mentioned wood shop.  That was what

5  it was.

6    A.   Yeah.

7    Q.   Did you participate in that at all?

8    A.   I -- I remember very little bit of it, but

9  yeah, I remember it -- that was -- that was one of my

10  classes.  Yeah.

11    Q.   Were the cousins the female cousins, or did

12  you have other male cousins?

13    A.   Yeah, the -- the -- they were all females.

14    Q.   And really, just, like, staying with the

15  family?  You guys would go home.  You'd take the bus,

16  and stuff?

17    A.   I think I was -- I think I was getting picked

18  up and dropped off.  Yeah, I don't remember catching a

19  bus out there.

20    Q.   Who would pick you up and drop you off from

21  school?

22    A.   I think it was my mom.  Yeah.

23    Q.   She was still working at this time, or was she

24  not working at this time?

25    A.   No.  That -- this was -- she wasn't working at

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  this time, no.

2    Q.  At -- I know you mentioned she did get

3  injured, but at what point did she get injured and she

4  was no longer working?

5    A.  I think she got injured, like, after I got out

6  of high school.  Like, right after I got out of high

7  school.  I was, like, 17.

8    Q.  Okay.  So she's just not working at this

9  point?

10    A.  Uh-huh.  Yes.

11    Q.  You don't know why she wasn't working?

12    A.  I think just, like, the language barrier had a

13  big -- big reason for her to find, like, a steady job. I

14  don't know if it was, like, scared her, or like, you

15  know -- she -- I just know that her language never

16  really got good.  And I -- I would say that was her

17  biggest reason for not finding, like, a steady job.

18    Q.  Was she -- she was working at Disney?

19    A.  Not that time.

20    Q.  Well, not at that time but --

21    A.  Yeah, a long time ago when I was, like, way

22  younger.

23    Q.  Why did she stop working at Disney?

24    A.  Not sure.

25    Q.  Was it just one day she was working there and

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1 then the next day she wasn't?

2     A.   For -- for me, that's what it -- what it

3 seemed like.  I don't know what the adults were doing.

4 But yeah, she -- she just didn't.  I don't know if it

5 didn't work out.  I don't know if it was a

6 transportation issue.  I don't know.  Not -- not really

7 sure what it was.

8     Q.   Why would it have been a transportation issue,

9 if you know?

10     A.   Oh, I -- I don't know.  I don't know if we had

11 a -- a vehicle at the time.  I know -- I don't know if

12 her and my dad were sharing a vehicle, and only he could

13 -- you know, I -- I don't know.

14     Q.   How many cars did you have at that point?

15     A.   I don't remember -- I don't remember having

16 more than one car ever so --

17     Q.   Was your stepfather working at this point when

18 you'd go to Massachusetts?

19     A.   Yes.

20     Q.   What was he doing?

21     A.   When he was in Massachusetts, I don't know

22 what he was doing.  I don't know what kind of -- what

23 kind of work he was doing.  I know he was struggling to

24 look for -- I think that's kind of why we came back.  I

25 think he couldn't find, like, a -- like, a steady job.

MILESTONE │ REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 So I think that's why we ended up coming back kind of

2 just a few months after.  It just didn't work out for

3 him.

4    Q.  Do you know what he was trying to do?

5    A.  Probably something in the same field.  I'm not

6 really sure what -- what his -- what his goals were, or

7 what his plan was at the time or -- it didn't really

8 work out.  I don't know if he was going out there to get

9 a -- try to get a specific job, and he ended up not

10 getting it.  Not sure what happened.

11    Q.  Were you living with your uncle out there?

12    A.  Yes.

13    Q.  All in the same house, apartment; what was it?

14    A.  Yeah, I was -- I was living with my uncle and

15 my cousins.  And my mom was living in my cousin's house

16 down the street because she had more room for them.

17    Q.  So your mom was in a different house?

18    A.  At the time, yes.  Like, down the street.

19    Q.  And did you -- were you ever given a reason

20 why?

21    A.  No.  I just know -- because we came out there

22 with nothing.  You know, we came out there in a little

23 rinky-dink car.  We didn't have, obviously, jobs lined

24 up.  So we came out there.  I guess the plan was to --

25 you know, for them to get settled, and we were going to

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  get our own place.  But it didn't really worked out that

2  way, which is why we ended up coming back.

3     Q.   Did you think it was strange that your mom was

4  living at a different location?

5     A.   No.  Well, I just knew it was, like, the best

6  situation at the time.  Just because we didn't have

7  anything, you know, so I knew she was -- I knew it was

8  temporary, so I wasn't really, like, stressing it.  And

9  I was living with my cousins, so I didn't -- it was fun

10  for me, and, like, hanging out with my cousins.  You

11  know, like, I didn't really mind it.

12     Q.   Were you with your stepfather in this -- at

13  this -- at that time?

14     A.   Yes.  So they were living -- my stepfather, my

15  mom, and my sister were living with my cousin, and then

16  I was living with my uncle.

17     Q.   Okay.  Was that a decision that you made?

18     A.   No.  No.

19     Q.   The -- your mom made that, maybe?

20     A.   Yeah.  I think she did it to make me more

21  comfortable, or just because they didn't have as much

22  room over there at my cousin's house so --

23     Q.   She wasn't trying to, like, shield you, or --

24     A.   Yeah.

25     Q.   -- protect you from anything --

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      A.   Yeah.

2      Q.   -- was she?

3      A.   Yeah, exactly.  No.  I think she was just

4  trying to make it more comfortable for me, if anything.

5      Q.   Was it comfortable?

6      A.   It wasn't bad.  I didn't -- I didn't mind.  I

7  knew they were down the street, so I saw them every day

8  and --

9      Q.   Did you have, like, a nice room or anything?

10      A.   No, I didn't have my own room.  I think I was

11  sharing a room with one of my cousins.  They had an

12  extra bed.  But they had, like, a big apartment, so it

13  was like -- it was comfortable.  Like, big living room,

14  and they had, like, two floors.  So it was -- it was

15  better than what I was used to.

16      Q.   You finished 10th grade at Salem High School?

17      A.   Yes.

18      Q.   And then you moved back to Orlando?

19      A.   Yes.

20      Q.   Again, you -- you're not really sure what the

21  reason was that you moved back?

22      A.   Yeah.  I think we just -- my dad couldn't get

23  settled to an occupation.  I think that was the main

24  reason.  It was hard to find work.  It was cold.  It was

25  snowy.  We didn't really have a reliable vehicle.  And

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    it just didn't work out, so we ended up coming back.

2        Q.   How did that make you feel?

3        A.   At the time, I was kind of happy to come back

4    to Florida.  I mean, this is -- this is what I grew up

5    knowing, so I was happy to come back.  Yeah.

6        Q.   You mentioned you went to -- well, let me back

7    up.  Did -- can you recall any, like, suspensions, or

8    discipline --

9        A.   No.

10       Q.   -- at the Salem High School?

11       A.   No.

12       Q.   Were your grades still okay at this point?

13       A.   Yep.  At the -- pretty sure.

14       Q.   Still, like, a B student, you think?

15       A.   Yes.

16       Q.   When you came back, you went to Boone High

17   School; is that correct?

18       A.   Correct.

19       Q.   And that was for the 11th grade?

20       A.   Yes, sir.

21       Q.   All the way through?

22       A.   Yep.

23       Q.   How was Boone High School?

24       A.   Boone?  It was -- it was nice.  Very normal,

25   nothing -- I was only there for a year, so didn't make

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  any, like, long-term friends again.  It was just kind of

2  like a normal school year at that point.

3      Q.  Was it difficult not having long-term friends?

4      A.  Not really.  I feel like if, you know, if

5  there was anybody that was a long-term friend, they'd

6  still be here.  I actually kind of like meeting new

7  people.  It was -- it was cool.

8      Q.  Okay.  Who'd you meet there?

9      A.  Just classmates.  I can't remember anybody

10  long-term.  I -- I became friends with one of my best

11  buddies after -- after -- we went to school that whole

12  time together, but we didn't become friends until after.

13  But yeah, we went to school together.

14          Yeah, just -- I just had, like -- like, one

15  friend that I spoke to every day because we had, like --

16  we both liked sneakers and stuff like that.  We had,

17  like, the same interests.  And it was, like -- you know,

18  I just had, like, one friend that I hung out with every

19  day, and kind of like that.

20      Q.  Do you recall their name?

21      A.  Yeah.  Marquis.

22      Q.  Is that the same Marquis that you would -- you

23  have an apartment, or you live with him later?

24      A.  Yeah.

25      Q.  Did you participate in any sports at Boone?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1   A.  No.

2   Q.  Clubs or anything?

3   A.  No.

4   Q.  The routine questions.  Like, any discipline?

5   A.  No.  I think I did, like -- like, an

6 after-school kind of detention thing one time.  I had to

7 stay for, like, an hour or something after school, just

8 be quiet in the room for an hour and read, but that's

9 about it.  I don't remember what it was for.

10   Q.  You don't remember what it was for?

11   A.  No.  Probably, like, a minor infraction or

12 something.  I don't know.  I don't -- I can't remember.

13 Maybe being late or interrupting the classroom or

14 something.

15   Q.  Were you late often?

16   A.  No.

17   Q.  No.  Not for, like, grades or anything?

18   A.  No.

19   Q.  Any -- other than this, the after-school

20 detention, any suspensions or anything?

21   A.  No.

22   Q.  For that after-school, did you feel like

23 whatever you did you deserved the after-school

24 detention?

25   A.  No.  I -- I don't -- I don't remember that.  I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

1    don't think so.

2      Q.   Take a minute.  I just want you to think back

3    and try to remember what the -- why you had to do the

4    after-school.

5      A.   Yeah, it was probably -- it had to be

6    something silly.  I can't -- I can't really remember.

7    It was like I had to stay, like, for an hour after class

8    or something like that.  It wasn't, like, nothing severe

9    or anything.

10     Q.   Okay.  Not like -- maybe, like, a buildup of

11   absences or something like that or --

12     A.   Yeah, no.

13     Q.   Okay.  Just can't recall?

14     A.   Yeah.

15         But definitely nothing like that.  No -- no

16   skipping classes or missing school.  I never

17   really had those issues.

18     Q.   Okay.  Were you dating any girls at this time?

19     A.   No.

20     Q.   This is about the time that kids get their

21   driver's license.

22         Would you -- did you have your driver's

23   license?

24     A.   No, I didn't get my driver's license until I

25   was 18.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   Any reason for waiting?

2    A.   My mom was just, like, a -- very protective.

3 And she just thought that you -- you shouldn't be

4 driving until you're 18.  And if you want to go get a

5 license, go get it yourself type of thing so --

6    Q.   Was she always very protective of you?

7    A.   Yeah.

8    Q.   What other situations can you recall where

9 she's protective?

10    A.   She's always been protective.  But yeah, that

11 was just one of those situations.  Yeah.  I can't really

12 think of anything.

13    Q.   Do you all -- the family still had the one

14 car?

15    A.   Yeah.

16    Q.   What kind of car did you have?

17    A.   At the time, when I -- when -- what -- when?

18    Q.   I guess at this time.  Boone High School time.

19    A.   Boone High School time?  I'm not sure.  Maybe

20 they drove, like, a Pontiac.  I remember they had, like,

21 a Pontiac GT at one point.

22    Q.   Would they --

23    A.   I remember -- I remember that car.

24    Q.   -- have different cars?

25    A.   I know we had, like, a van when I was, like,

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  in sophomore year, and then they got the -- then they

2  got the -- the Pontiac at some point. But yeah, we

3  always had, like, a single car in the family.

4      Q.  When you got back to Boone -- well, excuse me.

5  When you got back to Orlando, did your mother start

6  working again?

7      A.  No, I don't remember her working.

8      Q.  Was she mostly a stay-at-home mom at that

9  point?

10     A.  Yeah. For the most part, yeah.

11     Q.  What do you recall her doing when she just

12  maintained the home?

13     A.  Yeah, I know -- I know she spent some years

14  babysitting. Like, she used to babysit, like, one of

15  her close friend's kids. And there was, like, these --

16  these two other kids that she used to babysit,

17  sometimes. Other than that, I don't -- I don't remember

18  her working.

19     Q.  Would she get paid for those babysitting jobs?

20     A.  Yes.

21     Q.  How about your father -- your stepfather? Was

22  he working again?

23     A.  Yeah, he was -- he was probably doing back the

24  same thing, doing with installing garage doors and stuff

25  like that. I remember having, like, a work truck and

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  stuff.  So even though we had -- it was times where we

2  had a single-family car, like, he had his work truck so

3  --

4    Q.  That's -- he would, like, take that to jobs

5  and stuff, job sites?

6    A.  Yeah.  That was, like, his work vehicle with

7  the company name on it and stuff.

8    Q.  Okay.  For 12th grade, you said you went to

9  both Lake Nona and then Aloma High Schools, right?

10    A.  Yes.

11    Q.  So at what point did you kind of switch

12  between the two?

13    A.  I want to say maybe, like, somewhere right in

14  the middle of the school year.

15    Q.  Why did you switch from Boone High School to

16  Lake Nona High School?

17    A.  We just moved to a different, what do you call

18  it?  School -- school zone.

19    Q.  Uh-huh.  Where were you living when you came

20  back to Orlando?

21    A.  I was living in Conway.

22    Q.  In Conway?

23    A.  Yeah.

24    Q.  So you'd go -- living in Conway, going to

25  Boone High School?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1    A.  Correct.

2    Q.  What was the address at the Conway location?

3    A.  I --

4    Q.  And was it -- I'm sorry, was it an apartment,

5  a house?

6    A.  Yeah, it was -- I remember the apartment name

7  was Cornerstone.  I don't remember, like, the address.

8    Q.  Okay.  So for about a year, do you stay at the

9  Cornerstone Apartments while you're going to Boone?

10    A.  Yes.

11    Q.  And then there was a decision.  Was it your

12  parents decided they wanted to move?

13    A.  Yeah.  So we -- we were staying -- I came back

14  from Boston.  Obviously we came back with nothing again.

15  So we were living in a one-bedroom apartment at that

16  time -- at that time, the time that I was in Boone.  So

17  us going from Boone to Lake Nona, we actually upgraded

18  to, like, a two or -- two or three bedroom apartment, I

19  think it was.

20        I don't remember if it was three or two, but

21  that was the reasoning for that move.  We actually --

22  you know, when we had to come back from Boston, we had

23  to start out small, get back on our feet.  And a year

24  later, you know, we were able to get a bigger apartment,

25  and I was able to, like, get my own room and stuff like

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  that.

2    Q.  So the transition from Boone to Lake Nona,

3  that was not for any reason, like, getting kicked out of

4  school or anything?

5    A.  Right.  No, none of that.

6    Q.  And really none of the transitions you've

7  indicated, you were never -- you didn't make the

8  transition from one school to another because you're --

9  you were --

10    A.  Correct.

11    Q.  -- like, getting kicked out or anything?

12    A.  Correct.

13    Q.  Okay.  So you start at Lake Nona.  You're

14  there for about half the year --

15    A.  Uh-huh.

16    Q.  -- and then you go to Aloma High School,

17  right?

18    A.  Correct.

19    Q.  Again, what was the change?  Why did you

20  change from Lake Nona to Aloma?

21    A.  Yeah.  So at that -- at that point, it was

22  kind of -- that was -- that was the one transition that

23  was my decision.  The school was, like -- it was the

24  first year they opened.  I felt like it was a little bit

25  of, like, inconsistencies with the learning and --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Q.   And you -- you're meaning Lake Nona?

2    A.   Yeah, Lake Nona.  So that's where I -- that's

3  where I really truly felt like I started slowing down in

4  school.  Not grades-wise, but I felt like I wasn't being

5  very productive, you know?  Just because it was, like, a

6  new school and I was a new kid.  And I don't know.  There

7  was, like, no seniors.  We were -- the juniors were the

8  seniors.  You know, I -- I just saw myself kind of

9  becoming a little uninterested.

10        And that's when I had a friend who went to

11  Aloma High School.  And she ended up graduating pretty

12  fast because Aloma High School is like, you go, and then

13  you sit down, and you take online classes.  So you come

14  to school, but you sit down on a computer and do your

15  classes online, which helps concentrate on that, you

16  know, instead of other distractions.  So I saw that she

17  was doing very well, and she graduated early and

18  everything.

19        So I decided, hey, this school -- I'm kind of

20  losing interest in school at this point.  This is, like,

21  my fifth high school.  I'm not very interested in what's

22  going on here.  I saw my friend did well in Aloma, so I

23  decided, hey, you know, I'm going to give it a try.

24    Q.   So you really didn't like Lake Nona?

25    A.   Yeah.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.   Did -- were you getting okay grades at that

2   point, or were your grades suffering?

3    A.   Yeah.  No, they were good.  I just -- I just

4   felt like it was, like, that -- that's the one school I

5   felt I couldn't adjust to just because, like -- I don't

6   know if it was because it was their first year open or

7   -- or, you know, I just -- or maybe I didn't -- or

8   maybe I got tired of moving at that point.

9        I don't know.  It was like, all right.  This

10  is my fifth high school.  I'm getting tired of this.

11  Kind of just want to get it over with and graduate.  I

12  think that's what kind of was going on in my head.

13   Q.   At that point, did you have, like, a vision of

14  what you wanted to do after you graduated?

15   A.   Not really.  I mean, I knew I wanted to go to

16  college, and I -- I wasn't sure for what, but I knew I

17  wanted to get into something, you know?  Just because

18  that was -- it made sense to me.  You know, I was -- I

19  was only 17 years old when I graduated and can't -- you

20  know, other than going to school, I couldn't really get

21  too many jobs at that age, so I was like, yeah.

22   Q.   So you did graduate from Aloma?

23   A.   Uh-huh.  Yes.

24   Q.   Thank you.  You liked it a lot more there?

25   A.   It was -- it was, like, online classes, so it

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  wasn't much interaction going on with other people.  You

2  know, I kind of just went there, did my work online, and

3  went home.  I did like it.  You know, it was -- it was a

4  half day.  So I'd get off school earlier, too, and I

5  ended up catching up on some credits and ended up

6  graduating ahead of time.  I was supposed to be class of

7  2011, and I graduated in 2010.  So it kind of benefited

8  me.  After going to all those schools, I still graduated

9  early.

10     Q.   Did you find the online classes were easier

11  for you to do?

12     A.   Yeah.  Yeah.

13     Q.   And you liked maybe not having the teacher in

14  the room with you so much?  It -- or was there a

15  teacher?

16     A.   Yeah.

17     Q.   I don't even know.

18     A.   Yeah.  Yeah.  They -- well, they would have,

19  like, a teacher there, but just to, like, if you need --

20  if you had any questions about anything.  But, like,

21  they would take our phones in the -- in the beginning of

22  the -- of the class, just so we can concentrate on our

23  -- and we're not distracted on our online classes, which

24  I think also benefited everybody, too.  Because it gives

25  you the time to concentrate on your -- on the work.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Q.  Did you keep in touch with your friend?  Is it
2  Marquis or --
3    A.  Marquis.  Yes.
4    Q.  Marquis?
5    A.  Yeah.  He was actually going with me to Aloma
6  at the time.  That's when we actually got close.
7    Q.  But it was a different friend who kind of
8  convinced you to come to the school?
9    A.  Right.
10   Q.  Who was the other friend?
11   A.  Her name was Michelle.
12   Q.  Do you recall her last name?
13   A.  No.  She was, like, a friend of a friend.
14   Q.  Okay.  But she had already got --
15   A.  Yeah.
16   Q.  -- out of --
17   A.  Yeah, she had.  She was -- she had already
18  graduated, so that's why I was -- got -- became
19  interested.
20   Q.  Who was the friend in between you?
21   A.  I think his name was Anthony.  Anthony.  Yeah.
22   Q.  What was his last name?
23   A.  I think it was Siemer, S-I-E-M-E-R.
24   Q.  S-I-E-M-E-R?
25   A.  Yeah.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    Q.   Okay.

2    A.   That sounds about right.

3    Q.   How would you get to class when you went to

4  Aloma?

5    A.   We -- the school would give us a -- a city bus

6  pass -- a 30-day bus pass.  So we would just catch the

7  city public transportation.

8    Q.   And your mom's not working at this time?

9    A.   No.

10    Q.   During the times when she's not working, she's

11  not taking you to school, either?

12    A.   No.  I had the 30-day bus pass, so there was

13  no need.

14    Q.   How about at, like, Lake Nona or even at

15  Boone? She's not taking you to school then?

16    A.   No.  There was always a public -- or school

17  transportation available so --

18    Q.   Would you eat lunch at the schools, like

19  provided by the school?

20    A.   Yes.

21    Q.   Would you ever have a lunch that you would

22  take with you?

23    A.   Maybe a couple times.  I'm sure I had the

24  option to and I didn't.

25    Q.   Mom -- but your mom wasn't like, I packed your

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 lunch for you?

2    A. Yeah.

3    Q. No, never?

4    A. No. I'm sure there was always -- there was

5 always leftovers, but I wasn't the type to kind of carry

6 stuff. Try to --

7    Q. Did you hang out with Anthony a lot at Aloma?

8    A. No, Anthony wasn't in Aloma.

9    Q. Oh, okay.

10    A. He -- his friend, Michelle, was.

11    Q. I see. But Marquis was?

12    A. Yeah, Marquis was.

13    Q. You hung out with Marquis?

14    A. Yeah, that's when we became close.

15    Q. What would you guys do?

16    A. Play a lot of basketball. We'll do -- watch

17 YouTube videos at his house or -- yeah, stuff like that.

18 Well, a lot of basketball, to be honest. That was,

19 like, our -- our main thing.

20    Q. Where did he live?

21    A. He lived at the time on Curry Ford and Conway

22 area.

23    Q. Was he working at all?

24    A. Not right away, but I do remember him applying

25 for his first job and getting his first job while we

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    were in Aloma.

2        Q.  Where did he work?

3        A.  Universal Studios, Finnegan's Restaurant.  I'm

4    pretty sure his mom worked there, too.  I think that's

5    how he got the job.  He was, like, one of the -- he was,

6    like, one of the few of us that had jobs.  You know, we

7    were all young.

8        Q.  What did he do there?

9        A.  He was a busser.

10       Q.  Throughout high school, did you work anywhere?

11       A.  No.  I got my first job after high school.

12       Q.  Okay.  Just looking over the notes here.  At

13   Lake Nona, did you have any discipline issues?

14       A.  No.

15       Q.  No suspensions?

16       A.  No.

17       Q.  Same questions for Aloma High School.  Any

18   discipline issues, or suspensions, or anything?

19       A.  No.

20       Q.  So really other than the one after-school, you

21   didn't have any other issues with getting in trouble at

22   school or anything?

23       A.  No, not at all.

24       Q.  And this one time you did, that doesn't stand

25   out to you of what you --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.   No.

2    Q.   -- what rule you broke or whatever?

3    A.   No. The only thing I remember is being in a

4 room, and I had to be quiet for an hour with everybody

5 else. I really don't remember what the reasoning was.

6    Q.   Okay. Was it -- were you at -- did you have

7 friends in there with you when you were in the after-

8 school detention?

9    A.   No, not that I could recall.

10    Q.   At the latter places, Lake Nona, Aloma, were

11 you dating anyone at those points?

12    A.   No.

13    Q.   Did you ever take the SAT or ACT, those tests

14 to get into college?

15    A.   I went to -- I went to Valencia for one

16 semester. I -- I don't recall taking those tests,

17 though.

18    Q.   Okay. What was your grade point average, if

19 you can recall?

20    A.   When I graduated?

21    Q.   Uh-huh.

22    A.   Like, 3-point-something. Pretty average.

23    Q.   You don't have any children, do you?

24    A.   No.

25    Q.   Would you -- at this point, would your family,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  like, do any vacations, or trips, or anything?

2     A.   Not really.  If it was, it was something local

3  that we can drive to, like a beach or a spring.  My mom

4  doesn't do airplanes so --

5     Q.   Okay.  And you would take the family car?

6     A.   Yeah.

7     Q.   Growing up, I know you said you had the van.

8  You had maybe a Pontiac.  Can you recall the other cars

9  that you had growing up?

10    A.   Yes.

11    Q.   What cars can you recall that your family had?

12    A.   I know they had a Saturn -- like a coupe

13  Saturn.  And we had a minivan, a Honda -- Hyundai

14  Odyssey.  Hyundai -- Hyundai Odyssey minivan at one

15  point.  The Pontiac.  And that's pretty much all the

16  cars I could remember.

17    Q.   Did you think it was kind of cool that Marquis

18  had the job at Universal?

19    A.   Yeah, definitely.  I saw him apply for it, and

20  he was like, one of the first people I saw get a job,

21  you know, growing -- when we were coming out of high

22  school so --

23    Q.   What did -- how did that make you feel?

24    A.   Very proud and excited.

25    Q.   Did he go to university or college?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.   Yeah, me and him actually went -- did that

2    first semester in Valencia together.

3    Q.   Okay.

4    A.   We actually took an English class together,

5    also.

6         MR. MISTOLER:  We've been going about an hour.

7    You want to take a break?

8         MS. DILLON:  Yeah.  Do you want to have a

9    little back -- bathroom break, stretch?

10        THE WITNESS:  Yeah.  Yeah.

11        MR. MISTOLER:  It always helps to stretch.

12        MS. DILLON:  Yeah.

13        MR. MISTOLER:  We'll go off the record.

14        THE REPORTER:  We're off the record.

15         (A recess was taken.)

16        THE REPORTER:  All right.  We are back on.

17        You may continue.

18   BY MR. MISTOLER:

19    Q.   So you went to Valencia -- is it Valencia

20   Community College?  Is that what it is?

21    A.   Yes.

22    Q.   After you graduated from Aloma High School?

23    A.   Yes.

24    Q.   Did you immediately go to college?

25    A.   No.  There was a -- a small gap in between,

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  because I had finished high school, but I had failed my

2  FCAT reading exam.  So I had to -- like, I graduated

3  with a Certificate of Completion until I took my FCAT

4  retake, and I had to wait for the retake, which -- which

5  took, like, four months.  So after I graduated, waited

6  for the retake, passed the retake, then I got my

7  diploma, then I was able to go to college.  So there

8  was, like, a small gap in between, like, maybe, like,

9  four months or something.

10     Q.  Was it a certain point or, like, a certain

11  subject on the FCAT?

12     A.  Yeah, it was the reading.

13     Q.  The reading?

14     A.  I failed the reading by, like, very, very

15  close.  I remember it being very close.  I was upset.

16     Q.  What was your mom's reaction to that?

17     A.  No -- no big deal.  Just because, you know, I

18  was going to be able to take the retake in a couple

19  months and, you know, continue on what I was going to

20  do.  And also I had graduated early, so it was also not

21  too big of a burden.  I wasn't even 18 yet.

22     Q.  What did your mom think about you graduating

23  early?

24     A.  Yeah, she was she was excited.  She was happy,

25  proud.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Did your stepfather ever show interest or was

2   he proud of you?

3    A.   Yeah, he was -- he was always -- he's always

4   been there.  He's not, like, a very in-his-feelings guy.

5   He's pretty -- like, you know, he doesn't express

6   himself much, but -- but he was there.  He was always

7   been there.

8    Q.   Okay.  How did he take the news that you

9   failed the FCAT portion?

10    A.   I don't -- I don't remember anybody being

11   upset or anything about it.

12    Q.   Just kind of doubling back, like, you know,

13   would -- when you would hang out with your friends,

14   would you guys ever, like, smoke cigarettes or anything?

15    A.   No.

16    Q.   Drink alcohol or anything like that?

17    A.   No.  Not -- not at -- not in that -- not in

18   those times.

19    Q.   Okay.  When -- like, in high school?

20    A.   Yeah.

21    Q.   Nothing like that?

22    A.   No.

23    Q.   What about marijuana?  Any marijuana use in

24   high school?

25    A.   Not in high school.  I started smoking a

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 little bit after.

2     Q. Like Valencia times, now that we're getting

3 into?

4     A. Maybe even after that, to be honest.

5     Q. Was it, like, with a medical marijuana card?

6     A. No, not at the time.

7     Q. In between graduating from Aloma and beginning

8 Valencia, you're -- you need to take the FCAT. Kind of,

9 what were you doing at that point?

10     A. I was actually -- I think I'm pretty sure I

11 got, like, a part-time job at McDonald's at the airport

12 while I was waiting. I had a friend that worked there,

13 so I -- I'm pretty sure that I had, like, a part-time

14 job at the airport during that time.

15     Q. What was your position there?

16     A. Just cooking -- cooking and cleaning type of

17 thing.

18     Q. Is that in one of the terminals that --

19     A. Yeah, I was -- I remember having to take the

20 train and the terminal and take -- all the way back

21 there.

22     Q. Do you go through security every day or

23 something?

24     A. Yeah. Yeah. I had to, like, take a shuttle,

25 go through security, go -- I had to do all that. Just

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    to try -- just to get to work.

2        Q.   That's a hassle.

3        A.   Yeah.

4        Q.   And you said you were part-time?

5        A.   Yeah, I think I was part-time.  Yep.

6        Q.   Were you trying to find something full-time,

7    or what was the decision to have part-time work?

8        A.   I think that was all they had available.  I

9    was under age still, so I didn't really have any other

10   work experience.

11       Q.   Okay.  So you're still 17 at this point?

12       A.   Yeah.  So I think that was just what was

13   available at the time.

14       Q.   And you had a plan to take the FCAT, retake

15   the FCAT.

16           What was your plan after that?

17       A.   Just start going to school and getting an

18   Associate's degree, and try to figure out what I was

19   going to do with my life.

20       Q.   Were the -- was that something that you

21   discussed with any family members?

22       A.   No.  Just figured it was the most beneficial

23   thing to do and the smart thing to do.  It was between

24   that or go to military, and that didn't really interest

25   me much so --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  Did you apply to different colleges, or

2  was Valencia the one that really stuck out to you?

3    A.   Yeah.  I went to Valencia just because I knew

4  it was, like, what everybody else -- the school that

5  everybody else was kind of going to, the local college.

6  And I know they had, like, ties with UCF and stuff like

7  that.  So that's kind of why I made that decision.

8    Q.   Were you still 17 when you began work -- or

9  excuse me, when you began attending Valencia?

10   A.   No, I was I was already 18.  Yeah.  I think I

11  was actually -- like, I didn't go to Valencia right

12  away.  I think I was -- I think I ended up being out of

13  school for, like, maybe, like, a year and then going to

14  Valencia.

15   Q.   Okay.  So --

16   A.   Yeah.

17   Q.   -- maybe about four months to take the FCAT,

18  and then you were --

19   A.   Maybe, like, another six, seven months after.

20  I don't -- I don't remember the -- that gap to be

21  honest, too much.  The -- the gap between high school

22  and college.  I knew I got a job at McDonald's for a

23  little bit, and I was waiting for the FCAT retake, and

24  maybe a short period of time after is when I ended up in

25  Valencia.  My family ended up moving again after high

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    school.

2        Q.   Where'd they move to?

3        A.   By Universal Studios.  Like, Conroy area.

4    Conroy and Vineland, after high school.  Yeah, we moved.

5    We moved to the other side of town.

6        Q.   I think at one point you said your family

7    lived in Ocala. At what point was that?

8        A.   That was -- that was in, like, two years after

9    high school.

10       Q.   Okay.

11       A.   My mom ended up getting a house in Ocala.

12       Q.   So we're getting to that point?

13       A.   Yeah.

14       Q.   Okay.  I understand.  Did you move with your

15   family when they moved over by --

16       A.   Oh.  No.  So --

17       Q.   -- Vineland and --

18       A.   -- that's when -- that's actually when I ended

19   up moving out with Marquis, because my mom got a house

20   in Ocala, and I was going to school at Valencia at the

21   time.  Marquis was going to Valencia at the time.  And I

22   remember, like, my mom got a house in Ocala, and I

23   didn't want to move to Ocala because I -- I was going to

24   school.  You know, I'm already kind of established over

25   here.  And so that's when I made the decision to -- to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    leave my parents' house and go get my own apartment with

2    Marquis.

3        Q.  Were you living in the -- I'll call it the

4    Vineland house for a time?

5        A.  Yeah.  Yeah.  We were there for, like, a year

6    or so.

7        Q.  Did -- you kind of said you don't really

8    remember that year in between high school and attending

9    Valencia so well?

10       A.  Yeah.  It was a blur.  I just remember waiting

11   for the FCAT retakes and waiting to apply for financial

12   aid type of thing.  Just kind of, like, a bunch of

13   waiting around at that time.  I'm still working at

14   McDonald's.  I ended up transferring to the McDonald's

15   over there by Vineland and Conroy.  So I was still

16   working at McDonald's at the time.

17       Q.  Were you still part-time at that time?

18       A.  Part-time or maybe, like, 30 hours a week type

19   of thing.  I'm not really sure if I was working 40 or

20   not.  I can't remember.

21       Q.  That was really your first job, though?

22       A.  Yes.

23       Q.  Was it a blur -- was that year a blur for any

24   other reason?

25       A.  No, it just -- there just wasn't much going on

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   at the time, you know?

2       Q.   Did you -- have you ever used -- like, are you

3   on medications, or prescription drugs, or anything like

4   that?

5       A.   At the time?

6       Q.   Yeah.

7       A.   No.

8       Q.   Okay.  Would you hang out with Marquis at that

9   point in that year?

10      A.   Yes.  Because he ended up -- his mom also

11  ended up moving to the same side of town.  So we ended

12  up being close to each other again.  So we started

13  spending a lot of time with each other.  And when my mom

14  made the decision to move, that's when me and him were,

15  like, hey, you know.  He had a -- I think he was, like,

16  living with his sister and her lease was coming up.  So

17  he also needed to kind of find somewhere to stay.  And

18  then my mom was moving away, and I wanted to stay.  So

19  we made the decision to get an apartment together.

20      Q.   So there's the year where you're waiting to

21  take the FCAT, and working, and preparing for Valencia.

22  And then at what point do you get a place with Marquis?

23      A.   Well, when my mom decided to buy the house in

24  Ocala.  I remember it was, like, the beginning of the

25  year, because I remember, like, the apartment complex

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  having, like, a -- like, a New Year sale type of thing

2  going on.  So I remember, like, the flags being up.

3      Q.   So you were already in Valencia, attending

4  Valencia at that point?

5      A.   Yeah.  I think I went to Valencia, like, after

6  I moved in with Marquis.  Yeah.  Because we had took the

7  English class together, I remember.  Well, I don't know

8  if we were already enrolled and then moved in.  So it

9  was very, like, close in time.

10      Q.   You took a class with him, you said?

11      A.   Yeah.  Yeah.  We took an English class

12  together.

13      Q.   At Valencia?

14      A.   Yeah.

15      Q.   Do you have to choose a degree that you're

16  working towards?

17      A.   At the time?  I don't remember doing that.  I

18  think we were just kind of doing basic studies and stuff

19  at the time.

20      Q.   What was your plan?  What kind of field did

21  you want to work towards?

22      A.   At the time, I wasn't sure, because I was kind

23  of, like, in between, like, healthcare stuff and then

24  number -- I was between, like, you know, do I want to

25  do, like, healthcare stuff, or do I want to be, like, an

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    accountant because I'm good with numbers type of thing.

2    Like, I -- I wasn't really sure what my interest was --

3    was at.  I just knew school seemed like a good idea.

4        Q.   What -- healthcare is a pretty broad field.

5        A.   Right.

6        Q.   What kind of position in healthcare interests

7    you?

8        A.   Yeah.  So I don't know, because I know I

9    didn't want to be, like, a nurse or a doctor because I

10   knew that was kind of, like, too intense for me.  So I

11   wasn't -- I wasn't really sure what path to take at the

12   time. I was kind of, like -- I only got to do one

13   semester in Valencia anyways.  So, like, after that --

14   after that, I kind of stopped thinking about it.  My mom

15   had got her identity stolen, so I couldn't apply for,

16   like, financial aid because I was a dependent, so I

17   didn't get to go through, like, a second -- second

18   semester in school, stuff like that.  So stuff started

19   happening, and plans started changing.

20       Q.   What kind of classes did you take in that

21   first semester?

22       A.   Yeah, so I remember just taking, like, an

23   algebra class and, like, an English class.  That's

24   pretty much all I took.  I didn't get to do much else

25   after that.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.  Two classes?

2    A.  Yeah.  I think it was, like, two classes.

3  Maybe I took like, a third and fourth, but it was

4  probably, like, English 1 and English 2, and then, like,

5  Algebra 1 and Algebra 2, something like that.

6    Q.  Were you still working at McDonald's at this

7  time?

8    A.  I ended up getting another job.  I just don't

9  remember if it was during the -- while I was going to

10  school.  Yeah.  I think I was still at McDonald's at the

11  time.

12    Q.  Where was the other job you had?

13    A.  I ended up working at BJ's Brewhouse after a

14  while.  Yep.

15    Q.  What did you do at BJ's?

16    A.  I was a busser.  I was saw Marquis was doing

17  pretty well with tips at his job.  And so I figured, you

18  know, it might be something good for me too at the time.

19    Q.  Were you full-time, part-time at BJ's?

20    A.  It was -- well, it was -- it was in between

21  both, just because, like, you would work depending on

22  how busy it was.  So I mean, you can get sent home at

23  any time or you -- unless you were the closer, you can

24  work all night so --

25    Q.  Did you ever like to be the closer there?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.  I didn't mind.  That's where the money --

2  that's what -- who -- who makes the most money is the

3  one who's closing.  So I didn't mind it.

4    Q.  How did your mom's identity get stolen; do you

5  know?

6    A.  We never got any clarity on that, to be

7  honest. I don't know what happened.  They said it was

8  someone out of New York or something like that, or

9  somebody was trying to use her identity in another

10  state.

11    Q.  So her identity's stolen.  What did -- they

12  closed all her accounts, or, like, what -- how did --

13  what happened after that?

14    A.  Yeah.  So -- so because -- because I was a

15  dependent and to -- and I had to apply for financial aid

16  using her income, I think.  I don't remember -- know how

17  that works.  I was young.  I just knew I had to, like,

18  show proof of, like, her tax returns and -- and her

19  stuff to apply for financial aid.  And it came back that

20  somebody tried to use her identity in -- in another

21  state.  So therefore I wasn't able to apply for

22  financial aid, and that's kind of why I kind of let that

23  go at that time.  So I ended up applying to go to a -- a

24  technical college and doing an x-ray program, instead.

25    Q.  Was -- were -- was your stepfather still in

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  the picture?  Like, he still lived with your mom and

2  everything?

3     A.  Yeah, he always -- he's always been with us.

4     Q.  And there was no thought to, like, okay, well,

5  yeah.  Mom's identity's stolen, but to go through your

6  stepfather and apply for financial aid like that?

7     A.  Yeah.  It wasn't anything I -- I knew about.

8  I didn't -- I didn't know if it was an option or not.  I

9  didn't really question it.  I didn't really -- I don't

10  know if he knew, either.  I don't know if -- we weren't

11  really educated on the -- on the circumstances, whatever

12  the case may be.  I just knew I had to figure out a plan

13  B at the point -- at that point so --

14     Q.  So it really wasn't something that you delved

15  too deep into it?

16     A.  Right.

17     Q.  Okay.  No -- like, not a lot of research,

18  just, like --

19     A.  Correct.

20     Q.  -- this is the situation.

21     A.  Yeah.

22        THE REPORTER:  I'm so sorry.  I can only take

23  down one person talking at a time, if you'd just

24  take a moment.  Thank you.

25        MR. MISTOLER:  We'll do better.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  BY MR. MISTOLER:

2      Q.  So you applied to a technical college at some

3  point?

4      A.  Yes, sir.

5      Q.  At what point after the first semester of

6  Valencia did you apply to the technical college?

7      A.  Not long after.  Maybe it took me, like, a

8  couple months to make that decision.

9      Q.  Was that when you were not going to school at

10  that point?

11      A.  Yeah.  I finished that one semester in

12  Valencia.  I couldn't get into a second semester, so at

13  that point, Mom -- my mom was kind of, like, well, what

14  are you going to do?  So I did some research, and I

15  found a technical college nearby, and I decided to give

16  it a try.

17      Q.  You were 18 by the time you were at Valencia?

18      A.  Yes.

19      Q.  Is -- was there any, like, ability to, because

20  you're an adult, get your own financial aid and not go

21  through your mom?

22      A.  I'm not sure.  I don't know if I've never

23  looked into it, or I was uneducated about it, or --

24      Q.  Just something you never looked into?

25      A.  Yeah.  After -- after that happened with my

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  mom, I was just kind of, like, figure something else

2  out.

3      Q.  How were your grades that first semester?

4      A.  I think I did -- I remember doing good.  I

5  don't -- I -- I don't remember being concerned about

6  failing or anything.  I don't -- remember I wrote a

7  bunch of essays, and I didn't really have any issues.

8      Q.  Passed all your classes?

9      A.  Yes.  Algebra was easy.

10     Q.  No disciplinary trouble or anything there?

11     A.  No.

12     Q.  No suspensions?

13     A.  No.

14     Q.  Stayed out of trouble?

15     A.  Yes.

16     Q.  Up until this point, have you -- had you ever

17 been involved with any, like, legal actions against you?

18     A.  Yes.

19     Q.  What happened?

20     A.  When I was -- what was it?  Like, I think it

21 was that time between high school, or graduating high

22 school and -- and Valencia.  I was arrested as a

23 juvenile.

24     Q.  Why'd they arrest you?

25     A.  I was in the backseat of a stolen vehicle.  I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1    got charged with a trespassing.

2        Q.  Who was driving the car?

3        A.  Angel.  Angel Cruz, I think was his name.

4    Yeah.  Angel Cruz.

5        Q.  Who's Angel Cruz?

6        A.  He was just a friend at the time.

7        Q.  How'd you know Angel?

8        A.  Mutual friends.

9        Q.  Were you -- were there other people in the

10   automobile?

11       A.  Yeah.  There was another guy named Jamian.  He

12   was in the passenger seat.

13       Q.  So just you three in there?

14       A.  Yes.

15       Q.  What -- about what year was that?

16       A.  I graduated 2010.  So I'll say, like, 2011.

17       Q.  And you were charged?

18       A.  Yes.  I got charged with trespassing that --

19   the vehicle.

20       Q.  Were you aware that this vehicle had been

21   stolen when you were in it?

22       A.  Not at all.  Not until after I got in it.

23       Q.  Was Angel charged with anything?

24       A.  I think so.  I don't know what.  I don't --

25   because he was -- he didn't do any jail time or

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    anything.  I don't know if he got, like, probation or

2    anything.  I don't -- I don't know what his discipline

3    was, but I know his charges were different than mine,

4    just because he was, like, the driver and stuff.

5        Q.   And how did he -- how did you know Angel?

6        A.   Mutual friends.  I met him through a friend of

7    a friend.

8        Q.   Who was the -- what was the chain?  What were

9    those people?

10       A.   Just people -- I think, like, his sister knew

11   some of my friends or something like that, and we would

12   come around and, like, hang out with her, his sister,

13   and, like, he was always around.  That kind of -- he --

14   just part of the friends group and he was, like, the --

15   the younger one out of everybody.  But his little sister

16   always kept him around, and that's kind of how we got to

17   know each other.

18       Q.   How about Jamian?  How did you know him?

19       A.   Same -- same situation.  He was part of the

20   same friends group.  Met him through mutual friends.

21   Kind of just happened.

22       Q.   Were they guys that you had met in this period

23   in between high school and Valencia, or did you know

24   them before?

25       A.   Yeah.  No.  I met -- I met these guys after

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  high school and not long after, we got in trouble.

2      Q.  Do you keep in contact with Angel?

3      A.  No.

4      Q.  How about Jamian?

5      A.  Nope.

6      Q.  What were you guys doing on that night -- or

7  that day, I guess?  What -- I don't even know what time

8  -- what time was it where you pulled over?

9      A.  It was -- I want to say it was, like, the

10  middle of the day.  Nothing -- I was on my -- I was

11  riding my bicycle to his house to -- just to see what

12  they were doing that day.  And they -- I was crossing

13  the gas station, and they pulled up on me in a car, and

14  they're, like, hey, what are you doing? And I'm, like, I

15  was on my way to your house. He's all, get in the car.

16      I'm thinking it's, like, his mom's car or

17  something.  I'm not -- I'm not thinking, like, he's in a

18  stolen car.  So I was, like, all right.  And just jumped

19  in the car with them.  And after I got in the car, I

20  realized it wasn't his car and --

21      Q.  How -- how'd you realize that?

22      A.  Just because I looked -- looked like it was

23  broken stuff in the vehicle, like, by the key ignition

24  and stuff.  That's when I kind of realized it wasn't his

25  car.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   What'd you do after you realized it wasn't his

2  car?

3    A.   Me being young and stupid, I stayed in the

4  car. And not long after, we got pulled over.

5    Q.   What did you do with your bike?

6    A.   I had dropped it off at his apartment, I'm

7  pretty sure.  Something like that.

8    Q.   Were these guys in, like, a gang or anything?

9    A.   Not that I knew of.

10   Q.   You've never been in a gang, have you?

11   A.   No.

12   Q.   Did you fight this trespassing charge?

13   A.   I don't remember.  I -- I don't even remember,

14  like, going to court much about it.  I think -- I think

15  I -- I think I just paid some fines or something like

16  that.  I don't -- I don't remember, like, going -- going

17  to jail or doing probation or anything.

18   Q.   You were 18 at this point?

19   A.   No.  No.  I went, because I remember going to

20  juvenile jail, so I was, like, 17.

21   Q.   How old was Angel?

22   A.   He was a juvenile, too.  I think he was, like,

23  16 or 15.

24   Q.   And Jamian?

25   A.   Jamian was actually 18.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.  Did he ever tell you, like, how he stole the

2  car?

3    A.  No.

4    Q.  What -- was Jamian charged?

5    A.  I don't know, because he ended up going to,

6  like, adult jail, and we never -- we never really spoke

7  about the situation after the fact.

8    Q.  He -- and I'm sorry.  You said he was older?

9    A.  Yeah.

10    Q.  He was not a minor?

11    A.  Right.

12    Q.  You didn't help them steal the car, did you?

13    A.  No.

14    Q.  So any other involvements with law enforcement

15  like, you know, similar to this?

16    A.  No.

17    Q.  This -- so this is really the only time other

18  than, you know, what we'll get in today later, where you

19  had, like, a run-in with the police or anything?

20    A.  Yeah.

21    Q.  What did the police officers do?  Did they

22  just see the car --

23    A.  Well, Angel drove right in front of the police

24  station for some reason, and there was a cop next to us

25  at the red light.  And as soon as the light turned

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   green, they just pulled us over, and that was pretty

2   much it.  Yeah.

3       Q.   What was your thought in that moment?

4       A.   Never thought I'd be in this situation.  Kind

5   of scary.

6       Q.   Were you surprised?

7       A.   Very surprised.  But then I felt, like, you

8   know, I should have got out the car when I realized it

9   was --

10      Q.   Is that what you told the cops?

11      A.   I don't remember what I told the cops.  I

12  think -- I think I took accountability for -- for the

13  most part, you know, as far as, like, knowing that I

14  should have got out the car and -- when I realized what

15  was going on and stuff like that.

16      Q.   You didn't get a lawyer in that moment?

17      A.   No.

18      Q.   You took accountability for -- you didn't even

19  realize really you were in a stolen car, and maybe you

20  did, but you went ahead and said, yeah, I was in the --

21  I was trespassing in the stolen car?

22      A.   Correct.

23      Q.   Was this -- was -- were you originally charged

24  with something different, and then, like, the sentence

25  was changed?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   A.   I don't think so.  I think my charges were the

2   same from the beginning.

3   Q.   What kind of penalty did you have to -- do you

4   -- I think you mentioned fines?

5   A.   Yeah.  I did some -- I paid some fines, but I

6   don't remember ever having to, like, do any probation or

7   go to jail or anything like that.  I -- I would've

8   remembered that.

9   Q.   Any sort of, like, community service or

10  anything?

11  A.   I don't remember doing that, either.

12  Q.   Don't really remember what happened to Angel,

13  you said?

14  A.   No.  He -- from my knowledge -- I ended up

15  moving away to the other side of town.  And to my

16  knowledge, he kept being a troublemaker.  He ended up

17  going to prison and stuff so --

18  Q.   What'd he go to prison for?

19  A.   I'm not sure.  I know he did, like, five years

20  and he went in when he was, like, 15 and got out when he

21  was, like, 19.  He was an abused kid.

22  Q.   Did you know he was kind of trouble when you

23  were hanging out with him?

24  A.   He was -- we knew he was a troublemaker, but

25  he was also -- everybody liked him.  Like, he was one of

MILESTONE │ REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 those people, like -- like, he was liked by everybody,

2 you know?  Like, everybody looked at him as a little

3 brother.  Like, everybody just loved him, always smiles

4 around him.  For some reason, he was always getting into

5 trouble.  I don't know if it was who he grew up around,

6 or his family, or not.

7    Q.   At one point you -- at what point do you apply

8 for the technical college?

9    A.   Not long after I found out I couldn't do a

10 second semester at Valencia.  At that point, I kind of

11 tried to figure out plan B as fast as possible.

12    Q.   Was this incident -- well, I guess this was

13 before you went to Valencia, right?

14    A.   Yeah.  That was way before.  Yeah.

15    Q.   Did you have to disclose this to Valencia?

16    A.   No.

17    Q.   Okay.  So was this incident involved in any

18 other reason of why you didn't do another semester

19 there?

20    A.   Yeah.  No, it didn't have anything to do with

21 it.

22    Q.   What was the technical college you applied to?

23    A.   It was Anthem -- Anthem College.

24    Q.   Where is Anthem College?

25    A.   It was behind Fashion Square Mall in Colonial.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    It's not there any longer.  They closed.

2       Q.   What was your plan there?  Like, what did you

3    want to study?

4       A.   I was going to school to be an x-ray

5    technician at the time.

6       Q.   Is that, like, the program you were in?

7       A.   Yeah.  They -- they had other programs there.

8    I'm pretty sure they had, like, a medical assistant and

9    dental -- dental hygiene programs.  They had a couple

10   extra -- other programs in that school.

11      Q.   What does an x-ray technician do?

12      A.   Yeah.  We were just studying how to -- all --

13   learn all the bones in your body and how to take images

14   of them and stuff like that.

15      Q.   Did you enjoy that?

16      A.   Yeah, it was -- it was not -- not that hard

17   and a lot of studying, and reading, and terminology, but

18   other than that, it was -- it was chill.

19      Q.   Did you pass the classes there?

20      A.   Yeah, I passed all my classes.

21      Q.   How long were you at Anthem for?

22      A.   I want to say at least, like, nine, ten

23   months.

24      Q.   How long was the program supposed to be?

25      A.   Close to that.  I was almost done.

MILESTONE │ REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   And then are we kind of getting into the
2  incident here that prevented you from --
3    A.   Yes.  Yes.  While I was going to school is
4  when I got arrested.  Yeah.
5    Q.   Okay.  So you --
6    A.   I think I had just started.  Either I had just
7  started or I got arrested right before I started.
8    Q.   For the subject incident we're talking about?
9    A.   Uh-huh.  Yes.
10    Q.   So -- okay.  You had a plan to go to take the
11  x-ray technician program or whatever, but when you
12  started there -- a little bit after you started there is
13  kind of when you were arrested for this situation?
14    A.   Yes.
15    Q.   So how -- about how long would you say you
16  were even taking classes there?
17    A.   Before I got arrested or before I got --
18    Q.   Before you got --
19    A.   -- went to trial?
20    Q.   -- arrested?
21    A.   It was very close time frame.  It was -- I got
22  arrested either right after I started or right before I
23  started, and then I was out on bond for a whole year.
24  And that time that I was out on bond is when I finished
25  all my courses.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Before that, did you have any -- like, some

2  people do the GED.  That's, like, a test or whatever.

3  Did you think about doing anything like that?

4    A.   I didn't need it.  I had my diploma.

5    Q.   Okay.  So for here was really the idea you

6  wanted to do an x-ray technician program and kind of

7  pursue that area?

8    A.   Yes.

9    Q.   No longer wanting to do, I think you said

10  accounting or something like that?

11    A.   Yes.  Correct.

12    Q.   Were you dating anyone at the -- at this time?

13    A.   At the time?  No.

14    Q.   No girlfriend; anything like that?

15    A.   I met Jasmine, like, a month before I got

16  arrested.

17    Q.   And who is Jasmine?

18    A.   Jasmine is my girl now.  We've been together

19  ever since.

20    Q.   Still together?

21    A.   Yes.

22    Q.   What's Jasmine's last name?

23    A.   Ortiz, O-R-T-I-Z.

24    Q.   Does she have any relation to the -- this guy

25  we'll talk about, Amos Ortiz?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.  No.

2    Q.  Just similar last name?

3    A.  Oh, I -- I forgot they had the last name.

4  Yeah, just similar last names.

5    Q.  Okay.  Was Jasmine working at this time about,

6  you know, a month, you say, before you were arrested?

7    A.  Yeah, she was working.  She was -- she was

8  always working since I've known her.

9    Q.  What does she do?  What did she do at this

10  point?

11    A.  At -- at the time, she was -- when I got

12  arrested?  I want to say she was working at a restaurant

13  as a server, maybe.  I don't know.  She had, like, a

14  Planet Smoothie job for a little bit while I was

15  incarcerated.  So that was after.  Yeah.  I think she

16  just worked at -- at a restaurant, and she was -- pretty

17  sure she was, like, a full-time student too, at

18  Valencia.

19    Q.  What restaurant did she work at?

20    A.  At the time, I know she -- when I met her --

21  she got the restaurant after.  I don't know where she

22  was working at when I met her, exactly.  I know, like,

23  shortly after we met, though, she started working at

24  Cheddar's.

25    Q.  How'd you meet her?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    A.   We -- I met her at a -- at a party.

2    Q.   What kind of party?

3    A.   It was like an Airbnb,

4    high-school-kids-just-graduated type of thing.

5    Q.   Was that for your graduation or --

6    A.   Well -- well --

7    Q.   -- this was after?

8    A.   It wasn't Airbnb because Airbnb didn't exist

9    yet.  It was like a -- like a -- but it was, like a

10   resort-type, like villa, like a house type of thing.

11   Q.   Can you remember where it was?

12   A.   Yeah.  It was in -- what was it called?  It's

13   all -- it was off I-Drive by TopGolf.  I can't remember

14   the place.  I -- I can't think of it.  It'll -- it'll

15   pop up in my head, but yeah, it was like a -- it was

16   like a villa.

17   Q.   Was she younger than you or older?

18   A.   Yeah.  She's younger than me about, like, a

19   year-and-a-half.

20   Q.   So was it -- was she graduating high school,

21   and you were already out?

22   A.   Yeah, I was already out.  She had just

23   graduated.

24   Q.   Was this kind of her graduation party there?

25   A.   Yeah.  This was, like, a bunch of, like, her

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 high school buddies. And then I had a mutual friend who

2 brought me to the party.

3    Q. Who was the friend?

4    A. Karl.

5    Q. What's Karl's last name?

6    A. I don't know.

7    Q. Is it Karl Jeudy?

8    A. Yes. Karl Jeudy.

9    Q. How'd you meet Karl?

10    A. Karl was Marquis's friend.

11    Q. And you are living with Marquis at this time?

12    A. Yes.

13    Q. In that -- it was an apartment?

14    A. We had just got our apartment in January, and

15 I -- I think the party was, like, February.

16    Q. Before you had the apartment with Marquis, did

17 you know who Karl was?

18    A. Yeah. Just because he always hung out with

19 Marquis. They were like -- they, like, lived next to

20 each other in high school. And I was close with

21 Marquis, obviously, so -- he was close with Karl, and

22 that's kind of how I knew him.

23    Q. What did Karl do for work?

24    A. I'm not sure. I think -- I know he worked at

25 Universal for a while. I don't know how long or when.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1    Q.  Do you know what he did?

2    A.  No.

3    Q.  Do you know if he was, like, going to school

4  or anything?

5    A.  No.  I didn't really hang out with him much.

6  He was kind of more of Marquis's friend than mine.

7    Q.  Was Marquis still working at Universal at this

8  point?

9    A.  Yeah.  Marquis worked at Universal for, like,

10  seven years.  Or he -- actually, he worked there his

11  whole life, until he passed.

12    Q.  When did -- when did Marquis pass?

13    A.  He passed away -- I want to say it was, like,

14  2020.

15    Q.  Do you know how he died?

16    A.  Yeah.  He -- he had a heart condition, a

17  cardiomyopathy.  And he was on -- he was on a treadmill

18  at Planet Fitness, and his heart just stopped.

19    Q.  He was pretty young.

20    A.  Yeah.  He was 27.

21    Q.  There was no, like, drug abuse or anything

22  that caused that?

23    A.  No.  He -- he was aware of his condition.  I

24  think his dad passed away the same way.

25    Q.  What -- did you ever see him, like, using

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1   medicine for the heart condition?

2      A.   He was supposed to be, and he wasn't.

3      Q.   How do you know that?

4      A.   His mom.

5      Q.   You talked with his mom?

6      A.   Yeah.

7      Q.   And she -- what did she tell you?

8      A.   That he was supposed get a -- a defibrillator

9   or be on medication, and he didn't want to do either.

10     Q.   Is that something, when you were living with

11  him, you kind of knew that he had the heart condition?

12     A.   I actually didn't.  He didn't really, like --

13  was open -- he wasn't very open about it, so I didn't

14  know.

15     Q.   Okay.  So you kind of met Jasmine Ortiz at the

16  party --

17     A.   Uh-huh.  Yes.

18     Q.   -- and you hit it off from there, you guys

19  liked each other?

20     A.   Yes.

21     Q.   Would you go on dates or anything?

22     A.   Yeah.  We -- we would go to Universal Studios.

23  Because my buddy worked there, so he was able to give me

24  some tickets.  That was, like, one of our first dates,

25  went to Universal.  Dinner.  She would come to the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 house.  Yeah.  Stuff like that.

2     Q.  Is her family local?

3     A.  Yes.  Yes.

4     Q.  Does she have any children?

5     A.  No.

6     Q.  Which buddy would help you get to Universal or

7 get into Universal?

8     A.  Marquis.  He worked there.

9     Q.  Okay.  Okay.  Let me just look here.  How many

10 people lived at the apartment where you and Marquis

11 were?

12     A.  Just me and him.

13     Q.  How big was the apartment?

14     A.  The apartment building or the apartment?

15     Q.  The room that you -- or the unit that you had.

16     A.  Oh.  Yes.  It was a two-bedroom, two-bath.  I

17 had a balcony.  And it was, like, two stories.  We lived

18 on the second floor.

19     Q.  Would you all have friends come over often?

20     A.  Yes.

21     Q.  Sometimes?

22     A.  Sometimes.

23     Q.  Can you recall any friends, other than Karl,

24 who would come over?

25     A.  Jasmine.  I had a buddy that lived down the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  street who would come sometimes to play video games.

2  Q.  What was his name?

3  A.  Anthony also, but this is another Anthony.

4  Q.  What's Anthony's last name?

5  A.  Duran, D-U-R-A-N.

6  Q.  Who was the other Anthony?  We -- did we talk

7  about another Anthony?

8  A.  Yeah.  Yeah.  That was my high school buddy,

9  Anthony Siemer.

10  Q.  Got it.  Okay.  Do you know if Anthony did --

11  worked or anything?

12  A.  At the time, he's -- he would mention, like,

13  doing work, helping his dad do some handyman's type of

14  work.  I'm not really sure what it -- what it was.  I

15  just knew he, like, helped out his dad or work with his

16  dad sometimes.

17  Q.  Okay.  So at this point, you're working at

18  McDonald's and --

19  A.  Yeah.  So -- no.  When I moved in with

20  Marquis, I think I had already had got the BJ's

21  Brewhouse job.

22  Q.  Right.  Okay.  So you're working there, and

23  Marquis is still working at Universal?

24  A.  Correct.

25  MR. MISTOLER:  Let's see here.  I know you have

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    -- you have this one, Roz.

2        This is going to be Defendant's Exhibit number

3    1.  I don't know.  Do you want me to mark this up

4    for you?

5        (Exhibit 1 was marked for identification.)

6        THE REPORTER:  Just throw a number on there.

7        MR. MISTOLER:  Okay.

8        THE REPORTER:  And I'll fill out the rest.

9    BY MR. MISTOLER:

10       Q.  I'm handing you Defendant's Exhibit number 1.

11   Do you recognize this document I'm giving you?

12       A.  Yes.

13       Q.  What is this document?

14       A.  It's pictures of me and some of my friends.

15       Q.  You've seen this document before?

16       A.  Yes.  This was presented to me by Detective

17   Stanley.

18       Q.  How did Detective Stanley give this to you?

19       A.  He showed this to me when I was being

20   interrogated after my arrest.

21       Q.  Where did he interrogate you?

22       A.  Downtown Orlando.  I think it was, like, the

23   headquarters.

24       Q.  Okay.

25       A.  Some room.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Q.  I want you to take a minute and read this case

2  info block here.  Just -- you can read it by -- to

3  yourself.

4    A.  Okay.

5    Q.  Do you recall this -- the date here of April

6  3, 2013?

7    A.  This is the day we got pulled over.  Yes.

8    Q.  And it says, "An occupant of a silver

9  four-door 2003 Volkswagen Jetta GLS, similar to the one

10  pictured, bearing Florida tag M64-2EK was seen knocking

11  on doors to different houses and then entering the

12  backyard of 5075 Andrea Boulevard."  Were you in a car

13  like this on that day?

14    A.  Later on in the day, I was in that car.

15    Q.  And was this car pulled over at some point?

16    A.  Yeah, we got pulled over.  It was already dark

17  -- dark outside, so it was nighttime.  Yeah.  Just got

18  done playing basketball.

19    Q.  Why did you guys get pulled over?

20    A.  I thought it was because we didn't put our

21  turn signal on going into the gas station.  At least

22  that's what the -- I think the cops told us at the time.

23    Q.  Okay.

24    A.  I don't remember.

25    Q.  Did they indicate that they had seen

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  individuals knocking on doors like this?

2    A.  No.

3    Q.  So is -- for these -- where it says, "knocking

4  on doors," is that not you?  Was it -- that they're

5  talking about?

6    A.  Not at all.  No.

7    Q.  You -- have you ever been to this area, 5075

8  Andrea Boulevard?

9    A.  No.  I don't even know where that's at.

10    Q.  Do you recognize, like -- and I realize it

11  says it's similar to this one, but do you recognize a

12  car like that?

13    A.  Dani had a silver Volkswagen.  I don't know if

14  it was the same model as this one.  Hers looked actually

15  a little newer than this.

16    Q.  Okay.  Was she driving when you all got pulled

17  over?

18    A.  Yes, she was driving.  It was her car.

19    Q.  Who kind of gave this description of, I guess,

20  individuals in a car like this with the -- with the tag

21  and fitting, I guess, the -- your images here?  Do you

22  know who, sort of, called this in to the police

23  department?

24    MS. DILLON:  Objection.  Form.

25    You can answer.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1          THE WITNESS:  No.

2     BY MR. MISTOLER:

3          Q.   But it's your testimony today that you were

4     not, on April 3, 2013, knocking on doors and going from,

5     kind of, house to house, and going into the backyard of

6     different houses on Andrea Boulevard?

7          A.   What -- what are you -- what are you asking

8     me?

9          Q.   It wasn't the best question.

10         A.   Okay.

11         Q.   So you -- you're saying that the description

12     of individuals knocking on doors in different houses on

13     Andrea Boulevard and entering the backyard of this

14     particular residence, 5075 Andrea Boulevard, that was

15     not you?

16         A.   Correct.  Not me.

17         Q.   Why did they -- why was this bulletin

18     generated, then?

19         MS. DILLON:  Objection.  Form.  Foundation.

20         You can answer.

21         THE WITNESS:  I have no idea.

22     BY MR. MISTOLER:

23         Q.   Do you think it's kind of strange that a

24     criminal information bulletin with your image and other

25     individuals in the car was generated?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.  Do I think it's strange?  Yes.

2    Q.  But you have no idea why all of your images

3  were put together like this?

4    A.  Well, the only reason I could think of was

5  because we got pulled over, but other than that, I don't

6  know why else our pictures would be together.

7    Q.  You weren't casing houses on April 3, 2013?

8    A.  No, sir.

9    Q.  Were you casing houses on any other day around

10  this time?

11    A.  No.

12    Q.  This second photo is you, correct?

13    A.  Yes.

14    Q.  When was that photo taken?

15    A.  2011.  I'm not sure what the date was.  I just

16  know that was the year my license was issued, and that's

17  the picture out of my license.

18    Q.  Where were you during the day of April 3,

19  2013?

20    A.  April 3rd, when we got pulled over?

21    Q.  Before you got pulled over, what were you

22  doing that day?

23    A.  Oh.  I'm pretty sure I slept in kind of late,

24  maybe, like, until noon or 1:00.  I used to work late-

25  night shift, so I used to wake up late.  And I was

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  getting ready for an evening shift, probably, like,

2  around 5:30, 6:00, so I was probably just hanging out at

3  the house, waiting to go to work soon.

4     Q.  If they pulled the tag and it was M64-2EK, and

5  that was -- was that Dani's car?

6     A.  I don't know what her tag was, to be honest.

7     Q.  If somebody saw that car at this location and

8  copied that tag -- strike that.

9       Why do you think someone gave this tag number

10  matching Dani's car?

11       MS. DILLON:  Objection.  Form.  Foundation.

12       You can answer.

13       THE WITNESS:  I don't know.  I didn't even know

14   or -- that somebody had done that.

15  BY MR. MISTOLER:

16     Q.  But this was definitely not you that --

17  whoever was knocking on doors on Andrea Boulevard?

18     A.  Correct.

19     Q.  Do you even know where Andrea Boulevard is?

20     A.  I have no idea.  No.

21     Q.  Where does -- where does Dani live?

22     A.  I don't know.

23     Q.  Where did -- at this time, where did Dani

24  live?

25     A.  At the time, I don't know.  I never went to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  her house before or anything.

2      Q.   What's her connection to the rest of you all?

3      A.   She was Karl's girlfriend at the time.  And

4  -- yeah.  That was it.  She was Karl's girlfriend.  And

5  Karl was Marquis's friend, and they would come over to

6  the house and hang out sometimes.

7      Q.   Are you aware of any involvement with law

8  enforcement by any of these other individuals, not you?

9      A.   No.

10     Q.   Dani never had any troubles with the law, that

11  you know of?

12     A.   Not that I know of.

13     Q.   What about Marquis?

14     A.   Never.

15     Q.   Karl, no problems?

16     A.   No.

17     Q.   None of them ever arrested, as far as you

18  know?

19     A.   I don't think so.

20     Q.   Do you know if any of them would rob houses or

21  anything?

22     A.   No.  I'm pretty sure they wouldn't.

23     Q.   What makes you say that?

24     A.   I've never seen them do anything like that.

25  I've never seen them steal or anything like that, or

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  witnessed any type of criminal activity with them, so

2  never really had reasons to think that way.

3     Q.   Had you ever ridden with Dani before in her

4  car?

5     A.   If I did, maybe, like, one or two other times.

6  I don't remember being in her car many times at all.

7  That -- that probably was the only time I was in her car

8  ever, to be honest.  I don't remember ever getting in

9  her car.  I had my own car.

10    Q.   What kind of car did you have?

11    A.   I had a yellow Dodge Neon.

12    Q.   It says the officers stopped the vehicle the

13  same day and identified the four occupants below.  So do

14  you recall being pulled over?

15    A.   Yes.

16    Q.   What interaction did you have with the police?

17    A.   It was very short.  They searched the vehicle.

18  Don't know why.  They -- they told us that it -- it was

19  because we didn't have our turn signal on.  They -- they

20  never told us it was because of anything else.  They

21  searched the vehicle.  They didn't give us a ticket or

22  anything.  We kind of just went home after that.

23    Q.   Where were you all going?

24    A.   We were on our way back home.  We were -- just

25  got done playing basketball.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.   And about where in town did they pull you

2  over?

3    A.   It was on -- on Hoffner and Goldenrod at the

4  Wawa.  We were turning into the Wawa, and they kind of

5  just pulled in right behind us.  They were already

6  behind us, apparently.  So we were -- I -- we -- I'm

7  pretty sure we were stopping at the Wawa for -- for gas

8  or something.  They just pulled in right behind us.

9    Q.   Did they indicate that they had seen a car

10  with this tag or -- strike that. Did they indicate that

11  somebody had seen this car with the tag, M64-2EK,

12  earlier that day?

13    A.   Yeah.  No, they didn't mention anything about

14  that.

15    Q.   Why do you think they generated this criminal

16  information bulletin?

17        MS. DILLON:  Objection.  Form.  Foundation.

18    Asked and answered.

19        You can answer.

20        THE WITNESS:  If I had to take a guess, it was

21    because I had an Afro, and they were looking for

22    somebody with an Afro.

23  BY MR. MISTOLER:

24    Q.   Do you think they were also looking for, like,

25  a dude who looked like Marquis?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.  No.  Because they were never questioned, or

2  arrested, or -- or asked about anything.  It was just

3  me.

4    Q.  They weren't looking for Karl?

5    A.  Nope.

6    Q.  They weren't looking for Dani, either?

7    A.  Nope.

8    Q.  So you think they put you in this picture only

9  because you had an Afro?

10     MS. DILLON:  Objection.  Form.  Foundation.

11     You can answer.

12     THE WITNESS:  That's what I think.  Yes.

13  BY MR. MISTOLER:

14    Q.  Why would they put the other three in there?

15     MS. DILLON:  Objection.  Form.  Foundation.

16     You can answer.

17     THE WITNESS:  Just because we were all pulled

18  over together.

19  BY MR. MISTOLER:

20    Q.  Okay.  Were you going to work that night?

21    A.  I was supposed to, and I didn't.

22    Q.  Why did you not go?

23    A.  Because I decided to go play basketball with

24  my friends instead, and also because my work shift was,

25  like, a three-hour rolling silverware shift that I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    didn't mind skipping out on.  Yeah.  We had to just come

2    in, like, once a week and roll silverware for, like,

3    four hours at the restaurant.  And that didn't pay much,

4    so I didn't mind calling out that day.

5        Q.   Did you call out often?

6        A.   That was the only time I ever called out.

7        Q.   That was at the BJ's job?

8        A.   Yes.

9        Q.   Did all of you play basketball that day?

10       A.   Yes.  Except Danielle.

11       Q.   What was she doing?

12       A.   I think she was just watching.

13       Q.   What basketball court were you at?

14       A.   Dover Shores Community Center.

15       Q.   How many officers were involved in that

16   incident where you were pulled over here?

17       A.   I don't remember seeing, like, more than maybe

18   three.

19       Q.   Did they all talk with you?

20       A.   I don't remember talking to more than one.  I

21   don't think so.

22       Q.   Did they, like, ask you to get out of the car

23   and --

24       A.   Yeah.  I remember getting out of the car and

25   them searching the vehicle.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.   Okay.  But really, no, you don't -- you can't

2  recall any discussions they had?

3    A.   No, not really.

4    Q.   What did you all think after that?

5      MS. DILLON:  Objection.  Form.  Foundation.

6      You can answer.

7      THE WITNESS:  We didn't really think anything

8  of it.  We didn't get a traffic ticket.  I mean --

9  BY MR. MISTOLER:

10     Q.   You weren't like, oh, that was weird?

11     A.   Yeah.  We -- we didn't really think -- I just

12  thought they -- I thought my -- I thought she forgot to

13  put her blinker on, and I really thought that's all that

14  was.

15     Q.   Did you think it was like, oof, we're lucky

16  that -- didn't get a ticket or whatever?

17     A.   I was in the back seat, and it wasn't my car,

18  so I -- I was never really concerned, to be honest.

19     Q.   What about the other guys, Marquis and Karl?

20     A.   No.  We weren't doing anything wrong, so we

21  weren't really worried about anything.

22     Q.   Was Karl in the front-passenger side?

23     A.   Yes.

24     Q.   And Marquis was in the back-left -- or back

25  with you?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.   Yeah.  He was in the back seat with me.

2    Q.   You went home after that incident?

3    A.   Yes.

4    Q.   And just sort of went on with your day and

5  night?

6    A.   Yes.

7    Q.   When was the next time you would go to work?

8    A.   I don't know if I had to work the next day or

9  not, but -- yeah.  I don't -- maybe the next day.

10    Q.   Okay.  You said it was, like, midday when you

11  were pulled over?

12    A.   No.  We got pulled over, it was nighttime

13  already.

14    Q.   Did Dani have a car -- a Jetta like that?

15    A.   She had --

16       MS. DILLON:  Objection.  Form.

17       You can answer.

18       THE WITNESS:  She had a Jetta, yes.  I remember

19  her having a Jetta.

20  BY MR. MISTOLER:

21    Q.   And you have no idea who would've indicated

22  that there was a -- an occupant of that Jetta knocking

23  on doors?

24    A.   Nope.

25    Q.   Okay.  After this, what was the next sort of

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 involvement with this case? Were you arrested later --

2 sometime later?

3    A.  After this traffic stop, yeah, I think -- I

4 think I got arrested, like, two or three weeks after.

5    Q.  Were you also pulled over in a stop on a

6 different night?

7    A.  I don't think so.

8    Q.  Not on April 9, 2013?

9    A.  Pulled over April 9th?  I don't remember.  I

10 don't think so.

11    Q.  Just -- so, really, it was -- you just recall

12 being pulled over on this one --

13    A.  Uh-huh.  Yes.

14    Q.  -- for this one incident?  Was this on -- were

15 you pulled over on the 3rd?

16    A.  I don't remember the exact date, to be honest.

17    Q.  Okay.  Just recall that it was nighttime?

18    A.  Yeah.

19    Q.  What were you doing when you got arrested?

20    A.  I was in -- in my living room, waiting for the

21 maintenance guy to come fix something in my bathroom.  I

22 was at the house.

23    Q.  What was -- what needed fixing?

24    A.  I think it was, like, something with the

25 floors or the sink.  I couldn't remember.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   What time of day was it?

2    A.   It was -- it was early in the day.  It was,

3  like, noon-ish, probably.  I was just waiting for the

4  maintenance guy to come to the house.  And they -- U.S.

5  Marshals came to the house, and they arrested me in my

6  living room.

7    Q.   What went through your mind at that point?

8    A.   Very confused, upset, because they didn't want

9  to tell me why I was being arrested at first.  Mostly

10  confusion and -- yeah.  Just confusion and -- and upset.

11   Q.   Was Marquis also home on that day?

12   A.   Yes.

13   Q.   Did they -- somebody knocks at the door, and

14  one of you goes and answers?

15   A.   Yes.  Marquis opened the door.

16   Q.   What did they -- could you hear them at the

17  door on that day?

18   A.   No.  They just knocked, and we thought it was

19  the maintenance guy, so we kind of just opened the door.

20   Q.   Do you recall the date of that arrest?

21   A.   The actual date?

22   Q.   Yeah.

23   A.   I know it was, like, April.  Maybe April

24  20-something.

25   Q.   I think I had April 24th.  I'm not trying to

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1  --

2     A.   Yeah.  That sounds -- that sounds close.

3  Yeah. All right.

4     Q.   So you were just at home.  Were you planning

5  on going to work at that -- on that day?

6     A.   I don't.  I'm -- I'm -- I don't think so just

7  because Jasmine was also at the house, and -- so I don't

8  -- I think I had the day off that day.

9     Q.   Did you share with Jasmine this incident where

10  you were pulled over at the Wawa?

11     A.   Yes.  She knew about it.

12     Q.   Did she have any thoughts?

13     A.   No.  We didn't -- nobody really had a reaction

14  to it.  We just thought it was a regular traffic stop.

15     Q.   How many officers showed up to arrest you on

16  that day?

17     A.   I want to say it was more than five.  I was

18  kind of blindsided by the whole situation.  I couldn't

19  really tell how many people were around me, but

20  definitely more than a handful of -- of people.

21     Q.   Can you remember what they told you?

22     A.   I remember them saying there was a warrant out

23  for my arrest, and it was something along of -- the

24  lines of a burglary.  And that was it.  They put me in a

25  back of the cop car, and I went downtown to talk to

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Stanley.

2    Q.  Did you talk to him shortly after that or on

3  that same day?

4    A.  Yeah.  I remember going straight to the police

5  station, and he -- I went to he came to talked to me in

6  the room.

7    Q.  Did you -- when these officers showed up and

8  they're kind of, I guess, putting you in handcuffs, were

9  you protesting, or do you recall saying anything to

10  them?

11   A.  Yeah.  I was just telling them that they got

12  the wrong guy and they're making a mistake, there's no

13  way this could be happening.  It wasn't a long

14  conversation at all.

15   Q.  Did you think back about this pullover

16  incident at all and think that it could have been to

17  related --

18   A.  Tied to it?

19   Q.  -- to it?

20   A.  Nope, I didn't think about this incident at

21  all until after they brought it up.  I didn't think it

22  had anything to do with it.

23   Q.  Where did they take you?

24   A.  Just an interrogation room somewhere downtown.

25  I'm pretty sure it was at the police headquarters.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.   And what was -- what kind of -- what time of

2  day was that?

3    A.   Afternoon.  It was already -- it was, like,

4  early daytime, because I remember bonding out that night

5  and coming out.  So -- yeah.  It was noon-ish, maybe.

6    Q.   You talked to Stanley at the --

7    A.   Yeah.  Probably, like, somewhere, like, in the

8  afternoon.

9    Q.   What was the conversation that you and he had?

10     A.   He just showed me this lineup here and asked

11  me if that's me, and I said yes.  And he told me, well,

12  we have two people saying that you did this, so you

13  might as well fess up to it.  And I had no information

14  for him.  I didn't know what he was talking about, so

15  kind of just went to jail that night and -- what -- kept

16  waiting for court dates, and trials, and stuff like

17  that.

18     Q.   In the interactions with him, did you protest

19  or, you know, say that it wasn't you?

20     A.   Yeah.  I -- I always told -- I kept saying --

21  telling them that it wasn't me, they got the wrong guy,

22  I don't -- I don't know who they're looking for.  He

23  showing me a picture of me with an Afro, and I don't

24  even have an Afro at the time.

25     Q.   Well, what did your hair look like at that

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    time?

2        A.   I had, like, a long ponytail at the time.

3    Because it was in 2013.  This is 2011.  He's showing me

4    a two-year-old picture of me.

5        Q.   Do you have photos of yourself around that

6    time?

7        A.   I had some.  I'm pretty sure we submitted some

8    to the Court at the time.  Right now, I might be able to

9    -- to dig some up.  I can't -- I can't recall if I do or

10   not.

11       Q.   How long did they keep you there that day?

12       A.   I was there for -- at their interrogation or

13   at the jail?

14       Q.   Yeah.  Talking -- well, I guess --

15       A.   The interrogation room?  It was a -- it wasn't

16   long at all.  Just -- I had no information for them so

17   --

18       Q.   And just --

19       A.   It was --

20       Q.   How long were you there at the jail, just

21   generally?

22       A.   Just a few hours.  I bonded out right away.  I

23   would say maybe, like, six hours or something.

24       Q.   Was that something that you paid yourself?

25       A.   The bond?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.  Uh-huh.

2    A.  No.  Jasmine and Marquis helped.  They put --

3  they -- they both got me out.

4    Q.  How much was the bond?

5    A.  Oh, I think it was, like, a $5,000 bond.

6    Q.  Is that something that they -- that you were

7  going to pay them back for?

8    A.  We didn't really discuss that.  Yeah.  Well,

9  we paid a percentage of that, so it wasn't, like, a

10  whole 5,000.  I think we paid, like, 500.  No.  We

11  didn't -- nobody discussed it.  We kind of -- it was a

12  -- like a no-hesitation type of decision.

13    Q.  Okay.  Did you kind of discuss, like, thanks

14  so much.  I'll pay you guys back?

15    A.  I think we were all just young and -- and

16  ignorant that we -- we knew I was innocent, and we came

17  home.  And we were thinking we were going to go to court

18  and win eventually, so there wasn't really much stress

19  about it.

20    Q.  Did you get an attorney at any point at that

21  time?

22    A.  No.  Just because I didn't feel the need to.

23  I knew I was innocent, and I thought the truth was going

24  to speak for itself, so I never bothered to get an

25  attorney -- a paid-attorney.  And until it was -- when I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  started looking for an attorney, it was kind of a little

2  too late.  They were asking for money I didn't have.  So

3  no, I never really got an attorney.

4      Q.  Well, did it concern you that Stanley

5  indicated there were -- I think you said there were two

6  witnesses that had identified you?

7      A.  I didn't think it was true.  I figured there

8  was no way that two people could be identifying me when

9  I didn't do anything, so I didn't think much of it.

10     Q.  Did they tell you -- did Stanley tell you much

11 about the incident, and the burglary, and why you had

12 been arrested?

13     A.  No.  He just told me that he has two

14 eyewitnesses pointing at my picture, and that was it.

15     Q.  Was that your first time ever meeting Stanley?

16     A.  Yeah.

17     Q.  You didn't ever know him beforehand?

18     A.  No.

19     Q.  What did -- what was your impression of him?

20     A.  Not much of an impression.  I mean, I knew he

21 had the wrong guy so -- I was just kind of upset that

22 they could make a mistake like this.

23     Q.  Did you express all that to him?

24     A.  Yeah.  I told him that he had the wrong guy,

25 and I told him that they're looking for an Afro that I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    don't have, and I don't know what he was talking about,

2    and I had no information for him.  And I kind of just

3    stuck to that.

4        Q.  Did it seem like he had it out for you?

5            MS. DILLON:  Objection.  Form.  Foundation.

6            You can answer

7            THE WITNESS:  A little bit.  Just because I was

8        the only Afro in the lineup, I feel like I was being

9        kind of singled out.

10   BY MR. MISTOLER:

11       Q.  When you say "lineup," you mean this

12   information here?

13       A.  Just -- that and the other lineup.

14       Q.  Was it this one?  I got to put a number on it

15   before I give it to you.  All right.  This has been

16   marked as Defense Exhibit 2.  Do you recognize this

17   photo?

18           (Exhibit 2 was marked for identification.)

19       A.  Yes.

20   BY MR. MISTOLER:

21       Q.  Or this document, I should say?

22       A.  Yes.

23       Q.  What is this document?

24       A.  This is the photo lineup for the witness

25   identification.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.  And so you were just talking about a lineup.

2  Is this what you are -- were referencing?

3    A.  Yeah.  Kind of both, really.

4    Q.  Did somebody -- both of them?  Of this and the

5  other?

6      MR. MISTOLER:  Keep it close.  I'm sorry. We'll

7  keep it just here.

8      THE WITNESS:  So Stanley showed you both of

9  these documents?

10      No.  He only showed me this one.

11  BY MR. MISTOLER:

12    Q.  Okay.  So at what point -- you're referencing

13  a lineup and you're saying, no, I'm the only guy in that

14  lineup.  Is that -- you learned about this later?

15    A.  Yes.  And then this one.  Because he said that

16  they were looking for somebody with a lineup.

17    Q.  What do you mean they were looking for

18  somebody --

19    A.  Oh, somebody with a -- an Afro.

20    Q.  Okay.  When was -- this is your photo in

21  number 2, correct?

22    A.  Yes.

23    Q.  And Exhibit number 2?

24    A.  Yes.

25    Q.  When was this photo taken?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

407.423.9900        www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

Toll Free 855-MYDEPOS

1    A.  No idea.  Maybe that -- I think that might

2  have been from my -- when I had my ID before my license,

3  I think.

4    Q.  So an earlier photo than what we see in

5  Exhibit 1?

6    A.  Correct.

7    Q.  And so when you look at this, you feel like

8  you're the only person with an Afro style haircut in

9  this lineup?

10    A.  Yes.

11    Q.  Okay.  And you kind of indicated that -- and

12  I'm sorry.  I think -- how did you say -- did you think

13  Stanley, he did have it out for you or what?

14    A.  Yeah.  Just because I'm the only person with

15  an Afro and the victim was trying to say that it was

16  somebody with an Afro in his house.

17    Q.  Did he convey that message to Stanley?

18       MS. DILLON:  Objection.  Asked and answered.

19       You can answer.

20       THE WITNESS:  Me and Stanley's conversation was

21  very short, you know.  He just told me that if I

22  would admit to the crime, it would be a lot less

23  harsh on my -- on me.  And I might as well fess up

24  to it.  I told him I didn't know what he was talking

25  about.  And that was kind of it.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  BY MR. MISTOLER:

2     Q.   Okay.  So you bond out and you go home that

3  night?

4     A.   Yes.

5        MR. MISTOLER:  Okay.  We've been going for

6     another hour -- an hour, so let's take a break.

7        (A recess was taken.)

8        THE REPORTER:  We are back on record.

9        You may continue.

10  BY MR. MISTOLER:

11     Q.   The date of incident that was involved in this

12  issue was April 9, 2013.  That's when Mr. Gonzalez has

13  testified that he came home.  He encountered some

14  burglars.  He testified that you were one of those

15  individuals.

16        Were you there on that day?  Were you were you

17  one of the burglars in Mr. Gonzalez's house --

18     A.   No, sir.

19     Q.   -- or condo?  Sorry.

20     A.   No.

21     Q.   Where were you on that day?

22     A.   I don't know.  Probably work, if I had to take

23  a guess.  It's a regular day.  I don't know exactly what

24  I was doing that day.  A long time ago.

25     Q.   That's not something like it.  You haven't,

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 like, thought about that, of lining up your story or

2 anything for -- to, you know, say where you were on that

3 day?

4      MS. DILLON:  Objection.  Form.

5      You can answer.

6      THE WITNESS:  I don't know anything about the

7   burglary, or when it happened, or where it happened.

8   So I'm pretty sure at the time, I -- I did line it

9   up, and I came to the conclusion that it was a work

10   day.  But just now I can't -- I don't remember.  But

11   it was probably just a regular work day for me.

12   Waking up late.  Going to work.

13 BY MR. MISTOLER:

14   Q.  At BJ's still?

15   A.  Yeah.  At BJ's.

16   Q.  Okay.  In between being released on bond and

17 the next appearance at court, were you given information

18 by the police department?

19   A.  No.

20   Q.  How did you know what to show up to next?

21   A.  I'm not sure.  Probably -- I -- I don't

22 remember even meeting my public defender or anything.  I

23 -- I'm pretty sure I got, like, a court date or

24 something, and I just showed up.  Yeah.

25   Q.  In between that time, what did you do?  Were

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    you just working?

2        A.   Yeah.  I was going to school to do the x-ray

3    stuff, and I was just working.  I just kind of went

4    about -- I just went about my life.  I wasn't really too

5    stressed out about it.  I thought my innocence was

6    enough to, you know -- maybe all -- all this would just

7    blow away eventually.  So I -- I didn't really give it

8    much thought.

9        Q.   Were you worried?

10        A.   At first I wasn't worried because I was just

11    relying on my innocence and my truth.  But when I

12    started going to court, and they started actually having

13    these witnesses saying it was me, and me realizing the

14    severity of the situation, like, I -- I started to get a

15    little nervous, just because I saw that they were

16    already trying to pin this on me.

17        Q.   Were you surprised how adamant the witnesses

18    were?

19        MS. DILLON:  Objection.  Form, foundation.

20        You can answer.

21        THE WITNESS:  Yeah.  Very surprised.  I've

22    never seen him in my life.

23    BY MR. MISTOLER:

24        Q.   And specifically the victim has never recanted

25    or changed his opinion of what happened that day.  Is --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    do you find that surprising?

2        A.   Yes.  Well, he's the victim, so I -- I also

3    don't expect him to change his story.

4        Q.   Why do you say that?

5        A.   Just because he's the victim in the case, and

6    obviously he wants somebody to be held liable for the

7    situation.

8        Q.   Why do you think he chose you or selected you?

9            MS. DILLON:  Objection.  Form. You can answer.

10            THE WITNESS:  Well, I think it's because he

11    wasn't really given many other options to pick from.

12    BY MR. MISTOLER:

13        Q.   Are you aware that he could have not chosen

14    you from that lineup?

15            MS. DILLON:  Objection.  Form.

16            You can answer.

17            THE WITNESS:  Yeah.  I guess.

18    BY MR. MISTOLER:

19        Q.   And that he was adamant that you, you know --

20    he saw your face and he thought that you were the

21    individual who was -- he encountered during the burglary

22    in his home?

23        A.   What's the question?

24        Q.   That's a -- that is a good question right

25    there.  I guess, does it surprise you that he's been

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  adamant so -- all this time that you were the individual

2  in his home at the time of the burglary?

3      MS. DILLON:  Objection.  Asked and answered.

4      You can answer.

5      THE WITNESS:  Yes.  It's surprising me.

6  BY MR. MISTOLER:

7    Q.   And not only that, it -- why do you think he

8  -- when he saw the photo of you, and he could have said,

9  no.  None of the -- none of these individuals in this

10  lineup where at my house, why do you think he was so

11  certain that it was you?

12      MS. DILLON:  Objection.  Form.  Foundation.

13      You can answer.

14      THE WITNESS:  I'm not sure.  Maybe because I

15  was the only Afro in the lineup.

16  BY MR. MISTOLER:

17    Q.   Mr. Gonzalez said that the individual he

18  encountered, he had a pretty good look at that person.

19  And based on that, based on as this individual ran away

20  from him and that individual looked back, that, you

21  know, he was kind of certain that it was you that's --

22  why do you think he was -- has never changed his

23  testimony regarding that?

24      MS. DILLON:  Objection.  Form.  Foundation.

25      You can answer.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      THE WITNESS:  I just feel like he didn't really

2    have any -- anybody else to point at.  He was

3    looking for somebody with a certain type of

4    hairstyle, and he was presented with -- with a

5    lineup that I only have that hairstyle.  So I just

6    feel like he wasn't really given any other options,

7    or legit options at that.

8  BY MR. MISTOLER:

9      Q.  Do you know whether he was presented other

10   lineups of maybe some of the individuals we saw earlier

11   in the criminal bulletin?

12     A.  No.

13     Q.  But as far as you know, or as far as you can

14   recall, you were at work that day?

15     A.  Yes.

16     Q.  Have you ever turned over, like, time sheets

17   or anything to show precisely that you were at work?

18     A.  No.

19     Q.  Why not?

20        MS. DILLON:  Objection.  Form.  Foundation.

21        You can answer.

22        THE WITNESS:  It was never really brought up.

23   Like I said, I don't -- I'm not sure if I was at

24   work or not.  I'm -- I'm just assuming I was.  If it

25   was a regular day, then I was just thinking I was at

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    -- at work but --

2  BY MR. MISTOLER:

3      Q.   With a -- this -- with a situation like this,

4  you didn't think to precisely pinpoint where you were on

5  the 9th of April?

6      A.   Yeah.  I actually did give it some thought,

7  but I didn't think it would do anything because I worked

8  night shifts, and the burglary supposedly happened at

9  7:00 in the morning.  So me proving that I was at work

10  at 6:00 in the afternoon wasn't really going to do

11  anything for me.  That's -- maybe that's why.

12      Q.   Were there any individuals that vouched for

13  you and said, oh, yeah.  I saw him that -- in the

14  morning and --

15      A.   Yeah.  My -- my roommate, Marquis, he

16  testified and said that I was home.

17      Q.   So -- okay.  So you were at home?

18      A.   Yeah.  Yeah.  I was -- definitely at the time

19  of the burglary.  I never did anything at 7:00 in the

20  morning.  I used to sleep, like, most -- to, like, noon

21  every day because I worked the night shift.  So I'm not

22  100 percent sure, but I am, like, 80 percent sure, 90

23  percent sure that I was at home sleeping at that time.

24      MR. MISTOLER:  I had a little map here.  Madam

25  Court Reporter, I'm sorry, I'm going to use your

MILESTONE │ REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    stickers now.  So I'm handing you Defense Exhibit 3.

2        (Exhibit 3 was marked for identification.)

3  BY MR. MISTOLER:

4      Q.  Do you know what this is, sir?

5      A.  I see Curry Ford and Semoran intersection.  So

6  I don't know where it is.

7      Q.  Okay.  I've taken this from Google Maps as you

8  can see.  Would you agree with that?

9      A.  Yes.

10      Q.  So as you look at this map, would you be able

11  to point to, say, the residence of Mr. Gonzalez, the

12  victim of the burglary that day?

13      A.  Nope.

14      Q.  How about the 5075 Andrea Boulevard address?

15  Would you be able to pinpoint that on the -- on this

16  map?

17      A.  No.

18      Q.  And is that because really you never were at

19  both of those places on either March 3rd or -- excuse

20  me, April 3rd or April 9th?

21      A.  Correct.

22        MR. MISTOLER:  Okay.  I -- I'm going to hand it

23    to the court reporter.

24  BY MR. MISTOLER:

25      Q.  Do you recall the criminal trial?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   A.  For the most part.

2   Q.  Do you recall Mr. Gonzalez giving his

3  testimony that day?

4   A.  Yeah.  A little bit.  It was a little -- just

5  ten years ago, but I -- I remember.

6   Q.  Sure.  And a -- and a pandemic ago.

7   A.  Yeah.

8   Q.  Did he identify you that day in court?

9   A.  I'm pretty sure he did.

10   Q.  Like on -- like you see on TV where it's like,

11  that's the guy.  Like, did he do something like that?

12   A.  Yeah.  I think they asked him to, like, point

13  at me and -- or point at the accused, and he pointed at

14  me.

15   Q.  And I think there was another witness,

16  Ms. Bethany -- I'll call her Bethany S.  I think her

17  last name is Szenczyk.  Do you recall that she

18  identified you also that day?

19   A.  Yes.  Yes.

20   Q.  Did Detective Stanley also give testimony that

21  day?

22   A.  If he did, I don't remember it, or it was

23  short or something like that.  I don't know.

24   Q.  As the process was -- strike that. As the

25  criminal trial was proceeding and these individuals were

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900   www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

1  giving their testimony, what was kind of going through

2  your head?

3      A.  I was -- I was in shock.  I couldn't believe

4  they were really -- I was really in a trial for

5  something I didn't do.  I was just scared and confused.

6  And that was pretty much all I felt.  I -- I didn't know

7  what was going on.  I -- I'm in a courtroom, and people

8  are deciding my fate, people I've never seen before for

9  something I've never done before.  So it was -- it was a

10  little scary.

11      Q.  Did Marquis testify also on that day?

12      A.  Yeah.

13      Q.  What did he say?

14      A.  That I was at home sleeping that day, and that

15  we spent, like, almost every day together.  And, you

16  know, if -- he would've known if I had left the house or

17  anything like that.  Yeah.  Something along those lines.

18      Q.  Do you know whether Karl Jeudy testified?

19      A.  No.  He -- he didn't.

20      Q.  What about Danielle, or -- we've been calling

21  her Dani.  Dani -- how do I say her last name?  Colon?

22      A.  Yep.  Nope.  She wasn't there, either.

23      Q.  Were those individuals that you wanted to

24  testify or give a statement or something?

25      A.  Well, they were -- they were just with me

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1   during the traffic stop.  Other than that, I didn't

2   really, like, spend time with -- too much time with them

3   for them to, like, you know, know my routines or

4   anything like that.  So no -- no.  I didn't really think

5   they would've helped or -- or did damage to anything.

6   They were kind of useless.

7       Q.   In between the trial and the sentencing

8   hearing, was there a bit of time in between those two

9   dates?

10      A.   Yes.  From the time I lost trial to the

11  sentencing?

12      Q.   Yes.

13      A.   Yes.  Three months.  I remember sitting in

14  jail for three months, waiting to get sentenced.

15      Q.   What jail were you at?

16      A.   Orange County.

17      Q.   Is that, like, 33rd?

18      A.   Yes.

19      Q.   What kind of area were you staying in?

20      A.   I remember being in, like, a -- an area where

21  they, like, allowed inmates to, like, work and be a

22  little more free than the other -- it was, like, a low

23  -- what do you call it?  Like, a low --

24      Q.   Security?

25      A.   -- low custody type of thing.  Like, you know,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  you have your different levels, you know?  People --

2  obviously, they separate people who commit murder versus

3  the people who did, like, a petty theft or something. So

4  I was, like, in the lower level of the inmates.

5     Q.  And you were there, I know you just said it,

6  for two months?

7     A.  I think it was three months.  Yeah.

8     Q.  What was your day-to-day like there?

9     A.  I remember just working, just, like, feeding,

10  like, the -- like, the handicapped inmates, you know? We

11  had to go, like, feed them.  Like, that was one of my

12  jobs.  Cleaning and -- very stressful.  And just knowing

13  that I was about to get sentenced in three -- and in the

14  next three months.  And knowing that I just got found

15  guilty, not knowing how much time I'm going to get.  It

16  was just a really -- really stressful time.

17     Q.  Is that a time -- did then -- excuse me.  Is

18  that a time when you talked to other individuals at the

19  -- is it -- it's a prison at that point, or is it the

20  jail --

21     A.  No.  A jail.

22     Q.  How do we say it?  A jail?

23     A.  Yeah.  This is at the jail.

24     Q.  Did you talk with other individuals at the

25  jail?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Not -- not much -- not much conversation other

2    than probably somebody sleeping next to me or something,

3    chitchat a little bit.  But no.

4    Q.   How was the sleeping arrangement set up there?

5    A.   Yeah.  It was like a -- half of the time I

6    did, like, an open -- I was in an open-bay dorm, which

7    is, like, just a big room with a bunch of bunk beds.

8    And then I did some time at the other department where

9    you actually spend most of your day inside a cell with

10   somebody, and you come out for, like, an hour or two to

11   watch TV.  And -- and that was about it.  So yeah.

12   Q.   How did they determine what bunk you received

13   at the jail?

14   A.   I don't know.  I think it just depends on your

15   charges, to be honest.  And that -- that depends, like,

16   what side of the jail you're going to?

17   Q.   Did you have any communication with your

18   family at this time?  And maybe I'll back you up to, you

19   know, when you get arrested, did you communicate with

20   your family?

21   A.   Yeah.  I think so.  I mean, made some phone

22   calls here and there.

23   Q.   Yeah.  When you were arrested, who did you

24   call?

25   A.   Probably -- probably like -- I don't know if

MILESTONE │ REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   it was Marquis or Jasmine, or one of them two. Who -- I

2   don't remember which name -- which number I remembered

3   by -- by heart. But yeah. It was one of them two.

4       Q.   And then you were released on bond. And did

5   you communicate with your family at that point?

6       A.   Yeah.

7       Q.   What was the message that you gave to your

8   mom?

9       A.   Nothing. I told her that I had got arrested.

10  And I told her what the charges were. And I kind of

11  just told her not to worry about it just because I felt

12  like there was nothing to worry about. So my mom kind

13  of just took my word for it. She -- she thought it was

14  not -- not a big deal type of thing. I didn't think it

15  was a big deal type of thing. And we kind of just went

16  on with our lives, waiting for a court date, you know? I

17  continued to go to school, and I continued to go to

18  work. Yeah. I was just -- I was just thinking that one

19  day, this was all going to go away. So that's kind of

20  how I went about my day.

21      Q.   Was your mom scared for you at all?

22      A.   I think so. Yeah. She -- I don't think she

23  knew the severity of the situation because I didn't,

24  either. Because I wasn't worried, she wasn't worried.

25  But, you know, obviously we ended up going to trial, and

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    people are pointing their fingers at me.  So that's when

2    we kind of started getting a little concerned.

3        Q.  Did your mom go to that criminal trial?

4        A.  No.  It was just Jasmine.

5        Q.  Why did your mom not go?

6        A.  I told her not to.  I told her I was going to

7    win, and I'll be home.  So I told her not to worry about

8    it.  I didn't really -- I thought I was going to win, so

9    I just told her, don't worry about it.  And I didn't

10   want her to be there.

11       Q.  What about your stepfather.  Did you want him

12   there?

13       A.  No.  I didn't want anybody there.  I honestly

14   thought I was going to win, which is why I, like, just

15   took Jasmine with me.  Yeah.

16       Q.  What was the reaction from your little sister

17   when she also learned of your arrest?

18       A.  Yeah.  She -- from what I heard, she fell into

19   a little bit of depression.  I went -- I got handcuffed

20   right when I lost trial and never came back home, so I

21   wasn't around for it.  But my mom told me she went

22   through some depression, you know, to the point where

23   she tried to hurt herself and stuff like that, you know?

24   My mom fell into depression, Jasmine, everybody.  Yeah.

25   Those type of things.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    Q.   When you were at the jail waiting for the

2  sentencing, did you get into any trouble at the jail?

3    A.   I had -- yeah.  I think they -- they put me in

4  a box for, like, ten days.  I -- I -- something about me

5  refusing to work or something like that.  That -- that's

6  what -- that's their -- that was their reasoning, I

7  think.  They were saying that I -- I was refusing to

8  work or something like that.  So I don't remember that

9  though, I think.

10    Q.   Why did they say you were refusing to work?

11    A.   I'm not sure.  I think it was just kind of a

12  misunderstanding type of thing.

13    Q.   What was the situation?

14    A.   I don't remember.  I think the officer wanted

15  me to do something, and I don't know if I told her I

16  already did it, or -- it was, like, a misunderstanding

17  type of thing.  And she didn't want to talk.  She was in

18  a -- she looked like she was in a bad mood type of

19  thing.  So next thing I know they came, and got me and

20  put me in a box, and wrote me up for refusing to work.

21    Q.   Is that, like, solitary?

22    A.   Yeah.  It was, like, solitary for, like, ten

23  days.

24    Q.   How did you -- how did that make you feel?

25    A.   Another depressing situation, you know?  It's

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  pretty much stuck in a closet for ten days.

2      Q.   What -- is there, like, a bed in there, and

3  it's just you alone?

4      A.   Yeah.  It's just a bunk bed and a toilet.

5      Q.   No other person in there with you?

6      A.   With another person in there.

7      Q.   Another.  Would you talk with that other

8  person?

9      A.   Yeah.  We would play some chess games, and

10  card games, and stuff like that to make time go by.  And

11  that was about it.

12      Q.   So it's not, like, solitary?

13      A.   Correct.

14      Q.   You are with another person?

15      A.   Right.

16      Q.   In those situations, do you -- are you able to

17  -- and I'm talking about in the box.  Do you go outside

18  at all or --

19      A.   No.

20      Q.   -- is it just in that room?

21      A.   You are stuck in that room for ten days.

22      Q.   And that was while you were in the jail?

23      A.   Yeah.

24      Q.   Did you make any friends while you were at

25  that jail?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.  No.

2    Q.  Just mostly kept to yourself?

3    A.  Yes.

4    Q.  Can you recall people visiting you at that

5  time?

6    A.  Jasmine.  I think Marquis came once or twice.

7  That's about it.  Yeah.

8    Q.  Did your mom --

9    A.  I think -- I think my mom showed up, too.  I

10  wasn't there for long, so, like, three months.  I think

11  my mom showed up.  They only allowed, like, a certain

12  amount of visits per week or something like that.  And I

13  know Jasmine took up most of them.

14    Q.  Okay.  How about any of your other family

15  members?  Did your dad visit?

16    A.  No.  They -- they all started to, like, visit

17  me because in the jail, it's only, like, a video visit.

18  So it was only, like, 45 minutes.  So I started seeing

19  them -- more visits from them when I went to prison.

20    Q.  Okay.  So you're there for a few months and

21  you are brought back to the courtroom for sentencing?

22    A.  Correct.

23    Q.  And what did the Court tell you at that time?

24    A.  I was going to be sentenced to 30 months in

25  prison with five years of probation.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1     Q.   Did you have a reaction to that?

2     A.   Yeah.  I was -- I was -- I started crying.  I

3  was upset.  I was sad, you know?  I was just -- I knew

4  -- I had already got found guilty three months ago, so I

5  kind of went through the whole devastation thing for the

6  most part.  But yeah, I was just very upset.  I was

7  actually scared that I was going to get, like, 20 years

8  because that's what, like, the judge said that my

9  charges carry.  So -- but no.  That was -- I was just --

10     Q.   So you're almost relieved that you didn't get

11  20 years?

12     A.   Not necessarily relieved, but the --

13  definitely not -- not relieved that I'm -- I'm not

14  getting 20 years.  Do you know what I'm saying?

15     Q.   Uh-huh.  So after that sentencing hearing,

16  you're taken to the -- well, where are you taken at that

17  point?

18     A.   I was transferred to the Central Florida

19  Reception Center.  And then from there, I spent, like, a

20  couple -- like, maybe, like, a week or two there before

21  I got sent to another prison, the Taylor Correctional

22  Institute.

23     Q.   Where's Taylor?

24     A.   It's Perry, Florida.  The county is Taylor.

25     Q.   And so there, you had a room and you had a

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1 roommate?

2    A.  No.  That was also, like, an open-bay type of

3 thing, a bunch of bunk beds in one big room.

4    Q.  And was there any way that you were

5 determined, oh, this is your bunk?  Was it assigned, or

6 how did that work?

7    A.  Yeah.  They would just tell you what room and

8 bunk number to go to and --

9    Q.  What was your day-to-day like at Taylor?

10    A.  Just -- just long and hard -- hard time.  You

11 know, you got a lot of stuff going on around you.  But

12 they give us jobs.  Everybody gets jobs.  I was working

13 in the kitchen for a while.  I was the medical orderly

14 for a little bit, too.  Sometimes you get, like,

15 landscaping jobs or stuff like that.  So they'll give

16 you, like, an occupation to, kind of, go do day-to-day

17 stuff.

18    Q.  What did you do in the kitchen?

19    A.  I was just, like, washing dishes and stuff

20 like that, and cooking.

21    Q.  How about with the medical orderly?  What does

22 that involve?

23    A.  Yeah, just keeping -- keeping the areas clean,

24 taking out trash, cleaning up, stuff like that.

25    Q.  You said there's a lot of stuff going on

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

1  around you at that point.  What do you mean by that?

2      A.   Just, like, being in an open-bay dorm with,

3  like, all these people around you, you're not -- you

4  don't have, like, your own room.  So, you know, you --

5  she -- everybody has, kind of, got their own thing going

6  on.  Wait, what's the question?

7      Q.   Just there's a lot going on around you.

8      A.   Yeah.

9      Q.   And just I wanted you to elaborate on that.

10     A.   Yeah.  Just inmates with their own activities,

11  you got, like, gang members and violence around you and

12  stuff like that, that, you know, you really have no

13  control of.  So it's, kind of, like, makes it a little

14  uneasy to -- to relax, you know?

15     Q.   Did people try to get you to join a gang?

16     A.   No.

17     Q.   Did you join any gangs or groups in there?

18     A.   No.

19     Q.   And you -- I think you said earlier, but you

20  were not in a gang before you went to --

21     A.   Correct.

22     Q.   -- where you were sentenced?

23     A.   Correct.

24     Q.   Did people just, like, mess with you

25  sometimes?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    A.  Not necessarily, no.  I never really got

2  picked on.

3    Q.  Just kept to yourself, mostly?

4    A.  Yeah.

5    Q.  Did you have any friends or acquaintances that

6  you made in there?

7    A.  Not really.  I was just trying to, like, do my

8  time and go home.  I knew that the guys around me had

9  life sentences and 40, 50 years to do so, you know, kind

10  of, just keep to yourself and -- and stay out the way

11  type of mentality.

12    Q.  Did you have any disciplinary issues at the

13  Taylor correction?

14    A.  No.

15    Q.  Nothing like the box you talked about, being

16  put in the box or --

17    A.  No.

18    Q.  -- no solitary or anything like that?

19    A.  No.

20    Q.  When you were at Taylor, who would visit you?

21    A.  Just Jasmine, and my mom, and my sister,

22  stepdad.  Marquis came to see me once.  And I think that

23  was about it.

24    Q.  Were the visitation rights, or how many visits

25  you could have a week or whatever, was that different

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  than at Orange County Jail?

2    A.  Yeah.  I think Orange County, you can get a

3  visit, like, any day of the week.  In prison, you can

4  only do visits on weekends.

5    Q.  About how often -- or well, strike that. About

6  how frequent would your mom visit you?

7    A.  Not -- not too frequent because I was four or

8  five hours away.  They would try to come see me, like,

9  maybe once every couple weeks, maybe, like, once every

10  other month type of thing.  Other than that, we just

11  kept in contact with the phone.

12    Q.  How about Jasmine?  How often would she visit

13  you?

14    A.  Maybe, like, once a month.

15    Q.  Were you able to call people at all, like use

16  it -- a telephone or anything?

17    A.  Yeah.  We were able to use phones.

18    Q.  And who would you call?

19    A.  I would just talk to Jasmine and my mom.

20    Q.  Did you keep in touch with Marquis at that

21  time?

22    A.  A little bit.  Not much.

23    Q.  Were you able to, like, read or do any

24  pastimes like that?

25    A.  Yeah.  There was -- there was books available.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Not -- not really, though, other than that.  Just -- I

2    don't know, enjoy TV time and maybe go outside for a

3    little bit, but that wasn't very fun either so --

4        Q.   But really you didn't talk with very many

5    people there?

6        A.   I -- I talked -- I talked to, like, the guys

7    around me and stuff, you know?  But definitely didn't,

8    like, try to make friends with anybody.  It was kind of

9    hard to trust people, you know?  You don't -- you -- you

10   don't know what people are in here for.  So you don't

11   really want to -- it's not really the place to make too

12   many friends, you know?

13       Q.   Do you recall any individuals you did speak

14   with?

15       A.   Just whoever was, like, a neighbor of mine or

16   any -- something like that.

17       Q.   Do you recall any names of those people?

18       A.   No, not really.  I was -- I was moving around

19   a lot in there, too.  Like, sometimes they swap us to

20   another dorm, or the guys next to me will get moved or

21   transferred.  So there was a lot of movement going on

22   also so -- but yeah, no.

23       Q.   For your entire sentence, were you at Taylor?

24       A.   There was times where I was, like,

25   transferring back to Orlando to go to outside court.  So

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   I, like, stood in a -- a couple other places on the way

2   back here.  But yeah, most of my time was at Taylor.

3       Q.   Okay.  Were you up -- did you ever sustain any

4   injuries, or were you hurt while you were in prison?

5       MS. DILLON:  Objection.  Form.  Foundation.  You

6   can answer.

7       THE WITNESS:  Yeah -- yeah.  I had hurt my toe.

8   I remember I had to go to -- I had got cut because

9   of a rock while I was outside.

10  BY MR. MISTOLER:

11      Q.   So you hurt your toe on a rock and --

12      A.   Yeah.

13      Q.   Okay.  Okay.

14      A.   I had to get -- I don't know.  I almost had to

15  get stitches, but I didn't.

16      Q.   Was that just, like, you didn't see the rock

17  and you stepped on the rock or something?  Or what

18  happened there?

19      A.   Yeah -- yeah.  It was -- it was something like

20  that.  I had, like, not the best shoes on.  I had, like,

21  Crocs on, and I think I was, like, jogging or something.

22  And yeah, I had messed up my toe.  And I had gotten to,

23  like, a scuffle one time over a cell -- over the phone

24  use.  So some guys tried to put their hands on me about

25  it and stuff like that.  So I had to defend myself.

MILESTONE │ REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   Q.  Was it a fight ensued after that?

2   A.  It -- it -- yeah, pretty much.  It was more of

3  me defending myself.

4   Q.  Were you hurt in that action?

5   A.  Yeah.  I was a little banged up.

6   Q.  How were the other guys?

7   A.  Probably not.  It was probably not hurt that

8  much.

9   Q.  Was that something that, like, led to

10  discipline, or that was just, like, something that

11  happened and --

12   A.  Yeah.  No, it was -- it was something that

13  happened, kind of, off the scene.  And it was --

14  happened very quick.  Yeah.  It was just a

15  misunderstanding about phone use.  I guess I was using

16  the phone when it was supposed to be his turn, and I

17  didn't know.  And he was upset about it.  So I had to

18  defend myself.

19   Q.  Any other instances where you were -- got

20  injured or anything?

21   A.  I twisted my ankle playing basketball.  I

22  don't know if that counts or anything.

23   Q.  Sure.  That was just, like, a -- you stepped

24  wrong, though.  That wasn't --

25   A.  Yeah.  No, there was a pothole under the hoop.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  It wasn't even -- we weren't even supposed to be playing

2  basketball under there.  Yeah, I twisted my ankle, and

3  my ankle was swollen up for months after that.

4      Q.  How's your ankle now?

5      A.  It's never been the same.  I'll tell you that.

6      Q.  Did you ever have it looked at?

7      A.  No.

8      Q.  Even after you got out?

9      A.  Yeah, I never really got it looked at.

10     Q.  What about your toe?  Is your toe okay now?

11     A.  Yeah, it's fine now.

12     Q.  And really from -- with the incident over the

13  phones, are you okay from that incident?

14        MS. DILLON:  Objection.  Form.

15        You can answer.

16        THE WITNESS:  I mean, I'm not okay about it.

17  You know, I kind of have to go through it.  I mean,

18  as far as, like, any injuries -- sustaining any

19  injuries?

20  BY MR. MISTOLER:

21     Q.  Yes.  Physically?

22     A.  Yeah.  But mentally, it's definitely taken a

23  toll.

24     Q.  Did you complete your full sentence?

25     A.  Yes.  I did two -- well, I was sentenced 30

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   months, and I ended up doing 24 months with the gain

2   time privilege, whatever they call it.  And then I did

3   five years of probation.

4       Q.  So you, kind of, got out a little bit early?

5          MS. DILLON:  Objection.  Form.  Foundation.

6          You can answer.

7          THE WITNESS:  I -- I guess, yeah, like, six

8       months earlier than --

9   BY MR. MISTOLER:

10      Q.  Was that -- did you meet some requirements and

11   you qualified to get out?

12      A.  Yeah.  Most people get that.

13      Q.  Okay.

14      A.  If you don't -- everybody gets that 85

15   percent, kind of, minimum type of thing.  Yeah.  You,

16   kind of, have to earn that.

17      Q.  And then you were let out on probation?

18      A.  Yes.

19      Q.  And that was a five-year process?

20      A.  Yes.

21      Q.  Are you still on probation now?

22      A.  No.

23      Q.  No.  Did you have any trouble completing your

24   probation?

25      A.  No.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1    Q.  Were there any violations or anything of your

2  probation?

3    A.  No.

4    Q.  What was involved with that?  You -- do you

5  move and you -- you're -- where did you live, I guess,

6  after you got out of the prison?

7    A.  Yeah.  I lived in Ocala for two years.  And

8  then after those two years, we moved down back to

9  Orlando.

10    Q.  Who is "we"?

11    A.  My family, my mom, sister, dad.

12    Q.  And so you moved in with them?

13    A.  Yeah.  When I got out, I had to go move with

14  them in Ocala.  I had nowhere else to go.

15    Q.  That -- okay.  And they had the house at this

16  time in Ocala?

17    A.  Yes.

18    Q.  Was your family happy to have you home?

19    A.  Yes.

20    Q.  You're still dating Jasmine at this point when

21  you get out, correct?

22    A.  Yes.

23    Q.  Where did she live at that point?

24    A.  Same place.  She always lived at Orlando over

25  at there at Chickasaw Trail with her mom.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1   Q.  How about Marquis?

2   A.  Marquis, at the time, had got another

3 apartment at the same place we used to live at.  He just

4 got, like, a one-bedroom so --

5   Q.  Did you see him at all after you were out of

6 prison?

7   A.  Yeah.  He came to spend the night at my mom's

8 house the same night I got out.  And it was 4th of July,

9 so we shot some fireworks and stuff and spent some time

10 together.

11   Q.  How often would the probation officer come and

12 make a visit or what -- whatever it --

13   A.  Yeah, I think -- I think they had -- I had --

14 think I had to see them at their office once a month,

15 and they visited my house once a month.

16   Q.  But you never had any issues completing the

17 probation period?

18   A.  No -- no.

19   Q.  At what point did you start working to

20 overturn the conviction?

21   A.  I was always working to get my conviction

22 overturned.  Right when I got found guilty, I filed a --

23 an appeal with my public defender at the time.  I think

24 it was like a post-conviction relief type of paperwork.

25 And then once that got denied, we hired Adam Pallock as

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

1  my appeal attorney.  He filed a motion.  That also got

2  denied.

3       Then I filed my own motion from -- from

4  prison, and that got denied.  When I got out, I wrote a

5  letter to the Florida Innocence project.  They -- they

6  were more focused on people who are currently

7  incarcerated. So they didn't really want to put me at

8  the top of their list.  So that didn't work.  And then

9  after that, I, kind of -- I almost, kind of, gave up

10 trying and yeah. It was one day, Jasmine came across an

11 attorney who was willing to hear my story.

12     Q.  How did she find that attorney?

13     A.  Through her job.  She met somebody who worked

14 at the Court.  And Jasmine would share my story with her

15 coworkers.  And somebody that worked at the courthouse,

16 I don't remember who it was, came to her job one day.

17 And she -- Jasmine shared my story with her, and she

18 referred us to -- to a lawyer.  And then that lawyer

19 referred me to another lawyer.  And I called her, and I

20 -- I told her my story.  And -- and she believed in us.

21 She told us that, you know, there was -- there wasn't

22 much she could do, unless there was, like, newly

23 discovered evidence.

24     Q.  So how did -- I guess, from those calls, how

25 did you find out or learn that Bethany recanted her

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  testimony, I guess?

2    A.  Yeah.  So once -- once my attorney told me

3  that for us to get our case reopened, we needed, like,

4  new evidence, stuff like that.  And Jasmine had ran into

5  this picture of Amos.  You know, Amos, right?  Amos

6  Ortiz.

7    Q.  Yeah.  I know that.

8    A.  Yeah.  So Jasmine, like, ran into a picture of

9  him on Facebook, and she thought that he resembled me

10  pretty well.  And she started doing some research on --

11  on him, and she put some pieces together that made

12  sense.  We presented it to our lawyer.  She -- she

13  thought it made sense, too.  And we dug -- they -- they

14  ended up digging a little deeper, and -- and that's --

15  that's how they came about that.

16    Q.  Do you know what picture of Jasmine saw of

17  Amos?

18    A.  Yeah, the picture of that was all over the

19  news.

20    Q.  Like, was he arrested or something?

21    A.  No.  I think he was -- he was murdered, and

22  that's why he was on the news.

23    Q.  So really, she saw a news bulletin or --

24    A.  Correct.

25    Q.  -- something, and it had Amos on there?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.  Uh-huh.

2    Q.  And she was like, oh, it kind of looks similar

3  to --

4    A.  Correct.  Yeah.

5    Q.  -- to you?  Okay.  And from there, what

6  happened?

7    A.  Well, at first, she ran into the picture of

8  Amos while I was incarcerated.  But, you know, we never

9  really thought anything about it.  We just thought it

10  was crazy that he looked like me.  But later on, when I

11  met my attorney and she told me we needed new evidence,

12  Jasmine was like, well, let's -- let's look into this

13  guy that looks like you.  Jasmine did her own research,

14  found out about stuff that was going on.  And he had got

15  arrested nearby, and he got murdered nearby, and all

16  this stuff.  And we brought that discovery to -- to my

17  attorney.  And she was able to do a little more digging

18  of her own.  And that's how we came about the prior

19  investigator, and Bethany's recanting, and stuff like

20  that.

21    Q.  Okay.  But you never talked with Amos because

22  he was -- he had passed?

23    A.  Yeah.

24    Q.  Do you know if Jasmine ever talked with Amos?

25    A.  No.  Jasmine just knew his girlfriend.  Like,

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  she had went to high school with his girlfriend.  So --

2  and she's -- and that's how she, kind of, saw the

3  Facebook post about him.  But yeah, that was about it.

4      Q.   Who was your attorney at that time?

5      A.   When I -- which time?  When I went to my

6  criminal trial or my --

7      Q.   No.  So it sounded like you were talking about

8  maybe Jasmine passed this information along to you --

9      A.   Uh-huh.

10      Q.   -- and you gave it to your attorney at that

11  time?  And then there was a private investigator?

12      A.   Yeah.  No.  So we -- I reached out to my

13  lawyer.  Amos had nothing to do with anything at the

14  time.  I was just, kind of, telling her my side of the

15  story.  And she was just like, okay.  Yeah.  Sounds like

16  you were in a bad situation, but there's nothing I can

17  do to help you, unless there's, like, new evidence

18  discovered.  So Jasmine did a little research on Amos.

19  And I guess that was enough evidence for my lawyer to

20  take my case, or at least become interested in taking my

21  case.  And she -- she decided to get the private

22  investigator, and approach Bethany, and stuff like that.

23  That was all on my attorney.

24      Q.   What law firm was that?

25      A.   That was Lisbeth Fryer.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    Q.   Did you ever meet that guy Jerry Lyons, the
2  private investigator?
3    A.   No.
4    Q.   No.  You never had any interactions with him?
5    A.   No.
6    Q.   What about Jasmine?  Do you know if she had
7  any interactions with him?
8    A.   No, she didn't with him, either.
9    Q.   Do you know what kind of work he put in to
10  assist in your case?
11    A.   No.  He was working directly with -- with
12  Lisbeth.  I'm not really sure how much I -- what
13  conversation they had or stuff like that.
14    Q.   Are you employed now?
15    A.   Yes.
16    Q.   What do you do?
17    A.   I work with Telecom Innovations.  I do, like,
18  a lot of low voltage installations, so, like, deal with,
19  like, phone lines, and cameras, and Wi-Fi.  And I do a
20  lot of work at the -- the new Epic Universe, stuff like
21  that.  Yeah.
22    Q.   Is that Universal?
23    A.   IT stuff.  Yeah.
24    Q.   I don't want to talk over you.  I'm sorry.
25  That's Universal?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.  Yes.

2    Q.  How did you get that position?

3    A.  Yeah, so my -- my old boss from my last

4  company started his own company.  And he -- he, kind of,

5  just brought me along with him when he started his new

6  -- new -- his new company.

7    Q.  What was the old company?

8    A.  Custom Cable.

9    Q.  And is that when you -- when you got out of

10  prison, did you begin working with them?

11    A.  Not right away, maybe, like, four -- four

12  years after I got out.

13    Q.  What did you do for work when -- or I guess

14  what was the first work you did after you got out?

15    A.  I worked at a Pilot's Travel Center truck stop

16  as a maintenance -- just, like, cleaning up fuel pumps

17  and mopping, sweeping, taking out trash, stuff like

18  that.

19    Q.  How long did you do that for?

20    A.  I did that for, like -- like, two years.

21    Q.  Which Pilot?

22    A.  In Ocala right off the exit.

23    Q.  After that, where did you work?

24    A.  After that, I moved to Orlando with Jasmine,

25  and I got a job at a restaurant on I-Drive, BJ -- no,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1 not BJ's. I forgot the name of this restaurant. I

2 don't remember -- I don't remember. It was right in

3 front of the Icon Park, though. And they -- they closed

4 it down, and turned it into a -- a steakhouse. I don't

5 remember the name of that restaurant. It wasn't long I

6 had worked there.

7    Q. How long that -- was it?

8    A. I know it was for Landry's chain and

9 restaurants. Probably, like, not even a year, maybe,

10 like, eight months type of thing. They ended up

11 closing, so I had to go get another job.

12    Q. What was the reason from switching to Pilot to

13 this restaurant?

14    A. There was no Pilots out here in Orlando. And

15 I know I didn't want to do that type of work anymore.

16 So I figured going to go get a server job. I was also a

17 convicted felon on probation. So my -- my options were

18 limited. So I was just, kind of, going around applying

19 everywhere, seeing who hires me first. And I ended up

20 landing that job.

21    Q. After the restaurant job, where did you go?

22    A. That's when I started working with -- with

23 this field, low voltage field. And I was working at the

24 Margaritaville Resort on 192. They were building that

25 resort brand new. and I started working out there with

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1    one of my buddies, installing lights, and speakers, and

2    -- and cameras, and chandeliers, and all type of stuff

3    for the -- for the new resort.  And that's how I, kind

4    of, got into the field.

5        Q.   How long were you at that position?

6        A.   Well, ever since then until now.  Obviously I

7    switched companies, but still doing the same type of

8    work.

9        Q.   And I'm sorry, what was first company?

10       A.   Custom Cable.

11       Q.   Custom Cable.  And then you switched to --

12       A.   Telecom Innovations.

13       Q.   And that's where you work now?

14       A.   Yes.

15       Q.   How is that job going?

16       A.   It's good.  They treat me well.  I have a

17    company vehicle, work close to home.  I like it.

18       Q.   Have you thought about, you know, going back

19    to any of the -- going back to school?

20       A.   I thought about it, but it didn't really make

21    the most sense to me.  You know, it's been so long.  I

22    would have to start all over and pay for -- pay for it

23    again.  I just didn't think it was worth it.

24       Q.   How about, like, the x-ray technician?  Is

25    that something that you could do?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     A.   Yeah.  Well, that -- that's what I meant.  I

2   just felt, like, you know, it was a -- the school that I

3   was going to was closed.  The student loans that I paid

4   went down the drain.  So I just didn't want to go get

5   another loan, do the classes again.  And especially

6   after all this mental drainage I've been going through,

7   I just didn't see myself studying for -- for that stuff

8   again.  I thought about it, but it just didn't seem like

9   the best idea.

10     Q.   Where do you live now?

11     A.   I live on Millenia Boulevard.

12     Q.   What's your address?

13     A.   11 -- 3544 Millenia Boulevard, Apartment 6207.

14     Q.   You live there with Jasmine?

15     A.   Yes.

16     Q.   Just you two?

17     A.   Yes, and two dogs.

18     Q.   What are your dogs' names?

19     A.   Yoda and Xena.

20     Q.   Do they like Star Wars?

21     A.   Yep.

22     Q.   Let me just look at my notes really quick.  I

23   don't think I really have much left.  One second. What's

24   your vision for the future right now? What do you plan

25   to do?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.  I just have dreams of owning a home one day.

2  My plan was to maybe take my field to the next level.  I

3  see -- I see guys that were in my position at one point,

4  and I see -- and I've seen them grow throughout the

5  years and how successful they are.  So in this field --

6  so that's kind of made me a little optimistic about it.

7  I was offered a really good job last year at Disney and

8  with the IT department.  Obviously I couldn't take it

9  because of -- of my background, but that gave me a

10  little bit of hope knowing that, you know, there's --

11  there's a future in this field and people recognize my

12  -- my work ethic.  So I was just hoping to take this as

13  far as -- as I could, you know, and --

14    Q.  How did you get offered the job at Disney?

15    A.  It was another old boss of mine.  He ended up

16  where he was -- he was at Custom Cable.  And he -- he

17  ended up working for Disney.  And they were hiring and

18  he reached out to me out -- out of nowhere.  He was

19  like, hey, there's a spot over here, and I would love

20  for you to fill it.  But after I told him about my -- my

21  situation, there wasn't much he could do after that, you

22  know, because he -- he can give me the job, but I still

23  have to go through, like, Disney regulations and stuff.

24  So conversation kind of ended after that and put on

25  hold.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Do you think that Detective Stanley tried to

2  frame you?

3        MS. DILLON:  Objection.  Form.  Foundation.

4        You can answer.

5        THE WITNESS:  I think yes because just the body

6  of work that was done didn't seem like there was

7  much effort into him -- didn't seem like he was

8  trying to look for anybody else.

9  BY MR. MISTOLER:

10   Q.   So do you think that rises to him trying to

11 frame you or just not enough effort?

12       MS. DILLON:  Objection.  Form.  Foundation.

13       You can answer.

14       THE WITNESS:  Yeah.  I just feel like once he

15 saw my picture, he had tunnel vision.  He didn't

16 care to look for anybody else.  So, you know, he --

17 he kind of just stuck to me, and that's why I feel

18 that way.

19       MR. MISTOLER:  I don't think I have any more

20 questions for you.  I thank you so much.  Your

21 counsel probably has --

22          CROSS-EXAMINATION

23 BY MS. DILLON:

24   Q.   Based on that, just a couple and just about

25 this bulletin.  You testified that at some point in

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   April 2013, you're not really sure what day, but at some

2   point you were pulled over in a vehicle with Dani,

3   Marquis, and Karl; is that right?

4       A.  Yes.

5       Q.  And it was Dani's vehicle --

6       A.  Yes.

7       Q.  -- I think you said?  And you testified that

8   you were going to play basketball and you were coming

9   back from basketball when you got pulled over?

10      A.  Yes.

11      Q.  Do you know what time you went to play

12  basketball?

13      A.  It was in the evening.  I remember, like, the

14  -- the Dover Community Shores Basketball Center, they

15  didn't open basketball to the public until after, like,

16  6:00 in the afternoon.  So I knew -- I know it was,

17  like, somewhere around that time.

18      Q.  Okay.  Someone at -- somewhere in the later

19  afternoon?

20      A.  Yeah, late evening, that afternoon.

21      Q.  Before you went to play basketball in the

22  vehicle with Dani, Marquis, and Karl, were you in that

23  -- in Dani's vehicle any other time that day?

24      A.  No.  I was at home all day, all the way up to

25  basketball time.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    MS. DILLON:  Okay.  No other questions.

2    THE REPORTER:  Any redirect?

3    MR. MISTOLER:  No.

4    THE REPORTER:  Read or waive?

5    MS. DILLON:  We'll read.

6    THE REPORTER:  Read?

7    MS. DILLON:  Yeah.

8    THE REPORTER:  Absolutely.

9    MR. RAMOS:  Sorry.  I didn't --

10   MS. DILLON:  No, that's not on you.  That's on

11   me.

12   THE REPORTER:  And then very quickly, Stephen,

13   would you like to order at this time?

14   MR. MISTOLER:  Not right now.

15   THE REPORTER:  Sounds good.  Ms. Dillon, would

16   you like to order at this time?

17   MS. DILLON:  Not right now.

18   THE REPORTER:  Sounds good.  Please stand by.

19   Let me get us off record.

20       (Deposition concluded at 4:43 p.m. ET)

21

22

23

24

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE

I, the undersigned, certify that the witness in the foregoing transcript personally appeared before me and was duly sworn.

Identification:  Produced Identification

_____

LYNSI HERGERT

Court Reporter, Notary Public

State of Florida

Commission Expires: 11/15/2027

Commission Number: HH 464543

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1       C E R T I F I C A T E

2

3   STATE OF FLORIDA

4   COUNTY OF ORANGE

5

6       I, LYNSI HERGERT, Court Reporter and Notary Public

7   for the State of Florida at Large, do hereby certify

8   that I was authorized to and did report the foregoing

9   proceeding, and that said transcript is a true record of

10  the said proceeding.

11

12      I FURTHER CERTIFY that I am not of counsel for,

13  related to, or employed by any of the parties or

14  attorneys involved herein, nor am I financially

15  interested in said action.

16

17  Submitted on: November 25, 2025.

18

19

20                          *A Hergert*

21

22  _____

23      LYNSI HERGERT

24      Court Reporter, Notary Public

25

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

 **CITY OF ORLANDO**     POLICE DEPARTMENT 

# CRIMINAL INFORMATION BULLETIN
## APRIL 15, 2013     CAU #2013-0269
### SUSPICIOUS VEHICLE – INDIA SECTOR

Case #:     2013-137815
Location:   5075 Andrea Blvd.



**CASE INFO:**

ON 4/3/13, AN OCCUPANT OF A SILVER 4-DOOR 2003 VOLKSWAGEN JETTA GLS (SIMILAR TO THE ONE PICTURED) BEARING FLORIDA TAG M64-2EK WAS SEEN KNOCKING ON DOORS TO DIFFERENT HOUSES AND THEN ENTERING THE BACK YARD OF 5075 ANDREA BLVD. TAC OFFICERS STOPPED THE VEHICLE THE SAME DAY AND IDENTIFIED THE FOUR OCCUPANTS BELOW. PROBABLE CAUSE DOES NOT EXIST AT THIS TIME; HOWEVER, BE ON THE LOOKOUT FOR THIS VEHICLE. IF YOU COME INTO CONTACT WITH THE VEHICLE, PLEASE FIR ALL OCCUPANTS AND NOTIFY DETECTIVE OSSO.

   

| Danielle Colon | Jorge Ruben Valle Ramos | Marquis Hickson | Karl Jeudy |
| DOB: 9/24/93 | DOB: 4/21/93 | DOB: 12/2/92 | DOB: 7-9-93 |

If you have or need any additional information about this suspect/case, please contact:

## CRIMINAL INVESTIGATIONS DIVISION
## PROPERTY SECTION—EAST PROPERTY UNIT
### DETECTIVE DAVID OSSO
david.osso@cityoforlando.net
**Phone: 407.246.4168**
*Orlando Police Department*
**CONFIDENTIAL: For Law Enforcement Use Only**



Exhibit 1
RAMOS
Date 3/6/26

# Orlando Police Department





1



2



3



5



6

4

Lineup Identifier:
Printed Orlando PD:  7/24/124 9:32



Exhibit 2
RAMOS
Date 3/6/25

Google Maps



Imagery ©2025 Airbus, Maxar Technologies, Map data ©2025 Google    500 ft

Live traffic          Fast          Slow

Exhibit 3
RAM05
Date 3/16/25

1                          IN THE CIRCUIT COURT OF THE
                           NINTH JUDICIAL CIRCUIT, IN AND
2                          FOR ORANGE COUNTY, FLORIDA
                           CRIMINAL JUSTICE DIVISION

3
   STATE OF FLORIDA,
4
        PLAINTIFF,
5                                 CASE NUMBER:  48-2013-CF-5146A/O
   vs.
6                                 DIVISION NUMBER:  16
   JORGE VALLE-RAMOS,
7                                 VOLUME I OF II
        DEFENDANT./
8

9                          TRIAL PROCEEDINGS

10                              BEFORE

11                    THE HONORABLE GREG TYNAN

12

13                                In the Orange County Courthouse
                                  Courtroom 6D
14                                Orlando, Florida 32801
                                  May 21, 2014
15                                Rebecca Ruiz

16

17   A P P E A R A N C E S :

18   NATALIA SCOTT
     Assistant State Attorney
19   415 North Orange Avenue
     Building B
20   Orlando, Florida 32801
     On behalf of the State
21

22   CARLI CITRARO
     Assistant Public Defender
23   435 North Orange Avenue
     Suite 400
24   Orlando, Florida 32801
     On behalf of Defendant
25

1                    I N D E X

2   OPENING STATEMENT BY MS. SCOTT                    36

3   OPENING STATEMENT BY MS. CITRARO                 41

4   TESTIMONY OF GEORGE GONZALEZ

5        DIRECT EXAMINATION BY MS. SCOTT             42

6        CROSS-EXAMINATION BY MS. CITRARO            62

7        REDIRECT EXAMINATION BY MS. SCOTT           76

8   TESTIMONY OF BETHANY SZEWCZYK

9        DIRECT EXAMINATION BY MS. SCOTT             78

10        CROSS-EXAMINATION BY MS. CITRARO            89

11        REDIRECT EXAMINATION BY MS. SCOTT           96

12   TESTIMONY OF DETECTIVE MICHAEL STANLEY

13        DIRECT EXAMINATION BY MS. SCOTT             97

14        CROSS-EXAMINATION BY MS. CITRARO           108

15   TESTIMONY OF CHANTAL STYER

16        DIRECT EXAMINATION BY MS. SCOTT            117

17        CROSS-EXAMINATION BY MS. CITRARO           125

18   TESTIMONY OF MARQUIS HICKSON

19        DIRECT EXAMINATION BY MS. CITRARO          133

20        CROSS-EXAMINATION BY MS. SCOTT             139

21        REDIRECT EXAMINATION BY MS. CITRARO        140

22   TESTIMONY OF JORGE VALLE-RAMOS

23        DIRECT EXAMINATION BY MS. CITRARO          141

24        CROSS-EXAMINATION BY MS. SCOTT             148

25

1    CERTIFICATE OF REPORTER                          164

2                        E X H I B I T S

3    STATE'S EXHIBIT 1-2                               103

4    DEFENDANT'S EXHIBIT 1                             145
     STATE'S EXHIBIT 3                                 119
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 -     -     -

2                   P R O C E E D I N G S

3        **THE COURT:**  We are going on Valle-Ramos.  How many

4   witnesses for each side?

5        **MS. CITRARO:**  Two to three for the defense.

6        **MS. SCOTT:**  Fourish.

7        **THE COURT:**  Okay.

8        **MS. SCOTT:**  Been a long morning, Judge.

9        **THE COURT:**  All right.  Is he downstairs?

10        **MS. CITRARO:**  He's present.

11        **THE COURT:**  Let's go ahead and call up a panel.

12        **THE CLERK:**  Thirty still?

13        **THE COURT:**  I believe so.  No, forty.  It's an F1,

14   PBL.  Mr. Valle-Ramos, if you come up to the counsel

15   table, please.

16        **MS. CITRARO:**  I just spoke with our defense

17   witness, Ms. Bloom.  She had an ear infection.  If we

18   can just hold off, I told her to be here at 9:00 a.m.

19   tomorrow morning so she has some time to let her

20   medication begin.  So she's not contagious, but if we

21   can hold off until calling the defense case until first

22   thing tomorrow.

23        **THE COURT:**  Do you have other defense witnesses

24   that you can call if you needed to?

25        **MS. CITRARO:**  Yes.  I have one other if I needed

1    to.

2         **THE COURT:**  I don't think we will get that far at

3    this time.

4         **MS. CITRARO:**  I'm not sure if we will.  I just

5    wanted to let the Court know.  We have also discussed a

6    semi motion in limine in this case.  I just wanted to

7    put on the record.

8         Okay.  This is a kind of an interesting fact

9    pattern.  Mr. Valle-Ramos was stopped a couple weeks

10   before, and that stop provided some information that

11   comes into the investigation in this case.  For purposes

12   of keeping prejudicial, unrelated information out of

13   this case, um, we -- the State and I have just agreed to

14   just refer to that previous stop, which is unrelated, as

15   an unrelated stop for unrelated purposes.  But no

16   information whatsoever about it being in any way

17   regarding a burglary is to come out to the jury.

18        So any witnesses who may have information about

19   that -- I would expect it would just be the detective

20   and maybe the other officer -- would not be able to

21   testify as to that to keep it out since it's

22   prejudicial, unrelated and irrelevant.

23        **THE COURT:**  State?

24        **MS. SCOTT:**  That's fine.  I agree.

25        **THE COURT:**  Okay.

1      **MS. CITRARO:**  I think that was it for preliminary.

2    We do have a motion for an additional jury instruction

3    too, but we can take care of that later.

4      **THE COURT:**  What is it?

5      **MS. CITRARO:**  I had asked for a jury instruction

6    regarding eyewitness testimony.  My motion, which was

7    filed March 12th, actually includes a lot of stuff that

8    is really covered in the jury instruction for eyewitness

9    testimony.  So I'm just amending this just to ask for a

10   couple of these specific paragraphs.

11     There -- does the Court want me to read them?  They

12   are outlined in the motion.  It's, basically, just extra

13   information that the Court can give the jury regarding

14   eyewitness testimony and what they should take into

15   account when determining --

16     **MS. SCOTT:**  Judge, I would object to the additional

17   instructions.  The standard jury instructions already

18   addresses eyewitness identification.  Anything further

19   won't be necessary for the jury.  Supreme Court thinks

20   the standard ones are sufficient for that purpose and I

21   would argue that nothing more is needed.

22     **THE COURT:**  I'm printing a copy of it.  You tell me

23   what, perhaps, you want me to consider.  Then I'll think

24   about it during the course of the trial.

25     **MS. CITRARO:**  Sure.  First paragraph starting, an

1    important question.  The second paragraph starting, the

2    testimony you have heard.  After the numbered paragraphs

3    it starts, when you may also take into account.  The

4    next one, the witness's level of confidence.

5         **THE COURT:**  All right.  So you want the first

6    paragraph under paragraph 3 and the second paragraph

7    under paragraph 3?

8         **MS. CITRARO:**  Yes.

9         **THE COURT:**  And under paragraph 2 -- or actually

10   paragraph -- after paragraph 3 with the A's and B's.

11        **MS. CITRARO:**  Yeah.  I'm not asking for any of the

12   listed-out items so you -- you may also take into

13   account, short paragraph, the witness's level of

14   confidence, short paragraph, and that it is -- it is the

15   prosecution's burden, short paragraph.  Those will be

16   the ones I am asking to add to it, yes.

17        **THE COURT:**  All right.  I'll take it under

18   advisement.

19        Anything else?

20        **MS. CITRARO:**  I don't think so, Judge.  Thank you.

21   I'll invoke the rule.

22        **THE COURT:**  All right.  The rule of sequestration

23   is invoked.  Both parties will notify their respective

24   witnesses regarding the requirements of the rule.  Has

25   there been an offer made in the case?  Was that

1    discussed this morning with you and Judge Davis?

2        **MS. SCOTT:**  Judge, the State filed an amended

3    information this morning.  This case was previously

4    upgraded from simple burglary to burglary of a dwelling

5    with assault or battery.  It's my position it should

6    never have been upgraded.  So I went ahead and filed an

7    amended simple burg dwelling based on that amended

8    information.

9        The scoresheet now reads 21.9 months as a minimum

10    sentence.  I think it was 35 before with an F1 versus

11    the F2.  So the offer of the State was 21.9 months.

12        **THE COURT:**  As it relates to the amended

13    information, was that addressed this morning with Judge

14    Davis?

15        **MS. CITRARO:**  Yes.  We waived formal reading and

16    any defects in the information.

17        **THE COURT:**  Was the offer conveyed by Judge Davis?

18    Was it placed on the record?

19        **MS. SCOTT:**  Yes.

20        **THE COURT:**  Did she make inquiry of Mr. Valle-Ramos

21    whether he understood what the amended offer was?

22        **MS. CITRARO:**  After the amended offer was made, no.

23        **THE COURT:**  Mr. Valle-Ramos, you understand you are

24    charged by information with two counts of burglary of a

25    dwelling, a second degree felony, punishable by up to 15

1        years in prison as well as a $10,000 fine.

2            Count II you are charged with grand theft third

3        degree, a third degree felony punishable by up to five

4        years in a prison as well as a $5,000 fine.  Do you

5        understand what the maximum sentence is and what you are

6        charged with in each count?

7            **THE DEFENDANT:**  Yes.

8            **THE COURT:**  Do you understand the state attorney's

9        office has made an offer to you today, which is to, I

10       guess -- I assume it is Count I, State?

11           **MS. SCOTT:**  Count I, the amended information in

12       Count I and II.  So grand theft is still on there.

13           **THE COURT:**  All right.  It would be a plea to both

14       counts.  It would be an adjudication of guilt on both

15       counts, and then the bottom of the guidelines, which is

16       21.9 months in the Department of Corrections, court

17       costs, cost of prosecution fee, public defender's lien,

18       and if there was any restitution or cost of

19       investigation, those items would be applicable as well.

20       Do you understand what the offer is?

21           **THE DEFENDANT:**  I understand.

22           **THE COURT:**  Knowing what the offer is and knowing

23       what the potential exposure is should you go to trial

24       and lose, what is it you have decided to do?

25           **THE DEFENDANT:**  What did I decide to do if I lose?

1    **THE COURT:**  Well, you are looking at up to 15 years

2    in prison on the burglary, and up to five additional

3    years on the grand theft.  Okay.  So a maximum potential

4    sentence of up to 20 years if you're convicted.  And I'm

5    not saying you will be.  I'm not saying you won't be.  I

6    don't know what will happen.  The jury may acquit you.

7    But if the jury does convict you, you understand you

8    could be facing up to 15 years on the first charge and

9    up to five years on the second charge and potentially a

10   total of 20 years for both of them.  Do you understand

11   that?

12       **THE DEFENDANT:**  Yeah, I do.

13       **THE COURT:**  You understand the current offer is 22

14   months in the Department of Corrections?

15       **THE DEFENDANT:**  I do.

16       **THE COURT:**  Knowing that's what the offer is to

17   resolve the case today and knowing what you could be

18   facing if you're convicted by a jury, what would you

19   like to do?  Would you like to take the offer or would

20   you like to go to trial?

21       **THE DEFENDANT:**  Go to trial.

22       **THE COURT:**  Okay.  That's a decision that you made

23   freely, nobody forced you to make that decision?

24       **THE DEFENDANT:**  Yeah.

25       **THE COURT:**  Okay.  All right.

1           Defense, go ahead and name for me your defense

2     witnesses.

3           **THE DEFENDANT:**  Yes.  Marquis Hickson and Charlene

4     Bloom and potentially my client.

5           **THE COURT:**  Mr. Valle-Ramos, you understand other

6     than yourself, those other two witnesses are the only

7     two witnesses that your attorney has indicated she may

8     call in this case?

9           **THE DEFENDANT:**  I understand.

10          **THE COURT:**  Are you aware of any other witnesses or

11    are there any other witnesses at this point in time that

12    you want her to call?

13          **THE DEFENDANT:**  No.

14          **THE COURT:**  So you understand during the course of

15    the trial the only three witnesses that may be called on

16    your behalf are yourself and the two witnesses she just

17    named?

18          **THE DEFENDANT:**  Yes.

19          **THE COURT:**  You're okay with that decision?

20          **THE DEFENDANT:**  Yes.

21          **THE COURT:**  Ms. Citraro, have there been any items

22    of evidence taken from your client or any statements

23    that were taken from the police by your client.

24          **MS. CITRARO:**  I don't believe so.  Not that I'm

25    aware of.

1     **THE COURT:** Have you investigated the case and

2     believe there are no motions to suppress any of the

3     statements or any of the evidence in this case that

4     could be taken on a good-faith basis?

5     **MS. CITRARO:** I am not aware of any statements that

6     need to be suppressed because I'm not aware of any

7     admissions by my client whatsoever. I do have a few

8     items of evidence to place. We can do it after lunch or

9     before.

10     **THE CLERK:** Once the panel is selected, that is

11     when I can take the evidence.

12     **MS. CITRARO:** Okay. We can do it later. I'm not

13     aware of any motions to suppress, though.

14     **THE COURT:** All right. So you don't believe

15     there's a good faith basis to file any motions to

16     suppress in this case?

17     **MS. CITRARO:** Not in this case, no.

18     **THE COURT:** Do you understand that, Mr.

19     Valle-Ramos?

20     **THE DEFENDANT:** I do.

21     **THE COURT:** Okay. Does the defense intend to

22     concede during their opening statement or closing

23     statement any elements of the offense?

24     **MS. CITRARO:** The issue here is that a burglary

25     occurred, but it is a misidentification.

1    **THE COURT:**  Okay.

2    **MS. CITRARO:**  So --

3    **THE COURT:**  You will be arguing that potentially

4    during your opening as well as your closing?

5    **MS. CITRARO:**  Yes.

6    **THE COURT:**  Mr. Valle-Ramos, you understand that's

7    the theory of you-all's defense?

8    **THE DEFENDANT:**  I do understand.

9    **THE COURT:**  And she may be admitting that a

10   burglary happened, but the defense is it wasn't you?

11   **THE DEFENDANT:**  Exactly.

12   **THE COURT:**  You okay with that decision?

13   **THE DEFENDANT:**  Yes, I am.

14   **THE COURT:**  Do you understand that's how she's

15   going to be proceeding with the defense in this case?

16   **THE DEFENDANT:**  Yeah.

17   **THE COURT:**  Okay.

18   **MS. SCOTT:**  Can I get a time from the court as to

19   what time you anticipate the first witness?

20   **THE COURT:**  It's gonna depend on how long you take

21   to pick a jury.

22   **MS. CITRARO:**  My openings don't take more than five

23   minutes if it helps.

24   **THE COURT:**  All right.  Any other motions or

25   matters that we need to address before the jury comes

1    in?

2         **MS. CITRARO:**  I don't believe so.

3         **MS. SCOTT:**  None from the State.

4         **THE COURT:**  Okay.

5         Ms. Citraro, during my questioning with the panel

6    and during the opening statements, do you want me to

7    address the right to remain silent?

8         **MS. CITRARO:**  Sure.

9         **THE COURT:**  Okay.  Any special jury instructions

10   that I need to be aware of the standards?

11        **MS. CITRARO:**  Standards, including evidence.

12        **THE COURT:**  Anything else?

13        **MS. CITRARO:**  I don't think so.  There's no

14   specialist for identification, just eyewitness, correct?

15        **THE COURT:**  Right.  Eyewitness, I was thinking.

16   Necessity?

17        **MS. CITRARO:**  No.  No affirmative defense.

18        **THE COURT:**  Okay, great.  Thank you.

19        Did you give any consideration to what lessers you

20   want on the burglary count?

21        **MS. CITRARO:**  No.  If it comes to it later, can we

22   discuss that later?

23        **THE COURT:**  Yeah, I just like to know so I can

24   start.  I mean, you've got burglary of a dwelling.  I

25   guess the only other lesser would be burglary of a

1    structure?

2        **MS. CITRARO:**  Trespass.

3        **THE COURT:**  And then the grand theft which is even

4    lower levels of theft.

5        **MS. CITRARO:**  Yes.  I'm not sure that we are going

6    to be requesting that, but yes.

7        **THE COURT:**  I will put them in.  It's easier to

8    take them out.  All right.  Are we ready to proceed?

9        **MS. CITRARO:**  Yes, Judge.

10        **THE COURT:**  All right.  Let's bring in the members

11    of the jury.

12        (Whereupon, the Venire entered the courtroom.)

13        **COURT DEPUTY:**  Jurors please stand, raise your

14    right hand to be sworn by the clerk.

15        (Whereupon, the Venire was placed under oath.)

16        (Voir dire proceedings commenced, not transcribed

17    herein.)

18        **THE COURT:**  We will be in recess for about five

19    minutes for you-all to take a look at your notes, court

20    personnel to take a break, use the rest room if they

21    need to, and then we will come back and start back up.

22        (Whereupon a short recess was taken.)

23        **THE COURT:**  Juror in seat number 1, what says the

24    State?

25        **MS. SCOTT:**  Acceptable.

1        **THE COURT:**  Defense?

2        **MS. CITRARO:**  Use a peremptory.

3        **THE COURT:**  Juror in seat number 2, defense?

4        **MS. CITRARO:**  Acceptable.

5        **THE COURT:**  State?

6        **MS. SCOTT:**  Acceptable.

7        **THE COURT:**  Juror in seat number 3, State?

8        **MS. SCOTT:**  Judge, I ask to remove for cause.

9     He -- scheduling-wise, he said today.  I believe, he has

10    to leave by 4:30.

11       **THE COURT:**  Defense?

12       **MS. CITRARO:**  I have no objection.

13       **THE COURT:**  Grant it.

14    Juror in seat number 4, defense?

15       **MS. CITRARO:**  Acceptable.

16       **THE COURT:**  State?

17       **MS. SCOTT:**  Acceptable.

18       **THE COURT:**  Juror in seat number 5, State?

19       **MS. SCOTT:**  Acceptable.

20       **THE COURT:**  Defense?

21       **MS. CITRARO:**  I'm gonna ask for a cause challenge.

22    I'm not sure if it was the whole time, I know it was the

23    time the --

24       **THE COURT:**  His eyes were closing.  State?

25       **MS. SCOTT:**  I didn't look at him.  So if somebody

1      else -- I will take Ms. Citraro's word for that.  She

2      thinks he was sleeping.

3          **THE COURT:**  All right.  I'll go ahead and grant it.

4      I noted you made a comment about it on the record.

5          **MS. SCOTT:**  Who did?

6          **MS. CITRARO:**  I never directed it at him.

7          **THE COURT:**  I know.  I know it wasn't directed to

8      him.

9          Juror in seat number 6, Defense?

10         **MS. CITRARO:**  So she said she was uncomfortable and

11     can't sit, so that would be cause.

12         **THE COURT:**  State?

13         **MS. SCOTT:**  Agree.

14         **THE COURT:**  All right.  She will be stricken for

15     cause.

16         Juror in seat number 7, State?

17         **MS. SCOTT:**  Acceptable.

18         **THE COURT:**  Defense?

19         **MS. CITRARO:**  Acceptable.

20         **THE COURT:**  Juror in seat number 8, defense?

21         **MS. CITRARO:**  Acceptable.

22         **THE COURT:**  State?

23         **MS. SCOTT:**  State would strike.

24         **THE COURT:**  Juror in seat number 9, State?

25         **MS. SCOTT:**  I ask to strike her for cause.  She

1    said that she cannot reach a verdict based on testimony

2    alone.

3         **THE COURT:**  Defense?

4         **MS. CITRARO:**  I'll be honest, if there's a case out

5    there that says that that is enough for a cause

6    challenge, I have no objection.  But I'm not familiar

7    with the case, so I will take no position.

8         **THE COURT:**  I'm gonna go ahead and grant it.  She

9    gave a couple of other answers that were a little

10   evasive.

11        All right.  Juror in seat number 10, defense?

12        **MS. SCOTT:**  Acceptable.

13        **THE COURT:**  State?

14        **MS. SCOTT:**  Acceptable.

15        **THE COURT:**  Juror in seat number 11, State?

16        **MS. SCOTT:**  Acceptable.

17        **THE COURT:**  Defense?

18        **MS. CITRARO:**  Acceptable.

19        **THE COURT:**  Juror in seat number 12, defense?

20        **MS. CITRARO:**  Um, he was the doctor who's got 60

21   patients to reschedule tomorrow or something, so I ask

22   for a cause challenge.

23        **THE COURT:**  State?

24        **MS. SCOTT:**  No objection.

25        **THE COURT:**  Granted.

1          Juror in seat number 13, State?

2          **MS. SCOTT:**  Acceptable.

3          **THE COURT:**  Defense?

4          **MS. CITRARO:**  Acceptable.

5          **THE COURT:**  That leaves our jury as 2, 4, 7, 10,

6     11, and 13.

7          Any backstrikes by the State?

8          **MS. SCOTT:**  Strike 4, Your Honor.

9          **THE COURT:**  Brings us to juror in seat number 14.

10    Defense?

11         **MS. CITRARO:**  Acceptable.

12         **THE COURT:**  State?

13         **MS. SCOTT:**  Acceptable.

14         **THE COURT:**  That leaves our jury as 2, 7, 10, 13 --

15    or 11, 13 and 14.

16         Any backstrikes by the defense?

17         **MS. CITRARO:**  I'll backstrike 14.

18         **THE COURT:**  Brings us to juror in seat number 15.

19    What says the State?

20         **MS. SCOTT:**  I ask for a cause challenge, Judge.

21         **THE COURT:**  Any objection?

22         **MS. CITRARO:**  No, Judge.

23         **THE COURT:**  Based upon his responses in private,

24    I'll grant that.

25         Juror in seat number 17, defense?

1        **MS. CITRARO:**  We already struck 16.

2        **THE COURT:**  Sixteen, I'm sorry.

3        **MS. CITRARO:**  Sixteen, I think, was another cause

4    challenge.  He said he had been burglarized recently.  I

5    think he said he couldn't be fair and impartial.

6        **THE COURT:**  State?

7        **MS. SCOTT:**  I have notes of the burglary.  I don't

8    have any notes regarding impartiality.

9        **THE COURT:**  I have that he had been robbed, but I

10    did not get any indication that he said he could not be

11    fair.

12        **MS. CITRARO:**  I don't write anything down, but I

13    remember checking off in my head that that was cause

14    while he was talking the first time.

15        **THE COURT:**  I don't recall him saying anything that

16    would lead to a cause challenge.

17        **MS. CITRARO:**  All right.  I'll use a peremptory

18    then.

19        **THE COURT:**  Okay.  Juror in seat number 17, any

20    objection to striking her for cause on language?

21        **MS. CITRARO:**  No objection.

22        **MS. SCOTT:**  No objection.

23        **THE COURT:**  Juror number 18, what says the defense?

24        **MS. CITRARO:**  Peremptory.

25        **THE COURT:**  All right.  That's your fourth.

1          Juror in seat number 19, State?

2     **MS. SCOTT:** He's acceptable.  He's acceptable,

3     Judge.  I have a note here that he was previously

4     arrested.  I told defense prior to jury selection and he

5     did not volunteer when I asked him.  If I can have a

6     minute, I can bring up his rap sheet that I have to see

7     if his description matches.

8          Judge, I have that he was arrested in 2001 for

9     grand theft.  Adjudication was withheld.  He pled no

10    contest.  The description that I have given is date of

11    birth 3/24/81.  The same date of birth that he listed on

12    his jury questionnaire.  His height is 5'9",

13    approximately 170 pounds, brown hair, black eyes.

14    **THE COURT:** So what are you asking me to do?

15    **MS. SCOTT:** I'm asking you to strike him for cause

16    based on I think he lied to that question.  He didn't

17    answer it truthfully.

18    **THE COURT:** Defense?

19    **MS. CITRARO:** I'll take no position.

20    **THE COURT:** I'll strike him for cause.

21         Juror in seat number 20, any objection to removing

22    him?

23    **MS. CITRARO:** No.

24    **MS. SCOTT:** No.

25    **THE COURT:** All right.  Juror in seat number 21.

1        State?

2              **MS. SCOTT:**  No objection.

3              **THE COURT:**  Defense?

4              **MS. CITRARO:**  We will strike.

5              **THE COURT:**  All right.  That's your fifth.

6              Juror in seat number 22, defense?

7              **MS. CITRARO:**  Graduation tomorrow.  Cause

8        challenge.

9              **MS. SCOTT:**  Agree, Judge.

10             **THE COURT:**  All right.  Be granted.

11             Juror in seat number 23.  State?

12             **MS. SCOTT:**  Acceptable.

13             **THE COURT:**  Defense?

14             **MS. CITRARO:**  Acceptable.

15             **THE COURT:**  That leaves our jury as 2, 7, 10, 11,

16       13, 23.

17             Any backstrikes by the State?

18             **MS. SCOTT:**  State would backstrike number 11.

19             **THE COURT:**  That's your third.  Brings us to juror

20       in seat number 24.  What says the defense?

21             **MS. CITRARO:**  Acceptable.

22             **MS. SCOTT:**  Can he be stricken for cause?  He said

23       testimony is not enough.  He can't reach a verdict,

24       period, based on testimony alone.  He would need

25       something more than just testimony.

1        **THE COURT:**  Defense?

2        **MS. CITRARO:**  I'll take no position.

3        **THE COURT:**  I'll grant it.

4        Juror in seat number 25, State?

5        **MS. SCOTT:**  Acceptable.

6        **THE COURT:**  Defense?

7        **MS. CITRARO:**  He had mentioned something about

8   being broken into and said he couldn't be fair and

9   impartial, I think, is one of those last ones that said

10  it.  One of the last ones that started mentioning --

11  that started to happen with him at the very end of my

12  voir dire.

13       **MS. SCOTT:**  I have a note that his wife's car was

14  broken into.  I don't have anything in terms of him not

15  being able to be fair and impartial based on that.

16       **THE COURT:**  I remember him talking about his car

17  being broken into, but I don't remember him going into

18  any more detail about he can't be fair and impartial.

19       So what says the defense to juror in seat number

20  25?

21       **MS. CITRARO:**  We will do our last strike.

22       **THE COURT:**  That's the defense's sixth and final

23  strike.

24       Juror in seat number 26.  What says the State?

25       **MS. SCOTT:**  I will strike her for cause, Judge.

1    She said she can't sit on the case because she has been

2    robbed before so she doesn't think she could be a good

3    juror.  I also think there's a language issue even

4    though she didn't --

5         **THE COURT:**  Any objection?

6         **MS. CITRARO:**  No.

7         **THE COURT:**  Juror in seat number 27.  State?

8         **MS. SCOTT:**  Acceptable.

9         **THE COURT:**  All right.  Defense, any cause

10   challenges?

11        **MS. CITRARO:**  No.  Acceptable.

12        **THE COURT:**  All right.  So that leaves our jury as

13   2, 7, 10, 13, 23 and 27.

14        Any backstrikes by the State?

15        **MS. SCOTT:**  No.

16        **THE COURT:**  Any cause challenges by the defense?

17        **MS. CITRARO:**  No.

18        **THE COURT:**  That's our jury, seat number 2, seat

19   number 7, seat number 10, seat number 13, seat number

20   23, and seat number 27.

21        What says the parties as it relates to juror in

22   seat number 28 as the alternate.

23        **MS. SCOTT:**  Judge, I ask to strike him for cause.

24   He's another one that has a rap who did not say he was

25   arrested.  His name matches.

1        **THE COURT:**  Any objection?

2        **MS. CITRARO:**  No objection.

3        **MS. SCOTT:**  I'm just verifying the date of birth.

4        **THE COURT:**  They don't have any objection to it.

5    Move on.

6        Juror seat 29, any objection to 29 as being the

7    alternate?

8        **MS. SCOTT:**  I will strike 29.

9        **THE COURT:**  Juror in seat 30?

10        **MS. SCOTT:**  No objection.

11        **THE COURT:**  Defense?

12        **MS. CITRARO:**  No objection.

13        **THE COURT:**  Anybody think we need another

14    alternate?

15        **MS. SCOTT:**  My only concern is that we're going

16    overnight, and so we are going into a second day.

17        **MS. CITRARO:**  I don't have an objection to seating

18    another one.  I don't really care.

19        **THE COURT:**  Okay.  Juror in seat number 32.

20        **MS. SCOTT:**  I ask to strike for cause.

21        **THE COURT:**  Any objection to removing seat number

22    32 for cause?

23        **MS. CITRARO:**  What was the cause reason?

24        **THE COURT:**  He's going to Maine.  He has got a

25    physical.

1      **MS. CITRARO:**  Yeah, no objection.  No objection.

2      **THE COURT:**  A couple other things.

3      **MS. CITRARO:**  No objection.

4      **THE COURT:**  All right.  Juror in seat number 33 as

5      the second alternate.

6      **MS. SCOTT:**  No objection.

7      **MS. CITRARO:**  Acceptable.

8      **THE COURT:**  Okay.  So that is our panel, juror in

9      seat number 2, 7, 10, 13, 23, 27.  And the alternates

10     are 30 and 33.

11     All right.  Mr. Valle-Ramos, you had an opportunity

12     to sit through the jury selection process, correct?

13     **THE DEFENDANT:**  Yes, sir.

14     **THE COURT:**  And you had an opportunity to

15     participate with your attorney about the people who were

16     selected and stricken from the jury; is that correct?

17     **THE DEFENDANT:**  Yes, sir.

18     **THE COURT:**  Did you agree with all the cause

19     challenges that were made?

20     **THE DEFENDANT:**  Yes, sir.

21     **THE COURT:**  And did you agree with all the

22     peremptory challenges that your attorney made?

23     **THE DEFENDANT:**  Yes, sir.

24     **THE COURT:**  And is this jury that we are about to

25     seat acceptable to you?

1        **THE DEFENDANT:**  Acceptable, yeah.

2        **THE COURT:**  Is there anybody on here that you don't

3    want on here?

4        **THE DEFENDANT:**  No.

5        **THE COURT:**  Just checking.  Want to make sure.

6        Okay.  Let's go ahead and bring the members of the

7    jury back in.  If you guys want to turn your seats

8    around, we will announce who the members of the jury are

9    and we will go from there.

10        (Whereupon, the Venire entered the courtroom.)

11        **THE COURT:**  All right.  Ladies and gentlemen, we

12    have gone through our notes and we have determined who

13    is going to be on the jury for this particular case.

14        Madam Clerk, if you go -- will go ahead and please

15    announce the members of the jury.  When your badge

16    number is called, if you will just follow the court

17    deputies over here, and they'll give you the seating

18    assignments in the jury box.  Okay?

19        Juror number 477.  501.  542.  24.  521.  407.  36.

20    241.

21        Is the jury as seated acceptable to the State?

22        **MS. SCOTT:**  Yes, Your Honor.

23        **THE COURT:**  Is the jury as seated acceptable to the

24    defense?

25        **MS. CITRARO:**  Yes, Judge.

1    **THE COURT:**  And, Mr. Valle-Ramos, is the jury as

2    seated acceptable to you?

3    **THE DEFENDANT:**  Yes, sir.

4    **THE COURT:**  Madam Clerk, please swear in the

5    members of the jury.

6    (The jury, having been duly impaneled, was sworn to

7    well and truly try the issues of the case.)

8    **THE COURT:**  All right.  Ladies and gentlemen of the

9    jury, I will get with you-all in a second.  I'll give

10   instructions.

11   Ladies and gentlemen, for those of you who were not

12   selected in this case, I have some of good news for you.

13   Since it's after 2:30, you're gonna get released and go

14   home.  What I need you to do is go downstairs, check in

15   with the jury service room, hand them back your badges.

16   If you need excuses for work or anything of that nature,

17   they can give that to you downstairs.  Okay?

18   I do wish to thank you for your time and

19   consideration today.  I know it was a long day.  I know

20   it was not the most convenient thing or the place you

21   would have liked to have been today, but it is important

22   for our system of justice that members of our community,

23   like yourselves, come in.  And we wouldn't be able to do

24   the things we do here in our court system without your

25   assistance.  So for that, I do thank you.

1          If you want to go down and check in with the jury

2     services room on the first floor and get your excuses,

3     you are free to go.

4          (Venire exited the courtroom.)

5     **THE COURT:**  All right.  Ladies and gentlemen, what

6     I want to discuss with you a little bit is the

7     possibility of going past five a little bit tonight,

8     maybe to like six, so we can get some of this moving

9     along so we can get you out of here earlier tomorrow.

10    Anybody have any difficulty or any problem with maybe

11    going till about six tonight?  Nothing?

12         Okay.  Anybody need to make any phone calls or

13    anything before we do that?  Okay.  What we will do is

14    we will probably be going to take a recess here in a

15    little bit.  So what we will do is we will go through

16    the trial.  As long as I give you a recess in the next

17    hour or so to make phone calls, does that work?

18    **JURORS:**  Yes.

19    **THE COURT:**  Okay.  With that said, what I'm gonna

20    do is give you the preliminary instructions at this

21    point and then the attorneys will start with their case.

22         Ladies and gentlemen of the jury, you have been

23    selected and sworn as the jury to try the case of the

24    State of Florida versus Jorge Valle-Ramos.  This is a

25    criminal case.  Mr. Valle-Ramos is charged with two

1     counts of burglary of a dwelling and grand theft third

2     degree.  The definition of the elements of those crimes

3     will be explained to you later.

4         Now, it's your solemn responsibility to determine

5     if the State has proved its accusations beyond a

6     reasonable doubt against Mr. Valle-Ramos.  Your verdict

7     must be based solely upon the evidence or the lack of

8     evidence and the law.  The information as I stated

9     previously, is not evidence and is not to be considered

10    by you as any proof of guilt.  It is the judge's

11    responsibility to decide which laws apply to this case

12    and to explain those laws to you.  And it is your

13    responsibility to decide what the facts of this case may

14    be and to apply the law to that set of facts.  Thus, the

15    province of the jury and the province of the Court are

16    well-defined and they do not overlap.  This is a

17    fundamental principal of our system of justice.

18        Now, before proceeding further, it will be helpful

19    if you understand how a trial is conducted.  At the

20    beginning of the trial, the attorneys will have the

21    opportunity to, if they wish, to make what's called an

22    opening statement.  The opening statement gives the

23    attorneys a chance to tell you what evidence they

24    believe will be presented during the trial.  What the

25    lawyers say is not evidence, and you are not to consider

1    it as such.  It's just basically a road map or a way for

2    them to tell you what they think they'll be able to

3    prove during the course of their case.

4        Following the opening statement, witnesses will be

5    called to testify under oath.  They will be examined and

6    cross-examined by the attorneys, and documents and other

7    exhibits may be placed before you for your

8    consideration.  After the evidence has been presented,

9    the attorneys will make their final arguments, and

10   following the arguments by the attorneys, I will

11   instruct you on what the law is that's applicable to

12   this case.

13       After the instructions are given, I will release

14   the alternate jurors and then you-all will retire to

15   consider your verdict.  You should not form any definite

16   or fixed opinions on the merits of this case until you

17   have heard all of the evidence, the arguments of the

18   lawyers and the instructions on the law by the judge.

19   Until that time, you should not discuss the case amongst

20   yourselves.

21       During the course of the trial, the Court may take

22   recesses during which you'll be permitted to separate

23   and go about your own personal affairs.  During these

24   recesses, you will not discuss the case with anyone, nor

25   permit anyone to say anything to you or in your presence

1       about this case.  If anyone attempts to say anything to

2       you or in your presence about this case, tell him or her

3       that you are on the jury deciding the case and ask them

4       to stop.  If they persist, leave them at once and inform

5       one of the court deputies who will advise me.

6            This case must be decided by you only on the

7       evidence presented during the trial in your presence and

8       in the presence of the defendant, the attorneys and the

9       judge.  Jurors must not conduct any investigation of

10      their own, and this would include reading newspapers,

11      watching television or using a computer, cell phone, the

12      Internet, any electronic device or any other means at

13      all to get any information related to this case or the

14      people and places that are involved in this case.

15           This applies to whether you are at the courthouse,

16      at home or anywhere else.  You also must not visit any

17      places mentioned in the trial or use the Internet to

18      look up any maps or pictures to see any places discussed

19      during the course of the trial.

20           Jurors must not have communications or discussions

21      of any sort with family or friends about the case or the

22      people and places involved.  So please don't even let

23      your closest family members make comments to you or ask

24      questions about the trial.  In this age of electronic

25      communication, I want to stress again just as you must

1     not talk about this case face-to-face, you must not talk

2     about this case by using any electronic device.

3           You must not use phones, computer or other

4     electronic devices to communicate, and you are not to

5     send or accept any messages related to this case or your

6     jury service.  Do not discuss this case or ask for

7     advice by any means at all, including posting

8     information on the Internet, website, a chat room or a

9     blog.

10           In every criminal proceeding a defendant has the

11     absolute right to remain silent.  At no time is it the

12     duty of the defendant to prove his innocence.  From the

13     exercise of his right to remain silent, a jury is not

14     permitted to draw any inference of guilt, and the fact

15     that a defendant does not take the witness stand must

16     not influence your verdict in any manner whatsoever.

17           The attorneys in this case, as I stated previously,

18     are trained in the rules of evidence and trial procedure

19     and it is their duty to make all objections that they

20     feel are proper.  When an objection is made, you should

21     not speculate on the reason why it was made.  Likewise,

22     when an objection is sustained or upheld by me, you

23     should not speculate on what might have occurred had the

24     objection not been sustained, nor on what the witness

25     might had have said had they been permitted to answer

1      the question.

2          During the trial it may be necessary for me to

3      confer with the attorneys outside of your hearing to

4      discuss matters of law or other matters that require

5      consideration by me alone.  It is impossible for me to

6      predict when such conferences may be required or how

7      long that they will last.  However, be rest assured that

8      when such conferences do occur, they will be conducted

9      so as to consume as little of your time as necessary for

10     a fair and orderly trial of this case.

11         If you happen to see myself or any of the court

12     personnel or any of the witnesses or parties in this

13     case during any recesses during the course of the trial

14     and those individuals do not speak to you or even seem

15     to pay attention to you, please realize that they are

16     not being discourteous or rude.  They are only trying to

17     avoid the appearance of having any improper contact with

18     you-all as the members of the jury.

19         I will, in fact, be instructing everyone to stay

20     away from you with the exception of the court deputies

21     who will be in charge of your care and custody while

22     you're with us.  Okay?

23         Now, if you would like to take notes during the

24     trial, you may do so.  On the other hand, of course, you

25     are not required to take notes if you do not want to.

1    That is a decision left up to each one of you

2    individually.  You have been provided with a notepad and

3    a pen for your use if you wish to take notes.  Any notes

4    that you take will be for your own personal use.

5    However, you should not take them with you from the

6    courtroom.

7         What I would ask you to do is during recesses, fold

8    the pad over, put the pen on top of it, stick it on your

9    chair.  When you come back, the court deputies will make

10   sure it's in your chair for you and available when we

11   get back.  Okay?  At the end of the case after you've

12   completed your deliberations, the court deputies will

13   deliver your notes to me.  They'll be destroyed, and no

14   one will read whatever notes it is that you made

15   reference this case.

16        If you decide to take notes, please don't get so

17   involved in note-taking that you become distracted from

18   the proceedings.  Your notes should only be used as an

19   aid to your memory.  Whether or not you decide to take

20   notes, you should rely upon your own memory of the

21   evidence and you should not be unduly influenced by the

22   notes of another juror.  Notes are not entitled to any

23   greater weight than each juror's memory of the evidence.

24        At this time the attorneys for the parties will

25   have an opportunity, if they wish, to make their opening

1    statement in which they may explain to you the issues in

2    the case and give you a summary of the facts that they

3    expect that the evidence will show.

4        State, do you wish to give an opening statement at

5    this time?

6    **MS. SCOTT:**  Yes, Your Honor.

7    **THE COURT:**  You may.

8    **MS. SCOTT:**  In a few moments, you are going to meet

9    someone named George Gonzalez.  He's going to walk in

10   through the doors and sit at the stand.  He's going to

11   tell you about one of the most terrifying experiences of

12   his life.  He's going to tell you that back in April of

13   2013, April 9th, morning, he leaves.  He comes back, and

14   as soon as he enters his home, he hears that someone is

15   inside.

16       He hears shuffling.  He hears that there's --

17   something is happening.  No one is supposed to be there.

18   Someone is inside.  He is inside his house, and around

19   the corner pops out that man.  And the reason we know

20   it's that man is because Mr. Gonzalez saw him.  Mr.

21   Gonzalez and Mr. Valle-Ramos were face-to-face.  They

22   stared at one another.  Both of them were in shock to

23   see one another.  Both of them were not expecting the

24   other to be there.  And so they had this awkward

25   staring, what-are-you-doing-here type of moment.

1          Mr. Gonzalez at that point exchanges some words

2     with Mr. Valle-Ramos, and Mr. Valle-Ramos bails.  He

3     runs out the back door, runs out.  Mr. Gonzalez at that

4     point doesn't stop, doesn't call the police right then.

5     He gives chase.  He goes after the guy who just broke

6     into his house.  He chases him, he loses him.

7          He goes back to the house, his house, and there's

8     two more.  There is two more individuals that should not

9     be there.  Those two individuals don't run.  What they

10    do is they get in an altercation with Mr. Gonzalez.  Mr.

11    Gonzalez is not letting these people go.  They broke

12    into his home, he caught them red-handed, and he's gonna

13    do something about it.

14         He's struggling with one of these individuals.  At

15    one point he has mace, he sprays.  One of the other

16    individuals comes out.  So now he knows there's a total

17    of three of them in the house.  He doesn't know how many

18    more.  He doesn't know if they have weapons.  He doesn't

19    know any of this at this point.  He struggles.  Those

20    two people eventually get away.

21         Law enforcement responds.  He calls 911.  Law

22    enforcement comes out, collects statements, talks to

23    neighbors, and they talk to different witnesses that

24    were around.  And you're gonna hear from some of those

25    witnesses today, one of those witnesses, somebody by the

1 name of Bethany Szewczyk.  And I might be mispronouncing

2 her name because it's an odd spelling.

3  She's gonna tell that you she's never seen that man

4 before either, Mr. Gonzalez.  Hasn't met him prior to

5 that day.  They have no idea who this individual is.

6 But what both of them will tell you is that both of them

7 saw him that day.  Both of them will tell you that they

8 were presented a photo lineup.  Mr. Valle-Ramos was

9 presented that photo lineup not too long after this

10 incident where Mr. Valle-Ramos' picture was in that

11 photo lineup.  Without a doubt, without hesitation,

12 that's him.  He points to him.  He identifies him to law

13 enforcement.

14  Bethany is gonna tell you that she saw this happen.

15 The facts as to who went in what direction, who got

16 inside what kind of car, those might be a little bit

17 different.  Both Bethany and Mr. Gonzalez are gonna tell

18 you they did see a vehicle there.  They saw either a

19 gray Carolla or a Camry, a smaller sedan, grayish in

20 color.  Maybe a lighter beige in color, something along

21 those lines.

22  Ms. Bethany was presented that photo lineup months

23 after this happened.  She, too, has never seen this man

24 before other than when she saw him walk out of that

25 house.  Other than when she saw him flee the scene, and

1    she too was able to look at a photo lineup without

2    hesitation and say that's him.  Absolutely no doubt in

3    my mind.

4         Detective Stanley is an investigator that was put

5    on this case, the one that kind of put the pieces

6    together.  He's the one that constructed this photo

7    lineup and presented it to these witnesses.

8         There is another neighbor, Charlene Bloom.  You may

9    hear from her today.  She is one of the neighbors who

10   didn't have as clear of a shot from everything that

11   happened.  She had a balcony view.  She was, perhaps,

12   maybe across a street or a driveway of sorts.  The

13   neighborhood that this happened in, these are individual

14   homes next to one another.  There is not like a regular

15   set type of neighborhood.  It is almost like an

16   apartment/townhouse type of setup.  You will see photos

17   of the area so you'll be familiar with it.  And so her

18   recollection of things is slightly different than what

19   you will hear from Mr. Gonzalez and Ms. Bethany

20   Szewczyk.

21        The last person I anticipate you'll hear from is

22   Ms. Chantelle Styer.  She is a C.S.I. investigator.

23   She's the one that comes out on scene, does the fancy

24   dusting for fingerprints, takes the photographs and does

25   all that cool forensic stuff.  And you're not gonna have

1    any forensics in this case because there wasn't any.

2    And she's gonna explain to you why fingerprints weren't

3    lifted.  She's gonna explain to you certain things that

4    just because you touch it doesn't mean you leave a

5    print.

6        There is gonna be testimony that she's gonna

7    explain as to why DNA evidence wasn't collected or why

8    it wasn't tested.  What happens when someone is wearing

9    gloves.  All those details are going to come out to

10   explain the science behind why there are no forensics in

11   this case.  But the thing that you do have are going to

12   be the courage and conviction of two individuals who

13   have nothing to gain out of this.  Nothing.  They have

14   absolutely no dog in this fight other than the fact that

15   Mr. Gonzalez, himself, was the one that got burglarized

16   that day.  Not only did he get burglarized, he got a

17   bunch of stuff stolen from him.

18       He will also tell you about all of those items that

19   were taken from his house.  Once the conclusion of this

20   case is done, once you have heard everything, once you

21   talked -- use that common sense that we talked about in

22   jury selection and once you use all of the explanations

23   we gave about reasonable doubt and connect the dots in

24   this case, I'm confident you will return a verdict of

25   guilty.  Thank you.

1      **THE COURT:**  All right.  Does the defense wish to

2      give an opening at this time?

3      **MS. CITRARO:**  Yes, Judge.

4      **THE COURT:**  You may do so.

5      **MS. CITRARO:**  Thank you.  Thank you for sticking

6      around, ladies and gentlemen.  The State's case, as she

7      just laid out, is going to be based on eyewitness

8      testimony from several people.  The State told you that

9      Ms. Bloom, her testimony will be slightly different.

10     Slightly different from the other witnesses.  Her

11     testimony will be it was not Mr. Valle-Ramos.  I

12     consider that a little more than slightly different.

13     Please pay attention to the conflicts in the

14     evidence.  You are going to hear from more than one

15     person what they saw and what they didn't see.  Please

16     pay attention.  No one here will be disputing that Mr.

17     Gonzalez's home was burglarized by at least three

18     people.  You are gonna hear it from him.  Terrible.  He

19     was terrified.

20     State points out it's a scary event.  You can't let

21     emotions be what's ruling when you you're trying to

22     decide was it Mr. Valle-Ramos?  Somebody burglarized the

23     home.  The State needs to prove to you beyond a

24     reasonable doubt that it was Mr. Valle-Ramos beyond a

25     reasonable doubt.  You can't just hold somebody, because

1    he's the one charged, it's got to be him, so let's find

2    him guilty because this poor man, Mr. Gonzalez had his

3    house burglarized.  That's not how it works.

4         You are going to hear from multiple witnesses.

5    Please pay attention, and I'm confident you will hear

6    the conflicts in the evidence.  Mr. Valle-Ramos is not

7    guilty.  They got the wrong guy.  Thank you for your

8    time.

9         **THE COURT:**  All right.

10        State, call your first witness, please.

11        **MS. SCOTT:**  State calls George Gonzalez.

12   Thereupon,

13                       **GEORGE GONZALEZ**

14   was called as a witness and, having first been duly sworn,

15   testified as follows:

16        **THE COURT:**  Have a seat for me please.  If you will

17        go ahead and tell me your first name, your last name,

18        and spell both for me.

19        **THE WITNESS:**  George Gonzalez.  G-E-O-R-G-E,

20   Gonzalez, G-O-N-Z-A-L-E-Z.

21        **THE COURT:**  State, you may inquire.

22                     **DIRECT EXAMINATION**

23   BY MS. SCOTT:

24   **Q**    Good afternoon.  Can you tell the jury what you do

25   for a living.

1    **A**    I sell -- I have a little business.  I sell lethal

2    and nonlethal weapons.

3    **Q**    And what kind of hours do you have normally?

4    **A**    I work on weekends sometimes and sometimes during

5    the week.

6    **Q**    Okay.

7    **A**    Not long hours.

8    **Q**    Do you normally go to work in the morning?

9    **A**    Sometimes.

10    **Q**    Okay.  Back in April of last year, April 9, 2013,

11    of last year were you living at 1625 Little Falls Circle?

12    **A**    Uh-huh.

13    **Q**    Is that a yes?

14    **A**    That's a yes.

15    **Q**    Okay.  We are not being audio recorded, just video

16    or -- excuse me -- we are not being video recorded, just

17    audio.  Is that -- the 1625 Little Falls Circle, is that in

18    Orange County, Florida?

19    **A**    Uh-huh, yes.

20    **Q**    Okay.  Do you remember?

21    **A**    I just don't like my address being given out, but

22    since you are giving it out, everybody has a copy of that?

23    **Q**    They do.

24    **A**    Okay, fine.

25    **Q**    Do you remember that day?

1    **A**    Um, yeah.  A little bit.  Been a year-plus ago, I

2  think.

3    **Q**    Sure?

4    **A**    Uh-huh.

5    **Q**    Do you remember an incident occurring at your

6  residence that day?

7    **A**    Sure.  Uh-huh, yes.

8    **Q**    What's the first thing that you remember about that

9  incident?

10    **A**    Um, when I got home, I opened the door and I saw a

11  gentleman there peek outside my office.  And I looked at him,

12  he looked at me, and I realized I was being robbed.

13    **Q**    Okay.  I am gonna break that down a little bit and

14  slow you down a little bit.

15    **A**    Can I get some water or no?

16    **Q**    Sure.

17    **A**    I'm just a little dry.

18         **THE COURT:**  Why don't we do this, if you need,

19         there is a water fountain out there.  I don't have

20         anything I can give you.

21         **THE WITNESS:**  I'll hang tough.  Go ahead.

22         **THE COURT:**  Okay.

23  **BY MS. SCOTT:**

24    **Q**    I will really try to be brief.  When you say you

25  left that morning and you came back, about what time was that

 1    when you said you came back to your house?

 2        **A**    Um, around 9:30, maybe.

 3        **Q**    A.m.?

 4        **A**    Yes.

 5        **Q**    Okay.  When you came in to your house, were you

 6    expecting anybody to be there?

 7        **A**    No.

 8        **Q**    Okay.  Do you live by yourself?

 9        **A**    Yes.

10        **Q**    When you arrived back at 9:30 -- explain to me the

11    layout of your house.  When you say the front door, is there

12    a driveway that leads up to your front door?

13        **A**    No.  I park there.  I walked to the front door.  As

14    I open the door, then there's a little foyer, kitchen to the

15    left, living room straight ahead through a little door there,

16    or opening, and then my office is to the extreme right

17    towards the back.

18        **Q**    Okay.  And when you say you park there, is there,

19    like, a roadway that you would be able to park your car in?

20        **A**    There's a reserve spot for me in my unit.

21        **Q**    Okay.  And are these townhouses?

22        **A**    Condos, yeah.

23        **Q**    Condos that are next to one another?

24        **A**    Uh-huh.

25        **Q**    And are they covered either in the front or the

1    back?  Are there any fences enclosing them?

2        **A**    Yes.  In the back there's a fence there.  There's a

3    double fence, actually, at the time.

4        **Q**    Okay.  And what do you mean by double fence?  Can

5    you describe that?

6        **A**    Yeah, in the back patio it's all wood fence,

7    double-packaged wood, and behind that there's an easement,

8    and then there's another wood panel fence back there.

9        **Q**    Okay.  When you --

10       **A**    They have recently changed that to a link fence now

11   for people can see if there's anybody.

12       **Q**    Got it.  When you first came into your home -- is

13   the office you described, is it from the front door to where

14   your home office is?

15       **A**    Uh-huh.

16       **Q**    Approximately how far is that?

17       **A**    About 35, 40 feet, maybe.

18       **Q**    Okay.  And did you go straight to there or did you

19   just see someone come out?

20       **A**    No.  I walked into the foyer about another

21   five feet or so and then I saw the head turn and sort of --

22   he sort of leaned and looked like this, and then we stared at

23   each other for a moment.

24       **Q**    Okay.  And just for the record, you were leaning

25   out as if you were peeking around the corner?

1    **A**    He was leaning out.  I was looking straight ahead.

2    **Q**    Correct.  When you saw this individual look at you,

3    how far were you from him?

4    **A**    Um, say about 35, 40 feet.  I'd say I'd be about

5    maybe 35 to 25 feet.

6    **Q**    Okay.  What did you do after you saw him?

7    **A**    Well, after a little -- few seconds that we stared

8    at each other, then I cursed a few things and then I started

9    chasing him.

10    **Q**    Okay.  Which direction did you start chasing him?

11    **A**    Straight ahead right at him.

12    **Q**    Okay.  At that point did you know if there was

13    anybody else in the house?

14    **A**    No.

15    **Q**    What happened once you gave chase?

16    **A**    Well, he hauled out the back door and patio and I

17    realized that he's going to make it out there faster than I

18    can get to him.  He's a pretty quick guy.  So I went out the

19    front, hoped to cut him off, but I'm too slow.

20    **Q**    When you went out the front, which direction did

21    you go?

22    **A**    I took a left.

23    **Q**    And did you see when he went out your back, did he

24    cross the fence?

25    **A**    He actually came around and we are now in chase.

1    And then he turned around, was looking at me again, and then

2    I kept chasing.  But I couldn't catch up to him, so I let him

3    go.  Then started to call the police.

4        **Q**    Okay.  When you met up with him at some point

5    outside and he was looking back at you, was there anything

6    obstructing your view?

7        **A**    No.

8        **Q**    Okay.  You're wearing glasses today.  Do you

9    normally wear glasses?

10        **A**    Yes.

11        **Q**    Were you wearing glasses that day?

12        **A**    Oh, yeah.

13        **Q**    Okay.  Were you, um -- any change in prescription

14    or anything like that that day or did you have any issues

15    with your eyes?

16        **A**    No.  I wear them all the time.  They are for

17    distance.  I see very clearly, you know, and I take them off

18    to read.

19        **Q**    Okay.  Were you reading right before this incident

20    occurred?

21        **A**    No, I was driving, coming home just to relax.

22        **Q**    Okay.  Once the incident occurs outside and he runs

23    away from you, do you see where he goes?

24        **A**    Yes.  I turned around and then I went back towards

25    the easement side and then he jumped the fence and he looked

1    back at me one more time and then he just kept going.

2        **Q**    Okay.  Could you describe that individual that you

3    saw?

4        **A**    Yeah.  I pointed out the picture.  It's that guy

5    right there.

6        **Q**    Okay.  Back up just for a quick second.

7        **A**    Okay.

8        **Q**    Was it male or female?

9        **A**    It was male.

10       **Q**    Okay.  Was he black, white or Hispanic?

11       **A**    Yes.  Hispanic.  Hispanic, light brown color.

12       **Q**    If you had to -- when you, um --

13       **A**    To me, he looked Hispanic, just light, you know.

14       **Q**    Do you remember what he happened to be wearing that

15   day?

16       **A**    I believe it was a blue sort of jersey, cutoff

17   jersey, basketball jersey or something like that.

18       **Q**    Okay.

19       **A**    Didn't pay much to the clothing, more to his face

20   at the time.

21       **Q**    Sure.  Did law enforcement, um -- that individual

22   that you saw running away just a moment ago, do you see that

23   individual in the courtroom today?

24       **A**    Uh-huh.  That guy right there.

25       **Q**    Okay.  Can you describe just an article of clothing

1    he's wearing?

2    **A**    Right now he's got a long sleeve looks like a blue

3    shirt, white buttons, black T-shirt underneath.

4    **Q**    And, again, because we are not having video

5    recorded, where is he seated in the courtroom?

6    **A**    To the left of his attorney.

7    **MS. SCOTT:**  Let the record reflect the witness has

8    identified the defendant.

9    May I approach the clerk, Your Honor?

10    **THE COURT:**  You may.

11    **BY MS. SCOTT:**

12    **Q**    What happened after you -- after you gave up

13    chasing this guy?

14    **A**    Well, I proceeded to the front door, walked in the

15    front door, was out of breath a little bit there, and was

16    calling the police.  And then I was -- as I was calling the

17    police, I started going up the steps and then another guy

18    came down and we bumped right into each other.

19    **Q**    Did that individual see you coming?

20    **A**    Um, I don't think he did.  I think we just

21    happened -- I'm going up and he's coming down.  We just,

22    literally, like in the movies, just hopped right on chest to

23    chest.

24    **Q**    What happened once you bumped into each other?

25    **A**    Well, I turned, I had him in a chokehold and I was

1   dragging him down trying to call the police at the time.

2   Then I put the phone down.  I did have the police on the line

3   so they were on their way.

4        **Q**    Okay.

5        **A**    And, um -- then the other guy came down.

6        **Q**    Okay.  And you say the other guy, at this point are

7   you already downstairs with the individual you have in a

8   chokehold?

9        **A**    No.

10       **Q**    Okay.  What happens once the third individual comes

11  downstairs?

12       **A**    Well, I had a pepper spray gun on me.  My regular

13  gun I usually carry on me was in the car.  So that's all I

14  had on me at the time.  So I took that out and I shot him in

15  the face with it, the guy I had in a chokehold, and he

16  panicked.  And then I went to shoot the other guy, tried to

17  grab the other guy too, but I couldn't because I had -- my

18  rotary cuffs are torn on that side.  I just got over that,

19  over two operations with that, but they made it worse on the

20  left side from the struggle.  Yeah.

21       **Q**    Were those two individuals able to get away from

22  you?

23       **A**    Yeah.  Yeah.  They did, eventually.  Well, after I

24  see the third one, I wondered how many there are, you know.

25  I'm not Bruce Lee.  I'm almost 60 years old, so, you know.

1    **Q**    Right.  After you saw the third individual and

2    after the struggle that you just described occurs, what

3    happened?  Where do they go?  What happened after that?

4    **A**    Well, one went out the front door.  The guy I had a

5    chokehold on, I tried to switch to grab the other guy so I

6    released him because I couldn't do it because of my shoulders

7    went out.  Then the other guy ran up, so I decided to go

8    after him.  And I went out so far and then he took off

9    because they are young guys.  They run quite fast.  So then I

10   went to go get the other guy and I guess the other guy, I

11   thought he went out the back.

12            **MS. CITRARO:**  Objection, narrative.

13            **THE COURT:**  Sustained.

14            **THE WITNESS:**  And then the other -- oh, you want me

15        to be quiet?

16            **THE COURT:**  Yeah.  Let her ask the next question.

17            **THE WITNESS:**  Oh, okay.

18   **BY MS. SCOTT:**

19        **Q**    Once that first individual gets away and goes out

20   the front, the second individual goes out the back?

21        **A**    Well, I thought he might have.  I didn't see him.

22   The last time I saw him, he went out, so I searched the house

23   at that time.  It looked like he might have gone out the

24   window and jumped down.  So I am not really positive, but he

25   wasn't in the house because I searched the whole house.

1    **Q**    Okay.  After you searched the house, did you go

2  back outside?

3    **A**    Let me recant that.  Actually, I searched the house

4  after the fact when I saw that he wasn't upstairs on that

5  room, then -- and I saw the window, and then I went back down

6  and then I went to chase that guy again.  That's when I went

7  ahead and saw him jumping over the fence.

8    **Q**    Okay.  Once you see him jump over the fence, at

9  this point after he jumps over the fence do you have sight of

10  anybody else or is everybody gone?

11    **A**    I just have sight of him and then the car he got

12  into.

13    **Q**    Okay.

14    **A**    And I was going to get my car and chase him, but my

15  keys fell out when we were fighting or something.

16    **Q**    What kind of car did you see him get into?

17    **A**    Well, I was assuming it was a Camry, but I really

18  can't be positive on that.  Because it's a wood fence and I

19  just saw basic color and a body style.  I used to sell cars.

20  I got a basic idea.  I can't be 100 percent sure if it was a

21  Corolla or Camry, that kind of body style.

22    **Q**    What kind of color was it?  What family of colors

23  was it?

24    **A**    To me, it seemed like the bluish realm, greenish.

25  Right in there.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1   **Q**   And how many individuals did you see get into that

2   vehicle?

3   **A**   I didn't.  I just saw the one guy, then a driver,

4   of course, the guy that was driving, because he just jumped

5   over the fence and they took off pretty quick.

6   **Q**   Was the driver already in the car once you had a

7   sight of the vehicle?

8   **A**   Yeah.  He must have been because I didn't see

9   nobody else in-between where you see the fences running

10  around.

11  **Q**   Okay.  So you only witness the one person get

12  inside the vehicle before it drove away?

13  **A**   Jump over the fence and he had to get inside the

14  vehicle because that was it, yeah.

15  **Q**   What happened once he got inside the vehicle?

16  **A**   Well, they just took off.

17  **Q**   Okay.  Did law enforcement eventually arrive?

18  **A**   Yeah, eventually, but it was a long time.  I mean,

19  you know, they got a lot going on.  I don't blame those guys.

20  **Q**   Sure.  Once law enforcement arrived, did you speak

21  to them?

22  **A**   Uh-huh.  Yes.

23  **Q**   At that point that day, did you give any names of

24  any individuals to law enforcement?

25  **A**   No.

1      **Q**    Had you ever met the defendant in this case before?

2      **A**    (Shakes head.)

3      **Q**    Is that a no?

4      **A**    No.  I'm sorry.

5      **Q**    Had you ever seen him before?

6      **A**    No.

7      **Q**    Once law enforcement completed their investigation

8   that day, were you ever approached by law enforcement to look

9   at photographs?

10      **A**    Yeah, a detective.

11      **Q**    Okay.  And do you know how long after,

12   approximately, I'm not asking for exact times, but how long

13   after this incident to the time that you were presented with

14   photographs by a detective?

15      **A**    I think it was a few days.  I think it was a few

16   days, yeah.  It has been a long time.  A few days, yeah.

17          **MS. SCOTT:**  May I approach the witness, Judge?

18          **THE COURT:**  You may.

19   **BY MS. SCOTT:**

20      **Q**    I'm showing you what's been marked for

21   identification purposes as State's Exhibit A.  Without

22   showing the jury what this is --

23      **A**    Uh-huh.

24      **Q**    State's A, Composite, 1 through 3.  Can you look

25   through that.

1     **A**     You want me to read or just look at it?

2     **Q**     Just look at it and tell me if you recognize what

3  it is.

4     **A**     Uh-huh.  Yeah, that's the photo display.  Yeah.

5  That's where I picked him out immediately.

6     **Q**     Okay.  Again, for records purposes, the items that

7  I'm showing you, how do you know that -- how do you recognize

8  this?

9     **A**     Has my initials on it.  They presented that with

10  me.  This must be what he filled out that day.  Um, then I

11  wrote part of what happened here and then I signed this here

12  also.

13     **Q**     Did you date that was well?

14     **A**     Um --

15     **Q**     Or is it dated as well?

16     **A**     It's dated, yes.  But I -- that's him asking me the

17  questions and I answered it.

18     **Q**     Okay.  And the photographs?

19     **A**     And that's the photographs of the lineup they

20  showed me.  And then that's -- I picked him directly right

21  off the bat.

22     **Q**     Okay.  Photo number?

23     **A**     Two.

24     **Q**     Two in this lineup is circled.  There's a scribble

25  next to that.  What is that scribble?

1      **A**      That's my initial saying that's the guy.

2      **Q**      And is this the photo lineup that you identified

3   that day?

4      **A**      Yes, ma'am.  Uh-huh.

5      **Q**      Do you know how long it took you to pick out that

6   picture of that photo lineup when it was shown to you?

7      **A**      Immediately.  As soon as he showed it to me.  There

8   was another picture I thought might be one of the other guys,

9   but I didn't pick it because I wasn't sure.  So I just let it

10  go.

11     **Q**      When you say the other pictures, you thought it

12  might have been the other guy?

13     **A**      One of the other two.

14     **Q**      That you saw that day?

15     **A**      Uh-huh.

16     **Q**      Okay.  But that is the only photograph that you

17  circled identifying --

18     **A**      That's the one that's the for sure, yeah.  Yeah,

19  positive.

20     **Q**      Okay.  When -- that day -- let me back up to the

21  photo lineup real quick.  The law enforcement officer, were

22  you explained what was about to be shown to you prior to it

23  being shown?

24     **A**      Yeah.  He showed me, um, I think one set of

25  pictures and then another set of pictures, and I really can't

1    remember how many sets, but until I, um -- actually, I saw

2    that -- I'm trying to remember.  I saw that one picture and I

3    picked the face, and then he showed me another picture that

4    had an afro on it which was the same face with an afro.

5        Q    Okay.  The photographs prior to him showing them to

6    you, did -- were you instructed, um -- were you given any

7    sort of directions about the photos that you were about to

8    see?

9        A    No.  Just -- he just said this is it.  Do any of

10   these guys look familiar?

11       Q    Okay.

12       A    That's pretty much it.

13       Q    Okay.  Were you instructed to pick out a certain

14   picture?

15       A    No.  Only if I see something that I recognize.

16       Q    Correct.  Okay.

17       A    Yeah.

18       Q    The day that incident occurred, when those

19   individuals were in your home, were you missing any items

20   afterwards that you realized were stolen afterwards?

21       A    Yeah.  Jewelry that I had been saving.

22       Q    What kind of jewelry was it?

23       A    Sterling silver jewelry.

24       Q    Do you remember specifically the types of items

25   they were, whether rings or necklaces or --

1    **A**    Necklaces.  No -- no rings.  Well, yeah, there was

2    a ring there.  But there was one thing I put on the report I

3    did find, it was a gold ring.  It was my dad's.  And I found

4    it.  So...

5    **Q**    Okay.

6    **A**    And the rest was pretty much sterling silver and

7    stuff like that.  Yeah.

8    **Q**    So there was a gold ring that you eventually did

9    find?

10    **A**    (Nods head.)

11    **Q**    Other than the gold ring, the sterling silver

12    items, could you estimate an approximate value of those

13    items?

14    **A**    Um, yeah.  Its wholesale is about seven, eight

15    grand.

16    **Q**    Any other items other than the sterling silver that

17    were stolen?

18    **A**    Um, yeah.  I think there were some basic items too,

19    but it's -- oh, yeah.  My wedding band was gone.  It was a

20    gold one, a gold wedding band that I had.  A little music

21    gold necklace thing that I had that was gone.  Then I had a

22    lot of the fake jewelry, but they got that too.

23    **Q**    The wedding band, do you have an approximate value

24    of the wedding band?

25    **A**    Oh, I would say, um, five to 700, probably.

1     **Q**    Okay.  Did you -- all of the items, the wedding

2  band as well as the sterling silver items, did you purchase

3  those items?

4     **A**    Oh, yeah.

5     **Q**    Yes?

6     **A**    Yes.

7     **Q**    And has anybody had those items from the time that

8  you purchased them to today?

9     **A**    No.

10    **Q**    Okay.  Where were those items located in your

11 house?

12    **A**    Um, the ones that was in the closet is in a case,

13 and I had it covered up in a corner because it was just a

14 lot -- a jewelry -- steel case.

15    **Q**    And what items, specifically, were you talking

16 about in that case?

17    **A**    Those were all the sterling silver ones.  The other

18 one, I had a jewelry drawer that had a little box in one of

19 the drawers, and I guess they found the box in the back of

20 the drawer.

21    **Q**    And the closet, what room in the house was this in?

22    **A**    My master bedroom.

23    **Q**    Were those items there prior to April 9th, 2013?

24    **A**    Say again.

25    **Q**    Were those items in your home there, meaning

1    present --

2        **A**    Yeah.  Yeah.  Yeah.

3        **Q**    -- prior to April 9, 2013?

4        **A**    Yes, it was there.

5        **Q**    Okay.  And after this incident occurred, after

6    these individuals ran out of your house, were those items

7    gone?

8        **A**    Yeah.  They were gone.  One of them dropped a bag

9    of coins and stuff and a couple of knives I had in there.  So

10   he got scared, I guess.  He dropped that, yeah.

11       **Q**    Okay.  These items, did you ever give anybody

12   permission to take them?

13       **A**    No.

14       **Q**    Okay.  And did you ever give anybody permission to

15   enter your home?

16       **A**    No.

17       **Q**    When law enforcement approached you with

18   that -- with that photo lineup, you very confidently said

19   100 percent, this one.  Why were you so confident in that?

20       **A**    Just photogenic.  I have a photographic memory.

21   Right there when we were staring, we were staring at each

22   other, yeah.

23       **Q**    Okay.

24       **A**    I saw the other guy too.  I saw all of them, but I

25   really can't point out the other two because it was really

1    quick.  So I don't want to pick out somebody that I'm not

2    absolutely sure.

3         Q    Understood.

4              **MS. SCOTT:**  I have nothing further, Judge.

5              **THE COURT:**  All right.  Cross-examination?

6              **MS. CITRARO:**  Yes, Judge.

7                         **CROSS-EXAMINATION**

8    **BY MS. CITRARO:**

9         Q    Good afternoon.

10        A    Hello.

11        Q    You said that you believe Mr. Valle-Ramos popped

12   his head out of the den; is that correct?

13        A    The office area.

14        Q    Office area.  I call it a den.

15        A    All right.

16        Q    You said it was a few seconds that you looked at

17   him?

18        A    A few seconds, yeah.

19        Q    A few seconds like two or three seconds?

20        A    No, probably about seven to ten seconds.

21        Q    Seven to ten?

22        A    Yeah, it was a frozen moment.

23        Q    You sure it was about seven to ten seconds?

24        A    I didn't time him, bam.  I didn't have a clock

25   telling you what I feel.

1      **Q**    But you then say it was between seven to ten

2  seconds?

3      **A**    I think it is about that.  Let's just say -- seven

4  seconds is fine if you want to leave it there.

5      **Q**    Don't let me make you feel uncomfortable.  I'm

6  going to stare at you for seven seconds.  Tell me if this

7  feels about the right amount of time that you were staring at

8  him?

9      **A**    Yeah, that long.

10     **Q**    It was that long?

11     **A**    It was that long.

12     **Q**    Before somebody did something?

13     **A**    Yeah.  He freezed.  I was in shock.  He was there

14  and I was in shock he was there.

15     **Q**    And you can't really describe his face, what you

16  remember his face looked like?

17     **A**    Yeah.  I did in the picture, I picked it out, right

18  out.

19     **Q**    But you can't describe his features, his face, his

20  nose, there was nothing about his face that you actually

21  remember.  You just said that's the guy?

22     **A**    Yeah.  The reason I picked him is because I

23  remembered all the features in his face.  You want me to name

24  them or something?

25     **Q**    Anything specific.  Do you remember anything

1    specific about his face?

2       **A**    Well, he had an afro.  And he looks like, just,

3    that guy right there.

4       **Q**    Okay.  Tell me about the afro.  How big an afro?

5       **A**    He had a larger afro at the time.

6       **Q**    Okay.  I believe the State showed you --

7       **MS. SCOTT:**  If I may approach?

8       **THE COURT:**  You may.

9    **BY MS. SCOTT:**

10      **Q**    Showing you for identification purposes A, State's

11   1 through 3.  This is the photo lineup that you said you saw?

12      **A**    Uh-huh.

13      **Q**    The picture number 2 that you identified to be the

14   guy, is this the way his hair was done that day?

15      **A**    I think it was picked out a little bit more.  It

16   seemed like it was a little fluffier than that.

17      **Q**    So it was longer than that?

18      **A**    Yeah, fluffier.  I don't know how much longer.  You

19   can pack it in.  I have black friends in New York and I know

20   how it goes.

21      **Q**    Do you remember how tall he was?

22      **A**    At the time I guestimated about 5'9", 5'10",

23   between 5'8", 5'10", something like that.

24      **Q**    Does that include the fluffy hair?

25      **A**    No.  I don't know.  That's all he looked like to

1    me.  I don't count hair a lot.

2        **Q**    Okay.

3        **A**    They don't count mine.

4        **Q**    How about his clothing, you said you remember he

5    was wearing a basketball jersey?

6        **A**    Yeah, it was a basketball jersey, some sort of blue

7    jersey.

8        **Q**    So something sleeveless?

9        **A**    Yeah.  Something like that if I remember.  We are

10   talking a year and half later, ma'am, or whatever it was.

11   So...

12       **Q**    Do you recall if it had sleeves or not?

13       **A**    I don't think.  If it had any -- it had no -- I

14   think at the time I did the report it had no sleeves to short

15   leaves.  That's what I recall, you know, a year and something

16   later.

17       **Q**    Okay.  And is that the way your recollection is, no

18   sleeves or short sleeves still?  Is that what you remember?

19       **A**    Yes.

20       **Q**    Okay.  Do you remember if he had a backpack?

21       **A**    Yes.

22       **Q**    He had a backpack on?

23       **A**    Yes, they all had backpacks.

24       **Q**    Okay.  Do you remember if he was wearing long pants

25   or shorts?

1     **A**    Don't remember that.

2     **Q**    Don't remember.  Okay.  Can you describe the

3     backpack?

4     **A**    Typical medium-size backpack.

5     **Q**    Color?

6     **A**    No.  Probably darker, maybe.  Color, I can't really

7     recall.

8     **Q**    Okay.

9     **A**    Wasn't really focused on that.  I wish I was

10    because I would have taken it away from the other guy.

11    That's what had the jewelry in it.

12    **Q**    The photo lineup that I just showed you a second

13    ago, I can show it to you again if it would help refresh your

14    memory.  Do you recall any of those pictures of any of those

15    guys in that photo lineup to have afros?  And I can show it

16    to you again if that would make it better.

17    **A**    You mean the same one you just showed me?  The same

18    six pics I just saw?  No, I don't think anybody else had

19    afros.  But you can show me again just to cover myself.

20         **MS. CITRARO:**  Can I, Judge?

21         **THE COURT:**  You may.

22    **BY MS. CITRARO:**

23    **Q**    And I'm showing you again State's Exhibit A3.

24    Would you say that these five other guys have an afro-style

25    hairstyle?

1    **A**    Well, not what we call an afro, no.  Afro is more

2    puffier out, you know.

3    **Q**    So it's your testimony these guys, in your opinion,

4    do not have afros?

5    **A**    Correct.  Yeah, that's correct.  Not what we call

6    an afro.

7    **Q**    Okay.  But the person in number two has an afro?

8    **A**    Well, he has more of an afro, yeah.

9    **Q**    Okay.  How many times would you say you have seen

10   those pictures?

11   **A**    Today?

12   **Q**    No, just overall.

13   **A**    I guess you showed me a couple times.  Four times,

14   six times, maybe about eight times.  I'm guessing.

15   **Q**    About eight times you saw that face in those

16   pictures?

17   **A**    I'm guessing.

18   **Q**    Okay.  And did you say that the --

19   **A**    Most of it today.

20   **Q**    Including today?

21   **A**    Yeah.

22   **Q**    You said the vehicle when you saw it you were

23   looking through a wooden fence?

24   **A**    Yeah, I was looking through a wooden fence -- I'm

25   sorry, I'm a little dry -- and at a distance.  So yeah,

1    exactly like that, yeah.

2        Q    And you said the car looked bluish/greenish to you?

3        A    It did.  I was trying to follow it to keep an eye

4    on it, yeah.  That was my best guess.  Won't put any money on

5    it, I'll tell you that.

6        Q    What do you mean by follow it and keep an eye?

7        A    Me, I'm watching it and I'm watching after he

8    jumped over the fence.  I'm watching it trying to get an I.D

9    on the car the best I could.

10       Q    Did you watch the vehicle move?

11       A    Yeah.

12       Q    You saw it go away?

13       A    I saw it go away until I realized I didn't have my

14   key because I was going to chase him.  I had to go back

15   inside to chase him, but then I didn't.  I tried chasing them

16   but I couldn't see where they went.  Actually I ran into a

17   police officer trying to find out, I guess.

18       Q    Did you see the car go away -- move away before you

19   went back to your house and got into a fight with the other

20   guy?

21       A    Yeah.  The car started taking off, right, and the

22   reason I stopped and looked even more is because I didn't

23   have my keys on me.  I realized I didn't -- can't get in the

24   car fast enough to chase them.  Plus we have a gate to go

25   out, so I waited and looked.  I saw them jump over the fence.

1    They got into the car, and I watched the car move.  And I

2    know I didn't have my keys, so then I ran back inside.  They

3    were already gone then, you know, when I came back outside to

4    start the car to get them.

5        Q    When you say they, they were gone, was it the guys

6    that you saw in your house or just the first guy?

7        A    Well, like I said, only the guy that jumped over

8    the fence, and they had a driver.  That's all what I saw.

9        Q    Is the guy who jumps over the fence and got in the

10   car, is that the person you're alleging to be Mr. Valle-Ramos

11   or is that --

12       A    No.  No.  That's another guy.

13       Q    Or the second or third guy?

14       A    That's another guy.

15       Q    So it's one of the other guys that you were

16   chasing, not this one?

17       A    One of the other guys.

18       Q    Not this one?

19       A    He ran away.

20       Q    Okay.  The first one you lost sight of, you did not

21   see him get into the vehicle, is that true?

22       A    I did not, yeah, I did not.

23       Q    Is that true, you didn't see anybody else get into

24   the vehicle when you watched that last guy jump in and it

25   started moving, everybody else was already in the car, would

1    that be what you saw?

2       **A**    I don't know if everybody else was in the car.  All

3    I'm telling you is I saw the one guy jump over the fence, and

4    the other guy was the driver.  That's all I saw.  I don't

5    know how many guys were in the car.  There could have been

6    more guys, I don't know.

7       **Q**    And the location of that vehicle you are watching,

8    it's in a separate subdivision, isn't that true?

9       **A**    Yeah.  They park there.  Actually they did it again

10   a few months later --

11      **Q**    Okay.

12      **A**    -- to another condo, actually.

13         **MS. CITRARO:**  I will move to strike that.

14         **THE COURT:**  Sustained.

15   **BY MS. CITRARO:**

16      **Q**    The complexes are actually separate --

17      **A**    Yes.

18      **Q**    -- correct?

19      **A**    Yeah, just a fence.

20      **Q**    And they are separated by a fence?

21      **A**    Yeah.  The other condo has no gates or anything

22   like that.  So I can see why they pulled in there.  That way

23   we are not delayed from getting out from our condo because

24   the gate has to first open and then it takes its time.  Yeah,

25   that was smart move for them.  Yeah.

1    **Q**    Can you describe the second guy that you got into

2    the physical fight with?

3    **A**    Um, no.  I mean, there -- as far as, um, medium --

4    well, light build, really, medium to light build type of guy.

5    Once again, probably about my height.  And, um, to me it

6    looked Latino, light skinned, you know, like, brown skin.

7    And that was it.  But since when we bumped into each other,

8    when I put him in that chokehold and he was facing away from

9    me most of the time, struggling, I was dragging him backwards

10    until the third guy came down.

11    **Q**    So you never really got a good look at his face?

12    **A**    I looked at him, but I really, really can't say I'd

13    be able to pick him out of a lineup.

14    **Q**    But you saw his face?

15    **A**    I saw his face briefly, yeah.  I was worried about

16    a few other things going on at the time.  Yeah.  The third

17    guy coming, I'm worried is there a fourth and fifth, and I'm

18    looking for weapons to make sure I don't get stabbed or shot

19    or killed or something myself.

20    **Q**    Did you see the third guy's face?

21    **A**    Yeah.  I saw his face too.  It was a fight.  It's a

22    struggle.  Remember, I'm fighting here now.  It's not like

23    I'm holding him and looking at people.  Things are breaking,

24    you know, things are -- it's a fight.  You ever been in one?

25    **Q**    It's a fight?

1     **A**     You ever been in one?

2     **Q**     Sir, I ask the questions.

3     **A**     Thank you.  Well, you know, it gets a little --
4     when you are fighting three people --

5          **MS. CITRARO:**  Judge, if you can instruct the
6          witness to answer the question?

7          **THE WITNESS:**  I'm sorry.

8          **THE COURT:**  Mr. Gonzalez, just answer the questions
9          that are asked of you.

10         **THE WITNESS:**  It's not fun.  Go ahead.

11    **BY MS. CITRARO:**

12    **Q**     How many seconds would you say you saw the second
13    guy's face, the one you were in a physical fight with?

14    **A**     Briefly, because he came in now, saw me, saw him,
15    and he went back up when I went to shoot him with the second
16    shot of the pepper spray.  And I was worried about this guy.
17    I wasn't worried about this with him.

18    **Q**     Who is "this" guy?

19    **A**     The guy I got in the chokehold.

20    **Q**     No.  I'm talking -- I consider that to be the third
21    guy.  The guy you have in the chokehold, how long did you see
22    his face?

23    **A**     Not very long.  He was fighting, so the back of his
24    head was to me.  Remember, I got him this way.

25    **Q**     But you did see his face at some point?

1      **A**      Not much.  Just on or off.  I am looking for

2   weapons.  I'm looking for different things.  When you're in a

3   fight, I'm looking to protect myself --

4      **Q**      Okay.

5      **A**      -- at that time.

6      **Q**      Okay.

7      **A**      Okay.

8      **Q**      And the third guy you saw for a few seconds also?

9      **A**      Yeah.  Just very briefly.  I wasn't worried.  He

10   looked at me for a second and then he ran back upstairs that

11   quick.

12      **Q**      But you weren't able to identify those men?

13      **A**      No, I didn't.  No, I couldn't, no.  I thought I

14   could, and I possibly could point to them, but I'm not sure.

15   So I'm not gonna point them out.

16      **Q**      Did they have any distinct hairstyles?

17      **A**      Those guys had short hair.

18      **Q**      Nothing distinct about their appearance?

19      **A**      They -- to be honest with you, they were just young

20   men.  Latin to me, you know, 17 to 20 years old.  You know.

21   I'm in a place where there's a lot of Spanish people.  I'm

22   Spanish myself.

23      **Q**      Do you recall anything else that he was wearing?

24   You said a basketball jersey with short or no sleeves, not

25   sure about the pants?

1      **A**    Nuh-uh.

2      **Q**    Do you recall anything else that sticks out in your

3    mind?

4      **A**    Nah.

5      **Q**    Do you recall any gloves?

6      **A**    The other guy, I think, had gloves, that I had in a

7    chokehold.  The guy I was chasing, I wasn't focused on that,

8    but I was pretty sure the guy had gloves that I had in a

9    chokehold.

10      **Q**    The guy in the chokehold you think had gloves on?

11      **A**    Yes.  Yes.

12      **Q**    What kind of gloves?

13      **A**    I don't know what kind, because once again, I was

14    just trying to protect myself.

15      **Q**    What makes you think he had gloves on?

16      **A**    Well, when you just said it, it sort of recollects

17    a little bit in my head that he had some sort of gloves on,

18    yeah.

19      **Q**    Okay.  The items that were taken from your home,

20    were they ever recovered?

21      **A**    No, just one piece that some neighbor found in the

22    grass, and then the police officer called me, is this what

23    this looks like, is that one of yours?  And I told them, yes.

24      **Q**    Okay.

25           **THE WITNESS:**  Your Honor, I need that drink now

1          because I'm just so dry.

2                  **THE COURT:**  Okay.

3                  **THE WITNESS:**  I'll be right back.

4                  **THE COURT:**  Why don't we take a brief recess and go

5          out to the water fountain and come back in.

6                          (Jury exits the courtroom.)

7                  **MS. SCOTT:**  I'm concerned with how this is going

8          that he may say something that may cause a mistrial.

9                  **MS. CITRARO:**  May I be present for the

10         conversation?

11                 **THE COURT:**  Sure.  Since the rule has been invoked.

12                   (Whereupon a short recess was taken.)

13                 **THE COURT:**  Bring in the jury.

14                         (Jury enters the courtroom.)

15                 **THE COURT:**  Ladies and gentlemen, you-all made the

16         phone calls you needed to make?  Everybody is all set

17         for this afternoon?

18                 Ms. Citraro, you may continue.

19                 **MS. CITRARO:**  Thank you.

20     **BY MS. CITRARO:**

21         **Q**    Mr. Gonzalez, you said that the afro was picked up

22     like --

23         **A**    It looked like it was a little larger than it shows

24     in the picture there.  In my recollection, yeah.

25         **Q**    But it was up, it wasn't like pulled back or

1    slicked back or anything?

2         **A**     It was up.  No.  It seemed like a little more out,

3    just a little more out -- not out, just a little bit more

4    out.

5         **Q**     Not held back by anything that you could see, just

6    out?

7         **A**     Not that I recall, no.

8              **MS. CITRARO:**  It don't have anything further.

9              **THE COURT:**  All right.  Any redirect?

10                         **REDIRECT EXAMINATION**

11   **BY MS. SCOTT:**

12        **Q**     The item that -- you said one item was recovered in

13   the grass area?

14        **A**     Um, yes.

15        **Q**     What item, do you remember what item that was?

16        **A**     Well, um, the officer came to the house and, um,

17   after this incident happened -- I had a roommate then after

18   this happened and he was -- they took a picture of it, sent

19   it to me, so I just saw it through my phone, but it looked

20   definitely like the items I have, yes.

21        **Q**     And what kind -- can you describe the items to me?

22        **A**     It's, um, they are sterling silver, 9.25 sterling

23   silver with gemstones, like blue topaz.  This was a peridot,

24   I believe.

25        **Q**     Was this a necklace?

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1      **A**    I believe.  Oh, yes, it was a necklace that I

2   recall, yes.

3      **Q**    Do you remember -- were you made aware

4   what -- where it was specifically found?

5      **A**    It was found on the grass, close in -- I guess

6   somewhere in my area because that's all the officer said, it

7   was found in -- someone found it in the grass.  And, yeah, I

8   guess they must have known about what happened.  I don't

9   know.

10     **Q**    Do you know if it was on your property or outside

11  of your property?

12     **A**    I wouldn't know that.  I wouldn't know that.

13        **MS. SCOTT:**  I have nothing further, Judge.

14        **THE COURT:**  Thank you, Mr. Gonzalez.

15        **THE WITNESS:**  Okay, sir.  Thank you.

16        **THE COURT:**  All right.

17        State, call your next witness.

18        **MS. SCOTT:**  State calls Bethany Szewczyk.

19   Thereupon,

20                    **JORGE GONZALEZ**

21   was called as a witness and, having first been duly sworn,

22   testified as follows:

23        **THE COURT:**  All right.  Ma'am, can you tell me your

24        first name, your last name, and spell both for me,

25        please.

1          **THE WITNESS:**  My first name is Bethany.  Last name

2     is Szewczyk.  B-E-T-H-A-N-Y.  Last name, S, as in Sam,

3     Z, as in zebra, E-W-C-Z-Y-K.

4          **THE COURT:**  State, you may inquire of the witness.

5          **MS. SCOTT:**  Thank you, Judge.

6                    **DIRECT EXAMINATION**

7     **BY MS. SCOTT:**

8     **Q**     Ms. Szewczyk?

9     **A**     Yes.

10    **Q**     Can you tell the jurors what you do for a living?

11    **A**     I'm actually an attorney, but it's not my full-time

12    job.

13    **Q**     And on April 9th of 2013, what were you doing in

14    terms of occupation?  What was your job then?

15    **A**     Same position now.  I work at Siemens Energy.  I'm

16    a project manager.

17    **Q**     And where did you, um -- where did you live on

18    April 9th of 2013?

19    **A**     I lived in a condo in Liberty Square.

20    **Q**     Okay.

21    **A**     Do you want that --

22    **Q**     Do you still live there now?

23    **A**     I don't.  I actually just moved at the end of

24    February.

25    **Q**     Do you remember the address?

1     **A**     Yes.  1716 Lafayette Court.

2     **Q**     Do you remember an incident occurring on April 9th

3     of 2013?

4     **A**     Yes.

5     **Q**     What were you doing that morning?

6     **A**     I was leaving for work.

7     **Q**     Do you know, approximately, what time that was?

8     **A**     It was around eight o'clock.

9     **Q**     And what happened when you were leaving for work?

10     **A**     So I walked out of my privacy yard gate, and I was

11     standing under my carport, and as soon as I did, I looked

12     over to the right because I saw three young men running to a

13     vehicle that was parked in the roadway.  It wasn't an actual

14     parking space.  The car was facing out, and because it just

15     a -- it's just, basically, a driveway, and there's no exit

16     there.  It's just a row of units at Liberty Square, and I see

17     three young men jumping into the vehicle.  One on the

18     passenger side, one got in the driver's side, and then a

19     third behind the driver.

20         And they looked at me, I looked at them.  I heard

21     one of them say, hurry up before the cops come.  They get in

22     the car and they drove around.  So they actually had to

23     drive, like, past me around my unit and then left.

24     **Q**     I'm going to slow you down a little bit and back up

25     a little bit.

1      **A**     Okay.

2      **Q**     When you saw these three individuals, have you ever

3  seen these people before?

4      **A**     No.

5      **Q**     Did you recognize them as neighbors?

6      **A**     No.

7      **Q**     When they got into the vehicle, could you see which

8  direction they were coming from?

9      **A**     They were coming from -- they were coming from the

10  neighbors, which is, like -- Hidden Creek is another condo

11  community and we are separated by a fence there.  So I

12  presumed they came around that fence.  We have a lot of

13  trespassers that will cut through our property and go through

14  that way.  It happens all the time.  So when I saw them, I

15  knew they had come from there.  I knew they hadn't come from

16  one of the other units.

17      **Q**     Hidden Creek Community is the neighboring community

18  next to your condo at that point?

19      **A**     Correct.

20      **Q**     And can you describe to me both -- let's start with

21  Hidden Creek.  What -- structurally, what do the buildings

22  look like?

23      **A**     Hidden Creek?

24      **Q**     Yes.

25      **A**     What do you mean structurally?  They are condo

1    units and they have a red roof.

2        **Q**    Are they all linked together or are they individual

3    units?

4        **A**    They are all linked together.

5        **Q**    Does it resemble an apartment complex?

6        **A**    Yes.

7        **Q**    Did the community that you lived in, what was the

8    name of that community?

9        **A**    Liberty Square.

10        **Q**    Does Liberty Square have a similar setup?

11        **A**    Um, it's different.  They are more villa-like, I

12    would say.

13        **Q**    Okay.  Um, Liberty Square and Hidden Creek are

14    separated by what?

15        **A**    A red fence.  It's actually double fenced.

16        **Q**    Okay.  Are there any streets in-between the two

17    complexes, like are there any roadways or is the fence the

18    only thing that divides it?

19        **A**    The fence is the only thing, and then there's

20    obviously roadways on the other side of the fences, but yeah.

21        **Q**    Okay.  And the way that you described the vehicle,

22    was it -- if you were to leave in that vehicle, was it

23    already facing towards the exit or did it have to turn around

24    to exit?

25        **A**    It was facing the exit.

1    **Q**    All right.  And these individuals that you saw

2    getting into that vehicle, um -- well, let me ask you this.

3    What type vehicle, if you remember?

4    **A**    I don't remember what type, but I can tell you it

5    was not an American-made car.  I know that.

6    **Q**    Okay.  Was it a van or a smaller sedan?

7    **A**    It was a four-door sedan.

8    **Q**    Okay.  Do you know the color?

9    **A**    I believe it was gray.

10    **Q**    And did you see anybody other than those three

11    individuals?

12    **A**    No.

13    **Q**    Do you --

14    **A**    Well, I take that back.  My neighbor was reparking

15    his car.  He was inside his car and I knew he was out there

16    as well.  But other than them, no.

17    **Q**    Did you see any other individuals get into that

18    car?

19    **A**    No.

20    **Q**    The gray car?

21    **A**    No.

22    **Q**    The individuals that you saw get in, let's take

23    them one at a time.  The driver of the vehicle, the one that

24    you saw get into the driver's side, do you remember what he

25    looked like?

1    **A**    Yes.  He was about 5'10", 5'11", he was young.  I

2  would have guessed about 20.  I thought they all -- three

3  people looked very similar.  He was Hispanic, dark hair, dark

4  eyes, and just young.  I just remember them being, like,

5  thinking I was seeing three brothers who were kids.

6    **Q**    Okay.

7    **A**    And he was wearing blue latex gloves on his hands.

8    **Q**    The driver?

9    **A**    The driver.

10   **Q**    The other individual that got into the passenger

11 side, do you remember what he looked like?

12   **A**    I don't remember, specifically.  I can tell you he

13 was shorter and looked a little bit younger.  And then the

14 one who got behind the driver was the youngest.  I would say

15 he was even maybe as young as, like, 14 years old.  They were

16 very young kids.

17   **Q**    The person that was the driver, would you say he

18 was the oldest out of the three?

19   **A**    Yes, definitely.

20   **Q**    When this occurred that day, did you speak to law

21 enforcement?

22   **A**    I did.

23   **Q**    Did you write a statement to law enforcement?

24   **A**    I did.

25   **Q**    And that day that this happened, were any suspects

1   identified and presented to you?

2       **A**   No.

3       **Q**   Okay.  Were you later approached by law enforcement

4   with photographs of potential suspects in this case?

5       **A**   Yes.

6       **Q**   When was that, do you know?

7       **A**   I can't remember exactly when it was.  I was

8   approached about it not too long after.  I would --

9   maybe -- I don't know, a couple months or so.  But then it

10  took awhile for them to actually bring me the photos and

11  actually do the photo lineup.

12      **Q**   Okay.  The photo lineup that you're discussing now,

13  whenever -- and I'm not asking you at this point a specific

14  date for when that was presented to you, but whenever it was

15  presented to you, is it fair to say that it was presented to

16  you months after this event occurred?

17      **A**   Yes, it would be fair to say.

18      **Q**   The individuals -- when you saw them getting into

19  the vehicle, out of the three individuals, the driver, the

20  front passenger and the back passenger, out of those three,

21  who would you say you got the best look of?

22      **A**   The driver.

23      **Q**   Okay.  And why is that?

24      **A**   Because I stared at him.  Because I was kind of

25  stunned at what I was seeing, and I remembered seeing those

1   gloves and I heard what he said to the other two individuals

2   and I just was kind of just standing there staring at him

3   because I didn't know what else to do.  So I was kind of, am

4   I really seeing this?  And then as he was driving, him and I

5   both made eye contact and I stared at him through that window

6   as he drove around, and he knew I was looking at him,

7   obviously, so...

8       **Q**     I want to get an approximate distance from you, and

9   I know these are approximations, but you said you were in

10  your carport?

11      **A**     Right.

12      **Q**     And that this vehicle was in the roadway.  From

13  your carport to where this vehicle was, how many feet,

14  approximately?

15      **A**     About 20 feet, 20 to 30 feet, max.

16      **Q**     Did that vehicle get closer to you as it was

17  driving away?

18      **A**     Yes.

19      **Q**     And at the time that it got the closest to you,

20  how -- approximately how many feet would you say you were

21  from the driver of that vehicle?

22      **A**     Ten feet.

23      **MS. SCOTT:**  May I approach the clerk, Judge?

24      **THE COURT:**  You may.

25      **MS. SCOTT:**  May I approach the witness?

1              **THE COURT:**  You may.

2    **BY MS. SCOTT:**

3        **Q**    I'm showing you what's been previously marked for

4    identification State's Composite B1 through 3.  Without

5    showing the jury that, can you look through that and tell me

6    if you recognize it?

7        **A**    Yes, I recognize it there.

8        **Q**    And what do you recognize that as?

9        **A**    This is the photo lineup that the detective came to

10   my work and we did together.

11       **Q**    And how do you know that that's the photo lineup

12   and those are the things that you looked at with the

13   detective that day?

14       **A**    Um, well, my initials are on it and I recognize my

15   handwriting and my signature.

16       **Q**    Okay.  And the third, composite three of this

17   exhibit, is a series of six photographs?

18       **A**    Uh-huh.

19       **Q**    Photograph number 2 is circled with initials next

20   to it.  Whose initials are those?

21       **A**    Mine.

22       **Q**    And is that the photo lineup that you looked at on

23   the day that the detective presented it to you?

24       **A**    Yes, it is.

25       **Q**    And is that your handwriting and your initials that

1  you circled that individual?

2      **A**   Yes.

3      **Q**   When the detective presented this to you, how long

4  did it take you to pick out that picture?

5      **A**   Five seconds.

6      **Q**   Um, were you confident in your identification of

7  that picture?

8      **A**   Yes.

9      **Q**   Okay.  Why were you so confident in that?

10      **A**   Because that's the face that I saw that day.

11      **Q**   Do you remember, um, what that individual was

12  wearing that day?

13      **A**   I don't recall.

14      **Q**   Okay.  Do you remember, other than the gloves,

15  whether he had anything in his hands?

16      **A**   He had something in his hand.  It was small.  I

17  just remember he was clenching it in his hand.  I thought

18  maybe there was car keys or something, but it was something

19  small.  None of them were carrying anything.  I know he had

20  long sleeves on, but I don't remember anything else other

21  than that.

22      **Q**   Okay.  Were you focused on what he was wearing?

23      **A**   No.  Because I focused on those gloves, and then

24  his face.  And they were literally just getting in the car,

25  so I didn't even have the time to really look at the

1    clothing.

2        **Q**    Okay.  The individual that you saw getting into the

3    driver's side, did you hear him say anything?

4        **A**    Yes.

5        **Q**    What did you hear him say?

6        **A**    I heard him say, hurry up before the cops get here

7    or before the cops come.  One of the two.

8        **Q**    Okay.  That individual that you saw get into that

9    car that you heard say that, do you see that individual in

10   the courtroom today?

11       **A**    Yes.

12       **Q**    And can you identify by an article of clothing that

13   he's wearing?

14       **A**    I'm sorry?

15       **Q**    Can you identify him with an article of clothing

16   that he's wearing today?

17       **A**    A blue shirt.

18       **Q**    And just because we are not being video recorded,

19   only audio, can you describe where he's seated in the

20   courtroom?

21       **A**    Um, he's seated at the table behind you with his

22   attorney.

23       **Q**    Have you ever met this individual before?

24       **A**    No.

25       **Q**    Have you ever seen him prior to April 9, 2013?

1      **A**     No.

2      **Q**     Do you know somebody by the name of George

3   Gonzalez?

4      **A**     No.

5      **Q**     Do you know anybody personally related in this case

6   in any way at all?

7      **A**     No.

8      **Q**     Did you have anything stolen that day?

9      **A**     No.

10     **Q**     Were you a victim of any crime that day?

11     **A**     No.

12            **MS. SCOTT:**  I have nothing further.

13            **THE COURT:**  Cross-examination?

14            **MS. CITRARO:**  Yes.  Thank you.

15                        **CROSS-EXAMINATION**

16   **BY MS. CITRARO:**

17     **Q**     Good afternoon.

18     **A**     Hi.

19     **Q**     You said you remember he had long sleeves on?

20     **A**     Yes.

21     **Q**     Like a shirt, a long-sleeve shirt?

22     **A**     Yes.

23     **Q**     Okay.  With gloves?

24     **A**     Yes.  Blue latex gloves.

25     **Q**     Blue latex gloves.  Were they like tucked into the

1    sleeves, do you know?

2        **A**    I believe so.  One was tucked into the other.

3        **Q**    Did you see a backpack on him?

4        **A**    No.

5        **Q**    No backpack?

6        **A**    I don't recall a backpack, but I wasn't focused on

7    that.

8        **Q**    Do you recall any specific facial features?

9        **A**    Um, I just --

10       **Q**    Eye color?

11       **A**    The dark hair and just the general appearance of

12   him being Hispanic.

13       **Q**    Can you describe his hair?

14       **A**    Um, dark and just kind of poofy, I guess.

15       **Q**    Poofy like an afro?

16       **A**    Yeah, kind of.

17       **Q**    Poofy and afro?

18       **A**    Yeah.

19       **Q**    Do you know about how long it was?

20       **A**    It wasn't very long, but was not like clean cut.

21   It was -- it had enough length to look messy.

22       **Q**    Okay.

23           **MS. CITRARO:**  May I approach the witness?

24           **THE COURT:**  You may.

25

1    **BY MS. CITRARO:**

2    **Q**    The State just showed you a photo lineup.  This

3    picture number 2 here, is that how you would describe his

4    hair that day?

5    **A**    Yes.

6    **Q**    It was exactly that length?

7    **A**    Um, I don't recall specifically, but it was around

8    that length.  I don't want to say it was exactly that length,

9    but it was longer like that.

10    **Q**    Would you describe that hairdo as an afro?

11    **A**    A little bit of one, yes.

12    **Q**    Would you say that any of the other five

13    individuals in that lineup have afro-style haircuts?

14    **A**    No.

15    **Q**    Okay.  Do you remember pants, shoes, anything else

16    about his clothing?

17    **A**    I don't.

18    **Q**    You said there were three males?

19    **A**    Three males.

20    **Q**    And the one that you identified to be Mr.

21    Valle-Ramos is the one who got into the driver's side?

22    **A**    Correct.

23    **Q**    And his hair was not held back or slicked back or

24    anything, it was just a poofy afro that day?

25    **A**    Right.

1    **Q**   Do they all run up to the car at the same time?

2    **A**   Yes.

3    **Q**   So they all three came in a group.  It wasn't like

4    one runs and then the other one ran up and then the other

5    one?

6    **A**   No.  They were all almost right at the same time

7    getting in the car at the exact same time.

8    **Q**   Okay.  How many times would you say you have seen

9    that photo lineup, the group of six pictures?

10   **A**   Counting today?

11   **Q**   Counting today?

12   **A**   Five times.

13   **Q**   About five times?

14   **A**   Yeah.

15   **Q**   The other two guys that you saw getting into the

16   car, did either of them have an afro-style haircut?

17   **A**   Not that I recall.  But I wasn't really looking at

18   them.  They were more kind of present there because I was

19   really more focused on the driver.  He was the one closest to

20   me.  The only thing I recall is they looked like brothers,

21   they all looked very similar.

22   **Q**   And you said you were about 25 feet away at first,

23   and then later 10 feet away?

24   **A**   I was about 20 feet.  The car was about 20 feet,

25   yeah.  It was almost not directly behind my carport, but I'd

1    say almost directly behind my neighbor's carport.  So it was

2    a little bit of a diagonal to me.  And then as they left,

3    yeah, I was about 10 feet from the driver.

4        Q    And that complex, was it Lafayette Square Condos?

5        A    Liberty Square Condos.  That was -- my unit was on

6    Lafayette Court.

7        Q    The fence that -- you said you actually saw them

8    come around the fence?

9        A    No, I didn't see them come around the fence.

10       Q    You didn't see them?  Okay.  You said that people

11   had tried to come into the neighborhood before and they

12   usually jump that fence?

13       A    Yeah.  I actually served on the board, and it was

14   very routine for people to trespass around the actual end of

15   the fence.  They would because it's a -- the fence kind of

16   just comes to an end, so it served as a shortcut for kids or

17   anyone to just kind of come through.

18       Q    Does it come to an end in a lake?

19       A    Um, not right in the lake.  But right at the

20   opening of the lake, yes.

21            MS. CITRARO:  May I approach the witness?

22            THE COURT:  You may.

23   BY MS. CITRARO:

24       Q    Showing you what's marked as Defense Exhibit F

25   Composite 1 through 2.  Can you just look at these two

1    pictures.  There's a second one behind it too.

2        **A**    Yes.  This is the fence.

3        **Q**    That's the fence that you're referring to that

4    people would come around?

5        **A**    Well, what they would do is this -- these two

6    fences, there's a gap in-between.  So a lot of times they'd

7    go in-between this black fence and the red wooden fence.  I

8    think some people do go around, like they hang on, they put

9    their foot on here, they put their other foot on the other

10   side and they swing them.  That's how dedicated they are to

11   trespassing and getting a shortcut, but a lot of people,

12   especially kids, will just about through this part.

13       **MS. SCOTT:**  Objection.  I'll ask that the pictures

14       remain facedown.

15       **THE COURT:**  Since it's not in evidence at this

16       point in time, don't show it to the members of the jury.

17       **THE WITNESS:**  Oh, I'm sorry.

18   **BY MS. CITRARO:**

19       **Q**    Based on the location of the vehicle where you were

20   standing, what you saw where they were running from, would it

21   be -- would it make sense that they ran around that fence and

22   came from that direction to get to the vehicle?

23       **A**    It made sense to me, because I didn't think

24   any -- it was my immediate thought as soon as I saw them

25   because the only time we have cars parked back there that

1    shouldn't be is when someone has come around.  I don't know

2    if they jumped the fence.

3         **MS. SCOTT:**  Your Honor, I'm gonna object to

4         speculation.

5         **THE COURT:**  Overruled.

6         **THE WITNESS:**  I don't know if they jumped, they cut

7         through or they went around.  I don't know.  But I know

8         that they weren't there at Liberty Square.  They were

9         definitely coming from the neighbors.

10        **MS. CITRARO:**  Okay.  May I approach the witness

11        again?

12        **THE COURT:**  You may.

13   **BY MS. CITRARO:**

14   **Q**    I'm gonna take this one from you and I'm gonna show

15   you what's marked as Defense Exhibit E, Composite 1 and 2.

16   Can you just look at these two pictures for me.

17   **A**    Sure.  Okay.

18   **Q**    Is the angle of that picture facing your carport?

19   Do you recognize that area in the picture?

20   **A**    Yeah, I recognize the area.  The second one is

21   facing my carport.  The first picture is not.  My carport is

22   not in this picture.

23   **Q**    Okay.  The second one, it is?

24   **A**    Correct.

25   **Q**    Okay.  So that -- is that the general area of

1    where --

2        **A**    Yes.

3        **Q**    -- the vehicle was parked?

4        **A**    Yes.

5        **Q**    It was alongside the fence that you can see in that

6    picture?

7        **A**    Yes.

8            **MS. CITRARO:**  May I approach?

9            **THE COURT:**  You may.

10           **MS. CITRARO:**  May I have just one moment?

11           **THE COURT:**  You may.

12           **MS. CITRARO:**  I have nothing further.

13           **THE COURT:**  All right.  Any redirect?

14           **MS. SCOTT:**  Just one, Judge.

15                    **REDIRECT EXAMINATION**

16   **BY MS. SCOTT:**

17       **Q**    The photo lineup that you said you have seen five

18   times, the day that it was presented to you by law

19   enforcement, was that the first time you have ever seen it?

20       **A**    Yes.

21           **MS. SCOTT:**  I have nothing further.

22           **THE COURT:**  Thank you, ma'am.  You're excused.

23   Thank you.

24           **THE WITNESS:**  Oh, thank you.

25           **THE COURT:**  State, call your next witness.

1          **MS. SCOTT:**  State calls Detective Stanley.

2     Thereupon,

3                    **DETECTIVE MICHAEL STANLEY**

4     was called as a witness and, having first been duly sworn,

5     testified as follows:

6          **THE COURT:**  All right.  Detective, have a seat.

7          Once you get situated, tell me your first name, your

8          last name, and spell both for the record for me, please.

9          **THE WITNESS:**  Michael Stanley.  S-T-A-N-L-E-Y.

10         **MS. SCOTT:**  First name?

11         **THE WITNESS:**  Michael.  M-I-C-H-A-E-L.

12         **THE COURT:**  Thank you.

13         State, you may inquire of the witness.

14         **MS. SCOTT:**  Thank you, Judge.

15                      **DIRECT EXAMINATION**

16    **BY MS. SCOTT:**

17         **Q**    Good afternoon.

18         **A**    Good afternoon.

19         **Q**    Can you tell the members of the jury what you do

20    for a living?

21         **A**    I currently work as a detective for the Orlando

22    Police Department.

23         **Q**    And how long have you been with OPD?

24         **A**    Um, nine years.

25         **Q**    And how long have you been a detective with them?

1       **A**     Um, two years.  Two years this May.

2       **Q**     Do you have any other law enforcement experience

3   prior to Orlando Police Department?

4       **A**     No, I do not.

5       **Q**     Okay.  Can you describe briefly as a detective what

6   unit you are assigned to and what responsibilities that

7   entails?

8       **A**     I'm currently assigned to the assault and battery

9   unit.  At the time of this incident I was assigned to the

10  east property unit.  That unit is responsible for the

11  investigation of property-related crimes that occurred on the

12  east side of Orlando.

13      **Q**     And typically when you respond to a scene or an

14  investigation, at what point in the investigation do they

15  call you?

16      **A**     Um, in this instance I -- I did not respond

17  initially.  The incident had taken place and I was assigned

18  that investigation after it had already transpired.

19      **Q**     Let me clarify my question.  At what point is a

20  detective assigned to a crime?  Are they always assigned or

21  do certain things have to happen before a detective gets

22  assigned?

23      **A**     Um, they will always be assigned.  However, based

24  upon the varying degrees of evidence that is available to

25  work with depends on the priority of that specific case.

1    **Q**    And in a case like a burglary, for example, would

2  you typically respond to the scene or would you get assigned

3  and investigate at a later date?

4    **A**    Um, you would typically respond?  For some reason

5  this incident, we were not able to make a physical response

6  to the scene that day.

7    **Q**    Were you working as a detective with OPD on April

8  9th of 2013?

9    **A**    Yes, I was.

10    **Q**    And at what date were you assigned this case?

11    **A**    The following day.

12    **Q**    Okay.  So April 10th?

13    **A**    Correct.

14    **Q**    And what did you do on the case when you were

15  initially assigned?

16    **A**    Um, reviewed the incident report that had been

17  prepared by the responding officer.  I reviewed the

18  photographs that had been taken and documented the scene.  I

19  read the witness statements as well.

20    **Q**    Did you through the course of your investigation

21  develop a suspect?

22    **A**    Yes, I did.

23    **Q**    And did you develop more than one suspect or just

24  one?

25    **A**    Um, I was only able to develop one suspect.

1     **Q**    And do you know the name of that suspect that you

2   developed?

3     **A**    Yes, I do.

4     **Q**    And what is that name?

5     **A**    His name was Jorge Valle-Ramos.

6          **MS. SCOTT:**  May I approach the clerk?

7          **THE COURT:**  You may.

8          **MS. SCOTT:**  May I approach the witness?

9          **THE COURT:**  You may.

10   **BY MS. SCOTT:**

11     **Q**    I'm showing you what's been previously marked as

12   State's Composite A, 1 through 3, Composite B, 1 through 3.

13   I'll show you A first.

14     **A**    Okay.

15     **Q**    Do you recognize that?

16     **A**    Um, yes, I do.  It is a document that our

17   department has prepared, a photo lineup administration

18   witness instructions.

19     **Q**    That first page, what is that?  Just explain to the

20   jury.

21     **A**    Basically, it has some information, basically, the

22   case number, witness name, lineup name, date, time, um, and a

23   series of sections which I, as the administrator, filled in,

24   things that I had done.  It also includes some instructions

25   that I read verbatim to either a witness or a victim, and

1  they, um, then prepared -- provide their initials there

2  noting that they understood the instructions.

3      Q    Okay.  The second page, could you look at that and

4  tell me what that is?

5      A    Yes, I can.  This is another witness photo display

6  identification form in which, again, a victim or a witness

7  will circle and make at the same time about whether they have

8  made an identification or not in reference to a specific

9  lineup that is being presented to them.

10     Q    Those forms, are they standard with the Orlando

11 Police Department?

12     A    Yes, they are.

13     Q    And can you look at the third page?

14     A    Yes, I can.

15     Q    Do you recognize that?

16     A    Yes, I do.

17     Q    And what is that?

18     A    It is a photographic lineup that I prepared

19 containing a photograph of Mr. Valle-Ramos.

20     Q    Okay.  And were you the one that prepared that

21 photo lineup?

22     A    Yes, I did.

23     Q    And from where did you receive the types of

24 pictures that were to go into that photo lineup?

25     A    I obtained the photographs from the State's

1    driver's license database of photographs.

2        Q    Okay.  When you -- I'll take that back.  I want to

3    show you what's been marked now as State's Composite B, 1

4    through 3.  Same series of questions.  Could you look at that

5    and explain to me what that is and how you recognize it?

6        A    Again, it's my handwriting, my initials, and it is

7    the same photo lineup, witness instructions.  This time it

8    was presented to a witness to the incident.

9        Q    And the second and third page, what is that?

10       A    Second and third page, again, the second page is

11   the witness photo display identification form in which it

12   would have the person that is reviewing the form, circle if

13   they see a picture of the person that committed the crime and

14   the statement noting such.

15       Q    And the third page, what is that?

16       A    The third page, again, is the actual photographic

17   lineup itself which contains a photograph.

18       Q    And did you present that or did you compile that

19   photographic lineup?

20       A    Yes, I did.

21       Q    And where did you get those photographs from?

22       A    I obtained these photographs from the state of

23   Florida driver's license database.

24           MS. SCOTT:  At this time the State would move into

25       evidence what's been previously marked as State's A1

1        through 3 and State's B1 through 3 as State's 1 and 2.

2               **THE COURT:**  Any objection from the defense?

3               **MS. CITRARO:**  No objection.

4               **THE COURT:**  All right.  What's been marked as

5        State's Exhibit A for identification will be moved into

6        evidence as State's Exhibit 1 without objection from

7        defense.

8               What's been listed as State's Exhibit B for

9        identification will be moved into evidence as State's

10       Exhibit 2 without objection from the defense.

11              (State's Exhibits 1-2 received in evidence.)

12   **BY MS. SCOTT:**

13       **Q**    Detective Stanley, when you construct a photo

14   lineup, have you ever done that before?

15       **A**    Yes, numerous times.

16       **Q**    Prior to this case, approximately how many times?

17   Over 100?

18       **A**    Yes, easily.

19       **Q**    What do you do when you are constructing a photo

20   lineup?  What types of photos are you looking for?

21       **A**    I'm looking for photographs of those similar

22   characteristics based upon age, obviously sex, race,

23   hairstyle.

24       **Q**    When you present a witness or a victim to a crime a

25   photographic lineup, do you suggest to them which photograph

1    might be that of a particular suspect?

2         **A**    No.

3         **Q**    Do you at any point tell them that the suspect is

4    definitely in this photo lineup?

5         **A**    No, we do not.

6         **Q**    And why not?

7         **A**    It's very suggestive.  I think prior history and

8    studies have shown that, you know, it would lend -- try to

9    push a witness or victim to make a false identification.

10        **Q**    When you presented what's been now entered as

11   evidence State's 1 to the victim in this case, do you know

12   when that was presented to him?

13        **A**    Um, the date is notated.  I do not know exactly,

14   but the date is notated on the top of the instructions.

15        **Q**    Would it refresh your recollection if you looked at

16   it?

17        **A**    Yes, it would, please.

18        **MS. SCOTT:**  May I approach?

19        **THE COURT:**  You may.

20        **THE WITNESS:**  It was done on April 18, 2013, at

21        approximately 11:15 hours.

22   **BY MS. SCOTT:**

23        **Q**    Okay.  So April 18th.  You were assigned to this

24   case April 10th, so eight days prior (sic) to that?

25        **A**    Eight days after.

1    **Q**    Or excuse me, eight days after?

2    **A**    Correct.

3    **Q**    But you were assigned on April 10th, that was on

4    April 18th?

5    **A**    That's correct.

6    **Q**    The second photo lineup that you showed, do you

7    remember the date that you presented that to the witness?

8    **A**    I do not remember that either.

9    **Q**    Would it refresh your memory if you saw it?

10    **A**    Yes, it would.

11    **MS. SCOTT:**  May I approach?

12    **THE COURT:**  You may.

13    **THE WITNESS:**  That was done on September 4th of

14    2013, about ten o'clock in the morning.

15    **BY MS. SCOTT:**

16    **Q**    Okay.  Were you made aware of Ms. Bethany Szewczyk,

17    the person who identified in this photo lineup Mr.

18    Valle-Ramos, did you know who she was?

19    **A**    No, I did not.

20    **Q**    Okay.  When did you learn of who she was?

21    **A**    I had been aware that she was a witness to the

22    incident.

23    **Q**    Okay.  Were you made aware of her existence on

24    April 10th or later?

25    **A**    It would have been April -- um, I don't recall

1    exactly when I was made aware.

2        **Q**    Was that the first part of your investigation?  Did

3    you learn of her pretty quickly when you were assigned to the

4    case?

5        **A**    Yes, I was.

6        **Q**    Okay.  Can you explain why the victim was presented

7    the photo lineup shortly after the incident but the witness

8    was not presented it until a few months later?

9        **A**    Um ...

10       **Q**    Is that typical, normal?

11       **A**    No, it is not typical.  I just had realized we had

12   had another witness to the -- there was a witness to the

13   incident and I was looking to strengthen, if you will, the

14   identification, and that's where I did so at a later date.

15       **Q**    When you presented the photo lineup to the victim,

16   Mr. Gonzalez in this case, do you remember that day,

17   presenting it to him?

18       **A**    Yeah, I do.  It took place at our station in the

19   parking lot.

20       **Q**    Do you remember -- without going into what he said

21   to you, do you remember how quickly he identified Mr.

22   Valle-Ramos in that photo lineup that you presented to him?

23       **A**    Um, yes.  I presented it to him in a manila folder.

24   I handed it to him.  He then opened it, looked at it and then

25   he made his selection.  So it was rather quickly.

1    **Q**    Okay.  Did he need to study this photo lineup for

2    any extensive period of time?

3    **A**    Not for an extensive period of time, no.

4    **Q**    When Ms. Bethany Szewczyk looked at that photo

5    lineup, do you remember that day when you presented it to

6    her?

7    **A**    Yes, I do.  I met with her at her office.

8    **Q**    Okay.  And when you presented the photo lineup to

9    her, was it also in a manila envelope?

10    **A**    Yes, it was.  It was the same format, manila

11    envelope.  After I read the instructions to her, I presented

12    her the manila envelope.  She opened it and she made her

13    selection rather quickly as well.

14    **Q**    Her, um, for lack of better term, the amount of

15    time that she -- from the time she looked at it to the time

16    she I.D'd it, was it fast?

17    **A**    Yes, it was.

18    **Q**    Did she need to study it for any extensive period

19    of time?

20    **A**    No.

21    **Q**    Did she or Mr. Gonzalez ever falter or ever waver

22    in their conviction as to the correct selection of the

23    photograph?

24        **MS. CITRARO:**  Objection, hearsay.

25        **THE COURT:**  Overruled.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1    **BY MS. SCOTT:**

2        **Q**    You can't testify to what they said, just what you

3    observed.  Did they ever waver in whether or not they were

4    sure that that was the photograph?

5        **A**    No.  I -- they were fairly certain on their

6    selection.

7            **MS. CITRARO:**  Objection, speculation.

8            **THE COURT:**  Overruled.

9    **BY MS. SCOTT:**

10       **Q**    After the suspect was identified by these two

11   individuals, did you do any additional work on the case?

12       **A**    No, I did not.

13       **Q**    Okay.  Did that conclude your investigation?

14       **A**    Yes, it did.

15       **Q**    Okay.

16           **MS. SCOTT:**  I have nothing further.

17           **THE COURT:**  Cross-examination?

18           **MS. CITRARO:**  Yes, Judge.

19                        **CROSS-EXAMINATION**

20   **BY MS. CITRARO:**

21       **Q**    Good afternoon.

22       **A**    Good afternoon.

23       **Q**    Did you ever speak with a witness by the name of

24   Charlene Bloom?

25       **A**    I spoke to her.  Not in person, over the telephone,

1    however.

2         **Q**    Okay.  She did prepare a statement, correct?

3         **A**    She did, yes.

4         **Q**    She never did an identification?

5         **A**    I spoke --

6         **Q**    Photo I.D.?

7         **A**    I spoke to her on the telephone and she stated that

8    she would not have been able to offer any identification of

9    the person.  She didn't get a good enough look.

10        **Q**    You didn't feel that she had very much to offer,

11   that's true, right?

12        **A**    In speaking to her, she felt that she did not have

13   very much to offer about that.  That's correct.

14        **Q**    You didn't make an evaluation of whether or not her

15   testimony would be helpful or hurtful or useful at all?

16        **A**    I did when I spoke to her I looked at the

17   statement, and then I asked her -- was going to attempt to

18   provide her with a photo and have her conduct a photographic

19   identification.  However, she stated she did not believe she

20   had gotten a good enough look at the individuals involved in

21   which to assist or make an identification.

22        **Q**    Okay.  Do you know anything about any of the

23   physical evidence that was gathered?

24        **A**    At the scene?

25        **Q**    Yes.

1     **A**     Yes.  I believe there was a tire iron, I believe,

2    that someone had located, a Pop Tart wrapper that was left by

3    the vehicle, may or may not have been involved, or come from

4    the vehicle, and there were several backpacks that were left

5    at the scene in addition to, I believe, some blue latex

6    gloves.

7     **Q**     Okay.  Do you know if any fingerprints or DNA was

8    tried to be collected or attempted to be collected from any

9    of those items?

10     **A**    I do not believe that any fingerprints were able to

11    be lifted or obtained from those items.

12     **Q**    So nothing, no latent prints at all were collected?

13     **A**    Latents were not obtained, correct.

14     **Q**    You sure there were no latents collected from any

15    of the evidence?

16     **A**    I'm not 100 percent positive.  There were no

17    identifications made.  I don't know the results.  Some were

18    obtained and they were of no investigative value.

19     **Q**    So there were prints obtained?

20     **A**    They could have been obtained, but they were not of

21    enough quality with which to make an identification -- excuse

22    me -- which to make an identification.

23     **Q**    So they were not able to be matched to anybody,

24    would that be accurate?

25     **A**    You'd have to refer to the report that was prepared

1    by the latent print examiner for that.

2        **Q**    Okay.  Did Mr. Gonzalez tell you that the suspect

3    had an afro?

4            **MS. SCOTT:**  Objection, hearsay.

5            **THE COURT:**  Overruled.

6            **THE WITNESS:**  I was relying upon the report that

7        was prepared by the initial responding officer in

8        addition to the information that was noted in the, um --

9        that was provided at the time of the 911 call in which

10       there was noted that one person had had an afro.

11   **BY MS. CITRARO:**

12       **Q**    Okay.  So were you aware that there was some

13   suspicion that one of the persons that you were looking for

14   had an afro?

15       **A**    That's correct.

16       **Q**    Okay.

17           **MS. CITRARO:**  May I approach the witness?

18           **THE COURT:**  You may.

19   **BY MS. CITRARO:**

20       **Q**    I'm showing you -- both of these have been entered

21   into evidence as State's 1 Composite 1 through 3.  I'll show

22   you that one first.  I'm showing you the third page.  Would

23   you say that the picture in box two is an afro-style haircut?

24       **A**    Um, yes, it is.

25       **Q**    Would you say the pictures in 1, 3, 4, 5 or 6 is an

1  afro-style haircut?

2      **A**      They are probably short afro-style haircuts.  They

3  have the same type of hair.  However, the length is short.

4      **Q**      You are telling -- your testimony today is that the

5  pictures in 1, 3, 4, 5 and 6 are afro-style haircuts?

6      **A**      They are not the afro with which I was provided

7  information about at the time.

8      **Q**      So not the kind of afro style that you're looking

9  for for your suspect?

10      **A**      Um, in order to prepare the photograph lineup, I

11  had to have a picture of an afro that was much smaller than

12  the one that was described to me.

13      **Q**      Okay.  Same pictures are in the six -- Exhibit 2

14  State's Exhibit, page 3.  These are the same pictures that

15  you just looked at?

16      **A**      Yes, they are.  Yes, it is the exact same.

17      **Q**      And to be clear, your testimony is that 1, 3, 4, 5

18  and 6 are not the same afro style that was reported?

19      **A**      What I'm trying to say, and I'm not certain if

20  that's what you're asking, is, but the picture of Mr. Ramos

21  that is in there, um, is not the same picture as what was

22  described to me at the time of the incident.

23      **Q**      Okay.  But I'm talking about the other five

24  pictures.  Is that what was described to you at the time of

25  the incident?

1    **A**    It was described that the person had an afro-style

2  haircut at the time of the incident.

3    **Q**    Okay.  So it would be your belief that this suspect

4  with an afro-style haircut wouldn't have a hairdo like the

5  guy in 1, 3, 4, 5 or 6 based on what everyone said?

6    **A**    I'm sorry.  I'm completely off.

7    **Q**    I have used too many words.  Okay.  Based on the

8  information you were given, was it your belief that --

9    **MS. CITRARO:**  May I approach?

10    **THE COURT:**  Uh-huh.

11  **BY MS. CITRARO:**

12    **Q**    And I'm showing you Number 2.

13    **A**    Correct.

14    **Q**    Page 3.  Based on the information you were given,

15  would it be your belief that the guy you were looking for who

16  had an afro-style haircut has the hairdo in picture number 1?

17    **A**    His hair is not like that at all.

18    **Q**    Okay.  How about the guy in picture number 3, is

19  that the kind of hairstyle that you're looking for?

20    **A**    In none of the pictures, including the one of

21  number 2 had the hairstyle that was observed at the time of

22  the incident.

23    **Q**    But number 2 would be more of the afro-style

24  haircut?

25    **A**    A little bit more than the others, yes.

1  **Q**    Were there any other suspects that were found or

2  any other information gathered to come up with an

3  identification for the other two guys?

4  **A**    No, there were not.

5  **Q**    And there were no leads gathered by any, like, pawn

6  hits or anything for the missing jewelry?

7  **A**    No.  We had no other pawn hits or Crimeline tips.

8  **Q**    And you're saying that the latents that were

9  collected were not of good enough value to make a match?

10 **A**    Again, I would have to refer to the actual latent

11 print examiner's report.

12 **Q**    So you are not sure?

13 **A**    I'm not sure, no.

14 **Q**    Would it help to look at C.S.I. Styer's report?

15 **A**    I don't know if her report, but there's a latent

16 report that is generated.  Her report would not be --

17 **Q**    Is there a copy of that report that you would

18 not --

19 **A**    I would not have it.

20 **Q**    You would not receive that report?

21 **A**    Um, one would be done and submitted, the results of

22 which, you know, if a crime scene technician takes them,

23 fingerprints, submits them to a latent print examiner, they

24 would make a determination of yes, it's a match or, no, it's

25 not a match, or no, the print is not of quality to make a

1    determination.  I don't have that report.

2        **Q**    But latent prints are passed over to them.  There

3    is gonna be some kind of report generated?

4        **A**    Absolutely.

5        **Q**    Okay.

6        **MS. CITRARO:**  Nothing further.

7        **THE COURT:**  State, redirect?

8        **MS. SCOTT:**  None, Your Honor.

9        **THE COURT:**  All right.  Thank you, Detective.

10       **THE WITNESS:**  Yes, sir.

11       **THE COURT:**  All right.

12       State, call your next witness.

13       **MS. SCOTT:**  May we briefly approach or can I just

14   get a three-minute recess?  I'm going to set up audio.

15       **THE COURT:**  Set up what you need to set up.

16       **MS. SCOTT:**  Okay.  May we approach?

17    (Conference at the bench held on the record.)

18       **MS. SCOTT:**  I'm going to be very brief with the

19   next witness and we can be done, I would say, by five

20   o'clock, even if we take a two-minute recess and I'm

21   done.  I still want that recess.  I don't want to be

22   fiddling around with the audiovisual stuff in front of

23   the jury.

24       **THE COURT:**  With that?

25       **MS. SCOTT:**  I don't know --

1     **MS. CITRARO:**  You want to switch them?

2     **MS. SCOTT:**  Yes.  I am going to bring mine up here

3     that is in the courtroom.

4     **THE COURT:**  Where is it?

5     **MS. SCOTT:**  Right there on the other side of the

6     clerk.

7     **THE COURT:**  Okay.

8     (The following was in open court.)

9     **THE COURT:**  All right.  Ladies and gentlemen, we

10    are going to recess at this point for a couple of

11    minutes.  We will get things up and bring you back in.

12             (Jury exits the courtroom.)

13        (Whereupon a short recess was taken.)

14    **THE COURT:**  All right.  Ready to go?  Let's bring

15    in the jury.

16             (Jury enters the courtroom.)

17    **THE COURT:**  State, call your next witness.

18    **MS. SCOTT:**  State calls Chantal Styer.

19  Thereupon,

20                  **CHANTAL STYER**

21  was called as a witness and, having first been duly sworn,

22  testified as follows:

23    **THE COURT:**  All right, ma'am, have a seat.  Tell me

24    your first name, your last name, and spell both for me,

25    please.

1          **THE WITNESS:**  My name is Chantal, C-H-A-N-T-A-L.

2     Last name is Styer, S-T-Y-E-R.

3          **THE COURT:**  State, you may inquire.

4          **MS. SCOTT:**  Thank you, Judge.

5                    **DIRECT EXAMINATION**

6     **BY MS. SCOTT:**

7     **Q**     Ms. Styer, can you tell us where you work?

8     **A**     I work for the Orlando Police Department.

9     **Q**     In what capacity?

10    **A**     I'm a crime scene investigator.

11    **Q**     And what does that mean?

12    **A**     Basically, our job as a crime scene investigator is

13    to document crime scenes as we find them.  We also process

14    crime scenes, we collect evidence, we do sketches.

15    **Q**     And how long have you been working with OPD as a

16    C.S.I.?

17    **A**     Nine years.

18    **Q**     And were you assigned to a case for an incident

19    that occurred on April 9, 2013?

20    **A**     Yes.

21    **Q**     And was that for the defendant by the name of Jorge

22    Valle-Ramos?

23    **A**     Yes.

24    **Q**     And did you respond to 1625 Little Falls Circle?

25    **A**     Yes.

1    **Q**    And what did you do when you arrived?

2    **A**    After being briefed by the officer, I took

3    photographs of the crime scene.  I also collected evidence.

4         **MS. SCOTT:**  May I approach the clerk?

5         **THE COURT:**  You may.

6         **MS. SCOTT:**  May I approach the witness?

7         **THE COURT:**  You may.

8    **BY MS. SCOTT:**

9    **Q**    I'm showing you what's been previously marked as

10   State's for identification C Composite, 1 through 12.  Can

11   you just look through those and tell me if you recognize

12   them?

13   **A**    Okay.

14   **Q**    Do you recognize these?

15   **A**    Yes, I do.

16   **Q**    What are they?

17   **A**    They are the photographs I took of the crime scene.

18   **Q**    And do they fairly and accurately represent the

19   scene at the time that you took them?

20   **A**    Yes.

21        **MS. SCOTT:**  At this time the State would move into

22        evidence what's previously marked as State's C Composite

23        1 through 12 as State's 3.

24        **THE COURT:**  Any objection from the defense?

25        **MS. CITRARO:**  My only objection would be that

1        there's nothing specific whatsoever about what's being

2        entered into evidence, what the pictures are of, what we

3        are even looking at in each individual picture.

4            **THE COURT:**  Okay.  Objection is overruled.

5            What's been marked as State's Exhibit C for

6        identification will be moved into evidence as State's

7        Exhibit 3 over defense objection.

8            (State's Exhibit 3 received in evidence.)

9    **BY MS. SCOTT:**

10   **Q**    Can you describe -- when you arrive at a scene you

11   take photographs and you process a scene.  What does

12   "processing a scene" mean?

13   **A**    Processing a scene usually means for fingerprints

14   is what we are looking for.

15   **Q**    And in that case, did you process the scene for

16   fingerprints?

17   **A**    Yes.

18   **Q**    And did you -- were you able to successfully lift

19   any complete fingerprints?

20   **A**    Not from the crime scene, no.

21   **Q**    And what is your -- can you briefly tell the Court

22   your training in terms of fingerprinting and DNA analysis?

23   **A**    Yes.  I received my degree from UCF in criminal

24   justice.  We do have some training on fingerprinting during

25   that time span.  In my employment with the Orlando Police

1    Department, we go through a three-month training period which

2    is all hands-on and we do processing for latents just,

3    basically, every day.

4        **Q**    Okay.  And what about for DNA?

5        **A**    Yes.  We do -- normally we respond to collect DNA

6    on a weekly basis.

7        **Q**    Okay.  And we'll start with the fingerprints.  Can

8    you describe if there's a surface and an individual touches

9    that surface, does that necessarily mean a fingerprint will

10   be left on that surface?

11       **A**    No, not necessarily.

12       **Q**    And why not?

13       **A**    It depends on -- there's a lot of factors.  It

14   depends on the person's hands who is touching the surface.  A

15   latent print is left behind using the oils and moisture in

16   your skin.  If a person has very dry hands or calloused

17   hands, they may not necessarily leave a good fingerprint

18   behind.  Also, if they have gloves on, obviously, they would

19   not leave a fingerprint behind.

20       **Q**    And in this case did you process it for DNA?

21       **A**    No.

22       **Q**    Why not?

23       **A**    We don't normally process for, like, DNA unless

24   there is visible blood at the crime scene.

25       **Q**    Was there any visible blood at this crime scene?

1      **A**    No.

2      **Q**    The photos that I previously showed you, I just

3    want to go through them briefly.  If you could describe to

4    the jury what it is that we are looking at.

5      **A**    That is the front door to the residence, and that

6    is a screen from the second-story balcony that had fallen

7    out.

8      **Q**    Okay.

9      **A**    That is a closeup of the second-story window.

10      **Q**    And is that the same window where the screen you

11    believe came out of?

12      **A**    Yes, that's correct.

13      **Q**    And I know this is hard to see --

14      **A**    That is the front door to the entrance, and I

15    believe that was the victim's belongings at the entrance.

16    That is the front door just showing damage to the door.

17      **Q**    What is this on the ground over here?

18      **A**    I don't recall if it's part of the door or if it

19    was --

20      **Q**    Okay.

21      **A**    That is the staircase showing the pepper spray on

22    the walls.

23      **Q**    Okay.  This orange film on the walls?

24      **A**    Yes.

25      **Q**    That's pepper spray?

1     **A**     Yes.  That is an overall of the living room area.

2   That is a back gate which was expected or suspected to be the

3   point of entry.  And that is a crowbar on the ground at the

4   point of entry.

5          That is a knife and a cigarette butt.  The knife

6   was not part of the scene.  That belonged to the victim.

7     **Q**     What about the cigarette butt?

8     **A**     The cigarette butt was collected.

9     **Q**     Was that processed for any DNA?

10    **A**     No.

11    **Q**     What is done for the cigarette butt?

12    **A**     It was just placed into evidence.  That is a

13  backpack that did not belong to the victim that was full of

14  coins and it also had a knife inside.

15    **Q**     Where was this backpack located?

16    **A**     It was on the second floor in the hallway.

17    **Q**     Okay.  Was this backpack processed for any DNA?

18    **A**     No.

19    **Q**     Could this backpack have been processed for DNA?

20    **A**     Yes, it's possible.

21    **Q**     And what kind of DNA would it be?

22    **A**     It would have been touch DNA.

23    **Q**     Can you explain what touch DNA is?

24    **A**     Touch DNA is similar to a fingerprint.  It can be

25  left behind from your skin cells when you touch an object.

1    That is an overall of the master bedroom.  And that is inside

2    the master bedroom closet.

3        **Q**    All of these locations in the house, when you took

4    these photographs, did you know that they were part of the

5    crime scene?

6        **A**    Yes.  I was briefed by the police officer on the

7    scene, and he directed me to areas of disturbance.

8        **Q**    Typically in a -- do you typically work cases like

9    burglaries of dwellings?

10       **A**    Yes.

11       **Q**    Typically in a burglary of a dwelling if there is

12   no blood behind do you process a scene for DNA?

13       **A**    No.

14       **Q**    After you process a scene and no fingerprints were

15   lifted, can you briefly tell the jury what areas did you

16   process?

17       **A**    Um, in this particular scene I processed the point

18   of entry, like, the sliding glass door, the gate that was

19   open, the window, the second-story window, the window screen,

20   and any of the items inside that looked like they had been

21   touched or moved.

22       **Q**    Okay.  And were you made aware of the alleged point

23   of entry, point of exit, all of those things?  When you're

24   processing your scene, are you made aware of everything at

25   that point?

1    **A**    Yes.  Yes.

2    **Q**    What happens once, in terms of your role in a case,

3    once no fingerprints are lifted and no anything is really

4    collected of forensic value?

5    **A**    From that point I just submit the items that I have

6    collected and I do a report.

7    **Q**    Okay.  Based on your training and experience with

8    OPD and processing multiple scenes, is it atypical to not

9    recover fingerprints from a screen?

10    **A**    It does happen quite often that we don't get

11    fingerprints on a scene.

12    **Q**    And why is that?

13    **A**    For the reasons I described.  That they are wearing

14    gloves or just the condition of their hands, if they don't

15    have a lot of moisture to their skin.

16    **Q**    Okay.  If someone -- if there was any sort of

17    fingerprint that was lifted from the crime scene, what would

18    you do with it at that point?

19    **A**    That fingerprint gets submitted to our latent print

20    examiners and they do the examination of the latent print.

21    **Q**    And that did not happen in this case, correct?

22    **A**    Well, I did submit latent prints from a candy

23    wrapper that was found outside the scene.

24    **Q**    From inside the home, there was nothing?

25    **A**    No, there was not.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1      Q      No fingerprints that were lifted?

2      A      No.

3      Q      Okay.

4             **MS. SCOTT:**  I have nothing further.

5             **THE COURT:**  Cross-examination?

6                          **CROSS-EXAMINATION**

7      **BY MS. CITRARO:**

8      Q      Good afternoon.

9      A      Hi.

10     Q      You said that you didn't collect any latent prints

11     from inside the house?

12     A      Correct.

13     Q      But you did from the candy wrapper?

14     A      Yes.

15     Q      How many latents did you collect?

16     A      Five.

17     Q      What was the result of that?

18     A      They did not come back to anyone as far as I know.

19     Q      So they didn't match anybody?

20     A      No.

21     Q      So that means they didn't match Mr. Valle-Ramos?

22     A      Correct.

23     Q      Is there a report that was formulated or generated?

24     A      I do not believe there was a report from the latent

25     print examiner.  I checked before I came.

1    **Q**    So when it comes back with no matches, nothing is

2   ever documented?

3    **A**    Correct.

4    **Q**    Okay.  You said that you could have processed the

5   backpack for touch DNA?

6    **A**    Yes.

7    **Q**    But it was not processed?

8    **A**    Yes.

9    **Q**    And you could have processed a cigarette butt for

10   DNA?

11    **A**    Correct.

12    **Q**    But it was not processed?

13    **A**    No.

14    **Q**    Any other physical evidence that was collected from

15   the scene?

16    **A**    No.

17    **Q**    And when you say your latents were collected and

18   not matched to anybody, does that mean they were of good

19   enough quality they just didn't match anybody?

20    **A**    Correct.

21    **Q**    Okay.  And your system, what's the database that

22   they are matching to it?

23    **A**    There's not actually a physical database.  Our

24   latent print examiners have to go through them and look at

25   them by hand.

1    **Q**    Okay.  So who would they be comparing them to?

2    **A**    Well, they would have to be a suspect listed.  That

3    way if we have a name of someone, our latent print examiners

4    can pull their criminal history and their fingerprints to

5    compare the prints that I turn in.

6    **Q**    Do you know if they were compared to Mr.

7    Valle-Ramos?

8    **A**    No, I do not know that.

9    **Q**    You don't know that?

10   **A**    No.

11   **Q**    That would have been a separate person who made

12   that comparison?

13   **A**    Yes.  That would be the latent print examiners.

14   **Q**    But the information that you do have is that it

15   didn't come back to match anybody?

16   **A**    Correct.

17       **MS. CITRARO:**  Nothing further.

18       **THE COURT:**  Any redirect?

19       **MS. SCOTT:**  No, Your Honor.

20       **THE COURT:**  Thank you, ma'am.

21       State, call your next witness.

22       **MS. SCOTT:**  At this time the State rests.

23       **THE COURT:**  All right.  Ladies and gentlemen, at

24       this point in time the State Attorney's Office has

25       rested their case.  If you will step out for a few

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1    minutes, there is some legal matters that I need to take

2    up outside of your presence and when we are ready, I'll

3    bring you back in.

4         (Jury exits the courtroom.)

5    **THE COURT:** Any motions from the defense?

6    **MS. CITRARO:** I am not a self-court reporter in my

7    mind, but I have no recollect, and I could be wrong, I

8    do not recollect jurisdiction being noted in the

9    evidence of this case.

10   **THE COURT:** One of the first questions that was

11   asked of Mr. Gonzalez was venue.

12   **MS. CITRARO:** Okay.  I did not note it.  Then I

13   would just make a general argument that the elements

14   have not been proven to a high enough standard that they

15   pass JOA at this time.

16   **THE COURT:** Response?

17   **MS. SCOTT:** Your Honor, the elements were proven

18   both through Mr. Valle-Ramos -- excuse me --

19   Mr. Gonzalez that no one had permission to enter his

20   home, that he saw -- he identified Mr. Valle-Ramos both

21   via photo lineup as well as in-court identification of

22   one of the individuals that was in his home.  He then

23   proceeded to run out of his home.  Um, again, entry, no

24   one had permission to be there.  Um, Mr. Gonzalez also

25   testified that multiple items in his home were stolen.

1     When he was in there, he stated he heard shuffling,

2     rummaging through various items, the items that were

3     missing were there prior to the burglary and were not

4     there after the burglary.

5          There is enough evidence to support that Mr.

6     Valle-Ramos may have been one of the individuals who

7     stole those items.  That would be a determination up to

8     the jury, but as it is now, there is enough facts and

9     evidence for them to make that determination.

10         **THE COURT:**  I'm going to go ahead and deny the

11    judgment of acquittal based upon the evidence in the

12    light most favorable to the State at this point in time.

13         Does the defense wish to present a case?

14         **MS. CITRARO:**  It does.  I ask that we could begin

15    it tomorrow morning.  I have one witness now.  I guess

16    for aggregate purposes we can put all three together at

17    one time.

18         **THE COURT:**  No.  I told these jurors that we are

19    going to be here until six, so I'd like to do as much as

20    I can.

21         **MS. CITRARO:**  May we have five minutes and open our

22    case?  It would just be the one witness because I'd like

23    to have Ms. Bloom testify before I have my client

24    testify.

25         **MS. SCOTT:**  She has an ear infection today.

1      **THE COURT:**  I understand.   Is there any reason why

2      your client has to testify after that witness?

3      **MS. CITRARO:**  Just my preference.

4      **THE COURT:**  If he wants to testify, we are going to

5      be here until six.  I'd like to do it tonight.

6      **MS. CITRARO:**  We don't have to be here till six

7      tonight, Judge.

8      **THE COURT:**  I understand that.

9      **MS. CITRARO:**  Okay.  Can I have ten minutes?

10      **THE COURT:**  You may have ten minutes to speak with

11      your client and your witness.

12      **MS. CITRARO:**  Thank you.

13         (Whereupon a short recess was taken.)

14      **THE COURT:**  Ready to proceed?

15      **MS. CITRARO:**  Yes.  I'll notify the Court based on

16      the evidence I expect to come out today, I may have some

17      additional photographs to come in evidence tomorrow for

18      purposes of -- I may need to call my client again

19      tomorrow briefly to enter pictures into the evidence,

20      but I can have the bulk of his testimony done today.

21      **THE COURT:**  Okay.

22      **MS. CITRARO:**  Thank you.

23      **THE COURT:**  Mr. Valle-Ramos, you have had an

24      opportunity to talk with your attorney about the pros

25      and cons of testifying?

1        **THE DEFENDANT:**  Yes, sir.

2        **THE COURT:**  You also have had the opportunity to

3    speak with her about the pros and cons of not

4    testifying.

5        **THE DEFENDANT:**  Yes, sir.

6        **THE COURT:**  Do you understand if you do testify,

7    you will be treated just as any other witness?

8        **THE DEFENDANT:**  Yes, sir.

9        **THE COURT:**  And you will be subject to

10    cross-examination by the prosecutor?

11        **THE DEFENDANT:**  Yes, sir.

12        **THE COURT:**  If there are any impeachable offenses

13    that you have in your past, those may come out?

14        **THE DEFENDANT:**  Yeah.

15        **THE COURT:**  Okay.  All right.  And you also

16    understand that if you decided not to testify, I would

17    instruct the jury that they are not to consider that in

18    any way, shape or form.  Do you understand that?

19        **THE DEFENDANT:**  Yes.

20        **THE COURT:**  After having consulted with your

21    attorneys about the pros and cons of testifying as well

22    as the pros and cons of not testifying, have you reached

23    a decision what you'd like to do in this case?

24        **THE DEFENDANT:**  Testify.

25        **THE COURT:**  Is that a decision that you made on

1      your own?

2           **THE DEFENDANT:**  Yes, sir.

3           **THE COURT:**  No one has forced, threatened or

4      coerced you to make that decision?

5           **THE DEFENDANT:**  Not at all.

6           **THE COURT:**  You are making that decision freely and

7      voluntarily?

8           **THE DEFENDANT:**  Yes, sir.

9           **THE COURT:**  With that said, let's go ahead and

10      bring the jurors back in.

11                (Jury enters the courtroom.)

12           **THE COURT:**  All right.  Everybody have a seat.

13      Does the defense wish to present a case?

14           **MS. CITRARO:**  Yes, Judge.

15           **THE COURT:**  You may call your first witness.

16           **MS. CITRARO:**  Defense's first witness is Marquis

17      Hickson.

18           **THE COURT:**  Face the clerk and raise your right

19      hand to be sworn.

20  Thereupon,

21                      **MARQUIS HICKSON**

22  was called as a witness and, having first been duly sworn,

23  testified as follows:

24           **THE COURT:**  Sir, have a seat.  Get situated.  Tell

25      me your full name, first and last, spelling both for me.

1    **THE WITNESS:**  Marquis Hickson.  M-A-R-Q-U-I-S

2    H-I-C-K-S-O-N.

3    **THE COURT:**  Defense may inquire of the witness.

4                    **DIRECT EXAMINATION**

5    **BY MS. CITRARO:**

6    **Q**    Mr. Hickson, good afternoon.

7    **A**    Hi.

8    **Q**    How do you know my client?

9    **A**    School.

10   **Q**    So how long have you known him?

11   **A**    Um, since a little bit before senior year.

12   **Q**    Okay.  Back in April of 2013, were you residing

13   with him?

14   **A**    Was I living with him?

15   **Q**    Yes.

16   **A**    Yes.

17   **Q**    Do you remember the day of April 9th, 2013?

18   **A**    Yes.

19   **Q**    Okay.  What do you recall starting in the morning?

20   **A**    In the morning we wake up like we usually do and

21   hang out with each other for who knows how long until we

22   figure out something to do.

23   **Q**    Okay.  How late do you usually wake up?

24   **A**    Twelve, 11:00.

25   **Q**    Is there a reason why you get up so late?

1    **A**    Staying up -- staying up late.

2    **Q**    Were you not working at the time?

3    **A**    Yeah.  I have been working for the past -- since I

4    was 18 I have had a steady job, same job.

5    **Q**    Is it afternoon hours?

6    **A**    Um, it's mornings.  So that's why I usually -- when

7    my days are off, I do get up a little bit later.  Another

8    reason.

9    **Q**    That was one of your days off?

10   **A**    Yes.

11   **Q**    Do you remember what you did that day?

12   **A**    Played basketball and I spent my day with Jorge.

13   **Q**    What do you remember doing with him?

14   **A**    The only thing that we did outside of the house was

15   play basketball.

16   **Q**    So everything else was inside the house?

17   **A**    Everything else was inside the house.

18   **Q**    What time did you play basketball?

19   **A**    Six.  We left the house at 6 p.m.

20   **Q**    Had you left the house at all that morning?

21   **A**    No, ma'am.

22   **Q**    Do you know if Mr. Valle-Ramos had left the house

23   at all that morning?

24   **A**    I do not know.

25   **Q**    You do not know?

1      **A**     I'm sure he had not because of our routines, but

2   like I said, I would not, you know.

3      **Q**     And your routine is usually what?

4      **A**     Yeah.  We wake up together, we are in the house

5   together, we fall asleep together.

6      **Q**     So when you woke up that morning, was he present?

7      **A**     Yes.

8      **Q**     Okay.

9      **A**     Shirt off, drool.

10      **Q**     Anything seem out of ordinary or out of place that

11   morning?

12      **A**     Nope.

13      **Q**     Okay.  Um, April of 2013, can you describe what his

14   hair looked like?

15      **A**     It was long and had to be put in a ponytail.  If it

16   wasn't in a ponytail, it would fall down over his face almost

17   like a girl.

18      **Q**     So was he growing out an afro?

19      **A**     I mean, at one point.  But then it just turned into

20   long hair.  He wasn't -- his goal wasn't an afro.  We were

21   getting our hair braided.

22      **Q**     Okay.  So if -- if you were to see him in April of

23   last year with however his hair was at the time and he didn't

24   pull it back, he just stood there with his hair however it

25   would go, where would it fall?  Would it stick up or would it

1    just fall like girl's hair?

2        **A**    It would fall to his shoulders.

3        **Q**    It would fall to his shoulders?

4        **A**    Yes.

5        **Q**    So it was long enough that it wouldn't actually

6    stick up, it would actually come down?

7        **A**    Yes.

8        **Q**    Okay.  Do you remember anything else out of the

9    ordinary that day?

10       **A**    No.  It was a simple, regular day.

11       **Q**    And you went to play basketball?

12       **A**    Yes.

13       **Q**    Where did you go?

14       **A**    Dover Shores Community Center.

15       **Q**    Is that where you normally went?

16       **A**    Yes.

17       **Q**    Were you stopped at all that day?

18       **A**    Yes.  By a police officer.

19       **Q**    Why did the officer stop you?

20       **A**    Because of speeding.

21       **Q**    Okay.  Were you driving the vehicle?

22       **A**    I was not.

23       **Q**    Okay.  So were you in the vehicle that was stopped?

24       **A**    I was.

25       **Q**    What time do you know this would have been?

 1      **A**      8:30, nineish at night.

 2      **Q**      Were you stopped by a police officer in a vehicle

 3   that the driver was supposedly speeding in?

 4      **A**      Yes.

 5      **Q**      Okay.  Anybody get arrested?

 6      **A**      No.

 7      **Q**      Anybody get ticketed?

 8      **A**      No.

 9      **Q**      Did you have to hand over your I.D's at all?

10      **A**      Yes.

11      **Q**      Did you hand over yours?

12      **A**      Yes.

13      **Q**      Do you know if Mr. Valle-Ramos handed over his?

14      **A**      Yes.

15      **Q**      Okay.  And that was the end of it, you went home?

16      **A**      Yes.  The police officers let us go because they

17   didn't find anything relevant to what they were looking for.

18      **Q**      Okay.  You have no reason to think that Mr.

19   Valle-Ramos left the house that morning?

20      **A**      None whatsoever.

21      **Q**      Would that have been typical for him to just leave

22   without you?

23      **A**      No.

24           **MS. CITRARO:**  May I approach the witness?

25           **THE COURT:**  You may.

1    **BY MS. CITRARO:**

2       **Q**    I'm showing you what's marked for identification

3    purposes as Defense Exhibit C.  Do you recognize this?

4       **A**    It's Jorge's I.D.

5       **Q**    So you do recognize it?

6       **A**    Yes.

7       **Q**    This is his driver's license or I.D card?

8       **A**    Um, driver's license, it says.

9       **Q**    Okay.  Do you see the picture?  It's not a very

10   good picture because it's a xeroxed copy, but can you kind

11   of -- make out what his hairstyle looks like in that picture?

12      **A**    It's a bit of a fro.

13      **Q**    Is that what his hair looked like in April of 2013?

14      **A**    No.  Eventually it grew out.  It had its puffy

15   stage, but at the time April came around, it was already

16   hanging.

17      **Q**    So it has was hanging down here, it wasn't sticking

18   up?

19      **A**    No, I have Instagram photos.

20      **Q**    So that picture is not an accurate representation

21   of what he looked like in April of 2013?

22      **A**    No, ma'am.

23           **MS. CITRARO:**  May I?

24           **THE COURT:**  You may.

25           **MS. CITRARO:**  I have nothing further.

1          **THE COURT:**  Cross-examination?

2                    **CROSS-EXAMINATION**

3     BY MS. SCOTT:

4       **Q**    Good afternoon.

5       **A**    Hello.

6       **Q**    You said you woke up that morning around 11 or 12?

7       **A**    Yes.

8       **Q**    Okay.  Where is your bedroom or where was your

9     bedroom in that house?

10      **A**    Um, our bedrooms are on opposite sides of the

11    house, but you can see both doors from each other's door.

12      **Q**    And do you sleep with your door opened or closed?

13      **A**    We sleep with our doors closed.

14      **Q**    And do you guys sleep in the bedroom -- by "you

15    guys", I mean you and Mr. Valle-Ramos, do you sleep in the

16    same bedroom?

17      **A**    We do not sleep in the same bedroom.

18      **Q**    Are there any other individuals that were in the

19    house?

20      **A**    We had somebody staying with us at the time, but

21    that day he was not there.

22      **Q**    Okay.  At 11 or 12, um, whenever -- 11:00 a.m. to

23    12:00 p.m. when you woke up, where was Mr. Valle-Ramos?

24      **A**    Coming out of his room.

25      **Q**    Okay.  And what time had you gone to bed the night

1   before?

2       **A**     Um, late because it was my day off, so probably

3   three.

4       **Q**     Okay.  And when you went to sleep that night, Mr.

5   Valle-Ramos was in the house?

6       **A**     Yes.

7       **Q**     Okay.  But you didn't wake up until 11 or 12 the

8   next day?

9       **A**     Yes.

10      **Q**     At any point did you wake up before that?

11      **A**     No.

12      **Q**     So you have absolutely no idea whether or not he

13  was actually at the house between the hours of eight and ten

14  that morning?

15      **A**     I could not be a hundred percent of that, no.

16      **Q**     You didn't see him, you weren't with him, you were

17  sleeping in your bedroom with the doors closed?

18      **A**     Yes, I was sleeping with my door closed.

19          **MS. SCOTT:**  I have nothing further, Judge.

20          **THE COURT:**  Any redirect?

21                    **REDIRECT EXAMINATION**

22  **BY MS. CITRARO:**

23      **Q**     Was there anything that would have given you an

24  indication like a sound of a door, a noise, anything else, a

25  person moving at all that would make you think he was up?

1      **A**    I'm a very light sleeper.  I'm always waking up if

2   the door is open because why?  I have insecurities about

3   safety and stuff like that.  So...

4      **Q**    Do you recall hearing anything that would lead you

5   to think that he was awake or moving around?

6      **A**    No, nothing out of the normal.

7      **Q**    Okay.

8         **MS. CITRARO:**  Thank you.  Nothing further.

9         **THE COURT:**  Thank you, sir.

10        All right.  Defense, call your next witness.

11        **MS. CITRARO:**  I'll call Mr. Valle-Ramos.

12        **THE COURT:**  Mr. Valle-Ramos, come up to the stand.

13   Thereupon,

14                    **JORGE VALLE-RAMOS**

15   was called as a witness and, having first been duly sworn,

16   testified as follows:

17        **THE COURT:**  All right.  Go ahead and tell me your

18        full name, and spell your first and your last name for

19        me.

20        **THE WITNESS:**  Jorge Valle.  J-O-R-G-E, V-A-L-L-E.

21        **THE COURT:**  You may inquire.

22                    **DIRECT EXAMINATION**

23   **BY MS. CITRARO:**

24      **Q**    I'm going to continue to call you Valle Ramos.  It

25   is easier for me to say.

1    **A**    Uh-huh.

2    **Q**    Do you remember April 9th of 2013?

3    **A**    I remember.

4    **Q**    Okay.  Do you remember where you were, what you did

5    the beginning of the morning?

6    **A**    Yes.

7    **Q**    Okay.  Can you tell the Court where you were?

8    **A**    I was home all the way up to around six.  They

9    opened the basketball court at 6:30.

10    **Q**    Okay.  Did you leave the house in the morning at

11    all?

12    **A**    No.  Not till six o'clock in the afternoon.

13    **Q**    And that was to go play basketball?

14    **A**    Uh-huh.  Yes.

15    **Q**    Did you spend your day with Mr. Hickson?

16    **A**    Yes.

17    **Q**    What time did you wake up, would you say?

18    **A**    Eleven or 12.  I used to work late nights and I

19    worked the night before that.

20    **Q**    Okay.  What time did you -- would you say you got

21    home the night before?

22    **A**    Like 12:30.

23    **Q**    Okay?

24    **A**    Because I would work to midnight to closing up the

25    restaurant.  Yeah, I get home around 12:30.

1    **Q**    Okay.  So is it routine then that you sleep late if

2    you work late the day before?

3    **A**    Yeah.

4    **Q**    Okay.

5    **A**    I would -- I mean, I haven't woken up early.

6         **MS. SCOTT:**  Objection to nonresponsive.

7         **THE COURT:**  Sustained.

8    **BY MS. CITRARO:**

9    **Q**    Do you know Mr. Gonzalez?

10   **A**    No, I don't.

11   **Q**    Have you ever seen him before today?

12   **A**    Never.

13   **Q**    Okay.  Were you at his property?

14   **A**    Never.

15   **Q**    Okay.

16   **A**    I don't even know where he lives.

17   **Q**    Where, um -- in April of 2013, can you describe

18   what your hairdo was like?

19   **A**    Um, it fell over my shoulders.  I looked like

20   Tarzan.

21   **Q**    So if you weren't to hold it back or anything --

22   **A**    Uh-huh.

23   **Q**    -- it won't stick up, it would come down?

24   **A**    Yeah, it would just fall.

25   **Q**    Okay.  So how long would you say it was?

1      **A**    Like, it would fall down to here when it was wet.

2      **Q**    Okay.  You at one point had an afro haircut?

3      **A**    Yeah.  Uh-huh.

4      **Q**    Okay.

5          **MS. CITRARO:**  Can I approach?

6          **THE COURT:**  You may.

7  **BY MS. CITRARO:**

8      **Q**    Showing you what's marked for identification

9  purposes as Defense C.  Do you know what this is?

10     **A**    It's my license.

11     **Q**    Okay.  Okay.  That's your driver's license?

12     **A**    Yes.

13     **Q**    Okay.  What was the issue date on that driver's

14  license?

15     **A**    It looks like April, 2011.

16         **MS. SCOTT:**  Your Honor, I'm sorry.  I need to see

17     what he's looking at.  I'm sorry.  Say that again.

18         **THE WITNESS:**  It looks like April, 2011.

19  **BY MS. CITRARO:**

20     **Q**    2011?  Okay.  Is this -- did you take this

21  photograph when you got this card?

22     **A**    Yes.

23     **Q**    Okay.  So this representation of you with this

24  hair --

25     **A**    Uh-huh.

1     **Q**    -- would have been at the time that you took this

2   picture when this was issued in 2011?

3     **A**    Yes.  That's the picture from 2011.

4     **Q**    Okay.  Is there any way for you to know for sure

5   that this is a copy of your driver's license?

6     **A**    I have a copy on me right now.

7     **Q**    So this looks identical to the one that you have?

8     **A**    Yes.

9       **MS. CITRARO:**  I ask that this be moved into

10      evidence as 1.

11      **THE COURT:**  Any objection from the State?

12      **MS. SCOTT:**  No.

13      **THE COURT:**  What is has been marked as Defense

14      Exhibit C for identification will be moved into evidence

15      as Defense Exhibit 1 without objection from the State.

16      (Defendant's Exhibit 1 received in evidence.)

17  **BY MS. CITRARO:**

18    **Q**    Did you recognize Ms. Szewczyk, the lady that came

19   in here and testified earlier?  Did she look familiar to you?

20    **A**    Nobody that was up here looked familiar.

21    **Q**    And have you ever been to the residence of Little

22   Falls?

23    **A**    I don't know where that's at.

24    **Q**    Okay.  So this burglary that's alleged to have

25   occurred on April 9th of 2013, that wasn't you?

1     **A**     No.

2     **Q**     Okay.  Do you remember anything else that occurred

3     on that day?

4     **A**     Um, I woke up around noon.  My friend came over

5     with his girlfriend.  He asked us if we wanted to play

6     basketball.  So he drove us to the basketball court around

7     six o'clock when the basketball court opened.  After the

8     basketball court, around 8:30 to nine, we got pulled over.

9     **Q**     Why did you get pulled over?

10    **A**     For speeding.

11    **Q**     You were not driving the car?

12    **A**     I was in the backseat with Marquis.

13    **Q**     Did you hand the officer your driver's license?

14    **A**     I did.

15    **Q**     Would that have been the driver's license that you

16    had on you?

17    **A**     Yes.

18    **Q**     So he collected it --

19    **A**     Yep.

20    **Q**     -- on that day?

21    **A**     Yeah.

22    **Q**     You were released, not arrested for anything?

23    **A**     Yeah, we just went on our way.

24    **Q**     The reason for the stop was speeding?

25    **A**     Uh-huh.  But they were undercover, so they were

1    looking.  They weren't -- I mean, they didn't want to just

2    give us a speeding ticket.  It would have made them look.

3        **Q**    So they didn't issue any ticket?

4        **A**    Not a ticket, nothing.  They told us when they

5    pulled us over we are looking for guns, bombs, and, you know

6    what I'm saying?  They are looking, basically, for higher

7    crimes or whatever and we didn't -- all we did was speed,

8    so...

9            **MS. SCOTT:**  Objection, Your Honor.  Nonresponsive.

10           **THE COURT:**  Sustained.

11   **BY MS. CITRARO:**

12       **Q**    They told you they were undercover though?

13       **A**    Yeah.

14       **Q**    Um, did you go back home then after that?

15       **A**    Yeah, we want home right after that.  We were

16   sweaty.  We were just playing basketball.

17       **Q**    Anything else of note happen that day or evening?

18       **A**    Did anything else happen that day or evening?

19       **Q**    Of noteworthy that day or evening other than what

20   we just said?

21       **A**    No.

22       **Q**    And you were arrested later for this?

23       **A**    I was, days later, maybe like a week, two weeks

24   later.

25       **Q**    And they told you that they had a warrant for your

1    arrest?

2        **A**    Yeah, came into my house.

3        **Q**    Okay.  You have never seen Mr. Gonzalez before

4    today?

5        **A**    Never.

6            **MS. CITRARO:**  I have nothing else.

7            **THE COURT:**  Okay, cross-examination.

8                        **CROSS-EXAMINATION**

9    **BY MS. SCOTT:**

10       **Q**    Good afternoon, Mr. Valle-Ramos.

11       **A**    Good afternoon.

12       **Q**    Okay.  So let's back up just a little bit.  You are

13   at your house the day that this happened?

14       **A**    Crime happened.

15       **Q**    And you were sleeping until 12:30 or so, 12:00,

16   12:30 whenever you woke up?

17       **A**    Uh-huh.

18       **Q**    Do you sleep with your door -- bedroom door open or

19   closed?

20       **A**    Closed.

21       **Q**    And is Mr. Hickson, was he living with you at that

22   time?

23       **A**    Yes.

24       **Q**    How far is his bedroom from your bedroom?

25       **A**    Say 10, 15 feet.

1      **Q**    Okay.  And at any point in your normal routines

2    would you and Mr. Hickson ever sleep in the same room

3    together?

4      **A**    No.

5      **Q**    You had your separate bedrooms, separate times, you

6    slept here, he slept there?

7      **A**    Yeah.

8      **Q**    So if we were to -- the day that this happened, you

9    have no recollection of anything occurring at Mr. Gonzalez's

10   residence?

11     **A**    No, I don't.

12     **Q**    Do you think it's odd that he's identified you?

13     **A**    Very odd.

14     **Q**    Okay.  Do you think it's odd that another person

15   completely unrelated to Mr. Gonzalez who has no relation to

16   you or him also identified you?

17     **A**    Very odd.

18     **Q**    So two people who have nothing to do with anybody,

19   and don't know you from Adam --

20     **A**    Uh-huh.

21     **Q**    -- identified you --

22     **A**    Very odd.

23     **Q**    -- as the person that was in their house and that's

24   just odd to you?

25     **A**    Even more odd that there's a second person.

1    **Q**    Okay.  Just coincidence that they happened to ID

2  you?

3    **A**    Yeah.

4    **Q**    Have you been in court all day today?

5    **A**    Yeah.

6    **Q**    So you heard all the testimony that everybody said

7  to you or about the case?

8    **A**    Yes, I have.

9    **Q**    And even after that, all that, your contention is

10  still, that wasn't me, I don't care that two people who

11  picked me out months after this happened, they still

12  remembered my face, because they looked at me, they said all

13  that, didn't matter, it wasn't you?

14    **A**    It wasn't me.  It doesn't matter.

15    **Q**    Okay.  That night when were you pulled over before

16  6:00 p.m. when you left to go play basketball, you had stayed

17  at your house the entire day?

18    **A**    Yeah.

19    **Q**    Mr. Hickson was the only other person there?

20    **A**    Yes.

21    **Q**    You said your friend and his girlfriend came over.

22  What were their names?

23    **A**    Carl, and Danny (ph).  I don't know their last

24  names.

25    **Q**    What do they look like?

1    **A**    Carl is sitting right there, and Danny, they are

2  actually in the lineup, the four-picture lineup.

3    **Q**    What is -- can you just describe what Danny looks

4  like to me?

5    **A**    She is a white girl, blond hair, curly.

6    **Q**    And they were both there that day?

7    **A**    Yes.

8    **Q**    Okay.  What time did they get to your house, do you

9  remember?

10    **A**    Around three.

11    **Q**    Okay.  Anybody at your house that morning?

12    **A**    Nope.

13    **Q**    So the only person that can verify that you were

14  sleeping in your bedroom is you?

15    **A**    Uh-huh.

16    **Q**    Okay.

17    **MS. SCOTT:**  I have nothing further, Judge.

18    **THE COURT:**  Any redirect?

19    **MS. CITRARO:**  No redirect.

20    **THE COURT:**  All right.  Thank you, Mr. Valle-Ramos.

21    If you want to grab a seat.

22    All right, ladies and gentlemen, what we are going

23    to do at this point in time, we are going to recess for

24    the evening.  We will come back tomorrow morning at

25    9:00 a.m.  I have a few matters to take care of at 8:30,

1    but I don't anticipate I will have any problem getting

2    those done and taken care of by nine.  We will be ready

3    to start at nine with the remainder of the witnesses for

4    the defense.  I believe you have at lease one more,

5    correct?

6        **MS. CITRARO:**  Yes, Judge.

7        **THE COURT:**  That we will take tomorrow.  And if

8    there is any rebuttal case, we will do that and we

9    should be at a point where we can do the closing

10   arguments and the jury instructions shortly thereafter

11   and hopefully get this case to you by noon for your

12   deliberations.

13       Okay.  With that said, I want you to do a couple of

14   things for me this evening.  Number one, go home and

15   think of anything other than this case.  Okay?  Spend

16   time with your family, read a book, watch TV, do

17   anything other than this thing, okay.  Please do not do

18   any research or looking up of names, maps, anything that

19   has to do with this case, anything about the law of the

20   case.  Trust me, you'll get all of the evidence that you

21   need, and all of the law that you need to decide this

22   case while you're here.

23       Okay.  So that's rule number one.  Rule number two

24   is if you see any of the participants or any of the

25   parties or any of the court personnel overnight or any

1    time between now and when we come back and we don't pay

2    attention to you, please forgive us.  It's not a sign of

3    rudeness.  I'm just making sure that nobody has any

4    contact with you and the court deputies so we don't have

5    any complaints or any appearance of any improper

6    tampering with you-all as the members of the jury.

7        Okay.  And with that said, enjoy your evening and

8    I'll see you back here tomorrow morning at nine.  When

9    you go back here, the court deputies will take you out a

10   back door.  The door you come out at is where I would

11   like you-all to pool at when you get here tomorrow.  The

12   court deputies will periodically check to see if you're

13   here.  Once you're here, they will bring you back into

14   the jury room.  And once we are all set, we will bring

15   you back in and begin with the trial tomorrow morning.

16   Okay?  Thank you.  Have a good evening.

17        (Jury exits the courtroom.)

18        **THE COURT:**  All right.  In terms of jury

19   instructions, I have reviewed the State's request for

20   special jury instruction and I have reviewed the

21   standard instructions as well, and these were my

22   determinations.  The first paragraph that you wanted me

23   to read was the following, and it goes as to this:  An

24   important question in this case is the identification of

25   the defendant as the person who committed the crime.

1    The prosecution has the burden of proving beyond a

2    reasonable doubt that the crime was committed and that

3    the defendant was the person who committed the crime.

4    If you are not convinced beyond a reasonable doubt that

5    the defendant is the person who committed the crime, you

6    must find the defendant not guilty.

7         I am going to refuse to give that instruction.  The

8    reason for it is the first sentence is asking me to

9    comment on what is and what is not important in a case,

10   and I don't believe that it is my prerogative to do so.

11   I think all of the evidence is important and that the

12   jury should decide that as it relates to the other

13   items.  Those things are all adequately covered in the

14   standard instruction that has to do with plea of not

15   guilty, reasonable doubt and whatnot, that is contained

16   in that standard instruction which I believe is 3.7.

17        The next paragraph that you-all wanted me to read

18   to the jury was, the testimony you had heard concerning

19   identification represents the witness's expression of

20   his belief or impression.  You do not have to believe

21   that the identification witness was lying or not sincere

22   to find the defendant not guilty.  It is enough to

23   conclude that the witness was mistaken in misbelief or

24   opinion.  I'm going to decline to give that instruction

25   as well.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1       First of all, I believe the first sentence is,

2   again, having me make a comment on what the evidence is

3   in terms of their identification being their belief or

4   their impression, and I don't think that it is proper

5   for the Court to comment on what is their expression or

6   belief.  As it relates to the remaining paragraph of

7   that, that is a subject that can be argued to the

8   members of the jury, and I also believe those items are

9   adequately addressed by the weighing of evidence

10  instruction as well as the eyewitness identification

11  instruction, which is also going to be given in this

12  particular case.

13      The next paragraph that you ask me to read was as

14  follows:  You may also take into account that

15  identifications made from seeing the persons are

16  generally more reliable than identifications made from a

17  photograph.  Again, I'm going to deny to give that

18  instruction because I believe that that is something

19  that can be argued to the jury.  I also believe that it

20  is something that is adequately addressed by the

21  weighing the evidence as well as the eyewitness

22  identification instruction.  The eyewitness

23  identification instruction says they are to take into

24  consideration the totality of the circumstances.  That

25  could be one of those circumstances that could be argued

1    for them to consider.

2         The next paragraph that was asked to be read is the

3    witness's level of confidence in his identification of

4    the perpetrator is one of many factors that you may

5    consider in evaluating whether -- it says whether or the

6    witness correctly.  It's whether or not the witness

7    correctly identified the perpetrator.  However, a

8    witness who is confident that he correctly identified

9    the perpetrator may be mistaken.  Again, I think that's

10   asking me to improperly comment on what the evidence may

11   be.  I also believe that that is something that can be

12   adequately argued during closing argument based upon the

13   circumstances and the evidence in this case, and I also

14   think that those items are adequately addressed by the

15   Florida standard Supreme Court instruction on weighing

16   the evidence as well as the eyewitness identification

17   instruction that will be given.

18        The last paragraph that you asked me to give was,

19   it is the prosecutor's burden to prove beyond a

20   reasonable doubt that the defendant is the person who

21   committed the crime, and I'm going to decline to give an

22   additional instruction on that because that is actually

23   covered verbatim within the standard jury instruction of

24   plea of not guilty and reasonable doubt contained in

25   3.7.

1          So as it relates to the defense's special jury

2      instructions, those are the Court's rulings as it

3      relates to those items.  Based upon the amended

4      information that was filed, it is indicated here that

5      there are two different theories under which the

6      burglary of a dwelling is gonna happen.  It is either

7      entering or remaining in.  Based upon the testimony

8      that's been presented at this point in time, I'm going

9      to instruct on entering the burglary.  (sic) Anybody

10     have any objection?

11         **MS. CITRARO:**  No.

12         **MS. SCOTT:**  No.

13         **THE COURT:**  Because there are actually two separate

14     instructions, entering or remaining in, and all of the

15     evidence in this case seems to indicate that this was an

16     entering and not remaining in a situation.  So I will

17     instruct the jury on that.

18         All right.  I don't believe that there's any expert

19     witnesses, correct?

20         **MS. CITRARO:**  Correct.

21         **MS. SCOTT:**  Correct.

22         **THE COURT:**  There are no accomplices or informant's

23     testimony that is going to be presented?

24         **MS. SCOTT:**  No, Your Honor.

25         **THE COURT:**  No child witness necessary?

1      **MS. SCOTT:** No.

2      **THE COURT:** All of those items can come out of the

3      standard instructions.

4      **MS. SCOTT:** I would ask for the principal

5      instruction, Judge.

6      **THE COURT:** It's already in.

7      **MS. SCOTT:** Thank you.

8      **MS. CITRARO:** Is there a copy that has been emailed

9      to us that we are looking at right now?

10      **THE COURT:** I can send that to you right now.

11      **MS. CITRARO:** I'm just making sure I'm not missing

12      something.

13      **THE COURT:** If you want me to, I can do that right

14      now.

15      All right. On the weighing the evidence, anybody

16      believe there is going to be any evidence of general

17      reputation for truthfulness or dishonesty?

18      **MS. SCOTT:** No.

19      **MS. CITRARO:** No.

20      **THE COURT:** So I can delete paragraph ten. What

21      about items six through seven or six through nine in

22      that instruction?

23      **MS. SCOTT:** I'm sorry. Six through nine on what

24      page, Judge?

25      **THE COURT:** Would have been on page 16 under the

1    weighing the evidence instruction.  Are there any

2    impeachable priors for any of the witnesses?

3        **MS. CITRARO:**  Not that I'm aware of.

4        **THE COURT:**  State?

5        **MS. SCOTT:**  I don't think so.  No.  I was just

6    thinking of Ms. Bloom, but I don't --

7        **THE COURT:**  So paragraph nine on weighing the

8    evidence can come out?

9        **MS. SCOTT:**  Correct.  The only thing I would say is

10   I run a history on Ms. Bloom and she comes back to have

11   something, that would be the only additional.  Nobody

12   else.

13       **THE COURT:**  What about paragraphs six through

14   eight, any of you-all believe any of those apply at this

15   point?

16       **MS. CITRARO:**  Six through eight on the same page?

17       **THE COURT:**  Correct.  Has any witness been offered

18   or received any money, preferred treatment or other

19   benefit in order to get him to testify?

20       **MS. CITRARO:**  Yeah.  I have no objection to any of

21   those coming out.

22       **THE COURT:**  State?

23       **MS. SCOTT:**  I'd ask for eight to stay in, Judge.

24   There was testimony from Ms. Szewczyk that she heard the

25   defendant say hurry up, the police are coming.  Which

1    would be inconsistent with what he testified to today.

2        **THE COURT:**  All right.  I'll leave in eight.  What

3    about six or seven?

4        **MS. SCOTT:**  I'm fine with taking those out.

5        **THE COURT:**  Defense?

6        **MS. CITRARO:**  That's fine.

7        **THE COURT:**  So we will read one through five plus

8    eight which I will renumber as six.  All right.  In the

9    left of the theft instructions there's a -- you'll see

10   page 14, possession of recently stolen property.  He

11   wasn't found with any property on him, so take those

12   sections out.

13       **MS. SCOTT:**  Correct.

14       **THE COURT:**  Have you-all decided on lessers?  What

15   you want to do there?  Is it an all or nothing or do you

16   want lessers?

17       **MS. CITRARO:**  Can we leave that question till

18   tomorrow so I can discuss that question with him in

19   depth?

20       **MS. SCOTT:**  For what it's worth, I would ask for

21   lessers.

22       **THE COURT:**  Grand theft, petit theft between 100

23   and 300, and petit theft under 100?

24       **MS. SCOTT:**  Just the one petit theft, the first

25   one.  The -- actually, I'm not concerned about the

1    theft.  I'm concerned about the burglary.

2        **THE COURT:**  All right.  Well, I have got the theft

3    ones done.  I'll just leave them in there.  If you want

4    me to take them out tomorrow, I can take them out.

5        **MS. SCOTT:**  That's fine.

6        **THE COURT:**  And as far as the burglary goes, the

7    lessers there would be burglary of a structure, trespass

8    and an occupied structure and trespass.

9        **MS. SCOTT:**  I didn't ask for all of the trespasses

10    to remain.  I'm fine with taking out the burglary of a

11    structure.

12        **MS. CITRARO:**  I agree.  I see no reason.

13        **THE COURT:**  All right.  So I can take out burglary

14    of a structure and just leave the trespasses?

15        **MS. SCOTT:**  Just based on the facts I think that we

16    can still convict him of the trespass and not the

17    burglary.

18        **THE COURT:**  Trespass of an occupied structure and

19    trespass in a structure.

20        **MS. CITRARO:**  Would it make any difference if the

21    defense does not want those included and the State wants

22    them?

23        **THE COURT:**  If either side wants them, they are

24    category ones, they qualify.  So I would instruct them

25    on them.

1      **MS. CITRARO:**  So I'll take no position.

2      **THE COURT:**  So you want trespass in an occupied

3      structure and then simple trespass?

4      **MS. SCOTT:**  Right.

5      **THE COURT:**  So those will be the instructions on

6      one of the lessers.  Count II lessers, petit theft of

7      $100 or more, and then regular petit theft.

8      **MS. SCOTT:**  I don't -- petit theft of $100 more is

9      fine.

10      **THE COURT:**  Defense?

11      **MS. CITRARO:**  I'd ask that we leave them both in at

12      this time.

13      **THE COURT:**  All right.  I'll leave both of them in.

14      Any other special instructions or anything that anybody

15      wants added other than what we have here?

16      **MS. SCOTT:**  No, Judge.

17      **THE COURT:**  They are exactly the same except when

18      you get to the very last trespass in a structure, that

19      last paragraph is different.

20      Trespass in an occupied structure is not in the

21      trespass in a structure.  No other special instructions

22      or anything else you want me to add in?

23      **MS. CITRARO:**  No, Your Honor.

24      **THE COURT:**  What I will do is finish these up, send

25      them to you-all so you can have a completed draft that

1      you can discuss with your client and I'll see you-all

2      back here tomorrow morning at nine.

3           **MS. SCOTT:**  All right.

4           **THE COURT:**  Anything else that we need to address

5      before we break for the evening?

6           **MS. SCOTT:**  Not from the State.

7           **MS. CITRARO:**  No, Judge.

8           **THE COURT:**  All right.  I will see you-all back

9      here tomorrow morning at nine.

10           (The proceedings were concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

```
 1

 2                    C E R T I F I C A T E

 3

 4

 5   STATE OF FLORIDA:

 6   COUNTY OF ORANGE:

 7       I, Rebecca Ruiz, RPR, Official Court

 8   Reporter of the Ninth Judicial Circuit of Florida,

 9   do hereby certify pursuant to Florida Rules of Judicial

10   Administration 2.535(h)(3), that I was authorized to and did

11   report in stenographic shorthand the foregoing proceedings,

12   and that thereafter my stenographic shorthand notes

13   were transcribed to typewritten form by the process

14   of computer-aided transcription, and that the

15   foregoing pages contain a true and correct

16   transcription of my shorthand notes taken therein.

17

18       WITNESS my hand this _____ day of _____

19   2014, in the City of Orlando, County of Orange,

20   State of Florida.

21

22

23       _____

24           Rebecca Ruiz

25
```

1                      **IN THE CIRCUIT COURT OF THE**

                         **NINTH JUDICIAL CIRCUIT, IN AND**

2                      **FOR ORANGE COUNTY, FLORIDA**

                         **CRIMINAL JUSTICE DIVISION**

3

**STATE OF FLORIDA,**

4

     **PLAINTIFF,**

5                      **CASE NUMBER: 48-2013-CF-5146A/O**

  **vs.**

6                      **DIVISION NUMBER: 16**

**JORGE VALLE-RAMOS,**

7                      **VOLUME II OF II**

     **DEFENDANT./**

8

9                  **TRIAL PROCEEDINGS**

10                    **BEFORE**

11         **THE HONORABLE GREG TYNAN**

12

13                In the Orange County Courthouse

                   Courtroom 6D

14                Orlando, Florida 32801

                   May 22, 2014

15                Rebecca Ruiz

16

17  A P P E A R A N C E S:

18  **NATALIA SCOTT**

    Assistant State Attorney

19  415 North Orange Avenue

    Building B

20  Orlando, Florida 32801

    On behalf of the State

21

22  **CARLI CITRARO**

    Assistant Public Defender

23  435 North Orange Avenue

    Suite 400

24  Orlando, Florida 32801

    On behalf of Defendant

25

1                    I N D E X

2    TESTIMONY OF CHARLENE BLOOM

3         DIRECT EXAMINATION BY MS. CITRARO           178

4         CROSS-EXAMINATION BY MS. SCOTT              191

5         REDIRECT EXAMINATION BY MS. CITRARO         198

6    TESTIMONY OF JORGE VALLE-RAMOS

7         DIRECT EXAMINATION BY MS. CITRARO           199

8         CROSS-EXAMINATION BY MS. SCOTT              204

9    TESTIMONY OF JOY MORELLI

10        DIRECT EXAMINATION BY MS. SCOTT             209

11   CLOSING ARGUMENT BY MS. SCOTT                    225

12   CLOSING ARGUMENT BY MS. CITRARO                  245

13   REBUTTAL ARGUMENT BY MS. SCOTT                   254

14   CERTIFICATE OF REPORTER                          294

15                    E X H I B I T S

16   DEFENDANT'S EXHIBIT 2-4                          187

17   STATE'S EXHIBIT 4                                211

18   DEFENDANT'S EXHIBIT 5-6                          203

19

20

21

22

23

24

25

1                          -      -      -

2                     **P R O C E E D I N G S**

3         **THE COURT:**  Back on the record, State of Florida

4    versus Jorge Valle-Ramos.  All our jurors are now

5    present.  Is there anything that we need to do before we

6    bring the jurors back in and proceed with the remainder

7    of the defense's case?

8         **MS. SCOTT:**  Yes, Your Honor.  State, at this point,

9    wants to make an argument about something that we

10   discussed prior to trial beginning.  The criminal

11   bulletin that was issued in this case, we agreed that we

12   would not discuss it for purposes of prejudice to

13   defense.

14        Based on what was testified to yesterday, I believe

15   the argument at this point is 100 percent I.D, and that

16   the way the testimony came out, it's making it seem like

17   law enforcement pulled this photo out of thin air and

18   got this person out of thin air.

19        At this point the State would be moving to

20   introduce the criminal bulletin not for propensity

21   purposes but to prove I.D.  It wasn't Williams ruled

22   because I didn't know that's how the testimony was going

23   to happen.  I didn't know that was the argument the

24   defense was going to make.  Based on that testimony from

25   yesterday, I would ask that at this point for purposes

1    of I.D, to enter in the criminal bulletin.

2         **THE COURT:** Defense?

3         **MS. CITRARO:** Judge, when we did the motion in

4    limine, the purpose was not to keep it out entirely.  It

5    was to keep out the nature of the investigation to

6    another unrelated burglary as that would be prejudicial.

7    The fact if this comes in, I have already told Ms. Scott

8    I'm fine with that.  I just want it redacted.  The

9    pictures are fine.  The car is fine.  I just don't want

10   it saying criminal investigation for a burglary in the

11   area.  That is prejudicial on its face.

12        **MS. SCOTT:** And it might be prejudicial, but it

13   goes to the I.D of the defendant which I would say at

14   this point outweighs the prejudice he would experience

15   from it.

16        **THE COURT:** Let me see the bulletin.

17        **MS. SCOTT:** Simply entering photographs and not

18   saying where those photographs came from is no different

19   than what we did yesterday with the only photo lineup

20   saying here's the photo lineup even though law

21   enforcement testified he is the one that constructed it.

22   There's still nothing -- they are just photographs.  And

23   so at this point those photographs are being pulled from

24   thin air just like everything else.

25        The argument that defense is making to the jury at

1    this point is the defendant looks nothing like anybody

2    else in the photo lineup that is presented.  He is the

3    only one with that style of haircut.  It goes -- this is

4    completely an eyewitness identification case, so that

5    bulletin goes directly to I.D of the defendant.

6         **MS. CITRARO:**  If I may?

7         **THE COURT:**  Go ahead.

8         **MS. CITRARO:**  I don't understand how that goes to

9    any I.D.  Mr. Gonzalez isn't here to testify that he saw

10   that picture or he saw those pictures and that's what he

11   compared them to.  And he -- the State is saying I want

12   to enter this bulletin to show this is where the cops

13   got the idea of adding him.  This is where they got it.

14   And where did it come from?  From him being investigated

15   on another burglary.  There's no way to enter that into

16   evidence that that is not prejudicial which is why we

17   tried to keep it limited to some other purpose for a

18   stop.

19        Those pictures, fine, came out of the stop.  Those

20   are the I.D's that were collected, that's fine.  But the

21   fact that they were collected and were investigating

22   them for a burglary, that is prejudicial and it does not

23   outweigh on 403 purposes.

24        **THE COURT:**  This bulletin doesn't say anything

25   about a burglary.

1     **MS. SCOTT:**  It's a criminal investigation bulletin.

2     They are saying that these guys could have been involved

3     in some kind of investigation.

4     **THE COURT:**  The nature of it looks serious.

5     **MS. SCOTT:**  Judge, just because it looks serious

6     and looks bad doesn't mean that's not the standard that

7     we are applying.

8     **THE COURT:**  This says that an occupant, meaning

9     one, of a silver four-door Jetta was seen knocking on

10    doors to different houses and then entering the backyard

11    of another house.  Tact officer stopped the car that

12    same day, identified these four people inside the car.

13    There's no indication that Mr. Valle-Ramos is even one

14    that went into the backyard.  And it says that there was

15    no probable cause at that time.  And they said be on the

16    lookout for that vehicle.  If you come into contact with

17    the vehicle, get their information and notify -- looks

18    like Osceola County.

19    **MS. CITRARO:**  Judge, the other five pictures in the

20    photo lineup do not include those other three people.  A

21    sensible juror who sees that bulletin and knows there

22    was a connection made between that suspected burglary

23    and this suspected burglary and that Mr. Valle-Ramos's

24    picture is the only one that is in common with the two

25    investigations, it will become obvious that he is

1    suspected of another burglary.  That is a reasonable

2    conclusion to draw based on the evidence that she wants

3    to enter.

4        **MS. SCOTT:**  Judge, first, that was not -- again,

5    there's not a burglary in that picture or in that

6    bulletin.  The only thing they have are suspects.

7        **MS. CITRARO:**  Knocking on doors, entering property,

8    be on the lookout --

9        **MS. SCOTT:**  May I finish?

10       **THE COURT:**  Go ahead.

11       **MS. SCOTT:**  The argument that the State is

12   presenting right now has nothing to do with {potential

13   is I} just because he was there means he was here.  It

14   goes directly to I.D, and I.D in this case is identified

15   through a photo lineup where a detective constructed

16   that photo lineup based on information that he had from

17   another case.  This wasn't --

18       **THE COURT:**  Let me ask you this, this photograph

19   with his afro, when was that picture taken?

20       **MS. SCOTT:**  I have no idea.  That is his 2011

21   driver's license picture that we already entered into

22   evidence.

23       **THE COURT:**  Does anybody know that that's exactly

24   what it is?

25       **MS. SCOTT:**  I have the DAVID printout.  It looks

1    like the issue date on that was September 14, 2011.

2    However, it was replaced on February 8th of 2012.  So

3    it's not clear as to whether that photo was taken in

4    2011 or in 2012 since that's when the card was replaced.

5         **MS. CITRARO:**  He already testified to a date of

6    issuance.  That is when it was taken, even if it is

7    2012.

8         **THE COURT:**  I understand the reason.  My question

9    is, if this is a photograph that he was stopped on 4/3,

10   then it comes in.

11        **MS. CITRARO:**  That is not.

12        **THE COURT:**  That's why I asked you the question.

13        **MS. CITRARO:**  Okay.

14        **THE COURT:**  All right.  State, can you tell me why

15   it is you didn't file a Williams Rule notice?

16        **MS. SCOTT:**  Judge, I didn't know the arguments were

17   going to go the way they did.  Based on the testimony of

18   yesterday is when I knew what she is -- that she was

19   going to be arguing.  Obviously, I.D is always a common

20   defense that could be happening, but I have no idea

21   what's going to happen at trial.

22        The testimony yesterday that came out was made very

23   clear that after Mr. Valle-Ramos himself testified and

24   his friend testified that it's not a -- I wasn't -- it's

25   a complete misidentification is their argument.  I

1    didn't know that that was going to be the complete route

2    that they were going to go down literally until

3    yesterday.

4         I have a second issue in terms of evidence that --

5    once we get past this one.

6         **THE COURT:**  Well, what's the theory under which

7    this is admissible?

8         **MS. SCOTT:**  I.D.  It goes directly to why it is

9    that the detective picked that photo that he put in the

10   photo lineup of Mr. Valle-Ramos, why did he choose Mr.

11   Valle-Ramos to go into that photo lineup.

12        **THE COURT:**  He already testified under oath

13   yesterday he developed them as a suspect and that's the

14   reason he put them in a lineup.

15        **MS. SCOTT:**  Correct.  And then after defense

16   presented their case and cross-examined him, the only

17   thing that he was allowed to say at that point was he

18   put them in that photo lineup because of whatever means

19   he developed him as a suspect.  The way the defense is

20   presenting this to the jury now is he literally pulled

21   this guy out of thin air and found a person with an

22   afro, put him in a photo lineup and now we have an

23   innocent man accused.

24        That is misleading to the jury.  That is -- in a

25   completely eyewitness identification case, it would be

1    improper to leave them there.  If they are presented

2    with this type of evidence, they can then determine the

3    weight of that evidence.

4        **MS. CITRARO:**  If I may add something?

5        **THE COURT:**  You may.

6        **MS. CITRARO:**  We discussed before that we are not

7    denying that a stop occurred on that day.  But the State

8    is asking to have the detective testify the reason I was

9    suspecting him and put him in this lineup is because he

10   is suspected of another burglary.  That is the problem

11   with what he wants to connect.

12       If he wants to say there was a stop, that's fine.

13   That was the whole purpose of the motion in limine was

14   there was a stop for some purpose, but that purpose

15   cannot be told to the jury to be he's suspected of

16   another burglary.

17       **THE COURT:**  Well, the testimony that came out

18   yesterday was not there was a stop on 4/3, that there

19   was a stop on the day of the burglary, which was 4/9 and

20   that the stop on 4/9 was sometime after they were coming

21   back from playing basketball, and it was a stop for

22   speeding.  There has been no reference anywhere in this

23   record to any stop that happened three days or four days

24   or six days prior.  Am I missing something?

25       **MS. CITRARO:**  I mean, the testimony that came out

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1   during the course of the testimony yesterday was that he

2   was stopped after he was coming back from basketball on

3   the day of the burglary.

4       **THE COURT:** The activity observed on 4/3 and the

5   stop was that same day.

6       **MS. CITRARO:** May I look at the bulletin?

7       **THE COURT:** All right. Let me think about it and

8   I'll let you know what I'm going to do.

9       What else do we need to address?

10      **MS. SCOTT:** Judge, last night after the testimony

11  of the defendant, I contacted Detective Stanley on the

12  case as well as tried to get ahold of the arresting

13  officer in this case, I have the booking photo of the

14  defendant. He was booked, I believe, on 4/24. There

15  was significant testimony yesterday about his

16  appearance, how his hair looked during that time. I

17  have a printout from Orange County Corrections. I have

18  the Orange County Corrections officer here willing to

19  testify as a custodian of records to authenticate these

20  documents. It would be a late disclosure of a witness

21  and discovery based upon what was said yesterday,

22  probably about 5:30.

23      **THE COURT:** Let me see what you have. All right.

24  So what are you intending to move in?

25      **MS. SCOTT:** I'm sorry?

1    **THE COURT:**  What are you intending to move in?

2    **MS. SCOTT:**  Both of those documents, Judge.

3    **THE COURT:**  For what reason?

4    **MS. SCOTT:**  The hairstyle, that reason directly

5    contradicts to what defendant and his friend testified

6    to yesterday to what his hairstyle looked like.  That

7    was probably about two weeks after the event.

8    **THE COURT:**  Okay.  Well, if you want to introduce

9    it for the purposes of a hairstyle, there's no picture

10   on here.  Why is this coming in?

11   **MS. SCOTT:**  That is part of the document.  What she

12   was looking at on the screen, that was for a rule of

13   completeness.  That is the whole thing.  I'm fine with

14   not introducing the second thing.  I believe the date

15   and the photo is on the first page.

16   **THE COURT:**  All right.  Defense?

17   **MS. CITRARO:**  May I just see it one last time?  I'm

18   pretty sure I have no objection.  May I just have a

19   moment?

20        No objection to that coming in, Judge.  Just the

21   picture, not the second page.

22   **THE COURT:**  All right.  So no objection to this

23   picture coming in, the booking photo and the information

24   that's on that page?

25   **MS. CITRARO:**  Yeah.

1      **THE COURT:**  All right.  Without objection from the

2      defense, I will let you put it in.  I don't see any

3      reason to stick this information in since it doesn't

4      have a photograph on it.

5           All right.  Anything else that we need to address

6      before we bring the jurors back in?

7      **MS. CITRARO:**  No, Judge.

8      **MS. SCOTT:**  No.

9      **THE COURT:**  All right.  Let's go ahead and bring in

10     the jurors.

11          (Jury enters the courtroom.)

12     **THE COURT:**  All right.  Ladies and gentlemen,

13     welcome back.  I apologize for the delay.  We had some

14     issues that we needed to resolve this morning that has

15     now been taken care of.

16          Just a couple of questions over the evening.

17     Everybody followed the instructions that I gave you and

18     nobody did any research looking up of names, maps or

19     anything that had to do with this case, correct?  And

20     did anybody have any contact with you other than the

21     court deputies today?

22     **JURORS:**  No.

23     **THE COURT:**  With that said, we're ready to proceed

24     with the defense's case.

25          Defense, you may call your next witness.

1        **MS. CITRARO:**  Thank you, Judge.  Call Charlene

2    Bloom.

3    Thereupon,

4                          **CHARLENE BLOOM**

5    was called as a witness and, having first been duly sworn,

6    testified as follows:

7        **THE COURT:**  All right.  Ma'am, can you tell me your

8    full name, and spell your first and last name for me.

9        **THE WITNESS:**  Charlene Lizbeth Bloom.  B-L-O-O-M.

10       **THE COURT:**  All right.

11       Defense, you may inquire of the witness.

12       **MS. CITRARO:**  Thank you.

13       **THE WITNESS:**  I'm sorry?

14       **THE COURT:**  I just said that she can ask you

15    questions now.

16                        **DIRECT EXAMINATION**

17    **BY MS. CITRARO:**

18       **Q**    Good morning.

19       **A**    Good morning.

20       **Q**    Ms. Bloom, pardon my intimate question, but can you

21    tell the Court where you live, your address?

22       **A**    1708 Silver Creek Court, Orlando.

23       **Q**    Silver Creek Court, is that in the same subdivision

24    as Little Fall Circle?

25       **A**    Yes.  It's Hidden Creek Condominiums.

1     **Q**     Do you know Mr. Gonzalez, George Gonzalez?

2     **A**     I didn't until recently.

3     **Q**     Okay.

4     **A**     I had never really talked to him before.

5     **Q**     Are you familiar with where he lives?

6     **A**     I'm sorry?

7     **Q**     Are you familiar with where he lives?

8     **A**     Yes, now.

9     **Q**     Is it in the same subdivision?

10    **A**     Yes.

11    **Q**     Okay.  I'm gonna draw your attention to the events

12    of April 9th of last year, 2013.

13    **A**     Yes, ma'am.

14    **Q**     Did you see anything out of the ordinary that

15    morning around nine in the morning or so?

16    **A**     Yes, ma'am.  It was about 8:15.

17    **Q**     8:15?

18    **A**     Yeah.

19    **Q**     Can you tell the Court what you saw first?

20    **A**     Well, um, the dogs were barking in the complex

21    behind me because there's a fence between two complexes, and

22    the one dog never barks, so I got up and looked out.

23    **Q**     Where are you looking from exactly?

24    **A**     From my upstairs bedroom window.

25    **Q**     So you are on the second floor?

 1      **A**    Yes.  Well, it's two stories.  So I was on the

 2  second floor.

 3      **Q**    And you're looking out the window?

 4      **A**    That's correct.

 5      **Q**    Okay.  What did you see?

 6      **A**    Well, I saw that the gate behind the house, the

 7  next subdivision, was open and it never is.  So I wondered.

 8  So I stood for a few minutes and the neighbor next door came

 9  out, and he had heard the dog barking and went over there too

10  and looked.  He went over and looked, and it looked like

11  someone had tried to get in.  He closed the gate, came back

12  out, spoke to another neighbor who came out at that time and

13  I think it was about the same thing --

14      **Q**    Were you still in your bedroom looking out on all

15  of this?

16      **A**    Yes.  I'm still in the bedroom the whole time.

17      **Q**    Okay.  What did you see next?

18      **A**    So they were talking, and I just figured I'd see

19  what was going on.  So I stood there, and pretty soon it

20  looked like she got the phone.  So I figured she called the

21  police.  I didn't know.

22      **Q**    Do you know the woman?

23      **A**    A little while later the police came, but they came

24  into our side, our complex.  Because I can see from my window

25  directions -- both directions towards the lake and then

1    towards the street, which is the main street of the complex.

2        **Q**    So the police responded to your subdivision?

3        **A**    I saw the police over there, yeah.  Uh-huh.

4        **Q**    Did you notice any individuals or any suspicious

5    activity before the police arrived?

6        **A**    Um, right before they got there, um, I saw out of

7    the corner of my eye.  I could see that there was -- because

8    I was looking both directions -- that there were three guys

9    coming and I wouldn't have noticed them except that they took

10   off running to the vehicle, which I didn't realize there was

11   a vehicle.

12       **Q**    Where was the vehicle?

13       **A**    Behind my fence, like, directly behind my fence

14   where I couldn't really see it.  But they ran from the lake

15   area, like, they climbed the fence and ran towards the

16   vehicle.  If they hadn't run, I probably won't have noticed

17   it.

18       **Q**    And can you describe the female that you saw

19   running?

20       **A**    Yes.  There were three young men, probably early

21   twenties.  They all three had on long-sleeve dress shirts.

22   They looked like they were going to work or somewhere.  Um,

23   they ran.  There was a driver that had blond hair and was

24   kind of short, and there was two other guys.  One was -- they

25   got in the back passenger door.  The one on the right-hand

1    side was a short guy, kind of stocky.  The guy that was

2    closest to me was taller and thin, but not Hispanic or black,

3    either one.

4        **Q**    And could you describe more specifically the

5    driver?  Did you get a look at him?

6        **A**    I did.  I was looking -- I was looking out the

7    blinds and the driver was looking -- he looked -- turned

8    around to look at the guy, the man and the woman who had

9    their back to them so they didn't see them.  That's why I

10   went downstairs, because they didn't see the people that got

11   in the car.

12            So, um, he was standing at the car door and he was

13   kind of looking, and he looked up and he stood there for a

14   minute and just gazed at me.  I don't think he could see me,

15   but he could see me looking out, and he was blond.  He looked

16   like he was probably short, maybe 5'3", 5'4".  Maybe 5'5".

17   And he was dressed nicely.  Like I say, they looked like they

18   were going to work or to school or something.

19       **Q**    Okay.  On that day, April 9th when you were looking

20   at these guys, could you see pretty well?

21       **A**    I didn't have my glasses on, which I thought of

22   later, but I could see the people.  Of course, they

23   took -- they ran to the car and then they sped away.  And

24   without my glasses, there was no way I could look at a

25   license tag or anything.  But they were so fast that if they

1  hadn't done that too, that would have been another thing that

2  I wouldn't have noticed.

3      **Q**    So without your glasses, you couldn't read a tag?

4      **A**    I -- the other day I could kind of read a tag.  But

5  that morning I was tired.  I hadn't been to bed yet because I

6  was working midnight shifts prior to that, and it was kind of

7  still hard to go to sleep.  So I was tired.  So I couldn't

8  see the tag.  But they went so fast.  They were in a gray,

9  like a -- not a silver, but a gray sedan of some sort.  I

10 figured it was probably like a Hyundai or a Nissan, something

11 like that.  Kind of a 2000 -- earlier 2000 model.

12     **Q**    I'm guessing that your glasses are for distance?

13     **A**    They are for everything.

14     **Q**    Okay.

15     **A**    Yeah.

16     **Q**    Would you say your vision is pretty well without

17 the glasses?

18     **A**    Yes.  I can see people and animals.  So, you

19 know...

20     **Q**    So do you feel like you got a pretty clear look at

21 the driver's face?

22     **A**    I did.  I did.

23     **Q**    So you don't feel like your glasses, it was fuzzy

24 and you were not sure what you were seeing?

25     **A**    Not at all.  Not at all.  And the two people that

1    got in the back, I saw them, basically, from the side, but

2    when they got into the doors, I did see their faces.

3              **MS. CITRARO:**  May I approach the witness?

4              **THE COURT:**  You may.

5    **BY MS. CITRARO:**

6         **Q**    I'm showing you what's marked for identification

7    purposes only as Defense D.  Do you recognize this scene,

8    this view what you're looking at?

9         **A**    Yes, I do.

10        **Q**    Can you tell the Court what exactly is that a

11   picture of?

12        **A**    That's the entrance to my house to the left -- to

13   the right is the lake, because I think that that would have

14   been the way that the people that were at George's house

15   would have approached the lake because see, you can go to the

16   lake and climb the fence.  And that's what people do all the

17   time, because we are a gated community.

18        **Q**    And that would have been the direction that they

19   would have been coming from to get to the car?

20        **A**    Yes, that would be correct.  That would be correct.

21             **MS. CITRARO:**  May I approach the witness again?

22             **THE COURT:**  You may.

23   **BY MS. CITRARO:**

24        **Q**    Showing you what's marked for identification as

25   Defense F Composite 1 and 2.  There's two photographs here.

1    Take a look at both of them.

2        **A**    Okay.  Okay those are --

3        **Q**    Do you recognize them?

4        **A**    Yes, I do.

5        **Q**    What are you looking at?

6        **A**    Those are where the fence meets the lake on our

7    side of the property.  It has an extension, like a link

8    fence, and it's easy to go around it or climb it.  And the

9    same -- this is just a larger picture of the same view.

10        **Q**    Okay.  So would that be the fence that it would

11    make sense they were coming from?

12        **A**    Yes.  They would come from my side and go around it

13    or over it.  One of the two.

14            **MS. CITRARO:**  May I approach one more time?

15            **THE COURT:**  Yes, ma'am.

16    **BY MS. CITRARO:**

17        **Q**    This is Defense E for identification purposes.

18    There is two more pictures here.

19        **A**    Okay.

20        **Q**    Can you take a look at those?

21        **A**    Yes.  This is the back of my house and my complex.

22    It's the dog walk for the complex.  And there's a fence.  And

23    then it shows the next-door condo, which is Liberty Square, I

24    believe, condos on Lafayette Square Avenue or Lane.

25        **Q**    And the second picture?

1      **A**      Yes.  In the second picture is, um, where the

2  people were standing.  The car was below -- right below the

3  fence, right across from where the neighbors were standing,

4  but they were facing the other direction.

5      **Q**      Okay.  So the view that that picture is showing,

6  would that be your view from the bedroom window?

7      **A**      From my bedroom window, that's correct.

8      **Q**      So that would be exactly what you were seeing?

9      **A**      Exactly.  Exactly.

10      **Q**      And the vehicle would have been there where that

11  empty space is?

12      **A**      Yes.  It would have been right along the fence.

13  And as I say, I wouldn't have noticed it if they hadn't gone

14  to the car.  I didn't realize it was there until I saw them

15  running.  And then when they took off they sped away.

16      **Q**      Okay.  Judging by looking at that picture, does it

17  appear like it's been magnified, like it's closer than it is

18  or does that look about to be the right distance?

19          **THE WITNESS:**  That looks about the right distance.

20          **MS. CITRARO:**  May I approach?

21          **THE COURT:**  You may.

22          **MS. CITRARO:**  I'll move all three exhibits and

23          composites into evidence at this time.

24          **THE COURT:**  Any objection from the State?

25          **MS. SCOTT:**  No.

1        **MS. CITRARO:**  May I publish?

2        **THE COURT:**  All right.  What's been marked as

3    Defense Exhibit D for identification will be moved into

4    evidence as Defense Exhibit 2 without objection from the

5    State.

6        What's been marked as State's Exhibit E or Defense

7    Exhibit E for identification will be moved into evidence

8    as Defense Exhibit Number 3 without objection from the

9    State.

10        What's been marked as Defense Exhibit F for

11    identification will be moved into evidence as Defense

12    Exhibit Number 4 without objection from the State.

13        (Defendant's Exhibits 2-4 received in evidence.)

14        **MS. CITRARO:**  May I publish to the jury as soon as

15    it's marked?

16        **THE COURT:**  You may.

17    **BY MS. CITRARO:**

18        **Q**    Ms. Bloom?

19        **A**    Yes.

20        **Q**    On that date, April 9th, when you were looking at

21    these three fellows, the driver you said you got the best

22    look at?

23        **A**    Um, I did.

24        **Q**    Was the driver this man?

25        **A**    No.  No.

1    **Q**    Are you sure?

2    **A**    I'm positive.

3    **Q**    Could the driver have been this man with the large

4    Afro?

5    **A**    No.  No.  No one had an afro.  No one did.

6    **Q**    Could this man have been the other two passengers?

7    **A**    No.  No.

8    **Q**    Either one of them?

9    **A**    No.

10   **Q**    So this man does not look like the person that you

11   saw, any of these three men you saw get into that car?

12   **A**    No.

13   **Q**    And are you pretty sure of that?

14   **A**    I'm positive.

15   **Q**    You're positive?

16   **A**    Yeah.

17   **Q**    You wrote a statement for police?

18   **A**    I'm sorry?

19   **Q**    Did you speak with the police that day?

20   **A**    I did.  The reason I went down, the neighbors

21   didn't see them leave, and I thought I got to -- I know what

22   they look like.  So I went down to talk to him and I talked

23   through the fence, and then I went and drove around and gave

24   him a statement.  My statement was a little -- because I was

25   tired --

1        **MS. SCOTT:**  Objection, Your Honor, nonresponsive.

2        **THE COURT:**  Overruled.

3    **BY MS. CITRARO:**

4        **Q**    But you did write a statement in the matter?

5        **A**    I'm sorry?

6        **Q**    You did write a statement?

7        **A**    I did.

8        **Q**    Did the police talk to you any more about any

9    further investigation like a photo lineup or anything?

10       **A**    Well, they did call me and ask me if I could, you

11   know, if I knew what they looked like, and I explained, you

12   know, that I did.  But, um, I didn't talk to them until after

13   I got the paperwork, and the picture that I saw wasn't the

14   same person that was there and didn't appear to be this

15   gentleman either.  So...

16       **Q**    What picture did you see?

17       **A**    Oh, on the computer.  The mugshot.

18       **Q**    So you saw a mugshot --

19       **A**    Yes.

20       **Q**    -- of Mr. Valle-Ramos --

21       **A**    Right.

22       **Q**    -- after he was arrested in this?

23       **A**    Well, yes.  I had received two summons.  One said I

24   needed to come.  The second one said I didn't.  So I said,

25   well, I don't know who this is.  So I want to see if I knew

1    who he was, and it wasn't anyone that I have seen.

2         **Q**    So that picture, that mugshot, did you not think

3    that was the guy you saw and April 9th?

4         **A**    No.  Absolutely not.

5         **Q**    When did you offer to do any photo lineup?

6         **A**    Well, when he called me, I had explained that I had

7    looked at the picture and that it wasn't anyone that I had

8    seen, so for sure--

9         **Q**    So you didn't come in and do a photo lineup?

10        **A**    No.  He said he -- I didn't need to come for the

11   lineup.

12        **Q**    Okay.  Have the police contacted you at all after

13   that?

14        **A**    I'm sorry?

15        **Q**    Did the police contact you at all after that?

16        **A**    Someone else called me.  I talked to two different

17   people and, um -- but I can't remember what the second call

18   was about.

19        **Q**    They didn't ask you to come in for any other

20   identifications?

21        **A**    No.  No.  Just for the deposition to you.  That was

22   all.

23        **Q**    Okay.  Nothing further at this time.

24             **THE COURT:**  All right.  Cross-examination?

25                        **CROSS-EXAMINATION**

1   **BY MS. SCOTT:**

2   **Q**   Good morning, Ms. Bloom.

3   **A**   Good morning.

4   **Q**   Okay.  I want to take you back just a little bit.

5   **A**   Okay.

6   **Q**   What point did you get home the night before?  You

7   said you work midnight shift?

8   **A**   Well, I'm retired, and I had worked night shift for

9   many, many years so my sleep patterns are a little strange.

10  **Q**   Sure.

11  **A**   So I was home the whole night.

12  **Q**   Okay.

13  **A**   But I was up all night.

14  **Q**   Okay.  So you hadn't yet gone to bed?

15  **A**   Well, I was in bed.

16  **Q**   But not sleeping?

17  **A**   Not sleeping, no, trying to.

18  **Q**   Correct.  When was the last time you had actually

19  slept prior to that morning?

20  **A**   Um...

21  **Q**   Was it the night before?

22  **A**   During the --

23  **Q**   Or was it during the day?

24  **A**   I take naps during the evening.  (Laughing.)

25  **Q**   Okay.  Okay.  How long of a nap did you have?

1      **A**     Probably an hour, hour and a half, yeah.

2      **Q**     And prior to that, was it the previous night that

3    you had a full night's rest or the previous day?

4      **A**     No, during the day, yeah.

5      **Q**     Okay.  So probably about 24 hours before this

6    happened you were going on an hour's worth of sleep at this

7    point based on that nap?

8      **A**     Yeah, probably so.  Yeah.

9      **Q**     Do you -- at what point when you -- you stated you

10   looked out of the window and you noticed out of the corner of

11   your eye and you weren't wearing your glasses -- I presume

12   you weren't wearing your glasses because you were in bed,

13   correct?

14     **A**     Right.  Right.

15     **Q**     Normally speaking when you get out of bed, you grab

16   your glasses and put them on and continue with your day?

17     **A**     Normally I do, yeah.

18     **Q**     When you saw -- when you looked out the window and

19   you said you saw these people running --

20     **A**     Uh-huh.

21     **Q**     -- how far, if you had to give a feet estimation, I

22   know that's hard, but how far is your window from where these

23   people were?

24     **A**     Um, second floor, there's a fence.  Um, gosh, I

25   don't know.  Probably --

1      **Q**    Like 100 feet?

2      **A**    Maybe 50.

3      **Q**    Okay.

4      **A**    Yeah.  Maybe 50 feet.

5      **Q**    Okay.  And you stated before that you couldn't

6   really see the car from the angle and you probably

7   wouldn't --

8      **A**    I wasn't -- see what I did, the dog was barking --

9      **Q**    Uh-huh.

10     **A**    -- so I looked out because this particular dog

11  never barks.  The dog next door always barks and they were

12  both barking.  So that's what drew my attention to even look

13  out.  And I was just glancing, because I know the lake, so

14  I'm glancing at the lake and back, looking around to see

15  what, you know, was going on.  So I just -- I saw them come

16  out.  I saw him come out and check the gate next door because

17  it was wide open and the lady doesn't live there.

18     **Q**    Just to clarify, when you're observing all of this,

19  you are still on the second floor?

20     **A**    Yes.  And I didn't see the car at that point.

21     **Q**    And when -- at what point did you see the car?

22     **A**    Just when I saw them come from the lake running to

23  the vehicle.  And that's when I realized oh, there's a car

24  there.

25     **Q**    Okay.

1      **A**    And that caught my attention then.

2      **Q**    And then you looked at the car?

3      **A**    Yes.

4      **Q**    And then that's when you saw the driver?

5      **A**    Yes.

6      **Q**    Okay.  And there -- you stated before that they are

7   running, get in the car and speed away?

8      **A**    Yes.

9      **Q**    So it all happened very quickly?

10     **A**    Yes.  Except he stopped and looked up to try to see

11  which window it was, I guess.

12     **Q**    Right.  Would you say your memory -- when you see

13  something, would you say your memory is better closer to the

14  event that that happened, or later on in that?

15     **A**    Well, to be honest with you, I jotted it down,

16  because I thought, you know, when I went down and talked to

17  him, I thought I need to probably write this down.

18     **Q**    And him was law enforcement?

19     **A**    Yes, the police officer.

20     **Q**    And you wrote a statement that day?

21     **A**    I did.  Correct.

22     **Q**    Okay.

23          **MS. SCOTT:**  May I approach the witness?

24          **THE COURT:**  You may.

25

1    **BY MS. SCOTT:**

2        **Q**    Do you recognize that?

3        **A**    Yes.

4        **Q**    And is that your statement?

5        **A**    Yes.

6        **Q**    Can you read that statement to yourself and let me

7    know in there where you show -- where you tell the

8    description of the individuals other than what they are

9    wearing?

10       **A**    Okay.  Yes.

11       **Q**    Do you remember -- can you tell me from your

12   statement that you wrote that day what description did you

13   give to law enforcement as to these people that you saw?

14       **A**    I didn't give it to them much because I realized

15   later oh, I could have told them this, this and this, and I

16   didn't give it.

17       **Q**    But minutes after it happened, you didn't tell them

18   those details?

19       **A**    No.  No.

20       **Q**    Okay.  When you went downstairs, were there -- was

21   there -- who did you see when you went down there other than

22   law enforcement?

23       **A**    Okay.  There were the two neighbors on the other

24   side complex, they were standing talking, and then they had

25   their backs to the guys when they got in the car.

1    **Q**    Okay.

2    **A**    That's why I went down.

3    **Q**    One of the neighbors, is it a female?

4    **A**    Yes.

5    **Q**    Do you know who she is?

6    **A**    She's moved.  I didn't know her name.  I don't know

7    their names.

8    **Q**    Okay.

9    **A**    I just know who they are, you know.

10    **Q**    How long had you lived in that apartment complex?

11    **A**    Almost 14 years.

12    **Q**    Okay.  And I'm not trying to offend you, so please

13    excuse this question, but can you tell us how old you are?

14    **A**    I'm sorry?

15    **Q**    Can you tell us how old you are?

16    **A**    Yes, ma'am.  Sixty-five and a half.

17    **Q**    Okay.  Thank you.  Law enforcement, when you told

18    them, they didn't show you a photo lineup, right?  They never

19    ever went back out and showed you a photo lineup?

20    **A**    No.  No.

21    **Q**    And that was because when you called in response to

22    your subpoena, you said, the guy I looked up on the website

23    doesn't look like anybody that I saw?

24    **A**    Right.  When they called me, right.

25    **Q**    Okay.  And so the first time you had seen any

1   pictures was ones that you had looked up yourself months

2   after this event occurred?

3       **A**    Yes.  Because -- see, I received the first subpoena

4   probably in August.

5       **Q**    And this occurred back in April?

6       **A**    And then I got another one saying I didn't have to

7   come, so I thought well, I'll go look to see who it was, you

8   know.

9       **Q**    So just to clarify, this happens early April?

10      **A**    Uh-huh.

11      **Q**    You write your statement?

12      **A**    Uh-huh.

13      **Q**    You go on with your life, nothing happens with this

14  case, meaning no one is talking to you about it, no one is

15  showing you anything.  Then when did you say -- was it August

16  that you got the first subpoena?

17      **A**    August I got the subpoena, and I didn't know who it

18  was.

19      **Q**    And so in August you pull it up on the computer,

20  and that's when the first time you see a photo of anybody

21  related to anything that could be linked to the incident that

22  happened back in April?

23      **A**    That's correct.  That's correct.

24      **MS. SCOTT:**  Thank you.  I have no other questions.

25      **THE COURT:**  All right.  Any redirect?

1     **MS. CITRARO:**  Just briefly.

2                    **REDIRECT EXAMINATION**

3     **BY MS. CITRARO:**

4     **Q**     Did you get a look at pants or shorts?

5     **A**     Um, long pants.

6     **Q**     Long pants?

7     **A**     And long-sleeve shirts, dress shirts.

8     **Q**     Did you notice if they were wearing gloves?

9     **A**     No gloves.

10    **Q**     No gloves.  Did you notice any backpacks?

11    **A**     Nothing in their hands or anything, not carrying

12    anything.  No backpack or anything.

13    **Q**     Okay.

14    **A**     It might have been something different, I don't

15    know.  Because I didn't realize there was something going on

16    across the street where the actual thing happened until the

17    police officer told me that there was something over there,

18    too, in my complex, because I thought it was basically --

19    **Q**     And that's what turned out to be Mr. Gonzalez,

20    correct?

21    **A**     Right.  Uh-huh.

22    **Q**     Okay?

23    **MS. CITRARO:**  Nothing further.

24    **THE COURT:**  All right.  Thank you, ma'am.

25    **THE WITNESS:**  Thank you.

1        **THE COURT:**  Defense, call your next witness.

2        **MS. CITRARO:**  We will recall Mr. Valle-Ramos.

3    Thereupon,

4                        **JORGE VALLE-RAMOS**

5    was called as a witness and, having first been duly sworn,

6    testified as follows:

7        **THE COURT:**  All right.  You may inquire.

8        **MS. CITRARO:**  Should he spell the name again for

9        the record?

10        **THE COURT:**  No.  We have already got it once.

11        **MS. CITRARO:**  Okay.  Thank you.

12                        **DIRECT EXAMINATION**

13    **BY MS. CITRARO:**

14        **Q**    Good morning.

15        **A**    Good morning.

16        **Q**    I recalled you just for purposes of specifying what

17    your hair looked like in April of 2013, and you said

18    yesterday that you -- can you repeat how you wore your hair

19    then?

20        **A**    In a ponytail.

21        **Q**    So it was long enough to put back?

22        **A**    Yeah.

23        **Q**    So you didn't usually keep it out?

24        **A**    It would be too much.  No, I couldn't do it.

25        **MS. CITRARO:**  Okay.  May I approach the witness?

 1          **THE COURT:**  You may.

 2    **BY MS. CITRARO:**

 3      **Q**    I'm showing you what's marked for identification

 4    purposes only as Defense G.  Can you take a look at that and

 5    let me know if you recognize what this is?

 6      **A**    Yeah.  This is pictures of Christmas, 2012.

 7      **Q**    And how do you know that?

 8      **A**    It says it on there.

 9      **Q**    And where did those pictures come from?

10      **A**    My iPad.

11      **Q**    So those are your photos?

12      **A**    Yes.

13      **Q**    Does your iPad keep them dated?

14      **A**    Yes.

15      **Q**    Is that -- so that was 2012, so that was,

16    approximately, four months before --

17      **A**    Yes.

18      **Q**    -- what is alleged to have occurred at Mr.

19    Gonzalez's house?  Was that how you typically kept your hair

20    at that time?

21      **A**    Until I was able to put it in a full ponytail, yes.

22      **Q**    And how did you keep it at that time?

23      **A**    This time?

24      **Q**    Yes.

25      **A**    Well, it was almost in a ponytail.  So I would get

1   a headband and pull it up to right here.  So I would have a

2   puff back here.  And eventually, like two months after, I was

3   able to put it in a ponytail.  But if I just let it flare

4   out, it would be too much hair.  So that's why I put a

5   headband on to pull it back.

6       **Q**     So it was typical that you wear it back?

7       **A**     Yes.

8       **Q**     And that was in 2012?

9       **A**     Yes.

10          **MS. CITRARO:**  May I approach again?

11          **THE COURT:**  You may.

12  **BY MS. CITRARO:**

13      **Q**     Showing you what's marked for identification as

14  Defense H.  Let me know if you recognize that?

15      **A**     Yes.

16      **Q**     What is that a picture of?

17      **A**     It's a picture of me on February 8th, 2013.

18      **Q**     How do you know that that picture was from February

19  8th of 2013?

20      **A**     My iPad keeps dates on the pictures.

21      **Q**     Do you remember that picture?  Is that a picture of

22  you?

23      **A**     Yes.

24      **Q**     Okay.  Do you remember what is happening in that

25  picture?

1      **A**    Yes.  This is a picture of me taken by my

2  friend/associate, Ms. Arnette (ph).

3      **Q**    And do you remember the day -- do you know why it

4  was in February?

5      **A**    Because it was -- I moved into this apartment in

6  January, and my buddy Caesar was living with me for, like, a

7  month and a half.  So he left mid-February, and this is

8  February 8th, and I remember him taking this picture.

9      **Q**    Okay.  And how is your hair in that picture in

10  February of 2013?

11      **A**    Ponytail.

12      **Q**    So it was longer then in 2012?

13      **A**    Yes.

14      **Q**    You didn't put your hair in-between?

15      **A**    No.

16      **Q**    Okay.  Is that how you typically kept it then once

17  it gets to that length?

18      **A**    Yeah, all the time.

19      **Q**    So all the time you keep it back in a ponytail?

20      **A**    Yeah, unless I'm in the shower.

21      **Q**    And you continued to do that through April, May and

22  June?

23      **A**    Yes.

24      **Q**    When did you cut the afro off?

25      **A**    Around September, after the summer.

1    **Q**    Of last year?

2    **A**    Yeah.

3    **Q**    So you let it continue to grow?

4    **A**    Yes.

5    **Q**    And you never cut it in-between?

6    **A**    This?  Never.

7    **Q**    Okay.  How far did it eventually get?

8    **A**    Um, down to my nipples.

9    **Q**    Then you cut it?

10   **A**    Yes.

11   **MS. CITRARO:**  May I approach?

12   **THE COURT:**  You may.

13   **MS. CITRARO:**  I'll move both exhibits into evidence

14   at this time.

15   **THE COURT:**  Any objection from the State?

16   **MS. SCOTT:**  No, Your Honor.

17   **THE COURT:**  All right.  What has been marked as

18   Defense Exhibit G for identification will be moved into

19   evidence as Defense Exhibit Number 5 without objection

20   from the State.

21   What's been marked as Defense Exhibit H for

22   identification, without objection will be moved into

23   evidence as Defense Exhibit Number 6.

24   (Defendant's Exhibits 5-6 received in evidence.)

25   **MS. CITRARO:**  May I publish to the jury 5 and 6 as

1      well as one which was moved into evidence yesterday?

2          **THE COURT:**  Correct.  You may.

3          **MS. CITRARO:**  Thank you.

4  **BY MS. CITRARO:**

5      **Q**    Mr. Valle-Ramos, you were arrested on the warrant,

6  was it, April 24th of last year?

7      **A**    Yes.

8      **Q**    Did you keep your hair the same way then in a

9  ponytail?

10     **A**    Yes.

11         **MS. CITRARO:**  I have nothing further.

12         **THE COURT:**  Cross?

13                        **CROSS-EXAMINATION**

14  **BY MS. SCOTT:**

15     **Q**    Mr. Valle-Ramos --

16     **A**    Yes.

17     **Q**    -- yesterday you had testified that your hair at

18  the time that this happened, you looked like Tarzan and you

19  did this, you put your hand down to here?

20     **A**    Nipples.

21     **Q**    Right?

22     **A**    Yeah.

23     **Q**    When your hair -- let me show you this one.

24     **A**    Yes.

25     **Q**    This is February?

1    **A**    Yes.

2    **Q**    Right?

3    **A**    Yeah.

4    **Q**    March, April, two months later?

5    **A**    (Nods hair.)

6    **Q**    Your hair in this picture is probably about six to

7    seven inches away from your nipples?

8    **A**    No.

9    **Q**    No?

10   **A**    Oh, I mean, I'm wearing a hat.  It's puffy.

11   **Q**    Right.  I see that, but the back of your hair is

12   pulled back?

13   **A**    Yes.

14   **Q**    And you have it pulled back in a ponytail, and the

15   bottom of your hairline doesn't even hit your shoulders.  You

16   can see the wall between your neck and your shoulder?

17   **A**    It's in a ponytail.

18   **Q**    I understand.  It's pulled back?

19   **A**    If I took out the ponytail, then it would fall a

20   little bit more.

21   **Q**    And in this picture the texture of your hair if you

22   were to let the ponytail out, it would go out, correct?

23   **A**    Yeah, but fall more.  Fall more than out, because

24   at that time my hair was too heavy, so just be in a ball.

25   **Q**    I understand.  From that picture that you're

1    showing us that your attorney just put into evidence, your

2    hair is pulled back in a ponytail.  If you were to let that

3    down, give it maybe an inch or two at most?

4         **A**    Probably at my shoulders.

5         **Q**    Yesterday you told us it was here?

6         **A**    When I got arrested.

7         **Q**    Right.  That's April.  So you want the jury to

8    believe that your hair grew probably about 6 inches in two

9    months?

10        **A**    I mean, if I let that hair fall down, it would fall

11   down to my chest, still like to my shoulders right here,

12   right under my chin.

13            **MS. SCOTT:**  That's all I have, Judge.

14            **THE COURT:**  Okay.  Any redirect?

15            **MS. CITRARO:**  No redirect.

16            **THE COURT:**  All right.  Going to have you have a

17        seat back at the table.

18            All right.  Defense, call your next witness.

19            **MS. CITRARO:**  Defense rests.

20            **THE COURT:**  Does the State wish to present a

21        rebuttal case?

22            **MS. SCOTT:**  Yes, Your Honor.

23            **THE COURT:**  Call your first witness.

24            **MS. SCOTT:**  May we have a ruling on the previous

25        issue?

1    **THE COURT:**  Come on up.

2    (Conference at the bench held on the record.)

3    **THE COURT:**  If the purpose of this coming in is to

4    prove identity, it seems to be evidence of a prior bad

5    act.  It is not substantially similar.  For purposes of

6    prior bad acts under the evidence code, it would need to

7    be substantially similar, almost like a fingerprint.

8    The only thing that this indicates is that somebody in

9    that car, and it doesn't say who --

10   **MS. SCOTT:**  Right.

11   **THE COURT:**  -- was knocking on doors, and then went

12   into the backyard.

13   **MS. SCOTT:**  I would ask for a proffer from the

14   detective as to what he can testify to as to his

15   personal knowledge as to the facts of that.  And if he

16   can, if he can testify to the nature of where they were

17   located in proximity to this residence as well as what

18   it was that it was reported happening, I believe I can

19   establish those facts.

20   **THE COURT:**  Let's assume it's within close

21   proximity.

22   **MS. SCOTT:**  Close proximity, neighbor hears noise

23   going in from his house, going into backyards.

24   **THE COURT:**  Well, this indicates they went and

25   knocked on front doors and went into one backyard.  No

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1    other information.

2         **MS. SCOTT:**  Correct.  The evidence in our case

3    shows that the point of entry was through the front door

4    of one residence and they left through the backyard of

5    the same residence in the close proximity of the same

6    area.  I would say based on timing of when it occurred,

7    where it occurred, point of entry and exit, those are

8    always facts that would be substantially similar.

9         **THE COURT:**  I don't see it.

10        **MS. SCOTT:**  Okay.

11        **THE COURT:**  So I'm gonna not permit it to come in.

12        (The following was in open court.)

13        **THE COURT:**  All right.  Call your first witness.

14        **MS. SCOTT:**  State calls Joy Morelli.

15   Thereupon,

16                      **JOY MORELLI**

17   was called as a witness and, having first been duly sworn,

18   testified as follows:

19        **THE COURT:**  Ma'am, have a seat.  Once you get

20   seated, go ahead, tell me your first and last name, and

21   spell both for me, please.

22        **THE WITNESS:**  Joy Morelli.  J-O-Y M-O-R-E-L-L-I.

23        **THE COURT:**  State, you may inquire.

24        **MS. SCOTT:**  Thank you.

25                  **DIRECT EXAMINATION**

1    **BY MS. SCOTT:**

2        **Q**    Good morning.

3        **A**    Good morning.

4        **Q**    Ms. Morelli, can you tell the jury what you do for

5    a living?

6        **A**    I am an administrative sergeant with Orange County

7    Corrections.

8        **Q**    Okay.  And where, physically, do you work?

9        **A**    I work at the 33rd Street jail off of John Young

10   Parkway.

11       **Q**    And as part of administrative sergeant, what do

12   your regular duties entail?

13       **A**    Um --

14       **Q**    Generally speaking.

15       **A**    Generally speaking, I do administrative work for

16   the major.  I am also the records keeper for all video and

17   photo information.

18       **Q**    Okay.  Are you the custodian of records for Orange

19   County Jail?

20       **A**    Yes, I am.

21           **MS. SCOTT:**  May I approach the witness?

22           **THE COURT:**  You may.

23   **BY MS. SCOTT:**

24       **Q**    I am handing you what's been previously marked as

25   State's Exhibit D for identification.  Do you recognize that?

1      **A**     Yes, I do.

2      **Q**     And what do you recognize that as?

3      **A**     That is the booking picture for this inmate.

4      **Q**     And how do you know it's a booking picture?

5      **A**     Other than the fact that I printed it off this

6      morning?

7      **Q**     Correct.

8      **A**     It is out of our inmate management system.

9      **Q**     Do you recognize that screen shot that you're

10     looking at?

11     **A**     Yes, I do.

12     **Q**     Do you recognize the numbers and the codes and

13     everything else that's in there?

14     **A**     Yes, I do.

15     **Q**     And is that a document that's kept in the regular

16     course of business in your position?

17     **A**     Yes, it is.

18           **MS. SCOTT:**  At this time the State moves what's

19           been previously marked as State's D into evidence as

20           State's 4.

21           **THE COURT:**  Any objection?

22           **MS. CITRARO:**  No objection.

23           **THE COURT:**  Without objection from the defense,

24           what's been marked as State's Exhibit D for

25           identification will be moved into evidence as State's

1        Exhibit 4.

2                (State's Exhibit 4 received in evidence.)

3                **MS. SCOTT:** Permission to publish, Judge?

4                **THE COURT:** You may.

5    **BY MS. SCOTT:**

6        **Q**    Can you read what the date on that is?

7        **A**    Yes, it is 4/24/2013.

8        **Q**    Okay.  And what does that date signify?

9        **A**    That is the arrest date.

10       **Q**    And is the arrest date the same day that this

11   picture would have been taken?

12       **A**    Yes.

13       **Q**    Okay.

14               **MS. SCOTT:** Handing to the members of the jury.

15               The quality of the photograph did not display very well

16               on the overhead.

17   **BY MS. SCOTT:**

18       **Q**    Is there any confusion as to when that picture

19   could have been taken?

20       **A**    No.

21       **Q**    Okay.  How -- can you briefly explain the process

22   when somebody arrives to the Orange County Jail and they are

23   about to get booked, what physically happens to them when

24   they first get there?

25       **A**    When the law enforcement officer brings him into

1    the facility, they are seen by medical, taken to the LEO

2    lobby where the paperwork is processed.  It is turned over to

3    our inmate records management department which puts all of

4    the information into the system.  Once the inmate's

5    information and arrest information is in the system and to

6    the IMS system, the inmate is called up to the window, a

7    picture is taken and attached to that arrest, and then filed

8    into the system.

9        **Q**    So there's no possibility that a picture gets

10   separated from paperwork as the person moves on through the

11   channels, it all happens at the same time?

12       **A**    It is all attached inside the computer system.

13       **MS. SCOTT:**  Thank you.  I have nothing further.

14       **THE COURT:**  Okay.  Any cross?

15       **MS. CITRARO:**  I have no questions.

16       **THE COURT:**  Thank you, ma'am.

17       **MS. SCOTT:**  State rests.

18       **THE COURT:**  Ladies and gentlemen, there is legal

19       matters I have to take up outside your presence.  I

20       suspect what will happen is we will give you

21       instructions on closing arguments, go through the

22       closing arguments, and I will read you the jury

23       instructions and send you out to deliberate.

24          Okay.  So if you will excuse us for a few minutes,

25       as soon as we are ready, we will bring you back in.

1                    (Jury exits the courtroom.)

2          **THE COURT:**  Any motions from the defense?

3          **MS. CITRARO:**  Yes, Judge.  I'll move for a judgment

4     of acquittal as to Count II of the information, grand

5     theft third degree.  Judge, the sole witness who put any

6     testimony on about what was stolen was Mr. Gonzalez.

7          **THE COURT:**  What he reported to the jury, my notes,

8     show sterling silver and a necklace with gem stones, a

9     gold wedding band, and some fake jewelry.  Estimated

10    value, he said, wholesale, seven to eight thousand

11    dollars.  And as for the gold wedding band, I believe

12    five to $700, approximately.  I don't believe there was

13    any further testimony regarding the condition or any

14    specifics or the length of time that he had these items.

15         **MS. CITRARO:**  Um, I have got three cases for you

16    regarding a situation like this.  May I?

17         **THE COURT:**  Yep.

18         **MS. CITRARO:**  Where there's insufficient evidence

19    as to value in a grand theft charge, value is extremely

20    important and it must be proven by the State.  Value

21    means market value of the property at the time and place

22    of the offense.  If such -- I'm sorry.  I'm reading from

23    *Doane v. State*, 847 So.2d 1015.  This is a Fifth

24    District case.  The market value of the property at the

25    time and place of the offense or if such cannot be

1    satisfactorily ascertained, the cost of replacement of

2    the property within a reasonable time after the offense.

3        The common two-prong test requires, first,

4    determining whether or not the person is competent to

5    testify to the property and the value.  Owner is

6    generally presumed competent.  However, mere ownership

7    is not sufficient.

8        Second, if the person is competent, the Court must

9    ascertain by whether the evidence adduced at trial is

10   sufficient to prove that the property was worth over

11   $300 at the time of the theft.  Absent direct testimony

12   of the market value of the property, proof may be

13   established through the following factors:  Original

14   market cost, manner in which the item's been used,

15   general condition and quality, and the percentage of

16   depreciation since its purchase or construction.

17       There are several causes that are listed in here.

18   Um, generally finding that items will probably be worth

19   two or $300 or worth at least that much, that's not

20   sufficient.  Items roughly in excess of $300, not

21   sufficient.  The facts in this specific case of *Doane v.*

22   *State*, he testified that he paid $1,588 in '97, and $320

23   for a second item, and then replaced it for more than

24   $3000, but it was a different model computer that was in

25   question.

1          The testimony could be competently coming from that

2     witness; however, insufficient to prove that the

3     property was worth over $300 at the time of the theft.

4     State didn't adduce any other direct testimony about the

5     market value.  No testimony was taken in which the

6     manner of it being used and the general condition,

7     quality and depreciation of percentage.  All of those

8     things that were missing from the *Doane* case are also

9     missing in this case.  All we know is he said it was

10    worth this much wholesale when at the time of purchase

11    later was what was it used for, what is the condition of

12    it.  Depreciation.  Nothing was ever testified to

13    regarding that.

14         I have also given the Court *Sanchez v. State*, 101

15    So.3d 1283.  And that is a Fourth DCA opinion.  In that

16    case they are talking about a petit theft, but they have

17    to still show it was over $100 in order to prove that.

18    They applied the same two-prong test, and the Court

19    especially notes rather than offering up their opinion

20    an owner estimate of the value of stolen property must

21    be supported by facts that show enough familiarity with

22    the property to lend credence to the opinion.

23         Florida courts have found that an owner's opinion

24    of fair market value is sufficient where it's supported

25    by evidence establishing the condition, quality, age or

1      depreciation of the age of the item at the time it was

2      stolen.  By contrast where the value of the property is

3      estimated and no other proof is presented, the

4      owner -- the owner's evidence is insufficient to prove

5      fair market value.

6          They give a couple other examples of cases in here,

7      and in this specific case they find the State failed to

8      support the opinions made at trial by additional

9      evidence of value and didn't establish market value of

10     the items taken.  Thus, the Court had to grant a

11     jury -- a judgment of acquittal down to a petit theft

12     second degree.

13         Also given *Mansfield v. State*, 954 So.2d 74, also

14     out of the Fourth DCA.  Again, same analysis in that

15     case.  Witness and the testimony didn't meet either

16     prong.  The person who testified didn't buy it, and they

17     only testified as to the cost at the time of purchase

18     and didn't have any personal knowledge of depreciation

19     or use.  Though Mr. Gonzalez may have purchased these

20     items, there is no further testimony about their use,

21     depreciation, condition or market value at the time of

22     the theft.  And the State didn't offer any of that

23     evidence in support of finding that the value was over

24     $300.

25         As a result of the lack of evidence, I would ask

1    that the Court grant a judgment of acquittal as to the

2    grand theft, which I think should take it down to a

3    second degree misdemeanor petit theft if value cannot be

4    proven over $100 either.

5         **THE COURT:**  State?

6         **MS. SCOTT:**  Your Honor, Mr. Gonzalez testified that

7    he had rings, necklaces and he kept them in the closet.

8    He specifically said some of the sterling silver pieces

9    he was keeping them there.  That, I believe, is enough

10   testimony when he's saying he's keeping them in his

11   closet that he's keeping them, meaning they are just

12   sitting there not being used.  They are just being

13   stored.

14        When he is -- when he spoke about the value, he

15   said it was between 7000 to 8000 dollars on the sterling

16   silver alone.  He said that the wedding band itself was

17   gold and it was 500 to $700.  It's not -- the case that

18   defense has presented about the depreciation of value,

19   um, first one, *Doane v. State*, we are talking about

20   computers, depreciating the value.  That is a 2003 case,

21   and they are talking about computers they purchased in

22   1997, electronics and depreciation.  It obviously is

23   going to happen.  That testimony would, obviously, be

24   relevant for jewelry that he said he had always had in

25   his possession.  No one else has ever touched it.  It's

1    been in his possession.  He's been keeping it.  He's

2    been storing it.  And the fact that he estimated that

3    value also in the *Doane* case he -- one of the things

4    that they pointed out was the testimony of the owner's

5    property, said quote, owner estimated property value at

6    about $310, something like that, on a grand theft charge

7    where 300 is the threshold.

8         If we are $10 off, then yes, that -- if we are

9    going down to that small amount of money, um, I would

10   agree that in that kind of case we would have to provide

11   additional documentation as to that value.  In terms of

12   this value, we are talking about $8,000.00.  I have to

13   meet a burden of $300.  His intimate knowledge of it,

14   his familiarity with the items themselves, the fact that

15   he said no one else had them, just him, based on the

16   collective testimony that he provided, I believe the

17   jury could find beyond a reasonable doubt in the light

18   most favorable to the State.  We would ask you deny the

19   judgment of acquittal.

20        **THE COURT:**  Anything further from the defense?

21        **MS. CITRARO:**  I just add that Mr. Gonzalez's

22   testimony, that is an estimate, and it wasn't supported

23   by any additional evidence.  It is his speculation.

24   Keeping it in his closet doesn't indicate the condition

25   of it.  It certainly could have depreciated over time or

1    the conditions of the property.  Who knows what his

2    closet looks like?  The same two-prong test that was

3    applied in the cases that I have provided to the Court

4    should be applied here, and the evidence is insufficient

5    under those cases.

6        **MS. SCOTT:**  Judge, I'm not required to prove value.

7    I don't need to provide receipts or anything of that?

8    All I need to do is show the witness is familiar enough

9    with the property to put a value on it.  When he said

10   the value, he said the wholesale value is this and this.

11   It wasn't a ballpark guess.  It wasn't a, I think it's

12   this.  It wasn't $10 over the required amount.  It was a

13   significant amount of money that he was talking about.

14       **THE COURT:**  All right.  Not only did Mr. Gonzalez

15   testify as to the necklaces and the jewelry and the

16   rings that were sterling silver and placed a wholesale

17   value on the items, 7000 to 8000 dollars, he also

18   indicated when he bought them.  But there was also

19   testimony that there were coins taken as well as knives.

20   And there's a photograph in evidence of quite a big pile

21   of quarters, an awful lot of quarters in the

22   photographs.

23       Um, so I'm going to go ahead and deny the judgment

24   of acquittal as it relates to Count II based upon his

25   testimony, the photographs in evidence, plus the fact

1   that he indicated that there were knives that were

2   taken, there were coins that were taken.  There are

3   photographs of that number of coins that were taken and

4   then based upon the mere value that he placed on that

5   wholesale, that being 7000 to 8000 dollars, seems to

6   indicate that that is quite a large number of pieces of

7   jewelry that were taken.  So I'm gonna deny the judgment

8   of acquittal.

9        **MS. CITRARO:**  And if I may just place on the record

10   that my objection to the Court's finding that the coins

11   are going to add value over $300.  There has been no

12   evidence as to what the total amount of those coins is

13   or whether or not it makes the value $300.

14        **THE COURT:**  I know.  There is a photograph in

15   evidence and the jury can make an assessment of that.

16        All right.  Any other motions?

17        **MS. SCOTT:**  No.

18        **MS. CITRARO:**  No.

19        **MS. SCOTT:**  I just sent you the verdict form.  Does

20   Your Honor have a copy of the jury instructions?

21        **THE COURT:**  I sent them to you-all last night.  Are

22   we still doing the same lessers as we said yesterday?

23        **MS. SCOTT:**  Yes.  I just need to modify the verdict

24   form and send it right now.  On Count II, did we say

25   both petit thefts or just one?

1    **MS. CITRARO:**  I think we said we can keep both.

2    And I'll just note I'm not sure if it will just make it

3    less confusing, but the lesser included offense petit

4    theft first degree, could we note that as petit theft

5    over $100 or more and then petit theft of less than

6    $100, instead of first and second degree?

7    **THE COURT:**  Right.  So the second page should say

8    lesser included petit theft of $100 or more.  Then the

9    one after that should just say petit theft, nothing

10   more.  And then on Count I, it needs to be trespass in

11   an occupied structure and trespass in a structure.

12   **MS. SCOTT:**  You said trespass in an occupied

13   structure and then simple trespass in a structure?

14   **THE COURT:**  Correct.  Have you seen a copy of the

15   verdict forms?

16   **MS. CITRARO:**  That's fine.  No objection.

17   **THE COURT:**  Do you each have your copies of the

18   jury instructions that I emailed to you?

19   **MS. CITRARO:**  The ones from last night, yes.

20   **MS. SCOTT:**  Yes.

21   **MS. CITRARO:**  And I reviewed them.

22   **THE COURT:**  Do have you them up on your computer?

23   **MS. CITRARO:**  Yes.

24   **THE COURT:**  Mr. Valle-Ramos, have you had an

25   opportunity to look at the jury instructions?

1    **THE DEFENDANT:** Yes, sir.

2    **MS. SCOTT:** I'd like a physical copy for closing.

3    **THE COURT:** I'll give you one. So you had an

4    opportunity to review them last night, State?

5    **MS. SCOTT:** I reviewed them this morning, Judge.

6    **THE COURT:** Any objections, corrections, additions

7    or deletions?

8    **MS. SCOTT:** No.

9    **THE COURT:** Defense, you had an opportunity to

10    review them since last night?

11    **MS. CITRARO:** Yes.

12    **THE COURT:** Any additions, corrections,

13    modifications or deletions?

14    **MS. CITRARO:** No, Judge.

15    **THE COURT:** Mr. Valle-Ramos, have you had an

16    opportunity to review them?

17    **THE DEFENDANT:** Yes.

18    **THE COURT:** Do you want any corrections, additions,

19    modifications or deletions?

20    **THE DEFENDANT:** No.

21    **THE COURT:** And you have been able to participate

22    in lessers and the instructions have been given. Are

23    you satisfied with the instructions that are going to be

24    given as well as the lesser included offenses?

25    **THE DEFENDANT:** Yes.

1      **THE COURT:**  And your attorney earlier rested her

2      case, and I know we discussed this previously, but there

3      are no other witnesses and no other evidence that you

4      want presented other than what's been placed in the

5      record at this point, correct?

6      **THE DEFENDANT:**  Yes.

7      **THE COURT:**  Okay.  Let me print two copies, one for

8      each of you, so we can get that started.

9      **MS. CITRARO:**  If I can just note for the record

10     regarding additions or modifications.  Defense is still

11     asking for the specific instructions that were moved by

12     way of the written motion.  The Court has already

13     denied.

14     **THE COURT:**  Right.

15     State and defense, here's a copy for you to use for

16     purposes of clothing.  The other copies will be coming

17     down shortly.

18     Does the defense intend to concede any elements of

19     the offense?

20     **MS. CITRARO:**  Well, by nature of the argument, we

21     are conceding a burglary of a dwelling that occurred,

22     but the issue is the identification.

23     **THE COURT:**  Mr. Valle-Ramos, you understand that's

24     the theory of your defense and she will be conceding

25     that there is a burglary that occurred and that a theft

1      occurred, but it's just not you?

2          **THE DEFENDANT:**  Yes, sir.

3          **THE COURT:**  And you're in agreement with that

4      defense?

5          **THE DEFENDANT:**  Yeah.

6          **THE COURT:**  Anything else we need to address before

7      we start?  All right.  Did they finish making their

8      orders?

9          **COURT DEPUTY:**  Yes.

10         **THE COURT:**  Any reason why we can't bring the

11     jurors back in at this point and continue with the

12     closings?

13         **MS. SCOTT:**  No, Your Honor.

14         **MS. CITRARO:**  No, Judge.

15         **THE COURT:**  Let's go ahead and bring the jurors

16     back in.

17              (Jury enters the courtroom.)

18         **THE COURT:**  Ladies and gentlemen, at this time both

19     the State and the defense have now rested their cases.

20     The attorneys will now present their final arguments to

21     you.  Please remember that what the attorneys say is not

22     evidence, nor your instructions on the law.  However, do

23     listen closely to their arguments.  They are intended to

24     aid you in understanding the case.

25              Each side will have equal time, but the State is

1    entitled to divide that time between opening argument

2    and a rebuttal argument after the State (sic) has

3    spoken.

4        State wish to give their closing argument at this

5    time?

6        **MS. SCOTT:**  Yes, Your Honor.

7        **THE COURT:**  You may do so.

8        **MS. SCOTT:**  You've heard the same story being told

9    by three different people today, or including yesterday.

10   Almost comical as to the differences in the story.

11   Because from what Ms. Bloom testified to today, it's as

12   if she was at a completely different house and saw

13   something completely different.

14       I want to take her testimony, as well as the

15   testimony of Mr. Gonzalez and Ms. Szewczyk one by one.

16   One of the first things I want to go over with you is --

17   we had discussed this in jury selection -- a couple of

18   key things.  One of the things we discussed were

19   elements.  I have to prove to you elements beyond and to

20   the exclusion of every reasonable doubt.  That's it.  I

21   don't have to prove to you details that aren't elements.

22       The judge is gonna instruct you on the law.  He's

23   gonna give you a printout.  You are not gonna have to

24   memorize any of this.  He'll read it to you and then

25   you'll be able to take it back with you.  But I want to

1    go over some of those elements with you right now.

2        First charge in this case is burglary of a

3    dwelling.  The instructions are gonna read, to prove the

4    crime of burglary, the State must prove the following

5    two elements beyond a reasonable doubt.  Jorge

6    Valle-Ramos entered a structure owned by or in the

7    possession of George Gonzalez, and at the time of

8    entering the structure, Jorge Valle-Ramos had the intent

9    to commit an offense other than burglary or trespass in

10   that structure.  You may infer that Jorge Valle-Ramos

11   had the intent to commit a crime inside a structure if

12   the entering of the structure was done stealthily and

13   without the consent of the owner or the occupants.

14       Mr. Gonzalez was clear as day to you.  No one had

15   any permission to be in his house.  Nobody.  He lived

16   alone.  He wasn't expecting anybody.  Nothing.  He comes

17   home that morning, early-morning, that's when this

18   burglary occurred.  It occurred around nine o'clock.

19   Generally no one is home at that time because people are

20   at work.  Mr. Gonzalez comes home, he is surprised to

21   find somebody in his house.  Who else is surprised?  Is

22   that guy, Mr. Valle-Ramos.

23       We know he was surprised because him and Mr.

24   Gonzalez -- Mr. Gonzalez testified he got maybe this

25   close to him.  And they stared at one another for a full

1    seven to ten seconds because they both froze.  Some guy

2    is in my house, and Mr. Valle-Ramos is burglarizing that

3    house and some guy comes home.  Both are equally

4    surprised to see one another.  So we have this kind of

5    thing going on, crap, what just happened?  Is what's

6    going through their mind.

7         At that point Mr. Gonzalez realizes what's

8    happening.  His house got broken into.  Clearly doesn't

9    know this man, and he starts -- he says he exchanged

10   words with him, and at that point Jorge Valle-Ramos

11   bails.  He runs out the back.

12        Now, Mr. Gonzalez, as you saw, is a feisty guy.

13   He's not letting these people go.  At this point he

14   knows there's one, but there's one person inside his

15   house, so he goes after him.  He starts chasing after

16   him.  He jumps over a fence, he's out.  He can see him

17   going and he loses him.  He loses sight.  He says he

18   tries to go out the front, tries to cut him off, but at

19   that point he loses him.  So he goes back into the

20   house.

21        One thing -- I want to just kind of interrupt

22   myself here.  If there's anything that we say that is

23   different from what you remember, please rely on your

24   own memory and your notes.  If there is something that

25   you don't remember, everything is being written down.

1    You are allowed you to ask the court reporter to read

2    back any testimony.  Please rely on your own

3    recollection or, if needed, that of the court reporter.

4         He comes out, cuts them off, tries to cut him off,

5    gets away.  Gets back in the house, lo and behold

6    there's more people inside the house.  Now there's a guy

7    coming down the stairs.  He's going up the stairs and he

8    says, boom, they collided like in the midst, he said.

9    At that point he gets him in a headlock.  He's got his

10   mace or his pepper spray.

11        The third guy comes down.  He's fighting with this

12   guy, third guy coming down.  He's trying to spray these

13   people.  He's not looking at these peoples' faces for

14   obvious reasons.  One is in a headlock, the other one is

15   coming after him, and he's spraying him with a weapon.

16   What he's focusing on right now, per his testimony, is

17   there more?  Are there more people?  Were these the only

18   guys?  Do they have guns?  Do they have knives?  I don't

19   know what's happening.

20        Right now the goal now is to defend myself and to

21   try to keep these people before cops get there.  There

22   was not the same interaction that he had with

23   Valle-Ramos.  Valle-Ramos stared.  There is nothing

24   interfering with him at that point.  Nothing.  He saw

25   his face clear as day.

1       We went through jury selection and I asked the

2    question with individuals, describe features of myself.

3    No one could do that, and I was standing directly in

4    front of you.  Just because someone can't describe

5    somebody doesn't mean they can't recognize them.

6       In an event that Mr. Gonzalez just testified to in

7    telling you how terrified he was, how surprised he was

8    that somebody was in his house, people remember

9    something like that.  This isn't an individual you just

10   saw walking on the street.  This was a big deal.  He's

11   focused on his face.  He's not focused on his shoes.

12   He's not focused on his pants.  He's looking at his

13   face.  Straight at him.  A man will not forget that.

14      We know he won't forget that because once law

15   enforcement arrived, he describes this individual to

16   him.  No suspects at that point were given to Mr.

17   Gonzalez, but a few months later he was presented with a

18   photo lineup -- or excuse me -- a few days later.  This

19   is the photo lineup he was presented with.  This is in

20   evidence.  You'll be able to take this back.

21      He said, without hesitation, immediately pointed to

22   that man.  He circled it, initialed it.  He is, like, no

23   doubt, 100 percent that's the guy.  He was so emphatic

24   about it that when he was on the stand, I couldn't even

25   get the question out.  He's like, he's right there.

1    He's sitting right there.  Because he's that sure that

2    it's him.

3        What did he say about the other individuals?  He

4    says, I didn't see their faces well enough to make an

5    I.D.  So if the argument is he's just picking out any

6    guy with an afro or he's just picking out that guy

7    because he happens to be sitting at defense table, he

8    could have done that for the other two people and he

9    didn't, because he told you flat out, he's like, I can't

10   I can't positively I.D them, so I'm not going to because

11   I'm not sure.

12       He took that oath that he took in front of you

13   seriously, and he's telling the truth to you just like

14   he was telling the truth to law enforcement when he

15   picked this guy out.  He told you that when this was

16   presented to him -- the detective told you that when

17   this was presented him, it was in an envelope.  He

18   didn't see it.  He put it in front of him and within

19   seconds he pointed to it.

20       Mr. Gonzalez goes back into the house after he

21   loses Mr. Valle-Ramos and he engaged in this fight with

22   these two individuals.  Eventually they bail.  He tries

23   to go after them.  He told you he has torn rotator

24   cuffs.  He can't fight them as well as he would like to,

25   and they get away.  And they get inside some sort of

1     four-door sedan, silver, maybe gray, maybe light blue.

2     The color wasn't clear.  He said he was looking over the

3     fence line when he saw it and sees them get in.

4          One thing he did say is that he couldn't tell how

5     many people were in the car.  He said he knows there

6     were three people inside his house that he saw, but he

7     can't tell you how many people were already in that

8     vehicle because he couldn't see inside, he said.  He

9     just says he sees these people get in, but I can't tell

10    you how many other people were there.  I just can't.

11         He also testified to the second charge in this

12    case, which is grand theft.  One of the elements of

13    that -- to prove the crime of grand theft, the State

14    must prove beyond a reasonable doubt Jorge Valle-Ramos

15    knowingly, unlawfully obtained or used or endeavored to

16    obtain or to use the jewelry, coin collection or knife

17    of George Gonzalez.  He did so with the intent to either

18    temporarily or permanently deprive George Gonzalez of

19    his right to the property or appropriate the property of

20    Jorge Valle-Ramos to his own use or the use of a person

21    not entitled to it.  He stole it is what that means.

22         The items that we have, there's photographs in

23    evidence that we put on the overhead.  You'll be able to

24    see that one of the items that they recovered was a

25    backpack which had a ton of coins in it, a ton of

1    quarters he said he was saving.  None of the other

2    jewelry was recovered that he said other than there was

3    a ring that was later found.  Understand to steal

4    something and to be convicted of stealing something

5    doesn't mean they have to successfully get away with

6    stealing.

7         He took the bag, for example, the coins were found.

8    You can find, I would argue, that based on this charge,

9    those coins would be enough.  You don't have the

10   jewelry.  We don't have to show you what happened to the

11   jewelry.  That is not an element.  I don't need to show

12   you where it went.  I just need to prove the value to

13   you.  He testified to that.

14        One of the other instructions that I wanted to be

15   sure I go over with you is something called principal.

16   It's a fairly short instruction.  I'm just gonna read

17   it.  It says, if the defendant helped another person or

18   persons commit or attempt to commit a crime, the

19   defendant is a principal and must be treated as if he

20   had done all of the things the other person or persons

21   did if the defendant had a conscious intent that the

22   crime or act be done, and the defendant did some act or

23   said some word which is intended to, and which did

24   incite, cause, encourage, assist or advise the other

25   persons or persons to actually commit or attempt to

1     commit a crime.

2          What does that mean?  That means when four people

3     or three people in this case go inside to burglarize

4     this house, it doesn't matter if he actually, physically

5     picked anything else up.  If he helped any of those

6     people do what they did, meaning drive the car, meaning

7     open the door for them, meaning assist them in any way,

8     he is just as guilty as they are.  That's the law.

9          All of you told us in jury selection that you would

10    follow the law regardless if you agreed with it or not.

11    Some people don't agree with that.  Some people think

12    some people should be more guilty than others.  It's not

13    what it says, not for that.

14         Let's talk about Ms. Bethany Szewczyk.  Bethany

15    lives next door.  She lives next door to -- and I say

16    next door, neighboring complex.  Mr. Gonzalez explained

17    to you there's that fence, the fence that divides the

18    two, the two properties between the two complexes.  And

19    he explained to you that that's -- they jumped that

20    fence, they saw them go through that.

21         Ms. Bethany lives not in Mr. Gonzalez's apartment

22    or condo complex, she lives next door.  This is Mr.

23    Gonzalez's backyard.  Walking the door -- the gate was

24    open.  You can see another gate right there going into

25    another complex.  That's what they are talking about

1    when they say a double fence line, two fence lines right

2    there.

3        **MS. CITRARO:**  Objection.  Can we approach?

4        **THE COURT:**  Come on up.

5     (Conference at the bench held on the record.)

6        **MS. CITRARO:**  I'm not sure where she's going with

7    this, but I have been to this property.  That's not what

8    they are talking about.  I just want to make sure the

9    jury is not given new information that's not accurate.

10   That's not the fence that they are speaking about.

11       **THE COURT:**  What's the objection?  What was the

12   statement?

13       **MS. SCOTT:**  I said there's a double fence line.

14   That's what they are referring to when they say double

15   fence line.

16       **MS. CITRARO:**  I guess it would be a misstatement of

17   the evidence.

18       **MS. SCOTT:**  That was my interpretation of the

19   evidence.  If she wants to argue something else, she's

20   free to do that.

21       **THE COURT:**  What fence are you talking about?

22       **MS. SCOTT:**  There's one fence behind this one that

23   leads into the second complex, and behind this fence

24   somewhere the second complex is.

25       **MS. CITRARO:**  That's not accurate on the map.  I

1    didn't introduce it into evidence.  I have seen it and

2    it's not behind this property.  It's all the way on the

3    other side.

4        **MS. SCOTT:**  Okay.

5        **THE COURT:**  I'll sustain the objection.

6        (The following was in open court.)

7        **MS. SCOTT:**  Ms. Szewczyk lives in the neighboring

8    complex.  She said she's leaving for work that morning.

9    She said she's an attorney.  Presumably she slept more

10   than an hour the day before.  And she had more than a

11   nap.  She's well rested.

12       You saw she was young.  She had no problems with

13   her eyesight.  She goes outside, and what does she tell

14   you she sees?  She said she's leaving for work, she's

15   standing near a carport and she sees three young males

16   running.  She hears one of the males, Mr. Valle-Ramos,

17   say, hurry up before the cops get here, or something to

18   that effect.  He gets in the driver's side.  Other

19   people get in the car and they sped off.

20       She says at one point she initially -- when she saw

21   them, she was 20 to 30 feet away from him when they get

22   in the car and they drive.  She says they pass -- that

23   they were 10 feet -- 10 feet from one another and she

24   stares at his face and she sees him, and she knows what

25   he looks like.  She has no idea who this person is, she

1    has no dog in this fight at all.  Her stuff wasn't

2    stolen.  She frankly is here because we subpoenaed her

3    and told her to be here.

4        She gets contacted, she talks to law enforcement

5    that day, she writes him a statement, and then they

6    contact her later with a photo lineup.  And they contact

7    her actually months later, September 2013, and they show

8    her a photo lineup.  And that's the photo lineup they

9    showed Ms. Szewczyk.  And she did exactly what Mr.

10   Gonzalez did.  That's him, without question, that's the

11   guy.  Circles it, initials it.  I asked her, how did you

12   know that?  She says, I saw him.  I saw his face.  I

13   recognized him.

14       Defense has been trying throughout the case to say

15   he's a guy with an afro, that's why he's in that lineup,

16   that's it.  No other reason for it.  They said they saw

17   poofy hair.  And Ms. Szewczyk actually didn't even use

18   the term afro.  Her -- I think her exact terms were

19   either foo-fee (ph) or poofy hair.

20       Defense used the term afro and gave it to her.

21   That was a description she gave law enforcement.  These

22   people witnessed something that they know very well

23   wasn't right.  They know very well that it was a crime,

24   and so they remembered what they saw.  At no point

25   did -- when she described the individuals to law

1    enforcement that day, she gave them a description.

2    Oddly enough who didn't give a description to the

3    individuals is Ms. Bloom.

4        Now, I have nothing against Ms. Bloom.  She is a

5    sweet lady.  She's also 65-and-a-half years old, per her

6    own testimony, wasn't wearing her glasses that she said

7    she needs to have to see, and she was going on an hour's

8    sleep from the night before.  When she wrote her

9    statement, she said nothing about what these people

10   looked like.  All she said was they had long sleeves on

11   because apparently they were going to go work and they

12   looked nicely for work if they were going to work or

13   school.  That doesn't match anything else.  We know

14   those people were inside the house because he saw them

15   get in that car.  So if we are even talking about the

16   same car, we know Ms. Bloom has to be wrong because Mr.

17   Gonzalez literally watched them go from his property

18   into the car and drive away.  And they clearly were not

19   wearing business shirts when they were inside his house.

20       What else did Ms. Bloom tell you?  She said that

21   when she wrote her statement, she couldn't remember

22   anything.  But as I went on, she remembered more and

23   said, oh, I should have put that in there, the

24   description of the individuals that you saw that maybe

25   were burglarizing someone, yeah, you should have put

1    that in your statement.  When was the next time she

2    looked up these pictures?  Was when she got a subpoena.

3    It's not clear whether the subpoena was from my office

4    or defense's office.  When she gets the subpoena,

5    there's a case number.  She looks it up on the computer

6    and she sees that guy's mug and says no, that's not the

7    guy I saw.  Not him.  Totally somebody different.

8         So when law enforcement calls her, she says, I

9    can't do a photo lineup or I don't want to do a photo

10   lineup or I'm not gonna be helpful in a photo lineup

11   because I don't recognize that person at all.  That's

12   why they didn't present her with a photo lineup.

13        And let's talk about what she said she saw.  She

14   said she saw other than these professional looking

15   dressed men who are sprinting and running to a car that

16   she's looking at from her second floor window without

17   her glasses going on an hour's sleep and she said she

18   sees a blond guy get in the car.  I want you to try to

19   remember Mr. Valle-Ramos's testimony.  And, again, you

20   can get it read back if you'd like.

21        One of the things he testified to is that that day

22   after he wakes up around noon, his friend and his

23   friend's girlfriend Danny come to his house to hang out.

24   I asked him, what does his friend look like?  And he

25   points to the guy sitting in the gallery.  I said, okay,

1       tell me about the girl, what does Danny look like?

2       She's white, blond and curly hair.  Is it possible that

3       the person that Ms. Bloom saw in that car was Danny?

4       Maybe.  I don't know.  She's blond.

5           Mr. Gonzalez said I can't tell you how many people

6       were in that car.  I don't know because I didn't see the

7       full car of people.  But is it possible that that's

8       where the blond person came from?  Ms. Bloom says that

9       she -- that she first saw the car to -- the other car

10      to -- the individuals getting in the car and she heard

11      about this whole burglary thing.  She said, I may have

12      even seen something different because I don't know what

13      I saw was literally what she said when defense

14      redirected her.  She said, I don't know, I just don't

15      know.  That's not reasonable doubt.  It's a possible

16      doubt, maybe.  That is not a reasonable doubt.

17          One of the things that she was clear about, though,

18      is that she did see the three men with the long sleeves,

19      and one of them had blond hair.  I, again, remind you to

20      look at the testimony of Bethany and George Gonzalez.

21      Evaluate the credibility of those people and, again, not

22      the credibility in a sense that Ms. Bloom is lying,

23      maybe she really did think that she saw that.  But given

24      her age, given the lack of sleep that she had that

25      night, given the fact that she's not wearing glasses and

1    she's looking at this from a second-story balcony window

2    and she's looking down at it happening.  Who do you

3    believe more, her or the guy who stared at this person

4    for seven to ten seconds, who is in his house, who

5    chased after him and then the girl who saw him maybe

6    10 feet away from her?  That's your comparisons.  Those

7    are your three people that you're I.Ding in this case.

8    Who is more believable?

9        Let's talk about Mr. Valle-Ramos.  It wasn't me.

10   What's he gonna say?  It was me.  I'm sorry.  It wasn't

11   me.  That's all he's got?

12       **MS. CITRARO:**  Objection.  Can we approach?

13       **THE COURT:**  State the grounds.

14       **MS. CITRARO:**  Burden shifting.

15       **THE COURT:**  Overruled.

16       **MS. SCOTT:**  It wasn't me.  Convenient.  Okay.  It

17   wasn't you.  Tell us what you were doing that day.  I

18   was sleeping.  Okay.  Did anybody see you sleeping?  No.

19   What did his friend testify to?  We sleep on opposite

20   sides of the house.  Both of our doors are closed.  I

21   don't know.  I can't tell you that he was sleeping.  But

22   I know when I got up at noon he was getting up.  Okay.

23       What happened at eight to nine o'clock a.m. when

24   this happened?  Mr. Hickson was out cold.  He doesn't

25   know what has happening.  He can't tell you that he was

1      at home.  He has no clue.

2          And one of the things that's most interesting is

3      Mr. Ramos's testimony and Mr. Hickson's testimony about

4      Mr. Ramos's hair.  Today -- well, yesterday we start

5      talking about his hair, and Mr. Hickson testifies and

6      Mr. Valle-Ramos testifies.  Both say he had long hair.

7      Mr. Valle-Ramos said it was down to here, I looked like

8      Tarzan.  No other explanation was given about it.  Not

9      how he wore it, not anything.

10          We go home at night, we come back.  And maybe Mr.

11      Valle-Ramos realized oops, hair is something that the

12      State can easily prove.  Maybe we should clarify that.

13      So he comes back up there today and he tells you, oh,

14      you know what?  I had it pulled back.  I often pull it

15      back.  I had it in a headband.

16          What pictures did he show you?  This is February 8,

17      2013, from his Instagram.  I don't know where this is

18      from, but his own testimony, that's him.  His testimony.

19      He's wearing a hat.  You can see what I'm looking at.

20      His hair is pulled back in a poofy ponytail.  If he were

21      to let that poofy ponytail go because of the texture of

22      his hair and how heavy it is, what happens to that poofy

23      ponytail?  It expands and stays back here.  It doesn't

24      fall like my hair does.  It stays back here.  That's

25      February 8, 2013.

1    You'll be able to take these pictures back.  I

2    understand this doesn't do it justice.  This is

3    April 24th, 2013.  Do you see any poofy hair in the

4    back?  Do you see any shoulder-length hair?  Let's say

5    for argument sake he's got it pulled back in some sort

6    of knot or tie or something blocking back here.  If it

7    was nearly as long as what happened in this picture in

8    February, you'd be able to see it because you would be

9    able to see it behind his head.  And you don't in this

10   picture.

11       So what does that tell you?  That tells you

12   sometime between February and April the guy got his hair

13   cut.  He got his hair cut and he has this poofy -- some

14   call this an afro, some won't because it is too short,

15   poofy style of hair?  What did both Mr. Gonzalez and

16   Bethany tell you?  I keep calling her Ms. Bethany

17   because her last name is hard to pronounce, smaller

18   afro, poofy, fluffy hair.  That's him.  That's what he

19   looked like when this happened.

20       This picture was taken about two weeks after.  You

21   can't hide in this picture.  That's what you got.  And

22   this matches exactly the description of the individual

23   that Bethany and Mr. Gonzalez both saw.  Based on those

24   descriptions, that photo lineup was generated.  It

25   doesn't matter that in this photo lineup he's got longer

1    hair.  It doesn't make a difference.  His face hasn't

2    changed.  His hair might be slightly longer in this one,

3    slightly shorter in that one.  It doesn't matter.  It's

4    the same guy.  They know it was the same guy and they

5    told the cops it was the same guy.  To say I had

6    Tarzan-like hair in April, quite literally means that

7    from the time this photo was taken in February,

8    presuming it was taken in February, his hair grew about

9    6 inches.  Not possible.  That tells you he's lying.

10   That tells you both him and his friend are lying to you.

11   His friend told you we were growing it out so that we

12   can get braids done.  Okay.  Not cornrows, braids.  You

13   can't braid that hair.  It's too short.

14        This whole case falls on whether or not you think

15   Mr. Gonzalez and Ms. Bethany are telling you the truth.

16   Whether you think that what they saw is what they saw.

17   The amount of conviction that both of these individuals

18   have on that stand when they talked to you yesterday

19   should be enough for you to say and for you to evaluate

20   yep, they know what they are doing.  They know what they

21   are talking about.

22        Ms. Bloom's conviction of, it wasn't him, it was

23   the blond guy that gets in the car, first of all,

24   doesn't match anybody from -- on the scene.  No one

25   described that at all.  The person that actually sees it

1    from burglary to entrance of the vehicle is Mr.

2    Gonzalez.  At no point did he say anything about a blond

3    person.  Could there have been a blond person in the

4    car?  Sure.  Maybe, he said.  I don't know who else was

5    in that car.  Could it have been his friend's girlfriend

6    Danny?  Maybe.  None of that was there beyond a

7    reasonable doubt.  It's not a possible doubt.  It's

8    beyond a reasonable doubt.

9         The common sense that you have that you could put

10   those pieces together that we talked about in jury

11   selection that I begged you not to leave outside and the

12   life experiences I asked you to bring those in, and when

13   you do, I'm confident that you'll come back with a

14   verdict of guilty to the counts as charged.

15        You are gonna see in the jury instructions there's

16   lesser included counts, things like trespass and petit

17   theft.  The judge will read those to you.  I'm not going

18   to go into those because I think that if you believe

19   what the witnesses say they believe, you have to find

20   him guilty of the highest charge.  There is no other

21   charge.  Thank you.

22        **THE COURT:**  Defense wish to give your closing

23   argument at this time?

24        **MS. CITRARO:**  Thank you.

25        **THE COURT:**  You may.

1        **MS. CITRARO:**  Thank you for your time and attention

2        in this case.  The State gets to come up here twice and

3        talk to you, but I only get to talk to you once.  So I'm

4        gonna throw a lot of information at you-all at one time,

5        then she will get back up here and talk to you some

6        more.  And as much as I'm gonna want to reply and

7        respond to what she said, I can't.  Because I'm not

8        afforded a second time to talk to you.

9        Okay.  Here's what we know.  George Gonzalez's

10       house was burglarized.  Nobody is questioning that.  We

11       have seen pictures.  We have heard testimony.  Three

12       guys came into his house, he fought with one of them,

13       they all got away.  He pepper sprayed them.  His house

14       was burglarized.  He identified Mr. Valle-Ramos.  He

15       said he saw him for -- first, he said a few seconds.

16       Then he gave a number of seven seconds.  Then he stared

17       at him.  My recollection was he said about 25 feet away,

18       but the State told you ten.  I'm not sure.  Whatever

19       your recollection of the testimony was.

20       How do we explain that he identified Mr.

21       Valle-Ramos and that he's so sure in court that it's Mr.

22       Valle-Ramos that he was looking at?  How do we explain

23       that?  Mr. Gonzalez was shown a lineup -- the State

24       doesn't mind me using her machine.  This lineup, these

25       six faces.  Mr. Gonzalez reported the guy had an afro.

1    Detective Stanley in all of his wisdom puts together six

2    pictures, only one of which even fits the description of

3    who Mr. Gonzalez identified.  There is one afro in these

4    pictures.  I feel like I'm on crazy pills.  One, 3, 4, 5

5    and 6 do not have afro-style hairdos.  Mr. Gonzalez

6    looks at it, yes, that's the guy.  Right there.  The guy

7    with the afro.  That's him.  That's the guy.

8        And how many times has he seen that lineup?  Eight

9    times.  He's seen these pictures eight times.  He's

10   looked at this face eight times and said that's the guy.

11   That's the guy.  I know that's the guy.  Surrounded by a

12   whole bunch of other guys who don't even fit the

13   description.  So when he walks into the courtroom

14   yesterday, says that's the guy, you want to know why he

15   knows that's the guy?  Because of the picture in his

16   memory.  This is the picture he has seen eight times.

17   That's the guy who did it to him.

18       I'm not saying Mr. Gonzalez is lying.  He doesn't

19   have to be lying.  But he could be mistaken.  And

20   Detective Stanley didn't help.  This is a suggestive

21   lineup.  This is terrible police work.  Who even knows

22   who Mr. Gonzalez would have identified if there were six

23   pictures similar to number 2 all with afros?  Who knows?

24       We are not gonna know why because this is the

25   lineup that he showed.  Same goes for Ms. Szewczyk.

1    Nobody is saying she lied, but she looked at this same

2    lineup with one picture of one guy with an afro.  She

3    said she saw it five times.  Five times she looked at

4    that face.  So yeah, this is the face in her memory.

5    This is the exact same lineup that she saw.  So when she

6    looks at this face and she recognizes same face, yep,

7    that's the guy, hundred percent, that's the guy I saw,

8    she could be mistaken because this is a disgrace.

9        No one is saying that Mr. Gonzalez's house wasn't

10   burglarized.  The police want to get someone.  Mr.

11   Gonzalez wants to get someone.  Ms. Szewczyk wants to

12   help.  Everybody wants justice.  It matters who did it.

13   You can't just say somebody did it, try to create some

14   kind of lineup, say that's the guy, we gotta get him no

15   matter what if it's not the right guy.  That matters.

16       You even heard what significant conflicts and what

17   they said and how they described.  Mr. Gonzalez said the

18   guy had a backpack.  He had a basketball jersey with

19   either no sleeves or short sleeves, no gloves but maybe

20   the other guy had gloves on.  I'm not sure if he said

21   shorts or not.  And the car was bluish and greenish and

22   he had an afro.

23       Ms. Szewczyk said -- well, she said poofy hair.

24   Same thing.  And she says he had long sleeves.  Long

25   sleeves and blue latex gloves.  That's entirely

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

1    different.  That's not what Mr. Gonzalez saw.  No

2    sleeves and a jersey, long sleeve shirt with blue

3    gloves.  Okay.

4    Ms. Bloom, the State wants to discredit Ms. Bloom's

5    testimony.  She is an older lady.  Does that mean she

6    doesn't know what's going on?  She seemed very, very

7    well aware of things to me.  She had a view from her

8    apartment -- I believe this one shows it best.  This is

9    her view.  And this is from the actual blind from her

10    apartment.  Doesn't look that far.  She said this is

11    where the car was.  It was here.

12    I showed this same picture to Ms. Szewczyk

13    yesterday, asked her, is this your place?  She said,

14    yes, that's my carport, and this is where the car was.

15    They are talking about the exact same location.  This is

16    not -- I'm not sure what the State wants to you believe.

17    This is not some other place.  They both confirmed this

18    is where the car was that morning.  Right there.  And

19    they both say it was this four-door car, grayish or

20    light color, three guys running to it, you know, driving

21    off real fast.

22    Is it reasonable that three guys came running from

23    that fence area from the lake over to this area into a

24    car, a four-door car that was gray that was parked right

25    here all ran into it, sped away really, really fast, all

1    in that same time frame of that morning before the cops

2    came?  Is it reasonable that it happened twice?  That

3    she wasn't seeing the same thing?  That this happened

4    twice with three guys, same direction, same spot, same

5    exact location?  Is that reasonable?  It is entirely

6    reasonable what Ms. Bloom saw was what she saw.

7        She didn't see Mr. Valle-Ramos.  She didn't see him

8    driving.  She didn't see him anywhere in the car.  He

9    was not one of those three guys.  She's sure of it.

10   She's sure just like Ms. Szewczyk is sure, just like Mr.

11   Gonzalez is sure.  I was actually a witness.  It wasn't

12   a criminal case, but I actually had to testify very

13   briefly on something it was totally stupid.  Won't get

14   into the details of it.

15       **MS. SCOTT:**  Objection, Your Honor.  Improper

16   opinion.

17       **MS. CITRARO:**  It's not an opinion.  It's a story.

18       **THE COURT:**  Come on up.

19    (Conference at the bench held on the record.)

20       **THE COURT:**  Where we going?

21       **MS. CITRARO:**  The story is I testified about a guy

22   that I saw and I told them what I thought the appearance

23   was, and it turned out to be completely wrong.

24       **MS. SCOTT:**  Right.  It goes to her personal opinion

25   as to that testimony, which is not relevant to anything

1        that we are talking about right now.

2            **MS. CITRARO:**  It's not an opinion.  It is an

3        example of how human beings can get it wrong.  I don't

4        see how it is opinion.  It has nothing to do with a

5        case.  It's just an example.

6            **MS. SCOTT:**  I'm fine with giving an example.

7            **THE COURT:**  I'm going to sustain the argument.  You

8        can argue that people can makes mistakes.  I'm gonna

9        sustain that objection.

10            (The following was in open court.)

11            **MS. CITRARO:**  One person -- we talked in jury

12        selection.  One person can see one thing, another person

13        can see another thing.  It doesn't mean that they are

14        lying about it or that they are dishonest about it or

15        that they are being untruthful.  It means they saw

16        different things.  One of them could be right.  One of

17        them could be wrong.  They both could be wrong.  Who

18        knows?  Humans are flawed.

19            Mr. Gonzalez is a human being.  Ms. Szewczyk is a

20        human being.  Ms. Bloom is a human being.  Eyewitness

21        testimony can be flawed.  Let's even put that aside for

22        now and consider the police work that was done in this

23        case.

24            You heard from Detective Stanley, this brilliant

25        work that he did.  And then in addition we had a C.S.I.

1     tech come in and she told you they checked for

2     fingerprints.  They didn't pick up any except they did

3     get some from a wrapper.  They came back with latent

4     prints.  They didn't match anybody.  They didn't match

5     Mr. Valle-Ramos, not his fingerprints, not important.

6          I think it's important, but, you know, who cares?

7     It doesn't go to strengthening their case, so let's just

8     ignore it.  Let's see.  DNA could have been collected.

9     She told you it could have been collected.  There was

10    even a cigarette butt.  They could have tested it for

11    DNA.  Did they do it?  No.  Let's just ignore it.

12         Mr. Valle-Ramos gets stopped.  Guy with an afro,

13    maybe that's the guy.  Terrible these days to have a

14    distinctive, you know, personal feature about you,

15    apparently, because apparently it can get you into some

16    real trouble.

17         You heard from Mr. Valle-Ramos.  He doesn't know

18    Mr. Gonzalez.  He never went to that house.  He's never

19    been there.  He wasn't there that day.  He was at home

20    sleeping.  I get it, Mr. Hickson wasn't next to him

21    attached to him at the hip when he was sleeping, but you

22    heard from him.  He sleeps lightly.  He never heard

23    anything out of order.  Never heard any noise, anything

24    to make him think that Mr. Valle-Ramos would be up.

25    They had a regular day together doing whatever with

1    their friends playing basketball at night.  Nothing

2    crazy.  Nothing out of the ordinary.  He was at home.

3    He didn't even wear his hair in the afro that they are

4    saying he had.

5         Okay.  The picture, this afro is on a driver's

6    license that was issued in 2011.  It's at least a year

7    and a half before this.  That's what his afro looked

8    like.  Now I'm starting to pull it back.  Later on it's

9    pulled back in a ponytail.  It's long enough.

10   That -- think about it for a second.  To pull hair back

11   in a ponytail and have a large bush at the end, you're

12   pulling it back from the front of the head all the way

13   back and then you still have hair sticking out in the

14   bush.  It's how a ponytail works.  That means that that

15   hair starting from here is this long, then this long.

16   That's like really long.  That is longer than

17   what's -- what would just stick up.  Okay.  It came

18   down.

19        You heard by his very testimony and Mr. Hickson

20   they are friends.  They know each other.  They know what

21   they look like.  That's what his hair looked like.  This

22   picture that the State says -- and I know it's bad up

23   there, but this picture, absolutely reasonable that his

24   hair is pulled back.  It's sticking up with some frizz.

25   You got that much hair, there's gonna be frizz.  His

1    hair is pulled back.  This is not a haircut.  This is

2    the same length.  If the State wants to argue it has

3    been cut, fine, let her argue that.  Is it reasonable

4    that it's a ponytail right through?  Now -- and you

5    can't see it because you can't see through his head.

6    Yes, it's reasonable.  It's in a ponytail.  He didn't

7    wear his head out like that, and that was about two

8    weeks after the alleged incident.  We are not talking

9    about a serious time frame here.

10    Reasonable doubt can come from evidence, lack of

11    evidence and conflict in the evidence.  Reasonable doubt

12    is the rule that we go by.  What does it mean?  It means

13    if you think it's reasonable that Mr. Valle-Ramos was at

14    home, that Mr. Gonzalez got it wrong because of this

15    horrendous police work, if you think it's reasonable

16    Ms. Bloom saw something different, if you think it's

17    reasonable that human beings make mistakes about what

18    they saw, see and what they remember and what sticks up

19    here, if you think that is reasonable, then you find him

20    not guilty.

21    And it's reasonable.  Detective Stanley said it

22    himself, he wants to -- what was his quote?  I'll find

23    it.  Look to go strengthen his I.D.  He wants to

24    strengthen his case against Mr. Valle-Ramos.  Is there a

25    reasonable alternative to what occurred that day?

1     Mr. Gonzalez got burglarized.  Is it reasonable that it

2     wasn't Mr. Valle-Ramos who did it?  Yes.

3         There's a lot of counts listed on the verdict form.

4     It's gonna be confusing because first is the burglary,

5     but he's -- then there's lessers and then there's a

6     grand theft and then there's lessers.  Somebody

7     committed these crimes.  It wasn't Mr. Valle-Ramos.

8     There's reasonable doubt at every turn in this case.

9     Please find him not guilty of both counts and thank you

10    for your time.

11        **THE COURT:**  All right.

12        State, rebuttal?

13        **MS. SCOTT:**  How do they explain I.D.?  How do we

14    explain away that he was identified?  Bad police work,

15    that's it.  This photo lineup, that's why it's a bad

16    I.D..  These people have seen this five to eight times.

17    That argument works for I.D'ing him in court.  It

18    doesn't hold at all to why they I.D.'d him initially.

19    Why did they pick -- both pick him out?  Because they

20    both saw them.  One got 10 feet away, one 20 feet away.

21        He was inside his house.  There's no mistake about

22    that, folks.  We are asking to compare somebody who got

23    burglarized, came face-to-face with one of the people

24    that broke into his home, and you're being asked to

25    believe this woman over him.  This was her view.  You're

1    seeing what she saw.  From this angle, by her own

2    testimony, by Ms. Bethany's testimony, that vehicle was

3    here.  Some were right here and she's over on this side.

4    Look at that.  She's 65 years old.  She's going on an

5    hour's sleep, not wearing her glasses that she said she

6    needs to see, and she identified him from a second floor

7    window across the street.  That's her perspective.

8    That's not reasonable doubt.  It's not.

9        Just because you have a conflict in testimony, does

10   not mean you automatically have reasonable doubt.  You

11   get to determine that.  You get to determine is that

12   reasonable.  You get to figure out.  You get to use that

13   common sense and you get to say, you know what?  Maybe

14   she fully believes what she saw.  But given what I know,

15   given everything that I have heard and everything that

16   I'm putting together, that doesn't make sense.  Just

17   doesn't.

18       And when did she give that description to those

19   people the first time?  She said in her deposition,

20   which was in October, this happened in April.  That's

21   the first time that she says and actually gave her

22   description to somebody because she didn't write it in

23   her --

24       **MS. CITRARO:**  Objection.  Facts not in evidence.

25       **THE COURT:**  Overruled.  Ladies and gentlemen, rely

1      upon your own memory of what the evidence is.  Okay?

2          **MS. SCOTT:**  She read her statement.  It was given

3      to her and I asked her, tell me in there where you give

4      the description of the people other than the long sleeve

5      shirts.  Well, it's not in there.  It's not in there

6      because her memory is not good.  And she said, oh, I

7      remembered later and then this and that and whatever.

8          She is a sweet lady.  Bless her.  She doesn't know

9      what she saw.  She doesn't remember what she saw.  I'm

10     not saying she's not sane.  In her mind she knows very

11     well what's going on.  But what she's looking at, this

12     is what she sees.  It's completely reasonable that she

13     did not see things accurately based on everything that

14     you know.

15         Same thing with Mr. Gonzalez.  He's seen that

16     lineup eight times.  Ms. Bethany has seen it five times.

17     Seen it once when they I.D. him.  One time.  This

18     conflict in the testimony, somebody says they have short

19     sleeves, long sleeves, some have gloves, some don't have

20     gloves on.  Might be carrying something, some might not

21     be carrying something.  That doesn't matter.  It doesn't

22     matter because it doesn't go to prove the elements of

23     the crime, and it doesn't go to prove his I.D. because

24     what goes to prove his I.D. is his face.  You can't

25     change your face.

1     We can place semantics about the hair.  You-all are

2     smart people.  You can look at two pictures and figure

3     out if it's the same haircut.  You'll be able to do that

4     back there.  I'm not going to spend any more time on

5     that.  But you can't change your face.  And when you get

6     so close to somebody that you're able to see them this

7     close for seven to ten seconds, you are not gonna forget

8     that face.  And you're particularly not gonna forget

9     that face when that person is inside your house.

10     This is not somebody you ran into at a restaurant.

11     This is a significant event.  He's not going to forget

12     that face.  So regardless of who he sees in a photo

13     lineup, whether or not other people have afros, whether

14     or not you think that for whatever reason because the

15     argument now that has been presented to you is that cops

16     have it out for this guy.  We don't know why this guy,

17     but him.  He is the one we need to get, and we are gonna

18     manipulate everybody we talk to to catch him.  Why?  Mr.

19     Gonzalez told you, I can't I.D. the other two guys.  I'm

20     not even gonna try, because I don't know what they look

21     like in their face, and I would not be able to

22     confidently pick them out of a photo lineup.

23     The blame is being put also on law enforcement from

24     the C.S.I. technician, that she could have tested for

25     DNA but she didn't.  She could have, but she didn't.

1    And so that's bad police work?  No.  That's just how

2    they work.  I asked her, why didn't you test for DNA?

3    Because there was no blood.  We don't test for DNA

4    unless there's blood.  That makes sense.

5        How many cases do you think she gets called out to?

6    Can they test for DNA on every single case?  No.  That's

7    not reasonable.  They test it when they need it.  And in

8    this case, they didn't need it because there was no

9    blood.

10       Fingerprints on the wrapper did not come back to

11   anybody involved.  No, it didn't come back to him.  The

12   detective told you we didn't identify the other two

13   suspects.  We don't know who they are.  Obviously, the

14   prints didn't come back to them.  We don't have anything

15   to compare them to.  That was explained to you when they

16   run prints they compare it to people already in the

17   system, or if they have a suspect, they get fingerprints

18   from the suspect and compare them.  Well, if you don't

19   know who the suspects are, you don't have anything to

20   compare to.  So we have a candy wrapper or Pop-Tart

21   wrapper that had prints on it, and those were the prints

22   that was recovered and those didn't go to Mr.

23   Valle-Ramos.

24       Who cares?  It doesn't matter.  I am not even sure

25   that the testimony was clear as to where that wrapper

1    came from, whether it was in his house, whether it was

2    outside.  Even if you believe that it came from one of

3    those three people that were in his house, it could have

4    absolutely come from the other two people and not Mr.

5    Valle-Ramos because we don't know who those individuals

6    are.

7          Just because there's not prints on it, doesn't mean

8    he wasn't there.  Just because you don't have DNA

9    doesn't mean you have reasonable doubt.  Just because

10   you have a conflict in testimony or you have a lack of

11   evidence of something you might have wanted to have,

12   does not mean you have reasonable doubt.

13         One of the things that we talked about in jury

14   selection was whether or not all of you can convict

15   or -- excuse me -- whether or not all of you can reach a

16   verdict on testimony alone.  What if you didn't have

17   physical stuff?  We don't have physical stuff.  We have

18   testimony, that's it.  And each one of you said I can do

19   that, I can reach a verdict on that.  I don't need

20   physical stuff.  I may want to have it, but I don't need

21   it.  And if I'm presented with whatever it is I'm going

22   to be presented with, I can evaluate that.  I can judge

23   that and I can make a decision based on that.

24         Defense is actually asking you to make a decision

25   based on what you don't have.  And that's not -- just

1    because you don't have it, doesn't mean it's reasonable

2    doubt.  No matter how much they want to keep telling you

3    that.  That's not what the law says.

4        Something else that we made clear to you in jury

5    selection was there is no number associated to

6    reasonable doubt.  There's not gonna be a percent, and

7    it's not gonna say if you're 50 percent sure, if you're

8    80 percent sure, if you're a hundred percent sure, if

9    you're absolutely sure then you don't have reasonable

10   doubt.  None of those qualifications are in there.  All

11   it says is it can't be a possible doubt, a speculative

12   doubt or a forced doubt.

13       Everything that they are telling you and everything

14   that you may have doubt in this case fall into one of

15   those three, possible, speculative or forced.  None of

16   those are reasonable.  And they are not reasonable

17   because of everything that's been presented to you.  I

18   think it's interesting -- well, strike that.

19       We have seen pictures from -- Mr. Valle-Ramos

20   showed pictures from his iPad from February 8, 2013,

21   February 14, 2013, there's another date and

22   December 25th of 2012.  None of these are April 2013.

23   Why not?

24       **MS. CITRARO:**  Objection.  Burden shifting.

25       **THE COURT:**  Approach.

1          (Conference at the bench held on the record.)

2          **MS. CITRARO:**  She's making me prove something that

3     I don't have to prove.

4          **THE COURT:**  Response?

5          **MS. SCOTT:**  I'm not making her prove anything.  I'm

6     simply saying these are the photos she entered and

7     there's no photo from April 2013.  That's it.

8          **THE COURT:**  And you are asking the reason for why.

9          **MS. SCOTT:**  Why isn't it there?  I mean, I don't

10    understand what the Court is asking me.

11         **THE COURT:**  I'm gonna sustain the objection.

12         (The following was in open court.)

13         **THE COURT:**  The jurors have to disregard the last

14    comments made by the prosecutor.

15         **MS. SCOTT:**  You have the photos in evidence.

16    Again, we talked about the hair.  You can figure that

17    out.  When you look at everything collectively, when you

18    evaluate it collectively, and you put it all together,

19    there is no reasonable doubt in this case.  And I am

20    confident that you will come back with a verdict of

21    guilty as charged.  Thank you.

22         **THE COURT:**  All right.  Ladies and gentlemen, I'm

23    going to have the court deputy hand the jury

24    instructions to you.  I am required to read them to you.

25    But I also provide you a hard copy for you to take back

1       into the jury room with you when you deliberate.  This

2       is all of the law that is applicable to the case and

3       you'll have it with you for reference during the course

4       of your deliberations.  Okay?

5           Members of the jury, I thank you for your attention

6       during this trial.  Please pay attention to the

7       instructions I'm about to give you.

8           Jorge Valle-Ramos, the defendant in this case, has

9       been accused of the crimes of burglary of a dwelling and

10      grand theft third degree.

11          To prove the crime of burglary of a dwelling, the

12      State must prove the following elements:  One, Jorge

13      Valle-Ramos entered a structure owned by or in the

14      possession of George Gonzalez, and two, at the time of

15      entering the structure, Jorge Valle-Ramos had the intent

16      to commit an offense other than burglary or trespass in

17      that structure.

18          You may infer that Jorge Valle-Ramos had the intent

19      to commit a crime inside a structure if the entering of

20      the structure was done stealthily and without the

21      consent of the owner or occupant.

22          To prove the crime of grand theft third degree, the

23      State must prove the following two elements beyond a

24      reasonable doubt.  Jorge Valle-Ramos knowingly and

25      unlawfully obtained or used or endeavored to obtain or

1    use the jewelry, coin collection or knife of Jorge

2    Valle-Ramos.  Two, he did so with intent to either

3    temporarily or permanently deprive George Gonzalez of

4    his right to the property or any benefit from it or B,

5    appropriate the property of George Gonzalez to his own

6    use or to the use of any person not entitled to it.

7        If you find the defendant guilty of theft, you must

8    also determine if the State has proved beyond a

9    reasonable doubt whether the value of the property taken

10   was $300 or more.

11       Obtains or uses means any manner of A, taking or

12   exercising control over property.  B, making any

13   unauthorized use, disposition or transfer of property.

14   C, obtaining property by fraud, willful

15   misrepresentation of a future act or false promise.  D,

16   conduct previously known as stealing, larceny,

17   purloining, abstracting, embezzlement, misapplication,

18   misappropriation, conversion or obtaining money or

19   property by false pretenses, fraud, deception or any

20   similar conduct in nature.

21       Endeavor means to attempt or try.

22       Property means anything of value and includes

23   tangible or intangible personal property.

24       Value means the market value of the property at the

25   time and place of the offense, or if that value cannot

1   be satisfactorily ascertained, the cost of replacement

2   of the property within a reasonable time after the

3   offense.

4       If the exact value of the property cannot be

5   ascertained, you should attempt to determine a minimum

6   value.  If you cannot determine the minimum value, you

7   must find the value is less than one hundred dollars.

8       If the defendant helped a person or persons commit

9   or attempt to commit a crime, the defendant is a

10  principal and must be treated as if he had done all the

11  things that the other person or persons did if one, the

12  defendant had a conscious intent that the criminal act

13  be done, and two, the defendant did some act or said

14  some word which was intended to and which did incite,

15  cause, encourage, assist or advise the other person or

16  persons to actually commit or attempt to commit the

17  crime.  To be a principal, the defendant does not have

18  to be present when the crime is attempted or committed.

19      In considering the evidence, you should consider

20  the possibility that although the evidence may not

21  convince you that the defendant committed the main

22  crimes of which he is accused, there may be evidence

23  that he committed other acts that would constitute a

24  lesser included crime or crimes.  Therefore, if you

25  decide that the main accusation has not been proved

1    beyond a reasonable doubt, you will next need to decide

2    if the defendant is guilty of any lesser included crime.

3        The lesser crimes indicated in the definition of

4    burglary of a dwelling are trespass in an occupied

5    structure and trespass in a structure.  The lesser

6    crimes indicated in the definition of grand theft third

7    degree are petit theft of $100 or more and petit theft.

8        Lesser included offenses for Count I, trespass in

9    an occupied structure.  To prove the crime of trespass

10   in an occupied structure, the State must prove the

11   following three elements beyond a reasonable doubt.

12   One, Jorge Valle-Ramos willfully entered or remained in

13   a structure.  Two, the structure was in the lawful

14   possession of George Gonzalez.  Three, Jorge

15   Valle-Ramos' entering or remaining in the structure was

16   without authorization, license or invitation by George

17   Gonzalez or any other person authorized to give that

18   permission.

19       Authority to enter or remain in a structure need

20   not be given in express words.  It may be implied from

21   the circumstances.

22       It is lawful to enter or remain in a structure of

23   another if under all of the circumstances a reasonable

24   person would believe that he had permission of the owner

25   or occupants.

1          Person authorized means owner, or lessee, or his or

2     her agent, or any other law enforcement officer whose

3     department who has received written authorization from

4     the owner or lessee, or his or her agent to communicate

5     an order to depart the property in case of a threat to

6     public safety or welfare.

7          Willfully means intentionally, knowingly and

8     purposely.

9          Structure means any building of any kind, either

10    temporary or permanent, that has a roof over it, and the

11    enclosed space of ground and outbuildings immediately

12    surrounding that structure.

13         If you find the defendant guilty of trespass in a

14    structure, you must then determine whether the State

15    proved beyond a reasonable doubt there was a human being

16    in the structure at the time of the trespass.

17         Trespass in a structure.  To prove the crime of

18    trespass in a structure, the State must prove the

19    following three elements beyond a reasonable doubt.

20    One, Jorge Valle-Ramos willful entered or remained in a

21    structure.  Two, the structure was in the lawful

22    possession of George Gonzalez.  Three, Jorge

23    Valle-Ramos' entering or remaining in the structure was

24    without authorization, license or invitation by George

25    Gonzalez or any other person authorized to give that

1    permission.

2         Authority to enter or remain in a structure need

3    not be given in express words.  It may be implied from

4    the circumstances.  It is lawful to enter or remain in a

5    structure of another if under all of the circumstances a

6    reasonable person would believe that he had the

7    permission of the owner or occupant.

8         Person authorized means any owner or lessee or his

9    or her agent or any law enforcement officer whose

10   department has received written authorization from the

11   owner or lessee or his or her agent to communicate an

12   order to depart the property in case of a threat to

13   pubic safety or welfare.

14        Willfully means intentionally, knowingly and

15   purposely.

16        Structure means any building of any kind, either

17   temporary or permanent that has a roof over it and the

18   enclosed space of ground and outbuildings immediately

19   surrounding that structure.

20        The lesser included offenses for Count II, petit

21   theft of $100 or more.  To prove the crime of petit

22   theft of $100 or more, the State must prove the

23   following two elements beyond a reasonable doubt.  One,

24   Jorge Valle-Ramos knowingly and unlawfully obtained or

25   used, or endeavored to obtain or use, the jewelry, coin

1    collection or knife of George Gonzalez.  Two, he did so

2    with intent to either temporarily or permanently deprive

3    George Gonzalez of his right to the property or any

4    benefit from it or B, appropriate the property of George

5    Gonzalez to his own use or to the use of any person not

6    entitled to it.

7        If you find that the defendant -- if you find the

8    defendant guilty of theft, you must also determine if

9    the State has proved beyond a reasonable doubt whether

10   the value of the property taken was more than $100 but

11   less than $300.

12       Obtains or uses means any manner of A, taking or

13   exercising control over property.  B, making any

14   unauthorized use, disposition or transfer of property.

15   C, obtaining property by fraud, willful

16   misrepresentation of a future act or false promise.  D,

17   conduct previously known as stealing, larceny,

18   purloining abstracting, embezzlement, misapplication,

19   misappropriation, conversion, or obtaining money or

20   property by false pretenses, fraud, deception or other

21   conduct similar in nature.

22       Endeavor means to attempt or try.

23       Property means anything of value and includes

24   tangible and intangible personal property.

25       Value means the market value of property at the

1    time and place of the offense or if that value cannot be

2    satisfactorily ascertained, the cost of replacement of

3    the property within a reasonable time after the offense.

4        If the exact value of the property cannot be

5    ascertained, you should attempt to determine a minimum

6    value.  If you cannot determine the minimum value, you

7    must find that the value is less than $100.

8        To prove the crime of petit theft, the State must

9    prove the following two elements beyond a reasonable

10    doubt.  One, Jorge Valle-Ramos knowingly and unlawfully

11    obtained or used or endeavored to obtain or use the

12    jewelry, coin collection or knife of George Gonzalez.

13    Two, he did so with the intent to either permanently or

14    temporarily A, deprive George Gonzalez of his right to

15    the property or any benefit therefrom or B, appropriate

16    the property of George Gonzalez to his own use or to the

17    use of any person not entitled to it.

18        If you find the defendant guilty of theft, you also

19    must determine if the State has proved beyond a

20    reasonable doubt whether the value of the property taken

21    was less than $100.

22        Obtains or uses means any manner of A, taking or

23    exercising control over property.  B, making any

24    unauthorized use, disposition or transfer of property.

25    C, obtaining property by fraud, willful

1  misrepresentation of a future act or false promise.  D,

2  conduct previously known as stealing, larceny,

3  purloining, abstracting, embezzlement, misapplication,

4  misappropriation, conversion, or obtaining money or

5  property by false pretenses, fraud, deception, or other

6  similar conduct in nature.

7    Endeavor means to attempt or try.

8    Property means anything of value and includes

9  tangible and intangible personal property.

10    Value means the market value of the property at the

11  time and place of the offense, or if that cannot be

12  satisfactorily ascertained, the cost of replacement of

13  the property within a reasonable time after the offense.

14    If the exact value of the property cannot be

15  ascertained, you should attempt to determine a minimum

16  value.  If you cannot determine a minimum value, you

17  must find the value is less than $100.

18    The defendant in this case has entered a plea of

19  not guilty.  This means you must presume or believe the

20  defendant is innocent.  The presumption stays with the

21  defendant as to each material allegation in the

22  information through each stage of the trial unless it

23  has been overcome by the evidence to the exclusion of

24  and beyond a reasonable doubt.

25    To overcome the defendant's presumption of

1    innocence, the State has the burden of proving the crime

2    with which the defendant is charged was committed, and

3    the defendant is the person who committed the crime.

4    The defendant is not required to present evidence or

5    prove anything.

6        Whenever the words reasonable doubt are used, you

7    must consider the following:  A reasonable doubt is not

8    a mere possible doubt, a speculative, imaginary or

9    forced doubt.  Such a doubt must not influence you to

10   return a verdict of not guilty if you have an abiding

11   conviction of guilt.

12       On the other hand, if after carefully considering,

13   comparing and weighing all of the evidence there is not

14   an abiding conviction of guilt, or if having a

15   conviction it is one which is not stable, but one which

16   wavers and vacillates, then the charge is not proved

17   beyond a reasonable doubt and you must find the

18   defendant not guilty because the doubt is reasonable.

19       It is to the evidence introduced in this trial and

20   to it alone that you are to look for that proof.  A

21   reasonable doubt as to the guilt of the defendant may

22   arise from the evidence, conflict in the evidence or the

23   lack of evidence.  If you have a reasonable doubt, you

24   should find the defendant not guilty.  If you have no

25   reasonable doubt, you should find the defendant guilty.

1          Did I read that right?

2          **MS. CITRARO:**  Yes, you read it right.

3          **THE COURT:**  I thought I might have missed a word.

4          It is up to you to decide what evidence is

5     reliable.  You should use your common sense in deciding

6     which is a best evidence, and which evidence should not

7     be relied upon.  In considering your verdict, you may

8     find some of the evidence not reliable or less reliable

9     than other evidence.

10          You should consider how the witnesses acted as well

11     as what they said.  Some things you should consider are:

12          One, did the witness seem to have an opportunity to

13     see and know the things about which the witness

14     testified?

15          Two, did the witness seem to have an accurate

16     memory?

17          Three, was the witness honest and straightforward

18     in answering the attorneys' questions?

19          Four, did the witness have some interest in how the

20     case should be decided?

21          Five, does the witness's testimony agree with the

22     other testimony and other evidence in the case?

23          Six, did the witness at some other time make a

24     statement that is inconsistent with the testimony he or

25     she gave in court?

1      Whether the State has met the burden of proof does

2   not depend upon the number of the witnesses it has

3   called or upon the number of exhibits it has offered,

4   but instead upon the nature and quality of the evidence

5   presented.

6      The fact that a witness is employed in law

7   enforcement does not mean that his or her testimony

8   deserves more or less consideration than that of any

9   other witness.

10      The defendant in this case has become a witness.

11   You should apply the same rules to consideration of his

12   testimony that you apply to the testimony of the other

13   witnesses.

14      It is entirely proper for a lawyer to talk to a

15   witness about what testimony the witness would give if

16   called to the courtroom.  The witness should not be

17   discredited by talking to a lawyer about his or her

18   testimony.

19      You may rely upon your own conclusion about the

20   credibility of any witness.  A juror may believe or

21   disbelieve all or any part of the witness or the

22   testimony of a witness.

23      In this case you have heard testimony of eyewitness

24   identification.  If deciding how much weight to give

25   this testimony, you may consider the various factors

1     mentioned in these instructions considering credibility

2     of witnesses.  In addition to those factors in

3     evaluating eyewitness testimony, you may also consider

4     one, the capacity and opportunity of the eyewitness to

5     observe the offender based upon the length of time for

6     observations and the conditions at the time of

7     observations including lighting and distance.

8     Two, whether the identification was the product of

9     the eyewitness's own recollection or was the result of

10     influence or suggestiveness.

11     Three, the circumstances under which the defendant

12     was presented to the eyewitness for identification.

13     Four, any inconsistent identifications made by the

14     eyewitness.

15     Five, any instance in which the eyewitness did not

16     make an identification when given the opportunity to do

17     so.

18     Six, the witness's familiarity with the subject

19     identified.

20     Seven, lapses of time between the event and the

21     identifications.

22     Eight, whether the eyewitness and the offender are

23     of different races or ethnic groups and whether this may

24     have affected the accuracy of the identification.

25     And, nine, the totality of the circumstances

1    surrounding the eyewitness's identification.

2        Now these are some general rules that apply to your

3    discussions.  You must follow the law as it is set out

4    in these instructions.  If you fail to follow the law,

5    your verdict will be a miscarriage of justice.  There is

6    no reason for failing to follow the law in this case.

7        All of us are depending upon you to make a wise and

8    legal decision in this matter.

9        Two, this case must be decided only upon the

10   evidence that you have heard from the testimony of the

11   witnesses and have seen in the form of the exhibits in

12   evidence and these instructions.

13       Three, this case must not be decided for or against

14   anyone because you feel sorry for anyone or are angry at

15   anyone.

16       Four, the lawyers are not on trial.  Your feelings

17   about them should not influence your decision in this

18   case.

19       Five, your duty is to determine if the defendant

20   has been proven guilty or not in accord with the law.

21   It is the judge's job to determine a proper sentence if

22   the defendant is found guilty.

23       Six, whatever verdict you render must be unanimous.

24   That is, each juror must agree to the same verdict.

25       Seven, your verdict should not be influenced by

1    feelings of prejudice, bias or sympathy.  Your verdict

2    must be based on the evidence and the law contained in

3    these instructions.

4         Now, deciding a verdict is exclusively your job.  I

5    cannot participate in that decision in any way.  Please

6    disregard anything that I may have said or done that

7    makes you think I prefer one verdict over another.

8         Now, you may find the defendant guilty as charged

9    in the information or guilty of such lesser included

10   crime as the evidence may justify, or not guilty.

11        If you return a verdict of guilty, it should be for

12   the highest offense which has been proven beyond a

13   reasonable doubt.  If you find that no offense has been

14   proven beyond a reasonable doubt, then, of course, your

15   verdict must be not guilty.

16        Only one verdict may be returned as to the crime

17   charged.  This verdict must be unanimous.  That is, all

18   of you must agree to the same verdict.  The verdict must

19   be in writing, and for your convenience, the necessary

20   forms of verdict have been prepared for you as they are

21   as follows:

22        I have two verdict forms here for you.  One for

23   Count I and one for Count II.  The verdict form for

24   Count I reads as follows:  It has the caption of the

25   case, in the Circuit Court of the Ninth Judicial Circuit

1    in and for Orange County, Florida.  Has the case number

2    and the division that is assigned to this.  It says,

3    State of Florida, plaintiff, versus Jorge Valle-Ramos,

4    defendant, and it says verdict as to Count I.

5        You have four options.  The first one is, we, the

6    jury, find the defendant guilty of burglary of a

7    dwelling as charged in the information.  Option two is

8    we, the jury, find the defendant guilty of the lesser

9    included offense of trespass in an occupied structure.

10   Option three is we, the jury, find the defendant guilty

11   of the lesser included of trespass in a structure.  And

12   option four is we, the jury, find the defendant not

13   guilty.  It says so say we all.  Dated in Orlando,

14   Orange County, Florida, on this blank day of blank, 2000

15   blank.  And there's a place for the foreperson to sign.

16       When you-all have reached your verdict on Count I,

17   your foreperson should select and put an X or a check

18   mark in one of the four options and one of the four

19   options only.  They'll need to put the date the month,

20   the year and sign it.  Once you have done that, fold it

21   in half, put it aside and move on to verdict form number

22   two.

23       The caption on verdict form two is identical in

24   terms of case number, division and whatnot.  It says

25   verdict as to Count II.  You, again, have four options.

1    The first option is we, the jury, find the defendant

2    guilty of grand theft third degree, as charged in the

3    information.  Option two is, we, the jury, find the

4    defendant guilty of the lesser included offense of petit

5    theft of $100 or more.  Option three is we, the jury,

6    find the defendant guilty of the lesser included offense

7    of petit theft.  And option four is we, the jury, find

8    the defendant not guilty.

9        Again, it says dated -- so say we all.  Dated at

10   Orlando, Orange County, Florida, on this -- and there's

11   a blank for the day and a blank for the month and a

12   blank for the year, and a place for the foreperson to

13   sign.

14       When you have reached your verdict on Count II, you

15   will do the same thing.  Whoever your foreperson is,

16   they will make a mark or a check mark or an X in one of

17   the four options only and put the date, the month, the

18   year, sign it.  Once you have done that, fold it in

19   half, set it aside, knock on the door, let us know you

20   reached a verdict and we will bring you back in at that

21   time to take it.

22       A separate crime is charged in each count of the

23   information and while they have been tried together,

24   each crime and the evidence applicable to it must be

25   considered separately and a separate verdict must be

1    found as to each.  A finding of guilty or not guilty as

2    to one crime must not affect your verdict as to the

3    other crime charged.

4        In just a few moments, you'll be taken to the jury

5    room by the court deputy.  The first thing that you

6    should do is choose a foreperson who will preside over

7    your deliberations.  The foreperson should see to it

8    that your discussions are carried on in an organized

9    way, and that everyone has a fair chance to be heard.

10       It is also the foreperson's job to sign and date

11   the verdict form when all of you have agreed on a

12   verdict and to bring the verdict form back to the

13   courtroom when you return.

14       During your deliberations, jurors must communicate

15   about the case only with one another, and only when all

16   jurors are present in the jury room.  You are not to

17   communicate with any person outside the jury about this

18   case.  Until you have reached a verdict, you must not

19   talk about this case in person or through the telephone,

20   writing or electronic communication such as a blog,

21   Twitter, email, text message or any other means.

22       Do not contact anyone to assist you during your

23   deliberations.  And these communication rules apply

24   until I discharge you at the end of the case.  If you

25   become aware of any violation of these instructions or

1    any other instruction I give in this case, you must tell

2    me by giving a note to one of the court deputies.

3         If you need to communicate with me, you can send a

4    note to the court deputy signed by the foreperson.  If

5    you have questions, I'll talk with the attorneys before

6    I answer, so it may take some time.  You may continue

7    your deliberations while you wait for my answer.  And I

8    will answer any question if I can in writing or orally

9    here in open court.

10        Now, your verdict finding the defendant guilty or

11   not guilty must be unanimous.  That is, the verdict must

12   be the verdict of each juror as well as the jury as a

13   whole.

14        Now, during the trial, items were received into

15   evidence as exhibits.  You may examine whatever exhibits

16   you think will help you in your deliberations, and these

17   exhibits will be sent into the jury room with you when

18   you begin to deliberate.

19        In closing, let me remind you that it is important

20   that you follow the law spelled out in these

21   instructions in deciding your verdict.  There are no

22   other laws that apply to this case.  Even if you do not

23   like the laws that must be applied, you must use them.

24   For two centuries we have agreed to a constitution and

25   to live by the law, and no juror has the right to

1    violate the rules that we all share.

2        Any objection to the jury instructions as read by

3    the State?

4        **MS. SCOTT:**  No.

5        **MS. CITRARO:**  No objection.

6        **THE COURT:**  May I have the attorneys approach real

7    quick.

8      (Conference at the bench held on the record.)

9        **THE COURT:**  All right.  I thought there was

10   something wrong with that jury instruction on burglary.

11   Half of it I cut off.  I think that I am required to

12   read to them this section.  You, the definition of a

13   dwelling.  When I took out the other definitions, I

14   forgot to leave those two in.

15       **MS. SCOTT:**  Can we bring it -- I just noticed as I

16   was reading it.

17       **THE COURT:**  There's two additional items I'm going

18   to read.  Any objection from the State?

19       **MS. SCOTT:**  No.

20       **THE COURT:**  Defense?

21       **MS. CITRARO:**  No objection.

22       (The following was in open court.)

23       **THE COURT:**  Ladies and gentlemen, I noticed as I

24   was going through this that there were two omissions in

25   the burglary of a dwelling structure.  You might want to

1  know what the definition of a dwelling is, so I think I

2  probably need to give that to you.  And there is also

3  another instruction about intent, so I'm going to give

4  those to you.  I will draft something and I will have

5  the court deputy bring it in writing to you so you have

6  the additional instructions as it relates to the verdict

7  on Count I, which is the burglary of the dwelling

8  charge.  Okay.

9       One of the instructions that I omitted accidentally

10  was the intent with which an act is done is an operation

11  of the mind, and therefore is not always capable of

12  direct and positive proof.  It may be established by

13  circumstantial evidence like any other fact in a case.

14  Even though an unlawful entering of a structure is

15  proved, if the evidence does not establish that it was

16  done with the intent to commit an offense, the defendant

17  must be found not guilty of burglary.

18       And a dwelling means a building of any kind,

19  whether such building is temporary or permanent, mobile

20  or immobile, which has a roof over it and is designed to

21  be occupied by people lodging therein at night together

22  with the enclosed space of ground and outbuildings

23  immediately surrounding it.  For purposes of burglary, a

24  dwelling includes an attached porch or attached garage.

25       Okay.  And I will put that in writing for you and

1    send it back with you shortly.

2    Other than that, any other objections to the jury

3    instructions?

4    **MS. CITRARO:** No.

5    **MS. SCOTT:** No.

6    **THE COURT:** Other than Mr. Andersen and Ms. Perez,

7    the remaining six of you at this time are free to go

8    back and deliberate your verdict.

9    (At 12:18 p.m., the Jury retired to deliberate

10   their verdict.)

11    **THE COURT:** All right. I'll have State and defense

12    look at exhibits to make sure you-all agree on what's

13    going back.

14    **MS. CITRARO:** Defense has no objection.

15    **MS. SCOTT:** Fine.

16    **THE COURT:** Okay. Hand it back to the court

17   deputy.

18    Mr. Anderson and Ms. Perez, I just wanted to thank

19    you for your time and consideration of this case. I

20    understand that it is an imposition sometimes on your

21    time and you probably have other places you'd rather be,

22    but you do serve a very valuable and important function

23    for our system of justice.

24    The reason you were all selected, if somebody had

25    an emergency and could not come back with us, and it has

1    actually happened, with one of the jurors that you would

2    have been asked to step in and hear the case.

3    Fortunately everybody looks like they are healthy and

4    back deliberating.  So with that said, your jury service

5    is hereby concluded.  Thank you for your time.

6        (Alternate jurors exited courtroom.)

7        **THE COURT:**  I need to bring them back in.  I just

8    saw something else.  Let's go ahead and bring them back

9    in.

10        (Jury enters the courtroom.)

11        **THE COURT:**  All right.  Ladies and gentlemen, as

12    luck would have it as I was typing up what I needed to

13    send back with you, there was another paragraph that I

14    forgot to read to you.  So I'm confident it now covers

15    everything.

16        I've discussed it with the attorneys, but I need to

17    read it to you so it is part of our record.  So it is

18    clear, you were given the instruction.  I have a copy

19    here that says it is an addendum to the additional

20    instructions for the charge of burglary of a dwelling.

21    So you'll be able to take this back with you and make

22    sure you consider this as you go through the burglary

23    charge.

24        Okay.  The additional things that you need to know

25    are the intent with which an act is done is an operation

1      of the mind, and therefore is not always capable of

2      direct and positive proof.  It may be established by

3      circumstantial evidence like any other fact in a case.

4          Even though an unlawful entering a structure is

5      proved, if the evidence does not establish that it was

6      done with an intent to commit an offense other than

7      burglary or trespass, the defendant must be found not

8      guilty of burglary.

9          If you find Jorge Valle-Ramos guilty of burglary,

10     you must also determine if the State has proved beyond a

11     reasonable doubt whether the structure was a dwelling.

12         A dwelling means any building of any kind, whether

13     such building is temporary or permanent, mobile or

14     immobile, which has a roof over it and it is designed to

15     be occupied by people lodging therein at night together

16     with the enclosed space of ground and outbuildings

17     immediately surrounding it.  For purposes of burglary, a

18     dwelling includes an attached porch or attached garage.

19         Any objection to those instructions on the

20     burglary?

21         **MS. CITRARO:**  No.

22         **MS. SCOTT:**  No.

23         **THE COURT:**  With that said, I will give you this

24     and now you can go back to your deliberation.

25             (Jury exits the courtroom.)

1          **THE COURT:**  All right.  Everyone have a seat.  Mr.

2     Valle-Ramos, you had the opportunity to be present

3     during the entire course of the trial?

4          **THE DEFENDANT:**  Yes, sir.

5          **THE COURT:**  Are you satisfied with your attorney's

6     representation of you?

7          **THE DEFENDANT:**  Yes, sir.

8          **THE COURT:**  Has she done everything you asked her

9     to?

10          **THE DEFENDANT:**  Yes, sir.

11          **THE COURT:**  Has she failed to do anything you

12     wanted her to do?

13          **THE DEFENDANT:**  No.

14          **THE COURT:**  Are you satisfied with her services at

15     this point in time?

16          **THE DEFENDANT:**  Yes, sir.

17          **THE COURT:**  You should be.  She did a good job for

18     you.

19          **THE DEFENDANT:**  Yes.

20          **THE COURT:**  Anything else we need to address before

21     we adjourn?

22               (Court was at ease.)

23          **THE COURT:**  Without objection from the parties on

24     Mr. Valle-Ramos's case, there is no objection from the

25     parties, what I'm gonna have the court deputy do is to

1      step in and let the jurors know that between now and

2      1:30, nobody will be here.  So that everybody has an

3      opportunity to go to lunch and that if they have a

4      verdict, it'll just have to be held and we will take it

5      at 1:30.  Okay?

6                 (Luncheon recess.)

7           (Thereupon, at 3:10 p.m., the Jury returned

8  to the courtroom with their verdict.)

9      **THE COURT:**  All right.  Back on the record, State

10     of Florida versus Jorge Valle-Ramos.  I'll note for the

11     record that Ms. Casajuana is stepping in for Ms. Scott

12     on behalf the State.  Miss Citraro is present from the

13     Public Defender's office as well as Mr. Valle-Ramos, and

14     it's my understanding that the jury has reached a

15     verdict; is that correct?

16     Any reason why we can't bring the jurors back in

17     and take the verdict at this time?  Let's go ahead and

18     bring back the members of the jury.

19            (Jury enters the courtroom.)

20     **THE COURT:**  Everybody have a seat.  All right.

21     Ladies and gentlemen of the jury, I have been informed

22     that you-all have reached unanimous verdicts; is that

23     correct?

24     **FOREPERSON:**  If you'd go ahead and hand the verdict

25     forms to the court deputy for me, please.

1        **THE COURT:**  All right.  Will the defendant and his

2        attorney please rise?

3            Madam Clerk, if you'd go ahead and please announce

4        the verdict.

5        **THE CLERK:**  In the Circuit Court of the Ninth

6        Judicial Circuit in and for Orange County, Florida.

7        Case number 2013-CF-5146.  State of Florida versus Jorge

8        Valle-Ramos.  Division 16.  Verdict as to Count I, we,

9        the jury, find the defendant guilty of burglary of a

10       dwelling as charged in the information.

11           Verdict as to Count II.  We, the jury, find the

12       defendant guilty of grand theft third degree, as charged

13       in the information.  So say we all.  Dated at Orlando,

14       Orange County, Florida, on this 22nd day of May, 2014.

15       Signed by the foreperson.

16       **THE COURT:**  Either side wish to have the jury

17       polled?  State?

18       **MS. CITRARO:**  Yes.  I ask for the jury to be

19       polled.

20       **THE COURT:**  Juror Number 1, is this your true and

21       correct verdict?

22       **JUROR SEAT 1:**  Yes.

23       **THE COURT:**  Juror Number 2, is this your true and

24       correct verdict?

25       **JUROR SEAT 2:**  Yes.

1      **THE CLERK:**  Juror Number 3, is this your true and

2      correct verdict?

3      **JUROR SEAT 3:**  Yes.

4      **THE CLERK:**  Juror Number 4, is this your true and

5      correct verdict?

6      **JUROR SEAT 4:**  Yes.

7      **THE CLERK:**  Juror Number 5, is this your true and

8      correct verdict?

9      **JUROR SEAT 5:**  Yes.

10     **THE CLERK:**  Juror Number 6, is this your true and

11     correct verdict?

12     **JUROR SEAT 6:**  Yes.

13     **THE COURT:**  All right.  Mr. Valle-Ramos, if you

14     will just have a seat, we will get to sentencing in a

15     few seconds.

16     All right.  Ladies and gentlemen of the jury, I

17     wish to thank you for your time and consideration of

18     this case.  I know that jury duty is not always

19     convenient for you, and it's probably something that you

20     would rather not be here for.  However, you do serve a

21     very valuable and important function for our system of

22     justice in cases such as this where there is a dispute

23     between what the facts are.  That's why we rely upon

24     you-all to make the determination of what the dispute

25     and the facts are.

1          So for your service here on behalf of the citizens

2     of Orange County, I thank you for your time.  There is

3     one final instruction that I have to give you that has

4     to do with your service on a jury.  And it goes as

5     follows, ladies and gentlemen, I wish to thank you for

6     your time and consideration of this case.  I also wish

7     to advise you of some very special privileges that you

8     enjoy as a juror.

9          No juror can ever be required to talk about the

10    discussions that occur in the jury room except by court

11    order.  For many centuries, our society has relied upon

12    juries for consideration of difficult cases.  We have

13    recognized for hundreds of years that a jury's

14    deliberations, discussions and votes should remain their

15    private affair so long as they wish it.  Therefore, the

16    law gives you-all a unique privilege not to speak about

17    the jury's work.

18         Although you are at liberty to speak to anyone

19    about your deliberations, you were also at liberty to

20    refuse to speak to anyone.  A request may come from

21    those who are simply curious or from those who might

22    seek to find fault with you, and it'll be up to each one

23    of you as an individual whether to preserve your privacy

24    as a juror in this case.

25         With that said, um, you are hereby discharged from

1    jury service.  We have some certificates for you to

2    indicate you have been here.  There's also a letter.  If

3    you have any questions or concerns or anything that you

4    would like to pose on to me on things we can do to

5    improve our system here in Orange County, we are -- also

6    Osceola County, let me know and I'll make sure they go

7    up to the administrative judge.

8        With that said, I thank you for your service.

9           (Jury exits the courtroom.)

10    **MS. CITRARO:**  Judge, I'll make a motion for a

11    judgment of acquittal not withstanding verdict at this

12    time.

13    **THE COURT:**  Grounds?  Anything you want to add or

14    you're just making a motion?

15    **THE DEFENDANT:**  Can I say something?

16    **THE COURT:**  Not yet.

17    **MS. CITRARO:**  Grounds being that there was

18    sufficient conflict in the evidence, that there was

19    reasonable doubt in this case.

20    **THE COURT:**  I'm going to go ahead and deny that

21    motion.  All right.  Is there any legal reason why we

22    can't proceed to sentencing?

23    **MS. CITRARO:**  Yes.  We ask for a PSI.  He's

24    entitled to a PSI.

25    **THE COURT:**  Then what I'm gonna do is I'm gonna

1    order a presentence investigation in this case.  I'm

2    going to adjudicate him guilty of the two offenses at

3    this point in time, and we will set off sentencing eight

4    weeks from today's date.  July 17th.  That's a Thursday.

5    Sentencing will be set for July 18th at 8:30 in the

6    morning.

7        Mr. Valle-Ramos, at this point in time you are

8    going to be remanded into the custody of the Orange

9    County Sheriff's Office pending sentencing.

10    **MS. CITRARO:**  Would you be willing to let him stay

11    in the community?  He has no criminal history, no FTA's

12    on this case.

13    **THE COURT:**  At this point he's looking at a

14    mandatory prison sentence.  No, ma'am.

15    **THE DEFENDANT:**  May I say something?

16    **THE COURT:**  You can say whatever you want.

17    **THE DEFENDANT:**  Is that when I got arrested, when I

18    was being interrogated, there was a camera.  That camera

19    shows that I have a ponytail.  That's relevant.  Is that

20    irrelevant?  I can't do nothing about it?

21    **THE COURT:**  At this point in time all the evidence

22    has been heard by the jury.  The jury has made their

23    determination.  They weighed the evidence, credibility

24    of all who testified and we have to respect their

25    verdict at this point in time.  Okay.  We'll be in

1       recess.

2              (The proceedings were concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

```
 1

 2                    C E R T I F I C A T E

 3

 4

 5   STATE OF FLORIDA:

 6   COUNTY OF ORANGE:

 7        I, Rebecca Ruiz, RPR, Official Court

 8   Reporter of the Ninth Judicial Circuit of Florida,

 9   do hereby certify pursuant to Florida Rules of Judicial

10   Administration 2.535(h)(3), that I was authorized to and did

11   report in stenographic shorthand the foregoing proceedings,

12   and that thereafter my stenographic shorthand notes

13   were transcribed to typewritten form by the process

14   of computer-aided transcription, and that the

15   foregoing pages contain a true and correct

16   transcription of my shorthand notes taken therein.

17

18        WITNESS my hand this _____ day of _____

19   2014, in the City of Orlando, County of Orange,

20   State of Florida.

21

22

23        _____

24        Rebecca Ruiz

25
```

| | |
|---|---|
| 1 | **IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND** |
| 2 | **FOR ORANGE COUNTY, FLORIDA CRIMINAL JUSTICE DIVISION** |
| 3 | |
| | **STATE OF FLORIDA,** |
| 4 | |
| | Plaintiff, |
| 5 | **CASE NO.: 48-2013-CF-5146-A-O** |
| | **vs.** |
| 6 | **DIVISION NO.: 19** |
| | **JORGE VALLE-RAMOS,** |
| 7 | |
| | Defendant. |
| 8 | |
| 9 | **MOTION FOR POST-CONVICTION RELIEF** |
| 10 | **BEFORE** |
| 11 | **THE HONORABLE LUIS F. CALDERON** |
| 12 | |
| 13 | Orange County Courthouse |
| | 425 North Orange Avenue |
| 14 | Orlando, Florida 32801 |
| | Courtroom 12D |
| 15 | March 28, 2023 |
| | Stenographically reported |
| 16 | |
| 17 | **A P P E A R A N C E S :** |
| 18 | **ANNA RENEE' MOMPREMIER, ESQUIRE** |
| | Office of the State Attorney |
| 19 | 415 North Orange Avenue |
| | Orlando, Florida 32801 |
| 20 | On behalf of the State |
| 21 | **LAURA LYNN CEPERO, ESQUIRE** |
| | **LISABETH J. FRYER, ESQUIRE** |
| 22 | Lisabeth J. Fryer, P.A. |
| | 247 San Marcos Avenue |
| 23 | Sanford, Florida 32771 |
| | On behalf of the Defendant |
| 24 | |
| 25 | |

1                      -    -    -

2                    **I N D E X**

3  OPENING STATEMENTS
        By Ms. Fryer                              5
4
   **TESTIMONY OF BETHANY SZEWCZYK**
5       Direct Examination By Ms. Cepero          10
        Cross-Examination By Ms. Mompremier       21
6       Redirect Examination By Ms. Cepero        44
        Recross-Examination By Ms. Mompremier     49
7
   **TESTIMONY OF JORGE VALLE-RAMOS**
8       Direct Examination By Ms. Cepero          52
        Cross-Examination By Ms. Mompremier       59
9
   **TESTIMONY OF JASMINE ORTIZ**
10      Direct Examination By Ms. Cepero          61

11 **TESTIMONY OF BRIAN CAHILL, PH.D.**
        Direct Examination By Ms. Fryer           70
12      Cross-Examination By Ms. Mompremier       94

13 DEFENSE RESTS                                  109

14 **TESTIMONY OF GEORGE GONZALEZ**
        Direct Examination By Ms. Mompremier      110
15      Cross-Examination By Ms. Fryer            113

16 **TESTIMONY OF MICHAEL STANLEY**
        Direct Examination By Ms. Mompremier      116
17
   STATE RESTS                                    119
18
   CLOSING ARGUMENTS
19      Argument By Ms. Cepero                     120
        Argument By Ms. Mompremier                138
20      Rebuttal Argument By Ms. Cepero           150

21 CERTIFICATE OF REPORTER                        155

22

23

24

25

1   **FOR THE DEFENSE:**

2   Number 1        Photo lineup                           14
    Number 2        License photo                          56
3   Number 3        Photograph                             67

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    -   -   -

2                **P R O C E E D I N G S**

3              (March 28, 2023; 9:03 a.m.)

4          **THE COURT:**  This is 2013-CF-5146, State vs. Jorge

5     Valle-Ramos.

6          Ms. Mompremier for the State and Ms. Fryer for

7     Mr. Valle-Ramos.

8          Is this your cocounsel?

9          **MS. FRYER:**  She's actually lead on this case,

10    Your Honor.

11         **MS. CEPERO:**  Laura Cepero.

12         **THE COURT:**  Nice to meet you.

13         All right.  And Mr. Valle-Ramos is seated next to

14    counsel.

15         Good morning, Mr. Valle-Ramos.

16         **THE DEFENDANT:**  Good morning.

17         **THE COURT:**  All right.  So we're here for a

18    motion for post-conviction relief.  And there was a

19    motion filed that I wanted to address before we get

20    started.  This is a motion for a virtual appearance

21    that was filed by the State.  There was an objection

22    by the defense.

23         Defense, does that objection still stand?

24         **MS. FRYER:**

25    That appears to be moot, Your Honor.  Mr. Gonzalez is

1       present in the courtroom.

2           **THE COURT:**  So the motion is moot.  We'll proceed

3       forward.

4           And, Ms. Fryer, Ms. Cepero, the way that I

5       conduct this is like a mini trial.  I know you-all

6       haven't been before me.  But, basically, you can make

7       an opening statement if you wish.  The State will also

8       have an opportunity to do the same if they wish.

9           Then the defense, because they're the moving

10      party, will have the opportunity to present any

11      evidence, including any testimony, that they want the

12      Court to consider, any judicial notice that you wish

13      to take -- that you are asking the Court to take, you

14      can do so at that time.  State will then have an

15      opportunity to do the same.  Defense will then have

16      rebuttal, and then the parties will be able to make

17      their closing arguments.  Defense will have initial

18      and a rebuttal closing.

19          All right.  Defense, would you like to make an

20      opening statement?

21          **MS. FRYER:**  I'm -- I'm glad, Your Honor, to be

22      apprised of the -- with the procedure in the

23      courtroom, so if this sounds like we have just decided

24      to make an opening statement, that's true.

25          So, Your Honor, this is a unique set of

1    circumstances here.  What we have today is really a

2    textbook misidentification case.  Mr. Ramos was

3    convicted of a burglary, robbery, and he served

4    three years in prison.

5        At trial, what you'll hear and what the record

6    will reflect, is this was based entirely on two

7    identifications that occurred as the event was

8    unfolding; one by Mr. Gonzalez and then one by our

9    recanting witness today.

10       Over the course of time, Mr. Ramos has always

11   claimed his innocences, as his family has as well.

12   And what you'll hear today, Your Honor, is that he was

13   right.  His family was right.  They were -- it was

14   perfect that they didn't give up.  They never gave up.

15   Because Jerry Lyons, private investigator, through our

16   law office, went and started investigating the case

17   fresh, just like a police officer would; tried to talk

18   to witnesses and figure out what's going on.

19       And what you'll find today is our recanting

20   witness said, I always thought this would happen.

21   I've been thinking about this a long time.

22       What you're gonna hear is that through the course

23   of an overly suggestive lineup and then additional

24   bias-inducing gestures -- not even necessarily on

25   purpose -- by law enforcement and the other witness

1    here, that any doubt about our recanting witness'

2    identification at the time was overcome.  And what the

3    Court knows and what we've provided in the Innocence

4    Commission study, is that misidentification is the

5    number one correlate to false convictions.

6    Convictions that should never have occurred.

7        And so we're extremely honored to be presenting

8    this to Your Honor.  This is a case -- it's not a

9    recantation case where two guys just happen to run

10   into each other in prison.  This is a case that when

11   you dissect the only evidence in the case, you'll find

12   that by today's standards, it's wholly unreliable.

13   I'm not certain that the case would have been brought

14   previously.  And the evidence is just going to

15   establish that we should -- we should vacate the

16   judgment and sentence and set this for a new trial to

17   be able to address the flaws in the evidence as we

18   understand them now.

19       We'd ask the Court to take judicial notice of the

20   entire court file, including the transcripts from the

21   previous trial.

22       **THE COURT:**  State, any objection?

23       **MS. MOMPREMIER:**  No objection, Your Honor.

24       **THE COURT:**  All right.  The Court will take

25   judicial notice of the entire court file.

1          **MS. FRYER:**  Thank you, Your Honor.

2          **THE COURT:**  You're welcome.

3          State, you wish to make an opening statement?

4          **MS. MOMPREMIER:**  No opening, Your Honor.  We'll

5    reserve our comments for the closing.

6          **THE COURT:**  Thank you.

7          Defense, would you like to call your first

8    witness?

9          **MS. CEPERO:**  Yes.  We'd also like to invoke the

10   rule of sequestration.

11         **THE COURT:**  All right.  Are there any witnesses

12   present in the courtroom?

13         All right.  If you-all would step out.  We'll

14   call you when we're ready.  Do not discuss your

15   testimony with anyone or each other.

16         And, counsel, will you-all approach?

17         (At the bench.)

18         **THE COURT:**  I didn't realize Mr. Lyons was gonna

19   be called as a witness.  So I wanted to disclose to

20   the parties that when I was in private practice, I

21   used -- or Mr. Lyons would investigate cases that I

22   was working on as well.  But that was more than

23   six years ago.  Is that gonna be an issue for the

24   State?

25         **MS. MOMPREMIER:**  Not unless the Court doesn't

1      believe that he can remain fair throughout this

2      process.

3            THE COURT:  I err on the side of caution, so I

4      preferred to disclose.  It's not an issue for me,

5      otherwise I would just recuse myself at this point.

6            MS. FRYER:  Okay.

7            MS. MOMPREMIER:  Okay.

8            THE COURT:  Like I said, I just prefer to

9      disclose.

10            (In open court.)

11            THE COURT:  Defense, you may call your first

12      witness.

13            MS. CEPERO:  The defense calls Bethany Szewczyk.

14                        **BETHANY SZEWCZYK**

15      **was called as a witness and, having first been duly sworn,**

16      **testified as follows:**

17            THE WITNESS:  Yes, sir.

18            THE COURT:  Good morning, ma'am.  Please be

19      seated.

20            THE WITNESS:  Good morning.

21            THE COURT:  Please state your first and last

22      name.

23            THE WITNESS:  Bethany Szewczyk.

24            THE COURT:  And could you please spell your last

25      name for the court reporter.

1          **THE WITNESS:**  Sure.  It's S-z-e-w-c-z-y-k.

2          **MS. CEPERO:**  Thank you, Ms. Szewczyk.

3                              **DIRECT EXAMINATION**

4     **BY MS. CEPERO:**

5          **Q**     Are you currently employed?

6          **A**     Yes.

7          **Q**     And what do you do?

8          **A**     I'm an attorney.  I have my own practice.

9          **Q**     What kind of law do you practice?

10         **A**     Family law and probate.

11         **Q**     Do you have any prior employment experience?

12         **A**     Yes.  I worked for seven years at Siemens Energy.

13         **Q**     Now, where were you living around the time of

14    April of 2013?

15         **A**     I was living at 1716 Lafayette Court, here in

16    Orlando.

17         **Q**     Do you remember the day of April 9th, 2013?

18         **A**     Yes, I remember.

19         **Q**     What did you do that morning?

20         **A**     I got up and I got ready for work and left my

21    house.

22         **Q**     And as you were leaving for work, did something

23    out of the ordinary occur?

24         **A**     Yes.

25         **Q**     And what happened?

1    **A**    I exited my front door and then my privacy

2  gate -- fence -- gate and entered my carport to get into my

3  car.  And I stopped because there was a car parked directly

4  behind mine in the roadway.  And I saw three young men

5  running up to the car, and I didn't know who they were.

6  And the driver -- the one who got into the driver's side,

7  he had blue latex gloves on.

8    **Q**    And did you get a good look at any of these

9  individuals?

10    **A**    I did.  The driver.

11    **Q**    For how long?

12    **A**    Probably about 20 seconds as he drove away.  We,

13  like, stared at each other as he drove away.

14    **Q**    And from what distance were you from him?

15    **A**    Probably about 20 to 30 feet.

16    **Q**    Okay.  And can you describe any of the three

17  individuals that you saw, their characteristics?

18    **A**    I just remember that they were all very young.

19  They looked like brothers.  They were young, light-skinned

20  Hispanic males.  And the driver, he had, like, poofy hair,

21  'cause I remember as he ran, it was moving.

22    **Q**    Okay.  How big -- would you describe it as an

23  Afro, his hair?

24    **A**    Yeah, it was Afro-like hair.  Yes.

25    **Q**    How big was the Afro?

          1       **A**     It wasn't that big, but it was enough to -- that

          2    it was moving as he was running.

          3       **Q**     And did you -- had you ever seen any of those

          4    three individuals before?

          5       **A**     No, never.

          6       **Q**     Never met them?

          7               Did you give a statement to law enforcement?

          8       **A**     Yes, I did.

          9       **Q**     Did law enforcement later ask you to participate

         10    in a photographic array lineup?

         11       **A**     Yes, they did.

         12       **Q**     Do you know when that occurred?

         13       **A**     It was several months after the event happened.

         14       **Q**     Does September 4th, 2013, sound about right?  In

         15    that area?

         16       **A**     Probably.

         17       **Q**     Who conducted the lineup?

         18       **A**     The detective on the case.

         19       **Q**     Do you recall his name?

         20       **A**     I don't recall his name.

         21       **Q**     Does Michael Stanley sound familiar?

         22       **A**     Yes, Detective Stanley.  I remember the last name

         23    now.

         24       **Q**     I'm going to show you what's previously been

         25    marked as Defense Exhibit A.

1          **MS. CEPERO:**  May I approach?

2          **THE COURT:**  Show it to opposing counsel.

3  **BY MS. CEPERO:**

4     **Q**     Take a look at the pages.

5            Do you recognize that document?

6     **A**     Yes, I do.

7     **Q**     What is it?

8     **A**     This is the photo lineup that he presented to me.

9     **Q**     Does it fairly and accurately represent the

10  lineup that you saw in September of 2013?

11    **A**     Yes, I believe that was.

12    **Q**     And when you were shown the lineup on that day,

13  what was the first thing you noticed?

14    **A**     Well, that the pictures, number one, were all

15  very poor quality and dark.  They were dark pictures.

16    **Q**     Did the detective note the poor quality of the

17  photos?

18    **A**     Yeah, he did.  He's, like, I'm sorry, I know

19  they're not the best quality.

20    **Q**     Did you ultimately select a photo from the

21  lineup?

22    **A**     Yes, I did.

23    **Q**     What features or characteristics, when looking at

24  these individuals, did you concentrate on when making your

25  selection?

1    **A**    The hair, his Afro.

2    **Q**    Anything else?

3    **A**    No.  I mostly focused on that, 'cause he was the

4  only one in the lineup with an Afro, and he resembled the

5  person that I remember seeing.

6    **Q**    How certain were you when you selected that

7  photo?

8    **A**    I -- I was fairly certain, but I also knew that

9  the skin tone looked darker, but I figured it was because

10  of the poor quality of pictures, so I didn't know.

11    **MS. CEPERO:**  Okay.  May I have one moment with

12    cocounsel?

13    **THE COURT:**  You may.

14    **MS. CEPERO:**  Your Honor, we'd like to take what's

15    previously been marked as Defense Exhibit A and enter

16    it into evidence as Defense Exhibit 1.

17    **THE COURT:**  Any objection?

18    **MS. MOMPREMIER:**  No, Your Honor.

19    **THE COURT:**  What's been marked for identification

20    as Defense A will be moved into evidence as Defense 1.

21    If you could just hand the exhibit to the clerk

22    to be marked.

23    (Defendant's Exhibit 1 received in evidence.)

24    **MS. CEPERO:**  And may I approach the witness?

25    **THE COURT:**  You may.

1      **MS. CEPERO:**  May I have another moment?

2      **THE COURT:**  You may.

3      **MS. CEPERO:**  May I approach the clerk?

4      **THE COURT:**  You may.

5  **BY MS. CEPERO:**

6      **Q**    Ms. Szewczyk, this is the lineup that you saw

7  that day?

8      **A**    Yes.

9      **Q**    And you circled the second individual and

10  initialed it?

11      **A**    Yes.

12      **Q**    So after you made your selection in the lineup,

13  did Detective Stanley give you any feedback?

14      **A**    He smiled and said that's him.

15      **Q**    He said that's him.  And what did you interpret

16  that to mean?

17      **A**    That I had picked the guy that he ultimately

18  wanted me to choose; the one that he was -- that he had

19  previously arrested.

20      **Q**    Okay.  Did Detective Stanley give you an

21  indication of anyone else identifying that suspect -- or

22  that -- selecting that photograph?

23      **A**    Yeah.  He told me that the victim, Mr. Gonzalez,

24  had identified him also.

25      **Q**    Do you recall how many times you saw this lineup

1   prior to trial?

2        **A**    I don't recall.

3        **Q**    Do you know a man named Jorge Valle-Ramos?

4        **A**    I don't.  I mean, now I know him, but at the time

5   I did not.  I don't know him personally at all.

6        **Q**    So you did not know him prior to --

7        **A**    No.

8        **Q**    -- the events that took case -- place in this

9   case?

10            So you had never met him, never spoke with him?

11       **A**    I've still never spoken to him.  No, never.

12       **Q**    Did you testify at Mr. Valle-Ramos' trial?

13       **A**    Yes, I did.

14       **Q**    Did you recognize him when you saw him in the

15   courtroom that day?

16       **A**    No.

17       **Q**    No?

18       **A**    No.  In fact -- I mean, I recognized him from the

19   photo lineup.  But I also was like, I don't think that's

20   the guy that I saw that day.

21       **Q**    And why not?  What was different about him?

22       **A**    His skin tone was too dark, and his eyes were too

23   light.

24       **Q**    Do you know a man named George Gonzalez?

25       **A**    No.  I mean, I know of him now, but I don't know

1   him personally.

2       Q       How do you -- who do you know -- how do you know

3   about him?  Like, what is that you know in relation to this

4   case about him?

5       A       I know that he was the victim of the burglary,

6   that he lived in the neighboring condo community to me, and

7   he was the one who was burglarized that day.

8       Q       Have you ever met Mr. Gonzalez?

9       A       I met him the day of trial.

10      Q       Okay.  And how did that meeting happen?

11      A       He had testified first, and I was out waiting in

12  the waiting area.  And when he was done testifying, he left

13  the courtroom and approached the detective, and the

14  detective introduced us.

15      Q       So the detective introduced you, and then did you

16  have a conversation with Mr. Gonzalez?

17      A       Yes.  He proceeded to tell me his version of

18  events that had happened that day.

19      Q       Do you recall the details of his version of

20  events?

21      A       He said that he had come back home -- he had left

22  and came back home and confronted the burglars and they ran

23  out of his house.  And I just remember he was very emphatic

24  and very angry and upset.

25      Q       Did he tell you anything about the defendant?

1    **A**    That he had an Afro.

2    **Q**    Did he tell you that he was certain that he made

3    the correct identification, that the defendant was the

4    correct guy?

5    **A**    Yes, he did say that.

6    **Q**    Do you believe that his statement in any way

7    maybe influenced your confidence in your identification in

8    this case?

9    **A**    It certainly did.  Because after I had seen the

10   defendant and I had doubts -- 'cause I actually saw him

11   before I went into the courtroom.  The defendant left the

12   courtroom 'cause they -- after Mr. Gonzalez testified, they

13   took a break.  So he came out and -- I saw the defendant

14   come out and I knew it was him, 'cause I recognized him

15   from the photo.  And I was like, his skin is too dark.  I

16   don't think that's him.  And then after I talked to

17   Mr. Gonzalez, I was like, well, he must be sure, so I

18   guess...

19   **Q**    So, just to be clear, you say you recognized him

20   from the photo in the lineup, but you didn't recognize him

21   as the person who --

22   **A**    Right.

23   **Q**    -- got into the driver side of the vehicle?

24   **A**    Exactly.  I knew who he was, 'cause I knew he was

25   the defendant.  But I knew he wasn't the guy that I had

1   seen that day.

2          Q    And do you recall if, prior to your testimony,

3   you were instructed about the rule of sequestration?

4          A    No.  I just know it from law school, but I wasn't

5   told that it was invoked.

6          Q    Okay.  Now, in late 2021, were you approached by

7   a private investigator?

8          A    Yes, I was.

9          Q    Do you recall his name?

10         A    No.

11         Q    Does Jerry Lyons sound familiar?

12         A    Yes.  Yes, Jerry.  I'm sorry, I'm terrible with

13   names.

14         Q    No.  That's okay.

15              And what information did you share with him?

16   When you first saw him and he approached you, what did you

17   say?

18         A    I told him that I had been thinking about this,

19   that I had had doubts over the years, and that I always

20   wondered, did I help send somebody innocent to prison.  You

21   know, I always wondered if this day would come, that

22   somebody would come back and ask me about it again.

23         Q    And did Mr. Lyons show you some photographs?

24         A    Yes.

25         Q    What did you -- do you recall what the

1  photographs were?  Were they photographs you had seen

2  before?

3      **A**    He showed me -- the only -- the one I mainly

4  remember that he showed me was the photograph of somebody

5  else.

6      **Q**    Somebody else.

7           And what were your thoughts when you saw that

8  person?

9      **A**    That's him.  That was the guy.

10     **Q**    The guy who got in the driver's side of the

11  vehicle?

12     **A**    Correct.  I knew it wasn't Mr. Valle-Ramos, and

13  I -- but I knew that was the right guy right there.  That

14  was the guy that I had seen.

15     **Q**    How did you feel when you saw that photo?

16     **A**    Better.

17     **Q**    Better?

18     **A**    Yes.  It was, like, kind of a relief.  Like,

19  someone had finally found him.

20     **Q**    And do you recognize the individual sitting at

21  counsel table in the black button-up shirt?

22     **A**    I recognize him from the day of trial, yes.

23     **Q**    Okay.  But you do not recognize him as the person

24  who got in the driver's side?

25     **A**    No, that's definitely not him.

1    **MS. CEPERO:**  That's all I have.

2    **THE COURT:**  State, cross-examination?

3                    **CROSS-EXAMINATION**

4    **BY MS. MOMPREMIER:**

5    **Q**    Good morning, Ms. Szewczyk.  Am I pronouncing

6    that correctly?

7    **A**    Szewczyk.

8    **Q**    Szewczyk.  Okay.

9         So, Ms. Szewczyk, let's start from the beginning.

10   Before you were even a witness in this case, you were an

11   attorney at the time?

12   **A**    Yes.

13   **Q**    And, ultimately, you were one of the witnesses in

14   this case, correct?

15   **A**    Correct.

16   **Q**    You saw three young Hispanic males running from

17   an area, one of the adjacent residences, to the place where

18   you resided, correct?

19   **A**    Correct.

20   **Q**    And you were able to get a good look at the

21   driver?

22   **A**    Yes.

23   **Q**    And, ultimately, the police got a description

24   from you, correct?

25   **A**    Yes.

1    **Q**    And eventually you were presented a photo lineup,

2  correct?

3    **A**    Correct.

4    **Q**    So before you did that photo lineup, had anyone

5  suggested or presented any other people to you as a

6  potential suspect?

7    **A**    No, not that I recall.

8    **Q**    Okay.  And when you looked at the photo lineup --

9  let's talk about the lineup.  You would agree with me that

10  the first portion of the lineup, before you even received

11  it, the detective gave you instructions, correct?

12    **A**    Yes.  He gave me written instructions.

13    **Q**    Okay.  And you obviously were an attorney at that

14  time, correct?

15    **A**    Yes.  For -- yeah, but I wasn't practicing.

16    **Q**    But you were still an attorney that was barred by

17  the state of Florida, correct?

18    **A**    Absolutely.

19    **Q**    And you know how important it is to read

20  documents before you sign anything, correct?

21    **A**    Yes, ma'am.  I did read it.

22    **Q**    And did you do that due diligence when you did

23  the photo lineup?

24    **A**    Yes, I did.

25    **Q**    So you would have read the instructions that were

1  given to you on the form?

2  **A**    Uh-huh.

3  **Q**    Is that a yes?

4  **A**    That's a yes.

5  **Q**    Okay.  And in those instructions, in part, it

6  tells you, you don't have to make an identification,

7  correct?

8  **A**    Correct.

9  **Q**    And did you know that before you made that

10  identification that you did not have to pick somebody?

11  **A**    I don't recall the instructions.  I know that I

12  read them.  I don't remember what I was thinking at the

13  time.

14  **Q**    Do you have any reason to believe that you would

15  not have been mindful of these instructions?

16  **A**    What do you mean, "mindful"?

17  **Q**    Is there any reason to believe that you wouldn't

18  follow the instructions given?  So if the instruction tells

19  you you don't have to make an ID, is there any -- do you

20  have any knowledge that you wouldn't follow that, that you

21  would feel pressure or compelled to make an ID, even though

22  it tells you you don't have to make an ID?

23  **A**    I certainly did feel pressure, but, obviously, I

24  did read the instructions.  I know I signed them.

25  **Q**    Okay.  And you were aware of the quality of the

1    photographs before you made the ID, correct?

2        **A**    Yes.

3        **Q**    And you still made an ID anyway, correct?

4        **A**    Yes, I did.

5        **Q**    And when you made that initial ID, were you

6    confident in the decision that you made?

7        **A**    I was pretty confident, but I wasn't a hundred

8    percent certain.

9        **Q**    Did you tell the detective that?

10        **A**    No, because he immediately told me that I had

11    picked the right guy.

12        **Q**    Let's talk about that for a minute.  So you're

13    saying, at this point, you weren't completely confident in

14    your ID in the photo lineup?

15        **A**    No.  Because I thought that his skin looked too

16    dark, but I figured it was because of the poor quality of

17    the photographs.

18        **Q**    Did you ever tell the prosecutor that?

19        **A**    No.

20        **Q**    And at some point you had -- you spoke with the

21    prosecutor before this case went to trial, correct?

22        **A**    I did.

23        **Q**    You also spoke with the prosecutor and the

24    defense attorney in a deposition, correct?

25        **A**    I did, yes.

1    **Q**    And at no point did you ever say, hey, I think

2    the guy is too -- has a darker complexion?

3    **A**    No, 'cause it never came up.  They didn't ask me

4    about it.

5    **Q**    You understand that you were called because

6    you -- you identified somebody, correct?

7    **A**    Correct.

8    **Q**    And you didn't think it was important to let

9    anybody know that information?

10    **A**    At the time, no, because I was -- I was trusting

11    the detective that -- again, he told me that I picked the

12    right guy and that the other witness had already identified

13    him, so I was trying to reassure myself, I suppose.

14    **Q**    And so let's talk about the lineup itself.

15    Before the lineup -- before you made your selection in the

16    lineup, did the detective ever suggest or give you any

17    information about a potential suspect?

18    **A**    About the defendant?

19    **Q**    Yeah.  Like, did he suggest one person over

20    another?

21    **A**    No.

22    **Q**    Okay.  Did he tell you what the victim said

23    before you made your ID?

24    **A**    No.

25    **Q**    Did he show you any other photographs of anyone

1    before he showed you this photo lineup?

2        **A**    No.

3        **Q**    So, ultimately, your selection was of your own

4    accord, correct?

5        **A**    That is correct.

6        **Q**    And, ultimately, when you made this photo ID, you

7    weren't -- you didn't say, this is the person that I think

8    may have done it, correct?

9        **A**    I just simply pointed to the picture.  He was the

10   only one with an Afro.

11       **Q**    Just reading verbatim from the form, it says,

12   "The person in box number two was seen by me, early

13   morning, as he was getting into a vehicle with blue latex

14   gloves on and speeding away."

15            You said that this was the person who did this

16   action, correct?

17       **A**    I'm not looking at that, but if that's what I

18   wrote, then...

19            **MS. MOMPREMIER:**  If I can approach with the

20        defense witness [sic]?

21            **THE COURT:**  You may.

22            **MS. MOMPREMIER:**  For the record, I'm approaching

23        with Defense 1.

24   **BY MS. MOMPREMIER:**

25       **Q**    I'm going to show you the form that says "Witness

1    Photo Display Identification Form" as a part of State's 1.

2    Can you look over this part of your -- of that exhibit?

3        **A**    Yes.  Yes, I did write that.

4        **Q**    Okay.  So it wasn't his skin is too dark, or his

5    skin's a little darker, but this may be the person,

6    correct?  That's not what you wrote?

7        **A**    Correct, I did not write that.

8        **Q**    Okay.  That's a pretty -- it's a pretty direct

9    statement.  It says this is the person that did this

10   action, correct?

11       **A**    Correct.  I wish I had said something.

12       **Q**    Okay.  And isn't it true -- so let's talk about

13   Detective Stanley.  So you said he did not provide you

14   anything to make any suggestions one way or another before

15   you made your ID, correct?

16       **A**    Not before, but he did give me information right

17   after.

18       **Q**    Okay.  And isn't it true, in part, he gave you

19   that information because you asked him to provide you more

20   information?

21       **A**    Sure.  I asked him how they found him.

22       **Q**    And even when he made that statement, that's the

23   guy, you asked him what he meant by that; isn't that

24   correct?

25       **A**    I didn't ask him, what do you mean by that.  I

1    just said -- I said, can you tell me what happened, like,

2    how did you find him?

3         Q    Okay.  So you asked for additional information,

4    correct?

5         A    Correct.

6         Q    So, again, at this point, you make the photo ID,

7    you go to depositions, correct?

8         A    Yes.  I went to one deposition.

9         Q    And at no point did you express to either

10   attorney that you had doubts about your identification,

11   correct?

12        A    Not at that time.

13        Q    And were you pretrial?  Meaning, before you

14   testified, did the prosecutor go over the testimony with

15   you to prepare you for the trial?

16        A    No, not that I recall.

17        Q    Okay.  At trial, ultimately, you provided

18   testimony?

19        A    Yes, I did.

20        Q    And when you provided that testimony, you

21   identified Mr. Valle-Ramos as the person who committed the

22   crime?

23        A    Yes, I did.

24        Q    Okay.  And at no point on the stand did you say,

25   hey, I don't recognize that person in the courtroom?

1    **A**    No, I didn't, but I'd thought about it.

2    **Q**    Okay.  And I just want to be clear.  You're

3    saying at the photo lineup you had doubts?

4    **A**    (Nods head.)

5    **Q**    Is that a yes?

6    **A**    Yes.  Sorry.

7    **Q**    So before you even had -- went to trial you had

8    doubts?

9    **A**    Correct.

10    **Q**    And then you went to trial?

11    **A**    Correct.

12    **Q**    And you were sworn in the -- they swore and

13    affirmed you to tell the truth and the whole truth,

14    correct?

15    **A**    Correct.

16    **Q**    And you stated that this was the person who

17    committed the crime, correct?

18    **A**    Correct.

19    **Q**    So that was a lie?

20    **A**    No, it wasn't a lie.  At the time, I didn't know

21    what else to do.

22    **Q**    Well, you believed that that might not be the

23    person.  That's what a doubt means, correct?

24    **A**    Correct, I had doubts.  I should have said

25    something and I didn't.

1      **Q**    And so you told them something that was not

2    accurate, correct?

3      **A**    Correct.

4      **Q**    So you intentionally withheld that information on

5    a case where you knew --

6           **MS. CEPERO:**  Objection.  Argumentative.

7           **THE COURT:**  I'm gonna sustain the objection.

8           Rephrase.

9    **BY MS. MOMPREMIER:**

10      **Q**    You intentionally withheld that information?

11          **MS. CEPERO:**  Objection.  Argumentative.

12          **THE COURT:**  It's the same question.  I'm gonna

13          sustain it.

14          **MS. MOMPREMIER:**  Your Honor, is there a basis for

15          that objection?

16          **THE COURT:**  Counsel approach.

17          (At the bench.)

18          **THE COURT:**  She had previously stated in her

19          prior response that she felt that she didn't have an

20          option.  So her very next question was basically

21          saying she intentionally did so.  She already

22          explained her reasons for doing so.  So if you wanted

23          to give more explanation, that's fine.  But you're

24          mischaracterizing her testimony, potentially

25          misrepresenting something.  So if you want to rephrase

1    your question and ask her what was going through her

2    mind, that's fine.  But at this point, she's answered

3    the previous question as to what her intentions were,

4    so I'm going to sustain the objection.

5    **MS. MOMPREMIER:**  Yes, Your Honor.  And just for

6    the record, part of the analysis is if a witness

7    intentionally perjures her -- intentionally committed

8    perjury, and I'm trying to ask questions along that

9    vein.

10    **THE COURT:**  So, again, I'm not gonna tell you

11    exactly how to ask those questions, but if her

12    testimony is different at the time of trial than what

13    she -- and whether she did so knowingly and whether --

14    you can ask her, was it intentional, but she's already

15    answered that question.  So you're welcome to ask her

16    again, but she's answered the question, and I don't

17    want to get into a situation where --

18    **MS. FRYER:**  Sure, Your Honor.  And we just --

19    this is a concern now.  Ms. Szewczyk has counsel here.

20    Sounds like the State's brought up intentional perjury

21    at this point.  I think the statute of limitations may

22    or may not have run.  And she's here to do what she

23    believes to be the right thing, but is that -- is that

24    something she needs to be concerned about, or this

25    just a cross-examination --

1          **MS. MOMPREMIER:**  I'm cross-examining the

2     witness --

3          **THE COURT:**  All right.

4          (In open court.)

5          **THE COURT:**  And, once again, that objection is

6     sustained.

7          You nay rephrase the question.

8     **BY MS. MOMPREMIER:**

9     **Q**     So you stated that you felt you had no choice but

10    to give -- to not speak about your doubts.  Why is that?

11    **A**     I just felt pressured, and I felt that it was too

12    late.

13    **Q**     Felt pressure.  Please elaborate.

14    **A**     Well, I didn't have an attorney there with me.  I

15    was just there by myself, which is fine, but I was expected

16    to continue on with the same identification as before.  But

17    it wasn't until I saw the defendant in person on the day of

18    trial that I had that gut reaction that I really didn't

19    think it was him.  Because now I'm looking at him in

20    person, not in a blurry or darkened photograph, and I could

21    tell that his skin was darker.  But after I spoke with

22    Mr. Gonzalez and he was so sure, I just assumed that maybe

23    I wasn't remembering completely correctly.

24    **Q**     Okay.  But the State -- did the State ever put

25    pressure on you to make an ID or to keep your testimony

1   consistent?

2       **A**    I don't know how to answer that question.  I

3   mean, it wasn't like they were -- you know, I was expected

4   to be there.  I was expected to give that testimony.  Yes.

5       **Q**    Did they tell you you have to give that

6   testimony, or did they ask you to testify truthfully?

7       **A**    They didn't say anything one way or another.

8   They just encouraged me to be there and give that

9   testimony.  And when I was done, they said that I did a

10  great job.

11      **Q**    When you went to testify, you were sworn and

12  affirmed to tell the truth and nothing but the truth,

13  correct?

14      **A**    Correct.

15      **Q**    And even when the State came before you -- I

16  mean, when did the State put this pressure?  Because,

17  according to you, they didn't even give -- do a pretrial.

18  Like, when was this conversation with the prosecutor to

19  pressure --

20          **MS. CEPERO:**  Objection.  Argumentative.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  I -- on that day, I genuinely

23          thought I was doing the right thing and saying the

24          right thing.

25  **BY MS. MOMPREMIER:**

1      **Q**     Would it be safe to say that this is a lot of

2   self-pressure and not pressure from other people?

3      **A**     It could be.

4      **Q**     Is that a yes?

5      **A**     Yes.

6      **Q**     State never threatened you?

7      **A**     No.

8      **Q**     State never said you gotta stick with this

9   testimony and say nothing else?

10      **A**     No.

11      **Q**     No one threatened you with perjury charges or

12   anything like that?

13      **A**     No.

14      **Q**     And, again, at trial, you never said, hey, I

15   think his complexion is darker than the person I initially

16   saw?

17            **MS. CEPERO:**  Objection.  Asked and answered.

18            **THE COURT:**  Overruled.

19   **BY MS. MOMPREMIER:**

20      **Q**     You never said, I think this person's

21   complexion -- than the person that I saw?

22      **A**     I should have.

23      **Q**     But you never said it?

24      **A**     I didn't and I should have.

25      **Q**     At no point did you say, I think his eyes are

1  lighter than what I remember?

2      **A**    I didn't and I should have.

3      **Q**    And the trial -- at some point you finished your

4  testimony, and I'm assuming you left the courtroom,

5  correct?

6      **A**    I did.

7      **Q**    While we were talking about the courtroom, you

8  said that you had a conversation with Mr. Gonzalez?

9      **A**    I did.

10     **Q**    When did this conversation take place?

11     **A**    This was after I gave -- after -- I'm sorry,

12  after he gave his testimony, before I gave mine.

13     **Q**    Did you offer information to him?

14     **A**    No.

15     **Q**    Did he put any pressure on you to stay consistent

16  with your story?

17     **A**    No.  He just wanted to vent.

18     **Q**    Did he ever say specifically, this guy here in

19  the courtroom is the one who did it?

20     **A**    No, not that I recall.

21     **Q**    The information from that -- would it be safe to

22  say that he provided -- did he provide any descriptions to

23  you beyond the guy had an Afro?

24     **A**    He was wearing a hoodie, I think is what he said.

25     **Q**    Okay.  Anything else that -- any other

1    information -- what other information about the description

2    of the suspect did Mr. Gonzalez provide to you?

3        **A**    I don't recall, but I remember name calling, but

4    no physical description.

5        **Q**    Okay.  So just the Afro and the hoodie?

6        **A**    Right.

7        **Q**    And you saw the person -- you saw the suspect

8    yourself?

9        **A**    I did.

10       **Q**    And you already knew the person had an Afro?

11       **A**    Correct.

12       **Q**    And were you aware of the hoodie?

13       **A**    I didn't remember the clothing --

14       **Q**    Okay.

15       **A**    -- 'cause they got in the car so fast.

16       **Q**    And after trial, you, yourself, still did not

17   tell the prosecutor or even the defense attorney, hey, I'm

18   not so sure about my testimony?

19       **A**    I didn't.

20           **MS. CEPERO:**  Objection.  Asked and answered.

21           **THE COURT:**  Overruled.

22           **THE WITNESS:**  I didn't and I should have.

23   **BY MS. MOMPREMIER:**

24       **Q**    And, in fact, it wasn't until you wrote your

25   affidavit that it became known that you had doubts,

1  correct?

2      **A**    Correct.

3      **Q**    And this is -- even though -- at the point where

4  you wrote that affidavit, you were practicing at that time,

5  correct?

6      **A**    Correct.

7      **Q**    And safe to say this trial happened around 2014?

8      **A**    I believe so.

9      **Q**    And your affidavit wasn't written until 2021,

10  correct?

11      **A**    Correct.

12      **Q**    So seven years you sat on that information?

13      **A**    I did.  I shared it with family and friends.

14      **Q**    But not anybody who could actually do something

15  about it legally?

16      **A**    Correct.

17      **Q**    In fact, it wasn't until the investigator for the

18  defense came to you that you actually wrote this affidavit?

19      **A**    Correct.

20      **Q**    So this was not self-initiated by you?

21      **A**    It was not.

22      **Q**    You did not write an affidavit and submit it to

23  the state attorney's office to say, hey, I have doubts and

24  I just think you-all should know?

25      **A**    No.  But I also -- it wasn't requested of me, and

1   I didn't know that I could.

2        **Q**    But as a practicing attorney of law, you know how

3   important it is to make sure that the correct information

4   is given to the right parties.  In fact, it's a part of our

5   duties as attorneys, is it not?

6        **A**    Correct.  But the case was over, and I also don't

7   practice criminal law.  Never have and I never will.

8        **Q**    And because of part -- you're an attorney, you

9   know that, even if you're not aware of the law, you can go

10  to counsel or get an attorney to help guide you to make

11  sure that you're doing things correctly, correct?

12       **A**    I have one here today.

13       **Q**    And, in fact, you can call the Florida Bar

14  helpline to get information if you're not sure about

15  something regarding the law.

16       **A**    Well, the Florida Bar helpline is for me and my

17  ethical obligations regarding my own cases.  This was

18  different.  This was a case in which I was a witness.  And

19  just because I had doubts, it didn't mean that I was

20  certain that I had put the wrong person in prison.  I

21  simply didn't know.

22       **Q**    You don't believe that your testifying in court

23  as a witness has anything to do with your license as an

24  attorney?

25       **A**    No, not really.

1    **Q**    When the investigator approached you, did he --

2    well, first of all, where did he approach you?

3    **A**    The investigator?

4    **Q**    Uh-huh.

5    **A**    He called me and then we made an appointment and

6    he came to my home.

7    **Q**    Okay.  And when he came to your home, did --

8    isn't it true that he, more or less, told you, hey, I think

9    that you identified the wrong guy?

10   **A**    It didn't start out that way, no.

11   **Q**    Did he not, in fact, show you another potential

12   person who could have been the suspect?

13   **A**    He did.

14   **Q**    Okay.  So his purpose there was to introduce that

15   information to you to see if your testimony would change?

16   **A**    I can't say.

17        **MS. CEPERO:**  Objection.  Calls for speculation.

18        **THE COURT:**  Counsel approach.

19        (At the bench.)

20        **THE COURT:**  Response?

21        **MS. MOMPREMIER:**  Your Honor, she was present for

22        that conversation.  She knows the gist of that

23        conversation, what he relayed to her.  I think she can

24        talk about what he relayed to her.  If it's not

25        consistent, she can say -- and she's responded whether

1       my [sic] impression of the conversation was accurate

2       or not.

3              **MS. CEPERO:**  I think the pivotal issue here is

4       the purpose of why he met with her, and that's a

5       question for the investigator.

6              **THE COURT:**  I'm gonna sustain the objection.

7              (In open court.)

8              **THE COURT:**  That objection is sustained.

9    **BY MS. MOMPREMIER:**

10      **Q**     When -- the investigator presented Amos Matthew

11   Ortiz to you, correct?

12      **A**     I remember the name Amos, yes.

13      **Q**     He relayed to you that somebody else might have

14   done this crime, correct?

15      **A**     Yes.

16      **Q**     And he showed you a picture of that person that

17   he thought might be the true suspect?

18      **A**     He showed me a picture of somebody who he said

19   had been committing other burglaries in the area around

20   that time.

21      **Q**     Tell me what information he relayed to you about

22   this other person.

23      **A**     That's all I really recall.

24      **Q**     Okay.

25      **A**     I mean, he also told me after, at the end of the

1  conversation, that this person was deceased.

2  **Q**  So he told you that this person had been involved

3  in other crimes?

4  **A**  Yes.  He had been committing other burglaries in

5  the area, but it was after he showed me the picture and I

6  identified him.

7  **Q**  Okay.  When he showed you that picture, did he

8  show it to you in a photo lineup?

9  **A**  No.

10  **Q**  Did he show you a single photograph?

11  **A**  No.  He showed me a picture.  That picture, as

12  well as the defendant's picture, side by side.

13  **Q**  Okay.  So a picture of the defendant and a

14  picture -- or I'll say this.  A picture of Mr. Valle-Ramos

15  and then a picture of Mr. Ortiz side by side?

16  **A**  Correct.

17  **Q**  Okay.  You remember the process when you had a

18  photographic lineup with Detective Stanley?

19  **A**  Yes.

20  **Q**  And in that photographic lineup, he showed you

21  six different individuals and asked -- essentially had you

22  kind of make your own assessments before providing any

23  information, correct?

24  **A**  Correct.

25  **Q**  Okay.  But when you spoke with the investigator,

1   he showed you just the two photographs side by side?

2       **A**    From what I recall, yes.

3       **Q**    And when he showed you the photographs, did he

4   tell you why he was showing you those photographs?

5       **A**    I don't recall if he told me why.

6       **Q**    What did you -- why did you let him in your

7   house?

8       **A**    To talk about the case.  I had a feeling I knew

9   why he was there; to talk about the case.

10      **Q**    Okay.  And what did he tell you he wanted to talk

11  about?  What specifically about the case did he wish to

12  talk to you about?

13      **A**    I don't remember his exact words.  But he asked

14  me if I remembered the case and if I remembered testifying,

15  and I told him, yes.  And he said, do you mind if we sit

16  down and talk and I can show you some things?  He's like,

17  what do you -- no, first he asked me, what do you remember

18  about the case.  That's what he first said when we sat

19  down.  And so that was when I told him everything that I

20  remembered, which is what we've already discussed, as well

21  as the fact that I had always had doubts, and I didn't

22  think that I had identified the right person.

23          **MS. MOMPREMIER:**  Your Honor, if I could approach

24      the witness?

25          **THE COURT:**  You may.

1          **MS. MOMPREMIER:**  For the record, I'm showing

2          page 9 of defendant's initial motion for

3          post-conviction relief and incorporated memorandum of

4          law to the witness.

5          **MS. CEPERO:**  I'm sorry, Your Honor.  The only

6          issue that we have with that is that it's in black and

7          white and not color.  Would we be able to show a color

8          photo, which is what she saw?

9          **THE COURT:**  You can do that on --

10         **MS. CEPERO:**  Redirect?

11         **THE COURT:**  -- redirect, yes.

12         But is there any objection to that?  If you have

13         one and the State wants to use that one, it's up to

14         them.

15         **MS. CEPERO:**  No, that's fine.

16         **THE COURT:**  Okay.

17    **BY MS. MOMPREMIER:**

18         **Q**    Do you recognize those photographs?

19         **A**    Yes, I do.

20         **Q**    And were those the photographs shown to you by

21    the investigator?

22         **A**    I believe so.

23         **Q**    Okay.

24         **A**    Yes.

25         **Q**    And, ultimately, after speaking with that

1 investigator, you then selected Mr. Amos Ortiz as the

2 suspect, correct?

3     **A**    Yes.  Right away, a hundred percent.

4     **Q**    Are you a hundred percent positive in that

5 identification?

6     **A**    Yes, I am.

7         **MS. MOMPREMIER:**  No further questions,

8 Your Honor.

9         **THE COURT:**  Defense, redirect?

10        **MS. CEPERO:**  Yes.

11                    **REDIRECT EXAMINATION**

12 **BY MS. CEPERO:**

13    **Q**    Ms. Szewczyk, you're not a criminal defense

14 attorney, as you stated; is that correct?

15    **A**    No.

16    **Q**    You don't have any experience in criminal law?

17    **A**    None.

18    **Q**    And you -- you aren't a scientist dealing with

19 witness memory or witness identification?

20    **A**    No.

21    **Q**    So you don't know the factors that affect the

22 reliability of an eyewitness identification?

23    **A**    Outside of what I vaguely recall from law school,

24 no.

25    **Q**    And you're not a law enforcement officer?

1    **A**    No.

2    **Q**    So you don't know about the best methods for

3    creating a lineup?

4    **A**    No.

5    **Q**    So when a law enforcement officer presents you

6    with a lineup, as Detective Stanley did in this case, you

7    had no idea if it was appropriate, if it was in line with

8    the science?

9    **A**    No.

10    **Q**    You -- did you trust the law enforcement officer,

11    Detective Stanley, that he was giving you a lineup that was

12    appropriate?

13    **A**    Yes.

14    **MS. MOMPREMIER:**  Objection, Your Honor, as to

15    relevance.

16    **THE COURT:**  Overruled.

17    **BY MS. CEPERO:**

18    **Q**    I'm sorry.  Can you repeat your answer for the

19    record?

20    **A**    Yes.  Absolutely I did trust him.

21    **Q**    Now, when you saw this lineup in this case, is it

22    fair to say that Mr. Valle-Ramos was the only individual --

23    or that was the only photo with an Afro?

24    **A**    Correct, it was.

25    **Q**    And you've seen --

1    **MS. CEPERO:**  May I approach?

2    **THE COURT:**  You may.

3  **BY MS. CEPERO:**

4    **Q**    You've seen the side-by-side comparison of --

5    **THE COURT:**  Can you show that to the State?

6  **BY MS. CEPERO:**

7    **Q**    So you saw -- and I'm sorry it's poor quality on

8  here.  You saw the picture of Mr. Valle-Ramos on the left,

9  and he showed you a picture of Amos Ortiz on the right; is

10  that correct?

11    **A**    Correct.

12    **Q**    And Mr. Ortiz has a pretty big Afro in that

13  picture, correct?

14    **A**    Correct.

15    **Q**    How would you compare these two individuals?

16    **A**    I think they look very similar.

17    **Q**    Is it fair to say they could be related, maybe

18  twins?

19    **A**    Possibly, if you didn't know them.

20    **Q**    Do you recall how many times you saw the lineup

21  in this case?

22    **A**    I don't recall.

23    **Q**    Do you recall testifying at his trial about the

24  lineup in this case?

25    **A**    No, I don't directly recall my testimony.

1      **Q**    Would it help if I showed you your testimony?

2   Would that refresh your recollection?

3      **A**    Sure.

4      **THE COURT:**  Just show it to the State, please.

5   **BY MS. CEPERO:**

6      **Q**    If you'll take a look at this and read it to

7   yourself, page 92, lines 8 through 12.

8      **MS. MOMPREMIER:**  Your Honor, I would just object

9          to this form of testimony.  She said she doesn't

10         remember, and I believe that the record speaks for

11         itself as to her prior testimony.

12     **THE COURT:**  It's my understanding is that is for

13         the purposes of refreshing her recollection to ask

14         other questions; is that correct, defense?

15     **MS. MOMPREMIER:**  My understanding is specifically

16         to how many times did she the photo lineup.  She said

17         she doesn't remember that today, and she's previously

18         testified how many times she's seen it at trial.

19     **THE COURT:**  There's a lot -- there's a lot in her

20         testimony at trial that's different today.  I don't

21         know if this is going to fall into that same category,

22         so I'm gonna allow her to refresh her recollection and

23         see if that testimony is accurate.

24   **BY MS. CEPERO:**

25     **Q**    Did that refresh your recollection?

1    **A**    Yes and no.  I honestly -- I don't know if you

2    want me to read this, but I don't necessarily remember

3    seeing it that many times.  But if that's what I testified

4    to, than I'm sure I probably did.

5          **MS. CEPERO:**  May I have a moment with counsel?

6          **THE COURT:**  You may.

7    **BY MS. CEPERO:**

8    **Q**    Now let's go back to the trial when

9    Detective Stanley introduced you to Mr. Gonzalez.  You said

10    that he was vented -- venting?

11    **A**    He was venting, yeah.  He was angry, upset.

12    **Q**    Was he name calling?

13    **A**    I remember he was name calling or swearing, yeah.

14    **Q**    Who was he calling names?

15    **A**    The --

16          **MS. MOMPREMIER:**  Objection to hearsay.

17          **THE COURT:**  Response?

18          **MS. CEPERO:**  I'll withdraw the question.

19    **BY MS. CEPERO:**

20    **Q**    And do you recall him making a statement that

21    made you believe that he was confident?

22          **MS. MOMPREMIER:**  Objection to leading.

23          **THE COURT:**  Sustained.

24    **BY MS. CEPERO:**

25    **Q**    Now, you testified under oath in this case; is

1    that correct?

2         **A**    I did.

3         **Q**    And at the time that you were testifying, did you

4    believe that you were giving your truth?

5         **A**    Yes.  Uh-huh.

6              **MS. CEPERO:**  No further questions.

7              **MS. MOMPREMIER:**  Your Honor, do you want brief

8         redirect [sic] on this?

9              **THE COURT:**  You may do so.

10             And, Counsel, can you collect the exhibit?

11             **MS. MOMPREMIER:**  For clarification, do you intend

12        to introduce that?

13             **THE COURT:**  This has not been moved into

14        evidence.

15             **MS. CEPERO:**  Sorry.

16             **MS. MOMPREMIER:**  Are you going to admit it, or

17        no?

18             **MS. CEPERO:**  No.

19                        **RECROSS-EXAMINATION**

20   **BY MS. MOMPREMIER:**

21        **Q**    For clarification, you were shown this

22   photograph.  You said this is what the investigator

23   actually showed you, a color picture of these two

24   individuals?

25        **A**    Yes.

1    **Q**    Okay.  And then would it be safe to say that

2    similar, I guess, to your characterization of the photo

3    lineup, that the quality of Mr. Valle-Ramos is poor?

4    **A**    Yes, that's poor.

5    **Q**    It's very dark; is that correct?

6    **A**    Yes.

7    **Q**    Okay.  And in relation to Mr. Ortiz's picture,

8    which is pretty clear?

9    **A**    It is clearer.

10   **Q**    And so it would be safe to say that you can't

11   really get a fair assessment of even Mr. Valle-Ramos'

12   complexion from that photograph, correct?

13   **A**    That's true, but I also knew what he had looked

14   like in person.

15   **Q**    And you've never actually met with Mr. Ortiz in

16   person?

17   **A**    I've never me -- well --

18   **Q**    Yes.  The person on the right, Mr. Ortiz -- Amos

19   Ortiz, you never met him in person, as far as you know,

20   beyond him being potentially the suspect?  To your

21   knowledge, beyond that, you've never met this person?

22   **A**    With the exception of that day, no, I don't think

23   I've ever met that person.

24   **Q**    And so you can't say what his complexion looked

25   like in the winter versus the summer, correct?

1        **A**    No.

2        **Q**    Okay.  And you -- you've never seen that person

3     in trial to be able to say affirmatively whether that

4     person is the suspect or not, correct?

5        **A**    Correct.

6               **MS. MOMPREMIER:**  No further questions.

7               **THE COURT:**  Thank you, ma'am.  You may step down.

8               Is this witness excused?

9               **MS. CEPERO:**  Yes.

10              **THE COURT:**  State, any objection?

11              **MS. MOMPREMIER:**  No, Your Honor.

12              **THE COURT:**  Defense, your next witness?

13              **MS. CEPERO:**  I'd call the defendant, Jorge

14    Valle-Ramos.

15              **THE COURT:**  Mr. Valle-Ramos, come forward.

16                        **JORGE VALLE-RAMOS,**

17    **the defendant herein, testified upon his oath as follows:**

18              **THE DEFENDANT:**  Yes.

19              **THE COURT:**  Good morning, sir.  Please be seated.

20              And could you please state your first and last

21    name.

22              **THE DEFENDANT:**  Jorge Valle-Ramos.

23              **THE COURT:**  And could you spell your first and

24    last name for the court reporter.

25              **THE DEFENDANT:**  J-o-r-g-e V-a-l-l-e R-a-m-o-s.

1          **DIRECT EXAMINATION**

2     **BY MS. CEPERO:**

3          **Q**     Mr. Valle-Ramos, are you currently employed?

4          **A**     Yes.

5          **Q**     What do you do?

6          **A**     I work for Custom Cable, do low voltage.

7          **Q**     Do you have any prior employment experience?

8          **A**     Yes.

9          **MS. MOMPREMIER:**  Objection to relevance,

10    Your Honor.

11         **THE COURT:**  What's the relevance?

12         **MS. CEPERO:**  I'll withdraw.

13    **BY MS. CEPERO:**

14         **Q**     Now, let's go back to the time of the incident in

15    this case, April of 2013.  What kind of hairstyle did you

16    have at that time?

17         **A**     My hair was long, similar to what I have now.

18         **MS. MOMPREMIER:**  Objection, Your Honor, to his

19         testimony.  Ultimately, the Court is gonna make a

20         ruling of the newly-discovered evidence in relation to

21         the trial.  I don't see how the defendant presenting

22         information that's already a part of the record is

23         going to help that.  He can't testify to anything new

24         today, unless it's specifically related to, like, the

25         recantation.  Yeah, I'm objecting to them presenting

1    any newly-discovered evidence without making that --

2    putting on notice to the State that he has something

3    new.  Otherwise, what's the relevance for his

4    testimony for purposes of the witness recantation?

5         **THE COURT:**  Defense, response?

6         **MS. CEPERO:**  We have to lay a predicate for the

7    expert in this case who is gonna testify about the

8    significance of hairstyle in lineups and how that can

9    create a suggestive lineup.

10        **THE COURT:**  So, again, the question -- there's --

11   there's a few layers here.  So the first question is

12   with regards to his appearance at trial, which was

13   part of the in-court identification, which relates

14   back to the testimony of Ms. Szewczyk who just

15   testified.

16        There's also -- Mr. Gonzalez is gonna testify to

17   an in-court identification.  There's also descriptions

18   that were given by both witnesses at the time of the

19   offense, which ultimately directed law enforcement to

20   put together this photo lineup.

21        So his hairstyle at the time that he was arrested

22   and his hairstyle at the time that they went to trial

23   is relevant for the purpose of these proceedings to

24   see how it lines up with the testimony of those

25   witnesses.

1          So the objection is overruled.

2          Go ahead.

3          **MS. CEPERO:**  Thank you, Your Honor.

4    **BY MS. CEPERO:**

5     **Q**    What kind of hairstyle did you have in April of

6    2013?

7     **A**    My hair was long, similar to what I have now, but

8    longer, 'cause I have the sides shaved off now.  Back then

9    I didn't.

10    **Q**    So if you had taken your hair out of a ponytail,

11    what would it look like?

12    **A**    Just drop down to my shoulders.

13    **Q**    Can you demonstrate how it would look now if you

14    take your ponytail out?

15    **A**    Sure.

16         **MS. MOMPREMIER:**  Objection, Your Honor.  Again,

17         this isn't -- because of the delay in time, it would

18         be inaccurate and improper at this point to say that

19         what his hair is now is what his hair would be then.

20         And, again, it's already part of the court record.

21         I would object to his testimony being considered

22         by the Court, as it is not a part of the analysis for

23         the recantation part.  And as these questions were

24         addressed in the -- he's provided testimony at the

25         trial as to his hairstyle.  That is the testimony that

1        the State argues that the Court can rely on in making

2        this analysis, not his testimony here today.

3              **THE COURT:**  Defense, response?

4              **MS. CEPERO:**  What his hair looked like then is

5        the crux of this issue.  It's the crux of the

6        eyewitness testimony.  It's also pertinent to if he

7        had a retrial, if it would produce an acquittal on

8        retrial to demonstrate how his hair looks.

9              **THE COURT:**  I'm gonna overrule the objection.

10       But, again, this is based on his testimony that his

11       hair would have appeared similar, even though his hair

12       is cut differently.

13             **MS. CEPERO:**  Thank you, Your Honor.

14  **BY MS. CEPERO:**

15       **Q**    So you've taken your ponytail out.  And it --

16  what happened to your hair?

17       **A**    Just drops down.

18       **Q**    Now, I'm going to show you what's been previously

19  marked as Defense Exhibit B.

20             Do you recognize that?

21       **A**    Yes.

22       **Q**    What is it?

23       **A**    It's my license from 2011.

24       **Q**    So that photograph was taken in 2011?

25       **A**    Yes.

1      **Q**     Approximately two years before the incident in

2    this case?

3      **A**     Yes.

4      **Q**     And in that photograph, how would you describe

5    your hairstyle?

6           **MS. MOMPREMIER:**  Have we admitted this into

7           evidence?

8           **MS. CEPERO:**  Defense would like to introduce into

9           evidence what's previously been marked as

10          Defense Exhibit B.

11          **THE COURT:**  Any objection?

12          **MS. MOMPREMIER:**  No objection.

13          **THE COURT:**  All right.  What's been marked for

14          identification as Exhibit B by defense will be moved

15          into evidence as Defense 2.

16          (Defendant's Exhibit 2 received in evidence.)

17   **BY MS. CEPERO:**

18     **Q**     How would you describe your hairstyle in that --

19   in that photograph?

20     **A**     That's an Afro.

21     **Q**     Okay.  Now, where were you living around the time

22   of April 2013?

23          **MS. MOMPREMIER:**  Objection to relevance.

24          **THE COURT:**  What's the relevance?

25          **MS. CEPERO:**  It shows where he -- that he wasn't

1      in the area where Mr. Gonzalez lived.

2      **THE COURT:**  Counsel approach.

3      (At the bench.)

4      **MS. CEPERO:**  We're going to discuss where he

5      lived, where he worked, went to school to show he

6      didn't have time to --

7      **THE COURT:**  I mean, that's not really

8      newly-discovered-evidence, right?  So the Court's only

9      able to really consider any newly-discovered evidence

10      and how that would factor into -- did he give this

11      testimony in trial?

12      **MS. CEPERO:**  I believe so.

13      **THE COURT:**  Then it's part of the trial

14      transcript.  I'm going to sustain the State's

15      objection.

16      (In open court.)

17      **THE COURT:**  That objection is sustained.

18  **BY MS. CEPERO:**

19      **Q**    Are you familiar with the home located at 1625

20  Little Falls Circle in Orlando?

21      **A**    No.

22      **Q**    You ever been to that home?

23      **A**    No.

24      **Q**    Do you know someone by the name of George

25  Gonzalez?

1    **A**    No.

2    **Q**    You ever met him?

3         **MS. MOMPREMIER:**  Objection, again, to relevance.

4    Again, this is all laid out in the trial transcript.

5         **MS. CEPERO:**  I'll withdraw the question.

6    **BY MS. CEPERO:**

7    **Q**    Did you burglarize Mr. Gonzalez's home?

8         **MS. MOMPREMIER:**  Objection.  Again, laid out in

9    the trial transcript.

10         **THE COURT:**  Sustained.

11         **MS. CEPERO:**  I'll withdraw.

12   **BY MS. CEPERO:**

13   **Q**    Do you know an individual by the name of Amos

14   Matthew Ortiz?

15   **A**    No.

16   **Q**    You don't know him, but are you aware of someone

17   under that name?

18   **A**    Yeah, I know who he is.

19   **Q**    How did you learn about him?

20   **A**    My girlfriend found him on Facebook after he

21   passed away.  She just saw his picture all over the

22   internet.

23   **Q**    And what were your thoughts when you saw his

24   picture?

25         **MS. MOMPREMIER:**  Objection to relevance.

1          **THE COURT:**  Response?

2          **MS. CEPERO:**  I'll withdraw the question.

3          I have no further questions.

4          **THE COURT:**  Any questions?

5          **MS. MOMPREMIER:**  Yes, Your Honor.

6                         **CROSS-EXAMINATION**

7     **BY MS. MOMPREMIER:**

8          **Q**    Just one question, Mr. Ramos.  You just

9     demonstrated here in court where you took your hair down,

10    and it kind of just fell down, correct?

11         **A**    Yes.

12         **Q**    Okay.  Obviously, we don't know if you have done

13    anything to your hair, correct?

14         **A**    Sure, yes.

15         **Q**    You've got curly, textured hair?

16         **A**    Yes.

17         **Q**    If you blow it out, it's going to -- it'll look

18    different, correct?

19         **A**    Yes.

20         **Q**    There's different products that you can put in

21    your hair to make your curls more tighter?

22         **A**    My hair's usually the same always.

23         **Q**    My question was, you can put product in your hair

24    to make your curls tighter, correct?

25         **A**    I can.

1    **Q**    Okay.  And is it safe to say that your hair right

2    there is an Afro in your --

3    **A**    Yes, that's natural.

4         **THE COURT:**  Hold on.  Don't talk over each other.

5         **MS. MOMPREMIER:**  Yes, Your Honor.

6         **THE DEFENDANT:**  Sorry.

7         **THE COURT:**  Mr. Valle-Ramos, let her finish

8    asking her question, and then you can answer.

9         Go ahead, Ms. Mompremier.

10   **BY MS. MOMPREMIER:**

11   **Q**    Your hair in your ID is an Afro, correct?

12   **A**    Yes.

13   **Q**    And it is not how you hair is today when you just

14   put it down, correct?

15   **A**    Correct.

16        **MS. MOMPREMIER:**  No further questions.

17        **THE COURT:**  Any redirect?

18        **MS. CEPERO:**  No, Your Honor.

19        **THE COURT:**  Okay.  Thank you, Mr. Valle-Ramos.

20   You may step down.

21        **THE DEFENDANT:**  Thank you, sir.

22        **MS. FRYER:**  Your Honor, may we have just a

23   moment?

24        **THE COURT:**  You may.

25        **MS. FRYER:**  Thank you so much.

1          **MS. CEPERO:**  Defense would call Jasmine Ortiz as

2     their next witness.

3                         **JASMINE ORTIZ**

4     **was called as a witness and, having first been duly sworn,**

5     **testified as follows:**

6          **THE WITNESS:**  I do.

7          **THE COURT:**  Thank you, ma'am.  Please have a

8     seat.

9          Good morning.  Please state your first and last

10     name.

11          **THE WITNESS:**  Jasmine Ortiz.

12          **THE COURT:**  And could you spell your first and

13     last name for the court reporter.

14          **THE WITNESS:**  It's J-a-s-m-i-n-e O-r-t-i-z.

15          **THE COURT:**  All right.  Now, you're a little

16     soft-spoken, so I'm gonna need you to lean into that

17     microphone and speak up.

18          Go ahead.

19                      **DIRECT EXAMINATION**

20     **BY MS. CEPERO:**

21     **Q**     Good morning, Ms. Ortiz.  Do you know Jorge

22     Valle-Ramos?

23     **A**     I do.

24     **Q**     And how do you know him?

25     **A**     He is my boyfriend.

1      **Q**   And how long have you known him?

2      **A**   For ten years now, this month.

3      **Q**   And is it fair to say you knew him back in April

4  of 2013 when the incident occurred here?

5      **A**   Yes, we were dating.

6      **Q**   Do you recall what kind of hairstyle he had?

7      **A**   He had a long ponytail.

8      **Q**   Did you ever see his hair without a ponytail?

9      **A**   Yes.

10     **Q**   And what did it look like when you saw that?

11     **A**   It was very long.  We used to even joke that it

12  was longer than mine at the time.

13     **Q**   Are you aware of a time period when he had a

14  hairstyle that could be characterized as an Afro?

15     **MS. MOMPREMIER:**  Objection, Your Honor.  She's

16        attempting to introduce new evidence to the case.

17        This is not part of the newly-discovered evidence, so

18        I would object to her testimony as to this.

19     **THE COURT:**  Response?

20     **MS. CEPERO:**  If I can have one moment?

21        This is relevant to the identification issue in

22        this case.  It deals with how he actually appeared at

23        the time versus the photo that was shown in the

24        lineup.

25     **THE COURT:**  I'm gonna overrule the objection.

1  **BY MS. CEPERO:**

2  **Q**  Are you aware of a time when he had a hairstyle

3  that could be characterized as an Afro?

4  **A**  It was before I ever met him.

5  **Q**  Do you recall the day that Mr. Valle-Ramos was

6  arrested?

7  **A**  Yes.  I was actually present.

8  **Q**  Were you surprised?

9  **MS. MOMPREMIER:**  Objection, Your Honor, to

10  relevance.

11  **THE COURT:**  What's the relevance?

12  **MS. CEPERO:**  It's related to the later

13  investigation that she did in this case in locating

14  Mr. Ortiz.

15  **THE COURT:**  All right.  Overruled.

16  **BY MS. CEPERO:**

17  **Q**  How did you feel when that arrest occurred?

18  **A**  I could tell something was wrong just by his

19  reaction and the look on this face.  He looked completely

20  shocked.

21  **MS. MOMPREMIER:**  Objection, Your Honor, to her

22  impression of his reaction.

23  **THE COURT:**  What's the grounds for the objection?

24  **MS. MOMPREMIER:**  Speculation.

25  **THE COURT:**  Overruled.

**BY MS. CEPERO:**

    **Q**    So you were surprised based on his reaction?

    **A**    Extremely surprised.

    **Q**    Did you attend his trial?

    **A**    I did.  I did the second day.

    **Q**    So you're familiar with the evidence in the case that came out at trial?

    **A**    Yes, ma'am.

    **Q**    Based on your knowledge and understanding of the evidence, were you surprised when he was convicted?

    **A**    I was more than surprised.

    **Q**    And have you maintained a relationship with Jorge Valle-Ramos since all this happened?

    **A**    We still dated throughout the whole time he was incarcerated and been together since.

    **Q**    You're not in law enforcement, right?

    **A**    No.

    **Q**    You have no law enforcement experience?

    **A**    No.  I'm a registered nurse.

    **Q**    But is it fair to say that you're pretty savvy with a computer in terms of online research?

    **A**    Yeah, I would say I'm pretty techy.  I'm good with technology.

    **Q**    So in this case, you engaged in your own research after he was convicted?

1     **A**     I would say it found me.  The research found me.

2     **Q**     What do you mean by that?

3     **A**     I was scrolling through Facebook one day, and

4     that's when I noticed a photo of Mr. Amos Ortiz.  And I saw

5     how similar both the photos looked that got Jorge convicted

6     and the photo that was being used to represent Amos Ortiz.

7     **Q**     Okay.  And in the course of your investigation,

8     did you come across any newspaper articles about Mr. Ortiz?

9     **A**     Yes.  It appeared that he was murdered, and they

10    called him homeless as well.  That's all I had at the time.

11    **Q**     I'm going to show you what's previously been

12    marked as Defense Exhibit C.  Take a look at that.

13          Do you recognize that document?  And take your

14    time.

15    **A**     Yes.  This is the Orlando Sentinel article where

16    I saw this photo.

17    **Q**     Okay.  Does it fairly and accurately represent

18    the article that you learned about Mr. Ortiz from?

19    **A**     Yes.

20    **Q**     Does that article include a picture of Mr. Ortiz?

21    **A**     Yes.

22          **MS. CEPERO:**  The defense would move to have

23          Defense Exhibit C entered into evidence.

24          **THE COURT:**  Any objection?

25          **MS. MOMPREMIER:**  Yes, Your Honor.  I'm objecting

1     to relevance and hearsay, particularly to the written

2     portion of that document.  I believe that -- I have no

3     objection to the photograph that's included in that

4     being admitted.  It's the photograph she saw.  But

5     everything else about the article, I would absolutely

6     object to.

7          **THE COURT:**  May I please see the document?

8          **MS. CEPERO:**  Yes.

9          **THE COURT:**  So, State, your objection is with

10    regards to -- so this is -- the photograph is page 2

11    of the article.  Your objection is to all of the other

12    pages?

13         **MS. MOMPREMIER:**  Yes, Your Honor.

14         **THE COURT:**  And, defense, what is your response?

15         **MS. CEPERO:**  If we may have a moment?

16         **THE COURT:**  You may.

17         **MS. CEPERO:**  Your Honor, we'd agree just having

18    the photograph entered into evidence.

19         **THE COURT:**  Why don't you conform the exhibit,

20    remove the other pages, and then have the clerk place

21    the tag on page 2.

22         **MS. CEPERO:**  And we would move to have that

23    photograph entered into evidence.

24         **MS. MOMPREMIER:**  No objection to the photograph.

25         **THE COURT:**  All right.  In its current version,

1      State having no objection, the Court will move what's

2      been marked -- is that Exhibit C?

3          **MS. CEPERO:**  Yes.

4          **THE COURT:**  Will be moved into evidence, what's

5      been marked as Exhibit C, Defense's 3.

6          (Defendant's Exhibit 3 received in evidence.)

7  **BY MS. CEPERO:**

8      **Q**    Mr. Ortiz, when you saw this photograph of Amos

9  Ortiz, what were your thoughts?

10     **A**    My heart just sank immediately to my stomach, and

11 I screenshotted the photo.

12     **Q**    Why did your heart sink?

13     **A**    They just looked so similar, and I knew the photo

14 that got Jorge convicted was very similar to the photo of

15 Amos.

16     **Q**    So what steps did you take after seeing this

17 photograph?

18     **A**    So after taking the screenshot, I put both

19 Jorge's license photo and his photo side by side, and I

20 began to research Amos on the Orange County Clerk of

21 Courts, and that's where I found conviction records, arrest

22 records.  And I even tried looking into the murder case as

23 well, but couldn't find much.

24     **Q**    Okay.  Did you find any information about where

25 Mr. Ortiz lived or where he was arrested?

1       **A**     Yes.  So according to the --

2             **MS. MOMPREMIER:**  Objection.  Hearsay.

3             **THE COURT:**  Response?

4             **MS. CEPERO:**  It's not for the truth of the matter

5       asserted that he actually lived at those particular

6       addresses, but just showing that he frequented the

7       area.

8             **THE COURT:**  Any other objections?

9             **MS. MOMPREMIER:**  It seems like that's exactly

10      what they're trying to admit it for, the truth of the

11      matter asserted that he lived at that address.  And

12      I'd also object to lack of foundation, and there's

13      some certified documentation presented to overcome

14      those authentication issues, or the origin of it.

15            **THE COURT:**  All right.  Sustained.

16      **BY MS. CEPERO:**

17      **Q**     So did you learn about where he was living at the

18      time?

19      **A**     Yes.

20            **MS. MOMPREMIER:**  Objection on the same basis.

21            **THE COURT:**  Sustained.

22            **MS. CEPERO:**  I have no further questions.

23            **THE COURT:**  All right.  State, any cross?

24            **MS. MOMPREMIER:**  No questions, Your Honor.

25            **THE COURT:**  Thank you, ma'am.  You may step down.

1          **MS. FRYER:**  Your Honor, may we take a quick

2     bathroom break?

3          **THE COURT:**  Sure.  So we're gonna take a

4     ten-minute recess.

5          And, defense, who are you gonna be calling next?

6          **MS. FRYER:**  We're going to be calling Dr. Cahill.

7          **THE COURT:**  Okay.  We'll be in recess until

8     10:37.

9          **MS. FRYER:**  Thank you so much, Your Honor.

10          (Recess from 10:24 a.m. to 10:34 a.m.)

11          **THE COURT:**  All right.  Defense, ready to

12     proceed?

13          **MS. CEPERO:**  Yes, Your Honor.

14          **MS. FRYER:**  Next witness is Dr. Cahill.

15          **THE COURT:**  State, are you ready to proceed?

16          **MS. MOMPREMIER:**  Yes, Your Honor.

17          **THE COURT:**  Let's call in Dr. Cahill.

18               **BRIAN CAHILL, Ph.D.**

19     **was called as a witness and, having first been duly sworn,**

20     **testified as follows:**

21          **THE WITNESS:**  Yes.

22          **THE COURT:**  Good morning, sir.  Please be seated.

23          And could you please state your first and last

24     name for the record.

25          **THE WITNESS:**  Brian Cahill.  C-a-h-i-l-l.

1          **THE COURT:**  Thank you.

2               Ms. Fryer, you may inquire.

3                    **DIRECT EXAMINATION**

4     **BY MS. FRYER:**

5          **Q**     Dr. Cahill, can you please tell us about your

6     education?

7          **A**     I am a forensic psychologist.  I got my

8     bachelor's degree in psychology at Illinois State

9     University and then a master's in experimental psychology

10    and then a doctorate in legal psychology.

11         **Q**     Do you hold any academic positions?

12         **A**     I do.  I'm an associate instructional professor

13    at the University of Florida.

14         **Q**     What do you teach?

15         **A**     I teach legal psychology, cognitive psychology,

16    and research methods, typically.

17         **Q**     Related to witness identification, do you have

18    any scholarly activity?

19         **A**     I do.

20         **Q**     And has any of that been subject to the

21    peer-review process?

22         **A**     Yes, it has.

23         **Q**     Can you share with us the journal article --

24    well, first, let's talk about the peer-review process.  Can

25    you explain for the Court and for the record what that is?

1    **A**    Yes.  So basically peer-review is a way to ensure

2  that the research that's getting published is

3  methologically [sic] sound, is valid science.  So when you

4  submit an article to a journal, my peers, who are experts

5  in the area, review the article, look at the methodology

6  and the claims I'm making in the article, and give me

7  feedback, and either approve or disapprove of it.  And if

8  they approve it, it gets published.

9    **Q**    And how many articles have you -- have withstood

10  that rigor that you've contributed to?

11    **A**    About nine or ten, or something like that.

12    **Q**    Okay.  How many of those are related to witness

13  ID?

14    **A**    Two of them.

15    **Q**    Have you participated in any conference

16  presentations related to misidentification issues?

17    **A**    I do regularly, yes.

18    **Q**    And for who?  Where -- where -- where does that

19  occur?

20    **A**    Usually at what's called the American

21  Psychology-Law Society, which is my area's main body of

22  research.

23    **Q**    Have you contributed to any book chapters?

24    **A**    I have.  One book chapter on how to properly

25  interview witnesses.

1      **Q**    Okay.  And -- and your -- what university are you

2   currently with?

3      **A**    University of Florida.

4      **Q**    And have you -- you're at University of Florida,

5   you teach, but have you done any -- have you ever been

6   retained privately?

7      **A**    Yes, I have.

8      **Q**    Okay.  By who?

9      **A**    I work for public defenders, private attorneys,

10   Justice Administration Commission.

11      **Q**    Have you ever given any instruction on proper

12   methodology for witness identification?

13      **A**    I have.  I've trained Gainesville Police

14   Department in that method.  I have also trained the Federal

15   Public Defender's Office in Tallahassee, and a few other

16   defense attorney organizations.

17      **Q**    Have you ever testified as an expert on

18   misidentification?

19      **A**    I have.  I believe today -- including today would

20   be my fifth time testifying in front of a judge or jury.

21      **Q**    And do you take every case where people make

22   attempts to retain you?

23      **A**    I do not.  My main profession is a professor, so

24   I have the liberty to turn down cases that I do not deem

25   that I can add value to in my testimony.

1    **Q**    Is it fair to say that with the training,

2    education, knowledge, scholarly work, that you have the

3    background and experience to testify on identification

4    issues in criminal cases?

5    **A**    Yes, I would.

6    **Q**    Have you testified on this issue previously?

7    **A**    On what issue?  I'm sorry.

8    **Q**    I'm sorry.  Misidentification issues.

9    **A**    Yes, I have.

10    **Q**    And is that the five times?

11    **A**    Yes.

12    **Q**    Okay.  So, generally speaking, based on your

13    clinical experience, what factors affect eyewitness memory

14    and facial recognition?

15    **MS. MOMPREMIER:**  Your Honor, I'm gonna object at

16    this time to this witness' testimony as relevance for

17    this particular case.

18    State would argue that the law clearly dictates

19    the standards that the Court and what a jury would

20    ultimately rely on in terms of in-court

21    identifications, so that's the basis for it.  I

22    believe that the law covers that and that this witness

23    can't speak directly to why Ms. Szewczyk -- what may

24    or may not have affected her testimony.  She testified

25    to that on her own.

1    At this point, his testimony would be speculation

2    as to her.  So there is no other relevance to bring

3    this testimony, but to infer that these things that

4    he's gonna talk about affected her ability, and she's

5    already concretely testified to what affected her and

6    what did not affect her.

7        **THE COURT:**  Defense, response?

8        **MS. FRYER:**  Your Honor, I -- I have law on this

9    issue.

10    Two things:  I think that it -- it was a

11    relevancy objection in there?

12        **THE COURT:**  Relevance and calls for speculation.

13        **MS. FRYER:**  And calls for speculation.

14    Expert testimony on misidentification is not just

15    admissible.  People think they know what they know

16    about this subject.  But the truth of the matter --

17    and that is why it's so powerful and correlated so

18    strongly with wrongful convictions.

19    But misidentification not only helps the trier of

20    fact, any finder of fact, because it is technical

21    information.  But Ms. Szewczyk, as she sat on the

22    stand, the State absolutely eviscerated her as if she

23    had committed perjury, knowingly mistestified,

24    knowingly given false evidence.  And what this witness

25    will be able do is say, no, everyone can be

1     conditioned in a misidentification case.  It wasn't

2     purposeful.  She meant no ill will.  She just got it

3     wrong and realized she was mistaken.

4     **MS. MOMPREMIER:**  So, Your Honor, I think that

5     goes to my point.  For -- just for clarity sake too, I

6     also added, just for the legal standard, that the law

7     tells what the legal standard is, not what an expert's

8     impression of what they believe is the right or the

9     wrong way in order to conduct a case.

10    And, again, she's admitting to what is said, that

11    she's using this as an inference that what he's saying

12    is what Ms. Szewczyk believed.  And, again, that's

13    speculation.  She, again, already testified to why she

14    believed what she believed.  If we were --

15    **THE COURT:**  But is it speculation if it's an

16    expert giving that testimony?

17    **MS. MOMPREMIER:**  Because, ultimately, I believe

18    that the law covers it, and she's already testified to

19    it.  He can't say -- he doesn't -- she hasn't laid out

20    that he personally knows Ms. Szewczyk, that he's

21    reviewed this case, that he's reviewed the facts of

22    this case, that he's spoken with her.  And, again, it

23    would be, in part, based off of hearsay for her.  He's

24    not trained in order to speak in regards to her.

25    Furthermore, I would argue that the law already

1    covers if misidentification was proper or not.  It's

2    in case law, it's in jury instructions, and,

3    ultimately, for the Court.  It's what Ms. Szewczyk's

4    impression was, not --

5        **THE COURT:**  Well, I mean, whether or not -- look,

6    this is not an ineffective assistance claim.  This is

7    not a failure to investigate claim.  This is merely

8    newly-discovered evidence.  The Court is tasked with

9    the obligation to determine whether or not that

10   recantation is reliable, whether it's, I guess,

11   truthful.

12       And so one of the things that the defense is

13   setting forth is an expert who will testify how both

14   of these statements can be reconciled given the

15   science; that there's a statement that's made at the

16   time of trial, there's a statement being made now, and

17   both of those things the witness could have believed

18   to be true.

19       So, again, I want to see the case, Ms. Fryer,

20   that you're relying on, but I think that's essentially

21   the argument.

22       **MS. FRYER:**  May I approach?

23       **THE COURT:**  You may.

24       **MS. FRYER:**  Thank you.

25       May I approach, Your Honor?  I have a second case

1     as well.

2     **THE COURT:** You may.

3     **MS. FRYER:** Thank you.

4     **THE COURT:** All right. State, I'll give you a

5     couple minutes, but when you're ready to make any

6     additional argument based on the cases, I'll allow you

7     to do so. And then, defense, you can respond.

8     (Pause.)

9     **MS. MOMPREMIER:** Your Honor, I'm ready.

10     **THE COURT:** All right. Go ahead.

11     **MS. MOMPREMIER:** Your Honor, again, it's just a

12     general argument. For example, looking at *Blasdell v.*

13     *State*, it says in the case notes, "The party offering

14     it must prove by clear and convincing evidence that it

15     is sufficiently reliable and that it is relevant in

16     the instance that it will help the jury reach an

17     accurate result."

18     And then referring to *Jones v. State*, 197 So.3d

19     1085, it speaks that, ultimately, even in that case,

20     the Court found that it -- Your Honor, we would just

21     argue on the basic principle that the law does cover

22     what the Court would look at in terms of weighing

23     credibility. I do not believe that this witness can

24     offer anything that the law does not already cover.

25     And the witness herself has spoken specifically to why

1    she made the decision that she made.  Ultimately, his

2    testimony would just be cumulative and speculation as

3    to why she made the impression that she did.

4         **THE COURT:**  Okay.  And, defense, your response?

5         **MS. FRYER:**  Yes, Your Honor.  Thank you so much.

6         The *Jones* case we'll point to -- in this case, it

7    was an abuse of discretion to exclude testimony

8    exactly like this because it is outside the common

9    understanding and requires an expert to testify.  In

10   this case, it wasn't seen -- it was -- it was

11   harmless, because the individual -- there was a

12   confession, unlike here.  There was other evidence of

13   guilt in that case.  And here, all we have is a

14   misidentification.

15        So the Court's acknowledged that this is outside

16   the general understanding of laypeople.  And, as such,

17   it's abuse to -- to not include it.  And in this case

18   it's vital.  I mean, it just is.

19        So this is exactly where Mr. Valle-Ramos ended up

20   last time.  I'll just show you this picture.  You'll

21   see it's the only one with the Afro, and then you'll

22   see that I was -- I didn't have an Afro, and then

23   we'll all get where we need to go.

24        But those identifications are just so powerful.

25   I suspect the State's going to have at least two other

1     witnesses show up and say that's the guy, and we still

2     believe it.  And so what we need to do is establish

3     that this is how you get an unreliable result and why

4     and how and what the science says and what the

5     research is on it.  So we'd ask not only is it

6     admissible, it's vital.

7          **THE COURT:**  My concern is that this is not a

8     retrial.  And, again, no claims have been made with

9     regards to the failure to hire an expert at the time

10    of trial.  And -- but there is a general concern that

11    this newly-discovered evidence does raise questions

12    with regards to what the thrust of this information --

13    how that would have impacted a trial; specifically the

14    fact that the witness -- an eyewitness -- a

15    disinterested eyewitness -- one who is neither the

16    victim nor related to the defendant -- has basically

17    recanted their testimony, has been cross-examined

18    extensively with regards to their reliability of their

19    current testimony as compared with their former

20    testimony.

21          And so based on that issue -- again, if this were

22    a trial, I would have the expert proffer their

23    testimony.  The Court can make a decision as to what

24    weight to give this expert testimony.  That's what the

25    Court is tasked with.  If I don't think that it's

1      reliable or that it has any bearing on what the

2      Court's heard at this point, I'll set it aside or give

3      it the appropriator weight.

4           But at this point, I'm going to overrule the

5      defense's [sic] objection.  I think it goes to the

6      heart of the issue, which is the reliability of the

7      recantation and how those statements can be

8      reconciled; prior trial testimony as compared with the

9      testimony that's been presented in this hearing.

10          All right.  So, Ms. Fryer, you may continue you

11     inquiry.

12          **MS. FRYER:**  Thank you, Your Honor.

13     **BY MS. FRYER:**

14     **Q**     Based on your clinical experience, your training,

15     your research, what are the attributes and conditions of a

16     reliable photo array lineup?  And can you define "photo

17     array lineup"?

18     **A**     So a photo array would be a set of pictures.  It

19     varies from jurisdictions.  But, generally, in the U.S.,

20     it's a six -- six-person photograph picture lineup.  It can

21     be simultaneous or sequential.  Simultaneous, they're all

22     viewed at once, sequential is they're viewed one at a time.

23          **COURT REPORTER:**  I need you to please slow down.

24          **THE WITNESS:**  I'm sorry.  I'm a professor.  I

25     talk fast.

1       The -- a sequential lineup is they show them one

2       picture at a time.  But in the state of Florida, we

3       typically do a simultaneous lineup.

4   **BY MS. FRYER:**

5       **Q**     And what are the attributes of a reliable photo

6   lineup, based on your training and experience?

7       **A**     So currently there's certain factors that we

8   would call "pristine conditions" in my field to draw the

9   most reliable conclusions from a lineup.  We have nine

10  recommendations for these, but I'm just gonna talk about

11  five of these pristine conditions as they relate to

12  confidence and the ability to draw -- whether the

13  confidence that the witness makes is indicative of their

14  accuracy at the time of the identification.

15      And those five are:  There's a single suspect in

16  the lineup; that the lineup is a fair lineup; that the

17  suspect does not stand out unduly amongst the other

18  fillers; that the lineup was presented in a double-blind

19  fashion, which means in line with current state law; that

20  the administrator of the lineup does not know who the

21  suspect is while they're administering in.  There are ways

22  around that too, but that's the basic premise of that.

23  Confidence is measured immediately following the

24  identification.  And I'm missing one.  Oh, unbiased lineup

25  instructions.  So before the witness views the lineup, they

1    should be told, at a bare minimum, that the person may or

2    not be present in the lineup, and it is okay to say not

3    there.  I believe that's -- I believe I covered all five.

4        **Q**    You did.  Thank you.

5            So we're here on the State of Florida vs.

6    Mr. Jorge Valle-Ramos.  In preparing for your testimony

7    today, what materials did you review?

8        **A**    I reviewed depositions of the three witnesses;

9    the two eyewitnesses in particular.  I reviewed the

10   deposition of the detective in the case.  I reviewed trial

11   transcripts.  And I reviewed the two lineups that were

12   presented to the two eyewitnesses, and a license photo of

13   the defendant, of Mr. Ramos.

14           **MS. FRYER:**  May I approach, Your Honor?

15           **THE COURT:**  You may.

16   **BY MS. FRYER:**

17       **Q**    Can you see that, Doctor?

18       **A**    Yes, I can.

19       **Q**    This is one of the items you viewed, correct?

20       **A**    Correct.

21       **Q**    And from a clinical perspective, what, if

22   anything, stood out to you in this photo array lineup?

23       **A**    This is a very poorly constructed lineup.

24   There's only one individual in this lineup that remotely

25   fits the description provided by the witnesses; the main

1    attribute being an Afro.  And both witnesses mentioned this

2    in their report, in their depositions, and statements when

3    they said, I picked the person out because he had -- he had

4    the Afro.

5         So they're telling you in their own words the

6    attribute they're looking for in this lineup.  And the fact

7    that no one else in this lineup has an Afro makes this test

8    of the likely guilt or innocence of this person immaterial.

9         What I mean by that is, the purpose of a lineup

10   is the police have a hypothesis that the suspect is the

11   guilty party.  In order to test that hypothesis

12   appropriately, we need to set up a methological [sic] test

13   for it, an experiment.  All right?  To gather good

14   information from that experiment, it needs to be a sound

15   experiment.  It needs to have those five things, at least,

16   that I talked about.  All right, Your Honor?

17        If you do those five things and things are proper

18   and the witness has good encoding conditions and

19   everything, there's nothing wrong with witness reliability.

20   They can be perfectly reliable.  However, if you violate

21   any of those things I talked about, and other things too,

22   you do not learn anything from that identification.  In

23   other words, when the witnesses identified Mr. Ramos from

24   this photographic lineup, the police should not have

25   increased their likelihood that he is the guilty party.

1    They should not have gained any information from this

2    lineup because it's so poor.

3       **Q**    Is it fair to call it unreliable?

4       **A**    Yes.  And not just because of the construction of

5    the lineup, but other factors present in the case as well.

6    In the totality, in my expert opinion, of the

7    circumstances --

8    **BY MS. FRYER:**

9       **Q**    Well, hold on, hold on.  Let's talk about those

10   factors, Doctor, if you don't mind.  What other factors did

11   you take into consideration in forming your opinion today?

12      **A**    So one other major factor -- and this gets into

13   some math, so I apologize for those in the court that don't

14   want a lecture on math.

15         But there's something called "Bayes' Theorem,"

16   which has been around for about 200 years.  When you

17   calculate the posterior probability, the likelihood of an

18   event occurring, you can account for that likelihood based

19   upon two factors:  The base rate, how often that event

20   occurs in the population, and the likelihood ratio, which

21   is the information you gather after you know the base rate.

22   All right?

23         When you have low base rates, you learn nothing

24   from positive identifications.  In other words -- I can get

25   into all the math of it if Your Honor wants me too, but,

1   basically, when the witness identifies X person from the

2   lineup and makes a positive identification when there's an

3   extremely low base rate to begin with, the posterior

4   probability is not affected much at all from that

5   identification.  We don't learn much from that ID.

6          If the base rate is high, we learn a lot from the

7   identification.  It increases a lot of our likelihood that

8   that person is, in fact, guilty.  And if the witness

9   rejects the lineup, it decreases the likelihood that that

10  person is guilty.  But when you have such a low base rate

11  to begin with, you don't really change your posterior

12  probability at all because of that.

13         And, indeed, this is so important.  This is one

14  of our new recommendations for the field of eyewitness,

15  that we should have a priori suspicion before adding

16  someone to a lineup.  Just like we have probable cause to

17  search somebody or reasonable doubt to find someone guilty,

18  there should be some kind of evidence, other than fitting a

19  vague description of a Hispanic male with an Afro in the

20  City of Orlando where there's thousands of people that fit

21  that description, to be placed into a lineup.  That's

22  number one.

23         I can keep going if you don't have a follow-up

24  question.

25      Q   I'll -- I'll -- I'll ask some more questions, but

1    we'll get back to it, because the math --

2    **A**    Yeah.

3    **Q**    I had to take a minute there.

4          Doctor, are there established error rates when

5    you see a lineup like this that appears to be overly

6    suggestive?

7    **A**    There are.  So, generally speaking, some

8    estimates across a large sample of studies in my field

9    estimate the false ID error rate around 13 percent.  So

10   around 13 percent of witnesses who are shown a lineup with

11   a culprit who's not in the lineup, pick that person, make a

12   false ID 13 percent of the time.

13         When the lineup is biased, like it is in this

14   case, that false ID rate goes up to 35 percent.  It's huge.

15   That's 35 people out of a hundred that we're sending to

16   jail because they've been wrongfully identified.  And other

17   things will -- will vary that.

18         The base rate that I just talked about, lowering

19   base rate, increases that.  So I can show it mathematically

20   to you.  But, basically, when you have a low base rate and

21   a biased lineup and not double-blind and all these other

22   factors that I've discussed, this rate of a false ID, the

23   chances of this happening increases dramatically.

24   **Q**    Thank you, Doctor.

25         So, just generally, what, if any, effects does a

1   brief duration exposure to an individual by a witness have

2   on the reliability of a later identification?

3       **A**    Sure.  So this is one of the most basic findings

4   we have from memory literature from over a hundred years

5   ago.  Briefer exposure equals poorer memory accuracy,

6   simply put.

7       **Q**    And if -- if there's -- if there is an item,

8   something that you wouldn't expect to necessarily see,

9   would that -- like a blue rubber glove on an individual,

10  would that impact reliability in terms of identification?

11      **A**    Generally speaking, more distinctive items are

12  better recalled than less distinctive items.  There is some

13  research to suggest --

14          Am I going slow enough for you now?

15          **COURT REPORTER:**  Yes, thank you.

16          **THE WITNESS:**  Okay.  I'm trying.

17          There is some research to suggest that witness

18      descriptions, when they leave out distinctive

19      characteristics, are less accurate at the time of

20      identification than they are -- than are witnesses who

21      give -- who include those distinctive characteristics.

22          For instance, if the suspect has a huge tattoo

23      sleeve on their arm and the witness doesn't mention

24      that, their identifications tend to be less accurate.

25      But just general mismatches in description, there is

1       no relationship between identification accuracy.

2    **BY MS. FRYER:**

3       **Q**    Do the conditions under which the initial contact

4    between the witness and the identified subject have an

5    effect on the reliability?

6       **A**    Can you be more specific?

7       **Q**    Yeah.  I guess, does stress play a role in

8    reliability -- witness identification?

9       **A**    Yes, it does.  Stress is a complicated variable

10   in its effect on memory.  Simply put, you can kind of think

11   of stress -- there's two components to stress.  There's

12   cognitive stress; my thoughts about what's going on.  And

13   then there's a physiological response my body has to being

14   in a stressful situation.

15          And what we find is that as cognitive stress

16   increases, we will see an increase in memory as

17   physiological stress increases.  So we see better memory up

18   to a point.  We call it the "catastrophic drop-off point."

19   Once physiological stress and cognitive stress reach a

20   plateau and they both are extremely high, we see a

21   catastrophic drop off in not only memory for the witnessing

22   events -- so details around the event -- we see a drop off

23   in identification accuracy as well.

24      **Q**    What, if any, effects are presented on

25   reliability when you have people that are previously

1  strangers to each other?  Does that have --

2      A    Sure.  So the more -- when you're familiar with

3  folks, you're gonna be better at recognizing than when

4  you're not familiar.  Stranger identifications are harder.

5      Q    Is there any impact between the initial viewing

6  of an individual and the duration of time between when

7  they're presented with a lineup?

8      A    Yeah.  This is really interesting, actually.  So,

9  typically, what we find is within a week period, we see no

10  drop off in accuracy.  After a week, so after seven days,

11  we see a significant drop off in accuracy, but it plateaus

12  out.  So it doesn't matter whether it's six months later or

13  a year, it's that week mark.  We're really looking for --

14  we want identifications to be done within that first week.

15  If they're after that week, we see a drop off in accuracy.

16      Q    If there are multiple individuals involved in an

17  eyewitness scenario in terms of being the perpetrators,

18  does having multiple people involved have any effect on

19  later reliable identification?

20      A    Sure.  So there's research that shows that when

21  there's multiple perpetrators involved, identification

22  accuracy of those perpetrators is worse later on.

23      Q    Let's say, for instance, an individual chooses

24  the only guy with the Afro and is later told, you got the

25  right -- that's right, does that have any effect on later

1  identifications?

2  **A**    So it would -- it would -- it would increase

3  their likelihood, in my opinion, of staying with that

4  choice.  What she's talking about is post-ID feedback,

5  which is very bad.  We do not want that and we don't like

6  it.  Most of the impact we care about, in terms of my

7  ideas -- or in terms of my field is that accuracy is one of

8  the few things that we, as triers of the fact, can use to

9  infer accuracy.  It's one of the things that we can gather

10 as the criminal justice system and say, how accurate were

11 you.

12          And if you're highly accurate, if you do those

13 five pristine things I talked about earlier, Your Honor,

14 and the witness has good encoding conditions and all that

15 stuff, if witnesses are 90 percent or more accurate -- or

16 90 percent more confident, they're typically accurate.  We

17 can trust their identification.

18          However, when we violate any of those things,

19 accuracy no longer post -- sticks at all.  So giving

20 post-ID feedback before measuring confidence is not good,

21 because it ruins our ability to gather that very valuable

22 piece of evidence, to infer whether or not that witness was

23 accurate or not.  And even more so, the problem is that --

24 and I think this gets to an important point, so bear with

25 me.  Witnesses who make false identifications are not

1    lying.  They honestly believe that that was the person that

2    they saw commit the crime, right?

3            This is why it's hard that a lot of the

4    safeguards that we have as a system don't pick them up

5    because they're not able to be called out on

6    cross-examination, 'cause they believe that's the guy.  I

7    know it is.  He's the guy that was robbing me, or he's the

8    guy that raped me, or whatever the case may be.  But it can

9    happen that they can make that wrongful identification and

10   then not know that it's in error and be completely

11   convinced that it is an accurate memory.

12       **Q**    You use the term "encoding."  If you're exposed

13   to a picture, what does encoding mean thereafter?

14       **A**    So encoding -- there's three stages of memory:

15   Encoding, storage, and retrieval.  Encoding is the stage

16   where you bring in the information and put it into your

17   brain, basically.  So the event, the criminal event, would

18   be the encoding stage of it.  Showing them the lineup would

19   be the retrieval stage of it and so forth.  And errors can

20   happen at any one of these stages.

21       **Q**    If there's a later court -- in-court

22   identification in a witness ID scenario, is it fair to say

23   that the lineup itself is the memory of the individual?

24   Does that make sense?

25       **A**    Yeah.  So you learn nothing from in-court

1    identifications.  They tell you nothing regarding my

2    hypothesis that this person is a guilty party, and I'm

3    gonna test that by having the witness point to the person

4    who is sitting at the defense table.

5        **Q**    And, excuse me, Doctor, is that under this

6    scenario where you've had an overly suggestive lineup?

7        **A**    It doesn't matter whether the lineup's suggestive

8    or not.  In general, an in-court identification doesn't do

9    anything additive to what the original lineup

10   identification already told us.

11       **Q**    Is that because it's not an independent

12   occurrence?  It's --

13       **A**    Correct.

14       **Q**    -- predicated on previous --

15       **A**    Correct.

16       **Q**    Okay.

17       **COURT REPORTER:**  Please try not to talk over each

18       other.

19       **THE WITNESS:**  I'm sorry.  I get excited.

20       **MS. FRYER:**  I do too.

21       **THE WITNESS:**  So there's something that generally

22       people think is a truism across all science, that

23       test-retest is a good thing in any situation.  It is a

24       foundational element of most science.  But in this

25       specific instance --

1          **MS. MOMPREMIER:**  Your Honor, I'm gonna object at

2     this point to the testimony.  Ms. -- forgive me if I'm

3     mispronouncing her name -- Ms. Szewczyk's testimony

4     was not that she was confident in her ID.  Her

5     testimony today was not that she was confident in her

6     ID in the photo lineup and confident in her ID at

7     trial, and only after did she have hesitancy.  Her

8     testimony was, I had doubts of the photo lineup.  I

9     had doubts at trial.  He is testifying about a witness

10    who --

11         **THE COURT:**  What's the objection?

12         **MS. MOMPREMIER:**  I would object to relevance at

13    this point.  The factual basis the testimony's

14    provided is not for the witness that we have before

15    you.  It is for a different witness.  And it's not for

16    a witness who had doubts.  It is for a witness who was

17    certain, certain, and then later became uncertain.

18         **THE COURT:**  Okay.  Response?

19         **MS. FRYER:**  Thank you, Your Honor.

20         What Ms. Szewczyk testified to was that when she

21    testified, she told the truth.  She had her doubts,

22    but those were overcome by the scenario that he just

23    described.  The -- the confirmation bias that came

24    later, the -- being subject to it again, the encoding

25    that happens when you're making -- so her ultimate

1    testimony, I think the record's gonna reflect, is she

2    ultimately said she testified truthfully.  She had her

3    doubts, but those were overcome by the confirmation

4    that she got.

5         **THE COURT:**  All right.  Overruled.

6  **BY MS. FRYER:**

7    **Q**    Ultimately, Doctor, based on your training and

8  experience, are you able to state whether the lineup in

9  this matter is reliable?

10   **A**    In my expert opinion, this is not a reliable

11 lineup.

12        **MS. FRYER:**  I don't have any further questions

13   right now.

14        **THE COURT:**  Cross-examination?

15        **MS. MOMPREMIER:**  Yes, Your Honor.

16                      **CROSS-EXAMINATION**

17 **BY MS. MOMPREMIER:**

18   **Q**    I'm sorry.  I didn't catch your first name.  How

19 do you spell it?

20   **A**    Brian, B-r-i-a-n.

21   **Q**    Your last name?

22   **A**    C-a-h-i-l-l, Cahill.

23   **Q**    Dr. Cahill, so one of the things that I wanted to

24 talk about for your testimony, you stated that in-court

25 testimony is unreliable?

1     **A**    No.  I said in-court identifications don't

2     provide any value above what we've already learned from the

3     original identification.

4     **Q**    Okay.  Would you agree with me there might be a

5     situation where a witness could make an out-of-court ID and

6     then later change their mind in court when they actually

7     see the person?

8     **A**    It's possible, yes.

9     **Q**    Okay.  So that would make it valuable for the

10    analysis of whether the person being charged is the correct

11    person, correct?

12    **A**    I would say no.  The in-court identification

13    doesn't tell us anything more than what we already learned

14    from the original identification.

15    **Q**    Even if it's different than their out-of-court

16    identification?

17    **A**    Yes.  I would not put any bearing on the in-court

18    identification.

19    **Q**    Let me ask you this:  So in a situation where you

20    have, as you've described -- your testimony is you believe

21    that Ms. Szewczyk's testimony at court, in terms of her

22    identification, is unreliable, correct?

23    **A**    I would say yes.

24    **Q**    And that was based off of having -- being

25    presented with six different photographs, correct?

1     **A**     That's based upon --

2     **Q**     I mean, in part, that's one of the --

3     **A**     In part.  It's the construction of the lineup.

4  Not being presented with six photographs, but the type of

5  photographs she was presented with.

6     **Q**     Okay.  And is it your belief that in order to

7  determine an identification correctly, you should present

8  multiple photographs to somebody?

9     **A**     You need to be clearer with that.  I'm sorry.  Do

10  you mean of a suspect?

11     **Q**     Yes.

12     **A**     Generally, no.  There's a little bit of research

13  showing that if you show multiple photographs of everybody

14  in the lineup -- you can't just do it for one, because

15  that's -- that's biased.  That's leading them to pick that

16  person.  There's a little bit of research showing that, but

17  not enough for me to want to testify about that in court.

18     **Q**     Okay.  Well, for example, if, according to you,

19  the participants look more closely alike, the photographs

20  were clear, they were crisp, that would be a more reliable

21  photographic lineup, right?

22     **A**     So I think we're talking about two different

23  things.  In order for a lineup to be fair, you simply need

24  for the suspect not to stand out compared to the fillers in

25  the lineup.

1    **Q**    Okay.

2    **A**    It would be better -- if I was training police

3    officers, I would tell them to use the most recent photo

4    that you have of the suspect which matches what they look

5    like, what they tried to look like at the time of the

6    crime.  Because the better match we have, the better recall

7    experience you're gonna have.

8    **Q**    Okay.  But even still, my point is, do you think

9    you should show just one photograph or more than one?

10   'Cause one would be biased, correct?

11   **A**    You mean a show up?

12   **Q**    Yes.  If you're --

13   **A**    So a show up, I would recommend that we do not do

14   show ups.

15   **Q**    No, no.  For a photographic lineup -- we're

16   talking about this.  Okay?

17   **A**    Uh-huh.

18   **Q**    Someone's showing -- you would agree if the

19   detective just showed that person one photograph, that

20   would be biased?

21   **A**    But that's -- that's my point.  If you show them

22   one photograph, that's --

23   **Q**    Can you just answer my question, yes or no?

24        **MS. FRYER:**  I'm sorry, Your Honor.  This is

25        getting argumentative.  It's not necessary.

1          **MS. MOMPREMIER:**  I would object to nonresponsive.

2     He's not answering my question.

3          **THE COURT:**  Well, he hasn't had an opportunity.

4     There was an objection.

5          I'm gonna just ask the question, because I'm

6     trying to make sure I'm understanding it.

7          So are you asking the witness if a photo lineup

8     that only had one photograph would be a biased lineup?

9          **MS. MOMPREMIER:**  Correct.

10          **THE COURT:**  Okay.  Can you answer that question?

11          **THE WITNESS:**  So I would say that's not a lineup.

12     That's called a show up.  And a show up is biased in

13     other ways.  It can't be biased like a lineup can,

14     'cause there's only one photo.  So you can't -- if --

15     like, for instance, here, only one person has an Afro.

16     If you took away all the other five pictures and just

17     showed that one picture, his picture can't stand out

18     to the other pictures because there's no other

19     pictures.  So the context is removed, so you can't

20     call it bias.

21          I can elaborate on why we don't like show ups.

22     And what you're particularly proposing is a really bad

23     procedure called a photographic show up, which should

24     never be used.  But if you're meaning should we show

25     one photograph of each person in the lineup, that's

1          fine.  If you want to just show six photos, one of

2          suspect surrounded by five fillers who are known

3          innocents, who all resemble each other so no one

4          stands out, I have no problem with that lineup.

5     **BY MS. MOMPREMIER:**

6          **Q**     My question is, if a detective showed an

7     individual just one photograph and that photograph being

8     the suspect that they believe committed the crime --

9          **A**     Okay.

10         **Q**     -- you would agree with me that that would be

11    biased, correct?

12         **A**     No.  You would not get diagnostic information

13    from that because -- I can elaborate on that, if you want.

14    But we don't recommend show ups.  What you're proposing is

15    a show up.

16         **Q**     Okay.  So I'm not -- I think you're getting stuck

17    on the technical terms.  And I'm just asking, you have a

18    photograph of a suspect, and I go up to the victim and I

19    say, is this the person who did it, would you agree with me

20    that that would be biased?

21         **A**     No, not necessarily.  I would agree that you

22    don't get good information from that lineup procedure.

23         **Q**     So looking back at the five different standards

24    that you gave, it prevents you, for example, from having an

25    opportunity to have multiple people so that person doesn't

1   stand out, correct?

2       **A**    I'm sorry.  I don't understand the question.

3       **Q**    Well, if I only showed you one photograph,

4   there's no one else to be a filler -- those fillers are

5   there for a reason, correct?

6       **A**    They are there for good reason, yes.

7       **Q**    And, in general, in the state of Florida -- do

8   you agree with the state of Florida's approach that having

9   six individuals in a lineup is a good method?

10      **A**    Yes.  That is a good method if they match each

11  other and it's a fair lineup.  Yes.

12      **Q**    Okay.  Do you think if I only showed two

13  photographs that that would be reliable?

14      **A**    Again, I -- I -- it's -- you're not gonna get

15  good information from it.  Would you like me to elaborate

16  on why the show ups are not good versus lineups?

17      **Q**    So just to be clear, you'd agree with me that

18  showing just two photographs would not be a good practice?

19      **A**    It's not good practice, yes.

20      **Q**    And why is that not?

21      **A**    Because when you show a lineup versus a show up,

22  right, you actually get more choosing from a lineup, more

23  witnesses will choose.  But the thing about the fillers is

24  they suck away a bunch of those choices.  So instead of all

25  the choices landing on the suspect, in a show up, they all

1    land on him or her.  So it's a correct ID or a false ID,

2    right?

3              So back to that base rate idea.  If we have a low

4    base rate, every choice is gonna be a false ID.  If we have

5    a high base rate, every choice will be a correct ID, right?

6              In a lineup, a bunch of those choices get sucked

7    off into the fillers.  It's called "filler syphoning."  So

8    we see more suspect identifiers in a show up, but they're

9    less accurate because a bunch of those are false

10   identifications.

11             So the diagnosticity of a lineup gives you more

12   information compared to a show up, which is why we

13   recommend those.  However, we do say in our

14   recommendations -- best practices that there are times when

15   police need to do a show up because we understand certain

16   circumstances surrounding a criminal activity.  So when

17   they do a show up, they need to do it in the least biased

18   way possible following other procedures.

19        **Q**    So you would agree with me that the information

20   that you give someone before you do -- you do a

21   photographic lineup, it's important?

22        **A**    Very important, yes.

23        **Q**    Okay.  And not doing anything to suggest one

24   person over another is important?

25        **A**    Yes.  That would be unbiased lineup instructions,

1   and that's also why we recommend double-blind lineups so

2   that the administrator can't unintentionally or

3   intentionally influence the witness in any way.

4        **Q**    Okay.  So telling somebody that you think that

5   they may have made the wrong decision before you show them

6   those photographs would not -- would weigh heavily to

7   discrediting identification?

8        **A**    Well, I don't think you would tell somebody

9   before you showed them the photos that they made the wrong

10  decision, because they haven't had a chance to make the

11  decision yet.  But if you're showing them the lineup and

12  they choose one and then you tell them that's the wrong

13  choice, that's a really bad procedure.  Yes.

14       **Q**    Okay.  Do you think showing a witness two

15  photographs of individuals side by side is good practice?

16       **A**    No.

17       **Q**    Why not?

18       **A**    Again, back to the filler syphoning.  The more

19  photos you have in a lineup, to a point, the more

20  protection it gives to innocent persons in that lineup.

21       **Q**    Okay.  And in this situation for Ms. Szewczyk,

22  given that she's already -- well, let me ask you this:  So

23  when someone's already made an ID and then they later

24  identify somebody else, what's the science related to that?

25  Is there a term for that?

1      **A**    There is something called a "blind lineup

2  procedure," which might be something relevant.  Typically

3  speaking, though, I would say when a witness makes

4  different decisions of any kind, whether it's an

5  identification or they're changing their story and

6  contradicting one another, the contradiction in and of

7  itself tells us that there's inconsistency, 'cause only one

8  of them can be correct.

9      **Q**    Is there a statistic for the reliability of a

10  later identification?

11     **A**    So in a double -- sorry, in a blind lineup

12  procedure, or blank -- sorry, a blank lineup procedure --

13     **Q**    Can you clarify that term?

14     **A**    Yeah, yeah.  I'm gonna define it right now.

15  So --

16     **Q**    How do you -- no.  Please answer my question.

17  How do you define that term?

18     **A**    I'm going to answer that right now.

19         **THE COURT:**  Let's stop for one moment.

20         Counsel, you can't ask a question, and then when

21     the witness is answering the question, ask them

22     another question.

23         **MS. MOMPREMIER:**  Yes, Your Honor.

24         **THE COURT:**  So let him answer the first question,

25     and then you can ask him any follow up.  So we're

1       gonna start back over.

2              Counsel, ask your first question.

3    **BY MS. MOMPREMIER:**

4       **Q**    Can you define that term, the blank --

5       **A**    Blank lineup?

6       **Q**    Yes.

7       **A**    So a blank lineup procedure is when we give a

8    witness -- an eyewitness a lineup where the perpetrator is

9    not -- the suspect, sorry, is not in the lineup.  And then

10   we basically see whether the witness is gonna choose from

11   that lineup.  It's a way to -- to filter out crappy

12   witnesses.  'Cause if you choose from that lineup, then

13   you're telling us that you're not a good witness.  So what

14   we show is that people who choose from the blank lineup and

15   if they later choose from the real lineup, they are less

16   accurate than the witnesses who reject the original lineup

17   and choose from the later lineup, basically.

18      **Q**    Are you saying that the blank lineup is the

19   process you should use when a witness has already made an

20   identification?

21      **A**    So there's not enough research for us to make

22   that as a recommendation.  I think that it would show up

23   enough in research.  The problem with it, logistically, is

24   that once witnesses catch on to the idea that we always

25   show them a fake lineup beforehand, the utility of it goes

1    away.  So it wouldn't really work in the real world.

2        **Q**    Okay.  But my question specifically -- let me ask

3    you this:  If a witness has already made an identification

4    and we want to potentially show them someone else -- first

5    of all, do you even recommend doing that?

6        **A**    You can do multiple lineups with different

7    suspects.  That's fine.  I would be -- if a witness chooses

8    from a first lineup, right, and then you show them another

9    lineup later on, that witness is likely less reliable

10   because they've already made an error.  They're telling you

11   their memory sucks, because they've chosen someone that

12   wasn't the right person.  Okay?

13           And the only time you would do that is if they

14   pick a filler.  You wouldn't have them -- show them a

15   lineup, they pick out your suspect, and then all of a

16   sudden you get a different guy and then show him a new

17   suspect.  It just -- that, typically, doesn't happen as

18   much because once you get that first ID, you got your guy

19   and you're gonna charge him.  So it can happen where it

20   goes the other way around, but it's not as likely.  Usually

21   it's a filler identification.  And when they pick a filler,

22   they're telling you they don't know.

23       **Q**    Okay.  So you would agree with me, then, that

24   once an eyewitness has said they made a mistake in terms of

25   identification, they're less reliable for future

1    identifications?

2        **A**    I would say that their original identification --

3    not that -- you're trying to say if their original ID is

4    fine, and then anything else they do later is not reliable.

5    Anything they do is not reliable because they made an ID

6    here, and now they're changing it later.  None of it is

7    reliable.  We don't -- we shouldn't trust any of it, in my

8    opinion.

9        **Q**    And is there a statistical -- you provided

10   earlier the -- how the statistics go up in terms of making

11   errors.  Is there a statistic in terms of the error for a

12   subsequent ID when a witness has already made an

13   identification?

14       **A**    The blank lineup procedure, I don't know the

15   numbers off the top of my head.

16       **Q**    Not a blank lineup procedure, but just in

17   general.

18       **A**    It's -- it's the closest analogy I can give where

19   we have a witness making a lineup identification and later

20   making another one.  We don't typically do that because

21   it's not forensically relevant to test that.

22       **Q**    Okay.  So according to your science, then, it's

23   unreliable, so there's not much else in terms of your

24   analysis at that point?

25       **A**    I didn't say it's not reliable.  I said there's

1    not enough body of literature for me to feel comfortable

2    recommending it as a reform for police to follow.  But

3    there is enough sound science on it for me to speak about

4    it, to answer your question, I would say.

5        **Q**    Okay.  And you stated earlier that as part of

6    good police procedure, you should give instructions to the

7    witness?

8        **A**    Yeah.  They need to be good instructions, but,

9    yes.

10       **Q**    And part of those instructions would be that you

11   don't have to select somebody?

12       **A**    It should be made clear to the witness that their

13   job is not simply to pick out the person, who the guilty

14   party is, but that the person may not be there, and that it

15   is okay to say not there, correct.

16       **Q**    Okay.

17       **A**    It's called unbiased lineup instructions.

18       **MS. MOMPREMIER:**  Okay.  No further questions,

19   Your Honor.

20       **THE COURT:**  I have one follow up, so,

21   Ms. Mompremier, I don't know if you'll want to have a

22   follow up to my question.

23       Dr. Cahill, you talked about the unreliability of

24   the subsequent different identification, correct?

25       **THE WITNESS:**  Correct.

1          **THE COURT:**  That that second identification is
2     unreliable, that it has no value -- no forensic value
3     because the first identification is the one that
4     really kind of counts?
5          **THE WITNESS:**  Yes.
6          **THE COURT:**  Does the second identification, if it
7     is someone different, undercut the reliability of the
8     first identification?
9          **THE WITNESS:**  Yes, I would say it does.
10         **THE COURT:**  Any follow up with regards to that?
11         **MS. MOMPREMIER:**  No, Your Honor.
12         **THE COURT:**  Defense?
13         **MS. FRYER:**  I don't have any further questions.
14    This witness is released.
15         Thank you, Doctor.
16         **THE COURT:**  Thank you, Doctor.
17         **THE WITNESS:**  Thank you.
18         **THE COURT:**  All right.  State and defense,
19    approach.
20         (At the bench.)
21         **THE COURT:**  Okay.  So with regards to time,
22    obviously we'll go until noon, but I don't know that
23    that's gonna allow us to conclude the hearing.  I have
24    time -- I don't have a hearing set at 1:30, so we can
25    go into the afternoon.  But what I'd like to do is

1        stop at 12:00 if we're gonna continue at 1:30.

2              State, are you available?

3         **MS. MOMPREMIER:**  Yes.

4         **THE COURT:**  Defense?

5         **MS. CEPERO:**  Yes.

6         **THE COURT:**  And who is your next witness,

7    defense?

8         **MS. FRYER:**  We would rest.

9         **THE COURT:**  And, State, you said you had two

10   witnesses?

11        **MS. MOMPREMIER:**  Yes.

12        **THE COURT:**  Who are you calling first?

13        **MS. MOMPREMIER:**  I'm calling the victim first.

14   My questions won't be long.  Again, I'm sticking

15   with --

16              (In open court.)

17        **THE COURT:**  All right.  So, defense, you have no

18   further witnesses?

19        **MS. FRYER:**  That's correct, Your Honor.

20        **THE COURT:**  Is there any other evidence you want

21   the Court to take -- or that you want to present to

22   the Court at this time?

23        **MS. FRYER:**  No, Your Honor.  I think we've

24   entered everything into evidence and requested the

25   judicial notice.  So at this point defense rests.

1          **THE COURT:**  We just need Exhibit 1 back, please.

2          All right.  State?

3          **MS. MOMPREMIER:**  Yes, Your Honor.  State would

4     call George Gonzalez.

5          **THE COURT:**  All right.  Let's have Mr. Gonzalez

6     come in.

7                         **GEORGE GONZALEZ**

8     **was called as a witness and, having first been duly sworn,**

9     **testified as follows:**

10          **THE WITNESS:**  I do.

11          **THE COURT:**  Good morning, sir.  Please be seated.

12          **THE WITNESS:**  Good morning, Your Honor.

13          **THE COURT:**  Could you please state your first and

14     last name.

15          **THE WITNESS:**  George Gonzalez.

16          **THE COURT:**  And could you spell your last name

17     for --

18          **THE WITNESS:**  G-o-n-z-a-l-e-z.

19          **THE COURT:**  And, Ms. Mompremier, you may inquire.

20          **MS. MOMPREMIER:**  Thank you, Your Honor.

21                         **DIRECT EXAMINATION**

22     **BY MS. MOMPREMIER:**

23     **Q**     Good morning, Mr. Gonzalez.

24     **A**     Good morning.

25     **Q**     So just for the record, were you the victim in

1   this case?

2       **A**      Yes, I was.

3       **Q**      Okay.  And, obviously, you testified in court?

4       **A**      Yeah, the last time.

5       **Q**      And is there any change to your testimony?

6       **A**      No, there's no change.

7       **Q**      I want to turn your attention to the date of the

8   trial in this case.  When you were in trial, did you happen

9   to run into the female witness in this case?

10      **A**      Not in the -- outside, in the waiting room.

11      **Q**      Okay.  And do you know her name?

12      **A**      No, don't really know her.

13      **Q**      Okay.  And had you ever met that person before?

14      **A**      Never.

15      **Q**      Did you have interaction with her outside of the

16  courtroom?

17      **A**      Outside of the courtroom, no.

18      **Q**      Yes.  Did she speak with you at all?

19      **A**      Over here?

20      **Q**      Yes.

21      **A**      Yes.  Outside in the waiting room, we talked a

22  little bit.

23      **Q**      Okay.  Can you tell the Court what, like -- first

24  of all, how -- how did you meet with her, or how did that

25  interaction begin?

1      **A**    I think probably just talking, and then it came

2   up that she was a witness, I think, in the trial itself.

3   So I think -- I can't recall everything, but I think that,

4   you know, I was told there was another witness that saw

5   Jorge, that pointed him out or something, and that was her.

6   She pointed him out and she picked a picture, you know,

7   like I did, after looking at several.

8      **Q**    Did you talk with her about that?

9      **A**    No, we didn't get into a deep conversation or

10  anything that I can recall.  Of course, it's ten years ago,

11  but we didn't talk too long at all.

12     **Q**    Did Detective Stanley introduce you two?

13     **A**    Huh?

14     **Q**    The detective in the case?

15     **A**    No, no.  You mean -- no.

16     **Q**    Did he introduce you to Ms. Szewczyk?

17     **A**    To who?

18     **Q**    To the witness.

19     **A**    No, no.  Introduce me to the witness?

20     **Q**    Yes.

21     **A**    No, not that I recall at all.  No.

22     **Q**    In your conversation with her, did you ever tell

23  her that the person at trial during that time was the

24  person you selected?  Did you tell her that information?

25     **A**    I don't remember saying anything like that.  Of

1    course it's ten years ago, so anything's possible.

2        **Q**    And at any point did she ever express doubts to

3    you about her selection?

4        **A**    No.  I do just recall one thing.  I appreciated

5    the fact that she came out, because most people don't want

6    to be a witness to anything if it's not involved with

7    them -- nowadays, anyway -- but you still get a few out

8    there, so I appreciated that fact, that she picked him out

9    like I did.

10           **MS. MOMPREMIER:**  No further questions,

11       Your Honor.

12           **THE COURT:**  Ms. Fryer?

13           **MS. FRYER:**  Thank you, Your Honor.  I'll be brief

14       and respect your time.

15                        **CROSS-EXAMINATION**

16   **BY MS. FRYER:**

17       **Q**    So you stated that you knew Ms. Szewczyk, the

18   individual who testified, that you met that day after your

19   testimony --

20       **A**    That I knew her?

21       **Q**    No, sir.  I'm sorry.  That you learned that she

22   had chosen the same individual you had.  How did that

23   information come to you?

24       **A**    Just talking.  And she happened to be in the same

25   case I was that I can recall.  That was it.  There wasn't a

1   big -- like, we didn't have pictures or anything or

2   anything like that.

3       **Q**   Sure.  But was the -- had you ever had a

4   conversation prior to trial?

5       **A**   No.  I didn't even know who she was.  All I know,

6   that I think I learned from her that day, was that she

7   lives in the other side of the community where they parked

8   their car and they all jumped the fence.  And I guess

9   that's how she saw them, because I didn't know nothing

10  about her at all.

11      **Q**   Okay.  Did you -- did you ever have a

12  conversation with her after the trial?

13      **A**   No, never.

14      **Q**   Okay.  So the only time that you shared

15  information was that period of time after your testimony at

16  trial?

17      **A**   I don't know if you want to say information.  I

18  would say more just one sentence or two and that was it.

19  It wasn't a big conversation.

20      **Q**   Sure.

21          **MS. FRYER:**  I don't have any other questions.

22      Thank you.

23          **THE WITNESS:**  You're welcome.

24          **MS. MOMPREMIER:**  No further questions.

25          **THE COURT:**  Thank you, sir.  You may step down.

1              Is this witness released, State?

2              **MS. MOMPREMIER:**  Yes, Your Honor.

3              **THE COURT:**  Any objection, defense?

4              **MS. FRYER:**  No objection, Your Honor.  Thank you.

5              **THE COURT:**  Sir, you're welcome to remain in the

6      courtroom, if you'd like.

7              **THE WITNESS:**  Okay.  Thank you, Your Honor.

8              **THE COURT:**  State, your next witness?

9              **MS. MOMPREMIER:**  Detective Stanley.

10                        **MICHAEL STANLEY**

11     **was called as a witness and, having first been duly sworn,**

12     **testified as follows:**

13             **THE WITNESS:**  Yes, I do.

14             **THE COURT:**  Good morning, sir.  Please be seated.

15             And if you could please state your first and last

16     name.

17             **THE WITNESS:**  First name is Michael, last name is

18     Stanley.

19             **THE COURT:**  And could you spell your last name

20     for the court reporter.

21             **THE WITNESS:**  S-t-a-n-l-e-y.

22             **THE COURT:**  Ms. Mompremier, you may inquire.

23             **MS. MOMPREMIER:**  Thank you, Your Honor.

24

25

1              **DIRECT EXAMINATION**

2    **BY MS. MOMPREMIER:**

3         **Q**    Good morning, Detective Stanley.

4         **A**    Good morning.

5         **Q**    Were you the lead detective in this case?

6         **A**    Yes, I was.

7         **Q**    And, obviously, you testified at trial?

8         **A**    Yes, that's correct.

9         **Q**    I want to direct your attention to the

10   photographic lineup of Bethany Szewczyk.  Do you recall

11   giving that photo lineup to her?

12        **A**    I vaguely remember that, yes.

13        **Q**    Okay.  Did -- during that photographic lineup,

14   before she made a selection, did you tell her anything, any

15   information about the suspect that you had in mind?

16        **A**    No, I did not.

17        **Q**    Okay.  Did you -- what process did you do to

18   administer the photo lineup with her?

19        **A**    I read her, verbatim, our department's photo

20   lineup and witness instructions.  She signed that document

21   acknowledging that she understood the instructions.  I then

22   would have presented her the photographic lineup.

23        **Q**    And safe to say she made an identification pretty

24   quickly?

25        **A**    Yes, that's correct.

1    **Q**    Now, after that identification, what -- did you

2    make a comment to her about the person she selected?

3    **A**    No, I did not.

4    **Q**    Okay.  Do you recall saying something like, yes,

5    that's the guy?

6    **A**    No, I do not.

7    **Q**    Do you recall if you had further conversations

8    with her?  Did she inquire for more information about the

9    case and things like that?

10    **A**    No, I did not have any other contact with her.

11    **Q**    Is there a possibility that you could have

12    discussed with the witness about the victim or someone else

13    also identifying the defendant?

14    **A**    No, I would not have done that.

15    **Q**    Is there a particular practice that you-all have

16    in terms of -- are there rules that you have in terms of a

17    photo lineup, about what information to give or not to give

18    to witnesses?

19    **A**    Just to read the photographic lineup instructions

20    specifically verbatim off of our form and then to present

21    them the photographic lineup.

22    **Q**    And do you recall the day of trial?

23    **A**    Vaguely.

24    **Q**    Did you ever introduce Ms. Bethany [sic] to the

25    victim in this case?

1     **A**    No.

2     **Q**    And at any point when you were talking to

3  Ms. Bethany did she express doubt as to her identification?

4     **A**    During the photographic lineup administration?

5     **Q**    At any point you had interaction with her.

6     **A**    No.

7     **MS. MOMPREMIER:**  No further questions,

8  Your Honor.

9     **THE COURT:**  Ms. Fryer?

10     **MS. CEPERO:**  I -- I believe the photo lineup and

11    the prior testimony speaks for itself.  I don't have

12    any further questions.

13     **THE COURT:**  Thank you, Detective.  You may step

14    down.

15     **THE WITNESS:**  Thank you, Your Honor.

16     **THE COURT:**  State, is this witness released?

17     **MS. MOMPREMIER:**  Yes, Your Honor.

18     **THE COURT:**  Defense, any objection?

19     **MS. FRYER:**  No objection.

20     **THE COURT:**  Sir, you're released.

21    Ms. Mompremier, any other witnesses?

22     **MS. MOMPREMIER:**  No, Your Honor.

23     **THE COURT:**  Is there any other evidence that the

24    State wants to move in for the purposes of this

25    hearing?

1      **MS. MOMPREMIER:**  No, Your Honor.  The Court's

2      already taken judicial notice of the record.

3          **THE COURT:**  All right.  Any rebuttal, defense?

4          **MS. FRYER:**  Do you mind if we take about

5      two minutes to discuss?

6          **THE COURT:**  Sure.  We'll take a two-minute

7      recess.

8          (Pause.)

9          **MS. FRYER:**  No rebuttal witnesses.

10     Your Honor, may I ask Mr. Lyons, who is released,

11     to join us in the courtroom?  Would that be all right?

12         **THE COURT:**  That's fine.

13     And how much time, defense, would you like to

14     reserve for argument?

15         **MS. CEPERO:**  Maybe 30 minutes.

16         **THE COURT:**  State, how much time for argument?

17         **MS. MOMPREMIER:**  Your Honor, I would say 15, 20.

18         **THE COURT:**  All right.  So do you-all want to do

19     argument at 1:30, and we'll just do argument?  It'll

20     give you a little time to prepare anything additional

21     and provide any additional case law.

22         **MS. CEPERO:**  Yeah, we would be okay with that.

23         **THE COURT:**  State?

24         **MS. MOMPREMIER:**  I mean, my preference is to get

25     as much done now, but I'll leave it up to Your Honor.

1          **THE COURT:**  Well, that would take us to about

2     12:35.  I have an appointment at noon, so I'm just

3     gonna ask that we -- that you-all be back here at

4     1:30, and we'll go ahead and do the arguments at 1:30.

5          Defense, 30 minutes will include any rebuttal,

6     and the State will have equal time.  Okay?

7          All right.  We'll be in recess until 1:30.

8          (Recess from 11:38 a.m. to 1:48 p.m.)

9          **THE COURT:**  All right.  This is 2013-CF-5146,

10    State vs. Jorge Valle-Ramos.

11         And, defense, are you ready to proceed with

12    closing argument?

13         **MS. CEPERO:**  Yes.

14         **THE COURT:**  All right.  Go ahead.

15         **MS. CEPERO:**  May it please the Court.

16         Your Honor, what we have here today is a textbook

17    case of mistaken identity, and the circumstances and

18    conditions of the lineup created a roadmap for a

19    wrongful conviction here.

20         May I approach the clerk?

21         **THE COURT:**  You may.

22         **MS. CEPERO:**  I'm placing on the projector what's

23    been previously marked as Defense Identification A,

24    Defense Exhibit 1.

25         The Court has had the opportunity to observe the

1       lineup in this case.  The Court has also heard expert

2       testimony, which laid the foundation of what makes a

3       lineup reliable versus what makes a lineup not

4       reliable.  And the Court has also heard expert

5       testimony today about how certain factors, such as

6       stress or duration of exposure to a face, can affect

7       an eyewitness' memory and an eyewitness' ability to

8       recall a face or to identity a face.

9            And we've also heard from the recanting witness

10      in this case, Ms. Szewczyk, who no longer identifies

11      the defendant, Mr. Valle-Ramos, as the person who she

12      saw get into the vehicle of the getaway car of the

13      burglary in this case.  She simply made a mistake.

14           And this newly-discovered evidence, which is the

15      recantation, is exactly the type of newly-discovered

16      evidence that would produce an acquittal on retrial.

17      And as I'm sure you know, the legal standard that the

18      defense has the burden of showing is, number one, that

19      the newly-discovered evidence was unknown at the time

20      of trial and that it could not be discovered through

21      due diligence.  And we've established that here.

22           **THE COURT:**  If you don't mind, I will

23      occasionally interject some questions.

24           **MS. CEPERO:**  Yeah, of course.

25           **THE COURT:**  Now, this isn't simply a circumstance

1    where a witness is indicating that they were shown a

2    picture of a different suspect, or potential suspect,

3    and they said, yeah, it could be that person.  Is that

4    the case?  'Cause if that's the case, I mean, any

5    person who conducted an eyewitness identification

6    after the fact, would -- we'd find ourself in this

7    circumstance.  So what makes that scenario different

8    than this one?

9         **MS. CEPERO:**  Well, here, she had -- she testified

10   she had doubts the entire time.  She was expecting,

11   eventually, for a defense investigator to show up and

12   talk to her about this case.  And she's clearly

13   stated, that's not the guy, I always had doubts.

14        She testified that when she saw him in court, at

15   trial, that he appeared to be -- have darker skin and

16   that she had doubts.  So this is a little bit

17   different in this case.  She's more certain now about

18   the identification of Mr. Ortiz.

19        So as to the first prong of the newly-discovered

20   evidence case, the -- her recantation was unknown at

21   trial, obviously, because she hadn't made it yet, and

22   it couldn't be discovered until she courageously came

23   forward to right this wrong and to recant her

24   testimony.

25        The second prong we've also established, which is

1     that the newly-discovered evidence would probably

2     produce an acquittal at retrial.  And we have -- what

3     we know is it's well established in both science and

4     law that an eyewitness' memory and identification is

5     unreliable when the eyewitness is presented with a

6     suggestive lineup, and Dr. Cahill testified to that as

7     well.

8         It's also well established in both science and

9     law that eyewitness identification is the most common

10    cause of wrongful convictions in this country.

11        Florida law is starting to catch up with the

12    science on this.  It's been a little slow.  So at the

13    time of Mr. Valle-Ramos' trial, we didn't know as much

14    as we know now in the legal system.  But Florida has

15    taken steps to address this issue.  They recognize

16    that eyewitness misidentification is an issue.

17        We have a new standard jury instruction which

18    instructs jurors on the factors to consider when

19    evaluating eyewitness identifications and on proper

20    lineup procedures.  The legislature has also

21    acknowledged this problem in passing Section 92.70 in

22    2017, which provides the best practices for lineup

23    procedures, which requires an independent

24    administrator or an alternative method, neither of

25    which was used here.

1      **THE COURT:** But the law changes all the time. I

2      guess my question is, how much of this information can

3      the Court consider going forward in weighing, I guess,

4      what the weight of the evidence would be, given this

5      newly-considered evidence? 'Cause there's always

6      going to be changes in the law. And, you know, any

7      identification case prior to 2013, where they didn't

8      even have the instruction that they had in this case,

9      which talked about cross-racial identification, it

10     didn't go through the double-blind procedures like we

11     have now in our standard instructions whenever a

12     lineup is conducted. But there's always going to be

13     changes in the law. How much of that can the Court

14     consider with regards to weighing the probability of

15     an acquittal on retrial?

16     **MS. CEPERO:** Well, first of all, it demonstrates

17     that the law has recognized -- finally recognized the

18     science, number one; and, number two, if he gets a

19     retrial, he'll be entitled to this instruction, the

20     jury instruction on this case.

21     **THE COURT:** Can the Court consider the fact that

22     no one challenged the suggestiveness of this lineup at

23     trial, even though this was two witnesses that had

24     never met Mr. Valle-Ramos? Can the Court consider the

25     fact that nobody raised that one way or another? I

1    mean, this isn't an ineffective assistance claim.  But

2    does -- how does that weigh into the Court's

3    consideration?

4        **MS. CEPERO:**  Well, I think there was some

5    challenge at trial.  There was some cross-examination

6    about him being the only one with an Afro in the

7    lineup.  There were several witnesses where, I

8    believe, that was brought up.  Certainly

9    Detective Stanley, 'cause he ultimately stated that

10   the other -- he said the other five had somewhat of an

11   Afro, but he admitted that Mr. Valle-Ramos had a

12   longer Afro.

13       **THE COURT:**  But that was addressed in argument.

14   There was never a motion to suppress the lineup

15   themselves, correct?

16       **MS. CEPERO:**  Not my knowledge.

17       **THE COURT:**  Okay.  So the Court would only

18   consider the arguments that were made with regards to

19   this identification and the additional testimony based

20   on the recantation?

21       **MS. CEPERO:**  Well, I believe Detective Stanley

22   testified on cross about the Afros, and I think there

23   were -- I believe he was the one that testified on

24   cross about the Afros, and it being the only one in

25   the lineup with the Afro.

1          **THE COURT:**  I guess maybe I didn't ask the

2     question correctly, and that's my fault.

3          What -- can the Court consider whether or not

4     these out-of-court identifications would even be

5     admissible on a retrial, given the testimony we've

6     heard today?  No one challenged it at trial, but is it

7     something that the Court can consider at retrial?

8          **MS. CEPERO:**  I don't have law on that.  If I can

9     have a moment?

10          I would say, yes, he would be able to, because if

11     he's in a -- in a pretrial posture back at that point,

12     he could move to suppress it at that point, and it

13     would likely be suppressed under the testimony we've

14     established today and under the law on suggestive

15     lineups.  Does that answer --

16          **THE COURT:**  Yes.  Can the Court consider prior --

17     in that same vein, would the Court have to also

18     consider any prior testimony by any witness with

19     regards to the identification and any inconsistent

20     testimony, like the one we heard from Ms. Szewczyk

21     with regards to her trial testimony versus her

22     testimony here today?  Would the Court have to

23     consider that?

24          **MS. CEPERO:**  I would say, yes, because

25     credibility of the eyewitnesses are always gonna be at

1    issue.  So at the suppression hearing, that's

2    something that could be considered, and I think it

3    could be considered here as well.

4        **THE COURT:**  Okay.  Continue.

5        **MS. CEPERO:**  So as I stated, the Florida law is

6    now catching up on the science of that.  And we heard

7    testimony here today that demonstrates that there was

8    a suggestive lineup in this case.

9        We had Dr. Cahill, who's an expert in eyewitness

10   memory and identification, testify about the factors

11   that affect a witness' ability to remember faces.  He

12   discussed, for example, brief exposure.  And if we

13   look at Mr. Gonzalez's trial testimony -- which he

14   said he's not changing his testimony -- at trial, he

15   testified that he saw the assailant approximately 25

16   to 40 feet away for seven to ten seconds.

17       He also -- Dr. Cahill also testified about the

18   effect of stress on eyewitness memory.  He said it

19   decreases the ability to remember.  Somebody's usually

20   in a flight or fight state.  And here, Mr. Gonzalez

21   testified at trial that he was in shock, that he was

22   focused on trying to stop the assailants from

23   escaping.

24       Dr. Cahill also discussed stranger recognition,

25   and it's undisputed that neither eyewitness in the

1    case was familiar with the assailants or the

2    defendant.

3        And Dr. Cahill also discussed the effect of

4    having multiple perpetrators in an offense, where it

5    diverts the eyewitness' attention to multiple people

6    and reduces accuracy.  And here there were three

7    burglars.

8        Dr. Cahill also testified about the factors that

9    affect the suggestibility of a lineup.  And he noted

10   in this case that there were certain factors that

11   demonstrated that the lineup was suggestive.  There

12   was not a double-blind administrator.

13   Detective Stanley was the one who selected the photos.

14   He determined that Valle-Ramos was his suspect and

15   included his photo in the lineup.

16       He failed to select photos that stood out or that

17   matched the description.  None of these people, other

18   than Mr. Valle-Ramos, has anything that can arguably

19   be considered an Afro.  So Mr. Valle-Ramos stood out.

20   He was distinct.  It wasn't even a recent photograph.

21   It was a photograph that was taken earlier when he had

22   a short haircut, and it didn't reflect what he looked

23   at [sic] at the time of April of 2013.  He had much

24   longer hair that was too long to pop out like an Afro.

25       Dr. Cahill also discussed the effect of

1      post-identification feedback and how that inflates --

2      improperly inflates an eyewitness' confidence in their

3      initial selection.  And here, with Ms. Szewczyk, she

4      was told -- she selected the photo.  The detective

5      smiled at her and said, yeah, that's him.  And the

6      detective also told her that Mr. Gonzalez had selected

7      the same photograph.

8          Now, Dr. Cahill has clearly testified in this

9      case that these factors produced an unreliable lineup

10     in this case.  And as he also testified an unreliable

11     lineup significantly increases the error rate in

12     witness accuracy and identification.

13         Now, if we look at the testimony of the

14     eyewitnesses themselves, they support Dr. Cahill's

15     findings.  At trial, Mr. Gonzalez, when asked about if

16     he was able to describe specific facial features of

17     the assailant, he said, well, he had an Afro.  He

18     looked like that guy over there.  He wasn't able to

19     describe, you know, the guy's ears, if he had a flat

20     nose, a big nose, anything like that.

21         And Ms. Szewczyk testified today that she agreed

22     that Mr. Valle-Ramos was the only one with an Afro.

23     That's what drew her attention to his photograph.  She

24     testified that Detective Stanley gave her the

25     post-identification feedback, which boosted her

1      confidence.  And her confidence was further

2      artificially inflated when Mr. Gonzalez told her after

3      his testimony, prior to her testimony, that he was

4      sure it was the right guy.

5          Ms. Szewczyk no longer identifies Mr. Jorge

6      Valle-Ramos, and she's a credible witness.  She's an

7      attorney.  She has no reason to lie in this case.  She

8      has no relationship to Mr. Jorge Valle-Ramos.  She --

9      there's literally no benefit to her.  She bravely came

10     forward to right this wrong.

11         Now, also as to whether this newly-discovered

12     evidence would probably produce an acquittal on

13     retrial, if we look at Detective Stanley's trial

14     testimony, he testified that the reason that he had

15     Ms. Szewczyk do a lineup several months later is

16     because he wanted to strengthen the case.  So even he

17     knew that it was a weak case if it was relying simply

18     on the direct evidence of Mr. Gonzalez's testimony.

19         I also have some cases to discuss.  I sent them

20     to the Court by email.  Would you like a pape copy?

21         **THE COURT:**  No, email is fine.  Just put the

22     citations on the record as you go through them.

23         **MS. CEPERO:**  Sure.  So first I have *United States*

24     *v. Eltayib*, 88 F.3d 157, Second Circuit, 1996.  And

25     there the court found a suggestive lineup because,

1    again, the defendant was the only person in the lineup

2    with an Afro.  The witness testified that they had,

3    quote, a good look, 35 to 40 feet away, but that they

4    only saw the assailant's face for a few seconds or

5    better.  And that's similar to our case here where

6    Mr. Gonzalez saw the assailant, according to his trial

7    testimony, 25 to 40 feet away, for seven to

8    ten seconds.

9         In *Eltayib*, the witness was not able to recall

10   any specific details about the assailant's facial

11   features, and he only gave a description of, quote,

12   really bushy hair, Afro-type hair.  And that's similar

13   to our case here where when asked at trial, can you

14   describe the assailant's facial features, Mr. Gonzalez

15   testified, well, he has an Afro.  He looks like that

16   guy.  Afro is not a facial feature.  He wasn't able to

17   describe anything else.

18        In that court -- in *Eltayib*, the court found that

19   the lineup was not only suggestive, but also that

20   there wasn't sufficient evidence of reliability for

21   the identification, and the identification was

22   inadmissible.

23        I also have *Judd v. State*, 402 So.2d 1279,

24   Florida Fourth DCA, 1981.  In that case, there were --

25   the victim described someone with braided hair who was

1    bare-chested.  And the lineup included two people with

2    braided hair, and only the defendant's photograph

3    who -- he also had braided hair, was also bare-chested

4    in the photograph.  In that case, the victim gave a

5    very general description of the assailant, as in our

6    case here, where the general description provided was

7    young, Hispanic male, with a big Afro.

8        And the victim's observations in *Judd*, of the

9    assailant, were short-lived and made in a moment of

10   fear and uncertainty.  And here we have, again,

11   Mr. Gonzalez in a state of shock, seeing someone in

12   his home who shouldn't be there, in the early-morning

13   hours, and he was just trying to chase him so he could

14   capture him so the police could make an arrest.

15       And then I have *People v. Shea*, 54 A.D.2d 722,

16   New York Appellate Division, 1976.  In that case, the

17   defendant's photograph was the only one with a blond

18   Afro, which was described by the witness.  The witness

19   only saw the assailant for 10 to 12 seconds, which is

20   longer than Mr. Gonzalez saw the assailant here, for

21   seven to ten seconds.  And the court found there that

22   the lineup was suggestive because there was only the

23   blond Afro, and it found that it was inadmissible due

24   to there -- it wasn't a reliable identification that

25   could be admitted in court.

1    Next I have *State v. Armstrong*, which this one is

2    an unreported case.  So it's 2004 WL 120887, Tennessee

3    Criminal Appellate court.  In that case --

4         **THE COURT:**  I'm sorry.  I have it as 1208871.

5         **MS. CEPERO:**  Oh, I'm sorry.  1208871.

6    And that court -- again, a suggestive lineup was

7    found because the defendant was the only person with

8    an Afro.  And although the court found that the

9    identification was independently reliable, there are

10   huge distinctions in that case.

11   In that case, the victim saw the assailant for

12   approximately 15 minutes and looked intently at his

13   face.  Whereas here, Mr. Gonzalez only saw him for

14   seven to ten seconds.

15   In that case, the victim gave a detailed

16   description of the assailant.  Quote, beady, brown,

17   sluggish, puppy dog eyes, flattened nose with flaring

18   nostrils, dark skin, puffy face, and Afro-type hair.

19   Here, again, when Mr. Gonzalez was asked for facial

20   features, he just said it's the guy -- he had an Afro,

21   looked like the guy there.

22   Then I have *State v. Burrell*, which is

23   28 Wn. App. 606, Washington Court, 1981.  In that

24   case, the court found a suggestive lineup again

25   because the defendant was the only one who had frizzy,

1    Afro hair, and he had much longer hair, longer hair

2    than the other filler photographs.

3        In that case, the court did find that the

4    identification was independently reliable, but, again,

5    we have big differences there.  In that case, both the

6    victim and the eyewitness observed the defendant for

7    five minutes before the attack.  The victim had two

8    especially close encounters with the assailant, and

9    the police arrested the defendant the same night just

10    a few blocks away.  So we have five minutes versus

11    seven to ten seconds.  Mr. Valle-Ramos was not found

12    anywhere near the area on the same day.

13        On top of that, the identification in that case

14    occurred four days after the attack, whereas here, the

15    identification my Mr. Gonzalez, was nine days after

16    the attack.

17        So, in conclusion, Mr. Valle-Ramos has satisfied

18    his burden in this case.  We've established a

19    newly-discovered evidence claim which warrants

20    vacation of his convictions.

21        First, we know that the newly-discovered evidence

22    was unknown at trial and couldn't be discovered by due

23    diligence.  It could only be discovered when

24    Ms. Szewczyk -- I always struggle with that name --

25    when the independent eyewitness chose to recant and

1    come forward.

2         Second, the newly-discovered evidence in this

3    case would probably produce an acquittal on retrial.

4    If we look at the evidence that was introduced at

5    trial, which as Your Honor knows, you're required to

6    weigh the newly-discovered evidence versus the

7    evidence introduced at trial, no physical evidence, no

8    DNA, no confession, no cell tower evidence placing

9    Mr. Valle-Ramos near the location of the crime at the

10   time.  There were fingerprints, but they didn't match

11   Mr. Valle-Ramos, and there were no pawnshop records

12   showing that he had pawned any of the property in this

13   case.

14        The only direct evidence at trial were the two

15   eyewitnesses.  We had Mr. Gonzalez, who observes his

16   assailant seven to ten seconds, 25 to 40 feet away,

17   while he was in shock, trying to -- he was in

18   fight-or-flight mode, trying to stop the assailant

19   from getting away.  He didn't recognize -- he was

20   strangers with the assailant, and there were multiple

21   perpetrators, so his attention was diverted to

22   multiple people.

23        And as Dr. Cahill testified, this was a

24   suggestive lineup that he was shown; the only person

25   in the lineup with an Afro; it was not a double-blind

1     lineup; and there was an increased likelihood that the

2     incorrect person would be identified.

3          The other only piece of direct evidence that was

4     introduced at trial was Ms. Szewczyk's testimony,

5     which she recanted today, so that doesn't apply

6     anymore.  She's told us that she was always unsure.

7     She always had doubts.  She felt relieved when she saw

8     Mr. Ortiz's photograph because she was like, oh, I was

9     right this whole time about feeling uncomfortable with

10    this case.

11         She also testified that when she saw

12    Mr. Valle-Ramos in the courtroom, she thought his skin

13    tone was darker than the person that she saw get into

14    the vehicle.  And she also testified that her

15    confidence was boosted not only by Detective Stanley

16    smiling at her and saying you got the right guy, but

17    also by Detective Stanley telling her the victim

18    selected the same photo, and also by Mr. Gonzalez

19    expressing his certainty that they got the right guy

20    when he met her at trial.

21         Now, Dr. Cahill has provided plenty of testimony

22    explaining why these witnesses' initial

23    identifications were unreliable in this case.  He

24    discussed the factors that affected them and also the

25    fact that there was a suggestive lineup.

1          Now, on top of that, we had testimony from

2     Mr. Valle-Ramos himself and his girlfriend, Ms. Ortiz,

3     about his hair at the time.  And they both testified

4     that his hair was too long to be in an Afro.  It was

5     in a ponytail.  He took his ponytail down on the

6     stand, and it fell down to his hair [sic].

7          We also had a witness at trial who testified --

8     gave the same testimony as Mr. Marquis Hickson, who is

9     not, unfortunately, here today, as he's passed away.

10     And it's also important to note that despite the

11     eyewitnesses giving descriptions to police about a

12     large, bushy Afro, Detective Stanley chose this

13     photograph, with a small Afro, no one else having a

14     photograph with an Afro in there, which did not

15     reflect anywhere near what Mr. Valle-Ramos looked like

16     at the time of the offense.

17          So weighing the newly-discovered evidence here,

18     Ms. Szewczyk's recantation against the evidence at

19     trial, which, at this point, the only direct evidence

20     is Mr. Gonzalez's identification, which is unreliable

21     due to the reasons that Dr. Cahill explained and would

22     likely be suppressed at a suppression hearing, it's

23     clear that there would be an acquittal in this case on

24     retrial.  Highly probable.

25          So, in conclusion, Mr. Valle-Ramos has met his

1       burden in establishing this newly-discovered claim,

2       and we ask that this Court grant the motion -- his

3       motion for post-conviction relief and vacate his

4       conviction.

5           **THE COURT:**  All right.  Thank you.

6           State, response?

7           **MS. MOMPREMIER:**  Yes, Your Honor.  May I approach

8       with case law?

9           **THE COURT:**  You may.

10          **MS. MOMPREMIER:**  Your Honor, I'm sure, is already

11      aware of the standards in which newly-discovered

12      evidence, particularly in regards to a recantation --

13      the State's not contesting that this is

14      newly-discovered evidence, so we can just focus on the

15      second prong, which is the standard there -- beyond

16      newly-discovered evidence, recanted testimony is

17      subject to a different and more stringent standard.

18      The first of which is that the trial court has to be

19      satisfied the recantation is true; and, second, that

20      the witness testimony would change to such an extent

21      as to render a probable and different verdict.

22          In part, the Court's required to consider all new

23      evidence which would be admissible and then must

24      evaluate the weight of both that newly-discovered

25      evidence with the evidence introduced at trial.

1       For one, the State would just first point out

2    that the case law itself, in terms of recantation, or

3    recanted testimony, is assumably unreliable.  This is

4    reflected in *Armstrong v. State*, 642 So.2d 730.  And

5    so the Court has to look at this recantation with

6    suspicion and only after the Court is satisfied that

7    such testimony is true can the Court grant relief.

8       For the case law that defense put out in terms of

9    the photographic lineup itself, the State would first

10   point out that this isn't a motion to suppress.  It's

11   not also an ineffective assistance of counsel claim

12   where they're alleging that counsel, you know, failed

13   to move to suppress the ID.

14      This was a photographic lineup that was admitted

15   at trial, and it was subject to cross-examination, and

16   therefore represented to the jury.  The issues and the

17   points in terms of the photographic lineup were issues

18   that were already brought out at court.

19      So what the State would first point out is that

20   we believe that the testimony of Ms. -- I will say

21   Ms. Bethany, is unreliable.  We would argue, in fact,

22   that --

23      **THE COURT:**  Well, can I ask, is it the State's

24   position that the lineup is not unduly suggestive?

25      **MS. MOMPREMIER:**  Your Honor, I -- I do believe

1    that the lineup could have been better, that there
2    could have been people to better -- like, more Afros
3    at the very least to add.

4        **THE COURT:**  I mean, I think the State takes issue
5    with -- and you can point to the evidence.  I think
6    you take issue with the fact that the witness admitted
7    that they had doubts about the -- their testimony and
8    never voiced those concerns prior to the trial going
9    forward, and that undercuts, basically, whether now
10   she's being truthful in her testimony here today with
11   regards to, I guess, whether she identified the right
12   person.

13       **MS. MOMPREMIER:**  Correct.  And, Your Honor's
14   correct, because part of the analysis, especially when
15   you're turning to the reliability of a statement, it
16   goes to whether there was a confession of perjury.
17   The case law acknowledges that in cases of that, the
18   Court should look at it especially hard.

19       In my questioning, I tried to get that out of
20   her.  Because despite the way that she's framed this,
21   I do believe that you can characterize her statement
22   as perjury.  And I do think that there is an
23   enhancement on her, because regardless of her years of
24   experience as an attorney, she was a licensed bar
25   attorney at the time.  To even be an attorney, she had

1      to go through the process with the Florida Bar, have

2      an ethics test, so she knew rules of an attorney.

3          Furthermore, she sat on this information from

4      2014 to 2021, certainly at a point where she had the

5      skills and the knowledge of an attorney at that point

6      and still did not say anything until a defense

7      attorney -- or defense investigator came to her.

8          That is part of why we would argue that her

9      testimony is unreliable.  For someone who is a

10     licensed attorney, who has, under the Florida Bar

11     rules, not only a duty to her clients, but she is also

12     a member of the legal profession, an officer of the

13     legal system, and a public citizen having special

14     responsibilities for the quality of justice.

15         And to say I was at the photo lineup, I had

16     doubts, but I affirmatively identified him without

17     giving any other information to say, hey, I think this

18     is the guy, but I'm not sure; to go to depositions and

19     to never voice those doubts; to go to trial and then

20     to never voice those doubts, we do think that that

21     plays to her credibility as a witness.  I do think

22     that you can take her role as an attorney into

23     account; her duty not only to justice, but to her

24     obligations as a licensed attorney.

25         And, again --

1          **THE COURT:**  I guess my question is -- and, again,

2     the Court has to evaluate and weigh the credibility of

3     the witness in the context of all the other evidence.

4     But it was never expressed, in my recollection of her

5     testimony, as to the strength of these doubts, whether

6     they were doubts that were so strong that she needed

7     to, in the moment, reverse course.

8          It was not clear what -- my recollection of her

9     testimony was that pretty much at every point where

10    she would have expressed those doubts, someone

11    confirmed her identification.  So she sees the lineup,

12    and before she can even say -- based on her testimony,

13    before she can even say, but I want to, you know, add

14    that maybe this person's skin is darker or maybe their

15    eyes are lighter or darker -- I guess in the

16    photograph, the person's eyes were darker.  In real

17    life they were -- when she got to trial, they were

18    lighter.  But in that moment, the officer tells her,

19    you got the right guy.

20         Then she comes to court, and those doubts start

21    to come up again.  The detective tells her the victim

22    said you got the right guy.  So she comes up here, she

23    sees this guy, and she says, now I'm seeing him in

24    person.  And that's where you take, I guess, the --

25    where you're saying this is where the Court really has

1    to kind of evaluate that testimony -- is now she's

2    seeing this person, she's seeing them [sic] live, she

3    can really get a good look at them, and she's going to

4    stick to her story, even though she's got these

5    persistent doubts, that they've -- they've come up

6    twice.

7        So how do we put that in the context of

8    Dr. Cahill's testimony and how a person could

9    basically convince themselves, but then ten years

10   later, upon reflection and being given additional

11   information, come to a different conclusion?  Does

12   that make the first statement less reliable?  Does it

13   make the second statement less reliable?  I guess, how

14   does the Court -- how does the State believe the Court

15   should ultimately decide that and what conclusion it

16   should come to?

17       **MS. MOMPREMIER:**  I guess what the State would

18   point out, before all of this additional information

19   was given to her, she was given instructions.  And she

20   said to herself -- like, again, I do think the point

21   that she is an attorney is important.  She would have

22   read the instructions and been told, you don't have to

23   make an ID.  She didn't look at the photographic

24   lineup and say, hmm, like, this guy kind of looks like

25   him, but the complexion looks darker.

1        **THE COURT:**  Is there any case law that gives

2    special status based on profession?  Like, if she was

3    a medical doctor, would she have to have some sort of

4    elevated status with regards to the ability to

5    recognize someone or -- 'cause, again, this doesn't --

6    we're not talking about legal principles.  We're

7    talking about whether or not your recollection -- your

8    ability to perceive someone and whether that

9    perception is accurate, whether that's affected by

10   what your profession is.

11       **MS. MOMPREMIER:**  I don't -- I do not believe that

12   there is case law -- or I'm not aware of any

13   particular case law that gives a special enhancement.

14   But as part of your ability as the Court, you can

15   consider someone's profession, if they have any

16   knowledge that would put an additional burden on them

17   to make sure that it's right.  It's my position if

18   she's a witness testifying at trial and she

19   intentionally perjured herself, she could get in

20   trouble with the Florida Bar, regardless of whether

21   she's representing the client or not.

22       **THE COURT:**  But wouldn't that be more incentive

23   for her to stay quiet than to come forward?

24       **MS. MOMPREMIER:**  That -- that is an argument for

25   the Court to consider.  And the Court could consider

1    that her testimony later is credible because of that,

2    because of the potential trouble that she could bring

3    herself in.

4        It is our position that she made this initial

5    statement without giving that information and

6    identified the same person as the witness.  And so,

7    therefore, those are our lines in terms of her

8    credibility; that she never expressed those doubts to

9    the detective.

10       She had a deposition.  That would have been an

11   opportunity where she's talking mainly to the defense

12   attorney, and, again, she never expressed those doubts

13   to the defense attorney, that she had any doubts about

14   her identification.  And then furthermore at trial,

15   she did not as well.

16       And even in the photographic lineup, she's saying

17   this is the person, instead of this is -- you know, a

18   percentage or anything like that to qualify her

19   statement.

20       Again, to her credibility, she -- she did not

21   write this affidavit and send it to the state

22   attorney's office on her own.  She only did it after

23   being met with the investigator in this case who told

24   her, more or less, like -- you know, the purpose would

25   have been to say, hey, like, we think that you might

1   have made a mistake, can you look at this and confirm

2   that for us.

3       And so, again, I would say that any of those

4   statements made with the investigator are unreliable,

5   even under the standards by their own expert.  He

6   stated and testified that an additional identification

7   after the fact would be unreliable.

8       And then the method in which was -- and I think

9   that's important to stress this.  The reason why the

10  law has changed is because we want to be careful of

11  the way that we're presenting information to

12  witnesses.  And to present two photographs, side by

13  side, saying, hey, this person looks really similar to

14  this person and also lives in the area and also does

15  crime in this area, doesn't -- you know, is that -- is

16  that the person.

17      And I think that -- to go and say the State's

18  unduly suggestive and then to relay tactics that are

19  even more suggestive taints her testimony as a defense

20  witness in this proceeding.

21      **THE COURT:**  I mean, I don't -- and, again, I

22  think that was the question that I asked the expert,

23  was -- specifically, his testimony was that second

24  identification isn't reliable either.  But it just

25  kind of drives home the fact that if these six

1    individuals that are up on the projection looked more

2    similar, we'd actually know whether or not the person

3    was truly able to identify this.  It just calls into

4    question the reliability of the previous

5    identification.  I mean, that was the testimony we

6    heard today, correct?

7         **MS. MOMPREMIER:**  Yes, Your Honor.

8         **THE COURT:**  Okay.

9         **MS. MOMPREMIER:**  And so, ultimately, what the

10   Court will have to do is weigh that information, weigh

11   those reasons to question her credibility against

12   other evidence in the case.  I mean, we still have the

13   victim's testimony.  The victim saw the defendant in

14   his own home.  He stated that he was 25, 35 feet away

15   from him.  He stated that for this particular

16   defendant -- because there were two other people also

17   in his home that day -- he focused on his face.

18        He stated he was confident in this ID.  He did

19   not identify anybody else because he stated he was not

20   confident in those identifications, but he was -- he

21   was confident in this identification.  He testified

22   today that his position remains the same as to that

23   identification and the testimony that he relayed at

24   trial.  And so based off of that, Your Honor, we'd

25   just present that before you to consider in making

1        your decision.

2            **THE COURT:**  So can I just kind of -- let's assume

3        that the Court finds that her testimony is reliable.

4        Is there other evidence, despite that testimony being

5        reliable -- because the defense argued to a good

6        extent -- majority of their argument was dedicated to

7        this idea of, what evidence would be presented at

8        retrial would likely result in an acquittal.  Does the

9        State have any response to that part of the equation?

10           **MS. MOMPREMIER:**  I would just say I think, in

11       part, from my -- from my interpretation of the law, I

12       do think that they were a little erroneous in their

13       perception.  I think what the Court has to look at is

14       not what a retrial would look at it, but what this

15       recantation would look like in regards to the evidence

16       that is already a part of the record.  Not to anything

17       new, not to any new issues, new motions to suppress.

18       I don't think the Court can look at that.

19           There was no motion to suppress.  This was the

20       photo lineup that was in evidence.  So I think what

21       you have to do is basically say, okay, pick up

22       Ms. Bethany's testimony, put the recantation in, and

23       say if that is what was presented, do I think that

24       there's a probability that it would change at that

25       point?

1    **THE COURT:**  I mean, to a large extent, I agree

2    with you.  I think that that would be an inevitable

3    consequence.  Would that be -- lineups would come in,

4    because how else do you explain the prior inconsistent

5    statement?  I mean, whether the defense wanted to, I

6    think they would necessarily have to walk through that

7    door in order to give context as to why the two

8    statements are inconsistent.  So I think that would be

9    part of the evidence anyways.

10    But despite that evidence being in there, if the

11    Court found her testimony to be reliable -- we only

12    have two witnesses here.  So is there enough evidence,

13    given this recantation on retrial -- this is the

14    newly-discovered evidence.  Part of that, arguably,

15    defense could bootstrap Dr. Cahill's testimony to give

16    context to her inconsistent statements.  So the jury

17    would hear testimony with regards to what the standard

18    is now and how this exercise was performed.

19    So, ultimately, what evidence is there to suggest

20    that this would have -- this trial would have turned

21    out any differently than it did the first time?

22    **MS. MOMPREMIER:**  In candor to the Court, my -- my

23    argument is to credibility of the witness.

24    **THE COURT:**  Okay.

25    **MS. MOMPREMIER:**  We have the two witnesses, so, I

1    mean, I think the points that they raised were

2    correct.  Those are certainly things that you have to

3    consider.  So our argument is to credibility of the

4    witness.

5         **THE COURT:**  Okay.

6         Thank you, Ms. Mompremier.

7         And brief rebuttal.

8         **MS. CEPERO:**  Yes, just briefly.

9         So there was a lot of talk about Ms. Szewczyk

10   being an attorney, but it's -- everyone is subject to

11   bias, regardless of their profession.  It's part of

12   being human.  And the fact that -- she had these

13   doubts at various stages during the proceeding, and

14   every time she had a doubt, before she could express

15   it, somebody boosted her confidence.

16        After the lineup, the detective smiled, said,

17   that's the guy, told them -- told her that

18   Mr. Gonzalez selected the same photo.  When she had

19   doubts at trial before her testimony, Mr. Gonzalez

20   said he was certain it was the guy.  So as you had

21   discussed with the State, every time she had some

22   doubts, someone, you know, tempered her down and made

23   her feel more confident.

24        It's also important to show that she had doubts

25   even before she saw Mr. Ortiz's photo.  So as she told

1    the investigator, like, oh, I knew you were coming,

2    I'm relieved that someone has finally approached me

3    about this.  And, also, there was no perjury in this

4    case.  Eyewitness misidentifications happen all the

5    time.  They're mistakes.  They're very rarely someone

6    just lied.

7        So some of the cases that were relied on by the

8    State where they pointed out that the defendant

9    admitted he lied, that's not what we have here.

10   Ms. Szewczyk, she said, you know, I thought I was -- I

11   thought I had picked who was the right person based on

12   what everyone else was telling me, and I -- you know,

13   I have no reason to lie.  I just want to do the right

14   thing.  I want to right this wrong.  So her

15   credibility is not at issue in this case.  She just

16   came forward to do the right thing.

17       She also testified at trial --

18       **THE COURT:**  Can I ask this?  Because the case law

19   with regards to the issue of recantation has the Court

20   coming from a very skeptical position -- very, very,

21   skeptical starting point, particularly with perjury

22   testimony.  Is this perjured testimony?  Because the

23   State has argued that it is.  What's the defense's

24   position on whether this is perjury --

25       **MS. CEPERO:**  No.  At the time of trial, she

1    testified what she believed to be her truth.  And we

2    saw that she was influenced by post-identification

3    feedback.  Now she's realized that she was mistaken.

4    It was just a mistake.  That's all there was there.

5    And now she's come forward to right the wrong.  You

6    know, as you said earlier, she -- that almost supports

7    her credibility, because she could have subjected

8    herself to perjury, and that's what she's being

9    accused of here.

10         Does that answer your question?

11         **THE COURT:**  Well, I guess, you generally answered

12   my question, is an inconsistent statement, per se,

13   perjury, or perjured testimony, because it was

14   inconsistent?  But I think you answered that question.

15         **MS. CEPERO:**  Yeah.  No, it's not.  I mean, it

16   might be impeachment evidence, but it's not, per se --

17   you have to show an intent to lie.  And that intent

18   was not here.  She believed she was testifying

19   truthfully at the time of trial.

20         **THE COURT:**  All right.  I guess my other question

21   is, several of the cases you provided to the Court in

22   advance of the hearing, they're not post-conviction

23   cases, but it seems like a common thread is the

24   question of fundamental due process.

25         Is the defense raising that argument with respect

1          to this motion?

2                    **MS. CEPERO:**  Yes.

3                    **THE COURT:**  Can you just articulate exactly where

4          the fundamental due process flaws are in this case?

5                    **MS. CEPERO:**  If I can have an opportunity to

6          brief that and submit it to the Court?

7                    **THE COURT:**  Well, I mean, you've argued it.  I

8          just want you to kind of hit the highlights for the

9          purposes of closing argument, where you believe the

10         fundamental due process violations have occurred.

11                   **MS. CEPERO:**  Okay.  I would say, in this case,

12         it's -- some of it has to do with counsel, the right

13         to counsel and due process, because counsel didn't

14         really thoroughly challenge the identifications on

15         cross.  She didn't file a motion to suppress.  I would

16         say that's the key.

17                   **THE COURT:**  All right.  Counsel, that will

18         conclude arguments.

19                   I'm gonna take this matter under advisement.  I

20         will have an order in a timely fashion, but I am going

21         to request the copy of the transcript, so it may take

22         about 30 days for me to get that.  In the meantime,

23         I'll be working on the final order in this case.

24                   **MS. CEPERO:**  Thank you, Your Honor.

25                   **THE COURT:**  So thank you, State.  Thank you,

1           defense, for your arguments.  We'll be in recess.

2                   (These proceedings concluded at 2:34 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2   STATE OF FLORIDA:

 3   COUNTY OF ORANGE:

 4

 5        I, Tracy Hansen, RPR, Official Court Reporter of the

 6   Ninth Judicial Circuit of Florida, do hereby certify,

 7   pursuant to Florida Rules of Judicial Administration

 8   2.535(h)(3), that I was authorized to and did report in

 9   stenographic shorthand the foregoing proceedings, and that

10   thereafter my stenographic shorthand notes were transcribed

11   to typewritten form by the process of computer-aided

12   transcription, and that the foregoing pages contain a true

13   and correct transcription of my shorthand notes taken

14   therein.

15

16        WITNESS my hand this 14th day of April, 2023, in the

17   City of Orlando, County of Orange, State of Florida.

18

19

20                             s/Tracy Hansen
                               Tracy Hansen, RPR
21                             Official Court Reporter

22

23

24

25
```