407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

# CASE NO.: 6:24-CV-01276-CEM-DCI

## JORGE VALLE-RAMOS

## V.

## CITY OF ORLANDO, MICHAEL

## STANLEY, AND UNKNOWN OFFICERS

**DEPONENT:**

**CHARLENE BLOOM**

**DATE:**

**FEBRUARY 17, 2025**

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

CASE NO.: 6:24-CV-01276-CEM-DCI

HONORABLE CARLOS E. MENDOZA


JORGE VALLE-RAMOS,

Plaintiff


V.


CITY OF ORLANDO, MICHAEL

STANLEY, AND UNKNOWN OFFICERS,

Defendants

DEPONENT:   CHARLENE BLOOM

DATE:       FEBRUARY 17, 2025

REPORTER:   SARA FODOR

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

APPEARANCES

ON BEHALF OF THE PLAINTIFF, JORGE VALLE-RAMOS:

Roz Dillon, Esquire

Loevy & Loevy

311 North Aberdeen Street

3rd Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: dillon@loevy.com

(Appeared via videoconference)


ON BEHALF OF THE DEFENDANTS, CITY OF ORLANDO, MICHAEL

STANLEY, AND UNKNOWN OFFICERS:

Stephen M. Mistoler, Esquire

O'Connor, Haftel & Angell, PLLC

800 North Magnolia Avenue

Suite 1350

Orlando, Florida 32803

Telephone No.: (407) 843-2100

E-mail: smistoler@ohalaw.com

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

INDEX

                                                    Page

PROCEEDINGS                                            5

DIRECT EXAMINATION BY MS. DILLON                       6

CROSS-EXAMINATION BY MR. MISTOLER                     58

REDIRECT EXAMINATION BY MS. DILLON                    76


                        EXHIBITS

Exhibit                                             Page

1 - Testimony from Criminal Trial, 21-page

    Document - P 266-287                              20

2 - Testimony from Deposition, 19-page

    Document - P 1386-1404                            22

3 - Orlando Police Department Statement,

    1-Page Document, April 9, 2013 - P 1385          46

4 - Side-by-Side Photographs of

    Mr. Valle-Ramos and Mr. Ortiz - P 454            56

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

STIPULATION

The VIDEO deposition of CHARLENE BLOOM was taken at MILESTONE REPORTING COMPANY, 315 EAST ROBINSON STREET, SUITE 510, ORLANDO, FLORIDA 32801, via videoconference in which some participants attended remotely, on MONDAY the 17th day of FEBRUARY 2025 at 1:18 p.m. (ET); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure 45(a)(4).

It is agreed that SARA FODOR, being a Notary Public and Court Reporter for the State of FLORIDA, may swear the witness.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900        www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

PROCEEDINGS

THE REPORTER:  Okay.  We are on the record. Will all parties, except for the witness, please state your appearance, how you're attending, and your location?

MS. DILLON:  Roz Dillon for Plaintiff Valle-Ramos, attending via Zoom.

MR. MISTOLER:  Stephen Mistoler on behalf of the Defendants, attending at Milestone Reporting in Orlando, Florida.

THE REPORTER:  Thank you.

Ms. Bloom, will you please state your full name for the record?

THE WITNESS:  Charlene Elizabeth Bloom.

THE REPORTER:  Thank you.  And I already identified Ms. Bloom off of the record with her ID. Do all parties agree that the witness is, in fact, Ms. Charlene Bloom?

THE WITNESS:  Yes.

MS. DILLON:  Yes.

MR. MISTOLER:  Agreed.

THE REPORTER:  All right.  Ms. Bloom, will you please raise your right hand?  Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

the truth?

THE WITNESS:  Yes.  Absolutely.

THE REPORTER:  Thank you.

You may begin.

DIRECT EXAMINATION

BY MS. DILLON:

Q.   Morning -- or good afternoon, Ms. Bloom.  It's morning my time.  Will you please state and spell your name for the record?

A.   Say it and spell it?

Q.   Yes, please.

A.   Okay.  It's Charlene Bloom.  I -- it's Elizabeth in the middle, but I don't know if you need that.  It's C-H-A-R-L-E-N-E Bloom, B-L-O-O-M.

Q.   Perfect.  And if I refer to you as Ms. Bloom, is that all right, or is there something else you prefer?

A.   I'm sorry?

Q.   If I refer to you as Mrs. Bloom, is that okay --

A.   Oh, it's fine.

Q.   -- or is there a different way you'd like to be addressed?

A.   No, that's fine.

Q.   Okay.  Great.  My name is Roz Dillon, and I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

represent the Plaintiff, Jorge Valle-Ramos, in this lawsuit.  And I'm going to be deposing you this afternoon after which counsel for defendant, Stephen, may also depose, okay?

A.   Okay.

Q.   Okay.  And so by agreement of the parties, we're doing this -- by agreement of the parties, we're conducting this deposition via Zoom, and you're with the court reporter in their office, correct?

A.   Yes.

Q.   Okay.  And counsel for Defendants is also in the room?

A.   Yes.

Q.   Okay.  Is there anyone else in the room, besides counsel for defendants and the court reporter?

A.   No -- no.

Q.   Nobody under the desk?

A.   No.

Q.   Okay.  Great.  Ms. Bloom, have you ever been deposed before?

A.   Have I ever been what?

Q.   Deposed before?

A.   I guess I have, because I did that, right?

MR. MISTOLER:  You can't really ask me questions.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

THE WITNESS:  Oh --

MR. MISTOLER:  So to the best of your --

THE WITNESS:  -- I guess because I was at that trial.  Is that deposed?

BY MS. DILLON:

Q.  So the trial testimony that you gave is not a deposition, but if I represented to you that you gave a deposition as well in the underlying criminal case, does that sound right?

A.  I don't -- no, I didn't because I didn't do anything, but go to the court.

Q.  Okay.  I think that we have a transcript from a deposition that you gave on October -- in October of 2013.  Does that ring a bell?

A.  I'm 76.  I'm not the --

Q.  It's not a memory test.  So fair to say that's the only other time you've been deposed?

A.  That's the only --

Q.  Okay.

A.  Yeah.

Q.  Okay.  So I'm going to lay some ground rules just so we're on the same page about how this will go, okay?

A.  Okay.

Q.  So I'm going to ask you questions, and you're

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

going to be giving answers under oath.  That's just as if you were in a courtroom in front of a judge and jury; do you understand?

A.   Absolutely.

Q.   Okay.  If you don't understand a question that I ask, just say so, and I will rephrase it or will ask a new question, okay?

A.   Okay.  Okay.

Q.   If you answer, we're going to assume you understood the question, fair enough?

A.   Yes.

Q.   Okay.  Now, the court reporter is going to be taking your testimony today, and for that reason, it's important that we try not to speak over each other.  So I'm going to try to wait until you finished answering a question to ask you a question.  And then I just ask that you try to wait for me to ask my whole question before you answer, sound good?

A.   That's good.

Q.   Okay.  And for the same reason, it's important that you give verbal answers today.  So shaking your head won't work, giving hand gesture won't work.  We need the verbal answer so that the court reporter can write down --

A.   Yes.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Q.   -- what you're saying.

A.   Yes.

Q.   Okay.

A.   I understand.

Q.   All right.  Next, there might be some times today where the attorney for the other side objects to one of my questions.  Since there's no judge here to rule on objections, the rule is that you go ahead and answer anyway, even if the attorney objects.  You just let them get their objection on the record, sound okay?

A.   Yes.

Q.   Okay.  Last, if you need a break for any reason, you can have one and at any time, but if there's a question pending, you'll just need to answer before we take a break, okay?

A.   Okay.

Q.   Okay.  So anytime, feel free to stop me if you need to get up, get some water, whatever, sound good?

A.   I've got water.

Q.   Okay.  Great.  Ms. Bloom, do you have any medical conditions that might impact your ability to testify today?

A.   Well, I hate to admit it, but I have the marker for dementia.  It's been found three months ago. I'm doing very well because I'm rebuking it.  I don't

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

want it, but my father had it.  So it's -- I do very well. Sometimes, I can forget a word, but if I just stop and don't talk, it comes back.

And so I -- I am -- I don't think I'm completely to the point where I could not do it because I am -- I do remember I have a good memory, but it's, like -- at night or sometimes in the daytime, I'll forget something, but I'm not blah, blah, blah, blah, blah, you know, like that yet so --

Q.   Okay, and how are you feeling today?

A.   I'm good.  I was a little --

Q.   Okay.

A.   -- stressed, and I was a little uptight because I've never, you know, Ubered.

Q.   Oh --

A.   But he was wonderful.

Q.   Great.

A.   But -- yeah.  So that was a big stress off, I think.  So I'm fine.

Q.   Okay.  And you said you're 76; is that right?

A.   76.  I'll be --

Q.   Okay.

A.   -- 77 in September.

Q.   Great.  Are you receiving -- for this marker for dementia, do you receive any treatment for that, or

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

is it just something that doctors watch?

A.   I chose -- I was doing a study, and I chose to drop the study, and I have given myself Prevagen for three-and-a-half years, and that is what I take.  If I don't take that, I can't remember it.  I can remember; but not good.

Q.   Okay.

A.   So I'm not on a prescription yet, and I don't want to be, unless I have to be.

Q.   Okay.  Before you started taking the Prevagen, did you have any memories -- memory issues?

A.   Yes.  Yes.

Q.   Okay.

A.   I was talking on the phone, and I say, oh, wait a minute, and I have to think, and so the words wouldn't come.  So yes, I'm a good advertisement for Prevagen for anyone.

Q.   Okay.  Well, like I said, this is -- it's not a memory test.  If you don't remember --

A.   Yes.

Q.   -- something or don't know an answer, it's okay to say that, as long as it's the truth, okay?

A.   Right.  Oh, absolutely.  I do.

Q.   Okay.  Is --

A.   Never lie.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

362952 Bloom Charlene 02-17-2025

13

Q.    Of course.   Is there any other reason you can think of that you might not be able to give full and accurate testimony today?

A.    Not that I know of.

Q.    Okay.  Great.  So let -- let's get in.   I'm going to be asking you some questions about a burglary of your neighbor's home back in 2013.   Did you live in Orlando in 2013?

A.    Yes, I did.   I lived in the complex where that happened --

Q.    Okay.

A.    -- in Creek Condominiums.

Q.    Did you live with anybody else?

A.    Was I with him?  Anybody else?

Q.    Did you live with anybody else at that complex?

A.    No.  No.

Q.    Okay.

A.    Just me and the kids.

Q.    Okay.  So I -- I'll direct your attention to April 9, 2013, the day that your neighbor's home was burglarized.  As you sit here today, do you have a good memory of that day?

A.    I didn't know about the burglary and the -- whatever happened until I saw it on TV.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Q.   Okay.  But do you have -- as we sit here, do you remember that day happening or --

A.   Well, I remember what I saw.

Q.   Okay.

A.   But I do --

Q.   So you have a memory of what you saw that day?

A.   Yes.  Yes.

Q.   Great.  So where were you that morning?

A.   Being nosy, looking out the window.  I had just retired from Disney, and I heard some noise, and I looked out the window that -- this is all I really can offer.  I looked out the window.  There was a car parked where we normally don't park because behind me is the second condominium different place.

And ours fence is the -- was the difference between the little road at long -- I shouldn't tell you all that.  Anyway, there was a car parked there.  So it caught my attention.  I didn't have my glasses on, but I can see far away.  So I looked, and I thought, what -- what's going on?  I saw -- do you want me to tell you what I saw?  That's what you want?

Q.   Well -- so I'll ask you specific questions.

A.   Okay.

Q.   So the -- to the best you can -- I know it's hard when you're telling a story.  To the best you can,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

just try to answer the question that I'm asking.

A.    Okay.

Q.    And then I will -- I'll ask you for detail as we go along.  Does that make sense?

A.    Yes.

Q.    Okay.  So let's start with your view from your window.  The -- you said it was your bedroom window; is that right?

A.    Yes.  It's the second --

Q.    Okay.

A.    -- story window, and I was looking out the left --

Q.    Okay.

A.    -- over the fence.

Q.    Okay, and out the left, you said there's a fence, and there was a car behind the fence; is that right?

A.    Let's see.  Was it behind it?  No, actually, it was the side -- opposite side of me --

Q.    Okay.

A.    -- is where the car was, but there usually are never cars there.

Q.    Okay.  And when you look out your window, when you look -- do you still -- sorry.  Let me ask you a clarifying question.  Do you still live in the same

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

complex today?

A.   Yes.

Q.   Okay.

A.   Ten years.

Q.   So when you look out your bedroom window, you see immediately in front of you a car.  What do you see to the right of your window?  What's your view to the right of --

A.   To the right is the driveway.  It's a little road in their condo place.

Q.   Okay.

A.   I could see that, and I could see to the end where the road goes towards the road -- main road. Let's put it that way.  That's -- that was a different condominium.

Q.   Okay, and what is to your left as you look out the window?

A.   Okay.  As I looked out to my left, that's what made me look.  I heard a noise, and I got out of bed, and looked, and I thought, hmm.  So I opened my blinds, and I have to kind of move myself to the left to be able to see as far back as the car was parked, and I'm going, what's the car doing there?  So then do you want me to continue, or do you want to ask the questions?

Q.   Sure.  What did you see after you noticed the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

car parked there?

A. Okay. Okay. I saw the car there, and I just kind of looked, and I thought, what the heck? So -- said -- I just looked -- you know, looked again, and I could see there was a driver, and there were two younger men in the back of the car.

Q. Okay.

A. I could see that very clearly.

Q. You could see them in the car?

A. Yes.

Q. Is that right?

A. Yes.

Q. Did you see them before they got in the car?

A. No. No.

Q. Okay. Did you see --

A. There was no noise, you know, to -- I --

Q. Did you see them running, or did you just see them in the car?

A. I saw them in the car, and then the gentleman -- I don't know, whatever his name is. He got out of the car, and he went to the left, which was towards the pond. We have a pond at the end of my stretch of the condos, and it comes out to the side where he could come out front, where he could walk out into the parking lot. And that would take him over to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

little falls, where that was, I think.

Q. Okay. So you saw three boys in the car? There was a driver and two passengers. Is that what you said?

A. The driver was older. He looked --

Q. Okay.

A. -- teenage, but he was dressed nice, and the boys looked --

Q. Yeah. Let's --

A. -- the boys looked like they were going to Catholic school. They were all dressed up.

Q. Sure. Let's start with the boy in the driver's seat, okay?

A. Uh-huh.

Q. Did you get a good look at him?

A. No, I didn't really pay much attention. I just thought, I wonder who he is, and what's he doing here? You know, I just wondered because nobody ever did -- parked there or was there before.

