**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| JORGE VALLE-RAMOS, | ) |
| | ) |
| Plaintiff, | )    Case No. 6:24-cv-1276 |
| | ) |
| v. | ) |
| | ) |
| CITY OF ORLANDO et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Jorge Valle-Ramos was just 19 years old when Defendant Michael Stanley framed him for a burglary he knew Valle-Ramos had not committed. There was never any legitimate evidence linking Valle-Ramos to the burglary. Despite knowing that, Stanley manipulated two eyewitnesses—the victim and a neighbor—into falsely identifying Valle-Ramos as the perpetrator. Stanley also suppressed key evidence that would have helped Valle-Ramos prove his innocence. Based *solely* on the two fabricated eyewitness identifications, a jury convicted Valle-Ramos of burglary. As a result, he spent two years incarcerated and another five years on probation for a crime he had nothing to do with. Valle-Ramos maintained his innocence throughout his criminal proceedings and incarceration. After his release, he sought post-conviction relief and ultimately secured the reversal of his wrongful conviction. Valle-Ramos brings this suit to obtain some measure of accountability and redress for the devastating harm that Stanley caused him.

Defendant now moves for summary judgment on all claims.[1] But summary judgment is unwarranted on this record because a jury could reasonably find for Valle-Ramos on each of his

---

[1] Valle-Ramos no longer presses claims against Defendant Daniel Brady. He opposes Defendants' Motion for Summary Judgment only as to Counts I, II, VI, and VII in the Amended

constitutional claims. For example, a jury could reasonably conclude that Defendant sought a warrant to arrest Valle-Ramos without even arguable probable cause, which constituted malicious prosecution under both state and federal law. A jury could also reasonably find that Defendant violated Valle-Ramos's due process rights by fabricating evidence against him—specifically, by purposefully manipulating unwitting eyewitnesses into falsely identifying Valle-Ramos at trial. And independently, a jury could reasonably decide that Defendant violated Valle-Ramos's due process rights by purposefully suppressing or destroying *Brady* evidence. Defendant also moves for summary judgment on Valle-Ramos's claim for intentional infliction of emotional destress, but Defendant's arguments are cursory and undeveloped. The Court should treat these arguments as forfeited. Because the record is replete with genuine factual issues that a jury must decide, summary judgment is entirely inappropriate.

## FACTUAL BACKGROUND

The following evidence creates questions of fact that must be decided by a jury and precludes entry of summary judgment for Defendant.

## I.    Unknown Perpetrators Burglarize George Gonzalez's Residence.

The morning of April 9, 2013, George Gonzalez discovered three men burglarizing his Orlando residence. *See* Investigation Docs. at 1. Gonzalez chased the first burglar he saw out of the house. *Id.* When he returned inside, he tried to physically apprehend the other two. *Id.* But they too fled the scene. *Id.* At some point, Gonzalez called the police. Dkt. 73-2 at 47:23–48:3. Officer Alfonso Tejeira, a patrol officer with the Orlando Police Department (OPD), responded to the scene. *See* Dkt. 73-3 at 1.

---

Complaint, against Defendant Stanley. *See* Dkt. 41. Thus, in this brief, "Defendant" refers only to Defendant Stanley.

2

Officer Tejeira took statements from Gonzalez and two other eyewitnesses: neighbors Bethany Szewczyk and Charlene Bloom. Gonzalez stated that the first burglar he saw was a "Spanish individual" who "had a[n] afro" and that the second was a "Spanish" man with a "short hair cut," but he did not describe the third burglar. *See* Investigation Docs. at 1. Gonzalez reported several items stolen. *See id.* Szewczyk described seeing "3 young [H]ispanic males" with "dark hair" and "dark eyes" speed away in a gray Toyota sedan. *Id.* at 2. She did not mention hair styles. *Id.* And Bloom stated that she saw "3 young guys" who sped off in a "gray compact[,] maybe a H[y]undai or Datsun." Dkt. 73-4 at 1. Bloom did not mention the suspects' hair, race, or complexion. *Id.* In his field report, Officer Tejeira noted that the suspects were three Hispanic men, and that "[t]he description[s] given by the [other] witnesses . . . did not match" Gonzalez's description of the first burglar. *See* Dkt. 73-3 at 1.

The same day, crime scene investigators photographed the scene and searched for forensic evidence. *See* Dkt. 73-5 at 1. They did not collect DNA samples. Dkt. 73-2 at 120:20–21. They did, however, recover a Pop-Tarts wrapper with latent fingerprints. Dkt. 73-5 at 1.

## II.    Valle-Ramos Was Not One of the Burglars.

Valle-Ramos had nothing to do with the burglary. Dkt. 73-6 at 128:11–20. When it occurred, he was asleep at home, miles away. Dkt. 73-2 at 142:2–19; Dkt. 73-7 at 2 (showing Valle-Ramos's address). Valle-Ramos woke up around noon, hours after the burglary had finished, and he spent the entire day in his apartment with his roommate, Marquis Hickson. Dkt. 73-6 at 81:12–21; Dkt. 73-2 at 142:2–143:5. They did not leave the apartment until around 6:00 that evening. Dkt. 73-2 at 142:4–9.

At the time, Valle-Ramos was just 19 years old. *See* Dkt. 73-7 at 2 (birthday). He had no criminal history except a single juvenile adjudication that resulted in a fine. *See* Dkt. 73-6 at

3

85:16–89:20; Dkt. 73-8 at 217 ("No priors."). Valle-Ramos had been working at a restaurant while taking classes to become an x-ray technician. Dkt. 73-6 at 81:12–21, 93:22–94:5. He drove a yellow Dodge Neon. *Id.* at 111:10–11. And he did not have an afro. *Id.* at 121:18–24. Indeed, Valle-Ramos *could not* style his hair into an afro because it had grown too long to stand up straight. Dkt. 73-2 at 143:17–24 ("I looked like Tarzan."). Because it was long, Valle-Ramos wore his hair in a ponytail. Dkt. 73-6 at 121:25–122:4.

### III.   Defendant Struggles to Solve the Gonzalez Burglary.

The day after the Gonzalez burglary, Defendant was assigned to investigate. Dkt. 73-9 at 97:1–12. At the time, Defendant was both a detective and a "squad leader," meaning that he sometimes took on supervisory responsibilities in addition to his investigative duties. *See id.* at 109:11–17. Defendant looked up the case file through OPD's electronic case management system. Dkt. 73-10 at 34:16–18. He reviewed "all reports available" to him, including Officer Tejeira's field report, a report from the crime scene investigators, and the statements from Gonzalez, Szewczyk, and Bloom. *Id.* at 68:13–69:1. He learned that DNA had not been collected from the scene, and that the fingerprints from the Pop-Tart wrapper did not match anyone in OPD's system. *See id.* at 121:21–122:6. Defendant had no leads.

