10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

                                IN THE CIRCUIT COURT OF THE
                                NINTH JUDICIAL CIRCUIT, IN AND
                                FOR ORANGE COUNTY, FLORIDA
                                CRIMINAL JUSTICE DIVISION

STATE OF FLORIDA,

        PLAINTIFF,

                                CASE NUMBER:  48-2013-CF-5146A/O
vs.

                                DIVISION NUMBER:  16
JORGE VALLE-RAMOS,

                                VOLUME I OF II
        DEFENDANT./


                        TRIAL PROCEEDINGS

                            BEFORE

                    THE HONORABLE GREG TYNAN



                                In the Orange County Courthouse
                                Courtroom 6D
                                Orlando, Florida 32801
                                May 21, 2014
                                Rebecca Ruiz



A P P E A R A N C E S:

**NATALIA SCOTT**
Assistant State Attorney
415 North Orange Avenue
Building B
Orlando, Florida 32801
On behalf of the State


**CARLI CITRARO**
Assistant Public Defender
435 North Orange Avenue
Suite 400
Orlando, Florida 32801
On behalf of Defendant

P000089

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

I N D E X

OPENING STATEMENT BY MS. SCOTT                          36

OPENING STATEMENT BY MS. CITRARO                        41

TESTIMONY OF GEORGE GONZALEZ

        DIRECT EXAMINATION BY MS. SCOTT                 42

        CROSS-EXAMINATION BY MS. CITRARO                62

        REDIRECT EXAMINATION BY MS. SCOTT               76

TESTIMONY OF BETHANY SZEWCZYK

        DIRECT EXAMINATION BY MS. SCOTT                 78

        CROSS-EXAMINATION BY MS. CITRARO                89

        REDIRECT EXAMINATION BY MS. SCOTT               96

TESTIMONY OF DETECTIVE MICHAEL STANLEY

        DIRECT EXAMINATION BY MS. SCOTT                 97

        CROSS-EXAMINATION BY MS. CITRARO                108

TESTIMONY OF CHANTAL STYER

        DIRECT EXAMINATION BY MS. SCOTT                 117

        CROSS-EXAMINATION BY MS. CITRARO                125

TESTIMONY OF MARQUIS HICKSON

        DIRECT EXAMINATION BY MS. CITRARO               133

        CROSS-EXAMINATION BY MS. SCOTT                  139

        REDIRECT EXAMINATION BY MS. CITRARO             140

TESTIMONY OF JORGE VALLE-RAMOS

        DIRECT EXAMINATION BY MS. CITRARO               141

        CROSS-EXAMINATION BY MS. SCOTT                  148

P000090

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

CERTIFICATE OF REPORTER                                          164

                        E X H I B I T S

STATE'S EXHIBIT 1-2                                               103

DEFENDANT'S EXHIBIT 1                                             145
STATE'S EXHIBIT 3                                                 119

                    Official Court Reporters
                       407-836-2280

**P000091**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

- - -

P R O C E E D I N G S

THE COURT:  We are going on Valle-Ramos.  How many witnesses for each side?

MS. CITRARO:  Two to three for the defense.

MS. SCOTT:  Fourish.

THE COURT:  Okay.

MS. SCOTT:  Been a long morning, Judge.

THE COURT:  All right.  Is he downstairs?

MS. CITRARO:  He's present.

THE COURT:  Let's go ahead and call up a panel.

THE CLERK:  Thirty still?

THE COURT:  I believe so.  No, forty.  It's an F1, PBL.  Mr. Valle-Ramos, if you come up to the counsel table, please.

MS. CITRARO:  I just spoke with our defense witness, Ms. Bloom.  She had an ear infection.  If we can just hold off, I told her to be here at 9:00 a.m. tomorrow morning so she has some time to let her medication begin.  So she's not contagious, but if we can hold off until calling the defense case until first thing tomorrow.

THE COURT:  Do you have other defense witnesses that you can call if you needed to?

MS. CITRARO:  Yes.  I have one other if I needed

P000092

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

to.

THE COURT:  I don't think we will get that far at this time.

MS. CITRARO:  I'm not sure if we will.  I just wanted to let the Court know.  We have also discussed a semi motion in limine in this case.  I just wanted to put on the record.

Okay.  This is a kind of an interesting fact pattern.  Mr. Valle-Ramos was stopped a couple weeks before, and that stop provided some information that comes into the investigation in this case.  For purposes of keeping prejudicial, unrelated information out of this case, um, we -- the State and I have just agreed to just refer to that previous stop, which is unrelated, as an unrelated stop for unrelated purposes.  But no information whatsoever about it being in any way regarding a burglary is to come out to the jury.

So any witnesses who may have information about that -- I would expect it would just be the detective and maybe the other officer -- would not be able to testify as to that to keep it out since it's prejudicial, unrelated and irrelevant.

THE COURT:  State?

MS. SCOTT:  That's fine.  I agree.

THE COURT:  Okay.

P000093

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. CITRARO:  I think that was it for preliminary. We do have a motion for an additional jury instruction too, but we can take care of that later.

THE COURT:  What is it?

MS. CITRARO:  I had asked for a jury instruction regarding eyewitness testimony.  My motion, which was filed March 12th, actually includes a lot of stuff that is really covered in the jury instruction for eyewitness testimony.  So I'm just amending this just to ask for a couple of these specific paragraphs.

There -- does the Court want me to read them?  They are outlined in the motion.  It's, basically, just extra information that the Court can give the jury regarding eyewitness testimony and what they should take into account when determining --

MS. SCOTT:  Judge, I would object to the additional instructions.  The standard jury instructions already addresses eyewitness identification.  Anything further won't be necessary for the jury.  Supreme Court thinks the standard ones are sufficient for that purpose and I would argue that nothing more is needed.

THE COURT:  I'm printing a copy of it.  You tell me what, perhaps, you want me to consider.  Then I'll think about it during the course of the trial.

MS. CITRARO:  Sure.  First paragraph starting, an

P000094

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

important question.  The second paragraph starting, the testimony you have heard.  After the numbered paragraphs it starts, when you may also take into account.  The next one, the witness's level of confidence.

THE COURT:  All right.  So you want the first paragraph under paragraph 3 and the second paragraph under paragraph 3?

MS. CITRARO:  Yes.

THE COURT:  And under paragraph 2 -- or actually paragraph -- after paragraph 3 with the A's and B's.

MS. CITRARO:  Yeah.  I'm not asking for any of the listed-out items so you -- you may also take into account, short paragraph, the witness's level of confidence, short paragraph, and that it is -- it is the prosecution's burden, short paragraph.  Those will be the ones I am asking to add to it, yes.

THE COURT:  All right.  I'll take it under advisement.

Anything else?

MS. CITRARO:  I don't think so, Judge.  Thank you. I'll invoke the rule.

THE COURT:  All right.  The rule of sequestration is invoked.  Both parties will notify their respective witnesses regarding the requirements of the rule.  Has there been an offer made in the case?  Was that

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ, CLERK OF CIRCUIT COURT ORANGE CO FL

discussed this morning with you and Judge Davis?

**MS. SCOTT:** Judge, the State filed an amended information this morning. This case was previously upgraded from simple burglary to burglary of a dwelling with assault or battery. It's my position it should never have been upgraded. So I went ahead and filed an amended simple burg dwelling based on that amended information.

The scoresheet now reads 21.9 months as a minimum sentence. I think it was 35 before with an F1 versus the F2. So the offer of the State was 21.9 months.

**THE COURT:** As it relates to the amended information, was that addressed this morning with Judge Davis?

**MS. CITRARO:** Yes. We waived formal reading and any defects in the information.

**THE COURT:** Was the offer conveyed by Judge Davis? Was it placed on the record?

**MS. SCOTT:** Yes.

**THE COURT:** Did she make inquiry of Mr. Valle-Ramos whether he understood what the amended offer was?

**MS. CITRARO:** After the amended offer was made, no.

**THE COURT:** Mr. Valle-Ramos, you understand you are charged by information with two counts of burglary of a dwelling, a second degree felony, punishable by up to 15

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

years in prison as well as a $10,000 fine.

Count II you are charged with grand theft third degree, a third degree felony punishable by up to five years in a prison as well as a $5,000 fine.  Do you understand what the maximum sentence is and what you are charged with in each count?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand the state attorney's office has made an offer to you today, which is to, I guess -- I assume it is Count I, State?

MS. SCOTT:  Count I, the amended information in Count I and II.  So grand theft is still on there.

THE COURT:  All right.  It would be a plea to both counts.  It would be an adjudication of guilt on both counts, and then the bottom of the guidelines, which is 21.9 months in the Department of Corrections, court costs, cost of prosecution fee, public defender's lien, and if there was any restitution or cost of investigation, those items would be applicable as well. Do you understand what the offer is?

THE DEFENDANT:  I understand.

THE COURT:  Knowing what the offer is and knowing what the potential exposure is should you go to trial and lose, what is it you have decided to do?

THE DEFENDANT:  What did I decide to do if I lose?

Official Court Reporters
407-836-2280

**P000097**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  Well, you are looking at up to 15 years in prison on the burglary, and up to five additional years on the grand theft.  Okay.  So a maximum potential sentence of up to 20 years if you're convicted.  And I'm not saying you will be.  I'm not saying you won't be.  I don't know what will happen.  The jury may acquit you.  But if the jury does convict you, you understand you could be facing up to 15 years on the first charge and up to five years on the second charge and potentially a total of 20 years for both of them.  Do you understand that?

THE DEFENDANT:  Yeah, I do.

THE COURT:  You understand the current offer is 22 months in the Department of Corrections?

THE DEFENDANT:  I do.

THE COURT:  Knowing that's what the offer is to resolve the case today and knowing what you could be facing if you're convicted by a jury, what would you like to do?  Would you like to take the offer or would you like to go to trial?

THE DEFENDANT:  Go to trial.

THE COURT:  Okay.  That's a decision that you made freely, nobody forced you to make that decision?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  All right.

**P000098**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ, CLERK OF CIRCUIT COURT ORANGE CO FL

Defense, go ahead and name for me your defense witnesses.

THE DEFENDANT:  Yes.  Marquis Hickson and Charlene Bloom and potentially my client.

THE COURT:  Mr. Valle-Ramos, you understand other than yourself, those other two witnesses are the only two witnesses that your attorney has indicated she may call in this case?

THE DEFENDANT:  I understand.

THE COURT:  Are you aware of any other witnesses or are there any other witnesses at this point in time that you want her to call?

THE DEFENDANT:  No.

THE COURT:  So you understand during the course of the trial the only three witnesses that may be called on your behalf are yourself and the two witnesses she just named?

THE DEFENDANT:  Yes.

THE COURT:  You're okay with that decision?

THE DEFENDANT:  Yes.

THE COURT:  Ms. Citraro, have there been any items of evidence taken from your client or any statements that were taken from the police by your client.

MS. CITRARO:  I don't believe so.  Not that I'm aware of.

P000099

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  Have you investigated the case and believe there are no motions to suppress any of the statements or any of the evidence in this case that could be taken on a good-faith basis?

MS. CITRARO:  I am not aware of any statements that need to be suppressed because I'm not aware of any admissions by my client whatsoever.  I do have a few items of evidence to place.  We can do it after lunch or before.

THE CLERK:  Once the panel is selected, that is when I can take the evidence.

MS. CITRARO:  Okay.  We can do it later.  I'm not aware of any motions to suppress, though.

THE COURT:  All right.  So you don't believe there's a good faith basis to file any motions to suppress in this case?

MS. CITRARO:  Not in this case, no.

THE COURT:  Do you understand that, Mr. Valle-Ramos?

THE DEFENDANT:  I do.

THE COURT:  Okay.  Does the defense intend to concede during their opening statement or closing statement any elements of the offense?

MS. CITRARO:  The issue here is that a burglary occurred, but it is a misidentification.

Official Court Reporters
407-836-2280

P000100

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  Okay.

MS. CITRARO:  So --

THE COURT:  You will be arguing that potentially during your opening as well as your closing?

MS. CITRARO:  Yes.

THE COURT:  Mr. Valle-Ramos, you understand that's the theory of you-all's defense?

THE DEFENDANT:  I do understand.

THE COURT:  And she may be admitting that a burglary happened, but the defense is it wasn't you?

THE DEFENDANT:  Exactly.

THE COURT:  You okay with that decision?

THE DEFENDANT:  Yes, I am.

THE COURT:  Do you understand that's how she's going to be proceeding with the defense in this case?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.

MS. SCOTT:  Can I get a time from the court as to what time you anticipate the first witness?

THE COURT:  It's gonna depend on how long you take to pick a jury.

MS. CITRARO:  My openings don't take more than five minutes if it helps.

THE COURT:  All right.  Any other motions or matters that we need to address before the jury comes

P000101

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

in?

**MS. CITRARO:**  I don't believe so.

**MS. SCOTT:**  None from the State.

**THE COURT:**  Okay.

Ms. Citraro, during my questioning with the panel and during the opening statements, do you want me to address the right to remain silent?

**MS. CITRARO:**  Sure.

**THE COURT:**  Okay.  Any special jury instructions that I need to be aware of the standards?

**MS. CITRARO:**  Standards, including evidence.

**THE COURT:**  Anything else?

**MS. CITRARO:**  I don't think so.  There's no specialist for identification, just eyewitness, correct?

**THE COURT:**  Right.  Eyewitness, I was thinking.  Necessity?

**MS. CITRARO:**  No.  No affirmative defense.

**THE COURT:**  Okay, great.  Thank you.

Did you give any consideration to what lessers you want on the burglary count?

**MS. CITRARO:**  No.  If it comes to it later, can we discuss that later?

**THE COURT:**  Yeah, I just like to know so I can start.  I mean, you've got burglary of a dwelling.  I guess the only other lesser would be burglary of a

structure?

**MS. CITRARO:** Trespass.

**THE COURT:** And then the grand theft which is even lower levels of theft.

**MS. CITRARO:** Yes. I'm not sure that we are going to be requesting that, but yes.

**THE COURT:** I will put them in. It's easier to take them out. All right. Are we ready to proceed?

**MS. CITRARO:** Yes, Judge.

**THE COURT:** All right. Let's bring in the members of the jury.

(Whereupon, the Venire entered the courtroom.)

**COURT DEPUTY:** Jurors please stand, raise your right hand to be sworn by the clerk.

(Whereupon, the Venire was placed under oath.)

(Voir dire proceedings commenced, not transcribed herein.)

**THE COURT:** We will be in recess for about five minutes for you-all to take a look at your notes, court personnel to take a break, use the rest room if they need to, and then we will come back and start back up.

(Whereupon a short recess was taken.)

**THE COURT:** Juror in seat number 1, what says the State?

**MS. SCOTT:** Acceptable.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  Defense?

MS. CITRARO:  Use a peremptory.

THE COURT:  Juror in seat number 2, defense?

MS. CITRARO:  Acceptable.

THE COURT:  State?

MS. SCOTT:  Acceptable.

THE COURT:  Juror in seat number 3, State?

MS. SCOTT:  Judge, I ask to remove for cause. He -- scheduling-wise, he said today.  I believe, he has to leave by 4:30.

THE COURT:  Defense?

MS. CITRARO:  I have no objection.

THE COURT:  Grant it.

Juror in seat number 4, defense?

MS. CITRARO:  Acceptable.

THE COURT:  State?

MS. SCOTT:  Acceptable.

THE COURT:  Juror in seat number 5, State?

MS. SCOTT:  Acceptable.

THE COURT:  Defense?

MS. CITRARO:  I'm gonna ask for a cause challenge. I'm not sure if it was the whole time, I know it was the time the --

THE COURT:  His eyes were closing.  State?

MS. SCOTT:  I didn't look at him.  So if somebody

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

else -- I will take Ms. Citraro's word for that.  She thinks he was sleeping.

THE COURT:  All right.  I'll go ahead and grant it.  I noted you made a comment about it on the record.

MS. SCOTT:  Who did?

MS. CITRARO:  I never directed it at him.

THE COURT:  I know.  I know it wasn't directed to him.

Juror in seat number 6, Defense?

MS. CITRARO:  So she said she was uncomfortable and can't sit, so that would be cause.

THE COURT:  State?

MS. SCOTT:  Agree.

THE COURT:  All right.  She will be stricken for cause.

Juror in seat number 7, State?

MS. SCOTT:  Acceptable.

THE COURT:  Defense?

MS. CITRARO:  Acceptable.

THE COURT:  Juror in seat number 8, defense?

MS. CITRARO:  Acceptable.

THE COURT:  State?

MS. SCOTT:  State would strike.

THE COURT:  Juror in seat number 9, State?

MS. SCOTT:  I ask to strike her for cause.  She

P000105

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

said that she cannot reach a verdict based on testimony alone.

THE COURT:  Defense?

MS. CITRARO:  I'll be honest, if there's a case out there that says that that is enough for a cause challenge, I have no objection.  But I'm not familiar with the case, so I will take no position.

THE COURT:  I'm gonna go ahead and grant it.  She gave a couple of other answers that were a little evasive.

All right.  Juror in seat number 10, defense?

MS. SCOTT:  Acceptable.

THE COURT:  State?

MS. SCOTT:  Acceptable.

THE COURT:  Juror in seat number 11, State?

MS. SCOTT:  Acceptable.

THE COURT:  Defense?

MS. CITRARO:  Acceptable.

THE COURT:  Juror in seat number 12, defense?

MS. CITRARO:  Um, he was the doctor who's got 60 patients to reschedule tomorrow or something, so I ask for a cause challenge.

THE COURT:  State?

MS. SCOTT:  No objection.

THE COURT:  Granted.

P000106

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Juror in seat number 13, State?

**MS. SCOTT:**  Acceptable.

**THE COURT:**  Defense?

**MS. CITRARO:**  Acceptable.

**THE COURT:**  That leaves our jury as 2, 4, 7, 10, 11, and 13.

Any backstrikes by the State?

**MS. SCOTT:**  Strike 4, Your Honor.

**THE COURT:**  Brings us to juror in seat number 14. Defense?

**MS. CITRARO:**  Acceptable.

**THE COURT:**  State?

**MS. SCOTT:**  Acceptable.

**THE COURT:**  That leaves our jury as 2, 7, 10, 13 -- or 11, 13 and 14.

Any backstrikes by the defense?

**MS. CITRARO:**  I'll backstrike 14.

**THE COURT:**  Brings us to juror in seat number 15. What says the State?

**MS. SCOTT:**  I ask for a cause challenge, Judge.

**THE COURT:**  Any objection?

**MS. CITRARO:**  No, Judge.

**THE COURT:**  Based upon his responses in private, I'll grant that.

Juror in seat number 17, defense?

P000107

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. CITRARO:  We already struck 16.

THE COURT:  Sixteen, I'm sorry.

MS. CITRARO:  Sixteen, I think, was another cause challenge.  He said he had been burglarized recently.  I think he said he couldn't be fair and impartial.

THE COURT:  State?

MS. SCOTT:  I have notes of the burglary.  I don't have any notes regarding impartiality.

THE COURT:  I have that he had been robbed, but I did not get any indication that he said he could not be fair.

MS. CITRARO:  I don't write anything down, but I remember checking off in my head that that was cause while he was talking the first time.

THE COURT:  I don't recall him saying anything that would lead to a cause challenge.

MS. CITRARO:  All right.  I'll use a peremptory then.

THE COURT:  Okay.  Juror in seat number 17, any objection to striking her for cause on language?

MS. CITRARO:  No objection.

MS. SCOTT:  No objection.

THE COURT:  Juror number 18, what says the defense?

MS. CITRARO:  Peremptory.

THE COURT:  All right.  That's your fourth.

P000108

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Juror in seat number 19, State?

MS. SCOTT:  He's acceptable.  He's acceptable, Judge.  I have a note here that he was previously arrested.  I told defense prior to jury selection and he did not volunteer when I asked him.  If I can have a minute, I can bring up his rap sheet that I have to see if his description matches.

Judge, I have that he was arrested in 2001 for grand theft.  Adjudication was withheld.  He pled no contest.  The description that I have given is date of birth 3/24/81.  The same date of birth that he listed on his jury questionnaire.  His height is 5'9", approximately 170 pounds, brown hair, black eyes.

THE COURT:  So what are you asking me to do?

MS. SCOTT:  I'm asking you to strike him for cause based on I think he lied to that question.  He didn't answer it truthfully.

THE COURT:  Defense?

MS. CITRARO:  I'll take no position.

THE COURT:  I'll strike him for cause.

Juror in seat number 20, any objection to removing him?

MS. CITRARO:  No.

MS. SCOTT:  No.

THE COURT:  All right.  Juror in seat number 21.

P000109

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

State?

**MS. SCOTT:**  No objection.

**THE COURT:**  Defense?

**MS. CITRARO:**  We will strike.

**THE COURT:**  All right.  That's your fifth.

Juror in seat number 22, defense?

**MS. CITRARO:**  Graduation tomorrow.  Cause challenge.

**MS. SCOTT:**  Agree, Judge.

**THE COURT:**  All right.  Be granted.

Juror in seat number 23.  State?

**MS. SCOTT:**  Acceptable.

**THE COURT:**  Defense?

**MS. CITRARO:**  Acceptable.

**THE COURT:**  That leaves our jury as 2, 7, 10, 11, 13, 23.

Any backstrikes by the State?

**MS. SCOTT:**  State would backstrike number 11.

**THE COURT:**  That's your third.  Brings us to juror in seat number 24.  What says the defense?

**MS. CITRARO:**  Acceptable.

**MS. SCOTT:**  Can he be stricken for cause?  He said testimony is not enough.  He can't reach a verdict, period, based on testimony alone.  He would need something more than just testimony.

Official Court Reporters
407-836-2280

**P000110**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  Defense?

MS. CITRARO:  I'll take no position.

THE COURT:  I'll grant it.

Juror in seat number 25, State?

MS. SCOTT:  Acceptable.

THE COURT:  Defense?

MS. CITRARO:  He had mentioned something about being broken into and said he couldn't be fair and impartial, I think, is one of those last ones that said it.  One of the last ones that started mentioning -- that started to happen with him at the very end of my voir dire.

MS. SCOTT:  I have a note that his wife's car was broken into.  I don't have anything in terms of him not being able to be fair and impartial based on that.

THE COURT:  I remember him talking about his car being broken into, but I don't remember him going into any more detail about he can't be fair and impartial.

So what says the defense to juror in seat number 25?

MS. CITRARO:  We will do our last strike.

THE COURT:  That's the defense's sixth and final strike.

Juror in seat number 26.  What says the State?

MS. SCOTT:  I will strike her for cause, Judge.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

She said she can't sit on the case because she has been robbed before so she doesn't think she could be a good juror.  I also think there's a language issue even though she didn't --

THE COURT:  Any objection?

MS. CITRARO:  No.

THE COURT:  Juror in seat number 27.  State?

MS. SCOTT:  Acceptable.

THE COURT:  All right.  Defense, any cause challenges?

MS. CITRARO:  No.  Acceptable.

THE COURT:  All right.  So that leaves our jury as 2, 7, 10, 13, 23 and 27.

Any backstrikes by the State?

MS. SCOTT:  No.

THE COURT:  Any cause challenges by the defense?

MS. CITRARO:  No.

THE COURT:  That's our jury, seat number 2, seat number 7, seat number 10, seat number 13, seat number 23, and seat number 27.

What says the parties as it relates to juror in seat number 28 as the alternate.

MS. SCOTT:  Judge, I ask to strike him for cause. He's another one that has a rap who did not say he was arrested.  His name matches.

P000112

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  Any objection?

MS. CITRARO:  No objection.

MS. SCOTT:  I'm just verifying the date of birth.

THE COURT:  They don't have any objection to it. Move on.

Juror seat 29, any objection to 29 as being the alternate?

MS. SCOTT:  I will strike 29.

THE COURT:  Juror in seat 30?

MS. SCOTT:  No objection.

THE COURT:  Defense?

MS. CITRARO:  No objection.

THE COURT:  Anybody think we need another alternate?

MS. SCOTT:  My only concern is that we're going overnight, and so we are going into a second day.

MS. CITRARO:  I don't have an objection to seating another one.  I don't really care.

THE COURT:  Okay.  Juror in seat number 32.

MS. SCOTT:  I ask to strike for cause.

THE COURT:  Any objection to removing seat number 32 for cause?

MS. CITRARO:  What was the cause reason?

THE COURT:  He's going to Maine.  He has got a physical.

P000113

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. CITRARO:  Yeah, no objection.  No objection.

THE COURT:  A couple other things.

MS. CITRARO:  No objection.

THE COURT:  All right.  Juror in seat number 33 as the second alternate.

MS. SCOTT:  No objection.

MS. CITRARO:  Acceptable.

THE COURT:  Okay.  So that is our panel, juror in seat number 2, 7, 10, 13, 23, 27.  And the alternates are 30 and 33.

All right.  Mr. Valle-Ramos, you had an opportunity to sit through the jury selection process, correct?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you had an opportunity to participate with your attorney about the people who were selected and stricken from the jury; is that correct?

THE DEFENDANT:  Yes, sir.

THE COURT:  Did you agree with all the cause challenges that were made?

THE DEFENDANT:  Yes, sir.

THE COURT:  And did you agree with all the peremptory challenges that your attorney made?

THE DEFENDANT:  Yes, sir.

THE COURT:  And is this jury that we are about to seat acceptable to you?

**P000114**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE DEFENDANT:  Acceptable, yeah.

THE COURT:  Is there anybody on here that you don't want on here?

THE DEFENDANT:  No.

THE COURT:  Just checking.  Want to make sure.

Okay.  Let's go ahead and bring the members of the jury back in.  If you guys want to turn your seats around, we will announce who the members of the jury are and we will go from there.

(Whereupon, the Venire entered the courtroom.)

THE COURT:  All right.  Ladies and gentlemen, we have gone through our notes and we have determined who is going to be on the jury for this particular case.

Madam Clerk, if you go -- will go ahead and please announce the members of the jury.  When your badge number is called, if you will just follow the court deputies over here, and they'll give you the seating assignments in the jury box.  Okay?

Juror number 477.  501.  542.  24.  521.  407.  36. 241.

Is the jury as seated acceptable to the State?

MS. SCOTT:  Yes, Your Honor.

THE COURT:  Is the jury as seated acceptable to the defense?

MS. CITRARO:  Yes, Judge.

P000115

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT: And, Mr. Valle-Ramos, is the jury as seated acceptable to you?

THE DEFENDANT: Yes, sir.

THE COURT: Madam Clerk, please swear in the members of the jury.

(The jury, having been duly impaneled, was sworn to well and truly try the issues of the case.)

THE COURT: All right. Ladies and gentlemen of the jury, I will get with you-all in a second. I'll give instructions.

Ladies and gentlemen, for those of you who were not selected in this case, I have some of good news for you. Since it's after 2:30, you're gonna get released and go home. What I need you to do is go downstairs, check in with the jury service room, hand them back your badges. If you need excuses for work or anything of that nature, they can give that to you downstairs. Okay?

I do wish to thank you for your time and consideration today. I know it was a long day. I know it was not the most convenient thing or the place you would have liked to have been today, but it is important for our system of justice that members of our community, like yourselves, come in. And we wouldn't be able to do the things we do here in our court system without your assistance. So for that, I do thank you.

P000116

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

If you want to go down and check in with the jury services room on the first floor and get your excuses, you are free to go.

(Venire exited the courtroom.)

THE COURT: All right. Ladies and gentlemen, what I want to discuss with you a little bit is the possibility of going past five a little bit tonight, maybe to like six, so we can get some of this moving along so we can get you out of here earlier tomorrow. Anybody have any difficulty or any problem with maybe going till about six tonight? Nothing?

Okay. Anybody need to make any phone calls or anything before we do that? Okay. What we will do is we will probably be going to take a recess here in a little bit. So what we will do is we will go through the trial. As long as I give you a recess in the next hour or so to make phone calls, does that work?

JURORS: Yes.

THE COURT: Okay. With that said, what I'm gonna do is give you the preliminary instructions at this point and then the attorneys will start with their case.

Ladies and gentlemen of the jury, you have been selected and sworn as the jury to try the case of the State of Florida versus Jorge Valle-Ramos. This is a criminal case. Mr. Valle-Ramos is charged with two

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

counts of burglary of a dwelling and grand theft third degree. The definition of the elements of those crimes will be explained to you later.

Now, it's your solemn responsibility to determine if the State has proved its accusations beyond a reasonable doubt against Mr. Valle-Ramos. Your verdict must be based solely upon the evidence or the lack of evidence and the law. The information as I stated previously, is not evidence and is not to be considered by you as any proof of guilt. It is the judge's responsibility to decide which laws apply to this case and to explain those laws to you. And it is your responsibility to decide what the facts of this case may be and to apply the law to that set of facts. Thus, the province of the jury and the province of the Court are well-defined and they do not overlap. This is a fundamental principal of our system of justice.

Now, before proceeding further, it will be helpful if you understand how a trial is conducted. At the beginning of the trial, the attorneys will have the opportunity to, if they wish, to make what's called an opening statement. The opening statement gives the attorneys a chance to tell you what evidence they believe will be presented during the trial. What the lawyers say is not evidence, and you are not to consider

P000118

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

it as such.  It's just basically a road map or a way for them to tell you what they think they'll be able to prove during the course of their case.

Following the opening statement, witnesses will be called to testify under oath.  They will be examined and cross-examined by the attorneys, and documents and other exhibits may be placed before you for your consideration.  After the evidence has been presented, the attorneys will make their final arguments, and following the arguments by the attorneys, I will instruct you on what the law is that's applicable to this case.

After the instructions are given, I will release the alternate jurors and then you-all will retire to consider your verdict.  You should not form any definite or fixed opinions on the merits of this case until you have heard all of the evidence, the arguments of the lawyers and the instructions on the law by the judge.  Until that time, you should not discuss the case amongst yourselves.

During the course of the trial, the Court may take recesses during which you'll be permitted to separate and go about your own personal affairs.  During these recesses, you will not discuss the case with anyone, nor permit anyone to say anything to you or in your presence

P000119

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

about this case.  If anyone attempts to say anything to you or in your presence about this case, tell him or her that you are on the jury deciding the case and ask them to stop.  If they persist, leave them at once and inform one of the court deputies who will advise me.

This case must be decided by you only on the evidence presented during the trial in your presence and in the presence of the defendant, the attorneys and the judge.  Jurors must not conduct any investigation of their own, and this would include reading newspapers, watching television or using a computer, cell phone, the Internet, any electronic device or any other means at all to get any information related to this case or the people and places that are involved in this case.

This applies to whether you are at the courthouse, at home or anywhere else.  You also must not visit any places mentioned in the trial or use the Internet to look up any maps or pictures to see any places discussed during the course of the trial.

Jurors must not have communications or discussions of any sort with family or friends about the case or the people and places involved.  So please don't even let your closest family members make comments to you or ask questions about the trial.  In this age of electronic communication, I want to stress again just as you must

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

not talk about this case face-to-face, you must not talk about this case by using any electronic device.

You must not use phones, computer or other electronic devices to communicate, and you are not to send or accept any messages related to this case or your jury service.  Do not discuss this case or ask for advice by any means at all, including posting information on the Internet, website, a chat room or a blog.

In every criminal proceeding a defendant has the absolute right to remain silent.  At no time is it the duty of the defendant to prove his innocence.  From the exercise of his right to remain silent, a jury is not permitted to draw any inference of guilt, and the fact that a defendant does not take the witness stand must not influence your verdict in any manner whatsoever.

The attorneys in this case, as I stated previously, are trained in the rules of evidence and trial procedure and it is their duty to make all objections that they feel are proper.  When an objection is made, you should not speculate on the reason why it was made.  Likewise, when an objection is sustained or upheld by me, you should not speculate on what might have occurred had the objection not been sustained, nor on what the witness might had have said had they been permitted to answer

P000121

the question.

During the trial it may be necessary for me to confer with the attorneys outside of your hearing to discuss matters of law or other matters that require consideration by me alone.  It is impossible for me to predict when such conferences may be required or how long that they will last.  However, be rest assured that when such conferences do occur, they will be conducted so as to consume as little of your time as necessary for a fair and orderly trial of this case.

If you happen to see myself or any of the court personnel or any of the witnesses or parties in this case during any recesses during the course of the trial and those individuals do not speak to you or even seem to pay attention to you, please realize that they are not being discourteous or rude.  They are only trying to avoid the appearance of having any improper contact with you-all as the members of the jury.

I will, in fact, be instructing everyone to stay away from you with the exception of the court deputies who will be in charge of your care and custody while you're with us.  Okay?

Now, if you would like to take notes during the trial, you may do so.  On the other hand, of course, you are not required to take notes if you do not want to.

That is a decision left up to each one of you individually.  You have been provided with a notepad and a pen for your use if you wish to take notes.  Any notes that you take will be for your own personal use.  However, you should not take them with you from the courtroom.

What I would ask you to do is during recesses, fold the pad over, put the pen on top of it, stick it on your chair.  When you come back, the court deputies will make sure it's in your chair for you and available when we get back.  Okay?  At the end of the case after you've completed your deliberations, the court deputies will deliver your notes to me.  They'll be destroyed, and no one will read whatever notes it is that you made reference this case.

If you decide to take notes, please don't get so involved in note-taking that you become distracted from the proceedings.  Your notes should only be used as an aid to your memory.  Whether or not you decide to take notes, you should rely upon your own memory of the evidence and you should not be unduly influenced by the notes of another juror.  Notes are not entitled to any greater weight than each juror's memory of the evidence.

At this time the attorneys for the parties will have an opportunity, if they wish, to make their opening

P000123

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

statement in which they may explain to you the issues in the case and give you a summary of the facts that they expect that the evidence will show.

State, do you wish to give an opening statement at this time?

**MS. SCOTT:**  Yes, Your Honor.

**THE COURT:**  You may.

**MS. SCOTT:**  In a few moments, you are going to meet someone named George Gonzalez.  He's going to walk in through the doors and sit at the stand.  He's going to tell you about one of the most terrifying experiences of his life.  He's going to tell you that back in April of 2013, April 9th, morning, he leaves.  He comes back, and as soon as he enters his home, he hears that someone is inside.

He hears shuffling.  He hears that there's -- something is happening.  No one is supposed to be there. Someone is inside.  He is inside his house, and around the corner pops out that man.  And the reason we know it's that man is because Mr. Gonzalez saw him.  Mr. Gonzalez and Mr. Valle-Ramos were face-to-face.  They stared at one another.  Both of them were in shock to see one another.  Both of them were not expecting the other to be there.  And so they had this awkward staring, what-are-you-doing-here type of moment.

**P000124**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Mr. Gonzalez at that point exchanges some words with Mr. Valle-Ramos, and Mr. Valle-Ramos bails. He runs out the back door, runs out. Mr. Gonzalez at that point doesn't stop, doesn't call the police right then. He gives chase. He goes after the guy who just broke into his house. He chases him, he loses him.

He goes back to the house, his house, and there's two more. There is two more individuals that should not be there. Those two individuals don't run. What they do is they get in an altercation with Mr. Gonzalez. Mr. Gonzalez is not letting these people go. They broke into his home, he caught them red-handed, and he's gonna do something about it.

