Filing # 192704770 E-Filed 02/26/2024 11:36:39 AM

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA
CRIMINAL JUSTICE DIVISION

STATE OF FLORIDA,

    Plaintiff,

                         CASE NO.: 48-2013-CF-5146-A-O

vs.

                         DIVISION NO.: 19

JORGE VALLE-RAMOS,

    Defendant.

MOTION FOR POST-CONVICTION RELIEF

BEFORE

THE HONORABLE LUIS F. CALDERON

Orange County Courthouse
425 North Orange Avenue
Orlando, Florida 32801
Courtroom 12D
March 28, 2023
Stenographically reported

A P P E A R A N C E S:

ANNA RENEE' MOMPREMIER, ESQUIRE
Office of the State Attorney
415 North Orange Avenue
Orlando, Florida 32801
On behalf of the State

LAURA LYNN CEPERO, ESQUIRE
LISABETH J. FRYER, ESQUIRE
Lisabeth J. Fryer, P.A.
247 San Marcos Avenue
Sanford, Florida 32771
On behalf of the Defendant

P000535

- - -

INDEX

OPENING STATEMENTS
     By Ms. Fryer                                          5

**TESTIMONY OF BETHANY SZEWCZYK**
     Direct Examination By Ms. Cepero                     10
     Cross-Examination By Ms. Mompremier                  21
     Redirect Examination By Ms. Cepero                   44
     Recross-Examination By Ms. Mompremier                49

**TESTIMONY OF JORGE VALLE-RAMOS**
     Direct Examination By Ms. Cepero                     52
     Cross-Examination By Ms. Mompremier                  59

**TESTIMONY OF JASMINE ORTIZ**
     Direct Examination By Ms. Cepero                     61

**TESTIMONY OF BRIAN CAHILL, PH.D.**
     Direct Examination By Ms. Fryer                      70
     Cross-Examination By Ms. Mompremier                  94

DEFENSE RESTS                                            109

**TESTIMONY OF GEORGE GONZALEZ**
     Direct Examination By Ms. Mompremier                110
     Cross-Examination By Ms. Fryer                      113

**TESTIMONY OF MICHAEL STANLEY**
     Direct Examination By Ms. Mompremier                116

STATE RESTS                                             119

CLOSING ARGUMENTS
     Argument By Ms. Cepero                              120
     Argument By Ms. Mompremier                          138
     Rebuttal Argument By Ms. Cepero                      150

CERTIFICATE OF REPORTER                                  155

P000536

**FOR THE DEFENSE:**

| | | |
|---|---|---|
| Number 1 | Photo lineup | 14 |
| Number 2 | License photo | 56 |
| Number 3 | Photograph | 67 |

P000537

- - -

**P R O C E E D I N G S**

(March 28, 2023; 9:03 a.m.)

**THE COURT:** This is 2013-CF-5146, State vs. Jorge Valle-Ramos.

Ms. Mompremier for the State and Ms. Fryer for Mr. Valle-Ramos.

Is this your cocounsel?

**MS. FRYER:** She's actually lead on this case, Your Honor.

**MS. CEPERO:** Laura Cepero.

**THE COURT:** Nice to meet you.

All right. And Mr. Valle-Ramos is seated next to counsel.

Good morning, Mr. Valle-Ramos.

**THE DEFENDANT:** Good morning.

**THE COURT:** All right. So we're here for a motion for post-conviction relief. And there was a motion filed that I wanted to address before we get started. This is a motion for a virtual appearance that was filed by the State. There was an objection by the defense.

Defense, does that objection still stand?

**MS. FRYER:**

That appears to be moot, Your Honor. Mr. Gonzalez is

P000538

present in the courtroom.

THE COURT:  So the motion is moot.  We'll proceed forward.

And, Ms. Fryer, Ms. Cepero, the way that I conduct this is like a mini trial.  I know you-all haven't been before me.  But, basically, you can make an opening statement if you wish.  The State will also have an opportunity to do the same if they wish.

Then the defense, because they're the moving party, will have the opportunity to present any evidence, including any testimony, that they want the Court to consider, any judicial notice that you wish to take -- that you are asking the Court to take, you can do so at that time.  State will then have an opportunity to do the same.  Defense will then have rebuttal, and then the parties will be able to make their closing arguments.  Defense will have initial and a rebuttal closing.

All right.  Defense, would you like to make an opening statement?

MS. FRYER:  I'm -- I'm glad, Your Honor, to be apprised of the -- with the procedure in the courtroom, so if this sounds like we have just decided to make an opening statement, that's true.

So, Your Honor, this is a unique set of

P000539

circumstances here.  What we have today is really a textbook misidentification case.  Mr. Ramos was convicted of a burglary, robbery, and he served three years in prison.

At trial, what you'll hear and what the record will reflect, is this was based entirely on two identifications that occurred as the event was unfolding; one by Mr. Gonzalez and then one by our recanting witness today.

Over the course of time, Mr. Ramos has always claimed his innocences, as his family has as well. And what you'll hear today, Your Honor, is that he was right.  His family was right.  They were -- it was perfect that they didn't give up.  They never gave up. Because Jerry Lyons, private investigator, through our law office, went and started investigating the case fresh, just like a police officer would; tried to talk to witnesses and figure out what's going on.

And what you'll find today is our recanting witness said, I always thought this would happen. I've been thinking about this a long time.

What you're gonna hear is that through the course of an overly suggestive lineup and then additional bias-inducing gestures -- not even necessarily on purpose -- by law enforcement and the other witness

P000540

here, that any doubt about our recanting witness' identification at the time was overcome. And what the Court knows and what we've provided in the Innocence Commission study, is that misidentification is the number one correlate to false convictions. Convictions that should never have occurred.

And so we're extremely honored to be presenting this to Your Honor. This is a case -- it's not a recantation case where two guys just happen to run into each other in prison. This is a case that when you dissect the only evidence in the case, you'll find that by today's standards, it's wholly unreliable. I'm not certain that the case would have been brought previously. And the evidence is just going to establish that we should -- we should vacate the judgment and sentence and set this for a new trial to be able to address the flaws in the evidence as we understand them now.

We'd ask the Court to take judicial notice of the entire court file, including the transcripts from the previous trial.

**THE COURT:** State, any objection?

**MS. MOMPREMIER:** No objection, Your Honor.

**THE COURT:** All right. The Court will take judicial notice of the entire court file.

P000541

MS. FRYER:  Thank you, Your Honor.

THE COURT:  You're welcome.

State, you wish to make an opening statement?

MS. MOMPREMIER:  No opening, Your Honor.  We'll reserve our comments for the closing.

THE COURT:  Thank you.

Defense, would you like to call your first witness?

MS. CEPERO:  Yes.  We'd also like to invoke the rule of sequestration.

THE COURT:  All right.  Are there any witnesses present in the courtroom?

All right.  If you-all would step out.  We'll call you when we're ready.  Do not discuss your testimony with anyone or each other.

And, counsel, will you-all approach?

(At the bench.)

THE COURT:  I didn't realize Mr. Lyons was gonna be called as a witness.  So I wanted to disclose to the parties that when I was in private practice, I used -- or Mr. Lyons would investigate cases that I was working on as well.  But that was more than six years ago.  Is that gonna be an issue for the State?

MS. MOMPREMIER:  Not unless the Court doesn't

P000542

believe that he can remain fair throughout this process.

THE COURT:  I err on the side of caution, so I preferred to disclose.  It's not an issue for me, otherwise I would just recuse myself at this point.

MS. FRYER:  Okay.

MS. MOMPREMIER:  Okay.

THE COURT:  Like I said, I just prefer to disclose.

(In open court.)

THE COURT:  Defense, you may call your first witness.

MS. CEPERO:  The defense calls Bethany Szewczyk.

**BETHANY SZEWCZYK**

**was called as a witness and, having first been duly sworn, testified as follows:**

THE WITNESS:  Yes, sir.

THE COURT:  Good morning, ma'am.  Please be seated.

THE WITNESS:  Good morning.

THE COURT:  Please state your first and last name.

THE WITNESS:  Bethany Szewczyk.

THE COURT:  And could you please spell your last name for the court reporter.

P000543

**THE WITNESS:** Sure.  It's S-z-e-w-c-z-y-k.

**MS. CEPERO:**  Thank you, Ms. Szewczyk.

**DIRECT EXAMINATION**

**BY MS. CEPERO:**

Q    Are you currently employed?

A    Yes.

Q    And what do you do?

A    I'm an attorney.  I have my own practice.

Q    What kind of law do you practice?

A    Family law and probate.

Q    Do you have any prior employment experience?

A    Yes.  I worked for seven years at Siemens Energy.

Q    Now, where were you living around the time of April of 2013?

A    I was living at 1716 Lafayette Court, here in Orlando.

Q    Do you remember the day of April 9th, 2013?

A    Yes, I remember.

Q    What did you do that morning?

A    I got up and I got ready for work and left my house.

Q    And as you were leaving for work, did something out of the ordinary occur?

A    Yes.

Q    And what happened?

P000544

A    I exited my front door and then my privacy gate -- fence -- gate and entered my carport to get into my car. And I stopped because there was a car parked directly behind mine in the roadway. And I saw three young men running up to the car, and I didn't know who they were. And the driver -- the one who got into the driver's side, he had blue latex gloves on.

Q    And did you get a good look at any of these individuals?

A    I did. The driver.

Q    For how long?

A    Probably about 20 seconds as he drove away. We, like, stared at each other as he drove away.

Q    And from what distance were you from him?

A    Probably about 20 to 30 feet.

Q    Okay. And can you describe any of the three individuals that you saw, their characteristics?

A    I just remember that they were all very young. They looked like brothers. They were young, light-skinned Hispanic males. And the driver, he had, like, poofy hair, 'cause I remember as he ran, it was moving.

Q    Okay. How big -- would you describe it as an Afro, his hair?

A    Yeah, it was Afro-like hair. Yes.

Q    How big was the Afro?

P000545

A    It wasn't that big, but it was enough to -- that it was moving as he was running.

Q    And did you -- had you ever seen any of those three individuals before?

A    No, never.

Q    Never met them?

Did you give a statement to law enforcement?

A    Yes, I did.

Q    Did law enforcement later ask you to participate in a photographic array lineup?

A    Yes, they did.

Q    Do you know when that occurred?

A    It was several months after the event happened.

Q    Does September 4th, 2013, sound about right?  In that area?

A    Probably.

Q    Who conducted the lineup?

A    The detective on the case.

Q    Do you recall his name?

A    I don't recall his name.

Q    Does Michael Stanley sound familiar?

A    Yes, Detective Stanley.  I remember the last name now.

Q    I'm going to show you what's previously been marked as Defense Exhibit A.

P000546

MS. CEPERO:  May I approach?

THE COURT:  Show it to opposing counsel.

BY MS. CEPERO:

Q    Take a look at the pages.

Do you recognize that document?

A    Yes, I do.

Q    What is it?

A    This is the photo lineup that he presented to me.

Q    Does it fairly and accurately represent the lineup that you saw in September of 2013?

A    Yes, I believe that was.

Q    And when you were shown the lineup on that day, what was the first thing you noticed?

A    Well, that the pictures, number one, were all very poor quality and dark.  They were dark pictures.

Q    Did the detective note the poor quality of the photos?

A    Yeah, he did.  He's, like, I'm sorry, I know they're not the best quality.

Q    Did you ultimately select a photo from the lineup?

A    Yes, I did.

Q    What features or characteristics, when looking at these individuals, did you concentrate on when making your selection?

P000547

A    The hair, his Afro.

Q    Anything else?

A    No.  I mostly focused on that, 'cause he was the only one in the lineup with an Afro, and he resembled the person that I remember seeing.

Q    How certain were you when you selected that photo?

A    I -- I was fairly certain, but I also knew that the skin tone looked darker, but I figured it was because of the poor quality of pictures, so I didn't know.

MS. CEPERO:  Okay.  May I have one moment with cocounsel?

THE COURT:  You may.

MS. CEPERO:  Your Honor, we'd like to take what's previously been marked as Defense Exhibit A and enter it into evidence as Defense Exhibit 1.

THE COURT:  Any objection?

MS. MOMPREMIER:  No, Your Honor.

THE COURT:  What's been marked for identification as Defense A will be moved into evidence as Defense 1.

If you could just hand the exhibit to the clerk to be marked.

(Defendant's Exhibit 1 received in evidence.)

MS. CEPERO:  And may I approach the witness?

THE COURT:  You may.

P000548

MS. CEPERO:  May I have another moment?

THE COURT:  You may.

MS. CEPERO:  May I approach the clerk?

THE COURT:  You may.

BY MS. CEPERO:

Q    Ms. Szewczyk, this is the lineup that you saw that day?

A    Yes.

Q    And you circled the second individual and initialed it?

A    Yes.

Q    So after you made your selection in the lineup, did Detective Stanley give you any feedback?

A    He smiled and said that's him.

Q    He said that's him.  And what did you interpret that to mean?

A    That I had picked the guy that he ultimately wanted me to choose; the one that he was -- that he had previously arrested.

Q    Okay.  Did Detective Stanley give you an indication of anyone else identifying that suspect -- or that -- selecting that photograph?

A    Yeah.  He told me that the victim, Mr. Gonzalez, had identified him also.

Q    Do you recall how many times you saw this lineup

prior to trial?

A    I don't recall.

Q    Do you know a man named Jorge Valle-Ramos?

A    I don't.  I mean, now I know him, but at the time I did not.  I don't know him personally at all.

Q    So you did not know him prior to --

A    No.

Q    -- the events that took case -- place in this case?

So you had never met him, never spoke with him?

A    I've still never spoken to him.  No, never.

Q    Did you testify at Mr. Valle-Ramos' trial?

A    Yes, I did.

Q    Did you recognize him when you saw him in the courtroom that day?

A    No.

Q    No?

A    No.  In fact -- I mean, I recognized him from the photo lineup.  But I also was like, I don't think that's the guy that I saw that day.

Q    And why not?  What was different about him?

A    His skin tone was too dark, and his eyes were too light.

Q    Do you know a man named George Gonzalez?

A    No.  I mean, I know of him now, but I don't know

him personally.

Q    How do you -- who do you know -- how do you know about him?  Like, what is that you know in relation to this case about him?

A    I know that he was the victim of the burglary, that he lived in the neighboring condo community to me, and he was the one who was burglarized that day.

Q    Have you ever met Mr. Gonzalez?

A    I met him the day of trial.

Q    Okay.  And how did that meeting happen?

A    He had testified first, and I was out waiting in the waiting area.  And when he was done testifying, he left the courtroom and approached the detective, and the detective introduced us.

Q    So the detective introduced you, and then did you have a conversation with Mr. Gonzalez?

A    Yes.  He proceeded to tell me his version of events that had happened that day.

Q    Do you recall the details of his version of events?

A    He said that he had come back home -- he had left and came back home and confronted the burglars and they ran out of his house.  And I just remember he was very emphatic and very angry and upset.

Q    Did he tell you anything about the defendant?

P000551

**A**    That he had an Afro.

**Q**    Did he tell you that he was certain that he made the correct identification, that the defendant was the correct guy?

**A**    Yes, he did say that.

**Q**    Do you believe that his statement in any way maybe influenced your confidence in your identification in this case?

**A**    It certainly did.  Because after I had seen the defendant and I had doubts -- 'cause I actually saw him before I went into the courtroom.  The defendant left the courtroom 'cause they -- after Mr. Gonzalez testified, they took a break.  So he came out and -- I saw the defendant come out and I knew it was him, 'cause I recognized him from the photo.  And I was like, his skin is too dark.  I don't think that's him.  And then after I talked to Mr. Gonzalez, I was like, well, he must be sure, so I guess...

**Q**    So, just to be clear, you say you recognized him from the photo in the lineup, but you didn't recognize him as the person who --

**A**    Right.

**Q**    -- got into the driver side of the vehicle?

**A**    Exactly.  I knew who he was, 'cause I knew he was the defendant.  But I knew he wasn't the guy that I had

P000552

seen that day.

Q    And do you recall if, prior to your testimony, you were instructed about the rule of sequestration?

A    No.  I just know it from law school, but I wasn't told that it was invoked.

Q    Okay.  Now, in late 2021, were you approached by a private investigator?

A    Yes, I was.

Q    Do you recall his name?

A    No.

Q    Does Jerry Lyons sound familiar?

A    Yes.  Yes, Jerry.  I'm sorry, I'm terrible with names.

Q    No.  That's okay.

And what information did you share with him? When you first saw him and he approached you, what did you say?

A    I told him that I had been thinking about this, that I had had doubts over the years, and that I always wondered, did I help send somebody innocent to prison.  You know, I always wondered if this day would come, that somebody would come back and ask me about it again.

Q    And did Mr. Lyons show you some photographs?

A    Yes.

Q    What did you -- do you recall what the

P000553

photographs were?  Were they photographs you had seen before?

A    He showed me -- the only -- the one I mainly remember that he showed me was the photograph of somebody else.

Q    Somebody else.

And what were your thoughts when you saw that person?

A    That's him.  That was the guy.

Q    The guy who got in the driver's side of the vehicle?

A    Correct.  I knew it wasn't Mr. Valle-Ramos, and I -- but I knew that was the right guy right there.  That was the guy that I had seen.

Q    How did you feel when you saw that photo?

A    Better.

Q    Better?

A    Yes.  It was, like, kind of a relief.  Like, someone had finally found him.

