## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JORGE VALLE-RAMOS,                          Case No. 6:24-cv-1276-CEM-DCI

     Plaintiff,

vs.

CITY OF ORLANDO, MICHAEL
STANLEY, and DANIEL BRADY,

     Defendants.

_____/

### DEFENDANTS' REPLY IN SUPPORT OF SUMMARY JUDGMENT

COME NOW, Defendants CITY OF ORLANDO (the "City"), MICHAEL STANELY ("Det. Stanley"), and DANIEL BRADY ("Sgt. Brady"), pursuant to M.D. Fla. Local R. 3.01(d), and hereby file this reply in support of their pending motion for summary judgment (Doc. 71), as amended, following the Response filed by Plaintiff JORGE VALLE-RAMOS ("Valle-Ramos") (Doc. 72).

### I.    Plaintiff concedes that Sgt. Brady is entitled to judgment.

Plaintiff now concedes that his claims against Sgt. Brady have no merit, which includes the conspiracy theories alleged against Det. Stanley. (Doc. 72, 1.) Seeing that the City's motion to dismiss has already been granted, the only remaining claims against Det. Stanley are Count I (§ 1983 due process), Count II (§ 1983 malicious prosecution), Count VI (state law malicious prosecution), and Count VII (state law IIED).

1

**II.    The Response conflates "suggestion" with "fabrication" throughout.**

Plaintiff's most glaring jurisprudential failure has been the inability to identify any published Eleventh Circuit or Florida or U.S. Supreme Court decisions clearly establishing that anything Det. Stanley did was unconstitutional beyond debate, which we discuss *infra*.  Perhaps the most glaring analytical failure is the erroneous conflation of suggesting a suspect's identity to a witness and outright fabricating or falsifying evidence.  The two are not the same, and the body of case law is markedly, and appropriately, distinct.

To be sure, our motion's analysis of "suggestion" cases is not a "side-show" as Plaintiff claims.  (Doc. 72, 22.)  Rather, the <u>facts</u> within Plaintiff's own amended complaint describe improprieties with the allegedly suggestive lineup and the withholding of *Brady* evidence, <u>not</u> the fabrication of evidence.  Indeed, the word "suggest" or its variants appears eleven times.  (Doc. 41.)  In contrast, "fabricate" or any of its variants appears only once in the non-conceded causes of action as a conclusory allegation buried within Count I.[1]  (Doc. 41, 13.)

Procedurally, the sudden reliance on "fabricated evidence" is an impermissible attempt to add a new claim at the summary judgment phase.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing

---

[1] A similarly conclusory allegation of fabrication appears in the conceded Count IV conspiracy theory.  (Doc. 41, 15.)

summary judgment."); *Cruz v. Advance Stores Co.*, 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012) ("[A] party may not raise a new theory for the first time in response to a summary judgment motion."); *Horsman Holdings LLC v. Cooney*, 2026 WL 113586, *5 (M.D. Fla. Jan. 15, 2026) (rejecting as barred new claim of damages that constituted a "fundamental change" from the "gravamen" of the claim as pled). Plaintiff pled unduly-suggestive-lineup-procedure and *Brady* claims, not a fabrication of evidence claim.  The theory is accordingly barred.

Regardless, even if the Court accepts the substantively new theory, and now with the benefit of a full record, it is perhaps likely that Plaintiff recognizes the inability to base a § 1983 claim on an allegedly suggestive lineup in view of *Vega v. Tekoh*, 597 U.S. 134 (2022)—a pivotal decision completely ignored in the Response—and *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025), which Plaintiff half-heartedly attempts to distinguish because it did not involve a defendant who "knowingly caused witnesses to present false and fabricated identifications at trial."  (Doc. 72, 20.)   The trouble for Plaintiff is that even a substantively unconstitutional suggestion of a perpetrator's identity is not the same as "fabricating evidence."  After all, it is the <u>witness</u> who provides the testimonial evidence leading to conviction, and that witness's testimony is subject to both exclusion and cross-examination.  Absent some evidence of actual fraud on the court or the prosecution, an unconstitutionally suggestive identification procedure is not cognizable under § 1983.  *See Blackmon*, 132 F.4th at 525 ("Suppose the police coached the witnesses to identify the suspect <u>but told the prosecutor that</u>

3

they had not done so.  Or suppose the police had only one lookalike in the photo array but then furnished the prosecutor with a bogus array containing six or eight similar persons.") (emphasis added)).

