UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**JORGE VALLE-RAMOS,**

      **Plaintiff,**

**v.**                                  **Case No. 6:24-cv-1276-CEM-DCI**

**MICHAEL STANLEY and
DANIEL BRADY,**

      **Defendants.**

_____/

## ORDER

THIS CAUSE is before the Court on Defendants' Amended Motion for Summary Judgment ("Motion," Doc. 71),[1] to which Plaintiff filed a Response (Doc. 72), and Defendants filed a Reply (Doc. 79). This cause is also before the Court on Plaintiff's Amended Motion to File Excess Pages in Response to Defendants' Motion for Summary Judgment (Doc. 75)[2], and Defendants' Motion to File Excess Pages in Reply (Doc. 78). Finally, this cause is before this Court on Plaintiff's Motion for Leave to File Sur-Reply and Present Oral Argument (Doc. 80).

---

[1] Defendants' initial Motion for Summary Judgment (Doc. 63) and accompanying Motion to File Excess Pages (Doc. 65) will be denied as moot.

[2] Plaintiff's initial Motion to File Excess Pages in Response to Defendants' Motion for Summary Judgment (Doc. 74) will be denied as moot.

## I.   BACKGROUND

On the morning of April 9, 2013, George Gonzalez opened the front door to his home and saw a man standing in his office. (Investigation Documents, Doc. 73-1, at 1; Gonzalez Feb. 24, 2025 Dep., Doc. 71-3, 30–31). Gonzalez looked at the man for few seconds before chasing him out of his house. (Doc. 71-3 at 31–32). The man got away and Gonzalez called the police. (*Id.* at 39). When he re-entered his home, he encountered two additional men. (*Id.* at 41–42). After an altercation, the two men fled Gonzalez's home. (*Id.*).

Police officers from the Orlando Police Department arrived and took statements from Gonzalez and two of his neighbors—Bethany Szewczyk and Charlene Bloom. (Doc. 73-1 at 1–2; Bloom Statement, Doc. 73-4, at 1). Gonzalez described the first man he saw as a "Spanish individual" with an afro and the other men as being around seventeen to twenty years old. (Doc. 73-1 at 1). He also reported that several items were taken from his home. (*Id.*). Szewczyk observed three Hispanic men, around sixteen to twenty years old, with dark hair and dark eyes running and entering a gray Toyota. (*Id.* at 2). Bloom saw three men running towards a gray compact vehicle. (Doc. 73-4 at 1).

A few days before the burglary, an anonymous witness reported to the police that she observed two black men going door-to-door and knocking on the doors of residences without cars in their driveways. (April 3, 2013 Field Report 1, Doc. 73-

13, at 1). She also reported that one of the black male suspects walked around to the rear of her home while she was inside. (*Id.*). The anonymous witness stated that these individuals were in a gray 2003 Volkswagen and provided the license plate number. (*Id.*). A criminal information bulletin was posted about this suspicious activity. (Doc. 73-1 at 3). The bulletin stated that the car was a silver Volkswagen Jetta, included pictures of the occupants of the car, and noted the address where the suspicious activity occurred. (*Id.*). Later that day, a vehicle matching that description and license plate number was stopped by Orlando police officers. (April 3, 2013 Field Report 2, Doc. 73-14, at 1). In the vehicle there was a white Hispanic female, a black man, and two white Hispanic men, one of which was Plaintiff. (*Id.*).

Detective Michael Stanley ("Stanley") was assigned to investigate the burglary of Gonzalez's home. (Stanley Dep., Doc. 71-6, at 66). Stanley saw the bulletin and noted that the car pictured was similar to the car the witnesses to the burglary described, that one of men pictured on the bulletin had an afro, and that the suspicious activity occurred approximately two miles from Gonzalez's home. (*Id.* at 76–78, 80). Following this as a potential lead in the burglary case, Stanley assembled three photo lineups, one for each of the men pictured on the bulletin. (*Id.* at 86; *see generally* Photo Lineups, Doc. 71-12). Each photo lineup included one suspect and five other individuals. (Doc. 71-12). Stanley struggled to find individuals with similar traits to Plaintiff due to the large afro in his driver's license photo, so Stanley

used an older photograph of Plaintiff in which his hair was shorter. (Doc. 71-6 at 179–80).



(Doc. 73-1 at 6).