Q. Okay.

A. So I was just being questionable.

Q. Do you remember what he looked like?

A. He was dressed nicely. I thought he was probably going to work. He was -- I don't know how tall, but he wasn't real tall. Maybe -- I don't know.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900   www.MILESTONEREPORTING.com
ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

362352 Bloom Charlene 02-17-2025    19

He would've been taller than me by a long shot, but he had brown -- dark brown hair, and it was bushy, and at that time, everybody had bushy.  A lot people had bushy hair, but he had bushy hair, and it appeared he was going to take those kids to school, is what I thought.

But he's -- I watched him, and he told them -- I don't know if he told them, but he -- he pointed, and then he left.  He left one -- to the left direction towards the pond, and the kids were in the car.

Q.   Okay.

A.   He might have been 12 -- 11 and 12.  I don't know, but there were two of them.  I don't know if they were twins or if they were brothers.  I don't know.

Q.   Okay.  Ms. Bloom, I'm going to show you -- I'm going to mark our first exhibit.  I'm going to share my screen.  Let me make sure I've got the right one.

A.   Okay.

Q.   Okay.  Ms. Bloom, you testified -- you remember testifying during Jorge Valle-Ramos's criminal trial; is that right?

A.   I remember it testifying, but I don't know.  I couldn't tell you exactly what I said.  Like, I just did with that.  I wouldn't --

Q.   Sure.  Yeah.  That's okay.  I'm just going to show you a little bit of that testimony right now to see

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

362352 Bloom Charlene 02-17-2025

20

if it refreshes your memory.

A.   Okay.

MS. DILLON:  So what I've -- what I'm showing you right now is going to be Plaintiff's Exhibit 1. The -- for the record, this is a 21-page document. It's Bates numbered P266 to 287, and I'll represent to you that this is the transcript of the testimony you gave at the criminal trial of Jorge Valle-Ramos, okay?

THE WITNESS:  Okay.

(Exhibit 1 was marked for identification.)

BY MS. DILLON:

Q.   Okay.  So I'm going to direct our attention to Page 5 of the document, and that's Bates P270 for the record. and I'm going to direct our attention to Line four.

Q.   Can you see where my cursor is on the screen?

A.   Yes.

Q.   Okay.  And is that big enough for you to read it --

A.   It's --

Q.   -- the text?

A.   -- small, but I can read it.

Q.   Okay.  I'll zoom in a little bit more.

A.   Okay.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   And I'll -- I'm just going to read to you really quickly.  So you were asked at Line four, "Could you describe more specifically the driver?  Did you get a good look at him?"  And then you answered, if we go down to Line 16 -- or 15 and 16, you say, "He was blonde.  He looked like he was probably short, maybe 5'3, 5'4, maybe 5'5, and he was dressed nicely."

Q.   Do you see that?

A.   He was blonde?

Q.   Yeah.

A.   He wasn't blonde.

Q.   Okay.  The -- yeah.  So your testimony today is the driver was not blonde?

A.   He was not blonde, no.  He had hair the same color as the kids.  It was dark.

Q.   Okay.

A.   It was brownish.

Q.   Okay.  Ms. Bloom, would you agree that your memory at the trial which was closer in time to the incident was better than your memory is today?

MR. MISTOLER:  Object to the form.  You can answer.

THE WITNESS:  I can answer?

MR. MISTOLER:  Yes.

THE WITNESS:  Okay.  I get -- let's see.  Is it

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

better than then?  Yes, it had to be.

BY MS. DILLON:

Q.   Okay.

A.   I have a great memory.

Q.   Yeah.  So you don't recall giving that testimony; is that right?

A.   I don't remember saying he was blonde.  That's the only part.

Q.   Yeah.  Do you have any reason to doubt that you said that?

A.   Because he wasn't blonde, and I wouldn't -- you know, I don't know why that would've been said.

Q.   Okay.  So that -- reading that doesn't refresh your recollection that the driver was blonde?

A.   No, it makes me mad because I don't think I said that.

Q.   Okay.  So I'm going to show you -- I'm going to stop the screen share on this --

A.   Okay.

MS. DILLON:  -- document, and I'm going to share -- well, let me find it.  I'm going to share what's going to be marked as Plaintiff's Exhibit 2.  Sorry.  I am having trouble sharing it, but let me see if I can get this to work.

Okay.  So Ms. Bloom, I'm showing you what will

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

be Plaintiff's Exhibit 2.

(Exhibit 2 was marked for identification.)

BY MS. DILLON:

Q.   Can you see that on your screen?

A.   Yes, it's a little little.

Q.   Okay.

A.   But I'm okay.

Q.   That's okay.  I can zoom in, as well.  So for the record, this is a 19-page document that's Bates numbered P 1386 to 1404, and I'm going to represent to you that this is the transcript of the testimony you gave at your deposition during the criminal proceedings against Jorge Valle-Ramos, okay?

A.   Okay.

Q.   All right, and I'm going to direct our attention to Page four, which is Bates 1389.  And I'm going to start at Line three, and this is some testimony about the boys that you saw.  And it says, "And then I noticed there was a car parked directly behind my house at the fence, three young men.  One, the driver was blonde haired, light skinned.  They all dressed in dress clothes like they were going to work, but they came running to this car."

Q.   Do you -- did I read that correctly?

A.   That's what it says.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

362952 Bloom Charlene-02-17-2025

24

Q. Yeah. So this testimony, does this -- do you recall giving that testimony at your deposition?

A. It doesn't sound right, but I guess I did, if it's there. I didn't say they were blonde. The two kids were dark-haired, and he was blonde --

Q. Sure.

A. -- haired, for sure. I could see them, for sure.

Q. Okay.

A. And --

Q. So this doesn't -- seeing this doesn't refresh your recollection one way or the other about whether or not the driver was blonde?

A. No, he wasn't. He was the only driver, and he was dark-haired. That's for sure.

Q. Okay. I'm going to set this exhibit aside. Okay. So let's move on to the -- your -- to the other two boys and what they looked like. Did you get a good look at the other two boys?

A. I did. They almost looked identical. They were very short. They were probably, I said, 12. They probably were more, like, 8 to 9. Maybe 12, but I don't think so. They were dressed in, like, uniforms, like going to Catholic school or somewhere. So they were in the car, and they were in the back seat, and when he

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

362952 Bloom Charlene 02-17-2025                                    25

left, they got up in the front seat, and then when he came back, they got out and went in the back again. He hurried them to the back seat.

Q.   Okay.  So did -- do you remember anything else about what those boys looked like?

A.   They were Hispanic.  They were cute.  They looked -- they had short hair, and they were dressed, like I say, like, in dress clothes to go to school. They just looked like they could be twins or they could be brothers, but they weren't old.  They weren't old enough to drive or anything.

Q.   Okay.  Ms. Bloom, I'm going to, again, pull up the -- your trial transcript, what's been marked as Plaintiff's Exhibit 1.  Okay.  Can you see that on your screen?

A.   Yes.

Q.   All right.  So I'm going to direct our attention now kind of to the bottom of Page four, which is Bates 269, and I'm going to read from your testimony at the trial starting at Line 20, and you say, "Yes, there were three young men, probably early 20s.  They all three had on long sleeve dress shirts.  They looked like they were going to work or somewhere.  They ran. There was a driver who had blonde hair and was kind of short.  And there were two other guys.  One was -- they

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com
ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

got in the back passenger door.  The one on the right-hand side was a short guy, kind of stocky.  The guy who was closest to me was taller and thin, but not Hispanic or black, either one."

Q.    Ms. Bloom, do you remember giving that testimony?

A.    I don't, but the only --

Q.    Okay.

A.    -- way that could have happened would've been if that was a second day that I saw them because the first day, I saw them and I -- just as I said, they were in the car.  He walked away.  He came back, and they left.  And then I thought that there could have been a second day.  I really did.  I couldn't remember for sure, but this makes me think this was the first day or the second day, one of them.  And they asked me if he drove out, and I don't remember what I said now, but I believe I said, yes, he drove.  He was the only one that could drive with the first day because they were kids.  So I don't --

Q.    Okay.

A.    Okay.

Q.    -- know.  I really don't --

So that's -- it's -- and it's okay if you don't remember.  But -- so can you explain to me what

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

you mean by a first day and a second day?

A.   Well, I was thinking that the cars -- because, see, the first day, the car was there, and he just walked away, and he walked back, and they left.  I think, for -- I'm not positive, but I think that there was a second day, and when I see this deposition or the -- whatever you call it, there had to have been a second day because I wouldn't have said that because they weren't blonde.  They were definitely Hispanic kids, and they weren't blonde.

But now, the driver of the car the second day, I don't know now if it was him or if it was somebody else because I don't remember seeing other people. Maybe, I'm blocked.  I don't know but I don't know.  I'm sorry.

Q.   That's okay.  You don't need to apologize.  So safe to say, this doesn't refresh your memory of testifying that day as -- or testifying at the trial about the -- these two boys not being Hispanic; is that right?

A.   Right.  The two --

Q.   Okay.

A.   -- two little boys were Hispanic that --

Q.   Okay.  Do you --

A.   -- the first time I saw them.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   -- have any reason to doubt that you gave that testimony at the trial?

A.   No.  I guess I did.

Q.   Okay.

A.   I was scared that day, though.  Remember, I told you about being up in the garage, and I was frightened that day, but I don't -- it would -- I wouldn't have said that if I didn't think it because, I don't --

Q.   Sure.  And there's no reason to think that you wouldn't have told the truth at your trial; is that right?

A.   Absolutely.  Absolutely.

Q.   Okay.  So I'm.

A.   As from what I knew, let's say.

Q.   Sure.

A.   -- as to what I knew.

Q.   So I'm going to skip ahead a little bit and just go through some more of your trial testimony.

A.   Okay.

Q.   You -- as we mentioned, you -- or as you said, you testified at his -- at Jorge Valle-Ramos' criminal trial, and you remember that; is that correct?

A.   Yes.

Q.   Okay.  And you swore to tell the truth at

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

trial; is that right?

A.    Yes.

Q.    Okay.  At the trial, did you identify Jorge Valle-Ramos as one of the boys you saw on April 9, 2013?

A.    I believe I did.  I'm not positive.

Q.    Okay.  Okay.  So let me just direct you to -- am I still sharing this exhibit?  Can you still see Plaintiff's Exhibit 1 on the screen, what I'm scrolling through?

A.    I'm sorry.

Q.    Can you still see the transcript on your screen?

A.    Yes.  Thank you.

Q.    Okay.  So I'm going to direct our attention to Page 10, and that's Bates 275.  I'm going to go down to Line 20.

Q.    And you're asked, "On that date, April 9th, when you were looking at these three fellows, the driver, you said, you got the best look at."

And you answer, "I did."

And then you're asked, "Was the driver this man?"  Meaning Jorge Valle-Ramos.

And you said, "No.  No."

And then you're asked, "Are you sure?"

And you say, "I'm positive.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900      www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

And then you're asked, "Could the driver have been this man with a large afro?"

And you said, "No.  No one had an afro.  No one did."

Q.   Ms. Bloom, do you remember testifying to that?

A.   I remember the thing about the afro, but as far as far as the first part where I said that he wasn't driving, I don't know.  I thought, maybe -- well, I can't go by maybes.  That doesn't work.

I'm thinking there were two days, and I'm thinking that they came, and they left because the first time I saw the kids with him, when I saw them together, they didn't stay long.  He was gone, maybe ten -- 15 minutes.  And then he came back, and they drove away, and he did drive.  Maybe, I got confused between that.  And this testimony part, I don't know.

Q.   Okay.

A.   I don't remember saying blonde people because -- but it could have been.  Maybe, it was a -- the second day, and somebody came.  I don't know.  I'm sorry.

Q.   No need -- really, no need to apologize.  This is not -- it's not a memory test.  We're just -- I'm just trying to see if you do remember these things, and it -- it's okay if you don't.  That's a perfectly

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

acceptable answer.  So please don't feel bad.  I'm just -- I know these questions are tough.  This was a long time ago.  I'm just trying to see what you remember, okay?

A.   Uh-huh.

Q.   And so when you say you remember this thing about the afro, what do you mean?  That you remember saying nobody had an afro?

A.   I remembered it when you read it, but I --

Q.   Okay.

A.   -- think somebody had bushy hair, but --

Q.   Okay.  Is there -- do you have any reason to doubt that you gave this testimony?

A.   I'm not doubting it, but I'm thinking it could have been two different days, is what I'm thinking.

Q.   Okay.  So one of those days would have --

A.   The second day -- the second --

Q.   -- would have been the morning of the April 9th burglary; is that right?

A.   Well, I didn't know about that until I saw it on the news --

Q.   Right.

A.   -- the burglary and the guy got hurt.

Q.   Okay.  Do you --

A.   But --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Q. -- Ms. Bloom, do you remember talking to the police on April 9, 2013?

A. It wasn't that day. I -- I -- well, maybe it was. Yes, it was.

Q. Okay.

A. Yes, it was That's the day that my neighbor in the other complex behind me was standing out there and she had -- I guess she had called, or he had gone to her, and I said, yes, I want to go. I'm going to go outside, get dressed, run, go over, and talk to him, and tell him what I saw. So --

Q. Okay. And --

A. -- that --

Q. -- do you remember if you -- this testimony that you gave about seeing three people, one blonde and then two other boys that were not Hispanic, do you remember if that testimony comes from April 9, 2013, the morning you went out and talked to the police?

A. I only did one -- one court appearance. So it had to be the day, but I'm thinking that there were two days that they came because the first day, I just saw the dark-haired guy and the two kids, and then they left. They weren't there long. They left.

Now, the next -- I'm almost positive the next day. Another car came, and it -- there may have been

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

362952 Bloom Charlene-02-17-2025

33

blonde people in it.  Maybe, that's -- that would be what I think it is.  That's what I think it was.  But now, I can't honestly say, but that's what I think.  I think --

Q.    Okay.

A.    -- and they asked me if he was driving the first guy with the kids.  Was he driving?  And I said, no.  And that was because those people with blonde or hair that weren't Hispanic were in a car.  So I don't know.  I think that's -- this is what I feel with reading all this.  Now, that doesn't -- maybe this doesn't go well, but I believe this is the truth right here.

**Q.    Okay, and that's all I'm asking for, is the truth.  And if you don't remember, that's totally okay.**

A.    When you said two blonde guys, I remembered that.  That, I remembered, because I think it had to be two days, and I think it may even been two different cars.  I don't know.  That part, I don't know.

**Q.    Okay.  And so I'm just going to continue on Page 11 of the trial transcript when you're asked, "Could this man," meaning Jorge Valle-Ramos, "been the other two passengers?"**

**And you say, "No, no."**

**That -- you're asked, "Either one of them?"**

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

And you say, "no."