For several days, Defendant did not take steps to investigate the burglary. *See, e.g.*, Dkt. 73-7 at 1 (Stanley reporting his first investigative step was to read OPD bulletin); Dkt. 73-11 at 1 (bulletin issued April 15). Per OPD policy, if Defendant did not close the case within thirty days, he would have to file additional paperwork explaining why. Dkt. 73-9 at 27:6–28:3. Indeed, the department "didn't like to carry over cases" beyond the thirty-day mark. *Id.*

**IV.    Defendant Pins the Burglary on Valle-Ramos and Two Other Men.**

On April 15, with no leads to follow in the burglary case, Defendant saw an OPD "Criminal Information Bulletin" relating to events from roughly a week before the Gonzalez burglary. Dkt. 73-10 at 74:24–76:1. The bulletin stated that on April 3, OPD officers had pulled over a gray Volkswagen Jetta because "an occupant" of the car had been suspected of casing houses earlier in the day. *See* Dkt. 73-11 at 1. The bulletin further recounted that officers identified four occupants but released them because there was no probable cause for arrest. *Id.* The bulletin showed the driver's license photos of the occupants, Danielle Colon, Karl Jeudy, Marquis Hickson, and Valle-Ramos. *Id.* Valle-Ramos's photo, which had been taken in 2011, showed him with an afro. *Compare id.*, *with* Dkt. 73-12 at 1. The bulletin listed the OPD case number for the incidents it described.

After viewing the bulletin, Defendant looked up the underlying case file on OPD's case management system. *See* Dkt. 73-10 at 75:24–77:23. He reviewed the police reports of the alleged casing and car-stop. *Id.* at 77:2–23. According to the police reports, around noon on April 3, a woman called 911 to report that "two black male suspects" had been "going door to door knocking on the doors of residences." Dkt. 73-13 at 1. The caller reported that the men drove a gray Volkswagen and she provided its plate number. *Id.* Eight hours later, police pulled over a car with supposedly matching plates. Dkt. 73-14 at 1. The police report of the car-stop described the driver, Jeudy, as a Black man. *See id.* It described Valle-Ramos and Hickson, whom had been sitting in the back seat, as Hispanic men. *Id.* The police reports did not mention any of the passengers' hairstyles. At some point after reading the report, Defendant searched for Valle-Ramos on Florida's driver's license database. Dkt. 73-10 at 119:12–120:2. The database would have shown when the

license featuring the photo of Valle-Ramos had been issued and what vehicles he owned. *Id.*; Dkt. 73-15 at 149:11–25.

The bulletin's photo of Valle-Ramos was two years old. Defendant knew nothing about Valle-Ramos's current hairstyle (or Jeudy's or Hickson's). Valle-Ramos, a Hispanic man, did not fit the description of the Black men reportedly casing apartments on April 3. Neither Jeudy nor Hickson matched anyone's description of the Gonzalez burglars. And Valle-Ramos drove a yellow Dodge, not a gray Volkswagen.

Though nothing connected Valle-Ramos, Jeudy, or Hickson to the Gonzalez burglary, Defendant decided to pursue them as suspects. Dkt. 73-10 at 78:4–79:4, 82:5–22.

## V. Defendant Fabricates Gonzalez's Identification of Valle-Ramos.

Defendant constructed a six-person photographic lineup, or "six pack," featuring Valle-Ramos as a suspect. *See* Dkt. 73-7 at 1. To do so, Defendant pulled photos of Valle-Ramos and non-suspects, called "fillers," from Orange County Corrections' database of arrest photos and Florida's driver's license database. Dkt. 73-10 at 40:5–15. Defendant was familiar with best practices for administering six-pack lineups. *Id.* at 38:4–21. For instance, he knew that a six-pack should include a "picture of your potential suspect" and "five other people with similar physical characteristics," including sex, race, age, and "other physical characteristics" including hair. *Id.* at 39:24–43:1. And he understood that if the suspect's photo stood out, the lineup could be suggestive and could lead to misidentification. *See id.* at 41:8–12. Despite knowing these things, and despite having access to a vast pool of potential photos, Defendant constructed a photographic lineup in which Valle-Ramos's photo featured an afro—the only physical descriptor other than race that Gonzalez had provided for the first burglar—and all five fillers did not. *See* Dkt. 73-16 at 1.

6

Defendant's lineup did not even include one viable photograph other than Valle-Ramos's. *See* Dkt. 73-17 12–13.

Defendant also constructed six-packs featuring Jeudy and Hickson as suspects. Defendant did not create a record to document how he constructed those lineups. Or, if he did, he destroyed that record without disclosing it to prosecutors or Valle-Ramos. *See* Dkt. 61 at 2–3. Additionally, as explained below, there is virtually no evidence of Defendant presenting them.

On April 18, Defendant showed Gonzalez the six-packs. Dkt. 73-10 at 82:9–22. He started by presenting Gonzalez the six-pack featuring Valle-Ramos. *See id.* at 149:24–150:15; Dkt. 73-3 at 1 (showing Defendant's handwritten, sequential identification numbers for the six-packs). Unsurprisingly, Gonzalez identified Valle-Ramos from the lineup and signed a statement memorializing his identification on a standard OPD lineup report. Dkt. 73-1 at 3–5. Defendant knew that presenting a witness with multiple photos of a suspect could taint the witness's memory and cause misidentification. *See* Dkt. 73-10 at 52:4–53:14. Yet after Gonzalez's positive identification, Defendant showed him a large, independent photo of Valle-Ramos in which Valle-Ramos's hair was styled in an even larger afro. *See* Dkt. 73-8 at 279; Dkt. 73-18 at 11:25–14:8. Gonzalez confirmed his identification once again. Dkt. 73-18 at 11:25–14:8.

Then, Defendant showed Gonzalez the six-packs featuring Jeudy and Hickson. Dkt. 73-10 at 82:5–22; *see* Dkt. 73-19 at 1–2. Gonzalez did not identify anyone from either six-pack. Dkt. 73-10 at 87:7–19. Defendant's standard practice was to write a report and have the witness complete a statement every time he administered a lineup, even if the witness did not identify anyone. *Id.* at 25:18–26:3, 48:6–12, 54:18–21, 55:19–25. Defendant was responsible for uploading these reports to OPD's computer system, and he normally turned his entire file over to the prosecutor to make sure he was complying with his *Brady* obligations. *Id.* at 62:7–25, 82:23–83:8.

Yet the prosecutor's file in Valle-Ramos's criminal case does not contain the Jeudy and Hickson six-packs or any reports Defendant compiled after administering them to Gonzalez or any other witness. *See generally* Dkt. 73-8. And although Defendant belatedly produced the Jeudy and Hickson six-packs in this case, *see* Dkt. 61 at 2–3, even now, there are no reports or other documents memorializing that Defendant administered these two six-packs to Gonzalez.