He's struggling with one of these individuals. At one point he has mace, he sprays. One of the other individuals comes out. So now he knows there's a total of three of them in the house. He doesn't know how many more. He doesn't know if they have weapons. He doesn't know any of this at this point. He struggles. Those two people eventually get away.

Law enforcement responds. He calls 911. Law enforcement comes out, collects statements, talks to neighbors, and they talk to different witnesses that were around. And you're gonna hear from some of those witnesses today, one of those witnesses, somebody by the

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

name of Bethany Szewczyk. And I might be mispronouncing her name because it's an odd spelling.

She's gonna tell that you she's never seen that man before either, Mr. Gonzalez. Hasn't met him prior to that day. They have no idea who this individual is. But what both of them will tell you is that both of them saw him that day. Both of them will tell you that they were presented a photo lineup. Mr. Valle-Ramos was presented that photo lineup not too long after this incident where Mr. Valle-Ramos' picture was in that photo lineup. Without a doubt, without hesitation, that's him. He points to him. He identifies him to law enforcement.

Bethany is gonna tell you that she saw this happen. The facts as to who went in what direction, who got inside what kind of car, those might be a little bit different. Both Bethany and Mr. Gonzalez are gonna tell you they did see a vehicle there. They saw either a gray Carolla or a Camry, a smaller sedan, grayish in color. Maybe a lighter beige in color, something along those lines.

Ms. Bethany was presented that photo lineup months after this happened. She, too, has never seen this man before other than when she saw him walk out of that house. Other than when she saw him flee the scene, and

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

she too was able to look at a photo lineup without hesitation and say that's him.  Absolutely no doubt in my mind.

Detective Stanley is an investigator that was put on this case, the one that kind of put the pieces together.  He's the one that constructed this photo lineup and presented it to these witnesses.

There is another neighbor, Charlene Bloom.  You may hear from her today.  She is one of the neighbors who didn't have as clear of a shot from everything that happened.  She had a balcony view.  She was, perhaps, maybe across a street or a driveway of sorts.  The neighborhood that this happened in, these are individual homes next to one another.  There is not like a regular set type of neighborhood.  It is almost like an apartment/townhouse type of setup.  You will see photos of the area so you'll be familiar with it.  And so her recollection of things is slightly different than what you will hear from Mr. Gonzalez and Ms. Bethany Szewczyk.

The last person I anticipate you'll hear from is Ms. Chantelle Styer.  She is a C.S.I. investigator. She's the one that comes out on scene, does the fancy dusting for fingerprints, takes the photographs and does all that cool forensic stuff.  And you're not gonna have

P000127

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

any forensics in this case because there wasn't any. And she's gonna explain to you why fingerprints weren't lifted. She's gonna explain to you certain things that just because you touch it doesn't mean you leave a print.

There is gonna be testimony that she's gonna explain as to why DNA evidence wasn't collected or why it wasn't tested. What happens when someone is wearing gloves. All those details are going to come out to explain the science behind why there are no forensics in this case. But the thing that you do have are going to be the courage and conviction of two individuals who have nothing to gain out of this. Nothing. They have absolutely no dog in this fight other than the fact that Mr. Gonzalez, himself, was the one that got burglarized that day. Not only did he get burglarized, he got a bunch of stuff stolen from him.

He will also tell you about all of those items that were taken from his house. Once the conclusion of this case is done, once you have heard everything, once you talked -- use that common sense that we talked about in jury selection and once you use all of the explanations we gave about reasonable doubt and connect the dots in this case, I'm confident you will return a verdict of guilty. Thank you.

P000128

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT: All right. Does the defense wish to give an opening at this time?

MS. CITRARO: Yes, Judge.

THE COURT: You may do so.

MS. CITRARO: Thank you. Thank you for sticking around, ladies and gentlemen. The State's case, as she just laid out, is going to be based on eyewitness testimony from several people. The State told you that Ms. Bloom, her testimony will be slightly different. Slightly different from the other witnesses. Her testimony will be it was not Mr. Valle-Ramos. I consider that a little more than slightly different.

Please pay attention to the conflicts in the evidence. You are going to hear from more than one person what they saw and what they didn't see. Please pay attention. No one here will be disputing that Mr. Gonzalez's home was burglarized by at least three people. You are gonna hear it from him. Terrible. He was terrified.

State points out it's a scary event. You can't let emotions be what's ruling when you you're trying to decide was it Mr. Valle-Ramos? Somebody burglarized the home. The State needs to prove to you beyond a reasonable doubt that it was Mr. Valle-Ramos beyond a reasonable doubt. You can't just hold somebody, because

P000129

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

he's the one charged, it's got to be him, so let's find him guilty because this poor man, Mr. Gonzalez had his house burglarized.  That's not how it works.

You are going to hear from multiple witnesses. Please pay attention, and I'm confident you will hear the conflicts in the evidence.  Mr. Valle-Ramos is not guilty.  They got the wrong guy.  Thank you for your time.

THE COURT:  All right.

State, call your first witness, please.

MS. SCOTT:  State calls George Gonzalez.

Thereupon,

**GEORGE GONZALEZ**

was called as a witness and, having first been duly sworn, testified as follows:

THE COURT:  Have a seat for me please.  If you will go ahead and tell me your first name, your last name, and spell both for me.

THE WITNESS:  George Gonzalez.  G-E-O-R-G-E, Gonzalez, G-O-N-Z-A-L-E-Z.

THE COURT:  State, you may inquire.

**DIRECT EXAMINATION**

BY MS. SCOTT:

Q    Good afternoon.  Can you tell the jury what you do for a living.

P000130

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**   I sell -- I have a little business.  I sell lethal and nonlethal weapons.

**Q**   And what kind of hours do you have normally?

**A**   I work on weekends sometimes and sometimes during the week.

**Q**   Okay.

**A**   Not long hours.

**Q**   Do you normally go to work in the morning?

**A**   Sometimes.

**Q**   Okay.  Back in April of last year, April 9, 2013, of last year were you living at 1625 Little Falls Circle?

**A**   Uh-huh.

**Q**   Is that a yes?

**A**   That's a yes.

**Q**   Okay.  We are not being audio recorded, just video or -- excuse me -- we are not being video recorded, just audio.  Is that -- the 1625 Little Falls Circle, is that in Orange County, Florida?

**A**   Uh-huh, yes.

**Q**   Okay.  Do you remember?

**A**   I just don't like my address being given out, but since you are giving it out, everybody has a copy of that?

**Q**   They do.

**A**   Okay, fine.

**Q**   Do you remember that day?

P000131

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    Um, yeah.  A little bit.  Been a year-plus ago, I think.

**Q**    Sure?

**A**    Uh-huh.

**Q**    Do you remember an incident occurring at your residence that day?

**A**    Sure.  Uh-huh, yes.

**Q**    What's the first thing that you remember about that incident?

**A**    Um, when I got home, I opened the door and I saw a gentleman there peek outside my office.  And I looked at him, he looked at me, and I realized I was being robbed.

**Q**    Okay.  I am gonna break that down a little bit and slow you down a little bit.

**A**    Can I get some water or no?

**Q**    Sure.

**A**    I'm just a little dry.

**THE COURT:**  Why don't we do this, if you need, there is a water fountain out there.  I don't have anything I can give you.

**THE WITNESS:**  I'll hang tough.  Go ahead.

**THE COURT:**  Okay.

**BY MS. SCOTT:**

**Q**    I will really try to be brief.  When you say you left that morning and you came back, about what time was that

P000132

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

when you said you came back to your house?

**A**   Um, around 9:30, maybe.

**Q**   A.m.?

**A**   Yes.

**Q**   Okay.  When you came in to your house, were you expecting anybody to be there?

**A**   No.

**Q**   Okay.  Do you live by yourself?

**A**   Yes.

**Q**   When you arrived back at 9:30 -- explain to me the layout of your house.  When you say the front door, is there a driveway that leads up to your front door?

**A**   No.  I park there.  I walked to the front door.  As I open the door, then there's a little foyer, kitchen to the left, living room straight ahead through a little door there, or opening, and then my office is to the extreme right towards the back.

**Q**   Okay.  And when you say you park there, is there, like, a roadway that you would be able to park your car in?

**A**   There's a reserve spot for me in my unit.

**Q**   Okay.  And are these townhouses?

**A**   Condos, yeah.

**Q**   Condos that are next to one another?

**A**   Uh-huh.

**Q**   And are they covered either in the front or the

P000133

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

back?  Are there any fences enclosing them?

    **A**    Yes.  In the back there's a fence there.  There's a double fence, actually, at the time.

    **Q**    Okay.  And what do you mean by double fence?  Can you describe that?

    **A**    Yeah, in the back patio it's all wood fence, double-packaged wood, and behind that there's an easement, and then there's another wood panel fence back there.

    **Q**    Okay.  When you --

    **A**    They have recently changed that to a link fence now for people can see if there's anybody.

    **Q**    Got it.  When you first came into your home -- is the office you described, is it from the front door to where your home office is?

    **A**    Uh-huh.

    **Q**    Approximately how far is that?

    **A**    About 35, 40 feet, maybe.

    **Q**    Okay.  And did you go straight to there or did you just see someone come out?

    **A**    No.  I walked into the foyer about another five feet or so and then I saw the head turn and sort of -- he sort of leaned and looked like this, and then we stared at each other for a moment.

    **Q**    Okay.  And just for the record, you were leaning out as if you were peeking around the corner?

P000134

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**  He was leaning out.  I was looking straight ahead.

**Q**  Correct.  When you saw this individual look at you, how far were you from him?

**A**  Um, say about 35, 40 feet.  I'd say I'd be about maybe 35 to 25 feet.

**Q**  Okay.  What did you do after you saw him?

**A**  Well, after a little -- few seconds that we stared at each other, then I cursed a few things and then I started chasing him.

**Q**  Okay.  Which direction did you start chasing him?

**A**  Straight ahead right at him.

**Q**  Okay.  At that point did you know if there was anybody else in the house?

**A**  No.

**Q**  What happened once you gave chase?

**A**  Well, he hauled out the back door and patio and I realized that he's going to make it out there faster than I can get to him.  He's a pretty quick guy.  So I went out the front, hoped to cut him off, but I'm too slow.

**Q**  When you went out the front, which direction did you go?

**A**  I took a left.

**Q**  And did you see when he went out your back, did he cross the fence?

**A**  He actually came around and we are now in chase.

P000135

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

And then he turned around, was looking at me again, and then I kept chasing.  But I couldn't catch up to him, so I let him go.  Then started to call the police.

Q    Okay.  When you met up with him at some point outside and he was looking back at you, was there anything obstructing your view?

A    No.

Q    Okay.  You're wearing glasses today.  Do you normally wear glasses?

A    Yes.

Q    Were you wearing glasses that day?

A    Oh, yeah.

Q    Okay.  Were you, um -- any change in prescription or anything like that that day or did you have any issues with your eyes?

A    No.  I wear them all the time.  They are for distance.  I see very clearly, you know, and I take them off to read.

Q    Okay.  Were you reading right before this incident occurred?

A    No, I was driving, coming home just to relax.

Q    Okay.  Once the incident occurs outside and he runs away from you, do you see where he goes?

A    Yes.  I turned around and then I went back towards the easement side and then he jumped the fence and he looked

P000136

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

back at me one more time and then he just kept going.

Q    Okay.  Could you describe that individual that you saw?

A    Yeah.  I pointed out the picture.  It's that guy right there.

Q    Okay.  Back up just for a quick second.

A    Okay.

Q    Was it male or female?

A    It was male.

Q    Okay.  Was he black, white or Hispanic?

A    Yes.  Hispanic.  Hispanic, light brown color.

Q    If you had to -- when you, um --

A    To me, he looked Hispanic, just light, you know.

Q    Do you remember what he happened to be wearing that day?

A    I believe it was a blue sort of jersey, cutoff jersey, basketball jersey or something like that.

Q    Okay.

A    Didn't pay much to the clothing, more to his face at the time.

Q    Sure.  Did law enforcement, um -- that individual that you saw running away just a moment ago, do you see that individual in the courtroom today?

A    Uh-huh.  That guy right there.

Q    Okay.  Can you describe just an article of clothing

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

he's wearing?

A    Right now he's got a long sleeve looks like a blue shirt, white buttons, black T-shirt underneath.

Q    And, again, because we are not having video recorded, where is he seated in the courtroom?

A    To the left of his attorney.

MS. SCOTT:  Let the record reflect the witness has identified the defendant.

May I approach the clerk, Your Honor?

THE COURT:  You may.

BY MS. SCOTT:

Q    What happened after you -- after you gave up chasing this guy?

A    Well, I proceeded to the front door, walked in the front door, was out of breath a little bit there, and was calling the police.  And then I was -- as I was calling the police, I started going up the steps and then another guy came down and we bumped right into each other.

Q    Did that individual see you coming?

A    Um, I don't think he did.  I think we just happened -- I'm going up and he's coming down.  We just, literally, like in the movies, just hopped right on chest to chest.

Q    What happened once you bumped into each other?

A    Well, I turned, I had him in a chokehold and I was

Official Court Reporters
407-836-2280

P000138

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

dragging him down trying to call the police at the time. Then I put the phone down.  I did have the police on the line so they were on their way.

Q    Okay.

A    And, um -- then the other guy came down.

Q    Okay.  And you say the other guy, at this point are you already downstairs with the individual you have in a chokehold?

A    No.

Q    Okay.  What happens once the third individual comes downstairs?

A    Well, I had a pepper spray gun on me.  My regular gun I usually carry on me was in the car.  So that's all I had on me at the time.  So I took that out and I shot him in the face with it, the guy I had in a chokehold, and he panicked.  And then I went to shoot the other guy, tried to grab the other guy too, but I couldn't because I had -- my rotary cuffs are torn on that side.  I just got over that, over two operations with that, but they made it worse on the left side from the struggle.  Yeah.

Q    Were those two individuals able to get away from you?

A    Yeah.  Yeah.  They did, eventually.  Well, after I see the third one, I wondered how many there are, you know. I'm not Bruce Lee.  I'm almost 60 years old, so, you know.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Right.  After you saw the third individual and after the struggle that you just described occurs, what happened?  Where do they go?  What happened after that?

A    Well, one went out the front door.  The guy I had a chokehold on, I tried to switch to grab the other guy so I released him because I couldn't do it because of my shoulders went out.  Then the other guy ran up, so I decided to go after him.  And I went out so far and then he took off because they are young guys.  They run quite fast.  So then I went to go get the other guy and I guess the other guy, I thought he went out the back.

MS. CITRARO:  Objection, narrative.

THE COURT:  Sustained.

THE WITNESS:  And then the other -- oh, you want me to be quiet?

THE COURT:  Yeah.  Let her ask the next question.

THE WITNESS:  Oh, okay.

BY MS. SCOTT:

Q    Once that first individual gets away and goes out the front, the second individual goes out the back?

A    Well, I thought he might have.  I didn't see him. The last time I saw him, he went out, so I searched the house at that time.  It looked like he might have gone out the window and jumped down.  So I am not really positive, but he wasn't in the house because I searched the whole house.

P000140

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Okay.  After you searched the house, did you go back outside?

A    Let me recant that.  Actually, I searched the house after the fact when I saw that he wasn't upstairs on that room, then -- and I saw the window, and then I went back down and then I went to chase that guy again.  That's when I went ahead and saw him jumping over the fence.

Q    Okay.  Once you see him jump over the fence, at this point after he jumps over the fence do you have sight of anybody else or is everybody gone?

A    I just have sight of him and then the car he got into.

Q    Okay.

A    And I was going to get my car and chase him, but my keys fell out when we were fighting or something.

Q    What kind of car did you see him get into?

A    Well, I was assuming it was a Camry, but I really can't be positive on that.  Because it's a wood fence and I just saw basic color and a body style.  I used to sell cars. I got a basic idea.  I can't be 100 percent sure if it was a Corolla or Camry, that kind of body style.

Q    What kind of color was it?  What family of colors was it?

A    To me, it seemed like the bluish realm, greenish. Right in there.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**Q**    And how many individuals did you see get into that vehicle?

**A**    I didn't.  I just saw the one guy, then a driver, of course, the guy that was driving, because he just jumped over the fence and they took off pretty quick.

**Q**    Was the driver already in the car once you had a sight of the vehicle?

**A**    Yeah.  He must have been because I didn't see nobody else in-between where you see the fences running around.

**Q**    Okay.  So you only witness the one person get inside the vehicle before it drove away?

**A**    Jump over the fence and he had to get inside the vehicle because that was it, yeah.

**Q**    What happened once he got inside the vehicle?

**A**    Well, they just took off.

**Q**    Okay.  Did law enforcement eventually arrive?

**A**    Yeah, eventually, but it was a long time.  I mean, you know, they got a lot going on.  I don't blame those guys.

**Q**    Sure.  Once law enforcement arrived, did you speak to them?

**A**    Uh-huh.  Yes.

**Q**    At that point that day, did you give any names of any individuals to law enforcement?

**A**    No.

P000142

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Had you ever met the defendant in this case before?

A    (Shakes head.)

Q    Is that a no?

A    No.  I'm sorry.

Q    Had you ever seen him before?

A    No.

Q    Once law enforcement completed their investigation that day, were you ever approached by law enforcement to look at photographs?

A    Yeah, a detective.

Q    Okay.  And do you know how long after, approximately, I'm not asking for exact times, but how long after this incident to the time that you were presented with photographs by a detective?

A    I think it was a few days.  I think it was a few days, yeah.  It has been a long time.  A few days, yeah.

        MS. SCOTT:  May I approach the witness, Judge?

        THE COURT:  You may.

BY MS. SCOTT:

Q    I'm showing you what's been marked for identification purposes as State's Exhibit A.  Without showing the jury what this is --

A    Uh-huh.

Q    State's A, Composite, 1 through 3.  Can you look through that.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    You want me to read or just look at it?

**Q**    Just look at it and tell me if you recognize what it is.

**A**    Uh-huh.  Yeah, that's the photo display.  Yeah. That's where I picked him out immediately.

**Q**    Okay.  Again, for records purposes, the items that I'm showing you, how do you know that -- how do you recognize this?

**A**    Has my initials on it.  They presented that with me.  This must be what he filled out that day.  Um, then I wrote part of what happened here and then I signed this here also.

**Q**    Did you date that was well?

**A**    Um --

**Q**    Or is it dated as well?

**A**    It's dated, yes.  But I -- that's him asking me the questions and I answered it.

**Q**    Okay.  And the photographs?

**A**    And that's the photographs of the lineup they showed me.  And then that's -- I picked him directly right off the bat.

**Q**    Okay.  Photo number?

**A**    Two.

**Q**    Two in this lineup is circled.  There's a scribble next to that.  What is that scribble?

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    That's my initial saying that's the guy.

Q    And is this the photo lineup that you identified that day?

A    Yes, ma'am.  Uh-huh.

Q    Do you know how long it took you to pick out that picture of that photo lineup when it was shown to you?

A    Immediately.  As soon as he showed it to me.  There was another picture I thought might be one of the other guys, but I didn't pick it because I wasn't sure.  So I just let it go.

Q    When you say the other pictures, you thought it might have been the other guy?

A    One of the other two.

Q    That you saw that day?

A    Uh-huh.

Q    Okay.  But that is the only photograph that you circled identifying --

A    That's the one that's the for sure, yeah.  Yeah, positive.

Q    Okay.  When -- that day -- let me back up to the photo lineup real quick.  The law enforcement officer, were you explained what was about to be shown to you prior to it being shown?

A    Yeah.  He showed me, um, I think one set of pictures and then another set of pictures, and I really can't

P000145

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

remember how many sets, but until I, um -- actually, I saw that -- I'm trying to remember.  I saw that one picture and I picked the face, and then he showed me another picture that had an afro on it which was the same face with an afro.

Q    Okay.  The photographs prior to him showing them to you, did -- were you instructed, um -- were you given any sort of directions about the photos that you were about to see?

A    No.  Just -- he just said this is it.  Do any of these guys look familiar?

Q    Okay.

A    That's pretty much it.

Q    Okay.  Were you instructed to pick out a certain picture?

A    No.  Only if I see something that I recognize.

Q    Correct.  Okay.

A    Yeah.

Q    The day that incident occurred, when those individuals were in your home, were you missing any items afterwards that you realized were stolen afterwards?

A    Yeah.  Jewelry that I had been saving.

Q    What kind of jewelry was it?

A    Sterling silver jewelry.

Q    Do you remember specifically the types of items they were, whether rings or necklaces or --

P000146

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    Necklaces.  No -- no rings.  Well, yeah, there was a ring there.  But there was one thing I put on the report I did find, it was a gold ring.  It was my dad's.  And I found it.  So...

Q    Okay.

A    And the rest was pretty much sterling silver and stuff like that.  Yeah.

Q    So there was a gold ring that you eventually did find?

A    (Nods head.)

Q    Other than the gold ring, the sterling silver items, could you estimate an approximate value of those items?

A    Um, yeah.  Its wholesale is about seven, eight grand.

Q    Any other items other than the sterling silver that were stolen?

A    Um, yeah.  I think there were some basic items too, but it's -- oh, yeah.  My wedding band was gone.  It was a gold one, a gold wedding band that I had.  A little music gold necklace thing that I had that was gone.  Then I had a lot of the fake jewelry, but they got that too.

Q    The wedding band, do you have an approximate value of the wedding band?

A    Oh, I would say, um, five to 700, probably.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q   Okay.  Did you -- all of the items, the wedding band as well as the sterling silver items, did you purchase those items?

A   Oh, yeah.

Q   Yes?

A   Yes.

Q   And has anybody had those items from the time that you purchased them to today?

A   No.

Q   Okay.  Where were those items located in your house?

A   Um, the ones that was in the closet is in a case, and I had it covered up in a corner because it was just a lot -- a jewelry -- steel case.

Q   And what items, specifically, were you talking about in that case?

A   Those were all the sterling silver ones.  The other one, I had a jewelry drawer that had a little box in one of the drawers, and I guess they found the box in the back of the drawer.

Q   And the closet, what room in the house was this in?

A   My master bedroom.

Q   Were those items there prior to April 9th, 2013?

A   Say again.

Q   Were those items in your home there, meaning

P000148

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

present --

    **A**   Yeah.  Yeah.  Yeah.

    **Q**   -- prior to April 9, 2013?

    **A**   Yes, it was there.

    **Q**   Okay.  And after this incident occurred, after these individuals ran out of your house, were those items gone?

    **A**   Yeah.  They were gone.  One of them dropped a bag of coins and stuff and a couple of knives I had in there.  So he got scared, I guess.  He dropped that, yeah.

    **Q**   Okay.  These items, did you ever give anybody permission to take them?

    **A**   No.

    **Q**   Okay.  And did you ever give anybody permission to enter your home?

    **A**   No.

    **Q**   When law enforcement approached you with that -- with that photo lineup, you very confidently said 100 percent, this one.  Why were you so confident in that?

    **A**   Just photogenic.  I have a photographic memory.  Right there when we were staring, we were staring at each other, yeah.

    **Q**   Okay.

    **A**   I saw the other guy too.  I saw all of them, but I really can't point out the other two because it was really

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

quick.  So I don't want to pick out somebody that I'm not absolutely sure.

Q    Understood.

MS. SCOTT:  I have nothing further, Judge.

THE COURT:  All right.  Cross-examination?

MS. CITRARO:  Yes, Judge.

**CROSS-EXAMINATION**

BY MS. CITRARO:

Q    Good afternoon.

A    Hello.

Q    You said that you believe Mr. Valle-Ramos popped his head out of the den; is that correct?

A    The office area.

Q    Office area.  I call it a den.

A    All right.

Q    You said it was a few seconds that you looked at him?

A    A few seconds, yeah.

Q    A few seconds like two or three seconds?

A    No, probably about seven to ten seconds.

Q    Seven to ten?

A    Yeah, it was a frozen moment.

Q    You sure it was about seven to ten seconds?

A    I didn't time him, bam.  I didn't have a clock telling you what I feel.

P000150

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    But you then say it was between seven to ten seconds?

A    I think it is about that.  Let's just say -- seven seconds is fine if you want to leave it there.

Q    Don't let me make you feel uncomfortable.  I'm going to stare at you for seven seconds.  Tell me if this feels about the right amount of time that you were staring at him?

A    Yeah, that long.

Q    It was that long?

A    It was that long.

Q    Before somebody did something?

A    Yeah.  He freezed.  I was in shock.  He was there and I was in shock he was there.

Q    And you can't really describe his face, what you remember his face looked like?

A    Yeah.  I did in the picture, I picked it out, right out.

Q    But you can't describe his features, his face, his nose, there was nothing about his face that you actually remember.  You just said that's the guy?

A    Yeah.  The reason I picked him is because I remembered all the features in his face.  You want me to name them or something?

Q    Anything specific.  Do you remember anything

P000151

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

specific about his face?

A  Well, he had an afro.  And he looks like, just, that guy right there.

Q  Okay.  Tell me about the afro.  How big an afro?

A  He had a larger afro at the time.

Q  Okay.  I believe the State showed you --

MS. SCOTT:  If I may approach?

THE COURT:  You may.

BY MS. SCOTT:

Q  Showing you for identification purposes A, State's 1 through 3.  This is the photo lineup that you said you saw?

A  Uh-huh.

Q  The picture number 2 that you identified to be the guy, is this the way his hair was done that day?

A  I think it was picked out a little bit more.  It seemed like it was a little fluffier than that.

Q  So it was longer than that?

A  Yeah, fluffier.  I don't know how much longer.  You can pack it in.  I have black friends in New York and I know how it goes.

Q  Do you remember how tall he was?

A  At the time I guestimated about 5'9", 5'10", between 5'8", 5'10", something like that.

Q  Does that include the fluffy hair?

A  No.  I don't know.  That's all he looked like to

P000152

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

me.  I don't count hair a lot.

Q    Okay.

A    They don't count mine.

Q    How about his clothing, you said you remember he was wearing a basketball jersey?

A    Yeah, it was a basketball jersey, some sort of blue jersey.

Q    So something sleeveless?

A    Yeah.  Something like that if I remember.  We are talking a year and half later, ma'am, or whatever it was.  So...

Q    Do you recall if it had sleeves or not?

A    I don't think.  If it had any -- it had no -- I think at the time I did the report it had no sleeves to short leaves.  That's what I recall, you know, a year and something later.

Q    Okay.  And is that the way your recollection is, no sleeves or short sleeves still?  Is that what you remember?

A    Yes.

Q    Okay.  Do you remember if he had a backpack?

A    Yes.

Q    He had a backpack on?

A    Yes, they all had backpacks.

Q    Okay.  Do you remember if he was wearing long pants or shorts?

P000153

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    Don't remember that.

Q    Don't remember.  Okay.  Can you describe the backpack?

A    Typical medium-size backpack.

Q    Color?

A    No.  Probably darker, maybe.  Color, I can't really recall.

Q    Okay.

A    Wasn't really focused on that.  I wish I was because I would have taken it away from the other guy.  That's what had the jewelry in it.

Q    The photo lineup that I just showed you a second ago, I can show it to you again if it would help refresh your memory.  Do you recall any of those pictures of any of those guys in that photo lineup to have afros?  And I can show it to you again if that would make it better.

A    You mean the same one you just showed me?  The same six pics I just saw?  No, I don't think anybody else had afros.  But you can show me again just to cover myself.

MS. CITRARO:  Can I, Judge?

THE COURT:  You may.

BY MS. CITRARO:

Q    And I'm showing you again State's Exhibit A3.  Would you say that these five other guys have an afro-style hairstyle?

**P000154**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    Well, not what we call an afro, no.  Afro is more puffier out, you know.

Q    So it's your testimony these guys, in your opinion, do not have afros?

A    Correct.  Yeah, that's correct.  Not what we call an afro.

Q    Okay.  But the person in number two has an afro?

A    Well, he has more of an afro, yeah.

Q    Okay.  How many times would you say you have seen those pictures?

A    Today?

Q    No, just overall.

A    I guess you showed me a couple times.  Four times, six times, maybe about eight times.  I'm guessing.

Q    About eight times you saw that face in those pictures?

A    I'm guessing.

Q    Okay.  And did you say that the --

A    Most of it today.

Q    Including today?

A    Yeah.

Q    You said the vehicle when you saw it you were looking through a wooden fence?

A    Yeah, I was looking through a wooden fence -- I'm sorry, I'm a little dry -- and at a distance.  So yeah,

P000155

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

exactly like that, yeah.

Q    And you said the car looked bluish/greenish to you?

A    It did.  I was trying to follow it to keep an eye on it, yeah.  That was my best guess.  Won't put any money on it, I'll tell you that.

Q    What do you mean by follow it and keep an eye?

A    Me, I'm watching it and I'm watching after he jumped over the fence.  I'm watching it trying to get an I.D on the car the best I could.

Q    Did you watch the vehicle move?

A    Yeah.

Q    You saw it go away?

A    I saw it go away until I realized I didn't have my key because I was going to chase him.  I had to go back inside to chase him, but then I didn't.  I tried chasing them but I couldn't see where they went.  Actually I ran into a police officer trying to find out, I guess.

Q    Did you see the car go away -- move away before you went back to your house and got into a fight with the other guy?

A    Yeah.  The car started taking off, right, and the reason I stopped and looked even more is because I didn't have my keys on me.  I realized I didn't -- can't get in the car fast enough to chase them.  Plus we have a gate to go out, so I waited and looked.  I saw them jump over the fence.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

They got into the car, and I watched the car move.  And I know I didn't have my keys, so then I ran back inside.  They were already gone then, you know, when I came back outside to start the car to get them.

Q    When you say they, they were gone, was it the guys that you saw in your house or just the first guy?

A    Well, like I said, only the guy that jumped over the fence, and they had a driver.  That's all what I saw.

Q    Is the guy who jumps over the fence and got in the car, is that the person you're alleging to be Mr. Valle-Ramos or is that --

A    No.  No.  That's another guy.

Q    Or the second or third guy?

A    That's another guy.

Q    So it's one of the other guys that you were chasing, not this one?

A    One of the other guys.

Q    Not this one?

A    He ran away.

Q    Okay.  The first one you lost sight of, you did not see him get into the vehicle, is that true?

A    I did not, yeah, I did not.

Q    Is that true, you didn't see anybody else get into the vehicle when you watched that last guy jump in and it started moving, everybody else was already in the car, would

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

that be what you saw?

A    I don't know if everybody else was in the car.  All I'm telling you is I saw the one guy jump over the fence, and the other guy was the driver.  That's all I saw.  I don't know how many guys were in the car.  There could have been more guys, I don't know.

Q    And the location of that vehicle you are watching, it's in a separate subdivision, isn't that true?

A    Yeah.  They park there.  Actually they did it again a few months later --

Q    Okay.

A    -- to another condo, actually.

        MS. CITRARO:  I will move to strike that.

        THE COURT:  Sustained.

BY MS. CITRARO:

Q    The complexes are actually separate --

A    Yes.

Q    -- correct?

A    Yeah, just a fence.

Q    And they are separated by a fence?

A    Yeah.  The other condo has no gates or anything like that.  So I can see why they pulled in there.  That way we are not delayed from getting out from our condo because the gate has to first open and then it takes its time.  Yeah, that was smart move for them.  Yeah.

P000158

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q   Can you describe the second guy that you got into the physical fight with?

A   Um, no.  I mean, there -- as far as, um, medium -- well, light build, really, medium to light build type of guy. Once again, probably about my height.  And, um, to me it looked Latino, light skinned, you know, like, brown skin. And that was it.  But since when we bumped into each other, when I put him in that chokehold and he was facing away from me most of the time, struggling, I was dragging him backwards until the third guy came down.

Q   So you never really got a good look at his face?

A   I looked at him, but I really, really can't say I'd be able to pick him out of a lineup.

Q   But you saw his face?

A   I saw his face briefly, yeah.  I was worried about a few other things going on at the time.  Yeah.  The third guy coming, I'm worried is there a fourth and fifth, and I'm looking for weapons to make sure I don't get stabbed or shot or killed or something myself.

Q   Did you see the third guy's face?

A   Yeah.  I saw his face too.  It was a fight.  It's a struggle.  Remember, I'm fighting here now.  It's not like I'm holding him and looking at people.  Things are breaking, you know, things are -- it's a fight.  You ever been in one?

Q   It's a fight?

P000159

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    You ever been in one?

**Q**    Sir, I ask the questions.

**A**    Thank you.  Well, you know, it gets a little --
when you are fighting three people --

**MS. CITRARO:**  Judge, if you can instruct the
witness to answer the question?

**THE WITNESS:**  I'm sorry.

**THE COURT:**  Mr. Gonzalez, just answer the questions
that are asked of you.

**THE WITNESS:**  It's not fun.  Go ahead.

**BY MS. CITRARO:**

**Q**    How many seconds would you say you saw the second
guy's face, the one you were in a physical fight with?

**A**    Briefly, because he came in now, saw me, saw him,
and he went back up when I went to shoot him with the second
shot of the pepper spray.  And I was worried about this guy.
I wasn't worried about this with him.

**Q**    Who is "this" guy?

**A**    The guy I got in the chokehold.

**Q**    No.  I'm talking -- I consider that to be the third
guy.  The guy you have in the chokehold, how long did you see
his face?

**A**    Not very long.  He was fighting, so the back of his
head was to me.  Remember, I got him this way.

**Q**    But you did see his face at some point?

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**   Not much.  Just on or off.  I am looking for weapons.  I'm looking for different things.  When you're in a fight, I'm looking to protect myself --

**Q**   Okay.

**A**   -- at that time.

**Q**   Okay.

**A**   Okay.

**Q**   And the third guy you saw for a few seconds also?

**A**   Yeah.  Just very briefly.  I wasn't worried.  He looked at me for a second and then he ran back upstairs that quick.

**Q**   But you weren't able to identify those men?

**A**   No, I didn't.  No, I couldn't, no.  I thought I could, and I possibly could point to them, but I'm not sure. So I'm not gonna point them out.

**Q**   Did they have any distinct hairstyles?

**A**   Those guys had short hair.

**Q**   Nothing distinct about their appearance?

**A**   They -- to be honest with you, they were just young men.  Latin to me, you know, 17 to 20 years old.  You know. I'm in a place where there's a lot of Spanish people.  I'm Spanish myself.

**Q**   Do you recall anything else that he was wearing? You said a basketball jersey with short or no sleeves, not sure about the pants?

**P000161**

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**   Nuh-uh.

**Q**   Do you recall anything else that sticks out in your mind?

**A**   Nah.

**Q**   Do you recall any gloves?

**A**   The other guy, I think, had gloves, that I had in a chokehold.  The guy I was chasing, I wasn't focused on that, but I was pretty sure the guy had gloves that I had in a chokehold.

**Q**   The guy in the chokehold you think had gloves on?

**A**   Yes.  Yes.

**Q**   What kind of gloves?

**A**   I don't know what kind, because once again, I was just trying to protect myself.

**Q**   What makes you think he had gloves on?

**A**   Well, when you just said it, it sort of recollects a little bit in my head that he had some sort of gloves on, yeah.