Q    And do you recognize the individual sitting at counsel table in the black button-up shirt?

A    I recognize him from the day of trial, yes.

Q    Okay.  But you do not recognize him as the person who got in the driver's side?

A    No, that's definitely not him.

P000554

MS. CEPERO: That's all I have.

THE COURT: State, cross-examination?

CROSS-EXAMINATION

BY MS. MOMPREMIER:

Q    Good morning, Ms. Szewczyk. Am I pronouncing that correctly?

A    Szewczyk.

Q    Szewczyk. Okay.

So, Ms. Szewczyk, let's start from the beginning. Before you were even a witness in this case, you were an attorney at the time?

A    Yes.

Q    And, ultimately, you were one of the witnesses in this case, correct?

A    Correct.

Q    You saw three young Hispanic males running from an area, one of the adjacent residences, to the place where you resided, correct?

A    Correct.

Q    And you were able to get a good look at the driver?

A    Yes.

Q    And, ultimately, the police got a description from you, correct?

A    Yes.

P000555

Q    And eventually you were presented a photo lineup, correct?

A    Correct.

Q    So before you did that photo lineup, had anyone suggested or presented any other people to you as a potential suspect?

A    No, not that I recall.

Q    Okay.  And when you looked at the photo lineup -- let's talk about the lineup.  You would agree with me that the first portion of the lineup, before you even received it, the detective gave you instructions, correct?

A    Yes.  He gave me written instructions.

Q    Okay.  And you obviously were an attorney at that time, correct?

A    Yes.  For -- yeah, but I wasn't practicing.

Q    But you were still an attorney that was barred by the state of Florida, correct?

A    Absolutely.

Q    And you know how important it is to read documents before you sign anything, correct?

A    Yes, ma'am.  I did read it.

Q    And did you do that due diligence when you did the photo lineup?

A    Yes, I did.

Q    So you would have read the instructions that were

P000556

given to you on the form?

A    Uh-huh.

Q    Is that a yes?

A    That's a yes.

Q    Okay.  And in those instructions, in part, it tells you, you don't have to make an identification, correct?

A    Correct.

Q    And did you know that before you made that identification that you did not have to pick somebody?

A    I don't recall the instructions.  I know that I read them.  I don't remember what I was thinking at the time.

Q    Do you have any reason to believe that you would not have been mindful of these instructions?

A    What do you mean, "mindful"?

Q    Is there any reason to believe that you wouldn't follow the instructions given?  So if the instruction tells you you don't have to make an ID, is there any -- do you have any knowledge that you wouldn't follow that, that you would feel pressure or compelled to make an ID, even though it tells you you don't have to make an ID?

A    I certainly did feel pressure, but, obviously, I did read the instructions.  I know I signed them.

Q    Okay.  And you were aware of the quality of the

P000557

photographs before you made the ID, correct?

A   Yes.

Q   And you still made an ID anyway, correct?

A   Yes, I did.

Q   And when you made that initial ID, were you confident in the decision that you made?

A   I was pretty confident, but I wasn't a hundred percent certain.

Q   Did you tell the detective that?

A   No, because he immediately told me that I had picked the right guy.

Q   Let's talk about that for a minute.  So you're saying, at this point, you weren't completely confident in your ID in the photo lineup?

A   No.  Because I thought that his skin looked too dark, but I figured it was because of the poor quality of the photographs.

Q   Did you ever tell the prosecutor that?

A   No.

Q   And at some point you had -- you spoke with the prosecutor before this case went to trial, correct?

A   I did.

Q   You also spoke with the prosecutor and the defense attorney in a deposition, correct?

A   I did, yes.

Q    And at no point did you ever say, hey, I think the guy is too -- has a darker complexion?

A    No, 'cause it never came up.  They didn't ask me about it.

Q    You understand that you were called because you -- you identified somebody, correct?

A    Correct.

Q    And you didn't think it was important to let anybody know that information?

A    At the time, no, because I was -- I was trusting the detective that -- again, he told me that I picked the right guy and that the other witness had already identified him, so I was trying to reassure myself, I suppose.

Q    And so let's talk about the lineup itself. Before the lineup -- before you made your selection in the lineup, did the detective ever suggest or give you any information about a potential suspect?

A    About the defendant?

Q    Yeah.  Like, did he suggest one person over another?

A    No.

Q    Okay.  Did he tell you what the victim said before you made your ID?

A    No.

Q    Did he show you any other photographs of anyone

P000559

before he showed you this photo lineup?

A    No.

Q    So, ultimately, your selection was of your own accord, correct?

A    That is correct.

Q    And, ultimately, when you made this photo ID, you weren't -- you didn't say, this is the person that I think may have done it, correct?

A    I just simply pointed to the picture.  He was the only one with an Afro.

Q    Just reading verbatim from the form, it says, "The person in box number two was seen by me, early morning, as he was getting into a vehicle with blue latex gloves on and speeding away."

You said that this was the person who did this action, correct?

A    I'm not looking at that, but if that's what I wrote, then...

MS. MOMPREMIER:  If I can approach with the defense witness [sic]?

THE COURT:  You may.

MS. MOMPREMIER:  For the record, I'm approaching with Defense 1.

BY MS. MOMPREMIER:

Q    I'm going to show you the form that says "Witness

P000560

Photo Display Identification Form" as a part of State's 1.
Can you look over this part of your -- of that exhibit?

A     Yes.  Yes, I did write that.

Q     Okay.  So it wasn't his skin is too dark, or his skin's a little darker, but this may be the person, correct?  That's not what you wrote?

A     Correct, I did not write that.

Q     Okay.  That's a pretty -- it's a pretty direct statement.  It says this is the person that did this action, correct?

A     Correct.  I wish I had said something.

Q     Okay.  And isn't it true -- so let's talk about Detective Stanley.  So you said he did not provide you anything to make any suggestions one way or another before you made your ID, correct?

A     Not before, but he did give me information right after.

Q     Okay.  And isn't it true, in part, he gave you that information because you asked him to provide you more information?

A     Sure.  I asked him how they found him.

Q     And even when he made that statement, that's the guy, you asked him what he meant by that; isn't that correct?

A     I didn't ask him, what do you mean by that.  I

P000561

just said -- I said, can you tell me what happened, like, how did you find him?

Q    Okay.  So you asked for additional information, correct?

A    Correct.

Q    So, again, at this point, you make the photo ID, you go to depositions, correct?

A    Yes.  I went to one deposition.

Q    And at no point did you express to either attorney that you had doubts about your identification, correct?

A    Not at that time.

Q    And were you pretrial?  Meaning, before you testified, did the prosecutor go over the testimony with you to prepare you for the trial?

A    No, not that I recall.

Q    Okay.  At trial, ultimately, you provided testimony?

A    Yes, I did.

Q    And when you provided that testimony, you identified Mr. Valle-Ramos as the person who committed the crime?

A    Yes, I did.

Q    Okay.  And at no point on the stand did you say, hey, I don't recognize that person in the courtroom?

A    No, I didn't, but I'd thought about it.

Q    Okay.  And I just want to be clear.  You're saying at the photo lineup you had doubts?

A    (Nods head.)

Q    Is that a yes?

A    Yes.  Sorry.

Q    So before you even had -- went to trial you had doubts?

A    Correct.

Q    And then you went to trial?

A    Correct.

Q    And you were sworn in the -- they swore and affirmed you to tell the truth and the whole truth, correct?

A    Correct.

Q    And you stated that this was the person who committed the crime, correct?

A    Correct.

Q    So that was a lie?

A    No, it wasn't a lie.  At the time, I didn't know what else to do.

Q    Well, you believed that that might not be the person.  That's what a doubt means, correct?

A    Correct, I had doubts.  I should have said something and I didn't.

P000563

Q    And so you told them something that was not accurate, correct?

A    Correct.

Q    So you intentionally withheld that information on a case where you knew --

MS. CEPERO:  Objection.  Argumentative.

THE COURT:  I'm gonna sustain the objection. Rephrase.

BY MS. MOMPREMIER:

Q    You intentionally withheld that information?

MS. CEPERO:  Objection.  Argumentative.

THE COURT:  It's the same question.  I'm gonna sustain it.

MS. MOMPREMIER:  Your Honor, is there a basis for that objection?

THE COURT:  Counsel approach.

(At the bench.)

THE COURT:  She had previously stated in her prior response that she felt that she didn't have an option.  So her very next question was basically saying she intentionally did so.  She already explained her reasons for doing so.  So if you wanted to give more explanation, that's fine.  But you're mischaracterizing her testimony, potentially misrepresenting something.  So if you want to rephrase

P000564

your question and ask her what was going through her mind, that's fine. But at this point, she's answered the previous question as to what her intentions were, so I'm going to sustain the objection.

MS. MOMPREMIER: Yes, Your Honor. And just for the record, part of the analysis is if a witness intentionally perjures her -- intentionally committed perjury, and I'm trying to ask questions along that vein.

THE COURT: So, again, I'm not gonna tell you exactly how to ask those questions, but if her testimony is different at the time of trial than what she -- and whether she did so knowingly and whether -- you can ask her, was it intentional, but she's already answered that question. So you're welcome to ask her again, but she's answered the question, and I don't want to get into a situation where --

MS. FRYER: Sure, Your Honor. And we just -- this is a concern now. Ms. Szewczyk has counsel here. Sounds like the State's brought up intentional perjury at this point. I think the statute of limitations may or may not have run. And she's here to do what she believes to be the right thing, but is that -- is that something she needs to be concerned about, or this just a cross-examination --

P000565

**MS. MOMPREMIER:**  I'm cross-examining the witness --

**THE COURT:**  All right.

(In open court.)

**THE COURT:**  And, once again, that objection is sustained.

You nay rephrase the question.

**BY MS. MOMPREMIER:**

Q    So you stated that you felt you had no choice but to give -- to not speak about your doubts.  Why is that?

A    I just felt pressured, and I felt that it was too late.

Q    Felt pressure.  Please elaborate.

A    Well, I didn't have an attorney there with me.  I was just there by myself, which is fine, but I was expected to continue on with the same identification as before.  But it wasn't until I saw the defendant in person on the day of trial that I had that gut reaction that I really didn't think it was him.  Because now I'm looking at him in person, not in a blurry or darkened photograph, and I could tell that his skin was darker.  But after I spoke with Mr. Gonzalez and he was so sure, I just assumed that maybe I wasn't remembering completely correctly.

Q    Okay.  But the State -- did the State ever put pressure on you to make an ID or to keep your testimony

P000566

consistent?

     A    I don't know how to answer that question. I mean, it wasn't like they were -- you know, I was expected to be there. I was expected to give that testimony. Yes.

     Q    Did they tell you you have to give that testimony, or did they ask you to testify truthfully?

     A    They didn't say anything one way or another. They just encouraged me to be there and give that testimony. And when I was done, they said that I did a great job.

     Q    When you went to testify, you were sworn and affirmed to tell the truth and nothing but the truth, correct?

     A    Correct.

     Q    And even when the State came before you -- I mean, when did the State put this pressure? Because, according to you, they didn't even give -- do a pretrial. Like, when was this conversation with the prosecutor to pressure --

          MS. CEPERO:  Objection.  Argumentative.

          THE COURT:  Overruled.

          THE WITNESS:  I -- on that day, I genuinely thought I was doing the right thing and saying the right thing.

BY MS. MOMPREMIER:

P000567

Q    Would it be safe to say that this is a lot of self-pressure and not pressure from other people?

A    It could be.

Q    Is that a yes?

A    Yes.

Q    State never threatened you?

A    No.

Q    State never said you gotta stick with this testimony and say nothing else?

A    No.

Q    No one threatened you with perjury charges or anything like that?

A    No.

Q    And, again, at trial, you never said, hey, I think his complexion is darker than the person I initially saw?

MS. CEPERO:  Objection.  Asked and answered.

THE COURT:  Overruled.

BY MS. MOMPREMIER:

Q    You never said, I think this person's complexion -- than the person that I saw?

A    I should have.

Q    But you never said it?

A    I didn't and I should have.

Q    At no point did you say, I think his eyes are

P000568

lighter than what I remember?

A    I didn't and I should have.

Q    And the trial -- at some point you finished your testimony, and I'm assuming you left the courtroom, correct?

A    I did.

Q    While we were talking about the courtroom, you said that you had a conversation with Mr. Gonzalez?

A    I did.

Q    When did this conversation take place?

A    This was after I gave -- after -- I'm sorry, after he gave his testimony, before I gave mine.

Q    Did you offer information to him?

A    No.

Q    Did he put any pressure on you to stay consistent with your story?

A    No.  He just wanted to vent.

Q    Did he ever say specifically, this guy here in the courtroom is the one who did it?

A    No, not that I recall.

Q    The information from that -- would it be safe to say that he provided -- did he provide any descriptions to you beyond the guy had an Afro?

A    He was wearing a hoodie, I think is what he said.

Q    Okay.  Anything else that -- any other

P000569

information -- what other information about the description of the suspect did Mr. Gonzalez provide to you?

A    I don't recall, but I remember name calling, but no physical description.

Q    Okay.  So just the Afro and the hoodie?

A    Right.

Q    And you saw the person -- you saw the suspect yourself?

A    I did.

Q    And you already knew the person had an Afro?

A    Correct.

Q    And were you aware of the hoodie?

A    I didn't remember the clothing --

Q    Okay.

A    -- 'cause they got in the car so fast.

Q    And after trial, you, yourself, still did not tell the prosecutor or even the defense attorney, hey, I'm not so sure about my testimony?

A    I didn't.

MS. CEPERO:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I didn't and I should have.

BY MS. MOMPREMIER:

Q    And, in fact, it wasn't until you wrote your affidavit that it became known that you had doubts,

P000570

correct?

A    Correct.

Q    And this is -- even though -- at the point where you wrote that affidavit, you were practicing at that time, correct?

A    Correct.

Q    And safe to say this trial happened around 2014?

A    I believe so.

Q    And your affidavit wasn't written until 2021, correct?

A    Correct.

Q    So seven years you sat on that information?

A    I did.  I shared it with family and friends.

Q    But not anybody who could actually do something about it legally?

A    Correct.

Q    In fact, it wasn't until the investigator for the defense came to you that you actually wrote this affidavit?

A    Correct.

Q    So this was not self-initiated by you?

A    It was not.

Q    You did not write an affidavit and submit it to the state attorney's office to say, hey, I have doubts and I just think you-all should know?

A    No.  But I also -- it wasn't requested of me, and

P000571

I didn't know that I could.

Q    But as a practicing attorney of law, you know how important it is to make sure that the correct information is given to the right parties.  In fact, it's a part of our duties as attorneys, is it not?

A    Correct.  But the case was over, and I also don't practice criminal law.  Never have and I never will.

Q    And because of part -- you're an attorney, you know that, even if you're not aware of the law, you can go to counsel or get an attorney to help guide you to make sure that you're doing things correctly, correct?

A    I have one here today.

Q    And, in fact, you can call the Florida Bar helpline to get information if you're not sure about something regarding the law.

A    Well, the Florida Bar helpline is for me and my ethical obligations regarding my own cases.  This was different.  This was a case in which I was a witness.  And just because I had doubts, it didn't mean that I was certain that I had put the wrong person in prison.  I simply didn't know.

Q    You don't believe that your testifying in court as a witness has anything to do with your license as an attorney?

A    No, not really.

P000572

**Q** When the investigator approached you, did he -- well, first of all, where did he approach you?

**A** The investigator?

**Q** Uh-huh.

**A** He called me and then we made an appointment and he came to my home.

**Q** Okay. And when he came to your home, did -- isn't it true that he, more or less, told you, hey, I think that you identified the wrong guy?

**A** It didn't start out that way, no.

**Q** Did he not, in fact, show you another potential person who could have been the suspect?

**A** He did.

**Q** Okay. So his purpose there was to introduce that information to you to see if your testimony would change?

**A** I can't say.

**MS. CEPERO:** Objection. Calls for speculation.

**THE COURT:** Counsel approach.

(At the bench.)

**THE COURT:** Response?

**MS. MOMPREMIER:** Your Honor, she was present for that conversation. She knows the gist of that conversation, what he relayed to her. I think she can talk about what he relayed to her. If it's not consistent, she can say -- and she's responded whether

P000573

my [sic] impression of the conversation was accurate or not.

MS. CEPERO:  I think the pivotal issue here is the purpose of why he met with her, and that's a question for the investigator.

THE COURT:  I'm gonna sustain the objection.

(In open court.)

THE COURT:  That objection is sustained.

BY MS. MOMPREMIER:

Q    When -- the investigator presented Amos Matthew Ortiz to you, correct?

A    I remember the name Amos, yes.

Q    He relayed to you that somebody else might have done this crime, correct?

A    Yes.

Q    And he showed you a picture of that person that he thought might be the true suspect?

A    He showed me a picture of somebody who he said had been committing other burglaries in the area around that time.

Q    Tell me what information he relayed to you about this other person.

A    That's all I really recall.

Q    Okay.

A    I mean, he also told me after, at the end of the

P000574

conversation, that this person was deceased.

Q    So he told you that this person had been involved in other crimes?

A    Yes.  He had been committing other burglaries in the area, but it was after he showed me the picture and I identified him.

Q    Okay.  When he showed you that picture, did he show it to you in a photo lineup?

A    No.

Q    Did he show you a single photograph?

A    No.  He showed me a picture.  That picture, as well as the defendant's picture, side by side.