Unsurprisingly, Plaintiff's "fabrication" authorities all involve the fabrication of evidence in a context within the common sense understanding of that term.  *See Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997) ("If the jury were to find that Wooten planted the cocaine, this planting of false evidence could constitute a violation of Plaintiff's rights ... under Section 1983.  ... It was well established in 1989 that fabricating incriminating evidence violated constitutional rights."); *Aguirre v. Seminole County*, 158 F.4th 1276, 1299 (11th Cir. 2025) (involving fabricated results of a latent print examination) ("The purposeful failure to properly verify the results of a positive comparison is not mere error or overconfidence in expressing a forensic conclusion; it is the absence of a step required to report incriminating forensic evidence.  Any intentional transmittal to investigators of a positive identification without this step would thus be a fabrication of a forensic result, akin to reporting that a drug test confirms the identity of a substance even though the testing did not result in a confirmation.").

Plaintiff also misreads *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), which certainly did not "tak[e] as a given that state officials can be held liable for fabrication by soliciting an expert's false testimony." (Doc. 72, 18.)  Instead, *Buckley* decided that prosecutors are not entitled to absolute immunity when they act as investigators.  *Id.* at 275–76.  In reaching this conclusion, it made the

4

"important assumption[] … that [the plaintiffs] allege constitutional violations for which § 1983 provides a remedy." *Id.* at 261 (emphasis added). The analysis therefore left the question of qualified immunity to the lower courts. *Id.* at 279 (clarifying that the decision was limited to "the two challenged rulings on absolute immunity"). Moreover, the *Buckley* prosecutors' alleged intentional commission of an expert they knew would be willing to provide fraudulent opinions tying the suspect to a bootprint has next to nothing to do with our facts. *Id.* at 262.

We nonetheless note that an officer may be liable for coercing and then introducing perjured testimony, but that is not what our case involves. *See McMillian v. Johnson*, 88 F.3d 1554, 1570–71 (11th Cir. 1996) ("[I]f [Defendants] indeed coerced Myers into perjuring himself, they knew that Myers's testimony was false, and thus may be liable or causing the state to use perjured testimony to convict McMillian."). But the coercion in *McMillian* was just that—coercion, far beyond suggestion—where the officers "coerced Myers into falsely accusing McMillian of sodomy so that they could obtain custody of McMillian while constructing evidence inculpating McMillian in the Morrison murder." *Id.* at 1558. Similarly, it has long been unconstitutional to knowingly obtain a conviction based on knowingly false evidence, which should come as no surprise. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.").

There is no evidence that Det. Stanley coerced Mr. Gonzalez or Ms. Szewczyk to identify Mr. Valle-Ramos, and there similarly is no evidence that they committed perjury.  Indeed, Ms. Szewczyk directly testified that "I never felt that he was ever trying to force or coerce me ever into anything." (Doc. 71-7, 71.)  And Mr. Gonzalez remains adamant that Mr. Valle-Ramos was his burglar. (*E.g.*, Doc. 71-3, 95–96.)  This leads to the Response's second overarching analytical failure.

### III.    There is no evidence that Det. Stanley "knew" Plaintiff was allegedly innocent.

Even indulging all reasonable inferences in Plaintiff's favor as we must at summary judgment, our record cannot support an inference that Det. Stanley absolutely knew that Mr. Valle-Ramos was innocent.  Det. Stanley was not at Mr. Valle-Ramos's house watching him allegedly sleep the morning of April 9, 2023.  Nor did Det. Stanley know the identities of the "actual" burglars and decide to frame a random civilian.  Rather, Det. Stanely pieced together circumstantial evidence that sufficiently implicated Mr. Valle-Ramos to create probable cause, which of course is all the law requires for arrest.

Importantly, this lack of actual knowledge extends to Mr. Gonzalez's identification of Mr. Valle-Ramos during the initial six-pack procedure.  Assuming Mr. Gonzalez "got the wrong guy" for summary judgment purposes—despite his protestations to this day—no reasonable jury could properly find that Det. Stanley knew of the error.  Indeed, it is an open question whether Mr. Valle-Ramos was

innocent at all, which implicitly demonstrates the logical impossibility that Det. Stanley could have known of a still yet-to-be-proven fact.