Nine days after the burglary, Gonzalez looked at the lineup and positively identified Plaintiff as one of the men who burglarized his home. (*Id.* at 5–6; Doc. 71-3 at 83–84). Stanley showed Gonzalez an additional photograph of Plaintiff, and Gonzalez once again identified Plaintiff as one of the perpetrators of the burglary. (Gonzalez Jan. 22, 2014 Dep., Doc. 73-18, at 11–12). Gonzalez did not make an identification based on the lineups that included the other two male suspects. (Doc. 71-6 at 87). Stanley also contacted Bloom, but she did not participate in an identification procedure. (Criminal Trial Tr., Doc. 73-2, at 109, 190; Doc. 73-10 at 107). According to Bloom, she informed Stanley that she had seen Plaintiff's

mugshot and did not think it was the person she had seen fleeing Gonzalez's home. (*Id.* at 190).[3]

After Gonzalez identified Plaintiff, Stanley wrote an affidavit for an arrest warrant. (Doc. 73-1 at 8–10). The arrest warrant stated that Gonzalez described one suspect as having a "distinct [a]fro style hairdo," that the photo lineup used a picture of Plaintiff where he did not have a distinct afro, and that "[a]ll efforts to locate the suspects were met with negative results." (*Id.* at 9). The affidavit also referred to the bulletin and stated that it provided an investigative lead. (*Id.*). Detective Sergeant Daniel Brady ("Brady") reviewed the affidavit. (Brady Dep., Doc. 71-2, at 32, 106). An arrest warrant was issued. (Doc 73-1 at 11–12). Plaintiff was arrested and, according to Plaintiff, he was interrogated regarding the burglary. (Valle Ramos Dep., Doc. 73-6, at 120, 122). However, despite the Orlando Police Department's policy to record all such interrogations, (Doc. 73-10 at 126), no recording was provided to the state attorney, (*see* Case File, Doc. 73-8, at 281 (noting in response to a request from the state attorney's office that there was "no record of [an] interview").[4]

---

[3] Bloom testified to this at Plaintiff's criminal trial. (Doc. 73-2 at 190).

[4] In 2013, Stanley testified that Plaintiff "refused to speak with" law enforcement when he was arrested. (2013 Stanley Dep., Doc. 71-5, at 24). And of course, if that were the case, there would not have been any recording to turn over. However, at this stage of the proceedings, the facts must be construed in favor of Plaintiff.

Several months later, Szewczyk also completed a photo lineup where she identified Plaintiff as one of the burglars. (Doc. 73-1 at 15). After she did so, Stanley "immediately told [her] that [she] had picked the right guy." (Doc. 73-21 at 24). A criminal jury trial commenced in which Gonzalez, Szewczyk, Bloom, and Stanley testified. (Doc. 73-2 at 42, 78, 97, 178). During the trial, Stanley introduced Gonzalez and Szewczyk to each other in the waiting area before Szewczyk testified, and Gonzalez told Szewczyk his version of events, including that he was certain that he made the correct identification. (Post-Conviction Hr'g Tr., Doc. 73-21, at 17–18). The jury returned a guilty verdict. (Doc. 73-2 at 288).

Plaintiff completed his sentence in 2021, (Sentencing Records, Doc. 71-13, at 11), and sought post-conviction relief, (Motion for Post-Conviction Relief, Doc. 73-25). At an evidentiary hearing on the Motion for Post-Conviction Relief, Szewczyk recanted her identification of Plaintiff and stated that she was confident that someone else was the person she saw. (Doc. 73-21 at 16–18, 43–44). The state court then granted the Motion for Post-Conviction Relief, vacating the Judgement and Sentence and determining that Plaintiff was entitled to a new trial. (Circuit Ct. Order, Doc. 73-26, at 9). Instead of retrying the case, the state attorney entered a *nolle prosequi*. (Nolle Prosequi, Doc. 73-27, at 2).

Plaintiff then initiated this civil action against the City of Orlando, Stanley, and Brady. (Am. Compl., Doc. 41, at 1). The claims against the City of Orlando have

been dismissed. (July 16, 2025 Order, Doc. 52, at 6). Defendants now move for summary judgment on all the remaining counts. (Doc. 71 at 3–4).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.*

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1313–14 (11th Cir. 2007). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion,

perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary judgment should be denied only "[i]f reasonable minds could differ on the inferences arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)).

## III.    ANALYSIS

### A.    Section 1983 Claims

As relevant to Plaintiff's federal claims, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation omitted). To be entitled to qualified

immunity, a government official first must demonstrate that "'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Rich v. Dollar*, 841 F.2d 1558, 1563–64 (11th Cir. 1988) (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)). If the defendant satisfies this burden, then the court must grant qualified immunity unless the plaintiff can demonstrate that the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the defendant and that it was clearly established at the time of the incident that the actions of the defendant were unconstitutional. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009).