And then you're asked, "So this man does not look like the person that you saw -- any of these three men that you saw get into that car?"

And you say, "No."

And you're asked, "Are you pretty sure of that?"

You say, "I'm positive."

So I -- I'm --

A.   That's what I'm --

Q.   -- do you recall -- okay.  So do you recall that testimony?

A.   Yes, I do.

MR. MISTOLER:  Just make sure -- one second, Roz.  Just make sure she gets her full question out before you answer --

THE WITNESS:  Okay.  Yes.

MR. MISTOLER:  -- to make it easier for the court.

THE WITNESS:  Yes.  I'm sorry.

MR. MISTOLER:  Okay?

BY MS. DILLON:

Q.   Sure and the question to you, Ms. Bloom is: Do you remember that testimony that I just read back to you?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

A.   Yes.

Q.   Okay.  So is it the truth that you did not see Jorge Valle-Ramos jump into a car with two other boys on April 9, 2013?

A.   I think it was April 8th that he walked to the car with the kids, and they left.

Q.   Okay.

A.   And he did drive that day.  He drove out that day, but he was just driving.  It wasn't in a humongous hurry and then the next day, those -- that's what I'm thinking because -- I'd forgotten, but that's really what I'm thinking, that -- those three because they -- they were running when they came to the car.  He never ran to come to the car.

Q.   Okay.

A.   That, I remember.

Q.   So when you say they were running to the car, is this a different incident that you're remembering?

A.   That's what I think.

Q.   Okay.

A.   I think it's a -- the next day, the 9th, but the 8th is when I think I saw him with the two kids because it seems very much to be two separate situations.

Q.   Okay.  I'm going to direct our attention to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900   www.MILESTONEREPORTING.com
ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

one more part of your trial testimony.

A.    Okay.

Q.    We're going to go to Page 12 at Line eight.

And you're asked, "Did the police talk to an -- talk to you anymore about further investigation, like a photo lineup or anything?"

A.    No.

Q.    And you respond, "Well, they did call me and ask me if I could, you know -- if I knew" --

A.    No.

Q.    -- "what they looked like, and I explained, you know, that I did.  But I didn't talk to them until after I got the paperwork, and the picture that I saw wasn't the same person that was there and didn't appear to be this gentleman either."

Q.    Do you recall the police contacting you to see if you could identify anyone you had seen running to the car?  And again --

A.    12-and-a-half years?

Q.    -- if the answer is no, that's okay.  If the answer is I don't remember --

A.    (Audio cuts out.)

Q.    -- that's okay.

A.    They -- I don't think -- I can't remember.  I really can't.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Q.    That's okay.  So carrying on down to Line 16, you're asked, "What picture did you see?"

And you respond, "Oh, on the computer, the mugshot."

And then you're asked, "So you saw a mugshot?"

And you respond, "Yes."

And you're asked, "Of Mr. Valle-Ramos?"

And you say, "Right."

A.    It was.

Q.    Do you remember seeing a mugshot of Mr. Valle-Ramos on your computer?

A.    I do.  I do.

Q.    Okay.

A.    Yes.  Because I looked it up because of what I told you about the Sundays when I was doing the gardening, if you remember what I said.

Q.    When you say, "Sunday doing gardening," what do you mean?

A.    Well, after -- I don't know if it was after -- these -- I was out front two times on Sunday, doing my gardening, putting in plants, and a guy came with the bush -- bushy-ish hair and two guys.  And I felt them walk up.  I didn't bring my face up.  I didn't look, but I knew they were there.  And then I glanced, and they were sitting on the air conditioning electrical thing.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

362952 Bloom Charlene-02-17-2025

38

And he said, you look pretty busy.  And I said, yeah, I'm gardening, and I'm digging deeper and deeper because I was a little afraid because it was three people, and they weren't little kids.  So I slithered kind of, like -- and just kind of went into the house, and they came two times but then they never came back again.  So that would be --

Q.   Okay.  Okay.  So you --

A.   -- (audio cuts out) -- can't tell you if that was before court or after court?  I don't know.

Q.   Okay.  So you say there were three people outside your house when you were gardening.  You're not sure when.  Did you say one of them had bushy hair?

A.   Yes, it was a Sunday.  It was -- both days were Sundays.  It was, like, one week and then the next week.

Q.   Okay.  And the person with bushy hair, was that a man or a woman?

A.   A man.  They were all men.  Yeah.

Q.   And do you remember any other physical features of the person with bushy hair?

A.   He was tall -- taller than me and thin.

Q.   Okay.  And the two other people that were with him, were they male or female?

A.   They were male.  They had --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   And do you remember what --

A.   Go ahead.

Q.   Sorry.  Do you remember what they looked like?

A.   They were shorter than him, and they had shorter hair than he had.  But they were guys, and --

Q.   Okay.

A.   -- not real tall, but not as short as me.

Q.   Okay.  So this is when you're gardening outside the front of your house; is that right?

A.   Yes.  Yes.

Q.   Okay.  So this would not be the day that you were looking from your window --

A.   No -- no.

Q.   -- on the day that your neighbor was robbed, correct?

A.   No, absolutely not.

Q.   Okay.  So this was a different incident?

A.   Yes.  Yes.  And I didn't --

Q.   Okay.

A.   -- I didn't make anything of it because I figured the less I said, the better off I'd be, probably.

Q.   Okay, and you said there was another instance with those -- was it those same three individuals or different individuals?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.   The same.

Q.   Okay.  And was that before or after the incident when you were gardening?

A.   It was after.

Q.   Okay.

A.   It was, like, the next week or next few days after.

Q.   Okay.  And what happened during that incident?

A.   I was doing the same thing.  And I said less, and I just pulled myself towards the door -- and I -- it went real fast and closed the door.  I didn't speak to him that time, because I thought, I'm not doing this.  This is scary.  But I went in, and I didn't call anybody.  I probably should have, but I knew they'd be gone before I got anybody there, but --

Q.   Okay.

A.   -- they didn't say anything to me.  It was just kind of, like, a we're here thing.

Q.   Were they in a car, or were they just --

A.   They were walking.

Q.   -- standing.

A.   They were --

Q.   Walking?

A.   Yeah.  They were walking.  I -- we had a street and my parking places in my -- on my street.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

362952 Bloom Charlene-02-17-2025

41

They had walked up -- up from the main Hidden Creek Road -- or Avenue, and they had walked up, like, on the grass to talk, and I didn't talk to him.  I just said, I'm gardening.  And I put my head down.

Q.   Okay.  And so that also was not the day that your neighbor's house was robbed; is that right?

A.   No.  No, I don't --

Q.   Okay.

A.   -- even know that neighbor.  I just knew that he got hurt very, very badly and that he had been robbed, but that's on another street --

Q.   Okay.

A.   -- in that corner.  I know where it is, but I've never been there.

Q.   Okay.  So before we got into these incidences while you were gardening, we were talking about the mugshot that you saw of Mr. Valle-Ramos online.  And so I'm going to direct us back to your testimony down to Page 13, which is P278.

And you are asked, "So that picture, that mugshot, did you not think that was the guy you saw on April 9th?"

And you say, "No, absolutely not."

A.   Okay.  So I was right.  It's two dates.  It is.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Q.   Okay.  So do you remember -- does that refresh your memory --

A.   Yes.

Q.   -- about what happened on April 9, 2013?

A.   Yes, it does.  It does.

Q.   Okay.  So it --

A.   It wasn't him.  It wasn't him that day.  It was somebody else.

Q.   Okay.  So is it true that Jorge Valle-Ramos was not one of the three people you saw on April 9, 2013?

A.   No, it was not because they were the lighter haired guys.

Q.   Okay.  And then that's why you did not identify him at trial; is that right?

A.   Yes.

Q.   Okay.  Continuing on to Line five on the same page, Page 13, you're asked, "When did you offer to do any photo lineup?"

And you say, "Well, when he called me, I had explained that I had looked at the picture and that it wasn't anyone that I had seen."

And then you're asked, "So you didn't come in and do a photo lineup?"

And you respond, "No.  He said, I didn't need

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

to come in for the lineup."

Q. Do you remember giving that testimony?

A. Yes, I do, I think.

Q. Okay. Do -- and is it true that you told the police that you had seen Jorge Valle-Ramos's mugshot, and that it wasn't anyone you had seen on April 9, 2013?

A. Yes. I -- I'm sure of that. I'm sure of that.

Q. Okay. And is it true that once you said that, the police told you that you did not need to come in for a lineup?

A. Right.

Q. Okay. Do you remember who called you from the police station? It's okay if you don't.

A. It might have been the chief, but I doubt it.

Q. Okay.

A. I don't know.

Q. No, not a problem at all. Okay. I'm going to set this exhibit aside for a moment. And I'm going to direct us back to the day of your neighbor's robbery, April 9, 2013.

Do you remember that day now three men running to a car or do -- I'll leave it at that.

A. Yes.

Q. Okay. So do you -- before we got the -- your

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

descriptions of the boys, you were saying that they got into the car.  Do you remember that?

A.   The kids did, yeah.

Q.   Okay.  What happened next?

A.   He -- I -- whoever he was, the dark-haired guy, he would -- went around, I guess, by the pond and over. And he came back and got in the car, and then they left.

Q.   Okay.

A.   And he was driving that day.

Q.   On the day that your neighbor's --

A.   First day, that is --

Q.   Is that the day your neighbor's house was robbed?

A.   No.  No.

Q.   Okay.

A.   It wasn't the same day.

Q.   So on the day your neighbor's house was robbed, do you remember seeing three people in a car?

A.   I don't -- I'm not sure.  I'm really --

Q.   That's okay.

A.   -- not sure.

Q.   That's okay.  No problem.  Do you remember the police showing up on April 9, 2013?

A.   I'm sorry.  Again?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900        www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Q.   Do you remember the police showing up at your condominium complex on --

A.   No.

Q.   -- on April 9, 2013?

A.   Yes, because I could see out my -- if I looked the other way, I could see that there were police cars all over there.

Q.   Okay.  So I'd like to ask you a couple questions about your interactions with the police on April 9, 2013.

A.   I didn't see them that day.

Q.   You -- what -- you did --

A.   I did not see the police on the 9th.

Q.   What day did you see the police?

A.   I saw the police on the 8th, I think, when -- no, wait.  I'm sorry.  I'm getting here.

Q.   That's okay.

A.   Okay.  I saw the police, but not at my house. I saw them at Little Falls --

Q.   Okay.

A.   -- across the road, is when I saw them.  I didn't -- except for the one police officer that I went to talk to, that was another day.  That wasn't that day. That was -- well, maybe, it was that day, and that's why he was there.  I don't know.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

MS. DILLON:  That's okay.  I'm going to talk about a statement that you provided to the police about the robbery of your neighbor's house.  So I'm going to share what's been marked as Plaintiff's Exhibit 3.

(Exhibit 3 was marked for identification.)

BY MS. DILLON:

Q.  I know that's a little small, so I will zoom in.  Ms. Bloom, can you see that document on your screen?

A.  Oh, yeah and it is annoying.

Q.  Okay.  And that's okay.  With the dates, you know, it was a long time --

A.  (Audio cuts out.)

Q.  -- time ago.  For the record, this is a one-page document, Bates number P13085.  Ms. Bloom, do you recognize this document?

A.  It's my writing.

Q.  Okay.  It's your handwriting.  So let me scroll down to the bottom real fast.  Do you see it in the bottom right-hand corner where it says, "Charlene Bloom," next to signature?

A.  Right.

Q.  Is that your signature?

A.  It is.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900   www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Q.    Okay, and you can have a moment.  Would you like a moment to read this?

A.    Yeah.

Q.    Okay.  Just let me know when you're done.

A.    I see talking to each other.  Well, maybe, it must have been the 9th then.  I didn't think it -- I thought it was two days.  Maybe, it was only that day. I'm sorry.  Maybe, I'm wrong.

Q.    You don't need --

A.    (Audio cuts out.)

Q.    -- to apologize at all.  This -- again, not a memory test.  Just trying to see if you have any independent memory of what you -- what happened back in April of 2013, with the understanding that was a long time ago.  A lot of people would have trouble remembering things from that long ago.

Q.    So I just have a quick question -- a couple quick questions about this document.  So you said this is your handwriting in the body of the document; is that right?

A.    Right.

Q.    Okay.  And then it's your signature at the bottom?

A.    Yes.

Q.    And you would have read this before signing

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

it; is that right?

A.   Yes, I believe I would have.

Q.   Okay.  And is it fair to say that the
information in the statement you gave to police would've
been correct?

A.   I'm trying to read this.  Let's see

Q.   If it's helpful, I could read it for you.

A.   No, I think I've got it.  I've got it.

Q.   Okay.

A.   I don't know.  That would be on the 9th.  So
maybe the first day because the first day, they didn't
hurry away.  They really didn't.

Q.   And when you say, "first day," are you
referring to the incident while you were gardening --

A.   No.

Q.   -- or a different incident?

A.   No.  No.  While I was -- when I looked out the
window the first time.

Q.   Okay.  So there's April 9th, which is when the
robbery happened.

A.   Okay.

Q.   And then you're saying that there was a
different day, you looked out the window and also saw
three gentlemen in a car; is that right?

A.   Well, the first day, I saw the guy with the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

two smaller kids.  They were kids.  And the second time the next day -- I knew there were two days.  Thank you. That I saw a guy -- the guy -- same guy, I thought, but there was a car there, and then they sped off.  They weren't there long.  They sped off real quick, but I can't tell you who was in that car.  I don't know.

Q.   Okay.  Okay.  Is it fair to say that when you gave your statement to the police, you would have told the truth in your statement?

A.   Absolutely.

Q.   Okay.

A.   Absolutely.

Q.   Do you remember if anything happened after you gave your statement to the police?

A.   That may have been when the gardening things happened, but I'm not sure --

Q.   Okay.

A.   -- because I didn't -- probably had to be then because I didn't know anything prior to that.

Q.   Okay.  Do you mean the same day or a different day after?

A.   No, they were on Sundays.  They were on Sundays.

Q.   Okay.

A.   And I don't remember what day the 9th was, but

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

362952 Bloom Charlene-02-17-2025

50

it might have been a Friday.  It seems it could have been a Thursday, and a Friday, but I don't know.

Q.    That's okay.  I'm going to set this exhibit aside.  And now, I just want to talk a little bit about the deposition that you gave in the underlying criminal case.  We talked about it briefly, and you didn't recall testifying at a deposition in the criminal case; is that right?