## VI. Bloom Does Not Identify Valle-Ramos.

Defendant then called Bloom, one of the two neighbors who witnessed the burglary, to ask her to view a six-pack lineup. *See* Dkt. 73-2 at 108:23–109:21; Dkt. 73-10 at 106:22–108:15. Over the phone, Defendant asked Bloom if she remembered what the burglars had looked like. Dkt. 73-2 at 189:8–15. Bloom said she did and told Defendant she had seen three non-Hispanic men, one of whom had blond hair, driving from the scene. *See id.* at 181:18–182:18, 189:8–15. Defendant knew that when witness accounts conflicted, as they did here, best practice was to "follow-up with the individuals who gave the conflicting statements" to try to reconcile them. Dkt. 73-10 at 36:17–20. But Defendant chose not to do so. Instead, he decided not to invite Bloom to come in for a photo lineup. *Id.* at 107:5–7.

## VII. Defendant Ends His Investigation Without Attempting to Contact Szewczyk.

Defendant did not contact Szewczyk, the second neighbor who witnessed the burglary, at any point in his investigation. Dkt. 73-20 at 8:11–9:5. Like Bloom, Szewczyk had not initially stated that any of the perpetrators had an afro. Dkt. 73-1 at 2. And like Bloom, Szewczyk had not described any perpetrators who resembled Jeudy or Hickson. *Id.* Though Defendant's theory was that Valle-Ramos committed the burglary with Jeudy and Hickson, Defendant stopped pursuing Jeudy and Hickson as co-conspirators and stopped trying to identify additional burglars altogether. Dkt. 73-10 at 105:17–22. Moreover, Defendant never attempted to search Valle-Ramos's house or

car for physical evidence, including the items stolen from Gonzalez's residence or clothes matching the witnesses' descriptions. *Id.* at 116:25–120:2. This was unusual. According to Defendant's supervisor, OPD officers "normally ma[d]e an attempt to try to search" a suspect's residence before seeking an arrest warrant. Dkt. 73-9 at 107:17–108:1. What is more, Defendant testified that his ordinary practice was to continue investigating when there were multiple suspects still at large. Dkt. 73-10 at 51:9–14.

In total, Defendant spent just six hours investigating the Gonzalez burglary before pressing charges against Valle-Ramos. *See* Dkt. 73-1 at 7. Defendant's proffered police practice expert, Chief Ken Wallentine, testified that as an experienced detective in 2013, he could not have completed "a burglary investigation in a case like this in six hours." Dkt. 73-15 at 228:24–229:19. He would have needed to devote at least two or three full eight-hour work days to close the case. Dkt. 73-15 at 226:16–227:1.

## VIII.    Defendant Lies in His Affidavit to Obtain an Arrest Warrant for Valle-Ramos.

Per OPD policy, once a judge issued an arrest warrant, a case was considered closed. Dkt. 73-9 at 122:2–12. The day after he administered Gonzalez's lineup, Defendant drafted an affidavit for a warrant to arrest Valle-Ramos. Dkt. 73-10 at 138:19–140:7. In the affidavit, Defendant attested that Gonzalez initially "stated one of the suspects did have a distinct Afro style hairdo." Dkt. 73-1 at 9. Defendant also averred that "[a]ll efforts to locate the suspects" had been "met with negative results." *Id.* Defendant wrote that he had reviewed the OPD bulletin, which showed "three males and a female" who had been "stopped and detained" for "possible involvement in a Residential Burglary." *Id.* He also stated that he looked Valle-Ramos up on the driver's license database and confirmed that Valle-Ramos presently had "a distinct Afro style hairdo." *Id.* Finally, Defendant swore that he had shown Gonzalez a photographic lineup featuring a picture of Valle-

9

Ramos "in which he did not have a distinct Afro style hairdo," and Gonzalez identified Valle-Ramos. *Id.*

Defendant's affidavit contained numerous false and misleading statements. *First*, Gonzalez had not described the first burglar's afro as "distinct." *See* Dkt. 73-10 at 68:13–69:1; Dkt. 73-1 at 1. *Second*, there is no evidence that Defendant ever attempted to locate or even contact Valle-Ramos during the investigation. *Third*, Valle-Ramos could not have been one of the two men suspected of casing apartments on April 3 because those men were both Black and Valle-Ramos is not. Dkt. 73-10 at 75:24–77:23; Dkt. 73-13 at 1. *Fourth*, Defendant had no evidence of Valle-Ramos's current hairstyle. Dkt. 73-10 at 119:12–120:2; *see* Dkt. 73-15 at 149:11–25. And *fifth*, Valle-Ramos *did* have a distinct—albeit short—afro hairstyle in the lineup Defendant showed Gonzalez. *See* Dkt. 73-16 at 1.

The record is replete with evidence supporting the inference that Defendant knew Valle-Ramos was innocent when he applied for the arrest warrant. Defendant knew Gonzalez's identification of Valle-Ramos from the photo lineup was unreliable. Defendant knew Gonzalez had failed to identify Jeudy and Hickson—Valle-Ramos's supposed co-conspirators—from photo lineups even though Gonzalez supposedly made close contact with the co-conspirators in his house. Dkt. 73-10 at 87:7–19; Dkt. 73-1 at 1. Defendant also knew that neither of the two additional eyewitnesses had identified Valle-Ramos (not to mention Jeudy or Hickson) as Gonzalez's burglar.

Typically, Defendant's supervisor, Sergeant Daniel Brady, reviewed Defendant's arrest warrant affidavits before Defendant submitted them to a judge. Dkt. 73-10 at 167:15–19; Dkt. 73-9 at 37:1–38:3. Sergeant Brady checked to ensure that affidavits contained accurate information, that detectives had followed policy, and that the evidence "met the burden for probable cause." Dkt. 73-9 at 37:1–38:3, 64:13–24. But as a squad leader, Defendant had the power to approve his

10

own arrest warrant affidavits. *Id.* at 120:13–25. And in this case, Defendant approved his own affidavit and submitted it to the magistrate before Sergeant Brady had the chance to review it. *Id.* at 121:1–122:1; Dkt. 73-1 at 6–9 (no initials from Sergeant Brady). After reviewing Defendant's affidavit, the magistrate issued a warrant to arrest Valle-Ramos. *See* Dkt. 73-1 at 11–13.