**Q**   Okay.  The items that were taken from your home, were they ever recovered?

**A**   No, just one piece that some neighbor found in the grass, and then the police officer called me, is this what this looks like, is that one of yours?  And I told them, yes.

**Q**   Okay.

**THE WITNESS:**  Your Honor, I need that drink now

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

because I'm just so dry.

THE COURT:  Okay.

THE WITNESS:  I'll be right back.

THE COURT:  Why don't we take a brief recess and go out to the water fountain and come back in.

(Jury exits the courtroom.)

MS. SCOTT:  I'm concerned with how this is going that he may say something that may cause a mistrial.

MS. CITRARO:  May I be present for the conversation?

THE COURT:  Sure.  Since the rule has been invoked.

(Whereupon a short recess was taken.)

THE COURT:  Bring in the jury.

(Jury enters the courtroom.)

THE COURT:  Ladies and gentlemen, you-all made the phone calls you needed to make?  Everybody is all set for this afternoon?

Ms. Citraro, you may continue.

MS. CITRARO:  Thank you.

BY MS. CITRARO:

Q    Mr. Gonzalez, you said that the afro was picked up like --

A    It looked like it was a little larger than it shows in the picture there.  In my recollection, yeah.

Q    But it was up, it wasn't like pulled back or

Official Court Reporters
407-836-2280

P000163

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

slicked back or anything?

A    It was up.  No.  It seemed like a little more out, just a little more out -- not out, just a little bit more out.

Q    Not held back by anything that you could see, just out?

A    Not that I recall, no.

MS. CITRARO:  It don't have anything further.

THE COURT:  All right.  Any redirect?

REDIRECT EXAMINATION

BY MS. SCOTT:

Q    The item that -- you said one item was recovered in the grass area?

A    Um, yes.

Q    What item, do you remember what item that was?

A    Well, um, the officer came to the house and, um, after this incident happened -- I had a roommate then after this happened and he was -- they took a picture of it, sent it to me, so I just saw it through my phone, but it looked definitely like the items I have, yes.

Q    And what kind -- can you describe the items to me?

A    It's, um, they are sterling silver, 9.25 sterling silver with gemstones, like blue topaz.  This was a peridot, I believe.

Q    Was this a necklace?

P000164

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    I believe.  Oh, yes, it was a necklace that I recall, yes.

**Q**    Do you remember -- were you made aware what -- where it was specifically found?

**A**    It was found on the grass, close in -- I guess somewhere in my area because that's all the officer said, it was found in -- someone found it in the grass.  And, yeah, I guess they must have known about what happened.  I don't know.

**Q**    Do you know if it was on your property or outside of your property?

**A**    I wouldn't know that.  I wouldn't know that.

**MS. SCOTT:**  I have nothing further, Judge.

**THE COURT:**  Thank you, Mr. Gonzalez.

**THE WITNESS:**  Okay, sir.  Thank you.

**THE COURT:**  All right.

State, call your next witness.

**MS. SCOTT:**  State calls Bethany Szewczyk.

Thereupon,

                    **JORGE GONZALEZ**

was called as a witness and, having first been duly sworn, testified as follows:

**THE COURT:**  All right.  Ma'am, can you tell me your first name, your last name, and spell both for me, please.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE WITNESS:  My first name is Bethany.  Last name is Szewczyk.  B-E-T-H-A-N-Y.  Last name, S, as in Sam, Z, as in zebra, E-W-C-Z-Y-K.

THE COURT:  State, you may inquire of the witness.

MS. SCOTT:  Thank you, Judge.

**DIRECT EXAMINATION**

BY MS. SCOTT:

Q   Ms. Szewczyk?

A   Yes.

Q   Can you tell the jurors what you do for a living?

A   I'm actually an attorney, but it's not my full-time job.

Q   And on April 9th of 2013, what were you doing in terms of occupation?  What was your job then?

A   Same position now.  I work at Siemens Energy.  I'm a project manager.

Q   And where did you, um -- where did you live on April 9th of 2013?

A   I lived in a condo in Liberty Square.

Q   Okay.

A   Do you want that --

Q   Do you still live there now?

A   I don't.  I actually just moved at the end of February.

Q   Do you remember the address?

P000166

A    Yes.  1716 Lafayette Court.

Q    Do you remember an incident occurring on April 9th of 2013?

A    Yes.

Q    What were you doing that morning?

A    I was leaving for work.

Q    Do you know, approximately, what time that was?

A    It was around eight o'clock.

Q    And what happened when you were leaving for work?

A    So I walked out of my privacy yard gate, and I was standing under my carport, and as soon as I did, I looked over to the right because I saw three young men running to a vehicle that was parked in the roadway.  It wasn't an actual parking space.  The car was facing out, and because it just a -- it's just, basically, a driveway, and there's no exit there.  It's just a row of units at Liberty Square, and I see three young men jumping into the vehicle.  One on the passenger side, one got in the driver's side, and then a third behind the driver.

And they looked at me, I looked at them.  I heard one of them say, hurry up before the cops come.  They get in the car and they drove around.  So they actually had to drive, like, past me around my unit and then left.

Q    I'm going to slow you down a little bit and back up a little bit.

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**     Okay.

**Q**     When you saw these three individuals, have you ever seen these people before?

**A**     No.

**Q**     Did you recognize them as neighbors?

**A**     No.

**Q**     When they got into the vehicle, could you see which direction they were coming from?

**A**     They were coming from -- they were coming from the neighbors, which is, like -- Hidden Creek is another condo community and we are separated by a fence there.  So I presumed they came around that fence.  We have a lot of trespassers that will cut through our property and go through that way.  It happens all the time.  So when I saw them, I knew they had come from there.  I knew they hadn't come from one of the other units.

**Q**     Hidden Creek Community is the neighboring community next to your condo at that point?

**A**     Correct.

**Q**     And can you describe to me both -- let's start with Hidden Creek.  What -- structurally, what do the buildings look like?

**A**     Hidden Creek?

**Q**     Yes.

**A**     What do you mean structurally?  They are condo

P000168

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

units and they have a red roof.

Q    Are they all linked together or are they individual units?

A    They are all linked together.

Q    Does it resemble an apartment complex?

A    Yes.

Q    Did the community that you lived in, what was the name of that community?

A    Liberty Square.

Q    Does Liberty Square have a similar setup?

A    Um, it's different.  They are more villa-like, I would say.

Q    Okay.  Um, Liberty Square and Hidden Creek are separated by what?

A    A red fence.  It's actually double fenced.

Q    Okay.  Are there any streets in-between the two complexes, like are there any roadways or is the fence the only thing that divides it?

A    The fence is the only thing, and then there's obviously roadways on the other side of the fences, but yeah.

Q    Okay.  And the way that you described the vehicle, was it -- if you were to leave in that vehicle, was it already facing towards the exit or did it have to turn around to exit?

A    It was facing the exit.

P000169

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    All right.  And these individuals that you saw getting into that vehicle, um -- well, let me ask you this. What type vehicle, if you remember?

A    I don't remember what type, but I can tell you it was not an American-made car.  I know that.

Q    Okay.  Was it a van or a smaller sedan?

A    It was a four-door sedan.

Q    Okay.  Do you know the color?

A    I believe it was gray.

Q    And did you see anybody other than those three individuals?

A    No.

Q    Do you --

A    Well, I take that back.  My neighbor was reparking his car.  He was inside his car and I knew he was out there as well.  But other than them, no.

Q    Did you see any other individuals get into that car?

A    No.

Q    The gray car?

A    No.

Q    The individuals that you saw get in, let's take them one at a time.  The driver of the vehicle, the one that you saw get into the driver's side, do you remember what he looked like?

P000170

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    Yes.  He was about 5'10", 5'11", he was young.  I would have guessed about 20.  I thought they all -- three people looked very similar.  He was Hispanic, dark hair, dark eyes, and just young.  I just remember them being, like, thinking I was seeing three brothers who were kids.

Q    Okay.

A    And he was wearing blue latex gloves on his hands.

Q    The driver?

A    The driver.

Q    The other individual that got into the passenger side, do you remember what he looked like?

A    I don't remember, specifically.  I can tell you he was shorter and looked a little bit younger.  And then the one who got behind the driver was the youngest.  I would say he was even maybe as young as, like, 14 years old.  They were very young kids.

Q    The person that was the driver, would you say he was the oldest out of the three?

A    Yes, definitely.

Q    When this occurred that day, did you speak to law enforcement?

A    I did.

Q    Did you write a statement to law enforcement?

A    I did.

Q    And that day that this happened, were any suspects

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

identified and presented to you?

**A**    No.

**Q**    Okay.  Were you later approached by law enforcement with photographs of potential suspects in this case?

**A**    Yes.

**Q**    When was that, do you know?

**A**    I can't remember exactly when it was.  I was approached about it not too long after.  I would -- maybe -- I don't know, a couple months or so.  But then it took awhile for them to actually bring me the photos and actually do the photo lineup.

**Q**    Okay.  The photo lineup that you're discussing now, whenever -- and I'm not asking you at this point a specific date for when that was presented to you, but whenever it was presented to you, is it fair to say that it was presented to you months after this event occurred?

**A**    Yes, it would be fair to say.

**Q**    The individuals -- when you saw them getting into the vehicle, out of the three individuals, the driver, the front passenger and the back passenger, out of those three, who would you say you got the best look of?

**A**    The driver.

**Q**    Okay.  And why is that?

**A**    Because I stared at him.  Because I was kind of stunned at what I was seeing, and I remembered seeing those

P000172

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

gloves and I heard what he said to the other two individuals and I just was kind of just standing there staring at him because I didn't know what else to do.  So I was kind of, am I really seeing this?  And then as he was driving, him and I both made eye contact and I stared at him through that window as he drove around, and he knew I was looking at him, obviously, so...

Q   I want to get an approximate distance from you, and I know these are approximations, but you said you were in your carport?

A   Right.

Q   And that this vehicle was in the roadway.  From your carport to where this vehicle was, how many feet, approximately?

A   About 20 feet, 20 to 30 feet, max.

Q   Did that vehicle get closer to you as it was driving away?

A   Yes.

Q   And at the time that it got the closest to you, how -- approximately how many feet would you say you were from the driver of that vehicle?

A   Ten feet.

MS. SCOTT:  May I approach the clerk, Judge?

THE COURT:  You may.

MS. SCOTT:  May I approach the witness?

P000173

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  You may.

BY MS. SCOTT:

Q    I'm showing you what's been previously marked for identification State's Composite B1 through 3.  Without showing the jury that, can you look through that and tell me if you recognize it?

A    Yes, I recognize it there.

Q    And what do you recognize that as?

A    This is the photo lineup that the detective came to my work and we did together.

Q    And how do you know that that's the photo lineup and those are the things that you looked at with the detective that day?

A    Um, well, my initials are on it and I recognize my handwriting and my signature.

Q    Okay.  And the third, composite three of this exhibit, is a series of six photographs?

A    Uh-huh.

Q    Photograph number 2 is circled with initials next to it.  Whose initials are those?

A    Mine.

Q    And is that the photo lineup that you looked at on the day that the detective presented it to you?

A    Yes, it is.

Q    And is that your handwriting and your initials that

P000174

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

you circled that individual?

A    Yes.

Q    When the detective presented this to you, how long did it take you to pick out that picture?

A    Five seconds.

Q    Um, were you confident in your identification of that picture?

A    Yes.

Q    Okay.  Why were you so confident in that?

A    Because that's the face that I saw that day.

Q    Do you remember, um, what that individual was wearing that day?

A    I don't recall.

Q    Okay.  Do you remember, other than the gloves, whether he had anything in his hands?

A    He had something in his hand.  It was small.  I just remember he was clenching it in his hand.  I thought maybe there was car keys or something, but it was something small.  None of them were carrying anything.  I know he had long sleeves on, but I don't remember anything else other than that.

Q    Okay.  Were you focused on what he was wearing?

A    No.  Because I focused on those gloves, and then his face.  And they were literally just getting in the car, so I didn't even have the time to really look at the

P000175

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

clothing.

Q   Okay.  The individual that you saw getting into the driver's side, did you hear him say anything?

A   Yes.

Q   What did you hear him say?

A   I heard him say, hurry up before the cops get here or before the cops come.  One of the two.

Q   Okay.  That individual that you saw get into that car that you heard say that, do you see that individual in the courtroom today?

A   Yes.

Q   And can you identify by an article of clothing that he's wearing?

A   I'm sorry?

Q   Can you identify him with an article of clothing that he's wearing today?

A   A blue shirt.

Q   And just because we are not being video recorded, only audio, can you describe where he's seated in the courtroom?

A   Um, he's seated at the table behind you with his attorney.

Q   Have you ever met this individual before?

A   No.

Q   Have you ever seen him prior to April 9, 2013?

Official Court Reporters
407-836-2280

P000176

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    No.

Q    Do you know somebody by the name of George Gonzalez?

A    No.

Q    Do you know anybody personally related in this case in any way at all?

A    No.

Q    Did you have anything stolen that day?

A    No.

Q    Were you a victim of any crime that day?

A    No.

MS. SCOTT:  I have nothing further.

THE COURT:  Cross-examination?

MS. CITRARO:  Yes.  Thank you.

CROSS-EXAMINATION

BY MS. CITRARO:

Q    Good afternoon.

A    Hi.

Q    You said you remember he had long sleeves on?

A    Yes.

Q    Like a shirt, a long-sleeve shirt?

A    Yes.

Q    Okay.  With gloves?

A    Yes.  Blue latex gloves.

Q    Blue latex gloves.  Were they like tucked into the

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

sleeves, do you know?

**A**     I believe so.  One was tucked into the other.

**Q**     Did you see a backpack on him?

**A**     No.

**Q**     No backpack?

**A**     I don't recall a backpack, but I wasn't focused on that.

**Q**     Do you recall any specific facial features?

**A**     Um, I just --

**Q**     Eye color?

**A**     The dark hair and just the general appearance of him being Hispanic.

**Q**     Can you describe his hair?

**A**     Um, dark and just kind of poofy, I guess.

**Q**     Poofy like an afro?

**A**     Yeah, kind of.

**Q**     Poofy and afro?

**A**     Yeah.

**Q**     Do you know about how long it was?

**A**     It wasn't very long, but was not like clean cut. It was -- it had enough length to look messy.

**Q**     Okay.

        **MS. CITRARO:**  May I approach the witness?

        **THE COURT:**  You may.

P000178

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**BY MS. CITRARO:**

Q    The State just showed you a photo lineup.  This picture number 2 here, is that how you would describe his hair that day?

A    Yes.

Q    It was exactly that length?

A    Um, I don't recall specifically, but it was around that length.  I don't want to say it was exactly that length, but it was longer like that.

Q    Would you describe that hairdo as an afro?

A    A little bit of one, yes.

Q    Would you say that any of the other five individuals in that lineup have afro-style haircuts?

A    No.

Q    Okay.  Do you remember pants, shoes, anything else about his clothing?

A    I don't.

Q    You said there were three males?

A    Three males.

Q    And the one that you identified to be Mr. Valle-Ramos is the one who got into the driver's side?

A    Correct.

Q    And his hair was not held back or slicked back or anything, it was just a poofy afro that day?

A    Right.

Official Court Reporters
407-836-2280

P000179

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**Q**    Do they all run up to the car at the same time?

**A**    Yes.

**Q**    So they all three came in a group.  It wasn't like one runs and then the other one ran up and then the other one?

**A**    No.  They were all almost right at the same time getting in the car at the exact same time.

**Q**    Okay.  How many times would you say you have seen that photo lineup, the group of six pictures?

**A**    Counting today?

**Q**    Counting today?

**A**    Five times.

**Q**    About five times?

**A**    Yeah.

**Q**    The other two guys that you saw getting into the car, did either of them have an afro-style haircut?

**A**    Not that I recall.  But I wasn't really looking at them.  They were more kind of present there because I was really more focused on the driver.  He was the one closest to me.  The only thing I recall is they looked like brothers, they all looked very similar.

**Q**    And you said you were about 25 feet away at first, and then later 10 feet away?

**A**    I was about 20 feet.  The car was about 20 feet, yeah.  It was almost not directly behind my carport, but I'd

P000180

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

say almost directly behind my neighbor's carport.  So it was a little bit of a diagonal to me.  And then as they left, yeah, I was about 10 feet from the driver.

Q    And that complex, was it Lafayette Square Condos?

A    Liberty Square Condos.  That was -- my unit was on Lafayette Court.

Q    The fence that -- you said you actually saw them come around the fence?

A    No, I didn't see them come around the fence.

Q    You didn't see them?  Okay.  You said that people had tried to come into the neighborhood before and they usually jump that fence?

A    Yeah.  I actually served on the board, and it was very routine for people to trespass around the actual end of the fence.  They would because it's a -- the fence kind of just comes to an end, so it served as a shortcut for kids or anyone to just kind of come through.

Q    Does it come to an end in a lake?

A    Um, not right in the lake.  But right at the opening of the lake, yes.

MS. CITRARO:  May I approach the witness?

THE COURT:  You may.

BY MS. CITRARO:

Q    Showing you what's marked as Defense Exhibit F Composite 1 through 2.  Can you just look at these two

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

pictures.  There's a second one behind it too.

A    Yes.  This is the fence.

Q    That's the fence that you're referring to that people would come around?

A    Well, what they would do is this -- these two fences, there's a gap in-between.  So a lot of times they'd go in-between this black fence and the red wooden fence.  I think some people do go around, like they hang on, they put their foot on here, they put their other foot on the other side and they swing them.  That's how dedicated they are to trespassing and getting a shortcut, but a lot of people, especially kids, will just about through this part.

MS. SCOTT:  Objection.  I'll ask that the pictures remain facedown.

THE COURT:  Since it's not in evidence at this point in time, don't show it to the members of the jury.

THE WITNESS:  Oh, I'm sorry.

BY MS. CITRARO:

Q    Based on the location of the vehicle where you were standing, what you saw where they were running from, would it be -- would it make sense that they ran around that fence and came from that direction to get to the vehicle?

A    It made sense to me, because I didn't think any -- it was my immediate thought as soon as I saw them because the only time we have cars parked back there that

P000182

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

shouldn't be is when someone has come around.  I don't know if they jumped the fence.

**MS. SCOTT:**  Your Honor, I'm gonna object to speculation.

**THE COURT:**  Overruled.

**THE WITNESS:**  I don't know if they jumped, they cut through or they went around.  I don't know.  But I know that they weren't there at Liberty Square.  They were definitely coming from the neighbors.

**MS. CITRARO:**  Okay.  May I approach the witness again?

**THE COURT:**  You may.

**BY MS. CITRARO:**

Q    I'm gonna take this one from you and I'm gonna show you what's marked as Defense Exhibit E, Composite 1 and 2. Can you just look at these two pictures for me.

A    Sure.  Okay.

Q    Is the angle of that picture facing your carport? Do you recognize that area in the picture?

A    Yeah, I recognize the area.  The second one is facing my carport.  The first picture is not.  My carport is not in this picture.

Q    Okay.  The second one, it is?

A    Correct.

Q    Okay.  So that -- is that the general area of

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

where --

A     Yes.

Q     -- the vehicle was parked?

A     Yes.

Q     It was alongside the fence that you can see in that picture?

A     Yes.

MS. CITRARO:  May I approach?

THE COURT:  You may.

MS. CITRARO:  May I have just one moment?

THE COURT:  You may.

MS. CITRARO:  I have nothing further.

THE COURT:  All right.  Any redirect?

MS. SCOTT:  Just one, Judge.

REDIRECT EXAMINATION

BY MS. SCOTT:

Q     The photo lineup that you said you have seen five times, the day that it was presented to you by law enforcement, was that the first time you have ever seen it?

A     Yes.

MS. SCOTT:  I have nothing further.

THE COURT:  Thank you, ma'am.  You're excused. Thank you.

THE WITNESS:  Oh, thank you.

THE COURT:  State, call your next witness.

Official Court Reporters
407-836-2280

P000184

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. SCOTT:  State calls Detective Stanley.

Thereupon,

**DETECTIVE MICHAEL STANLEY**

was called as a witness and, having first been duly sworn,

testified as follows:

THE COURT:  All right.  Detective, have a seat.

Once you get situated, tell me your first name, your

last name, and spell both for the record for me, please.

THE WITNESS:  Michael Stanley.  S-T-A-N-L-E-Y.

MS. SCOTT:  First name?

THE WITNESS:  Michael.  M-I-C-H-A-E-L.

THE COURT:  Thank you.

State, you may inquire of the witness.

MS. SCOTT:  Thank you, Judge.

**DIRECT EXAMINATION**

BY MS. SCOTT:

Q    Good afternoon.

A    Good afternoon.

Q    Can you tell the members of the jury what you do
for a living?

A    I currently work as a detective for the Orlando
Police Department.

Q    And how long have you been with OPD?

A    Um, nine years.

Q    And how long have you been a detective with them?

P000185

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    Um, two years.  Two years this May.

**Q**    Do you have any other law enforcement experience prior to Orlando Police Department?

**A**    No, I do not.

**Q**    Okay.  Can you describe briefly as a detective what unit you are assigned to and what responsibilities that entails?

**A**    I'm currently assigned to the assault and battery unit.  At the time of this incident I was assigned to the east property unit.  That unit is responsible for the investigation of property-related crimes that occurred on the east side of Orlando.

**Q**    And typically when you respond to a scene or an investigation, at what point in the investigation do they call you?

**A**    Um, in this instance I -- I did not respond initially.  The incident had taken place and I was assigned that investigation after it had already transpired.

**Q**    Let me clarify my question.  At what point is a detective assigned to a crime?  Are they always assigned or do certain things have to happen before a detective gets assigned?

**A**    Um, they will always be assigned.  However, based upon the varying degrees of evidence that is available to work with depends on the priority of that specific case.

P000186

10/06/2014 FILED IN OFFICE EDDIE FERNÁNDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    And in a case like a burglary, for example, would you typically respond to the scene or would you get assigned and investigate at a later date?

A    Um, you would typically respond?  For some reason this incident, we were not able to make a physical response to the scene that day.

Q    Were you working as a detective with OPD on April 9th of 2013?

A    Yes, I was.

Q    And at what date were you assigned this case?

A    The following day.

Q    Okay.  So April 10th?

A    Correct.

Q    And what did you do on the case when you were initially assigned?

A    Um, reviewed the incident report that had been prepared by the responding officer.  I reviewed the photographs that had been taken and documented the scene.  I read the witness statements as well.

Q    Did you through the course of your investigation develop a suspect?

A    Yes, I did.

Q    And did you develop more than one suspect or just one?

A    Um, I was only able to develop one suspect.

P000187

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    And do you know the name of that suspect that you developed?

A    Yes, I do.

Q    And what is that name?

A    His name was Jorge Valle-Ramos.

MS. SCOTT:  May I approach the clerk?

THE COURT:  You may.

MS. SCOTT:  May I approach the witness?

THE COURT:  You may.

BY MS. SCOTT:

Q    I'm showing you what's been previously marked as State's Composite A, 1 through 3, Composite B, 1 through 3. I'll show you A first.

A    Okay.

Q    Do you recognize that?

A    Um, yes, I do.  It is a document that our department has prepared, a photo lineup administration witness instructions.

Q    That first page, what is that?  Just explain to the jury.

A    Basically, it has some information, basically, the case number, witness name, lineup name, date, time, um, and a series of sections which I, as the administrator, filled in, things that I had done.  It also includes some instructions that I read verbatim to either a witness or a victim, and

Official Court Reporters
407-836-2280

P000188

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

they, um, then prepared -- provide their initials there
noting that they understood the instructions.

Q    Okay.  The second page, could you look at that and
tell me what that is?

A    Yes, I can.  This is another witness photo display
identification form in which, again, a victim or a witness
will circle and make at the same time about whether they have
made an identification or not in reference to a specific
lineup that is being presented to them.

Q    Those forms, are they standard with the Orlando
Police Department?

A    Yes, they are.

Q    And can you look at the third page?

A    Yes, I can.

Q    Do you recognize that?

A    Yes, I do.

Q    And what is that?

A    It is a photographic lineup that I prepared
containing a photograph of Mr. Valle-Ramos.

Q    Okay.  And were you the one that prepared that
photo lineup?

A    Yes, I did.

Q    And from where did you receive the types of
pictures that were to go into that photo lineup?

A    I obtained the photographs from the State's

P000189

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

driver's license database of photographs.

Q    Okay.  When you -- I'll take that back.  I want to show you what's been marked now as State's Composite B, 1 through 3.  Same series of questions.  Could you look at that and explain to me what that is and how you recognize it?

A    Again, it's my handwriting, my initials, and it is the same photo lineup, witness instructions.  This time it was presented to a witness to the incident.

Q    And the second and third page, what is that?

A    Second and third page, again, the second page is the witness photo display identification form in which it would have the person that is reviewing the form, circle if they see a picture of the person that committed the crime and the statement noting such.

Q    And the third page, what is that?

A    The third page, again, is the actual photographic lineup itself which contains a photograph.

Q    And did you present that or did you compile that photographic lineup?

A    Yes, I did.

Q    And where did you get those photographs from?

A    I obtained these photographs from the state of Florida driver's license database.

MS. SCOTT:    At this time the State would move into evidence what's been previously marked as State's A1

Official Court Reporters
407-836-2280

**P000190**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

through 3 and State's B1 through 3 as State's 1 and 2.

THE COURT:  Any objection from the defense?

MS. CITRARO:  No objection.

THE COURT:  All right.  What's been marked as State's Exhibit A for identification will be moved into evidence as State's Exhibit 1 without objection from defense.

What's been listed as State's Exhibit B for identification will be moved into evidence as State's Exhibit 2 without objection from the defense.

(State's Exhibits 1-2 received in evidence.)

BY MS. SCOTT:

Q    Detective Stanley, when you construct a photo lineup, have you ever done that before?

A    Yes, numerous times.

Q    Prior to this case, approximately how many times?  Over 100?

A    Yes, easily.

Q    What do you do when you are constructing a photo lineup?  What types of photos are you looking for?

A    I'm looking for photographs of those similar characteristics based upon age, obviously sex, race, hairstyle.

Q    When you present a witness or a victim to a crime a photographic lineup, do you suggest to them which photograph

Official Court Reporters
407-836-2280

P000191

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

might be that of a particular suspect?

A   No.

Q   Do you at any point tell them that the suspect is definitely in this photo lineup?

A   No, we do not.

Q   And why not?

A   It's very suggestive.  I think prior history and studies have shown that, you know, it would lend -- try to push a witness or victim to make a false identification.

Q   When you presented what's been now entered as evidence State's 1 to the victim in this case, do you know when that was presented to him?

A   Um, the date is notated.  I do not know exactly, but the date is notated on the top of the instructions.

Q   Would it refresh your recollection if you looked at it?

A   Yes, it would, please.

MS. SCOTT:  May I approach?

THE COURT:  You may.

THE WITNESS:  It was done on April 18, 2013, at approximately 11:15 hours.

BY MS. SCOTT:

Q   Okay.  So April 18th.  You were assigned to this case April 10th, so eight days prior (sic) to that?

A   Eight days after.

P000192

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Or excuse me, eight days after?

A    Correct.

Q    But you were assigned on April 10th, that was on April 18th?

A    That's correct.

Q    The second photo lineup that you showed, do you remember the date that you presented that to the witness?

A    I do not remember that either.

Q    Would it refresh your memory if you saw it?

A    Yes, it would.

MS. SCOTT:  May I approach?

THE COURT:  You may.

THE WITNESS:  That was done on September 4th of 2013, about ten o'clock in the morning.

BY MS. SCOTT:

Q    Okay.  Were you made aware of Ms. Bethany Szewczyk, the person who identified in this photo lineup Mr. Valle-Ramos, did you know who she was?

A    No, I did not.

Q    Okay.  When did you learn of who she was?

A    I had been aware that she was a witness to the incident.

Q    Okay.  Were you made aware of her existence on April 10th or later?

A    It would have been April -- um, I don't recall

Official Court Reporters
407-836-2280

P000193

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

exactly when I was made aware.

Q    Was that the first part of your investigation?  Did you learn of her pretty quickly when you were assigned to the case?

A    Yes, I was.

Q    Okay.  Can you explain why the victim was presented the photo lineup shortly after the incident but the witness was not presented it until a few months later?

A    Um ...

Q    Is that typical, normal?

A    No, it is not typical.  I just had realized we had had another witness to the -- there was a witness to the incident and I was looking to strengthen, if you will, the identification, and that's where I did so at a later date.

Q    When you presented the photo lineup to the victim, Mr. Gonzalez in this case, do you remember that day, presenting it to him?

A    Yeah, I do.  It took place at our station in the parking lot.

Q    Do you remember -- without going into what he said to you, do you remember how quickly he identified Mr. Valle-Ramos in that photo lineup that you presented to him?

A    Um, yes.  I presented it to him in a manila folder.  I handed it to him.  He then opened it, looked at it and then he made his selection.  So it was rather quickly.

Official Court Reporters
407-836-2280

**P000194**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL
PageID 3688

**Q**   Okay.  Did he need to study this photo lineup for any extensive period of time?

**A**   Not for an extensive period of time, no.

**Q**   When Ms. Bethany Szewczyk looked at that photo lineup, do you remember that day when you presented it to her?

**A**   Yes, I do.  I met with her at her office.

**Q**   Okay.  And when you presented the photo lineup to her, was it also in a manila envelope?

**A**   Yes, it was.  It was the same format, manila envelope.  After I read the instructions to her, I presented her the manila envelope.  She opened it and she made her selection rather quickly as well.

**Q**   Her, um, for lack of better term, the amount of time that she -- from the time she looked at it to the time she I.D'd it, was it fast?

**A**   Yes, it was.

**Q**   Did she need to study it for any extensive period of time?

**A**   No.

**Q**   Did she or Mr. Gonzalez ever falter or ever waver in their conviction as to the correct selection of the photograph?

**MS. CITRARO:**  Objection, hearsay.

**THE COURT:**  Overruled.

Official Court Reporters
407-836-2280

P000195

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**BY MS. SCOTT:**

Q    You can't testify to what they said, just what you observed.  Did they ever waver in whether or not they were sure that that was the photograph?

A    No.  I -- they were fairly certain on their selection.

MS. CITRARO:  Objection, speculation.

THE COURT:  Overruled.

**BY MS. SCOTT:**

Q    After the suspect was identified by these two individuals, did you do any additional work on the case?

A    No, I did not.

Q    Okay.  Did that conclude your investigation?

A    Yes, it did.

Q    Okay.

MS. SCOTT:  I have nothing further.

THE COURT:  Cross-examination?

MS. CITRARO:  Yes, Judge.

**CROSS-EXAMINATION**

**BY MS. CITRARO:**

Q    Good afternoon.

A    Good afternoon.

Q    Did you ever speak with a witness by the name of Charlene Bloom?

A    I spoke to her.  Not in person, over the telephone,

Official Court Reporters
407-836-2280

**P000196**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

PageID 3690

however.

**Q**   Okay.  She did prepare a statement, correct?

**A**   She did, yes.

**Q**   She never did an identification?

**A**   I spoke --

**Q**   Photo I.D.?

**A**   I spoke to her on the telephone and she stated that she would not have been able to offer any identification of the person.  She didn't get a good enough look.

**Q**   You didn't feel that she had very much to offer, that's true, right?

**A**   In speaking to her, she felt that she did not have very much to offer about that.  That's correct.

**Q**   You didn't make an evaluation of whether or not her testimony would be helpful or hurtful or useful at all?

**A**   I did when I spoke to her I looked at the statement, and then I asked her -- was going to attempt to provide her with a photo and have her conduct a photographic identification.  However, she stated she did not believe she had gotten a good enough look at the individuals involved in which to assist or make an identification.

**Q**   Okay.  Do you know anything about any of the physical evidence that was gathered?

**A**   At the scene?

**Q**   Yes.

P000197

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A** Yes. I believe there was a tire iron, I believe, that someone had located, a Pop Tart wrapper that was left by the vehicle, may or may not have been involved, or come from the vehicle, and there were several backpacks that were left at the scene in addition to, I believe, some blue latex gloves.

**Q** Okay. Do you know if any fingerprints or DNA was tried to be collected or attempted to be collected from any of those items?

**A** I do not believe that any fingerprints were able to be lifted or obtained from those items.

**Q** So nothing, no latent prints at all were collected?

**A** Latents were not obtained, correct.

**Q** You sure there were no latents collected from any of the evidence?

**A** I'm not 100 percent positive. There were no identifications made. I don't know the results. Some were obtained and they were of no investigative value.

**Q** So there were prints obtained?

**A** They could have been obtained, but they were not of enough quality with which to make an identification -- excuse me -- which to make an identification.

**Q** So they were not able to be matched to anybody, would that be accurate?

**A** You'd have to refer to the report that was prepared

P000198

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

by the latent print examiner for that.

Q    Okay.  Did Mr. Gonzalez tell you that the suspect had an afro?

MS. SCOTT:  Objection, hearsay.

THE COURT:  Overruled.

THE WITNESS:  I was relying upon the report that was prepared by the initial responding officer in addition to the information that was noted in the, um -- that was provided at the time of the 911 call in which there was noted that one person had had an afro.

BY MS. CITRARO:

Q    Okay.  So were you aware that there was some suspicion that one of the persons that you were looking for had an afro?

A    That's correct.

Q    Okay.

MS. CITRARO:  May I approach the witness?

THE COURT:  You may.

BY MS. CITRARO:

Q    I'm showing you -- both of these have been entered into evidence as State's 1 Composite 1 through 3.  I'll show you that one first.  I'm showing you the third page.  Would you say that the picture in box two is an afro-style haircut?

A    Um, yes, it is.

Q    Would you say the pictures in 1, 3, 4, 5 or 6 is an

Official Court Reporters
407-836-2280

**P000199**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

afro-style haircut?

A    They are probably short afro-style haircuts.  They have the same type of hair.  However, the length is short.

Q    You are telling -- your testimony today is that the pictures in 1, 3, 4, 5 and 6 are afro-style haircuts?

A    They are not the afro with which I was provided information about at the time.

Q    So not the kind of afro style that you're looking for for your suspect?

A    Um, in order to prepare the photograph lineup, I had to have a picture of an afro that was much smaller than the one that was described to me.

Q    Okay.  Same pictures are in the six -- Exhibit 2 State's Exhibit, page 3.  These are the same pictures that you just looked at?

A    Yes, they are.  Yes, it is the exact same.

Q    And to be clear, your testimony is that 1, 3, 4, 5 and 6 are not the same afro style that was reported?

A    What I'm trying to say, and I'm not certain if that's what you're asking, is, but the picture of Mr. Ramos that is in there, um, is not the same picture as what was described to me at the time of the incident.

Q    Okay.  But I'm talking about the other five pictures.  Is that what was described to you at the time of the incident?

P000200

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    It was described that the person had an afro-style haircut at the time of the incident.

**Q**    Okay.  So it would be your belief that this suspect with an afro-style haircut wouldn't have a hairdo like the guy in 1, 3, 4, 5 or 6 based on what everyone said?