Q    Okay.  So a picture of the defendant and a picture -- or I'll say this.  A picture of Mr. Valle-Ramos and then a picture of Mr. Ortiz side by side?

A    Correct.

Q    Okay.  You remember the process when you had a photographic lineup with Detective Stanley?

A    Yes.

Q    And in that photographic lineup, he showed you six different individuals and asked -- essentially had you kind of make your own assessments before providing any information, correct?

A    Correct.

Q    Okay.  But when you spoke with the investigator,

P000575

he showed you just the two photographs side by side?

A    From what I recall, yes.

Q    And when he showed you the photographs, did he tell you why he was showing you those photographs?

A    I don't recall if he told me why.

Q    What did you -- why did you let him in your house?

A    To talk about the case.  I had a feeling I knew why he was there; to talk about the case.

Q    Okay.  And what did he tell you he wanted to talk about?  What specifically about the case did he wish to talk to you about?

A    I don't remember his exact words.  But he asked me if I remembered the case and if I remembered testifying, and I told him, yes.  And he said, do you mind if we sit down and talk and I can show you some things?  He's like, what do you -- no, first he asked me, what do you remember about the case.  That's what he first said when we sat down.  And so that was when I told him everything that I remembered, which is what we've already discussed, as well as the fact that I had always had doubts, and I didn't think that I had identified the right person.

MS. MOMPREMIER:  Your Honor, if I could approach the witness?

THE COURT:  You may.

P000576

MS. MOMPREMIER:  For the record, I'm showing page 9 of defendant's initial motion for post-conviction relief and incorporated memorandum of law to the witness.

MS. CEPERO:  I'm sorry, Your Honor.  The only issue that we have with that is that it's in black and white and not color.  Would we be able to show a color photo, which is what she saw?

THE COURT:  You can do that on --

MS. CEPERO:  Redirect?

THE COURT:  -- redirect, yes.

But is there any objection to that?  If you have one and the State wants to use that one, it's up to them.

MS. CEPERO:  No, that's fine.

THE COURT:  Okay.

BY MS. MOMPREMIER:

Q    Do you recognize those photographs?

A    Yes, I do.

Q    And were those the photographs shown to you by the investigator?

A    I believe so.

Q    Okay.

A    Yes.

Q    And, ultimately, after speaking with that

P000577

investigator, you then selected Mr. Amos Ortiz as the suspect, correct?

A    Yes.  Right away, a hundred percent.

Q    Are you a hundred percent positive in that identification?

A    Yes, I am.

MS. MOMPREMIER:  No further questions, Your Honor.

THE COURT:  Defense, redirect?

MS. CEPERO:  Yes.

REDIRECT EXAMINATION

BY MS. CEPERO:

Q    Ms. Szewczyk, you're not a criminal defense attorney, as you stated; is that correct?

A    No.

Q    You don't have any experience in criminal law?

A    None.

Q    And you -- you aren't a scientist dealing with witness memory or witness identification?

A    No.

Q    So you don't know the factors that affect the reliability of an eyewitness identification?

A    Outside of what I vaguely recall from law school, no.

Q    And you're not a law enforcement officer?

P000578

A    No.

Q    So you don't know about the best methods for creating a lineup?

A    No.

Q    So when a law enforcement officer presents you with a lineup, as Detective Stanley did in this case, you had no idea if it was appropriate, if it was in line with the science?

A    No.

Q    You -- did you trust the law enforcement officer, Detective Stanley, that he was giving you a lineup that was appropriate?

A    Yes.

MS. MOMPREMIER:  Objection, Your Honor, as to relevance.

THE COURT:  Overruled.

BY MS. CEPERO:

Q    I'm sorry.  Can you repeat your answer for the record?

A    Yes.  Absolutely I did trust him.

Q    Now, when you saw this lineup in this case, is it fair to say that Mr. Valle-Ramos was the only individual -- or that was the only photo with an Afro?

A    Correct, it was.

Q    And you've seen --

P000579

MS. CEPERO:  May I approach?

THE COURT:  You may.

BY MS. CEPERO:

Q    You've seen the side-by-side comparison of --

THE COURT:  Can you show that to the State?

BY MS. CEPERO:

Q    So you saw -- and I'm sorry it's poor quality on here.  You saw the picture of Mr. Valle-Ramos on the left, and he showed you a picture of Amos Ortiz on the right; is that correct?

A    Correct.

Q    And Mr. Ortiz has a pretty big Afro in that picture, correct?

A    Correct.

Q    How would you compare these two individuals?

A    I think they look very similar.

Q    Is it fair to say they could be related, maybe twins?

A    Possibly, if you didn't know them.

Q    Do you recall how many times you saw the lineup in this case?

A    I don't recall.

Q    Do you recall testifying at his trial about the lineup in this case?

A    No, I don't directly recall my testimony.

P000580

Q    Would it help if I showed you your testimony? Would that refresh your recollection?

A    Sure.

THE COURT:  Just show it to the State, please.

BY MS. CEPERO:

Q    If you'll take a look at this and read it to yourself, page 92, lines 8 through 12.

MS. MOMPREMIER:  Your Honor, I would just object to this form of testimony.  She said she doesn't remember, and I believe that the record speaks for itself as to her prior testimony.

THE COURT:  It's my understanding is that is for the purposes of refreshing her recollection to ask other questions; is that correct, defense?

MS. MOMPREMIER:  My understanding is specifically to how many times did she the photo lineup.  She said she doesn't remember that today, and she's previously testified how many times she's seen it at trial.

THE COURT:  There's a lot -- there's a lot in her testimony at trial that's different today.  I don't know if this is going to fall into that same category, so I'm gonna allow her to refresh her recollection and see if that testimony is accurate.

BY MS. CEPERO:

Q    Did that refresh your recollection?

P000581

A    Yes and no.  I honestly -- I don't know if you want me to read this, but I don't necessarily remember seeing it that many times.  But if that's what I testified to, than I'm sure I probably did.

MS. CEPERO:  May I have a moment with counsel?

THE COURT:  You may.

BY MS. CEPERO:

Q    Now let's go back to the trial when Detective Stanley introduced you to Mr. Gonzalez.  You said that he was vented -- venting?

A    He was venting, yeah.  He was angry, upset.

Q    Was he name calling?

A    I remember he was name calling or swearing, yeah.

Q    Who was he calling names?

A    The --

MS. MOMPREMIER:  Objection to hearsay.

THE COURT:  Response?

MS. CEPERO:  I'll withdraw the question.

BY MS. CEPERO:

Q    And do you recall him making a statement that made you believe that he was confident?

MS. MOMPREMIER:  Objection to leading.

THE COURT:  Sustained.

BY MS. CEPERO:

Q    Now, you testified under oath in this case; is

P000582

that correct?

A    I did.

Q    And at the time that you were testifying, did you believe that you were giving your truth?

A    Yes.  Uh-huh.

MS. CEPERO:  No further questions.

MS. MOMPREMIER:  Your Honor, do you want brief redirect [sic] on this?

THE COURT:  You may do so.

And, Counsel, can you collect the exhibit?

MS. MOMPREMIER:  For clarification, do you intend to introduce that?

THE COURT:  This has not been moved into evidence.

MS. CEPERO:  Sorry.

MS. MOMPREMIER:  Are you going to admit it, or no?

MS. CEPERO:  No.

#### RECROSS-EXAMINATION

BY MS. MOMPREMIER:

Q    For clarification, you were shown this photograph.  You said this is what the investigator actually showed you, a color picture of these two individuals?

A    Yes.

P000583

Q    Okay.  And then would it be safe to say that similar, I guess, to your characterization of the photo lineup, that the quality of Mr. Valle-Ramos is poor?

A    Yes, that's poor.

Q    It's very dark; is that correct?

A    Yes.

Q    Okay.  And in relation to Mr. Ortiz's picture, which is pretty clear?

A    It is clearer.

Q    And so it would be safe to say that you can't really get a fair assessment of even Mr. Valle-Ramos' complexion from that photograph, correct?

A    That's true, but I also knew what he had looked like in person.

Q    And you've never actually met with Mr. Ortiz in person?

A    I've never me -- well --

Q    Yes.  The person on the right, Mr. Ortiz -- Amos Ortiz, you never met him in person, as far as you know, beyond him being potentially the suspect?  To your knowledge, beyond that, you've never met this person?

A    With the exception of that day, no, I don't think I've ever met that person.

Q    And so you can't say what his complexion looked like in the winter versus the summer, correct?

P000584

A    No.

Q    Okay.  And you -- you've never seen that person in trial to be able to say affirmatively whether that person is the suspect or not, correct?

A    Correct.

MS. MOMPREMIER:  No further questions.

THE COURT:  Thank you, ma'am.  You may step down.

Is this witness excused?

MS. CEPERO:  Yes.

THE COURT:  State, any objection?

MS. MOMPREMIER:  No, Your Honor.

THE COURT:  Defense, your next witness?

MS. CEPERO:  I'd call the defendant, Jorge Valle-Ramos.

THE COURT:  Mr. Valle-Ramos, come forward.

**JORGE VALLE-RAMOS,**

**the defendant herein, testified upon his oath as follows:**

THE DEFENDANT:  Yes.

THE COURT:  Good morning, sir.  Please be seated.

And could you please state your first and last name.

THE DEFENDANT:  Jorge Valle-Ramos.

THE COURT:  And could you spell your first and last name for the court reporter.

THE DEFENDANT:  J-o-r-g-e V-a-l-l-e R-a-m-o-s.

P000585

**DIRECT EXAMINATION**

**BY MS. CEPERO:**

Q    Mr. Valle-Ramos, are you currently employed?

A    Yes.

Q    What do you do?

A    I work for Custom Cable, do low voltage.

Q    Do you have any prior employment experience?

A    Yes.

**MS. MOMPREMIER:**  Objection to relevance, Your Honor.

**THE COURT:**  What's the relevance?

**MS. CEPERO:**  I'll withdraw.

**BY MS. CEPERO:**

Q    Now, let's go back to the time of the incident in this case, April of 2013.  What kind of hairstyle did you have at that time?

A    My hair was long, similar to what I have now.

**MS. MOMPREMIER:**  Objection, Your Honor, to his testimony.  Ultimately, the Court is gonna make a ruling of the newly-discovered evidence in relation to the trial.  I don't see how the defendant presenting information that's already a part of the record is going to help that.  He can't testify to anything new today, unless it's specifically related to, like, the recantation.  Yeah, I'm objecting to them presenting

any newly-discovered evidence without making that -- putting on notice to the State that he has something new.  Otherwise, what's the relevance for his testimony for purposes of the witness recantation?

THE COURT:  Defense, response?

MS. CEPERO:  We have to lay a predicate for the expert in this case who is gonna testify about the significance of hairstyle in lineups and how that can create a suggestive lineup.

THE COURT:  So, again, the question -- there's -- there's a few layers here.  So the first question is with regards to his appearance at trial, which was part of the in-court identification, which relates back to the testimony of Ms. Szewczyk who just testified.

There's also -- Mr. Gonzalez is gonna testify to an in-court identification.  There's also descriptions that were given by both witnesses at the time of the offense, which ultimately directed law enforcement to put together this photo lineup.

So his hairstyle at the time that he was arrested and his hairstyle at the time that they went to trial is relevant for the purpose of these proceedings to see how it lines up with the testimony of those witnesses.

P000587

So the objection is overruled.

Go ahead.

**MS. CEPERO:**  Thank you, Your Honor.

**BY MS. CEPERO:**

Q    What kind of hairstyle did you have in April of 2013?

A    My hair was long, similar to what I have now, but longer, 'cause I have the sides shaved off now.  Back then I didn't.

Q    So if you had taken your hair out of a ponytail, what would it look like?

A    Just drop down to my shoulders.

Q    Can you demonstrate how it would look now if you take your ponytail out?

A    Sure.

**MS. MOMPREMIER:**  Objection, Your Honor.  Again, this isn't -- because of the delay in time, it would be inaccurate and improper at this point to say that what his hair is now is what his hair would be then.  And, again, it's already part of the court record.

I would object to his testimony being considered by the Court, as it is not a part of the analysis for the recantation part.  And as these questions were addressed in the -- he's provided testimony at the trial as to his hairstyle.  That is the testimony that

P000588

the State argues that the Court can rely on in making this analysis, not his testimony here today.

THE COURT: Defense, response?

MS. CEPERO: What his hair looked like then is the crux of this issue. It's the crux of the eyewitness testimony. It's also pertinent to if he had a retrial, if it would produce an acquittal on retrial to demonstrate how his hair looks.

THE COURT: I'm gonna overrule the objection. But, again, this is based on his testimony that his hair would have appeared similar, even though his hair is cut differently.

MS. CEPERO: Thank you, Your Honor.

BY MS. CEPERO:

Q    So you've taken your ponytail out. And it -- what happened to your hair?

A    Just drops down.

Q    Now, I'm going to show you what's been previously marked as Defense Exhibit B.

Do you recognize that?

A    Yes.

Q    What is it?

A    It's my license from 2011.

Q    So that photograph was taken in 2011?

A    Yes.

P000589

Q    Approximately two years before the incident in this case?

A    Yes.

Q    And in that photograph, how would you describe your hairstyle?

MS. MOMPREMIER:  Have we admitted this into evidence?

MS. CEPERO:  Defense would like to introduce into evidence what's previously been marked as Defense Exhibit B.

THE COURT:  Any objection?

MS. MOMPREMIER:  No objection.

THE COURT:  All right.  What's been marked for identification as Exhibit B by defense will be moved into evidence as Defense 2.

(Defendant's Exhibit 2 received in evidence.)

BY MS. CEPERO:

Q    How would you describe your hairstyle in that -- in that photograph?

A    That's an Afro.

Q    Okay.  Now, where were you living around the time of April 2013?

MS. MOMPREMIER:  Objection to relevance.

THE COURT:  What's the relevance?

MS. CEPERO:  It shows where he -- that he wasn't

P000590

in the area where Mr. Gonzalez lived.

THE COURT:  Counsel approach.

(At the bench.)

MS. CEPERO:  We're going to discuss where he lived, where he worked, went to school to show he didn't have time to --

THE COURT:  I mean, that's not really newly-discovered-evidence, right?  So the Court's only able to really consider any newly-discovered evidence and how that would factor into -- did he give this testimony in trial?

MS. CEPERO:  I believe so.

THE COURT:  Then it's part of the trial transcript.  I'm going to sustain the State's objection.

(In open court.)

THE COURT:  That objection is sustained.

BY MS. CEPERO:

Q    Are you familiar with the home located at 1625 Little Falls Circle in Orlando?

A    No.

Q    You ever been to that home?

A    No.

Q    Do you know someone by the name of George Gonzalez?

P000591

A       No.

Q       You ever met him?

MS. MOMPREMIER:  Objection, again, to relevance.
Again, this is all laid out in the trial transcript.

MS. CEPERO:  I'll withdraw the question.

BY MS. CEPERO:

Q       Did you burglarize Mr. Gonzalez's home?

MS. MOMPREMIER:  Objection.  Again, laid out in
the trial transcript.

THE COURT:  Sustained.

MS. CEPERO:  I'll withdraw.

BY MS. CEPERO:

Q       Do you know an individual by the name of Amos
Matthew Ortiz?

A       No.

Q       You don't know him, but are you aware of someone
under that name?

A       Yeah, I know who he is.

Q       How did you learn about him?

A       My girlfriend found him on Facebook after he
passed away.  She just saw his picture all over the
internet.

Q       And what were your thoughts when you saw his
picture?

MS. MOMPREMIER:  Objection to relevance.

P000592

THE COURT:  Response?

MS. CEPERO:  I'll withdraw the question.

I have no further questions.

THE COURT:  Any questions?

MS. MOMPREMIER:  Yes, Your Honor.

CROSS-EXAMINATION

BY MS. MOMPREMIER:

Q   Just one question, Mr. Ramos.  You just demonstrated here in court where you took your hair down, and it kind of just fell down, correct?

A   Yes.

Q   Okay.  Obviously, we don't know if you have done anything to your hair, correct?

A   Sure, yes.

Q   You've got curly, textured hair?

A   Yes.

Q   If you blow it out, it's going to -- it'll look different, correct?

A   Yes.

Q   There's different products that you can put in your hair to make your curls more tighter?

A   My hair's usually the same always.

Q   My question was, you can put product in your hair to make your curls tighter, correct?

A   I can.

P000593

Q   Okay.  And is it safe to say that your hair right there is an Afro in your --

A   Yes, that's natural.

THE COURT:  Hold on.  Don't talk over each other.

MS. MOMPREMIER:  Yes, Your Honor.

THE DEFENDANT:  Sorry.

THE COURT:  Mr. Valle-Ramos, let her finish asking her question, and then you can answer.

Go ahead, Ms. Mompremier.

BY MS. MOMPREMIER:

Q   Your hair in your ID is an Afro, correct?

A   Yes.

Q   And it is not how you hair is today when you just put it down, correct?

A   Correct.

MS. MOMPREMIER:  No further questions.

THE COURT:  Any redirect?

MS. CEPERO:  No, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Valle-Ramos. You may step down.

THE DEFENDANT:  Thank you, sir.

MS. FRYER:  Your Honor, may we have just a moment?

THE COURT:  You may.

MS. FRYER:  Thank you so much.

Ninth Judicial Circuit
Court Reporting Services

P000594

MS. CEPERO:  Defense would call Jasmine Ortiz as their next witness.