### IV. Plaintiff's unpublished district court citations are unavailing.

Plaintiff cites *James v. Conley*, 2024 WL 5374037 (S.D. Fla. Mar. 26, 2024), and *Diaz-Martinez v. Miami-Dade County*, 2009 WL 2970471 (S.D. Fla. June 9, 2009), both of which were orders on motions to dismiss.  We recognize that both orders at least signal that unconstitutionally suggestive photo identification procedures which lead to misidentifications constitute "a valid claim in the Eleventh Circuit."  *James*, 2024 WL 5374037 at *3; *Diaz-Martinez*, 2009 WL 2970471 at *8.  However, both support this position by citing only *Cikora v. Dugger*, 840 F.2d 893 (11th Cir. 1988).  *Cikora* was a habeas case, not a § 1983 action, and, as our motion pointed out, it denied habeas even though the "filler" photographs included individuals of a different race that the defendant.  More importantly, neither decision can be harmonized with *Vega* as explained in *Blackmon*.  *Diaz-Martinez* of course did not have the benefit of *Vega*, and it appears that the *James* defendants did not argue *Vega* to the court.

Specifically, under *Vega-Blackmon*, unconstitutionally suggesting a suspect's identity to a witness by itself causes no actionable harm to the suspect. The harm occurs when the witness's unconstitutionally influenced testimony is introduced <u>at trial</u> and even then only when a conviction occurs.  That <u>conviction</u>, tainted by an unfair process, violates due process.

Indeed, both *Diaz-Martinez* and *James* expressly recognize that it is the conviction, not the suggestion, that causes the constitutional injury.  2024 WL 5374037 at *3; 2009 WL 2970471 at *8.  But both orders fail to continue to the next step which *Vega* now requires: "Do the police violate the suspect's constitutional right to a fair trial by introducing into evidence the results of a suggestive identification?"  *Blackmon*, 132 F.4th at 525 (emphasis in original).  Absent an "unusual circumstance" tantamount to fraud as discussed above, the answer is no.  *Id.* at 525–26 ("Blackmon's appropriate remedy on that subject would have been exclusion of evidence at trial, not damages.").

That does not mean that either *Diaz-Martinez* or *James* were wrongly decided.  Considering their motion to dismiss postures, the *James* plaintiff was permitted to generally allege that the defendants indeed "fabricated" "knowingly" false identifications.  2024 WL 5374037 at *6.  The *Diaz-Maritnez* plaintiff went much further, detailing fabricated interviews with the non-English speaking plaintiff and a litany of invented facts linking the defendant to the underlying sexual assaults that the prosecutor relied upon in authorizing charges.  2009 WL 2970471 at *3–4.  These constitute the sort of "unusual circumstances" contemplated by *Vega-Blackmon* that open the doors to discovery.  We are beyond that phase here.  Plaintiff has identified no evidence of fraud, fabrication, or other misconduct despite his rhetoric to the contrary.

8

### V.   Plaintiff fails to seriously argue that clearly established law informed all officers in 2013 that Det. Stanley's investigative tactics were unconstitutional beyond debate.

One does not need a law degree, or even a high school diploma, to conclude that "the planting of false evidence could constitute a violation of Plaintiff's rights under the Federal Constitution." *Riley*, 104 F.3d at 1253. We have no qualms "admitting" that it was clearly established in 2013 that an officer violates the rights of a suspect where the officer sentiently sets in motion a prosecution based upon such fraudulent evidence resulting in a conviction obtained by a naïve prosecutor. But that is simply not the same thing as obtaining identification testimony based upon an allegedly flawed identification procedure.

Instead, to pierce Det. Stanley's qualified immunity, Plaintiff was obligated to show that this identification procedure was so clearly unconstitutional that everyone knew it in 2013. Plaintiff has not even tried. After all, it is not enough to demonstrate that the procedure was in fact unconstitutional—frankly, Plaintiff has come nowhere close to show substantive unconstitutionality either—but Plaintiff must point to law spelling it out so Det. Stanley would have known it. Thus, Plaintiff's resort to his retained expert's opinion is woefully out of place in this § 1983 action. *See, e.g., Kobie v. Fifthian*, 2014 WL 1652421, *9 (M.D. Fla. Apr. 23, 2014) ("Mr. Sweeting may testify to Defendant Fifthian's investigative procedures and tactics that are in essence disclosed in his report, but he may not state his opinion that Defendant lacked probable cause."). Plaintiff's expert's testimony would have been well-served to attack Det. Stanley's procedures in Mr. Valle-

9

<u>Ramos's criminal trial</u> to create reasonable doubt, but not here.  Of course, Mr. Valle-Ramos's criminal lawyer <u>did</u> challenge the reliability of the witnesses' identifications, and a jury unanimously found guilt anyway.

Plaintiff has failed to carry his burden to show that clearly established law precluded Det. Stanley's procedures, and summary judgment is appropriate for this reason alone.