Here, there is no question that Defendants were acting within the scope of their discretionary authority when investigating the burglary. (Doc. 41 at 12, 14); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1262 (11th Cir. 2010) (finding that a law enforcement officer acted within the scope of his authority when he brought a bribery charge). Consequently, for each of Plaintiff's federal claims Plaintiff bears the burden to show that Defendants' conduct (1) violated a constitutional right, and (2) that the constitutional right was clearly established at that time. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).

*1.    Due Process*

Plaintiff brings a due process claim against Defendants alleging a violation of

the Fourteenth Amendment. The Fourteenth Amendment provides a cause of action

for both procedural and substantive due process claims. *Maddox v. Stephens*, 727

F.3d 1109, 1118 (11th Cir. 2013). But Plaintiff does not specify which type of due

process claim he is bringing, and thus the Court will consider both.

a.    <u>Substantive Due Process</u>

Generally, the "touchstone of due process is protection of the individual

against arbitrary action of government." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833,

845–46, (1998) (citations and quotations omitted). Yet "'not every wrong committed

by a state actor rises to the level of a "constitutional tort," sufficient to trigger a

substantive due process violation.'" *Maddox*, 727 F.3d at 1119 (quoting *Lee v.

Hutson*, 810 F.2d 1030, 1032 (11th Cir. 1987)); *Daniels v. Williams*, 474 U.S. 327,

328 (1986) ("[T]he Due Process Clause is simply not implicated by a *negligent* act

of an official causing unintended loss of or injury to life, liberty, or property").

Plaintiff alleges that Stanley—acting with the intention to implicate

Plaintiff—fabricated evidence against Plaintiff such that it violated Plaintiff's right

to a fair trial. (Doc. 41 at 13; Doc. 72 at 15); *see also Aguirre-Jarquin v. Seminole

Cnty.*, 158 F.4th 1276, 1297 (11th Cir. 2025) (indicating that the fabrication of

inculpatory evidence implicates the due process right to a fair trial).

Plaintiff refers to the following facts in support of his claim: (1) the photo-lineup, arguing that it was unduly suggestive; (2) Stanley's post-identification statement to Szewczyk that she picked the right guy; and (3) the conversation Szewczyk had with Gonzalez after Stanley introduced them before she testified. According to Plaintiff, these facts show that Stanley fabricated false witness identification evidence. Plaintiff also points to purported failures in the investigation to show that Stanley did not pursue exculpatory evidence that would contradict the allegedly fabricated witness identification. Those purported failures include: (1) the fact that Stanley did not invite Bloom to participate in a lineup; (2) Stanley did not order DNA testing, (Doc. 73-2 at 110); and (3) Stanley never produced a video of Plaintiff's interrogation.

Although Plaintiff has presented caselaw that indicates fabricating evidence violates a clearly established constitutional right, Plaintiff has not pointed to any authority supporting his claim that Stanley's actions amount to fabricating evidence. (*See generally* Doc. 72 at 15–22). And upon review of the relevant authority, the Court concludes that, at a minimum, it was not clearly established that Stanley's actions amounted to fabrication of evidence.

"'For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' such that 'in the light of pre-existing law the unlawfulness [is]

apparent.'" *Aguirre-Jarquin*, 158 F.4th at 1297 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "Sometimes, 'a very high degree of prior factual particularity may be necessary' to provide fair warning. 'But general statements of the law are not inherently incapable of giving fair and clear warning,' with general constitutional rules expressed in decisional law able to apply with 'obvious clarity' to the conduct in question." *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

The Court begins with the photo lineup. Plaintiff argues it was unduly suggestive because the suspect had been reported as having an afro, and in the photo lineup, Plaintiff had somewhat longer hair than the other individuals. The legal authority in the Eleventh Circuit does not put a reasonable officer on notice that the photo lineup in this case was unduly suggestive, much less that it would constitute fabrication of evidence. *See United States v. Daniels*, 97 F.4th 800, 810 (11th Cir. 2024) ("[U]nder our case law, even if Daniels were the only person in the array wearing a black hoodie or with a certain hairstyle, that does not necessarily mean that the lineup was unduly suggestive." (collecting cases)); *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015) (rejecting the argument that a photo lineup "was unduly suggestive because [the defendant was] the only man in the lineup with gold teeth, a distinguishing feature of his"); *c.f. Aguirre-Jarquin*, 158 F.4th at 1298 (citing cases that pre-date the investigation here as examples of acts that clearly constitute fabrication of evidence, including "planting cocaine in a suspect's car"

"fabricating a boot print at a murder scene" and "switching exculpatory evidence with inculpatory evidence during a search").[5]

As to Stanely's post-identification feedback to Szewczyk, Plaintiff has cited no authority to indicate that this can even constitute fabrication of evidence, and the Court has located none. Thus, it certainly is not clearly established that such feedback violated Plaintiff's constitutional rights. *See Legenzoff v. Steckel*, 564 F. App'x 136, 145 (6th Cir. 2014) (stating in an unlawful arrest probable cause analysis: "Because all of this alleged feedback occurred after the witnesses had identified Legenzoff, there is no reason to believe it impacted their identifications").