A.    I don't.  No.

Q.    Okay.  Has anything we've talked about today refreshed your memory about testifying at a deposition?

A.    I didn't go anywhere, but to the Court.  I didn't have to go to another office or anything.

Q.    Okay.

A.    And the police did come to the house, and I believe that was what I told them.

Q.    Okay.  So you remember going to court to testify.  Did you only go to court one time?

A.    Yes.  Yes.

Q.    Okay.  Okay.  So did -- I'm going to pull up Plaintiff's Exhibit 2 one more time.

A.    Yes.

Q.    Okay.  This is Exhibit 2, which I've already shown you, recall that this is a transcript of the deposition that you gave in the underlying case.  And

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

I'm just going to direct our attention to the first page.

Q.   Do you see where it says, "Deposition recorded on Thursday, October 10, 2013"?

A.   Yes.

Q.   Does that help refresh your memory at all to giving a deposition in the underlying case?  It -- again, it's okay if not.

A.   It really doesn't.

Q.   Okay.

A.   I don't remember it.

Q.   Okay.  I'm going to set that document aside. Well, actually, just a couple quick questions.  Assuming that you gave a deposition in the underlying case on October 10, 2013, you would have told the truth at that deposition; is that right?

A.   Yes.  Can you tell me where it was done?  And that --

Q.   Sure.

A.   -- will refresh --

Q.   Yeah.  Let me see.  It might have been at the public defender office.

A.   I don't remember going there.

Q.   Let me see.

A.   Maybe, I did but --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

52

Q.   And it's okay if you don't remember.  I'm just asking if you do remember, and if you don't, that's all right.  I'm also just asking that, you know, if you were sworn to tell the truth at your deposition, that's something you would have done, right?

A.   Oh, always.  Always.

Q.   Okay.  Okay.  And your deposition in October of 2013 was closer in time to the robbery of your neighbor's house than your deposition today, nearly over ten years later; is that right?

A.   That's correct.

Q.   Okay.

A.   It's --

Q.   And would you agree that your --

A.   -- 12 -- 12 years, actually.

Q.   Yeah.  Would you agree that your memory of the events was better in October 2013 than it is today in February 2025?

A.   Yes.

Q.   Okay.

A.   We would presume.

Q.   Okay.  I am -- I'm kind of getting close to being done, but let me -- let us keep moving along.  I want to ask you about any other interactions that you can remember with the Orlando Police in connection with

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

Toll Free 855-MYDEPOS

the burglary of your neighbor's home.  We talked about your initial statement; is that right?

A.   Uh-huh.

Q.   So that's one interaction you had with the police; is that right?

A.   I stopped and talked to a -- I mean, a police officer on my own at my neighbor's house.

Q.   Okay.  And was that the day of the robbery?

A.   I believe it was --

Q.   Okay.

A.   -- because he walked around, and he walked up to her.  And I thought, I'm going to go tell him what I saw this week.

Q.   Okay, and do you remember if you spoke -- do you remember what police officer you spoke to their name?

A.   No, he was just somebody that had come up.

Q.   Okay.  And did the police officer ask you questions?

A.   I don't remember what they were.  If they did, he probably did, or I may have just --

Q.   Okay.

A.   -- started telling him what I saw the days before.

Q.   Okay.  And then did the police officer ask you

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

to give a statement?

A.   I don't know.  I'm sorry.

Q.   Okay.  That's okay.  It really is okay.
Please don't feel bad.

Q.   Did you ever speak with an Orlando Police
officer by the name of Michael Stanley?

A.   No, I don't know of the name.

MS. DILLON:  Okay.  Okay.  I think I'm done,
but can I ask for just a quick five-minute break to
go over my notes, and then we can come back on the
record?

MR. MISTOLER:  Of course.

MS. DILLON:  Okay.  So let's go off record.

THE REPORTER:  One moment.

(A recess was taken.)

THE REPORTER:  We're back on the record.

BY MS. DILLON:

Q.   All right, Ms. Bloom, I know I promised I was
close to being done.  I swear that's still true, but I
have just a couple more questions for you, okay?

A.   That's fine.

Q.   So I'm going to share, again, Plaintiff's
Exhibit 2 and this is the transcript of your deposition
testimony.  And I want to direct our attention to Page
eight, Line 21.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

And you're asked, "And you looked up Valle-Ramos?"

And you answer, "And then I maybe had to go just to Ramos, but I did start with Valle-Ramos."

Okay. And then I'm going to jump down to Page nine, and I'm going to direct your attention to Line six where it says, "You looked at his face?"

And you answered, "I did."

And then you -- you're asked -- and you said, "That's not the guy." And you --

A.   I remember.

Q.   -- answer, "That can't be the guy who gets in the car, but he looks familiar to me." And you said you remember.

Do you remember giving that testimony?

A.   Yes, I do.

Q.   Okay. And so it's true that when you looked up Valle-Ramos on the internet, it wasn't the guy that you had seen on April 9, 2013; is that right?

A.   I don't think so.

Q.   Okay. But he looked familiar to you, is what you said?

A.   He didn't look like that much like him.

Q.   Okay. And then let me direct your attention to the answer that begins at Line 11 on the same page,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page nine of Exhibit 2.  And you say, "Now, the reason I say that, and you're going to think this is weird, but two times, I don't know how long.  I don't know if he's still in jail, or if he's been in jail the whole time, or if he got out because in May, one day -- I have this electrical thing outside of my house, like, a box, and one day, I looked out, and there were four people sitting on the box."

Q.   Is this the incident that you were describing earlier --

A.   Yes.

Q.   -- while you were gardening?

A.   Exactly, yes.

Q.   Okay.  And were you saying that the guy -- one of the people you had seen that day resembled Mr. Valle-Ramos?

A.   I thought he was.

Q.   Okay.

A.   Yeah.

MS. DILLON:  I'm going to stop sharing on this exhibit, and I'm going to share one final exhibit.  This is an exhibit that's been marked as Plaintiff's Exhibit 4, and for the record, this is Bates P454.

(Exhibit 4 was marked for identification.)

BY MS. DILLON:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Q.    Ms. Bloom, do you see those photographs on your screen?

A.    I do.

Q.    Okay.  I'm -- I'll represent to you that the gentleman on the right is Mr. Valle-Ramos.  The gentleman on the left is a man by the name of Amos Ortiz.

Q.    Do either of these men resemble the person that you think you saw outside of your home while you were gardening?

A.    Yes.

Q.    Okay.  As you sit here today, could you say for sure if it was either one of these men?

A.    I think it was the one in the blue shirt.

Q.    Okay.  Where you lived in April 2013, was the type of hairstyle you see in this photo common?

A.    Yes.

Q.    Okay.  And was it a common hairstyle on folks of this complexion?

A.    Yes.

MS. DILLON:  Okay.  Thanks so much, Ms. Bloom. I have no further questions for you.  I think the City of Orlando and Defendant Officers still may have some questions for you, but I'm all done. Thank you so much for your time.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

362952 Bloom charlene-02-17-2025

58

THE WITNESS:  Oh, no.

CROSS-EXAMINATION

BY MR. MISTOLER:

Q.  I will try to be brief, but I do have some questions --

A.  Okay.

Q.  -- for you, ma'am.  First off, before your deposition here today, did you talk with anyone?

A.  Just her.

Q.  Just Roz?

A.  Uh-huh.

Q.  What did you all talk about?

A.  What it would be like when I got here, how I would get here, how she would get me a ride and what I would wear, that I could wear whatever I wanted.  And that's about it.

Q.  Did she go over any of the facts or the background of the case with you at all?

A.  No.  No.

Q.  Did she offer any strategies for how to respond here today?

A.  No.

Q.  No?  The neighbor, Mr. Gonzalez, is that correct, the individual who was the victim?

A.  I didn't really know him --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Q.   Yeah.

A.   -- to tell you the truth.  I just knew my -- I have friends that live at the end of the walk, the driveway, but the -- there's a walkway that goes back into another building.  That's where it was.  I've never been there.

Q.   And when you're looking out your window, and it looks out the back of the -- your property, your area; is that correct?

A.   Yes.  And it's facing the opposite complex.  It's -- I can't think -- what's its name.  I can't think of the name of it.

Q.   But that is -- that opposite complex is not the place.

A.   No.

Q.   That's not the location --

A.   No, no, no.  And that place that you're talking about is actually -- if I was to get out of my house, I'd walk back this way.  And then I'd have to turn.  And that's where I get my mail.

Q.   Okay.

A.   But it was at the back, the very back of that area.  So I've never been back there.

Q.   Okay.  So really, from the view from your window, you can't see the location of where this

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

407.423.9900    www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

Toll Free 855-MYDEPOS

burglary was located?

A.   No.  Oh, no.  Not at all.  All I could see was the cars because when -- that's when I went to talk to that guy because I said, why is -- you know?  So I believe that -- I didn't see -- I didn't even -- I could see the police cars, but that was it.

Q.   Is there a fence out back there that kind of obstructs the view of the car at all?

A.   Well, yes.  Let's see.  Let me think.  No.  We have a dog walk behind my house, and it is open to the road, and it does open -- Little Falls is the name of the street, is right across the road.  You know, you walk across around Little Falls, but it was way down to the end to the back.  So you -- I could never see that.

Q.   Okay.

A.   No.  And this kid that I saw with these two boys, he didn't -- he came around this way, which he would've could have walked in front of my house to go there, maybe as a look, see, I don't know.  But he couldn't -- you know, he couldn't -- he shouldn't have been able to drive.  He drove out of the complex that he was in --

Q.   Okay.

A.   -- besides mine.

Q.   Did you ever talk to Mr. Gonzalez, the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

neighbor victim?

A.   No.

Q.   No?  Have you had a chance to read any of his testimony that you gave in this --

A.   No.

Q.   -- incident?  In his testimony, and I'll represent to you, he tells us that when he comes home, he encounters these individuals in his home, and one of the individuals he comes in -- he encounters face to face, and he gets a really good look at him.  And he says that --

MS. DILLON:  Objection.  Misstates testimony.

Go ahead.

BY MR. MISTOLER:

Q.   You can still answer.  He says he looks at this individual, and I'm getting to the question.  And that person had a jersey on, like, a basketball or a sports- type jersey.  And my question for you is: These three individuals that you see getting into the car, they didn't have any jerseys on, correct?

A.   No.  And I don't think it was the 9th.  I think it was the 8th that I saw them.  I really do.

Q.   Okay.  You didn't see anyone with a jersey -- wearing a jersey?

A.   No.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   You didn't see anyone -- plaintiff just showed you in their Exhibit 4 matching the description of either of those individuals --

A.   No.

Q.   -- on the day of the burglary --

A.   No.

Q.   -- right?  Would you defer to Mr. Gonzalez if he -- as he walks in, and he gets a clear view of one of these individuals, would you defer to him if he says he saw this other individual with a jersey on?

A.   Would I defer?

MS. DILLON:  Objection.  Form.

Go ahead.

BY MR. MISTOLER:

Q.   (Audio cuts out.)

A.   I don't know what -- how you mean?

Q.   That's okay.  What -- let me ask it a different way.

Q.   Do you think you -- those three individuals getting into the car, do you think they were involved in the burglary to begin with?

MS. DILLON:  Objection.  Foundation.

Go ahead.

BY MR. MISTOLER:

Q.   You can answer.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.   Okay.  I didn't -- let's see.  I'm trying to think.  I didn't see -- the first day that I saw them, the guy had dark hair.  But then I didn't see -- they -- he -- that person was not the same person that came back the second day, I don't believe.  I think those people were whoever they were, and they were probably in on it, but I don't know.

Q.   Do you think those three individuals -- now having heard that the victim saw a man in a jersey, do you think those three individuals were the only individuals involved, if at all, in the burglary?

MS. DILLON:  Objection.  Form.

You can answer.

THE WITNESS:  On the -- let's see.  The day that I was speaking about the first day, I -- the second day, I didn't -- don't think I saw the guy with the dark hair, because I said they had blonder hair, and I would never have said that about him because he's very dark- haired.  So I'm not -- I'm not sure.

BY MR. MISTOLER:

Q.   Could there have been other individuals that you didn't see?

A.   Definitely -- definitely because they said there were about eight of them -- six or eight, and they

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

would've been over by the lake of the other side.

Q.    Six or eight individuals in total?

A.    They said that there were -- I thought on -- I thought it was on the news that there were several -- or several, they probably said several, individuals that were -- came down, and they heard him and took his stuff, but I don't know.

Q.    So it does sound like there were more than the three individuals --

A.    Yes.

Q.    -- you saw get into the car?

A.    Yes.  It's -- I think it was more.  I think I had heard was six, but I don't know.  And I didn't know much about that, other than what I heard and what I saw on TV.

Q.    This was pretty early in the morning, right?

A.    Uh-huh.

Q.    But when you saw this out of the back window and, you -- I mean, we looked at your statement earlier. It was the Plaintiff's Exhibit number 3.  This has a timestamp, and I'll show you this, ma'am.  This one has a timestamp at the top of 8:00, 8:20.  Do you see that?

A.    Uh-huh.

Q.    What were you doing up so early in the morning at that time?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

A.   I had just retired for my 38 years with Disney, and the last ten years, I worked midnights.  So I was awake.  I would wake up if I heard something

Q.   You were physically awake?

A.   Yes.

Q.   But maybe a little bit a --

A.   Yeah.

Q.   -- a mentally sleepy?

A.   Could have been, yeah.

Q.   Could have been?  I'm going to show you here.  This is Plaintiff's second exhibit, and this is on Bates stamp 1391.  It's Page six of 19, starting at Line eight.  Do you see what you say here, ma'am?  This is --

A.   Yes.

Q.   -- well -- and go ahead and read this part here --

A.   Okay.

Q.   -- eight and nine.

A.   I didn't give a very good statement because I was sleepy, and I laughed.  Afterwards, I thought well, I should have told him blonde-brown, you know, like me.

Q.   So maybe the statement you gave was not the best.  And you say that in your own words, right?

A.   Yes.

Q.   There's also now in here where we're

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

indicating that it could have been more brown.  It's hard to -- it was hard to remember, even in that moment -- a few minutes later, correct?

A.    Uh-huh.

MS. DILLON:  Objection.  Misstates.

Go ahead.

BY MR. MISTOLER:

Q.    And, you know, simply being sleepy had an effect on you and what you could remember, you know, just a few minutes later; is that correct?

A.    Right.  Well, see, this was the first day, the day the kids were in the car because I heard a noise, and I looked out.  And, like I said, we had, like, a fence.  And the other side of the fence is where the car was.  And that's a small drive -- road drive, like thing to go to a bigger one to go out of.  It's almost on my brain.  It sounds like -- oh, shoot.  Just looked at the name of it.  Oh, Liberty Square is the name of the place. what -- was at the very back to my gate, my fence.