## IX.     Valle-Ramos is Arrested and Interrogated, but the Video Recording Goes Missing.

OPD officers arrested Valle-Ramos at his apartment on April 24, just three days after his twentieth birthday. Dkt. 73-6 at 118:20–119:3; *see* Dkt. 73-7 at 2. They immediately brought him back to the local OPD station and placed him in an interrogation room. Dkt. 73-6 at 120:23–25. Defendant entered the room and began interrogating Valle-Ramos. *Id.* at 121:6–17. Defendant showed Valle-Ramos the six-pack featuring his photo, falsely told Valle-Ramos that two people had identified him as a burglar, and pressured Valle-Ramos to confess. *Id.* All the while, Valle-Ramos "kept saying . . . they got the wrong guy." *Id.* at 121:18–24. Valle-Ramos recalls that Defendant showed him "a picture of [him] with an Afro," even though Valle-Ramos did not "even have an Afro at the time." *Id.* The interrogation ended after a short time.

OPD video-recorded all interviews in its interrogation rooms. Dkt. 73-10 at 125:21–25. The video of this interrogation would have shown that Valle-Ramos's hair was too long to stand up straight and be styled in an afro. Dkt. 73-2 at 143:17–24. However, when prosecutors later asked Defendant to provide them with the recording of Valle-Ramos's interrogation, Defendant informed them that there was "no record of interview." Dkt. 73-8 at 130, 281.

## X.     Defendant Fabricates Szewczyk's Identification.

For over four months, Defendant did not touch the Gonzalez burglary investigation. Dkt. 73-10 at 105:5–9. Then, in August 2013, prosecutors requested that Defendant present photo lineups to both Bloom and Szewczyk. *See* Dkt. 73-8 at 129. Defendant reached out to Szewczyk

11

to schedule a lineup. Dkt. 73-20 at 8:11–9:5. This was the first time Defendant had attempted to contact Szewczyk. *Id.*

Defendant administered a photo lineup on Szewczyk on September 4. *Id.* He showed her the same six-pack featuring Valle-Ramos that he had shown Gonzalez months prior. *See* Dkt. 73-1 at 14–16. Szewczyk chose Valle-Ramos from the lineup. *Id.* Defendant knew that officers should not tell a witness they picked the correct suspect, or that another witness had identified the same person. Dkt. 73-10 at 47:13–15, 51:15–19, 52:4–23. He knew that doing so could blend a witness's "recollection of the incident and their participation in the photo lineup," possibly "taint[ing] the identification." *See id.* at 52:4–53:14. Yet immediately after Szewczyk picked Valle-Ramos's photo, Defendant smiled, said "that's him," and told Szewczyk that Gonzalez had also identified the same person. Dkt. 73-21 at 15:12–24.

Defendant also called Bloom to set up a time for a photo lineup. Dkt. 73-22 at 42:17–43:3. But Bloom informed Defendant that after receiving a subpoena, she had looked Valle-Ramos up online, had seen a picture of him, and knew that Valle-Ramos was not one of the people she had seen on April 9. *Id.* at 43:4–8. As he had before, Defendant told Bloom that she did not need to come in for a lineup. Dkt. 73-2 at 190:9–11.

### XI.    A Jury Convicts Valle-Ramos Based Solely on the Fabricated Identifications, While Defendant Suppresses Exculpatory Evidence.

At Valle-Ramos's criminal trial, the prosecution presented just two pieces of evidence against him: the identifications by Gonzalez and Szewczyk. Gonzalez testified first and, on the stand, named Valle-Ramos as the first burglar he saw. *See* Dkt. 73-2 at 49:21–50:8. As he did, Szewczyk and Defendant sat separately in the waiting area outside the courtroom. *See* Dkt. 73-21 at 17:8–14. When Gonzalez finished testifying, he left the courtroom, entered the waiting area, and approached Defendant. *Id.* Defendant then introduced Gonzalez to Szewczyk. *Id.* Gonzalez told

12

Szewczyk that "he was certain that he made the correct identification" and "that the defendant was the correct guy." *Id.* at 18:2–5.

After seeing Valle-Ramos in-person for the first time during a court break, Szewczyk had developed doubts that Valle-Ramos was actually the burglar she remembered. *Id.* at 18:6–19:1. But talking to Gonzalez boosted her confidence and convinced her to identify Valle-Ramos on the stand, despite her doubts. *Id.* at 18:6–18; Crim Trial Tr. at 88:8–22.

Meanwhile, Defendant suppressed key *Brady* materials from Valle-Ramos, his attorney, and the prosecutor, including: 1) the Jeudy and Hickson six-packs; 2) any documents or reports memorializing that Gonzalez did not identify Jeudy and Hickson from those lineups; 3) the video-recording of Valle-Ramos's interrogation; 4) any evidence that Defendant had provided Szewczyk with post-identification feedback; and 5) any evidence that Defendant had introduced Szewczyk and Gonzalez at trial before she testified. *See generally* Dkt. 73-8; Dkt. 73-23 ¶ 5.

Ultimately, the jury convicted Valle-Ramos of burglary and third-degree grand theft. Dkt. 73-2 at 295–96. He was sentenced to 30 months in prison followed by five years of probation. Dkt. 73-24 at 1.

## XII.    The Court Vacates Valle-Ramos's Conviction.

Valle-Ramos was released from prison after two years. Dkt. 73-6 at 154:24–155:3. He completed his probation in 2021 without any violations. *Id.* at 156:1–3; Dkt. 73-24 at 11. Through it all, Valle-Ramos maintained his innocence and constantly fought to clear his name. Dkt. 73-6 at 157:19–158:11. After his release, Valle-Ramos moved for post-conviction relief. *See* Dkt. 73-25 at 1. The court granted his motion and vacated his convictions after Szewczyk recanted her identification and revealed how Defendant had given her post-conviction feedback and introduced

her to Gonzalez at Valle-Ramos's trial. *See* Dkt. 73-26 at 4–10. The state subsequently entered a motion of *nolle prosequi* and dropped all charges against Valle-Ramos. Dkt. 73-27 at 2.

Valle-Ramos suffered immensely from his wrongful conviction. He spent many formative years incarcerated and under supervision by the judicial system rather than experiencing what free people in their twenties get to experience. During his incarceration, he was physically assaulted by other inmates. Dkt. 73-6 at 152:16–153:5. On probation, he missed out on valuable job opportunities, including an offer to work at Disney, because of his status as a convicted felon. *Id.* at 167:14–25. The technical school he was enrolled in before his arrest closed while he was incarcerated, and he now must pay back student loans for a degree he will never get to finish. Dkt. 73-6 at 165:24–166:9. And, Marquis Hickson, Valle-Ramos's roommate and one of his closest friends, died from a congenital heart condition shortly after Valle-Ramos came home from prison. *Id.* at 100:9–24. Valle-Ramos's wrongful conviction deprived him of precious opportunities to spend time with his best friend, which he will never get back.