**A**    I'm sorry.  I'm completely off.

**Q**    I have used too many words.  Okay.  Based on the information you were given, was it your belief that --

       **MS. CITRARO:**  May I approach?

       **THE COURT:**  Uh-huh.

**BY MS. CITRARO:**

**Q**    And I'm showing you Number 2.

**A**    Correct.

**Q**    Page 3.  Based on the information you were given, would it be your belief that the guy you were looking for who had an afro-style haircut has the hairdo in picture number 1?

**A**    His hair is not like that at all.

**Q**    Okay.  How about the guy in picture number 3, is that the kind of hairstyle that you're looking for?

**A**    In none of the pictures, including the one of number 2 had the hairstyle that was observed at the time of the incident.

**Q**    But number 2 would be more of the afro-style haircut?

**A**    A little bit more than the others, yes.

P000201

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Were there any other suspects that were found or any other information gathered to come up with an identification for the other two guys?

A    No, there were not.

Q    And there were no leads gathered by any, like, pawn hits or anything for the missing jewelry?

A    No.  We had no other pawn hits or Crimeline tips.

Q    And you're saying that the latents that were collected were not of good enough value to make a match?

A    Again, I would have to refer to the actual latent print examiner's report.

Q    So you are not sure?

A    I'm not sure, no.

Q    Would it help to look at C.S.I. Styer's report?

A    I don't know if her report, but there's a latent report that is generated.  Her report would not be --

Q    Is there a copy of that report that you would not --

A    I would not have it.

Q    You would not receive that report?

A    Um, one would be done and submitted, the results of which, you know, if a crime scene technician takes them, fingerprints, submits them to a latent print examiner, they would make a determination of yes, it's a match or, no, it's not a match, or no, the print is not of quality to make a

Official Court Reporters
407-836-2280

P000202

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

determination.  I don't have that report.

Q   But latent prints are passed over to them.  There is gonna be some kind of report generated?

A   Absolutely.

Q   Okay.

MS. CITRARO:  Nothing further.

THE COURT:  State, redirect?

MS. SCOTT:  None, Your Honor.

THE COURT:  All right.  Thank you, Detective.

THE WITNESS:  Yes, sir.

THE COURT:  All right.

State, call your next witness.

MS. SCOTT:  May we briefly approach or can I just get a three-minute recess?  I'm going to set up audio.

THE COURT:  Set up what you need to set up.

MS. SCOTT:  Okay.  May we approach?

(Conference at the bench held on the record.)

MS. SCOTT:  I'm going to be very brief with the next witness and we can be done, I would say, by five o'clock, even if we take a two-minute recess and I'm done.  I still want that recess.  I don't want to be fiddling around with the audiovisual stuff in front of the jury.

THE COURT:  With that?

MS. SCOTT:  I don't know --

P000203

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. CITRARO:  You want to switch them?

MS. SCOTT:  Yes.  I am going to bring mine up here that is in the courtroom.

THE COURT:  Where is it?

MS. SCOTT:  Right there on the other side of the clerk.

THE COURT:  Okay.

(The following was in open court.)

THE COURT:  All right.  Ladies and gentlemen, we are going to recess at this point for a couple of minutes.  We will get things up and bring you back in.

(Jury exits the courtroom.)

(Whereupon a short recess was taken.)

THE COURT:  All right.  Ready to go?  Let's bring in the jury.

(Jury enters the courtroom.)

THE COURT:  State, call your next witness.

MS. SCOTT:  State calls Chantal Styer.

Thereupon,

**CHANTAL STYER**

was called as a witness and, having first been duly sworn, testified as follows:

THE COURT:  All right, ma'am, have a seat.  Tell me your first name, your last name, and spell both for me, please.

P000204

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**THE WITNESS:**  My name is Chantal, C-H-A-N-T-A-L.
Last name is Styer, S-T-Y-E-R.

**THE COURT:**  State, you may inquire.

**MS. SCOTT:**  Thank you, Judge.

**DIRECT EXAMINATION**

**BY MS. SCOTT:**

Q    Ms. Styer, can you tell us where you work?

A    I work for the Orlando Police Department.

Q    In what capacity?

A    I'm a crime scene investigator.

Q    And what does that mean?

A    Basically, our job as a crime scene investigator is to document crime scenes as we find them.  We also process crime scenes, we collect evidence, we do sketches.

Q    And how long have you been working with OPD as a C.S.I.?

A    Nine years.

Q    And were you assigned to a case for an incident that occurred on April 9, 2013?

A    Yes.

Q    And was that for the defendant by the name of Jorge Valle-Ramos?

A    Yes.

Q    And did you respond to 1625 Little Falls Circle?

A    Yes.

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    And what did you do when you arrived?

A    After being briefed by the officer, I took photographs of the crime scene.  I also collected evidence.

MS. SCOTT:  May I approach the clerk?

THE COURT:  You may.

MS. SCOTT:  May I approach the witness?

THE COURT:  You may.

BY MS. SCOTT:

Q    I'm showing you what's been previously marked as State's for identification C Composite, 1 through 12.  Can you just look through those and tell me if you recognize them?

A    Okay.

Q    Do you recognize these?

A    Yes, I do.

Q    What are they?

A    They are the photographs I took of the crime scene.

Q    And do they fairly and accurately represent the scene at the time that you took them?

A    Yes.

MS. SCOTT:  At this time the State would move into evidence what's previously marked as State's C Composite 1 through 12 as State's 3.

THE COURT:  Any objection from the defense?

MS. CITRARO:  My only objection would be that

P000206

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

there's nothing specific whatsoever about what's being entered into evidence, what the pictures are of, what we are even looking at in each individual picture.

THE COURT: Okay. Objection is overruled.

What's been marked as State's Exhibit C for identification will be moved into evidence as State's Exhibit 3 over defense objection.

(State's Exhibit 3 received in evidence.)

BY MS. SCOTT:

Q    Can you describe -- when you arrive at a scene you take photographs and you process a scene. What does "processing a scene" mean?

A    Processing a scene usually means for fingerprints is what we are looking for.

Q    And in that case, did you process the scene for fingerprints?

A    Yes.

Q    And did you -- were you able to successfully lift any complete fingerprints?

A    Not from the crime scene, no.

Q    And what is your -- can you briefly tell the Court your training in terms of fingerprinting and DNA analysis?

A    Yes. I received my degree from UCF in criminal justice. We do have some training on fingerprinting during that time span. In my employment with the Orlando Police

P000207

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Department, we go through a three-month training period which is all hands-on and we do processing for latents just, basically, every day.

Q   Okay.  And what about for DNA?

A   Yes.  We do -- normally we respond to collect DNA on a weekly basis.

Q   Okay.  And we'll start with the fingerprints.  Can you describe if there's a surface and an individual touches that surface, does that necessarily mean a fingerprint will be left on that surface?

A   No, not necessarily.

Q   And why not?

A   It depends on -- there's a lot of factors.  It depends on the person's hands who is touching the surface.  A latent print is left behind using the oils and moisture in your skin.  If a person has very dry hands or calloused hands, they may not necessarily leave a good fingerprint behind.  Also, if they have gloves on, obviously, they would not leave a fingerprint behind.

Q   And in this case did you process it for DNA?

A   No.

Q   Why not?

A   We don't normally process for, like, DNA unless there is visible blood at the crime scene.

Q   Was there any visible blood at this crime scene?

**P000208**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    No.

Q    The photos that I previously showed you, I just want to go through them briefly.  If you could describe to the jury what it is that we are looking at.

A    That is the front door to the residence, and that is a screen from the second-story balcony that had fallen out.

Q    Okay.

A    That is a closeup of the second-story window.

Q    And is that the same window where the screen you believe came out of?

A    Yes, that's correct.

Q    And I know this is hard to see --

A    That is the front door to the entrance, and I believe that was the victim's belongings at the entrance. That is the front door just showing damage to the door.

Q    What is this on the ground over here?

A    I don't recall if it's part of the door or if it was --

Q    Okay.

A    That is the staircase showing the pepper spray on the walls.

Q    Okay.  This orange film on the walls?

A    Yes.

Q    That's pepper spray?

P000209

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A   Yes.   That is an overall of the living room area. That is a back gate which was expected or suspected to be the point of entry.  And that is a crowbar on the ground at the point of entry.

That is a knife and a cigarette butt.  The knife was not part of the scene.  That belonged to the victim.

Q   What about the cigarette butt?

A   The cigarette butt was collected.

Q   Was that processed for any DNA?

A   No.

Q   What is done for the cigarette butt?

A   It was just placed into evidence.  That is a backpack that did not belong to the victim that was full of coins and it also had a knife inside.

Q   Where was this backpack located?

A   It was on the second floor in the hallway.

Q   Okay.  Was this backpack processed for any DNA?

A   No.

Q   Could this backpack have been processed for DNA?

A   Yes, it's possible.

Q   And what kind of DNA would it be?

A   It would have been touch DNA.

Q   Can you explain what touch DNA is?

A   Touch DNA is similar to a fingerprint.  It can be left behind from your skin cells when you touch an object.

P000210

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

That is an overall of the master bedroom.  And that is inside the master bedroom closet.

Q    All of these locations in the house, when you took these photographs, did you know that they were part of the crime scene?

A    Yes.  I was briefed by the police officer on the scene, and he directed me to areas of disturbance.

Q    Typically in a -- do you typically work cases like burglaries of dwellings?

A    Yes.

Q    Typically in a burglary of a dwelling if there is no blood behind do you process a scene for DNA?

A    No.

Q    After you process a scene and no fingerprints were lifted, can you briefly tell the jury what areas did you process?

A    Um, in this particular scene I processed the point of entry, like, the sliding glass door, the gate that was open, the window, the second-story window, the window screen, and any of the items inside that looked like they had been touched or moved.

Q    Okay.  And were you made aware of the alleged point of entry, point of exit, all of those things?  When you're processing your scene, are you made aware of everything at that point?

P000211

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A** Yes. Yes.

**Q** What happens once, in terms of your role in a case, once no fingerprints are lifted and no anything is really collected of forensic value?

**A** From that point I just submit the items that I have collected and I do a report.

**Q** Okay. Based on your training and experience with OPD and processing multiple scenes, is it atypical to not recover fingerprints from a screen?

**A** It does happen quite often that we don't get fingerprints on a scene.

**Q** And why is that?

**A** For the reasons I described. That they are wearing gloves or just the condition of their hands, if they don't have a lot of moisture to their skin.

**Q** Okay. If someone -- if there was any sort of fingerprint that was lifted from the crime scene, what would you do with it at that point?

**A** That fingerprint gets submitted to our latent print examiners and they do the examination of the latent print.

**Q** And that did not happen in this case, correct?

**A** Well, I did submit latent prints from a candy wrapper that was found outside the scene.

**Q** From inside the home, there was nothing?

**A** No, there was not.

P000212

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    No fingerprints that were lifted?

A    No.

Q    Okay.

         MS. SCOTT:  I have nothing further.

         THE COURT:  Cross-examination?

                   **CROSS-EXAMINATION**

**BY MS. CITRARO:**

Q    Good afternoon.

A    Hi.

Q    You said that you didn't collect any latent prints from inside the house?

A    Correct.

Q    But you did from the candy wrapper?

A    Yes.

Q    How many latents did you collect?

A    Five.

Q    What was the result of that?

A    They did not come back to anyone as far as I know.

Q    So they didn't match anybody?

A    No.

Q    So that means they didn't match Mr. Valle-Ramos?

A    Correct.

Q    Is there a report that was formulated or generated?

A    I do not believe there was a report from the latent print examiner.  I checked before I came.

P000213

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    So when it comes back with no matches, nothing is ever documented?

A    Correct.

Q    Okay.  You said that you could have processed the backpack for touch DNA?

A    Yes.

Q    But it was not processed?

A    Yes.

Q    And you could have processed a cigarette butt for DNA?

A    Correct.

Q    But it was not processed?

A    No.

Q    Any other physical evidence that was collected from the scene?

A    No.

Q    And when you say your latents were collected and not matched to anybody, does that mean they were of good enough quality they just didn't match anybody?

A    Correct.

Q    Okay.  And your system, what's the database that they are matching to it?

A    There's not actually a physical database.  Our latent print examiners have to go through them and look at them by hand.

P000214

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Okay.  So who would they be comparing them to?

A    Well, they would have to be a suspect listed.  That way if we have a name of someone, our latent print examiners can pull their criminal history and their fingerprints to compare the prints that I turn in.

Q    Do you know if they were compared to Mr. Valle-Ramos?

A    No, I do not know that.

Q    You don't know that?

A    No.

Q    That would have been a separate person who made that comparison?

A    Yes.  That would be the latent print examiners.

Q    But the information that you do have is that it didn't come back to match anybody?

A    Correct.

MS. CITRARO:  Nothing further.

THE COURT:  Any redirect?

MS. SCOTT:  No, Your Honor.

THE COURT:  Thank you, ma'am.

State, call your next witness.

MS. SCOTT:  At this time the State rests.

THE COURT:  All right.  Ladies and gentlemen, at this point in time the State Attorney's Office has rested their case.  If you will step out for a few

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

minutes, there is some legal matters that I need to take up outside of your presence and when we are ready, I'll bring you back in.

(Jury exits the courtroom.)

THE COURT:  Any motions from the defense?

MS. CITRARO:  I am not a self-court reporter in my mind, but I have no recollect, and I could be wrong, I do not recollect jurisdiction being noted in the evidence of this case.

THE COURT:  One of the first questions that was asked of Mr. Gonzalez was venue.

MS. CITRARO:  Okay.  I did not note it.  Then I would just make a general argument that the elements have not been proven to a high enough standard that they pass JOA at this time.

THE COURT:  Response?

MS. SCOTT:  Your Honor, the elements were proven both through Mr. Valle-Ramos -- excuse me -- Mr. Gonzalez that no one had permission to enter his home, that he saw -- he identified Mr. Valle-Ramos both via photo lineup as well as in-court identification of one of the individuals that was in his home.  He then proceeded to run out of his home.  Um, again, entry, no one had permission to be there.  Um, Mr. Gonzalez also testified that multiple items in his home were stolen.

Official Court Reporters
407-836-2280

**P000216**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

When he was in there, he stated he heard shuffling, rummaging through various items, the items that were missing were there prior to the burglary and were not there after the burglary.

There is enough evidence to support that Mr. Valle-Ramos may have been one of the individuals who stole those items.  That would be a determination up to the jury, but as it is now, there is enough facts and evidence for them to make that determination.

**THE COURT:**  I'm going to go ahead and deny the judgment of acquittal based upon the evidence in the light most favorable to the State at this point in time.

Does the defense wish to present a case?

**MS. CITRARO:**  It does.  I ask that we could begin it tomorrow morning.  I have one witness now.  I guess for aggregate purposes we can put all three together at one time.

**THE COURT:**  No.  I told these jurors that we are going to be here until six, so I'd like to do as much as I can.

**MS. CITRARO:**  May we have five minutes and open our case?  It would just be the one witness because I'd like to have Ms. Bloom testify before I have my client testify.

**MS. SCOTT:**  She has an ear infection today.

**P000217**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  I understand.  Is there any reason why your client has to testify after that witness?

MS. CITRARO:  Just my preference.

THE COURT:  If he wants to testify, we are going to be here until six.  I'd like to do it tonight.

MS. CITRARO:  We don't have to be here till six tonight, Judge.

THE COURT:  I understand that.

MS. CITRARO:  Okay.  Can I have ten minutes?

THE COURT:  You may have ten minutes to speak with your client and your witness.

MS. CITRARO:  Thank you.

(Whereupon a short recess was taken.)

THE COURT:  Ready to proceed?

MS. CITRARO:  Yes.  I'll notify the Court based on the evidence I expect to come out today, I may have some additional photographs to come in evidence tomorrow for purposes of -- I may need to call my client again tomorrow briefly to enter pictures into the evidence, but I can have the bulk of his testimony done today.

THE COURT:  Okay.

MS. CITRARO:  Thank you.

THE COURT:  Mr. Valle-Ramos, you have had an opportunity to talk with your attorney about the pros and cons of testifying?

P000218

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE DEFENDANT:  Yes, sir.

THE COURT:  You also have had the opportunity to speak with her about the pros and cons of not testifying.

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand if you do testify, you will be treated just as any other witness?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you will be subject to cross-examination by the prosecutor?

THE DEFENDANT:  Yes, sir.

THE COURT:  If there are any impeachable offenses that you have in your past, those may come out?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  All right.  And you also understand that if you decided not to testify, I would instruct the jury that they are not to consider that in any way, shape or form.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  After having consulted with your attorneys about the pros and cons of testifying as well as the pros and cons of not testifying, have you reached a decision what you'd like to do in this case?

THE DEFENDANT:  Testify.

THE COURT:  Is that a decision that you made on

P000219

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

your own?

THE DEFENDANT:  Yes, sir.

THE COURT:  No one has forced, threatened or coerced you to make that decision?

THE DEFENDANT:  Not at all.

THE COURT:  You are making that decision freely and voluntarily?

THE DEFENDANT:  Yes, sir.

THE COURT:  With that said, let's go ahead and bring the jurors back in.

(Jury enters the courtroom.)

THE COURT:  All right.  Everybody have a seat. Does the defense wish to present a case?

MS. CITRARO:  Yes, Judge.

THE COURT:  You may call your first witness.

MS. CITRARO:  Defense's first witness is Marquis Hickson.

THE COURT:  Face the clerk and raise your right hand to be sworn.

Thereupon,

MARQUIS HICKSON

was called as a witness and, having first been duly sworn, testified as follows:

THE COURT:  Sir, have a seat.  Get situated.  Tell me your full name, first and last, spelling both for me.

P000220

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE WITNESS:  Marquis Hickson.  M-A-R-Q-U-I-S H-I-C-K-S-O-N.

THE COURT:  Defense may inquire of the witness.

**DIRECT EXAMINATION**

BY MS. CITRARO:

Q    Mr. Hickson, good afternoon.

A    Hi.

Q    How do you know my client?

A    School.

Q    So how long have you known him?

A    Um, since a little bit before senior year.

Q    Okay.  Back in April of 2013, were you residing with him?

A    Was I living with him?

Q    Yes.

A    Yes.

Q    Do you remember the day of April 9th, 2013?

A    Yes.

Q    Okay.  What do you recall starting in the morning?

A    In the morning we wake up like we usually do and hang out with each other for who knows how long until we figure out something to do.

Q    Okay.  How late do you usually wake up?

A    Twelve, 11:00.

Q    Is there a reason why you get up so late?

P000221

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    Staying up -- staying up late.

Q    Were you not working at the time?

A    Yeah.  I have been working for the past -- since I was 18 I have had a steady job, same job.

Q    Is it afternoon hours?

A    Um, it's mornings.  So that's why I usually -- when my days are off, I do get up a little bit later.  Another reason.

Q    That was one of your days off?

A    Yes.

Q    Do you remember what you did that day?

A    Played basketball and I spent my day with Jorge.

Q    What do you remember doing with him?

A    The only thing that we did outside of the house was play basketball.

Q    So everything else was inside the house?

A    Everything else was inside the house.

Q    What time did you play basketball?

A    Six.  We left the house at 6 p.m.

Q    Had you left the house at all that morning?

A    No, ma'am.

Q    Do you know if Mr. Valle-Ramos had left the house at all that morning?

A    I do not know.

Q    You do not know?

P000222

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    I'm sure he had not because of our routines, but like I said, I would not, you know.

**Q**    And your routine is usually what?

**A**    Yeah.  We wake up together, we are in the house together, we fall asleep together.

**Q**    So when you woke up that morning, was he present?

**A**    Yes.

**Q**    Okay.

**A**    Shirt off, drool.

**Q**    Anything seem out of ordinary or out of place that morning?

**A**    Nope.

**Q**    Okay.  Um, April of 2013, can you describe what his hair looked like?

**A**    It was long and had to be put in a ponytail.  If it wasn't in a ponytail, it would fall down over his face almost like a girl.

**Q**    So was he growing out an afro?

**A**    I mean, at one point.  But then it just turned into long hair.  He wasn't -- his goal wasn't an afro.  We were getting our hair braided.

**Q**    Okay.  So if -- if you were to see him in April of last year with however his hair was at the time and he didn't pull it back, he just stood there with his hair however it would go, where would it fall?  Would it stick up or would it

P000223

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

just fall like girl's hair?

**A**    It would fall to his shoulders.

**Q**    It would fall to his shoulders?

**A**    Yes.

**Q**    So it was long enough that it wouldn't actually stick up, it would actually come down?

**A**    Yes.

**Q**    Okay.  Do you remember anything else out of the ordinary that day?

**A**    No.  It was a simple, regular day.

**Q**    And you went to play basketball?

**A**    Yes.

**Q**    Where did you go?

**A**    Dover Shores Community Center.

**Q**    Is that where you normally went?

**A**    Yes.

**Q**    Were you stopped at all that day?

**A**    Yes.  By a police officer.

**Q**    Why did the officer stop you?

**A**    Because of speeding.

**Q**    Okay.  Were you driving the vehicle?

**A**    I was not.

**Q**    Okay.  So were you in the vehicle that was stopped?

**A**    I was.

**Q**    What time do you know this would have been?

P000224

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    8:30, nineish at night.

**Q**    Were you stopped by a police officer in a vehicle that the driver was supposedly speeding in?

**A**    Yes.

**Q**    Okay.  Anybody get arrested?

**A**    No.

**Q**    Anybody get ticketed?

**A**    No.

**Q**    Did you have to hand over your I.D's at all?

**A**    Yes.

**Q**    Did you hand over yours?

**A**    Yes.

**Q**    Do you know if Mr. Valle-Ramos handed over his?

**A**    Yes.

**Q**    Okay.  And that was the end of it, you went home?

**A**    Yes.  The police officers let us go because they didn't find anything relevant to what they were looking for.

**Q**    Okay.  You have no reason to think that Mr. Valle-Ramos left the house that morning?

**A**    None whatsoever.

**Q**    Would that have been typical for him to just leave without you?

**A**    No.

**MS. CITRARO:**  May I approach the witness?

**THE COURT:**  You may.

Official Court Reporters
407-836-2280

**P000225**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**BY MS. CITRARO:**

Q    I'm showing you what's marked for identification purposes as Defense Exhibit C.  Do you recognize this?

A    It's Jorge's I.D.

Q    So you do recognize it?

A    Yes.

Q    This is his driver's license or I.D card?

A    Um, driver's license, it says.

Q    Okay.  Do you see the picture?  It's not a very good picture because it's a xeroxed copy, but can you kind of -- make out what his hairstyle looks like in that picture?

A    It's a bit of a fro.

Q    Is that what his hair looked like in April of 2013?

A    No.  Eventually it grew out.  It had its puffy stage, but at the time April came around, it was already hanging.

Q    So it has was hanging down here, it wasn't sticking up?

A    No, I have Instagram photos.

Q    So that picture is not an accurate representation of what he looked like in April of 2013?

A    No, ma'am.

    **MS. CITRARO:**  May I?

    **THE COURT:**  You may.

    **MS. CITRARO:**  I have nothing further.

Official Court Reporters
407-836-2280

**P000226**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  Cross-examination?

CROSS-EXAMINATION

BY MS. SCOTT:

Q    Good afternoon.

A    Hello.

Q    You said you woke up that morning around 11 or 12?

A    Yes.

Q    Okay.  Where is your bedroom or where was your bedroom in that house?

A    Um, our bedrooms are on opposite sides of the house, but you can see both doors from each other's door.

Q    And do you sleep with your door opened or closed?

A    We sleep with our doors closed.

Q    And do you guys sleep in the bedroom -- by "you guys", I mean you and Mr. Valle-Ramos, do you sleep in the same bedroom?

A    We do not sleep in the same bedroom.

Q    Are there any other individuals that were in the house?

A    We had somebody staying with us at the time, but that day he was not there.

Q    Okay.  At 11 or 12, um, whenever -- 11:00 a.m. to 12:00 p.m. when you woke up, where was Mr. Valle-Ramos?

A    Coming out of his room.

Q    Okay.  And what time had you gone to bed the night

Official Court Reporters
407-836-2280

P000227

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

before?

**A**    Um, late because it was my day off, so probably three.

**Q**    Okay.  And when you went to sleep that night, Mr. Valle-Ramos was in the house?

**A**    Yes.

**Q**    Okay.  But you didn't wake up until 11 or 12 the next day?

**A**    Yes.

**Q**    At any point did you wake up before that?

**A**    No.

**Q**    So you have absolutely no idea whether or not he was actually at the house between the hours of eight and ten that morning?

**A**    I could not be a hundred percent of that, no.

**Q**    You didn't see him, you weren't with him, you were sleeping in your bedroom with the doors closed?

**A**    Yes, I was sleeping with my door closed.

**MS. SCOTT:**  I have nothing further, Judge.

**THE COURT:**  Any redirect?

**REDIRECT EXAMINATION**

**BY MS. CITRARO:**

**Q**    Was there anything that would have given you an indication like a sound of a door, a noise, anything else, a person moving at all that would make you think he was up?

P000228

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**     I'm a very light sleeper.  I'm always waking up if the door is open because why?  I have insecurities about safety and stuff like that.  So...

**Q**     Do you recall hearing anything that would lead you to think that he was awake or moving around?

**A**     No, nothing out of the normal.

**Q**     Okay.

          **MS. CITRARO:**  Thank you.  Nothing further.

          **THE COURT:**  Thank you, sir.

          All right.  Defense, call your next witness.

          **MS. CITRARO:**  I'll call Mr. Valle-Ramos.

          **THE COURT:**  Mr. Valle-Ramos, come up to the stand.

Thereupon,

**JORGE VALLE-RAMOS**

was called as a witness and, having first been duly sworn, testified as follows:

          **THE COURT:**  All right.  Go ahead and tell me your full name, and spell your first and your last name for me.

          **THE WITNESS:**  Jorge Valle.  J-O-R-G-E, V-A-L-L-E.

          **THE COURT:**  You may inquire.

**DIRECT EXAMINATION**

**BY MS. CITRARO:**

**Q**     I'm going to continue to call you Valle Ramos.  It is easier for me to say.

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A    Uh-huh.

Q    Do you remember April 9th of 2013?

A    I remember.

Q    Okay.  Do you remember where you were, what you did the beginning of the morning?

A    Yes.

Q    Okay.  Can you tell the Court where you were?

A    I was home all the way up to around six.  They opened the basketball court at 6:30.

Q    Okay.  Did you leave the house in the morning at all?

A    No.  Not till six o'clock in the afternoon.

Q    And that was to go play basketball?

A    Uh-huh.  Yes.

Q    Did you spend your day with Mr. Hickson?

A    Yes.

Q    What time did you wake up, would you say?

A    Eleven or 12.  I used to work late nights and I worked the night before that.

Q    Okay.  What time did you -- would you say you got home the night before?

A    Like 12:30.

Q    Okay?

A    Because I would work to midnight to closing up the restaurant.  Yeah, I get home around 12:30.

P000230

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Okay.  So is it routine then that you sleep late if you work late the day before?

A    Yeah.

Q    Okay.

A    I would -- I mean, I haven't woken up early.

MS. SCOTT:  Objection to nonresponsive.

THE COURT:  Sustained.

BY MS. CITRARO:

Q    Do you know Mr. Gonzalez?

A    No, I don't.

Q    Have you ever seen him before today?

A    Never.

Q    Okay.  Were you at his property?

A    Never.

Q    Okay.

A    I don't even know where he lives.

Q    Where, um -- in April of 2013, can you describe what your hairdo was like?

A    Um, it fell over my shoulders.  I looked like Tarzan.

Q    So if you weren't to hold it back or anything --

A    Uh-huh.

Q    -- it won't stick up, it would come down?

A    Yeah, it would just fall.

Q    Okay.  So how long would you say it was?

P000231

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    Like, it would fall down to here when it was wet.

**Q**    Okay.  You at one point had an afro haircut?

**A**    Yeah.  Uh-huh.

**Q**    Okay.

        **MS. CITRARO:**  Can I approach?

        **THE COURT:**  You may.

**BY MS. CITRARO:**

**Q**    Showing you what's marked for identification purposes as Defense C.  Do you know what this is?

**A**    It's my license.

**Q**    Okay.  Okay.  That's your driver's license?

**A**    Yes.

**Q**    Okay.  What was the issue date on that driver's license?

**A**    It looks like April, 2011.

        **MS. SCOTT:**  Your Honor, I'm sorry.  I need to see what he's looking at.  I'm sorry.  Say that again.

        **THE WITNESS:**  It looks like April, 2011.

**BY MS. CITRARO:**

**Q**    2011?  Okay.  Is this -- did you take this photograph when you got this card?

**A**    Yes.

**Q**    Okay.  So this representation of you with this hair --

**A**    Uh-huh.

P000232

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL
PageID 3726

Q   -- would have been at the time that you took this picture when this was issued in 2011?

A   Yes.  That's the picture from 2011.

Q   Okay.  Is there any way for you to know for sure that this is a copy of your driver's license?

A   I have a copy on me right now.

Q   So this looks identical to the one that you have?

A   Yes.

MS. CITRARO:  I ask that this be moved into evidence as 1.

THE COURT:  Any objection from the State?

MS. SCOTT:  No.

THE COURT:  What is has been marked as Defense Exhibit C for identification will be moved into evidence as Defense Exhibit 1 without objection from the State.

(Defendant's Exhibit 1 received in evidence.)

BY MS. CITRARO:

Q   Did you recognize Ms. Szewczyk, the lady that came in here and testified earlier?  Did she look familiar to you?

A   Nobody that was up here looked familiar.

Q   And have you ever been to the residence of Little Falls?

A   I don't know where that's at.

Q   Okay.  So this burglary that's alleged to have occurred on April 9th of 2013, that wasn't you?

P000233

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL
PageID 3727

**A**     No.

**Q**     Okay.  Do you remember anything else that occurred on that day?

**A**     Um, I woke up around noon.  My friend came over with his girlfriend.  He asked us if we wanted to play basketball.  So he drove us to the basketball court around six o'clock when the basketball court opened.  After the basketball court, around 8:30 to nine, we got pulled over.

**Q**     Why did you get pulled over?

**A**     For speeding.

**Q**     You were not driving the car?

**A**     I was in the backseat with Marquis.

**Q**     Did you hand the officer your driver's license?

**A**     I did.

**Q**     Would that have been the driver's license that you had on you?

**A**     Yes.

**Q**     So he collected it --

**A**     Yep.

**Q**     -- on that day?

**A**     Yeah.

**Q**     You were released, not arrested for anything?

**A**     Yeah, we just went on our way.

**Q**     The reason for the stop was speeding?

**A**     Uh-huh.  But they were undercover, so they were

P000234

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL
PageID 3728

looking.  They weren't -- I mean, they didn't want to just give us a speeding ticket.  It would have made them look.

Q    So they didn't issue any ticket?

A    Not a ticket, nothing.  They told us when they pulled us over we are looking for guns, bombs, and, you know what I'm saying?  They are looking, basically, for higher crimes or whatever and we didn't -- all we did was speed, so...

    **MS. SCOTT:**  Objection, Your Honor.  Nonresponsive.

    **THE COURT:**  Sustained.

**BY MS. CITRARO:**

Q    They told you they were undercover though?

A    Yeah.

Q    Um, did you go back home then after that?

A    Yeah, we want home right after that.  We were sweaty.  We were just playing basketball.

Q    Anything else of note happen that day or evening?

A    Did anything else happen that day or evening?

Q    Of noteworthy that day or evening other than what we just said?

A    No.

Q    And you were arrested later for this?

A    I was, days later, maybe like a week, two weeks later.

Q    And they told you that they had a warrant for your

P000235

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

arrest?

A    Yeah, came into my house.

Q    Okay.  You have never seen Mr. Gonzalez before today?

A    Never.

MS. CITRARO:  I have nothing else.

THE COURT:  Okay, cross-examination.

**CROSS-EXAMINATION**

BY MS. SCOTT:

Q    Good afternoon, Mr. Valle-Ramos.

A    Good afternoon.

Q    Okay.  So let's back up just a little bit.  You are at your house the day that this happened?

A    Crime happened.

Q    And you were sleeping until 12:30 or so, 12:00, 12:30 whenever you woke up?

A    Uh-huh.

Q    Do you sleep with your door -- bedroom door open or closed?

A    Closed.

Q    And is Mr. Hickson, was he living with you at that time?

A    Yes.

Q    How far is his bedroom from your bedroom?

A    Say 10, 15 feet.

P000236

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**Q**   Okay.  And at any point in your normal routines would you and Mr. Hickson ever sleep in the same room together?

**A**   No.

**Q**   You had your separate bedrooms, separate times, you slept here, he slept there?

**A**   Yeah.

**Q**   So if we were to -- the day that this happened, you have no recollection of anything occurring at Mr. Gonzalez's residence?

**A**   No, I don't.

**Q**   Do you think it's odd that he's identified you?

**A**   Very odd.

**Q**   Okay.  Do you think it's odd that another person completely unrelated to Mr. Gonzalez who has no relation to you or him also identified you?

**A**   Very odd.

**Q**   So two people who have nothing to do with anybody, and don't know you from Adam --

**A**   Uh-huh.

**Q**   -- identified you --

**A**   Very odd.

**Q**   -- as the person that was in their house and that's just odd to you?

**A**   Even more odd that there's a second person.

Official Court Reporters

407-836-2280

P000237

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Okay.  Just coincidence that they happened to ID you?

A    Yeah.

Q    Have you been in court all day today?

A    Yeah.

Q    So you heard all the testimony that everybody said to you or about the case?

A    Yes, I have.

Q    And even after that, all that, your contention is still, that wasn't me, I don't care that two people who picked me out months after this happened, they still remembered my face, because they looked at me, they said all that, didn't matter, it wasn't you?

A    It wasn't me.  It doesn't matter.

Q    Okay.  That night when were you pulled over before 6:00 p.m. when you left to go play basketball, you had stayed at your house the entire day?

A    Yeah.

Q    Mr. Hickson was the only other person there?

A    Yes.

Q    You said your friend and his girlfriend came over. What were their names?

A    Carl, and Danny (ph).  I don't know their last names.

Q    What do they look like?

P000238

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL
PageID 3732

**A**    Carl is sitting right there, and Danny, they are actually in the lineup, the four-picture lineup.

**Q**    What is -- can you just describe what Danny looks like to me?

**A**    She is a white girl, blond hair, curly.

**Q**    And they were both there that day?

**A**    Yes.

**Q**    Okay.  What time did they get to your house, do you remember?

**A**    Around three.

**Q**    Okay.  Anybody at your house that morning?

**A**    Nope.

**Q**    So the only person that can verify that you were sleeping in your bedroom is you?

**A**    Uh-huh.

**Q**    Okay.

**MS. SCOTT:**  I have nothing further, Judge.

**THE COURT:**  Any redirect?

**MS. CITRARO:**  No redirect.

**THE COURT:**  All right.  Thank you, Mr. Valle-Ramos.  If you want to grab a seat.

All right, ladies and gentlemen, what we are going to do at this point in time, we are going to recess for the evening.  We will come back tomorrow morning at 9:00 a.m.  I have a few matters to take care of at 8:30,

P000239

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

but I don't anticipate I will have any problem getting those done and taken care of by nine.  We will be ready to start at nine with the remainder of the witnesses for the defense.  I believe you have at lease one more, correct?