JASMINE ORTIZ

was called as a witness and, having first been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURT:  Thank you, ma'am.  Please have a seat.

Good morning.  Please state your first and last name.

THE WITNESS:  Jasmine Ortiz.

THE COURT:  And could you spell your first and last name for the court reporter.

THE WITNESS:  It's J-a-s-m-i-n-e O-r-t-i-z.

THE COURT:  All right.  Now, you're a little soft-spoken, so I'm gonna need you to lean into that microphone and speak up.

Go ahead.

DIRECT EXAMINATION

BY MS. CEPERO:

Q    Good morning, Ms. Ortiz.  Do you know Jorge Valle-Ramos?

A    I do.

Q    And how do you know him?

A    He is my boyfriend.

P000595

Q    And how long have you known him?

A    For ten years now, this month.

Q    And is it fair to say you knew him back in April of 2013 when the incident occurred here?

A    Yes, we were dating.

Q    Do you recall what kind of hairstyle he had?

A    He had a long ponytail.

Q    Did you ever see his hair without a ponytail?

A    Yes.

Q    And what did it look like when you saw that?

A    It was very long.  We used to even joke that it was longer than mine at the time.

Q    Are you aware of a time period when he had a hairstyle that could be characterized as an Afro?

MS. MOMPREMIER:  Objection, Your Honor.  She's attempting to introduce new evidence to the case. This is not part of the newly-discovered evidence, so I would object to her testimony as to this.

THE COURT:  Response?

MS. CEPERO:  If I can have one moment?

This is relevant to the identification issue in this case.  It deals with how he actually appeared at the time versus the photo that was shown in the lineup.

THE COURT:  I'm gonna overrule the objection.

P000596

**BY MS. CEPERO:**

Q    Are you aware of a time when he had a hairstyle that could be characterized as an Afro?

A    It was before I ever met him.

Q    Do you recall the day that Mr. Valle-Ramos was arrested?

A    Yes.  I was actually present.

Q    Were you surprised?

MS. MOMPREMIER:  Objection, Your Honor, to relevance.

THE COURT:  What's the relevance?

MS. CEPERO:  It's related to the later investigation that she did in this case in locating Mr. Ortiz.

THE COURT:  All right.  Overruled.

**BY MS. CEPERO:**

Q    How did you feel when that arrest occurred?

A    I could tell something was wrong just by his reaction and the look on this face.  He looked completely shocked.

MS. MOMPREMIER:  Objection, Your Honor, to her impression of his reaction.

THE COURT:  What's the grounds for the objection?

MS. MOMPREMIER:  Speculation.

THE COURT:  Overruled.

P000597

**BY MS. CEPERO:**

Q    So you were surprised based on his reaction?

A    Extremely surprised.

Q    Did you attend his trial?

A    I did.  I did the second day.

Q    So you're familiar with the evidence in the case that came out at trial?

A    Yes, ma'am.

Q    Based on your knowledge and understanding of the evidence, were you surprised when he was convicted?

A    I was more than surprised.

Q    And have you maintained a relationship with Jorge Valle-Ramos since all this happened?

A    We still dated throughout the whole time he was incarcerated and been together since.

Q    You're not in law enforcement, right?

A    No.

Q    You have no law enforcement experience?

A    No.  I'm a registered nurse.

Q    But is it fair to say that you're pretty savvy with a computer in terms of online research?

A    Yeah, I would say I'm pretty techy.  I'm good with technology.

Q    So in this case, you engaged in your own research after he was convicted?

P000598

A    I would say it found me.  The research found me.

Q    What do you mean by that?

A    I was scrolling through Facebook one day, and that's when I noticed a photo of Mr. Amos Ortiz.  And I saw how similar both the photos looked that got Jorge convicted and the photo that was being used to represent Amos Ortiz.

Q    Okay.  And in the course of your investigation, did you come across any newspaper articles about Mr. Ortiz?

A    Yes.  It appeared that he was murdered, and they called him homeless as well.  That's all I had at the time.

Q    I'm going to show you what's previously been marked as Defense Exhibit C.  Take a look at that.

Do you recognize that document?  And take your time.

A    Yes.  This is the Orlando Sentinel article where I saw this photo.

Q    Okay.  Does it fairly and accurately represent the article that you learned about Mr. Ortiz from?

A    Yes.

Q    Does that article include a picture of Mr. Ortiz?

A    Yes.

MS. CEPERO:  The defense would move to have Defense Exhibit C entered into evidence.

THE COURT:  Any objection?

MS. MOMPREMIER:  Yes, Your Honor.  I'm objecting

P000599

to relevance and hearsay, particularly to the written portion of that document. I believe that -- I have no objection to the photograph that's included in that being admitted. It's the photograph she saw. But everything else about the article, I would absolutely object to.

THE COURT: May I please see the document?

MS. CEPERO: Yes.

THE COURT: So, State, your objection is with regards to -- so this is -- the photograph is page 2 of the article. Your objection is to all of the other pages?

MS. MOMPREMIER: Yes, Your Honor.

THE COURT: And, defense, what is your response?

MS. CEPERO: If we may have a moment?

THE COURT: You may.

MS. CEPERO: Your Honor, we'd agree just having the photograph entered into evidence.

THE COURT: Why don't you conform the exhibit, remove the other pages, and then have the clerk place the tag on page 2.

MS. CEPERO: And we would move to have that photograph entered into evidence.

MS. MOMPREMIER: No objection to the photograph.

THE COURT: All right. In its current version,

P000600

State having no objection, the Court will move what's been marked -- is that Exhibit C?

**MS. CEPERO:** Yes.

**THE COURT:** Will be moved into evidence, what's been marked as Exhibit C, Defense's 3.

(Defendant's Exhibit 3 received in evidence.)

**BY MS. CEPERO:**

Q    Mr. Ortiz, when you saw this photograph of Amos Ortiz, what were your thoughts?

A    My heart just sank immediately to my stomach, and I screenshotted the photo.

Q    Why did your heart sink?

A    They just looked so similar, and I knew the photo that got Jorge convicted was very similar to the photo of Amos.

Q    So what steps did you take after seeing this photograph?

A    So after taking the screenshot, I put both Jorge's license photo and his photo side by side, and I began to research Amos on the Orange County Clerk of Courts, and that's where I found conviction records, arrest records. And I even tried looking into the murder case as well, but couldn't find much.

Q    Okay. Did you find any information about where Mr. Ortiz lived or where he was arrested?

P000601

A    Yes.  So according to the --

MS. MOMPREMIER:  Objection.  Hearsay.

THE COURT:  Response?

MS. CEPERO:  It's not for the truth of the matter asserted that he actually lived at those particular addresses, but just showing that he frequented the area.

THE COURT:  Any other objections?

MS. MOMPREMIER:  It seems like that's exactly what they're trying to admit it for, the truth of the matter asserted that he lived at that address.  And I'd also object to lack of foundation, and there's some certified documentation presented to overcome those authentication issues, or the origin of it.

THE COURT:  All right.  Sustained.

BY MS. CEPERO:

Q    So did you learn about where he was living at the time?

A    Yes.

MS. MOMPREMIER:  Objection on the same basis.

THE COURT:  Sustained.

MS. CEPERO:  I have no further questions.

THE COURT:  All right.  State, any cross?

MS. MOMPREMIER:  No questions, Your Honor.

THE COURT:  Thank you, ma'am.  You may step down.

P000602

MS. FRYER: Your Honor, may we take a quick bathroom break?

THE COURT: Sure. So we're gonna take a ten-minute recess.

And, defense, who are you gonna be calling next?

MS. FRYER: We're going to be calling Dr. Cahill.

THE COURT: Okay. We'll be in recess until 10:37.

MS. FRYER: Thank you so much, Your Honor.

(Recess from 10:24 a.m. to 10:34 a.m.)

THE COURT: All right. Defense, ready to proceed?

MS. CEPERO: Yes, Your Honor.

MS. FRYER: Next witness is Dr. Cahill.

THE COURT: State, are you ready to proceed?

MS. MOMPREMIER: Yes, Your Honor.

THE COURT: Let's call in Dr. Cahill.

**BRIAN CAHILL, Ph.D.**

**was called as a witness and, having first been duly sworn, testified as follows:**

THE WITNESS: Yes.

THE COURT: Good morning, sir. Please be seated.

And could you please state your first and last name for the record.

THE WITNESS: Brian Cahill. C-a-h-i-l-l.

P000603

THE COURT:  Thank you.

Ms. Fryer, you may inquire.

**DIRECT EXAMINATION**

**BY MS. FRYER:**

Q    Dr. Cahill, can you please tell us about your education?

A    I am a forensic psychologist.  I got my bachelor's degree in psychology at Illinois State University and then a master's in experimental psychology and then a doctorate in legal psychology.

Q    Do you hold any academic positions?

A    I do.  I'm an associate instructional professor at the University of Florida.

Q    What do you teach?

A    I teach legal psychology, cognitive psychology, and research methods, typically.

Q    Related to witness identification, do you have any scholarly activity?

A    I do.

Q    And has any of that been subject to the peer-review process?

A    Yes, it has.

Q    Can you share with us the journal article -- well, first, let's talk about the peer-review process.  Can you explain for the Court and for the record what that is?

P000604

A    Yes.  So basically peer-review is a way to ensure that the research that's getting published is methologically [sic] sound, is valid science.  So when you submit an article to a journal, my peers, who are experts in the area, review the article, look at the methodology and the claims I'm making in the article, and give me feedback, and either approve or disapprove of it.  And if they approve it, it gets published.

Q    And how many articles have you -- have withstood that rigor that you've contributed to?

A    About nine or ten, or something like that.

Q    Okay.  How many of those are related to witness ID?

A    Two of them.

Q    Have you participated in any conference presentations related to misidentification issues?

A    I do regularly, yes.

Q    And for who?  Where -- where -- where does that occur?

A    Usually at what's called the American Psychology-Law Society, which is my area's main body of research.

Q    Have you contributed to any book chapters?

A    I have.  One book chapter on how to properly interview witnesses.

P000605

Q    Okay.  And -- and your -- what university are you currently with?

A    University of Florida.

Q    And have you -- you're at University of Florida, you teach, but have you done any -- have you ever been retained privately?

A    Yes, I have.

Q    Okay.  By who?

A    I work for public defenders, private attorneys, Justice Administration Commission.

Q    Have you ever given any instruction on proper methodology for witness identification?

A    I have.  I've trained Gainesville Police Department in that method.  I have also trained the Federal Public Defender's Office in Tallahassee, and a few other defense attorney organizations.

Q    Have you ever testified as an expert on misidentification?

A    I have.  I believe today -- including today would be my fifth time testifying in front of a judge or jury.

Q    And do you take every case where people make attempts to retain you?

A    I do not.  My main profession is a professor, so I have the liberty to turn down cases that I do not deem that I can add value to in my testimony.

P000606

Q    Is it fair to say that with the training, education, knowledge, scholarly work, that you have the background and experience to testify on identification issues in criminal cases?

A    Yes, I would.

Q    Have you testified on this issue previously?

A    On what issue?  I'm sorry.

Q    I'm sorry.  Misidentification issues.

A    Yes, I have.

Q    And is that the five times?

A    Yes.

Q    Okay.  So, generally speaking, based on your clinical experience, what factors affect eyewitness memory and facial recognition?

MS. MOMPREMIER:  Your Honor, I'm gonna object at this time to this witness' testimony as relevance for this particular case.

State would argue that the law clearly dictates the standards that the Court and what a jury would ultimately rely on in terms of in-court identifications, so that's the basis for it.  I believe that the law covers that and that this witness can't speak directly to why Ms. Szewczyk -- what may or may not have affected her testimony.  She testified to that on her own.

P000607

At this point, his testimony would be speculation as to her.  So there is no other relevance to bring this testimony, but to infer that these things that he's gonna talk about affected her ability, and she's already concretely testified to what affected her and what did not affect her.

THE COURT:  Defense, response?

MS. FRYER:  Your Honor, I -- I have law on this issue.

Two things:  I think that it -- it was a relevancy objection in there?

THE COURT:  Relevance and calls for speculation.

MS. FRYER:  And calls for speculation.

Expert testimony on misidentification is not just admissible.  People think they know what they know about this subject.  But the truth of the matter -- and that is why it's so powerful and correlated so strongly with wrongful convictions.

But misidentification not only helps the trier of fact, any finder of fact, because it is technical information.  But Ms. Szewczyk, as she sat on the stand, the State absolutely eviscerated her as if she had committed perjury, knowingly mistestified, knowingly given false evidence.  And what this witness will be able do is say, no, everyone can be

conditioned in a misidentification case.  It wasn't purposeful.  She meant no ill will.  She just got it wrong and realized she was mistaken.

**MS. MOMPREMIER:**  So, Your Honor, I think that goes to my point.  For -- just for clarity sake too, I also added, just for the legal standard, that the law tells what the legal standard is, not what an expert's impression of what they believe is the right or the wrong way in order to conduct a case.

And, again, she's admitting to what is said, that she's using this as an inference that what he's saying is what Ms. Szewczyk believed.  And, again, that's speculation.  She, again, already testified to why she believed what she believed.  If we were --

**THE COURT:**  But is it speculation if it's an expert giving that testimony?

**MS. MOMPREMIER:**  Because, ultimately, I believe that the law covers it, and she's already testified to it.  He can't say -- he doesn't -- she hasn't laid out that he personally knows Ms. Szewczyk, that he's reviewed this case, that he's reviewed the facts of this case, that he's spoken with her.  And, again, it would be, in part, based off of hearsay for her.  He's not trained in order to speak in regards to her.

Furthermore, I would argue that the law already

P000609

covers if misidentification was proper or not.  It's in case law, it's in jury instructions, and, ultimately, for the Court.  It's what Ms. Szewczyk's impression was, not --

THE COURT:  Well, I mean, whether or not -- look, this is not an ineffective assistance claim.  This is not a failure to investigate claim.  This is merely newly-discovered evidence.  The Court is tasked with the obligation to determine whether or not that recantation is reliable, whether it's, I guess, truthful.

And so one of the things that the defense is setting forth is an expert who will testify how both of these statements can be reconciled given the science; that there's a statement that's made at the time of trial, there's a statement being made now, and both of those things the witness could have believed to be true.

So, again, I want to see the case, Ms. Fryer, that you're relying on, but I think that's essentially the argument.

MS. FRYER:  May I approach?

THE COURT:  You may.

MS. FRYER:  Thank you.

May I approach, Your Honor?  I have a second case

P000610

as well.

THE COURT: You may.

MS. FRYER: Thank you.

THE COURT: All right. State, I'll give you a couple minutes, but when you're ready to make any additional argument based on the cases, I'll allow you to do so. And then, defense, you can respond.

(Pause.)

MS. MOMPREMIER: Your Honor, I'm ready.

THE COURT: All right. Go ahead.

MS. MOMPREMIER: Your Honor, again, it's just a general argument. For example, looking at *Blasdell v. State*, it says in the case notes, "The party offering it must prove by clear and convincing evidence that it is sufficiently reliable and that it is relevant in the instance that it will help the jury reach an accurate result."

And then referring to *Jones v. State*, 197 So.3d 1085, it speaks that, ultimately, even in that case, the Court found that it -- Your Honor, we would just argue on the basic principle that the law does cover what the Court would look at in terms of weighing credibility. I do not believe that this witness can offer anything that the law does not already cover. And the witness herself has spoken specifically to why

P000611

she made the decision that she made.  Ultimately, his testimony would just be cumulative and speculation as to why she made the impression that she did.

**THE COURT:**  Okay.  And, defense, your response?

**MS. FRYER:**  Yes, Your Honor.  Thank you so much.

The *Jones* case we'll point to -- in this case, it was an abuse of discretion to exclude testimony exactly like this because it is outside the common understanding and requires an expert to testify.  In this case, it wasn't seen -- it was -- it was harmless, because the individual -- there was a confession, unlike here.  There was other evidence of guilt in that case.  And here, all we have is a misidentification.

So the Court's acknowledged that this is outside the general understanding of laypeople.  And, as such, it's abuse to -- to not include it.  And in this case it's vital.  I mean, it just is.

So this is exactly where Mr. Valle-Ramos ended up last time.  I'll just show you this picture.  You'll see it's the only one with the Afro, and then you'll see that I was -- I didn't have an Afro, and then we'll all get where we need to go.

But those identifications are just so powerful. I suspect the State's going to have at least two other

P000612

witnesses show up and say that's the guy, and we still believe it. And so what we need to do is establish that this is how you get an unreliable result and why and how and what the science says and what the research is on it. So we'd ask not only is it admissible, it's vital.

**THE COURT:** My concern is that this is not a retrial. And, again, no claims have been made with regards to the failure to hire an expert at the time of trial. And -- but there is a general concern that this newly-discovered evidence does raise questions with regards to what the thrust of this information -- how that would have impacted a trial; specifically the fact that the witness -- an eyewitness -- a disinterested eyewitness -- one who is neither the victim nor related to the defendant -- has basically recanted their testimony, has been cross-examined extensively with regards to their reliability of their current testimony as compared with their former testimony.

And so based on that issue -- again, if this were a trial, I would have the expert proffer their testimony. The Court can make a decision as to what weight to give this expert testimony. That's what the Court is tasked with. If I don't think that it's

P000613

reliable or that it has any bearing on what the Court's heard at this point, I'll set it aside or give it the appropriator weight.