## VI.   The *Brady* evidence is not *Brady* evidence.

Plaintiff now contends that there were four pieces of *Brady* evidence sufficient to pierce qualified immunity and proceed to trial: (1) the six-packs of Mr. Jeudy and Mr. Hickson and Mr. Gonzalez's non-identifications of them; (2) the unknown video of Mr. Valle-Ramos's non-statement immediately prior to arrest; (3) "evidence that [Det. Stanley] had provided Szewczyk with post-identification feedback"; and (4) Det. Stanley's alleged introduction of Ms. Szewczyk and Mr. Gonzalez outside the criminal courtroom.[2]

We fail to see how not producing the other two six-packs to the prosecution could have been *exculpatory* of Mr. Valle-Ramos.  In fact, the State stipulated to Mr. Valle-Ramos's motion in limine to exclude any mention of the "casing"

---

[2] As argued in § II *supra*, three of these pieces of alleged *Brady* evidence are not identified in the amended complaint and are therefore procedurally barred.  *See Gilmour*, 382 F.3d at 1315 ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).").  Only the allegedly missing video is identified in the amended complaint.  (Doc. 41 ¶ 54.)  We analyze all four in an abundance of caution.

incident and the BOLO stop at the outset of the criminal trial.  (Doc. 73-2, 5.)  In other words, <u>at Mr. Valle-Ramos's request</u>, any mention of Mr. Jeudy or Mr. Hickson was kept out of evidence.  Indeed, as Mr. Valle-Ramos's criminal defense attorney argued, "[T]he state and I have just agreed to just refer to that previous stop, which is unrelated, as an unrelated stop for unrelated purposes.  But no information whatsoever about it being in any way regarding a burglary is to come out to the jury."  (Doc. 73-2, 5.)  Logically then, anything to do with Mr. Jeudy or Mr. Hickson was kept out of the criminal trial at Mr. Valle-Ramos's request precisely because it would have been inculpatory.   And, where Plaintiff now complains that Det. Stanley should have revealed the three six-packs while testifying,[3] this would have run directly afoul of his own lawyer's admonition that, "any witness who may have information about that [BOLO stop] -- I would expect it would just be the detective and maybe the other officer -- <u>would not be able to testify as to that</u> to keep it out."  (Doc. 73-2, 5.)

It goes without saying that a criminal defendant cannot exclude evidence at trial and then sue the detective for not discussing the evidence successfully excluded.  Moreover, the initial BOLO tip involved two black males casing houses. (Doc. 73-13, 1.)  The three witnesses to the Gonzalez burglary uniformly identified three Hispanic suspects.   It is altogether possible that Mr. Valle-Ramos had

---

[3] This new claim violates Det. Stanley's absolute immunity as discussed in § VIII, *infra*.

different accomplices on the two dates.[4]  The Jeudy and Hickson six-packs were therefore irrelevant at best and inculpatory at worst, and they do not constitute *Brady* evidence in the first place.

Next, Plaintiff brushes off the mugshot taken the same day as his pre-arrest interview as "far from definitive."  That is wishful thinking; the Court can view the mugshot for itself.  (Doc. 71-14, 5.)  Moreover, the video of Mr. Valle-Ramos's prearrest questioning, had it existed, would have been in OPD's possession at the time of the criminal proceedings and subject to discovery.  A decade later, no one knows what might have come of it, but it would constitute rank speculation for a jury to conclude that (1) the video existed; (2) Det. Stanley deliberately withheld it from the prosecution in bad faith rather than merely negligently;[5] (3) Det. Stanley had reason to believe the video would have been somehow exculpatory; and (4) Mr. Valle-Ramos's hair shown in the video would have been different than his mugshot taken immediately afterwards.  The video is not *Brady* evidence and cannot base a § 1983 action, to say nothing of the lack of clearly established law on maintaining video evidence of every police interview.

---

[4] Even farther afield is Plaintiff's reference to Mr. Valle-Ramos's alleged yellow car. Det. Stanley would have no reason to know who owned whatever car was used in whatever burglary and even less reason to know what color Mr. Valle-Ramos's uninvolved car was.  These are great facts for arguing the existence of reasonable doubt to a jury; they have no relevance in a probable cause analysis.

[5] As indicated in our motion, the Eleventh Circuit has never held that recklessness is enough in the *Brady* context, and we therefore contend that clearly established law requires a showing of intentional nondisclosure to be actionable under § 1983.