Moving on to Szewczyk's conversation with Gonzalez after Stanley introduced them during Plaintiff's trial, Plaintiff attempts to impute the conversation, where Gonzalez conveyed his version of events to Szewczyk, to Stanley. But there is no evidence that Stanley participated in or prompted the substance of that conversation. (Doc. 71-11 at 17–18, 48). And, obviously, simply introducing witnesses to one another without more cannot possibly amount to fabrication of evidence. Moreover, even if Stanley could be held responsible for the conversation, it would equate to breaking the rules of sequestration, which is not a clearly

---

[5] Plaintiff argues that *Aguirre-Jarquin* "leaves no doubt that [Stanley] had notice he was violating [Plaintiff's] clearly established rights." (Doc. 72 at 19). But *Aguirre-Jarquin* does not address photo lineups. Instead, construing the facts in favor of the plaintiff, the evidence in *Aguirre-Jarquin* suggested that the latent print examiner falsely identified the plaintiff and then intentionally enlisted an incompetent examiner to verify her results. 158 F.4th at 1300. These facts are obviously distinguishable from those at issue here.

established constitutional right. *Hilton v. Sec'y, Fla. Dep't of Corr.*, No. 25-10207, 2025 U.S. App. LEXIS 9795, at *4 (11th Cir. Apr. 23, 2025) ("Hilton failed to show that the state court's decision [to not sequester a rebuttal witness] was contrary to clearly established federal law because there is no federal right to sequestration."); *United States v. Edwards*, 526 F.3d 747, 758 (11th Cir. 2008) ("A criminal defendant has no constitutional right to exclude witnesses from the courtroom.").

The remaining facts Plaintiff cites in support of his fabrication of evidence argument are not alleged to be fabrication of evidence in and of itself, but evidence that Stanley did not investigate leads that would possibly lead to exculpatory evidence. As an initial matter, it is unclear whether there were any leads that would have uncovered additional exculpatory evidence. Plaintiff takes issue with Bloom not participating in the photo lineup, but Bloom was contacted and testified at trial that she did not believe Plaintiff was the individual she saw that day. Thus, Bloom's exculpatory evidence was uncovered and presented to the jury.

As to the failure to order DNA testing, while they did test for fingerprints, (Doc. 71-5 at 6–8), Stanley testified that they did not order DNA testing because the witnesses stated the suspects were wearing latex gloves, meaning it was unlikely there would be DNA and because the Florida Department of Law Enforcement ("FDLE") would not process touch DNA testing for anything other than violent crimes. (*Id.* at 6; 2025 Stanley Dep., Doc. 71-6, at 122–23). Finally, while Stanley

never produced a video of Plaintiff's interrogation, the only exculpatory evidence Plaintiff argues would be on that video is the length of his hair, but that was also evidenced by his mugshot.

Regardless, even assuming these were possible exculpatory leads, "'[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *Aguirre-Jarquin*, 158 F.4th at 1309 (quoting *Patterson v. New York*, 432 U.S. 197, 208 (1977)). Moreover, "[s]uspects ha[ve] no right to 'an error-free investigation' of exculpatory leads." *Id.* (quoting *Baker v. McCollan*, 443 U.S. 137, 146 (1979)).

The limited circumstances where the Eleventh Circuit has found a clearly established constitutionally inadequate investigation was where "the available evidence, uncorroborated by additional evidence or information, on its face actually introduced significant doubts about a suspect's culpability such that resolution of those doubts via further investigation was required." *Id.* at 1310. Like the *Aguirre-Jarquin* Court, this Court "cannot conclude that it was clearly established that [Plaintiff] had a right to an investigation that pursued all potentially exculpatory leads in the face of contrasting evidence that inculpated [Plaintiff], when the investigators did not actually harbor significant doubts about [Plaintiff's] culpability." *Id.*