Q.    Okay.

A.    And they were on the other side of the fence. This was the gentleman with the two kids, and when the others came, that -- that -- I guess the next day, they must have come from around, but I didn't -- I don't

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

know.  It's not very good.  I'm sorry.

Q.   None of those individuals that you're talking about on either day had a -- any sort of jersey, though, on?

A.   No.  No jerseys, no.  The second day that the guy wasn't dressed up, but the guys I saw weren't dressed up.

Q.   And I think we heard testimony but you were never shown a lineup, like you see in the movies --

A.   No.  Never did.

Q.   -- or even a photograph of a bunch of pictures?

A.   No.

Q.   You never saw anything?

A.   No.

Q.   And that's maybe you saw -- you were watching TV, the news --

A.   Yes.

Q.   -- and you saw a mugshot related to this situation?

A.   Yes, that's possible.

Q.   And you decided to call over to the police station and say, well, I didn't see that guy get in the car; is that correct?

A.   Yeah.  Well, they asked me at the -- in court,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900          www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

did you see him get into the car?  And it would've been the night, and I said, no.  So I don't --

Q.   Because you only saw three individuals get into the car, correct?

A.   On -- on -- I think it could have been before the other ones came.  I don't know.  I really don't.

Q.   But there may have been other individuals out there that --

A.   Yeah, I didn't see anybody else.  I didn't see anybody that was in the guy's house, except for whoever came to my garden, and I --

Q.   Did the police officers or the police department, did they ever reach out to you at all other than this -- in this --

A.   Not much after that.  No.  No, because I found out about it on TV, because I didn't know he'd been hurt, and I didn't know he had a lot of stuff in his house.

Q.   They weren't pestering you, though?

A.   No.  Oh, no.  No.

Q.   They weren't trying to get you to say --

A.   No

Q.   -- anything?

A.   No.

Q.   No?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.   Not that I remember because I -- I'm not going to be one to say something new.  Now, here, I'm confused that I am, but I'm not going to say something that's not true.

Q.   Did you ever learn what was stolen from the victim?

A.   I didn't hear what it was, but I know it was a lot of money -- worth a lot of money.  I don't know if it was jewelry or if it was stuff.  I don't know.  But they said it was a lot of money.  That was the talk of the neighborhood.

Q.   At one point, there was testimony that one of the items was found in the grass.

A.   Oh.

Q.   Did you know about that?

A.   No.

Q.   At one point, your -- you said that the individual looked familiar.  One of these individuals looked familiar because he was out maybe in front of your house on the electrical box.  Do you recall that?

A.   Yeah.

Q.   I'm going to show you again.  This is Plaintiff's second exhibit, starting at Line five.

MS. DILLON:  Sorry.  What page?

BY MR. MISTOLER:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Q.   Yes.  Thank you.  It's Page 10.  Let me see if that's where I want to start.  I'm sorry.  I'm going to back it up.  I'm going to say Page nine.  Just take a moment to look at this where you're talking about looking up the mugshot.

A.   And I looked it up under the name.

Q.   And at one point on Line nine, you say, "kind of looks familiar."  Do you see that?

A.   Uh-huh.

Q.   You give an account here where four people are sitting on the electrical box, and you kind of overhear them talking, and you're -- and they're talking about it's over here somewhere.  Do you see that on -- at the -- on Line 24, Page --

A.   I forgot that.  I -- yeah.  I did forget that. I did hear that.

Q.   And then on the next Page on Line 10 -- excuse me.  Excuse me.  I messed that up.  Page 10, Line five, they begin -- you hear them say, oh, yeah, it's over here.  And when you ask them, what's over there, they indicate, I put trash or something over here.

A.   Oh, yeah.

Q.   And you thought that was odd?

A.   I remember that.

Q.   Do you think that maybe these individuals were

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

looking for something they dropped?

A.   Possible.

     MS. DILLON:  Objection.  Calls for speculation.

     You can answer.

     THE WITNESS:  Possible.

BY MR. MISTOLER:

Q.   And you said one of those individuals had an
afro; is that correct?

A.   Uh-huh.  A fuller hair, anyway.

Q.   Fuller hair?

A.   That -- it was a real afro.

Q.   Did you get a very clear look at those
individuals?

A.   Yes, because I was scared.

Q.   Yeah.

A.   Yeah, because I kind of looked at him, you
know?  And then I looked at the other two.  They were
shorter.

     MR. MISTOLER:  Roz, would you pull up your
Plaintiff 4?

     MS. DILLON:  Of course.

     MR. MISTOLER:  Okay.  (Audio cuts out) --
around here so I can see what it says.

     THE WITNESS:  Okay.

BY MR. MISTOLER:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

407.423.9900       www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Q. When you look at these two images as they load, are you -- can you be certain that it's either one of those individuals you saw out in front of kind of looking in the grass?

A. It was one of them, but I'm not sure which.

Q. They looked pretty similar?

A. They do.

Q. So really, you're not able to say one way or the other --

A. No.

Q. -- it was either of those guys?

A. I'm really not. I think it might have been the one in the blue shirt, but I'm not sure.

Q. I think that photo also has just a -- you come around. That one's also just easier to see in that image; is that right?

A. Yeah. That's true.

Q. The one on the right is a little bit harder to see, a little bit grainier.

A. Yeah.

Q. And do we have any idea, or do you, as you sit here, have any idea when either of those photos were taken?

A. No. No.

Q. So it could be one of the individuals, but

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

it's a later photo, and his hair's bigger or --

A.    Could be.

Q.    Okay.  So we're not really sure when those were taken?

A.    No, but it's not two miles to my house from a -- oh, at (audio cuts out) -- never mind.

MS. DILLON:  Stephen, do you still need the exhibit, or should I take it down?

MR. MISTOLER:  You can take it down.  Thank you.

MS. DILLON:  Yep.

MR. MISTOLER:  I'm just looking over my notes also.  Just bear with me here.

THE WITNESS:  Sure.

MS. DILLON:  No problem.

BY MR. MISTOLER:

Q.    I think you began today by saying that you heard a noise out back on that one day, and that's kind of what clued you to go look.

A.    Yeah.

Q.    And really, if you're hearing noises, there's things that are happening out there that you're -- you can't see.  Is that -- would you agree with that?

A.    Well, when I look out my backyard -- into my backyard from my window, and I look this way, I can see

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

my actual dog walk that goes all the way down to the pond, and there was always a fence at the dog walk. They were parked on the opposite side, but not all the way to the end, but close to the dog.  The dog thing is right behind my house.  So it was kind of close to my house, but it was across the fence, but I could see down to see that.

Q.    It sounds like you follow the news.  You watch the evening news, and you kind of followed along with this on --

A.    I do know -- this was before.

Q.    Before?

A.    This was before that happened.  This was the first day.  Yeah.

Q.    Those men who got into the car, did you ever see their faces on the news in mugshots or anything?

A.    No, I didn't look anything up.  I wouldn't -- didn't want to look up anybody else's.  I'm scared.

Q.    Is it possible that they weren't just going to school?  Like you say, they were dressed like Catholic school kids.

A.    Those two kids were, yeah.

Q.    Yeah.

A.    That was the first day.  That wasn't the 9th.

Q.    But -- so was there a car on the 9th or not?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

A.   There was a car, I believe, on the 9th.

Q.   And who was --

A.   I'm not sure.

Q.   You can't recall?

A.   I'm not sure if he was driving because they asked me who was driving, and I said, did he drive? And -- and somebody said, yeah.  I said, yeah, he was driving because he drove both times that I saw him.  I didn't see him drive in either time, but I saw him drive out, because what he would've had to do is come down the driveway, which is a road and make a U-turn and then get on the grass beside the wall, the -- where -- fence. That's what bothered me because nobody ever does that, you know?

Q.   But none of them wore jerseys?

A.   No.  No.

Q.   Did any of them have backpacks on, that you can recall?

A.   I don't think so.  There may have been in the car for the kids.  I don't know.

Q.   None that you saw, though?

A.   No.  No.  Not that I remember.

     MR. MISTOLER:  Ma'am.  I think those are all the questions I have for you.  Roz may have some follow- ups.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

407.423.9900          www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

Toll Free 855-MYDEPOS

THE WITNESS:  Okay.

                    REDIRECT EXAMINATION

BY MS. DILLON:

     Q.   Just a couple really quick follow-ups.  Ms.
Bloom, is your garden in the front of your house?

     A.   Is what?

     Q.   Is your garden in the front of your house?

     A.   When I was able to -- we used to be able to do
it in the front, yes.  That was the front.  Now, we
can't touch it but --

     Q.   Okay.  And does your bedroom window face the
front or the back of your house?

     A.   The very back.

     Q.   Okay.

     A.   And it's upstairs, and it faces the complex
behind me and the -- what we call the dog walk.

     Q.   Okay.

     A.   And then there's a fence, and on that side,
it's very close to the road.

          MS. DILLON:  Okay.  I have no further questions
     for you.  I'm not sure if Counsel has any follow-up
     based on that.

          THE WITNESS:  Okay.

          MR. MISTOLER:  Nope.  I don't have any further
     questions for you, ma'am.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

THE WITNESS:  Thank you.

MR. MISTOLER:  Thank you.

THE WITNESS:  And I'm sorry if I got messed up.

MR. MISTOLER:  No, you don't --

MS. DILLON:  Please don't apologize.  Thank you so much for your time.

THE WITNESS:  And you're welcome.

THE REPORTER:  Ms. Bloom, would you like to read or waive today?

THE WITNESS:  Huh?

THE REPORTER:  Would you like to read or waive?

MR. MISTOLER:  So it is your right to read the transcript that the court reporter has put down, that not a slight on her.  It's -- you know, some people choose to read the transcript and see if it was accurately taken down.  Many people also waive that.

THE WITNESS:  I think you were accurate.

MR. MISTOLER:  Okay.

THE REPORTER:  Okay.  So waive.  Ms. Dillon, would you like to order the transcript at this time?

MS. DILLON:  Not at this time.  I'll follow up after.

THE REPORTER:  Okay.  And Mr. Mistoler, would you like to?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

MR. MISTOLER:  No.  Thank you.

THE REPORTER:  Okay.  I'll get us off record.

   (Deposition concluded at 2:48 p.m. ET)

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE


     I, the undersigned, certify that the witness in the foregoing transcript personally appeared before me and was duly sworn.


Identification:  Produced Identification

*Sara Fodor*

_____

SARA FODOR

Court Reporter, Notary Public

State of Florida

Commission Expires: 07/31/2028

Commission Number: HH 577206

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

362352 Bloom Charlene 02-17-2025

80

C E R T I F I C A T E

STATE OF FLORIDA)

COUNTY OF ORANGE)


     I, SARA FODOR, Court Reporter and Notary Public for the State of Florida at Large, do hereby certify that I was authorized to and did report the foregoing proceeding, and that said transcript is a true record of the said proceeding.


     I FURTHER CERTIFY that I am not of counsel for, related to, or employed by any of the parties or attorneys involved herein, nor am I financially interested in said action.


Submitted on: November 20, 2025.

_____

SARA FODOR

Court Reporter, Notary Public

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

                    **MS. CITRARO:**  Thank you, Judge.  Call Charlene
Bloom.

Thereupon,

                          **CHARLENE BLOOM**

was called as a witness and, having first been duly sworn,

testified as follows:

                    **THE COURT:**  All right.  Ma'am, can you tell me your
     full name, and spell your first and last name for me.

                    **THE WITNESS:**  Charlene Lizbeth Bloom.  B-L-O-O-M.

                    **THE COURT:**  All right.

          Defense, you may inquire of the witness.

                    **MS. CITRARO:**  Thank you.

                    **THE WITNESS:**  I'm sorry?

                    **THE COURT:**  I just said that she can ask you
     questions now.

                          **DIRECT EXAMINATION**

**BY MS. CITRARO:**

     **Q**    Good morning.

     **A**    Good morning.

     **Q**    Ms. Bloom, pardon my intimate question, but can you
tell the Court where you live, your address?

     **A**    1708 Silver Creek Court, Orlando.

     **Q**    Silver Creek Court, is that in the same subdivision
as Little Fall Circle?

     **A**    Yes.  It's Hidden Creek Condominiums.

                    Official Court Reporters
                         407-836-2280

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Do you know Mr. Gonzalez, George Gonzalez?

A    I didn't until recently.

Q    Okay.

A    I had never really talked to him before.

Q    Are you familiar with where he lives?

A    I'm sorry?

Q    Are you familiar with where he lives?

A    Yes, now.

Q    Is it in the same subdivision?

A    Yes.

Q    Okay.  I'm gonna draw your attention to the events of April 9th of last year, 2013.

A    Yes, ma'am.

Q    Did you see anything out of the ordinary that morning around nine in the morning or so?

A    Yes, ma'am.  It was about 8:15.

Q    8:15?

A    Yeah.

Q    Can you tell the Court what you saw first?

A    Well, um, the dogs were barking in the complex behind me because there's a fence between two complexes, and the one dog never barks, so I got up and looked out.

Q    Where are you looking from exactly?

A    From my upstairs bedroom window.

Q    So you are on the second floor?

Official Court Reporters
407-836-2280

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    Yes.  Well, it's two stories.  So I was on the second floor.

Q    And you're looking out the window?

A    That's correct.

Q    Okay.  What did you see?

A    Well, I saw that the gate behind the house, the next subdivision, was open and it never is.  So I wondered. So I stood for a few minutes and the neighbor next door came out, and he had heard the dog barking and went over there too and looked.  He went over and looked, and it looked like someone had tried to get in.  He closed the gate, came back out, spoke to another neighbor who came out at that time and I think it was about the same thing --

Q    Were you still in your bedroom looking out on all of this?

A    Yes.  I'm still in the bedroom the whole time.

Q    Okay.  What did you see next?

A    So they were talking, and I just figured I'd see what was going on.  So I stood there, and pretty soon it looked like she got the phone.  So I figured she called the police.  I didn't know.

Q    Do you know the woman?

A    A little while later the police came, but they came into our side, our complex.  Because I can see from my window directions -- both directions towards the lake and then

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

towards the street, which is the main street of the complex.

Q    So the police responded to your subdivision?

A    I saw the police over there, yeah.  Uh-huh.

Q    Did you notice any individuals or any suspicious activity before the police arrived?

A    Um, right before they got there, um, I saw out of the corner of my eye.  I could see that there was -- because I was looking both directions -- that there were three guys coming and I wouldn't have noticed them except that they took off running to the vehicle, which I didn't realize there was a vehicle.

Q    Where was the vehicle?

A    Behind my fence, like, directly behind my fence where I couldn't really see it.  But they ran from the lake area, like, they climbed the fence and ran towards the vehicle.  If they hadn't run, I probably won't have noticed it.