## LEGAL STANDARD

A party seeking summary judgment must "identify[] each claim ... on which summary judgment is sought." Fed. R. Civ. P. 56(a). For the specific claims on which a moving party seeks summary judgment, the motion will be granted only if there are no genuine disputes of material facts. Fed. R. Civ. P. 56(a); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). When determining whether a factual dispute exists, a court must draw all facts and reasonable inferences in favor of the non-moving party. *Id.* A fact is "material" when it might affect the outcome of the case, and a dispute is "genuine" if it could lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobb, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

14

**ARGUMENT**

**I.     Defendant is Not Entitled to Summary Judgment on Valle-Ramos's Fabrication Claim.**

Defendant argues that the record is devoid of evidence to support a verdict for Valle-Ramos on his fabrication claim, and that, in any event, Defendant would be entitled to qualified immunity on the claim because the right Valle-Ramos claims Defendant violated was not clearly established at the time of his wrongful conviction. Dkt. 71 at 19–28. Defendant's attack against the fabrication claim is a nonstarter, however, because Defendant appears to misapprehend the nature of the due process violation at issue. As a result, he overlooks the copious evidence supporting the claim and the well-settled law establishing it.

**A.     The Record Contains Evidence to Support a Verdict that Defendant Violated Valle-Ramos's Due Process Rights by Fabricating Evidence Against Him.**

Valle-Ramos alleges that Defendant violated his right to due process by fabricating evidence that Gonzalez and Szewczyk identified him as the man who burglarized Gonzalez, and then by causing that false evidence to be used to wrongfully charge, prosecute, and convict Valle-Ramos. The record is replete with evidence to support a finding of liability against Valle-Ramos on this theory.

To start, a jury could conclude that Defendant knew Valle-Ramos had nothing to do with the burglary. Defendant knew that fingerprints from the scene did not match Valle-Ramos; no DNA linked him to the burglary; Valle-Ramos was not one of the individuals suspected of casing residences a week prior; there was no evidence of Valle-Ramos's current hairstyle; and Valle-Ramos drove a car that looked nothing like the ones reported in either the casing incident or the burglary. Dkt. 73-10 at 68:13–69:1, 77:2–23, 75:24–77:23, 119:12–120:2; Dkt. 73-5 at 1; Dkt. 73-2 at 121:21–122:6, 125:10–25; Dkt. 73-13 at 1; Dkt. 73-14 at 1; *see* Dkt. 73-15 at 149:11–25.

15

When Defendant interrogated Valle-Ramos after his arrest, Defendant saw that Valle-Ramos did not (and could not) wear his hair in an afro. Dkt. 73-2 at 143:17–24; Dkt. 73-6 at 120:23–122:4. And Bloom told Defendant, both in the early investigative stages and after Valle-Ramos's arrest, that she did not see anyone who looked like Valle-Ramos. *See* Dkt. 73-2 at 108:23–109:21, 181:18–182:18, 189:8–15; Dkt. 73-10 at 106:22–108:15. A jury could conclude from these facts that Defendant knew all along that Valle-Ramos was not one of the burglars.

Additionally, a jury could reasonably conclude that Defendant purposefully caused Gonzalez and Szewczyk to falsely identify Valle-Ramos as the perpetrator anyway. Defendant knew that in a six-pack, the filler photos should match the suspect's physical characteristics, including hair. Dkt. 73-10 at 39:24–43:1. Yet he constructed a photo lineup in which Valle-Ramos had an afro, which was the only notable physical descriptor Gonzalez had provided, and none of the fillers had that hairstyle. *See* Dkt. 73-16 at 1; Dkt. 73-17 at 12–13. A jury could reasonably conclude that Defendant designed the six-pack this way to ensure that eyewitnesses would identify Valle-Ramos. Defendant also knew that it was improper to show a witness multiple photos of a suspect, to tell a witness they picked the right suspect, or to tell a witness that another witness had chosen the same photo, because doing so could taint the witness's memory and lead to misidentification. Dkt. 73-10 at 47:13–15, 51:15–19, 52:4–23. Nonetheless, after Gonzalez identified Valle-Ramos, Defendant showed him a second photo of Valle-Ramos, this one with an even larger afro. *See* Dkt. 73-8 at 279; Dkt. 73-18 at 11:25–14:8. Likewise, right after Szewczyk identified Valle-Ramos from the six-pack, Defendant smiled and told her both that she had picked the correct person and that she had picked the same suspect as Gonzalez, despite knowing at the time that Valle Ramos did not actually have an afro haircut. Dkt. 73-21 at 15:12–24; Dkt. 73-6 at 120:23–122:4. Finally, Defendant introduced Gonzalez and Szewczyk before Szewczyk testified

at trial, and Gonzalez informed Szewczyk that he was sure they had identified the same person. Dkt. 73-21 at 17:8–14. A jury could reasonably conclude that Defendant took all these steps *after* Gonzalez and Szewczyk's photo identifications because he knew their identifications were false, he believed they might realize they had not seen Valle-Ramos, and he wanted to solidify their identifications so they would falsely testify against Valle-Ramos at trial. Similarly, a jury could infer from the fact that Defendant did not show Bloom the six-pack with Valle-Ramos's photo in it because he knew Bloom would not identify Valle-Ramos and he did not wish to undermine the identifications he had manufactured from the other two witnesses.

Defendant does not address let alone undermine any of those facts. Instead, Defendant challenges Valle-Ramos's fabrication claim in a single sentence, arguing: "[T]he Amended Complaint contains offhand, borderline scandalous allegations that Det. Stanely [sic] 'fabricated evidence' despite no whisper of such egregious conduct arising elsewhere in the pleadings or the now-comprehensive evidentiary record." Dkt. 71 at 20 (citation omitted). Defendant's perfunctory treatment of the facts supporting Valle-Ramos' due process claim does not entitle him to summary judgment.[2] *See, e.g., Dates v. Frank Norton, LLC*, 190 F. Supp. 3d 1037, 1067 (N.D. Ala. 2016) (holding that a movant had not met its initial burden at summary judgment because its arguments were "vague," "underdeveloped," and made "no attempt to examine the evidence in this case in the context of the authority cited"); *Bequer v. Brinker Fla., Inc.*, No. 23-CV-20537, 2024 WL 6846053, at *14 (S.D. Fla. Nov. 22, 2024) (holding that a movant had not met its initial burden at summary judgment because it failed to "accurately describe[e]" the opponent's arguments or

---

[2] To the extent Defendant is arguing that Valle-Ramos's fabrication claim is not properly pleaded, that argument is specious. The amended complaint is filled with allegations that Defendant fabricated testimonial evidence by Gonzalez and Szewczyk into providing false identifications against him at trial. Dkt. 41 at 1, 2, 6–9, 13, 15.

17

"cit[e] relevant record evidence," instead relying on "strawm[e]n" (emphasis omitted)); *see also United States v. F.E.B. Corp.*, 52 F.4th 916, 933 (11th Cir. 2022) (a "passing reference to an issue" in a summary judgment brief "is not enough"); *Christmas v. Harris County*, 51 F.4th 1348, 1354 n.4 (11th Cir. 2022) (declining to consider two-sentence argument without citations to evidentiary or legal authority finding argument was so cursory it was waived).