**MS. CITRARO:**  Yes, Judge.

**THE COURT:**  That we will take tomorrow.  And if there is any rebuttal case, we will do that and we should be at a point where we can do the closing arguments and the jury instructions shortly thereafter and hopefully get this case to you by noon for your deliberations.

Okay.  With that said, I want you to do a couple of things for me this evening.  Number one, go home and think of anything other than this case.  Okay?  Spend time with your family, read a book, watch TV, do anything other than this thing, okay.  Please do not do any research or looking up of names, maps, anything that has to do with this case, anything about the law of the case.  Trust me, you'll get all of the evidence that you need, and all of the law that you need to decide this case while you're here.

Okay.  So that's rule number one.  Rule number two is if you see any of the participants or any of the parties or any of the court personnel overnight or any

P000240

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

time between now and when we come back and we don't pay attention to you, please forgive us.  It's not a sign of rudeness.  I'm just making sure that nobody has any contact with you and the court deputies so we don't have any complaints or any appearance of any improper tampering with you-all as the members of the jury.

Okay.  And with that said, enjoy your evening and I'll see you back here tomorrow morning at nine.  When you go back here, the court deputies will take you out a back door.  The door you come out at is where I would like you-all to pool at when you get here tomorrow.  The court deputies will periodically check to see if you're here.  Once you're here, they will bring you back into the jury room.  And once we are all set, we will bring you back in and begin with the trial tomorrow morning.  Okay?  Thank you.  Have a good evening.

(Jury exits the courtroom.)

THE COURT:  All right.  In terms of jury instructions, I have reviewed the State's request for special jury instruction and I have reviewed the standard instructions as well, and these were my determinations.  The first paragraph that you wanted me to read was the following, and it goes as to this:  An important question in this case is the identification of the defendant as the person who committed the crime.

P000241

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

The prosecution has the burden of proving beyond a reasonable doubt that the crime was committed and that the defendant was the person who committed the crime. If you are not convinced beyond a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.

I am going to refuse to give that instruction. The reason for it is the first sentence is asking me to comment on what is and what is not important in a case, and I don't believe that it is my prerogative to do so. I think all of the evidence is important and that the jury should decide that as it relates to the other items. Those things are all adequately covered in the standard instruction that has to do with plea of not guilty, reasonable doubt and whatnot, that is contained in that standard instruction which I believe is 3.7.

The next paragraph that you-all wanted me to read to the jury was, the testimony you had heard concerning identification represents the witness's expression of his belief or impression. You do not have to believe that the identification witness was lying or not sincere to find the defendant not guilty. It is enough to conclude that the witness was mistaken in misbelief or opinion. I'm going to decline to give that instruction as well.

P000242

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

First of all, I believe the first sentence is, again, having me make a comment on what the evidence is in terms of their identification being their belief or their impression, and I don't think that it is proper for the Court to comment on what is their expression or belief.  As it relates to the remaining paragraph of that, that is a subject that can be argued to the members of the jury, and I also believe those items are adequately addressed by the weighing of evidence instruction as well as the eyewitness identification instruction, which is also going to be given in this particular case.

The next paragraph that you ask me to read was as follows:  You may also take into account that identifications made from seeing the persons are generally more reliable than identifications made from a photograph.  Again, I'm going to deny to give that instruction because I believe that that is something that can be argued to the jury.  I also believe that it is something that is adequately addressed by the weighing the evidence as well as the eyewitness identification instruction.  The eyewitness identification instruction says they are to take into consideration the totality of the circumstances.  That could be one of those circumstances that could be argued

P000243

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

for them to consider.

The next paragraph that was asked to be read is the witness's level of confidence in his identification of the perpetrator is one of many factors that you may consider in evaluating whether -- it says whether or the witness correctly.  It's whether or not the witness correctly identified the perpetrator.  However, a witness who is confident that he correctly identified the perpetrator may be mistaken.  Again, I think that's asking me to improperly comment on what the evidence may be.  I also believe that that is something that can be adequately argued during closing argument based upon the circumstances and the evidence in this case, and I also think that those items are adequately addressed by the Florida standard Supreme Court instruction on weighing the evidence as well as the eyewitness identification instruction that will be given.

The last paragraph that you asked me to give was, it is the prosecutor's burden to prove beyond a reasonable doubt that the defendant is the person who committed the crime, and I'm going to decline to give an additional instruction on that because that is actually covered verbatim within the standard jury instruction of plea of not guilty and reasonable doubt contained in 3.7.

P000244

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

So as it relates to the defense's special jury instructions, those are the Court's rulings as it relates to those items.  Based upon the amended information that was filed, it is indicated here that there are two different theories under which the burglary of a dwelling is gonna happen.  It is either entering or remaining in.  Based upon the testimony that's been presented at this point in time, I'm going to instruct on entering the burglary.  (sic) Anybody have any objection?

**MS. CITRARO:**  No.

**MS. SCOTT:**  No.

**THE COURT:**  Because there are actually two separate instructions, entering or remaining in, and all of the evidence in this case seems to indicate that this was an entering and not remaining in a situation.  So I will instruct the jury on that.

All right.  I don't believe that there's any expert witnesses, correct?

**MS. CITRARO:**  Correct.

**MS. SCOTT:**  Correct.

**THE COURT:**  There are no accomplices or informant's testimony that is going to be presented?

**MS. SCOTT:**  No, Your Honor.

**THE COURT:**  No child witness necessary?

P000245

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. SCOTT:  No.

THE COURT:  All of those items can come out of the standard instructions.

MS. SCOTT:  I would ask for the principal instruction, Judge.

THE COURT:  It's already in.

MS. SCOTT:  Thank you.

MS. CITRARO:  Is there a copy that has been emailed to us that we are looking at right now?

THE COURT:  I can send that to you right now.

MS. CITRARO:  I'm just making sure I'm not missing something.

THE COURT:  If you want me to, I can do that right now.

All right.  On the weighing the evidence, anybody believe there is going to be any evidence of general reputation for truthfulness or dishonesty?

MS. SCOTT:  No.

MS. CITRARO:  No.

THE COURT:  So I can delete paragraph ten.  What about items six through seven or six through nine in that instruction?

MS. SCOTT:  I'm sorry.  Six through nine on what page, Judge?

THE COURT:  Would have been on page 16 under the

P000246

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

weighing the evidence instruction.  Are there any impeachable priors for any of the witnesses?

**MS. CITRARO:**  Not that I'm aware of.

**THE COURT:**  State?

**MS. SCOTT:**  I don't think so.  No.  I was just thinking of Ms. Bloom, but I don't --

**THE COURT:**  So paragraph nine on weighing the evidence can come out?

**MS. SCOTT:**  Correct.  The only thing I would say is I run a history on Ms. Bloom and she comes back to have something, that would be the only additional.  Nobody else.

**THE COURT:**  What about paragraphs six through eight, any of you-all believe any of those apply at this point?

**MS. CITRARO:**  Six through eight on the same page?

**THE COURT:**  Correct.  Has any witness been offered or received any money, preferred treatment or other benefit in order to get him to testify?

**MS. CITRARO:**  Yeah.  I have no objection to any of those coming out.

**THE COURT:**  State?

**MS. SCOTT:**  I'd ask for eight to stay in, Judge. There was testimony from Ms. Szewczyk that she heard the defendant say hurry up, the police are coming.  Which

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

would be inconsistent with what he testified to today.

THE COURT:  All right.  I'll leave in eight.  What about six or seven?

MS. SCOTT:  I'm fine with taking those out.

THE COURT:  Defense?

MS. CITRARO:  That's fine.

THE COURT:  So we will read one through five plus eight which I will renumber as six.  All right.  In the left of the theft instructions there's a -- you'll see page 14, possession of recently stolen property.  He wasn't found with any property on him, so take those sections out.

MS. SCOTT:  Correct.

THE COURT:  Have you-all decided on lessers?  What you want to do there?  Is it an all or nothing or do you want lessers?

MS. CITRARO:  Can we leave that question till tomorrow so I can discuss that question with him in depth?

MS. SCOTT:  For what it's worth, I would ask for lessers.

THE COURT:  Grand theft, petit theft between 100 and 300, and petit theft under 100?

MS. SCOTT:  Just the one petit theft, the first one.  The -- actually, I'm not concerned about the

P000248

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

theft.  I'm concerned about the burglary.

THE COURT:  All right.  Well, I have got the theft ones done.  I'll just leave them in there.  If you want me to take them out tomorrow, I can take them out.

MS. SCOTT:  That's fine.

THE COURT:  And as far as the burglary goes, the lessers there would be burglary of a structure, trespass and an occupied structure and trespass.

MS. SCOTT:  I didn't ask for all of the trespasses to remain.  I'm fine with taking out the burglary of a structure.

MS. CITRARO:  I agree.  I see no reason.

THE COURT:  All right.  So I can take out burglary of a structure and just leave the trespasses?

MS. SCOTT:  Just based on the facts I think that we can still convict him of the trespass and not the burglary.

THE COURT:  Trespass of an occupied structure and trespass in a structure.

MS. CITRARO:  Would it make any difference if the defense does not want those included and the State wants them?

THE COURT:  If either side wants them, they are category ones, they qualify.  So I would instruct them on them.

Official  Court  Reporters
407-836-2280

P000249

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. CITRARO:  So I'll take no position.

THE COURT:  So you want trespass in an occupied structure and then simple trespass?

MS. SCOTT:  Right.

THE COURT:  So those will be the instructions on one of the lessers.  Count II lessers, petit theft of $100 or more, and then regular petit theft.

MS. SCOTT:  I don't -- petit theft of $100 more is fine.

THE COURT:  Defense?

MS. CITRARO:  I'd ask that we leave them both in at this time.

THE COURT:  All right.  I'll leave both of them in. Any other special instructions or anything that anybody wants added other than what we have here?

MS. SCOTT:  No, Judge.

THE COURT:  They are exactly the same except when you get to the very last trespass in a structure, that last paragraph is different.

Trespass in an occupied structure is not in the trespass in a structure.  No other special instructions or anything else you want me to add in?

MS. CITRARO:  No, Your Honor.

THE COURT:  What I will do is finish these up, send them to you-all so you can have a completed draft that

P000250

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

you can discuss with your client and I'll see you-all back here tomorrow morning at nine.

MS. SCOTT:  All right.

THE COURT:  Anything else that we need to address before we break for the evening?

MS. SCOTT:  Not from the State.

MS. CITRARO:  No, Judge.

THE COURT:  All right.  I will see you-all back here tomorrow morning at nine.

(The proceedings were concluded.)

Official Court Reporters
407-836-2280

P000251

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

C E R T I F I C A T E

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, Rebecca Ruiz, RPR, Official Court Reporter of the Ninth Judicial Circuit of Florida, do hereby certify pursuant to Florida Rules of Judicial Administration 2.535(h)(3), that I was authorized to and did report in stenographic shorthand the foregoing proceedings, and that thereafter my stenographic shorthand notes were transcribed to typewritten form by the process of computer-aided transcription, and that the foregoing pages contain a true and correct transcription of my shorthand notes taken therein.

WITNESS my hand this _____ day of _____ 2014, in the City of Orlando, County of Orange, State of Florida.

_____
Rebecca Ruiz

P000252

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

                              IN THE CIRCUIT COURT OF THE
                              NINTH JUDICIAL CIRCUIT, IN AND
                              FOR ORANGE COUNTY, FLORIDA
                              CRIMINAL JUSTICE DIVISION

STATE OF FLORIDA,

        PLAINTIFF,

                              CASE NUMBER:  48-2013-CF-5146A/O
vs.

                              DIVISION NUMBER:  16
JORGE VALLE-RAMOS,

                              VOLUME II OF II
        DEFENDANT./


                    TRIAL PROCEEDINGS

                         BEFORE

                THE HONORABLE GREG TYNAN



                              In the Orange County Courthouse
                              Courtroom 6D
                              Orlando, Florida 32801
                              May 22, 2014
                              Rebecca Ruiz



A P P E A R A N C E S:

**NATALIA SCOTT**
Assistant State Attorney
415 North Orange Avenue
Building B
Orlando, Florida 32801
On behalf of the State


**CARLI CITRARO**
Assistant Public Defender
435 North Orange Avenue
Suite 400
Orlando, Florida 32801
On behalf of Defendant

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

I N D E X

TESTIMONY OF CHARLENE BLOOM

    DIRECT EXAMINATION BY MS. CITRARO        178

    CROSS-EXAMINATION BY MS. SCOTT        191

    REDIRECT EXAMINATION BY MS. CITRARO      198

TESTIMONY OF JORGE VALLE-RAMOS

    DIRECT EXAMINATION BY MS. CITRARO        199

    CROSS-EXAMINATION BY MS. SCOTT        204

TESTIMONY OF JOY MORELLI

    DIRECT EXAMINATION BY MS. SCOTT        209

CLOSING ARGUMENT BY MS. SCOTT        225

CLOSING ARGUMENT BY MS. CITRARO        245

REBUTTAL ARGUMENT BY MS. SCOTT        254

CERTIFICATE OF REPORTER        294

E X H I B I T S

DEFENDANT'S EXHIBIT 2-4        187

STATE'S EXHIBIT 4        211

DEFENDANT'S EXHIBIT 5-6        203

P000254

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

- - - -

**P R O C E E D I N G S**

**THE COURT:** Back on the record, State of Florida versus Jorge Valle-Ramos. All our jurors are now present. Is there anything that we need to do before we bring the jurors back in and proceed with the remainder of the defense's case?

**MS. SCOTT:** Yes, Your Honor. State, at this point, wants to make an argument about something that we discussed prior to trial beginning. The criminal bulletin that was issued in this case, we agreed that we would not discuss it for purposes of prejudice to defense.

Based on what was testified to yesterday, I believe the argument at this point is 100 percent I.D, and that the way the testimony came out, it's making it seem like law enforcement pulled this photo out of thin air and got this person out of thin air.

At this point the State would be moving to introduce the criminal bulletin not for propensity purposes but to prove I.D. It wasn't Williams ruled because I didn't know that's how the testimony was going to happen. I didn't know that was the argument the defense was going to make. Based on that testimony from yesterday, I would ask that at this point for purposes

P000255

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

of I.D, to enter in the criminal bulletin.

**THE COURT:** Defense?

**MS. CITRARO:** Judge, when we did the motion in limine, the purpose was not to keep it out entirely. It was to keep out the nature of the investigation to another unrelated burglary as that would be prejudicial. The fact if this comes in, I have already told Ms. Scott I'm fine with that. I just want it redacted. The pictures are fine. The car is fine. I just don't want it saying criminal investigation for a burglary in the area. That is prejudicial on its face.

**MS. SCOTT:** And it might be prejudicial, but it goes to the I.D of the defendant which I would say at this point outweighs the prejudice he would experience from it.

**THE COURT:** Let me see the bulletin.

**MS. SCOTT:** Simply entering photographs and not saying where those photographs came from is no different than what we did yesterday with the only photo lineup saying here's the photo lineup even though law enforcement testified he is the one that constructed it. There's still nothing -- they are just photographs. And so at this point those photographs are being pulled from thin air just like everything else.

The argument that defense is making to the jury at

P000256

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL
PageID 3750

this point is the defendant looks nothing like anybody else in the photo lineup that is presented.  He is the only one with that style of haircut.  It goes -- this is completely an eyewitness identification case, so that bulletin goes directly to I.D of the defendant.

**MS. CITRARO:**  If I may?

**THE COURT:**  Go ahead.

**MS. CITRARO:**  I don't understand how that goes to any I.D.  Mr. Gonzalez isn't here to testify that he saw that picture or he saw those pictures and that's what he compared them to.  And he -- the State is saying I want to enter this bulletin to show this is where the cops got the idea of adding him.  This is where they got it.  And where did it come from?  From him being investigated on another burglary.  There's no way to enter that into evidence that that is not prejudicial which is why we tried to keep it limited to some other purpose for a stop.

Those pictures, fine, came out of the stop.  Those are the I.D's that were collected, that's fine.  But the fact that they were collected and were investigating them for a burglary, that is prejudicial and it does not outweigh on 403 purposes.

**THE COURT:**  This bulletin doesn't say anything about a burglary.

P000257

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. SCOTT:  It's a criminal investigation bulletin. They are saying that these guys could have been involved in some kind of investigation.

THE COURT:  The nature of it looks serious.

MS. SCOTT:  Judge, just because it looks serious and looks bad doesn't mean that's not the standard that we are applying.

THE COURT:  This says that an occupant, meaning one, of a silver four-door Jetta was seen knocking on doors to different houses and then entering the backyard of another house.  Tact officer stopped the car that same day, identified these four people inside the car. There's no indication that Mr. Valle-Ramos is even one that went into the backyard.  And it says that there was no probable cause at that time.  And they said be on the lookout for that vehicle.  If you come into contact with the vehicle, get their information and notify -- looks like Osceola County.

MS. CITRARO:  Judge, the other five pictures in the photo lineup do not include those other three people.  A sensible juror who sees that bulletin and knows there was a connection made between that suspected burglary and this suspected burglary and that Mr. Valle-Ramos's picture is the only one that is in common with the two investigations, it will become obvious that he is

**P000258**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

suspected of another burglary.  That is a reasonable conclusion to draw based on the evidence that she wants to enter.

MS. SCOTT:  Judge, first, that was not -- again, there's not a burglary in that picture or in that bulletin.  The only thing they have are suspects.

MS. CITRARO:  Knocking on doors, entering property, be on the lookout --

MS. SCOTT:  May I finish?

THE COURT:  Go ahead.

MS. SCOTT:  The argument that the State is presenting right now has nothing to do with {potential is I} just because he was there means he was here.  It goes directly to I.D, and I.D in this case is identified through a photo lineup where a detective constructed that photo lineup based on information that he had from another case.  This wasn't --

THE COURT:  Let me ask you this, this photograph with his afro, when was that picture taken?

MS. SCOTT:  I have no idea.  That is his 2011 driver's license picture that we already entered into evidence.

THE COURT:  Does anybody know that that's exactly what it is?

MS. SCOTT:  I have the DAVID printout.  It looks

Official Court Reporters
407-836-2280

P000259

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

like the issue date on that was September 14, 2011. However, it was replaced on February 8th of 2012. So it's not clear as to whether that photo was taken in 2011 or in 2012 since that's when the card was replaced.

**MS. CITRARO:** He already testified to a date of issuance. That is when it was taken, even if it is 2012.

**THE COURT:** I understand the reason. My question is, if this is a photograph that he was stopped on 4/3, then it comes in.

**MS. CITRARO:** That is not.

**THE COURT:** That's why I asked you the question.

**MS. CITRARO:** Okay.

**THE COURT:** All right. State, can you tell me why it is you didn't file a Williams Rule notice?

**MS. SCOTT:** Judge, I didn't know the arguments were going to go the way they did. Based on the testimony of yesterday is when I knew what she is -- that she was going to be arguing. Obviously, I.D is always a common defense that could be happening, but I have no idea what's going to happen at trial.

The testimony yesterday that came out was made very clear that after Mr. Valle-Ramos himself testified and his friend testified that it's not a -- I wasn't -- it's a complete misidentification is their argument. I

Official Court Reporters
407-836-2280

**P000260**

didn't know that that was going to be the complete route that they were going to go down literally until yesterday.

I have a second issue in terms of evidence that -- once we get past this one.

**THE COURT:** Well, what's the theory under which this is admissible?

**MS. SCOTT:** I.D. It goes directly to why it is that the detective picked that photo that he put in the photo lineup of Mr. Valle-Ramos, why did he choose Mr. Valle-Ramos to go into that photo lineup.

**THE COURT:** He already testified under oath yesterday he developed them as a suspect and that's the reason he put them in a lineup.

**MS. SCOTT:** Correct. And then after defense presented their case and cross-examined him, the only thing that he was allowed to say at that point was he put them in that photo lineup because of whatever means he developed him as a suspect. The way the defense is presenting this to the jury now is he literally pulled this guy out of thin air and found a person with an afro, put him in a photo lineup and now we have an innocent man accused.

That is misleading to the jury. That is -- in a completely eyewitness identification case, it would be

Official Court Reporters
407-836-2280

**P000261**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

improper to leave them there.  If they are presented

with this type of evidence, they can then determine the

weight of that evidence.

**MS. CITRARO:**  If I may add something?

**THE COURT:**  You may.

**MS. CITRARO:**  We discussed before that we are not

denying that a stop occurred on that day.  But the State

is asking to have the detective testify the reason I was

suspecting him and put him in this lineup is because he

is suspected of another burglary.  That is the problem

with what he wants to connect.

If he wants to say there was a stop, that's fine.

That was the whole purpose of the motion in limine was

there was a stop for some purpose, but that purpose

cannot be told to the jury to be he's suspected of

another burglary.

**THE COURT:**  Well, the testimony that came out

yesterday was not there a stop on 4/3, that there

was a stop on the day of the burglary, which was 4/9 and

that the stop on 4/9 was sometime after they were coming

back from playing basketball, and it was a stop for

speeding.  There has been no reference anywhere in this

record to any stop that happened three days or four days

or six days prior.  Am I missing something?

**MS. CITRARO:**  I mean, the testimony that came out

P000262

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

during the course of the testimony yesterday was that he was stopped after he was coming back from basketball on the day of the burglary.

THE COURT:  The activity observed on 4/3 and the stop was that same day.

MS. CITRARO:  May I look at the bulletin?

THE COURT:  All right.  Let me think about it and I'll let you know what I'm going to do.

What else do we need to address?

MS. SCOTT:  Judge, last night after the testimony of the defendant, I contacted Detective Stanley on the case as well as tried to get ahold of the arresting officer in this case, I have the booking photo of the defendant.  He was booked, I believe, on 4/24.  There was significant testimony yesterday about his appearance, how his hair looked during that time.  I have a printout from Orange County Corrections.  I have the Orange County Corrections officer here willing to testify as a custodian of records to authenticate these documents.  It would be a late disclosure of a witness and discovery based upon what was said yesterday, probably about 5:30.

THE COURT:  Let me see what you have.  All right.  So what are you intending to move in?

MS. SCOTT:  I'm sorry?

P000263

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  What are you intending to move in?

MS. SCOTT:  Both of those documents, Judge.

THE COURT:  For what reason?

MS. SCOTT:  The hairstyle, that reason directly contradicts to what defendant and his friend testified to yesterday to what his hairstyle looked like.  That was probably about two weeks after the event.

THE COURT:  Okay.  Well, if you want to introduce it for the purposes of a hairstyle, there's no picture on here.  Why is this coming in?

MS. SCOTT:  That is part of the document.  What she was looking at on the screen, that was for a rule of completeness.  That is the whole thing.  I'm fine with not introducing the second thing.  I believe the date and the photo is on the first page.

THE COURT:  All right.  Defense?

MS. CITRARO:  May I just see it one last time?  I'm pretty sure I have no objection.  May I just have a moment?

No objection to that coming in, Judge.  Just the picture, not the second page.

THE COURT:  All right.  So no objection to this picture coming in, the booking photo and the information that's on that page?

MS. CITRARO:  Yeah.

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT: All right. Without objection from the defense, I will let you put it in. I don't see any reason to stick this information in since it doesn't have a photograph on it.

All right. Anything else that we need to address before we bring the jurors back in?

MS. CITRARO: No, Judge.

MS. SCOTT: No.

THE COURT: All right. Let's go ahead and bring in the jurors.

(Jury enters the courtroom.)

THE COURT: All right. Ladies and gentlemen, welcome back. I apologize for the delay. We had some issues that we needed to resolve this morning that has now been taken care of.

Just a couple of questions over the evening. Everybody followed the instructions that I gave you and nobody did any research looking up of names, maps or anything that had to do with this case, correct? And did anybody have any contact with you other than the court deputies today?

JURORS: No.

THE COURT: With that said, we're ready to proceed with the defense's case.

Defense, you may call your next witness.

P000265

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. CITRARO:  Thank you, Judge.  Call Charlene Bloom.

Thereupon,

CHARLENE BLOOM

was called as a witness and, having first been duly sworn, testified as follows:

THE COURT:  All right.  Ma'am, can you tell me your full name, and spell your first and last name for me.

THE WITNESS:  Charlene Lizbeth Bloom.  B-L-O-O-M.

THE COURT:  All right.

Defense, you may inquire of the witness.

MS. CITRARO:  Thank you.

THE WITNESS:  I'm sorry?

THE COURT:  I just said that she can ask you questions now.

DIRECT EXAMINATION

BY MS. CITRARO:

Q    Good morning.

A    Good morning.

Q    Ms. Bloom, pardon my intimate question, but can you tell the Court where you live, your address?

A    1708 Silver Creek Court, Orlando.

Q    Silver Creek Court, is that in the same subdivision as Little Fall Circle?

A    Yes.  It's Hidden Creek Condominiums.

P000266

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Do you know Mr. Gonzalez, George Gonzalez?

A    I didn't until recently.

Q    Okay.

A    I had never really talked to him before.

Q    Are you familiar with where he lives?

A    I'm sorry?

Q    Are you familiar with where he lives?

A    Yes, now.

Q    Is it in the same subdivision?

A    Yes.

Q    Okay.  I'm gonna draw your attention to the events of April 9th of last year, 2013.

A    Yes, ma'am.

Q    Did you see anything out of the ordinary that morning around nine in the morning or so?

A    Yes, ma'am.  It was about 8:15.

Q    8:15?

A    Yeah.

Q    Can you tell the Court what you saw first?

A    Well, um, the dogs were barking in the complex behind me because there's a fence between two complexes, and the one dog never barks, so I got up and looked out.

Q    Where are you looking from exactly?

A    From my upstairs bedroom window.

Q    So you are on the second floor?

P000267

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL
PageID 3761

**A**    Yes.  Well, it's two stories.  So I was on the second floor.

**Q**    And you're looking out the window?

**A**    That's correct.

**Q**    Okay.  What did you see?

**A**    Well, I saw that the gate behind the house, the next subdivision, was open and it never is.  So I wondered.  So I stood for a few minutes and the neighbor next door came out, and he had heard the dog barking and went over there too and looked.  He went over and looked, and it looked like someone had tried to get in.  He closed the gate, came back out, spoke to another neighbor who came out at that time and I think it was about the same thing --

**Q**    Were you still in your bedroom looking out on all of this?

**A**    Yes.  I'm still in the bedroom the whole time.

**Q**    Okay.  What did you see next?

**A**    So they were talking, and I just figured I'd see what was going on.  So I stood there, and pretty soon it looked like she got the phone.  So I figured she called the police.  I didn't know.

**Q**    Do you know the woman?

**A**    A little while later the police came, but they came into our side, our complex.  Because I can see from my window directions -- both directions towards the lake and then

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

towards the street, which is the main street of the complex.

Q    So the police responded to your subdivision?

A    I saw the police over there, yeah.  Uh-huh.

Q    Did you notice any individuals or any suspicious activity before the police arrived?

A    Um, right before they got there, um, I saw out of the corner of my eye.  I could see that there was -- because I was looking both directions -- that there were three guys coming and I wouldn't have noticed them except that they took off running to the vehicle, which I didn't realize there was a vehicle.

Q    Where was the vehicle?

A    Behind my fence, like, directly behind my fence where I couldn't really see it.  But they ran from the lake area, like, they climbed the fence and ran towards the vehicle.  If they hadn't run, I probably won't have noticed it.

Q    And can you describe the female that you saw running?

A    Yes.  There were three young men, probably early twenties.  They all three had on long-sleeve dress shirts. They looked like they were going to work or somewhere.  Um, they ran.  There was a driver that had blond hair and was kind of short, and there was two other guys.  One was -- they got in the back passenger door.  The one on the right-hand

P000269

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

side was a short guy, kind of stocky.  The guy that was closest to me was taller and thin, but not Hispanic or black, either one.

Q    And could you describe more specifically the driver?  Did you get a look at him?

A    I did.  I was looking -- I was looking out the blinds and the driver was looking -- he looked -- turned around to look at the guy, the man and the woman who had their back to them so they didn't see them.  That's why I went downstairs, because they didn't see the people that got in the car.

So, um, he was standing at the car door and he was kind of looking, and he looked up and he stood there for a minute and just gazed at me.  I don't think he could see me, but he could see me looking out, and he was blond.  He looked like he was probably short, maybe 5'3", 5'4".  Maybe 5'5".  And he was dressed nicely.  Like I say, they looked like they were going to work or to school or something.

Q    Okay.  On that day, April 9th when you were looking at these guys, could you see pretty well?

A    I didn't have my glasses on, which I thought of later, but I could see the people.  Of course, they took -- they ran to the car and then they sped away.  And without my glasses, there was no way I could look at a license tag or anything.  But they were so fast that if they

P000270

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

hadn't done that too, that would have been another thing that I wouldn't have noticed.

Q    So without your glasses, you couldn't read a tag?

A    I -- the other day I could kind of read a tag.  But that morning I was tired.  I hadn't been to bed yet because I was working midnight shifts prior to that, and it was kind of still hard to go to sleep.  So I was tired.  So I couldn't see the tag.  But they went so fast.  They were in a gray, like a -- not a silver, but a gray sedan of some sort.  I figured it was probably like a Hyundai or a Nissan, something like that.  Kind of a 2000 -- earlier 2000 model.

Q    I'm guessing that your glasses are for distance?

A    They are for everything.

Q    Okay.

A    Yeah.

Q    Would you say your vision is pretty well without the glasses?

A    Yes.  I can see people and animals.  So, you know...

Q    So do you feel like you got a pretty clear look at the driver's face?

A    I did.  I did.

Q    So you don't feel like your glasses, it was fuzzy and you were not sure what you were seeing?

A    Not at all.  Not at all.  And the two people that

P000271

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

got in the back, I saw them, basically, from the side, but when they got into the doors, I did see their faces.

MS. CITRARO:  May I approach the witness?

THE COURT:  You may.

BY MS. CITRARO:

Q    I'm showing you what's marked for identification purposes only as Defense D.  Do you recognize this scene, this view what you're looking at?

A    Yes, I do.

Q    Can you tell the Court what exactly is that a picture of?

A    That's the entrance to my house to the left -- to the right is the lake, because I think that that would have been the way that the people that were at George's house would have approached the lake because see, you can go to the lake and climb the fence.  And that's what people do all the time, because we are a gated community.

Q    And that would have been the direction that they would have been coming from to get to the car?

A    Yes, that would be correct.  That would be correct.

MS. CITRARO:  May I approach the witness again?

THE COURT:  You may.

BY MS. CITRARO:

Q    Showing you what's marked for identification as Defense F Composite 1 and 2.  There's two photographs here.

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Take a look at both of them.

A   Okay.  Okay those are --

Q   Do you recognize them?

A   Yes, I do.

Q   What are you looking at?

A   Those are where the fence meets the lake on our side of the property.  It has an extension, like a link fence, and it's easy to go around it or climb it.  And the same -- this is just a larger picture of the same view.

Q   Okay.  So would that be the fence that it would make sense they were coming from?

A   Yes.  They would come from my side and go around it or over it.  One of the two.

MS. CITRARO:  May I approach one more time?

THE COURT:  Yes, ma'am.

BY MS. CITRARO:

Q   This is Defense E for identification purposes. There is two more pictures here.

A   Okay.

Q   Can you take a look at those?

A   Yes.  This is the back of my house and my complex. It's the dog walk for the complex.  And there's a fence.  And then it shows the next-door condo, which is Liberty Square, I believe, condos on Lafayette Square Avenue or Lane.

Q   And the second picture?

Official Court Reporters
407-836-2280

P000273

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A** Yes. In the second picture is, um, where the people were standing. The car was below -- right below the fence, right across from where the neighbors were standing, but they were facing the other direction.

**Q** Okay. So the view that that picture is showing, would that be your view from the bedroom window?

**A** From my bedroom window, that's correct.

**Q** So that would be exactly what you were seeing?

**A** Exactly. Exactly.

**Q** And the vehicle would have been there where that empty space is?

**A** Yes. It would have been right along the fence. And as I say, I wouldn't have noticed it if they hadn't gone to the car. I didn't realize it was there until I saw them running. And then when they took off they sped away.

**Q** Okay. Judging by looking at that picture, does it appear like it's been magnified, like it's closer than it is or does that look about to be the right distance?

**THE WITNESS:** That looks about the right distance.

**MS. CITRARO:** May I approach?

**THE COURT:** You may.

**MS. CITRARO:** I'll move all three exhibits and composites into evidence at this time.

**THE COURT:** Any objection from the State?

**MS. SCOTT:** No.

**P000274**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**MS. CITRARO:**  May I publish?

**THE COURT:**  All right.  What's been marked as Defense Exhibit D for identification will be moved into evidence as Defense Exhibit 2 without objection from the State.

What's been marked as State's Exhibit E or Defense Exhibit E for identification will be moved into evidence as Defense Exhibit Number 3 without objection from the State.

What's been marked as Defense Exhibit F for identification will be moved into evidence as Defense Exhibit Number 4 without objection from the State.

(Defendant's Exhibits 2-4 received in evidence.)

**MS. CITRARO:**  May I publish to the jury as soon as it's marked?

**THE COURT:**  You may.

**BY MS. CITRARO:**

Q   Ms. Bloom?

A   Yes.

Q   On that date, April 9th, when you were looking at these three fellows, the driver you said you got the best look at?

A   Um, I did.

Q   Was the driver this man?

A   No.  No.

Official Court Reporters
407-836-2280

P000275

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Are you sure?

A    I'm positive.

Q    Could the driver have been this man with the large Afro?

A    No.  No.  No one had an afro.  No one did.

Q    Could this man have been the other two passengers?

A    No.  No.

Q    Either one of them?

A    No.

Q    So this man does not look like the person that you saw, any of these three men you saw get into that car?

A    No.

Q    And are you pretty sure of that?

A    I'm positive.

Q    You're positive?

A    Yeah.

Q    You wrote a statement for police?

A    I'm sorry?

Q    Did you speak with the police that day?

A    I did.  The reason I went down, the neighbors didn't see them leave, and I thought I got to -- I know what they look like.  So I went down to talk to him and I talked through the fence, and then I went and drove around and gave him a statement.  My statement was a little -- because I was tired --

P000276

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**MS. SCOTT:** Objection, Your Honor, nonresponsive.

**THE COURT:** Overruled.

**BY MS. CITRARO:**

Q    But you did write a statement in the matter?

A    I'm sorry?

Q    You did write a statement?

A    I did.

Q    Did the police talk to you any more about any further investigation like a photo lineup or anything?

A    Well, they did call me and ask me if I could, you know, if I knew what they looked like, and I explained, you know, that I did.  But, um, I didn't talk to them until after I got the paperwork, and the picture that I saw wasn't the same person that was there and didn't appear to be this gentleman either.  So...

Q    What picture did you see?

A    Oh, on the computer.  The mugshot.

Q    So you saw a mugshot --

A    Yes.

Q    -- of Mr. Valle-Ramos --

A    Right.

Q    -- after he was arrested in this?

A    Well, yes.  I had received two summons.  One said I needed to come.  The second one said I didn't.  So I said, well, I don't know who this is.  So I want to see if I knew

Official Court Reporters
407-836-2280

**P000277**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

who he was, and it wasn't anyone that I have seen.