But at this point, I'm going to overrule the defense's [sic] objection. I think it goes to the heart of the issue, which is the reliability of the recantation and how those statements can be reconciled; prior trial testimony as compared with the testimony that's been presented in this hearing.

All right. So, Ms. Fryer, you may continue you inquiry.

**MS. FRYER:** Thank you, Your Honor.

**BY MS. FRYER:**

**Q** Based on your clinical experience, your training, your research, what are the attributes and conditions of a reliable photo array lineup? And can you define "photo array lineup"?

**A** So a photo array would be a set of pictures. It varies from jurisdictions. But, generally, in the U.S., it's a six -- six-person photograph picture lineup. It can be simultaneous or sequential. Simultaneous, they're all viewed at once, sequential is they're viewed one at a time.

**COURT REPORTER:** I need you to please slow down.

**THE WITNESS:** I'm sorry. I'm a professor. I talk fast.

P000614

The -- a sequential lineup is they show them one picture at a time.  But in the state of Florida, we typically do a simultaneous lineup.

BY MS. FRYER:

Q    And what are the attributes of a reliable photo lineup, based on your training and experience?

A    So currently there's certain factors that we would call "pristine conditions" in my field to draw the most reliable conclusions from a lineup.  We have nine recommendations for these, but I'm just gonna talk about five of these pristine conditions as they relate to confidence and the ability to draw -- whether the confidence that the witness makes is indicative of their accuracy at the time of the identification.

And those five are:  There's a single suspect in the lineup; that the lineup is a fair lineup; that the suspect does not stand out unduly amongst the other fillers; that the lineup was presented in a double-blind fashion, which means in line with current state law; that the administrator of the lineup does not know who the suspect is while they're administering in.  There are ways around that too, but that's the basic premise of that. Confidence is measured immediately following the identification.  And I'm missing one.  Oh, unbiased lineup instructions.  So before the witness views the lineup, they

P000615

should be told, at a bare minimum, that the person may or not be present in the lineup, and it is okay to say not there. I believe that's -- I believe I covered all five.

Q    You did. Thank you.

So we're here on the State of Florida vs. Mr. Jorge Valle-Ramos. In preparing for your testimony today, what materials did you review?

A    I reviewed depositions of the three witnesses; the two eyewitnesses in particular. I reviewed the deposition of the detective in the case. I reviewed trial transcripts. And I reviewed the two lineups that were presented to the two eyewitnesses, and a license photo of the defendant, of Mr. Ramos.

MS. FRYER: May I approach, Your Honor?

THE COURT: You may.

BY MS. FRYER:

Q    Can you see that, Doctor?

A    Yes, I can.

Q    This is one of the items you viewed, correct?

A    Correct.

Q    And from a clinical perspective, what, if anything, stood out to you in this photo array lineup?

A    This is a very poorly constructed lineup. There's only one individual in this lineup that remotely fits the description provided by the witnesses; the main

P000616

attribute being an Afro.  And both witnesses mentioned this in their report, in their depositions, and statements when they said, I picked the person out because he had -- he had the Afro.

So they're telling you in their own words the attribute they're looking for in this lineup.  And the fact that no one else in this lineup has an Afro makes this test of the likely guilt or innocence of this person immaterial.

What I mean by that is, the purpose of a lineup is the police have a hypothesis that the suspect is the guilty party.  In order to test that hypothesis appropriately, we need to set up a methological [sic] test for it, an experiment.  All right?  To gather good information from that experiment, it needs to be a sound experiment.  It needs to have those five things, at least, that I talked about.  All right, Your Honor?

If you do those five things and things are proper and the witness has good encoding conditions and everything, there's nothing wrong with witness reliability.  They can be perfectly reliable.  However, if you violate any of those things I talked about, and other things too, you do not learn anything from that identification.  In other words, when the witnesses identified Mr. Ramos from this photographic lineup, the police should not have increased their likelihood that he is the guilty party.

They should not have gained any information from this lineup because it's so poor.

Q    Is it fair to call it unreliable?

A    Yes.  And not just because of the construction of the lineup, but other factors present in the case as well. In the totality, in my expert opinion, of the circumstances --

**BY MS. FRYER:**

Q    Well, hold on, hold on.  Let's talk about those factors, Doctor, if you don't mind.  What other factors did you take into consideration in forming your opinion today?

A    So one other major factor -- and this gets into some math, so I apologize for those in the court that don't want a lecture on math.

But there's something called "Bayes' Theorem," which has been around for about 200 years.  When you calculate the posterior probability, the likelihood of an event occurring, you can account for that likelihood based upon two factors:  The base rate, how often that event occurs in the population, and the likelihood ratio, which is the information you gather after you know the base rate. All right?

When you have low base rates, you learn nothing from positive identifications.  In other words -- I can get into all the math of it if Your Honor wants me too, but,

P000618

basically, when the witness identifies X person from the lineup and makes a positive identification when there's an extremely low base rate to begin with, the posterior probability is not affected much at all from that identification. We don't learn much from that ID.

If the base rate is high, we learn a lot from the identification. It increases a lot of our likelihood that that person is, in fact, guilty. And if the witness rejects the lineup, it decreases the likelihood that that person is guilty. But when you have such a low base rate to begin with, you don't really change your posterior probability at all because of that.

And, indeed, this is so important. This is one of our new recommendations for the field of eyewitness, that we should have a priori suspicion before adding someone to a lineup. Just like we have probable cause to search somebody or reasonable doubt to find someone guilty, there should be some kind of evidence, other than fitting a vague description of a Hispanic male with an Afro in the City of Orlando where there's thousands of people that fit that description, to be placed into a lineup. That's number one.

I can keep going if you don't have a follow-up question.

Q    I'll -- I'll -- I'll ask some more questions, but

P000619

we'll get back to it, because the math --

A    Yeah.

Q    I had to take a minute there.

Doctor, are there established error rates when you see a lineup like this that appears to be overly suggestive?

A    There are.  So, generally speaking, some estimates across a large sample of studies in my field estimate the false ID error rate around 13 percent.  So around 13 percent of witnesses who are shown a lineup with a culprit who's not in the lineup, pick that person, make a false ID 13 percent of the time.

When the lineup is biased, like it is in this case, that false ID rate goes up to 35 percent.  It's huge.  That's 35 people out of a hundred that we're sending to jail because they've been wrongfully identified.  And other things will -- will vary that.

The base rate that I just talked about, lowering base rate, increases that.  So I can show it mathematically to you.  But, basically, when you have a low base rate and a biased lineup and not double-blind and all these other factors that I've discussed, this rate of a false ID, the chances of this happening increases dramatically.

Q    Thank you, Doctor.

So, just generally, what, if any, effects does a

P000620

brief duration exposure to an individual by a witness have on the reliability of a later identification?

A   Sure.  So this is one of the most basic findings we have from memory literature from over a hundred years ago.  Briefer exposure equals poorer memory accuracy, simply put.

Q   And if -- if there's -- if there is an item, something that you wouldn't expect to necessarily see, would that -- like a blue rubber glove on an individual, would that impact reliability in terms of identification?

A   Generally speaking, more distinctive items are better recalled than less distinctive items.  There is some research to suggest --

Am I going slow enough for you now?

COURT REPORTER:  Yes, thank you.

THE WITNESS:  Okay.  I'm trying.

There is some research to suggest that witness descriptions, when they leave out distinctive characteristics, are less accurate at the time of identification than they are -- than are witnesses who give -- who include those distinctive characteristics.

For instance, if the suspect has a huge tattoo sleeve on their arm and the witness doesn't mention that, their identifications tend to be less accurate. But just general mismatches in description, there is

P000621

no relationship between identification accuracy.

**BY MS. FRYER:**

Q    Do the conditions under which the initial contact between the witness and the identified subject have an effect on the reliability?

A    Can you be more specific?

Q    Yeah.  I guess, does stress play a role in reliability -- witness identification?

A    Yes, it does.  Stress is a complicated variable in its effect on memory.  Simply put, you can kind of think of stress -- there's two components to stress.  There's cognitive stress; my thoughts about what's going on.  And then there's a physiological response my body has to being in a stressful situation.

And what we find is that as cognitive stress increases, we will see an increase in memory as physiological stress increases.  So we see better memory up to a point.  We call it the "catastrophic drop-off point." Once physiological stress and cognitive stress reach a plateau and they both are extremely high, we see a catastrophic drop off in not only memory for the witnessing events -- so details around the event -- we see a drop off in identification accuracy as well.

Q    What, if any, effects are presented on reliability when you have people that are previously

P000622

strangers to each other?  Does that have --

A    Sure.  So the more -- when you're familiar with folks, you're gonna be better at recognizing than when you're not familiar.  Stranger identifications are harder.

Q    Is there any impact between the initial viewing of an individual and the duration of time between when they're presented with a lineup?

A    Yeah.  This is really interesting, actually.  So, typically, what we find is within a week period, we see no drop off in accuracy.  After a week, so after seven days, we see a significant drop off in accuracy, but it plateaus out.  So it doesn't matter whether it's six months later or a year, it's that week mark.  We're really looking for -- we want identifications to be done within that first week. If they're after that week, we see a drop off in accuracy.

Q    If there are multiple individuals involved in an eyewitness scenario in terms of being the perpetrators, does having multiple people involved have any effect on later reliable identification?

A    Sure.  So there's research that shows that when there's multiple perpetrators involved, identification accuracy of those perpetrators is worse later on.

Q    Let's say, for instance, an individual chooses the only guy with the Afro and is later told, you got the right -- that's right, does that have any effect on later

P000623

identifications?

**A**     So it would -- it would -- it would increase their likelihood, in my opinion, of staying with that choice.  What she's talking about is post-ID feedback, which is very bad.  We do not want that and we don't like it.  Most of the impact we care about, in terms of my ideas -- or in terms of my field is that accuracy is one of the few things that we, as triers of the fact, can use to infer accuracy.  It's one of the things that we can gather as the criminal justice system and say, how accurate were you.

And if you're highly accurate, if you do those five pristine things I talked about earlier, Your Honor, and the witness has good encoding conditions and all that stuff, if witnesses are 90 percent or more accurate -- or 90 percent more confident, they're typically accurate.  We can trust their identification.

However, when we violate any of those things, accuracy no longer post -- sticks at all.  So giving post-ID feedback before measuring confidence is not good, because it ruins our ability to gather that very valuable piece of evidence, to infer whether or not that witness was accurate or not.  And even more so, the problem is that -- and I think this gets to an important point, so bear with me.  Witnesses who make false identifications are not

P000624

lying.  They honestly believe that that was the person that they saw commit the crime, right?

This is why it's hard that a lot of the safeguards that we have as a system don't pick them up because they're not able to be called out on cross-examination, 'cause they believe that's the guy.  I know it is.  He's the guy that was robbing me, or he's the guy that raped me, or whatever the case may be.  But it can happen that they can make that wrongful identification and then not know that it's in error and be completely convinced that it is an accurate memory.

Q    You use the term "encoding."  If you're exposed to a picture, what does encoding mean thereafter?

A    So encoding -- there's three stages of memory: Encoding, storage, and retrieval.  Encoding is the stage where you bring in the information and put it into your brain, basically.  So the event, the criminal event, would be the encoding stage of it.  Showing them the lineup would be the retrieval stage of it and so forth.  And errors can happen at any one of these stages.

Q    If there's a later court -- in-court identification in a witness ID scenario, is it fair to say that the lineup itself is the memory of the individual? Does that make sense?

A    Yeah.  So you learn nothing from in-court

P000625

identifications.  They tell you nothing regarding my hypothesis that this person is a guilty party, and I'm gonna test that by having the witness point to the person who is sitting at the defense table.

Q    And, excuse me, Doctor, is that under this scenario where you've had an overly suggestive lineup?

A    It doesn't matter whether the lineup's suggestive or not.  In general, an in-court identification doesn't do anything additive to what the original lineup identification already told us.

Q    Is that because it's not an independent occurrence?  It's --

A    Correct.

Q    -- predicated on previous --

A    Correct.

Q    Okay.

COURT REPORTER:  Please try not to talk over each other.

THE WITNESS:  I'm sorry.  I get excited.

MS. FRYER:  I do too.

THE WITNESS:  So there's something that generally people think is a truism across all science, that test-retest is a good thing in any situation.  It is a foundational element of most science.  But in this specific instance --

P000626

**MS. MOMPREMIER:** Your Honor, I'm gonna object at this point to the testimony. Ms. -- forgive me if I'm mispronouncing her name -- Ms. Szewczyk's testimony was not that she was confident in her ID. Her testimony today was not that she was confident in her ID in the photo lineup and confident in her ID at trial, and only after did she have hesitancy. Her testimony was, I had doubts of the photo lineup. I had doubts at trial. He is testifying about a witness who --

**THE COURT:** What's the objection?

**MS. MOMPREMIER:** I would object to relevance at this point. The factual basis the testimony's provided is not for the witness that we have before you. It is for a different witness. And it's not for a witness who had doubts. It is for a witness who was certain, certain, and then later became uncertain.

**THE COURT:** Okay. Response?

**MS. FRYER:** Thank you, Your Honor.

What Ms. Szewczyk testified to was that when she testified, she told the truth. She had her doubts, but those were overcome by the scenario that he just described. The -- the confirmation bias that came later, the -- being subject to it again, the encoding that happens when you're making -- so her ultimate

P000627

testimony, I think the record's gonna reflect, is she ultimately said she testified truthfully. She had her doubts, but those were overcome by the confirmation that she got.

THE COURT: All right. Overruled.

BY MS. FRYER:

Q   Ultimately, Doctor, based on your training and experience, are you able to state whether the lineup in this matter is reliable?

A   In my expert opinion, this is not a reliable lineup.

MS. FRYER: I don't have any further questions right now.

THE COURT: Cross-examination?

MS. MOMPREMIER: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. MOMPREMIER:

Q   I'm sorry. I didn't catch your first name. How do you spell it?

A   Brian, B-r-i-a-n.

Q   Your last name?

A   C-a-h-i-l-l, Cahill.

Q   Dr. Cahill, so one of the things that I wanted to talk about for your testimony, you stated that in-court testimony is unreliable?

P000628

A     No.  I said in-court identifications don't provide any value above what we've already learned from the original identification.

Q     Okay.  Would you agree with me there might be a situation where a witness could make an out-of-court ID and then later change their mind in court when they actually see the person?

A     It's possible, yes.

Q     Okay.  So that would make it valuable for the analysis of whether the person being charged is the correct person, correct?

A     I would say no.  The in-court identification doesn't tell us anything more than what we already learned from the original identification.

Q     Even if it's different than their out-of-court identification?

A     Yes.  I would not put any bearing on the in-court identification.

Q     Let me ask you this:  So in a situation where you have, as you've described -- your testimony is you believe that Ms. Szewczyk's testimony at court, in terms of her identification, is unreliable, correct?

A     I would say yes.

Q     And that was based off of having -- being presented with six different photographs, correct?

P000629

A    That's based upon --

Q    I mean, in part, that's one of the --

A    In part.  It's the construction of the lineup. Not being presented with six photographs, but the type of photographs she was presented with.

Q    Okay.  And is it your belief that in order to determine an identification correctly, you should present multiple photographs to somebody?

A    You need to be clearer with that.  I'm sorry.  Do you mean of a suspect?

Q    Yes.

A    Generally, no.  There's a little bit of research showing that if you show multiple photographs of everybody in the lineup -- you can't just do it for one, because that's -- that's biased.  That's leading them to pick that person.  There's a little bit of research showing that, but not enough for me to want to testify about that in court.

Q    Okay.  Well, for example, if, according to you, the participants look more closely alike, the photographs were clear, they were crisp, that would be a more reliable photographic lineup, right?

A    So I think we're talking about two different things.  In order for a lineup to be fair, you simply need for the suspect not to stand out compared to the fillers in the lineup.

P000630

Q    Okay.

A    It would be better -- if I was training police officers, I would tell them to use the most recent photo that you have of the suspect which matches what they look like, what they tried to look like at the time of the crime. Because the better match we have, the better recall experience you're gonna have.

Q    Okay. But even still, my point is, do you think you should show just one photograph or more than one? 'Cause one would be biased, correct?

A    You mean a show up?

Q    Yes. If you're --

A    So a show up, I would recommend that we do not do show ups.

Q    No, no. For a photographic lineup -- we're talking about this. Okay?

A    Uh-huh.

Q    Someone's showing -- you would agree if the detective just showed that person one photograph, that would be biased?

A    But that's -- that's my point. If you show them one photograph, that's --

Q    Can you just answer my question, yes or no?

MS. FRYER:  I'm sorry, Your Honor. This is getting argumentative. It's not necessary.

P000631

MS. MOMPREMIER:  I would object to nonresponsive. He's not answering my question.

THE COURT:  Well, he hasn't had an opportunity. There was an objection.

I'm gonna just ask the question, because I'm trying to make sure I'm understanding it.

So are you asking the witness if a photo lineup that only had one photograph would be a biased lineup?

MS. MOMPREMIER:  Correct.

THE COURT:  Okay.  Can you answer that question?

THE WITNESS:  So I would say that's not a lineup. That's called a show up.  And a show up is biased in other ways.  It can't be biased like a lineup can, 'cause there's only one photo.  So you can't -- if -- like, for instance, here, only one person has an Afro. If you took away all the other five pictures and just showed that one picture, his picture can't stand out to the other pictures because there's no other pictures.  So the context is removed, so you can't call it bias.