12

Third, Plaintiff imaginatively claims that Det. Stanley had an affirmative duty to report that, after Ms. Szewczyk identified Mr. Valle-Ramos, he "smiled" and said "that's him."  This is metaphysical, seeing that Det. Stanley denies ever having done so.  In any event, Plaintiff offers no clearly established law that every word exchanged and facial reaction made must be reported to the prosecution lest the officer subject himself to § 1983 personal liability.  The slippery slope danger here is prohibitive.  Moreover, Plaintiff fails to explain how this "evidence" is either material in the *Brady* context, *see Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (asking whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different") (quotations omitted), or rises beyond negligence into intentional bad faith.

Finally, perhaps the most tenuous allegation is that Det. Stanley's alleged introduction of the witnesses outside the courtroom should have been reported to Mr. Valle-Ramos's criminal defense attorney.  Again, Det. Stanley denies the introduction and therefore could not have reported it.  But even assuming he acted politely by introducing the witnesses, how *not reporting the introduction* could have materially impacted the trial or risen to the level of intentional misconduct escapes us.

## VII.  Probable cause supported the arrest, vitiating the malicious prosecution claims.

Plaintiff's only objection to our motion for summary judgment on the malicious prosecution actions is that Det. Stanley allegedly falsified the arrest

13

affidavit.  His contrived attempts to identify falsehoods are hard to take seriously,[6] but they ask the wrong question.  As Plaintiff's own authority recognizes, "the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen if such false statements were necessary to the probable cause." *Williams*, 965 F.3d at 1169 (quotation omitted) (emphasis added).

The "false" statements in Det. Stanley's arrest affidavit were therefore immaterial so long as Det. Stanley himself had probable cause.  An objectively reasonable officer could rely on the BOLO, the history of casing residences in the area, the similar vehicle, and, most importantly, the victim's confident identification of the suspect such that *at least* arguable probable cause existed for Mr. Valle-Ramos's arrest.  The affidavit is of no moment, and the malicious prosecution claims, like the others, cannot survive summary judgment.

## VIII. Plaintiff is barred procedurally and substantively from challenging Det. Stanley's testimony in the criminal trial.

In another brand new theory of liability, Plaintiff claims that Det. Stanley's criminal trial testimony that he "did not remember" the Jeudy/Hickson six-packs exposes him to § 1983 liability.  Nothing of the sort was alleged in the amended complaint, and we therefore did not address the claim in our motion.  Nor would

---

[6] For example, reporting that Mr. Gonzalez stated that the suspect had a "distinct" afro is actually supported by the record in that Mr. Gonzalez provided that information orally in addition to his written report.  (Doc. 73-10, 78 ("It had been provided to me by Mr. Gonzalez that the -- one of the suspects in the burglary at his residence had a very distinct Afro haircut.").)  There is no contrary evidence.

14

have any such claim survived dismissal—Det. Stanley enjoys <u>absolute</u> immunity from liability for trial testimony. *See Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) ("[A] grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony."); *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999) ("Police officers enjoy the same absolute immunity as lay witnesses for their testimony at trial or in front of the grand jury.") (quotations omitted); *Pribyl v. Uknown FDLE Ofcs.*, 2021 WL 1799426, *2 n.3 ("N.D. Fla. Mar. 16, 2021) ("A claim for perjury is precluded in a § 1983 action based on witness testimony.").

Accordingly, Plaintiff's arguments related to Det. Stanley's testimony cannot serve as a basis for § 1983 as a categorical matter of law.

## IX.    The IIED claim essentially rises and falls with the others.

Plaintiff argues that we somehow waived our IIED arguments by not more fully discussing the tort in an already exhaustive motion. Not so. Instead, we simply pointed out the lack of evidence which could support a reasonable jury finding that Det. Stanley intentionally framed a stranger. This would require a finding that Det. Stanley <u>knew</u> of Mr. Valle-Ramos's <u>actual</u> innocence, and our other arguments comfortably encapsulate the question. That is, it is logically impossible for Det. Stanley to know that Mr. Valle-Ramos is innocent to this day, so Det. Stanley could not have knowingly and intentionally arrested him with <u>actual knowledge</u> of innocence in 2013.

/

/

15

Respectfully submitted this **19th** day of May, 2026, by:

*/s Derek J. Angell*
DEREK J. ANGELL, ESQ.
Fla. Bar No. 73449
dangell@ohalaw.com
O'CONNOR, HAFTEL & ANGELL, PLLC
800 N Magnolia Ave, Ste 1350
Orlando, Florida 32803
(407) 843-2100
*Lead Counsel for Defendants*