Nonetheless Stanley's actions may trigger a substantive due process claim if they shock the conscience. *See Chavez v. Martinez*, 538 U.S. 760, 774 (2003). "Convictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause." *Id.* (quoting *Rochin v. California*, 342 U.S. 165, 172, 174 (1952)). Courts applying the shocks the conscience inquiry consider the unreasonableness of the officer's conduct given the totality of the circumstances. *Tinker v. Beasley*, 429 F.3d 1324, 1328 (11th Cir. 2005). It is apparent that Stanley did not conduct a particularly thorough investigation. But "[e]ven conduct that is 'untoward,' 'unfortunate,' and 'understandably upsetting' does not necessarily rise to the level of a substantive due process violation." *Maddox*, 727 F.3d at 1127; *c.f. Vega v. Tekoh*, 597 U.S. 134, 150 (2022) (holding that § 1983 cannot be used to obtain an award of damages against a law enforcement officer for a violation of *Miranda* procedures); *c.f. Blackmon v. Jones*, 132 F.4th 522, 524–26 (7th Cir. 2025) (applying the Supreme Court's holding in *Vega*, to claims based on unduly suggestive photo lineups and concluding that an unduly suggestive photo lineup, by itself, does not entitle a plaintiff to damages).

In *Moran v. Burbine*, the Supreme Court remarked that "police deception might rise to a level of a due process violation" but declined to find a due process violation where law enforcement officers did not inform a suspect that an attorney

had been calling on his behalf before continuing an interrogation. 475 U.S. 412, 415, 428, 432–33 (1986). Similarly, in *Tinker*, the Eleventh Circuit declined to find a due process violation where officers falsely told a suspect that her attorney had abandoned her and proceeded to interrogate her. 429 F.3d at 1328–29. Like the officers' actions in *Moran* and *Tinker*, Stanley's investigation into this burglary may have been improper and may have led to inadmissible evidence, yet even when viewing the facts in the light most favorable to Plaintiff, the Court cannot say that Defendants' conduct rises to the conscience-shocking level such that it triggers a substantive due process violation.

Plaintiff has not shown that Defendants violated a specific constitutional right that was clearly established, and therefore, has not overcome Stanley's qualified immunity.

### b.    Procedural Due Process

Plaintiff asserts that his due process rights were violated when Stanley concealed and destroyed evidence (Doc. 41 at 13). This can be construed as an allegation that a procedural due process violation occurred. *See Porter v. White*, 483 F.3d 1294, 1303 (11th Cir. 2007) (noting that the plaintiff's procedural due process rights were violated by the prosecution's failure to observe its *Brady* obligations). In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment." 373 U.S. 83, 87 (1963). The

Eleventh Circuit has held that "§ 1983 provides a cause of action for a violation of

the due process right to a fair trial that is protected by *Brady*." *McMillian v. Johnson*,

88 F.3d 1554, 1567, n.12 (11th Cir. 1996).

When a law enforcement officer, rather than a prosecutor, suppresses material

evidence the circumstances must be such that "a reasonable officer in [the

defendant's] position would know, when they acted, that the evidence withheld from

the prosecutor was material." *Id.* at 1569. Additionally, while *Brady* imposes a "no-

fault standard of care" on prosecutors, this standard "has no place in a § 1983

damages action against a law enforcement official in which the plaintiff alleges a

violation of due process." *Porter*, 483 F.3d at 1306. A plaintiff must show more than

"mere negligence or inadvertence on the part of a law enforcement official in failing

to turn over *Brady* material to the prosecution." *Id.* at 1308. Moreover, a plaintiff

must show an affirmative causal connection between the officer's conduct and the

denial of due process. *Id.*

Plaintiff alleges that Stanley concealed the following *Brady* materials: the

lineups involving the other suspects and any documentation relating to those lineups,

the recording of Plaintiff's interrogation, evidence that Stanley provided post-

identification feedback, and evidence that Stanley introduced Szewczyk and

Gonzalez. (Doc. 72 at 13). While testifying during the criminal trial, Stanley did not

mention the lineups involving the other suspects and Plaintiff claims that this is evidence that Stanley knowingly suppressed these materials. (Doc. 72 at 25).[6] But Stanley was not asked any questions that would have necessarily prompted him to disclose that information. (Doc. 73-2 at 97–115). Aside from Stanley's trial testimony, Plaintiff does not present any other evidence of Stanley's intent in failing to turn over materials to the state. As a result, Plaintiff has not demonstrated a genuine dispute of material fact regarding whether Stanley's failure to turn over materials was more than mere negligence or inadvertence.

Additionally, Plaintiff has not shown that it was clearly established that a law enforcement officer must turn over ancillary photo lineups where no one was identified. *See Davis v. United States*, 735 A.2d 467, 476 n.14 (D.C. 1999) ("We also disagree with Sanders' contention that the prosecution violated the strictures of *Brady* . . . by failing to disclose Tapp's failure to make an identification from the photo array, for a failure to identify (as opposed to a misidentification) is not exculpatory.").