Q    And can you describe the female that you saw running?

A    Yes.  There were three young men, probably early twenties.  They all three had on long-sleeve dress shirts. They looked like they were going to work or somewhere.  Um, they ran.  There was a driver that had blond hair and was kind of short, and there was two other guys.  One was -- they got in the back passenger door.  The one on the right-hand

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

side was a short guy, kind of stocky.  The guy that was closest to me was taller and thin, but not Hispanic or black, either one.

Q    And could you describe more specifically the driver?  Did you get a look at him?

A    I did.  I was looking -- I was looking out the blinds and the driver was looking -- he looked -- turned around to look at the guy, the man and the woman who had their back to them so they didn't see them.  That's why I went downstairs, because they didn't see the people that got in the car.

So, um, he was standing at the car door and he was kind of looking, and he looked up and he stood there for a minute and just gazed at me.  I don't think he could see me, but he could see me looking out, and he was blond.  He looked like he was probably short, maybe 5'3", 5'4".  Maybe 5'5".  And he was dressed nicely.  Like I say, they looked like they were going to work or to school or something.

Q    Okay.  On that day, April 9th when you were looking at these guys, could you see pretty well?

A    I didn't have my glasses on, which I thought of later, but I could see the people.  Of course, they took -- they ran to the car and then they sped away.  And without my glasses, there was no way I could look at a license tag or anything.  But they were so fast that if they

Official Court Reporters
407-836-2280

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

hadn't done that too, that would have been another thing that I wouldn't have noticed.

Q    So without your glasses, you couldn't read a tag?

A    I -- the other day I could kind of read a tag.  But that morning I was tired.  I hadn't been to bed yet because I was working midnight shifts prior to that, and it was kind of still hard to go to sleep.  So I was tired.  So I couldn't see the tag.  But they went so fast.  They were in a gray, like a -- not a silver, but a gray sedan of some sort.  I figured it was probably like a Hyundai or a Nissan, something like that.  Kind of a 2000 -- earlier 2000 model.

Q    I'm guessing that your glasses are for distance?

A    They are for everything.

Q    Okay.

A    Yeah.

Q    Would you say your vision is pretty well without the glasses?

A    Yes.  I can see people and animals.  So, you know...

Q    So do you feel like you got a pretty clear look at the driver's face?

A    I did.  I did.

Q    So you don't feel like your glasses, it was fuzzy and you were not sure what you were seeing?

A    Not at all.  Not at all.  And the two people that

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

got in the back, I saw them, basically, from the side, but when they got into the doors, I did see their faces.

MS. CITRARO:  May I approach the witness?

THE COURT:  You may.

BY MS. CITRARO:

Q    I'm showing you what's marked for identification purposes only as Defense D.  Do you recognize this scene, this view what you're looking at?

A    Yes, I do.

Q    Can you tell the Court what exactly is that a picture of?

A    That's the entrance to my house to the left -- to the right is the lake, because I think that that would have been the way that the people that were at George's house would have approached the lake because see, you can go to the lake and climb the fence.  And that's what people do all the time, because we are a gated community.

Q    And that would have been the direction that they would have been coming from to get to the car?

A    Yes, that would be correct.  That would be correct.

MS. CITRARO:  May I approach the witness again?

THE COURT:  You may.

BY MS. CITRARO:

Q    Showing you what's marked for identification as Defense F Composite 1 and 2.  There's two photographs here.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Take a look at both of them.

    A    Okay.  Okay those are --

    Q    Do you recognize them?

    A    Yes, I do.

    Q    What are you looking at?

    A    Those are where the fence meets the lake on our side of the property.  It has an extension, like a link fence, and it's easy to go around it or climb it.  And the same -- this is just a larger picture of the same view.

    Q    Okay.  So would that be the fence that it would make sense they were coming from?

    A    Yes.  They would come from my side and go around it or over it.  One of the two.

        MS. CITRARO:  May I approach one more time?

        THE COURT:  Yes, ma'am.

BY MS. CITRARO:

    Q    This is Defense E for identification purposes.  There is two more pictures here.

    A    Okay.

    Q    Can you take a look at those?

    A    Yes.  This is the back of my house and my complex.  It's the dog walk for the complex.  And there's a fence.  And then it shows the next-door condo, which is Liberty Square, I believe, condos on Lafayette Square Avenue or Lane.

    Q    And the second picture?

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    Yes.  In the second picture is, um, where the people were standing.  The car was below -- right below the fence, right across from where the neighbors were standing, but they were facing the other direction.

Q    Okay.  So the view that that picture is showing, would that be your view from the bedroom window?

A    From my bedroom window, that's correct.

Q    So that would be exactly what you were seeing?

A    Exactly.  Exactly.

Q    And the vehicle would have been there where that empty space is?

A    Yes.  It would have been right along the fence. And as I say, I wouldn't have noticed it if they hadn't gone to the car.  I didn't realize it was there until I saw them running.  And then when they took off they sped away.

Q    Okay.  Judging by looking at that picture, does it appear like it's been magnified, like it's closer than it is or does that look about to be the right distance?

THE WITNESS:  That looks about the right distance.

MS. CITRARO:  May I approach?

THE COURT:  You may.

MS. CITRARO:  I'll move all three exhibits and composites into evidence at this time.

THE COURT:  Any objection from the State?

MS. SCOTT:  No.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**MS. CITRARO:**  May I publish?

**THE COURT:**  All right.  What's been marked as Defense Exhibit D for identification will be moved into evidence as Defense Exhibit 2 without objection from the State.

What's been marked as State's Exhibit E or Defense Exhibit E for identification will be moved into evidence as Defense Exhibit Number 3 without objection from the State.

What's been marked as Defense Exhibit F for identification will be moved into evidence as Defense Exhibit Number 4 without objection from the State.

(Defendant's Exhibits 2-4 received in evidence.)

**MS. CITRARO:**  May I publish to the jury as soon as it's marked?

**THE COURT:**  You may.

**BY MS. CITRARO:**

Q    Ms. Bloom?

A    Yes.

Q    On that date, April 9th, when you were looking at these three fellows, the driver you said you got the best look at?

A    Um, I did.

Q    Was the driver this man?

A    No.  No.

Q    Are you sure?

A    I'm positive.

Q    Could the driver have been this man with the large Afro?

A    No.  No.  No one had an afro.  No one did.

Q    Could this man have been the other two passengers?

A    No.  No.

Q    Either one of them?

A    No.

Q    So this man does not look like the person that you saw, any of these three men you saw get into that car?

A    No.

Q    And are you pretty sure of that?

A    I'm positive.

Q    You're positive?

A    Yeah.

Q    You wrote a statement for police?

A    I'm sorry?

Q    Did you speak with the police that day?

A    I did.  The reason I went down, the neighbors didn't see them leave, and I thought I got to -- I know what they look like.  So I went down to talk to him and I talked through the fence, and then I went and drove around and gave him a statement.  My statement was a little -- because I was tired --

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. SCOTT: Objection, Your Honor, nonresponsive.

THE COURT: Overruled.

BY MS. CITRARO:

Q    But you did write a statement in the matter?

A    I'm sorry?

Q    You did write a statement?

A    I did.

Q    Did the police talk to you any more about any further investigation like a photo lineup or anything?

A    Well, they did call me and ask me if I could, you know, if I knew what they looked like, and I explained, you know, that I did.  But, um, I didn't talk to them until after I got the paperwork, and the picture that I saw wasn't the same person that was there and didn't appear to be this gentleman either.  So...

Q    What picture did you see?

A    Oh, on the computer.  The mugshot.

Q    So you saw a mugshot --

A    Yes.

Q    -- of Mr. Valle-Ramos --

A    Right.

Q    -- after he was arrested in this?

A    Well, yes.  I had received two summons.  One said I needed to come.  The second one said I didn't.  So I said, well, I don't know who this is.  So I want to see if I knew

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

who he was, and it wasn't anyone that I have seen.

Q    So that picture, that mugshot, did you not think that was the guy you saw and April 9th?

A    No.  Absolutely not.

Q    When did you offer to do any photo lineup?

A    Well, when he called me, I had explained that I had looked at the picture and that it wasn't anyone that I had seen, so for sure--

Q    So you didn't come in and do a photo lineup?

A    No.  He said he -- I didn't need to come for the lineup.

Q    Okay.  Have the police contacted you at all after that?

A    I'm sorry?

Q    Did the police contact you at all after that?

A    Someone else called me.  I talked to two different people and, um -- but I can't remember what the second call was about.

Q    They didn't ask you to come in for any other identifications?

A    No.  No.  Just for the deposition to you.  That was all.

Q    Okay.  Nothing further at this time.

THE COURT:  All right.  Cross-examination?

CROSS-EXAMINATION

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**BY MS. SCOTT:**

Q    Good morning, Ms. Bloom.

A    Good morning.

Q    Okay.  I want to take you back just a little bit.

A    Okay.

Q    What point did you get home the night before?  You said you work midnight shift?

A    Well, I'm retired, and I had worked night shift for many, many years so my sleep patterns are a little strange.

Q    Sure.

A    So I was home the whole night.

Q    Okay.

A    But I was up all night.

Q    Okay.  So you hadn't yet gone to bed?

A    Well, I was in bed.

Q    But not sleeping?

A    Not sleeping, no, trying to.

Q    Correct.  When was the last time you had actually slept prior to that morning?

A    Um...

Q    Was it the night before?

A    During the --

Q    Or was it during the day?

A    I take naps during the evening.  (Laughing.)

Q    Okay.  Okay.  How long of a nap did you have?

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A     Probably an hour, hour and a half, yeah.

Q     And prior to that, was it the previous night that you had a full night's rest or the previous day?

A     No, during the day, yeah.

Q     Okay.  So probably about 24 hours before this happened you were going on an hour's worth of sleep at this point based on that nap?

A     Yeah, probably so.  Yeah.

Q     Do you -- at what point when you -- you stated you looked out of the window and you noticed out of the corner of your eye and you weren't wearing your glasses -- I presume you weren't wearing your glasses because you were in bed, correct?

A     Right.  Right.

Q     Normally speaking when you get out of bed, you grab your glasses and put them on and continue with your day?

A     Normally I do, yeah.

Q     When you saw -- when you looked out the window and you said you saw these people running --

A     Uh-huh.

Q     -- how far, if you had to give a feet estimation, I know that's hard, but how far is your window from where these people were?

A     Um, second floor, there's a fence.  Um, gosh, I don't know.  Probably --

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Like 100 feet?

A    Maybe 50.

Q    Okay.

A    Yeah.  Maybe 50 feet.

Q    Okay.  And you stated before that you couldn't really see the car from the angle and you probably wouldn't --

A    I wasn't -- see what I did, the dog was barking --

Q    Uh-huh.

A    -- so I looked out because this particular dog never barks.  The dog next door always barks and they were both barking.  So that's what drew my attention to even look out.  And I was just glancing, because I know the lake, so I'm glancing at the lake and back, looking around to see what, you know, was going on.  So I just -- I saw them come out.  I saw him come out and check the gate next door because it was wide open and the lady doesn't live there.

Q    Just to clarify, when you're observing all of this, you are still on the second floor?

A    Yes.  And I didn't see the car at that point.

Q    And when -- at what point did you see the car?

A    Just when I saw them come from the lake running to the vehicle.  And that's when I realized oh, there's a car there.

Q    Okay.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    And that caught my attention then.

Q    And then you looked at the car?

A    Yes.

Q    And then that's when you saw the driver?

A    Yes.

Q    Okay.  And there -- you stated before that they are running, get in the car and speed away?

A    Yes.

Q    So it all happened very quickly?

A    Yes.  Except he stopped and looked up to try to see which window it was, I guess.

Q    Right.  Would you say your memory -- when you see something, would you say your memory is better closer to the event that that happened, or later on in that?

A    Well, to be honest with you, I jotted it down, because I thought, you know, when I went down and talked to him, I thought I need to probably write this down.

Q    And him was law enforcement?

A    Yes, the police officer.

Q    And you wrote a statement that day?

A    I did.  Correct.

Q    Okay.

MS. SCOTT:  May I approach the witness?

THE COURT:  You may.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

BY MS. SCOTT:

Q    Do you recognize that?

A    Yes.

Q    And is that your statement?

A    Yes.

Q    Can you read that statement to yourself and let me know in there where you show -- where you tell the description of the individuals other than what they are wearing?

A    Okay.  Yes.

Q    Do you remember -- can you tell me from your statement that you wrote that day what description did you give to law enforcement as to these people that you saw?

A    I didn't give it to them much because I realized later oh, I could have told them this, this and this, and I didn't give it.

Q    But minutes after it happened, you didn't tell them those details?

A    No.  No.

Q    Okay.  When you went downstairs, were there -- was there -- who did you see when you went down there other than law enforcement?

A    Okay.  There were the two neighbors on the other side complex, they were standing talking, and then they had their backs to the guys when they got in the car.

Official Court Reporters
407-836-2280

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Okay.

A    That's why I went down.

Q    One of the neighbors, is it a female?

A    Yes.

Q    Do you know who she is?

A    She's moved.  I didn't know her name.  I don't know their names.

Q    Okay.

A    I just know who they are, you know.

Q    How long had you lived in that apartment complex?

A    Almost 14 years.

Q    Okay.  And I'm not trying to offend you, so please excuse this question, but can you tell us how old you are?

A    I'm sorry?

Q    Can you tell us how old you are?

A    Yes, ma'am.  Sixty-five and a half.

Q    Okay.  Thank you.  Law enforcement, when you told them, they didn't show you a photo lineup, right?  They never ever went back out and showed you a photo lineup?

A    No.  No.

Q    And that was because when you called in response to your subpoena, you said, the guy I looked up on the website doesn't look like anybody that I saw?

A    Right.  When they called me, right.

Q    Okay.  And so the first time you had seen any

Official Court Reporters
407-836-2280

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

pictures was ones that you had looked up yourself months after this event occurred?

A    Yes.  Because -- see, I received the first subpoena probably in August.

Q    And this occurred back in April?

A    And then I got another one saying I didn't have to come, so I thought well, I'll go look to see who it was, you know.

Q    So just to clarify, this happens early April?

A    Uh-huh.

Q    You write your statement?

A    Uh-huh.

Q    You go on with your life, nothing happens with this case, meaning no one is talking to you about it, no one is showing you anything.  Then when did you say -- was it August that you got the first subpoena?

A    August I got the subpoena, and I didn't know who it was.

Q    And so in August you pull it up on the computer, and that's when the first time you see a photo of anybody related to anything that could be linked to the incident that happened back in April?

A    That's correct.  That's correct.

MS. SCOTT:  Thank you.  I have no other questions.