**B.      The right defendant violated was clearly established at the relevant time**

Defendant's argument for qualified immunity on Plaintiff's due process claim is equally meritless. As to the first prong of qualified immunity, as discussed above, there is sufficient evidence to show Defendant violated Valle-Ramos's constitutional right. As to the second prong, there can be no credible dispute that right was clearly established. The Supreme Court and the Eleventh Circuit have held for decades that "a conviction obtained through the use of false evidence, known to be such by representatives of the State," violates a criminal defendant's due process rights. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997) ("[F]abricating evidence violate[s] constitutional rights."). Testimony is evidence, and false testimony is false evidence. Thus, an officer violates a defendant's due process rights by knowingly causing a witness to give false testimony that inculpates the defendant. *See McMillan v. Johnson*, 88 F.3d 1554, 1570–71 (11th Cir. 1996); *see Buckley v. Fitzsimmons*, 509 U.S. 259, 262, 272–76 (1993) (taking as a given that state officials can be held liable for fabrication by soliciting an expert's false testimony).

The Eleventh Circuit's recent decision in *Aguirre v. Seminole County*, 158 F.4th 1276 (11th Cir. 2025), sheds light on the scope of this right. The plaintiff in *Aguirre* alleged that in 2004, a police fingerprint examiner had fabricated evidence against him in violation of his due process rights. *Id.* at 1287, 1297. The examiner asserted qualified immunity. *Id.* at 1290. The Court

18

reviewed the Eleventh Circuit's cases on the fabrication theory of due process liability, which had sustained due process claims against officers who "plant[ed] cocaine in a suspect's car," "fabricat[ed] a boot print at a murder scene," and "switch[ed] exculpatory evidence with inculpatory evidence during a search." *Id.* (citations omitted). None of the Court's decisions had expressly discussed fabricated fingerprints. *See id.* Yet even though there was no caselaw "directly on point," the Court concluded that it was "clearly established" as of 2004 that "it is unlawful to knowingly incriminate a suspect by falsely creating or falsely attesting to the existence of inculpatory evidence." *Id.* at 1299. Thus, the Court held that the examiner would have had notice that her actions were unlawful. *Id.* at 1298. *Aguirre* leaves no doubt that Defendant had notice he was violating Valle-Ramos' clearly established rights when he falsely created evidence that two eyewitnesses freely identified Valle-Ramos as the Gonzalez burglar.

### C.    Defendant Misapprehends the Fabrication Claim.

Defendant does not meaningfully address relevant caselaw or evidence supporting Plaintiff's due process claim because he devotes most of his brief to the strawman argument that Valle-Ramos's due process is really a "suggestive lineup" claim, that suggestive lineup alone cannot sustain a § 1983 claim, and alternatively, that Defendant's six-pack was not suggestive. *See* Dkt. 71 at 20–28. But it is irrelevant whether a suggestive identification procedure can sustain a § 1983 claim on its own, as that is not what Valle-Ramos has alleged here. Rather, as noted above, Valle-Ramos claims that Defendant fabricated Gonzalez and Szewczyk's eyewitness identifications through a sustained pattern of manipulation that included presenting them with an extraordinarily suggestive lineup, improperly providing them post-identification feedback to increase their confidence in their false identifications, and introducing them during the trial to influence Szewczyk to provide her false identification on the stand. Courts in this circuit have

19

repeatedly sustained analogous claims. *See, e.g.*, *James v. Conley*, No. 1:23-cv-24467-KMM, 2024 WL 5374037, at *3 (S.D. Fla. Mar. 26, 2024) (citing *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988)); *Diaz-Martinez v. Miami-Dade County*, No. 07-20914-CIV, 2009 WL 2970471, at *8 (S.D. Fla. June 9, 2009) ("Plaintiff does not allege a constitutional violation arising solely from the allegedly impermissibly suggestive identification procedures; instead, he alleges that as a result . . . ten victims misidentified [him] both before and at trial . . . . This is a valid claim in the Eleventh Circuit." (quotation marks omitted)). Defendant's sole citation to the contrary, *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025), does not dictate a different result. For one thing, *Blackmon* is not the law in the Eleventh Circuit, and no court in this circuit has cited it or adopted its holding. For another, *Blackmon* dealt solely with suggestive identification procedures, not with allegations that the defendant knowingly caused witnesses to present false and fabricated identifications at trial.

Moreover, even assuming it were necessary to Valle-Ramos's due process claim (and it is not), a jury could reasonably find that the six-pack featuring Valle-Ramos was unduly suggestive. This is because there are facts in the record to support the inference that the photo array's characteristics and "the manner of its presentation" were suggestive, and the resulting identification was unreliable. *United States v. Daniels*, 97 F.4th 800, 809 (11th Cir. 2024) (citation omitted). Gonzalez described the suspect as a Hispanic man with an afro. Dkt. 73-1 at 1. The lineup contained photos of Valle-Ramos, who had an afro, and five fillers who did not have afros. *See* Dkt. 73-16 at 1. A jury could conclude that inherently, Valle-Ramos stood out from the fillers in the lineup. Moreover, Plaintiff's expert, Dr. Brian Cahill, conducted a "mock-witness task" using the lineup from this case and the description Gonzalez had provided of the suspect. *See* Dkt. 73-17 at 12–13. The mock-witness task is a widely accepted and replicated methodology that scientists studying eyewitness behavior use to measure the amount of structural bias in a lineup. *Id.* at 12.

Dr. Cahill administered his experiment to 117 people. *Id.* The experiment revealed that the lineup in this case had an "effective size" of 1.77, meaning that apart from Valle-Ramos, there were only 0.77 viable fillers in the lineup. *Id.* at 13. In other words, Defendant did not include even one photo that plausibly matched Gonzalez's description other than Valle-Ramos's. A jury could reasonably decide, based on their own appraisal of the lineup and Dr. Cahill's testimony, not only that the lineup was unduly biased against Valle-Ramos, but that it was so biased that Defendant must have designed it to be so.[3]

Moreover, a jury could conclude that Gonzalez and Szewczyk's identifications were unreliable based on the totality of the circumstances. *Daniels*, 97 F.4th at 809 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)) (setting out five-part test for reliability). For one, the witnesses never got a good look at the burglar. Gonzalez conceded it was "dark inside" his house when he came in and saw the burglars, Dkt. 73-28 at 20:15–21. Szewczyk, likewise saw the suspect only through the windshield of the getaway car as the suspects sped away. Dkt. 73-20 at 84:23–84:7. Second, Gonzalez's description was inaccurate, as he had described a person with an afro and chosen a photo of Valle-Ramos, who did not (and could not) sport an afro at the time of the burglary. Dkt. 73-1 at 1; Dkt. 73-2 at 143:17–24; Dkt. 73-6 at 121:25–122:4. Meanwhile, Szewczyk's initial statement said only that the suspects were "young [H]ispanic males," which could apply to every photo in the six-pack. Dkt. 73-1 at 2. What's more, there's no evidence to suggest any witness was confident in their identification. Defendant did not ask the witnesses how certain they were of the burglar's appearance either after the burglary or after their lineup identifications. *See* Dkt. 73-10 at 48:17–49:10, 71:2–6, 74:6–10; Dkt. 73-1 at 5, 15. And as to the