Q    So that picture, that mugshot, did you not think that was the guy you saw and April 9th?

A    No.  Absolutely not.

Q    When did you offer to do any photo lineup?

A    Well, when he called me, I had explained that I had looked at the picture and that it wasn't anyone that I had seen, so for sure--

Q    So you didn't come in and do a photo lineup?

A    No.  He said he -- I didn't need to come for the lineup.

Q    Okay.  Have the police contacted you at all after that?

A    I'm sorry?

Q    Did the police contact you at all after that?

A    Someone else called me.  I talked to two different people and, um -- but I can't remember what the second call was about.

Q    They didn't ask you to come in for any other identifications?

A    No.  No.  Just for the deposition to you.  That was all.

Q    Okay.  Nothing further at this time.

THE COURT:  All right.  Cross-examination?

CROSS-EXAMINATION

Official Court Reporters
407-836-2280

P000278

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**BY MS. SCOTT:**

Q   Good morning, Ms. Bloom.

A   Good morning.

Q   Okay.  I want to take you back just a little bit.

A   Okay.

Q   What point did you get home the night before?  You said you work midnight shift?

A   Well, I'm retired, and I had worked night shift for many, many years so my sleep patterns are a little strange.

Q   Sure.

A   So I was home the whole night.

Q   Okay.

A   But I was up all night.

Q   Okay.  So you hadn't yet gone to bed?

A   Well, I was in bed.

Q   But not sleeping?

A   Not sleeping, no, trying to.

Q   Correct.  When was the last time you had actually slept prior to that morning?

A   Um...

Q   Was it the night before?

A   During the --

Q   Or was it during the day?

A   I take naps during the evening.  (Laughing.)

Q   Okay.  Okay.  How long of a nap did you have?

P000279

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    Probably an hour, hour and a half, yeah.

**Q**    And prior to that, was it the previous night that you had a full night's rest or the previous day?

**A**    No, during the day, yeah.

**Q**    Okay.  So probably about 24 hours before this happened you were going on an hour's worth of sleep at this point based on that nap?

**A**    Yeah, probably so.  Yeah.

**Q**    Do you -- at what point when you -- you stated you looked out of the window and you noticed out of the corner of your eye and you weren't wearing your glasses -- I presume you weren't wearing your glasses because you were in bed, correct?

**A**    Right.  Right.

**Q**    Normally speaking when you get out of bed, you grab your glasses and put them on and continue with your day?

**A**    Normally I do, yeah.

**Q**    When you saw -- when you looked out the window and you said you saw these people running --

**A**    Uh-huh.

**Q**    -- how far, if you had to give a feet estimation, I know that's hard, but how far is your window from where these people were?

**A**    Um, second floor, there's a fence.  Um, gosh, I don't know.  Probably --

P000280

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Like 100 feet?

A    Maybe 50.

Q    Okay.

A    Yeah.  Maybe 50 feet.

Q    Okay.  And you stated before that you couldn't
really see the car from the angle and you probably
wouldn't --

A    I wasn't -- see what I did, the dog was barking --

Q    Uh-huh.

A    -- so I looked out because this particular dog
never barks.  The dog next door always barks and they were
both barking.  So that's what drew my attention to even look
out.  And I was just glancing, because I know the lake, so
I'm glancing at the lake and back, looking around to see
what, you know, was going on.  So I just -- I saw them come
out.  I saw him come out and check the gate next door because
it was wide open and the lady doesn't live there.

Q    Just to clarify, when you're observing all of this,
you are still on the second floor?

A    Yes.  And I didn't see the car at that point.

Q    And when -- at what point did you see the car?

A    Just when I saw them come from the lake running to
the vehicle.  And that's when I realized oh, there's a car
there.

Q    Okay.

P000281

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A** And that caught my attention then.

**Q** And then you looked at the car?

**A** Yes.

**Q** And then that's when you saw the driver?

**A** Yes.

**Q** Okay. And there -- you stated before that they are running, get in the car and speed away?

**A** Yes.

**Q** So it all happened very quickly?

**A** Yes. Except he stopped and looked up to try to see which window it was, I guess.

**Q** Right. Would you say your memory -- when you see something, would you say your memory is better closer to the event that that happened, or later on in that?

**A** Well, to be honest with you, I jotted it down, because I thought, you know, when I went down and talked to him, I thought I need to probably write this down.

**Q** And him was law enforcement?

**A** Yes, the police officer.

**Q** And you wrote a statement that day?

**A** I did. Correct.

**Q** Okay.

**MS. SCOTT:** May I approach the witness?

**THE COURT:** You may.

P000282

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**BY MS. SCOTT:**

Q    Do you recognize that?

A    Yes.

Q    And is that your statement?

A    Yes.

Q    Can you read that statement to yourself and let me know in there where you show -- where you tell the description of the individuals other than what they are wearing?

A    Okay.  Yes.

Q    Do you remember -- can you tell me from your statement that you wrote that day what description did you give to law enforcement as to these people that you saw?

A    I didn't give it to them much because I realized later oh, I could have told them this, this and this, and I didn't give it.

Q    But minutes after it happened, you didn't tell them those details?

A    No.  No.

Q    Okay.  When you went downstairs, were there -- was there -- who did you see when you went down there other than law enforcement?

A    Okay.  There were the two neighbors on the other side complex, they were standing talking, and then they had their backs to the guys when they got in the car.

P000283

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q    Okay.

A    That's why I went down.

Q    One of the neighbors, is it a female?

A    Yes.

Q    Do you know who she is?

A    She's moved.  I didn't know her name.  I don't know their names.

Q    Okay.

A    I just know who they are, you know.

Q    How long had you lived in that apartment complex?

A    Almost 14 years.

Q    Okay.  And I'm not trying to offend you, so please excuse this question, but can you tell us how old you are?

A    I'm sorry?

Q    Can you tell us how old you are?

A    Yes, ma'am.  Sixty-five and a half.

Q    Okay.  Thank you.  Law enforcement, when you told them, they didn't show you a photo lineup, right?  They never ever went back out and showed you a photo lineup?

A    No.  No.

Q    And that was because when you called in response to your subpoena, you said, the guy I looked up on the website doesn't look like anybody that I saw?

A    Right.  When they called me, right.

Q    Okay.  And so the first time you had seen any

Official Court Reporters
407-836-2280

P000284

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

pictures was ones that you had looked up yourself months after this event occurred?

A     Yes.  Because -- see, I received the first subpoena probably in August.

Q     And this occurred back in April?

A     And then I got another one saying I didn't have to come, so I thought well, I'll go look to see who it was, you know.

Q     So just to clarify, this happens early April?

A     Uh-huh.

Q     You write your statement?

A     Uh-huh.

Q     You go on with your life, nothing happens with this case, meaning no one is talking to you about it, no one is showing you anything.  Then when did you say -- was it August that you got the first subpoena?

A     August I got the subpoena, and I didn't know who it was.

Q     And so in August you pull it up on the computer, and that's when the first time you see a photo of anybody related to anything that could be linked to the incident that happened back in April?

A     That's correct.  That's correct.

          MS. SCOTT:  Thank you.  I have no other questions.

          THE COURT:  All right.  Any redirect?

Official Court Reporters
407-836-2280

**P000285**

MS. CITRARO:  Just briefly.

REDIRECT EXAMINATION

BY MS. CITRARO:

Q    Did you get a look at pants or shorts?

A    Um, long pants.

Q    Long pants?

A    And long-sleeve shirts, dress shirts.

Q    Did you notice if they were wearing gloves?

A    No gloves.

Q    No gloves.  Did you notice any backpacks?

A    Nothing in their hands or anything, not carrying anything.  No backpack or anything.

Q    Okay.

A    It might have been something different, I don't know.  Because I didn't realize there was something going on across the street where the actual thing happened until the police officer told me that there was something over there, too, in my complex, because I thought it was basically --

Q    And that's what turned out to be Mr. Gonzalez, correct?

A    Right.  Uh-huh.

Q    Okay?

MS. CITRARO:  Nothing further.

THE COURT:  All right.  Thank you, ma'am.

THE WITNESS:  Thank you.

Official Court Reporters
407-836-2280

P000286

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT: Defense, call your next witness.

MS. CITRARO: We will recall Mr. Valle-Ramos.

Thereupon,

**JORGE VALLE-RAMOS**

was called as a witness and, having first been duly sworn,

testified as follows:

THE COURT: All right. You may inquire.

MS. CITRARO: Should he spell the name again for

the record?

THE COURT: No. We have already got it once.

MS. CITRARO: Okay. Thank you.

**DIRECT EXAMINATION**

**BY MS. CITRARO:**

Q   Good morning.

A   Good morning.

Q   I recalled you just for purposes of specifying what

your hair looked like in April of 2013, and you said

yesterday that you -- can you repeat how you wore your hair

then?

A   In a ponytail.

Q   So it was long enough to put back?

A   Yeah.

Q   So you didn't usually keep it out?

A   It would be too much. No, I couldn't do it.

MS. CITRARO: Okay. May I approach the witness?

P000287

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  You may.

BY MS. CITRARO:

Q    I'm showing you what's marked for identification purposes only as Defense G.  Can you take a look at that and let me know if you recognize what this is?

A    Yeah.  This is pictures of Christmas, 2012.

Q    And how do you know that?

A    It says it on there.

Q    And where did those pictures come from?

A    My iPad.

Q    So those are your photos?

A    Yes.

Q    Does your iPad keep them dated?

A    Yes.

Q    Is that -- so that was 2012, so that was, approximately, four months before --

A    Yes.

Q    -- what is alleged to have occurred at Mr. Gonzalez's house?  Was that how you typically kept your hair at that time?

A    Until I was able to put it in a full ponytail, yes.

Q    And how did you keep it at that time?

A    This time?

Q    Yes.

A    Well, it was almost in a ponytail.  So I would get

P000288

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

a headband and pull it up to right here.  So I would have a puff back here.  And eventually, like two months after, I was able to put it in a ponytail.  But if I just let it flare out, it would be too much hair.  So that's why I put a headband on to pull it back.

Q    So it was typical that you wear it back?

A    Yes.

Q    And that was in 2012?

A    Yes.

MS. CITRARO:  May I approach again?

THE COURT:  You may.

BY MS. CITRARO:

Q    Showing you what's marked for identification as Defense H.  Let me know if you recognize that?

A    Yes.

Q    What is that a picture of?

A    It's a picture of me on February 8th, 2013.

Q    How do you know that that picture was from February 8th of 2013?

A    My iPad keeps dates on the pictures.

Q    Do you remember that picture?  Is that a picture of you?

A    Yes.

Q    Okay.  Do you remember what is happening in that picture?

P000289

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A** Yes.  This is a picture of me taken by my friend/associate, Ms. Arnette (ph).

**Q** And do you remember the day -- do you know why it was in February?

**A** Because it was -- I moved into this apartment in January, and my buddy Caesar was living with me for, like, a month and a half.  So he left mid-February, and this is February 8th, and I remember him taking this picture.

**Q** Okay.  And how is your hair in that picture in February of 2013?

**A** Ponytail.

**Q** So it was longer then in 2012?

**A** Yes.

**Q** You didn't put your hair in-between?

**A** No.

**Q** Okay.  Is that how you typically kept it then once it gets to that length?

**A** Yeah, all the time.

**Q** So all the time you keep it back in a ponytail?

**A** Yeah, unless I'm in the shower.

**Q** And you continued to do that through April, May and June?

**A** Yes.

**Q** When did you cut the afro off?

**A** Around September, after the summer.

P000290

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Q   Of last year?

A   Yeah.

Q   So you let it continue to grow?

A   Yes.

Q   And you never cut it in-between?

A   This?  Never.

Q   Okay.  How far did it eventually get?

A   Um, down to my nipples.

Q   Then you cut it?

A   Yes.

MS. CITRARO:  May I approach?

THE COURT:  You may.

MS. CITRARO:  I'll move both exhibits into evidence at this time.

THE COURT:  Any objection from the State?

MS. SCOTT:  No, Your Honor.

THE COURT:  All right.  What has been marked as Defense Exhibit G for identification will be moved into evidence as Defense Exhibit Number 5 without objection from the State.

What's been marked as Defense Exhibit H for identification, without objection will be moved into evidence as Defense Exhibit Number 6.

(Defendant's Exhibits 5-6 received in evidence.)

MS. CITRARO:  May I publish to the jury 5 and 6 as

Official Court Reporters
407-836-2280

P000291

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

well as one which was moved into evidence yesterday?

THE COURT:  Correct.  You may.

MS. CITRARO:  Thank you.

BY MS. CITRARO:

Q    Mr. Valle-Ramos, you were arrested on the warrant, was it, April 24th of last year?

A    Yes.

Q    Did you keep your hair the same way then in a ponytail?

A    Yes.

MS. CITRARO:  I have nothing further.

THE COURT:  Cross?

CROSS-EXAMINATION

BY MS. SCOTT:

Q    Mr. Valle-Ramos --

A    Yes.

Q    -- yesterday you had testified that your hair at the time that this happened, you looked like Tarzan and you did this, you put your hand down to here?

A    Nipples.

Q    Right?

A    Yeah.

Q    When your hair -- let me show you this one.

A    Yes.

Q    This is February?

Official Court Reporters
407-836-2280

P000292

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

A     Yes.

Q     Right?

A     Yeah.

Q     March, April, two months later?

A     (Nods hair.)

Q     Your hair in this picture is probably about six to seven inches away from your nipples?

A     No.

Q     No?

A     Oh, I mean, I'm wearing a hat.  It's puffy.

Q     Right.  I see that, but the back of your hair is pulled back?

A     Yes.

Q     And you have it pulled back in a ponytail, and the bottom of your hairline doesn't even hit your shoulders.  You can see the wall between your neck and your shoulder?

A     It's in a ponytail.

Q     I understand.  It's pulled back?

A     If I took out the ponytail, then it would fall a little bit more.

Q     And in this picture the texture of your hair if you were to let the ponytail out, it would go out, correct?

A     Yeah, but fall more.  Fall more than out, because at that time my hair was too heavy, so just be in a ball.

Q     I understand.  From that picture that you're

P000293

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

showing us that your attorney just put into evidence, your hair is pulled back in a ponytail.  If you were to let that down, give it maybe an inch or two at most?

A    Probably at my shoulders.

Q    Yesterday you told us it was here?

A    When I got arrested.

Q    Right.  That's April.  So you want the jury to believe that your hair grew probably about 6 inches in two months?

A    I mean, if I let that hair fall down, it would fall down to my chest, still like to my shoulders right here, right under my chin.

MS. SCOTT:  That's all I have, Judge.

THE COURT:  Okay.  Any redirect?

MS. CITRARO:  No redirect.

THE COURT:  All right.  Going to have you have a seat back at the table.

All right.  Defense, call your next witness.

MS. CITRARO:  Defense rests.

THE COURT:  Does the State wish to present a rebuttal case?

MS. SCOTT:  Yes, Your Honor.

THE COURT:  Call your first witness.

MS. SCOTT:  May we have a ruling on the previous issue?

Official Court Reporters
407-836-2280

P000294

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  Come on up.

(Conference at the bench held on the record.)

THE COURT:  If the purpose of this coming in is to prove identity, it seems to be evidence of a prior bad act.  It is not substantially similar.  For purposes of prior bad acts under the evidence code, it would need to be substantially similar, almost like a fingerprint.  The only thing that this indicates is that somebody in that car, and it doesn't say who --

MS. SCOTT:  Right.

THE COURT:  -- was knocking on doors, and then went into the backyard.

MS. SCOTT:  I would ask for a proffer from the detective as to what he can testify to as to his personal knowledge as to the facts of that.  And if he can, if he can testify to the nature of where they were located in proximity to this residence as well as what it was that it was reported happening, I believe I can establish those facts.

THE COURT:  Let's assume it's within close proximity.

MS. SCOTT:  Close proximity, neighbor hears noise going in from his house, going into backyards.

THE COURT:  Well, this indicates they went and knocked on front doors and went into one backyard.  No

P000295

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

other information.

MS. SCOTT: Correct. The evidence in our case shows that the point of entry was through the front door of one residence and they left through the backyard of the same residence in the close proximity of the same area. I would say based on timing of when it occurred, where it occurred, point of entry and exit, those are always facts that would be substantially similar.

THE COURT: I don't see it.

MS. SCOTT: Okay.

THE COURT: So I'm gonna not permit it to come in.

(The following was in open court.)

THE COURT: All right. Call your first witness.

MS. SCOTT: State calls Joy Morelli.

Thereupon,

**JOY MORELLI**

was called as a witness and, having first been duly sworn, testified as follows:

THE COURT: Ma'am, have a seat. Once you get seated, go ahead, tell me your first and last name, and spell both for me, please.

THE WITNESS: Joy Morelli. J-O-Y M-O-R-E-L-L-I.

THE COURT: State, you may inquire.

MS. SCOTT: Thank you.

**DIRECT EXAMINATION**

Official Court Reporters
407-836-2280

P000296

BY MS. SCOTT:

Q    Good morning.

A    Good morning.

Q    Ms. Morelli, can you tell the jury what you do for a living?

A    I am an administrative sergeant with Orange County Corrections.

Q    Okay.  And where, physically, do you work?

A    I work at the 33rd Street jail off of John Young Parkway.

Q    And as part of administrative sergeant, what do your regular duties entail?

A    Um --

Q    Generally speaking.

A    Generally speaking, I do administrative work for the major.  I am also the records keeper for all video and photo information.

Q    Okay.  Are you the custodian of records for Orange County Jail?

A    Yes, I am.

MS. SCOTT:  May I approach the witness?

THE COURT:  You may.

BY MS. SCOTT:

Q    I am handing you what's been previously marked as State's Exhibit D for identification.  Do you recognize that?

Official Court Reporters
407-836-2280

P000297

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**A**    Yes, I do.

**Q**    And what do you recognize that as?

**A**    That is the booking picture for this inmate.

**Q**    And how do you know it's a booking picture?

**A**    Other than the fact that I printed it off this morning?

**Q**    Correct.

**A**    It is out of our inmate management system.

**Q**    Do you recognize that screen shot that you're looking at?

**A**    Yes, I do.

**Q**    Do you recognize the numbers and the codes and everything else that's in there?

**A**    Yes, I do.

**Q**    And is that a document that's kept in the regular course of business in your position?

**A**    Yes, it is.

**MS. SCOTT:**  At this time the State moves what's been previously marked as State's D into evidence as State's 4.

**THE COURT:**  Any objection?

**MS. CITRARO:**  No objection.

**THE COURT:**  Without objection from the defense, what's been marked as State's Exhibit D for identification will be moved into evidence as State's

**P000298**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Exhibit 4.

(State's Exhibit 4 received in evidence.)

**MS. SCOTT:** Permission to publish, Judge?

**THE COURT:** You may.

**BY MS. SCOTT:**

Q    Can you read what the date on that is?

A    Yes, it is 4/24/2013.

Q    Okay.  And what does that date signify?

A    That is the arrest date.

Q    And is the arrest date the same day that this picture would have been taken?

A    Yes.

Q    Okay.

**MS. SCOTT:** Handing to the members of the jury. The quality of the photograph did not display very well on the overhead.

**BY MS. SCOTT:**

Q    Is there any confusion as to when that picture could have been taken?

A    No.

Q    Okay.  How -- can you briefly explain the process when somebody arrives to the Orange County Jail and they are about to get booked, what physically happens to them when they first get there?

A    When the law enforcement officer brings him into

Official Court Reporters
407-836-2280

**P000299**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

the facility, they are seen by medical, taken to the LEO lobby where the paperwork is processed.  It is turned over to our inmate records management department which puts all of the information into the system.  Once the inmate's information and arrest information is in the system and to the IMS system, the inmate is called up to the window, a picture is taken and attached to that arrest, and then filed into the system.

Q    So there's no possibility that a picture gets separated from paperwork as the person moves on through the channels, it all happens at the same time?

A    It is all attached inside the computer system.

MS. SCOTT:  Thank you.  I have nothing further.

THE COURT:  Okay.  Any cross?

MS. CITRARO:  I have no questions.

THE COURT:  Thank you, ma'am.

MS. SCOTT:  State rests.

THE COURT:  Ladies and gentlemen, there is legal matters I have to take up outside your presence.  I suspect what will happen is we will give you instructions on closing arguments, go through the closing arguments, and I will read you the jury instructions and send you out to deliberate.

Okay.  So if you will excuse us for a few minutes, as soon as we are ready, we will bring you back in.

Official Court Reporters
407-836-2280

**P000300**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

(Jury exits the courtroom.)

THE COURT:  Any motions from the defense?

MS. CITRARO:  Yes, Judge.  I'll move for a judgment of acquittal as to Count II of the information, grand theft third degree.  Judge, the sole witness who put any testimony on about what was stolen was Mr. Gonzalez.

THE COURT:  What he reported to the jury, my notes, show sterling silver and a necklace with gem stones, a gold wedding band, and some fake jewelry.  Estimated value, he said, wholesale, seven to eight thousand dollars.  And as for the gold wedding band, I believe five to $700, approximately.  I don't believe there was any further testimony regarding the condition or any specifics or the length of time that he had these items.

MS. CITRARO:  Um, I have got three cases for you regarding a situation like this.  May I?

THE COURT:  Yep.

MS. CITRARO:  Where there's insufficient evidence as to value in a grand theft charge, value is extremely important and it must be proven by the State.  Value means market value of the property at the time and place of the offense.  If such -- I'm sorry.  I'm reading from Doane v. State, 847 So.2d 1015.  This is a Fifth District case.  The market value of the property at the time and place of the offense or if such cannot be

Official Court Reporters
407-836-2280

P000301

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

satisfactorily ascertained, the cost of replacement of the property within a reasonable time after the offense.

The common two-prong test requires, first, determining whether or not the person is competent to testify to the property and the value.  Owner is generally presumed competent.  However, mere ownership is not sufficient.

Second, if the person is competent, the Court must ascertain by whether the evidence adduced at trial is sufficient to prove that the property was worth over $300 at the time of the theft.  Absent direct testimony of the market value of the property, proof may be established through the following factors:  Original market cost, manner in which the item's been used, general condition and quality, and the percentage of depreciation since its purchase or construction.

There are several causes that are listed in here. Um, generally finding that items will probably be worth two or $300 or worth at least that much, that's not sufficient.  Items roughly in excess of $300, not sufficient.  The facts in this specific case of *Doane v. State*, he testified that he paid $1,588 in '97, and $320 for a second item, and then replaced it for more than $3000, but it was a different model computer that was in question.

P000302

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

The testimony could be competently coming from that witness; however, insufficient to prove that the property was worth over $300 at the time of the theft. State didn't adduce any other direct testimony about the market value.  No testimony was taken in which the manner of it being used and the general condition, quality and depreciation of percentage.  All of those things that were missing from the *Doane* case are also missing in this case.  All we know is he said it was worth this much wholesale when at the time of purchase later was what was it used for, what is the condition of it.  Depreciation.  Nothing was ever testified to regarding that.

I have also given the Court *Sanchez v. State*, 101 So.3d 1283.  And that is a Fourth DCA opinion.  In that case they are talking about a petit theft, but they have to still show it was over $100 in order to prove that. They applied the same two-prong test, and the Court especially notes rather than offering up their opinion an owner estimate of the value of stolen property must be supported by facts that show enough familiarity with the property to lend credence to the opinion.

Florida courts have found that an owner's opinion of fair market value is sufficient where it's supported by evidence establishing the condition, quality, age or

P000303

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

depreciation of the age of the item at the time it was stolen. By contrast where the value of the property is estimated and no other proof is presented, the owner -- the owner's evidence is insufficient to prove fair market value.

They give a couple other examples of cases in here, and in this specific case they find the State failed to support the opinions made at trial by additional evidence of value and didn't establish market value of the items taken. Thus, the Court had to grant a jury -- a judgment of acquittal down to a petit theft second degree.

Also given *Mansfield v. State*, 954 So.2d 74, also out of the Fourth DCA. Again, same analysis in that case. Witness and the testimony didn't meet either prong. The person who testified didn't buy it, and they only testified as to the cost at the time of purchase and didn't have any personal knowledge of depreciation or use. Though Mr. Gonzalez may have purchased these items, there is no further testimony about their use, depreciation, condition or market value at the time of the theft. And the State didn't offer any of that evidence in support of finding that the value was over $300.

As a result of the lack of evidence, I would ask

**P000304**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

that the Court grant a judgment of acquittal as to the grand theft, which I think should take it down to a second degree misdemeanor petit theft if value cannot be proven over $100 either.

THE COURT:  State?

MS. SCOTT:  Your Honor, Mr. Gonzalez testified that he had rings, necklaces and he kept them in the closet. He specifically said some of the sterling silver pieces he was keeping them there.  That, I believe, is enough testimony when he's saying he's keeping them in his closet that he's keeping them, meaning they are just sitting there not being used.  They are just being stored.

When he is -- when he spoke about the value, he said it was between 7000 to 8000 dollars on the sterling silver alone.  He said that the wedding band itself was gold and it was 500 to $700.  It's not -- the case that defense has presented about the depreciation of value, um, first one, *Doane v. State*, we are talking about computers, depreciating the value.  That is a 2003 case, and they are talking about computers they purchased in 1997, electronics and depreciation.  It obviously is going to happen.  That testimony would, obviously, be relevant for jewelry that he said he had always had in his possession.  No one else has ever touched it.  It's

P000305

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

been in his possession.  He's been keeping it.  He's

been storing it.  And the fact that he estimated that

value also in the *Doane* case he -- one of the things

that they pointed out was the testimony of the owner's

property, said quote, owner estimated property value at

about $310, something like that, on a grand theft charge

where 300 is the threshold.

If we are $10 off, then yes, that -- if we are

going down to that small amount of money, um, I would

agree that in that kind of case we would have to provide

additional documentation as to that value.  In terms of

this value, we are talking about $8,000.00.  I have to

meet a burden of $300.  His intimate knowledge of it,

his familiarity with the items themselves, the fact that

he said no one else had them, just him, based on the

collective testimony that he provided, I believe the

jury could find beyond a reasonable doubt in the light

most favorable to the State.  We would ask you deny the

judgment of acquittal.

**THE COURT:**  Anything further from the defense?

**MS. CITRARO:**  I just add that Mr. Gonzalez's

testimony, that is an estimate, and it wasn't supported

by any additional evidence.  It is his speculation.

Keeping it in his closet doesn't indicate the condition

of it.  It certainly could have depreciated over time or

Official Court Reporters
407-836-2280

P000306

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

the conditions of the property.  Who knows what his closet looks like?  The same two-prong test that was applied in the cases that I have provided to the Court should be applied here, and the evidence is insufficient under those cases.

**MS. SCOTT:**  Judge, I'm not required to prove value. I don't need to provide receipts or anything of that? All I need to do is show the witness is familiar enough with the property to put a value on it.  When he said the value, he said the wholesale value is this and this. It wasn't a ballpark guess.  It wasn't a, I think it's this.  It wasn't $10 over the required amount.  It was a significant amount of money that he was talking about.

**THE COURT:**  All right.  Not only did Mr. Gonzalez testify as to the necklaces and the jewelry and the rings that were sterling silver and placed a wholesale value on the items, 7000 to 8000 dollars, he also indicated when he bought them.  But there was also testimony that there were coins taken as well as knives. And there's a photograph in evidence of quite a big pile of quarters, an awful lot of quarters in the photographs.

Um, so I'm going to go ahead and deny the judgment of acquittal as it relates to Count II based upon his testimony, the photographs in evidence, plus the fact

Official Court Reporters
407-836-2280

**P000307**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

that he indicated that there were knives that were taken, there were coins that were taken.  There are photographs of that number of coins that were taken and then based upon the mere value that he placed on that wholesale, that being 7000 to 8000 dollars, seems to indicate that that is quite a large number of pieces of jewelry that were taken.  So I'm gonna deny the judgment of acquittal.

MS. CITRARO:  And if I may just place on the record that my objection to the Court's finding that the coins are going to add value over $300.  There has been no evidence as to what the total amount of those coins is or whether or not it makes the value $300.

THE COURT:  I know.  There is a photograph in evidence and the jury can make an assessment of that.

All right.  Any other motions?

MS. SCOTT:  No.

MS. CITRARO:  No.

MS. SCOTT:  I just sent you the verdict form.  Does Your Honor have a copy of the jury instructions?

THE COURT:  I sent them to you-all last night.  Are we still doing the same lessers as we said yesterday?

MS. SCOTT:  Yes.  I just need to modify the verdict form and send it right now.  On Count II, did we say both petit thefts or just one?

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

MS. CITRARO:  I think we said we can keep both. And I'll just note I'm not sure if it will just make it less confusing, but the lesser included offense petit theft first degree, could we note that as petit theft over $100 or more and then petit theft of less than $100, instead of first and second degree?

THE COURT:  Right.  So the second page should say lesser included petit theft of $100 or more.  Then the one after that should just say petit theft, nothing more.  And then on Count I, it needs to be trespass in an occupied structure and trespass in a structure.

MS. SCOTT:  You said trespass in an occupied structure and then simple trespass in a structure?

THE COURT:  Correct.  Have you seen a copy of the verdict forms?

MS. CITRARO:  That's fine.  No objection.

THE COURT:  Do you each have your copies of the jury instructions that I emailed to you?

MS. CITRARO:  The ones from last night, yes.

MS. SCOTT:  Yes.

MS. CITRARO:  And I reviewed them.

THE COURT:  Do have you them up on your computer?

MS. CITRARO:  Yes.

THE COURT:  Mr. Valle-Ramos, have you had an opportunity to look at the jury instructions?

Official Court Reporters
407-836-2280

P000309

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE DEFENDANT:  Yes, sir.

MS. SCOTT:  I'd like a physical copy for closing.

THE COURT:  I'll give you one.  So you had an opportunity to review them last night, State?

MS. SCOTT:  I reviewed them this morning, Judge.

THE COURT:  Any objections, corrections, additions or deletions?

MS. SCOTT:  No.

THE COURT:  Defense, you had an opportunity to review them since last night?

MS. CITRARO:  Yes.

THE COURT:  Any additions, corrections, modifications or deletions?

MS. CITRARO:  No, Judge.

THE COURT:  Mr. Valle-Ramos, have you had an opportunity to review them?

THE DEFENDANT:  Yes.

THE COURT:  Do you want any corrections, additions, modifications or deletions?

THE DEFENDANT:  No.

THE COURT:  And you have been able to participate in lessers and the instructions have been given.  Are you satisfied with the instructions that are going to be given as well as the lesser included offenses?

THE DEFENDANT:  Yes.

Official Court Reporters
407-836-2280

P000310

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT: And your attorney earlier rested her case, and I know we discussed this previously, but there are no other witnesses and no other evidence that you want presented other than what's been placed in the record at this point, correct?

THE DEFENDANT: Yes.

THE COURT: Okay. Let me print two copies, one for each of you, so we can get that started.

MS. CITRARO: If I can just note for the record regarding additions or modifications. Defense is still asking for the specific instructions that were moved by way of the written motion. The Court has already denied.

THE COURT: Right.

State and defense, here's a copy for you to use for purposes of clothing. The other copies will be coming down shortly.

Does the defense intend to concede any elements of the offense?

MS. CITRARO: Well, by nature of the argument, we are conceding a burglary of a dwelling that occurred, but the issue is the identification.

THE COURT: Mr. Valle-Ramos, you understand that's the theory of your defense and she will be conceding that there is a burglary that occurred and that a theft

P000311

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

occurred, but it's just not you?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  And you're in agreement with that defense?

**THE DEFENDANT:**  Yeah.

**THE COURT:**  Anything else we need to address before we start?  All right.  Did they finish making their orders?

**COURT DEPUTY:**  Yes.

**THE COURT:**  Any reason why we can't bring the jurors back in at this point and continue with the closings?

**MS. SCOTT:**  No, Your Honor.

**MS. CITRARO:**  No, Judge.

**THE COURT:**  Let's go ahead and bring the jurors back in.

(Jury enters the courtroom.)

**THE COURT:**  Ladies and gentlemen, at this time both the State and the defense have now rested their cases. The attorneys will now present their final arguments to you.  Please remember that what the attorneys say is not evidence, nor your instructions on the law.  However, do listen closely to their arguments.  They are intended to aid you in understanding the case.

Each side will have equal time, but the State is

P000312

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

entitled to divide that time between opening argument and a rebuttal argument after the State (sic) has spoken.

State wish to give their closing argument at this time?

MS. SCOTT:  Yes, Your Honor.

THE COURT:  You may do so.

MS. SCOTT:  You've heard the same story being told by three different people today, or including yesterday. Almost comical as to the differences in the story. Because from what Ms. Bloom testified to today, it's as if she was at a completely different house and saw something completely different.

I want to take her testimony, as well as the testimony of Mr. Gonzalez and Ms. Szewczyk one by one. One of the first things I want to go over with you is -- we had discussed this in jury selection -- a couple of key things.  One of the things we discussed were elements.  I have to prove to you elements beyond and to the exclusion of every reasonable doubt.  That's it.  I don't have to prove to you details that aren't elements.

The judge is gonna instruct you on the law.  He's gonna give you a printout.  You are not gonna have to memorize any of this.  He'll read it to you and then you'll be able to take it back with you.  But I want to

P000313

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

go over some of those elements with you right now.

First charge in this case is burglary of a dwelling.  The instructions are gonna read, to prove the crime of burglary, the State must prove the following two elements beyond a reasonable doubt.  Jorge Valle-Ramos entered a structure owned by or in the possession of George Gonzalez, and at the time of entering the structure, Jorge Valle-Ramos had the intent to commit an offense other than burglary or trespass in that structure.  You may infer that Jorge Valle-Ramos had the intent to commit a crime inside a structure if the entering of the structure was done stealthily and without the consent of the owner or the occupants.

Mr. Gonzalez was clear as day to you.  No one had any permission to be in his house.  Nobody.  He lived alone.  He wasn't expecting anybody.  Nothing.  He comes home that morning, early-morning, that's when this burglary occurred.  It occurred around nine o'clock. Generally no one is home at that time because people are at work.  Mr. Gonzalez comes home, he is surprised to find somebody in his house.  Who else is surprised?  Is that guy, Mr. Valle-Ramos.

We know he was surprised because him and Mr. Gonzalez -- Mr. Gonzalez testified he got maybe this close to him.  And they stared at one another for a full

Official Court Reporters
407-836-2280

P000314

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

seven to ten seconds because they both froze.  Some guy is in my house, and Mr. Valle-Ramos is burglarizing that house and some guy comes home.  Both are equally surprised to see one another.  So we have this kind of thing going on, crap, what just happened?  Is what's going through their mind.

At that point Mr. Gonzalez realizes what's happening.  His house got broken into.  Clearly doesn't know this man, and he starts -- he says he exchanged words with him, and at that point Jorge Valle-Ramos bails.  He runs out the back.

Now, Mr. Gonzalez, as you saw, is a feisty guy. He's not letting these people go.  At this point he knows there's one, but there's one person inside his house, so he goes after him.  He starts chasing after him.  He jumps over a fence, he's out.  He can see him going and he loses him.  He loses sight.  He says he tries to go out the front, tries to cut him off, but at that point he loses him.  So he goes back into the house.