I can elaborate on why we don't like show ups. And what you're particularly proposing is a really bad procedure called a photographic show up, which should never be used.  But if you're meaning should we show one photograph of each person in the lineup, that's

P000632

fine.  If you want to just show six photos, one of suspect surrounded by five fillers who are known innocents, who all resemble each other so no one stands out, I have no problem with that lineup.

BY MS. MOMPREMIER:

Q    My question is, if a detective showed an individual just one photograph and that photograph being the suspect that they believe committed the crime --

A    Okay.

Q    -- you would agree with me that that would be biased, correct?

A    No.  You would not get diagnostic information from that because -- I can elaborate on that, if you want. But we don't recommend show ups.  What you're proposing is a show up.

Q    Okay.  So I'm not -- I think you're getting stuck on the technical terms.  And I'm just asking, you have a photograph of a suspect, and I go up to the victim and I say, is this the person who did it, would you agree with me that that would be biased?

A    No, not necessarily.  I would agree that you don't get good information from that lineup procedure.

Q    So looking back at the five different standards that you gave, it prevents you, for example, from having an opportunity to have multiple people so that person doesn't

P000633

stand out, correct?

A   I'm sorry.  I don't understand the question.

Q   Well, if I only showed you one photograph, there's no one else to be a filler -- those fillers are there for a reason, correct?

A   They are there for good reason, yes.

Q   And, in general, in the state of Florida -- do you agree with the state of Florida's approach that having six individuals in a lineup is a good method?

A   Yes.  That is a good method if they match each other and it's a fair lineup.  Yes.

Q   Okay.  Do you think if I only showed two photographs that that would be reliable?

A   Again, I -- I -- it's -- you're not gonna get good information from it.  Would you like me to elaborate on why the show ups are not good versus lineups?

Q   So just to be clear, you'd agree with me that showing just two photographs would not be a good practice?

A   It's not good practice, yes.

Q   And why is that not?

A   Because when you show a lineup versus a show up, right, you actually get more choosing from a lineup, more witnesses will choose.  But the thing about the fillers is they suck away a bunch of those choices.  So instead of all the choices landing on the suspect, in a show up, they all

P000634

land on him or her.  So it's a correct ID or a false ID, right?

So back to that base rate idea.  If we have a low base rate, every choice is gonna be a false ID.  If we have a high base rate, every choice will be a correct ID, right?

In a lineup, a bunch of those choices get sucked off into the fillers.  It's called "filler syphoning."  So we see more suspect identifiers in a show up, but they're less accurate because a bunch of those are false identifications.

So the diagnosticity of a lineup gives you more information compared to a show up, which is why we recommend those.  However, we do say in our recommendations -- best practices that there are times when police need to do a show up because we understand certain circumstances surrounding a criminal activity.  So when they do a show up, they need to do it in the least biased way possible following other procedures.

Q   So you would agree with me that the information that you give someone before you do -- you do a photographic lineup, it's important?

A   Very important, yes.

Q   Okay.  And not doing anything to suggest one person over another is important?

A   Yes.  That would be unbiased lineup instructions,

P000635

and that's also why we recommend double-blind lineups so that the administrator can't unintentionally or intentionally influence the witness in any way.

Q    Okay.  So telling somebody that you think that they may have made the wrong decision before you show them those photographs would not -- would weigh heavily to discrediting identification?

A    Well, I don't think you would tell somebody before you showed them the photos that they made the wrong decision, because they haven't had a chance to make the decision yet.  But if you're showing them the lineup and they choose one and then you tell them that's the wrong choice, that's a really bad procedure.  Yes.

Q    Okay.  Do you think showing a witness two photographs of individuals side by side is good practice?

A    No.

Q    Why not?

A    Again, back to the filler syphoning.  The more photos you have in a lineup, to a point, the more protection it gives to innocent persons in that lineup.

Q    Okay.  And in this situation for Ms. Szewczyk, given that she's already -- well, let me ask you this:  So when someone's already made an ID and then they later identify somebody else, what's the science related to that?  Is there a term for that?

P000636

A    There is something called a "blind lineup procedure," which might be something relevant.  Typically speaking, though, I would say when a witness makes different decisions of any kind, whether it's an identification or they're changing their story and contradicting one another, the contradiction in and of itself tells us that there's inconsistency, 'cause only one of them can be correct.

Q    Is there a statistic for the reliability of a later identification?

A    So in a double -- sorry, in a blind lineup procedure, or blank -- sorry, a blank lineup procedure --

Q    Can you clarify that term?

A    Yeah, yeah.  I'm gonna define it right now.  So --

Q    How do you -- no.  Please answer my question.  How do you define that term?

A    I'm going to answer that right now.

THE COURT:  Let's stop for one moment.

Counsel, you can't ask a question, and then when the witness is answering the question, ask them another question.

MS. MOMPREMIER:  Yes, Your Honor.

THE COURT:  So let him answer the first question, and then you can ask him any follow up.  So we're

P000637

gonna start back over.

Counsel, ask your first question.

**BY MS. MOMPREMIER:**

Q    Can you define that term, the blank --

A    Blank lineup?

Q    Yes.

A    So a blank lineup procedure is when we give a witness -- an eyewitness a lineup where the perpetrator is not -- the suspect, sorry, is not in the lineup.  And then we basically see whether the witness is gonna choose from that lineup.  It's a way to -- to filter out crappy witnesses.  'Cause if you choose from that lineup, then you're telling us that you're not a good witness.  So what we show is that people who choose from the blank lineup and if they later choose from the real lineup, they are less accurate than the witnesses who reject the original lineup and choose from the later lineup, basically.

Q    Are you saying that the blank lineup is the process you should use when a witness has already made an identification?

A    So there's not enough research for us to make that as a recommendation.  I think that it would show up enough in research.  The problem with it, logistically, is that once witnesses catch on to the idea that we always show them a fake lineup beforehand, the utility of it goes

P000638

away.  So it wouldn't really work in the real world.

Q    Okay.  But my question specifically -- let me ask you this:  If a witness has already made an identification and we want to potentially show them someone else -- first of all, do you even recommend doing that?

A    You can do multiple lineups with different suspects.  That's fine.  I would be -- if a witness chooses from a first lineup, right, and then you show them another lineup later on, that witness is likely less reliable because they've already made an error.  They're telling you their memory sucks, because they've chosen someone that wasn't the right person.  Okay?

And the only time you would do that is if they pick a filler.  You wouldn't have them -- show them a lineup, they pick out your suspect, and then all of a sudden you get a different guy and then show him a new suspect.  It just -- that, typically, doesn't happen as much because once you get that first ID, you got your guy and you're gonna charge him.  So it can happen where it goes the other way around, but it's not as likely.  Usually it's a filler identification.  And when they pick a filler, they're telling you they don't know.

Q    Okay.  So you would agree with me, then, that once an eyewitness has said they made a mistake in terms of identification, they're less reliable for future

P000639

identifications?

A     I would say that their original identification -- not that -- you're trying to say if their original ID is fine, and then anything else they do later is not reliable. Anything they do is not reliable because they made an ID here, and now they're changing it later. None of it is reliable. We don't -- we shouldn't trust any of it, in my opinion.

Q     And is there a statistical -- you provided earlier the -- how the statistics go up in terms of making errors. Is there a statistic in terms of the error for a subsequent ID when a witness has already made an identification?

A     The blank lineup procedure, I don't know the numbers off the top of my head.

Q     Not a blank lineup procedure, but just in general.

A     It's -- it's the closest analogy I can give where we have a witness making a lineup identification and later making another one. We don't typically do that because it's not forensically relevant to test that.

Q     Okay. So according to your science, then, it's unreliable, so there's not much else in terms of your analysis at that point?

A     I didn't say it's not reliable. I said there's

P000640

not enough body of literature for me to feel comfortable recommending it as a reform for police to follow. But there is enough sound science on it for me to speak about it, to answer your question, I would say.

Q    Okay. And you stated earlier that as part of good police procedure, you should give instructions to the witness?

A    Yeah. They need to be good instructions, but, yes.

Q    And part of those instructions would be that you don't have to select somebody?

A    It should be made clear to the witness that their job is not simply to pick out the person, who the guilty party is, but that the person may not be there, and that it is okay to say not there, correct.

Q    Okay.

A    It's called unbiased lineup instructions.

MS. MOMPREMIER:  Okay. No further questions, Your Honor.

THE COURT:  I have one follow up, so, Ms. Mompremier, I don't know if you'll want to have a follow up to my question.

Dr. Cahill, you talked about the unreliability of the subsequent different identification, correct?

THE WITNESS:  Correct.

P000641

THE COURT: That that second identification is unreliable, that it has no value -- no forensic value because the first identification is the one that really kind of counts?

THE WITNESS: Yes.

THE COURT: Does the second identification, if it is someone different, undercut the reliability of the first identification?

THE WITNESS: Yes, I would say it does.

THE COURT: Any follow up with regards to that?

MS. MOMPREMIER: No, Your Honor.

THE COURT: Defense?

MS. FRYER: I don't have any further questions. This witness is released.

Thank you, Doctor.

THE COURT: Thank you, Doctor.

THE WITNESS: Thank you.

THE COURT: All right. State and defense, approach.

(At the bench.)

THE COURT: Okay. So with regards to time, obviously we'll go until noon, but I don't know that that's gonna allow us to conclude the hearing. I have time -- I don't have a hearing set at 1:30, so we can go into the afternoon. But what I'd like to do is

stop at 12:00 if we're gonna continue at 1:30.

State, are you available?

MS. MOMPREMIER:  Yes.

THE COURT:  Defense?

MS. CEPERO:  Yes.

THE COURT:  And who is your next witness, defense?

MS. FRYER:  We would rest.

THE COURT:  And, State, you said you had two witnesses?

MS. MOMPREMIER:  Yes.

THE COURT:  Who are you calling first?

MS. MOMPREMIER:  I'm calling the victim first. My questions won't be long.  Again, I'm sticking with --

(In open court.)

THE COURT:  All right.  So, defense, you have no further witnesses?

MS. FRYER:  That's correct, Your Honor.

THE COURT:  Is there any other evidence you want the Court to take -- or that you want to present to the Court at this time?

MS. FRYER:  No, Your Honor.  I think we've entered everything into evidence and requested the judicial notice.  So at this point defense rests.

P000643

THE COURT:  We just need Exhibit 1 back, please.

All right.  State?

MS. MOMPREMIER:  Yes, Your Honor.  State would call George Gonzalez.

THE COURT:  All right.  Let's have Mr. Gonzalez come in.

**GEORGE GONZALEZ**

**was called as a witness and, having first been duly sworn, testified as follows:**

THE WITNESS:  I do.

THE COURT:  Good morning, sir.  Please be seated.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Could you please state your first and last name.

THE WITNESS:  George Gonzalez.

THE COURT:  And could you spell your last name for --

THE WITNESS:  G-o-n-z-a-l-e-z.

THE COURT:  And, Ms. Mompremier, you may inquire.

MS. MOMPREMIER:  Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MS. MOMPREMIER:**

Q    Good morning, Mr. Gonzalez.

A    Good morning.

Q    So just for the record, were you the victim in

this case?

A    Yes, I was.

Q    Okay.  And, obviously, you testified in court?

A    Yeah, the last time.

Q    And is there any change to your testimony?

A    No, there's no change.

Q    I want to turn your attention to the date of the trial in this case.  When you were in trial, did you happen to run into the female witness in this case?

A    Not in the -- outside, in the waiting room.

Q    Okay.  And do you know her name?

A    No, don't really know her.

Q    Okay.  And had you ever met that person before?

A    Never.

Q    Did you have interaction with her outside of the courtroom?

A    Outside of the courtroom, no.

Q    Yes.  Did she speak with you at all?

A    Over here?

Q    Yes.

A    Yes.  Outside in the waiting room, we talked a little bit.

Q    Okay.  Can you tell the Court what, like -- first of all, how -- how did you meet with her, or how did that interaction begin?

P000645

A    I think probably just talking, and then it came up that she was a witness, I think, in the trial itself. So I think -- I can't recall everything, but I think that, you know, I was told there was another witness that saw Jorge, that pointed him out or something, and that was her. She pointed him out and she picked a picture, you know, like I did, after looking at several.

Q    Did you talk with her about that?

A    No, we didn't get into a deep conversation or anything that I can recall.  Of course, it's ten years ago, but we didn't talk too long at all.

Q    Did Detective Stanley introduce you two?

A    Huh?

Q    The detective in the case?

A    No, no.  You mean -- no.

Q    Did he introduce you to Ms. Szewczyk?

A    To who?

Q    To the witness.

A    No, no.  Introduce me to the witness?

Q    Yes.

A    No, not that I recall at all.  No.

Q    In your conversation with her, did you ever tell her that the person at trial during that time was the person you selected?  Did you tell her that information?

A    I don't remember saying anything like that.  Of

P000646

course it's ten years ago, so anything's possible.

Q    And at any point did she ever express doubts to you about her selection?

A    No.  I do just recall one thing.  I appreciated the fact that she came out, because most people don't want to be a witness to anything if it's not involved with them -- nowadays, anyway -- but you still get a few out there, so I appreciated that fact, that she picked him out like I did.

MS. MOMPREMIER:  No further questions, Your Honor.

THE COURT:  Ms. Fryer?

MS. FRYER:  Thank you, Your Honor.  I'll be brief and respect your time.

CROSS-EXAMINATION

BY MS. FRYER:

Q    So you stated that you knew Ms. Szewczyk, the individual who testified, that you met that day after your testimony --

A    That I knew her?

Q    No, sir.  I'm sorry.  That you learned that she had chosen the same individual you had.  How did that information come to you?

A    Just talking.  And she happened to be in the same case I was that I can recall.  That was it.  There wasn't a

P000647

big -- like, we didn't have pictures or anything or anything like that.

Q    Sure.  But was the -- had you ever had a conversation prior to trial?

A    No.  I didn't even know who she was.  All I know, that I think I learned from her that day, was that she lives in the other side of the community where they parked their car and they all jumped the fence.  And I guess that's how she saw them, because I didn't know nothing about her at all.

Q    Okay.  Did you -- did you ever have a conversation with her after the trial?

A    No, never.

Q    Okay.  So the only time that you shared information was that period of time after your testimony at trial?

A    I don't know if you want to say information.  I would say more just one sentence or two and that was it.  It wasn't a big conversation.

Q    Sure.

MS. FRYER:  I don't have any other questions. Thank you.

THE WITNESS:  You're welcome.

MS. MOMPREMIER:  No further questions.

THE COURT:  Thank you, sir.  You may step down.

P000648

Is this witness released, State?

MS. MOMPREMIER:  Yes, Your Honor.

THE COURT:  Any objection, defense?

MS. FRYER:  No objection, Your Honor.  Thank you.

THE COURT:  Sir, you're welcome to remain in the courtroom, if you'd like.

THE WITNESS:  Okay.  Thank you, Your Honor.

THE COURT:  State, your next witness?

MS. MOMPREMIER:  Detective Stanley.

**MICHAEL STANLEY**

**was called as a witness and, having first been duly sworn, testified as follows:**

THE WITNESS:  Yes, I do.

THE COURT:  Good morning, sir.  Please be seated.

And if you could please state your first and last name.

THE WITNESS:  First name is Michael, last name is Stanley.

THE COURT:  And could you spell your last name for the court reporter.

THE WITNESS:  S-t-a-n-l-e-y.

THE COURT:  Ms. Mompremier, you may inquire.

MS. MOMPREMIER:  Thank you, Your Honor.

P000649

**DIRECT EXAMINATION**

**BY MS. MOMPREMIER:**

Q    Good morning, Detective Stanley.

A    Good morning.

Q    Were you the lead detective in this case?

A    Yes, I was.

Q    And, obviously, you testified at trial?

A    Yes, that's correct.

Q    I want to direct your attention to the photographic lineup of Bethany Szewczyk.  Do you recall giving that photo lineup to her?

A    I vaguely remember that, yes.

Q    Okay.  Did -- during that photographic lineup, before she made a selection, did you tell her anything, any information about the suspect that you had in mind?

A    No, I did not.

Q    Okay.  Did you -- what process did you do to administer the photo lineup with her?

A    I read her, verbatim, our department's photo lineup and witness instructions.  She signed that document acknowledging that she understood the instructions.  I then would have presented her the photographic lineup.

Q    And safe to say she made an identification pretty quickly?

A    Yes, that's correct.

P000650

Q    Now, after that identification, what -- did you make a comment to her about the person she selected?

A    No, I did not.

Q    Okay.  Do you recall saying something like, yes, that's the guy?

A    No, I do not.

Q    Do you recall if you had further conversations with her?  Did she inquire for more information about the case and things like that?

A    No, I did not have any other contact with her.

Q    Is there a possibility that you could have discussed with the witness about the victim or someone else also identifying the defendant?

A    No, I would not have done that.

Q    Is there a particular practice that you-all have in terms of -- are there rules that you have in terms of a photo lineup, about what information to give or not to give to witnesses?

A    Just to read the photographic lineup instructions specifically verbatim off of our form and then to present them the photographic lineup.

Q    And do you recall the day of trial?

A    Vaguely.

Q    Did you ever introduce Ms. Bethany [sic] to the victim in this case?

P000651

A    No.

Q    And at any point when you were talking to Ms. Bethany did she express doubt as to her identification?