### 2. *Malicious Prosecution*

To establish a malicious prosecution claim a plaintiff must prove "(1) the plaintiff was seized under legal process; (2) the legal process justifying the plaintiff's

---

[6] But Stanley has absolute immunity for his testimony during the criminal trial, *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999), so Plaintiff cannot rely on Stanley's trial testimony as a basis for liability here.

seizure was constitutionally infirm; (3) the suit or proceeding terminated in the plaintiff's favor; and (4) the seizure would not otherwise be justified without legal process." *Gervin v. Florence*, 139 F.4th 1236, 1248 (11th Cir. 2025). Here, the first element is easily met. Stanley seized Plaintiff under legal process by "seeking and obtaining" a warrant that led to Plaintiff's arrest. *Id.*

The second element is more complex. An arrest warrant will be found to be constitutionally infirm when a plaintiff establishes "either that the officer who applied for the warrant should have known that his application failed to establish probable cause or that an official . . . intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020) (citations omitted). If the warrant contains an intentional or reckless misstatement or omission, courts examine "the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). Probable cause exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* at 1285. It "requires 'less than evidence which would justify condemnation,' and 'is not a high bar.'" *Aguirre*, 158 F.4th at 1307 (11th Cir. 2025)

(citations omitted). Arguable probable cause entitles an officer to qualified immunity and only requires that "a reasonable officer in [the defendant's] position could have believed that probable cause existed to arrest [the plaintiff]." *Id.*

Plaintiff argues that Stanley's affidavit contained several intentional or reckless misstatements and an omission and that these misstatements and the omission were necessary to support the warrant. (Doc. 72 at 26). Defendants argue that, even assuming these statements and omissions constitute misrepresentations, they were immaterial because there is still probable cause even if those misrepresentations are excluded. (Doc. 79 at 14).

Plaintiff asserts the following statements are misrepresentations: Gonzalez described one of the burglars as having a distinct afro, Gonzalez viewed a photo lineup where Plaintiff did not have a distinct afro, and all efforts to locate the suspects met with negative results. (Doc. 72 at 26–27). And Plaintiff claims the affidavit omitted the material fact that the anonymous witness who reported suspicious activity before the burglary said that she saw two black men. (*Id.*). Therefore, in considering whether there is probable cause, the Court will exclude the alleged misrepresentations and include the additional, omitted information.

Aside from this information, the affidavit states that the burglary suspects were described as Hispanic males in their early 20's, a criminal information bulletin stated that Plaintiff and three others had been stopped and detained in reference to

their possible involvement in a residential burglary days before the burglary of
Gonzalez's house, in the same general area as Gonzalez's house, and that Gonzalez
immediately selected Plaintiff in a photo lineup. (Doc. 73-1 at 8–10).

Plaintiff argues the photo lineup was unduly suggestive and that Gonzalez's
identification is not legitimate evidence that can contribute to a finding of probable
cause. (*See* Doc. 72 at 27). Generally, "suggestiveness in the context of suspect
identification is a matter of evidentiary law, and . . . does not have a direct bearing
on a probable cause inquiry." *Mills v. Town of Davie*, 48 F. Supp. 2d 1378, 1381
(S.D. Fla. 1999). In any event, "the framework for analyzing the admissibility of . .
. identification evidence can be useful in assessing its reliability for the purposes of
a probable cause determination." *Id.*; *see Gore v. Hardy*, No. 3:10-cv-343-J-34TEM,
2011 WL 13295388, at *12–13 (M.D. Fla. May 23, 2011) (using the analysis for the
admissibility of an identification procedure in considering whether a police officer
lacked probable cause).

The Eleventh Circuit applies a two-step analysis for determining whether
photo lineups were so unreliable as to violate due process. *Williams v. Weldon*, 826
F.2d 1018, 1021 (11th Cir. 1987). First, courts decide whether the original
identification procedure was unduly suggestive. *Id.* Then, if it is found to be unduly
suggestive, they "determine whether the suggestive procedure, given the totality of

the circumstances, created a substantial risk of irreparable misidentification at trial."

*Id.*

As discussed above in the substantive due process analysis, Plaintiff asserts that because Gonzalez described one of the burglars as having an afro and Plaintiff is the only person pictured in the photo lineup that has an afro the lineup is unduly suggestive. Notably, Plaintiff's hair is short and dark like the hair of the other individuals pictured. Witness identifications based on photo lineups of a similarly suggestive nature to this one have been found not to be unduly suggestive. *See Williams*, 826 F.2d at 1021 (finding that an identification procedure was not impermissibly suggestive where the plaintiff was the only black man in the lineup and noting that the other members of the group all had similar skin tone and facial characteristics); *United States v. Smith*, 148 F. App'x 867, 874–75 (11th Cir. 2005) (concluding that a lineup was not unduly suggestive where a witness observed an individual wearing a blue T-shirt and only one individual was wearing a blue T-shirt in the lineup).