THE COURT:  All right.  Any redirect?

Official Court Reporters
407-836-2280

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. CITRARO:  Just briefly.

REDIRECT EXAMINATION

BY MS. CITRARO:

Q    Did you get a look at pants or shorts?

A    Um, long pants.

Q    Long pants?

A    And long-sleeve shirts, dress shirts.

Q    Did you notice if they were wearing gloves?

A    No gloves.

Q    No gloves.  Did you notice any backpacks?

A    Nothing in their hands or anything, not carrying anything.  No backpack or anything.

Q    Okay.

A    It might have been something different, I don't know.  Because I didn't realize there was something going on across the street where the actual thing happened until the police officer told me that there was something over there, too, in my complex, because I thought it was basically --

Q    And that's what turned out to be Mr. Gonzalez, correct?

A    Right.  Uh-huh.

Q    Okay?

MS. CITRARO:  Nothing further.

THE COURT:  All right.  Thank you, ma'am.

THE WITNESS:  Thank you.

Official Court Reporters
407-836-2280

# C E R T I F I C A T E



**Organization:** Office of the Public Defender - 9th Circuit - Florida
**Section:** Public Defender
**Division:** Orange and Osceola
**Case Number:** 13-CF-005146-A-OR
**Case Style:** State vs. Jorge Valle-Ramos
**Deponent:** Charlene Bloom
**Deposing Attorney:** Carli Citraro
**Other Attorneys in Appearance:**
**Deposition Recorded On:** Thursday, October 10, 2013
**Duration:** 0 Hours, 27 Minutes, 0 Seconds

**\* Note: This media was uploaded to Depotek from our client for transcription and was not recorded using Depotek's secured recording systems. Therefore, Depotek can not attest to the chain of custody of the original media or have anyway of knowing if the audio is original, edited or altered in any fashion.**

DepoTek Digital Recording Services certifies that the foregoing

transcription is true and correct to the best of our transcriptionist's ability.

Dated this 22nd day of January, 2014,

**Digital Certification Number:**
**UPLOADED-WMA-635254709435625000-133**

Depotek Digital Recording Service
PO Box 1686
Orlando, Florida 32801

Page 1 of 19

**P001386**

WHEREUPON:

CHARLENE BLOOM

was examined and testified as follows:

DIRECT EXAMINATION

BY CARLI CITRARO:

Q: All right, we're just gonna go right on the record.

A: Okay.

Q: This is 2013-CF-5146, State of Florida vs. Jorge Valle-Ramos.  Carli Citraro on behalf of Mr. Valle-Ramos.  From the state attorney's office we have –

Q: Rachel Garcia.

Q: And here to be deposed, can you state your name for the record?

A: Charlene Bloom.

Q: Great.  Um, now you're being recorded.

A: Okay.

Q: Because everything that you say here, it's – it's picking you up on the computer.

A: Okay.

Q: Uh, this is simple.  Have you ever been deposed before?

A: No.

Q: Okay, it's a simple question and answer.

A: Okay.

Q: But you're on the record and you're sworn to tell the truth.

A: Okay.  **I see**.

Q: If my question confuses you, let me know.  I will rephrase.

A: Okay.

Q: If you don't ask, then I'm gonna assume you understood my question.

A: Okay.

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001387

Q: Good.

A: All right.

Q: Always answer out loud.  Otherwise it can't pick up your answer.

A: Okay.  Right *[clears throat]*.

Q: It can't see a shake or a nod.  Okay, great.  Um, and today is October 10th, 2013.  It's 2:27 PM.  All right, so this was back in April of this year.  Do you remember what we're in reference to with this ____ _____?

A: Yes, I do.

Q: Okay.

A: Yes, ma'am.

Q: What do you remember seeing that day?

A: Well, I live in Hidden Creek Condominiums and my backyard faces into the Lafayette Square Condominiums.  There's a fence between us.  Um, I – my bedroom is upstairs and I was trying to go to sleep because I was awake all night because I'm used to being up all night.  Anyway, so from working the night shifts.  Um, I couldn't get to sleep.  I heard a noise.  The dogs behind were barking and they don't normally.  So I looked out.  I saw my – the neighbor behind me's gate was open and she goes to work at Disney and never leaves it open.  So I was a little concerned.  So I was looking out the window.  Well, then I noticed that the neighbor next door, the dogs were barking.  So he came out and went and checked.  Okay, so then he, um – let's see.  What next?  Um, he – the girl next door to him came out to go to work, so they started talking about the gate being open.  I could tell.

Q: Who are these people?  Do you know their names?

A: I don't know their names.

Q: Okay.

A: I really don't.  I don't know them.  I just know them from seeing out my window and

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001388

so anyway, so I'm watching them. They're talking because sometimes there's – they kinda get upset with each other and I thought, "Well, I'll just keep an eye on it." And the next thing I know, I see – I look – I see these guys running. And then I noticed there was a car parked directly behind my house at the fence. Three young men, one, uh – the driver was blonde haired, uh light skinned. Uh, they all dressed in dress clothes like they were going to work. But they came running to this car. If they hadn't ran, I may not thought of anything, you know? So I saw them running and I thought – and the bad part is, I didn't have my glasses on, but I didn't wanna leave the window because I was afraid I'd miss something, you know? And I might need to know. So I'm looking and there was a driver that was blonde haired with light skin. I don't know what color eyes. I couldn't see. Long sleeved shirt, short, thin. Um, there were two guys that ran to the back of the car. And all I got of them was they were dressed in nice clothes. The one that got in on the side by where I could see was tallish. He had dark hair, but it seemed to be – if I remember correctly, it was like, straight. It was flat, you know, regular hair. I don't know how to call it. And then a –

Q: Not like an afro style?

A: No.

Q: Okay.

A: And then the other guy that got in the other side, he was a short, stocky guy with light brown hair and they were all dressed in long sleeved shirts and dress pants. And I thought, "Oh, man. They're probably in a hurry to go to college." Well, then I thought maybe she'd call the police. I don't know how I knew it, but I just had that feeling. And I'm watching and then the police department – three – three police cars came into ours and I thought, "Oh, man. They're probably looking for these guys." So I stayed and I kept watching, because I can see over to Little Falls Court is where the robbery was. And I can see to the mailboxes and over to see that. Well, they came down the main for, uh,

P001389

Hidden Creek Court and turned down –

Q: Are you talking about the cops or the car that was –

A: The police.

Q: Okay.

A: The police.

Q: Yeah.

A: Now, the – the guys jumped in the car.  When he first got there, when he – he looked up because they looked around.  He turned around to look at the people to see if they were watching.

Q: Who's – who's he?  Who's _____?

A: The driver.

Q: The driver.

A: I'm sorry.  The driver looked at – turned around and looked to see.  He was the only one in the front.  The other two got in the back.

Q: Okay.

A: And he looked to see and of course they had their backs to him because they were talking to each other.  And they were kind of together.  So um, then he – he's turned to get in the car and he looked up and he saw me looking out.

Q: Okay.

A: And he stood and he stared at me and I thought, "Oh, no." *[Laughs]* You know?  So anyways, they jumped in the car and they took off so fast.  And I didn't have my glasses on or otherwise I would've gotten the license tag number.  Um, it was a gray – not a dark gray and not a silver, but a gray, um, I would say an older model – it's either a Hyundai or a, um – what's the Nissan called?

Q: _____.

A: Um, oh, shoot.  I can't remember the name of the car.  It used to be a Datsun Nissan

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001390

but it's – now it begins with an M, but I can't think of the kind of car. But it was a small sedan. And I didn't get to really see much of it. I just saw the roof and they took off and they spun out and went past those people. And then they turn around. They saw them leave, but I don't know if they got a look – look at them or not, but um, I watched and then I found out that there wasn't a robbery. I went downstairs, because I thought I probably saw much more than anybody else did, so I'll go down there, because the police came around to them. And I talked to the policeman and he asked if I would give a statement. And I didn't give a very good statement because I was sleepy *[laughs]*. Afterwards, I thought, "Well, I should have told him blond, brown," you know? That kind of thing. But um, I really thought that they were all, um, white skinned, light skinned. Um, they – that's all basically I know. I've heard – I heard what was on TV and I talked to the policeman and gave him my deposition – I mean my, uh – my statement. I drove around, because we were talking through the fence, and so I drove around and gave him my statement. And then I found out that there had been a robbery of two places on Middle Falls Court, which was the street that I saw the policeman pull into. And by then, there were three police cars and crime scene assistants and stuff. So, um, that's basically all. Now I – I did get asked to come to see you all and I didn't know the name at all, the name knew nothing to me. I thought, "What is this about?" But I wasn't gonna look at the computer, because I didn't know if that was okay or not. So then I got a letter from you saying I didn't have to come. So the first thing I did, I ran upstairs and I pulled him up at Orange County to see what it was about. And when it listed the date, and it listed, you know, it was a robbery with a burglary with people inside, I knew that people were inside because of the TV thing. And um, I – I looked at the face. The face looks familiar to me. I've seen him somewhere, but I don't think he was the – the – the third person that got in the car with the dark hair. I really don't.

Q: Are you talking about a face you saw on – on TV?

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

**P001391**

A: Um, no. On – on the site under his name. It was him. I had pulled it up and then after that, I got another summons to come down. And I thought, "Oh, man, maybe I shouldn't have looked." But I wouldn't have had a clue what it was about, so – because I even called and told them here that I don't know what it's about. I have no idea, you know?

Q: What site would you have been looking at that you're looking at a face?

A: Uh, I went to Orange County – did I go to Orange County Sheriff? And then I went to jail, I think.

Q: Uh-huh.

A: Or Orange County Jail, one of the two.

Q: Okay.

A: Because I know it was Orange County, because Orange County had delivered the – the uh, thing to me through the mail. And then I got another one from the state.

Q: Were you looking at, like, an inmate picture?

A: Yes. Yes.

Q: What did you do, look up the last name?

A: Yes. I looked up his whole name.

Q: Yeah.

A: If you go to Orange County, um, Orange County –

Q: This thing is super slow.

A: **Sheriff's Office**? And I didn't know if he was still in, or out, or whatever, you know? I –

Q: Do you mean – was it like the – the inmate database that you were looking at?

A: Yes. It was.

Q: Like this? And then you just looked up his name?

A: Right.

Q: Did you look up Valle, V-A-L-L-E?

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001392

A: I put Valle-Ramos.

Q: And you found him in there?

A: Yeah. Mm-hmm.

Q: When did you do the search?

A: That was, um, the first? Let me see. When did I get the second letter? Let me see. One second. One – come on. Where did I put it?  ___ ____ my purse *[laughs]*. ____ _____ ____ _____. Okay, so this is my _____ form for me. Yeah. Okay. I received this about August 11th, so it was right around August 11th.

Q: That one's from me.

A: Yes. Uh-huh. To say I didn't need – oh, were you Kristen?

Q: Um, I'm Carli.

A: No? All right.

Q: But she would have sent this to you.

A: Okay. Okay.

Q: And what do you mean you didn't need to come – oh, you mean it was a cancellation.

A: It was a cancellation. Right.

Q: I see what you're saying.

A: And I thought, "Oh, good."

Q: But you looked him up at that time and you found him in here?

A: I found him in there, in that.

Q: And you looked up Valle-Ramos?

A: And then I maybe had to go just to Ramos, but I did start with Valle-Ramos.

Q: And you're sure it's the guy that's in – in question here that – that you found?

A: Well, from what it showed, as far as the – the, uh, why he was arrested, it looked like him, because it was a larceny of, um – not a larceny. A –

Q: Can you see this picture here? Is that the picture you looked at?

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

**P001393**

A: Yes, that's the picture I looked at.

Q: That's the face you looked at?

A: That's the picture and the face I looked at.

Q: So you found him on the, um, database.

A: On the internet. I did.

Q: You looked at his face.

A: I did.

Q: And you said, "That's not the guy"?

A: I said, "That can't be the guy who got in the car, but he looks familiar to me."

Q: Okay.

A: Now the reason I say that, and you're gonna think this is weird, but two times – I don't know how long. I don't know if he's still in jail or if he's been in jail the whole time or ____ if he got out, because in May, um, one day – I have this electrical thing in front of my house. It's like a box. And one day I looked out and there were four people sitting on the box. Well, the – and you're gonna think this isn't important, but it might be. Um, there were two guys and two girls. I think the one guy was this guy, if he was out then. I don't know. Um, he was with a stout guy who could have been the other guy that was with them, and two girls. They sat there for a long time and then they just left. Well, I thought nothing about it. And then – and I went out to do some gardening around the 4th of July, I believe it was. And um, I had my head down and I *[laughs]* – I heard some people laughing and walking, so I looked up. I came up and as I came up, they got quiet. And the guy – the guy that was – who I think was him was talking and he said, "I put it right over here. It's over here somewhere. It's over here somewhere." That's what he said. "It's over here somewhere."

Q: Was it this guy who was saying that?

A: Yeah, it was that guy talking. And he was walking and then he saw me after he said

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001394

that. He was talking to the green thing, the box. He was walking there and then he – he just – he kinda did this thing and then he – he struggled to change what he was saying. I could tell.

Q: Mm-hmm.

A: And he said, "Oh, oh, oh, yeah. Yeah. It's over here." So I – I put my head up. I had put my head up before that and they saw me. And I said, because I'm inquisitive – I said, "What's over there?" Because there's not anything but grass. And he said, "Oh, uh, uh, um, I put trash or something over here." And I thought, "That's odd." That was before I saw the picture. And then – so they stayed for about two minutes. They walked in front of my house and they looked all around and then they left. And they never came back again, but to me it was odd and when I saw that picture, I thought, "You know, that could be that tallest – taller guy that was with them. I think it probably was." But now if he was in jail, of course it couldn't have been him at that time. But I don't know when he got out. They didn't do anything.

Q: He wasn't in jail during July.

A: No? Okay. Well, my fear was the driver said, "It's a window there. Go check it out." Or whatever and he came back around. I didn't see him the day – the day that I saw three people getting into the car. I did not see him. He wasn't one of the three that got into the car that I saw. But I don't know. People have friends, you know?

Q: So you – you – you saw his face that day in July and that day – how long before was it that you saw –

A: In May. May.

Q: Okay, so May and July.

A: ____ ___ _____ unfortunately.

Q: And you –

A: **And I'm too good**.

**Certified by Depotek Recording and Transcription Services**
**Digital Certification Number:** UPLOADED-WMA-635254709435625000-133

P001395

Q: You saw him with some people and you're sure it was this face?

A: I'm not positive, but I'm pretty sure that this was the guy that was with some.

Q: And this face you're pretty sure is not one of the faces of the guys in the car that day?