---

[3] Defendant has not challenged Dr. Cahill's qualifications as an expert or otherwise moved to limit his testimony.

timing of the identifications, Defendant administered the six-pack to Gonzalez eight days after the burglary, and to Szewczyk nearly five months later. *See* Dkt. 73-1 at 4, 14. Dr. Cahill reports that accuracy of identification drops precipitously after exactly one week. Dkt. 73-17 at 6–7. Likewise, Chief Wallentine testified that waiting four months to administer a lineup would have been "way too long." Dkt. 73-15 at 171:20–172:4. A jury could reasonably conclude from all those facts that the eyewitness identifications were unreliable.

All that said, the Court need not decide whether Defendant's lineup alone perfectly satisfies the Eleventh Circuit's two-part test for unduly suggestive lineup procedures. That is because Valle-Ramos's due process claim hinges on whether Defendant fabricated evidence (eyewitness identifications) that was used to secure his wrongful conviction, not simply on whether Defendant created suggestive photo lineups. Ultimately, Defendant's focus on the lineup (and not the fabrication) is a side-show.

## II.    Valle-Ramos's *Brady* Theory of Due Process Liability Must Proceed to Trial.

Defendant's arguments for summary judgment on Valle-Ramos's *Brady* theory are fatally deficient. Defendant focuses his entire discussion on arguing that the suppressed video-recording was neither exculpatory nor material. *See* Dkt. 71 at 29–32. Yet Defendant evidence that Defendant knowingly suppressed many other *Brady* materials. Even Defendant's arguments on the video-recording fall short, as they improperly rely on drawing inferences in Defendant's favor. The Court should deny Defendant's motion as to Valle-Ramos's *Brady* theory of due process liability.

Long before 2013, the Supreme Court and the Eleventh Circuit had clearly established that a police officer violates an accused person's due process rights by concealing exculpatory or impeachment evidence. *McMillan*, 88 F.3d at 1569; *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). In 2007, the Eleventh Circuit articulated that a

22

plaintiff can hold a police officer liable for a *Brady* violation under § 1983 by proving that the officer suppressed favorable, material evidence from the prosecution and defense, and that the officer's conduct was more than just negligent. *See Porter v. White*, 483 F.3d 1294, 1304–09 (11th Cir. 2007).

A jury could reasonably find that Defendant suppressed several pieces of material exculpatory and impeaching evidence from Valle-Ramos, his attorneys, and the prosecutor. Defendant did not disclose the Jeudy and Hickson six-packs, documentation that Gonzalez did not identify Jeudy and Hickson from those lineups, evidence that Defendant had provided Szewczyk with post-identification feedback, evidence that Defendant had introduced Szewczyk and Gonzalez at trial before she testified, and the video-recording of Valle-Ramos's interrogation. *See* Dkt. 73-23 ¶ 5 (prosecutor relied on police to turn over files); Dkt. 73-10 at 87:7–19; Dkt. 73-21 at 17:8–14; *see generally* Dkt. 73-8 (prosecutor's file lacks any of these pieces of evidence). Each of these pieces of evidence would have been exculpatory or impeaching. For example, Gonzalez's failure to identify either Jeudy and Hickson would have poked holes in Defendant's theory that Valle-Ramos committed the burglary with the two of them. And had Valle-Ramos known about Defendant's efforts to manipulate Szewczyk's identification at trial, Valle-Ramos could have undermined her identification on cross-examination. *See Diaz-Martinez*, 2009 WL 2970471, at *12 (finding it "axiomatic" that officers' "failure to disclose that they fabricated evidence would also be a *Brady* violation"); *accord Aguirre-Jarquin v. Hemmert*, No. 6:20-cv-25-Orl-37DCI, 2020 WL 13664132, at *8 (M.D. Fla. Aug. 28, 2020). Moreover, a jury could reasonably find that this body of *Brady* evidence was material. There was no physical evidence linking Valle-Ramos to the burglary, and the prosecution rested entirely on Gonzalez's and Szewczyk's fabricated identifications. *See* Dkt. 73-5 at 1; Dkt. 73-2 at 110:7–11 (Stanley testifying there were no

23

fingerprints or DNA). Each of the pieces of evidence listed above would have helped Valle-Ramos demonstrate that he did not match the description of the burglars, and that Gonzalez's and Szewczyk's identifications were fabricated and unreliable. Defendant does not address most of these pieces of evidence at all, and thus, has not made an initial showing that he is entitled to summary judgment.

Defendant's sole argument in favor of summary judgment is that the suppressed video-recording was not material or exculpatory. Defendant is wrong on both fronts. *First*, courts evaluate the materiality of exculpatory evidence cumulatively. *Kyles v. Whitley*, 514 U.S. 419, 421 (1995). So even if Defendant were correct—and he is not—that the suppressed video would have been immaterial, that would not justify summary judgment given all of the other suppressed evidence described above. *Second*, Defendant contends the video would have been irrelevant because Valle-Ramos's mugshot, taken contemporaneously with the interrogation, provided undisputed evidence that he had an afro in April 2013. *See* Dkt. 71 at 31–32; Dkt. 71-14 at 5. But the mugshot is far from definitive, and a jury could reasonably conclude that it shows Valle-Ramos with hair so long it is falling or tied backwards, rather than with an afro. Dkt. 71-14 at 5. Moreover, at this stage, the Court must credit Valle-Ramos's testimony that he did not and could not have kept his hair in an afro at the time of the interrogation. Dkt. 73-2 at 143:17–24; Dkt. 73-6 at 121:25–122:4. So in any event, a jury could determine that the interrogation video would have provided a much clearer picture of Valle-Ramos's long hair, and thus, would have allowed him to prove that he did not fit the description of the burglary suspect, regardless of the mugshot. Defendant's arguments on the video-recording boil down to drawing inferences in his own favor.