One thing -- I want to just kind of interrupt myself here.  If there's anything that we say that is different from what you remember, please rely on your own memory and your notes.  If there is something that you don't remember, everything is being written down.

P000315

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

You are allowed you to ask the court reporter to read back any testimony.  Please rely on your own recollection or, if needed, that of the court reporter.

He comes out, cuts them off, tries to cut him off, gets away.  Gets back in the house, lo and behold there's more people inside the house.  Now there's a guy coming down the stairs.  He's going up the stairs and he says, boom, they collided like in the midst, he said. At that point he gets him in a headlock.  He's got his mace or his pepper spray.

The third guy comes down.  He's fighting with this guy, third guy coming down.  He's trying to spray these people.  He's not looking at these peoples' faces for obvious reasons.  One is in a headlock, the other one is coming after him, and he's spraying him with a weapon. What he's focusing on right now, per his testimony, is there more?  Are there more people?  Were these the only guys?  Do they have guns?  Do they have knives?  I don't know what's happening.

Right now the goal now is to defend myself and to try to keep these people before cops get there.  There was not the same interaction that he had with Valle-Ramos.  Valle-Ramos stared.  There is nothing interfering with him at that point.  Nothing.  He saw his face clear as day.

P000316

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

We went through jury selection and I asked the question with individuals, describe features of myself. No one could do that, and I was standing directly in front of you.  Just because someone can't describe somebody doesn't mean they can't recognize them.

In an event that Mr. Gonzalez just testified to in telling you how terrified he was, how surprised he was that somebody was in his house, people remember something like that.  This isn't an individual you just saw walking on the street.  This was a big deal.  He's focused on his face.  He's not focused on his shoes. He's not focused on his pants.  He's looking at his face.  Straight at him.  A man will not forget that.

We know he won't forget that because once law enforcement arrived, he describes this individual to him.  No suspects at that point were given to Mr. Gonzalez, but a few months later he was presented with a photo lineup -- or excuse me -- a few days later.  This is the photo lineup he was presented with.  This is in evidence.  You'll be able to take this back.

He said, without hesitation, immediately pointed to that man.  He circled it, initialed it.  He is, like, no doubt, 100 percent that's the guy.  He was so emphatic about it that when he was on the stand, I couldn't even get the question out.  He's like, he's right there.

P000317

He's sitting right there.  Because he's that sure that it's him.

What did he say about the other individuals?  He says, I didn't see their faces well enough to make an I.D.  So if the argument is he's just picking out any guy with an afro or he's just picking out that guy because he happens to be sitting at defense table, he could have done that for the other two people and he didn't, because he told you flat out, he's like, I can't I can't positively I.D them, so I'm not going to because I'm not sure.

He took that oath that he took in front of you seriously, and he's telling the truth to you just like he was telling the truth to law enforcement when he picked this guy out.  He told you that when this was presented to him -- the detective told you that when this was presented him, it was in an envelope.  He didn't see it.  He put it in front of him and within seconds he pointed to it.

Mr. Gonzalez goes back into the house after he loses Mr. Valle-Ramos and he engaged in this fight with these two individuals.  Eventually they bail.  He tries to go after them.  He told you he has torn rotator cuffs.  He can't fight them as well as he would like to, and they get away.  And they get inside some sort of

P000318

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

four-door sedan, silver, maybe gray, maybe light blue. The color wasn't clear.  He said he was looking over the fence line when he saw it and sees them get in.

One thing he did say is that he couldn't tell how many people were in the car.  He said he knows there were three people inside his house that he saw, but he can't tell you how many people were already in that vehicle because he couldn't see inside, he said.  He just says he sees these people get in, but I can't tell you how many other people were there.  I just can't.

He also testified to the second charge in this case, which is grand theft.  One of the elements of that -- to prove the crime of grand theft, the State must prove beyond a reasonable doubt Jorge Valle-Ramos knowingly, unlawfully obtained or used or endeavored to obtain or to use the jewelry, coin collection or knife of George Gonzalez.  He did so with the intent to either temporarily or permanently deprive George Gonzalez of his right to the property or appropriate the property of Jorge Valle-Ramos to his own use or the use of a person not entitled to it.  He stole it is what that means.

The items that we have, there's photographs in evidence that we put on the overhead.  You'll be able to see that one of the items that they recovered was a backpack which had a ton of coins in it, a ton of

P000319

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

quarters he said he was saving.  None of the other jewelry was recovered that he said other than there was a ring that was later found.  Understand to steal something and to be convicted of stealing something doesn't mean they have to successfully get away with stealing.

He took the bag, for example, the coins were found. You can find, I would argue, that based on this charge, those coins would be enough.  You don't have the jewelry.  We don't have to show you what happened to the jewelry.  That is not an element.  I don't need to show you where it went.  I just need to prove the value to you.  He testified to that.

One of the other instructions that I wanted to be sure I go over with you is something called principal. It's a fairly short instruction.  I'm just gonna read it.  It says, if the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all of the things the other person or persons did if the defendant had a conscious intent that the crime or act be done, and the defendant did some act or said some word which is intended to, and which did incite, cause, encourage, assist or advise the other persons or persons to actually commit or attempt to

Official Court Reporters
407-836-2280

**P000320**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

commit a crime.

What does that mean?  That means when four people or three people in this case go inside to burglarize this house, it doesn't matter if he actually, physically picked anything else up.  If he helped any of those people do what they did, meaning drive the car, meaning open the door for them, meaning assist them in any way, he is just as guilty as they are.  That's the law.

All of you told us in jury selection that you would follow the law regardless if you agreed with it or not.  Some people don't agree with that.  Some people think some people should be more guilty than others.  It's not what it says, not for that.

Let's talk about Ms. Bethany Szewczyk.  Bethany lives next door.  She lives next door to -- and I say next door, neighboring complex.  Mr. Gonzalez explained to you there's that fence, the fence that divides the two, the two properties between the two complexes.  And he explained to you that that's -- they jumped that fence, they saw them go through that.

Ms. Bethany lives not in Mr. Gonzalez's apartment or condo complex, she lives next door.  This is Mr. Gonzalez's backyard.  Walking the door -- the gate was open.  You can see another gate right there going into another complex.  That's what they are talking about

P000321

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

when they say a double fence line, two fence lines right there.

MS. CITRARO: Objection. Can we approach?

THE COURT: Come on up.

(Conference at the bench held on the record.)

MS. CITRARO: I'm not sure where she's going with this, but I have been to this property. That's not what they are talking about. I just want to make sure the jury is not given new information that's not accurate. That's not the fence that they are speaking about.

THE COURT: What's the objection? What was the statement?

MS. SCOTT: I said there's a double fence line. That's what they are referring to when they say double fence line.

MS. CITRARO: I guess it would be a misstatement of the evidence.

MS. SCOTT: That was my interpretation of the evidence. If she wants to argue something else, she's free to do that.

THE COURT: What fence are you talking about?

MS. SCOTT: There's one fence behind this one that leads into the second complex, and behind this fence somewhere the second complex is.

MS. CITRARO: That's not accurate on the map. I

P000322

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

didn't introduce it into evidence.  I have seen it and it's not behind this property.  It's all the way on the other side.

MS. SCOTT:  Okay.

THE COURT:  I'll sustain the objection.

(The following was in open court.)

MS. SCOTT:  Ms. Szewczyk lives in the neighboring complex.  She said she's leaving for work that morning. She said she's an attorney.  Presumably she slept more than an hour the day before.  And she had more than a nap.  She's well rested.

You saw she was young.  She had no problems with her eyesight.  She goes outside, and what does she tell you she sees?  She said she's leaving for work, she's standing near a carport and she sees three young males running.  She hears one of the males, Mr. Valle-Ramos, say, hurry up before the cops get here, or something to that effect.  He gets in the driver's side.  Other people get in the car and they sped off.

She says at one point she initially -- when she saw them, she was 20 to 30 feet away from him when they get in the car and they drive.  She says they pass -- that they were 10 feet -- 10 feet from one another and she stares at his face and she sees him, and she knows what he looks like.  She has no idea who this person is, she

P000323

has no dog in this fight at all.  Her stuff wasn't stolen.  She frankly is here because we subpoenaed her and told her to be here.

She gets contacted, she talks to law enforcement that day, she writes him a statement, and then they contact her later with a photo lineup.  And they contact her actually months later, September 2013, and they show her a photo lineup.  And that's the photo lineup they showed Ms. Szewczyk.  And she did exactly what Mr. Gonzalez did.  That's him, without question, that's the guy.  Circles it, initials it.  I asked her, how did you know that?  She says, I saw him.  I saw his face.  I recognized him.

Defense has been trying throughout the case to say he's a guy with an afro, that's why he's in that lineup, that's it.  No other reason for it.  They said they saw poofy hair.  And Ms. Szewczyk actually didn't even use the term afro.  Her -- I think her exact terms were either foo-fee (ph) or poofy hair.

Defense used the term afro and gave it to her.  That was a description she gave law enforcement.  These people witnessed something that they know very well wasn't right.  They know very well that it was a crime, and so they remembered what they saw.  At no point did -- when she described the individuals to law

P000324

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

enforcement that day, she gave them a description. Oddly enough who didn't give a description to the individuals is Ms. Bloom.

Now, I have nothing against Ms. Bloom.  She is a sweet lady.  She's also 65-and-a-half years old, per her own testimony, wasn't wearing her glasses that she said she needs to have to see, and she was going on an hour's sleep from the night before.  When she wrote her statement, she said nothing about what these people looked like.  All she said was they had long sleeves on because apparently they were going to go work and they looked nicely for work if they were going to work or school.  That doesn't match anything else.  We know those people were inside the house because he saw them get in that car.  So if we are even talking about the same car, we know Ms. Bloom has to be wrong because Mr. Gonzalez literally watched them go from his property into the car and drive away.  And they clearly were not wearing business shirts when they were inside his house.

What else did Ms. Bloom tell you?  She said that when she wrote her statement, she couldn't remember anything.  But as I went on, she remembered more and said, oh, I should have put that in there, the description of the individuals that you saw that maybe were burglarizing someone, yeah, you should have put

P000325

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

that in your statement.  When was the next time she looked up these pictures?  Was when she got a subpoena. It's not clear whether the subpoena was from my office or defense's office.  When she gets the subpoena, there's a case number.  She looks it up on the computer and she sees that guy's mug and says no, that's not the guy I saw.  Not him.  Totally somebody different.

So when law enforcement calls her, she says, I can't do a photo lineup or I don't want to do a photo lineup or I'm not gonna be helpful in a photo lineup because I don't recognize that person at all.  That's why they didn't present her with a photo lineup.

And let's talk about what she said she saw.  She said she saw other than these professional looking dressed men who are sprinting and running to a car that she's looking at from her second floor window without her glasses going on an hour's sleep and she said she sees a blond guy get in the car.  I want you to try to remember Mr. Valle-Ramos's testimony.  And, again, you can get it read back if you'd like.

One of the things he testified to is that that day after he wakes up around noon, his friend and his friend's girlfriend Danny come to his house to hang out. I asked him, what does his friend look like?  And he points to the guy sitting in the gallery.  I said, okay,

P000326

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

tell me about the girl, what does Danny look like? She's white, blond and curly hair. Is it possible that the person that Ms. Bloom saw in that car was Danny? Maybe. I don't know. She's blond.

Mr. Gonzalez said I can't tell you how many people were in that car. I don't know because I didn't see the full car of people. But is it possible that that's where the blond person came from? Ms. Bloom says that she -- that she first saw the car to -- the other car to -- the individuals getting in the car and she heard about this whole burglary thing. She said, I may have even seen something different because I don't know what I saw was literally what she said when defense redirected her. She said, I don't know, I just don't know. That's not reasonable doubt. It's a possible doubt, maybe. That is not a reasonable doubt.

One of the things that she was clear about, though, is that she did see the three men with the long sleeves, and one of them had blond hair. I, again, remind you to look at the testimony of Bethany and George Gonzalez. Evaluate the credibility of those people and, again, not the credibility in a sense that Ms. Bloom is lying, maybe she really did think that she saw that. But given her age, given the lack of sleep that she had that night, given the fact that she's not wearing glasses and

P000327

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

she's looking at this from a second-story balcony window and she's looking down at it happening. Who do you believe more, her or the guy who stared at this person for seven to ten seconds, who is in his house, who chased after him and then the girl who saw him maybe 10 feet away from her? That's your comparisons. Those are your three people that you're I.Ding in this case. Who is more believable?

Let's talk about Mr. Valle-Ramos. It wasn't me. What's he gonna say? It was me. I'm sorry. It wasn't me. That's all he's got?

**MS. CITRARO:** Objection. Can we approach?

**THE COURT:** State the grounds.

**MS. CITRARO:** Burden shifting.

**THE COURT:** Overruled.

**MS. SCOTT:** It wasn't me. Convenient. Okay. It wasn't you. Tell us what you were doing that day. I was sleeping. Okay. Did anybody see you sleeping? No. What did his friend testify to? We sleep on opposite sides of the house. Both of our doors are closed. I don't know. I can't tell you that he was sleeping. But I know when I got up at noon he was getting up. Okay.

What happened at eight to nine o'clock a.m. when this happened? Mr. Hickson was out cold. He doesn't know what has happening. He can't tell you that he was

P000328

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

at home.  He has no clue.

And one of the things that's most interesting is Mr. Ramos's testimony and Mr. Hickson's testimony about Mr. Ramos's hair.  Today -- well, yesterday we start talking about his hair, and Mr. Hickson testifies and Mr. Valle-Ramos testifies.  Both say he had long hair.  Mr. Valle-Ramos said it was down to here, I looked like Tarzan.  No other explanation was given about it.  Not how he wore it, not anything.

We go home at night, we come back.  And maybe Mr. Valle-Ramos realized oops, hair is something that the State can easily prove.  Maybe we should clarify that.  So he comes back up there today and he tells you, oh, you know what?  I had it pulled back.  I often pull it back.  I had it in a headband.

What pictures did he show you?  This is February 8, 2013, from his Instagram.  I don't know where this is from, but his own testimony, that's him.  His testimony.  He's wearing a hat.  You can see what I'm looking at.  His hair is pulled back in a poofy ponytail.  If he were to let that poofy ponytail go because of the texture of his hair and how heavy it is, what happens to that poofy ponytail?  It expands and stays back here.  It doesn't fall like my hair does.  It stays back here.  That's February 8, 2013.

P000329

You'll be able to take these pictures back.  I understand this doesn't do it justice.  This is April 24th, 2013.  Do you see any poofy hair in the back?  Do you see any shoulder-length hair?  Let's say for argument sake he's got it pulled back in some sort of knot or tie or something blocking back here.  If it was nearly as long as what happened in this picture in February, you'd be able to see it because you would be able to see it behind his head.  And you don't in this picture.

So what does that tell you?  That tells you sometime between February and April the guy got his hair cut.  He got his hair cut and he has this poofy -- some call this an afro, some won't because it is too short, poofy style of hair?  What did both Mr. Gonzalez and Bethany tell you?  I keep calling her Ms. Bethany because her last name is hard to pronounce, smaller afro, poofy, fluffy hair.  That's him.  That's what he looked like when this happened.

This picture was taken about two weeks after.  You can't hide in this picture.  That's what you got.  And this matches exactly the description of the individual that Bethany and Mr. Gonzalez both saw.  Based on those descriptions, that photo lineup was generated.  It doesn't matter that in this photo lineup he's got longer

P000330

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

hair.  It doesn't make a difference.  His face hasn't changed.  His hair might be slightly longer in this one, slightly shorter in that one.  It doesn't matter.  It's the same guy.  They know it was the same guy and they told the cops it was the same guy.  To say I had Tarzan-like hair in April, quite literally means that from the time this photo was taken in February, presuming it was taken in February, his hair grew about 6 inches.  Not possible.  That tells you he's lying. That tells you both him and his friend are lying to you. His friend told you we were growing it out so that we can get braids done.  Okay.  Not cornrows, braids.  You can't braid that hair.  It's too short.

This whole case falls on whether or not you think Mr. Gonzalez and Ms. Bethany are telling you the truth. Whether you think that what they saw is what they saw. The amount of conviction that both of these individuals have on that stand when they talked to you yesterday should be enough for you to say and for you to evaluate yep, they know what they are doing.  They know what they are talking about.

Ms. Bloom's conviction of, it wasn't him, it was the blond guy that gets in the car, first of all, doesn't match anybody from -- on the scene.  No one described that at all.  The person that actually sees it

P000331

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

from burglary to entrance of the vehicle is Mr. Gonzalez. At no point did he say anything about a blond person. Could there have been a blond person in the car? Sure. Maybe, he said. I don't know who else was in that car. Could it have been his friend's girlfriend Danny? Maybe. None of that was there beyond a reasonable doubt. It's not a possible doubt. It's beyond a reasonable doubt.

The common sense that you have that you could put those pieces together that we talked about in jury selection that I begged you not to leave outside and the life experiences I asked you to bring those in, and when you do, I'm confident that you'll come back with a verdict of guilty to the counts as charged.

You are gonna see in the jury instructions there's lesser included counts, things like trespass and petit theft. The judge will read those to you. I'm not going to go into those because I think that if you believe what the witnesses say they believe, you have to find him guilty of the highest charge. There is no other charge. Thank you.

THE COURT: Defense wish to give your closing argument at this time?

MS. CITRARO: Thank you.

THE COURT: You may.

Official Court Reporters
407-836-2280

**P000332**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

**MS. CITRARO:** Thank you for your time and attention in this case. The State gets to come up here twice and talk to you, but I only get to talk to you once. So I'm gonna throw a lot of information at you-all at one time, then she will get back up here and talk to you some more. And as much as I'm gonna want to reply and respond to what she said, I can't. Because I'm not afforded a second time to talk to you.

Okay. Here's what we know. George Gonzalez's house was burglarized. Nobody is questioning that. We have seen pictures. We have heard testimony. Three guys came into his house, he fought with one of them, they all got away. He pepper sprayed them. His house was burglarized. He identified Mr. Valle-Ramos. He said he saw him for -- first, he said a few seconds. Then he gave a number of seven seconds. Then he stared at him. My recollection was he said about 25 feet away, but the State told you ten. I'm not sure. Whatever your recollection of the testimony was.

How do we explain that he identified Mr. Valle-Ramos and that he's so sure in court that it's Mr. Valle-Ramos that he was looking at? How do we explain that? Mr. Gonzalez was shown a lineup -- the State doesn't mind me using her machine. This lineup, these six faces. Mr. Gonzalez reported the guy had an afro.

P000333

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Detective Stanley in all of his wisdom puts together six pictures, only one of which even fits the description of who Mr. Gonzalez identified. There is one afro in these pictures. I feel like I'm on crazy pills. One, 3, 4, 5 and 6 do not have afro-style hairdos. Mr. Gonzalez looks at it, yes, that's the guy. Right there. The guy with the afro. That's him. That's the guy.

And how many times has he seen that lineup? Eight times. He's seen these pictures eight times. He's looked at this face eight times and said that's the guy. That's the guy. I know that's the guy. Surrounded by a whole bunch of other guys who don't even fit the description. So when he walks into the courtroom yesterday, says that's the guy, you want to know why he knows that's the guy? Because of the picture in his memory. This is the picture he has seen eight times. That's the guy who did it to him.

I'm not saying Mr. Gonzalez is lying. He doesn't have to be lying. But he could be mistaken. And Detective Stanley didn't help. This is a suggestive lineup. This is terrible police work. Who even knows who Mr. Gonzalez would have identified if there were six pictures similar to number 2 all with afros? Who knows?

We are not gonna know why because this is the lineup that he showed. Same goes for Ms. Szewczyk.

P000334

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Nobody is saying she lied, but she looked at this same lineup with one picture of one guy with an afro.  She said she saw it five times.  Five times she looked at that face.  So yeah, this is the face in her memory.  This is the exact same lineup that she saw.  So when she looks at this face and she recognizes same face, yep, that's the guy, hundred percent, that's the guy I saw, she could be mistaken because this is a disgrace.

No one is saying that Mr. Gonzalez's house wasn't burglarized.  The police want to get someone.  Mr. Gonzalez wants to get someone.  Ms. Szewczyk wants to help.  Everybody wants justice.  It matters who did it.  You can't just say somebody did it, try to create some kind of lineup, say that's the guy, we gotta get him no matter what if it's not the right guy.  That matters.

You even heard what significant conflicts and what they said and how they described.  Mr. Gonzalez said the guy had a backpack.  He had a basketball jersey with either no sleeves or short sleeves, no gloves but maybe the other guy had gloves on.  I'm not sure if he said shorts or not.  And the car was bluish and greenish and he had an afro.

Ms. Szewczyk said -- well, she said poofy hair.  Same thing.  And she says he had long sleeves.  Long sleeves and blue latex gloves.  That's entirely

P000335

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

different.  That's not what Mr. Gonzalez saw.  No sleeves and a jersey, long sleeve shirt with blue gloves.  Okay.

Ms. Bloom, the State wants to discredit Ms. Bloom's testimony.  She is an older lady.  Does that mean she doesn't know what's going on?  She seemed very, very well aware of things to me.  She had a view from her apartment -- I believe this one shows it best.  This is her view.  And this is from the actual blind from her apartment.  Doesn't look that far.  She said this is where the car was.  It was here.

I showed this same picture to Ms. Szewczyk yesterday, asked her, is this your place?  She said, yes, that's my carport, and this is where the car was.  They are talking about the exact same location.  This is not -- I'm not sure what the State wants to you believe.  This is not some other place.  They both confirmed this is where the car was that morning.  Right there.  And they both say it was this four-door car, grayish or light color, three guys running to it, you know, driving off real fast.

Is it reasonable that three guys came running from that fence area from the lake over to this area into a car, a four-door car that was gray that was parked right here all ran into it, sped away really, really fast, all

P000336

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

in that same time frame of that morning before the cops came?  Is it reasonable that it happened twice?  That she wasn't seeing the same thing?  That this happened twice with three guys, same direction, same spot, same exact location?  Is that reasonable?  It is entirely reasonable what Ms. Bloom saw was what she saw.

She didn't see Mr. Valle-Ramos.  She didn't see him driving.  She didn't see him anywhere in the car.  He was not one of those three guys.  She's sure of it. She's sure just like Ms. Szewczyk is sure, just like Mr. Gonzalez is sure.  I was actually a witness.  It wasn't a criminal case, but I actually had to testify very briefly on something it was totally stupid.  Won't get into the details of it.

**MS. SCOTT:**  Objection, Your Honor.  Improper opinion.

**MS. CITRARO:**  It's not an opinion.  It's a story.

**THE COURT:**  Come on up.

(Conference at the bench held on the record.)

**THE COURT:**  Where we going?

**MS. CITRARO:**  The story is I testified about a guy that I saw and I told them what I thought the appearance was, and it turned out to be completely wrong.

**MS. SCOTT:**  Right.  It goes to her personal opinion as to that testimony, which is not relevant to anything

P000337

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

that we are talking about right now.

MS. CITRARO:  It's not an opinion.  It is an example of how human beings can get it wrong.  I don't see how it is opinion.  It has nothing to do with a case.  It's just an example.

MS. SCOTT:  I'm fine with giving an example.

THE COURT:  I'm going to sustain the argument.  You can argue that people can makes mistakes.  I'm gonna sustain that objection.

(The following was in open court.)

MS. CITRARO:  One person -- we talked in jury selection.  One person can see one thing, another person can see another thing.  It doesn't mean that they are lying about it or that they are dishonest about it or that they are being untruthful.  It means they saw different things.  One of them could be right.  One of them could be wrong.  They both could be wrong.  Who knows?  Humans are flawed.

Mr. Gonzalez is a human being.  Ms. Szewczyk is a human being.  Ms. Bloom is a human being.  Eyewitness testimony can be flawed.  Let's even put that aside for now and consider the police work that was done in this case.

You heard from Detective Stanley, this brilliant work that he did.  And then in addition we had a C.S.I.

P000338

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

tech come in and she told you they checked for fingerprints.  They didn't pick up any except they did get some from a wrapper.  They came back with latent prints.  They didn't match anybody.  They didn't match Mr. Valle-Ramos, not his fingerprints, not important.

I think it's important, but, you know, who cares? It doesn't go to strengthening their case, so let's just ignore it.  Let's see.  DNA could have been collected. She told you it could have been collected.  There was even a cigarette butt.  They could have tested it for DNA.  Did they do it?  No.  Let's just ignore it.

Mr. Valle-Ramos gets stopped.  Guy with an afro, maybe that's the guy.  Terrible these days to have a distinctive, you know, personal feature about you, apparently, because apparently it can get you into some real trouble.

You heard from Mr. Valle-Ramos.  He doesn't know Mr. Gonzalez.  He never went to that house.  He's never been there.  He wasn't there that day.  He was at home sleeping.  I get it, Mr. Hickson wasn't next to him attached to him at the hip when he was sleeping, but you heard from him.  He sleeps lightly.  He never heard anything out of order.  Never heard any noise, anything to make him think that Mr. Valle-Ramos would be up. They had a regular day together doing whatever with

**P000339**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

their friends playing basketball at night.  Nothing crazy.  Nothing out of the ordinary.  He was at home.  He didn't even wear his hair in the afro that they are saying he had.

Okay.  The picture, this afro is on a driver's license that was issued in 2011.  It's at least a year and a half before this.  That's what his afro looked like.  Now I'm starting to pull it back.  Later on it's pulled back in a ponytail.  It's long enough.  That -- think about it for a second.  To pull hair back in a ponytail and have a large bush at the end, you're pulling it back from the front of the head all the way back and then you still have hair sticking out in the bush.  It's how a ponytail works.  That means that that hair starting from here is this long, then this long.  That's like really long.  That is longer than what's -- what would just stick up.  Okay.  It came down.

You heard by his very testimony and Mr. Hickson they are friends.  They know each other.  They know what they look like.  That's what his hair looked like.  This picture that the State says -- and I know it's bad up there, but this picture, absolutely reasonable that his hair is pulled back.  It's sticking up with some frizz.  You got that much hair, there's gonna be frizz.  His

P000340

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

hair is pulled back.  This is not a haircut.  This is the same length.  If the State wants to argue it has been cut, fine, let her argue that.  Is it reasonable that it's a ponytail right through?  Now -- and you can't see it because you can't see through his head.  Yes, it's reasonable.  It's in a ponytail.  He didn't wear his head out like that, and that was about two weeks after the alleged incident.  We are not talking about a serious time frame here.

Reasonable doubt can come from evidence, lack of evidence and conflict in the evidence.  Reasonable doubt is the rule that we go by.  What does it mean?  It means if you think it's reasonable that Mr. Valle-Ramos was at home, that Mr. Gonzalez got it wrong because of this horrendous police work, if you think it's reasonable Ms. Bloom saw something different, if you think it's reasonable that human beings make mistakes about what they saw, see and what they remember and what sticks up here, if you think that is reasonable, then you find him not guilty.

And it's reasonable.  Detective Stanley said it himself, he wants to -- what was his quote?  I'll find it.  Look to go strengthen his I.D.  He wants to strengthen his case against Mr. Valle-Ramos.  Is there a reasonable alternative to what occurred that day?

**P000341**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Mr. Gonzalez got burglarized.  Is it reasonable that it wasn't Mr. Valle-Ramos who did it?  Yes.

There's a lot of counts listed on the verdict form.  It's gonna be confusing because first is the burglary, but he's -- then there's lessers and then there's a grand theft and then there's lessers.  Somebody committed these crimes.  It wasn't Mr. Valle-Ramos.  There's reasonable doubt at every turn in this case.  Please find him not guilty of both counts and thank you for your time.

**THE COURT:**  All right.

State, rebuttal?

**MS. SCOTT:**  How do they explain I.D.?  How do we explain away that he was identified?  Bad police work, that's it.  This photo lineup, that's why it's a bad I.D..  These people have seen this five to eight times.  That argument works for I.D'ing him in court.  It doesn't hold at all to why they I.D.'d him initially.  Why did they pick -- both pick him out?  Because they both saw them.  One got 10 feet away, one 20 feet away.

He was inside his house.  There's no mistake about that, folks.  We are asking to compare somebody who got burglarized, came face-to-face with one of the people that broke into his home, and you're being asked to believe this woman over him.  This was her view.  You're

P000342

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

seeing what she saw.  From this angle, by her own testimony, by Ms. Bethany's testimony, that vehicle was here.  Some were right here and she's over on this side.  Look at that.  She's 65 years old.  She's going on an hour's sleep, not wearing her glasses that she said she needs to see, and she identified him from a second floor window across the street.  That's her perspective.  That's not reasonable doubt.  It's not.

Just because you have a conflict in testimony, does not mean you automatically have reasonable doubt.  You get to determine that.  You get to determine is that reasonable.  You get to figure out.  You get to use that common sense and you get to say, you know what?  Maybe she fully believes what she saw.  But given what I know, given everything that I have heard and everything that I'm putting together, that doesn't make sense.  Just doesn't.

And when did she give that description to those people the first time?  She said in her deposition, which was in October, this happened in April.  That's the first time that she says and actually gave her description to somebody because she didn't write it in her --

**MS. CITRARO:**  Objection.  Facts not in evidence.

**THE COURT:**  Overruled.  Ladies and gentlemen, rely

P000343

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

upon your own memory of what the evidence is.  Okay?

**MS. SCOTT:**  She read her statement.  It was given to her and I asked her, tell me in there where you give the description of the people other than the long sleeve shirts.  Well, it's not in there.  It's not in there because her memory is not good.  And she said, oh, I remembered later and then this and that and whatever.

She is a sweet lady.  Bless her.  She doesn't know what she saw.  She doesn't remember what she saw.  I'm not saying she's not sane.  In her mind she knows very well what's going on.  But what she's looking at, this is what she sees.  It's completely reasonable that she did not see things accurately based on everything that you know.

Same thing with Mr. Gonzalez.  He's seen that lineup eight times.  Ms. Bethany has seen it five times.  Seen it once when they I.D. him.  One time.  This conflict in the testimony, somebody says they have short sleeves, long sleeves, some have gloves, some don't have gloves on.  Might be carrying something, some might not be carrying something.  That doesn't matter.  It doesn't matter because it doesn't go to prove the elements of the crime, and it doesn't go to prove his I.D. because what goes to prove his I.D. is his face.  You can't change your face.

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

We can place semantics about the hair.  You-all are smart people.  You can look at two pictures and figure out if it's the same haircut.  You'll be able to do that back there.  I'm not going to spend any more time on that.  But you can't change your face.  And when you get so close to somebody that you're able to see them this close for seven to ten seconds, you are not gonna forget that face.  And you're particularly not gonna forget that face when that person is inside your house.

This is not somebody you ran into at a restaurant.  This is a significant event.  He's not going to forget that face.  So regardless of who he sees in a photo lineup, whether or not other people have afros, whether or not you think that for whatever reason because the argument now that has been presented to you is that cops have it out for this guy.  We don't know why this guy, but him.  He is the one we need to get, and we are gonna manipulate everybody we talk to to catch him.  Why?  Mr. Gonzalez told you, I can't I.D. the other two guys.  I'm not even gonna try, because I don't know what they look like in their face, and I would not be able to confidently pick them out of a photo lineup.

The blame is being put also on law enforcement from the C.S.I. technician, that she could have tested for DNA but she didn't.  She could have, but she didn't.

P000345

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

And so that's bad police work?  No.  That's just how they work.  I asked her, why didn't you test for DNA?  Because there was no blood.  We don't test for DNA unless there's blood.  That makes sense.

How many cases do you think she gets called out to?  Can they test for DNA on every single case?  No.  That's not reasonable.  They test it when they need it.  And in this case, they didn't need it because there was no blood.

Fingerprints on the wrapper did not come back to anybody involved.  No, it didn't come back to him.  The detective told you we didn't identify the other two suspects.  We don't know who they are.  Obviously, the prints didn't come back to them.  We don't have anything to compare them to.  That was explained to you when they run prints they compare it to people already in the system, or if they have a suspect, they get fingerprints from the suspect and compare them.  Well, if you don't know who the suspects are, you don't have anything to compare to.  So we have a candy wrapper or Pop-Tart wrapper that had prints on it, and those were the prints that was recovered and those didn't go to Mr. Valle-Ramos.

Who cares?  It doesn't matter.  I am not even sure that the testimony was clear as to where that wrapper

P000346

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

came from, whether it was in his house, whether it was outside.  Even if you believe that it came from one of those three people that were in his house, it could have absolutely come from the other two people and not Mr. Valle-Ramos because we don't know who those individuals are.

Just because there's not prints on it, doesn't mean he wasn't there.  Just because you don't have DNA doesn't mean you have reasonable doubt.  Just because you have a conflict in testimony or you have a lack of evidence of something you might have wanted to have, does not mean you have reasonable doubt.

One of the things that we talked about in jury selection was whether or not all of you can convict or -- excuse me -- whether or not all of you can reach a verdict on testimony alone.  What if you didn't have physical stuff?  We don't have physical stuff.  We have testimony, that's it.  And each one of you said I can do that, I can reach a verdict on that.  I don't need physical stuff.  I may want to have it, but I don't need it.  And if I'm presented with whatever it is I'm going to be presented with, I can evaluate that.  I can judge that and I can make a decision based on that.

Defense is actually asking you to make a decision based on what you don't have.  And that's not -- just

P000347

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

because you don't have it, doesn't mean it's reasonable doubt.  No matter how much they want to keep telling you that.  That's not what the law says.

Something else that we made clear to you in jury selection was there is no number associated to reasonable doubt.  There's not gonna be a percent, and it's not gonna say if you're 50 percent sure, if you're 80 percent sure, if you're a hundred percent sure, if you're absolutely sure then you don't have reasonable doubt.  None of those qualifications are in there.  All it says is it can't be a possible doubt, a speculative doubt or a forced doubt.

Everything that they are telling you and everything that you may have doubt in this case fall into one of those three, possible, speculative or forced.  None of those are reasonable.  And they are not reasonable because of everything that's been presented to you.  I think it's interesting -- well, strike that.

We have seen pictures from -- Mr. Valle-Ramos showed pictures from his iPad from February 8, 2013, February 14, 2013, there's another date and December 25th of 2012.  None of these are April 2013. Why not?

**MS. CITRARO:**  Objection.  Burden shifting.

**THE COURT:**  Approach.

P000348

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

(Conference at the bench held on the record.)

MS. CITRARO:  She's making me prove something that I don't have to prove.

THE COURT:  Response?

MS. SCOTT:  I'm not making her prove anything.  I'm simply saying these are the photos she entered and there's no photo from April 2013.  That's it.

THE COURT:  And you are asking the reason for why.

MS. SCOTT:  Why isn't it there?  I mean, I don't understand what the Court is asking me.

THE COURT:  I'm gonna sustain the objection.

(The following was in open court.)

THE COURT:  The jurors have to disregard the last comments made by the prosecutor.

MS. SCOTT:  You have the photos in evidence.  Again, we talked about the hair.  You can figure that out.  When you look at everything collectively, when you evaluate it collectively, and you put it all together, there is no reasonable doubt in this case.  And I am confident that you will come back with a verdict of guilty as charged.  Thank you.