A    During the photographic lineup administration?

Q    At any point you had interaction with her.

A    No.

MS. MOMPREMIER:  No further questions, Your Honor.

THE COURT:  Ms. Fryer?

MS. CEPERO:  I -- I believe the photo lineup and the prior testimony speaks for itself.  I don't have any further questions.

THE COURT:  Thank you, Detective.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  State, is this witness released?

MS. MOMPREMIER:  Yes, Your Honor.

THE COURT:  Defense, any objection?

MS. FRYER:  No objection.

THE COURT:  Sir, you're released.

Ms. Mompremier, any other witnesses?

MS. MOMPREMIER:  No, Your Honor.

THE COURT:  Is there any other evidence that the State wants to move in for the purposes of this hearing?

P000652

**MS. MOMPREMIER:**  No, Your Honor.  The Court's already taken judicial notice of the record.

**THE COURT:**  All right.  Any rebuttal, defense?

**MS. FRYER:**  Do you mind if we take about two minutes to discuss?

**THE COURT:**  Sure.  We'll take a two-minute recess.

(Pause.)

**MS. FRYER:**  No rebuttal witnesses.

Your Honor, may I ask Mr. Lyons, who is released, to join us in the courtroom?  Would that be all right?

**THE COURT:**  That's fine.

And how much time, defense, would you like to reserve for argument?

**MS. CEPERO:**  Maybe 30 minutes.

**THE COURT:**  State, how much time for argument?

**MS. MOMPREMIER:**  Your Honor, I would say 15, 20.

**THE COURT:**  All right.  So do you-all want to do argument at 1:30, and we'll just do argument?  It'll give you a little time to prepare anything additional and provide any additional case law.

**MS. CEPERO:**  Yeah, we would be okay with that.

**THE COURT:**  State?

**MS. MOMPREMIER:**  I mean, my preference is to get as much done now, but I'll leave it up to Your Honor.

P000653

THE COURT:  Well, that would take us to about 12:35.  I have an appointment at noon, so I'm just gonna ask that we -- that you-all be back here at 1:30, and we'll go ahead and do the arguments at 1:30.

Defense, 30 minutes will include any rebuttal, and the State will have equal time.  Okay?

All right.  We'll be in recess until 1:30.

(Recess from 11:38 a.m. to 1:48 p.m.)

THE COURT:  All right.  This is 2013-CF-5146, State vs. Jorge Valle-Ramos.

And, defense, are you ready to proceed with closing argument?

MS. CEPERO:  Yes.

THE COURT:  All right.  Go ahead.

MS. CEPERO:  May it please the Court.

Your Honor, what we have here today is a textbook case of mistaken identity, and the circumstances and conditions of the lineup created a roadmap for a wrongful conviction here.

May I approach the clerk?

THE COURT:  You may.

MS. CEPERO:  I'm placing on the projector what's been previously marked as Defense Identification A, Defense Exhibit 1.

The Court has had the opportunity to observe the

lineup in this case. The Court has also heard expert testimony, which laid the foundation of what makes a lineup reliable versus what makes a lineup not reliable. And the Court has also heard expert testimony today about how certain factors, such as stress or duration of exposure to a face, can affect an eyewitness' memory and an eyewitness' ability to recall a face or to identity a face.

And we've also heard from the recanting witness in this case, Ms. Szewczyk, who no longer identifies the defendant, Mr. Valle-Ramos, as the person who she saw get into the vehicle of the getaway car of the burglary in this case. She simply made a mistake.

And this newly-discovered evidence, which is the recantation, is exactly the type of newly-discovered evidence that would produce an acquittal on retrial. And as I'm sure you know, the legal standard that the defense has the burden of showing is, number one, that the newly-discovered evidence was unknown at the time of trial and that it could not be discovered through due diligence. And we've established that here.

THE COURT: If you don't mind, I will occasionally interject some questions.

MS. CEPERO: Yeah, of course.

THE COURT: Now, this isn't simply a circumstance

P000655

where a witness is indicating that they were shown a picture of a different suspect, or potential suspect, and they said, yeah, it could be that person.  Is that the case?  'Cause if that's the case, I mean, any person who conducted an eyewitness identification after the fact, would -- we'd find ourself in this circumstance.  So what makes that scenario different than this one?

MS. CEPERO:  Well, here, she had -- she testified she had doubts the entire time.  She was expecting, eventually, for a defense investigator to show up and talk to her about this case.  And she's clearly stated, that's not the guy, I always had doubts.

She testified that when she saw him in court, at trial, that he appeared to be -- have darker skin and that she had doubts.  So this is a little bit different in this case.  She's more certain now about the identification of Mr. Ortiz.

So as to the first prong of the newly-discovered evidence case, the -- her recantation was unknown at trial, obviously, because she hadn't made it yet, and it couldn't be discovered until she courageously came forward to right this wrong and to recant her testimony.

The second prong we've also established, which is

P000656

that the newly-discovered evidence would probably produce an acquittal at retrial.  And we have -- what we know is it's well established in both science and law that an eyewitness' memory and identification is unreliable when the eyewitness is presented with a suggestive lineup, and Dr. Cahill testified to that as well.

It's also well established in both science and law that eyewitness identification is the most common cause of wrongful convictions in this country.

Florida law is starting to catch up with the science on this.  It's been a little slow.  So at the time of Mr. Valle-Ramos' trial, we didn't know as much as we know now in the legal system.  But Florida has taken steps to address this issue.  They recognize that eyewitness misidentification is an issue.

We have a new standard jury instruction which instructs jurors on the factors to consider when evaluating eyewitness identifications and on proper lineup procedures.  The legislature has also acknowledged this problem in passing Section 92.70 in 2017, which provides the best practices for lineup procedures, which requires an independent administrator or an alternative method, neither of which was used here.

P000657

THE COURT:  But the law changes all the time.  I guess my question is, how much of this information can the Court consider going forward in weighing, I guess, what the weight of the evidence would be, given this newly-considered evidence?  'Cause there's always going to be changes in the law.  And, you know, any identification case prior to 2013, where they didn't even have the instruction that they had in this case, which talked about cross-racial identification, it didn't go through the double-blind procedures like we have now in our standard instructions whenever a lineup is conducted.  But there's always going to be changes in the law.  How much of that can the Court consider with regards to weighing the probability of an acquittal on retrial?

MS. CEPERO:  Well, first of all, it demonstrates that the law has recognized -- finally recognized the science, number one; and, number two, if he gets a retrial, he'll be entitled to this instruction, the jury instruction on this case.

THE COURT:  Can the Court consider the fact that no one challenged the suggestiveness of this lineup at trial, even though this was two witnesses that had never met Mr. Valle-Ramos?  Can the Court consider the fact that nobody raised that one way or another?  I

P000658

mean, this isn't an ineffective assistance claim. But does -- how does that weigh into the Court's consideration?

MS. CEPERO: Well, I think there was some challenge at trial. There was some cross-examination about him being the only one with an Afro in the lineup. There were several witnesses where, I believe, that was brought up. Certainly Detective Stanley, 'cause he ultimately stated that the other -- he said the other five had somewhat of an Afro, but he admitted that Mr. Valle-Ramos had a longer Afro.

THE COURT: But that was addressed in argument. There was never a motion to suppress the lineup themselves, correct?

MS. CEPERO: Not my knowledge.

THE COURT: Okay. So the Court would only consider the arguments that were made with regards to this identification and the additional testimony based on the recantation?

MS. CEPERO: Well, I believe Detective Stanley testified on cross about the Afros, and I think there were -- I believe he was the one that testified on cross about the Afros, and it being the only one in the lineup with the Afro.

P000659

THE COURT: I guess maybe I didn't ask the question correctly, and that's my fault.

What -- can the Court consider whether or not these out-of-court identifications would even be admissible on a retrial, given the testimony we've heard today? No one challenged it at trial, but is it something that the Court can consider at retrial?

MS. CEPERO: I don't have law on that. If I can have a moment?

I would say, yes, he would be able to, because if he's in a -- in a pretrial posture back at that point, he could move to suppress it at that point, and it would likely be suppressed under the testimony we've established today and under the law on suggestive lineups. Does that answer --

THE COURT: Yes. Can the Court consider prior -- in that same vein, would the Court have to also consider any prior testimony by any witness with regards to the identification and any inconsistent testimony, like the one we heard from Ms. Szewczyk with regards to her trial testimony versus her testimony here today? Would the Court have to consider that?

MS. CEPERO: I would say, yes, because credibility of the eyewitnesses are always gonna be at

P000660

issue.  So at the suppression hearing, that's something that could be considered, and I think it could be considered here as well.

THE COURT:  Okay.  Continue.

MS. CEPERO:  So as I stated, the Florida law is now catching up on the science of that.  And we heard testimony here today that demonstrates that there was a suggestive lineup in this case.

We had Dr. Cahill, who's an expert in eyewitness memory and identification, testify about the factors that affect a witness' ability to remember faces.  He discussed, for example, brief exposure.  And if we look at Mr. Gonzalez's trial testimony -- which he said he's not changing his testimony -- at trial, he testified that he saw the assailant approximately 25 to 40 feet away for seven to ten seconds.

He also -- Dr. Cahill also testified about the effect of stress on eyewitness memory.  He said it decreases the ability to remember.  Somebody's usually in a flight or fight state.  And here, Mr. Gonzalez testified at trial that he was in shock, that he was focused on trying to stop the assailants from escaping.

Dr. Cahill also discussed stranger recognition, and it's undisputed that neither eyewitness in the

P000661

case was familiar with the assailants or the defendant.

And Dr. Cahill also discussed the effect of having multiple perpetrators in an offense, where it diverts the eyewitness' attention to multiple people and reduces accuracy. And here there were three burglars.

Dr. Cahill also testified about the factors that affect the suggestibility of a lineup. And he noted in this case that there were certain factors that demonstrated that the lineup was suggestive. There was not a double-blind administrator. Detective Stanley was the one who selected the photos. He determined that Valle-Ramos was his suspect and included his photo in the lineup.

He failed to select photos that stood out or that matched the description. None of these people, other than Mr. Valle-Ramos, has anything that can arguably be considered an Afro. So Mr. Valle-Ramos stood out. He was distinct. It wasn't even a recent photograph. It was a photograph that was taken earlier when he had a short haircut, and it didn't reflect what he looked at [sic] at the time of April of 2013. He had much longer hair that was too long to pop out like an Afro.

Dr. Cahill also discussed the effect of

P000662

post-identification feedback and how that inflates -- improperly inflates an eyewitness' confidence in their initial selection. And here, with Ms. Szewczyk, she was told -- she selected the photo. The detective smiled at her and said, yeah, that's him. And the detective also told her that Mr. Gonzalez had selected the same photograph.

Now, Dr. Cahill has clearly testified in this case that these factors produced an unreliable lineup in this case. And as he also testified an unreliable lineup significantly increases the error rate in witness accuracy and identification.

Now, if we look at the testimony of the eyewitnesses themselves, they support Dr. Cahill's findings. At trial, Mr. Gonzalez, when asked about if he was able to describe specific facial features of the assailant, he said, well, he had an Afro. He looked like that guy over there. He wasn't able to describe, you know, the guy's ears, if he had a flat nose, a big nose, anything like that.

And Ms. Szewczyk testified today that she agreed that Mr. Valle-Ramos was the only one with an Afro. That's what drew her attention to his photograph. She testified that Detective Stanley gave her the post-identification feedback, which boosted her

P000663

confidence. And her confidence was further artificially inflated when Mr. Gonzalez told her after his testimony, prior to her testimony, that he was sure it was the right guy.

Ms. Szewczyk no longer identifies Mr. Jorge Valle-Ramos, and she's a credible witness. She's an attorney. She has no reason to lie in this case. She has no relationship to Mr. Jorge Valle-Ramos. She -- there's literally no benefit to her. She bravely came forward to right this wrong.

Now, also as to whether this newly-discovered evidence would probably produce an acquittal on retrial, if we look at Detective Stanley's trial testimony, he testified that the reason that he had Ms. Szewczyk do a lineup several months later is because he wanted to strengthen the case. So even he knew that it was a weak case if it was relying simply on the direct evidence of Mr. Gonzalez's testimony.

I also have some cases to discuss. I sent them to the Court by email. Would you like a pape copy?

THE COURT: No, email is fine. Just put the citations on the record as you go through them.

MS. CEPERO: Sure. So first I have *United States v. Eltayib*, 88 F.3d 157, Second Circuit, 1996. And there the court found a suggestive lineup because,

again, the defendant was the only person in the lineup with an Afro.  The witness testified that they had, quote, a good look, 35 to 40 feet away, but that they only saw the assailant's face for a few seconds or better.  And that's similar to our case here where Mr. Gonzalez saw the assailant, according to his trial testimony, 25 to 40 feet away, for seven to ten seconds.

In *Eltayib*, the witness was not able to recall any specific details about the assailant's facial features, and he only gave a description of, quote, really bushy hair, Afro-type hair.  And that's similar to our case here where when asked at trial, can you describe the assailant's facial features, Mr. Gonzalez testified, well, he has an Afro.  He looks like that guy.  Afro is not a facial feature.  He wasn't able to describe anything else.

In that court -- in *Eltayib*, the court found that the lineup was not only suggestive, but also that there wasn't sufficient evidence of reliability for the identification, and the identification was inadmissible.

I also have *Judd v. State*, 402 So.2d 1279, Florida Fourth DCA, 1981.  In that case, there were -- the victim described someone with braided hair who was

P000665

bare-chested.  And the lineup included two people with braided hair, and only the defendant's photograph who -- he also had braided hair, was also bare-chested in the photograph.  In that case, the victim gave a very general description of the assailant, as in our case here, where the general description provided was young, Hispanic male, with a big Afro.

And the victim's observations in *Judd*, of the assailant, were short-lived and made in a moment of fear and uncertainty.  And here we have, again, Mr. Gonzalez in a state of shock, seeing someone in his home who shouldn't be there, in the early-morning hours, and he was just trying to chase him so he could capture him so the police could make an arrest.

And then I have *People v. Shea*, 54 A.D.2d 722, New York Appellate Division, 1976.  In that case, the defendant's photograph was the only one with a blond Afro, which was described by the witness.  The witness only saw the assailant for 10 to 12 seconds, which is longer than Mr. Gonzalez saw the assailant here, for seven to ten seconds.  And the court found there that the lineup was suggestive because there was only the blond Afro, and it found that it was inadmissible due to there -- it wasn't a reliable identification that could be admitted in court.

P000666

Next I have *State v. Armstrong*, which this one is an unreported case.  So it's 2004 WL 120887, Tennessee Criminal Appellate court.  In that case --

THE COURT:  I'm sorry.  I have it as 1208871.

MS. CEPERO:  Oh, I'm sorry.  1208871.

And that court -- again, a suggestive lineup was found because the defendant was the only person with an Afro.  And although the court found that the identification was independently reliable, there are huge distinctions in that case.

In that case, the victim saw the assailant for approximately 15 minutes and looked intently at his face.  Whereas here, Mr. Gonzalez only saw him for seven to ten seconds.

In that case, the victim gave a detailed description of the assailant.  Quote, beady, brown, sluggish, puppy dog eyes, flattened nose with flaring nostrils, dark skin, puffy face, and Afro-type hair.  Here, again, when Mr. Gonzalez was asked for facial features, he just said it's the guy -- he had an Afro, looked like the guy there.

Then I have *State v. Burrell*, which is 28 Wn. App. 606, Washington Court, 1981.  In that case, the court found a suggestive lineup again because the defendant was the only one who had frizzy,

P000667

Afro hair, and he had much longer hair, longer hair than the other filler photographs.

In that case, the court did find that the identification was independently reliable, but, again, we have big differences there. In that case, both the victim and the eyewitness observed the defendant for five minutes before the attack. The victim had two especially close encounters with the assailant, and the police arrested the defendant the same night just a few blocks away. So we have five minutes versus seven to ten seconds. Mr. Valle-Ramos was not found anywhere near the area on the same day.

On top of that, the identification in that case occurred four days after the attack, whereas here, the identification my Mr. Gonzalez, was nine days after the attack.

So, in conclusion, Mr. Valle-Ramos has satisfied his burden in this case. We've established a newly-discovered evidence claim which warrants vacation of his convictions.

First, we know that the newly-discovered evidence was unknown at trial and couldn't be discovered by due diligence. It could only be discovered when Ms. Szewczyk -- I always struggle with that name -- when the independent eyewitness chose to recant and

P000668

come forward.

Second, the newly-discovered evidence in this case would probably produce an acquittal on retrial. If we look at the evidence that was introduced at trial, which as Your Honor knows, you're required to weigh the newly-discovered evidence versus the evidence introduced at trial, no physical evidence, no DNA, no confession, no cell tower evidence placing Mr. Valle-Ramos near the location of the crime at the time. There were fingerprints, but they didn't match Mr. Valle-Ramos, and there were no pawnshop records showing that he had pawned any of the property in this case.

The only direct evidence at trial were the two eyewitnesses. We had Mr. Gonzalez, who observes his assailant seven to ten seconds, 25 to 40 feet away, while he was in shock, trying to -- he was in fight-or-flight mode, trying to stop the assailant from getting away. He didn't recognize -- he was strangers with the assailant, and there were multiple perpetrators, so his attention was diverted to multiple people.