Even assuming the lineup was unduly suggestive, it may still be reliable such that it can contribute to the finding of probable cause. When considering the reliability of an identification, the factors to be considered include, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of

certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). Here, Gonzalez saw the individual later identified as Plaintiff for a few seconds before running after him, Gonzalez provided a brief description of the burglars to the police on the day of the burglary, the lineup took place nine days after the burglary, and Gonzalez was certain of his identification at the time of the photo lineup and during the subsequent criminal trial. These factors support a finding that the lineup was reliable and that Gonzalez's identification was reasonably trustworthy information which Stanley could rely upon in making a probable cause determination.

From the undisputed facts within the affidavit, particularly the criminal information bulletin, Plaintiff's similarities to the witnesses' descriptions, and Gonzalez's identification of Plaintiff, a prudent person could believe that Plaintiff committed the burglary. *See Brock v. City of Zephyrhills*, 232 F. App'x 925, 928 (11th Cir. 2007) (affirming a district court's finding of probable cause where the plaintiff matched the physical descriptions of the witnesses, the plaintiff owned a vehicle that matched the getaway vehicle, and witnesses identified the plaintiff); *Hunter v. Schoeppner*, 559 F. App'x 893, 895 (11th Cir. 2014) (concluding that a detective had probable cause to obtain arrest warrants where a demand note left at a

robbery was written on a check issued to the plaintiff's business; the plaintiff resembled the robber; and two witnesses tentatively identified the plaintiff).

Considering the omitted statement that the anonymous witness observed two black men does not change this outcome. The witness provided the police with the license plate information of the car she saw and when the car was stopped the individuals in the car were identified and only one of them was black. Given these circumstances, the anonymous witness' conflicting description of the suspects' race does not negate probable cause. *See Aguirre*, 158 F.4th at 1307–08 (explaining that "[a] probable cause determination does not require the fine resolution of conflicting evidence" and that "the availability of alternative inferences does not prevent a finding of probable cause so long as the inference upon which the officer relies is reasonable") (citations and quotations omitted). Because the affidavit establishes probable cause, the legal process justifying Plaintiff's seizure was not constitutionally infirm. Defendants are entitled to summary judgment on Plaintiff's § 1983 malicious prosecution claim.

## B.    State Claims

Applicable to Plaintiff's state claims, a Florida officer, employee, or agent is immune from lawsuits arising from "any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and

willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). Defendants were acting within the scope of their authority. *See McGhee v. Volusia Cnty.*, 679 So. 2d 729, 732–33 (Fla. 1996) (concluding that an officer had lawful authority to restrain arrestees, detain them, or respond with force). Thus, Plaintiff must show Defendants acted with the requisite intent to pierce Defendants' statutory immunity.

### 1.    *Malicious Prosecution*

To prevail in a malicious prosecution claim brought under Florida common law, a plaintiff must demonstrate:

> (1) The commencement or continuance of an original criminal or civil judicial proceeding. (2) Its legal causation by the present defendant against plaintiff who was defendant in the original proceeding. (3) Its bona fide termination in favor of the present plaintiff. (4) The absence of probable cause for such proceeding. (5) The presence of malice therein. (6) Damage conforming to legal standards resulting to plaintiff.

*Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1218 (Fla. 1986) (citation omitted). The failure to show one of these elements is fatal to the action. *Id.* Plaintiff therefore has the "heavy burden" of proving "that the criminal proceeding was initiated by the defendant without probable cause." *Id.* at 1219; *see Fernander v. Bonis*, 947 So. 2d 584, 589 (Fla. 4th DCA 2007) (explaining that the presence of probable cause under the facts alleged by a plaintiff prevents the plaintiff from showing the absence of probable cause or malice).

As explained in the analysis of Plaintiff's § 1983 malicious prosecution claims, the undisputed facts establish that Stanley had probable cause to believe Plaintiff committed the burglary of Gonzalez's home. *See Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) ("[T]he standard for determining whether probable cause exists is the same under Florida and federal law."). Thus, Defendants are also entitled to summary judgment on Plaintiff's state malicious prosecution claim.

### 2.    Intentional Infliction of Emotional Distress

Under Florida law, an intentional infliction of emotional distress ("IIED") claim consists of the following elements: "(1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous, beyond all bounds of decency, and odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1367–68 (11th Cir. 2024) (citations and quotations omitted). The first element encompasses the statutory immunity standard, therefore a "valid claim for intentional infliction of emotional distress is sufficient to overcome an officer's state-level immunity." *Id.* at 1369.