A: That got in the car – that got in the car, no, no. If there were any more people involved, I don't know. But as far as I know, there were the three people got in the car is all I witnessed.

Q: Tell us about your eyesight. You said you didn't have your glasses on. How well can you –

A: Well, I can see distance. And I mean I can see them fine. But I couldn't see, like, the tag and I went, "Oh, my glasses." And by the time I grabbed for the glasses, it was the case that they were gone. They were long gone.

Q: So you can't read far away.

A: No.

Q: But you can see pretty well far away?

A: I can see far away, but I can't read far away.

Q: Do you know what, like, your prescription is?

A: It's um, 1 – 225 maybe. Maybe 225.

Q: _____.

A: So it's – but it's for – more for – it's kinda like, uh – because I had surgery a long time ago to make it mono vision, so I can't read up close and I can't read that far. But I can see. I can see the TV without them, you know? I'm fine.

Q: So would you – would you say you saw their faces fairly clearly?

A: I saw the driver only. The driver and the only thing I saw on the other two were the clothes as they were walking up – running up – the clothes and then I saw the top of their heads.

Q: So you saw their hairstyles?

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001396

A: Yeah. Yeah. That's all I saw. Yeah.

Q: Okay. Did – did any of the three people, when you saw their hairstyles or whatever you did see, did any of them have a big afro?

A: No. No.

Q: No big afro?

A: No.

Q: You're sure?

A: I'm positive. The dark haired taller guy –

Q: Not for those guys.

A: No. The dark haired taller guy that I saw had almost straight hair or flat, almost flat. Flat hair and it might have been straight. I don't know. But it was flat where – because I would have remembered if there had been – because of the one thing I was thinking at the moment, and I was gonna put it on the paper and I forgot. They looked to me to be all white, you know? They didn't' look –

Q: Did they look Hispanic and white?

A: No. No.

Q: It was just Caucasian white?

A: Yeah. Yeah. They did. They did. So those three guys for sure weren't him.

Q: Did you see them – uh, did you see any latex gloves on any of them?

A: No one had anything in their hands. They didn't have any gloves on. They were running. Like I say, if they hadn't been running, I would've thought, "Oh, somebody parked their car there. They're on their way to school or to work." If they'd just nonchalantly walked, I would've never noticed it, because I didn't even notice the car was there till I saw them running to it. And then I went, "Oh, there's a car down there." You know, because –

Q: Did you see where they ran from?

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001397

A: Yes.  We have behind – okay, my house is here, okay?  There's a lake here.  You go around the lake.  The fence from Lafayette Square extends into the water.  But ours – or actually it's the other way around.  Theirs stops.  Ours extends.  We have a wooden fence. But people continually walk to the lake.  They will climb it and they don't get wet.  They go foot by foot and get over.  They don't get wet.  So I'm almost positive that that is where they went.  Now, the place where it – the robbery was is – there's a main street. There's another section of condos to the left of that and that's where it was back in the corner.  So basically, I'm on the same – there's a street between us and we're apart, but I'm exactly in the same physical direction that they are, but just further down.  Um –

Q: Can you see the – the location of the house where this burglary occurred?  Can you see that from where you were looking?

A: I can't.  I could see the police officers' cars in the – because I did this and kinda went to the side.  I could see the police officers' cars, but I don't know which house it is or where it was.

Q: Okay.

A: But I know it was in the corner.

Q: Would the direction that you saw them coming from, would that be consistent with them running from Mr. Gonzalez's house?

A: Yes.  It could be.

Q: It could be?

A: It could be because they could come – they were – they – I think they ran out the back, because that's how they were getting in, apparently, according to the TV.  They were getting in the back doors and the lady next door was home when they went into hers.  She didn't know they were there and she came down and saw them or saw them just leaving. They didn't get anything in her house, I don't think.  But anyway, um, to come out the door, if they went to the right, crossed the main street, went directly in front of my place,

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001398

it goes right to the lake.  And around my building to the end of the lake is where the fence is.  And that's how they got to where they were.  They – they definitely came that way.

Q: How far would you estimate the distance from where the vehicle was parked to Mr. Gonzalez's residence?

A: Oh, let's see.

Q: Bird's eye, so like wherever they would have –

A: Bird's eye?

Q: – they would – would have run from.

A: Okay, um, the car.  Okay, from my – let me think.  I don't know how many feet it is.  Um –

Q: We're talking less than a mile, right?

A: Oh.  Oh.  ____ ____ _____.

Q: We're talking less than half a mile?

A: By all means.  By all means, yeah.  It's – let's see.  There's how many?  There's – I think there's four – four units and they were in the corner as far as I know on this side and the lake is over here.  There's – the street is here.  There's four – there might be five.  There's four or five units here and then it goes around the side.  So probably if they were running the whole time, I don't know if they were, because first they were walking as they – because I saw them come from that direction.  I went, "Oh, that's odd."  Because I – I noticed something moved as I was looking out.  And I saw them kind of walking.  And then they started running.  And they ran to the car.  As I saw them, they ran to the car.

Q: Were they all three together?

A: Yes.  Yes.  These three were together and the driver went in the front and the two guys got in the back.  The taller guy with the dark hair got in on the side by me.  And then the shorter, stout guy got in on the other side.  So it would be he got in on the right.  The

Certified by Depotek Recording and Transcription Services
Digital Certification Number:  UPLOADED-WMA-635254709435625000-133

P001399

other guy got in on the left in the – the backseat.

Q: Is – where they left – where that car was and then they took off, is that where the police arrived, right where they were parked?

A: Not then, no. The police came in. I actually thought I'm going – I'm – I'm standing there because somehow I knew she called the police. I don't know how. But anyway *[laughs]*, I'm standing there and I'm thinking, "Oh, wait. They're in the wrong place," because I saw the police coming down our main road. And I thought, "Oh, no. She needs to re-call," and I'm standing there to see if I should call again or if they should call. And I could see she was making another phone call. And I felt she probably was calling them. I don't know. I don't know them, so I don't really know, but this is what I figured. And about that time, then a few minutes later, the police came around to her, because I guess she re-called, so they came over too. So there were three next door and then one to us in the back. And then I talked to them through the fence and I just said, "I was upstairs and I saw this." And he said, "Oh, do you mind giving a statement?" And I said "No," *[laughs]* as I always do. I – I – if – if something was wrong with me, I'd want someone to help, you know, whatever I can help. So um –

Q: What floor do you live on?

A: I – I had an up and down, two story.

Q: So were you on the second story?

A: I was on the second floor, looking out my bedroom window, which faces – it was literally right – the car was right behind the fence. But I didn't notice it because I was looking out until they ran to it. And it was gray. My fence is red, but I didn't really notice that car until they ran to it. And then I went, "Oh, there's a car parked down there."

Q: Your address is 1708 Silver Creek?

A: That's correct.

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001400

Q: Is there an apartment number on that or that's just the _____ the unit?

A: That's the address, yeah.

Q: Okay.

A: Yeah. Well, they call it unit 97 for the – for the proper papers, but my address is 1708.

Q: So if I drove by there and it would say 1708, I would know that was where you lived?

A: Exactly. Exactly. Yeah.

Q: Okay. I think I'm gonna need to scout this one out.

A: Yeah.

Q: Because this is an interesting layout. Um –

A: I can let you get in it ____ ____ _____ _____ because it's – it's secured. So that's another thing. They – they did that roundabout because the gate was there, and you have to either be buzzed in or follow someone in.

Q: Mm-hmm.

A: People do that all the time then.

Q: Are there any trees or other obstructions that would have gotten in your way of seeing them?

A: No. No. It's direct. It's nothing there. Yeah, it's the dog walk is behind my house and then a fixed fence and then they have a patch of grass where they parked and then a regular drive.

Q: Did you hear or see anything else suspicious at that time?

A: That was all. I mean just their – the way they were running, because I went, "Ooh, wait." Because I put two to two together, because the gate next door is open and she wouldn't have left it open. Because see, their gates are basically their front door. They have big gates. They open up and then they go into their backdoor, which is their main entrance on Lafayette Square. So that was basically their main entrance and I don't know

**Certified by Depotek Recording and Transcription Services**
**Digital Certification Number: UPLOADED-WMA-635254709435625000-133**

**P001401**

that that place was even touched, other than the dogs barked. That's what bothered me, because the dogs don't bark, you know, unless you're – he's out there playing with them.

He has a big collie and she has her little black and white something. I don't know what it is *[laughs].*

Q: Do you – uh –

A: But –

Q: Do you have any idea if it's possible that the police were responding to an incident, but it was not that vehicle of three guys that ran into – do you think that something else could have gone down where you lived that you would have missed?

A: Well, that would be possible, except for George. I don't even know George's last name. He was on TV and he – he actually walked in on them and he saw them.

Q: Mm.

A: And he did see there were three or four. I don't know which and I – I thought, "I only saw three." He's coming in at three, I think, but I only saw three. But he actually saw the guys. He pepper sprayed them, so he got the look at them.

Q: Do you know what he thinks he saw?

A: I didn't know it. I talked to him yesterday for two seconds.

Q: ____ ____ _____?

A: And I just said, "Did you get deposed up there?"

Q: Okay.

A: And he said, "Yes."

Q: Okay.

A: And we left it at that.

Q: Um, okay. I don't think I have any other questions. Do you have any questions?

Q: No questions.

A: Okay.

Certified by Depotek Recording and Transcription Services
Digital Certification Number: UPLOADED-WMA-635254709435625000-133

P001402

Q: Okay.

A: Okay, good.

Q: Um, all right.  It – when we take a deposition, it's all audio recorded.

A: Mm-hmm.

Q: But what we can do is we can transcribe it into writing.

A: Mm-hmm.

Q: Which means somebody listens to it and then types it up.

A: Okay.

Q: And it becomes writing.

A: Okay.

Q: Um, if you – if we do that at any point, you have a right to read it to make sure that there's no typos.

A: Okay.

Q: That what you said is what in fact got down on paper.

A: Okay.

Q: You can't change what you said.

A: Right.

Q: But you can make sure that those were the words that came out of your mouth.

A: Okay.

Q: Do you wanna read it or do you wanna waive that right?

A: Um *[laughs]*, if it's gonna be just what I said, I guess it wouldn't matter.  I mean –

Q: All right.

A: Is there any way that that couldn't –

Q: Sometimes typos occur, which is why it's up to you to waive it, waive the right, if you're not interested in checking.

A: Will I need to come back down to do it?

**Certified by Depotek Recording and Transcription Services**
**Digital Certification Number:**  UPLOADED-WMA-635254709435625000-133

P001403

Q: Um, what – what we could do is we could just give it to you on the day of, I think if –
if this is a trial.

A: Okay, yeah.  I'll read it.

Q: We'll just let you read over it.

A: Oh, okay.  Okay, fine.

Q: Um, could you get a good phone number for us on the record?  Just say it out loud.

A: Yes.  407 –

Q: Mm-hmm.

A: 273 –

Q: Mm-hmm.

A: 4769 is my home.  I can give you the cell if you'd like that too.

Q: Great.

A: 407-234-5379.

Q: Okay, great.  Okay, um, I'm going to stop this at 2:52 PM.  Uh, and for the record, when I was showing her a picture, I was showing the inmate management system photograph of his booking photo from April 24th of this year.  Um, and I showed her that on my I – iPad.  And it is 2:53 PM.  I'm closing this call.  **Okay**.

[End of Audio]

P001404

# ORLANDO POLICE DEPARTMENT

Case #: 2013-146382

## Statement
Please fill out in full detail

| Date of Statement: | Month: 04 | Day: 09 | Year: 2013 | Time: 0870 |
|---|---|---|---|---|

Offense: Res Burglary

| Date of Offense: | Month: 04 | Day: 09 | Year: 2013 | Time: 08 00 |
|---|---|---|---|---|

Suspect (last, first, middle): UNK.

Location of Offense: 1628 Little Falls Cir

District: T-2

Person Code: W

Name (last, first, middle): BLOOM, CHARLENE ELIZABETH

Age:

DOB: 09-14-48

Race: W

Sex: F

Address Residence: 1708 SILVER CREEK CT. ORLANDO, FL

Zip: 32807

Phone: 4072734769

Address Business:

Zip:

Phone:

Email Address: CBloom1@cfl.rr.com

Type of ID shown: FL DL

ID# if applicable: B450-105-48-834-0

I, CHARLENE BLOOM, do hereby voluntarily make the following statement without threat, coercion, offer of benefit, or favor by any persons whomsoever.

08:15 Looked out the window upstairs - saw 3 young guys running to their car, they were looking towards my neighbors talking to each other. Guys small built + height with dress shirts long sleeved, dressed nicely like school or college guys. CAR was gray compact maybe a Hundai or Datsun. They took off fast + sped off. Spoke to officers about I saw.

Sworn to and subscribed before me, this 9th day of APRIL 2013

OFC. _____ OPD/LEO

Notary Public ☐    Law Enforcement Officer ☒    Name Key 5261

Personally Known ☐    Produced Identification ☐    Type_____

I swear/affirm the above and/or attached statements are correct and true.

Signature: x Charlene E. Bloom

My signature below means that I refuse to prosecute the person(s) named above for the alleged crime(s) that occurred to me or to the property under my control.

Signature_____ Date_____
(Departmental policy prohibits use of this section in domestic violence cases.)

Victim Rights Booklet provided?    Yes ☐    No ☐

I will testify in court and prosecute criminally.    Initials:

Miranda Warning Read?    Yes ☐    No ☒

Page 1 of 1

1113.9  6/7/11          White: State Attorney    Yellow: Records

**P001385**

use of diligence"; and (2) is "of such nature that it would probably produce an acquittal on retrial." *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (citations and quotations omitted). "To reach this conclusion the trial court is required to consider all newly discovered evidence which would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." *Id.*

The newly discovered evidence here concerns a sworn affidavit executed by Ms. Szewczyk. *See* Bethany Szewczyk Aff. 1, Dec. 1, 2021 ("Exhibit A"). Ms. Szewczyk's affidavit arose from the discovery of an individual named Amos Matthew Ortiz. Mr. Valle-Ramos and Mr. Ortiz bear a striking resemblance to one another. *See* Figure 1; *see also* Exhibit B.[1] Mr. Ortiz also has an afro-style haircut in his driver's license photograph. *See* Figure 1.



*Figure 1: Amos Matthew Ortiz (left), Jorge R. Valle-Ramos (right)*

Approximately two weeks before the burglary, Mr. Ortiz was for possession and purchase of cannabis at Lake Underhill Park—approximately 2.2 miles from Mr. Gonzalez's home. *See*

---

[1] Exhibit B consists of a composite of Mr. Ortiz's and Mr. Valle-Ramos' respective driver's license photograph.

9

P000454