To the extent that Defendant suggests there is no evidence that he suppressed evidence more than negligently, he is wrong. As previously discussed, knowledge can be proven through

24

circumstantial evidence. *Poole*, 878 F.2d at 1391–92. Here, there is ample circumstantial evidence that Defendant knew he was suppressing evidence. Notably, while Defendant was testifying in Valle-Ramos's criminal trial, immediately after the prosecutor asked him about administering lineup featuring Valle-Ramos to Gonzalez, the prosecutor asked, "The second photo lineup that you showed, do you remember the date that you presented that to the witness?" Dkt. 73-2 at 105:6–7. Rather than responding that he had shown Gonzalez a "second photo lineup" (and indeed, a third) on the same day, he said, "I do not remember," and when prompted, discussed the lineup he administered five months later to Szewczyk. *Id.* at 105:8–19. Then, on cross-examination, Valle-Ramos's defense attorney asked Defendant, "Were there any other suspects that were found or any other information gathered to come up with an identification for the other two guys?" *Id.* at 114:1–3. Defendant responded, "No, there were not." *Id.* at 114:4. A jury could reasonably conclude that Defendant avoided mentioning the Jeudy and Hickson lineups during his testimony because he had suppressed these lineups intentionally. Put another way, a jury could infer that had Defendant simply forgotten to include these materials in his file, he would have simply clarified that in his testimony when opportunities presented themselves. More broadly, if the jury found that Defendant knowingly fabricated evidence against Valle-Ramos, it could reasonably find that his suppression of that information was knowing. *See Diaz-Martinez*, 2009 WL 2970471, at *12; *accord Aguirre-Jarquin*, 2020 WL 13664132, at *8.

III.    **Defendant is Not Entitled to Summary Judgment on Valle-Ramos's Malicious Prosecution Claims.**

Valle-Ramos presses malicious prosecution claims under both federal and state law. Dkt. 41 at 14, 19. To succeed on his § 1983 malicious prosecution claim at trial, Valle-Ramos will have to prove that Defendant seized him under the Fourth Amendment, instituted or continued a criminal prosecution against him, acted with malice and without probable cause, caused Valle-Ramos

damage, and that the proceeding terminated in Valle-Ramos's favor. *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019). A state-law claim for malicious prosecution requires proving the same facts. *See Verdon v. Song*, 251 So. 3d 256, 259 n.2 (Fla. Dist. Ct. App. 2018). Defendant advances only one argument for granting summary judgment on Valle-Ramos's malicious prosecution claims: he asserts that Valle-Ramos cannot defeat qualified immunity because there is no evidence that Defendant lacked arguable probable cause. Dkt. 71 at 34, 41. But Defendant is wrong on the evidence and the law.

There is evidence that Defendant intentionally lied in his arrest warrant affidavit, and under clearly established law, that is enough to show he lacked even arguable probable cause. In *Williams v. Aguirre*, the plaintiff alleged that in 2014, officers had initiated his prosecution by making material misstatements in their affidavit supporting his arrest warrant. 965 F.3d 1147, 1165 (11th Cir. 2020). The defendant officers asserted qualified immunity. *Id.* at 1168. The Eleventh Circuit held that for at least three decades, the Supreme Court and this circuit had held that an officer's misstatements and omissions on an arrest warrant affidavit violate an accused person's Fourth Amendment rights if the affidavit would have lacked probable cause without those misstatements and omissions. *Id.* at 1169. Thus, the Eleventh Circuit denied qualified immunity and denied summary judgment. *Id.* at 1169–70. Here, a jury could find that Defendant made numerous material misstatements and omissions on the affidavit supporting Valle-Ramos's arrest warrant. For example, Defendant stated that Gonzalez had described the first burglar's afro as "distinct," which Gonzalez had not done *See* Dkt. 73-10 at 68:13–69:1; Dkt. 73-1 at 1. And despite Defendant's claim in his affidavit, there was no evidence that Defendant ever attempted to locate or even contact Valle-Ramos during the investigation. Moreover, the affidavit claimed that Valle-Ramos had been linked to a prior burglary, even though Defendant knew that Valle-Ramos could

26

not have been one of the two men suspected of casing apartments on April 3, as those men were both Black and Valle-Ramos is not. Dkt. 73-10 at 75:24–77:23; Dkt. 73-13 at 1. Next, Defendant had no evidence of Valle-Ramos's current hairstyle, yet he represented in the affidavit that Valle-Ramos presently had an afro. Dkt. 73-10 at 119:12–120:2; *see* Dkt. 73-15 at 149:11–25. And finally, Valle-Ramos *did* have a distinct—albeit short—afro hairstyle in the lineup Defendant showed Gonzalez, despite Defendant's claim to the contrary. *See* Dkt. 73-16 at 1. A jury could reasonably conclude that without these misstatements, it would have been clear on the affidavit that there was no legitimate evidence connecting Valle-Ramos to the burglary, and thus, there was no probable cause.

A jury could also determine that Defendant falsified the affidavit intentionally. Though Sergeant Brady typically reviewed Defendant's arrest warrant affidavits, Defendant chose to circumvent Sergeant Brady's review and submit the affidavit directly to a magistrate. *See* Dkt. 73-10 at 167:15–19; Dkt. 73-9 at 37:1–38:3, 121:1–122:1; Dkt. 73-1 at 6–9 (no initials from Sergeant Brady). After reviewing Defendant's affidavit, the magistrate issued a warrant to arrest Valle-Ramos. *See* Dkt. 73-1 at 11–13. A jury could reasonably conclude based on this decision that Defendant knew Sergeant Brady would have noticed that probable cause was absent, and would have rejected the affidavit.

Defendant does not grapple with the falsehoods and omissions in the arrest warrant affidavit at all. Instead, he draws inferences in his own favor regarding the evidence he reviewed prior to drafting it. This is insufficient to show that summary judgment is appropriate. The Court should allow Valle-Ramos's malicious prosecution claims to proceed to a jury.

**IV.    Defendant Has Waived All Arguments As to Valle-Ramos's Claim for Intentional Infliction of Emotional Distress.**

Finally, Defendant moves for summary judgment on Valle-Ramos's claim for intentional infliction of emotional distress (IIED). But Defendant cites no evidence from the record to show an absence of disputed facts. Rather, he simply recites the standard for an IIED claim and calls Valle-Ramos's claim "sensational." Dkt. 71 at 40–41. As discussed above, Defendant's failure to grapple with the record constitutes a waiver of its arguments for summary judgment. *See Dates*, 190 F. Supp. 3d at 1067; *Bequer*, 2024 WL 6846053, at *14; *F.E.B. Corp.*, 52 F.4th at 933; *Christmas*, 51 F.4th at 1354 n.4

.**CONCLUSION**

For the foregoing reasons, the Court should deny summary judgment on Counts I, II, VI, and VII in the Amended Complaint, against Defendant Stanley.

**Local Rule 3.01(g) Certification**

I hereby certify that I conferred with opposing counsel on May 4, 2026, and opposing counsel did not object to the relief sought herein.

Dated: May 5, 2026                            Respectfully submitted,

                                              /s/ Aaditya Tolappa

Jon Loevy
Aaditya Tolappa
Loevy & Loevy
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900

*Counsel for Plaintiff*