THE COURT:  All right.  Ladies and gentlemen, I'm going to have the court deputy hand the jury instructions to you.  I am required to read them to you.  But I also provide you a hard copy for you to take back

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

into the jury room with you when you deliberate.  This is all of the law that is applicable to the case and you'll have it with you for reference during the course of your deliberations.  Okay?

Members of the jury, I thank you for your attention during this trial.  Please pay attention to the instructions I'm about to give you.

Jorge Valle-Ramos, the defendant in this case, has been accused of the crimes of burglary of a dwelling and grand theft third degree.

To prove the crime of burglary of a dwelling, the State must prove the following elements:  One, Jorge Valle-Ramos entered a structure owned by or in the possession of George Gonzalez, and two, at the time of entering the structure, Jorge Valle-Ramos had the intent to commit an offense other than burglary or trespass in that structure.

You may infer that Jorge Valle-Ramos had the intent to commit a crime inside a structure if the entering of the structure was done stealthily and without the consent of the owner or occupant.

To prove the crime of grand theft third degree, the State must prove the following two elements beyond a reasonable doubt.  Jorge Valle-Ramos knowingly and unlawfully obtained or used or endeavored to obtain or

**P000350**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

use the jewelry, coin collection or knife of Jorge Valle-Ramos.  Two, he did so with intent to either temporarily or permanently deprive George Gonzalez of his right to the property or any benefit from it or B, appropriate the property of George Gonzalez to his own use or to the use of any person not entitled to it.

If you find the defendant guilty of theft, you must also determine if the State has proved beyond a reasonable doubt whether the value of the property taken was $300 or more.

Obtains or uses means any manner of A, taking or exercising control over property.  B, making any unauthorized use, disposition or transfer of property. C, obtaining property by fraud, willful misrepresentation of a future act or false promise.  D, conduct previously known as stealing, larceny, purloining, abstracting, embezzlement, misapplication, misappropriation, conversion or obtaining money or property by false pretenses, fraud, deception or any similar conduct in nature.

Endeavor means to attempt or try.

Property means anything of value and includes tangible or intangible personal property.

Value means the market value of the property at the time and place of the offense, or if that value cannot

P000351

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

be satisfactorily ascertained, the cost of replacement of the property within a reasonable time after the offense.

If the exact value of the property cannot be ascertained, you should attempt to determine a minimum value.  If you cannot determine the minimum value, you must find the value is less than one hundred dollars.

If the defendant helped a person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things that the other person or persons did if one, the defendant had a conscious intent that the criminal act be done, and two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime.  To be a principal, the defendant does not have to be present when the crime is attempted or committed.

In considering the evidence, you should consider the possibility that although the evidence may not convince you that the defendant committed the main crimes of which he is accused, there may be evidence that he committed other acts that would constitute a lesser included crime or crimes.  Therefore, if you decide that the main accusation has not been proved

P000352

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

beyond a reasonable doubt, you will next need to decide if the defendant is guilty of any lesser included crime.

The lesser crimes indicated in the definition of burglary of a dwelling are trespass in an occupied structure and trespass in a structure.  The lesser crimes indicated in the definition of grand theft third degree are petit theft of $100 or more and petit theft.

Lesser included offenses for Count I, trespass in an occupied structure.  To prove the crime of trespass in an occupied structure, the State must prove the following three elements beyond a reasonable doubt.  One, Jorge Valle-Ramos willfully entered or remained in a structure.  Two, the structure was in the lawful possession of George Gonzalez.  Three, Jorge Valle-Ramos' entering or remaining in the structure was without authorization, license or invitation by George Gonzalez or any other person authorized to give that permission.

Authority to enter or remain in a structure need not be given in express words.  It may be implied from the circumstances.

It is lawful to enter or remain in a structure of another if under all of the circumstances a reasonable person would believe that he had permission of the owner or occupants.

P000353

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Person authorized means owner, or lessee, or his or her agent, or any other law enforcement officer whose department who has received written authorization from the owner or lessee, or his or her agent to communicate an order to depart the property in case of a threat to public safety or welfare.

Willfully means intentionally, knowingly and purposely.

Structure means any building of any kind, either temporary or permanent, that has a roof over it, and the enclosed space of ground and outbuildings immediately surrounding that structure.

If you find the defendant guilty of trespass in a structure, you must then determine whether the State proved beyond a reasonable doubt there was a human being in the structure at the time of the trespass.

Trespass in a structure.  To prove the crime of trespass in a structure, the State must prove the following three elements beyond a reasonable doubt. One, Jorge Valle-Ramos willful entered or remained in a structure.  Two, the structure was in the lawful possession of George Gonzalez.  Three, Jorge Valle-Ramos' entering or remaining in the structure was without authorization, license or invitation by George Gonzalez or any other person authorized to give that

Official Court Reporters
407-836-2280

P000354

permission.

Authority to enter or remain in a structure need not be given in express words. It may be implied from the circumstances. It is lawful to enter or remain in a structure of another if under all of the circumstances a reasonable person would believe that he had the permission of the owner or occupant.

Person authorized means any owner or lessee or his or her agent or any law enforcement officer whose department has received written authorization from the owner or lessee or his or her agent to communicate an order to depart the property in case of a threat to pubic safety or welfare.

Willfully means intentionally, knowingly and purposely.

Structure means any building of any kind, either temporary or permanent that has a roof over it and the enclosed space of ground and outbuildings immediately surrounding that structure.

The lesser included offenses for Count II, petit theft of $100 or more. To prove the crime of petit theft of $100 or more, the State must prove the following two elements beyond a reasonable doubt. One, Jorge Valle-Ramos knowingly and unlawfully obtained or used, or endeavored to obtain or use, the jewelry, coin

P000355

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

collection or knife of George Gonzalez.  Two, he did so with intent to either temporarily or permanently deprive George Gonzalez of his right to the property or any benefit from it or B, appropriate the property of George Gonzalez to his own use or to the use of any person not entitled to it.

If you find that the defendant -- if you find the defendant guilty of theft, you must also determine if the State has proved beyond a reasonable doubt whether the value of the property taken was more than $100 but less than $300.

Obtains or uses means any manner of A, taking or exercising control over property.  B, making any unauthorized use, disposition or transfer of property.  C, obtaining property by fraud, willful misrepresentation of a future act or false promise.  D, conduct previously known as stealing, larceny, purloining abstracting, embezzlement, misapplication, misappropriation, conversion, or obtaining money or property by false pretenses, fraud, deception or other conduct similar in nature.

Endeavor means to attempt or try.

Property means anything of value and includes tangible and intangible personal property.

Value means the market value of property at the

P000356

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

time and place of the offense or if that value cannot be satisfactorily ascertained, the cost of replacement of the property within a reasonable time after the offense.

If the exact value of the property cannot be ascertained, you should attempt to determine a minimum value. If you cannot determine the minimum value, you must find that the value is less than $100.

To prove the crime of petit theft, the State must prove the following two elements beyond a reasonable doubt. One, Jorge Valle-Ramos knowingly and unlawfully obtained or used or endeavored to obtain or use the jewelry, coin collection or knife of George Gonzalez. Two, he did so with the intent to either permanently or temporarily A, deprive George Gonzalez of his right to the property or any benefit therefrom or B, appropriate the property of George Gonzalez to his own use or to the use of any person not entitled to it.

If you find the defendant guilty of theft, you also must determine if the State has proved beyond a reasonable doubt whether the value of the property taken was less than $100.

Obtains or uses means any manner of A, taking or exercising control over property. B, making any unauthorized use, disposition or transfer of property. C, obtaining property by fraud, willful

P000357

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

misrepresentation of a future act or false promise.  D, conduct previously known as stealing, larceny, purloining, abstracting, embezzlement, misapplication, misappropriation, conversion, or obtaining money or property by false pretenses, fraud, deception, or other similar conduct in nature.

Endeavor means to attempt or try.

Property means anything of value and includes tangible and intangible personal property.

Value means the market value of the property at the time and place of the offense, or if that cannot be satisfactorily ascertained, the cost of replacement of the property within a reasonable time after the offense.

If the exact value of the property cannot be ascertained, you should attempt to determine a minimum value.  If you cannot determine a minimum value, you must find the value is less than $100.

The defendant in this case has entered a plea of not guilty.  This means you must presume or believe the defendant is innocent.  The presumption stays with the defendant as to each material allegation in the information through each stage of the trial unless it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt.

To overcome the defendant's presumption of

P000358

innocence, the State has the burden of proving the crime with which the defendant is charged was committed, and the defendant is the person who committed the crime. The defendant is not required to present evidence or prove anything.

Whenever the words reasonable doubt are used, you must consider the following:  A reasonable doubt is not a mere possible doubt, a speculative, imaginary or forced doubt.  Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt.

On the other hand, if after carefully considering, comparing and weighing all of the evidence there is not an abiding conviction of guilt, or if having a conviction it is one which is not stable, but one which wavers and vacillates, then the charge is not proved beyond a reasonable doubt and you must find the defendant not guilty because the doubt is reasonable.

It is to the evidence introduced in this trial and to it alone that you are to look for that proof.  A reasonable doubt as to the guilt of the defendant may arise from the evidence, conflict in the evidence or the lack of evidence.  If you have a reasonable doubt, you should find the defendant not guilty.  If you have no reasonable doubt, you should find the defendant guilty.

Official Court Reporters
407-836-2280

**P000359**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Did I read that right?

**MS. CITRARO:**  Yes, you read it right.

**THE COURT:**  I thought I might have missed a word.

It is up to you to decide what evidence is reliable.  You should use your common sense in deciding which is a best evidence, and which evidence should not be relied upon.  In considering your verdict, you may find some of the evidence not reliable or less reliable than other evidence.

You should consider how the witnesses acted as well as what they said.  Some things you should consider are:

One, did the witness seem to have an opportunity to see and know the things about which the witness testified?

Two, did the witness seem to have an accurate memory?

Three, was the witness honest and straightforward in answering the attorneys' questions?

Four, did the witness have some interest in how the case should be decided?

Five, does the witness's testimony agree with the other testimony and other evidence in the case?

Six, did the witness at some other time make a statement that is inconsistent with the testimony he or she gave in court?

**P000360**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

Whether the State has met the burden of proof does not depend upon the number of the witnesses it has called or upon the number of exhibits it has offered, but instead upon the nature and quality of the evidence presented.

The fact that a witness is employed in law enforcement does not mean that his or her testimony deserves more or less consideration than that of any other witness.

The defendant in this case has become a witness. You should apply the same rules to consideration of his testimony that you apply to the testimony of the other witnesses.

It is entirely proper for a lawyer to talk to a witness about what testimony the witness would give if called to the courtroom.  The witness should not be discredited by talking to a lawyer about his or her testimony.

You may rely upon your own conclusion about the credibility of any witness.  A juror may believe or disbelieve all or any part of the witness or the testimony of a witness.

In this case you have heard testimony of eyewitness identification.  If deciding how much weight to give this testimony, you may consider the various factors

P000361

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

mentioned in these instructions considering credibility of witnesses.  In addition to those factors in evaluating eyewitness testimony, you may also consider one, the capacity and opportunity of the eyewitness to observe the offender based upon the length of time for observations and the conditions at the time of observations including lighting and distance.

Two, whether the identification was the product of the eyewitness's own recollection or was the result of influence or suggestiveness.

Three, the circumstances under which the defendant was presented to the eyewitness for identification.

Four, any inconsistent identifications made by the eyewitness.

Five, any instance in which the eyewitness did not make an identification when given the opportunity to do so.

Six, the witness's familiarity with the subject identified.

Seven, lapses of time between the event and the identifications.

Eight, whether the eyewitness and the offender are of different races or ethnic groups and whether this may have affected the accuracy of the identification.

And, nine, the totality of the circumstances

Official Court Reporters
407-836-2280

**P000362**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

surrounding the eyewitness's identification.

Now these are some general rules that apply to your discussions.  You must follow the law as it is set out in these instructions.  If you fail to follow the law, your verdict will be a miscarriage of justice.  There is no reason for failing to follow the law in this case.

All of us are depending upon you to make a wise and legal decision in this matter.

Two, this case must be decided only upon the evidence that you have heard from the testimony of the witnesses and have seen in the form of the exhibits in evidence and these instructions.

Three, this case must not be decided for or against anyone because you feel sorry for anyone or are angry at anyone.

Four, the lawyers are not on trial.  Your feelings about them should not influence your decision in this case.

Five, your duty is to determine if the defendant has been proven guilty or not in accord with the law. It is the judge's job to determine a proper sentence if the defendant is found guilty.

Six, whatever verdict you render must be unanimous. That is, each juror must agree to the same verdict.

Seven, your verdict should not be influenced by

P000363

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

feelings of prejudice, bias or sympathy.  Your verdict must be based on the evidence and the law contained in these instructions.

Now, deciding a verdict is exclusively your job.  I cannot participate in that decision in any way.  Please disregard anything that I may have said or done that makes you think I prefer one verdict over another.

Now, you may find the defendant guilty as charged in the information or guilty of such lesser included crime as the evidence may justify, or not guilty.

If you return a verdict of guilty, it should be for the highest offense which has been proven beyond a reasonable doubt.  If you find that no offense has been proven beyond a reasonable doubt, then, of course, your verdict must be not guilty.

Only one verdict may be returned as to the crime charged.  This verdict must be unanimous.  That is, all of you must agree to the same verdict.  The verdict must be in writing, and for your convenience, the necessary forms of verdict have been prepared for you as they are as follows:

I have two verdict forms here for you.  One for Count I and one for Count II.  The verdict form for Count I reads as follows:  It has the caption of the case, in the Circuit Court of the Ninth Judicial Circuit

P000364

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

in and for Orange County, Florida.  Has the case number and the division that is assigned to this.  It says, State of Florida, plaintiff, versus Jorge Valle-Ramos, defendant, and it says verdict as to Count I.

You have four options.  The first one is, we, the jury, find the defendant guilty of burglary of a dwelling as charged in the information.  Option two is we, the jury, find the defendant guilty of the lesser included offense of trespass in an occupied structure.  Option three is we, the jury, find the defendant guilty of the lesser included of trespass in a structure.  And option four is we, the jury, find the defendant not guilty.  It says so say we all.  Dated in Orlando, Orange County, Florida, on this blank day of blank, 2000 blank.  And there's a place for the foreperson to sign.

When you-all have reached your verdict on Count I, your foreperson should select and put an X or a check mark in one of the four options and one of the four options only.  They'll need to put the date the month, the year and sign it.  Once you have done that, fold it in half, put it aside and move on to verdict form number two.

The caption on verdict form two is identical in terms of case number, division and whatnot.  It says verdict as to Count II.  You, again, have four options.

**P000365**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

The first option is we, the jury, find the defendant guilty of grand theft third degree, as charged in the information.  Option two is, we, the jury, find the defendant guilty of the lesser included offense of petit theft of $100 or more.  Option three is we, the jury, find the defendant guilty of the lesser included offense of petit theft.  And option four is we, the jury, find the defendant not guilty.

Again, it says dated -- so say we all.  Dated at Orlando, Orange County, Florida, on this -- and there's a blank for the day and a blank for the month and a blank for the year, and a place for the foreperson to sign.

When you have reached your verdict on Count II, you will do the same thing.  Whoever your foreperson is, they will make a mark or a check mark or an X in one of the four options only and put the date, the month, the year, sign it.  Once you have done that, fold it in half, set it aside, knock on the door, let us know you reached a verdict and we will bring you back in at that time to take it.

A separate crime is charged in each count of the information and while they have been tried together, each crime and the evidence applicable to it must be considered separately and a separate verdict must be

P000366

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

found as to each.  A finding of guilty or not guilty as to one crime must not affect your verdict as to the other crime charged.

In just a few moments, you'll be taken to the jury room by the court deputy.  The first thing that you should do is choose a foreperson who will preside over your deliberations.  The foreperson should see to it that your discussions are carried on in an organized way, and that everyone has a fair chance to be heard.

It is also the foreperson's job to sign and date the verdict form when all of you have agreed on a verdict and to bring the verdict form back to the courtroom when you return.

During your deliberations, jurors must communicate about the case only with one another, and only when all jurors are present in the jury room.  You are not to communicate with any person outside the jury about this case.  Until you have reached a verdict, you must not talk about this case in person or through the telephone, writing or electronic communication such as a blog, Twitter, email, text message or any other means.

Do not contact anyone to assist you during your deliberations.  And these communication rules apply until I discharge you at the end of the case.  If you become aware of any violation of these instructions or

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

any other instruction I give in this case, you must tell me by giving a note to one of the court deputies.

If you need to communicate with me, you can send a note to the court deputy signed by the foreperson.  If you have questions, I'll talk with the attorneys before I answer, so it may take some time.  You may continue your deliberations while you wait for my answer.  And I will answer any question if I can in writing or orally here in open court.

Now, your verdict finding the defendant guilty or not guilty must be unanimous.  That is, the verdict must be the verdict of each juror as well as the jury as a whole.

Now, during the trial, items were received into evidence as exhibits.  You may examine whatever exhibits you think will help you in your deliberations, and these exhibits will be sent into the jury room with you when you begin to deliberate.

In closing, let me remind you that it is important that you follow the law spelled out in these instructions in deciding your verdict.  There are no other laws that apply to this case.  Even if you do not like the laws that must be applied, you must use them.  For two centuries we have agreed to a constitution and to live by the law, and no juror has the right to

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

violate the rules that we all share.

Any objection to the jury instructions as read by the State?

**MS. SCOTT:** No.

**MS. CITRARO:** No objection.

**THE COURT:** May I have the attorneys approach real quick.

(Conference at the bench held on the record.)

**THE COURT:** All right. I thought there was something wrong with that jury instruction on burglary. Half of it I cut off. I think that I am required to read to them this section. You, the definition of a dwelling. When I took out the other definitions, I forgot to leave those two in.

**MS. SCOTT:** Can we bring it -- I just noticed as I was reading it.

**THE COURT:** There's two additional items I'm going to read. Any objection from the State?

**MS. SCOTT:** No.

**THE COURT:** Defense?

**MS. CITRARO:** No objection.

(The following was in open court.)

**THE COURT:** Ladies and gentlemen, I noticed as I was going through this that there were two omissions in the burglary of a dwelling structure. You might want to

P000369

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

know what the definition of a dwelling is, so I think I probably need to give that to you. And there is also another instruction about intent, so I'm going to give those to you. I will draft something and I will have the court deputy bring it in writing to you so you have the additional instructions as it relates to the verdict on Count I, which is the burglary of the dwelling charge. Okay.

One of the instructions that I omitted accidentally was the intent with which an act is done is an operation of the mind, and therefore is not always capable of direct and positive proof. It may be established by circumstantial evidence like any other fact in a case. Even though an unlawful entering of a structure is proved, if the evidence does not establish that it was done with the intent to commit an offense, the defendant must be found not guilty of burglary.

And a dwelling means a building of any kind, whether such building is temporary or permanent, mobile or immobile, which has a roof over it and is designed to be occupied by people lodging therein at night together with the enclosed space of ground and outbuildings immediately surrounding it. For purposes of burglary, a dwelling includes an attached porch or attached garage.

Okay. And I will put that in writing for you and

P000370

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

send it back with you shortly.

Other than that, any other objections to the jury instructions?

**MS. CITRARO:** No.

**MS. SCOTT:** No.

**THE COURT:** Other than Mr. Andersen and Ms. Perez, the remaining six of you at this time are free to go back and deliberate your verdict.

(At 12:18 p.m., the Jury retired to deliberate their verdict.)

**THE COURT:** All right. I'll have State and defense look at exhibits to make sure you-all agree on what's going back.

**MS. CITRARO:** Defense has no objection.

**MS. SCOTT:** Fine.

**THE COURT:** Okay. Hand it back to the court deputy.

Mr. Anderson and Ms. Perez, I just wanted to thank you for your time and consideration of this case. I understand that it is an imposition sometimes on your time and you probably have other places you'd rather be, but you do serve a very valuable and important function for our system of justice.

The reason you were all selected, if somebody had an emergency and could not come back with us, and it has

P000371

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

actually happened, with one of the jurors that you would have been asked to step in and hear the case. Fortunately everybody looks like they are healthy and back deliberating. So with that said, your jury service is hereby concluded. Thank you for your time.

(Alternate jurors exited courtroom.)

**THE COURT:** I need to bring them back in. I just saw something else. Let's go ahead and bring them back in.

(Jury enters the courtroom.)

**THE COURT:** All right. Ladies and gentlemen, as luck would have it as I was typing up what I needed to send back with you, there was another paragraph that I forgot to read to you. So I'm confident it now covers everything.

I've discussed it with the attorneys, but I need to read it to you so it is part of our record. So it is clear, you were given the instruction. I have a copy here that says it is an addendum to the additional instructions for the charge of burglary of a dwelling. So you'll be able to take this back with you and make sure you consider this as you go through the burglary charge.

Okay. The additional things that you need to know are the intent with which an act is done is an operation

P000372

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

of the mind, and therefore is not always capable of direct and positive proof.  It may be established by circumstantial evidence like any other fact in a case.

Even though an unlawful entering a structure is proved, if the evidence does not establish that it was done with an intent to commit an offense other than burglary or trespass, the defendant must be found not guilty of burglary.

If you find Jorge Valle-Ramos guilty of burglary, you must also determine if the State has proved beyond a reasonable doubt whether the structure was a dwelling.

A dwelling means any building of any kind, whether such building is temporary or permanent, mobile or immobile, which has a roof over it and it is designed to be occupied by people lodging therein at night together with the enclosed space of ground and outbuildings immediately surrounding it.  For purposes of burglary, a dwelling includes an attached porch or attached garage.

Any objection to those instructions on the burglary?

**MS. CITRARO:**  No.

**MS. SCOTT:**  No.

**THE COURT:**  With that said, I will give you this and now you can go back to your deliberation.

(Jury exits the courtroom.)

Official Court Reporters
407-836-2280

**P000373**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  All right.  Everyone have a seat.  Mr. Valle-Ramos, you had the opportunity to be present during the entire course of the trial?

THE DEFENDANT:  Yes, sir.

THE COURT:  Are you satisfied with your attorney's representation of you?

THE DEFENDANT:  Yes, sir.

THE COURT:  Has she done everything you asked her to?

THE DEFENDANT:  Yes, sir.

THE COURT:  Has she failed to do anything you wanted her to do?

THE DEFENDANT:  No.

THE COURT:  Are you satisfied with her services at this point in time?

THE DEFENDANT:  Yes, sir.

THE COURT:  You should be.  She did a good job for you.

THE DEFENDANT:  Yes.

THE COURT:  Anything else we need to address before we adjourn?

(Court was at ease.)

THE COURT:  Without objection from the parties on Mr. Valle-Ramos's case, there is no objection from the parties, what I'm gonna have the court deputy do is to

Official Court Reporters
407-836-2280

P000374

step in and let the jurors know that between now and 1:30, nobody will be here.  So that everybody has an opportunity to go to lunch and that if they have a verdict, it'll just have to be held and we will take it at 1:30.  Okay?

(Luncheon recess.)

(Thereupon, at 3:10 p.m., the Jury returned to the courtroom with their verdict.)

THE COURT:  All right.  Back on the record, State of Florida versus Jorge Valle-Ramos.  I'll note for the record that Ms. Casajuana is stepping in for Ms. Scott on behalf the State.  Miss Citraro is present from the Public Defender's office as well as Mr. Valle-Ramos, and it's my understanding that the jury has reached a verdict; is that correct?

Any reason why we can't bring the jurors back in and take the verdict at this time?  Let's go ahead and bring back the members of the jury.

(Jury enters the courtroom.)

THE COURT:  Everybody have a seat.  All right. Ladies and gentlemen of the jury, I have been informed that you-all have reached unanimous verdicts; is that correct?

FOREPERSON:  If you'd go ahead and hand the verdict forms to the court deputy for me, please.

Official Court Reporters
407-836-2280

P000375

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE COURT:  All right.  Will the defendant and his attorney please rise?

Madam Clerk, if you'd go ahead and please announce the verdict.

THE CLERK:  In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida. Case number 2013-CF-5146.  State of Florida versus Jorge Valle-Ramos.  Division 16.  Verdict as to Count I, we, the jury, find the defendant guilty of burglary of a dwelling as charged in the information.

Verdict as to Count II.  We, the jury, find the defendant guilty of grand theft third degree, as charged in the information.  So say we all.  Dated at Orlando, Orange County, Florida, on this 22nd day of May, 2014. Signed by the foreperson.

THE COURT:  Either side wish to have the jury polled?  State?

MS. CITRARO:  Yes.  I ask for the jury to be polled.

THE COURT:  Juror Number 1, is this your true and correct verdict?

JUROR SEAT 1:  Yes.

THE COURT:  Juror Number 2, is this your true and correct verdict?

JUROR SEAT 2:  Yes.

Official Court Reporters
407-836-2280

P000376

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

THE CLERK:  Juror Number 3, is this your true and correct verdict?

JUROR SEAT 3:  Yes.

THE CLERK:  Juror Number 4, is this your true and correct verdict?

JUROR SEAT 4:  Yes.

THE CLERK:  Juror Number 5, is this your true and correct verdict?

JUROR SEAT 5:  Yes.

THE CLERK:  Juror Number 6, is this your true and correct verdict?

JUROR SEAT 6:  Yes.

THE COURT:  All right.  Mr. Valle-Ramos, if you will just have a seat, we will get to sentencing in a few seconds.

All right.  Ladies and gentlemen of the jury, I wish to thank you for your time and consideration of this case.  I know that jury duty is not always convenient for you, and it's probably something that you would rather not be here for.  However, you do serve a very valuable and important function for our system of justice in cases such as this where there is a dispute between what the facts are.  That's why we rely upon you-all to make the determination of what the dispute and the facts are.

P000377

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

So for your service here on behalf of the citizens of Orange County, I thank you for your time.  There is one final instruction that I have to give you that has to do with your service on a jury.  And it goes as follows, ladies and gentlemen, I wish to thank you for your time and consideration of this case.  I also wish to advise you of some very special privileges that you enjoy as a juror.

No juror can ever be required to talk about the discussions that occur in the jury room except by court order.  For many centuries, our society has relied upon juries for consideration of difficult cases.  We have recognized for hundreds of years that a jury's deliberations, discussions and votes should remain their private affair so long as they wish it.  Therefore, the law gives you-all a unique privilege not to speak about the jury's work.

Although you are at liberty to speak to anyone about your deliberations, you were also at liberty to refuse to speak to anyone.  A request may come from those who are simply curious or from those who might seek to find fault with you, and it'll be up to each one of you as an individual whether to preserve your privacy as a juror in this case.

With that said, um, you are hereby discharged from

P000378

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

jury service.  We have some certificates for you to indicate you have been here.  There's also a letter.  If you have any questions or concerns or anything that you would like to pose on to me on things we can do to improve our system here in Orange County, we are -- also Osceola County, let me know and I'll make sure they go up to the administrative judge.

With that said, I thank you for your service.

(Jury exits the courtroom.)

**MS. CITRARO:**  Judge, I'll make a motion for a judgment of acquittal not withstanding verdict at this time.

**THE COURT:**  Grounds?  Anything you want to add or you're just making a motion?

**THE DEFENDANT:**  Can I say something?

**THE COURT:**  Not yet.

**MS. CITRARO:**  Grounds being that there was sufficient conflict in the evidence, that there was reasonable doubt in this case.

**THE COURT:**  I'm going to go ahead and deny that motion.  All right.  Is there any legal reason why we can't proceed to sentencing?

**MS. CITRARO:**  Yes.  We ask for a PSI.  He's entitled to a PSI.

**THE COURT:**  Then what I'm gonna do is I'm gonna

**P000379**

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

order a presentence investigation in this case. I'm going to adjudicate him guilty of the two offenses at this point in time, and we will set off sentencing eight weeks from today's date. July 17th. That's a Thursday. Sentencing will be set for July 18th at 8:30 in the morning.

Mr. Valle-Ramos, at this point in time you are going to be remanded into the custody of the Orange County Sheriff's Office pending sentencing.

**MS. CITRARO:** Would you be willing to let him stay in the community? He has no criminal history, no FTA's on this case.

**THE COURT:** At this point he's looking at a mandatory prison sentence. No, ma'am.

**THE DEFENDANT:** May I say something?

**THE COURT:** You can say whatever you want.

**THE DEFENDANT:** Is that when I got arrested, when I was being interrogated, there was a camera. That camera shows that I have a ponytail. That's relevant. Is that irrelevant? I can't do nothing about it?

**THE COURT:** At this point in time all the evidence has been heard by the jury. The jury has made their determination. They weighed the evidence, credibility of all who testified and we have to respect their verdict at this point in time. Okay. We'll be in

P000380

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

recess.

    (The proceedings were concluded.)

Official Court Reporters
407-836-2280

P000381

10/06/2014 FILED IN OFFICE EDDIE FERNANDEZ CLERK OF CIRCUIT COURT ORANGE CO FL

                    C E R T I F I C A T E

STATE OF FLORIDA:

COUNTY OF ORANGE:

        I, Rebecca Ruiz, RPR, Official Court

Reporter of the Ninth Judicial Circuit of Florida,

do hereby certify pursuant to Florida Rules of Judicial

Administration 2.535(h)(3), that I was authorized to and did

report in stenographic shorthand the foregoing proceedings,

and that thereafter my stenographic shorthand notes

were transcribed to typewritten form by the process

of computer-aided transcription, and that the

foregoing pages contain a true and correct

transcription of my shorthand notes taken therein.

        WITNESS my hand this _____ day of _____

2014, in the City of Orlando, County of Orange,

State of Florida.


                    _____

                    Rebecca Ruiz

P000382

STATE OF FLORIDA
        Plaintiff,

vs.

JORGE R. VALLE RAMOS
        Defendant.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

CASE NO:   48-2013-CF-005146-O

DIVISION:  16

## V E R D I C T
(as to Count 1)

✓     WE, THE JURY, find the Defendant guilty of Burglary of a Dwelling as charged in the Information.

_____     WE, THE JURY, find the Defendant guilty of the lesser-included offense of Trespass in an Occupied Structure.

_____     WE, THE JURY, find the Defendant guilty of the lesser-included offense of Trespass in a Structure.

_____     WE, THE JURY, find the Defendant not guilty.

SO SAY WE ALL.

DATED at Orlando, Orange County, Florida, on this 22 day of _____May_____, 2014.

_____
FOREPERSON

FILED IN OPEN COURT 5/22/14
Clerk, Cir. Ct., Orange Co., Fl
By _____ D.C.

**P000383**

STATE OF FLORIDA
        Plaintiff,

vs.

JORGE R. VALLE RAMOS
        Defendant.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

CASE NO:  48-2013-CF-005146-O

DIVISION: 16

## VERDICT
(as to Count 2)

✓      WE, THE JURY, find the Defendant guilty of Grand Theft Third Degree as charged in the Information.

_____     WE, THE JURY, find the Defendant guilty of the lesser-included offense of Petit Theft of 100 dollars or more.

_____     WE, THE JURY, find the Defendant guilty of the lesser-included offense of Petit Theft.

_____     WE, THE JURY, find the Defendant not guilty.

SO SAY WE ALL.

DATED at Orlando, Orange County, Florida, on this 22 day of May, 2014.

_____
FOREPERSON

FILED IN OPEN COURT 5/22/14
Clerk, Cir. Ct., Orange Co., FL
By _____ D.C.

**P000384**

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA
CASE NUMBER: 2013-CF-5146

JURY TRIAL
COURT MINUTES

COURT OPENED at 11:10AM, Wednesday, May 21, 2014 with the following officers
present: The Honorable Greg A. Tynan, Circuit Judge Presiding; Natalia Scott, Assistant
State Attorney; Theresa M. Luckey, Deputy Clerk; Al Alemany, Court Deputy; Rebecca
Ruiz Official Court Reporter.

2013-CF-5146 STATE OF FLORIDA VS. JORGE VALLE-RAMOS
Charge with:
1.  Burglary of dwelling
2.  Grand theft third degree

The defendant Jorge Valle-Ramos , appeared with Counsel Carli Citrato; having
previously entered a plea of not guilty herein.

The prospective jurors were sworn and voir dire commenced.

**COURT RECESSED** at 11:50 AM to reconvene at 1:15 PM on May 21, 2014

**COURT OPENDED** at 1:20 PM on May 21, 2014 with all officer presents

Voir Dire commenced

The following jurors were accepted, called and sworn:
1.  Keyun Dorothy Arnette
2.  Erin Elizabeth Addison
3.  David Randal Gardner
4.  Kelly Ross Storms
5.  Richard McFadden Reaves
6.  Sean Matthew Donohoe
    Alternate #1: Travis A. Andersen
    Alternate #2: Monikka Vianey Perez

Opening statements presented by the State & Defense

P000385

State witness sworn and testified
George Gonzalez
Bethany Szewczyk
Detective Michael Stanley

State exhibits entered into evidence without objection:
A1- Photo lineup instructions packet (1-3) Gonzalez
B2- Photo lineup instructions packet (1-3) Szenczyk

State witness called & sworn:
Shantal Styer

State exhibits entered into evidence over objection:
C3- Photo's composite (1-12)

State rest

Defense motion for judgment of acquittal is hereby- Denied

Defense witness called & sworn:
Marquis Hickson
Jorge Valle-Ramos

Defense exhibit entered into evidence without objection:
C1- Copy of defendant's Fl-Driver's license

Jurors released at 5:35pm on May 21, 2014 to reconvene at 9:00am on May 22, 2014

Out of the presence of the jurors, the court went over the jury instructions

**COURT RECESSED** at 5:55 PM to reconvene at 9:00am on May 22, 2014

**COURT OPENDED** at 9:25 AM on May 22, 2014 with all officers present

Trial resumed

Defense witness called and sworn:
Charlene Bloom

Defense exhibits entered into evidence without objection:
D2- Photo of side view of apt
E3- Composite (1-2) photos
F4- Composite (1-2) outside view of apt

Defense recalled Jorge Valle-Ramos

**P000386**

Defense exhibits entered into evidence without objection:
G5- Picture snap shot from camera roll (437)
H6- Picture snap shot from camera roll (438)

Defense rest

State witness called & sworn:
Morelly Joy

State exhibit entered into evidence without objection:
D4- Inmate history detail

State re-rest

Defense made said motion for judgment of acquittal is hereby- Denied as to COUNT 2

Closing presented to the jurors from the State & Defense

Jury instructions presented to the jurors

Jurors out at 12:19 PM to deliberate

Jurors brought back in at 12:30 PM to be given the amended instructions

Jurors back out at 12:31 PM to continue with deliberations

Jurors with a verdict at 3:10 PM on May 22, 2014

Defendant found guilty as to Counts 1 & 2

Jurors polled

**SEE ATTACHED:**

Adjudicated Guilty

Order PSI

Sentencing set for 07/18/14 @ 8:30 AM

Defendant remanded to custody

**P000387**

LYDIA GARDNER, CLERK OF THE CIRCUIT AND COUNTY COURTS
BY: _____Deputy Clerk in Attendance.
Theresa M. Luckey

P000388