And as Dr. Cahill testified, this was a suggestive lineup that he was shown; the only person in the lineup with an Afro; it was not a double-blind

P000669

lineup; and there was an increased likelihood that the incorrect person would be identified.

The other only piece of direct evidence that was introduced at trial was Ms. Szewczyk's testimony, which she recanted today, so that doesn't apply anymore. She's told us that she was always unsure. She always had doubts. She felt relieved when she saw Mr. Ortiz's photograph because she was like, oh, I was right this whole time about feeling uncomfortable with this case.

She also testified that when she saw Mr. Valle-Ramos in the courtroom, she thought his skin tone was darker than the person that she saw get into the vehicle. And she also testified that her confidence was boosted not only by Detective Stanley smiling at her and saying you got the right guy, but also by Detective Stanley telling her the victim selected the same photo, and also by Mr. Gonzalez expressing his certainty that they got the right guy when he met her at trial.

Now, Dr. Cahill has provided plenty of testimony explaining why these witnesses' initial identifications were unreliable in this case. He discussed the factors that affected them and also the fact that there was a suggestive lineup.

P000670

Now, on top of that, we had testimony from Mr. Valle-Ramos himself and his girlfriend, Ms. Ortiz, about his hair at the time. And they both testified that his hair was too long to be in an Afro. It was in a ponytail. He took his ponytail down on the stand, and it fell down to his hair [sic].

We also had a witness at trial who testified -- gave the same testimony as Mr. Marquis Hickson, who is not, unfortunately, here today, as he's passed away. And it's also important to note that despite the eyewitnesses giving descriptions to police about a large, bushy Afro, Detective Stanley chose this photograph, with a small Afro, no one else having a photograph with an Afro in there, which did not reflect anywhere near what Mr. Valle-Ramos looked like at the time of the offense.

So weighing the newly-discovered evidence here, Ms. Szewczyk's recantation against the evidence at trial, which, at this point, the only direct evidence is Mr. Gonzalez's identification, which is unreliable due to the reasons that Dr. Cahill explained and would likely be suppressed at a suppression hearing, it's clear that there would be an acquittal in this case on retrial. Highly probable.

So, in conclusion, Mr. Valle-Ramos has met his

P000671

burden in establishing this newly-discovered claim, and we ask that this Court grant the motion -- his motion for post-conviction relief and vacate his conviction.

**THE COURT:**  All right.  Thank you.

State, response?

**MS. MOMPREMIER:**  Yes, Your Honor.  May I approach with case law?

**THE COURT:**  You may.

**MS. MOMPREMIER:**  Your Honor, I'm sure, is already aware of the standards in which newly-discovered evidence, particularly in regards to a recantation -- the State's not contesting that this is newly-discovered evidence, so we can just focus on the second prong, which is the standard there -- beyond newly-discovered evidence, recanted testimony is subject to a different and more stringent standard. The first of which is that the trial court has to be satisfied the recantation is true; and, second, that the witness testimony would change to such an extent as to render a probable and different verdict.

In part, the Court's required to consider all new evidence which would be admissible and then must evaluate the weight of both that newly-discovered evidence with the evidence introduced at trial.

P000672

For one, the State would just first point out that the case law itself, in terms of recantation, or recanted testimony, is assumably unreliable.  This is reflected in *Armstrong v. State*, 642 So.2d 730.  And so the Court has to look at this recantation with suspicion and only after the Court is satisfied that such testimony is true can the Court grant relief.

For the case law that defense put out in terms of the photographic lineup itself, the State would first point out that this isn't a motion to suppress.  It's not also an ineffective assistance of counsel claim where they're alleging that counsel, you know, failed to move to suppress the ID.

This was a photographic lineup that was admitted at trial, and it was subject to cross-examination, and therefore represented to the jury.  The issues and the points in terms of the photographic lineup were issues that were already brought out at court.

So what the State would first point out is that we believe that the testimony of Ms. -- I will say Ms. Bethany, is unreliable.  We would argue, in fact, that --

**THE COURT:**  Well, can I ask, is it the State's position that the lineup is not unduly suggestive?

**MS. MOMPREMIER:**  Your Honor, I -- I do believe

P000673

that the lineup could have been better, that there could have been people to better -- like, more Afros at the very least to add.

THE COURT: I mean, I think the State takes issue with -- and you can point to the evidence. I think you take issue with the fact that the witness admitted that they had doubts about the -- their testimony and never voiced those concerns prior to the trial going forward, and that undercuts, basically, whether now she's being truthful in her testimony here today with regards to, I guess, whether she identified the right person.

MS. MOMPREMIER: Correct. And, Your Honor's correct, because part of the analysis, especially when you're turning to the reliability of a statement, it goes to whether there was a confession of perjury. The case law acknowledges that in cases of that, the Court should look at it especially hard.

In my questioning, I tried to get that out of her. Because despite the way that she's framed this, I do believe that you can characterize her statement as perjury. And I do think that there is an enhancement on her, because regardless of her years of experience as an attorney, she was a licensed bar attorney at the time. To even be an attorney, she had

P000674

to go through the process with the Florida Bar, have an ethics test, so she knew rules of an attorney.

Furthermore, she sat on this information from 2014 to 2021, certainly at a point where she had the skills and the knowledge of an attorney at that point and still did not say anything until a defense attorney -- or defense investigator came to her.

That is part of why we would argue that her testimony is unreliable.  For someone who is a licensed attorney, who has, under the Florida Bar rules, not only a duty to her clients, but she is also a member of the legal profession, an officer of the legal system, and a public citizen having special responsibilities for the quality of justice.

And to say I was at the photo lineup, I had doubts, but I affirmatively identified him without giving any other information to say, hey, I think this is the guy, but I'm not sure; to go to depositions and to never voice those doubts; to go to trial and then to never voice those doubts, we do think that that plays to her credibility as a witness.  I do think that you can take her role as an attorney into account; her duty not only to justice, but to her obligations as a licensed attorney.

And, again --

P000675

THE COURT:  I guess my question is -- and, again, the Court has to evaluate and weigh the credibility of the witness in the context of all the other evidence. But it was never expressed, in my recollection of her testimony, as to the strength of these doubts, whether they were doubts that were so strong that she needed to, in the moment, reverse course.

It was not clear what -- my recollection of her testimony was that pretty much at every point where she would have expressed those doubts, someone confirmed her identification.  So she sees the lineup, and before she can even say -- based on her testimony, before she can even say, but I want to, you know, add that maybe this person's skin is darker or maybe their eyes are lighter or darker -- I guess in the photograph, the person's eyes were darker.  In real life they were -- when she got to trial, they were lighter.  But in that moment, the officer tells her, you got the right guy.

Then she comes to court, and those doubts start to come up again.  The detective tells her the victim said you got the right guy.  So she comes up here, she sees this guy, and she says, now I'm seeing him in person.  And that's where you take, I guess, the -- where you're saying this is where the Court really has

P000676

to kind of evaluate that testimony -- is now she's seeing this person, she's seeing them [sic] live, she can really get a good look at them, and she's going to stick to her story, even though she's got these persistent doubts, that they've -- they've come up twice.

So how do we put that in the context of Dr. Cahill's testimony and how a person could basically convince themselves, but then ten years later, upon reflection and being given additional information, come to a different conclusion? Does that make the first statement less reliable? Does it make the second statement less reliable? I guess, how does the Court -- how does the State believe the Court should ultimately decide that and what conclusion it should come to?

MS. MOMPREMIER: I guess what the State would point out, before all of this additional information was given to her, she was given instructions. And she said to herself -- like, again, I do think the point that she is an attorney is important. She would have read the instructions and been told, you don't have to make an ID. She didn't look at the photographic lineup and say, hmm, like, this guy kind of looks like him, but the complexion looks darker.

P000677

THE COURT:  Is there any case law that gives special status based on profession?  Like, if she was a medical doctor, would she have to have some sort of elevated status with regards to the ability to recognize someone or -- 'cause, again, this doesn't -- we're not talking about legal principles.  We're talking about whether or not your recollection -- your ability to perceive someone and whether that perception is accurate, whether that's affected by what your profession is.

MS. MOMPREMIER:  I don't -- I do not believe that there is case law -- or I'm not aware of any particular case law that gives a special enhancement. But as part of your ability as the Court, you can consider someone's profession, if they have any knowledge that would put an additional burden on them to make sure that it's right.  It's my position if she's a witness testifying at trial and she intentionally perjured herself, she could get in trouble with the Florida Bar, regardless of whether she's representing the client or not.

THE COURT:  But wouldn't that be more incentive for her to stay quiet than to come forward?

MS. MOMPREMIER:  That -- that is an argument for the Court to consider.  And the Court could consider

P000678

that her testimony later is credible because of that, because of the potential trouble that she could bring herself in.

It is our position that she made this initial statement without giving that information and identified the same person as the witness.  And so, therefore, those are our lines in terms of her credibility; that she never expressed those doubts to the detective.

She had a deposition.  That would have been an opportunity where she's talking mainly to the defense attorney, and, again, she never expressed those doubts to the defense attorney, that she had any doubts about her identification.  And then furthermore at trial, she did not as well.

And even in the photographic lineup, she's saying this is the person, instead of this is -- you know, a percentage or anything like that to qualify her statement.

Again, to her credibility, she -- she did not write this affidavit and send it to the state attorney's office on her own.  She only did it after being met with the investigator in this case who told her, more or less, like -- you know, the purpose would have been to say, hey, like, we think that you might

P000679

have made a mistake, can you look at this and confirm that for us.

And so, again, I would say that any of those statements made with the investigator are unreliable, even under the standards by their own expert. He stated and testified that an additional identification after the fact would be unreliable.

And then the method in which was -- and I think that's important to stress this. The reason why the law has changed is because we want to be careful of the way that we're presenting information to witnesses. And to present two photographs, side by side, saying, hey, this person looks really similar to this person and also lives in the area and also does crime in this area, doesn't -- you know, is that -- is that the person.

And I think that -- to go and say the State's unduly suggestive and then to relay tactics that are even more suggestive taints her testimony as a defense witness in this proceeding.

THE COURT:  I mean, I don't -- and, again, I think that was the question that I asked the expert, was -- specifically, his testimony was that second identification isn't reliable either.  But it just kind of drives home the fact that if these six

P000680

individuals that are up on the projection looked more similar, we'd actually know whether or not the person was truly able to identify this. It just calls into question the reliability of the previous identification. I mean, that was the testimony we heard today, correct?

MS. MOMPREMIER: Yes, Your Honor.

THE COURT: Okay.

MS. MOMPREMIER: And so, ultimately, what the Court will have to do is weigh that information, weigh those reasons to question her credibility against other evidence in the case. I mean, we still have the victim's testimony. The victim saw the defendant in his own home. He stated that he was 25, 35 feet away from him. He stated that for this particular defendant -- because there were two other people also in his home that day -- he focused on his face.

He stated he was confident in this ID. He did not identify anybody else because he stated he was not confident in those identifications, but he was -- he was confident in this identification. He testified today that his position remains the same as to that identification and the testimony that he relayed at trial. And so based off of that, Your Honor, we'd just present that before you to consider in making

P000681

your decision.

THE COURT:  So can I just kind of -- let's assume that the Court finds that her testimony is reliable. Is there other evidence, despite that testimony being reliable -- because the defense argued to a good extent -- majority of their argument was dedicated to this idea of, what evidence would be presented at retrial would likely result in an acquittal.  Does the State have any response to that part of the equation?

MS. MOMPREMIER:  I would just say I think, in part, from my -- from my interpretation of the law, I do think that they were a little erroneous in their perception.  I think what the Court has to look at is not what a retrial would look at it, but what this recantation would look like in regards to the evidence that is already a part of the record.  Not to anything new, not to any new issues, new motions to suppress. I don't think the Court can look at that.

There was no motion to suppress.  This was the photo lineup that was in evidence.  So I think what you have to do is basically say, okay, pick up Ms. Bethany's testimony, put the recantation in, and say if that is what was presented, do I think that there's a probability that it would change at that point?

P000682

THE COURT: I mean, to a large extent, I agree with you. I think that that would be an inevitable consequence. Would that be -- lineups would come in, because how else do you explain the prior inconsistent statement? I mean, whether the defense wanted to, I think they would necessarily have to walk through that door in order to give context as to why the two statements are inconsistent. So I think that would be part of the evidence anyways.

But despite that evidence being in there, if the Court found her testimony to be reliable -- we only have two witnesses here. So is there enough evidence, given this recantation on retrial -- this is the newly-discovered evidence. Part of that, arguably, defense could bootstrap Dr. Cahill's testimony to give context to her inconsistent statements. So the jury would hear testimony with regards to what the standard is now and how this exercise was performed.

So, ultimately, what evidence is there to suggest that this would have -- this trial would have turned out any differently than it did the first time?

MS. MOMPREMIER: In candor to the Court, my -- my argument is to credibility of the witness.

THE COURT: Okay.

MS. MOMPREMIER: We have the two witnesses, so, I

P000683

mean, I think the points that they raised were correct. Those are certainly things that you have to consider. So our argument is to credibility of the witness.

**THE COURT:** Okay.

Thank you, Ms. Mompremier.

And brief rebuttal.

**MS. CEPERO:** Yes, just briefly.

So there was a lot of talk about Ms. Szewczyk being an attorney, but it's -- everyone is subject to bias, regardless of their profession. It's part of being human. And the fact that -- she had these doubts at various stages during the proceeding, and every time she had a doubt, before she could express it, somebody boosted her confidence.

After the lineup, the detective smiled, said, that's the guy, told them -- told her that Mr. Gonzalez selected the same photo. When she had doubts at trial before her testimony, Mr. Gonzalez said he was certain it was the guy. So as you had discussed with the State, every time she had some doubts, someone, you know, tempered her down and made her feel more confident.

It's also important to show that she had doubts even before she saw Mr. Ortiz's photo. So as she told

P000684

the investigator, like, oh, I knew you were coming, I'm relieved that someone has finally approached me about this.  And, also, there was no perjury in this case.  Eyewitness misidentifications happen all the time.  They're mistakes.  They're very rarely someone just lied.

So some of the cases that were relied on by the State where they pointed out that the defendant admitted he lied, that's not what we have here.  Ms. Szewczyk, she said, you know, I thought I was -- I thought I had picked who was the right person based on what everyone else was telling me, and I -- you know, I have no reason to lie.  I just want to do the right thing.  I want to right this wrong.  So her credibility is not at issue in this case.  She just came forward to do the right thing.

She also testified at trial --

THE COURT:  Can I ask this?  Because the case law with regards to the issue of recantation has the Court coming from a very skeptical position -- very, very, skeptical starting point, particularly with perjury testimony.  Is this perjured testimony?  Because the State has argued that it is.  What's the defense's position on whether this is perjury --

MS. CEPERO:  No.  At the time of trial, she

P000685

testified what she believed to be her truth.  And we saw that she was influenced by post-identification feedback.  Now she's realized that she was mistaken.  It was just a mistake.  That's all there was there.  And now she's come forward to right the wrong.  You know, as you said earlier, she -- that almost supports her credibility, because she could have subjected herself to perjury, and that's what she's being accused of here.

Does that answer your question?

THE COURT:  Well, I guess, you generally answered my question, is an inconsistent statement, per se, perjury, or perjured testimony, because it was inconsistent?  But I think you answered that question.

MS. CEPERO:  Yeah.  No, it's not.  I mean, it might be impeachment evidence, but it's not, per se -- you have to show an intent to lie.  And that intent was not here.  She believed she was testifying truthfully at the time of trial.

THE COURT:  All right.  I guess my other question is, several of the cases you provided to the Court in advance of the hearing, they're not post-conviction cases, but it seems like a common thread is the question of fundamental due process.

Is the defense raising that argument with respect

P000686

to this motion?

MS. CEPERO: Yes.

THE COURT: Can you just articulate exactly where the fundamental due process flaws are in this case?

MS. CEPERO: If I can have an opportunity to brief that and submit it to the Court?

THE COURT: Well, I mean, you've argued it. I just want you to kind of hit the highlights for the purposes of closing argument, where you believe the fundamental due process violations have occurred.

MS. CEPERO: Okay. I would say, in this case, it's -- some of it has to do with counsel, the right to counsel and due process, because counsel didn't really thoroughly challenge the identifications on cross. She didn't file a motion to suppress. I would say that's the key.

THE COURT: All right. Counsel, that will conclude arguments.

I'm gonna take this matter under advisement. I will have an order in a timely fashion, but I am going to request the copy of the transcript, so it may take about 30 days for me to get that. In the meantime, I'll be working on the final order in this case.

MS. CEPERO: Thank you, Your Honor.

THE COURT: So thank you, State. Thank you,

P000687

defense, for your arguments.  We'll be in recess.

(These proceedings concluded at 2:34 p.m.)

P000688

C E R T I F I C A T E

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, Tracy Hansen, RPR, Official Court Reporter of the Ninth Judicial Circuit of Florida, do hereby certify, pursuant to Florida Rules of Judicial Administration 2.535(h)(3), that I was authorized to and did report in stenographic shorthand the foregoing proceedings, and that thereafter my stenographic shorthand notes were transcribed to typewritten form by the process of computer-aided transcription, and that the foregoing pages contain a true and correct transcription of my shorthand notes taken therein.

WITNESS my hand this 14th day of April, 2023, in the City of Orlando, County of Orange, State of Florida.

s/Tracy Hansen
Tracy Hansen, RPR
Official Court Reporter

P000689

P000690