As it relates to the second element, "'[w]hether conduct is outrageous enough to support a claim of intentional infliction of emotional distress [is] a question of law.'" *Id.* at 1368 (quoting *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007)). In Florida, "the standard for outrageous conduct is particularly

high." *Id.* (quoting *Clemente v. Horne*, 707 So. 2d 865, 867 (Fla. 3d DCA 1998)). "[L]iability for intentional infliction of emotional distress attaches 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 1369 (quoting *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985)). "[C]ourts uphold claims of intentional infliction of emotional distress only in 'extremely rare circumstances.'" *Triana v. Diaz*, No. 12-21309-CIV, 2014 WL 5319800, at *7 (S.D. Fla. Oct. 16, 2014) (quoting *Metro. Life Ins. Co.*, 467 So. 2d at 278).

Defendants argue that they are entitled to summary judgment on Plaintiff's IIED claim because no evidence supports Plaintiff's theory that Defendants intentionally framed Plaintiff. (Doc. 71 at 41; Doc. 79 at 15). In response, Plaintiff summarily states that Defendants have waived their arguments for summary judgment by failing to cite evidence from the record showing the absence of disputed facts. (Doc. 72 at 28). Plaintiff misunderstands Defendants' burden. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (explaining that upon a motion for summary judgment "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). To survive summary judgment

Plaintiff must demonstrate that Defendants' alleged conduct was outrageous as a matter of law. *See Plowright*, 102 F. 4th at 138.

Defendants' actions during the burglary investigation, which are the basis for the IIED claim, have been discussed at length throughout this Order. Just as Defendants' actions did not shock the conscience, they also are not sufficiently outrageous to support an IIED claim. *Compare Casado v. Miami-Dade Cnty.*, 340 F. Supp. 3d 1320, 1324, 1332 (S.D. Fla. 2018) (determining that a plaintiff failed to show outrageous conduct where a police officer punched the plaintiff in the face repeatedly before arresting and charging the plaintiff with multiple offenses which were nolle prossed), *and Corbin v. Prummell*, 655 F. Supp. 3d 1143, 1166 (M.D. Fla. 2023) (finding that a plaintiff did not sufficiently assert an IIED claim where the plaintiff alleged that the defendant police officer kicked the plaintiff, broke her leg, and attempted to walk her to a police vehicle), *with Liberty Mut. Ins. Co.*, 968 So. 2d at 596 (concluding that a plaintiff stated an IIED claim where she alleged that the defendant denied her a lung transplant after being ordered to do so, despite knowing that the plaintiff had a very limited life expectancy). Thus, Defendants are entitled to summary judgment on Plaintiff's IIED claim.

### C.    Abandoned Claims

In Response to the Motion for Summary Judgment, Plaintiff stated that he "no longer presses claims against Defendant Daniel Brady. He opposes Defendants'

Motion for Summary Judgment only as to Counts I, II, VI, and VII in the Amended Complaint against Defendant Stanley." (Doc. 72 at 1–2 n.1). Upon a motion for summary judgment, "'the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.'" *Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 855 (11th Cir. 2013) (quoting *Resol. Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). Plaintiff did not offer any substantive arguments or evidence to support his failure to intervene and conspiracy claims (Counts III, IV, VII). (*See generally* Doc. 72). Because Plaintiff has abandoned these claims and for the reasons stated in Defendants' Motion, Defendants are entitled to summary judgment as to Counts III, IV, and VII. *See Clark*, 544 F. App'x at 855 (finding that the district court properly treated as abandoned plaintiff's claims, which were alleged in the complaint, but not addressed in the response in opposition to the motion for summary judgment).

## IV.   CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Amended Motion for Summary Judgment (Doc. 71) is **GRANTED**.

2. Defendants' Motion for Summary Judgment (Doc. 63) is **DENIED as moot**.

3. Defendants' Motion to File Excess Pages (Doc. 65) **DENIED as moot**.

4. Plaintiff's Amended Motion to File Excess Pages in Response to Defendants' Motion for Summary Judgment (Doc. 75) is **GRANTED**.

5. Plaintiff's Motion to File Excess Pages in Response to Defendants' Motion for Summary Judgment (Doc. 74) is **DENIED as moot**.

6. Defendants' Motion to File Excess Pages in Reply (Doc. 78) is **GRANTED**.

7. Plaintiff's Motion for Leave to File Sur-Reply and Present Oral Argument (Doc. 80) is **DENIED**.

8. The remaining motions are **DENIED as moot**.

9. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff, providing that Plaintiff shall take nothing on his claims.

10. Thereafter, the Clerk is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida on July 14, 2026.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record